# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*,[1] | Case No. 20-81688-11 |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF KEN D'ARCY
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY
## PLEADINGS OF REMINGTON OUTDOOR COMPANY, INC.
## AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION

I, Ken D'Arcy, hereby declare under penalty of perjury:

1.      I have served as the Chief Executive Officer of each of the above-captioned debtors and debtors in possession (each, a "**Debtor**" and, collectively, the "**Debtors**") since June 17, 2019. I have also served as a member of board of directors of Remington Outdoor Company, Inc. since May 2018.

2.      From October 2018 to May 2019, I served as Chief Executive Officer of G. I. Sportz Inc., a Canada-based producer of innovative products designed for paintball enthusiasts. From March 2017 to July 2018, I served as Chairman and Chief Executive Officer of TrackingPoint, Inc., a Texas-based applied technology company. Prior to joining TrackingPoint, Inc. in March 2017, I worked for more than twenty-five years in the outdoor sports industry, including serving as Chief Executive Officer, President, and board member of Crosman Corporation, a shooting

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

sports industry company. I have also led multiple other outdoor consumer products companies throughout North America and Europe. In these roles, I have been heavily involved in developing operational and financing strategies and execution, mergers and acquisitions and cost strategy initiatives.

3.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and other personnel, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      Since early 2019, the Debtors and their advisors have engaged in an extensive review of the Debtors' operations and strategic alternatives in order to maximize the value of their businesses, and best protect the interests of their employees, secured and unsecured creditors, and other stakeholders.  After engaging in that review, the Debtors have determined that the best available alternative is to sell substantially all of their business as a going concern pursuant to a sale process under Section 363 of the Bankruptcy Code. The Debtors also intend to seek confirmation of a joint plan (the "**Plan**") following the sale process in order to expeditiously complete the distribution of proceeds from the sale and conclude these bankruptcy cases (the "**Chapter 11 Cases**").  Given the Debtors' operational needs, the concessions made by certain of their creditors to effectuate this process and the desire to maximize value and reduce administrative expenses, the Debtors seek to promptly complete the sale.

5.      Consequently, on July 27, 2020 (the "**Petition Date**"), each of the Debtors filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

6.     The Debtors continue to operate their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases. No creditors' or other official committee has yet been appointed pursuant to section 1102 of the Bankruptcy Code.

7.     The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

8.     The Debtors also filed other "first day" applications and motions with the Court (collectively, the "**First Day Pleadings**")[2] in order to minimize certain of the potential adverse effects of the commencement of the Chapter 11 Cases and to maximize the value of their estates while they undertake the sale process and seek confirmation of the Plan.  I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of the Chapter 11 Cases and in support of the Debtors' chapter 11 petitions for relief and the First Day Pleadings.

9.     Parts I and II of this Declaration provide an overview of the Debtors' businesses, organizational structure, and capital structure.  Part III provides an overview of the circumstances leading to the commencement of the Chapter 11 Cases.  Part IV discusses the bases for relief sought in the First Day Pleadings.

10.     As described in detail below, the Debtors commenced the Chapter 11 Cases to effectuate a prompt sale of substantially all of their assets and to confirm a Chapter 11 plan to address their existing obligations that are not otherwise assumed through the sale.  The Debtors are requesting an expeditious timeline from the Court to complete the sale.  The Debtors believe

---

[2]     Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Pleadings.

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document      Page 3 of 196

this timeline is appropriate in the Chapter 11 Cases for many reasons including:

- The Debtors ran an extensive pre-petition marketing process designed to maximize the value received by stakeholders.

- The sale process was overseen by a separate Restructuring Committee made up of independent non-management board members with independent counsel.

- The liens supporting the Debtors' prepetition secured debt were validated as part of the Debtors' prior bankruptcy cases in 2018. As a result, any lien investigation or challenge period should be limited.

- Certain of the Debtors' prepetition secured creditors have been made aware of the Debtors' process and evaluation to date, and have already made significant concessions to allow this transaction to move forward.

- The access to cash collateral secured by the estates is designed to fund the proposed process and support current operations; it is not designed to address longer term structural needs.

- Delay would result in increased administrative expenses that may degrade creditor recoveries and potentially jeopardize operations.

## I. Description of the Debtors

### A. The Debtors' Businesses

11. The Debtors are among America's oldest and largest manufacturers of firearms, ammunition, and related products for commercial, military, and law enforcement customers throughout the world. The Debtors hold a diverse portfolio of category-defining brands, including Remington, Marlin, Bushmaster, Barnes Bullets, Advanced Armament Corp., and DPMS.

12. The Debtors have held leading market positions in the United States in a variety of firearms and ammunition categories. The Debtors have several key strengths that provide them with a significant competitive advantage in the firearm and ammunition markets, including, among other things, (i) category defining brands, (ii) a broad product portfolio, (iii) multiple distribution channels designed to reach diverse end markets, and (iv) a differentiated, customer-focused management, sales, and marketing approach. In addition, the Debtors are the only U.S. company

that manufactures both firearms and ammunition, which provides them with a unique servicing edge, supports their market leading positions, and adds a recurring revenue component to sales.

13. The Debtors currently manufacture their products in seven different facilities located across the United States with an aggregate 2.5 million square feet of manufacturing space, enabling them to deliver products throughout the United States and globally to approximately 52 countries. The majority of the Debtors' revenue is derived from two key firearms facilities in Huntsville, Alabama and Ilion, New York, and two primary ammunition plants in Lonoke, Arkansas and Mona, Utah. The Debtors' principal customers are various mass market retail chains (e.g., Wal-Mart), specialty retail stores (e.g., Bass Pro Shops and Cabela's) and wholesale distributors (e.g., Sports South). As of the Petition Date, the Debtors employed approximately 2,100 full-time employees, with an additional work force of temporary employees engaged during peak production schedules at certain of their manufacturing facilities.[3]

### B. Organizational Structure

14. Formed in 2007, Debtor Remington Outdoor Company, Inc. ("**ROC**") is a holding company that is currently majority owned by a disparate group of shareholders.[4] The Debtors believe that a majority of these shareholders acquired their equity positions as distributions made to them during the Debtors' prior chapter 11 cases, which are discussed in greater detail below.

15. ROC was previously known as Freedom Group, Inc. ("**FGI**"), which was formed principally for the purpose of acquiring Remington Arms Company, LLC[5] ("**RAC**") in 2007. On

---

[3] Approximately 30% of the Debtors' employees are full-time union employees. Additional details regarding the Debtors' employees in the "Employee Wages Motion" section below.

[4] The substantially majority of the common stock of ROC is held through the Depository Trust Company, making the identity of every ROC shareholder at any given time not subject to perfect access by the Debtors.

[5] Formerly known as Remington Arms Company, Inc., which was formerly known as RACI Acquisition Corporation.

Case 20-81688-CRJ11   Doc 6   Filed 07/27/20   Entered 07/27/20 23:54:33   Desc Main
Document   Page 5 of 196

December 12, 2007, through a series of transactions, Bushmaster Firearms International, LLC and RAC became wholly owned subsidiaries of FGI.

16.     Debtors ROC, FGI Holding Company, LLC ("**FGI Holding**"), and FGI Operating Company, LLC ("**FGI Opco**") principally serve as holding companies. ROC owns 100% of the equity interests in FGI Holding, which in turn owns 100% of the equity interests in FGI Opco.

17.     FGI Opco owns 100% of the equity interests in Debtors RAC, Barnes Bullets, LLC ("**Barnes**"), RA Brands, L.L.C. ("**RA Brands**"), FGI Finance, Inc. ("**FGI Finance**"), and Outdoor Services, LLC. RAC, in turn, owns 100% of the equity interests in Debtors Remington Arms Distribution Company, LLC ("**RAD**"), TMRI, Inc. ("**TMRI**"), Huntsville Holdings LLC, 32E Productions, LLC and Great Outdoors Holdco, LLC. A chart showing the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit A**.

18.     Debtors RAC, Barnes, TMRI, and RAD are the principal operating companies within the Debtors' corporate enterprise and the owner of the Debtors' principal manufacturing plants. Brief descriptions of certain of the operating entities' functions are outlined below:

- Remington Arms Company, LLC – manufacturer of firearms, ammunition, and related products.

- Barnes Bullets, LLC – manufacturer of ammunition and ammunition components for the Barnes Bullets brand.

- RA Brands, L.L.C. – owns the Debtors' core brand trademarks and charges a royalty to other Debtors for use of those brands.

- TMRI, Inc. – manufacturer of barrel components with certain Debtors as primary customers.

- Remington Arms Distribution Company, LLC – distributes Remington products to retail chains/dealers.

19.     Debtors FGI Finance, Inc., Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC and Outdoor Services, LLC are inactive shell entities that do not have any

material assets but are obligors in connection with the Prepetition Facilities (as defined and more fully described below).

20.     The Debtors' corporate headquarters are located at 100 Electronics Blvd SW, Huntsville, Alabama  35824.  In addition, the Debtors' plant in Huntsville, Alabama constitutes a plurality of the Debtors' tangible assets based upon the Debtors' internal corporate records.

## II.     Prepetition Capital Structure[6]

21.     The Debtors commenced previous chapter 11 cases on March 25, 2018 in the United States Bankruptcy Court for the District of Delaware in cases jointly administered as case number 18-10684 (the "**Prior Cases**") in order to implement a comprehensive balance sheet restructuring, pursuant to a prepackaged plan of reorganization.  The Debtors confirmed their *Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and its Affiliated Debtors and Debtors in Possession* on May 4, 2018 (the "**Prior Plan**").  A true and correct copy of the *Order (A) Approving Solicitation Procedures, (B) Approving Adequacy of Disclosure Statement, and (C) Confirming Plan* (the "**Prior Confirmation Order**") entered by the United States Bankruptcy Court for the District of Delaware in the Prior Cases on May 4, 2018,  is attached hereto as **Exhibit C**.

22.     The Debtors emerged from the Prior Cases on May 15, 2018 with a more streamlined capital structure consisting of: (i) an asset-based loan facility (the "**Exit ABL Facility**") that was subsequently refinanced with the proceeds of a priority term loan facility (the "**Priority Term Loan Facility**"), (ii) a first-lien-last-out term loan facility (the "**FILO Term Loan Facility**"), (iii) an exit term loan facility (the "**Exit Term Loan Facility**" and together with

---

[6]     The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

Case 20-81688-CRJ11     Doc 6     Filed 07/27/20     Entered 07/27/20 23:54:33     Desc Main
Document     Page 7 of 196

the Priority Term Loan Facility and the FILO Term Loan Facility, collectively, the "**Prepetition Facilities**"), (iv) a real property-secured promissory note owed to the City of Huntsville, Alabama, and (v) an unsecured intercompany note. A summary of these debt facilities is provided below.[7]

23. The Prior Confirmation Order included findings and conclusions concerning the Exit ABL Facility, the FILO Term Loan Facility, and the Exit Term Loan Facility (collectively with the Exit ABL Facility and the FILO Term Loan Facility, the "**Exit Facilities**"). Specifically, the Prior Confirmation Order found that (A) the Exit Facilities were "effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby" (Prior Confirmation Order, ¶ 19); (B) the liens granted by the Debtors to secure the obligations under the Exit Facilities were "valid, binding, and enforceable liens on the collateral specified in the relevant documents executed by the . . . Debtors" (*id.*, ¶ 20) ; (C) the guarantees, mortgages, pledges, liens, and other security interests granted pursuant to or in connection with the Exit Facilities were "granted in good faith" and "deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination" (*id.*); and (D) the liens and security interests granted in connection with the Exit Facilities were automatically perfected upon entry of the Prior Confirmation Order, without the need for any filings, recordings, approvals, and consents to perfect such liens and security interests (*id.*, ¶ 21).

A. **Priority Term Loan Facility**

24. Debtor FGI Opco is the borrower under the Priority Term Loan Facility, in an original principal amount of up to $85.5 million, which is memorialized pursuant to that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended (i) by that certain (a)

---

[7]    A chart that further illustrates the outstanding amounts under the debt facilities and the applicable guarantors, borrowers, and issuers under the debt facilities is attached as **Exhibit B** thereto.

Amendment No. 1 dated May 1, 2019, (b) Amendment No. 2 dated June 24, 2019, (c) Amendment No. 3 dated August 15, 2019, (d) Amendment No. 4 dated October 11, 2019, (e) Amendment No. 5 dated February 21, 2020, (f) Amendment No. 6 dated March 27, 2020, (g) Amendment No. 7 dated June 18, 2020, (h) Amendment No. 8 dated June 26, 2020, and (i) Amendment No. 9 dated July 7, 2020 and (ii) as further amended, restated, modified, or supplemented from time to time, the "**Priority Term Loan Credit Agreement**"), by and among FGI Opco, as borrower, the other Debtors, as guarantors, Cantor Fitzgerald Securities, as administrative agent (the "**Priority Term Loan Agent**"), and the lenders from time to time party thereto (the "**Priority Term Loan Lenders**"). The Debtors other than FGI Opco are guarantors of the Priority Term Loan Facility (together with FGI Opco, the "**Priority Term Loan Parties**"). The proceeds of the Priority Term Loan Facility were used, in part, to refinance the Exit ABL Facility. The maturity date for the Priority Term Loan Facility is April 18, 2022.

25. The Priority Term Loan Parties' obligations under the Priority Term Loan Facility are secured by first priority liens on (a) certain of the Priority Term Loan Parties' collateral, including but not limited to accounts receivable, intellectual property, inventory, and proceeds thereof and (b) liens on substantially all other assets of the Priority Term Loan Parties (the "PPE Collateral"); provided, however, that the liens securing the Priority Term Loan Obligations are perfected first priority liens on the PPE Collateral only up to the first $7.5 million of the value and/or proceeds thereof and, upon recovery of such amount from the PPE Collateral, the liens of the Priority Term Loan Lenders on the PPE Collateral will have third priority (the collateral subject to a first priority lien of the Priority Term Loan Agent, the "**ABL Priority Collateral**", and the collateral subject to a third priority lien of the Priority Term Loan Agent, the "**TL Priority Collateral**" and together with the ABL Priority Collateral, the "**Prepetition Collateral**" and liens

granted to the Priority Term Loan Agent thereon, the "**Priority Term Loan Liens**").

26.     The Priority Term Loan Facility includes a collateral base floor requirement. Under the Priority Term Loan Credit Agreement, a collateral base floor of $105 million was initially established and was subsequently reduced to $87.5 million. To the extent that the Debtors' borrowing base (comprised of certain eligible accounts receivable and eligible inventory) is less than the collateral base floor, the Debtors are required to either prepay the Priority Term Loan Facility or cash collateralize the Priority Term Loan Facility in the amount of the difference. Because prepayments under the Priority Term Loan Facility must be accompanied by a prepayment fee of 1.5% and an exit fee of 2.0%, the Debtors have historically elected to cash collateralize any deficiency. This approach also conserved cash for later use if the borrowing base restrictions were relaxed, including as an alternative for debtor in possession financing. That cash collateral is held in a blocked deposit account that the Debtors are not permitted to access (the "**Dominion Account**"). As of the Petition Date, the amount of such cash collateral was approximately $38.7 million. In addition, the Debtors are required to maintain an additional minimum cash balance of $3.5 million in the Dominion Account, tying up additional working capital.[8]

27.     As of the Petition Date, the aggregate outstanding principal balance under the Priority Term Loan Facility was approximately $75.5 million, plus any accrued and unpaid interest, fees, expenses, and other amounts due and owing pursuant to the terms of the Priority Term Loan Credit Agreement and related loan documents. As of the Petition Date, the amount of the pre-payment penalty payable on the outstanding principal balance of the Priority Term Loan

---

[8] The cash collateral, including the minimum cash balance, that are maintained in the Dominion Account are collectively referred to the "**Dominion Cash**".

Credit Agreement was approximately $1.1 million and the amount of the exit fee was approximately $1.5 million.

**B.     FILO Term Loan Facility**

28.     Debtor FGI Opco is the borrower under the FILO Term Loan Facility, which is memorialized pursuant to that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain (a) Amendment No. 1, dated as of April 18, 2019, (b) Amendment No. 2,  dated as of May 1, 2019, (c) Amendment No. 3, dated as of August 15, 2019, (d) Amendment No. 4, dated as of October 11, 2019, (e) Amendment No. 5, dated as of February 21, 2020, and (f) Amendment No. 6, dated as of March 27, 2020, and (ii) as further amended, restated, supplemented and/or otherwise modified from time to time, including any replacements or refinancings thereof, the "**FILO Term Loan Agreement**" and together with all other related documents, guarantees and agreements, including, without limitation, security agreements, mortgages, pledge agreements, assignments, financing statements and other agreements, documents, instruments or certificates executed in connection with the FILO Term Loan Agreement, the "**FILO Term Loan Documents**"), by and between FGI Opco, as borrower, the other Debtors, as guarantors, Ankura Trust Company, LLC, as administrative agent (in such capacities, the "**FILO Agent**"), and the lenders from time to time party thereto (the "**FILO Lenders**").  The Debtors other than FGI Opco are guarantors under the FILO Term Loan Facility (together with Debtor FGI Opco, the "**FILO Loan Parties**").  The maturity date for the FILO Term Loan Facility is May 15, 2021.

29.     The FILO Loan Parties' obligations under the FILO Term Loan Facility are secured by (a) first priority security interests in and liens on the TL Priority Collateral and (b) second priority security interests in and liens on the ABL Priority Collateral (the "**FILO Term Loan Liens**").

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document      Page 11 of 196

30.     As of the Petition Date, the aggregate outstanding principal balance under the FILO Term Loan Facility was approximately $55 million, plus any accrued and unpaid interest, fees, expenses, and other amounts due and owing pursuant to the terms of the FILO Term Loan Agreement and related loan documents.

C.     **Exit Term Loan Facility**

31.     Debtor FGI Opco is the borrower under the Exit Term Loan Facility, in an original principal amount of $100 million, which increased due to PIK elections to a principal amount of $110.7 million, which is memorialized pursuant to that certain Term Loan Agreement, dated as of May 15, 2018 (as amended (i) by that certain (a) Amendment No. 1, dated as of April 18, 2019, (b) Amendment No. 2, dated as of May 1, 2019, (c) Amendment No. 3, dated as of August 15, 2019, (d) Amendment No. 4, dated as of February 21, 2020, and (f) Amendment No. 5, dated as of March 27, 2020, and (ii) as further amended, restated, supplemented and/or otherwise modified from time to time, including any replacements or refinancings thereof, the "**Exit Term Loan Agreement**" and together with all other related documents, guarantees and agreements, including without limitation, security agreements, mortgages, pledge agreements, assignments, financing statements and other agreements, documents, instruments or certificates executed in connection with the Exit Term Loan Agreement, the "**Exit Term Loan Documents**"), by and between FGI Opco, as borrower, the other Debtors, as guarantors, Ankura Trust Company, LLC, as administrative agent (in such capacities, the "**Exit Term Loan Agent**" and collectively with the Priority Term Loan Agent and the FILO Agent, the "**Prepetition Agents**"), and the lenders from time to time party thereto (the "**Exit Term Loan Lenders**" and together with the Priority Term Loan Lenders and the FILO Lenders, collectively, the "**Prepetition Lenders**", and the Prepetition Lenders with the Prepetition Agents, collectively, the "**Prepetition Secured Creditors**").  The Debtors other than FGI Opco are guarantors under the Exit Term Loan Facility (together with

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document       Page 12 of 196

Debtor FGI Opco, the "**Exit Term Loan Parties**"). The maturity date for the Exit Term Loan Facility is May 15, 2022.

32. The Exit Term Loan Parties' obligations under the Exit Term Loan Facility are secured by (a) second priority security interests in and liens on the TL Priority Collateral and (b) third priority security interests in and liens on the ABL Priority Collateral (collectively, the "**Exit Term Loan Liens**").

33. As of the Petition Date, the aggregate outstanding principal balance under the Exit Term Loan Facility was approximately $110.7 million, plus any accrued and unpaid interest, fees, expenses, and other amounts due and owing pursuant to the terms of the Exit Term Loan Agreement and related loan documents.

34. The Debtors, the Priority Term Loan Agent, the FILO Agent, and the Exit Term Loan Agent are party to that certain Intercreditor Agreement dated as of April 18, 2019 (as subsequently amended) that, among other things, sets forth the relationship in terms of claims, priority, rights and remedies between and among the parties.[9]

D. **Huntsville Secured Note**

35. In February 2014, Debtor ROC obtained a $12.5 million loan from the City of Huntsville, Alabama (the "**City of Huntsville**") in order to improve its manufacturing facility there. The loan is evidenced by a promissory note executed by Debtor ROC in favor of the City

---

[9] The Priority Term Loan Agent, the FILO Agent, and the Exit Term Loan Agent are collectively referred to herein as the "**Prepetition Agents**." The Priority Term Loan Secured Creditors, FILO Term Loan Secured Creditors, and Exit Term Loan Secured Creditors are collectively referred to herein as the "**Prepetition Secured Creditors**." The Priority Term Loan Documents, FILO Term Loan Documents, and Exit Term Loan Documents are collectively referred to herein as the "**Prepetition Credit Documents**." The Priority Term Loan Facility, FILO Term Loan Facility, and Exit Term Loan Facility are collectively referred to herein as the "**Prepetition Secured Credit Facilities**." The Priority Term Loan Liens, FILO Term Loan Liens, and Exit Term Loan Liens are collectively referred to herein as the "**Prepetition Liens**." The Priority Term Loan Obligations, FILO Term Loan Obligations, and Exit Term Loan Obligations are collectively referred to herein as the "**Prepetition Secured Obligations**."

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document    Page 13 of 196

of Huntsville (the "**Huntsville Note**") and secured by a first priority mortgage on the Debtors' firearm facilities in Huntsville. The Huntsville Note has an eleven-year term with annual amortization payments due each year beginning on the second anniversary of the issuance equal to 10% of the original principal balance, provided that if ROC meets certain employment goals for the year preceding the principal and interest payment dates, the annual principal and related interest for that payment period will be forgiven, subject to reinstatement in certain circumstances. The Debtors were not in compliance with the employment goal for the annual test period most recently ended. As of the Petition Date, the aggregate outstanding principal balance under the Huntsville Note was $12.5 million.

### E. Intercompany Note

36.     On April 18, 2019, Debtor RAC issued Debtor FGI Holding an Amended and Restated Promissory Note ("**Intercompany Note**") in the original principal amount of $100,000,000. The Intercompany Note restated a promissory note originally issued by RAC to FGI Holding on December 30, 2018. The Intercompany Note evidences loans made by FGI Opco, which FGI Opco subsequently transferred and assigned to FGI Holding, to RAC for the purposes of funding RAC's and its various subsidiaries' working capital needs.

### F. Other Liabilities

37.     As of the Petition Date, the Debtors have approximately $30 million in outstanding claims owed to its various vendors, suppliers, and service providers, including claims reflected in the Debtors' current accounts payable or otherwise accrued and/or attributable to the period prior to the Petition Date. Additionally, the Debtors are party to various litigation matters, including products liability actions. The claims associated with such litigation matters are disputed, contingent, and/or unliquidated as of the Petition Date.

### F. ROC Common Stock

38. Debtor ROC has 13,272,325 shares of common stock (including restricted stock units) issued and outstanding.

39. Debtor ROC also has 2,342,175 warrants outstanding (each, a "**Warrant**" and, collectively, the "**Warrants**").[10] Each Warrant gives the holder thereof the right to purchase one share of common stock, par value $0.01 per share, of Debtor ROC at an exercise price, subject to adjustment, of $35.05 per share. The Warrants expire at 5:00 p.m. EDT, on May 15, 2022.

### III. Commencement of the Chapter 11 Cases

### A. Key Events Leading to Chapter 11

40. Although the Prior Cases restructured the balance sheet, the Debtors emerged from the Prior Cases with an elevated level of inventory and a wide range of brands that extended the Debtors beyond their core focus. Most importantly, the unfavorable business trends continued after exit from the Prior Cases.

41. In order to provide the Debtors more runway, in late 2018 and early 2019, the Debtors commenced a robust process to refinance the Exit ABL Facility as a means to alleviate covenant concerns and provide new capital. The Debtors engaged Ducera Partners LLC and, where appropriate, Ducera Securities LLC (collectively, "**Ducera**"), in March 2019 to advise the Debtors and market the investment. As part of the refinancing process, Ducera contacted over 60 potential lenders to solicit financing interest. Over a period of three weeks, the Debtors received three non-binding indications of interest. Ultimately, the Debtors moved forward with Whitebox Advisors, and the Priority Term Loan Facility was entered into in April, 2019, refinancing the Exit

---

[10] The Warrants are held through the Depository Trust Company, making the precise identity of warrant holders at any given time not subject to ready access by the Debtors.

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document    Page 15 of 196

ABL Facility, resolving covenant concerns that existed at the time, and providing incremental liquidity to the Debtors.

42.     The Debtors appointed a new chief executive officer, chief financial officer, and chief operating officer in 2019.  After these appointments, the Debtors undertook an analysis of their strategic priorities, various cost-cutting measures, and financing alternatives.  The Debtors initiated reductions of excess inventory and sought increased profitability via continued improvements in operational efficiencies, growth in international and dealer sales channels, and growth in defense and law enforcement channels.

43.     Despite the Debtors' efforts, which resulted in significantly improved efficiencies and savings, their financial performance continued to deteriorate, owing in large part to the inability to purchase raw materials at the required level to grow revenues. At the conclusion of 2019, the Debtors had realized approximately $437.5 million in total net sales and an adjusted EBITDA of $(74.7) million. In comparison, in 2015 and 2016, the Debtors had achieved approximately $808.9 million and $865.1 million in sales and $64 million and $119.8 million in adjusted EBITDA, respectively.

44.     The Debtors also continued to face liquidity pressure and were increasingly challenged to meet the collateral base floor requirements imposed under the Priority Term Loan Facility. That limited the availability of the credit line under the Priority Term Loan Facility and triggered an obligation to post cash collateral in the amount of any difference between the Debtors' borrowing base and the collateral base floor. In February 2020, the Debtors negotiated an amendment to the Priority Term Loan Credit Agreement that reduced the collateral base floor by $7.5 million and deferred a $5.0 million amortization payment for a month and a half, but the amendment did not provide a permanent liquidity solution.

45.     To preserve liquidity, the Debtors deferred payment of the firearms and ammunition excise tax under 26 U.S.C. Section 4181 (the "**Excise Tax**") in compliance with the CARES Act.

46.     The COVID-19 pandemic has recently sparked increased demand for the Debtors' core products.  The Debtors, however, have been unable to meet such demand because of (i) the need to suspend operations temporarily to respond to the pandemic, and (ii) insufficient liquidity to fund raw material purchases needed to scale up production.  As a result, the Debtors' liquidity remains challenged.

**B.     Pre-Petition Marketing Process**

47.     In late 2019, the Debtors embarked on a process to explore strategic alternatives. Among the options considered were a potential recapitalization of the Prepetition Facilities, refinancing of the Priority Term Loan Facility, a potential equity raise, and a potential sale of the Debtors' assets or merger.  The Debtors were willing to entertain both in-court and out-of-court options during this process.

48.     On December 2, 2019, the Debtors again engaged Ducera to advise them in connection with exploring strategic alternatives.  Ducera contacted over 200 potential new investors regarding engaging in a potential transaction with the Debtors, including over 20 potential lenders regarding a possible refinancing of the Priority Term Loan Facility.  Of these, approximately 40 entered into confidentiality agreements and engaged in further dialogue and diligence with Ducera and the Debtors.  Ultimately, approximately 5 potential investors submitted non-binding indications of intents with proposed investment terms.  One of those proposals was a proposal by an entity (the "**Potential Bidder**") purchase the Debtors' businesses as a going concern.

49.     For most of February 2020 and into March 2020, the Debtors with the assistance of

Ducera and their other advisors negotiated over terms of potential transactions with these parties. While some parties were forced to halt their participation in the process due to the impacts on their businesses from the COVID-19 pandemic, among other reasons, the bid to acquire the businesses by the Potential Bidder, emerged as the lead bid.

50.     Ducera also concurrently engaged in in-depth discussions with all of the Debtors' major stakeholders, including the Priority Term Loan Lenders, FILO Lenders, Exit Term Loan Lenders, and the Debtors' major shareholders, to investigate the viability of a consensual out-of-court restructuring.  None of these stakeholders, however, offered a proposal that was feasible.

51.     In April 2020, the board of directors of ROC also formed a special restructuring committee comprised of solely independent and disinterested directors (the "**Restructuring Committee**") to, among other things, review and evaluate, with the assistance of financial and other advisors and separate legal counsel, any and all possible transactions available to the Debtors.

52.     Although a deal in principle had been reached with the Potential Bidder, in May and June 2020, the Debtors, with the assistance of Ducera and their other advisors and under the supervision of the Restructuring Committee, made another solicitation for additional bids for the Company in order to both further market test the Potential Bidder bid and to serve as back-ups in the event that the offer fell through.  The Debtors and their advisors engaged a number of parties, including private equity firms and strategics, to evaluate interest in asset sale transactions.  The Debtors set a response deadline of June 8, 2020 and received bids through June 15, 2020.  During the solicitation period, parties were requested to provide indications of interest on any potential asset sale transactions including both segment and enterprise level transactions.

53.     The Debtors and the Potential Bidder's representatives negotiated a final purchase agreement and debtor in possession financing agreement on or about June 18, 2020, which

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document        Page 18 of 196

remained subject to final internal approval by the Potential Bidder's regulatory and legal oversight. Among other things, the negotiated transaction provided for the assumption by the buyer of many ordinary course pre-petition liabilities including taxes (including excise and employment taxes) and trade accounts payable. While the negotiated transaction received certain of the required regulatory approvals, the transaction with the Potential Bidder became the subject of public reports and the final approval by the Potential Bidder's governing bodies expected in mid-July 2020 was not obtained within the timeframe necessary to move forward with the transaction. The Company and the Restructuring Committee concluded that they could no longer wait to see if the Potential Bidder could successfully complete the governance approval process, whether based upon the negotiated transaction or some modification of that agreement. The Debtors extended deadlines for the Potential Bidder and other bidders and then worked to develop their options.

54.     Multiple parties continued diligence efforts and provided indications of interest. The Debtors received asset purchase agreement mark-ups from 4 bidders in addition to the Potential Bidder, and the Debtors continued to receive expressions of interest from still other potential bidders who are conducting diligence. The Debtors proceeded to negotiate with each of these bidders. While negotiations progressed, the Debtors had not yet finalized the terms of these sales by the time that their liquidity position necessitated this filing. The Debtors are assessing all of these options, including sales for all or parts of their businesses.

### C.     Cash Collateral

55.     As part of the agreement negotiated with the Potential Bidder, the Potential Bidder was to extend debtor in possession financing to the Debtors. When it became clear that the transaction with the Potential Bidder was not likely to be finalized on the Debtors' requisite timeframe and after assessing all other financing alternatives available, the Debtors reached

agreement with the Prepetition Secured Creditors to make their cash collateral available to finance the Chapter 11 Cases including a substantial part of the Dominion Cash. The Prepetition Secured Creditors consented to the Debtors using their operating cash and to advance $23.5 million of funds from the Dominion Cash that are otherwise required to be maintained in the blocked Dominion Account as cash collateral solely to secure the Prepetition Secured Obligations and to which the Debtors do not otherwise have access.

56.     Under the terms negotiated with the Prepetition Secured Creditors, the Debtors will gain access to $23.5 million in additional liquidity to finance the Chapter 11 Cases and continued operations. The Prepetition Secured Creditors will receive replacement liens and super-priority administrative expense treatment. Additionally, the Priority Term Loan Secured Creditors, who currently have a first priority perfected security interest in the $23.5 million (and all other amounts) in the Debtors' Dominion Account, will, with the consent of the FILO Term Loan Secured Creditors and Exit Term Loan Creditors, have their existing third priority security interest in the PPE Collateral elevated in priority over the security interests of the FILO Term Loan Secured Creditors and Exit Term Loan Secured Creditors to the extent of the $23.5 million advance. The other terms are described in more detail below and in the Cash Collateral Motion.

57.     Before agreeing to accept this financing mechanism, the Debtors (with the assistance of Ducera) made inquiries into alternatives available for financing and solicited proposals for debtor in possession financing from other financial institutions. These included lenders under the Prepetition Facilities, other financial institutions who historically provide debtor in possession financing, and the Company's prepetition investors. The Company contacted over fifteen potential lenders, including its prepetition lenders. The proposed arrangement with the Prepetition Secured Creditors to gain access to the Dominion Cash was the best alternative for the

Debtors.

58.    Under the circumstances, where substantially all (if not all) of the Debtors' cash constitutes cash collateral of the Debtors' prepetition secured lenders, the Debtors need access to such cash collateral to fund the Chapter 11 Cases and support operations.   The Debtors are seeking interim approval of their use of cash collateral, including $23.5 million of the Dominion Cash, the primary terms of which are described below.

**IV.    First Day Pleadings**

59.    Concurrently with its chapter 11 petitions, the Debtors are filing the following First Day Pleadings:

    a.    Debtors' Motion for Entry of Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief ("**Joint Administration Motion**");

    b.    Debtors' Motion for Entry of Order (I) Authorizing the Debtors to File a Consolidated List of the 40 Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Creditors, and (III) Establishing Procedures for Notifying Creditors of the Commencement of Debtors' Chapter 11 Cases ("**Creditor Matrix Motion"**);

    c.    Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent;

    d.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Operating Cash Management System and Bank Accounts, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Performing and Granting Administrative Priority for Intercompany Transactions, (II) Waiving Certain Bankruptcy Administrator Requirements, (III) Granting the Debtors an Extension to Comply With the Requirements of Section 345(b) of the Bankruptcy Code, and (IV) Scheduling a Final Hearing ("**Cash Management Motion**");

    e.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Employee Benefits, and (B) Continue Existing Employee Benefit Plans and Programs, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing, and (III) Scheduling a Final Hearing ("**Employee Wages Motion**");

f.   Debtors' Motion for Entry of an Order (I) Authorizing Debtors to (A) Continue Debtors' Insurance Programs, (B) Pay Certain Obligations in Respect Thereof Postpetition, and (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing ("**Insurance Motion**");

g.   Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Scheduling a Final Hearing ("**Utilities Motion**");

h.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing But Not Directing Debtors to Remit and Pay Certain Prepetition Taxes, Governmental Assessments, and Fees, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing, (III) Scheduling a Final Hearing and (IV) Granting Related Relief ("**Taxes Motion**");

i.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Certain Customer and Consumer Programs and (B) Honor or Pay Certain Prepetition Obligations Related Thereto, and (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing, (III) Scheduling a Final Hearing and (IV) Granting Related Relief ("**Customer and Consumer Programs Motion**");

j.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay (A) Certain Prepetition Claims of Shippers and Warehousemen and (B) Import Charges, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers and (III) Granting Related Relief ("**Common Carriers Motion**");

k.   Debtors' Motion for Entry of Interim and Final Orders Authorizing the Employment and Compensation of Professionals Utilized in the Ordinary Course of Business ("**Ordinary Course Professionals Motion**");

l.   Debtors' Motion to Authorize the Bankruptcy Administrator to Solicit and Form Consolidated Unsecured Creditors' Committee ("**Consolidated Committee Motion**");

m.   Debtors' Motion for Entry of an Order Granting the Debtors an Extension of Time Within Which to File Schedules and Related Documents ("**Schedule Extension Motion**");

n.   Debtors' Motion for Entry of An Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals ("**Interim Compensation Motion**");

o. Debtors' Motion for Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying Automatic Stay, (V) Granting Related Relief, and (VI) Scheduling a Final Hearing ("**Cash Collateral Motion**"); and

p. Debtors' Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order Approving the Sale of the Debtors' Assets ("**Bidding Procedures Motion**".

60.     The Debtors are also seeking to retain professionals on an interim and final basis, which applications are supported by separate declarations.

61.     I am familiar with the contents of each First Day Pleading (including the exhibits to such motions) and believe the relief sought in each First Day Pleading will allow for an orderly transition of the Debtors into the Chapter 11 Cases and is critical to maintaining operational stability and preserving the value of the estates as the Debtors seek to consummate an orderly sale process and the confirmation of a Chapter 11 Plan.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and their stakeholders.

62.     As noted above, the relief sought in the various First Day Pleadings would allow the Debtors to, among other things, (i) obtain certain operational relief and establish various administrative procedures to promote a seamless transition into bankruptcy and (ii) obtain access to cash collateral in order to fund the Debtors' business operations and the administration of the Chapter 11 Cases.

63.     I have reviewed each of the First Day Pleadings or had their contents explained to me, and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief sought in the First Day Pleadings will be critical to maintaining the stability of the

Debtors business operations, preserving value, and allowing the Debtors to focus their efforts on the Sale.

64.     Several of the First Day Pleadings request authority to pay certain prepetition claims.  I am told by the Debtors' advisors that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."   In light of this requirement, the Debtors have limited their request for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

65.     Below is a brief discussion of the Debtors' operational First Day Pleadings and an explanation of why, in my belief, such motions are critical to the successful prosecution of the Chapter 11 Cases.  More detailed descriptions of the facts regarding the Debtors' operations, and the bases for the relief requested in the operational motions, can be found in each relevant First Day Pleading.

### Cash Management Motion

66.     In the ordinary course of business, the Debtors utilize an integrated and centralized cash management system (the "**Cash Management System**") to collect, manage, and disburse funds used in their operations.  The Cash Management System is essential to the efficient execution and achievement of the Debtors' business objectives, and to maximizing the value of their estates. As of the Petition Date, the Debtors maintained 17 bank accounts (collectively, the "**Bank Accounts**") at several banks (each, a "**Bank**" and, collectively, the "**Banks**") in the United States. The Debtors primarily operate their Cash Management System through 14 active Bank Accounts

maintained at Cadence Bank. Money is transferred between the Bank Accounts, and payments to creditors are made from the Bank Accounts, in a variety of manners, including checks, drafts, wire transfers, and automated clearinghouse ("**ACH**") transfers. Additional detail regarding the Cash Management System, including a detailed diagram of the system, is provided in the Cash Management Motion.

67.     Pursuant to the Cash Management Motion, the Debtors request authority to continue operating their Cash Management System, to honor and pay associated Bank Fees, to continue and pay all obligations under the Debtors' purchase card system, maintain existing business forms, and to continue performing Intercompany Transactions in the ordinary course of business. The Debtors also request a 60-day extension to comply with the investment requirements of section 345(b) of the Bankruptcy Code. I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to avoid significant interruptions to the operation of the Debtors' businesses. I believe that authorizing the Debtors to, among other things, continue operating their Cash Management System, maintain existing business forms, honor and pay the Bank Fees, honor and pay obligations with respect to the Company's Expense Cards, and continue Intercompany Transactions is essential to the Debtors' operational stability and restructuring efforts. The Debtors maintain a relatively complex Cash Management System, and some of the Debtors' most critical operations, including payroll, are funded via Intercompany Transactions. In my opinion, continued use of the Cash Management System will facilitate the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of postpetition obligations. Moreover, I believe that allowing the Debtors to continue Intercompany Transactions, as well as to continue performing certain other status quo cash management operations, such as

maintaining current business forms, will assure that the Debtors' businesses will be uninterrupted by the commencement of this bankruptcy, thereby ensuring the efficient administration of the Chapter 11 Cases, and maximizing the value of the Debtors' estates.

**Employee Wages Motion**

68. As of the Petition Date, the Debtors employ approximately 2,045 employees, consisting of approximately 463 full-time salaried and 1,582 full-time hourly employees.[11] Of the 1,582 full-time hourly employees, 617 are union employees[12] and 965 are non-union employees.

69. The Employees perform a wide variety of functions critical to the administration of the Chapter 11 Cases and the Debtors' operations generally. In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, or who have developed relationships with counterparties that are essential to the Debtors' business. To that end, and as discussed in greater detail in the Employee Wages Motion, in the ordinary course of business, the Debtors pay and incur a number of obligations related to the Employees, including, among other things, wages, salaries and business expense reimbursements.

70. Pursuant to the Employee Wages Motion, the Debtors request authority to pay prepetition Employee Obligations to their employees and to continue existing Employee Benefit Programs for their current Employees in the normal course. I believe the relief requested in the Employee Wages Motion is necessary and appropriate in order to avoid any unnecessary disruptions to the Debtors' operations and any resulting deterioration in the value of the Debtors'

---

[11] Due to certain business conditions within the past year, including the recent COVID-19 pandemic, the Debtors have at times furloughed employees. This information reflects averages based on the Debtors' entire workforce, which includes employees that may currently be furloughed.

[12] In connection with the unionized work force, Debtor Remington Arms Company, LLC is party to a collective bargaining agreement with the International Union, United Mine Workers of America, effective as of December 16, 2016 (the "**CBA**"). The CBA is currently set to expire on October 29, 2022.

estates. I believe paying prepetition employee wages, benefits, and certain other compensation, as well as continuing existing employee benefits for the Debtors' staff, is necessary to ensure the Debtors' seamless transition into bankruptcy and the operational stability needed as the Debtors promptly consummate the Sale and seek confirmation of the Plan. In the absence of paying prepetition wages and benefits and continuing existing employee benefits, I believe the Debtors would face severe threats to the successful operation of their businesses, including employee attrition and turnover, loss of goodwill, and loss of morale, thereby unnecessarily impairing the Debtors' ability to continue operations and reducing the value of the Debtors' estates. Therefore, I believe that such authorization is necessary to keep the Debtors' existing workforce intact in order to maximize the value of the bankruptcy estates for the benefit of all parties in interest in the Chapter 11 Cases.

**Insurance Motion**

71.     In the ordinary course of business, the Debtors maintain 14 insurance programs, with many of those programs encompassing multiple policies. These programs provide insurance coverage for, among other things, the Debtors' property and machinery, general liability, automobile, workers' compensation, umbrella coverage, and directors and officers (each, an "**Insurance Program**" and, collectively, the "**Insurance Programs**"). In addition, in the ordinary course of business, the Debtors finance, through premium financing agreements (the "**PFAs**"), the payment of their premiums on certain Insurance Programs. The Debtors' Insurance Programs and PFAs, along with a description of the insurance brokers' fees that the Debtors pay in the normal course, are described in further detail in the Insurance Motion.

72.     Pursuant to the Insurance Motion, the Debtors request authority to maintain and continue to honor certain Insurance Policies, and pay Insurance Obligations, whether such

obligations relate to the period prior to or after the commencement of the Chapter 11 Cases, in the ordinary course of business. I believe that the relief requested in the Insurance Motion is necessary and appropriate because continuation of the Debtors' Insurance Programs and payment of the Debtors' Insurance Obligations are imperative to the Debtors' continued operation and preserving the value of the Debtors' estates. It is essential for the Debtors to carry insurance in their day-to-day operations, or they run the risk of, among other harms, incurring financial responsibility and legal liability for potential occurrences not covered by insurance. Moreover, in many cases, coverage provided by the Debtors' Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities. Accordingly, maintaining the Debtors' Insurance Programs, and paying their Insurance Obligations, ensures that the value of the Debtors' estate is maximized for the benefit of all stakeholders.

**Utilities Motion**

73.     In connection with the operation of their business, certain of the Debtors obtain electricity, telephone, water, gas, internet, waste disposal, and other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Companies**"), as identified in the Utilities Motion. I believe the continued and uninterrupted provision of Utility Services during the postpetition period is necessary to allow a smooth operation of the Debtors' business and ensure stability in the production of the Debtors' various products.

74.     Pursuant to the Utilities Motion, the Debtors request that the Court (i) establish procedures for determining adequate assurance of payment, (ii) determine adequate assurance of payment for future utility services, and (iii) prohibit Utility Companies from altering, refusing, or discontinuing utility services. I believe the relief requested in the Utilities Motion is necessary

and appropriate because it will ensure a clear process to address any utility provider that may make a demand to the Debtors for adequate assurance or otherwise threaten to alter, refuse, or discontinue utility service, thereby minimizing any disruptions to the Debtors' business operations. I am informed and believe that the proposed adequate assurance procedures are consistent with procedures that are typically approved in chapter 11 cases in this district.

**Taxes Motion**

75.     In the ordinary course of business, the Debtors incur federal excise taxes, sales and use taxes, real estate taxes, personal property taxes, and other taxes, fees, and charges, each as more particularly described in the Taxes Motion (collectively, the "**Taxes and Fees**").  The Debtors remit the Taxes and Fees to various federal, state, and local governments and agencies, including taxing and licensing authorities (collectively, the "**Governmental Authorities**").

76.     Pursuant to the Taxes Motion, the Debtors request authority (but not the obligation) to pay certain prepetition taxes, governmental assessments, and fees as those obligations become due in the normal course, taking into account the Debtors' budget, cash collateral arrangements and other limitations on payment.  I believe that the relief requested in the Taxes Motion is necessary and appropriate because the Debtors' failure to pay prepetition Taxes and Fees could materially and adversely impact their business operations and impair the value of the Debtors' estates.  Specifically, if the Debtors were to delay paying prepetition Taxes and Fees, there is a risk that Governmental Authorities would assess penalty fees on the past due amounts, thereby increasing the size of the Debtors' financial liability, or that Governmental Authorities would pursue claims against the Debtors' officers and directors, thereby distracting them from the operation of their businesses, the administration of the Chapter 11 Cases, and the Debtors' pursuit of confirmation of the Plan.  Therefore, I believe that the ability to pay prepetition Taxes and Fees,

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document      Page 29 of 196

taking into account the Debtors' budget, cash collateral arrangements and other limitations on payment, will greatly assist the Debtors in maximizing the value of their estates for the benefit of all stakeholders.  Payment of the tax obligations may be subject to certain restrictions, including limitations imposed as a result of the Cash Collateral arrangements and applicable bankruptcy law.

### Customer and Consumer Programs Motion

77.     In order to develop and sustain positive reputations in the marketplace for their products and maximize the loyalty of, and goodwill with, their customers, the Debtors historically have engaged in certain practices and programs designed to provide certain incentives and services to the Debtors' various customers as well as the consumer end users of the Debtors' products (collectively, the "**Customer and Consumer Programs**").  The Customer and Consumer Programs principally consist of five categories of programs or services:  customer rebates; show special promotions; consumer rebates; recalls and settlements; and a consumer warranty program. The specific Customer and Consumer Programs are described in greater detail in the Customer and Consumer Programs Motion.

78.     Pursuant to the Customer and Consumer Programs Motion, the Debtors request authority to continue the Customer and Consumer Programs and to honor and pay certain prepetition obligations related to the Customer and Consumer Programs.  I believe that the relief requested in the Customer and Consumer Programs Motion is necessary and appropriate to preserve the value of the Debtors' estates.  I believe the ability to continue the Customer and Consumer Programs and honor and pay the related expenses in the ordinary course is critical to ensuring the continued operation of the Debtors' business.  The Debtors operate in a highly competitive sector.  Much of the success and viability of the Debtors' business is dependent upon the loyalty and confidence of their customers and the end users of the Debtors' products.  Any

failure to maintain the Customer and Consumer Programs or pay the Customer and Consumer Obligations could result in the Debtors losing the support of their loyal customers and consumers and could tarnish the Debtors' reputation in the marketplace. I believe that if the Debtors failed to honor the Customer and Consumer Programs or pay the related obligations in the ordinary course and without interruption, they would almost certainly suffer an irreparable loss of customer support and confidence and sales would dwindle, to the ultimate detriment of the Debtors' estates and all stakeholders.

### Common Carriers Motion

79.      In the ordinary course of operating the firearm manufacturing business, the Debtors depend on the uninterrupted flow of inventory and other goods through a supply chain and distribution network, including the purchase, importation, warehousing, and shipment of the Debtors' inventory, merchandise, and other materials related to their ongoing operations (collectively, the "**Merchandise**"). Generally, the Debtors source Merchandise from third-party manufacturers (the "**Vendors**"). Certain of the Debtors' Merchandise is sourced from Vendors located outside the United States. I believe that the Debtors' ability to operate in the ordinary course of business therefore includes the need to transport, import, and take delivery of Merchandise in a timely fashion and on a worldwide basis.

80.      The Debtors rely on a network of common carriers, expeditors, consolidators, warehousemen and transportation service providers, and other related parties (collectively, the "**Shippers and Warehousemen**") in the process of operating the businesses. Services provided by the Debtors' Shippers and Warehousemen include transportation of Merchandise from Vendors to the Debtors' manufacturing plants and other operations, along with the coordination and processing of various import duties and related charges at ports or transportation centers in the

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document      Page 31 of 196

United States, transportation and storage of Merchandise to and between the Debtors' manufacturing and warehousing operations (collectively, the "**Warehouses**"), and transportation from the Warehouses to other locations to effect distribution and sale of the Debtors' goods. I believe that a disruption in the chain of transportation and storage arrangements due to nonpayment of shipping and warehouse charges could cause substantial delays, great expense and irreparable harm to the Debtors' estates.

81.     Timely receipt of Merchandise, including from foreign countries, is critical to the Debtors' business operations, and the Debtors may be required to pay certain import charges (the "**Import Charges**"), including, but not limited to, customs duties, detention and demurrage fees, tariffs, excise taxes, and other similar obligations. I believe that payment of Import Charges is critical to ensure the uninterrupted flow of Merchandise, and that a disruption in the supply chain due to nonpayment of Import Charges could cause substantial delays, great expense and irreparable harm to the Debtors' estates. I believe that the relief sought in the Common Carriers Motion is necessary and appropriate to preserve the value of the Debtors' estates.

**Ordinary Course Professionals Motion**

82.     The Debtors, in the day-to-day operation of their businesses, regularly call upon certain professionals, including attorneys, accountants and other professionals (collectively, the "**OCPs**"), to assist them in carrying out their responsibilities. The OCPs provide services to the Debtors in a variety of matters unrelated to the Chapter 11 Cases, including regulatory, consulting and financial services, and legal services with regard to specialized areas of law.

83.     I believe that the continued employment and compensation of the OCPs is in the best interests of the Debtors' estates, creditors and other parties in interest. It is critical that the Debtors be able to engage the OCPs in an effort to defend potential claims against their estates and

preserve the value for stakeholders. Without the background knowledge, expertise, and familiarity that the OCPs have regarding the Debtors and their operations, the Debtors would undoubtedly incur additional and unnecessary expenses in educating and retaining replacement professionals. Accordingly, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day management of the Debtors' businesses.

84.     I am informed and believe that, in light of the significant costs associated with the preparation of employment applications for professionals who will receive relatively modest fees, it would be impractical, inefficient and costly for the Debtors and their advisors to prepare and submit individual applications and proposed retention orders for each OCP.

85.     I am informed and believe that certain OCPs may hold minor amounts of unsecured claims against the Debtors in respect of prepetition services rendered, but none of the OCPs have an interest materially adverse to the Debtors, their creditors, or any other parties in interest. I believe that the relief sought in the OCP Motion is necessary and appropriate to preserve the value of the Debtors' estates.

**Joint Administration Motion**

86.     The Debtors are seeking joint administration of the Chapter 11 Cases. I am informed and believe that, given the integrated nature of the Debtors' operations and the Debtors' joint proposal of the Plan, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Each Debtor is an "affiliate" of Remington Outdoor Company, Inc. as I have been advised such term is defined in section 101(2) of the Bankruptcy Code. The Debtors only seek administrative, not substantive, consolidation of their estates for procedural purposes. Intercompany claims among

the Debtors also will be preserved, and each of the Debtors will maintain separate records of assets and liabilities,

87.     I am informed and believe that permitting the Debtors to file their schedules and statements on a consolidated basis will avoid unnecessary costs and delay in light of the Debtors' integrated operations, and that this relief will not prejudice parties in interest because the required information will still be made available in a single location. I believe that the relief sought in the Joint Administration Motion is necessary and appropriate to preserve the value of the Debtors' estates.

**Consolidated Committee Motion**

88.     I am informed and believe that authorizing the Bankruptcy Administrator to solicit and form a Consolidated Committee, in lieu of soliciting and forming separate unsecured creditors' committees in each of the Debtors' thirteen (13) Chapter 11 Cases, is necessary and appropriate to preserve the value of the Debtors' estates. The Debtors are affiliates with integrated operations, many of the same creditors, and a consolidated and centralized cash management system that is described in the Cash Management Motion.

89.     Allowing the Bankruptcy Administrator to solicit and form a single Consolidated Committee will save resources and permit the efficient administration of the Chapter 11 Cases. I am informed and believe that without the relief sought in the Consolidated Committee Motion, the Bankruptcy Administrator may otherwise need to solicit separate committees for each of the estates. I believe that requiring the formation of thirteen separate creditors' committees would significantly increase the costs of administering the bankruptcy estates without a concomitant benefit and could divert the Debtors' management from the critical tasks involved in maximizing the value of the Debtors' assets for the benefit of stakeholders. I am informed and believe that the

Bankruptcy Administrator's formation of a single creditors' committee will adequately represent the interests of unsecured creditors in the Chapter 11 Cases.

**Schedule Extension Motion**

90.     The Debtors are in the process of compiling and organizing the information required for the Schedules and Statements, but the finalization of these documents will extend past the Fourteen-Day Period.  The Debtors have been primarily focused on assessing business operations and negotiating a course of action.

91.     I believe that because of the (a) size and scope of the Debtors' business; (b) complexity of the financial affairs; and (c) press of numerous business matters incident to the commencement of the Chapter 11 Cases, it was impracticable for the Debtors to assemble all of the information necessary to complete the Schedules and Statements prior to the Petition Date. The Debtors have many known and potential creditors, and I believe that having to file the Schedules and Statements within fourteen days after the Petition Date would not provide the Debtors with sufficient time to complete the Schedules and Statements.

92.     I am informed and believe that an extension of thirty (30) days (without prejudice to the Debtors' right to seek one or more further extensions of this deadline) to file the Schedules and Statements is appropriate, and that the relief requested in the Schedule Extension Motion is necessary and appropriate to preserve the value of the Debtors' estates.

**Interim Compensation Motion**

93.     I am informed and believe that, concurrently herewith, the Debtors are filing applications to retain and employ certain professionals in the Chapter 11 Cases, including legal counsel, investment bankers, financial advisors, and a claims, noticing, and solicitation agent.  The Debtors may also need to retain additional professionals in connection with the Chapter 11 Cases.

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document       Page 35 of 196

I am also informed and believe that an official committee of unsecured creditors may be appointed in the Chapter 11 Cases and may wish to retain professionals.

94.     I believe that establishing orderly procedures for the payment of fees and expenses for professionals whose retentions are approved by this Court will streamline the administration of the Chapter 11 Cases and otherwise promote efficiency, and that a streamlined process for serving fee applications is in the best interest of the Debtors because it will facilitate efficient review of such professionals' fees and expenses while saving the Debtors unnecessary copying and mailing expenses.  Accordingly, I believe that the relief requested in the Interim Compensation Motion is necessary and appropriate to preserve the value of the Debtors' estates.

### Cash Collateral Motion

95.     In the Cash Collateral Motion, the Debtors seek entry of an interim order (the "**Interim Cash Collateral Order**") and a final order (the "**Final Cash Collateral Order**," and together with the Interim Order, the "**Cash Collateral Orders**") approving the Debtors' use of the cash collateral of the Prepetition Secured Creditors (the "**Cash Collateral**").

96.     The Debtors, with the assistance of Ducera and their other advisors and under the oversight of the Restructuring Committee, evaluated multiple options to finance their operation and case budget.  This included negotiations with prospective stalking horse bidders, existing creditors and multiple third party lenders.  No third party lender was identified that would provide financing on a basis superior to the negotiated terms for the use of Cash Collateral.  Given the complex capital structure, three different tranches of liens would all have to agree to be subordinated to the extent a new lender required a first priority lien (or the Debtors would have to be able to prime such liens).  The Debtors concluded that any effort to prime the existing liens would be extremely challenging and subject to significant risks and costs.

Case 20-81688-CRJ11     Doc 6     Filed 07/27/20     Entered 07/27/20 23:54:33     Desc Main
Document     Page 36 of 196

97.	However, the substantial cash reserves associated with the Prepetition Facilities created an opportunity to obtain additional credit beyond the incremental cash collateral generated by the Debtors' businesses.  For the Debtors to obtain such access, the requisite lenders under the Prepetition Facilities would have to adjust their borrowing base formulas and minimum cash requirements to in effect relend those amounts back to the Debtors to fund the Chapter 11 Cases and continued operations.  This is the proposed structure of the financing provided under the Cash Collateral Orders.  This financing provides an additional $23.5 million in liquidity that is not available under the Prepetition Facilities given the prior contractual borrowing base formulas.

98.	The Prepetition Secured Creditors have consented to the use of their Cash Collateral, and the FILO Lenders and the Exit Term Loan Lenders have consented to the priming of the FILO Term Loan Liens and the Exit Term Loan Liens, by the Priority Term Loan Liens in the amount of the additional liquidity provided.  In consideration of for those consents and in respect of the diminution in value of their interests in the prepetition collateral, the Debtors have agreed to provide the Prepetition Secured Parties with adequate protection on the terms described in the Cash Collateral Motion.

99.	The terms of the use of the Cash Collateral were extensively negotiated.  The Debtors believe this represents the best available source of financing to the Debtors.

100.	The Debtors have an immediate need to use Cash Collateral to permit them to consummate the Sale and proceed toward confirmation of the Plan, in addition to, among other purposes, (a) operate the businesses in the ordinary course, (b) maintain business relationships with vendors, suppliers and customers, (c) pay employee wages in the ordinary course, (d) make necessary capital expenditures, and (e) satisfy other working capital and operational needs, all of which are necessary to preserve and maximize the going-concern value of the Debtors.

101.     Without the use of Cash Collateral and access to the additional liquidity, the Debtors will not be able to meet their day-to-day operational needs.  In such a scenario, the Debtors would have to consider halting their operations, potentially drastically impairing the overall value of their business.  Further, having access to the Cash Collateral is critical for the Debtors to demonstrate to their customers and vendors that they have sufficient working capital to operate their businesses in the ordinary course.  Absent this, customers may stop making purchases from the Debtors and vendors will cease providing trade terms and/or shipping goods to the Debtors.  As a result, immediate and irreparable harm could be suffered by the Debtors' estates if the Debtors are unable to obtain access to the Cash Collateral.  The additional liquidity allows the Debtors to pay the incremental operating expenses they will incur from operations and case expenses.  Therefore, the Debtors' request for approval of the Cash Collateral Motion on an expedited basis is critical.

102.     In conjunction with their financial advisor, M-III Advisory Partners, LP, the Debtors considered whether they could operate using only the cash generated from their post-petition operations (without access to the Cash Collateral provided by the relaxation of the borrowing base and lending restrictions).  The Debtors determined that they could do so only for a limited period of time and then only if they refrained from making purchases and payments that are critical to the success of the Chapter 11 Cases.  In addition, as discussed above, the Debtors' prepetition secured creditors are unlikely to consent.  Finally, it is unclear whether the Debtors would prevail in the face of objections by secured creditors to their use of cash collateral (whether from operations or from the reserve cash) given the three separate tranches of secured debt with liens in assets that generate cash .

103.     The Debtors' ability to finance their operations, maintain business relationships,

pay their employees, protect the value of their assets, and otherwise finance their operations and pursue a strategy to maximize value for their creditors requires the availability of working capital from the use of Cash Collateral. The absence of such working capital would immediately and irreparably harm the Debtors, their estates, their creditors and equity holders, and materially impair the possibility for a successful administration of the Chapter 11 Cases. Also important is the consideration that any buyer looking to acquire the Debtors' assets as a going concern will want to make sure that the Debtors' operations remain stable. A failure of the Debtors' suppliers to provide goods and employees to provide services to the Debtors at this time could have a deeply negative effect on the Debtors' ability to seek bids for the business as a going concern.

104.    The liquidity provided by the Cash Collateral Orders will support the Debtors' ability to pay their trade creditors in the ordinary course during the pendency of the Chapter 11 Cases and facilitate the orderly sale of the Debtors' assets and the ultimate wind-down of their estates.

105.    Accordingly, I believe that entry into the Cash Collateral arrangements is in the best interests of the Debtors' estates and the various stakeholders.

**Bidding Procedures Motion**

106.    In the Bidding Procedures Motion, the Debtors seek entry of an order (the "**Bidding Procedures Order**") approving the proposed bidding procedures attached thereto as Exhibit B (the "**Bidding Procedures**"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of their assets; establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts, approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described therein and attached hereto;

authorizing the Debtors to select one or more stalking horse bidders for its assets (which may include a stalking horse bidder for its ammunition business, a stalking horse bidder for its firearms business or a stalking horse bidder for the Debtors' entire business, among other asset combinations) and to provide Bid Protections (as defined below) to any stalking horse bidder; scheduling an auction (the "**Auction**") if the Debtors receive two or more timely and acceptable Qualified Bids (as defined in the Bidding Procedures), and a final hearing (the "**Sale Hearing**") to approve one or more sales of the Debtors' assets; and granting related relief.

107.    The Debtors, in consultation with their advisors, believe that pursuing a sale transaction at this time is the course of action most likely to maximize value and encourage robust bidder participation. The Debtors are close to finalizing the terms of a sale with multiple potential stalking horse bidders whose bids will importantly serve as a floor for the sale process. The Bidding Procedures facilitate a streamlined marketing and sale process that take into consideration the robust marketing process engaged in prior to the Petition Date that is described above, provide flexibility for the sale of all or a portion of their assets, and deliver market feedback regarding the value of the potential stalking horse bids. I believe this approach represents a sound exercise of the Debtors' business judgment, is consistent with their fiduciary obligation to maximize the recoverable value of their estates, including by preserving the right to entertain a value-maximizing alternative should one arise, and is in the best interest of the Debtors' estates and stakeholders. I believe the Prepetition Secured Creditors support of this sale process, and the agreement of the FILO Lenders and the Exit Term Loan Lenders to subordinate to the Priority Term Loan has helped to facilitate this process.

108.    Moreover, the schedule proposed by the Debtors is premised on the operational needs of their businesses. The Cash Collateral arrangements are designed to support the Debtors'

operations and fund the expenses of the Chapter 11 Cases incurred over the proposed timeline. The use of Cash Collateral is not sized to provide for the long term needs of the business or to fund a longer reorganization process.[13]

109.     The Debtors have determined that seeking the relief requested in the Bidding Procedures Motion and commencing a sale process with the option of designating one or more stalking horse bidders is warranted and necessary.  The transaction set forth in any stalking horse asset purchase agreement would establish a minimum Qualified Bid with respect to the assets to which it pertains at, and subject to higher or otherwise better offers during, the Auction.  The proposed stalking horse asset purchase agreements that the Debtors are in the process of negotiating are being negotiated at arm's-length by sophisticated parties, each represented by their own advisors.

110.     To facilitate a competitive, value-maximizing Sale Transaction, the Debtors are requesting authority to offer a potential stalking horse bidder:  (i) a break-up fee in the amount of 3.5% of the cash purchase price component of its bid (the "**Break-Up Fee**"); (ii) reimbursement of such stalking horse bidder's and its attorneys', accountants', investment bankers', and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the stalking horse asset purchase agreement up to a maximum aggregate amount of 1.0% of the cash purchase price component of its bid (the "**Expense Reimbursement**"); and/or (iii) minimum overbid protection (together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**").

111.     The Debtors believe that the Bid Protections are a necessary inducement to any

---

[13] Importantly, while the Cash Collateral Order does not require entry of the Sale Order until November 4, the liquidity provided will only support the proposed sale process.

Case 20-81688-CRJ11    Doc 6    Filed 07/27/20    Entered 07/27/20 23:54:33    Desc Main
Document        Page 41 of 196

stalking horse bidder contractually committing to serve as a bidder at a price the Debtors believe is fair, while providing the Debtors with an opportunity to enhance the value to their estate through an auction process. Without the Bid Protections, I believe that a stalking horse bidder may not be willing to enter into a stalking horse asset purchase agreement. The Bid Protections have been and will be negotiated in good faith. The Debtors do not intend to terminate any stalking horse asset purchase agreement and pay the Bid Protections, unless doing so would permit the Debtors to accept a better bid.

112. I understand that a consumer privacy ombudsman may be required to be appointed where a debtor is proposing to sell personally identifiable information as part of a sale outside of the ordinary course of business and the debtor disclosed to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and such policy is in effect on the date of the commencement of the case. That is not the case here. The Debtors do collect personally identifiable information, which may be transferred in connection with the Sale. However, the Debtors' privacy policy in effect for years prior to and on the Petition Date, a true and correct screenshot of which is attached hereto as **Exhibit D**, permits the transfer of such information. The privacy policy provides that the Debtors "reserve the right to transfer any information, including Personal Information, in the event all, or a portion, of our business or assets are sold or transferred, including in connection with a sale, merger, consolidation, change in control, transfer of assets, reorganization or liquidation of our business."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  July 27, 2020

/s/ Ken D'Arcy
Ken D'Arcy
Chief Executive Officer
Remington Outdoor Company, Inc.

**EXHIBIT A**

43879086 v1



**Remington Outdoor Company, Inc.**
26-0174491

100%

**FGI Holding Company, LLC**
27-1679899

100%

**FGI Operating Company, LLC**
27-1679774

*Remington Charitable Fund (private foundation)*
46-5352572

100%

**Remington Arms Company, LLC**
51-0350935

100%

**Barnes Bullets, LLC**
27-1488510

100%

**RA Brands, L.L.C.**
56-2201477

100%

**Outdoor Services, LLC**
27-2522405

100%

100%

100%

100%

100%

50%

100%

100%

**Huntsville Holdings LLC**
82-3913525

**TMRI, Inc.**
81-0493522

**Remington Arms Distribution Company, LLC**
37-1864655

**32E Productions, LLC**
47-3532381

**Great Outdoors Holdco, LLC**
**46-4657744**

**Remington Licensing Corporation**
22-2845016

*FGI Finance, Inc.*
90-0820109

# EXHIBIT B

| | Priority Term Loan Facility | FILO Term Loan Facility | Exit Term Loan Facility |
|---|---|---|---|
| **Outstanding Principal Amount** | $75,500,000 | $55,000,000 | $110,707,574.49 |



**Borrower**

**Guarantors**

Remington Outdoor Company, Inc.
→ FGI Holding Company, LLC
→ FGI Operating Company, LLC
→ Barnes Bullets, LLC; Remington Arms Company, LLC; RA Brands, L.L.C.; Outdoor Services, LLC; Great Outdoors Holdco, LLC; FGI Finance Inc.

Remington Arms Company, LLC → Huntsville Holdings LLC; TMRI, Inc.; Remington Arms Distribution Company, LLC; 32E Productions, LLC

| | Huntsville Note | Intercompany Note |
|---|---|---|
| **Outstanding Principal Amount** | $12,500,000 | $100,000,000 |
| **Issuer** | Remington Outdoor Company, Inc. | Remington Arms Company, LLC |
| **Holder** | City of Huntsville, Alabama | FGI Holding Company, LLC |

**EXHIBIT C**

43879086 v1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x
: 
In re:                                                         :    Chapter 11
                                                               :
REMINGTON OUTDOOR COMPANY, INC., *et*                          :    Case No. 18-10684 (BLS)
*al.*,[1]                                                      :
                                                               :    (Jointly Administered)
                                                               :
                              Debtors.                         :
-------------------------------------------------------------- x

## ORDER (A) APPROVING SOLICITATION PROCEDURES, (B) APPROVING ADEQUACY OF DISCLOSURE STATEMENT, AND (C) CONFIRMING PLAN

Remington Outdoor Company, Inc. and its affiliated debtors, as debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases having proposed the *First Amended Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession (Technical Modifications)*, dated April 30, 2018 [Docket No. 221] (as amended, supplemented, restated, or modified through the date hereof, and together with the Plan Supplement (defined below), the "Plan");[2] and upon consideration of:

a.    *Debtors' Motion For Entry of (I) Order (A) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan, (B) Approving Form and Manner of Notice of Combined Hearing and Commencement of Chapter 11 Cases, (C) Approving Solicitation of Non-Accredited Holders, (D) Establishing Procedures For Objecting to Disclosure Statement or Plan, (E) Conditionally Waiving Requirement to File Statements and Schedules, and (F) Directing that a Meeting of Creditors Not Be Convened, and (II) Order (A)*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The principal offices of Debtor Remington Outdoor Company, Inc., the top-level holding company, are located at 870 Remington Drive, Madison, NC 27025.

[2]    The Plan is attached as **Exhibit A** hereto.

*Approving Prepetition Solicitation Procedures, (B) Approving Adequacy of Disclosure Statement, and (C) Confirming Plan* [Docket No. 12] (the "Motion"), with respect to which the Court has entered the Order *(A) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan, (B) Approving Form and Manner of Notice of Combined Hearing and Commencement of Chapter 11 Cases, (C) Establishing Procedures For Objecting to Disclosure Statement or Plan, (D) Conditionally Waiving Requirement to File Statements and Schedules, and (E) Directing that a Meeting of Creditors Not Be Convened* [Docket No. 64] (the "Scheduling Order");

b.  *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession,* dated March 22, 2018 [Docket No. 14] (as amended, supplemented, restated, or modified through the date hereof, the "Disclosure Statement");[3]

c.  the Plan, including *Notice of Filing First Amended Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession (Technical Modifications)* [Docket No. 221];

d.  *Notice of Filing of Plan Supplement Pursuant to Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 186] (the "Initial Plan Supplement"); and

e.  *Notice of Filing of First Amended Plan Supplement Pursuant to Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and its Affiliated Debtors and Debtors in Possession* [Docket No. 194] (the "First Amended Plan Supplement"; together with the Initial Plan Supplement, the "Plan Supplement");

and upon consideration of (collectively, the "Declarations"):

f.  *Declaration of Steven P. Jackson, Jr. in Support of Chapter 11 Petitions and First Day Pleadings of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 7] (the "First Day Declaration");

g.  *Declaration of Joseph J. Sciametta in Support of Confirmation of the Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and its Affiliated Debtors and Debtors in Possession* [Docket No. 223] (the "Sciametta Declaration");

h.  *Declaration of Ari N. Lefkovits in Support of Confirmation of the Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and its*

---

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan. Any reference in the Plan to "Remington Entities", "Remington Entity", "Reorganized Remington" or "Reorganized Remington entity", as applicable, shall have the same meaning as "Debtors", "Debtor", "Reorganized Debtors" or "Reorganized Debtor", as applicable, as such terms are used herein.

2

> *Affiliated Debtors and Debtors in Possession* [Docket No. 224] (the "Lefkovits Declaration") and

i.      *Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 220] (the "Tabulation Declaration").

and the Court having reviewed all other filed pleadings, exhibits, statements, and comments regarding the Debtors' request for entry of an order (this "Confirmation Order") (i) approving the Debtors' prepetition and postpetition solicitation procedures, (ii) approving the adequacy of the Disclosure Statement, and (iii) confirming the Plan; and the Court having scheduled, pursuant to the Scheduling Order, May 2, 2018 at 1:00 p.m. (prevailing Eastern Time) as the date and time to commence a hearing (the "Combined Hearing") to consider the proposed entry of this Confirmation Order; and the Combined Hearing having been held before the Court; and it appearing to the Court that notice of the Combined Hearing and the opportunity for any party in interest to object to the proposed entry of this Confirmation Order have been adequate and appropriate and no other notice need be provided, as evidenced by (collectively, the "Affidavits"):

a.      *Affidavit of Service of Solicitation Materials* [Docket No. 50] (the "Solicitation Affidavit"), sworn to March 26, 2018, by James Daloia, an employee of Prime Clerk LLC ("Prime Clerk"), relating to service of the Disclosure Statement (including, as an exhibit, the Plan), a letter of transmittal from the Debtors, appropriate ballots for holders to accept or reject the Plan (the "Ballots"), and a return envelope (collectively, the "Solicitation Package") on March 22, 2018;

b.      *Affidavit of Service* [Docket No. 49], sworn to March 26, 2018, by Kadeem Champagnie, an employee of Prime Clerk, relating to service of the *Notice of Hearing on First Day Motions* [Docket No. 27] on March 26, 2018;

c.      *Affidavit of Service* [Docket No. 115], sworn to April 2, 2018, by Craig Kaufman, an employee of Prime Clerk, relating to service of the (i) *Notice of Bankruptcy Court Approval to Solicit Non-Accredited Holders* [Docket No. 84] (the "Non-Accredited Holder Notice") on March 28, 2018, and (ii) *Notice of Chapter 11 Bankruptcy Cases; Notice of Deadlines to Object to (I) Adequacy of Disclosure Statement and (II) Plan Confirmation; Notice of Hearing on Disclosure Statement*

3

*and Plan Confirmation; and Summary of Plan of Reorganization* [Docket No. 83] (the "Combined Notice") on March 28, 2018;

  d. *Affidavit of Publication* [Docket No. 120], sworn to April 3, 2018, by Calvin C. Liu, an employee of Prime Clerk, relating to publication of the Combined Notice on April 2, 2018;

and based upon and after full consideration of the entire record of the Combined Hearing, including (i) all statements, arguments, and objections made by counsel regarding the proposed entry of this Confirmation Order at or in connection with the Combined Hearing, and (ii) all oral representations, testimony, documents, filings, and other evidence proffered, adduced, or presented regarding the proposed entry of this Confirmation Order at or in connection with the Combined Hearing including, but not limited to, the Declarations; and the Court having ruled on any and all objections, statements, and reservations of rights not consensually resolved or withdrawn regarding the Plan, Disclosure Statement, Motion, and proposed entry of this Confirmation Order, unless otherwise indicated herein; and the Court being fully familiar with, and taking judicial notice of, the entire record of these chapter 11 cases; and it appearing to the Court that the legal and factual bases set forth in the documents filed in support of the proposed entry of this Confirmation Order and presented at the Combined Hearing, including the Declarations and Affidavits, establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor,

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, AND DECREED THAT:

## Findings of Fact and Conclusions of Law[4]

  A. **Jurisdiction and Venue**.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Approval of the Solicitation Procedures (as defined below),

---

[4] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

approval of the adequacy of the Disclosure Statement, and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

      **B.**    **Chapter 11 Petitions**.    On the Petition Date, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing in the Court these chapter 11 cases.    The Court has ordered the joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).    Each Debtor is an eligible debtor under section 109 of the Bankruptcy Code.    Since the Petition Date, each Debtor has remained authorized to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.    No trustee or examiner has been appointed in these chapter 11 cases pursuant to section 1104 of the Bankruptcy Code.    On April 9, 2018, the Office of the United States Trustee appointed an official committee of unsecured creditors for these Chapter 11 Cases (the "Committee") [Docket No. 127].    No statutory committee of equity security holders has been appointed pursuant to section 1102 of the Bankruptcy Code.    The Debtors timely requested an extension for filing their schedules and statements of financial affairs, which extension was approved by the Scheduling Order.

      **C.**    **Filing of Plan and Disclosure Statement**.    On March 25, 2018, the Debtors filed (i) the *Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession*, dated March 22, 2018 [Docket No. 13] and (ii) the Disclosure Statement.    On April 18, 2018, the Debtors filed the Plan Supplement.    On April 20, 2018, the Debtors filed the First Amended Plan Supplement.    On April 30, 2018, the Debtors

5

filed the amended Plan reflecting certain technical modifications addressing both formal and informal comments received from various parties in interest.

D.    **Judicial Notice and Objections**.  The Court takes judicial notice of (and deems admitted into evidence for entry of this Confirmation Order) the docket of these chapter 11 cases maintained by the Clerk of Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of these chapter 11 cases.  Any resolutions of objections to entry of this Confirmation Order explained on the record at the Combined Hearing are hereby incorporated by reference.  The objections of the U.S. Trustee and the SEC are sustained in part, and overruled in part, as set forth on the record at the hearing on May 2, 2018.  All other unresolved objections, statements, and reservations of rights are overruled on the merits.

E.    **Burden of Proof**.  The Debtors have the burden of proving the elements of section 1129 of the Bankruptcy Code by a preponderance of the evidence.  As demonstrated by, among other things, the Declarations and Affidavits, the Debtors have met such burden.

F.    **Notice**.  The transmittal and service of the Solicitation Package prior to the Petition Date, and the Combined Notice and Non-Accredited Holder Notice after the Petition Date, were adequate and sufficient under the circumstances, and all parties required to be given notice of the Combined Hearing (including the deadline for filing and serving objections to the Plan, Disclosure Statement, Motion, or proposed entry of this Confirmation Order) have been given due, proper, timely, and adequate notice in accordance with the Scheduling Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable non-bankruptcy law, rule, and regulation, and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required.

G.    **Solicitation Procedures**.  The Debtors' procedures for soliciting votes to accept

or reject the Plan (the "Solicitation Procedures"), as set forth in the Solicitation Package, the

Non-Accredited Holder Notice, and described in the Motion and Tabulation Declaration, were

appropriate and satisfactory based upon the circumstances and in compliance with the provisions

of the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules,

including Bankruptcy Rules 3017 and 3018, the Local Rules, and any other applicable rules,

laws, and regulations.  In particular and without limitation, as detailed below, (1) the Solicitation

Package and the Non-Accredited Holder Notice were transmitted to all holders of Claims and

Interests entitled to vote on the Plan and were not required to be transmitted to any other holders

of Claims and Interests, (2) the Ballots included in the Solicitation Package adequately addressed

the particular needs of these chapter 11 cases, (3) holders of Claims and Interests, including any

non-Accredited Holders of Term Loan Claims or Third Lien Notes Claims, entitled to vote on the

Plan were prescribed sufficient and reasonable time and notice to submit Ballots, and (4) votes

were tabulated fairly, in good faith, and as set forth in the Solicitation Package and the

Tabulation Declaration.

(i)    *Transmission of Solicitation Packages*.  As evidenced by the Solicitation
Affidavit and Tabulation Declaration, the Debtors only solicited votes to
accept or reject the Plan from holders of Allowed Claims in Class 4 and
Class 5 (collectively, the "Voting Classes").  All Classes other than the
Voting Classes (collectively, the "Non-Voting Classes") are either (a)
Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code,
conclusively presumed to have accepted the Plan, or (b) Impaired and,
pursuant to section 1126(g) of the Bankruptcy Code, deemed to have
rejected the Plan.  The Debtors therefore were not required to solicit votes
on the Plan from holders in Class 1 (Priority Non-Tax Claims), Class 2
(Other Secured Claims), Class 3 (ABL Facility Claims), Class 6 (General
Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Settled
Intercompany Claims), Class 9 (Interests in ROC), or Class 10
(Intercompany Interests).

On March 22, 2018, the Solicitation Packages (including the Plan) were
distributed to all holders of record of the Claims in the Voting Classes.

Holders of record were determined as of the date specified in the Solicitation Package for such purpose, March 19, 2018 (the "Voting Record Date"), the selection of which was appropriate and reasonable under the circumstances. Transmission of the Solicitation Package to holders of Claims and Interests in the Voting Classes was timely, adequate, and sufficient under the circumstances, and no further transmission of the Solicitation Package was required.

On March 27, 2018, the Debtors obtained the Court's approval to solicit votes on the Plan from all beneficial holders of Claims in the Voting Classes who were not "accredited investors" (an "Accredited Investor") as defined in Rule 501 of the Securities Act of 1933, as amended (the "Securities Act"). The Non-Accredited Holder Notice, and the solicitation of holders who were not Accredited Investors, was timely, adequate, and sufficient under the circumstances (see *Affidavit of Service* [Docket No. 115]).

(ii)     *Ballots.* The Ballots, forms of which are attached as an exhibit to the Motion, adequately conform to Official Form No. 14, and the modifications thereto addressed the particular needs of these chapter 11 cases and were appropriate for the holders of Claims and Interests entitled to vote to accept or reject the Plan. As evidenced by the Tabulation Declaration, the Ballots included in the tabulation results for the Plan were in form consistent with the requirements of Bankruptcy Rule 3018(c).

(iii)     *Voting Deadline.* Establishment and notice of the deadline by which Ballots were required to be received by Prime Clerk in order to be counted for or against the Plan (the "Voting Deadline") was appropriate and reasonable under the circumstances. The period during which the Debtors solicited acceptances to the Plan was a reasonable period of time for the holders of Claims and Interests entitled to vote on the Plan to make an informed decision to accept or reject the Plan.

(iv)     *Vote Tabulation.* As evidenced by the Tabulation Declaration, Prime Clerk adhered to a tabulation protocol set forth in the Solicitation Packages (including in the instructions in the Ballots), which protocol was appropriate and reasonable under the circumstances. In particular, the tabulation results for the Plan only included those timely Ballots that were properly completed and executed by the holder of record of the relevant Claim or Interest (or such holder's authorized representative) as of the Voting Record Date. Votes to accept or reject the Plan were tabulated fairly and in good faith.

Accordingly, the Solicitation Procedures are approved in all respects, and the acceptances of the

Plan obtained in accordance with the Solicitation Procedures, both prior to and subsequent to the

Petition Date, satisfy the applicable requirements set forth in Bankruptcy Rule 3018 for such acceptances to be deemed to be acceptances of the Plan pursuant to section 1125 and 1126 of the Bankruptcy Code, as applicable.

      **H.**    **Adequacy of Disclosure Statement**.  Based on the circumstances of these chapter 11 cases and the extensive and comprehensive nature of the Disclosure Statement, which included descriptions and summaries of, among other things, (1) the Plan, (2) certain events preceding the commencement of these chapter 11 cases, (3) securities to be issued under the Plan, (4) the Restructuring Support Agreement, (5) risk factors affecting the Plan, (6) an analysis setting forth the estimated return that creditors would receive in a chapter 7 liquidation, (7) financial projections and a valuation analysis that would be relevant to holders of Claims in determining whether to accept or reject the Plan, and (8) certain federal tax law consequences of the Plan, the adequacy of the Disclosure Statement is approved in all respects.[5]  The Disclosure Statement contains (1) sufficient information of a kind to satisfy the disclosure requirements of all applicable non-bankruptcy law, rules, and regulations, including the Securities Act, and (2) "adequate information," as such term is defined in section 1125(a) of the Bankruptcy Code, with respect to the Debtors, the Plan, and the transactions contemplated therein.  Accordingly, the Disclosure Statement complies with section 1126(b) of the Bankruptcy Code for purposes of subsections (c) and (d) of section 1126 of the Bankruptcy Code.  By filing both the Disclosure Statement and the Plan on the Petition Date, the Debtors have satisfied the filing requirement in Bankruptcy Rule 3016(b).

      **I.**    **Plan Supplement**.  All materials in the Plan Supplement comply with the terms of the Plan, and the filing and notice of such documents is good and proper in accordance with

---

[5]    As a matter of clarification, the Disclosure Statement in certain instances referred to the Huntsville Note as the "Huntsville Third Lien Note," which instead should have been the "Huntsville First Lien Note."

9

the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and no other or further notice is or shall be required.  All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  The rights of the Debtors are reserved, subject to the consent rights set forth in the Plan, to further amend, update, or modify the Plan Supplement prior to the Effective Date subject to the terms of this Confirmation Order.

J.    **Solicitation in Good Faith**.  The Debtors have solicited votes to accept or reject the Plan in good faith and in compliance with the Bankruptcy Code.  Pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any prior version thereof, and, therefore, none of any such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any prior version thereof.

K.    **Plan's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**   As detailed below, the Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

  (i)    *Plan Proponents (11 U.S.C. § 1121(a))*.  The Debtors are proper plan proponents under section 1121(a) of the Bankruptcy Code.  In addition, the Plan is dated and identifies the Debtors as proponents, thereby satisfying Bankruptcy Rule 3016(a).

  (ii)   *Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1))*.  Except with respect to Administrative Expenses, ABL DIP Claims, Term DIP Claims, ROC DIP Claims, and Priority Tax Claims, which need not be classified, Article III of the Plan classifies all Claims and Interests into ten Classes. Because the Plan constitutes a separate chapter 11 plan with respect to each Debtor, Article III of the Plan also provides that, while the Claims or

10

Interests in a particular Class have been placed in one Class for the purposes of nomenclature, the Claims and Interests against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan. Each Claim and Interest is substantially similar to all other Claims or Interests, as the case may be, that have been placed into the same Class as such Claim or Interest. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, including by each Debtor, and such Classes do not unfairly discriminate among the holders of Claims and Interests. The Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(iii)   *Unimpaired Classes (11 U.S.C. § 1123(a)(2))*. Article III of the Plan specifies each Class that is Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(iv)   *Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))*. Article III of the Plan specifies the treatment of all Classes that are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(v)   *Same Treatment Within Classes (11 U.S.C. § 1123(a)(4))*. Article III of the Plan provides for the same treatment of each Claim or Interest in a particular Class, unless the holder of a particular Claim or Interest agrees to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(vi)   *Implementation of Plan (11 U.S.C. § 1123(a)(5))*. Article V and other provisions of the Plan specifically provide, in detail, adequate and proper means for the Plan's implementation. On the Effective Date, Reorganized ROC will issue and distribute the New Common Units and New Warrants, and Reorganized OpCo will fund other distributions required under the Plan with Cash on hand, including Cash from operations and any Cash received on the Effective Date, and borrowings under the Term/ROC DIP Facility, the ABL DIP Facility, the New ABL Facility, and the New Term Loan Facility, as applicable. In addition, cash on hand at Reorganized ROC will be used to pay the Third Lien Noteholder Cash Distribution. Accordingly, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

(vii)   *Charter Provisions (11 U.S.C. § 1123(a)(6))*. The New Organizational Documents, filed as part of the Plan Supplement, prohibit the issuance of nonvoting equity securities, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

(viii)   *Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))*. Article V.I. of the Plan and the New Organizational Documents, filed as part of

11

the Plan Supplement, contain provisions with respect to the selection of the Reorganized Debtors' directors and officers that are consistent with the interests of creditors and equity security holders and with public policy. The Plan does not contain any provisions with respect to the selection of the Reorganized Debtors' directors and officers that are inconsistent with the interests of creditors and equity security holders or with public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

(ix)    *No Individual Debtor – Requirement Inapplicable (11 U.S.C. § 1123(a)(8))*.  None of the Debtors is an individual, and section 1123(a)(8) of the Bankruptcy Code is therefore inapplicable to the Plan.

(x)     *Impairment/Unimpairment of Classes (11 U.S.C. § 1123(b)(1))*. Article III of the Plan impairs the Classes 4, 5, 8 and 9, and leaves unimpaired Classes 1, 2, 3, 6, 7, and 10, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

(xi)    *Assumption and Rejection (11 U.S.C. § 1123(b)(2))*.  Article VII.A of the Plan provides for the assumption and rejection of Executory Contracts and Unexpired Leases in accordance with section 365 of the Bankruptcy Code, as contemplated by section 1123(b)(2) of the Bankruptcy Code.

(xii)   *Settlement of Claims and Interests (11 U.S.C. § 1123(b)(3))*.  The Plan provides for certain settlements of the Debtors' claims and interests, including through the releases, exculpation, and injunction pursuant to Article IX of the Plan and through a Litigation Settlement, if applicable. The Plan also provides for the retention and enforcement by the Litigation Trust, if one is established, of certain of the Debtors' claims and interests, as contemplated by section 1123(b)(3) of the Bankruptcy Code.

(xiii)  *Additional Provisions (11 U.S.C. § 1123(b)(6))*.  The Plan contains other appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code, as contemplated by section 1123(b)(6) of the Bankruptcy Code.

**L.    Plan Proponents' Compliance with Bankruptcy Code (11 U.S.C. §**

**1129(a)(2))**. As detailed below, the Debtors have complied with the applicable provisions of the

Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code:

(i)     Each Debtor is eligible under section 109 of the Bankruptcy Code to be a debtor in these chapter 11 cases;

(ii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the

12

Scheduling Order, and any applicable non-bankruptcy law, rule, and regulation in transmitting the Plan, Plan Supplement, Disclosure Statement, Non-Accredited Holder Notice, Ballots, and related documents and notices and in soliciting and tabulating the votes on the Plan; and

(iii)     The Debtors have complied in all other respects with any applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court.

**M.     Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))**.  The Debtors have proposed the Plan (including all documents necessary to effectuate the Plan) and the transactions contemplated in the Plan in good faith and not by any means forbidden by law.  The Debtors' good faith is evident from the facts and record of these chapter 11 cases, the Disclosure Statement, the record of the Combined Hearing and other proceedings held in these chapter 11 cases, and the overwhelming support indicated by substantially all creditors who voted on the Plan voting to accept the Plan.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Estates and to effectuate a successful and efficient reorganization of the Debtors.  The Plan (including all documents necessary to effectuate the Plan) was negotiated at arm's length among the Debtors, the Consenting Creditors, the ABL Parties, and each of their respective professionals.  Further, the Plan's classification, indemnification, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's-length, are consistent with sections 105, 1122, 1123, 1129, and 1142 of the Bankruptcy Code and are each necessary for the Debtors' successful reorganization.  Accordingly, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

**N.     Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))**.  Any payment made or to be made by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses of the Debtors' professionals in connection with these chapter 11 cases, or in connection with the Plan and incident to the

13

chapter 11 cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

O.      **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**  The identity and affiliations of any individual proposed to serve as a director or officer of the Reorganized Debtors and the identity and nature of any compensation of any insider that will be employed or retained by the Reorganized Debtors have been fully disclosed in the Disclosure Statement, Plan, and Plan Supplement, to the extent available, and the appointment to, or continuance in, such offices of such individuals is consistent with the interests of holders of Claims and Interests and with public policy.  Each such individual will serve in accordance with the terms and subject to the conditions of the New Organizational Documents and any other relevant organizational documents, each as applicable.  Accordingly, the Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.

P.      **No Rate Changes – Requirement Inapplicable (11 U.S.C. § 1129(a)(6)).**  The Plan does not provide for any rate changes by the Debtors, and section 1129(a)(6) of the Bankruptcy Code is therefore inapplicable to the Plan.

Q.      **Best Interest of Creditors (11 U.S.C. § 1129(a)(7)).**  The liquidation analysis attached to the Disclosure Statement and other evidence submitted, proffered, or adduced in support of the Plan at or in connection with the Combined Hearing (1) is persuasive and credible, (2) has not been controverted by other persuasive and credible evidence, (3) employs reasonable methodologies and assumptions, and (4) establishes that each holder of an Impaired Claim or Interest will receive or retain property under the Plan, on account of such Impaired Claim or Interest, with a value as of the Effective Date that is not less than the amount that such holder

14

would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

      **R.**    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** The Plan does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code. Classes 1, 2, 3, 6, 7, and 10 constitute Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code. The Voting Classes have voted to accept the Plan. However, holders of Claims or Interests in Classes 8 and 9 (the "Deemed Rejecting Classes"), if any, receive no recovery on account of their Claims or Interests pursuant to the Plan and are deemed to have rejected the Plan. Notwithstanding the foregoing, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

      **S.**    **Treatment of Administrative Expenses, DIP Claims, and Priority Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Expenses, ABL DIP Claims, Term DIP Claims, ROC DIP Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

      **T.**    **Acceptance by Impaired Class of Claims (11 U.S.C. § 1129(a)(10)).** Three Classes of Claims are Impaired under the Plan. As evidenced by the Tabulation Declaration, two Impaired Classes of Claims – Class 4 (Term Loan Claims) and Class 5 (Third Lien Notes Claims) – have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, determined without including any acceptance of the Plan by any "insider," as that term is defined in section 101(31) of the Bankruptcy Code, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.

      **U.**    **Feasibility (11 U.S.C. § 1129(a)(11)).** The projected financial results attached to the Disclosure Statement and other evidence submitted, proffered, or adduced in support of the

Plan at or in connection with the Combined Hearing (1) are persuasive and credible, (2) have not been controverted by other persuasive and credible evidence, (3) employ reasonable methodologies and assumptions, and (4) establish that the Plan is feasible and that there is a reasonable prospect of the Reorganized Debtors being able to meet their financial obligations under the Plan and in their businesses in the ordinary course and that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

V.    **Payment of Fees (11 U.S.C. § 1129(a)(12)).**  Articles II.A and XIII.C of the Plan provide for the payment on the Effective Date of all General Administrative Expenses, including all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code, which includes section 1930 thereof, that are then due and owing, to the extent not already paid during these chapter 11 cases, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

W.    **No Retiree Benefits – Requirement Inapplicable (11 U.S.C. § 1129(a)(13)).** The Debtors do not provide or pay any "retiree benefits," as such term is defined in section 1114 of the Bankruptcy Code, and section 1129(a)(13) of the Bankruptcy Code is therefore inapplicable to the Plan.

X.    **No Domestic Support Obligations – Requirement Inapplicable (11 U.S.C. § 1129(a)(14)).**  The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligation, and section 1129(a)(14) of the Bankruptcy Code is therefore inapplicable to the Plan.

16

**Y.      No Individual Debtor – Requirement Inapplicable (11 U.S.C. § 1129(a)(15))**.
None of the Debtors is an individual, and section 1129(a)(15) of the Bankruptcy Code is
therefore inapplicable to the Plan.

**Z.      No Applicable Nonbankruptcy Law Regarding Transfers – Requirement
Inapplicable (11 U.S.C. § 1129(a)(16))**.    Each of the Debtors is a moneyed, business, or
commercial corporation or trust, and section 1129(a)(16) of the Bankruptcy Code is therefore
inapplicable to the Plan.

**AA.    "Cram Down" Requirements (11 U.S.C. § 1129(b))**. The Plan satisfies the
requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the
Deemed Rejecting Classes (Class 8 (Settled Intercompany Claims) and Class 9 (Interests in
ROC)) have been deemed to reject the Plan, the Plan may be confirmed pursuant to section
1129(b)(l) of the Bankruptcy Code. *First*, all of the requirements of section 1129(a) of the
Bankruptcy Code other than section 1129(a)(8) have been met. *Second*, the Plan is fair and
equitable with respect to the Deemed Rejecting Classes.  The Plan has been proposed in good
faith, is reasonable and meets the requirements that no holder of any Claim or Interest that is
junior to each Deemed Rejecting Class will receive or retain any property under the Plan on
account of such junior Claim or Interest and no holder of a Claim in a Class senior to such
Classes is receiving more than 100% on account of its Claim. Accordingly, the Plan is fair and
equitable towards all holders of Claims and Interests in the Deemed Rejecting Classes. *Third*, the
Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because no
similarly situated class will receive more favorable treatment.  Where the Plan provides differing
treatment for certain Classes of Claims or Interests, the Debtors have a rational basis for doing so

(or the Class consented to such treatment). The Plan may therefore be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

**BB.    Only One Plan (11 U.S.C. § 1129(c)).** The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in each of these chapter 11 cases.

**CC.    Principal Purpose of the Plan (11 U.S.C. § 1129(d)).** The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

**DD.    No Small Business Case (11 U.S.C. § 1129(e)).** None of the Debtors is a "small business debtor," as such term is defined in section 101(51D) of the Bankruptcy Code, and section 1129(e) of the Bankruptcy Code is therefore inapplicable to the Plan.

**EE.    Satisfaction of Confirmation Requirements.** Based upon the foregoing, all applicable requirements for confirming the Plan set forth in section 1129 of the Bankruptcy Code have been satisfied.

**FF.    Implementation.** All documents necessary to implement the Plan, including those contained in the Plan Supplement, the New ABL Facility Documents, the New FILO Term Loan Facility Documents, and the New Term Loan Facility Documents, and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and shall not be in conflict with any federal or state law.

**GG.    Releases, Exculpation, and Injunction.** The Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the releases, exculpation, and injunction set forth in the Plan. The settlements reflected in the Plan are (1) in

18

the best interests of the Debtors, their Estates, and all holders of Claims or Interests, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) hereby approved by the Court pursuant to Bankruptcy Rule 9019. The allowance, classification, and treatment of any Allowed Claims and Allowed Interests of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between the Debtors and any Released Party.

**HH.** As contemplated by section 1123(b)(3) of the Bankruptcy Code, Article IX.D of the Plan describes certain releases granted by the Debtors and certain third parties (the "Releases"). The Releases, including the Releases of non-Debtor third parties, are permitted under applicable bankruptcy law when, as has been established here based upon the record in these chapter 11 cases and the evidence presented at the Combined Hearing, they are (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by Article IX.D of the Plan; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; (6) a bar to any Entity (including the Debtors) asserting any claim or Cause of Action released pursuant to Article IX.D the Plan, (7) consensual, and (8) are integral parts of the Plan.

**II.** Furthermore, the Releases of non-debtors in Article IX of the Plan are fair to holders of Claims and Interests, are necessary to the proposed restructuring, and such Releases are appropriate because (1) there is an identity of interest between the Debtors and each of the Released Parties as they share the common goal of confirming the Plan and implementing the transactions contemplated thereby; (2) each of the Released Parties provided a substantial contribution to the reorganization, including without limitation the efforts of the Released Parties

19

to, among other things, facilitate the reorganization of the Debtors, implement the restructuring contemplated by the Restructuring Support Agreement and the Plan, and provide funding for the Chapter 11 Cases, (3) each Impaired Class entitled to vote on the Plan voted to accept, and (4) the Plan provides for all holders of General Unsecured Claims to be paid in full or otherwise be unimpaired.  In addition, the Releases provide finality for the Debtors, the Reorganized Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and were specifically negotiated by the Debtors, the Consenting Creditors, and the ABL Parties as part of the Restructuring Support Agreement and the Plan.  Without the Releases, the Released Parties are not willing to make their contributions under the Plan.

> **JJ.** Further, the exculpation provision described in Article IX.E of the Plan (the "Exculpation") is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents and is appropriately limited in scope, as it will have no effect on the liability of any Entity for any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.  The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

> **KK.** The injunction provision set forth in Article IX.F of the Plan is necessary to implement, preserve, and enforce the discharge described in Article IX.B of the Plan, the

Releases, and the Exculpation.  The injunction provision is narrowly tailored to achieve this purpose.

      **LL.**    The record of the Combined Hearing and these chapter 11 cases, including the Declarations, is sufficient to support the releases, exculpation, and injunction provided for in Article IX.D, Article IX.E, and Article IX.F of the Plan, respectively.  Accordingly, based upon the record of these chapter 11 cases, the representations and the evidence proffered, adduced and presented at the Combined Hearing, the Court finds that the releases, exculpation, and injunction set forth in Article IX of the Plan are consistent with the Bankruptcy Code and applicable law. The failure to implement the injunction, exculpation, and releases would seriously impair the Debtors' ability to confirm the Plan.

      **MM.  Preservation of Causes of Action**.  Article V.M of the plan provides, in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Articles VI and IX of the Plan, that each Debtor shall retain all rights to commence and pursue, as appropriate, any and all Litigation Claims that such Debtor or its Estate may hold whether arising before or after the Petition Date, including any actions specifically identified in the Plan Supplement, and such rights to commence, prosecute, settle, or assert as a defense such Litigation Claims shall be preserved notwithstanding the occurrence of the Effective Date.  If a Litigation Trust is established, any and all Litigation Claims that constitute Litigation Trust Assets shall be transferred to the Litigation Trust on the Effective Date, and the Litigation Trustee shall be entitled to enforce all rights to commence and pursue any such Litigation Claims at the Direction of the Litigation Trust Advisory Board in accordance with the terms of the Litigation Trust Agreement.  The provisions of the Plan, including the Plan Supplement, regarding the Litigation Claims and the Litigation Trust are appropriate, fair, equitable, and

reasonable and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

**NN.** **Good Faith**. The Debtors, the Reorganized Debtors, the Consenting Creditors, each of the New ABL Parties, and each of the Released Parties have been, are, and will continue to be acting in good faith if they proceed to (1) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby and (2) take the actions authorized, directed or contemplated by this Confirmation Order.

**OO.** **Exit Facility**. The New Exit Facilities Documents (as defined below), and each of the New Exit Facilities (as defined below) to which they respectively relate, are, individually and collectively, essential elements of the Plan, and entry into the New Exit Facilities Documents is in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests and is necessary and appropriate for consummation of the Plan and the operations of the Reorganized Debtors. The Debtors have exercised sound business judgment in determining to enter into the New Exit Facilities Documents and have provided adequate notice thereof. The New Exit Facilities Documents have been negotiated in good faith and at arm's length among the Debtors and the applicable New ABL Parties, New FILO Term Loan Lenders, New FILO Term Loan Agent, New Term Loan Lenders, and the New Term Loan Agent, without the intent to hinder, delay, or defraud any creditor of the Debtors, and any credit extended and loans made or deemed made to the Reorganized Debtors by the applicable New ABL Lenders, New FILO Term Loan Lenders, and/or New Term Loan Lenders pursuant to the applicable New Exit Facilities Documents, and any fees paid thereunder, are deemed to have been extended, issued, and made or deemed made in good faith and for legitimate business purposes. The terms and conditions of

the New Exit Facilities Documents set forth in the Plan Supplement are fair and reasonable and are approved.

**PP.    New Organizational Documents.** The terms of the New Organizational Documents are fair and reasonable and are in the best interests of the Debtors' Estates and their creditors.    The New Organizational Documents are the result of good faith, arm's-length negotiations among the Debtors and the Consenting Creditors, are appropriate and consistent with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, including, but not limited to, Bankruptcy Code sections 1123, 1129, and 1142, and are necessary to the Debtors' successful emergence from chapter 11. The execution, delivery, or performance by the Debtor or Reorganized Debtors, as the case may be, of any documents in connection with the New Organizational Documents and compliance by the Debtors or Reorganized Debtors, as the case may be, with the terms thereof is authorized by, and will not conflict with, the terms of the Plan or this Order. The notice provided by the Debtor of the New Organizational Documents was consistent with the Bankruptcy Code and the Bankruptcy Rules and no other or further notice is or shall be required. The New Organizational Documents are hereby approved and shall constitute legal, valid, binding and authorized agreements of the Reorganized Debtors enforceable in accordance with their terms.

**QQ.    Valuation.** The valuation of the Reorganized Debtors set forth in the Disclosure Statement was prepared, at the Debtors' request, by Lazard Frères & Co. LLC, in accordance with standard and customary valuation principles and practices, and is a fair and reasonable estimate of the value of the Reorganized Debtors' businesses as a going concern.

**RR.** **Retention of Jurisdiction**. Pursuant to sections 105(a) and 1142 of the Bankruptcy Court, the Court may properly retain jurisdiction over the matters arising out of, or related to, these chapter 11 cases and the Plan as set forth in Article XII of the Plan.

**SS.** **Waiver of Stay**. Given the facts and circumstances of the Chapter 11 Cases, it is appropriate that this Confirmation Order shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(g), 6006(d), or 7062, and the Confirmation Order shall take effect immediately upon its entry.

AND IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

<u>Order</u>

1. **Findings of Fact and Conclusions of Law**. The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and, together with the findings and conclusions in the record of the Combined Hearing, shall constitute the Court's findings of fact and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

2. **Notice of Combined Hearing**. The Combined Notice complied with the terms of the Scheduling Order, was adequate and sufficient under the circumstances, and all parties required to be given notice of the Combined Hearing (including the deadline for filing and serving objections to the Plan, Disclosure Statement, Motion, or proposed entry of this Confirmation Order) have been given due, proper, timely, and adequate notice in accordance with the Scheduling Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable non-bankruptcy law, rule, and regulation, and such parties

24

have had an opportunity to appear and be heard with respect thereto. No other or further notice is required.

3. **Objections**. The objections of the U.S. Trustee and the SEC are sustained in part, and overruled in part, as set forth on the record at the hearing on May 2, 2018. All other objections, responses to, and statements and comments, if any, in opposition to, the Plan and/or the Disclosure Statement, respectively, which have not been resolved as set forth on the record, or withdrawn, shall be, and hereby are, overruled in their entirety or are otherwise resolved as incorporated herein.

4. **Solicitation Procedures**. The Solicitation Procedures are approved in all respects, including the selection of the Voting Record Date and Voting Deadline, and were appropriate and satisfactory based upon the circumstances and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable non-bankruptcy law. Transmission of the Solicitation Package and Non-Accredited Holder Notice to holders of Claims in the Voting Classes was timely, adequate, and sufficient under the circumstances, and no further transmission of the Solicitation Package was required.

5. **Ballots**. The Ballots are in compliance with Bankruptcy Rule 3018(c), adequately conform to Official Form B314, and are approved in all respects.

6. **Adequacy of Disclosure Statement**. The Disclosure Statement is approved in all respects and contains (a) sufficient information of a kind to satisfy the disclosure requirements of all applicable non-bankruptcy law, rules, and regulations, including the Securities Act, to the extent applicable, and (b) "adequate information," as such term is defined in section 1125(a) of the Bankruptcy Code, with respect to the Debtors, the Plan, and the transactions contemplated therein.

25

7.      **Approval of Solicitation**.  The solicitation of votes on the Plan conducted prior to the Petition Date complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of these chapter 11 cases, and was in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, including, for the avoidance of doubt, section 1125(g) of the Bankruptcy Code.  Holders of Claims or Interests who accepted the Plan prior to the Petition Date pursuant to the Debtors' solicitation of the Plan are deemed, pursuant to section 1126(b) of the Bankruptcy Code, to have accepted the Plan for purposes of subsections (c) and (d), as applicable, of section 1126 of the Bankruptcy Code.  The solicitation of votes on the Plan conducted after the Petition Date complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of these chapter 11 cases, and was in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, including, for the avoidance of doubt, sections 1125 and 1126 of the Bankruptcy Code.

8.      To the extent that the Debtors' prepetition solicitation of acceptances of the Plan is deemed to constitute an offer of new securities, the Debtors are exempt from the registration requirements of the Securities Act (and of any equivalent state securities or "blue sky" laws) with respect to their prepetition solicitation under section 4(a)(2) of the Securities Act and similar Blue Sky Laws provisions.  Likewise, any offer of new securities after the Petition Date is likewise exempt from registration with the SEC, and similar state authorities, under section 1145(a) of the Bankruptcy Code.

9.      **Confirmation of Plan**.  The Plan and each of its provisions shall be, and hereby are, CONFIRMED pursuant to section 1129 of the Bankruptcy Code.  The documents contained in the Plan Supplement are authorized and approved.  The terms of the Plan, including the Plan

26

Supplement, are incorporated by reference into and are an integral part of this Confirmation Order.

10.     **No Action Required**.  Pursuant to the appropriate provisions of applicable law and section 1142(b) of the Bankruptcy Code, no action of the respective directors, equity holders, managers, or members of the Debtors or the Reorganized Debtors, as applicable, shall be required to authorize the Debtors or the Reorganized Debtors, as applicable, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including the Plan Supplement.

11.     **Binding Effect**.   Subject to Article X.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Debtors' counterparties to Executory Contracts, Unexpired Leases, and any other prepetition agreements and each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, or guardians.

12.     **Vesting of Assets**.   Except as otherwise provided in the Plan or in this Confirmation Order, on the Effective Date, all property in each Estate, and any property acquired by the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and

clear of all Liens, Claims, charges, or other encumbrances other than any Unimpaired Claims or any valid liens or security interests securing such Unimpaired Claims; provided, however, that (i) each Litigation Claim shall either (a) be treated pursuant to the terms of a Litigation Settlement, or (b) if no such Litigation Settlement occurs with respect to such Litigation Claim, shall be transferred to the Litigation Trust, and (ii) all unsecured claims against ROC as of the Effective Date shall be assumed by Reorganized OpCo on the Effective Date.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  If a Litigation Trust is established, any and all Litigation Claims that constitute Litigation Trust Assets shall be transferred to the Litigation Trust on the Effective Date, and the Litigation Trustee shall be entitled to enforce all rights to commence and pursue any such Litigation Claims at the Direction of the Litigation Trust Advisory Board in accordance with the terms of the Litigation Trust Agreement.  Pursuant to Article VI of the Plan, in connection with the vesting and transfer of the Litigation Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral and including, electronic information) relating to the Litigation Trust Assets (collectively, the "Privileges") shall vest in the Litigation Trust.  The Debtors, the Reorganized Debtors, the Consenting Creditors, and the Litigation Trustee shall take all necessary actions to effectuate the transfer of such privileges, protections, and immunities. The Litigation Trust's, Litigation Trustee's, and the Litigation Trust Advisory Board's receipt of the Privileges shall be without waiver in recognition of the joint/successorship interest in prosecuting claims on behalf of the

28

applicable stakeholders of the Debtors' Estates. For the avoidance of doubt, upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the Debtors' rights, title, and interest in the Litigation Trust Assets, and the Debtors shall have no further interest in or with respect to the Litigation Trust.

13. **Authorizations to Undertake Restructuring Transactions**.  The Debtors are authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate and other Entity restructuring of their businesses, to otherwise simplify the overall corporate and other Entity structure of the Debtors, or to reincorporate or reorganize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are incorporated or formed.  In furtherance thereof, the Debtors, and the directors, officers, or managers acting on its behalf, may (a) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree; (b)  execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement, and having such other terms to which the applicable Entities may agree; (c) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable state law, consistent with the terms of the Plan and the Restructuring Support Agreement; and (d) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law

29

in connection with such transactions, consistent with the terms of the Plan and Restructuring Support Agreement.

14.    **Effectiveness of All Actions**.  On the Effective Date, all actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including:  (a) appointment of the New Boards pursuant to Article V.I of the Plan and any other managers, directors, or officers for the Reorganized Debtors identified in the Plan Supplement; (b) the issuance and distribution of the New Common Units and the New Warrants (including entry into the Warrant Agreement substantially in the form submitted with the Plan Supplement); (c) entry into the New Organizational Documents substantially in the forms submitted with the Plan Supplement; (d) entry into the New ABL Facility Loan Agreement, the New FILO Term Loan Agreement, and the New Term Loan Agreement, each substantially in the form submitted with the Plan Supplement, and the other New ABL Facility Documents, the New FILO Term Loan Facility Documents, and the New Term Loan Facility Documents (collectively, the "New Exit Facilities Documents"); (e) entry into the Litigation Trust Agreement substantially in the forms submitted with the Plan Supplement; (f) implementation of the Restructuring Transactions; and (g) all other actions contemplated under the Plan.  All matters provided for in the Plan involving the corporate or other Entity structure of the Debtors or the Reorganized Debtors, and any corporate or other Entity action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue,

30

execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name, and on behalf, of the Reorganized Debtors, including any and all agreements, documents, securities, and instruments relating to the foregoing. The foregoing authorizations and approvals shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

15.     **ABL DIP Facility**.  Any letter of credit issued under the ABL DIP Facility Loan Agreement which is undrawn as of the Effective Date (an "ABL DIP Undrawn Letter of Credit") will be (a) with the consent of the issuer thereof, deemed a letter of credit issued under the New ABL Facility Loan Agreement in an equal stated face amount (provided, that (x) all provisions governing letters of credit in the New  ABL Facility Loan Agreement are in form and substance satisfactory to the issuer thereof and (y) the issuer thereof shall have no obligation after such deemed issuance to renew, amend, extend, or otherwise modify any such letter of credit so deemed issued unless otherwise agreed by such issuer), or (b) otherwise treated in a manner acceptable to the ABL DIP Agent. Upon treatment of each ABL DIP Undrawn Letter of Credit in accordance with the preceding sentence, any ABL DIP Claim corresponding to such ABL DIP Undrawn Letter of Credit shall be deemed satisfied in full (excluding fees and expenses accrued thereon in accordance with the ABL DIP Facility Loan Agreement).

16.     The Debtors' contingent reimbursement obligations or indemnity obligations under the ABL DIP Facility Loan Agreement, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner acceptable to the ABL DIP Agent, any affected ABL DIP Facility Lender or any other Holder of a ABL DIP Claim, as

31

applicable, shall survive the Effective Date and shall not be released or discharged pursuant to this Order or the Plan, notwithstanding any provision hereof or thereof to the contrary.

17.    **New Exit Facilities**.  On the Effective Date, subject to the terms of the Plan, the Reorganized Debtors shall enter into the New ABL Facility, the New FILO Term Loan Facility, and the New Term Loan Facility (collectively, the "New Exit Facilities"), which are hereby approved (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, obligations to be incurred, fees and expenses to be paid, and indemnities to be provided by the Debtors or the Reorganized Debtors in connection therewith). Each Reorganized Debtor is authorized to: (1) finalize, execute, deliver, and take such actions as necessary to perform under, or otherwise effectuate, those documents necessary or appropriate to obtain the New Exit Facilities, including the applicable New Exit Facilities Documents substantially in the forms submitted with the Plan Supplement, and (2) grant all liens and security interests thereunder to the New ABL Agent, the New ABL Lenders, the New FILO Term Loan Agent, the New FILO Term Loan Lenders, the New Term Loan Agent, and the New Term Loan Lenders, as applicable, in accordance with the terms of the New Exit Facilities Documents, in each case without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person (including, without limitation, creditors, stockholders, directors, members or partners of the Debtors or the Reorganized Debtors), subject to such modifications as permitted by the terms and conditions of the Plan.

18.    Until the New Exit Facilities Documents are finalized and executed, without further order or authorization of this Court, the Debtors, the Reorganized Debtors and their successors are authorized and empowered to further negotiate and make any and all

modifications to the New Exit Facilities Documents in accordance with the Plan.  Subject to the occurrence of the Effective Date, the New Exit Facilities Documents shall constitute the legal, valid, and binding obligations of the Debtors and the Reorganized Debtors, as applicable, and shall be enforceable in accordance with their respective terms.  Notwithstanding anything to the contrary in the Plan, in the event of a conflict between the Plan (including, without limitation, the Plan Supplement) and the New Exit Facilities Documents, the New Exit Facilities Documents shall control.

19.     On the Effective Date, the New ABL Facility (including any letters of credit deemed issued thereunder), the New FILO Term Loan Facility, and the New Term Loan Facility, together with any new promissory notes evidencing the obligations of the Reorganized Debtors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder (including the New Exit Facilities Documents and all "Loan Documents" or "Financing Agreements" as defined therein), shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the Reorganized Debtors pursuant to the New ABL Facility (including any letters of credit deemed issued thereunder), the New FILO Term Loan Facility, and the New Term Loan Facility, and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the New Exit Facilities Documents.

20.     The liens contemplated by and related to the New Exit Facilities and related documents are valid, binding, and enforceable liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the New Exit Facilities. The guarantees, mortgages, pledges, liens, and other security interests granted pursuant to or in connection with the New Exit Facilities are granted in good faith as an inducement to the lenders

33

and other secured parties thereunder to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination, and the priorities of such guarantees, mortgages, pledges, liens, and other security interests shall be as set forth in the applicable intercreditor agreement(s) and other definitive documentation executed in connection with the New Exit Facilities.

21.     The Reorganized Debtors and the secured parties (and their designees and agents) under the New Exit Facilities are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to evidence, establish, and perfect such liens and security interests in connection with the New Exit Facilities under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required as a matter of law to perfect such liens and other security interests), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

22.     Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the Court's retention of jurisdiction shall not govern any disputes arising or asserted under the New Exit Facilities Documents or related loan documents or financing agreements executed in connection with the New Exit Facilities or any liens, rights or remedies related thereto.

23.     Upon the Effective Date, the DIP Agent (as defined in the Final DIP Order) and the DIP Lenders (as defined in the Final DIP Order) shall be released from any and all liability,

responsibility, and/or obligation to hold, reserve for, or otherwise fund or ensure the funding of the Carve-Out (as defined in the Final DIP Order) or any other expenses included within the Carve-Out and from any obligation, responsibility or liability to the Debtors, any of the Professionals (as defined in the Final DIP Order) or any other third party to pay, fund or otherwise satisfy the fees and expenses of such Professionals.

24.    **Managers and Officers**.   As of the Effective Date, the terms of the current members of the boards of directors or managers (as applicable) of the Debtors shall expire, such directors shall be deemed to have resigned, and the initial boards of directors or managers (as applicable), including the New Boards identified in the Plan Supplement, and the officers of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.  Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.  Pursuant to section 1129(a)(5)(A)(ii) of the Bankruptcy Code, the Court approves as consistent with the interests of holders of Claims and Interests and with public policy the selection, election and/or continuance, as the case may be, of these individuals; provided that nothing set forth herein shall prevent any of the foregoing individuals from resigning or from being removed or replaced as director or manager without further order of the Court in accordance with the terms of the Reorganized Debtors' organizational documents, as applicable.   On or immediately prior to the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors will, to the extent such New Organizational Documents were included in the Plan Supplement, file its New Organizational Documents (if so required under applicable state law) with the applicable Secretaries of State and/or other applicable

35

authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation or formation.

25.    **Compliance with Section 1123(a)(6) of Bankruptcy Code**. The Plan complies with section 1123(a)(6) of the Bankruptcy Code.

26.    **Exemption from Securities Law**. Pursuant to section 1145 of the Bankruptcy Code, the issuance and distribution of the New Common Units, the New Warrants (and the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests as contemplated by the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration thereunder. In addition, under section 1145 of the Bankruptcy Code, the New Common Units, the New Warrants (and the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments and subject to any restrictions in the New Organizational Documents, the Warrant Agreement, and the Litigation Trust Agreement, as applicable; *provided*, *however*, that notwithstanding anything to the contrary herein, the transfer of the New Common Units, the New Warrants, and the Litigation Trust Interests will be prohibited to the extent such transfer would subject the Reorganized Debtors or the Litigation Trust to the registration and reporting requirements of the Securities Act and the Securities Exchange Act of 1934, as amended.

27.    **Cancellation of Certain Loans, Securities and Agreements**.    Except as otherwise provided in the Plan (including with respect to Unimpaired Claims), on the Effective Date: (1) the Term/ROC DIP Credit Agreement, the ABL DIP Facility Loan Agreement, the ABL Facility, the Term Loan Agreement, the Third Lien Notes Indenture, the Interests in ROC, any intercompany notes memorializing or evidencing the Settled Intercompany Claims, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of, or ownership interest in, the Debtors that are reinstated pursuant to the Plan), shall be deemed cancelled, surrendered, and discharged as to the Debtors without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and the Reorganized Debtors shall not have any continuing obligations thereunder or in any way related thereto; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be deemed satisfied in full, released, and discharged without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity; provided, however, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for

37

purposes of (a) allowing holders to receive distributions under the Plan, (b) with respect to the ABL Facility, as necessary to enforce the terms of the ABL Payoff Letter, including but not limited to the Surviving Obligations (as defined in the ABL Payoff Letter), (c) with respect to the Third Lien Notes Indenture, as necessary to (i) permit the Third Lien Notes Indenture Trustee to take such action as contemplated by the Plan and Confirmation Order, (ii) enforce the rights, Claims and interests of the Third Lien Notes Indenture Trustee vis a vis the Third Lien Noteholders, (iii) preserve any rights of the Third Lien Notes Indenture Trustee as against any money or property distributable to the Third Lien Noteholders, including any priority in respect of payment and the right to exercise any charging lien, provided further, that except with respect to its rights and obligations with respect to this Plan and the Confirmation Order, the Third Lien Notes Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Third Lien Notes Indenture, and (d) solely with respect to the Term Loan Agreement, as necessary to (i) enforce the rights, Claims and interests of the Term Loan Agent and any predecessor thereof vis-a-vis the Secured Parties (as defined in the Term Loan Agreement) and any parties other than the Debtors or the Reorganized Debtors, (ii) preserve any rights of the Term Loan Agent and any predecessor thereof as against any money or property distributable to holders of Term Loan Claims, including any priority in respect of payment and the right to exercise any charging lien, and (iii) enforce the terms of the OpCo Bridge Payoff Letter, including but not limited to the Surviving Obligations (as defined in the OpCo Bridge Payoff Letter); provided further, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, this Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors.  Except for the foregoing, the Term Loan Agent and its respective agents shall be relieved of all further duties and responsibilities

related to the Financing Agreements (as defined in the Term Loan Agreement) and the Plan, except with respect to such other rights of the Term Loan Agent that, pursuant to the Term Loan Agreement, survive the termination of the Financing Agreements. Subsequent to the performance by the Term Loan Agent of its obligations pursuant to the Plan, the Term Loan Agent and its agents shall be relieved of all further duties and responsibilities related to the Financing Agreements.

28.    **Release of Liens**.  Except as otherwise expressly provided in the Plan (including with respect to Unimpaired Claims), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the New ABL Facility Documents, New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents, on the Effective Date, upon (1) the applicable distributions made pursuant to the Plan, and (2) the effectiveness of the New ABL Facility Documents, New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and each of their successors and assigns.  For the avoidance of doubt, any release of a prepetition Lien pursuant to this paragraph shall be automatic, without any further action or filings on the part of the Debtors or the Reorganized Debtors; provided, however, that a certified copy of this Confirmation Order may be filed or recorded in addition to or in lieu of any document or instrument necessary to confirm any such release.

29.    Notwithstanding the entry of this Confirmation Order, from the Confirmation Date through the Effective Date, all of the claims, liens, interests, rights, priorities, protections

and remedies afforded to the DIP Agent (as defined in the Final DIP Order) and DIP Lenders (as defined in the Final DIP Order) in the Final DIP Order shall remain in full force and effect, and shall constitute, and continue to constitute, the legal, valid, binding and enforceable obligations of the Debtors, which shall not be impaired, prejudiced or modified in any way at any time prior to the Effective Date.

30.     **General Settlement of Claims and Interests**.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  All distributions made to holders of Allowed Claims in any Class and Interests in accordance with the Plan are intended to be, and shall be, final.

31.     **COAC Agreement**. Article V.I.3 of the Plan and any other provisions or conditions related thereto that address the proposed amended of the COAC Agreement are hereby waived in accordance with the terms and conditions of the *Agreed Order Resolving Cerberus Operations and Advisory Company, LLC's (1) Limited Objection to Plan Confirmation and (2) Motion for Relief from the Automatic Stay to Terminate Services Agreement* [Docket No. 233], which is hereby incorporated into and made a part of this Confirmation Order as though fully set forth herein.  Any and all Claims of Cerberus, COAC, or each of their respective affiliates are hereby Disputed Claims as defined in the Plan.

32.     **Preservation of Causes of Action**.  In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Articles VI and IX of the Plan, each Debtor shall retain all rights to commence and pursue, as appropriate, any and all Litigation Claims that such

Debtor or its Estate may hold whether arising before or after the Petition Date, including any actions specifically identified in the Plan Supplement, and such rights to commence, prosecute, settle, or assert as a defense such Litigation Claims shall be preserved notwithstanding the occurrence of the Effective Date.

33.    **Assumption or Rejection of Contracts and Leases**.  On the Effective Date, except as otherwise ordered by the Court or provided in the Plan, all Executory Contracts and Unexpired Leases of the Debtors, including that certain Employment Agreement dated as of August 15, 2015, by and between Remington Outdoor Company, Inc. and Stephen P. Jackson, Jr. and that certain Employment Agreement dated as of October 19, 2017, by and between Remington Outdoor Company, Inc. and Anthony A. Acitelli (collectively, the "Existing Employment Agreements"), shall be deemed assumed by the applicable Debtor counterparty in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, and such assumptions are hereby approved.  Notwithstanding anything to the contrary herein, on the Effective Date, all Executory Contracts and Unexpired Leases to which ROC or FGI Holding is a party shall be deemed assumed by Reorganized OpCo; provided, that all federal, state, or local government licenses, permits, and similar rights or privileges held by ROC shall be deemed assumed on the Effective Date by Reorganized ROC.  All indemnification contracts and employment contracts (except for the Existing Employment Agreements) to which one or more Debtors is a party shall be rejected to the extent permitted by law unless expressly assumed prior to the Effective Date or pursuant to the terms of this Plan.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan and this Confirmation Order, which has not been assigned to a third party prior to the Confirmation Date, shall revest in, and be fully

enforceable by, Reorganized OpCo in accordance with its terms, except as such terms are modified by the provisions of the Plan or otherwise ordered by the Court.

34.    Any disputes between the Debtors or the Reorganized Debtors, on the one hand, and the counterparty to any Executory Contract and Unexpired Lease regarding cure amounts or "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) shall be governed by the procedures set forth in Article VII.B of the Plan; *provided*, *however*, for the avoidance of doubt, any undisputed ordinary course payments made to such counterparty pursuant to the Bankruptcy Court's orders (including, but not limited to, any "first day" orders entered by this Bankruptcy Court) or as a result of the unimpairment of Claims under the Plan shall be deemed ordinary course payments of the amounts that become due under such Executory Contract or Unexpired Lease and shall not be deemed cure payments that require the parties to submit to any particular procedure under the Plan.

35.    **Authorization to Consummate**.  The Debtors are authorized to consummate the Plan at any time after the entry of this Confirmation Order, subject to satisfaction or waiver (by the required parties as set forth in the Plan) of the conditions precedent to the Effective Date set forth in Article X.B of the Plan.

36.    . **General Administrative Expenses**.    Each holder of an Allowed General Administrative Expense, to the extent such Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date (or, if payment is not then due, then in the applicable Debtor's ordinary course of business), unless otherwise agreed by the holder of such General Administrative Expense and the applicable Debtor.

42

37.    **Professional Fees**.  All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on the Reorganized Debtors no later than forty-five (45) days after the Effective Date, unless the Reorganized Debtors agree otherwise in writing.  Objections to Professional Fees must be filed with the Bankruptcy Court and served on the Reorganized Debtors and the applicable Professional no later than seventy-five (75) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Professional Fees Escrow Account; provided, however, that if the funds in the Professional Fees Escrow Account are insufficient to pay the full Allowed amounts of the Professional Fees, the Reorganized Debtors shall promptly pay any remaining Allowed amounts from its Cash on hand.  For the avoidance of doubt, in no circumstance shall ROC funds be contributed to the Professional Fees Escrow Account or used to pay any Professional Fees except as otherwise provided pursuant to the Plan.

38.    For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Debtors are permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of the Debtors' businesses (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of Confirmation

39.    **Discharge**.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, this Confirmation Order, or in any contract,

43

instrument, or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the Plan Supplement), the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including (i) the Settled Intercompany Claims and (ii) any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose prior to the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), (h), or (i) of the Bankruptcy Code. This Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests as set forth above subject to the occurrence of the Effective Date. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, (i) the discharge of all Claims and Interests as set forth above shall not apply to any Litigation Claim unless such Litigation Claim is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Litigation Settlement, or a Bankruptcy Court order, and (ii) (a) each Administrative Expense and any Claim or Interest arising prior to the Effective Date in Classes 1, 2, 3, 6, (including Claims for rejection damages pursuant to section 365 of the Bankruptcy Code), 7, or 10 of the Plan shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of the Plan (including, for the avoidance of doubt, Articles IX.D.1 and IX.D.2 of the Plan), and (b) the

Debtors and the Reorganized Debtors shall retain all defenses, counterclaims, rights to setoff, and rights to recoupment, if any, as to the foregoing Claims.

40.    **Releases, Injunction, Exculpation, and Related Provisions under the Plan**. The releases, injunctions, and related provisions set forth in Article IX of the Plan are hereby approved and authorized in their entirety.  Only to the fullest extent permitted under Bankruptcy Code Section 1125(e), the exculpations and related provisions set forth in Article IX of the Plan are hereby approved and authorized in their entirety.  Except as set forth in the Plan, as of the Effective Date, any and all Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between the Debtors and any Released Party (except for Causes of Action held by any employee, other than a director and/or officer acting in such capacity, of the Debtors or any Released Party) shall be deemed settled, compromised, and released as set forth in the Plan; *provided, however,* that the foregoing shall not apply to any Litigation Claims in the event a Litigation Trust is established.  The Court hereby authorizes and approves the releases by all Entities of all such contractual, legal, and equitable subordination rights and Causes of Action that are satisfied, compromised, and settled pursuant to the Plan.  Nothing in Article IX.A of the Plan shall compromise or settle, in any way whatsoever, any Causes of Action that the Debtors or the Reorganized Debtors, as applicable, may have against any Entity that is not a Released Party.  For the avoidance of doubt, the term "employee," as used in this paragraph, does not include any officers and/or directors to the extent an employee acts or acted in such capacity."

41.    **Compliance with Tax Requirements**.  In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the

Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

42.     **Section 1146 Exemption**. Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

43.     **Documents, Mortgages, and Instruments**. Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan and this Confirmation Order.

44.     **Reversal/Stay/Modification/Vacatur of Confirmation Order**. Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, or stayed by subsequent order of

the Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors or the Reorganized Debtors, as applicable, prior to the effective date of any such reversal, stay, modification, or vacatur, including, without limitation, the validity of any obligation, indebtedness, or liability incurred by the Debtors or the Reorganized Debtors pursuant to any of the New Exit Facilities.  Notwithstanding any such reversal, stay, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan or any amendments or modifications thereto.

45.    **Continued Effect of Stays and Injunction Until Effective Date**.  Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

46.    **Retention of Jurisdiction**.  The Court retains jurisdiction over the matters arising out of, or related to, these chapter 11 cases and the Plan as set forth in Article XII of the Plan.

47.    **Nonseverability of Plan Provisions upon Confirmation**.  Each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without consent of the Debtors, and subject to the terms and conditions of the Plan, the Requisite Consenting Creditors, the Term Loan Agent, the Term/ROC

47

DIP Agent, the ABL DIP Agent, the New FILO Term Loan Lenders, and the New ABL Required Lenders; and (c) nonseverable and mutually dependent.

48.    **Modifications**.  Except as otherwise specifically provided in the Plan, and subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, with the consent of the Requisite Consenting Creditors, the Term Loan Agent, the Term/ROC DIP Agent, the ABL DIP Agent, the New FILO Term Loan Lenders, and the New ABL Required Lenders, which consent may be withheld in their sole and absolute discretion, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the terms of the Restructuring Support Agreement, and subject to the consent of the Requisite Consenting Creditors, the ABL DIP Agent, the New FILO Term Loan Lenders, and the New ABL Required Lenders, which consent may be withheld in their sole and absolute discretion, each Debtor expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, to the extent necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement, including by structuring the Plan, the Restructuring, and the Restructuring Transaction in a manner that preserves favorable tax attributes; *provided, however*, that any such amendment or modification shall not cause Class 6 General Unsecured Claims to be Impaired. Each Debtor may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Restructuring

Support Agreement.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.

49.    **Distributions to Holders of Allowed Third Lien Notes Claims**.    All distributions to holders of Allowed Third Lien Notes Claims shall be governed by the Third Lien Notes Indenture, including, but not limited to, the provisions therein for the payment of the fees and expenses of the Third Lien Notes Indenture Trustee, and shall be made to each holder of an Allowed Third Lien Notes Claim, or such holder's authorized designee, for purposes of distributions to be made hereunder.

50.    **Governing Law**.    Unless federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, and unless specifically stated otherwise, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate or entity governance matters relating to the Debtors or the Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the relevant Debtor or the Reorganized Debtors, as applicable.

51.    **Applicable Non-Bankruptcy Law**.    Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Confirmation Order, the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

52.    **Governmental Approvals Not Required**.    Except as otherwise stated in the Plan, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws,

rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Plan and Disclosure Statement, any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

53.    **Reservation of Rights in Favor of Governmental Units**.  Notwithstanding any provision in the Plan, this Confirmation Order (but subject to paragraph 54 of this Confirmation Order) or the related Plan documents (together with the Plan and this Confirmation Order, the "Plan Documents"), nothing discharges or releases the Debtors, the Reorganized Debtors or any non-debtor from any claim, liability or cause of action of the United States or any State, or impairs the ability of the United States or any State to pursue any claim, liability, defense, right or cause of action against the Debtors, the Reorganized Debtors or any non-debtor.  Contracts, leases, covenants, guaranties, indemnifications, operating rights agreements or other interests or agreements with the United States or any State shall be, subject to any applicable legal or equitable rights or defenses of the Debtors or the Reorganized Debtors under applicable non-bankruptcy law, paid, treated, determined and administered in the ordinary course of business as if the Debtors' bankruptcy cases were never filed, and the Debtors and the Reorganized Debtors shall comply with all applicable non-bankruptcy law. All claims, liabilities, causes of action, or defenses of or to the United States or any State shall survive the Chapter 11 Cases as if they had not been commenced and be determined in the ordinary course of business, including in the manner and by the administrative or judicial tribunals in which such rights, defenses, claims, liabilities, or causes of action would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided*, that nothing in the Plan or this Confirmation Order shall alter any legal or equitable rights or defenses of the Debtors or the Reorganized Debtors under

50

nonbankruptcy law with respect to any such claim, liability or cause of action. Without limiting the foregoing, for the avoidance of doubt: (a) the United States and any State shall not be required to file any proofs of claim in the Chapter 11 Cases for any claim, liability or cause of action; and (b) nothing in the Plan Documents shall (i) affect or impair the exercise of the United States' or any State's police and regulatory powers against the Debtors, the Reorganized Debtors or any non-debtor; (ii) be interpreted to set cure amounts or to require the United States or any State to novate or otherwise consent to the transfer of any federal or state contracts, leases, guaranties, indemnifications, grants, agreements or interests; (iii) affect or impair the United States' or any State's rights and defenses of setoff and recoupment, or to assert setoff or recoupment against the Debtors or the Reorganized Debtors and such rights and defenses are expressly preserved; or (iv) constitute an approval or consent by the United States without compliance with all applicable legal requirements and approvals under non-bankruptcy law.

54.     **Securities and Exchange Commission**.  Except for the Court's findings of fact, conclusions of law and rulings in respect of the prepetition and postpetition solicitation of the Plan, nothing in this Plan or the Order is intended to affect the police or regulatory activities of the U.S. Securities and Exchange Commission (the "SEC") or release any non-Debtor from liability in connection with any legal action brought by the SEC.

55.     **Filing and Recording**.  This Confirmation Order is and shall be binding upon and shall govern the acts of all persons or entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgage, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law,

51

the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.

56.    **Notice of Confirmation Order**.   In accordance with Bankruptcy Rules 2002 and 3020(c), the Debtors shall serve notice of the entry of this Confirmation Order, substantially in the form attached hereto as **Exhibit B**, to all parties who hold a Claim or Interest in these chapter 11 cases, including those parties who have requested service of papers under Bankruptcy Rule 2002 and the Office of the United States Trustee within ten (10) business days after entry of this Confirmation Order.   The Debtors shall also publish notice of Confirmation once in the national edition of *USA Today (National Edition)* or other nationally-circulated newspaper. Mailing and publication of the notice of Confirmation Order in the time and manner set forth in this paragraph shall be deemed good and sufficient notice of entry of this Confirmation Order and no further notice is necessary.

57.    **Substantial Consummation**.   On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

58.    **Effect of Non-Occurrence of Effective Date**.   If the Effective Date does not occur within ninety (90) days of the Confirmation Date (or such other extended deadline as may be ordered by the Bankruptcy Court), the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by the Debtors, any holders of Claims or Interests (including the Consenting Creditors and the ABL Parties), or any other Entity; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests (including the Consenting Creditors and the ABL Parties), or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests (including the Consenting Creditors and the ABL

52

Parties), or any other Entity, in any respect. For the avoidance of doubt, except as provided in the Restructuring Support Agreement, nothing in the Plan shall be construed as requiring termination or avoidance of the Restructuring Support Agreement upon non-occurrence of the Effective Date (subject, in all respects, to any consent, termination, or other rights of the Consenting Creditors under the Restructuring Support Agreement) or as otherwise preventing the Restructuring Support Agreement from being effective in accordance with its terms.

59.    **References to Plan Provisions**.  References to Articles of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan except as specifically provided herein.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan or any related document in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan and any related documents be confirmed in their entirety.

60.    **Headings**.  Headings utilized herein are for convenience and reference only, and shall not constitute a part of the Plan or this Confirmation Order for any other purpose.

61.    **Effect of Conflict between Plan and Confirmation Order**.  If there is any inconsistency between the terms of the Plan or the Plan Supplement and the terms of this Confirmation Order, the terms of this Confirmation Order shall govern and control.

62.    **No Stay of Confirmation**. The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of 14 days after entry of the order are hereby waived. This Confirmation Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(g), 6006(d), 7062, or otherwise.

63.    **No Waiver**.  The failure to specifically include any particular provision of the Plan in this Confirmation Order will not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of the Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

64.    **Sports Molding Inc. d/b/a SMI Molding Inc.** Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, this Confirmation Order, any amendment or supplement to any of the foregoing items, or in any document executed or delivered pursuant to or related to the Plan or this Confirmation Order including, without limitation, any Plan Supplement, exhibit, or trust agreement, all defenses of Sports Molding, Inc. (d/b/a SMI Molding, Inc.) to any Cause of Action asserted by a Released Party are hereby preserved and are not released, discharged, enjoined or exculpated.

65.    **Special Provision Governing Unimpaired Claims**.  Except as otherwise provided in the Plan, nothing under the Plan shall affect (i) the Debtors' rights and defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims or (ii) the rights and defenses of any holder of Unimpaired Claims in respect of its Unimpaired Claims.  Any disputes between the Debtors or the Reorganized Debtors, on the one hand, and the holder of an Unimpaired Claim, on the other hand, shall be adjudicated in the ordinary course of dealing between such parties (including, if necessary, in a court of competent jurisdiction other than the Bankruptcy Court), subject to the rights of such parties as set forth in Article V.O.1 of the Plan to have such disputes adjudicated in the Bankruptcy Court.

66.    **Final Order**.  This Confirmation Order is a Final Order.

Dated:  May 4 , 2018
Wilmington, Delaware

THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

55

**Exhibit A**

**Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ---------------------------------------------------------- x | |
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*,[1] | Case No. 18-10684 (BLS) |
| | (Jointly Administered) |
| Debtors. | |
| ---------------------------------------------------------- x | |

## FIRST AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF REMINGTON OUTDOOR COMPANY, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION (TECHNICAL MODIFICATIONS)

### April 30, 2018

**MILBANK, TWEED, HADLEY & McCLOY LLP**

Gregory A. Bray (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Haig M. Maghakian (admitted *pro hac vice*)
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (No. 2436)
Timothy P. Cairns (No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705

*Counsel to Remington Outdoor Company, Inc.
and Its Affiliated Debtors and Debtors in Possession*

**LOWENSTEIN SANDLER LLP**
Robert G. Minion
Paul Kizel (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020

*Conflicts Counsel to Remington Outdoor Company, Inc.*

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each anticipated debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings, LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The principal offices of Remington Outdoor Company Inc., the top-level holding company, are located at 870 Remington Drive, Madison, NC 27025.

**TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
      OF TIME, AND GOVERNING LAW ................................................................. 1

    A.    Defined Terms ...................................................................................... 1
    B.    Rules of Interpretation ...................................................................... 19
    C.    Computation of Time......................................................................... 19
    D.    Governing Law .................................................................................. 19
    E.    Reference to Monetary Figures.......................................................... 20

ARTICLE II ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED
      CLAIMS ............................................................................................ 20

    A.    General Administrative Expenses...................................................... 20
    B.    Restructuring Expenses...................................................................... 20
    C.    Professional Fees .............................................................................. 21
            1.    Final Fee Applications ........................................................... 21
            2.    Professional Fees Escrow Account ........................................ 21
            3.    Post-Effective Date Fees and Expenses ................................. 22
    D.    Term DIP Claims .............................................................................. 22
    E.    ROC DIP Claims............................................................................... 22
    F.    ABL DIP Claims............................................................................... 23
    G.    Priority Tax Claims........................................................................... 23

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND
      INTERESTS ....................................................................................... 23

    A.    Classification of Claims and Interests............................................... 23
    B.    Treatment of Claims and Interests .................................................... 24
            1.    Class 1 – Priority Non-Tax Claims........................................ 24
            2.    Class 2 – Other Secured Claims............................................. 24
            3.    Class 3 – ABL Facility Claims .............................................. 25
            4.    Class 4 – Term Loan Claims.................................................. 25
            5.    Class 5 – Third Lien Notes Claims ........................................ 26
            6.    Class 6 – General Unsecured Claims...................................... 27
            7.    Class 7 – Intercompany Claims ............................................. 27
            8.    Class 8 – Settled Intercompany Claims ................................. 28
            9.    Class 9 – Interests in ROC .................................................... 28
            10.    Class 10 – Intercompany Interests ......................................... 28
    C.    Special Provision Governing Unimpaired Claims............................. 28

ARTICLE IV ACCEPTANCE OR REJECTION OF PLAN.......................................... 29

    A.    Voting Classes .................................................................................. 29
    B.    Presumed Acceptance of the Plan...................................................... 29
    C.    Non-Consensual Confirmation .......................................................... 29
    D.    Subordinated Claims.......................................................................... 29

ii

ARTICLE V MEANS FOR IMPLEMENTATION OF PLAN ................................................... 30

    A.    General Settlement of Claims and Interests ............................................. 30
    B.    Restructuring Transactions .................................................................... 30
    C.    Sources of Consideration for Plan Distributions ..................................... 31
          1.    Issuance of New Common Units and New Warrants .............................. 31
          2.    Cash ................................................................................................... 31
          3.    New ABL Facility ................................................................................ 31
          4.    New Term Loan Facility ...................................................................... 32
          5.    New FILO Term Loan Facility ............................................................ 33
    D.    Corporate Existence ............................................................................. 33
    E.    Vesting of Assets in Reorganized Remington .......................................... 34
    F.    Cancellation of Loans, Securities, and Agreements ................................ 34
    G.    Corporate and Other Entity Action ....................................................... 35
    H.    New Organizational Documents ............................................................. 36
    I.    Directors and Officers of Reorganized Remington and its Subsidiaries .............. 36
          1.    Reorganized ROC Board ..................................................................... 36
          2.    New Subsidiary Boards ........................................................................ 37
          3.    Certain Personnel ............................................................................... 37
    J.    Effectuating Documents; Further Transactions ...................................... 37
    K.    Section 1146 Exemption ....................................................................... 37
    L.    Litigation Trust .................................................................................. 38
    M.    Preservation of Litigation Claims .......................................................... 38
    N.    Management Incentive Plan ................................................................... 39
    O.    Procedures for Treating Disputed Claims and Interests Under the Plan .............. 39
          1.    Disputed Claims and Interests Process ................................................. 39
          2.    No Distributions Pending Allowance .................................................... 39
          3.    Distributions after Allowance .............................................................. 40
    P.    Pension Plans ..................................................................................... 40

ARTICLE VI THE LITIGATION TRUST ...................................................................... 40

    A.    Establishment of Litigation Trust ......................................................... 40
    B.    Vesting of Assets ................................................................................ 41
    C.    The Litigation Trustee .......................................................................... 42
          1.    Appointment ...................................................................................... 42
          2.    Powers ............................................................................................... 43
          3.    Litigation; Responsibilities of Litigation Trustee .................................. 43
          4.    Employment of Professionals .............................................................. 44
          5.    Value of Litigation Trust Assets ......................................................... 44
    D.    Litigation Trust Advisory Board ........................................................... 44
          1.    Appointment ...................................................................................... 44
          2.    Authority and Responsibilities ............................................................. 45
    E.    Expense Reserve and Litigation Trust Expenses .................................... 45
    F.    Compensation of the Litigation Trustee ................................................. 46
    G.    Litigation Trust Interests ...................................................................... 46
    H.    Distributions by Litigation Trustee ....................................................... 46

iii

I.      Termination ........................................................................................................... 48

ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ................................................................................................................ 48

A.      Assumption of Executory Contracts and Unexpired Leases.................................. 48
B.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ........ 49
C.      Insurance Policies ................................................................................................. 49
D.      Employment Agreements ...................................................................................... 50
E.      Modifications, Amendments, Supplements, Restatements, or Other
        Agreements ............................................................................................................ 50
F.      Reservation of Rights............................................................................................ 50
G.      Non-Occurrence of Effective Date ....................................................................... 50
H.      Contracts and Leases Entered into after Petition Date.......................................... 50
I.      Rejection Damages Claims .................................................................................... 51

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ........................................... 51

A.      Timing and Calculation of Amounts to Be Distributed ....................................... 51
B.      Application of Distributions ................................................................................. 51
C.      Disbursing Agent .................................................................................................. 51
D.      Rights and Powers of Disbursing Agent ............................................................... 51
        1.      Powers of the Disbursing Agent ................................................................ 51
        2.      Incurred Expenses ..................................................................................... 52
E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ........... 52
        1.      Delivery of Distributions to Term Loan Agent and Third Lien
                Notes Indenture Trustee ............................................................................ 52
        2.      Delivery of Distributions in General .......................................................... 53
        3.      Minimum Distributions .............................................................................. 53
        4.      Undeliverable Distributions and Unclaimed Property ............................... 53
F.      Section 1145 Exemption ....................................................................................... 54
G.      Compliance with Tax Requirements...................................................................... 54
H.      No Postpetition Interest on Claims and Interests.................................................. 55
I.      Setoffs and Recoupment ....................................................................................... 55
J.      Claims Paid or Payable by Third Parties .............................................................. 55
        1.      Claims Paid by Third Parties ..................................................................... 55
        2.      Claims Payable by Third Parties ................................................................ 56
        3.      Applicability of Insurance Policies ............................................................ 56

ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
        PROVISIONS ....................................................................................................... 56

A.      Compromise and Settlement.................................................................................. 56
B.      Discharge of Claims and Termination of Interests ............................................... 57
C.      Release of Liens.................................................................................................... 58
D.      Releases of Released Parties ................................................................................. 58
        1.      Releases by the Remington Entities........................................................... 58

iv

       2.     Third-Party Releases by Holders of Claims or Interests ........................... 59
E.    Exculpation ...................................................................... 60
F.    Injunction ........................................................................ 60

ARTICLE X CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ...................... 61

A.    Conditions to Confirmation ................................................... 61
B.    Conditions to Effective Date.................................................. 62
C.    Waiver of Conditions .......................................................... 64
D.    Effect of Non-Occurrence of Effective Date ............................. 64

ARTICLE XI MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN ................ 64

A.    Modification and Amendments............................................... 64
B.    Effect of Confirmation on Modifications ................................. 65
C.    Revocation or Withdrawal of Plan.......................................... 65

ARTICLE XII RETENTION OF JURISDICTION ................................................... 65

ARTICLE XIII MISCELLANEOUS PROVISIONS ................................................. 68

A.    Immediate Binding Effect.................................................... 68
B.    Additional Documents ......................................................... 68
C.    Payment of Statutory Fees .................................................... 68
D.    Reservation of Rights.......................................................... 69
E.    Successors and Assigns........................................................ 69
F.    Notices ............................................................................ 69
G.    Term of Injunctions or Stays................................................. 71
H.    Entire Agreement ............................................................... 72
I.    Exhibits .......................................................................... 72
J.    Nonseverability of Plan Provisions......................................... 72
K.    Votes Solicited in Good Faith................................................ 72
L.    Closing of Chapter 11 Cases ................................................. 73
M.    Document Retention ........................................................... 73
N.    Conflicts.......................................................................... 73
O.    Dissolution of Creditors' Committee........................................ 73

v

**Introduction**

Remington Outdoor Company, Inc. ("ROC") and its subsidiaries FGI Holding Company, LLC ("FGI Holding"), FGI Operating Company, LLC ("OpCo"), Remington Arms Company, LLC, Barnes Bullets, LLC, TMRI, Inc., RA Brands, L.L.C., FGI Finance, Inc., Remington Arms Distribution Company, LLC, Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC, and Outdoor Services, LLC, as debtors and debtors in possession (each a "Remington Entity" and, collectively, the "Remington Entities"), jointly propose this prepackaged plan of reorganization, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan"), for the resolution of certain outstanding Claims against, and Interests in, the Remington Entities, pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended and as in effect on the Confirmation Date or otherwise applicable to the Chapter 11 Cases, the "Bankruptcy Code").

Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

Each Remington Entity is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan of reorganization for each Remington Entity. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Remington Entities' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

# ARTICLE I
# DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below:

1.    "*ABL DIP Agent*" means Bank of America, N.A., as Administrative Agent under the ABL DIP Facility Loan Agreement.

2.    "*ABL DIP Claims*" means all Claims against any Remington Entity arising on account of the ABL DIP Facility or pursuant to or secured by the ABL DIP Facility Loan Agreement, and which constitute "Obligations," as such term is defined in the ABL DIP Facility Loan Agreement.

3.    "*ABL DIP Facility*" means the superpriority senior secured asset-based revolving credit facility made available by the ABL DIP Facility Lenders to the Remington Entities to provide financing and otherwise extend credit during the pendency of the Chapter 11 Cases

pursuant to and subject to the terms and conditions of the ABL DIP Facility Loan Agreement and the DIP Orders.

4.     "*ABL DIP Facility Lenders*" means the financial institutions party from time to time to the ABL DIP Facility Loan Agreement as lenders or issuing banks, in their respective capacities as such.

5.     "*ABL DIP Facility Loan Agreement*" means that certain Superpriority Senior Debtor-In-Possession Asset-Based Loan And Security Agreement by and among OpCo and certain of its subsidiaries, as Borrowers, FGI Holding, the other guarantors, lenders, and issuing banks from time to time party thereto, and the ABL DIP Agent, as amended, modified, or supplemented from time to time, as approved by the DIP Orders.

6.     "*ABL Facility*" means the senior secured asset-based revolving credit facility made available by the ABL Facility Lenders to the Remington Entities to provide financing and otherwise extend credit prior to the filing of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the ABL Facility Loan Agreement.

7.     "*ABL Facility Agent*" means Bank of America, N.A., as Administrative Agent under the ABL Facility Loan Agreement.

8.     "*ABL Facility Claims*" means all Claims against any Remington Entity arising on account of the ABL Facility or pursuant to or secured by the ABL Facility Loan Agreement, and which constitute "Obligations," as such term is defined in the ABL Facility Loan Agreement.

9.     "*ABL Facility Lenders*" means the financial institutions party from time to time to the ABL Facility Loan Agreement as lenders or issuing banks, in their respective capacities as such.

10.     "*ABL Facility Loan Agreement*" means that certain Loan and Security Agreement by and among OpCo and certain of its subsidiaries, as Borrowers, FGI Holding, the other guarantors, lenders, and issuing banks from time to time party thereto, and the ABL Facility Agent, dated as of April 19, 2012, as amended, modified, or supplemented from time to time.

11.     "*ABL Facility Loan Documents*" means the documents that govern the ABL Facility, including the ABL Facility Loan Agreement.

12.     "*ABL Parties*" means, collectively, each of the "Secured Parties" as defined in the ABL Facility Loan Agreement and each of the "Secured Parties" as defined in the ABL DIP Facility Loan Agreement.

13.     "*ABL Payoff Letter*" means that certain postpetition Termination Agreement, by and among OpCo and certain of its subsidiaries, as Borrowers, FGI Holding, the other guarantors, lenders, and issuing banks from time to time party thereto, and the ABL Facility Agent, as amended, modified, or supplemented from time to time, as approved by the DIP Orders.

2

14.    "*Administrative Expense*" means any cost or expense of administration of the Chapter 11 Cases entitled to priority pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the Remington Entities' businesses; (b) professional compensation and reimbursement awarded or allowed pursuant to sections 330(a) or 331 of the Bankruptcy Code, including the Professional Fees; (c) an administrative expense of the type described in section 503(b)(9) of the Bankruptcy Code; and (d) any and all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code; provided, however, that "Administrative Expense" shall not include any ABL DIP Claim, Term DIP Claim, or ROC DIP Claim.

15.    "*Allowed*" means, with respect to any Claim or Interest, the extent to which such Claim or Interest is not Disputed.  An Allowed Claim: (a) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed; and (b) shall be net of any setoff amount that may be asserted by any Remington Entity against the holder of such Claim, which shall be deemed to have been setoff in accordance with the provisions of the Plan.  Notwithstanding anything to the contrary herein, Reorganized Remington shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan.

16.    "*Alternative New Term Loan Facility*" has the meaning specified in Article V.C.4.

17.    "*Article*" refers to an article of the Plan.

18.    "*Avoidance Actions*" means any and all actual or potential claims and Causes of Action to avoid a transfer of property from, or an obligation incurred by, one or more of the Remington Entities, that arise under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code or similar state law.

19.    "*Bankruptcy Code*" has the meaning specified in the Introduction hereto.

20.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Chapter 11 Cases.

21.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended from time to time and as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075 and the general, local, and chamber rules of the Bankruptcy Court.

22.    "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or day on which commercial banks in New York are required or authorized by law to remain closed.

23.    "*Cash*" means cash and cash equivalents in U.S. dollars.

24.    "*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, action, remedy, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or

3

unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date and before the Effective Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, including, but not limited to, Avoidance Actions; (d) any counterclaim or defense, including fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer or similar claim.

25.    "*CEO Director*" means the chief executive officer of Reorganized Remington, as a Director on the Reorganized ROC Board as set forth in Article V.I.

26.    "*Cerberus Entity*" means Cerberus Capital Management L.P., and any entity that is owned, controlled by, or affiliated with Cerberus Capital Management L.P.

27.    "*Chapter 11 Case*" means, with respect to a particular Remington Entity, the case under chapter 11 of the Bankruptcy Code pending for such Remington Entity in the Bankruptcy Court, jointly administered with each other Remington Entity's Chapter 11 Case, and the "*Chapter 11 Cases*" means every Remington Entity's Chapter 11 Case, collectively.

28.    "*claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, and "*Claim*" means a claim as such term is defined in section 101(5) of the Bankruptcy Code against a Remington Entity.

29.    "*Class*" means a class of Claims or Interests designated in Article III of the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code.

30.    "*COAC*" means Cerberus Operations & Advisory Company, LLC.

31.    "*Combined Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation and approval of the Disclosure Statement, as such hearing may be continued from time to time.

32.    "*Committee*" means the statutory committee of unsecured creditors appointed by the Office of the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

33.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021, subject to all conditions to Confirmation specified in Article X.A having been satisfied or waived in accordance with Article X.C.

34.    "*Confirmation Date*" means the date upon which Confirmation occurs.

35.    "*Confirmation Order*" means the Bankruptcy Court order confirming the Plan pursuant to section 1129 of the Bankruptcy Code that is (i) consistent with the Restructuring Support Agreement and otherwise satisfactory to the Remington Entities and the Requisite

4

Consenting Creditors in their sole and absolute discretion, (ii) in form and substance satisfactory to the ABL DIP Agent, the Term/ROC DIP Agent, the New ABL Agent, the New FILO Term Loan Lenders, and the New ABL Required Lenders in their sole and absolute discretion, and (iii) to the extent any provision of such order materially affects the New Term Loan Agent, in form and substance acceptable to the New Term Loan Agent.

36.    "*Consenting Creditors*" means the Consenting Term Loan Creditors and Consenting Third Lien Creditors.

37.    "*Consenting Term Loan Creditors*" means each creditor party to the Restructuring Support Agreement that is a holder of, or an investment advisor or an investment manager to a holder or holders of, Term Loan Claims.

38.    "*Consenting Third Lien Creditors*" means each creditor party to the Restructuring Support Agreement that is a holder of, or an investment advisor or an investment manager to a holder or holders of, Third Lien Notes Claims.

39.    "*Consummation*" means the occurrence of the Effective Date.

40.    "*Designated Directors*" means, collectively, the Term Loan Directors and the Third Lien Notes Directors.

41.    "*DIP Orders*" means the Interim DIP Order and Final DIP Order.

42.    "*Direction*" shall mean the prior express written consent, approval, direction, acceptance, authorization, certification, or affirmation, in each case, by a majority in number of the Litigation Trust Advisory Board members.

43.    "*Director*" means a member of the board of directors or board of managers, as applicable, of Reorganized ROC.

44.    "*Disallowed*" means, with respect to a Claim or Interest or portion thereof, that such Claim or Interest or portion thereof has been disallowed by a Final Order.

45.    "*Disbursing Agent*" means one or more of Reorganized Remington and/or any other Entity or Entities selected by the Remington Entities or Reorganized Remington to make or facilitate distributions contemplated under the Plan.

46.    "*Discharge*" has the meaning specified in Article IX.F.

47.    "*Disclosure Statement*" means that certain *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession*, dated March 22, 2018, as it may be amended, supplemented, restated, or modified from time to time, including all exhibits and schedules thereto and references therein, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and as approved by the Bankruptcy Court.

5

48.    "*Disputed*" means: (i) with respect to a Claim or Interest as to which a proof of claim has been filed with the Bankruptcy Court and has not been withdrawn, that an objection to such Claim or Interest or portion thereof has been filed in accordance with Article V.O herein; and (ii) with respect to a Claim or Interest as to which no proof of claim has been filed in the Bankruptcy Court, that such Claim or Interest is being adjudicated by a court of competent jurisdiction in accordance with applicable non-bankruptcy law or otherwise disputed or challenged by the Remington Entities or Reorganized Remington, as applicable, in the ordinary course of business or pursuant to the terms of any contract or other applicable law.

49.    "*Distribution Record Date*" means the Confirmation Date or such later date as agreed to by Reorganized Remington and the Consenting Term Loan Creditors in their sole and absolute discretion; *provided, however*, that the Distribution Record Date shall not apply to publicly-held securities, including, without limitation, the Third Lien Notes.  Notwithstanding any of the foregoing, the Distribution Record Date for purposes of making any determinations with respect to qualification of any holder of a Class 4 Claim or Class 5 Claim as an Electing Term Loan Lender or Electing Third Lien Noteholder, and with respect to receiving any distributions of Litigation Trust Interests under the Plan, shall be made by reference to the Voting Record Date.

50.    "*DTC*" means Depository Trust Company.

51.    "*Effective Date*" means the date selected by the Remington Entities, in consultation with the Requisite Consenting Creditors and the ABL DIP Agent and in accordance with the Restructuring Support Agreement, that is the first Business Day after the Confirmation Date, on which date all conditions to the Effective Date specified in Article X.B have been satisfied or waived in accordance with Article X.C.

52.    "*Electing Creditors*" means the Electing Term Loan Lenders and the Electing Third Lien Noteholders.

53.    "*Electing Creditor Causes of Action*" means all Causes of Action related to the Remington Entities held by the Electing Creditors.

54.    "*Electing Term Loan Lender*" means a Term Loan Lender that either (i) votes to approve the Plan or (ii) elects to (a) include its Causes of Action related to the Remington Entities in the Litigation Trust Assets in exchange for its Pro Rata Class 4 Share of the Litigation Trust Class A Interests or (b) otherwise release any such Causes of Action in exchange for its Pro Rata Class 4 Share of the proceeds of any Litigation Settlement.

55.    "*Electing Third Lien Noteholder*" means a Third Lien Noteholder that either (i) votes to approve the Plan or (ii) elects to (a) include its Causes of Action related to the Remington Entities in the Litigation Trust Assets in exchange for its Pro Rata Class 5 Share of the Litigation Trust Class B Interests or (b) otherwise release any such Causes of Action in exchange for its Pro Rata Class 5 Share of the proceeds of any Litigation Settlement.

56.    "*Entity*" means any "entity," as such term is defined in section 101(15) of the Bankruptcy Code.

6

57.    "*Estate*" means, with respect to a particular Remington Entity, the estate created for such Remington Entity upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and the "*Estates*" means every Remington Entity's Estate, collectively.

58.    "*Estate Causes of Action*" means all Causes of Action held by the Remington Entities and their Estates (other than any Intercompany Claim or Settled Intercompany Claim).

59.    "*Exculpated Parties*" means any persons entitled to the protections of Section 1125(e) of the Bankruptcy Code.

60.    "*Exculpation*" has the meaning specified in Article IX.F.

61.    "*Executory Contract*" means a contract to which one or more of the Remington Entities are party, other than an Unexpired Lease, which contract is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

62.    "*Existing COAC Agreement*" has the meaning set forth in Article VII.I.3.

63.    "*Existing Employment Agreements*" has the meaning specified in Article VII.D.

64.    "*FGI Holding*" has the meaning specified in the Introduction hereto.

65.    "*Final DIP Order*" means the Bankruptcy Court order authorizing use of cash collateral, the Term/ROC DIP Facility, and the ABL DIP Facility on a final basis.

66.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or (b) any appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, petitioned, or moved.

67.    "*General Administrative Expense*" means any Administrative Expense other than Professional Fees.

68.    "*General Unsecured Claim*" means any Unsecured Claim, other than an Intercompany Claim or a Settled Intercompany Claim, against any Remington Entity, including, for the avoidance of doubt, all Claims for rejection damages pursuant to section 365 of the Bankruptcy Code related to an executory contract or unexpired lease to which a Remington Entity was a party.

69.    "*Governmental Unit*" means any "governmental unit," as such term is defined in section 101(27) of the Bankruptcy Code.

70.    "*Impaired*" means, with respect to (a) a Class, Claim, or Interest, that such Class, Claim, or Interest is "impaired" within the meaning of section 1124 of the Bankruptcy Code and

(b) the holder of a Claim or Interest, that such Claim or Interest is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

71.     "*Independent Directors and Officers*" means any director or officer of the Remington Entities as of and after the Petition Date who is not, as of any date while serving in such capacity, or prior to serving in such capacity, an employee of or affiliated with any Cerberus Entity; *provided, however*, if the Remington Entities are the only Cerberus Entities that a director or officer of the Remington Entities is an employee of or affiliated with (and such director or officer has never served as an employee of and/or been affiliated with any Cerberus owned or controlled entity in the past), then such director or officer will still be considered an Independent Director and/or Officer.

72.     "*Initial Distribution*" shall have the meaning set forth in Article VI.H.

73.     "*Interim DIP Order*" means the Bankruptcy Court order authorizing use of cash collateral, the Term/ROC DIP Facility, and the ABL DIP Facility on an interim basis.

74.     "*Intercompany Claim*" means any Claim held by a Remington Entity against another Remington Entity, but excluding any Settled Intercompany Claim.

75.     "*Interest*" means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Remington Entity, including any share of common or preferred stock, membership interest, partnership unit, or other evidence of ownership of, or a similar interest in, a Remington Entity, and any option, warrant, or right, contractual or otherwise, to purchase, sell, subscribe, or acquire any such equity security or other equity interest in a Remington Entity, whether or not transferable, issued or unissued, authorized, or outstanding.

76.     "*Lien*" means a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

77.     "*Litigation Claims*" means (i) all Estate Causes of Action, and (ii) all Electing Creditor Causes of Action, in each case, including all Causes of Action against the Unreleased Debtor Parties; provided, however, that any recovery on account of any potential and/or actual claims against the Independent Directors and Officers of the Remington Entities' shall be within and to the extent of the limits of liability and the scope of coverage afforded by the insurance held by the Remington Entities. For the avoidance of doubt, Litigation Claims shall not include (i) the Settled Intercompany Claims or (ii) any Cause of Action held by a holder of a Claim in Classes 1, 2, 3, 6, 7, or 8.

78.     "*Litigation Settlement*" means a settlement or resolution of the Litigation Claims that occurs prior to the Effective Date and is acceptable to the Remington Entities and the Requisite Consenting Creditors.

79.     "*Litigation Trust Advisory Board*" shall have the meaning ascribed to such term in the Litigation Trust Agreement.

8

80.    *"Litigation Trust Agreement"* means that certain agreement made by and among Reorganized Remington, the Litigation Trust Beneficiaries and the Litigation Trustee, establishing and delineating the terms and conditions of the Litigation Trust substantially in the form to be filed as part of the Plan Supplement.

81.    *"Litigation Trust Assets"* means the Litigation Claims, the Litigation Trust Fund, and any other assets acquired by the Litigation Trust after the Effective Date or pursuant to the Plan.  For the avoidance of doubt, any Cause of Action settled prior to the Effective Date pursuant to a Litigation Settlement shall not constitute a Litigation Trust Asset.

82.    *"Litigation Trust Beneficiaries"* means the Electing Term Loan Lenders and Electing Third Lien Noteholders.

83.    *"Litigation Trust Expenses"* mean the fees and expenses of the Litigation Trust, including, without limitation, professional fees and expenses incurred in connection with the prosecution of the Litigation Claims.

84.    *"Litigation Trust Fund"* means $5,000,000 in borrowings under the ROC DIP Facility.

85.    *"Litigation Trust Class A Interests"* means the interests, if any, to be issued to the Electing Term Loan Lenders evidencing their interests in the Litigation Trust and the right to receive certain distributions therefrom in accordance with the Litigation Trust Agreement.

86.    *"Litigation Trust Class B Interests"* means the interests, if any, to be issued to the Electing Third Lien Noteholders evidencing their interests in the Litigation Trust and the right to receive certain distributions therefrom in accordance with the Litigation Trust Agreement.

87.    *"Litigation Trust Interests"* means the Litigation Trust Class A Interests and the Litigation Trust Class B Interests.

88.    *"Litigation Trustee"* means that person selected by the Requisite Third Lien Creditors (in consultation with the Requisite Consenting Term Loan Creditors) to act as the trustee of the Litigation Trust or any of his or her or its successors.

89.    *"Management Incentive Plan"* means a customary performance-based incentive plan to be adopted by the Reorganized Parent Board after the Effective Date.

90.    *"Member"* shall mean a member of the Litigation Trust Advisory Board.

91.    *"New ABL Agent"* means Bank of America, N.A., in its capacity as administrative agent under the New ABL Facility Loan Agreement and the other New ABL Facility Documents.

92.    *"New ABL Facility"* means the new $193 million senior secured asset-based revolving credit facility with material terms consisting of those set forth on the commitment letter and term sheet attached as **Exhibit 1** to this Plan, to be made available to Reorganized

9

Remington pursuant to and subject to the terms and conditions of the New ABL Facility Loan Agreement and the other New ABL Facility Documents.

93.    "*New ABL Facility Documents*" means the following documents that will govern the New ABL Facility: (a) the New ABL Facility Loan Agreement and (b) such other financing documents related to the New ABL Facility, including intercreditor agreements, each in form and substance (i) reasonably acceptable to Reorganized Remington, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New ABL Lenders, the New ABL Agent, and the New FILO Term Lenders.

94.    "*New ABL Facility Loan Agreement*" means the loan and security agreement, to be dated as of the Effective Date, that will govern the New ABL Facility, in such form filed with the Plan Supplement, which shall be in form and substance (i) reasonably acceptable to Reorganized Remington and the New FILO Term Lenders, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New ABL Lenders, and the New ABL Agent.

95.    "*New ABL Lenders*" means the financial institutions party from time to time to the New ABL Facility Loan Agreement as lenders or issuing banks, in their respective capacities as such.

96.    "*New ABL Parties*" means the New ABL Agent and the New ABL Lenders.

97.    "*New ABL Required Lenders*" has the meaning ascribed to "Required Lenders" in in **Exhibit 1** hereto.

98.    "*New Boards*" means the Reorganized ROC Board and New Subsidiary Boards.

99.    "*New Common Units*" means the common units in Reorganized ROC to be authorized, issued, or outstanding on and after the Effective Date.

100.    "*New FILO Term Loan Agent*" means in respect of the New FILO Term Loan Facility, Ankura Trust Company, LLC, in its capacities as administrative agent and collateral agent under the New FILO Term Loan Facility Documents.

101.    "*New FILO Term Loan Agreement*" means the credit agreement that will govern the New FILO Term Loan Facility, in such form filed with the Plan Supplement in form and substance (i) reasonably acceptable to Reorganized Remington and, (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New FILO Term Loan Agent, the New ABL Agent, and New FILO Term Loan Lenders.

102.    "*New FILO Term Loan Facility*" means that senior secured first in, last out asset based term loan facility, with last out waterfall priority on ABL priority collateral and first out waterfall priority on Term Loan priority collateral, with material terms consisting of those set forth on the term sheet attached as **Exhibit 4** to this Plan, to be made available to Reorganized Remington pursuant to the New FILO Term Loan Facility Documents.

10

103.    "*New FILO Term Loan Facility Documents*" means the following documents that will govern the New FILO Term Loan Facility, each dated as of the Effective Date: (a) the New FILO Term Loan Agreement, and (b) such other financing documents, including, to the extent necessary and applicable, intercreditor agreements, each in form and substance (i) reasonably acceptable to Reorganized Remington, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New FILO Term Loan Lenders, the New FILO Term Loan Agent, and the New ABL Agent.

104.    "*New FILO Term Loan Lenders*" means those means the financial institution(s) party from time to time to the New FILO Term Loan Agreement as lenders, in their respective capacities as such.

105.    "*New Organizational Documents*" means the new bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, certificates of limited partnership, agreements of limited partnership, or such other organizational documents of Reorganized Remington, which shall be consistent in all respects with the Corporate Governance Term Sheet attached as **Exhibit 2** to this Plan.

106.    "*New Term Loan Agent*" means (a) in respect of the RSA Term Loan Facility Ankura Trust Company, LLC, in its capacities as administrative agent and collateral agent under the New Term Loan Facility Documents, or (b) in respect of an Alternative New Term Loan Facility, the administrative agent and collateral agent thereunder.

107.    "*New Term Loan Agreement*" means the credit agreement that will govern the New Term Loan Facility, in such form filed with the Plan Supplement in form and substance (i) reasonably acceptable to Reorganized Remington, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New ABL Agent, and the New Term Loan Agent.

108.    "*New Term Loan Facility*" means the RSA Term Loan Facility or an Alternative New Term Loan Facility. For the avoidance of doubt, the New Term Loan FILO Facility is an independent facility that is not conditioned upon Reorganized Remington's entry into, and shall under no circumstances be made a part of, the New Term Loan Facility.

109.    "*New Term Loan Facility Documents*" means the following documents that will govern the New Term Loan Facility, each dated as of the Effective Date: (a) the New Term Loan Agreement, and (b) such other financing documents related to the New Term Loan Facility, including, to the extent necessary and applicable, intercreditor agreements, each in form and substance (i) reasonably acceptable to Reorganized Remington, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New Term Loan Agent, and the New ABL Agent.

110.    "*New Term Loan Lenders*" means the financial institution(s) party from time to time to the New Term Loan Agreement as lenders, in their respective capacities as such.

111.    "*New Subsidiary Boards*" means the initial board of directors or managers (as applicable) for Reorganized Remington (other than Reorganized ROC), as appointed pursuant to Article V.I.

11

112.    "*New Warrants*" means four-year warrants for 15% of Reorganized ROC equity at a strike price calculated based on a $700 million enterprise value for Reorganized ROC issued pursuant to the Warrant Agreement.

113.    "*Notice of Entry of Confirmation Order*" means a notice to be sent by Reorganized Remington following the entry of the Confirmation Order stating that the Bankruptcy Court has confirmed the Plan and providing such other information as required by the Confirmation Order.

114.    "*Other Secured Claim*" means any Secured Claim against any Remington Entity other than an Administrative Expense, ABL DIP Claim, Term DIP Claim, ROC DIP Claim, Priority Claim, ABL Facility Claim, Term Loan Claim, or Third Lien Notes Claim.

115.    "*OpCo*" has the meaning specified in the Introduction hereto.

116.    "*OpCo Bridge Payoff Letter*" means that certain postpetition Termination Agreement, by and among OpCo as Borrower, the guarantors and lenders from time to time party thereto, and the Term Loan Agent, as agent, as amended, modified, or supplemented from time to time, as approved by the DIP Orders.

117.    "*PBGC*" means the Pension Benefit Guaranty Corporation.

118.    "*Pension Plans*" has the meaning specified in Article V.P.

119.    "*Petition Date*" means March 25, 2018.

120.    "*Plan*" has the meaning specified in the Introduction hereto.

121.    "*Plan Supplement*" means the compilation of documents (or forms thereof), schedules, and exhibits to the Plan, as each may be amended, supplemented, or modified from time to time in accordance with the Plan, Restructuring Support Agreement, Bankruptcy Code, and Bankruptcy Rules, to be filed with the Bankruptcy Court in accordance with Article X.A.3, including, as applicable: (a) the New Organizational Documents; (b) a list of the members of the New Boards; (c) the Litigation Trust Agreement, if any; (d) the identity of the Litigation Trustee, if any; (e) the New ABL Facility Loan Agreement; (f) the New Term Loan Agreement; (g) New FILO Term Loan Agreement; (h) the Warrant Agreement, and (i) such other documents as are necessary or advisable to implement the Restructuring Transactions contemplated by the Restructuring Support Agreement and the Plan, each of which shall be consistent in all respects with the Restructuring Support Agreement and, except as otherwise provided herein, reasonably acceptable in form and substance to the Requisite Consenting Creditors, the ABL DIP Agent, and the New FILO Term Loan Lenders (*provided, however*, that to the extent any of the ABL Parties or Term DIP Lenders are materially affected, acceptable to the ABL DIP Agent or the Term ROC DIP Agent, respectively, in their sole and absolute discretion). For the avoidance of doubt, the Remington Entities shall have the right to amend, supplement, or modify the Plan Supplement through the Effective Date in accordance with the Plan, Restructuring Support Agreement, Bankruptcy Code, and Bankruptcy Rules; *provided that* any such amendment or modification (i) shall be reasonably acceptable in form and substance to the Requisite Consenting Creditors, the ABL DIP Agent, and the New FILO Term Loan Lenders (*provided,*

12

*however*, that to the extent any of the ABL Parties or Term DIP Lenders are materially affected, acceptable to the ABL DIP Agent or the Term/ROC DIP Agent, respectively, in their sole and absolute discretion) and (ii) shall not cause Class 6 General Unsecured Claims to be Impaired.

122.     "*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

123.     "*Priority Non-Tax Claim*" means any Claim against any Remington Entity entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense, ABL DIP Claim, Term DIP Claim, ROC DIP Claim, or Priority Tax Claim.

124.     "*Priority Tax Claim*" means any Claim of a Governmental Unit against any Remington Entity entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

125.     "*Privileges*" shall have the meaning set forth in Article VI.B.

126.     "*Pro Forma Equity*" means the New Common Units to be issued under the Plan on the Effective Date.

127.     "*Pro Rata*" means, for the holder of an Allowed Claim or Interest in a particular Class, proportional to the ratio of the amount of such Allowed Claim or Interest to the amount of all Allowed Claims or Interests (as applicable) in the same Class.

128.     "*Pro Rata Class 4 Share*" means, for each Electing Term Loan Lender, proportional to the ratio of all Allowed Class 4 Claims of such Electing Term Loan Lender to the amount of all Allowed Class 4 Claims held by all Electing Term Loan Lenders determined in each case by reference to such claims held as of the Voting Record Date.

129.     "*Pro Rata Class 5 Share*" means, for each Electing Third Lien Noteholder, proportional to the ratio of all Allowed Class 5 Claims of such Electing Third Lien Noteholder to the amount of all Allowed Class 5 Claims held by all Electing Third Lien Noteholders determined in each case by reference to such claims held as of the Voting Record Date.

130.     "*Professional*" means any Entity that is, by Bankruptcy Court order: (a) employed for legal, financial advisory, accounting, or other professional services during the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code and to be compensated and reimbursed therefor in accordance with sections 327, 328, 329, 330, 331, and/or 1103 of the Bankruptcy Code; or (b) allowed compensation and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code upon a motion on notice; provided, however, that "Professional" shall not include any professional-service Entity that the Remington Entities are authorized to employ, compensate, and reimburse in the ordinary course of its businesses. For the avoidance of doubt, "Professional" does not include any professional-service Entity retained by the ABL Parties, the Term DIP Agent, or the Requisite Consenting Lenders, whose fees shall be reimbursed by the Remington Entities in accordance with the terms and conditions of the Interim DIP Order, the Final DIP Order, or this Plan.

13

131.    "*Professional Fees*" means the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement for expenses incurred, by Professionals, that:  (a) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date; (b) have not been denied by the Bankruptcy Court by Final Order; (c) have not been previously paid (regardless of whether a fee application has been filed for any such amount); and (d) remain outstanding after applying any retainer that has been provided to such Professional.  To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order of the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

132.    "*Professional Fees Escrow Account*" means the account established on the Effective Date pursuant to Article II.C.2.

133.    "*Released Claims*" has the meaning specified in Article IX.F.

134.    "*Released Parties*" means to the extent such party has not opted out of being a Releasing Party (as set forth in the definition thereof), all of the following, each in their respective capacities as such: (a) Reorganized Remington, (b) the Term/ROC DIP Agent, (c) the Term DIP Lenders, (d) the Term Loan Agent, (e) the ABL DIP Agent, (f) the ABL DIP Facility Lenders, and each of the "Secured Parties" as defined in the ABL DIP Facility Loan Agreement, (g) the ABL Lenders and each of the "Secured Parties" as defined in the ABL Facility Loan Agreement, (h) the ABL Agent, (i) the Third Lien Notes Indenture Trustee; (j) the Consenting Creditors; (k) the New FILO Term Loan Lenders; (l) to the extent that the applicable foregoing Entity has not opted out of being a Releasing Party, each of the foregoing Entities' respective successors, assigns, current and former shareholders, subsidiaries, directors, officers, funds, affiliates, members, employees, partners, limited partners, general partners, members, management companies, investment managers, investment advisors, investment bankers, financial advisors, restructuring advisors, accountants, managers, agents, representatives, principals, consultants, attorneys, and professional advisors (each in their capacity as such); (m) to the extent that the applicable foregoing Entity has not opted out of being a Releasing Party (or, in the case of any Entity identified in clause (l), if the party in clause (a) through (k) to which such Entity relates has not opted out of being a Releasing Party), each such Entity's, other than Reorganized Remington's and ROC's, predecessors; and (n) with respect to the Remington Entities, each of their investment bankers, financial advisors, restructuring advisors, accountants, consultants, attorneys, and professional advisors.  "Released Parties" shall not include any Unreleased Debtor Party or any Entity that "opts out" of being a Releasing Party (as described in the definition therefor); *provided, however,* that for the avoidance of doubt, Reorganized Remington shall be deemed a "Released Party" notwithstanding that Reorganized Remington is not a "Releasing Party."

135.    "*Releasing Parties*" means all of the following, each in their respective capacities as such: (a) the Remington Entities; (b) Released Parties (each in their capacity as such, but not including any current or former employees of Reorganized Remington, or any current or former employees of any of the other Released Parties); (c) each present and former holder of a Claim or Interest who either votes to accept the Plan or is conclusively presumed to have accepted the Plan; (d) each present and former holder of a Claim or Interest who is entitled to vote on the Plan

14

and (i) either votes to reject the Plan or abstains from voting to accept or reject the Plan and (ii) does not check the appropriate box on such holder's ballot to indicate such holder opts not to grant the releases provided under the Plan; and (e) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, subsidiaries, directors, officers, funds, affiliates, members, partners, limited partners, general partners, management companies, investment managers, managers, investment advisors, investment bankers, financial advisors, restructuring advisors, accountants, managers, agents (other than employees), representatives (other than employees), principals, consultants, attorneys, and professional advisors (each in their capacity as such). For the avoidance of doubt, the term "employees," as used in this paragraph, refers to employees solely in their capacities as such and does not exclude any officers and/or directors from the definition of "Releasing Parties" to the extent an employee acts or acted in such capacity.

136.   "*Reorganized OpCo*" means OpCo or any successor thereto, by merger, consolidation, or otherwise, in each case on or after the Effective Date.

137.   "*Reorganized Remington*" means, collectively, Reorganized ROC and its direct and indirect subsidiaries, or any successors thereto, by merger, consolidation, or otherwise, in each case on or after the Effective Date.

138.   "*Reorganized ROC*" means ROC or any successor thereto, by merger, consolidation, or otherwise, in each case on or after the Effective Date.

139.   "*Reorganized ROC Board*" means the initial board of Directors of Reorganized ROC, as appointed pursuant to Article V.I.

140.   "*Requisite Consenting Creditors*" means, as of any time of determination, a group of creditors that includes the Requisite Term Loan Creditors and Requisite Third Lien Creditors.

141.   "*Requisite Consenting Term Loan Creditors*" means, as of any time of determination, the Consenting Term Loan Creditors holding a majority of the aggregate amount of all Term Loan Claims held at such time by all of the Consenting Term Loan Creditors.

142.   "*Requisite Consenting Third Lien Creditors*" means, as of any time of determination, the Consenting Third Lien Creditors holding a majority of the aggregate amount of all Third Lien Notes Claims held at such time by all of the Consenting Third Lien Creditors.

143.   "*Restructuring*" means the comprehensive restructuring of the existing debt and other obligations of the Remington Entities on the terms and conditions set forth in this Plan and the Restructuring Support Agreement.

144.   "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of February 11, 2018, by and among the Remington Entities and the Consenting Creditors, together with all exhibits and schedules thereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

145.   "*Restructuring Transactions*" has the meaning set forth in Article V.B.

15

146.    "*ROC*" has the meaning specified in the Introduction hereto.

147.    "*ROC DIP Claims*" means all Claims against any Remington Entity arising on account of the ROC DIP Facility.

148.    "*ROC DIP Distribution*" means a distribution of 17.5% of the New Common Units of Reorganized ROC, plus Cash in an amount equal to all accrued and unpaid postpetition interest on the ROC DIP Facility.

149.    "*ROC DIP Lender*" means ROC in its capacity as lender under the ROC DIP Facility.

150.    "*ROC DIP Facility*" means the component of the Term/ROC DIP Facility made available by ROC to the Remington Entities to provide financing and otherwise extend credit during the pendency of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the Term/ROC DIP Credit Agreement and the DIP Orders.

151.    "*RSA Term Loan Facility*" means the new $100 million senior secured term loan facility with material terms consisting of those set forth on the term sheet attached as **Exhibit 3** to this Plan, to be made available to Reorganized Remington pursuant to the New Term Loan Facility Documents, automatically upon the Effective Date unless the Term/ROC DIP Facility is repaid in Cash with the proceeds of an Alternative New Term Loan Facility.

152.    "*Secured Claim*" means any Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

153.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

154.    "*Settled Intercompany Claim*" means, subject to the terms and conditions of Article X.D of the Plan, any Claim held by ROC or FGI Holding against OpCo (excluding, for the avoidance of doubt, the ROC DIP Claim) and any Claim held by OpCo against ROC or FGI Holding. For the avoidance of doubt, this definition includes claims against OpCo related to that certain Note Purchase Agreement dated May 11, 2017, but does not include any claims that ROC or FGI Holding may have against other parties arising out of or related to that certain Note Purchase Agreement dated May 11, 2017, including claims for breach of fiduciary duty against their directors or former directors. Nothing contained in this Plan shall be construed as an admission that the Settled Intercompany Claims has or lacks merit.

155.    "*Term/ROC DIP Agent*" means Ankura Trust Company, LLC or another financial institution satisfactory to the Required Lenders (as defined in the Term/ROC DIP Credit Agreement), in its capacity as administrative agent under the Term/ROC DIP Credit Agreement.

16

156. *"Term/ROC DIP Credit Agreement"* means that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, by and among OpCo, as borrower, the guarantors party thereto, the Term/ROC DIP Agent, the Term DIP Lenders and the ROC DIP Lender, approved by the DIP Orders.

157. *"Term/ROC DIP Facility"* means the Term DIP Facility and the ROC DIP Facility made available to the Remington Entities to provide financing and otherwise extend credit during the pendency of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the Term/ROC DIP Credit Agreement and the DIP Orders. The terms and conditions of the Term/ROC DIP Facility are more specifically set forth in the commitment letter and term sheets attached as **Exhibit 5** to the Plan.

158. *"Term DIP Claims"* means all Claims against any Remington Entity arising on account of the Term/ROC DIP Facility.

159. *"Term DIP Facility"* means the component of the Term/ROC DIP Facility made available by the Term DIP Lenders to the Remington Entities to provide financing and otherwise extend credit during the pendency of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the Term/ROC DIP Credit Agreement and the DIP Orders.

160. *"Term DIP Lenders"* means the financial institutions party from time to time to the Term/ROC DIP Credit Agreement as lenders under the Term DIP Facility, solely in their respective capacities as such.

161. *"Term Loan Agreement"* means the Term Loan Agreement, dated as of April 19, 2012, by and among OpCo as Borrower, the guarantors and lenders from time to time party thereto, and Bank of America, N.A., as agent, as amended, modified, or supplemented from time to time.

162. *"Term Loan Agent"* means Ankura Trust Company, LLC as successor administrative agent and collateral agent under the Term Loan Agreement.

163. *"Term Loan Claims"* means all Claims against any Remington Entity arising on account of the term loan made available to the Remington Entities pursuant to the Term Loan Agreement, and which constitute "Obligations," as such term is defined in the Term Loan Agreement.

164. *"Term Loan Director"* shall have the meaning set forth in Article V.I.1.

165. *"Term Loan Lenders"* means the financial institutions party from time to time to the Term Loan Agreement as lenders, solely in their respective capacities as such.

166. *"Termination Event"* means a Creditor Termination Event (as set forth in Section 6 of the Restructuring Support Agreement) or a Company Termination Event (as set forth in Section 9 of the Restructuring Support Agreement).

167. *"Third Lien Notes"* shall mean the 7.875% senior secured notes due 2020 issued pursuant to the terms of the Third Lien Notes Indenture.

17

168.    "*Third Lien Notes Claims*" means all Claims against any Remington Entity arising on account of the Third Lien Notes Indenture, and which constitute "Note Obligations," as such term is defined in the Third Lien Notes Indenture; provided, however, that Third Lien Notes Claims shall not include any Claims arising on account of Treasury Notes, which have been extinguished.

169.    "*Third Lien Notes Director*" shall have the meaning set forth in Article V.I.1

170.    "*Third Lien Notes Indenture*" means that certain Indenture, dated as of April 19, 2012, between OpCo and FGI Finance Inc., as Issuers of the 7.875% Senior Secured Notes due 2020, the guarantors named therein, and Wilmington Trust, National Association, as Trustee and Collateral Agent, as amended, modified, or supplemented from time to time.

171.    "*Third Lien Notes Indenture Trustee*" means Wilmington Trust, National Association, as indenture trustee under the Third Lien Notes Indenture.

172.    "*Third Lien Noteholders*" means the holders of the Third Lien Notes Claims, solely in their capacity as such.

173.    "*Third Lien Noteholder Cash Distribution*" means $39.3 million in Cash at ROC to be distributed to the holders of Allowed Third Lien Notes Claims on the Effective Date, *less* all fees and expenses incurred by Willkie Farr & Gallagher LLP, Young Conaway Stargatt & Taylor, LLP, and Perella Weinberg Partners on behalf of the Consenting Third Lien Creditors, *plus* $5.0 million to be distributed on the Effective Date in the event of a Litigation Settlement.

174.    "*Treasury Notes*" means Third Lien Notes that are held by (i) ROC, OpCo, or any other direct or indirect subsidiary of ROC, or (ii) any of the Cerberus Entities.

175.    "*Warrant Agreement*" means that certain warrant agreement in such form filed as **Exhibit 6** to the Plan, which shall be in form and substance reasonably acceptable to Reorganized Remington and the Requisite Consenting Creditors.

176.    "*Unexpired Lease*" means a lease to which one or more of the Remington Entities are party, which lease is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

177.    "*Unreleased Debtor Parties*" means the Remington Entities and each of their predecessors, successors (other than Reorganized Remington), assigns, subsidiaries, current and former shareholders, current and former directors, current and former officers, funds, affiliates, members, employees, partners, limited partners, and general partners.

178.    "*Unimpaired*" means, with respect to a Class, Claim, Interest, or a holder of a Claim or Interest, that such Class, Claim, Interest, or holder is not Impaired.

179.    "*Unsecured Claim*" means any Claim, other than an Administrative Expense, ABL DIP Claim, Term DIP Claim, ROC DIP Claim, Priority Claim, Intercompany Claim, ABL Claim, Term Loan Claim, Third Lien Notes Claim, or Other Secured Claim.

18

180.    *"Voting Record Date"* means March 19, 2018.

B.    *Rules of Interpretation*

For purposes of the Plan and unless otherwise specified herein: (1) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (2) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (3) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (4) all references to articles or Articles are references to the Articles hereof; (5) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the interpretation of, the Plan; (6) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (7) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule or exhibit, as it may thereafter be amended, modified, or supplemented; (8) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (9) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as specifically provided herein; (10) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (11) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (12) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (13) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, and unless specifically stated otherwise , the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate or entity governance matters relating to the Remington Entities or Reorganized

19

Remington shall be governed by the laws of the state of incorporation or organization of the relevant Remington Entity or Reorganized Remington entity, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II
## ADMINISTRATIVE EXPENSES AND
## OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, ABL DIP Claims, Term DIP Claims, ROC DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *General Administrative Expenses*

Each holder of an Allowed General Administrative Expense, to the extent such Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date (or, if payment is not then due, when such payment otherwise becomes due in the applicable Remington Entity's ordinary course of business), unless otherwise agreed by the holder of such General Administrative Expense and the applicable Remington Entity.  For the avoidance of doubt, holders of a General Administrative Expense shall not be required to file a request for payment of a claim with the Bankruptcy Court.

B.    *Restructuring Expenses*

Except as otherwise specifically provided in the Plan, Reorganized OpCo shall, without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash all reasonable and documented accrued and unpaid (i) Creditor Fees and Expenses (as defined in the Restructuring Support Agreement) in accordance with the terms of the Restructuring Support Agreement and the Bankruptcy Code, and (ii) subject to and in accordance with the ABL Loan Facility Agreement, the fees, expenses and other disbursements of the ABL Parties, whether incurred before or after the Petition Date, including without limitation, the reasonable and documented fees and expenses of the ABL Parties' professional advisors.  Reorganized OpCo shall, without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash all reasonable and documented accrued and unpaid fees and expenses of the Term Loan Agent in accordance with that certain Successor Agent Fee Letter, dated March 2, 2018.  Notwithstanding anything to the contrary herein, (i) Cash associated with the Third Lien Noteholder Cash Distribution on the Effective Date shall only be used to satisfy the Third Lien Noteholder Cash Distribution and to fund payment of fees and expenses incurred by Willkie Farr & Gallagher LLP, Young Conaway Stargatt & Taylor, LLP, and Perella Weinberg Partners on behalf of the Consenting Third Lien Creditors; *provided that* documentation of such fees and expenses shall be summary in nature and shall not include billing detail, and (ii) with respect to any professional fees and expenses of non-Remington Entities that are governed by the Final DIP

20

Order, the applicable professionals shall continue to comply with the procedures set forth in the Final DIP Order, including the review rights of the Office of the U.S. Trustee, through the Effective Date of the Plan.

C.    *Professional Fees*

    1.    Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on Reorganized Remington, the Office of the United States Trustee, counsel to the Committee, and all other parties that have requested notice in these Chapter 11 Cases by no later than forty-five (45) days after the Effective Date, unless Reorganized Remington agrees otherwise in writing.  Objections to Professional Fees must be filed with the Bankruptcy Court and served on Reorganized Remington and the applicable Professional no later than seventy-five (75) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Professional Fees Escrow Account; *provided, however,* that if the funds in the Professional Fees Escrow Amount are insufficient to pay the full Allowed amounts of the Professional Fees, Reorganized Remington shall promptly pay any remaining Allowed amounts from its Cash on hand.  For the avoidance of doubt, in no circumstance shall ROC funds be contributed to the Professional Fees Escrow Account or used to pay any Professional Fees except as otherwise provided pursuant to the Plan.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Remington Entities are permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of the Remington Entities' businesses (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of Confirmation.

    2.    Professional Fees Escrow Account

On the Effective Date, Reorganized Remington shall establish the Professional Fees Escrow Account in an amount equal to all asserted Claims for Professional Fees outstanding as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts payable by the Remington Entities or Reorganized Remington).  Amounts held in the Professional Fees Escrow Account shall not constitute property of Reorganized Remington. The Professional Fees Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the Professional Fees Escrow Account following payment to all holders of Claims for Professional Fees under the Plan, any such amounts shall be returned to Reorganized Remington.

Professionals shall estimate their unpaid Claims for Professional Fees incurred in rendering services to the Remington Entities, their Estates or the Committee, as applicable, before and as of the Effective Date and shall deliver such estimate to counsel for the Remington

Entities no later than ten (10) Business Days before the Effective Date; *provided, however,* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of filed Professional Fees Claims. If a Professional does not provide an estimate, the Remington Entities shall estimate the unpaid and unbilled fees and expenses of such Professional in order for such Professional to be entitled to payment from the Professional Fees Escrow Account. The total amount proposed to be allocated to the Professional Fees Escrow Account pursuant to this Section shall be provided to the attorneys for the Remington Entities no later than three (3) Business Days before the Effective Date.

> 3.     Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, Reorganized OpCo shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by Reorganized Remington on and after the Effective Date.  On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized Remington may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

D.     *Term DIP Claims*

On the Effective Date, each holder of an Allowed Term DIP Claim shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Term DIP Claim, have such Allowed Term DIP Claim replaced with obligations in an amount equal to such Allowed Term DIP Claim under the RSA Term Loan Facility or repaid in full in cash with the proceeds of an Alternative New Term Loan Facility. Pursuant to the Restructuring Support Agreement, each holder of an Allowed Term DIP Claim shall be deemed to have consented to receive such treatment for such Allowed Term DIP Claim.  The specific terms and conditions of the New Term Loan Facility will be subject to and may require material modifications depending on the terms and conditions of the New ABL Facility, the New FILO Term Loan Facility, or such other exit asset-based lending facility that Remington enters into on the Effective Date.  For the avoidance of doubt, the obligations under the New FILO Term Loan Facility shall not replace the Allowed Term DIP Claims and no portion of the proceeds of the New FILO Term Loan Facility shall be used in any part to satisfy the Allowed Term DIP Claims.

E.     *ROC DIP Claims*

On the Effective Date, ROC, as the holder of the Allowed ROC DIP Claims, shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed ROC DIP Claims, (i) receive the ROC DIP Distribution, and (ii) be deemed to automatically, and without need for any further action or notice, distribute such ROC DIP Distribution on a Pro Rata basis to the holders of Third Lien Notes Claims, consistent with the distributions described in Article III.B.5.

F.     *ABL DIP Claims*

On the Effective Date, except to the extent such holder has agreed to an alternative treatment (which may include participation in an exit asset-based lending facility), each holder of any Allowed ABL DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, consideration equal to the Allowed amount of such Claim, in Cash, on the Effective Date.

G.     *Priority Tax Claims*

Except to the extent that a holder of a Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim also is secured, such Claim shall, to the extent it is Allowed, be treated as an Allowed Other Secured Claim if such Claim is not otherwise paid or satisfied in full.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF
## CLAIMS AND INTERESTS

A.     *Classification of Claims and Interests*

Claims and Interests, except for Administrative Expenses, ROC DIP Claims, Term DIP Claims, ABL DIP Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class. To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist. To the extent that a particular Claim does not qualify within the description of any Class and the Plan otherwise fails to classify such Claim or specify its treatment, then such Claim shall be deemed to be part of Class 6; *provided, however*, that all rights of the holder(s) of such Claim(s), including the right to object to such classification, and the Remington Entities' and Reorganized Remington's rights and defenses thereto, are reserved.

The Plan constitutes a separate chapter 11 plan of reorganization for each Remington Entity. Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |

23

| Class | Claims or Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 3 | ABL Facility Claims | Unimpaired | Deemed to accept |
| 4 | Term Loan Claims | Impaired | Entitled to vote |
| 5 | Third Lien Notes Claims | Impaired | Entitled to vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed to accept |
| 7 | Intercompany Claims | Unimpaired | Deemed to accept |
| 8 | Settled Intercompany Claims | Impaired | Deemed to reject |
| 9 | Interests in ROC | Impaired | Deemed to reject |
| 10 | Intercompany Interests | Unimpaired | Deemed to accept |

B.    *Treatment of Claims and Interests*

1.    Class 1 – Priority Non-Tax Claims

a.    *Classification*: Class 1 consists of all Allowed Priority Non-Tax Claims. Although all Priority Non-Tax Claims have been placed in one Class for the purposes of nomenclature, the Priority Non-Tax Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.    *Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 1 Claim shall (i) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the later of the Effective Date and the date such Claim becomes due and payable in the ordinary course of business or (ii) be otherwise rendered Unimpaired.

c.    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

a.    *Classification*: Class 2 consists of all Allowed Other Secured Claims. Although all Other Secured Claims have been placed in one Class for the purposes of nomenclature, the Other Secured Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

24

    b.    *Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 2 Claim (i) have its Claim be reinstated or receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the Effective Date or (ii) be otherwise rendered Unimpaired.

    c.    *Voting*: Class 2 is Unimpaired under the Plan.  Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.    Class 3 – ABL Facility Claims

    a.    *Classification*: Class 3 consists of all Allowed ABL Facility Claims. Although all ABL Facility Claims have been placed in one Class for the purposes of nomenclature, the ABL Facility Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

    b.    *Allowance*: Except to the extent previously indefeasibly paid during the Chapter 11 Cases, Class 3 Claims are deemed Allowed in the aggregate principal amount of $114,500,000, plus any pre-petition and post-petition interest, fees, expenses, and other amounts due and owing pursuant to or secured by the terms of the ABL Facility Loan Documents as of the Effective Date.

    c.    *Treatment*: Except to the extent each holder has agreed to an alternative treatment (which may include participation in an exit asset based lending facility), each holder of an Allowed Class 3 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, consideration equal to the Allowed amount of such Claim, in Cash, on the Effective Date.

    d.    *Voting*:  Class 3 is Unimpaired under the Plan.  Therefore, holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

4.    Class 4 – Term Loan Claims

    a.    *Classification*: Class 4 consists of all Allowed Term Loan Claims. Although all Allowed Term Loan Claims have been placed in one Class for the purposes of nomenclature, the Allowed Term Loan Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

25

b.  *Allowance*: Class 4 Claims are deemed Allowed in the aggregate principal amount of $550,475,000, plus any interest, fees, and expenses due and owing pursuant to the terms of the Term Loan Agreement as of the Effective Date.

c.  *Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, its Pro Rata share of (i) 82.5% of the New Common Units, (ii) to the extent such holder is an Electing Term Loan Lender, its Pro Rata Class 4 Shares of either (a) the Litigation Trust Class A Interests, or (b) any amounts allocated for distribution to the Electing Term Loan Lenders under a Litigation Settlement, and (iii) to the extent not previously paid to the Term Loan Lenders in accordance with the terms of the Interim DIP Order, Cash in an amount equal to the approximately $2.67 million interest payment that was due to the Term Loan Lenders on February 1, 2018.

d.  *Voting*:  Class 4 is Impaired under the Plan.  Therefore, holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

5.  Class 5 – Third Lien Notes Claims

a.  *Classification*: Class 5 consists of all Allowed Third Lien Notes Claims. Although all Allowed Third Lien Notes Claims have been placed in one Class for the purposes of nomenclature, the Allowed Third Lien Notes Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.  *Allowance*:  Class 5 Claims are deemed Allowed in the aggregate amount of $226,012,000, plus any interest, fees, and expenses due and owing pursuant to the terms of the Third Lien Notes Indenture as of the Effective Date.

c.  *Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, its Pro Rata share of: (i) the ROC DIP Distribution, (ii) the Third Lien Noteholder Cash Distribution, (iii) the New Warrants, and (iv) to the extent such holder is an Electing Third Lien Noteholder, its Pro Rata Class 5 Shares of either (a) the Litigation Trust Class B Interests, or (b) any amounts allocated for distribution to the Electing Third Lien Noteholders under a Litigation Settlement.  To the extent not previously paid by OpCo to ROC in accordance with the terms of the Interim DIP Order, on the Effective Date, OpCo shall transfer Cash to ROC in an amount equal to $924,375.61 for reimbursement of fees and

26

costs previously paid by ROC between January 30, 2018 and March 16, 2018.

    d.    *Voting*: Class 5 is Impaired under the Plan. Therefore, holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

6.    Class 6 – General Unsecured Claims

    a.    *Classification*: Class 6 consists of all Allowed General Unsecured Claims. Although all General Unsecured Claims have been placed in one Class for the purposes of nomenclature, the General Unsecured Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

    b.    *Treatment*: Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 6 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) payment equal to the Allowed amount of such Claim, in Cash, as an when such Claim becomes due and payable in the ordinary course of the applicable Remington Entity's business or in accordance with applicable court order (plus any interest accrued after the Petition Date with respect to such Claim as may be required by law to render such Claim Unimpaired, as determined by the Remington Entities or ordered by the Bankruptcy Court), or (ii) such other treatment that renders such holder Unimpaired; *provided, that* any Allowed General Unsecured Claim against ROC shall be assumed by Reorganized OpCo in accordance with the foregoing terms.

    c.    *Voting*: Class 6 is Unimpaired under the Plan. Holders of Allowed Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

7.    Class 7 – Intercompany Claims

    a.    *Classification*: Class 7 consists of all Allowed Intercompany Claims. Although all Allowed Intercompany Claims have been placed in one Class for the purposes of nomenclature, the Intercompany Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

    b.    *Treatment*: Each holder of an Allowed Class 7 Claim shall (i) have its Claim be paid, reinstated, or cancelled, to the extent determined appropriate by the Remington Entities, or (ii) receive such other treatment that renders such holder Unimpaired.

27

       c.     *Voting*:  Class 7 is Unimpaired under the Plan.  Holders of Allowed Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

8.     Class 8 – Settled Intercompany Claims

       a.     *Classification:*  Class 8 consists of all Settled Intercompany Claims.

       b.     *Treatment*:  No holder of a Class 8 Claim shall receive a distribution under the Plan.

       c.     *Voting*:  Class 8 is Impaired under the Plan.  Each holder of a Claim in Class 8 shall be deemed to have rejected this Plan and, therefore, is not entitled to vote.

9.     Class 9 – Interests in ROC

       a.     *Classification*: Class 9 consists of all Interests in ROC.

       b.     *Treatment*:  No holder of a Class 9 Interest shall receive a distribution under the Plan.

       c.     *Voting*:  Class 9 is Impaired under the Plan. Each holder of a Claim in Class 9 shall be deemed to have rejected this Plan and, therefore, is not entitled to vote.

10.     Class 10 – Intercompany Interests

       a.     *Classification*: Class 10 consist of all Allowed Interests in the Remington Entities other than in ROC, separately classified by Remington Entity.

       b.     *Treatment*:  Each holder of an Allowed Interest in Class 10 shall (i) have its Interest be reinstated or (ii) receive such other treatment that renders such holder Unimpaired.

       c.     *Voting*:  Class 10 is Unimpaired under the Plan.  Holders of Allowed Interests in Class 10 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect (i) the Remington Entities' or Reorganized Remington's rights and defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims or (ii) the rights and defenses of any holder of Unimpaired Claims in respect of its Unimpaired Claims.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF PLAN

A.    *Voting Classes*

Classes 4 and 5 are Impaired under the Plan; therefore, holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan.

B.    *Presumed Acceptance of the Plan*

Classes 1, 2, 3, 6, 7, and 10 are Unimpaired under the Plan. Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.    *Non-Consensual Confirmation*

Class 8 and Class 9 are Impaired and will not receive a distribution under the Plan. Accordingly, Class 8 and Class 9 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Because Class 8 and Class 9 are deemed to reject the Plan, and to the extent that any other Impaired Class rejects the Plan, the Remington Entities will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. The Remington Entities reserve the right to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, subject in each instance to the Restructuring Support Agreement.

D.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, Reorganized Remington reserves the right to re-classify, with the consent of the Requisite Consenting Creditors, any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

29

## ARTICLE V
## MEANS FOR IMPLEMENTATION OF PLAN

A.    *General Settlement of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims in any Class and Interests in accordance with the Plan are intended to be, and shall be, final.

Although the Plan does not provide for substantive consolidation of the Estates, it also does not contemplate individual recoveries on a debtor-by-debtor basis. Rather, it represents a global and integrated series of compromises and settlements of all Allowed Claims and Interests against the Remington Entities, including, but not limited to, the settlement of all Allowed Claims held by the Consenting Creditors. The treatment of the Consenting Creditors' Claims and the ABL Parties' Claims set forth in the Plan supports maximum recoveries for all other creditors, including the unimpairment of holders of Claims in Class 6 (General Unsecured Claims).

B.    *Restructuring Transactions*

On the Confirmation Date, subject to and consistent with the terms of its obligations under the Plan, the New ABL Facility Documents, the New Term Loan Facility Documents, the New FILO Term Loan Facility Documents, and the Restructuring Support Agreement, and subject to the rights of the Consenting Creditors under the Restructuring Support Agreement, the Remington Entities shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate and other Entity restructuring of their businesses, to otherwise simplify the overall corporate and other Entity structure of the Remington Entities, or to reincorporate or reorganize certain of the Remington Entities under the laws of jurisdictions other than the laws under which such Remington Entities currently are incorporated or formed, which restructuring may include one or more mergers, consolidations, dispositions, liquidations or dissolutions, as may be determined by the Remington Entities to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Remington Entities vesting in one or more surviving, resulting or acquiring entities (collectively, the "Restructuring Transactions"). Subject to the terms of this Plan, in each case in which the surviving, resulting or acquiring Entity in any such transaction is a successor to a Remington Entity, such surviving, resulting or acquiring Entity will perform the obligations of such Remington Entity pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Remington Entity, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring Entity, which may provide that another Remington Entity will perform such obligations.

30

In effecting the Restructuring Transactions, the Remington Entities shall be permitted to: (1) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree; (2) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree; (3) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable state law; and (4) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. The terms of the Restructuring Transactions shall be structured to preserve favorable tax attributes, if any, of the Remington Entities.

C.      *Sources of Consideration for Plan Distributions*

      1.      Issuance of New Common Units and New Warrants

On the Effective Date, Reorganized ROC shall issue the New Common Units and the New Warrants. All of the securities issued pursuant to the Plan shall be duly authorized, validly issued, and fully paid, and non-assessable. Each distribution and issuance referred to in Article VIII shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, ROC, as the holder of the Allowed ROC DIP Claims, shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed ROC DIP Claims, (i) receive the ROC DIP Distribution, and (ii) be deemed to automatically and without need for any further action or notice distribute such ROC DIP Distribution on a Pro Rata basis to the holders of Third Lien Notes Claims, consistent with the distributions described in Article III.B.5.

      2.      Cash

Other than the Third Lien Noteholder Cash Distribution, Reorganized OpCo shall fund distributions under the Plan required to be paid in Cash with Cash on hand, including Cash from operations and any Cash received on the Effective Date, and borrowings under the Term/ROC DIP Facility, the ABL DIP Facility, the New ABL Facility, and the New Term Loan Facility, as applicable.

      3.      New ABL Facility

On the Effective Date, Reorganized Remington shall enter into the $193 million New ABL Facility. The ABL DIP Lenders will commit to provide an exit facility upon Remington's emergence from bankruptcy, subject to the terms and conditions set forth in its commitment letter and the term sheet attached as **Exhibit 1** to this Plan. The borrowers and guarantors under the New ABL Facility will be the same as the existing ABL Facility, and additionally, ROC will

31

become a guarantor after the Third Lien Noteholder Cash Distribution. The New ABL Facility is expected to contain affirmative and negative covenants that are customary for similar facilities, and will be secured by the same assets as the existing ABL Facility.

Confirmation shall be deemed approval of the New ABL Facility, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized Remington in connection therewith) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New ABL Facility, including the New ABL Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, and the New ABL Agent may mutually agree to be necessary to consummate the New ABL Facility. The terms and conditions of the New ABL Facility are more specifically set forth in the commitment letter attached as **Exhibit 1**.

4.    New Term Loan Facility

As of the Petition Date, the Term DIP Lenders have committed to provide the RSA Term Loan Facility (in an amount equal to the Term DIP Facility Claims outstanding as of the Effective Date), which shall refinance the outstanding Term DIP Facility Claims. In the event that Remington's board of directors, in its good faith judgment, determines, prior to the Effective Date, and consistent with the milestone dates set forth in the Restructuring Support Agreement, that one or more alternative commitments for financing (such facility, an "Alternative New Term Loan Facility") with the same or longer maturity and weighted average maturity, the same collateral priority and ranking and the same aggregate principal amount as the RSA Term Loan Facility is available at a lower effective yield (taking into account interest margins, minimum LIBOR rates, original issue discount, upfront fees and other fees, costs and expenses) than the RSA Term Loan Facility or otherwise on terms no less favorable, taken as a whole, to Reorganized Remington than the RSA Term Loan Facility, Remington may accept such commitment and consummate the transactions contemplated thereby without any liability in respect of the RSA Term Loan Facility, including any fees, costs or expenses thereunder; *provided that* (i) the Alternative New Term Loan Facility shall not include any commitment replacing, repaying or refinancing the New FILO Term Loan Facility, and (ii) Remington's acceptance of any Alternative New Term Loan Facility shall not release Remington or Reorganized Remington (after the Effective Date) from liability in respect of the New FILO Term Loan Facility, including any fees, costs or expenses thereunder.

On the Effective Date, Reorganized Remington shall enter into the New Term Loan Facility (in an amount equal to the Term DIP Facility Claims outstanding as of the Effective Date), and the outstanding Term DIP Facility Claims shall be replaced with, or repaid in full in cash with the proceeds of, the obligations under the New Term Loan Facility. Confirmation shall be deemed approval of the New Term Loan, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized Remington in connection therewith) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain and/or

32

effectuate the New Term Loan Facility without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, the New ABL Agent, the New Term Loan Agent, and the New FILO Term Loan Agent (solely to the extent such modification materially affects the New ABL Agent, the New Term Loan Agent or the New FILO Term Loan Agent, as applicable) may mutually agree to be necessary to consummate the New Term Loan Facility. The specific terms and conditions of the New Term Loan Facility will be subject to and may require material modifications depending on the terms and conditions of the New ABL Facility, the New FILO Term Loan Facility, or such other exit asset-based lending facility that Remington enters into on the Effective Date.

     5.     New FILO Term Loan Facility

On the Effective Date, Reorganized Remington shall enter into the New FILO Term Loan Facility. Confirmation shall be deemed approval of the New FILO Term Loan Facility, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized Remington in connection therewith and subject to the terms of conditions of the New FILO Term Loan Facility Documents) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New FILO Term Loan Facility, including the New FILO Term Loan Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, and the New FILO Term Loan Agent may mutually agree to be necessary to consummate the New FILO Term Loan Facility. For the avoidance of doubt, the Remington Entities shall not solicit alternative commitments for financing in place of the New FILO Term Loan Facility.

D.     *Corporate Existence*

Except as otherwise provided in the Plan, each of Reorganized ROC and its direct and indirect subsidiaries shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Remington Entity is incorporated or formed and pursuant to the respective bylaws, limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law).

33

E.      *Vesting of Assets in Reorganized Remington*

Except as otherwise provided in the Plan, on the Effective Date, all property in each Estate, and any property acquired by the Remington Entities pursuant to the Plan shall vest in Reorganized Remington, free and clear of all Liens, Claims, charges, or other encumbrances other than any Unimpaired Claims or any valid liens or security interests securing such Unimpaired Claims; *provided, however,* that (i) each Litigation Claim shall either (a) be treated pursuant to the terms of a Litigation Settlement, or (b) if no such Litigation Settlement occurs with respect to such Litigation Claim, shall be transferred to the Litigation Trust, and (ii) all unsecured claims against ROC as of the Effective Date shall be assumed by Reorganized OpCo on the Effective Date; provided, further, that in respect of any Claims against ROC that are assumed by Reorganized OpCo, Reorganized OpCo shall retain any rights and defenses of ROC in with respect to such assumed claims.  On and after the Effective Date, except as otherwise provided in the Plan, Reorganized Remington may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or causes of action without supervision or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Cancellation of Loans, Securities, and Agreements*

Except as otherwise provided in the Plan (including with respect to Unimpaired Claims), on the Effective Date: (1) the Term/ROC DIP Credit Agreement, the ABL DIP Facility Loan Agreement, the ABL Facility, the Term Loan Agreement, the Third Lien Notes Indenture, the Interests in ROC, any intercompany notes memorializing or evidencing the Settled Intercompany Claims, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Remington Entities giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of, or ownership interest in, the Remington Entities that are reinstated pursuant to the Plan), shall be deemed cancelled, surrendered, and discharged as to the Remington Entities without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and Reorganized Remington shall not have any continuing obligations thereunder or in any way related thereto; and (2) the obligations of the Remington Entities pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Remington Entities (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Remington Entities that are specifically reinstated pursuant to the Plan) shall be deemed satisfied in full, released, and discharged without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity; provided, however, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders to receive distributions under the Plan, (b) with respect to the ABL Facility, as necessary to enforce the terms of the ABL Payoff Letter, including but not limited to the Surviving Obligations (as defined in the ABL Payoff Letter), (c) with respect to the Third Lien Notes Indenture, as necessary to (i) permit the Third Lien Notes Indenture Trustee to

34

take such action as contemplated by the Plan and Confirmation Order, (ii) enforce the rights, Claims and interests of the Third Lien Notes Indenture Trustee vis a vis the Third Lien Noteholders, (iii) preserve any rights of the Third Lien Notes Indenture Trustee as against any money or property distributable to the Third Lien Noteholders, including any priority in respect of payment and the right to exercise any charging lien, provided further, that except with respect to its rights and obligations with respect to this Plan and the Confirmation Order, the Third Lien Notes Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Third Lien Notes Indenture, and (d) solely with respect to the Term Loan Agreement, as necessary to (i) enforce the rights, Claims and interests of the Term Loan Agent and any predecessor thereof vis-a-vis the Secured Parties (as defined in the Term Loan Agreement) and any parties other than Remington or Reorganized Remington, (ii) preserve any rights of the Term Loan Agent and any predecessor thereof as against any money or property distributable to holders of Term Loan Claims, including any priority in respect of payment and the right to exercise any charging lien, and (iii) enforce the terms of the OpCo Bridge Payoff Letter, including but not limited to the Surviving Obligations (as defined in the OpCo Bridge Payoff Letter); provided further, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to Reorganized Remington. Except for the foregoing, the Term Loan Agent and its respective agents shall be relieved of all further duties and responsibilities related to the Financing Agreements (as defined in the Term Loan Agreement) and the Plan, except with respect to such other rights of the Term Loan Agent that, pursuant to the Term Loan Agreement, survive the termination of the Financing Agreements. Subsequent to the performance by the Term Loan Agent of its obligations pursuant to the Plan, the Term Loan Agent and its agents shall be relieved of all further duties and responsibilities related to the Financing Agreements.

G.    *Corporate and Other Entity Action*

On the Effective Date, all actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including: (1) appointment of the New Boards pursuant to Article V.I and any other managers, directors, or officers for Reorganized Remington identified in the Plan Supplement; (2) the issuance and distribution of the New Common Units by Reorganized ROC; (3) entry into the New Organizational Documents; (4) entry into the New ABL Facility Documents; (5) entry into the New Term Loan Facility Documents and the New FILO Term Loan Facility Documents; (6) entry into the Warrant Agreement and the issuance and distribution of the New Warrants by Reorganized ROC pursuant thereto; (7) implementation of the Restructuring Transactions; (8) the establishment of the Litigation Trust and the issuance of the Litigation Trust Interests, in each case, if applicable; and (9) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate or other Entity structure of the Remington Entities or Reorganized Remington, and any corporate or other Entity action required by the Remington Entities or Reorganized Remington in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, or officers of the Remington Entities or Reorganized Remington. On or before the Effective Date, the appropriate officers of the Remington Entities or Reorganized Remington, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and

35

instruments contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name, and on behalf, of Reorganized Remington, including any and all agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article V.G shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

H.    *New Organizational Documents*

On or immediately prior to the Effective Date or as soon thereafter as is practicable, Reorganized Remington shall, to the extent such New Organizational Documents were included in the Plan Supplement, file their New Organizational Documents (if so required under applicable state law) with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, Reorganized Remington may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the Plan, the laws of their respective states, provinces, or countries of incorporation or formation, and their respective New Organizational Documents, without further order of the Bankruptcy Court.

I.    *Directors and Officers of Reorganized Remington and its Subsidiaries*

As of the Effective Date, the terms of the current members of the boards of directors or managers (as applicable) of the Remington Entities shall expire, such directors shall be deemed to have resigned, and the initial boards of directors or managers (as applicable), including the New Boards, and the officers of each Reorganized Remington entity shall be appointed in accordance with the respective New Organizational Documents. The members of the New Boards will be identified in the Plan Supplement, together with biographical information. If any such director, manager, or officer of Reorganized Remington is an "insider" under the Bankruptcy Code, the Remington Entities also will disclose the nature of any compensation to be paid to such director or officer. Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized Remington.

1.    Reorganized ROC Board

The Reorganized ROC Board shall consist of seven (7) initial Directors appointed as follows on the Effective Date: (i) four (4) Directors appointed by the Requisite Consenting Term Loan Creditors (each, a "Term Loan Director"); (ii) two (2) Directors appointed by the Requisite Consenting Third Lien Creditors (the "Third Lien Notes Director"); and (iii) the CEO Director.

Thereafter, for so long as they own certain amounts of Reorganized ROC equity, certain stockholders of Reorganized ROC will have the right to appoint one or more directors to the Reorganized ROC Board, subject to the terms and conditions of the New Organizational Documents. Except as provided below, in the event that any Designated Director for any reason ceases to serve as a member of the Reorganized ROC Board, the resulting vacancy on the

36

Reorganized ROC Board shall be filled by a person designated by the party who designated such Designated Director.  In the event that the CEO Director for any reason ceases to serve as a member of the Reorganized ROC Board (including as a result of ceasing to be Reorganized Remington's chief executive officer), the CEO Director board seat shall remain vacant until Reorganized Remington's chief executive officer is next appointed by the Reorganized ROC Board.  Following the loss of any party's right to appoint a Designated Director, such party will cause its Designated Director to promptly resign, and the board seat formerly occupied by such Designated Director will thereafter be subject to a one-year term, with the vacancy resulting from such loss of designation rights initially filled by a vote of the holders of the New Common Units (determined by plurality) at a special meeting called for such purposes and, thereafter, shall be elected annually by the holders of the New Common Units.

      2.      New Subsidiary Boards

On the Effective Date, the New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents.

      3.      Certain Personnel

On and after the Effective Date until June 30, 2018, COAC shall continue to make available to Reorganized Remington each of Jim Geisler, John Kwapis, Jason Bixby, and Jed Dunbar, and COAC in accordance with past practice under the prepetition agreement between COAC and ROC (the "Existing COAC Agreement"); *provided, however,* that on and prior to the Effective Date, the Existing COAC Agreement shall be deemed to be amended (the "COAC Amendment") to provide that COAC shall pay for the foregoing personnel without any cost to the Remington Entities or Reorganized Remington.

J.     *Effectuating Documents; Further Transactions*

On and after the Effective Date, Reorganized Remington and the officers and members of the boards of directors thereof are authorized to, and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued pursuant to the Plan in the name, and on behalf, of Reorganized Remington, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan or the New Organizational Documents.

K.     *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

L.    *Litigation Trust*

Pursuant to Article VI hereof, a Litigation Trust shall be established in the event that Litigation Claims are not settled or otherwise resolved through a Litigation Settlement prior to the Effective Date. For the avoidance of doubt, if a Litigation Settlement occurs, the Litigation Trust will not be established.

M.    *Preservation of Litigation Claims*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VI and Article IX, each Remington Entity shall retain all rights to commence and pursue, as appropriate, any and all Litigation Claims that such Remington Entity or its Estate may hold whether arising before or after the Petition Date, including any actions specifically identified in the Plan Supplement, and such rights to commence, prosecute, settle, or assert as a defense such Litigation Claims shall be preserved notwithstanding the occurrence of the Effective Date. No Litigation Claim belonging to any of the Remington Entities prior to the occurrence of the Effective Date shall be settled without the consent of the Requisite Consenting Creditors. Unless any Litigation Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, each Remington Entity and its Estate expressly reserve any and all Litigation Claims that such Remington Entity or its Estate may hold.

If a Litigation Trust is established, any and all Litigation Claims that constitute Litigation Trust Assets shall be transferred to the Litigation Trust on the Effective Date, and the Litigation Trustee shall be entitled to enforce all rights to commence and pursue any such Litigation Claims at the Direction of the Litigation Trust Advisory Board in accordance with the terms of the Litigation Trust Agreement.  If a Litigation Trust is established, the Litigation Trust expressly reserves any and all Litigation Claims that constitute Litigation Trust Assets for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Litigation Claims upon, after, or as a consequence of, the Confirmation or Consummation.

If the Litigation Trust is established, the Litigation Trustee, at the Direction of the Litigation Trust Advisory Board and in accordance with the terms of the Litigation Trust Agreement, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Litigation Claims and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Litigation Claim against it as any indication that Reorganized Remington or the Litigation Trust, as applicable, will not, or may not, pursue any and all available Litigation Claims against it.

38

N.     *Management Incentive Plan*

Following the Effective Date, the Reorganized ROC Board shall reserve a customary amount of the New Common Units for distribution to certain employees of Reorganized Remington pursuant to the Management Incentive Plan. The terms of the Management Incentive Plan and any awards thereunder shall be determined by the Reorganized ROC Board.

O.     *Procedures for Treating Disputed Claims and Interests Under the Plan*

1.     Disputed Claims and Interests Process

Except as otherwise specified in the Plan or required by an order of the Bankruptcy Court, holders of Claims or Interests need not file proofs of claim or interest with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent that a holder of a Claim or Interest files a proof of claim or other request for payment in the Bankruptcy Court, and does not withdraw the same (any such withdrawal being without prejudice to the holder of such Claim or Interest to pursue the same in a court of competent jurisdiction other than the Bankruptcy Court). If a proof of claim or interest or other request for payment is filed in the Bankruptcy Court, and if Remington or Reorganized Remington dispute any such Claim or Interest, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; provided, however, that Remington or Reorganized Remington may elect to object to any proof of claim or interest, and to have the validity or amount of any Claim or Interest adjudicated by, the Bankruptcy Court, if such proof of claim or other request for payment filed in the Bankruptcy Court is not withdrawn; provided further, that holders of Claims or Interests may elect to resolve the validity or amount of any Claim or Interest in the Bankruptcy Court. If a holder makes such an election, the Bankruptcy Court shall apply applicable bankruptcy law and the law that would have governed the dispute if the Chapter 11 Cases had not been filed. Notwithstanding anything to the contrary herein, (1) Reorganized Remington shall retain all defenses and counterclaims to Claims and Interests under applicable law, including, but not limited to, setoff and recoupment and (2) notwithstanding anything to the contrary herein, on the Effective Date, any proof of claim or interest filed by an Entity whose Allowed Claim or Allowed Interest is otherwise addressed, resolved, paid, or satisfied by the Plan shall be automatically expunged without further notice to or action, order, or approval of the Bankruptcy Court. To the extent any holder of a Claim or Interest files a proof of claim or interest with the Bankruptcy Court and does not withdraw the same, any objections to any such proof of claim or interest must be filed by no later than (i) ninety (90) days after the Effective Date if such proof of claim or interest is filed prior to the Effective Date or (ii) ninety (90) days after the date of the filing of such proof of claim or interest if such proof of claim or interest was filed after the Effective Date.

2.     No Distributions Pending Allowance

Notwithstanding anything to the contrary herein, if any portion of a Claim or Interest is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes Allowed.

3.      Distributions after Allowance

To the extent that a Disputed Claim or Disputed Interest ultimately becomes Allowed, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment finding or deeming any Disputed Claim or Disputed Interest to be Allowed has become a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest (except to the extent payment of interest on such Allowed Claim is required by Article III.B.6).

P.      *Pension Plans*

On the Effective Date, Reorganized OpCo or one of the Reorganized Remington entities shall assume and continue to maintain the Remington Company Inc. Pension and Retirement Plan and the Marlin Firearms Company Employees' Pension Plans (collectively, the "Pension Plans") in accordance with the terms of the Pension Plans (as such terms may be amended from time to time) and applicable non-bankruptcy law (and Reorganized Remington reserves all of its rights thereunder), and shall pay any aggregate unpaid minimum funding contributions, with interest, for the Pension Plans under ERISA or the Internal Revenue Code.  After the Effective Date, Reorganized OpCo shall (i) satisfy the minimum funding requirements under 26 §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 for the Pension Plans, (ii) pay all required PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307 for the Pension Plans, and (iii) administer the Pension Plans in accordance with the applicable provisions of ERISA and the Internal Revenue Code (and Reorganized Remington reserves all of its rights thereunder).  With respect to the Pension Plans, no provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve Reorganized Remington, or their successors, from liabilities or requirements imposed under any law or regulatory provision arising after the Effective Date with respect to the Pension Plans or the PBGC.  The PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability with respect to the Pension Plans as a result of any provision of the Plan, this Confirmation Order, or section 1141 of the Bankruptcy Code.  The PBGC and the Reorganized Remington entities agree that all proofs of Claim filed by the PBGC shall be deemed to be withdrawn upon assumption of the Pension Plans on the Effective Date.

## ARTICLE VI
## THE LITIGATION TRUST

A.      *Establishment of Litigation Trust*

The parties shall execute the Litigation Trust Agreement on or before the Effective Date if no Litigation Settlement has occurred.  In the event that a Litigation Settlement does not occur on or before the Effective Date, then on the Effective Date, the Litigation Trust Agreement shall be effective and the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purposes of, among other things, (i) administering the Litigation Trust Assets, (ii) prosecuting, settling, adjusting, retaining, and enforcing any Litigation Claims, (iii) making any distributions as provided for under the Plan and the Litigation Trust Agreement, and (iv)

liquidating the Litigation Trust Assets. Each Electing Term Loan Lender and Electing Third Lien Noteholder has consented to treating its Litigation Claims as Litigation Trust Assets subject to the Litigation Trust Agreement by voting in favor of the Plan or otherwise checking the appropriate box on its ballot to "opt in" to such treatment. Accordingly, pursuant to the Plan, the Litigation Trust Beneficiaries shall be deemed parties to the Litigation Trust Agreement, and the Litigation Trust Agreement shall be binding upon all of the Litigation Trust Beneficiaries, without the need for any Litigation Trust Beneficiary to execute the Litigation Trust Agreement. The Litigation Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Article 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and shall take no action inconsistent with such qualification. The Litigation Trust will be initially funded by the Litigation Trust Fund.

For the avoidance of doubt, if a Litigation Settlement occurs, then no Litigation Trust shall be established and the remaining provisions of this Article VI below shall be of no force or effect.

B.    *Vesting of Assets*

On the Effective Date, provided that a Litigation Settlement does not occur, then the Remington Entities and the Litigation Trust Beneficiaries shall be deemed to transfer all of the Litigation Trust Assets (and, in the case of (x) the Remington Entities, the rights and powers of the Remington Entities' Estates applicable to the Litigation Trust Assets in accordance with section 1141 of the Bankruptcy Code, and (y) the Consenting Third Lien Creditors, the Litigation Trust Fund) to the Litigation Trust, including all information necessary to investigate, prosecute, protect, and conserve all Litigation Claims, free and clear of all liens, Claims, encumbrances, and Interests (legal, beneficial, or otherwise) for the benefit of the Litigation Trust Beneficiaries. For the avoidance of doubt, upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the Remington Entities' rights, title, and interest in the Litigation Trust Assets, and the Remington Entities shall have no further interest in or with respect to the Litigation Trust. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. In connection with the vesting and transfer of the Litigation Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral and including, electronic information) relating to the Litigation Trust Assets (collectively, the "Privileges") shall vest in the Litigation Trust. The Remington Entities, Reorganized Remington, the Consenting Creditors, and the Litigation Trustee shall take all necessary actions to effectuate the transfer of such privileges, protections, and immunities. The Litigation Trust's, Litigation Trustee's, and the Litigation Trust Advisory Board's receipt of the Privileges shall be without waiver in recognition of the joint/successorship interest in prosecuting claims on behalf of the applicable stakeholders of the Remington Entities' Estates.

The transfer of the Litigation Trust Assets to the Litigation Trust shall be made for the benefit and on behalf of the Litigation Trust Beneficiaries. The assets comprising the Litigation Trust Assets will be treated for tax purposes as being transferred by the Remington Entities to the Litigation Trust Beneficiaries pursuant to the Plan in exchange for a portion of their Allowed Claims and then by the Litigation Trust Beneficiaries to the Litigation Trust in exchange for the

41

Litigation Trust Interests in the Litigation Trust. Article VII of the Litigation Trust Agreement ("Tax Matters") is incorporated by reference as if set forth fully herein. The Litigation Trust Beneficiaries shall be treated as the grantors and owners of their respective share of the Litigation Trust Assets. Upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the Remington Entities' rights, title and interest in the Litigation Trust Assets, and the Remington Entities will have no further interest in or with respect to the Litigation Trust.

Except as provided in, and unless expressly released, compromised, or settled in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, the Litigation Trustee, upon the Direction (as defined in the Litigation Trust Agreement) of the Litigation Trust Advisory Board, shall enforce the Litigation Claims, in accordance with sections 1123(a)(5)(A) and 1123(b)(3) of the Bankruptcy Code. For the avoidance of doubt, any Direction of the Litigation Trust Advisory Board to release, compromise, or settle a Litigation Claim must be consistent with the Advisory Board's fiduciary obligations to the Litigation Trust Beneficiaries pursuant to Section 5.3 of the Litigation Trust Agreement. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel, (judicial, equitable, or otherwise), or laches shall apply to the Litigation Trust, the Litigation Trustee, or the Litigation Trust Advisory Board by virtue of or in connection with the confirmation, consummation, or effectiveness of the Plan. No Person or entity may rely on the absence of a specific reference in the Plan to any claim against them as any indication that the Litigation Trustee will not pursue any and all available Litigation Claims against them. Unless any Causes of Action against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Litigation Trustee expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation Order.

In accordance with the Litigation Trust Agreement, the Litigation Trustee will prepare and make available to Litigation Trust Beneficiaries, on an annual basis, a written report detailing, among other things, the litigation status of the Litigation Claims, any settlements entered into by the Litigation Trust, the proceeds recovered to date from the Litigation Trust Assets, and the distributions made by the Litigation Trust. Such report shall be posted on a website maintained by the Litigation Trustee. In addition, the Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article VI.B and Section 7.2 of the Litigation Trust Agreement.

C.      *The Litigation Trustee*

      1.      Appointment

The Litigation Trustee shall be selected no later than thirty (30) days after the Effective Date or as soon as practicable thereafter by the Requisite Third Lien Creditors in consultation with the Requisite Consenting Term Loan Creditors. The Litigation Trustee may be named in

the Confirmation Order if selected prior to the Combined Hearing, or in the Litigation Trust Agreement if selected prior to the deadline for filing the Plan Supplement. Prior to the appointment of the Litigation Trustee, a majority of the Members may exercise all powers otherwise belonging to the Litigation Trustee, in addition to the powers provided to the Litigation Trust Advisory Board, pursuant to the Litigation Trust Agreement.

   2.     Powers

   The powers and responsibilities of the Litigation Trustee shall include, but shall not be limited to, those responsibilities vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee shall maintain good and sufficient books and records of account relating to the Litigation Trust Assets, the management thereof, all transactions undertaken by the Litigation Trustee, all expenses incurred by or on behalf of the Litigation Trustee, and all distributions to Litigation Trust Beneficiaries contemplated or effectuated under the Plan. In connection with the administration of the Litigation Trust, the Litigation Trustee shall have all powers necessary to implement the provisions of the Plan relating to the Litigation Trust, within the bounds of the Plan, the Litigation Trust Agreement, and applicable law.

   3.     Litigation; Responsibilities of Litigation Trustee

   The Litigation Trustee shall, upon the Direction of the Litigation Trust Advisory Board, in an expeditious but orderly manner, and subject to the other provisions of the Plan, the Confirmation Order, and the Litigation Trust Agreement, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions, and not unduly prolong the duration of the Litigation Trust. The Litigation Trust Advisory Board shall take into consideration the Members' fiduciary obligations pursuant to Section 5.3 of the Litigation Trust Agreement and the risks, timing, and costs of potential actions, in exercising its reasonable business judgment to maximize net recoveries to the Litigation Trust Beneficiaries. Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment, or dismissal of any or all claims, rights, or causes of action of the Litigation Claims or otherwise or through the sale or other disposition of the Litigation Trust Assets (in whole or in combination). Consistent with an agreed-upon budget in accordance with Section 3.12(b) of the Litigation Trust Agreement, if any, the Litigation Trustee may incur any reasonable and necessary expenses in connection with liquidating and converting the Litigation Trust Assets to Cash and distribution of the proceeds thereof.

   The Litigation Trust Advisory Board shall have the absolute right to provide Direction to the Litigation Trustee to prosecute, pursue, commence, object to, seek to estimate, seek to subordinate, compromise, settle, or take any other action concerning any and all Litigation Claims as it determines in good faith to be in the best interests of the Litigation Trust Beneficiaries, and consistent with (i) the Members' fiduciary obligations to the Litigation Trust Beneficiaries pursuant to Section 5.3 of the Litigation Trust Agreement; and (ii) the purposes of the Litigation Trust; provided, that neither the Litigation Trustee nor the Litigation Trust Advisory Board Members, and their representatives, shall have any liability for any actions or omissions in accordance with the Litigation Trust Agreement or with respect to the Litigation

43

Trust unless arising out of such Person's own fraud, self-dealing, intentional misrepresentation, willful misconduct, breach of the fiduciary duty of loyalty, or gross negligence. The Litigation Trustee may incur any reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash and shall be reimbursed in accordance with the provisions of the Litigation Trust Agreement. Any and all proceeds generated from the Litigation Trust Assets shall be the property of the Litigation Trust.

4.    Employment of Professionals

The Litigation Trustee may, without further order of the Bankruptcy Court, but subject to the terms of the Litigation Trust Agreement, employ various professionals, including, but not limited to, counsel, experts, consultants, and financial advisors, as needed to assist the Litigation Trustee in fulfilling its obligations under the Plan. Such employment agreements shall be acceptable to the Litigation Trust Advisory Board. Professionals engaged by the Litigation Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. For the avoidance of doubt, unless an alternative fee arrangement has been agreed to (either by order of the Bankruptcy Court, at the Direction of the Litigation Trust Advisory Board, or the Litigation Trustee, as applicable), professionals retained by the Litigation Trustee shall be compensated solely by the Litigation Trust Fund. Any and all proceeds generated from the Litigation Trust Assets shall be the property of the Litigation Trust.

5.    Value of Litigation Trust Assets

As soon as reasonably practicable following the Effective Date, but in no event later than sixty (60) days thereafter, the Litigation Trustee shall inform, in writing, the Litigation Trust Advisory Board and the Litigation Trust Beneficiaries of the value of the Litigation Trust Assets, based on the good-faith determination of the Litigation Trustee. The valuation of the Litigation Trust Assets prepared pursuant to this Article VI.C.5 and Section 1.8 of the Litigation Trust Agreement shall be used consistently by all parties (including the Litigation Trust) for all federal income tax purposes. The Litigation Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Litigation Trust that are required by any governmental unit.

D.    . *Litigation Trust Advisory Board*

1.    Appointment

On or prior to the Confirmation Date, a three-member Litigation Trust Advisory Board shall be appointed as follows: (i) two Members to be appointed by the holders of Litigation Trust Class B Interests; and (ii) one Member to be appointed by the holders of Litigation Trust Class A Interests. The Litigation Trustee shall not be a Member. Each Member shall designate an alternate representative to attend meetings and participate in other activities of the Litigation Trust Advisory Board when the corresponding Member is unavailable to participate in such meetings and activities. With the express written consent of a majority in number of the Members, the Litigation Trust Advisory Board may appoint ex officio members. Such ex officio members shall not be entitled to vote.

44

2.      Authority and Responsibilities

The Litigation Trust Advisory Board shall, as and when requested by the Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or the Litigation Trust Agreement, consult with and advise the Litigation Trustee as to the administration and management of the Litigation Trust in accordance with the Plan, the Confirmation Order, or the Litigation Trust Agreement, and the Litigation Trustee's and the Litigation Trust Advisory Board's fiduciary duties and shall have the other responsibilities and powers as set forth herein.  The Litigation Trust Advisory Board shall have the authority and responsibility to provide Direction with respect to the activities of the Litigation Trust and the performance of the Litigation Trustee and shall have the authority to remove the Litigation Trustee in accordance with Section 4.4 of the Litigation Trust Agreement *provided, however*, that the Litigation Trust Advisory Board may not provide Direction to the Litigation Trustee or the Members to act inconsistently with their duties under the Plan, the Confirmation Order, or the Litigation Trust Agreement, or their fiduciary obligations to the Litigation Trust Beneficiaries; *provided, further*, that the Litigation Trust Class A Trust Representative shall not have the authority to provide Direction to the Litigation Trustee with respect to any Litigation Claims to which only holders of Litigation Trust Class B Interests are entitled to proceeds, as set forth in Section 3.5(a) of the Litigation Trust Agreement. Notwithstanding anything to the contrary herein, the Litigation Trust Class A Trust Representative shall receive notice of and a reasonable opportunity to attend all meetings of the Litigation Trust Advisory Board.

The Litigation Trustee shall consult with and provide information to the Litigation Trust Advisory Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, or the Litigation Trust Agreement to enable the Litigation Trust Advisory Board to meet its obligations hereunder.

Notwithstanding any provision of Litigation Trust Agreement to the contrary, the Litigation Trustee shall not be required to (i) obtain the Direction of the Litigation Trust Advisory Board to the extent that the Litigation Trust Advisory Board has not provided Direction to the Litigation Trustee to take any action that the Litigation Trustee, in good faith, reasonably determines, based on the advice of legal counsel, is required to be taken by applicable law; or (ii) follow the Direction of the Litigation Trust Advisory Board to the extent that the Litigation Trust Advisory Board provides Direction to the Litigation Trustee to take action that the Litigation Trustee, in good faith, reasonably determines, based on the advice of legal counsel, is prohibited by applicable law or by the Litigation Trustee's fiduciary obligations.

E.      *Expense Reserve and Litigation Trust Expenses*

The Litigation Trustee shall establish a segregated account, maintained by the Litigation Trustee, to be funded initially by the Litigation Trust Fund and thereafter by such amounts as reasonably estimated from time to time by the Litigation Trustee as being necessary to assure payment when due of all expenses that the Litigation Trustee anticipates will be incurred in connection with carrying out the provisions of the Plan, the Litigation Trust Agreement, and applicable law, which amounts are to be reserved from distributions to Litigation Trust Beneficiaries.

45

Except as otherwise ordered by the Bankruptcy Court, the Litigation Trust Expenses, on or after the Effective Date, shall be paid in accordance with the Litigation Trust Agreement without further order of the Bankruptcy Court. For the avoidance of doubt, (i) the Litigation Trust Assets may not be used to pay professional fees and expenses other than those of the Litigation Trustee and professionals or vendors retained by the Litigation Trustee or his/her counsel, and (ii) the Remington Entities shall not have any obligation, or be required, to pay any of the Litigation Trust Expenses, other than the Litigation Trust Fund.

F.      *Compensation of the Litigation Trustee*

In addition to reimbursement for the Litigation Trust Expenses, the Litigation Trustee shall, upon the Direction of the Litigation Trust Advisory Board without necessity for review or approval by the Bankruptcy Court or any other Person, shall be paid reasonable compensation as provided by the Litigation Trust Agreement. The reasonable costs and expenses incurred by the Litigation Trustee in performing the duties set forth in the Plan shall be paid by the Litigation Trust from the Litigation Trust Fund. All costs, expenses, and obligations incurred by the Litigation Trustee in administering the Plan, or in any manner connected, incidental, or related thereto, including those of attorneys, accountants, and other persons employed to assist in the administration and distribution of the Litigation Trust Assets, shall be a charge against such assets.

G.      *Litigation Trust Interests*

Each Litigation Trust Interest will entitle its holder to distributions from the Litigation Trust in accordance with the terms of the Litigation Trust Agreement. The Litigation Trust Interests will be uncertificated; thus, distributions of Litigation Trust Interests will be accomplished solely by the entry of the names of the holders and their respective Litigation Trust Interests in the books and records of the Litigation Trust. Each holder of a Litigation Trust Interest shall take and hold its uncertificated beneficial interest subject to all of the terms and provisions of the Plan, the Confirmation Order, and the Litigation Trust Agreement.

The Litigation Trust Interests shall not be registered pursuant to the Securities Act of 1933, as amended, or any state securities law and shall be exempt from registration thereunder pursuant to section 1145 of the Bankruptcy Code. The Litigation Trust Interests shall be freely transferable; *provided, however*, that the transfer of the Litigation Trust Interests will be prohibited to the extent such transfer would subject the Remington Entities to the registration and reporting requirements of the Securities Act and the Securities Exchange Act of 1934, as amended.

H.      *Distributions by Litigation Trustee*

The Litigation Trustee shall make distributions on account of Litigation Trust Interests in accordance with the terms of the Litigation Trust Agreement. The first $5,000,000 of any aggregate net proceeds of the Litigation Claims shall be allocated on a pro rata basis to the holders of Litigation Trust Class B Interests (the "Initial Distribution"), and any recoveries in excess of $5,000,000 obtained by the Litigation Trust shall be shared equally among the holders of Litigation Trust Class A Interests and holders of the Litigation Trust Class B Interests, if

46

applicable. The Litigation Trustee shall classify and allocate recoveries from Litigation Claims in good faith and consistent with its fiduciary obligations to all Litigation Trust Beneficiaries under Section 3.2 of the Litigation Trust Agreement. Notwithstanding the foregoing, the holders of Litigation Trust Class B Interests shall receive all recovery amounts from any Litigation Claims that (i) are exclusively related to amounts transferred within applicable statutes of limitations from ROC to any transferee, or (ii) belong solely to ROC or any of its stakeholders; *provided, however,* for the avoidance of doubt, that any Litigation Claim based on mismanagement or a fiduciary-duty breach in connection with any potential merger, acquisition or similar change in control transaction of the Remington Entities, or against any third party in connection with the same; or based on mismanagement or a fiduciary-duty breach that had a material adverse effect on the value of any of the non-ROC Remington Entities (excluding claims related to amounts transferred within applicable statutes of limitations from ROC to any transferee, as set forth in (i) above), shall in each case not be deemed to belong solely to ROC.

The identities and entitlements of the Litigation Trust Beneficiaries shall be maintained in a registry of the Litigation Trust, based on the ballots received from holders of Class 4 Claims and Class 5 Claims and using the Voting Record Date (as defined below) as the determinative date for such determination.

The Litigation Trustee shall distribute or cause to be distributed to each Litigation Trust Beneficiary its share of any proceeds of the Litigation Trust Assets semi-annually, or more frequently as otherwise determined upon the Direction of the Litigation Trust Advisory Board, until such time as there are no longer any proceeds to distribute; provided, however, that the Litigation Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation; (ii) to pay or reserve for reasonable administrative expenses (including the costs and expenses of the Litigation Trust and the Litigation Trustee and the fees, costs, and expenses of all professionals retained by the Litigation Trustee, and any taxes imposed on the Litigation Trust or in respect of the assets of the Litigation Trust); and (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Litigation Trust Agreement. All reasonable and documented fees and expenses of the Term Loan Agent or any successor agent designated by the holders of Litigation Trust Class A Interests or the Litigation Trust, as applicable, to receive distributions pursuant to the terms of the Litigation Trust Agreement (including the reasonable and documented fees and expenses of its counsel and agents) incurred in connection with such distributions shall be paid by Reorganized OpCo.

No Cash distributions shall be required to be made to any Litigation Trust Beneficiary in an amount less than $100.00. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions. Notwithstanding the foregoing, all cash shall be distributed in the final distribution of the Litigation Trust.

Notwithstanding the foregoing and the terms of the Litigation Trust Agreement, upon a motion by the Litigation Trustee (filed upon the Direction of the Litigation Trust Advisory Board) asserting reasonable grounds therefor, the Bankruptcy Court shall have the authority to enter an order directing that distributions to be made on account of Litigation Trust Interests issued to the Third Lien Notes Indenture Trustee or the Term Loan Agent instead be made to the

47

beneficial and/or record Third Lien Noteholders and/or Term Loan Lenders. Reasonable grounds shall include, without limitation, an insolvency proceeding relating to the Third Lien Notes Indenture Trustee or Term Loan Agent, or any other circumstance in which the distributions being made on account of Litigation Trust Interests would not or cannot promptly be made to the beneficial Third Lien Noteholders or the Term Loan Lenders.

I.      *Termination*

The Litigation Trust Advisory Board and the Litigation Trust shall be dissolved no later than five years from the Effective Date unless the Litigation Trust Advisory Board determines that a fixed period extension (not to exceed three years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Trust Advisory Board that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

Notwithstanding the foregoing, multiple extensions can be effectuated as long as the Litigation Trust Advisory Board determines that each such extension is necessary at least ninety (90) days prior to the expiration of each extended term; *provided*, *however*, that in no event shall the term of the Litigation Trust extend past ten years from the Effective Date. In the event a Cash balance exists in the Litigation Trust Fund upon termination of the Litigation Trust, (i) if holders of the Litigation Trust Class B Interests have not received, or have only received a portion of, the Initial Distribution contemplated by Article VI.H of the Plan, the difference between $5,000,000 and the portion of the Initial Distribution the holders of Litigation Trust Class B Interests have received shall be distributed to holders of the Litigation Trust Class B Interests, and (ii) any remaining balance shall be shared equally by holders of the Litigation Trust Class A Interests and Litigation Trust Class B Interests.

## ARTICLE VII
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise ordered by the Bankruptcy Court or provided herein, all Executory Contracts and Unexpired Leases of the Remington Entities, including the Existing Employment Agreements, shall be deemed assumed by the applicable Remington Entity counterparty in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, on the Effective Date, all Executory Contracts and Unexpired Leases to which ROC or FGI Holding is a party shall be deemed assumed by Reorganized OpCo; provided, that all federal, state, or local government licenses, permits, and similar rights or privileges held by ROC shall be deemed assumed on the Effective Date by Reorganized ROC. All indemnification contracts and employment contracts to which one or more Remington Entities is a party shall be rejected to the extent permitted by law unless expressly assumed prior to the Effective Date or pursuant to the terms of this Plan.

48

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, and assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article VII.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in, and be fully enforceable by, Reorganized OpCo in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Remington Entity that is party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.       *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of Reorganized OpCo or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of the applicable cure amount, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

C.       *Insurance Policies*

Each of the insurance policies of the Remington Entities, including all director and officer insurance policies in place as of the Petition Date are deemed to be and treated as Executory Contracts under the Plan.  On the Effective Date, the Remington Entities shall be deemed to have assumed all insurance policies, including all director and officer insurance policies in place as of the Petition Date.

49

D.    *Employment Agreements*

On the Effective Date, Reorganized OpCo shall be deemed to have assumed that certain Employment Agreement dated as of August 15, 2015, by and between Remington Outdoor Company, Inc. and Stephen P. Jackson, Jr., and that certain Employment Agreement dated as of October 19, 2017, by and between Remington Outdoor Company, Inc. and Anthony A. Acitelli (collectively, the "Existing Employment Agreements"). The Existing Employment Agreements are the only two employment contracts of which the Remington Entities are aware.

E.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is assumed and, if applicable, assigned to OpCo, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts or Unexpired Leases that have been executed by the Remington Entities during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith; *provided*, that the Remington Entities shall not execute any material modification, amendment, supplement, and/or restatement on or after the Confirmation Date and prior to the Effective Date without the consent of the Requisite Consenting Creditors, which consent shall not be unreasonably withheld, and upon notice to the ABL DIP Agent.

F.    *Reservation of Rights*

Nothing contained in the Plan shall constitute an admission by the Remington Entities that any Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease or that the Remington Entities or Reorganized Remington has any liability thereunder.

G.    *Non-Occurrence of Effective Date*

In the event that the Effective Date does not occur prior to such time as the applicable Chapter 11 Case is closed, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    *Contracts and Leases Entered into after Petition Date*

Contracts and leases entered into after the Petition Date by any Remington Entity, including any Executory Contracts and Unexpired Leases assumed by a Remington Entity, will be performed by the applicable Remington Entity or Reorganized OpCo, as the case may be, liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

I.    *Rejection Damages Claims*

If the rejection of an executory contract or unexpired lease by the Remington Entities results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be classified and treated in Class 6 (General Unsecured Claims).

## ARTICLE VIII
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, on the Effective Date (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class; *provided however*, that holders of Third Lien Notes Claims will receive their distribution (other than any such distributions of Litigation Trust Interests) on, or as soon as practicable after, the Effective Date via customary methods to make distributions through DTC, including via a mandatory exchange upon surrender of the Third Lien Notes Claims. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

B.    *Application of Distributions*

Any distribution made under the Plan on account of an Allowed Claim shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to any portion of such Claim for accrued but unpaid interest.

C.    *Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. If the Disbursing Agent is one or more of Reorganized Remington, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized OpCo.

D.    *Rights and Powers of Disbursing Agent*

1.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (d) exercise such other

51

powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

     2.     Incurred Expenses

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and documented expenses incurred by the Disbursing Agent on and after, or in contemplation of, the Effective Date (including taxes) and any reasonable compensation and documented expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by Reorganized OpCo.

E.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

     1.     Delivery of Distributions to Term Loan Agent and Third Lien Notes Indenture Trustee

No later than two (2) Business Days after the Distribution Record Date, the Term Loan Agent shall provide to counsel to the Remington Entities a list of all holders of Term Loan Claims as of such date and such additional information as reasonably requested by counsel to the Remington Entities or the Disbursing Agent required to make distributions under the Plan. The Term Loan Agent may, in its sole discretion, limit the further assignment of Term Loan Claims to allow for the accurate recording of the holders of Term Loan Claims as of the Distribution Record Date with respect to the Term Loan Claims. All distributions of Cash on account of Term Loan Claims shall be deposited with the Term Loan Agent for distribution to holders of Term Loan Claims in accordance with terms of the Plan and the Term Loan Agreement. All distributions other than Cash on account of Term Loan Claims shall be made by the Disbursing Agent directly to holders of Term Loan Claims or such holder's authorized designee in accordance with terms of the Plan and the Term Loan Agreement. All reasonable and documented fees and expenses of the Term Loan Agent (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the Chapter 11 Cases or the implementation of the Plan, including but not limited to as part of this Article VIII.E.1, shall be paid by Reorganized OpCo.

All distributions to holders of Allowed Third Lien Notes Claims shall be governed by the Third Lien Notes Indenture, including, but not limited to, the provisions therein for the payment of the fees and expenses of the Third Lien Notes Indenture Trustee, and shall be made to each holder of an Allowed Third Lien Notes Claim, or such holder's authorized designee, for purposes of distributions to be made hereunder. Notwithstanding the foregoing, except as otherwise provided in the Plan or reasonably requested by the Third Lien Notes Indenture Trustee, all distributions to holders of Allowed Third Lien Notes Claims shall be deemed completed when made to the Third Lien Notes Indenture Trustee, which shall be deemed to be the holder of all Allowed Third Lien Notes Claims for purposes of distributions to be made hereunder. The Third Lien Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Third Lien Notes Claims. As soon as practicable in accordance with the requirements set forth in this Article VIII, the Third Lien Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders. If the Third Lien Notes Indenture Trustee is unable

52

to make, or consents to Reorganized Remington or the Disbursing Agent making, such distributions, Reorganized Remington or the Disbursing Agent, as applicable, with such Third Lien Notes Indenture Trustee's cooperation, shall make such distributions to the extent reasonably practicable to do so. As to any holder of an Allowed Third Lien Notes Claims that is held in the name of, or by a nominee of, DTC, Reorganized Remington, or the Disbursing Agent, as applicable, shall seek the cooperation of DTC so that such distribution shall be made through the facilities of DTC on or as soon as practicable on or after the Effective Date. All reasonable and documented fees and expenses of the Third Lien Notes Indenture Trustee incurred after the Effective Date as part of this Article VIII.E.1 shall be paid by Reorganized OpCo.

> 2.    Delivery of Distributions in General

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date (provided that the foregoing shall not apply to publicly held securities, including, without limitation, the Third Lien Notes), at the address for each such holder as indicated on the Remington Entities' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of Reorganized Remington. Notwithstanding any of the foregoing, and for the avoidance of doubt, the Distribution Record Date for purposes of making any determinations with respect to qualification of any holder of a Class 4 Claim or Class 5 Claim as an Electing Term Loan Lender, Electing Third Lien Noteholder, or a Litigation Trust Beneficiary, and with respect to receiving any distributions of Litigation Trust Interests under the Plan, shall be made by reference to the Voting Record Date.

> 3.    Minimum Distributions

No fractional New Common Units, New Warrants, or Litigation Trust Interests shall be distributed, and no Cash shall be distributed with respect to such fractional amounts. When any distribution pursuant to the Plan would otherwise result in the issuance of a number of New Common Units, New Warrants, or Litigation Trust Interests that is not a whole number, the actual distribution of New Common Units New Warrants, or Litigation Trust Interests, as applicable, shall be rounded as follows: (a) fractions of greater than one-half (½)shall be rounded to the next higher whole number, and (b) fractions of one-half (½) or less shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized New Common Units, New Warrants, or Litigation Trust Interests, as applicable, to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding. DTC is considered a single holder for rounding and distribution purposes and no additional cash or securities will be distributed to DTC on account of rounding at the DTC participant or beneficial holder level.

> 4.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date

on which such distribution was attempted to be made; provided further, that the Remington Entities or Reorganized Remington, as applicable, shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable.  After such date, all unclaimed property or interests in property shall revert to Reorganized Remington automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred; provided, that all distributions of (i) the ROC DIP Distribution, (ii) the Third Lien Noteholder Cash Distribution, (iii) New Warrants, (iv) Cash, and (v) New Common Units that are unclaimed by a holder of Allowed Class 4 Claims or Allowed Class 5 Claims, as applicable, shall be distributed on a Pro Rata basis to the holders of Allowed Class 4 Claims or Allowed Class 5 Claims, as applicable, whose distributions of the preceding items (i)-(v) on the Effective Date were not returned as undeliverable; provided further, that no unclaimed distributions on account of an Allowed Class 4 Claim shall be distributed to the holders of Allowed Class 5 Claims, and no unclaimed distributions on account of an Allowed Class 5 Claim shall be distributed to the holders of Allowed Class 4 Claims; provided further, that if a Litigation Trust is established pursuant to Article VI of the Plan, each Electing Term Loan Lender whose distributions of the preceding items (i)-(v) were not returned as undeliverable shall receive their Pro Rata Class 4 Share of all unclaimed distributions of Litigation Trust Class A Interests, and each Electing Third Lien Noteholder whose distributions of the preceding items (i)-(v) were not returned as undeliverable shall receive their Pro Rata Class 5 Share of all unclaimed distributions of Litigation Trust Class B Interests.

F.     *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the issuance and distribution of the New Common Units, the New Warrants (and the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests as contemplated by the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration thereunder. In addition, under section 1145 of the Bankruptcy Code, the New Common Units, the New Warrants (and the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments and subject to any restrictions in the New Organizational Documents, the Warrant Agreement, and the Litigation Trust Agreement, as applicable.  Notwithstanding anything to the contrary herein, the transfer of the New Common Units, the New Warrants, and the Litigation Trust Interests will be prohibited to the extent such transfer would subject the Remington Entities to the registration and reporting requirements of the Securities Act and the Securities Exchange Act of 1934, as amended.

G.     *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, Reorganized Remington shall comply with all tax withholding and reporting requirements imposed on them by any

54

Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, Reorganized Remington and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. Reorganized Remington reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

H.      *No Postpetition Interest on Claims and Interests*

Unless otherwise specifically provided for in the Restructuring Support Agreement, Plan, Confirmation Order, or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

I.      *Setoffs and Recoupment*

The Remington Entities and Reorganized Remington are authorized to set off against or recoup from any Claims (to the extent not released pursuant to the Plan) of any nature whatsoever that the Remington Entities or Reorganized Remington may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Remington Entities or Reorganized Remington of any such claim they may have against the holder of such Claim; *provided, however*, that with respect to any Administrative Claims, or Claims or Interests arising under Class 1, 2, 3, 6, 7 or 10, the Remington Entities and Reorganized Remington, as applicable, shall exercise their rights to setoff and recoupment in accordance with applicable non-bankruptcy law.

J.      *Claims Paid or Payable by Third Parties*

        1.      Claims Paid by Third Parties

The Remington Entities or Reorganized Remington, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Remington Entity or Reorganized Remington; *provided, however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to the party that is not a Remington Entity or Reorganized Entity, and such holder in fact repays all or a portion of the Claim to such third party, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Remington Entities or Reorganized Remington, as applicable, and the holder of such Claim. To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Remington Entity or Reorganized Remington entity on account of such Claim,

55

such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Remington Entity or Reorganized Remington entity, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Remington entity annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.  Notwithstanding the foregoing, if a Litigation Trust is established, nothing in this Section VIII(J) shall apply to any treatment or recoveries on account of being a Litigation Trust Beneficiary.

2.    Claims Payable by Third Parties

To the extent that one or more of the Remington Entities' insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court; *provided, however,* if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to a Remington Entity insurer, and such holder in fact repays all or a portion of the Claim to such insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Remington Entities or Reorganized Remington, as applicable, and the holder of such Claim.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Remington Entities or any Entity, including the Litigation Trustee and any holders of Claims, may hold against any other Entity under any insurance policies, including against insurers or any insured, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE IX
## SETTLEMENT, RELEASE, INJUNCTION,
## AND RELATED PROVISIONS

A.    *Compromise and Settlement*

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Remington Entities, their Estates, and all holders of Claims or Interests, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) approved by the Bankruptcy Court pursuant to applicable bankruptcy law.  In addition, the allowance, classification, and treatment of any Allowed Claims of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise

56

under applicable non-bankruptcy law, that may exist between the Remington Entities and any Released Party and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released as set forth in the Plan. The Confirmation Order shall authorize and approve the releases by all Entities of all such contractual, legal, and equitable subordination rights and Causes of Action that are satisfied, compromised, and settled pursuant hereto. Nothing in this Plan shall compromise or settle, in any way whatsoever, (i) any Causes of Action that the Remington Entities or Reorganized Remington, as applicable, may have against any Entity that is not a Released Party or (ii) any Claims or Interests in Classes 1, 2, 3, 6, 7, or 10.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court, but subject in all respects to Article VI, after the Effective Date, except with respect to the Litigation Trust Assets, Reorganized Remington may, in its sole and absolute discretion, compromise and settle (1) Claims (including Causes of Action) against and Interests in the Remington Entities (if any), and (2) claims (including Causes of Action) against other Entities.

B.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the Plan Supplement), the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by Reorganized Remington), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Remington Entities or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose prior to the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), (h), or (i) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests as set forth above subject to the occurrence of the Effective Date. The discharge of all Claims and Interests as set forth above shall not apply to any Litigation Claim unless such Litigation Claim is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Litigation Settlement, or a Bankruptcy Court order. Notwithstanding the foregoing or anything to the contrary in the Plan or in the Confirmation Order, (a) each Administrative Expense and any Claim or Interest arising prior to the Effective Date in Classes 1, 2, 3, 6 (including Claims for rejection damages pursuant to section 365 of the Bankruptcy Code), 7, or 10 of the Plan shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of the Plan (including, for the avoidance of doubt, Articles IX.D.1 and IX.D.2), and (b) Remington and Reorganized Remington shall retain all defenses, counterclaims, rights to setoff, and rights to recoupment, if any, as to the foregoing Claims.

57

C.    *Release of Liens*

Except as otherwise expressly provided in the Plan (including with respect to Unimpaired Claims), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the New ABL Facility Documents, New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the New ABL Facility Documents, New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to Reorganized Remington and each of their successors and assigns.

D.    *Releases of Released Parties*

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to applicable bankruptcy law, of the releases described in this Article IX.D.

1.    Releases by the Remington Entities

Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Released Parties to facilitate the reorganization of the Remington Entities and the implementation of the restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, the Remington Entities, and the Estates are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions and Settled Intercompany Claims), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Remington Entity, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereinafter arising, in law, equity, or otherwise, that the Remington Entities, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Remington Entity), based on or relating to, or in any manner arising from, in whole or in part, the Remington Entities, the Chapter 11 Cases, the ABL DIP Claims, the Term DIP Claims, the ROC DIP Claims, the ABL Facility Claims, the Term Loan Claims, the Third Lien Notes Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Remington Entities or Reorganized Remington, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Remington Entity and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of: (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New Term Loan Facility, (iii) the New FILO Term Loan Facility, (iv)

58

the New ABL Facility, (v) the Disclosure Statement, (vi) the Restructuring Support Agreement, or (vii) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence. For the avoidance of doubt, the releases described in this Article IX.D.1 do not release any Litigation Claim asserted or that could be asserted against any Unreleased Debtor Parties or any Independent Directors and Officers. However, such Litigation Claims may be released pursuant to a Litigation Settlement. Any recovery on account of any potential and/or actual claims against the Independent Directors and Officers of the Remington Entities shall be within and to the extent of the limits of liability and the scope of coverage afforded by the insurance held by the Remington Entities.

      2.      Third-Party Releases by Holders of Claims or Interests

      Except as otherwise expressly provided in the Plan, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Remington Entity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Remington Entity), based on or relating to, or in any manner arising from, in whole or in part, the Remington Entities, the Chapter 11 Cases, the ABL DIP Claims, the Term DIP Claims, the ROC DIP Claims, the ABL Facility Claims, the Term Loan Claims, the Third Lien Notes Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Remington Entities or Reorganized Remington, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Remington Entity and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of: (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New Term Loan Facility, (iii) the New ABL Facility, (iv) the Disclosure Statement, (v) the Restructuring Support Agreement, or (vi) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.  For the avoidance of doubt, the releases described in this Article IX.D.2 do not release (i) any Litigation Claim asserted or that could be asserted against any Unreleased Debtor Parties or any Independent Directors and Officers or (ii) any Claims or Interests under Classes 1, 2, 3, 6, 7, or 10. However, such Litigation Claims may be released pursuant to a Litigation Settlement. Any recovery on account of any

59

potential and/or actual claims against the Independent Directors and Officers of the Remington Entities shall be within and to the extent of the limits of liability and the scope of coverage afforded by the insurance held by the Remington Entities.

E.    *Exculpation*

Except as otherwise expressly provided in the Plan, and to the extent permitted under Section 1125(e) of the Bankruptcy Code, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any claims (including any Cause of Action), whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereinafter arising, in law, equity, or otherwise, related to or arising out of any act taken or omitted to be taken in connection with, or relating to, negotiation of and entry into the Restructuring Support Agreement, the ABL DIP Facility Loan Agreement, the Term/ROC DIP Credit Agreement, the New ABL Facility Documents, the New Term Loan Facility Documents, the New FILO Term Loan Facility Documents, the issuance of the New Common Units and the New Warrants pursuant to this Plan, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the preparation or filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the Restructuring Transactions, and the administration and implementation of the Plan, including the issuance of any securities or the distribution of property under the Plan or any other agreement or any obligation, cause of action, or liability for any such Claim; provided, however, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence; provided further, that in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan; provided, further that the exculpations set forth herein shall not be deemed a release of any claims or Causes of Action that are otherwise expressly preserved by the Plan.    The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Injunction*

Except as otherwise expressly provided in the Plan (including, for the avoidance of doubt, Article XIII.G) and, if applicable, the Litigation Trust Agreement, and except for obligations issued pursuant to the Plan, including with respect to the New ABL Facility, the New Term Loan Facility, and the New FILO Term Loan Facility, all Entities (along with their respective current or former employees, agents, officers, directors, principals, and affiliates) who have held, hold, or may hold claims, Causes of Action, or interests that have

been released pursuant to Article IX.D (the "Released Claims") or discharged pursuant to Article IX.B (the "Discharge"), or that are subject to exculpation pursuant to Article IX.E (the "Exculpation"), are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties or the Exculpated Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; (2) enforcing, attaching, collecting, or recovering, by any manner or means any judgment, award, decree or order against the Released Parties or the Exculpated Parties, as applicable, on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Released Parties or the Exculpated Parties, as applicable, or their property or assets on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; and (4) asserting any right of subrogation, setoff (except with respect to setoffs properly exercised prior to the Petition Date) of any kind against any obligation due from the Released Parties or the Exculpated Parties, as applicable, or against their property or assets on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation. Pursuant to sections 1142 and 105 of the Bankruptcy Code, from and after the Effective Date, all holders of Claims and Interests and other parties in interest, along with their respective current or former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan; provided, that if a Litigation Trust is established, this Section F shall not apply to the Litigation Trustee, the Litigation Trust Advisory Board, or any Litigation Trust Beneficiary, each, solely in its capacity as such, and shall not enjoin such parties with respect to the Litigation Trust or any of the Litigation Trust Assets (including the Litigation Claims).

## ARTICLE X
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

A.    *Conditions to Confirmation*

The following are conditions to Confirmation that shall have been satisfied or waived in accordance with Article X.C:

1.    no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred in accordance with the terms of the Restructuring Support Agreement, and no Termination Event shall have occurred and not been waived;

2.    the Confirmation Order shall approve all provisions, terms, and conditions hereof and be in form and substance (i) acceptable to the Remington Entities, the Requisite Consenting Creditors, the ABL DIP Agent, the New ABL Agent, and New FILO Term Loan Lenders, and the ABL Required Lenders, each in its sole

61

and absolute discretion and (ii) to the extent any provision of such order materially affects the New Term Loan Agent, acceptable to the New Term Loan Agent in its sole and absolute discretion; and

3.    the Plan Supplement shall have been filed at least fourteen (14) days prior to the Combined Hearing, and shall be (i) in form and substance reasonably acceptable to the Remington Entities and the Requisite Consenting Creditors, and (ii) to the extent ABL Parties are materially affected, in form and substance acceptable to the ABL DIP Agent in its sole and absolute discretion, and any additional documents or amendments to previously-filed documents shall have been filed as amendments to the Plan Supplement prior to Confirmation.

B.    *Conditions to Effective Date*

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article X.C:

1.    no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred in accordance with the terms of the Restructuring Support Agreement, and no Termination Event shall have occurred and not been waived;

2.    the Bankruptcy Court shall have entered the Final DIP Order in such form and substance as is (i) consented to by each of the Remington Entities and to the Requisite Consenting Creditors, (ii) acceptable to the ABL DIP Agent in its sole and absolute discretion, and (iii) and otherwise consistent with the Restructuring Support Agreement;

3.    Confirmation shall have occurred, the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation shall not be subject to any stay, modification or reversal;

4.    all authorizations, consents, regulatory approvals, rulings, or documents required by applicable law to implement and effectuate the Plan, including any approvals required in connection with the transfer, change of control, or assignment of the Remington Entities' permits and licenses, shall have been obtained from any appropriate regulatory agencies and not subject to any appeal;

5.    except as otherwise expressly provided herein, all documents to be executed, delivered, assumed, or performed upon or in connection with Consummation shall have been executed, delivered, assumed, or performed, as the case may be, and any conditions contained therein (other than Consummation or notice of Consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement, which are in form and substance (i) reasonably acceptable to the Remington Entities and the Requisite Consenting Creditors, and otherwise consistent with the Restructuring Support Agreement, (ii) reasonably acceptable to the ABL DIP Agent, Term/ROC DIP Agent, and the New FILO Term Loan Lenders (*provided, however,* that to the

62

extent the ABL Parties, Term DIP Lenders, ROC DIP Lender, or the New FILO Term Loan Lenders are materially affected, acceptable to the ABL DIP Agent, Term/ROC DIP Agent, or the New FILO Term Loan Lenders, respectively, in their sole and absolute discretion), and (iii) to the extent Class 6 General Unsecured Creditors are materially affected, reasonably acceptable to the Committee;

6.      all other actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered, as the case may be, to the appropriate parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable law;

7.      there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

8.      the conditions to the effectiveness of each of the New ABL Facility, the New Term Loan Facility, and the New FILO Term Loan Facility shall have been satisfied or waived in accordance with the terms of the New ABL Facility Documents, the New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents (as applicable) on or prior to the Effective Date;

9.      the Third Lien Noteholder Cash Distribution shall be $39.3 million in Cash at ROC, *less* all fees and expenses incurred by Willkie Farr & Gallagher LLP, Young Conaway Stargatt & Taylor, LLP, and Perella Weinberg Partners on behalf of the Consenting Third Lien Creditors, *plus* $5.0 million to be distributed on the Effective Date in the event of a Litigation Settlement;

10.     the Professional Fees Escrow Account shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan;

11.     on the date of the initial extension of credit pursuant to the terms of the Term/ROC DIP Credit Agreement, (a) OpCo shall have paid ROC in Cash an amount equal to $924,375.61 for reimbursement of fees and costs previously paid by ROC between January 30, 2018 and March 16, 2018, and (b) the Term Loan Lenders shall have received Cash in an amount equal to the approximately $2.67 million interest payment that was due to the Term Loan Lenders on February 1, 2018; and

12.     the New FILO Term Loan Facility, in the form of the term sheet attached to the Plan as **Exhibit 4**, shall have been consummated in accordance with such term sheet and is otherwise reasonably acceptable to the Requisite Consenting Creditors.

C.      *Waiver of Conditions*

The conditions to Confirmation and the Effective Date set forth in this Article X may be waived only by the Remington Entities with the consent of the Requisite Consenting Creditors and the ABL DIP Agent, which consents may be withheld in their sole and absolute discretion, in whole or in part, without notice, leave, or order of the Bankruptcy Court. Notwithstanding the foregoing, the condition set forth in Article X.B.9 may be waived only by the Requisite Consenting Third Lien Creditors.

D.      *Effect of Non-Occurrence of Effective Date*

If the Effective Date does not occur within ninety (90) days of the Confirmation Date (or such other extended deadline as may be ordered by the Bankruptcy Court), the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by the Remington Entities, any holders of Claims or Interests (including the Consenting Creditors), or any other Entity; (2) prejudice in any manner the rights of the Remington Entities, any holders of Claims or Interests (including the Consenting Creditors), or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Remington Entities, any holders of Claims or Interests (including the Consenting Creditors), or any other Entity, in any respect. For the avoidance of doubt, except as provided in the Restructuring Support Agreement, nothing in the Plan shall be construed as requiring termination or avoidance of the Restructuring Support Agreement upon non-occurrence of the Effective Date (subject, in all respects, to any consent, termination, or other rights of the Consenting Creditors under the Restructuring Support Agreement) or as otherwise preventing the Restructuring Support Agreement from being effective in accordance with its terms.

# ARTICLE XI
# MODIFICATION, REVOCATION OR
# WITHDRAWAL OF PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, and subject to the terms of the Restructuring Support Agreement, the Remington Entities reserve the right to modify the Plan, with the consent of the Requisite Consenting Creditors, the Term Loan Agent, the Term/ROC DIP Agent, the ABL DIP Agent, the New FILO Term Lenders, and the New ABL Required Lenders, which consent may be withheld in their sole and absolute discretion, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the terms of the Restructuring Support Agreement, and subject to the consent of the Requisite Consenting Creditors, the ABL DIP Agent, the New FILO Term Lenders, and the New ABL Required Lenders, which consent may be withheld in their sole and absolute discretion, each Remington Entity expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Remington Entity, one or more times, after Confirmation, to the extent necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement, including by structuring the Plan, the Restructuring, and the Restructuring

64

Transaction in a manner that preserves favorable tax attributes; *provided, however,* that any such amendment or modification shall not cause Class 6 General Unsecured Claims to be Impaired. Each Remington Entity may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Remington Entities reserve the right to revoke or withdraw the Plan with respect to any or all of the Remington Entities prior to the Confirmation Date and to file subsequent plans of reorganization, subject in each instance to the Restructuring Support Agreement. If the Remington Entities revoke or withdraw the Plan, Confirmation does not occur, or the Effective Date does not occur within ninety (90) days of the Confirmation Date (or such other extended deadline as may be ordered by the Bankruptcy Court), then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Remington Entity or any other Entity (including the Consenting Creditors and the ABL Parties); or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Remington Entity or any other Entity (including the Consenting Creditors and the ABL Parties).

## ARTICLE XII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest that is not a Litigation Trust Asset, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

65

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Remington Entities are party or with respect to which the Remington Entities may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Remington Entities that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article IX, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts

66

owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VIII.J.1;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.     determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order or final decree concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article IX, regardless of whether such termination occurred before or after the Effective Date;

22.     hear and determine all disputes that arise out of the formation or initial implementation of the Litigation Trust Agreement or the transfer of the Litigation Trust Assets to the Litigation Trust on the Effective Date;

23.     determine whether a Claim is Allowed or Disallowed;

24.     enforce all orders previously entered by the Bankruptcy Court; and

25.     hear any other matter as to which the Bankruptcy Court has jurisdiction.

*provided*, however, that the Bankruptcy Court shall not retain exclusive jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

**ARTICLE XIII**
**MISCELLANEOUS PROVISIONS**

A.    *Immediate Binding Effect*

Subject to Article X.B and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon Consummation, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Remington Entities, Reorganized Remington, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Remington Entities' counterparties to Executory Contracts, Unexpired Leases, and any other prepetition agreements.

B.    *Additional Documents*

On or before the Effective Date, the Remington Entities may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Remington Entities or Reorganized Remington, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Remington Entities in these cases on the Effective Date. After the Effective Date, the Reorganized Remington entities shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Remington Entities shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, Reorganized Remington shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. Each and every one of the Remington Entities and the Reorganized Remington entities shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. Notwithstanding the foregoing, nothing herein shall prohibit Reorganized OpCo (or the Disbursing Agent on behalf of Reorganized OpCo) from paying any Quarterly Fees that become due and payable.

68

D.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Remington Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Remington Entity with respect to the holders of Claims or Interests before Consummation.

E.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      *Notices*

All notices, requests, and demands to or upon the Remington Entities shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Remington Entities, to:

> Remington Outdoor Company, Inc.
> 870 Remington Drive
> Madison, NC 27025
> Attn:  Stephen P. Jackson, Jr., Chief Financial Officer (steve.jackson@remington.com)
>
> and
>
> Remington Outdoor Company, Inc.
> 1816 Remington Circle SW
> Huntsville, Alabama 35824
> Attn: Andrew Logan, Executive Vice President and General Counsel
> (andrew.logan@remington.com)

with copies to:

> Milbank, Tweed, Hadley & McCloy LLP
> 2029 Century Park East, 33rd Floor
> Los Angeles, CA 90067
> Attn:  Gregory A. Bray (gbray@milbank.com)
> Attn:  Thomas R. Kreller (tkreller@milbank.com)
> Attn:  Haig M. Maghakian (hmaghakian@milbank.com)

69

and

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19801
Attn: Laura Davis Jones (ljones@pszjlaw.com)

If to ROC, to:

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Robert G. Minion (rminion@lowenstein.com)
Paul Kizel (pkizel@lowenstein.com)

If to the ABL Agent, to:

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036
Attn: Paul Leake (paul.leake@skadden.com)
Attn: Shana Elberg (shana.elberg@skadden.com)

and

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
920 N. King Street
Wilmington, DE, 19801
Attn: Jason Liberi (jason.liberi@skadden.com)

If to the Term Loan Lenders:

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attn: Andrew Parlen (aparlen@omm.com)
Attn: Joseph Zujkowski (jzujkowski@omm.com)

and

Richards, Layton & Finger LLP
920 N King Street, Suite 200
Wilmington, DE 19801

70

        Attn: Mark D. Collins (collins@rlf.com)

If to the Third Lien Noteholders:

        Willkie Farr & Gallagher LLP
        787 Seventh Avenue
        New York, NY 10019
        Attn: Rachel C. Strickland (rstrickland@willkie.com)
        Attn: Joseph G. Minias (jminias@willkie.com)

        and

        Young Conaway Stargatt & Taylor, LLP
        Rodney Square
        1000 North King Street
        Wilmington, DE 19801
        Attn: Edmon L. Morton (emorton@ycst.com)

If to the Committee:

        Fox Rothschild LLP
        2000 Market St.
        20th Floor
        Philadelphia, PA 19103
        Attn: Michael G. Menkowitz (mmenkowitz@foxrothschild.com)

        In the Notice of Entry of Confirmation Order, the Remington Entities shall notify all Entities that, in order to continue to receive documents after the Effective Date pursuant to Bankruptcy Rule 2002, such Entity (excluding the United States Trustee) must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After service of the Notice of Entry of Confirmation and the occurrence of the Effective Date, the Remington Entities shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the United States Trustee and those Entities who have filed such renewed requests.

G.     *Term of Injunctions or Stays*

        Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. For the avoidance of doubt, (i) upon the Effective Date, the automatic stay pursuant to Bankruptcy Code section 362 of any litigation proceedings against or involving the Remington Entities shall terminate and (ii) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.    *Entire Agreement*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Remington Entities' counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at http://www.ecf.deb.uscourts.gov/ or the website of the Remington Entities' notice and voting agent at http://cases.primeclerk.com/remington. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan shall control.

J.    *Nonseverability of Plan Provisions*

Before Confirmation, if any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without consent of the Remington Entities and the Requisite Consenting Creditors; and (3) nonseverable and mutually dependent.

K.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Remington Entities shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and, pursuant to section 1125(e) of the Bankruptcy Code, the Remington Entities and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, none of any such parties or individuals or Reorganized Remington will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

72

L.      *Closing of Chapter 11 Cases*

Reorganized Remington shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, any applicable Local Rules of the Bankruptcy Court, and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.      *Document Retention*

On and after the Effective Date, Reorganized Remington may maintain documents in accordance with its current document retention policy, as may be altered, amended, modified, or supplemented by Reorganized Remington.

N.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, Plan Supplement, Restructuring Support Agreement, or any other document (but excluding, for the avoidance of doubt, the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan (without reference to the Plan Supplement), the Plan (without reference to the Plan Supplement) shall govern and control. Notwithstanding the foregoing, in the event of a conflict between Article VI of the Plan and the Litigation Trust Agreement, the Litigation Trust Agreement shall control; *provided, however,* that nothing in the Litigation Trust Agreement shall be deemed to expand or modify the scope of the Litigation Trust Assets, including but not limited to the Litigation Claims.

O.      *Dissolution of Creditors' Committee*

On the Effective Date, the Committee shall be deemed to have been dissolved, and the members thereof, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, except for the limited purpose of prosecuting requests for allowances of compensation and reimbursement of expenses incurred prior to the Effective Date.

*[Remainder of page intentionally left blank]*

73

Dated:  April 30, 2018

Respectfully submitted,

REMINGTON OUTDOOR COMPANY,
INC.

By:    /s/ Anthony Acitelli
      Name:  Anthony Acitelli
      Title: Chief Executive Officer

FGI HOLDING COMPANY, LLC

By:    /s/ Anthony Acitelli
      Name:  Anthony Acitelli
      Title: Chief Executive Officer

FGI OPERATING COMPANY, LLC

By:    /s/ Anthony Acitelli
      Name:  Anthony Acitelli
      Title: Chief Executive Officer

REMINGTON ARMS COMPANY, LLC

By:    /s/ Anthony Acitelli
      Name:  Anthony Acitelli
      Title: Chief Executive Officer

BARNES BULLETS, LLC

By:    /s/ Anthony Acitelli
      Name:  Anthony Acitelli
      Title: Chief Executive Officer

TMRI, INC.

By:    /s/ Anthony Acitelli
      Name:  Anthony Acitelli
      Title: Chief Executive Officer

74

RA BRANDS, L.L.C.

By:     /s/ Anthony Acitelli
       Name: Anthony Acitelli
       Title: Chief Executive Officer


FGI FINANCE, INC.

By:     /s/ Anthony Acitelli
       Name: Anthony Acitelli
       Title: Chief Executive Officer


REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By:     /s/ Anthony Acitelli
       Name: Anthony Acitelli
       Title: Chief Executive Officer

HUNTSVILLE HOLDINGS, LLC

By:     /s/ Anthony Acitelli
       Name: Anthony Acitelli
       Title: Chief Executive Officer

32E PRODUCTIONS, LLC

By:     /s/ Anthony Acitelli
       Name: Anthony Acitelli
       Title: Chief Executive Officer


GREAT OUTDOORS HOLDCO, LLC

By:     /s/ Anthony Acitelli
       Name: Anthony Acitelli
       Title: Chief Executive Officer


OUTDOOR SERVICES, LLC

By:     /s/ Anthony Acitelli
       Name: Anthony Acitelli
       Title: Chief Executive Officer

75

**Exhibit B**

**Form of Notice of Confirmation Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------  x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
REMINGTON OUTDOOR COMPANY, INC., et                         :    Case No. 18-10684 (BLS)
al.,¹                                                       :
                                                            :    (Jointly Administered)
                                                            :
                                       Debtors.             :
----------------------------------------------------------  x
```

### NOTICE OF ENTRY OF ORDER CONFIRMING JOINT PREPACKAGED CHAPTER 11 PLAN OF REMINGTON OUTDOOR COMPANY, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION TO ALL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED CHAPTER 11 CASES

**PLEASE TAKE NOTICE THAT**, on March 25, 2018 Remington Outdoor Company, Inc. and its subsidiaries FGI Holding Company, LLC, FGI Operating Company, LLC, Remington Arms Company, LLC, Barnes Bullets, LLC, TMRI, Inc., RA Brands, L.L.C., FGI Finance, Inc., Remington Arms Distribution Company, LLC, Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC, and Outdoor Services, LLC, as debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE THAT**, on [●], 2018, the Bankruptcy Court entered an order [Docket No. ●] (the "Confirmation Order") which, among other things, confirmed the *Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and its Affiliated Debtors and Debtors in Possession* [Docket No. 13] (as may be further amended, modified and/or supplemented, the "Plan").

**PLEASE TAKE FURTHER NOTICE THAT**, the Confirmation Order, the Plan, and all other documents filed with, and orders granted by, the Bankruptcy Court, are available for viewing on the Bankruptcy Court's website at www.deb.uscourts.gov and at no cost on the Debtors' restructuring website at http://cases.primeclerk.com/remington, and copies of such documents can be obtained by telephoning Prime Clerk LLC, the Debtors' notice and servicing agent, at (877) 755-3450.

---

¹   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The principal offices of Debtor Remington Outdoor Company, Inc., the top-level holding company, are located at 870 Remington Drive, Madison, NC 27025.

**PLEASE TAKE FURTHER NOTICE THAT**, following the occurrence of the Effective Date (as defined in the Plan), the Debtors will file with the Bankruptcy Court a notice of occurrence of the Effective Date, identifying, among other things, the date on which the Effective Date occurred.

**PLEASE TAKE FURTHER NOTICE THAT**, in order for any Entity to continue to receive documents after the Effective Date pursuant to Bankruptcy Rule 2002, such Entity (excluding the United States Trustee) must file with the Bankruptcy Court a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE THAT**, in accordance with Article VIII.J.1 of the Plan, to the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Remington Entity or Reorganized Remington entity on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Remington Entity or Reorganized Remington entity, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Remington entity annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

Wilmington, Delaware
Dated: May [___], 2018

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ [DRAFT]*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
    tcairns@pszjlaw.com
    jmulvihill@pszjlaw.com

- and -

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Gregory A. Bray (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Haig M. Maghakian (admitted *pro hac vice*)
2029 Century Park East, 33rd Floor

59

Los Angeles, CA 90067
Telephone:     (424) 386-4000
Facsimile:     (213) 629-5063
Email:          gbray@milbank.com
                 tkreller@milbank.com
                 hmaghakian@milbank.com

*Counsel for the Debtors and Debtors in Possession*

60

**EXHIBIT D**

43879086 v1

 (/)                                                      SHOP
                                                   (/RETAIL(/SHOP/)
# PRIVACY POLICIES                                  LOCATOR)



Effective Date: February 1, 2017

The www.remington.com (http://www.remington.com) website is operated by Remington Arms Company, LLC and its affiliates and subsidiaries (collectively, "our", "us", or "we"). This Privacy Policy applies to www.remington.com (http://www.remington.com) and any other website offered by us, which references or links to this Privacy Policy (each a "Site" and together the "Sites"), and which may include our sites entered via tabs or portals accessible via Twitter®, Facebook® or other social sharing sites.

Review this Privacy Policy from time to time as we may update or change this Privacy Policy at any time for any reason without prior notice to you. By using this Site, you indicate your assent to all of the terms of this Privacy Policy and its Terms of Use.  If you do not agree with any term of this Privacy Policy or the Terms of Use, do not use this Site or submit any Personal Information to us via the Site.

## Personal Information We Collect
We do not collect Personal Information unless you voluntarily provide it to us. "Personal Information" is data that can be used to uniquely identify or contact a single person. If you wish to participate in some of the features and services the Site may offer, we may ask you to provide certain Personal Information. The Personal Information we collect may include your full name, phone number, date of birth, e-mail address, and mailing address. By initiating any activity or transaction that uses financial information on our Site, you consent to providing your financial information to our service providers processing the transaction to the extent required to provide the payment services to you.

## Cookies and Other Software

When you visit or interact with the Site, we, as well as our service providers may use assorted technologies that automatically or passively collect information about how the Site is accessed and used. This usage information may include, but is not limited to, information considered non-personally identifying such as browser type, device type used to access the Site (i.e., computer or mobile device), unique number assigned to identify such device, geographic location, click path taken through the Site, your use of features or applications on the Site, and other publicly available information. This information helps us improve our Site, products and services.

We may use cookies, beacons, or other visit recognition software to improve the use and functionality of our Sites. A cookie is a small data file sent to your browser from a web server to be stored on your hard drive that may allow easier access the next time the same page is visited and to allow storage of items in your shopping cart between visits. We, or our vendors, may place cookies or similar files on your computer or other devices used to access the Site for security purposes, to facilitate Site navigation and to personalize your experience while visiting the Site. You can configure your browser to reject cookies by modifying your browser settings, but if your browser settings do not accept cookies from us, then some functions of the Sites may not operate as intended.

## Information We Receive from Third Parties

We may receive information about you, including Personal Information, from third parties, such as persons assisting us in administering or fulfilling a sweepstakes or contest. Also, if you are on another website and you opt-in to receive information from us, that website will forward to us your e-mail address and other information about you so that we may contact you as requested. We may also supplement the information we collect about you through the Site with outside records from third parties in order to enhance our ability to serve you. We may combine the information we receive from these third parties with information we collect through the Site.

## How We Use Your Information

We use Personal Information you provide for various purposes, including to provide products and services that you request; to assist us in distributing e-mails and to communicate with you; to administer surveys, polls, sweepstakes, contests, and other promotional events; and to do all things necessary to administer our Sites, products and services, and manage, protect and improve them.

We use the Site usage information we collect for various purposes, including to administer our Sites, products and services, and manage, protect and improve the use and functionality of our Sites.

We also share information as indicated below.

## What We Share With Others

We may use or disclose your Personal Information and other information we collect to affiliates and subsidiaries, to third-party partners in certain joint promotional and marketing programs, to manage databases of customer information, to assist us in distributing emails, to manage the Site, to administer and fulfill sweepstakes and contests, in connection with surveys, or to take precautions against liability. If you request products or services via a mobile device, your request will be transmitted to your mobile carrier's network and your carrier may have access to it. Consult your carrier's privacy policy for additional information.

We may disclose information to outside companies that help us bring you the products and services we offer, and in connection with any services or products you purchase from us, to your credit card issuer, credit reporting and fraud checking agencies. We may employ other companies and individuals to perform functions on our behalf. Examples include providing web site services, fulfilling orders, delivering packages, sending postal mail and e-mail, processing credit card payments, and providing customer service. They have access to Personal Information needed to perform their functions.

We reserve the right to transfer any information, including Personal Information, in the event all, or a portion, of our business or assets are sold or transferred, including in connection with a sale, merger, consolidation, change in control, transfer of assets, reorganization or liquidation of our business.

We reserve the right to disclose any Personal Information requested by law enforcement or if we are required to do so by law, regulation, subpoena, court order, or by a government entity. We reserve the right to disclose any Personal Information to enforce or apply our Terms of Use and other agreements and to protect our rights, property, or safety and those of our users, and others.

## Do Not Track Requests; Third Party Tracking

Unless your browser settings are configured to make your online activities and publicly available information about your online activities invisible to usage analytics tools, we do not presently have the capability to omit you from Site usage information we collect to the extent your browser only sends us a "do not track" message and does not otherwise screen you from tracking without any action on our part.

Third parties, other than our vendors (such as our cookie server), do not have authorization from us to track which websites you visited prior and after visiting our website. That said, we cannot control third party tracking and there may be some third party tracking that occurs without our knowledge or consent.

## Third-Party Sites

This Site may link you to other sites on the Internet, which are not operated by us and not under our control, including sites operated by third parties that have merely licensed the right to use one

of our brands, which sites we do not operate or control. You acknowledge that we are not responsible for the accuracy, or any other aspect of the content of sites we do not operate or control. Your accessing the links to any other sites is at your own risk and subject to the applicable privacy policies and terms and conditions of such websites.

## Updating Personal Information; Opt-Out

You can help us maintain the accuracy of your information by notifying us of any changes. If your Personal Information changes (such as physical or email address), contact us by email to **webmaster@remington.com (mailto:webmaster@remington.com)** to update or correct such information.

If you no longer wish to receive our promotional communications, each message will give you the option to "unsubscribe" from receiving further email communications from us at any time. Your option not to receive promotional and marketing material will not preclude us from corresponding with you, by email or otherwise, regarding your existing or past business relationships with us (e.g., any purchase of our products or use of our services, or responses to requests for information you pose to us either through use of a Site or by other means), and will not preclude us from accessing and viewing your personal information in the course of maintaining and improving our Sites, products and services.

If you sign up to receive mobile messaging (e.g., SMS and MMS) offers and communications but later decide you no longer wish to receive them, simply follow the opt-out instructions included in the mobile message.

## Children's Privacy

The Sites are not intended for minors. We do not knowingly solicit or collect Personal Information from children under 13. If you are under the age of 13, please do not submit your e-mail address or any other Personal Information to us through the Sites. If we learn that we have collected Personal Information of a child under 13 we will take steps to delete the information as soon as possible.

We encourage parents to go online with their children. Parents should understand the sites their children are visiting and which sites are appropriate. There are parental control tools available such as browsers and filtering software that prevent children from accessing inappropriate sites.

## Your California Privacy Rights

Pursuant to Section 1798.83 of the California Civil Code, residents of California have the right to request from a business, with whom the California resident has an established business relationship, certain information with respect to the types of Personal Information the business shares with third parties for direct marketing purposes by such third party and the identities of the third parties with whom the business has shared such information in the immediately preceding calendar year. To access this information, write to Remington Arms Company, LLC, PO Box 700, Madison, NC 27025, Attention: CA Privacy Requests or email **webmaster@remington.com**

(mailto:webmaster@remington.com) with "CA Privacy Requests" in the subject line. Please note that, under the law, we are not required to respond to your request **more than once in a calendar year,** nor are we required to respond to any requests that are not sent to the above-designated email or mailing address.

### Consent to Transfer Information to the United States

The Sites are intended for users residing in the United States and are governed by and operated in accordance with the laws of the United States. We make no representation that the Sites are operated in accordance with the laws or regulations of, or governed by, any other nation. If you are located outside of the United States, please be advised that any information (including Personal Information) you provide to us will be transferred to the United States and that by submitting information to the Sites, you explicitly consent to its transfer to the United States.

We do not intend to conduct business via the Sites with users located in the European Economic Area and Switzerland (the "European Area"), and do not knowingly solicit or accept Personal Information transferred from the European Area for any purposes. If you are located in the European Area, do not submit any Personal Information to the Sites. We expressly disclaim any liability in connection with any such transfer of Personal Information from the European Area.

### Public Forums

If you post self-identifying information or other content on or through public areas on our Site, e.g., chats, blog comments, this information is public information and is generally accessible to, and may be collected and used by, others and may result in unsolicited messages or other contact from others. You are encouraged to exercise caution when posting online self-identifying information. You warrant that you have permission to upload any third-party information and you agree to indemnify, defend and hold us and our agents harmless from and against any claim, liability, cost and expense arising in connection with your provision of that information.

### Changes to Privacy Policy

We may occasionally update this policy by posting an updated version of this Privacy Policy on our Site. All revisions will become effective on the date that the modified policy is posted on our Site.

### Contact Us

We welcome questions or comments on this Privacy Policy. Please contact us by writing to Remington Arms Company LLC, PO Box 700, Madison, NC 27025 or e-mail **webmaster@remington.com (mailto:webmaster@remington.com)**.

SIGN UP FOR EXCLUSIVE OFFERS & PRODUCT NEWS

| Newsletter Signup → |
| --- |

RIFLES
(HTTPS://WWW.REMINGTO

Bolt-Action
(https://www.remington.com/r
action)

Muzzleloading
(https://www.remington.com/r

Pump-Action
(https://www.remington.com/r
action)

Rimfire
(https://www.remington.com/r

SHOTGUNS
(HTTPS://WWW.REMINGTO

Autoloading
(https://www.remington.com/s

Pump Action
(https://www.remington.com/s
action)

Tactical
(https://www.remington.com/s

HANDGUNS
(HTTPS://WWW.REMINGTO

Remington R51
(https://www.remington.com/h
r51)

Remington RP
(https://www.remington.com/h
rp)

Remington RM380
(https://www.remington.com/h
rm380)

Model 1911 R1
(https://www.remington.com/h
1911-r1)

Model 1911 R1 Enhanced
(https://www.remington.com/h
1911-r1-enhanced)

Model 1911 R1 Carry
(https://www.remington.com/h
1911-r1-carry)

AMMUNITION
(HTTPS://WWW.REMINGTO

Shotshell
(https://www.remington.com/a

Centerfire Rifle
(https://www.remington.com/a
rifle)

Handgun
(https://www.remington.com/a

Rimfire
(https://www.remington.com/a

Components
(https://www.remington.com/a

Peters
(https://www.remington.com/a

OTHER PRODUCTS
(HTTPS://WWW.REMINGTO
PRODUCTS)

TAC-13
(https://www.remington.com/c
products/v3-tac-13)

TAC-14
(https://www.remington.com/c
products/model-870-tac-14)

TAC-14 Marine Magnum
(https://www.remington.com/c
products/model-870-tac-14-
marine-magnum)

TAC-14 DM
(https://www.remington.com/c
products/tac-14-dm)

TAC-14 Arm Brace
(https://www.remington.com/c
products/model-870-tac-14-
arm-brace)

TAC-14 Hardwood
(https://www.remington.com/c
products/model-870-tac-14-
hardwood)

Rifle Parts
(https://www.remington.com/s
20Parts/c/RifleParts)

Shotgun Parts
(https://www.remington.com/s
20Parts/c/ShotgunParts)

Handgun Parts
(https://www.remington.com/s
20Parts/c/HandgunParts)

Gun Care
(https://www.remington.com/s
20Care/c/GunCare)

Sales & Clearance
(https://www.remington.com/s
20&%20Clearance/c/Sale%
26Clearance)

CUSTOM SHOP
(HTTPS://WWW.REMINGTO
SHOP)

Classic Series Rifles
(https://www.remington.com/c
shop/classic-series-rifles)

40-X Series Rifles
(https://www.remington.com/c
shop/40-x-series-rifles)

Rimfire Rifles
(https://www.remington.com/c
shop/rimfire-rifles)

Handguns
(https://www.remington.com/c
shop/handguns)

High Grade
(https://www.remington.com/c
shop/high-grade)

Blog
(https://www.remington.com/c
shop/blog)

REMINGTON COUNTRY
(HTTPS://WWW.REMINGTO

Live
(https://www.remington.com/c

Company info
(https://www.remington.com/a
us)

Home
(https://www.remington.com/)

Catalog (https://remington-
catalog.com/catalogs/remingto

Rebates & Promotions
(https://www.remington.com/r
promotions)

Help Center
(https://www.remington.com/s
center)

Contact
(https://www.remington.com/c
us)

Safety Center
(https://www.remington.com/s
center)

Employment (https://careers-
remington.icims.com/)

Export Restrictions
(https://www.remington.com/e
restrictions)

Terms of use
(https://www.remington.com/t
use)

Privacy Policy
(https://www.remington.com/p
policies)

Co-op Marketing Portal
(https://www.remingtoncoop.c

News
(https://www.remington.com/n



(//remington-
catalog.com/catalogs/remington/2019/)

# CATALOG

PDF (85MB) (//REMINGTON-
CATALOG.COM/CATALOGS/REMINGTON/2019/PDF/2019-
REMINGTON-CATALOG.PDF)

EZINE (HTTPS://REMINGTON-
CATALOG.COM/CATALOGS/REMINGTON/2019/)

   

(//facebo(//lnstag(//twitte(//youtu

© Remington Arms Company, LLC. All rights reserved.

