# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*,[1] | Case No. 20-81688-11 |
| Debtors. | Joint Administration Requested |

## DEBTORS' APPLICATION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE EMPLOYMENT AND RETENTION OF M-III ADVISORY PARTNERS, LP AS FINANCIAL ADVISOR TO THE DEBTORS

Remington Outdoor Company, Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") hereby file this application (the "**Application**") for entry of an interim order, substantially in the form of **Exhibit B** hereto (the "**Proposed Interim Order**"), and a final order, substantially in the form of **Exhibit C** hereto (the "**Proposed Final Order**," and together with the Proposed Interim Order, the "**Proposed Orders**") pursuant to section 327(a) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**") and Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing the employment and retention of M-III Advisory Partners, LP ("**M-III**"), as financial advisor to the Debtors as of the Petition Date (as defined below), in accordance with the terms and conditions of that certain engagement letter dated April 23, 2020, including any amendments and schedules

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

Case 20-81688-CRJ11   Doc 22   Filed 07/28/20   Entered 07/28/20 01:01:14   Desc Main
Document   Page 1 of 101

thereto (the "**Engagement Agreement**"), attached as <u>**Exhibit 1**</u> to the Proposed Orders. In support of this Application, the Debtors submit the *Declaration of Colin M. Adams in Support of Debtors' Application for Entry of Interim and Final Orders Authorizing the Employment and Retention of M-III Advisory Partners, LP as Financial Advisor to the Debtors* (the "**Adams Declaration**"), attached hereto as <u>**Exhibit A**</u>, and respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter interim and final orders consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and procedural predicates for the relief requested herein are Bankruptcy Code section 327(a) and Bankruptcy Rules 2014 and 2016. Compensation will be in accordance with sections 330 and 331 of the Bankruptcy Code.

## GENERAL BACKGROUND

4.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner and no committee has been appointed or designated in these Chapter 11 Cases. The Debtors' request for joint administration of these Chapter 11 Cases for procedural purposes only is currently pending.

5.      The Debtors are one of America's oldest and largest manufacturers of firearms, ammunition and related products for commercial, military, and law enforcement customers throughout the world. The Debtors employ approximately 2,100 full-time employees and operate

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 2 of 101

seven manufacturing facilities located across the United States. The Debtors' corporate headquarters is located in Huntsville, Alabama.

6. Additional information regarding the Debtors' businesses, assets, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the *Declaration of Ken D'Arcy in Support of Chapter 11 Petitions and First Day Pleadings of Remington Outdoor Company, Inc. and its Affiliated Debtors and Debtors in Possession* (the "**First Day Declaration**"),[2] filed contemporaneously herewith and incorporated by reference herein.

## RELIEF REQUESTED

7. By this Application, the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit B** and **Exhibit C**, respectively, to employ and retain M-III pursuant to section 327(a) of the Bankruptcy Code as their financial advisor in these Chapter 11 Cases, effective as of the Petition Date.

## BASIS FOR RELIEF REQUESTED

### A.    M-III's Qualifications

8. To effectively manage their transition into and continuation of operations in these Chapter 11 Cases, the Debtors require a qualified and experienced financial advisor with the resources, capabilities and experience of M-III. As described in the Adams Declaration, M-III has a wealth of experience in providing financial advisory services to distressed companies in complex restructurings, including those in industries similar to the Debtors. M-III has an excellent reputation for the services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. M-III's expertise includes significant experience assisting distressed companies with day-to-day management activities, including

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

development of *pro forma* financials and business plans, cash flow management, and implementation of liquidity-enhancing and cost-saving strategies.

9. In addition, as a result of the significant prepetition work performed on behalf of the Debtors, M-III has acquired significant knowledge of the Debtors and their businesses and is intimately familiar with the Debtors' financial affairs, systems, assets, capital structure, operations and related matters. During its prepetition engagement, M-III's services have included a wide range of activities targeted at stabilizing and improving the Debtors' financial position, including: (i) developing or validating forecasts, business plans, and related assessments of the business's strategic position; (ii) monitoring and managing cash and cash flow; (iii) preparation and planning for chapter 11 filing and first-day relief; and (iv) designing and assessing financial restructuring alternatives.

**B.     Services to Be Provided**

10. The Debtors anticipate that M-III will provide restructuring advisory services as M-III and the Debtors deem appropriate and feasible during these Chapter 11 Cases, including, without limitation, the following:

- Assist the Debtors in the development and administration of its short-term cash flow forecasting, budgeting and related methodologies, as well as its cash management planning;

- Assist the Debtors in connection with preparation for and conduct of a reorganization process, including, without limitation, (i) development of restructuring plans and strategic alternatives intended to maximize the enterprise value and (ii) development and presentation of any related forecasts and monthly operating plans and results that may be required by creditor constituencies in connection with negotiations or by the Debtors for other corporate purposes;

- Assist the Debtors in obtaining and presenting such information as may be required by the parties in interest to these Chapter 11 Cases and the bankruptcy process, including any creditors' committees and the Court, with such information to include, among other things, budgets and financial models

required in connection with any debtor-in-possession financing to be obtained by the Debtors;

- Assist the professionals who are representing the Debtors in the reorganization process or who are working for the Debtors various stakeholders to coordinate their efforts and individual work product in order to be consistent with the Debtors' overall restructuring goals;

- Assist, if required, the Debtors in communications and negotiations with its outside constituents, including creditors, trade vendors and their respective advisors;

- Provide such other services as are reasonable and customary for a financial advisor in connection with the administration and prosecution of a bankruptcy proceeding; and

- Provide such additional services as M-III and the Debtors shall otherwise agree in writing.

**C.      No Duplication of Services**

11.      The services provided by M-III are distinct and specific financial advising and consulting services, and such services will complement and not duplicate the services rendered by any other professional retained in these Chapter 11 Cases.  As set forth in the Adams Declaration, M-III understands that the Debtors have retained and may retain additional professionals during the term of the engagement and M-III agrees to work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

**D.      Professional Compensation**

12.      In consideration of the services to be provided by M-III pursuant to the terms of the Engagement Agreement and subject to Court approval, the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, the Debtors have agreed to the following fee structure (the "**Fee Structure**") to (a) compensate M-III for the services set forth in the Engagement Agreement on an hourly basis in accordance with M-III's ordinary and customary rates in effect on the date such

services are rendered; and (b) reimburse reasonable allocated and direct expenses incurred by M-III in connection with all services performed on behalf of the Debtors.

13.     Under Bankruptcy Code section 327(a), the Debtors may retain M-III on reasonable terms and conditions.  The Debtors submit that the terms and conditions set forth in the Engagement Agreement, which are similar to the terms and conditions M-III offers to similar clients for similar services, are reasonable.

14.     Before the Petition Date, M-III received an initial retainer of $200,000.00 (the "**Retainer**"), which may be replenished from time to time. Pursuant to the Engagement Agreement, M-III applied the Retainer to prepetition fees and expenses.  During the 90 days prior to the commencement of these Chapter 11 Cases, the Debtors paid M-III a total of $1,185,244.25 for M-III's services to the Debtors in contemplation of, and in connection with, prepetition restructuring activities. M-III's current estimate is that it received unapplied advance payments from the Debtors in excess of prepetition billings of approximately $120,000.00, which is subject to final determination after all prepetition billings and collections are reconciled.  The unapplied residual Retainer will not be segregated by M-III in a separate account and (except as expressly contemplated by the Engagement Agreement) will be held until the end of these Chapter 11 Cases and applied to M-III's finally approved fees in these proceedings.

15.     The current standard U.S. hourly rates[3] (expressed in USD), subject to periodic adjustments, that M-III professionals will charge pursuant to the Engagement Agreement are as follows:

---

[3]  Rates included in the Application are current M-III hourly rates and have been approved by the Debtors in accordance with the Engagement Agreement.

| Professional | Standard Rate |
|---|---|
| Managing Partner | $1,150 |
| Managing Director | $900 - $1,025 |
| Director | $725 - $825 |
| Vice President | $650 |
| Senior Associate | $550 |
| Associate | $475 |
| Analyst | $375 |

16.     The hourly rates set forth above are M-III's applicable hourly rates for its professionals and staff members for the engagement set forth in the Engagement Agreement. These hourly rates reflect M-III's normal and customary billing practices for engagements of this complexity and magnitude.  M-III revises its hourly rates periodically and M-III will provide notice of any rate increases to the Debtors, the Bankruptcy Administrator for the Northern District of Alabama (the "**Bankruptcy Administrator**"), and any official committee of unsecured creditors appointed in these Chapter 11 Cases.

17.     In addition, M-III will invoice the Debtors for its reasonable and direct out-of-pocket expenses charged during these Chapter 11 Cases, which include, among other things, internet access, conference calls, overnight mail, messenger, travel, meals, and accommodations and other expenses, specifically related to this engagement.

18.     The Debtors believe that the Fee Structure is reasonable and comparable to those generally charged by financial advisors and consultants of similar stature to M-III for comparable engagements, both in and out of chapter 11.  The Fee Structure summarized above and described more fully in the Engagement Agreement is consistent with M-III's normal and customary billing practices for comparably sized and complex cases and transactions, both in and out of court, involving the services to be provided in connection with Chapter 11 Cases.  M-III and the Debtors believe that the Fee Structure is both reasonable and market-based.  The Debtors therefore submit

that the Fee Structure is fair and reasonable under the standards required under Bankruptcy Code section 328(a).

19. To the best of the Debtors' knowledge, information, and belief, and as set forth in the Adams Declaration, M-III has not shared or agreed to share any of its compensation from the Debtors or any other person, other than as permitted under Bankruptcy Code section 504. In addition, M-III has not received any promises as to compensation in connection with these Chapter 11 Cases, other than as outlined in the Engagement Agreement.

20. M-III will seek the Court's approval of its compensation for professional services rendered and reimbursement of expenses incurred in connection with these Chapter 11 Cases in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and any other applicable procedures and orders of the Court, and consistent with the proposed compensation set forth in the Engagement Agreement.

### E. Record Keeping

21. M-III will maintain records, in one-tenth of an hour increments, in support of any fees incurred in connection with its services in these Chapter 11 Cases by category and nature of the services rendered. M-III will file such records with the Court, which will include reasonably detailed descriptions of those services provided, the approximate time expended in providing those services, and the individuals who provided such professional services on behalf of the Debtors.

22. M-III will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services. M-III's applications for compensation and expenses will be paid by the Debtors pursuant to the terms of the Engagement Agreement and in accordance with any procedures established by the Court.

### F. Indemnification Provisions

23.     As part of the overall compensation payable to M-III under the terms of the Engagement Agreement, the Debtors have agreed to certain indemnification and contribution provisions described in Annex I to the Engagement Agreement (the "**Indemnification Provisions**").  As more fully set forth in the Engagement Agreement, the Indemnification Provisions provide that the Debtors agreed to indemnify and hold harmless M-III and its affiliates, equity holders, partners, directors, employees, agents, representatives and contractors to the extent described in Annex I to the Engagement Agreement against all costs, fees, expenses, damages, and liabilities (including defense costs) associated with any pending or threatened third party claim, action or proceeding relating to or arising as a result of this engagement or the provision of the services, except to the extent such losses are determined to be the result of M-III's bad faith, gross negligence, or willful misconduct.

24.     The Debtors and M-III believe that the Indemnification Provisions are customary and reasonable for financial advisor engagements, both out-of-court and in chapter 11 cases. Indemnification provisions for advisors have been approved in other chapter 11 cases in this District. *See, e.g.*, *In re Mission Coal Co., LLC*, Case No. 18-04177-TOM11 (Bankr. N.D. Ala. Nov. 30, 2018) [Doc. 364]; *In re Walter Energy, Inc.*, Case No. 15-02741-TOM11 (Bankr. N.D. Ala. Oct. 1, 2015) [Doc. 819]; *In re Belle Foods, LLC*, Case No. 13-81963-JAC11 (Bankr. N.D. Ala. July 18, 2013) [Doc. 158].

25.     The terms of the Engagement Agreement, including the Indemnification Provisions, were fully negotiated between the Debtors and M-III at arm's length.  The Debtors respectfully submit that the Indemnification Provisions, as modified by the Proposed Orders, are customary, reasonable and in the best interests of the Debtors, their estates and creditors.

Accordingly, as part of this Application, the Debtors request that this Court approve the Indemnification Provisions.

### G. M-III's Disinterestedness

26. As set forth in the Adams Declaration, M-III has represented to the Debtors that it is not engaged by and will not become engaged by any parties other than the Debtors in these Chapter 11 Cases. In addition, as set forth in the Adams Declaration, M-III has represented to the Debtors that it is not engaged by and will not become engaged by any parties in connection with any matter that would be adverse to the Debtors arising from, or related to, these Chapter 11 Cases.

27. To the best of the Debtors' knowledge, information, and belief, and except to the extent disclosed herein and in the Adams Declaration and the exhibits thereto, the Debtors believe that: (i) M-III is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estates; and (ii) M-III has no connection to the Debtors, their creditors, the Bankruptcy Administrator, or any other party with an actual or potential interest in the Debtors' cases or their attorneys or accountants, except as may be disclosed in the Adams Declaration. To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of the Debtors' retention are discovered or arise, M-III will use reasonable efforts to file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

28. M-III's current estimate is that it received unapplied advance payments from the Debtors in excess of prepetition billings of approximately $120,000.00, which is subject to final determination after all prepetition billings and collections are reconciled. As such, it is believed that the Debtors do not owe M-III any amounts for services rendered before the Petition Date.

### H.    The Relief Requested Should be Granted

29.    The Debtors seek authority to retain and employ M-III as their financial advisor under Bankruptcy Code section 327, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtors] in carrying out the [Debtors'] duties under this title." 11 U.S.C. § 327(a).  Section 1107(b) of the Bankruptcy Code elaborates upon sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11 of the Bankruptcy Code and provides that "a person is not disqualified for employment under section 327 of [the Bankruptcy Code] by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).

30.    The Debtors seek approval of the Fee Structure and the Engagement Agreement (including the Indemnification Provisions) pursuant to Bankruptcy Code section 328(a), which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).  Accordingly, Bankruptcy Code section 328 permits the compensation of professionals, including consultants, on flexible terms that reflect the nature of their services and market conditions.  Thus, section 328 is a significant departure from prior bankruptcy practice relating to the compensation of professionals.  Indeed, as the United States Court of Appeals for the Fifth Circuit recognized in *Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum* (*In re Nat'l Gypsum Co.*), 123 F.3d 861, 862 (5th Cir. 1997):

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done.  That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court

> award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc.  Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

(internal citations omitted).

31.     The Debtors believe that the Fee Structure in the Engagement Agreement sets forth reasonable terms and conditions of employment and should be approved under Bankruptcy Code section 328(a).  The Fee Structure adequately reflects (i) the nature of the services to be provided by M-III and (ii) fee and expense structures and indemnification provisions typically used by M-III and other leading financial advisory and consulting firms.  In addition, as noted above, M-III is "disinterested" and all of its fees and expenses are subject to approval of the Court in accordance with the Bankruptcy Code, the Bankruptcy Rules, and further orders of the Court.

32.     The Debtors respectfully request that M-III's retention be made effective as of the Petition Date so that M-III may be compensated for all services it has performed for the benefit of the Debtors' bankruptcy estates.  Indeed, M-III rendered these services to the Debtors in advance of approval of this Application in anticipation that its retention would be approved as of the Petition Date.  Due in part to the many significant, pressing issues facing the Debtors in the early days of these Chapter 11 Cases, M-III has been focused on ensuring a smooth transition for the Debtors into chapter 11, and working with the Debtors' other advisors and other parties in interest on numerous strategic negotiations.  Compensating M-III for the necessary and critical services performed as of the Petition Date would not prejudice third parties as the services performed by M-III were needed in any event and any other professional would have had to be similarly compensated.  The Debtors, their estates and creditors, received a material benefit from the services rendered by M-III after the Petition Date, and the Debtors believe it just and appropriate

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 12 of 101

to compensate M-III accordingly. The Debtors respectfully submit that the circumstances of these Chapter 11 Cases warrant retroactive approval of the Application as of the Petition Date.

33.     For the foregoing reasons, the Debtors submit that the relief requested in the Application is in the best interests of the Debtors, their estates, and all other parties in interest in these Chapter 11 Cases and the Court should approve the retention and employment of M-III pursuant to the terms set forth in the Engagement Agreement.

## NOTICE

34.     Notice of the hearing on the relief requested in this Application will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014 and is sufficient under the circumstances. The Debtors will provide notice of this Application to the following parties-in-interest: (i) the Bankruptcy Administrator; (ii) the Debtors' consolidated list of creditors holding the forty largest unsecured claims; (iii) counsel to Whitebox Advisors LLC, as Priority Term Loan Lender; (iv) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (v) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (vi) counsel to Franklin Advisors, Inc., as FILO Lender; (vii) the United States Internal Revenue Service; (viii) counsel to the United Mine Workers of America; and (ix) all parties entitled to notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary under the circumstances.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit B** and **Exhibit C**, respectively, authorizing the employment and retention of M-III as financial advisor to the Debtors in these Chapter 11

Cases as requested in this Application, and granting such other and further relief as may be just and proper under the circumstances.

Dated: July 28, 2020

<div style="margin-left: 40%;">

*/s/ Derek F. Meek*

**BURR & FORMAN LLP**
Derek F. Meek
Hanna Lahr
420 20th Street North, Suite 3400
Birmingham, AL 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
Email: dmeek@burr.com
        hlahr@burr.com

- and -

**O'MELVENY & MYERS LLP**
Stephen H. Warren (*pro hac vice* admission pending)
Karen Rinehart (*pro hac vice* admission pending)
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
Email: swarren@omm.com
        krinehart@omm.com

*Proposed Attorneys for the Debtors and Debtors in Possession*

</div>

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 14 of 101

**<u>Exhibit A</u>**

**Adams Declaration**

43701634 v1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY, INC., *et al.*,[1]<br><br>           Debtors. | Chapter 11<br><br>Case No. 20-81688-11<br><br>Joint Administration Requested |

**DECLARATION OF COLIN M. ADAMS**
**IN SUPPORT OF DEBTORS' APPLICATION FOR ENTRY OF INTERIM**
**AND FINAL ORDERS AUTHORIZING THE RETENTION AND EMPLOYMENT OF**
**M-III ADVISORY PARTNERS, LP AS FINANCIAL ADVISOR TO THE DEBTORS**

I, Colin M. Adams, make this declaration pursuant to 28 U.S.C. § 1746 and state as follows:

1.      I am a Managing Director at M-III Advisory Partners, LP (together with its wholly-owned subsidiaries, "**M-III**"), an independent corporate turnaround and advisory firm providing operational, strategic and financial advice for our clients with headquarters are located at 130 West 42nd Street, 17th Floor, New York, New York 10036.

2.      I am duly authorized to make this declaration (this "**Declaration**") on behalf of M-III and submit this Declaration in support of the *Debtors' Application for Entry of Interim and Final Orders Authorizing the Retention and Employment of M-III Advisory Partners, LP as Financial Advisor to the Debtors* (the "**Application**"),[2] filed concurrently with this Declaration, in which the Debtors seek entry of interim and final orders authorizing the employment of M-III

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Application.

43701634 v1

as financial advisor to the Debtors pursuant to Bankruptcy Code section 327(a), Bankruptcy Rules 2014(a) and 2016, and under the terms and conditions set forth in the Application.

3.     Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify thereto.  Certain of the disclosures set forth herein are related to matters within the knowledge of other employees of M-III and are based on information provided by them.

## M-III'S QUALIFICATIONS

4.     M-III has a wealth of experience in providing financial advisory services to distressed companies, including those in industries similar to the Debtors, in complex restructurings.  M-III has an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.  M-III's expertise includes significant experience assisting distressed companies with day-to-day management activities, including development of pro forma financials and business plans, cash flow management, and implementation of liquidity-enhancing and cost-saving strategies.

5.     In addition, as a result of the significant prepetition work performed on behalf of the Debtors, M-III has acquired significant knowledge of the Debtors and their businesses and is intimately familiar with the Debtors' financial affairs, systems, assets, capital structure, operations and related matters.  During its prepetition engagement, M-III's services have included a wide range of activities targeted at stabilizing and improving the Debtors' financial position, including: (i) developing or validating forecasts, business plans, and related assessments of the business's strategic position; (ii) monitoring and managing cash and cash flow; (iii) preparation and planning for chapter 11 filing and first-day relief; and (iv) designing and assessing financial restructuring alternatives.

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 17 of 101

## SERVICES TO BE PROVIDED

6.       During these Chapter 11 Cases, M-III will render restructuring advisory services as

M-III and the Debtors deem appropriate and feasible, including, without limitation, the following:

- Assist the Debtors in the development and administration of its short-term cash flow forecasting, budgeting and related methodologies, as well as its cash management planning;

- Assist the Debtors in connection with preparation for and conduct of a reorganization process, including, without limitation, (i) development of restructuring plans and strategic alternatives intended to maximize the enterprise value and (ii) development and presentation of any related forecasts and monthly operating plans and results that may be required by creditor constituencies in connection with negotiations or by the Debtors for other corporate purposes;

- Assist the Debtors in obtaining and presenting such information as may be required by the parties in interest to these Chapter 11 Cases and the bankruptcy process, including any creditors' committees and the Court, with such information to include, among other things, budgets and financial models required in connection with any debtor-in-possession financing to be obtained by the Debtors;

- Assist the professionals who are representing the Debtors in the reorganization process or who are working for the Debtors various stakeholders to coordinate their efforts and individual work product in order to be consistent with the Debtors' overall restructuring goals;

- Assist, if required, the Debtors in communications and negotiations with its outside constituents, including creditors, trade vendors and their respective advisors;

- Provide such other services as are reasonable and customary for a financial advisor in connection with the administration and prosecution of a bankruptcy proceeding; and

- Provide such additional services as M-III and the Debtors shall otherwise agree in writing.

## NO DUPLICATION OF SERVICES

7.       M-III understands that the Debtors have retained and may retain additional

professionals during the term of the engagement and agrees to work cooperatively with such

professionals to integrate any respective work conducted by the professionals on behalf of the Debtors. I believe that M-III is providing distinct and specific financial advising and consulting services as set forth in the Engagement Agreement, and such services are not expected to duplicate those to be provided by any other consultants or advisors.

## PROFESSIONAL COMPENSATION

8.     In consideration of the Services to be provided by M-III, subject to this Court's approval, the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and any applicable orders of the Court, and pursuant to the terms and conditions of the Engagement Agreement, the Debtors have agreed to the following fee structure (the "**Fee Structure**") to (i) compensate M-III for the services set forth in the Engagement Agreement on an hourly basis in accordance with M-III's ordinary and customary rates in effect on the date such services are rendered and (ii) reimburse actual and necessary costs and expenses incurred by M-III in connection with all services performed on behalf of the Debtors.

9.     Before the Petition Date, M-III received an initial retainer from the Debtors of $200,000.00 (the "**Retainer**"), which may be replenished from time to time. Pursuant to the Engagement Agreement, M-III applied the Retainer to prepetition fees and expenses. During the 90 days prior to the commencement of these Chapter 11 Cases, the Debtors paid M-III a total of $1,185,244.25 for M-III's services to the Debtors in contemplation of, and in connection with, prepetition restructuring activities. M-III's current estimate is that it received unapplied advance payments from the Debtors in excess of prepetition billings of approximately $120,000.00, which is subject to final determination after all prepetition billings and collections are reconciled. The unapplied residual Retainer will not be segregated by M-III in a separate account and (except as expressly contemplated by the Engagement Agreement) will be held until the end of these Chapter 11 Cases and applied to M-III's finally approved fees in these proceedings.

10. The current standard U.S. hourly rates[3] (expressed in USD), subject to periodic adjustments, that M-III professionals will charge pursuant to the Engagement Agreement are as follows:

| Professional | Standard Rate |
|---|---|
| Managing Partner | $1,150 |
| Managing Director | $900 - $1,025 |
| Director | $725 - $825 |
| Vice President | $650 |
| Senior Associate | $550 |
| Associate | $475 |
| Analyst | $375 |

11. The hourly rates set forth above are M-III's applicable hourly rates for its professionals and staff members for the engagement set forth in the Engagement Agreement. These hourly rates reflect M-III's normal and customary billing practices for engagements of this complexity and magnitude. M-III revises its hourly rates periodically and M-III will provide notice of any rate increases to the Debtors, the Bankruptcy Administrator, and any official committee of unsecured creditors appointed in these Chapter 11 Cases.

12. In addition, M-III will invoice the Debtors for its reasonable and direct out-of-pocket expenses charged during these Chapter 11 Cases, which include, among other things, internet access, conference calls, overnight mail, messenger, travel, meals, accommodations and other expenses, specifically related to its engagement by the Debtors.

13. I believe that the fees are reasonable and comparable to those generally charged by financial advisors and consultants of similar stature to M-III for comparable engagements, both in and out of chapter 11. The Fee Structure summarized above and described more fully in the Engagement Agreement is consistent with M-III's normal and customary billing practices for

---

[3] Rates included in the Application are current M-III hourly rates and have been approved by the Debtors in accordance with the Engagement Agreement.

5

comparably-sized and complex cases and transactions, both in and out of court, involving the services to be provided in connection with chapter 11 cases. Moreover, the fees are consistent with and typical of arrangements entered into by M-III and other financial advisory and consulting firms with the rendering of comparable services to clients such as the Debtors. I believe that the fees are both reasonable and market-based.

## INDEMNIFICATION PROVISIONS

14. As part of the overall compensation payable to M-III under the terms of the Engagement Agreement, the Debtors have agreed to certain indemnification and contribution provisions described in the Engagement Agreement (the "**Indemnification Provisions**"). As more fully set forth in the Engagement Agreement, the Indemnification Provisions provide that the Debtors agreed to indemnify and hold harmless M-III and its affiliates, equity holders, partners, directors, employees, agents, representatives and contractors to the extent described in Annex I to the Engagement Agreement against all costs, fees, expenses, damages, and liabilities (including defense costs) associated with any pending or threatened third party claim, action or proceeding relating to or arising as a result of the Engagement or the provision of the Services, except to the extent such losses are determined to be the result of M-III's bad faith, gross negligence, or willful misconduct.

15. The terms of the Engagement Agreement, including the Indemnification Provisions, were fully negotiated between the Debtors and M-III at arm's length. I believe that the Indemnification Provisions, as modified by the Proposed Orders, are customary, reasonable and in the best interests of the Debtors, their estates and creditors.

## M-III'S DISINTERESTEDNESS

16. In connection with the preparation of this Declaration, M-III requested and obtained from the Debtors' proposed counsel a list of interested parties and significant creditors in these

Chapter 11 Cases (collectively, the "**Potential Parties in Interest**").  The list of Potential Parties in Interest is reflected on **Schedule 1** attached hereto.

17.     Senior professionals of M-III then reviewed the names of each of the Potential Parties in Interest and M-III compared the names on the list with its records concerning current and former clients and key parties in interest with respect to those current and former clients. Known connections between former or recent clients of M-III and the Potential Parties in Interest were compiled for purposes of preparing this Declaration.   These connections are listed on **Schedule 2** attached hereto.

18.     To the best of my knowledge, information, and belief, and based on the foregoing inquiry, other than in connection with this engagement and as otherwise disclosed in this Declaration or as set forth in **Schedule 2**, M-III has no relationships or connections with the Debtors or their affiliates.   In addition, to the best of my knowledge, information, and belief, neither I nor any other professional of M-III who is working on this engagement:

a.   is a creditor, equity security holder, or insider of the Debtors;

b.   is or has been within two years before the Petition Date, a director, officer, or employee of the Debtors; or

c.   has any interest materially adverse to the interests of the Debtors' estates, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

19.     M-III provides services to many clients with interests in the Debtors' Chapter 11 Cases.  To the best of my knowledge, except as indicated below, M-III's services for such clients do not relate to these Chapter 11 Cases.

20.     Further, as part of its diverse practice, M-III appears in numerous cases and proceedings, and participates in transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who represent claimants and parties-in-interest

in these Chapter 11 Cases. M-III has been represented by several attorneys and law firms, some of which may be involved in these proceedings. Based on my current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in matters upon which M-III is to be employed, and none are in connection with these cases.

21.     If any new material relevant facts or relationships are discovered or arise, M-III will promptly file a supplemental declaration.

22.     M-III's current estimate is that it received unapplied advance payments from the Debtors in excess of prepetition billings of approximately $120,000.00, which is subject to final determination after all prepetition billings and collections are reconciled. As such, it is believed that the Debtors do not owe M-III any amounts for services rendered before the Petition Date.

23.     To the best of my knowledge, (a) no commitments have been made or received by M-III with respect to compensation or payment in connection with these Chapter 11 Cases other than in accordance with the provisions of the Bankruptcy Code, and (b) M-III has no agreement with any other entity to share with such entity any compensation received by M-III in connection with these Chapter 11 Cases.

24.     I have read the Application that accompanies this Declaration and, to the best of my knowledge, information and belief, the contents of such Application are true and correct.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on July 27, 2020

*/s/ Colin M. Adams*  
Colin M. Adams  
Managing Director  
M-III Advisory Partners, LP  
130 W 42nd Street, 17th Floor  
New York, New York 10036

**<u>Schedule 1</u>**

**List of Potential Parties in Interest**

43701634 v1

# LIST OF PARTIES SEARCHED[1]

## DEBTORS

Remington Outdoor Company, Inc.

FGI Holding Company, LLC

FGI Operating Company, LLC

Barnes Bullets, LLC

Remington Arms Company, LLC

Huntsville Holdings LLC

TMRI, Inc.

Remington Arms Distribution Company, LLC

32E Productions, LLC

Great Outdoors Holdco, LLC

RA Brands, L.L.C.

FGI Finance Inc.

Outdoor Services, LLC

## NON-DEBTOR CORPORATE ENTITIES

Remington Outdoor (UK) Ltd.

Remington Licensing Corporation

Remington Charitable Fund

## CREDIT FACILITY LENDERS

### Priority Term Loan Lenders

Cantor Fitzgerald Securities

Whitebox GT Fund, LP

Whitebox Multi-Strategy Partners, LP

Whitebox Credit Partners, LP

Whitebox Asymmetric Partners, LP

Pandora Select Partners, LP

---

[1] Inclusion in a category for search purposes is solely to illustrate the conflicts search process and is not an admission that any party has a valid claim against the Debtors or that any party properly belongs in the Debtors' schedules or has a claim or legal relationship to the Debtors of the nature described in the schedules.

Whitebox Caja Blanca Fund, LP

**<u>FILO Lenders</u>**[2]

Ankura Trust Company, LLC

Funds and accounts managed by Franklin Advisers, Inc.

**<u>Exit Term Loan Lenders</u>**

Ankura Trust Company, LLC

Funds and accounts managed by Franklin Advisers, Inc.

JPMorgan Chase Bank, N.A.; funds and accounts managed by JPMorgan Chase Bank, N.A.

J.P. Morgan Investment Management Inc.; funds and accounts managed by J.P. Morgan Investment Management Inc.

Lord Abbett; funds and accounts managed by Lord Abbett

Renaissance Investment Holdings Ltd.

Teachers Retirement Systems of Oklahoma

---

[2] Where available, the names of the individual funds and accounts managed by investment advisors that are holders of the FILO Term Loan, the Exit Term Loan, and equity securities have been provided to the Office of the Bankruptcy Administrator.

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document       Page 27 of 101

### S<small>TOCKHOLDERS</small>: K<small>NOWN</small> C<small>URRENT</small> / R<small>ECENT</small> S<small>TOCKHOLDERS</small>

Funds and accounts managed by Franklin Advisers, Inc.

Funds and accounts managed by J.P. Morgan Investment Management Inc.

Funds and accounts managed by JPMorgan Chase Bank, N.A

Funds and accounts managed by Lord Abbett

First Southern Securities, LLC

Logen Asset Management, L.P.

Whitebox Multi-Strategy Partners, LP

Whitebox Asymmetric Partners, LP

Renaissance Investment Holdings, Ltd.

Newmark Capital Funding 2013-1CLO

ACIS CLO 2013-1, Ltd.

Artisan Credit Opportunities Master Fund LP

DG Value Partners, LP

DG Value Partners II Master Fund, LP

Cantor Fitzgerald & Co.

Antora Peak Capital Management LP

Antora Peak Credit Opportunities Fund, LP

Schultze Master Fund, Ltd.

Hillmark Funding, Ltd.

ACIS CLO 2014-3 Ltd.

ACIS CLO 2014-4 Ltd.

ACIS CLO 2014-5 Ltd.

ACIS CLO 2014-6 Ltd.

BTIG, LLC

LCM XIII Limited Partnership

LCM XIV Limited Partnership

LCM XV Limited Partnership

LCM XVI Limited Partnership

LCM XVII Limited Partnership

LCM XVIII Limited Partnership

LCM XIX Limited Partnership

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document    Page 28 of 101

LCM XX Limited Partnership

LCM XXI Limited Partnership

LCM XXII LTD.

LCM XXIII LTD.

LCM XXIV LTD.

LCM XXV LTD.

<div align="center">

**OFFICERS AND DIRECTORS**

</div>

Melissa Anderson

Mark Boyadjian

Jeff Brown

Emile Buzaid

Joanne Chomiak

Melissa Cofield

Ken D'Arcy

Gene Davis

Billy Hogue

Rick Kilts

William Krogseng

Mark Little

Matt McCarrol

Chuck Rink

Charles Thurman

Matt Trask

John Trull

Brian Wheatley

Ehsan Zargar

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 29 of 101

### BANK ACCOUNTS

Adirondack Bank

Cadence Bank

First State Bank

Wells Fargo Bank

### COMPANY-HELD EQUITY INTERESTS

Walmart Inc.

### UCC SEARCH NAMES

Remington Outdoor Company, Inc.

FGI Holding Company, LLC

FGI Operating Company, LLC

Barnes Bullets, LLC

Remington Arms Company, LLC

Huntsville Holdings LLC

TMRI, Inc.

Remington Arms Distribution Company, LLC

32E Productions, LLC

Great Outdoors Holdco, LLC

RA Brands, L.L.C.

FGI Finance Inc.

Outdoor Services, LLC

Remington Outdoor (UK) Ltd.

Remington Licensing Corporation

Remington Charitable Fund

### DEBTORS' PROFESSIONALS

O'Melveny & Myers LLP

M-III Advisory Partners, LP

Akin Gump

Womble Bond Dickson

Shook, Hardy, and Bacon

Swanson, Martin, and Bell

## EQUITY OWNERS, POTENTIALLY 5% OR GREATER

Schultze Master Fund, Ltd.

Funds and accounts managed by Franklin Advisers, Inc.

Funds and accounts managed by J.P. Morgan Investment Management Inc. and/or funds and accounts managed by JPMorgan Chase Bank, N.A.

## 40 LARGEST UNSECURED CREDITORS

Pension Benefit Guaranty Corporation

State of Arkansas, Business Development, Arkansas Economic Development Commission

City of Huntsville, Alabama

State of Alabama

State of Missouri

St. Marks Powder

Eco-Bat Indiana LLC

Art Guild Inc.

Dasan USA Inc.

Alliant TechSystems Operations LLC

QIQIHAR Hawk Industries Co. Ltd.

MSC Industrial Supply Co.

Swanson Martin & Bell

SAP America Inc.

Helio Precision Inc.

The Doe Run Company

DIE-NAMIC Inc.

Alltrista Plastics LLC

A M Castle & Co. / Castle Metals

Decimet Sales Inc.

Kennametal Inc.

Brothers & Co.

Vista Outdoor Sales LLC

Amark Engineering & Mfg Inc.

6

Geodis Logistics LLC

Chessgroup

Continental Traffic Service Inc.

Dayton Lamina Corp.

Safari Classics Production

General Dynamics

G & R Manufacturing

National Rifle Association

Oberg Industries

Westrock Converting

Bushnell Inc.

Electro-Tech Inc.

Nordic Components Inc.

Producto Corporation

Luvata Appleton LLC

Village of Ilion Treasurer, Utica, NY

**32E Productions, LLC**

Cantor Fitzgerald Securities

Ankura Trust Company, LLC

**Barnes Bullets, LLC**

Bank of America, N.A.

Ankura Trust Company, LLC

Wilmington Trust, National Association

Cantor Fitzgerald Securities

**FGI Finance Inc.**

Bank of America, N.A.

Ankura Trust Company, LLC

Wilmington Trust, National Association

Cantor Fitgerald Securities

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 32 of 101

**FGI Holding Company, LLC**

Bank of America, N.A.

Ankura Trust Company, LLC

Wilmington Trust, National Association

Cantor Fitzgerald Securities

**FGI Operating Company, LLC**

Bank of America, N.A.

Ankura Trust Company, LLC

Wilmington Trust, National Association

Cantor Fitzgerald Securities

**Great Outdoors Holdco, LLC**

Cantor Fitzgerald Securities

Ankura Trust Company, LLC

**Huntsville Holdings Company, LLC**

Ameritas Life Insurance Corporation

**Huntsville Holdings LLC**

Cantor Fitzgerald Securities

Ankura Trust Company, LLC

**Outdoor Services, L.L.C.**

Caterpillar Financial Services Corporation

**Outdoor Services LLC**

Internal Revenue Service

**Outdoor Services, LLC**

Cantor Fitzgerald Securities

Ankura Trust Company, LLC

**RA Brands, L.L.C.**

Bank of America, N.A.

Ankura Trust Company, LLC

Wilmington Trust, National Association

Cantor Fitzgerald Securities


**Remington Arms Company, LLC**

Air Liquide Industrial U.S. LP

Bank of America, N.A.

Ankura Trust Company, LLC

Wilmington Trust, National Association

NMHG Financial Services, Inc.

HYG Financial Services, Inc.

J.R. Automation Technologies, LLC

Cantor Fitzgerald Securities


**Remington Arms Company, Inc. and Herkimer County Sheriff**

Richard Keith Caister and d/b/a RKC Products

The Edmunds Manufacturing Company and d/b/a Edmunds Gages


**Remington Arms Company, Inc.**

Regions Commercial Equipment Finance, LLC


**Remington Arms Distribution Company, LLC**

Wilmington Trust, National Association

Bank of America, N.A.

Ankura Trust Company, LLC

Cantor Fitzgerald Securities

**Remington Charitable Fund**

[No Results]


**Remington Licensing Corporation**

[No Results]

9

**Remington Outdoor (UK) Ltd.**

[No Results]

**Remington Outdoor Company, Inc.**

Wilmington Trust, National Association

Bank of America, N.A.

Ankura Trust Company, LLC

Cantor Fitzgerald Securities

**Remington Outdoors Company, Inc.**

Ellison Technologies

**TMRI, Inc.**

Bank of America, N.A.

Ankura Trust Company, LLC

Wilmington Trust, National Association

Cantor Fitzgerald Securities

## LETTERS OF CREDIT

Geodis Logistics LLC

## FREIGHT BROKERS AND COMMON CARRIERS

CTSI

Continental Traffic Service, Inc.

## INSURANCE

Sompo

Berkshire Hathaway

Greewich Insurance Company

XL Insurance America, Inc.

National Fire & Marine Insurance

Ironshore

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 35 of 101

Hiscox/StarStone/ACT

AIG

Starr Aviation

Indemnity Insurance Company of North America

Chubb

Endurance

Markel

Axis

Navigators

Beazley

Berkley Pro

US Specialty

WorldSource

XL

Berkley Asset Protection

Illinois Union Insurance Co. (Chubb)

James River Insurance Company

North American Capacity Insurance Company

Westchester Surplus Lines Insurance Company

ACE Property & Casualty Insurance Company

## **LANDLORDS**

PanCal Southhaven One 127, LLC

First Stamford Place SPE L.L.C. and Merrifield First Stamford SPE L.L.C.

Stout Industral Properties, LLC

PAM Industrial Properties, LLC

Norma J. Allen

Sturgis Economic Development Corporation

BCR Enterprises, Ltd.

Glassell Family LLC

FW Properties, L.L.C.

Eagle Bulk Shipping International (USA) LLC (Subtenant)

## LITIGATION (PENDING / POTENTIAL)

United Mine Workers of America, Local Union 717

U.S. Environmental Protection Agency

Chemetco, Inc. Superfund Site

Layne Kay and Emily Kay v. Barnes Bullets (Utah Supreme Court, Appellate Case No. 2018-0821-SC)

Lori Evans (USDC, E.D. Ark., Case No. 4:19-cv-801)

Sharron Evars (USDC, N.D. Ala., Case No. 5:20-cv-0705)

John Coburn (EEOC Case No. 493-2020-00206)

Alison Manning (EEOC Case No. 420-2020-01534)

Mollie Todd (Smalls Claims Court, District Court of Madison County, Ala., Case No. 47-SM-2019-000969.00)

Worker's Comp Litigant:  Floyd Brothers (Case No. G807557)

Workers Comp Litigant:  Avery Gardner (Case No. F701796)

Workers Comp Litigant:  Johnathan Oliver (Case No. G602108)

Workers Comp Litigant:  Anthony Webster (Case No. G70625)

Workers Comp Litigant:  Chris Strong (Case No. G703571)

Workers Comp Litigant:  Richard Zona (Case No. 985039)

Workers Comp Litigant:  Ruth Suarez (Case No. 300084274)

Workers Comp Litigant:  Corey Castleman (Case No. 201356687)

Workers Comp Litigant:  Nicholas Croan (Case No. 16-014763)

Workers Comp Litigant:  Monica Czarrunchick (Case No. G0743503)

Workers Comp Litigant:  Jason Lape (Case No. G1328832)

Workers Comp Litigant:  Colleen Smith (Case No. G0634470)

Workers Comp Litigant:  Colleen Stanburg (Case No. 60309132)

Workers Comp Litigant:  Susan Barger (Case No. 60703435)

Workers Comp Litigant:  Stephen Brown (Case No. 60500499)

Workers Comp Litigant:  Adam Boepple (Case No. G1851684)

Workers Comp Litigant:  Kim Faubert (Case No. GL450563)

Workers Comp Litigant:  Kevin Trevor (Case No. G1067691)

Workers Comp Litigant:  Matthew Davis (Case No. 60805819)

Workers Comp Litigant:  Lois Sill (Case No. G0490071)

Workers Comp Litigant:  Kerry Atwood (Case No. 60703961)

Workers Comp Litigant:  Scott Miller (Case No. 60607085)

Workers Comp Litigant: Raymond Wiegand (Case No. 60506411)

Workers Comp Litigant: Todd Zielinski (Case No. G2063301)

Workers Comp Litigant: Eugene Smith (Case No. 60608514)

Workers Comp Litigant: Larry Hallenbeck (Case No. G2210819)

Workers Comp Litigant: John McKusick (Case No. G1975913)

Workers Comp Litigant: Jessica Boepple (Case No. G1583518)

Workers Comp Litigant: Basilio Santiago (Case No. G1581701)

Workers Comp Litigant: Douglas Pedrick (Case No. G2211672)

Workers Comp Litigant: Eric True (Case No. G1702070)

Workers Comp Litigant: Cynthia Uhlig (Case No. G1975103)

Workers Comp Litigant: Wade Haponski (Case No. G2212070)

JoAnn Harris (USDC, W.D. Okla., Case No. 5:15-cv-1375) / USCA, 8th Circuit

Ryan Carr (USDC, W.D. Okla., Case No. 5:16-cv-1153)

Cody Shearouse (USDC, S.D. Ga., Case No. 4:17-cv-0107)

Vincent Tate (Circuit Court for the County of Henrico, Va., Case No. 087CL17004633-00)

Roger Stringer, (USDC, S.D. Miss., Case No. 2:18-cv-0059) USCA, 5th Circuit

Kimberly Hyder, (USDC, S.D. Miss., Case No. 2:18-cv-0059) USCA, 5th Circuit

Zachary Stringer, (USDC, S.D. Miss., Case No. 2:18-cv-0059) USCA, 5th Circuit

Sharon Teague and Randall Teague (Estate of Mark Randall Teague) (USDC, D. Mont., Case No. 9:18-cv-0184)

Brett Nielsen (USDC, D. Utah, Case No. 2:20-cv-0011)

Richard Clay (Estate of) (Circuit Court of St. Clair County, Ala., Case No. CV2018-900221)

Alyssa Scott (Estate of) (USDC, N.D. Ala., Case No. 19-cv-1891)

Steven Wharton (San Diego County Superior Court, State of California, Case No. 37-2019-000121144-CU-PL-CTL)

Miguel Angeles (Santa Barbara County Superior Court, State of California, Case No. 18-cv-4922)

Travis Walton (Los Angeles County Superior Court, State of California, Case No. BC723793)

Precious Sequin (USDC, E.D. La., Case No. 2:14-cv-2442) USCA, 5th Circuit

Primus Group, LLC (USDC, S.D. Ohio, Case No. 2:19-cv-3450) USCA, 6th Circuit

Donna L. Soto (Estate of Victoria L. Soto) v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

Ian Hockley and Nicole Hockley (Estate of Dylan C. Hockley) v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

13

William D. Sherlach (Estate of Mary Joy Sherlach) v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

Leonard Pozner (Estate of Noah S. Pozner) v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

Gilles J. Rousseau (Estate of Lauren G. Rousseau) v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

David C. Wheeler (Estate of Benjamin A. Wheeler) v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

Neil Heslin and Scarlett Lewis (Estate of Jesse McCord Lewis) v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

Mark Barden and Jacqueline Barden (Estate of Daniel G. Barden) v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

Mary D'Avino (Estate of Rachel M. D'Avino) v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

Natalie Hammond v. Bushmaster Firearms International, LLC, et al. (Superior Court for the Judicial District of Fairfield, Bridgeport, Conn., Case No. FBT-CV15-6048103-S, Case Transferred to UWY-CV15-6050025-S)

Pollard v. Remington (USCA, 8th Circuit)


### TAXING AUTHORITIES

Ohio Treasurer of State, Columbus, Ohio

Delaware Division of Corporations, Dover, Delaware

Alabama Department of Revenue, Montgomery, Alabama

Franchise Tax Board, Sacramento, California

Tennessee Department of Revenue, Nashville, Tennessee

North Carolina Department of Revenue - W/H

Clark County Treasurer, Jeffersonville, Indiana

La Porte County Treasurer, Michigan City, Indiana

North Carolina Secretary of State, Raleigh, North Carolina

James W. Wilburn III, Treasurer, Lenoir City, Tennessee

Loudon County Trustee, Loudon, Tennessee

14

North Carolina Division of Motor Vehicles, Raleigh, North Carolina

Randolph County Treasurer, Chester, Illinois

Receiver of Taxes, Mohawk, NY

Village of Ilion Treasurer, Ilion, NY

Desoto County, Tax Collector, Hernando, Mississippi

Treasurer of Hancock County, Findlay, Ohio

Lonoke County Collector, Lonoke, Arkansas

Marion County Collector, Yellville, Arkansas

Benton County Collector, Bentonville, Arkansas

Office of the Fayette County Sheriff, Lexington, Kentucky

Crittenden County Sheriff, Marion, Kentucky

Douglas County Tax Commissioner, Douglasville, Georgia

Pinellas County Tax Collector, Seminole, Florida

Juab County Assessor, Nephi, Utah

Lafayette County Collector, Lexington, Missouri

Madison County Tax Collector, Huntsville, Alabama

Butler County Sheriff, Morgantown, Kentucky

Collector of Revenue, Springfield, Missouri

Rockingham County Tax Department, Charlotte, North Carolina

Wake County Department of Revenue, Raleigh, North Carolina

Alabama Department of Revenue, Birmingham, Alabana

City of Huntsville, Huntsville, Alabama

Arizona Department of Revenue, Phoenix, Arizona

State of Arkansas, Little Rock, Arkansas

State of California, Sacramento, California

Colorado Department of Revenue, Denver, Colorado

State of Connecticut, Hartford, Connecticut

Florida Department of Revenue, Tallahassee, Florida

Georgia Sales and Use Tax Division, Atlanta, Georgia

State of Hawaii, Honolulu, Hawaii

Idaho State Tax Commission, Boise, Idaho

Illinois Department of Revenue, Springfield, Illinois

Indiana Department of Revenue, Indianapolis, Indiana

State of Iowa Treasurer, Des Moines, Iowa

Kansas Department of Revenue, Topeka, Kansas

Kentucky State Treasurer, Frankfort, Kentucky

Louisiana Department of RevenueBaton Ruoge, Louisiana

Maine Bureau of Taxation, Augusta, Maine

Maryland Comptroller of the Treasury, Baltimore, Maryland

Massachusetts Department of Revenue, Boston, Massachusetts

State of Michigan, Lansing, Michigan

Minnesota Department of Revenue, St. Paul, Minnesota

Mississippi Tax Commission, Jackson, Mississippi

Missouri Department of Revenue, Jefferson City, Missouri

Nebraska Department of Revenue, Lincoln, Nebraska

Nevada Department of Taxation, Las Vegas, Nevada

State of New Jersey, Trenton, New Jersey

New Mexico Taxation and Revenue Department, Santa Fe, New Mexico

New York State Sales Tax, Albany, NY

North Carolina Department of Revenue, Raleigh, North Carolina

State of North Dakota, Bismarck, North Dakota

Treasurer of State, Columbus, Ohio

Oklahoma Tax Commission, Oklahoma City, Oklahoma

Pennsylvania Department of Revenue, Harrisburg, Pennsylvania

State of Rhode Island, Providence, Rhode Island

South Carolina Department of Revenue, Columbia, South Carolina

South Dakota Department of Revenue, Sioux Falls, South Dakota

Texas State Treasurer, Austin, Texas

Utah State Tax Commission, Salt lake City, Utah

Vermont Department of Taxes, Montpelier, Vermont

Virginia Department of Taxation, Richmond, Virginia

State of Washington Department of Revenue, Seattle, Washington

Department of Tax & Revenue, Charleston, West Virginia

Wisconsin Department of Revenue, Milwaukee, Wisconsin

Wyoming Department of Revenue, Cheyenne, Wyoming

District of Columbia Government, Washington, DC

Alcohol Tobacco Tax & Trade Bureau. Cincinnati, Ohio

## **PROMISSORY NOTES**

Industrial Row Realty LLC (as successor-in-interest to H&R 1871, LLC)

L R Nash (SMK) Ltd.

Remington Arms Company, LLC

## **OTHER EQUITY INTERESTS**

Remington Licensing Corporation

Sporting Activities Insurance Limited

Wal-Mart Stores, Inc.

Case 20-81688-CRJ11   Doc 22   Filed 07/28/20   Entered 07/28/20 01:01:14   Desc Main
Document     Page 42 of 101

## UTILITY PROVIDERS

AAA Disposal Services Inc. (Disposal)

ADCO Companies Ltd. (Boiler Room / Steam)

Airgas USA LLC (Gas)

AT&T (Phone at all Remington Locations)

Centracom (Telephone)

CenturyLink (Telephone)

CenturyLink Communications LLC (Telephone)

City of Huntsville Utilities (Huntsville, Alabama) (Electricity)

City of Lexington, Missouri (Water / Sewer)

Constellation NewEnergy - Gas Division

Cox Communications (Internet Services)

Duke Energy (Electricity)

Empire District (Electricity)

Evergy Inc. (Energy)

First Electric Cooperative Corp. (Electricity)

Frontier Communications (Internet / Telephone)

Herkimer County Sewer District (Mohawk, NY) (Sewer)

Ilion Water Department (Ilion, NY) (Water)

Intercall (Atlanta, GA) (Telephone)

Jay Mecham's Country Garbage (Mona, Utah) (Landfill Usage)

Madison Electric Inc. (Madison, Alabama) (Electricity)

Mail Finance Inc. (Dallas, Texas) (Electricity)

Mona City (Mona, Utah) (Water / Sewer)

National Grid (Gas)

Piedmont Natural Gas Company (Dallas, Texas) (Gas)

Rocky Mountain Power (Electricity)

Spectrum (Cable TV and Internet)

Sprague Operating Resources LLC (Electricity / Gas)

Town of Mayodan (Mayodan, NC) (Water / Sewer)

Verizon (Telephone)

Village of Ilion, Light Department (Ilion, NY) (Electricity)

18

Waste Management (Carol Stream, Illinois) (Waste Management)

Waste Management of Alabama North (Huntsville, Alabama) (Waste Management)

Waste Management of New York - Utica (Waste Management)

Windstream Corporation (Louisville, Kentucky) (Data Networking / Communications)

## ALABAMA BANKRUPTCY JUDGES (N.D. ALA.)

James J. Robinson

Tamara O. Mitchell

Jennifer H. Henderson

Clifton R. Jessup, Jr.

D. Sims Crawford

## BANKRUPTCY ADMINISTRATOR / TRIAL ATTORNEYS (N.D. ALA.)

Thomas Corbett (Bankruptcy Administrator)

Richard Blythe (Assistant Bankruptcy Administrator)

Jon Dudeck (Deputy in Charge)

Tazewell Shepard (U.S. Trustee's Office, Northern Division)

Judith Thompson (U.S. Trustee's Office, Northern Division)

Michele T. Hatcher (U.S. Trustee's Office, Northern Division)

## EXECUTORY CONTRACTS
## (FROM SPREADSHEET DATED 4/27/20 FROM CLIENT)

Windstream

Microsoft EA & SCE

Rimini Street

Paymetric

BAH (formerly Morphick)

Panaya

DPSI

ERP Maestro

DarkTrace

NetBrain

SAP / SuccessFactors

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 44 of 101

SAP C4C

SEI

AT&T

CISCO SmartNet (via CDW)

Segra (formerly Data Chambers / Northstate)

Sunview Software

Illinois Department of Natural Resources

National Skeet Shooting Association

Widen Enterprise Inc.

MODX System

NRA Publications

Oracle / Bronto

Magento / Adobe

Union Sportsmen's Alliance

National Wild Turkey Federation

Boone & Crockett Club

Rocky Mountain Elk Foundation

Western Hunting & Conservation Expo

Full Curl Society

Sportsman for Fish & Wildlife

Ducks Unlimited

Outdoor Sportsmans Group

Heartland Waterfowl

Whitetails Unlimited

Phesants Forever

Delta Waterfowl

Independent Hunting LLC

Zmags Corp

Ruffed Grouse Society

Safari Classic Productions

Sportscar Vintage Racing Association

National Machinery

Siemens

Video Jet

Westrock

Sprague

Toshiba

SAP Success Factors

RSR (Quemetco EcoBat) Lead

Doe Run Lead

Gopher Resources - Lead

Cintas

G4S

Diversified Maintenance-RWS, LLC

Niagara LaSalle

Precision Kidd

Eaton Steel

### <u>ADDITIONAL EXECUTORY CONTRACTS</u>
### <u>(FROM SPREADSHEETS DATED 5/7/20 AND 5/11/20)</u>

**<u>SOURCING - Direct (Raw Materials)</u>**
RSR (Quemetco (EcoBat))
Doe Run
Gopher Resources
Sanders
Aurubis
General Dynamics-OTS
LyondelBassel

**<u>SOURCING - Direct (Not Raw Materials)</u>**
National Machinery
Westrock
Manth Brownell

**<u>SOURCING - Indirect</u>**
Sprague Operating Resources
G4S
Siemens (Fire Alarm (Lonoked))
Diversified Maintenance
Pitney Bowes
Stanley Security
Les Olson (Barnes CyberSecurity)

21

Aagard Group
Airgas
Alabama Equipment
American Food & Vending
American Safety & Health Institute (HSI)
Applied Combustion and Equipment
Arkansas Copier Center
Carlson Wagonlit Travel
Cintas
CoreTrust
Diversified Maintenance
Mail Finance / Ed & Ed Business Technology
Instream Environmental
Les Olson (MONA Barnes CyberSecurity)
LiftOne
Meridian IT
MSC Industrial Supply
National Machinery
Nationwide Power
Otis Elevator Company
Pitney Bowes
Schnitzer Southeast
Security Equipment Inc.
Shred-It
Siemens
SiteHawk
Southern Sweepers
Sprague Operating Resources
Stanley Security
Trane Building Services
Vanguard Cleaning Systems
Videojet
Waste Management
Wiese USA
Stryker Tech LLC

**SALES - Retail Customers (Domestic)**

Mills Fleet Farm

Academy Sports & Outdoors

Bass Pro - Cabela's

Bi-Mart

Dunham's Sporting Goods

Mattoon Rural King

Midway Arms

Pacific Flyway

Scheel's Consolidated

Big 5 Corporation

**SALES - Wholesale Distributors (Domestic)**

All State Police Equipment

Bailey's Firearms Country

Bailey's House of Guns

Barney's

Craig's Firearms

Davidson's

Ed's Public Safety

Firing Line

H&H Gunrange

Kiesler

Lawmen Supply Company

Lawmens' & Shooters

Lawmen's Distribution

LC Action

Lou's Police Distributors

Michigan Police Equipment

Proforce

Smyrna

Surplus Arms & Ammo

Targetmaster

The Attic

Town Police Supply

Witmer Associates

Galls

Bangers LP

Big Rock Sports, LLC

Bill Hicks & Co., Ltd.

Camfour, Inc.

Davidson's, Inc.

Grice Wholesale

Hicks Inc.

Lew Horton Distributing Co., Inc.

RSR Group

Sports South, LLC

VF Grace, Inc.

Williams Shooters Supply Inc.

Zanders Sporting Goods

## **SALES - Sales Reps (Domestic)**

Maschmedt & Associates

Murski Breeding Sales, Inc.

ProActive Sales & Marketing

## **SALES - Wholesale Distributors (Foreign)**

A&A Dealers

AS Oliva

Abaco Hardware

Aekaphatt Firearms Ltd.

Al Hadaf

Arcocity

Armaq

Artemis

Artemix

Astroclassic

B&B Target

Bell

Bignami

Borchers

Bowmac

BRS

Cabela's

Cairo

Casa El Cazador

CB Servis Centrum

Central Dealers

Chasse Et Loisirs

Civil Arms

Comercial Palmera

Delta Firearms

Diamantopoulos

Discovery

Dolphin Gun Company

Dossul

Edelweiss

Ellwood Epps

Europa

Fancesa

Faulkners

Firearms Training Institute

Formalito

Full Metal

GDV

GP Interarms

General Dynamics

Glaser

Glenn's Ammo

Gowen

Gravel

Grunig

Helmut Hoffman - Germany

Helmut Hoffman - Austria

Hokuto Trading

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 50 of 101

Horst Trigatti

Hubertech

Importadora Daher

Izhevsky

Jaguar Gruppen

Jakt & Friluft

Juan Ruiz de Velazco (Vega Seis)

Krometal

Kulim Arms

Lawry Shooting Sports

LDS Long Distance Services

Le Baron

Leonowens

Magne Landro

Magnum

Mario Ludwig

Meguro Gun Shop

Midarms

Municiones

Nippo Kogyo

Norma AS

Norma Precision AB

Normark

North Sylva

Omnium Celdonien

Outdoor Brands

Parabellum

PB Dionisio

Peche

Pronature

Purnavu Muiza

Raja Firearms

Raytrade

Raytrade UK Ltd

Redl Sports

Riflecraft

Rivolier

RUAG Germany

Safari & Outdoor

Safari Master

Sail Outdoors

Sako

Sarsilmaz

Shooting Supply Ltd.

Skenco Europe

Skenco International

Soboce

Sofarca

Sologne

Special Tactical

Star Force

Tankeeraq

Thai National

The Gunshop

Topth

Veidihornid

Velkoobchod Zbrane

West Gun Trading Co.

Wholesale Sports

**SALES - Brokers (Foreign)**

ARLE

Atlantic Diving Supply

Aquaterro

Aquila

Ascim

Azimuth Defense

B&B Target

BU Combines

Banzai SPOL S.R.O.

Cairo

Century Dynamics

Clemente Serna Barrera

Continental Defence Solutions

Cornerstone Technica

Counter Measures Technologies

Droo Tactical Trading

DSE Corporation

Dukef Holdings

DW Global

Eton International

Eurooptic

G4 Solutions & Research

Glaser Trading

Glaucus APS

Global Nepal Trading & Consultants

Goldbelt Wolf

Gravel Agency

Hantaurus Shot OY

Helmut Hoffman - Germany

Hyphen Industrial

Iberfix

Igniter

Importadora

K Tree Corp.

Korea Infomax Science

Kornnarath Ltd.

LE&M Distributors

Leonowens

LHB Ltd.

MG Suber & Associates

Magne Landro AS

Magnum Vadasz

Milipol ZRT

Mission Equipment Sweden

Naphantorn Limited Partnership

Nathat

PB Dionisio

Poligoni Shenjetarise Katana

Priamos s Coumas

Prof Investment Co.

Promoteq Sandviken

Quintilio Chesi E Hijos

Rainier Arms

Rein International Group

Rescomp

Richmond Global Traders

Riflecraft

Rigg AS

Rivolier SAS

Royal Defence

RUAG Ammotec

SEEEP

Sirien SA

Tactical Power

Tactical Trading

Thai National Trading Co.

UMO

Val Redena

W.H. Brennan

XTEK

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document      Page 54 of 101

**SALES - Foreign Governments**

Republic of Tunisia

Royal Defence, for Resale to Thailand


**SALES - U.S. Government**

US Department of Homeland Security - FLETC

US Department of Justice

US Army Contracting Command - Foreign Military Sales

NSWC

US Department of Energy

US21 Inc. / US Department of State

US Department of Agriculture - FS

US SOCOM - United States Special Operations Command

US Department of Homeland Security - ICE

US Department of Homeland Security - USSS

US Department of State

FRS


**LICENSING - Outbound Trademark Licenses**

Ashgrove Marketing

Baschieri & Pellagri

Buck Knives

Coastal Pet

Crosman / Velocity Outdoor

Deperate Enterprises

Gator Cases

High Performance Designs

IRIS

Nippo Kogyo

Open Roads Brands

Outdoor Cap

PEM America

SMK

Smoky Mountain Knife Works

Southern Fried Cotton

Top Promotions

Vintage Editions


**LICENSING - Inbound Licenses**

Haas Outdoors, Inc.

Jordan Outdoor Enterprises, Ltd.

MagPul Industries Corp.

National Machinery

Ducks Unlimited

Norgon, LLC

Silvers, Robert

Advanced Technology International USA, LLC

Veil Camo LLC


**MARKETING - TV Sponsorship Agreements**

Heartland Waterfowl

Independent Hunting

Outdoor Sportsman Group


**MARKETING - Marketing Transaction Agreements**

NRA

Delta Waterfowl

Full Curl Society

National Wild Turkey Federation

Outdoor Sportsman Group/KSE Sportsman

Pheasants Forever

Rocky Mountain Elk Foundation

Rocky Mountain Elk Foundation (1st amendment)

Ruffed Grouse Society

SportscarVintage Racing Association

Western Hunting & Conservation Expo

Sportsmen for Fish & Wildlife

Whitetails Unlimited

**MARKETING - Event Sponsorship Agreements**

None

**MARKETING - Conservation Sponsorship Agreements**

Ducks Unlimited

**CONSUMER SERVICE - Rebate Services**

Velocity

**CONSUMER SERVICE - Warranty and Repair Services**

Wild West Guns

Sprague's Sports Inc.

J & G Gunsmithing

Higher Power Outfitters Inc.

Scheels All Sport

Mann & Son Sporting Goods

Paducah Shooters Supply

Williams Gun Sight

Dick Williams Gun Shop, Inc.

Alhman's Inc.

B&B Arms

Skip's Gun Shop

Wild West Guns

The Gunworks of Central New York

Sports World

Allison & Carey Gunworks

Southland Gun Works, Inc.

Scheels All Sport

Triton Arms

Carter Gunsmithing

**CUSTOMER SERVICE - Co-Op Program**

None

**FULFILLMENT - Logistics and Warehousing**

Geodis

Continental Traffic Service

DG Advisor LLC

Livingston

GCB Glover Customs Brokers

**FULFILLMENT - Shipping**

CTSI

FedEx Transportation Services

Manitoulin Transport

Old Dominion Freight Line

Saia Inc.

YRC Inc.

Swift Transportation

United Parcel Service

Ozark Motor Linds (Ozark Motor Lines)

A. Duie Pyle

Teals Express

XPO Logistics

**COMPLIANCE - Environmental Health & Safety**

Cintas

HSI

Safety Kleen

Siemens

Site Hawk

VSC

Waste Management

ACE Industries

Advantage

Air Gas

ALX

American Equipment Inc.

Aon

Apex Engineering

Bell

Bronstein Container

Brown Randall

Call-Em-All

Cell Mark

Clean Harbors

Concentra

Confidata

CTEH

David's Fire Equipment

Dr. McFadden

ECCI

Enersolv

Environmental Resource Center

Environmental Works

Fastenal

Foster Brothers

Frakes

FTN

G4S

Gallagher Bassett

Gellco

GHD

Grainger

HazMat

Heritage

Howa

Hoya

Independent Electric

Industrial Health Council

Industrial Hearing

Instream

Interplex

JJKeller Online

Johnson Contracting

K Safety

Koorsen

K-ter

L&T Health Systems

Life Science Labs

Lion Technologies

LSC

Marx Optical

Melfie's Shoes

Metalico

MJ Communications

Modern Shoes

MSC

MT2

Northern Safety

One Stop

Opaque Smoke School

Paper & Dust Pros

Pollution Control Incorporated

Shoe Maker

Simplex Grinell

Slocum Dickson

Sound Choice

Southern Optical (switching vendor)

Spohns

Terrell Technical

Thompson Tractor

Tim Crumb

TK Group

Utah Fire Equipment

Utah Manufacturing Association

Utah Safety Council

WCF Insurance

Work Wear


**COMPLIANCE - Firearms, Ammo and Sales**

Navex Global

Amber Roads

Orchid Advisors


**FINANCE - Insurance Brokerage**

Aon


**FINANCE - Insurance Policies**

None


**INFORMATION TECHNOLOGY - Software**

SAP

Microsoft

DarkTrace

Windstream


**SALES - International Warehouse and Distribution Agreements**

Borchers, S.A.

Helmut Hofmann GMBH

Jaguar Gruppen A/S

Midarms, SPRL

Norma Precision AB

Raytrade Pty Ltd.

Raytrade UK Limited

Sako Ltd.

Skenco Europe, Kft.

## LEASES

Norma J. Allen

Sturgis Economic Development Corporation

FW Properties, LLC

Toyota Industries Commercial Finance

HYG Financial Services

BCR Enterprises Ltd.

Empire State Realty Trust (ESRT) First Stamford Place SPE LLC

Eagle Bulk Shipping International (USA) LLC

GEODIS Logistics LLC

Arkansas Copier (De Large)

Safety Kleen

Wiese Lifts

Mail Finance Inc.

Stout Industrial (Tom Stout and Pam Stout)

PAM Industrial Properties

Applied Combustion

MacCopy

Great America Financial/Toshiba Business Solutions

Glassell Family LLC

S&K Industries

PanCal Southhaven One 127, LLC

## OTHER PARTIES SUBMITTING LOI'S

(CONFIDENTIAL)

<u>**Schedule 2**</u>

**Potential Connections or Related Parties**

- M-III previously was engaged in April 2018 by O'Melveny & Myers LLP and FGI Operating Company, LLC to provide financial advisory services to them. Pursuant to that engagement, M-III provided services, through O'Melveny & Myers LLP, to affiliates of Franklin Templeton and JPMorgan Asset Management, who at that time were lenders to FGI Operating Company and later became lenders to, and equity interest holders of, the Debtors. Work on that engagement was completed in June 2018 and M-III has been paid in full for that work. To the best knowledge of the senior professionals at M-III, such engagement does not create interests adverse to the Debtors and was not in connection with these cases.

- Mohsin Y. Meghji, the Managing Partner of M-III, was a founder and sponsor of M III Acquisition Corp., which consummated an initial public offering in 2016 in which Cantor Fitzgerald Securities served as lead underwriter. To the best knowledge of the senior professionals at M-III on the date hereof, such relationship was unrelated to the Debtors, does not create interests adverse to the Debtors and is not in connection with these cases.

- Mohsin Y. Meghji, the Managing Partner of M-III, currently serves as an independent director on the Board of Directors of Frontier Communications Corp. To the best knowledge of the senior professionals at M-III on the date hereof, Mr. Meghji's role with Frontier has been unrelated to the Debtors, does not create interests adverse to the Debtors and is not in connection with these cases.

- M-III or its senior professionals also have recently had, currently have, and in the future are likely to have, relationships in the ordinary course of business with professionals (including law firms, accountants, financial consultants, and other professionals and service providers) (each, an "**Ancillary Entity**") who may be involved in these proceedings. Such relationships may include, among other things, M-III or its senior professionals (a) appearing in transactions and cases that involve Ancillary Entities and, (b) serving as advisor where law firms or financial advisors that constitute Ancillary Entities have represented M-III's client or other parties-in-interest. The entities shown on <u>Schedule 1</u> who constitute (or whose affiliates constitute) Ancillary Entities include, without limitation, the following:

  - O'Melveny & Myers LLP
  - Burr & Forman
  - Akin Gump Strauss Hauer & Feld LLP
  - Ducera Partners LLC

  To the best knowledge of the senior professionals at M-III on the date hereof, each such relationship has been unrelated to the Debtors, does not create interests adverse to the Debtors and is not in connection with these cases.

- M-III has recently represented, currently represents, and may in the future represent, credit facility agents and syndicate lenders (the "**Financial Entities**") who may be involved in these

proceedings in various engagements unrelated to the Debtors or these proceedings. The entities shown on the <u>Schedule 1</u> who constituted (or whose affiliates constitute) Financial Entities include, without limitation, the following:

- o JP Morgan Chase Bank, NA
- o Wells Fargo Bank
- o Bank of America
- o Regions Bank
- o Franklin Templeton

To the best knowledge of the senior professionals at M-III on the date hereof, such relationships have been unrelated to the Debtors, do not create interests adverse to the Debtors and are not in connection with these cases.

- M-III purchases services in the ordinary course of business and in the open market from numerous vendors who as serve as vendors and contact counterparties to the Debtors. To the best knowledge of the senior professionals at M-III on the date hereof, such relationships have been unrelated to the Debtors, do not create interests adverse to the Debtors and are not in connection with these cases.

- M-III and its professionals participate in many proceedings and transactions in various federal bankruptcy courts throughout the country and, as a result, has in the recent past, currently or may in the future participate in cases in which the U.S. Trustee and a United States Bankruptcy Judge is involved and certain of those individuals may be parties in interest in this proceeding. To the best knowledge of the senior professionals at M-III on the date hereof, such relationships have been unrelated to the Debtors, do not create interests adverse to the Debtors and are not in connection with these cases.

43701634 v1

**<u>Exhibit B</u>**

**Proposed Interim Order**

43701634 v1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*,[1] | Case No. 20-81688-11 |
| Debtors. | Joint Administration Requested |

## INTERIM ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF
## M-III ADVISORY PARTNERS, LP AS FINANCIAL ADVISOR TO THE DEBTORS

Upon the *Debtors' Application for Entry of Interim and Final Orders Authorizing the Retention and Employment of M-III Advisory Partners, LP as Financial Advisor to the Debtors* (the "**Application**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for entry of an interim order (this "**Interim Order**") pursuant to Bankruptcy Code section 327(a) and Bankruptcy Rules 2014(a) and 2016 authorizing the Debtors to retain and employ M-III Advisory Partners, LP ("**M-III**"), as financial advisor for the Debtors effective as of [July 27, 2020] (the "**Petition Date**"), in accordance with the terms and conditions of that certain engagement letter executed on April 23, 2020, including any amendments and schedules thereto (the "**Engagement Agreement**"), attached hereto as **Exhibit 1**, all as more fully set forth in the Application; and upon consideration of the Adams Declaration filed contemporaneously therewith;

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

[2]  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Application.

43701634 v1

and upon the First Day Declaration; and it appearing that (i) the Court has jurisdiction over these Chapter 11 Cases and the Application under 28 U.S.C. §§ 1334(b) and 157, and the *Amended General Order of Reference* from the United States District Court for the Northern District of Alabama dated as of July 17, 1984, (ii) venue of these Chapter 11 Cases and the Application in this Court is proper under 28 U.S.C. §§ 1408 and 1409, (iii) the Application is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter interim and final orders consistent with Article III of the United States Constitution, and (iv) notice of the Application was adequate and proper under the circumstances, and no other or further notice need be given; and this Court being satisfied, based on the representations made in the Application and the Adams Declaration, that M-III is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and as required under section 327(a) of the Bankruptcy Code, and that M-III represents no interest adverse to the Debtors' estates; and the Court having held an interim hearing, if necessary, to consider the relief requested in the Application (the "**Interim Hearing**"); and upon the record of the Interim Hearing, if any; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and it appearing that the relief requested in the Application is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.      The Application is GRANTED on an interim basis as set forth herein.

2.      In accordance with Bankruptcy Code section 327(a), the Debtors are authorized to employ and retain M-III as their financial advisor effective as of the Petition Date under the terms set forth in the Application, the Adams Declaration, and the Engagement Agreement, including

the Fee Structure and Indemnification Provisions set forth therein (as modified by this Interim Order).

3.      M-III shall be entitled to allowance of compensation and reimbursement of expenses, upon the filing and approval of interim and final applications pursuant to the Bankruptcy Rules and such other orders as this Court may direct, including, without limitation, any order of this Court establishing procedures for interim compensation and reimbursement of professionals retained in these Chapter 11 Cases.

4.      The terms of the Engagement Agreement, as modified by this Interim Order, are reasonable terms and conditions of employment and are approved.

5.      M-III shall use reasonable efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these Chapter 11 Cases.

6.      The Indemnification Provisions set forth in the Engagement Agreement are approved, subject during the pendency of these Chapter 11 Cases to the following:

     a.  if, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these Chapter 11 Cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these Chapter 11 Cases, M-III believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Engagement Agreement, as modified by this Interim Order, including without limitation the advancement of defense costs, M-III must file an application therefore in this Court, and the Debtors may not pay any such amounts to M-III before the entry of an order by this Court approving such payment.  This subparagraph (a) is intended only to specify the period during which the Court shall have jurisdiction over any request by M-III for indemnification, contribution or reimbursement and is not a provision limiting the duration of the Debtors' obligation to indemnify;

     b.  subject to the provisions of subparagraph (c) below, the Debtors are authorized to indemnify, and shall indemnify, M-III in accordance with the Engagement Agreement for any claim arising from related to or in connection with the services provided for, whether prepetition or postpetition, in the Engagement Agreement; and

c. notwithstanding any provisions of the Engagement Agreement to the contrary, the Debtors shall have no obligation to indemnify M-III or provide contribution or reimbursement to M-III for any claim or expense that is either (i) judicially determined to have resulted primarily from the willful misconduct, gross negligence, bad faith or self-dealing of M-III, or (ii) settled prior to a judicial determination as to M-III's willful misconduct, gross negligence, bad faith or self-dealing, but determined by the Court, after notice and a hearing pursuant to this subparagraph (c), to be a claim or expense for which M-III should not receive indemnity, contribution or reimbursement under the terms of the Engagement Agreement.

7.      To the extent there may be any inconsistency between the terms of the Application, the Engagement Agreement, the Adams Declaration and this Interim Order, this Interim Order shall govern.

8.      Notice of the Application is adequate under Bankruptcy Rule 6004(a).

9.      The Debtors are authorized to take all actions necessary to implement the relief granted in this Interim Order.

10.     The final hearing (the "**Final Hearing**") on the Application is scheduled for _____, 2020, at __:__ _.m., Central Time, before this Court.  Any objections or responses to entry of a final order on the Application shall be filed on or before 4:00 p.m. Central Time on _____, 2020, and served on the following parties: (a) proposed counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA, 90071 (Attn: Stephen H. Warren and Karen Rinehart) (Emails: swarren@omm.com; krinehart@omm.com) and Burr & Forman LLP, 420 20th Street North, Suite 3400, Birmingham, AL 35203 (Attn: Derek F. Meek and Hanna Lahr) (Emails: dmeek@burr.com; hlahr@burr.com); (b) the Office of the Bankruptcy Administrator for the Northern District of Alabama, P.O. Box 3045, Decatur, AL 35602 (Attn: Richard Blythe) (Email: richard_blythe@alnba.uscourts.gov); and (c) counsel to the Creditors' Committee (if any).  In the event no objections to the entry of a final order on the

Application are timely received, this Court may enter a final order without need for a hearing thereon.

11.     No later than two (2) business days after the date this Interim Order is entered, the Debtors shall cause this Interim Order to be served via first class U.S. mail on the following parties, which shall constitute adequate notice of the Final Hearing on the Application: (i) the Bankruptcy Administrator; (ii) the Debtors' consolidated list of creditors holding the forty largest unsecured claims; (iii) counsel to Whitebox Advisors LLC, as Priority Term Loan Lender; (iv) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (v) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (vi) counsel to Franklin Advisors, Inc., as FILO Lender; (vii) the United States Internal Revenue Service; (viii) counsel to the United Mine Workers of America; and (ix) all parties entitled to notice pursuant to Bankruptcy Rule 2002.

12.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Interim Order.

Dated: _____, 2020         _____
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**M-III Engagement Agreement**

43701634 v1



April 23, 2020

Remington Arms Company, LLC
870 Remington Drive
Madison, NC 27025-0700

<u>Engagement Letter</u>

Ladies and Gentlemen:

This letter agreement (this "***Agreement***") sets forth the terms and conditions of the engagement (the "***Engagement***") of M-III Advisory Partners, LP ("***M-III***") to provide the Services (as defined below) to Remington Arms Company, LLC and certain of its affiliates (collectively, the "***Client***"). M-III and the Client are collectively referred to in this Agreement as the "***Parties***."

1.  <u>Services</u>:  The Client hereby retains M-III to provide, and M-III hereby agrees to provide, the following services (the "***Services***") upon the terms and subject to the conditions set forth in this Agreement:

> (a) assist the Client in the development and administration of its short-term cash flow forecasting, budgeting and related methodologies, as well as its cash management planning;

> (b) provide such assistance as reasonably may be required by the Client its management and advisors in connection with preparation for and conduct of a reorganization process, including, without limitation, (i) development of restructuring plans and strategic alternatives intended to maximize the enterprise value and (ii) development and presentation of any related forecasts and monthly operating plans and results that may be required by creditor constituencies in connection with negotiations or by the Client for other corporate purposes;

> (c) in the event that the Client commences a bankruptcy case (the "***Case***"), the Client so requests and, to the extent necessary, the relevant United States Bankruptcy Court (the "***Court***") so approves, assist the Client in obtaining and presenting such information as may be required by the parties in interest to the Case and bankruptcy process, including any creditors' committees and the Court, with such information to include, among other things, budgets and financial models required in connection with any debtor-in-possession financing to be obtained by the Client;

> (d) assist the professionals who are representing the Client in the reorganization process or who are working for the Client's various stakeholders to coordinate their efforts and individual work product in order to be consistent with the Client's overall restructuring goals;

M-III ADVISORY PARTNERS, LP  •  130 WEST 42ND STREET, 17TH FLOOR, NEW YORK, NY 10036
T: (212) 716-1491  •  F: (212) 531-4532  •  WWW.MIIIPARTNERS.COM

Case 20-81688-CRJ11    Doc 22    Filed 07/28/20    Entered 07/28/20 01:01:14    Desc Main
Document    Page 72 of 101

(e) assist, if required, the Client in communications and negotiations with its outside constituents, including creditors, trade vendors and their respective advisors;

(f) provide such additional services as M-III and the Client shall otherwise agree in writing.

2. <u>Engagement Term</u>. (a) The Engagement shall commence on the date of acceptance of this Agreement and may be terminated by either Party at any time upon ten business days' written notice. Following any such termination, neither Party shall have further liability to the other, except with respect to fees and expenses earned and incurred through the date of termination and any provisions of this Agreement which are expressly stated to survive its termination or expiration.

(b) In the event that the Client commences a Case, the Client will promptly apply to the Court for approval of M-III's retention *nunc pro tunc* to the date of filing. The form of retention application and proposed order shall be reasonably acceptable to M-III and M-III shall have no obligation to provide any further services if the Client becomes a debtor under the Bankruptcy Code unless M-III's retention under the terms of the Agreement is approved by a final order of the Court reasonably acceptable to M-III. The Client shall assist, or cause its counsel to assist, with filing, serving and noticing of papers related to M-III's retention and fee and expense applications.

3. <u>Staffing</u>. M-III will staff a team that it believes to be appropriate to provide the Services in accordance with the terms of this Agreement. The individual members of the team are subject to change by M-III from time to time in its sole discretion.

4. <u>Compensation for Services</u>. (a) M-III's compensation for services rendered under this Agreement shall be paid by the Client by wire transfer of immediately available funds in accordance with instructions provided from time to time by M-III to the Client and will consist of the following:

(i) <u>Retainer</u>: M-III presently holds a $200,000.$^{\underline{00}}$ retainer balance from the Client (the "***Retainer***"). All billings for fees, expenses and any other amounts due and owing hereunder will be paid by drawings against the Retainer and the Client shall be obligated to promptly replenish the Retainer in advance of any further Services being provided hereunder. The Retainer is not intended to be an estimate of the fees and expenses for the Engagement. Once received by us, the Retainer and any additional amounts received by M-III as replenishment of the Retainer will irrevocably become the property of M-III, and shall not be subject to any claim of set-off, recoupment or other defense in respect of M-III's ownership thereof or entitlement to such funds under the terms hereof.

(ii)    <u>Hourly Fees</u>:  As compensation for providing the Services hereunder, M-III shall be entitled to non-refundable professional fees based on the actual hours incurred by M-III personnel on matters pertinent to this case (the "***Hourly Fees***").  The Hourly Fees shall be based upon the following hourly rates:

| Professional | Standard Rate |
|---|---|
| Managing Partner | $1,150 |
| Managing Director | $900 - $1,025 |
| Director | $725 - $825 |
| Vice President | $650 |
| Senior Associate | $550 |
| Associate | $475 |
| Analyst | $375 |

The Hourly Fees shall be billed by M-III to the Client twice per month (or more frequently if M-III so elects) by M-III furnishing to the Client copies of an invoice for the Hourly Fees in respect of the billing period.  As previously noted, M-III is authorized to apply the Retainer to such amounts and, to the extent that the Retainer is insufficient to pay the amounts then due, the Client shall pay such excess by wire transfer of immediately available funds within three (3) business days after the date of service of the relevant invoice.  M-III may adjust its billing rates from time to time in the normal course of business upon notice to the Client.

(iii)    <u>Expenses</u>:  In addition to any compensation for providing the Services, the Client shall reimburse M-III for all reasonable and documented out-of-pocket expenses incurred in the performance of the Services (including, without limitation, reasonable travel costs).  Such reimbursement shall be paid by application of the Retainer and, to the extent that the Retainer is insufficient to pay such amounts, by wire transfer within three (3) business days after delivery by M-III to the Client of a reasonably detailed invoice for reimbursement thereof.

(b)    In the event that the Retainer is not replenished upon our request, or amounts payable hereunder are not paid within three (3) business days of the date when due, such amounts shall be deemed "past due" and M-III shall have the right to suspend further Services until payment is received on past due invoices and/or the Retainer is replenished. In the event that M-III so suspends the Services, M-III shall not be responsible or liable for any resulting loss, damage or expense due to such suspension.

(c)    Notwithstanding anything to the contrary contained in this Section 4, in the event that a Case shall be commenced, then the Company promptly shall seek an order of the Court approving the retention of M-III as its financial advisor and, upon such approval and during the continuance of such Case, amounts owing to M-III under this Section 4 shall be submitted monthly to the Court for review and payment in accordance with the guidelines and rules promulgated by the Court for such matters.

(c)     All fees payable to M-III are exclusive of taxes or similar charges, which shall be the sole obligation of the Client (other than any taxes which may be payable on account of M-III's income generally, which shall be the obligation of M-III).

5.     Cooperation from Client.  In order to properly perform the Services and fulfill its responsibilities on a timely basis, M-III will rely on the timely cooperation of the Client and its other professional advisors, including, without limitation, making available to M-III relevant data, information and personnel, performing any tasks or responsibilities assigned to the Client and notifying M-III of any issues or concerns that the Client may have relating to the Services.  The Client will provide M-III with reasonable access to all personnel, books and records of the Client and its subsidiaries, as well as to all advisors and professionals retained by the Client and its Subsidiaries.  The Client understands and acknowledges that M-III's proper delivery of the Services is dependent upon timely decisions and approvals by the Client and its management. M-III shall have no responsibility or liability for any delays, additional costs or other deficiencies caused by the Client failing to properly fulfill its responsibilities under this Agreement.

6.     Deliverables.  (a) In connection with the Engagement, M-III may furnish the Client with information, advice, reports, analyses, presentations or other materials (the "***Deliverables***").  The Deliverables may contain factual data, the interpretation of which may change over the project term as more information or better understanding becomes available.  The Client acknowledges that M-III will have no obligation to update the Deliverables as part of the Services in the event of such a change.

(b)     Any materials prepared by M-III are solely for the confidential use of the Client and its directors, officers, employees and advisors and will not be distributed, reproduced, summarized, referred to, disclosed publicly or given to any other person without the prior written consent of M-III (with such consent not to be unreasonably withheld in the case of distribution to parties in interest to the Case and their advisors), *provided* that such permission shall not be required if the materials are required to be disclosed by applicable law or by order or act of any court or governmental or regulatory authority or body.  M-III will not provide such materials to any other person (natural or otherwise) without the consent of the Client or its counsel.

(c)     The provisions of this Section shall survive the termination or expiration of this Agreement.

7.     Limitations on Services.  (a)  The Services are limited to those specifically noted in this Agreement.

(b)     M-III does not provide accounting or tax-related assistance and no Deliverable or other information or advice provided to the Client shall be deemed to be accounting or tax-related assistance.  The Client shall be solely responsible for determining the accounting and tax-related implications of the Deliverables and other information and advice provided to it by M-III.  M-III shall not express any professional opinions on financial statements or perform attest procedures

with respect to other information in conjunction with the Engagement. The Services are not designed, nor should they be relied upon, to disclose weaknesses in internal controls, financial statement errors, irregularities or illegal acts. M-III shall assume the accuracy and completeness of all information submitted by or on behalf of the Client to M-III for analysis and which will form the basis of M-III's conclusions, without any obligation of M-III to verify the accuracy or completeness of such information, and M-III shall not be responsible for any analysis, advice or other Services to the extent based on inaccurate or incomplete information provided or accepted by or on behalf of the Client.

(c) The Services shall not include preparing, auditing or otherwise attesting in any way (including without limitation, with respect to the accuracy, achievability, reliability, relevance, usefulness or other appropriateness) to the Client's financial projections, and the Client has not engaged M-III for that purpose. The Services are provided based upon the understanding that the Client has sole responsibility for its financial projections (including preparation thereof), developing underlying assumptions and providing any disclosure related thereto. To the extent that, during the performance of Services hereunder, M-III is required to consider the Client's financial projections, the Client understands that M-III's procedures with respect to such projections do not constitute an examination in accordance with procedures established by the American Institute of Certified Public Accountants and do not and are not intended to provide any assurance on any aspect of such projections, including, without limitation, the reasonableness of the assumptions underlying such projections, nor do they provide assurance that M-III might not become aware of significant matters affecting the reasonableness of the projections that might be disclosed by more extensive procedures. There will usually be differences between projected and actual results, and those differences may be material. The Client understands and agrees that M-III will have no responsibility or liability relating to any such differences.

(b) M-III does not provide investment advice and the Services shall not include the provision of investment advice. The Client shall have sole responsibility for all investment decisions made by it. Similarly, M-III is providing advisory and consulting services only and will not make management decisions for the Client. Although M-III may from time to time suggest or recommend options that may be available to the Client, the ultimate decision with respect to such options rests with the Client and the Client shall be solely responsible for such decision and its outcome. M-III makes no representation, promise or guarantee with respect to the outcome of any matter affecting the Client.

(d) To the extent that the performance of the Services requires that M-III form conclusions or reach opinions, M-III shall do so without regard to or consideration of the impact that such conclusions or opinions may have on the initiation or outcome of any litigation to which the Client is or may become a party.

(e) The Client shall be solely responsible for the work and fees of any third parties engaged by the Client to provide services in connection with the Engagement, regardless of whether such third party was recommended to you by M-III or M-III is involved with the services provided by it. M-III shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.

(f) The provisions of this Section shall survive the termination or expiration of this Agreement.

8. <u>Non-Solicitation</u>.  The Client covenants and agrees that, prior to the first anniversary of the termination or expiration of this Agreement, it will not, directly or indirectly, hire directly or as an independent contractor, or refer to another for employment, any person who was during the term of this Agreement an employee or contractor of M-III or any of its affiliated entities who was involved on behalf of M-III with the Engagement or the performance of the Services. In the event of the breach of the foregoing covenant, the Client shall be liable to M-III, and shall pay on demand to M-III, liquidated damages equal to 200% of the total annual compensation of each relevant employee for the preceding calendar year (and, in the event that any such employee was not employed for the full year, the amount equal to 200% of his or her annualized compensation). The Parties mutually agree that the actual damages that would be sustained by M-III as the result of any such breach will be substantial and will be impossible to measure accurately, and that the foregoing liquidated damage amount is fair and reasonable.  The provisions of this Section shall survive the termination or expiration of this Agreement.

9. <u>Confidentiality</u>. (a) Each Party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other party in the scope of the Engagement (the "***Confidential Information***"), and neither Party will disclose any Confidential Information of the other Party to any other person or entity.  For the avoidance of doubt, the term "Confidential Information" shall include (i) the terms of this Agreement, including M-III's retention by the Client, (ii) all non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models and (iii) any work product relating to the business of either party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants.  Notwithstanding the foregoing, the term "Confidential Information" shall not include information that (a) is or becomes publicly available other than as a result of disclosure by the receiving Party, (b) was already known to the receiving Party or (c) was independently acquired or developed by the receiving Party from a source not known by it to be bound by a confidentiality requirement with respect to such information.  In performing the Services, M-III will use and rely primarily on the Confidential Information and on information available from public sources without having independently verified any of such information.

(b)  The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, M-III from making such disclosures of Confidential Information that M-III reasonably believes are required by law or any regulatory requirement or authority, or to clear client conflicts.  M-III also may disclose Confidential Information to its partners, directors, officers, employees, independent contractors and agents who have a need to know the Confidential Information for the proper performance of the Services or otherwise in connection with the Engagement.

(c) The provisions of this Section shall survive for a period of two years following the termination or expiration of this Agreement and shall supersede any separate confidentiality or analogous agreement between M-III and the Client.

10. <u>Intellectual Property</u>.  Upon payment in full of all amounts owing to M-III hereunder, the Client will own all Deliverables furnished by M-III to the Client in connection with the Services, *provided* that M-III will retain ownership of (a) all concepts, analyses, know-how, tools, frameworks, models and industry perspectives used and/or developed by M-III in connection with the Services and (b) all other intellectual property not containing Confidential Information which has been developed by M-III outside of the provision of the Services (the "***M-III Tools***"), it being understood that M-III will have no ownership right to, and will maintain in accordance with the provisions of this Agreement the confidentiality of, any Confidential Information contained in the M-III Tools.  To the extent that the Deliverables include any M-III Tools, M-III hereby grants the Client a non-exclusive, non-transferable, non-sublicensable worldwide, royalty-free license to use and copy the M-III Tools solely as part of the Deliverables and subject to the confidentiality provisions contained in this Agreement; *provided* that, in the event that a Case is commenced, nothing contained herein shall be deemed to restrict the transfer of the Company's license to the M-III Tools to any successor to the Company approved by the Court.  The Client acknowledges and agrees that the M-III Tools are provided to the Client on an "as is" basis and without any warranty or condition of any kind (whether express, implied or otherwise), and including without limitation any implied warranty of merchantability or fitness for a particular purpose. The provisions of this Section shall survive the termination or expiration of this Agreement.

11. <u>Indemnification</u>.  The Client hereby agrees to indemnify and hold harmless M-III and its affiliates, equity holders, partners, directors, employees, agents, representatives and contractors to the extent described in Annex I to this Agreement, with such Annex I being incorporated herein by reference and constituting an integral and enforceable part of this Agreement.  The provisions of this Section (including, without limitation, the provisions of Annex I) shall survive the termination or expiration of this Agreement.

12. <u>Limitation on Damages</u>.  In no event shall M-III or any other Indemnitee be liable to the Client or its affiliates, successors, or any person claiming on behalf of or in the right of the Client (including the Client's owners, parents, affiliates, directors, officers, employees, agents, security holders, or creditors) for (i) any amount which, when taken together with all losses for which M-III and the Indemnitee are liable in connection with this Agreement or the Engagement, would exceed the amount of fees for the Services actually received by M-III from the Client in connection with the Engagement during the immediately preceding 12 months or (ii) any special, consequential, incidental or exemplary damages or loss (or any lost profits, savings or business opportunity) (collectively, the "***Liability Cap***").  This paragraph shall apply regardless of the nature of any claim(s) (including claims based on contract, statute, negligence, tort, strict liability or otherwise), regardless of any failure of the essential purpose of any remedy and whether or not M-III was advised of the possibility of the damage or loss asserted, but shall not apply to the extent finally determined by final and non-appealable judgment of a court of competent jurisdiction to be prohibited by applicable law.  For the avoidance of doubt, the Parties hereby irrevocably agree that the Liability Cap is intended to be the total limit of liability for M-III and all other Indemnitee in

the aggregate for any and all claims or demand by anyone in connection with this Agreement, the Services and the Engagement, including without limitation any liability to the Client and to any others making claims relating to the Services and the Engagement. Any such claimants shall allocate among themselves any amounts payable by M-III, but the failure of the claimants to reach such an agreement shall not affect the enforceability of the Liability Cap. Under no circumstances shall the collective liability of M-III and the other Indemnitee in connection with this Agreement exceed the Liability Cap. The provisions of this Section shall survive the termination or expiration of this Agreement.

13. <u>Client Acknowledgement</u>. The Client hereby acknowledges and agrees that M-III may, in the ordinary course of its business, serve clients who are competitive with, or have conflicting interests with, the Client. Consistent with its confidentiality obligations hereunder and its confidentiality obligations to its other clients, M-III will not advise or consult to the Client with respect to any aspect of M-III's engagement or potential engagement with any other client, potential client or former client. Similarly, M-III will not advise or consult to any other client, potential client or former client with respect to any aspect of the Engagement. M-III will maintain the confidentiality of the Confidential Information in accordance with the terms of this Agreement and, similarly, will not share confidential information of any client, potential client or former client of M-III with the Client. The provisions of this Section shall survive the termination or expiration of this Agreement.

14. <u>Miscellaneous</u>. (a) This Agreement (i) constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements (both written and oral) among the parties with respect to the subject matter hereof, and (ii) may be modified, amended or supplemented only by prior written agreement of each of the Parties.

(b) M-III acknowledges that, in the event that a Case is commenced, (i) the continued retention of M-III by the Company will be subject to the approval of the Court and (ii) the Court may require changes in the terms of this Agreement as a condition to providing its approval. Any such changes will be subject to M-III's approval, which shall not be unreasonably withheld.

(c) The invalidity, illegality, or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality, or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction. If feasible, any such offending provision shall be deemed modified to be within the limits of enforceability or validity; *provided* that, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

(d) M-III's services hereunder are personal in nature and may not be assigned without the written consent of the Client. The obligations of M-III hereunder are owing only to the Client and there shall be no third-party beneficiaries of the obligations of M-III hereunder.

(e)  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument, and all signatures need not appear on any one counterpart.

(f)  This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts to be executed and performed within such state.  The Parties hereby submit to the exclusive jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement.  Notwithstanding the foregoing, during such time as the Court has jurisdiction over the Case, the Court shall have exclusive jurisdiction and venue with respect to any such dispute.  The provisions of this paragraph shall survive the termination or expiration of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

This Agreement shall be binding upon the Parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

M-III ADVISORY PARTNERS, LP

By _____
Name: Mohsin Y. Meghji
Title: Managing Member

ACCEPTED AND AGREED
as of the date first set forth above:

REMINGTON ARMS COMPANY, LLC

By: _____
Name: Ken D'Arcy
Title: CEO



<u>Annex I</u>

AGREEMENTS REGARDING INDEMNIFICATION

In consideration of M-III performing the Services for the benefit of the Client, the Client (the "**_Indemnitor_**") shall indemnify M-III and its affiliates, equity holders, partners, directors, employees, agents, representatives and contractors, including past, present or future partners, principals and personnel of each (collectively hereinafter called the "**_Indemnitees_**") against all costs, fees, expenses, damages, and liabilities (including defense costs) associated with any pending or threatened third party claim, action or proceeding (a "**_Claim_**") relating to or arising as a result of the Engagement or the provision of the Services, the Client's use or disclosure of the Deliverables, or this Agreement ("**_Losses_**"). This provision is intended to apply regardless of the nature of any Claim (including contract, statute, any form of negligence, whether of the Client, M-III, or others, tort, strict liability or otherwise), except to the extent such Losses are determined to be the result of M-III's bad faith, gross negligence or willful misconduct.

The Indemnitor shall not, without M-III's prior written consent (which will not be unreasonably withheld) settle, compromise, or consent to the entry of any judgment in any pending or threatened Claim in respect of which indemnification could reasonably be sought hereunder (whether or not M-III or any other Indemnitee is an actual or potential party to such Claim), if such settlement, compromise, or consent does not include an unconditional release of each Indemnitee from all liability arising out of such Claim; _provided_, _however_, that the Indemnitor shall not enter into any such settlement, compromise or consent of a Claim without M-III's prior written consent (which may be granted or withheld in M-III's sole discretion) if such settlement, compromise or proceeding provides for injunctive relief against an Indemnitee or an admission of liability by an Indemnitee. The Indemnitor shall not be liable hereunder to any Indemnitee for any amount paid or payable in the settlement of any action, proceeding or investigation entered into by such Indemnitee without the Indemnitor's written consent.

Upon receipt by an Indemnitee of actual notice of a Claim against such Indemnitee in respect of which indemnity may be sought hereunder, such Indemnitee shall promptly notify the Indemnitor with respect thereto. In addition, an Indemnitee shall promptly notify the Indemnitor after any action is commenced (by way of service with a summons or other legal process giving information as to the nature and basis of the claim) against such Indemnitee in respect of which indemnity may be sought hereunder. In any event, failure to notify the Indemnitor shall not relieve the Indemnitor from any liability which the Indemnitor may have on account of this indemnity or otherwise, except to the extent, and only to the extent, that the Indemnitor shall have been materially prejudiced by such failure.

Indemnitor shall advance all expenses indemnifiable hereunder that are reasonably incurred by or on behalf of each Indemnitee in connection with any Claim within thirty (30) days after receipt by Indemnitor of a statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Claim. Such statement or statements shall reasonably evidence the expenses incurred by Indemnitee and shall include or be preceded or accompanied by a written undertaking by or on behalf of Indemnitee to repay any expenses advanced if it shall ultimately be determined that Indemnitee is not entitled to be

indemnified against such expenses. Any advances and undertakings to repay pursuant to this paragraph shall be unsecured and interest free.

To the extent that the Indemnitor so elects, it shall be entitled to assume the defense, with counsel selected by the Indemnitor (and approved by M-III, with such approval not to be unreasonably withheld), of any action that is the subject of the proceeding in respect of which indemnity may be sought. After notice to the Indemnitees of its election to assume the defense thereof, the Indemnitor will not be liable to the Indemnitee under this Agreement for any expenses subsequently incurred by such Indemnitee in connection with the defense thereof except as otherwise provided below. Such Indemnitee shall have the right to employ counsel of its choice in such Claim, but the fees and expenses of such counsel incurred after notice from the Indemnitor of the assumption of the defense thereof shall be at the expense of the Indemnitee unless the employment of counsel by the Indemnitee has been authorized by the Indemnitor, in which case the reasonably incurred fees and expenses of such counsel of the Indemnitee shall be at the expense of the Indemnitor.

The Client agrees that neither M-III nor any other Indemnitee shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Client or any person or entity asserting claims on behalf of or in right of the Client caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, except for losses, claims, damages, penalties or liabilities incurred by the Client which are finally determined by a non-appealable judgment of a court of competent jurisdiction to have resulted primarily and directly from the bad faith, willful misconduct or gross negligence of M-III or any other Indemnites and do not exceed the Liability Cap.

In the event that any M-III personnel are requested or required to appear as a witness in connection with any claim, action or proceeding relating to or arising as a result of the Engagement or the provision of the Services, the Client's use or disclosure of the Deliverables, or this Agreement, the Indemnitor shall, to the extent permitted by applicable law, reimburse M-III for all reasonable and documented out-of-pocket expenses incurred by it in connection with such personnel appearing and preparing to appear as a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel, and to compensate M-III at a rate equal to M-III's then standard hourly rate for the relevant personnel for each day that such personnel is involved in preparation, discovery proceedings or testimony pertaining to such Claim. Additionally, M-III will have the right to obtain advice from independent legal counsel with respect to its actual or potential obligations and liability hereunder and the Client will promptly reimburse M-III for the reasonable out-of-pocket fees and expenses paid by M-III on account thereof.

The provisions of this Annex I shall be deemed to be an integral part of this Agreement to which this Annex I is affixed and shall survive the termination or expiration of this Agreement for any reason. The provisions of this Annex I shall be binding upon the Client and its successors and assigns.

**Exhibit C**

**Proposed Final Order**

43701634 v1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*,[1] | Case No. 20-81688-11 |
| Debtors. | Joint Administration Requested |

## FINAL ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF
## M-III ADVISORY PARTNERS, LP AS FINANCIAL ADVISOR TO THE DEBTORS

Upon the *Debtors' Application for Entry of Interim and Final Orders Authorizing the Retention and Employment of M-III Advisory Partners, LP as Financial Advisor to the Debtors* (the "**Application**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for entry of a final order (this "**Final Order**") pursuant to Bankruptcy Code section 327(a) and Bankruptcy Rules 2014(a) and 2016 authorizing the Debtors to retain and employ M-III Advisory Partners, LP ("**M-III**"), as financial advisor for the Debtors effective as of [July 27, 2020] (the "**Petition Date**"), in accordance with the terms and conditions of that certain engagement letter executed on April 23, 2020, including any amendments and schedules thereto (the "**Engagement Agreement**"), attached hereto as **Exhibit 1**, all as more fully set forth in the Application; and upon consideration of the Adams Declaration filed contemporaneously therewith;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Application.

43701634 v1

and upon the First Day Declaration; and it appearing that (i) the Court has jurisdiction over these Chapter 11 Cases and the Application under 28 U.S.C. §§ 1334(b) and 157, and the *Amended General Order of Reference* from the United States District Court for the Northern District of Alabama dated as of July 17, 1984, (ii) venue of these Chapter 11 Cases and the Application in this Court is proper under 28 U.S.C. §§ 1408 and 1409, (iii) the Application is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter interim and final orders consistent with Article III of the United States Constitution, and (iv) notice of the Application was adequate and proper under the circumstances, and no other or further notice need be given; and this Court being satisfied, based on the representations made in the Application and the Adams Declaration, that M-III is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and as required under section 327(a) of the Bankruptcy Code, and that M-III represents no interest adverse to the Debtors' estates; and the Court having held a final hearing, if necessary, to consider the relief requested in the Application (the "**Final Hearing**"); and upon the record of the Final Hearing, if any; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and it appearing that the relief requested in the Application is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.      The Application is GRANTED on a final basis as set forth herein.

2.      In accordance with Bankruptcy Code section 327(a), the Debtors are authorized to employ and retain M-III as their financial advisor effective as of the Petition Date under the terms set forth in the Application, the Adams Declaration, and the Engagement Agreement, including

the Fee Structure and Indemnification Provisions set forth therein (as modified by this Final Order).

3.      M-III shall be entitled to allowance of compensation and reimbursement of expenses, upon the filing and approval of interim and final applications pursuant to the Bankruptcy Rules and such other orders as this Court may direct, including, without limitation, any order of this Court establishing procedures for interim compensation and reimbursement of professionals retained in these Chapter 11 Cases.

4.      The terms of the Engagement Agreement, as modified by this Final Order, are reasonable terms and conditions of employment and are approved.

5.      M-III shall use reasonable efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these Chapter 11 Cases.

6.      The Indemnification Provisions set forth in the Engagement Agreement are approved, subject during the pendency of these Chapter 11 Cases to the following:

> d.  if, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these Chapter 11 Cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these Chapter 11 Cases, M-III believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Engagement Agreement, as modified by this Final Order, including without limitation the advancement of defense costs, M-III must file an application therefore in this Court, and the Debtors may not pay any such amounts to M-III before the entry of an order by this Court approving such payment. This subparagraph (a) is intended only to specify the period during which the Court shall have jurisdiction over any request by M-III for indemnification, contribution or reimbursement and is not a provision limiting the duration of the Debtors' obligation to indemnify;
>
> e.  subject to the provisions of subparagraph (c) below, the Debtors are authorized to indemnify, and shall indemnify, M-III in accordance with the Engagement Agreement for any claim arising from related to or in connection with the services provided for, whether prepetition or postpetition, in the Engagement Agreement; and

f.  notwithstanding any provisions of the Engagement Agreement to the contrary, the Debtors shall have no obligation to indemnify M-III or provide contribution or reimbursement to M-III for any claim or expense that is either (i) judicially determined to have resulted primarily from the willful misconduct, gross negligence, bad faith or self-dealing of M-III, or (ii) settled prior to a judicial determination as to M-III's willful misconduct, gross negligence, bad faith or self-dealing, but determined by the Court, after notice and a hearing pursuant to this subparagraph (c), to be a claim or expense for which M-III should not receive indemnity, contribution or reimbursement under the terms of the Engagement Agreement.

7.      To the extent there may be any inconsistency between the terms of the Application, the Engagement Agreement, the Adams Declaration and this Final Order, this Final Order shall govern.

8.      Notice of the Application is adequate under Bankruptcy Rule 6004(a).

9.      The Debtors are authorized to take all actions necessary to implement the relief granted in this Final Order.

10.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Final Order.

Dated:  _____, 2020          _____

                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**M-III Engagement Agreement**

43701634 v1



April 23, 2020

Remington Arms Company, LLC
870 Remington Drive
Madison, NC 27025-0700

<u>Engagement Letter</u>

Ladies and Gentlemen:

This letter agreement (this "***Agreement***") sets forth the terms and conditions of the engagement (the "***Engagement***") of M-III Advisory Partners, LP ("***M-III***") to provide the Services (as defined below) to Remington Arms Company, LLC and certain of its affiliates (collectively, the "***Client***"). M-III and the Client are collectively referred to in this Agreement as the "***Parties***."

1.  <u>Services</u>:  The Client hereby retains M-III to provide, and M-III hereby agrees to provide, the following services (the "***Services***") upon the terms and subject to the conditions set forth in this Agreement:

> (a) assist the Client in the development and administration of its short-term cash flow forecasting, budgeting and related methodologies, as well as its cash management planning;

> (b) provide such assistance as reasonably may be required by the Client its management and advisors in connection with preparation for and conduct of a reorganization process, including, without limitation, (i) development of restructuring plans and strategic alternatives intended to maximize the enterprise value and (ii) development and presentation of any related forecasts and monthly operating plans and results that may be required by creditor constituencies in connection with negotiations or by the Client for other corporate purposes;

> (c) in the event that the Client commences a bankruptcy case (the "***Case***"), the Client so requests and, to the extent necessary, the relevant United States Bankruptcy Court (the "***Court***") so approves, assist the Client in obtaining and presenting such information as may be required by the parties in interest to the Case and bankruptcy process, including any creditors' committees and the Court, with such information to include, among other things, budgets and financial models required in connection with any debtor-in-possession financing to be obtained by the Client;

> (d) assist the professionals who are representing the Client in the reorganization process or who are working for the Client's various stakeholders to coordinate their efforts and individual work product in order to be consistent with the Client's overall restructuring goals;

M-III Advisory Partners, LP  •  130 West 42nd Street, 17th Floor, New York, NY 10036
t: (212) 716-1491  •  f: (212) 531-4532  •  www.miiipartners.com

(e) assist, if required, the Client in communications and negotiations with its outside constituents, including creditors, trade vendors and their respective advisors;

(f) provide such additional services as M-III and the Client shall otherwise agree in writing.

2. Engagement Term. (a) The Engagement shall commence on the date of acceptance of this Agreement and may be terminated by either Party at any time upon ten business days' written notice. Following any such termination, neither Party shall have further liability to the other, except with respect to fees and expenses earned and incurred through the date of termination and any provisions of this Agreement which are expressly stated to survive its termination or expiration.

(b) In the event that the Client commences a Case, the Client will promptly apply to the Court for approval of M-III's retention *nunc pro tunc* to the date of filing. The form of retention application and proposed order shall be reasonably acceptable to M-III and M-III shall have no obligation to provide any further services if the Client becomes a debtor under the Bankruptcy Code unless M-III's retention under the terms of the Agreement is approved by a final order of the Court reasonably acceptable to M-III. The Client shall assist, or cause its counsel to assist, with filing, serving and noticing of papers related to M-III's retention and fee and expense applications.

3. Staffing. M-III will staff a team that it believes to be appropriate to provide the Services in accordance with the terms of this Agreement. The individual members of the team are subject to change by M-III from time to time in its sole discretion.

4. Compensation for Services. (a) M-III's compensation for services rendered under this Agreement shall be paid by the Client by wire transfer of immediately available funds in accordance with instructions provided from time to time by M-III to the Client and will consist of the following:

(i) Retainer: M-III presently holds a \$200,000.$^{\underline{00}}$ retainer balance from the Client (the "***Retainer***"). All billings for fees, expenses and any other amounts due and owing hereunder will be paid by drawings against the Retainer and the Client shall be obligated to promptly replenish the Retainer in advance of any further Services being provided hereunder. The Retainer is not intended to be an estimate of the fees and expenses for the Engagement. Once received by us, the Retainer and any additional amounts received by M-III as replenishment of the Retainer will irrevocably become the property of M-III, and shall not be subject to any claim of set-off, recoupment or other defense in respect of M-III's ownership thereof or entitlement to such funds under the terms hereof.

(ii)     <u>Hourly Fees</u>:  As compensation for providing the Services hereunder, M-III shall be entitled to non-refundable professional fees based on the actual hours incurred by M-III personnel on matters pertinent to this case (the "***Hourly Fees***").  The Hourly Fees shall be based upon the following hourly rates:

| Professional | Standard Rate |
|---|---|
| Managing Partner | $1,150 |
| Managing Director | $900 - $1,025 |
| Director | $725 - $825 |
| Vice President | $650 |
| Senior Associate | $550 |
| Associate | $475 |
| Analyst | $375 |

The Hourly Fees shall be billed by M-III to the Client twice per month (or more frequently if M-III so elects) by M-III furnishing to the Client copies of an invoice for the Hourly Fees in respect of the billing period.  As previously noted, M-III is authorized to apply the Retainer to such amounts and, to the extent that the Retainer is insufficient to pay the amounts then due, the Client shall pay such excess by wire transfer of immediately available funds within three (3) business days after the date of service of the relevant invoice.  M-III may adjust its billing rates from time to time in the normal course of business upon notice to the Client.

(iii)     <u>Expenses</u>:  In addition to any compensation for providing the Services, the Client shall reimburse M-III for all reasonable and documented out-of-pocket expenses incurred in the performance of the Services (including, without limitation, reasonable travel costs).  Such reimbursement shall be paid by application of the Retainer and, to the extent that the Retainer is insufficient to pay such amounts, by wire transfer within three (3) business days after delivery by M-III to the Client of a reasonably detailed invoice for reimbursement thereof.

(b)     In the event that the Retainer is not replenished upon our request, or amounts payable hereunder are not paid within three (3) business days of the date when due, such amounts shall be deemed "past due" and M-III shall have the right to suspend further Services until payment is received on past due invoices and/or the Retainer is replenished. In the event that M-III so suspends the Services, M-III shall not be responsible or liable for any resulting loss, damage or expense due to such suspension.

(c)     Notwithstanding anything to the contrary contained in this Section 4, in the event that a Case shall be commenced, then the Company promptly shall seek an order of the Court approving the retention of M-III as its financial advisor and, upon such approval and during the continuance of such Case, amounts owing to M-III under this Section 4 shall be submitted monthly to the Court for review and payment in accordance with the guidelines and rules promulgated by the Court for such matters.

(c)     All fees payable to M-III are exclusive of taxes or similar charges, which shall be the sole obligation of the Client (other than any taxes which may be payable on account of M-III's income generally, which shall be the obligation of M-III).

5.  Cooperation from Client.  In order to properly perform the Services and fulfill its responsibilities on a timely basis, M-III will rely on the timely cooperation of the Client and its other professional advisors, including, without limitation, making available to M-III relevant data, information and personnel, performing any tasks or responsibilities assigned to the Client and notifying M-III of any issues or concerns that the Client may have relating to the Services.  The Client will provide M-III with reasonable access to all personnel, books and records of the Client and its subsidiaries, as well as to all advisors and professionals retained by the Client and its Subsidiaries.  The Client understands and acknowledges that M-III's proper delivery of the Services is dependent upon timely decisions and approvals by the Client and its management. M-III shall have no responsibility or liability for any delays, additional costs or other deficiencies caused by the Client failing to properly fulfill its responsibilities under this Agreement.

6.  Deliverables.  (a) In connection with the Engagement, M-III may furnish the Client with information, advice, reports, analyses, presentations or other materials (the "*Deliverables*"). The Deliverables may contain factual data, the interpretation of which may change over the project term as more information or better understanding becomes available.  The Client acknowledges that M-III will have no obligation to update the Deliverables as part of the Services in the event of such a change.

(b)  Any materials prepared by M-III are solely for the confidential use of the Client and its directors, officers, employees and advisors and will not be distributed, reproduced, summarized, referred to, disclosed publicly or given to any other person without the prior written consent of M-III (with such consent not to be unreasonably withheld in the case of distribution to parties in interest to the Case and their advisors), *provided* that such permission shall not be required if the materials are required to be disclosed by applicable law or by order or act of any court or governmental or regulatory authority or body.  M-III will not provide such materials to any other person (natural or otherwise) without the consent of the Client or its counsel.

(c)  The provisions of this Section shall survive the termination or expiration of this Agreement.

7.  Limitations on Services.  (a)  The Services are limited to those specifically noted in this Agreement.

(b)  M-III does not provide accounting or tax-related assistance and no Deliverable or other information or advice provided to the Client shall be deemed to be accounting or tax-related assistance.  The Client shall be solely responsible for determining the accounting and tax-related implications of the Deliverables and other information and advice provided to it by M-III.  M-III shall not express any professional opinions on financial statements or perform attest procedures

with respect to other information in conjunction with the Engagement. The Services are not designed, nor should they be relied upon, to disclose weaknesses in internal controls, financial statement errors, irregularities or illegal acts. M-III shall assume the accuracy and completeness of all information submitted by or on behalf of the Client to M-III for analysis and which will form the basis of M-III's conclusions, without any obligation of M-III to verify the accuracy or completeness of such information, and M-III shall not be responsible for any analysis, advice or other Services to the extent based on inaccurate or incomplete information provided or accepted by or on behalf of the Client.

(c) The Services shall not include preparing, auditing or otherwise attesting in any way (including without limitation, with respect to the accuracy, achievability, reliability, relevance, usefulness or other appropriateness) to the Client's financial projections, and the Client has not engaged M-III for that purpose. The Services are provided based upon the understanding that the Client has sole responsibility for its financial projections (including preparation thereof), developing underlying assumptions and providing any disclosure related thereto. To the extent that, during the performance of Services hereunder, M-III is required to consider the Client's financial projections, the Client understands that M-III's procedures with respect to such projections do not constitute an examination in accordance with procedures established by the American Institute of Certified Public Accountants and do not and are not intended to provide any assurance on any aspect of such projections, including, without limitation, the reasonableness of the assumptions underlying such projections, nor do they provide assurance that M-III might not become aware of significant matters affecting the reasonableness of the projections that might be disclosed by more extensive procedures. There will usually be differences between projected and actual results, and those differences may be material. The Client understands and agrees that M-III will have no responsibility or liability relating to any such differences.

(b) M-III does not provide investment advice and the Services shall not include the provision of investment advice. The Client shall have sole responsibility for all investment decisions made by it. Similarly, M-III is providing advisory and consulting services only and will not make management decisions for the Client. Although M-III may from time to time suggest or recommend options that may be available to the Client, the ultimate decision with respect to such options rests with the Client and the Client shall be solely responsible for such decision and its outcome. M-III makes no representation, promise or guarantee with respect to the outcome of any matter affecting the Client.

(d) To the extent that the performance of the Services requires that M-III form conclusions or reach opinions, M-III shall do so without regard to or consideration of the impact that such conclusions or opinions may have on the initiation or outcome of any litigation to which the Client is or may become a party.

(e) The Client shall be solely responsible for the work and fees of any third parties engaged by the Client to provide services in connection with the Engagement, regardless of whether such third party was recommended to you by M-III or M-III is involved with the services provided by it. M-III shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.

(f) The provisions of this Section shall survive the termination or expiration of this Agreement.

8. <u>Non-Solicitation</u>.  The Client covenants and agrees that, prior to the first anniversary of the termination or expiration of this Agreement, it will not, directly or indirectly, hire directly or as an independent contractor, or refer to another for employment, any person who was during the term of this Agreement an employee or contractor of M-III or any of its affiliated entities who was involved on behalf of M-III with the Engagement or the performance of the Services. In the event of the breach of the foregoing covenant, the Client shall be liable to M-III, and shall pay on demand to M-III, liquidated damages equal to 200% of the total annual compensation of each relevant employee for the preceding calendar year (and, in the event that any such employee was not employed for the full year, the amount equal to 200% of his or her annualized compensation). The Parties mutually agree that the actual damages that would be sustained by M-III as the result of any such breach will be substantial and will be impossible to measure accurately, and that the foregoing liquidated damage amount is fair and reasonable.  The provisions of this Section shall survive the termination or expiration of this Agreement.

9. <u>Confidentiality</u>. (a) Each Party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other party in the scope of the Engagement (the "***Confidential Information***"), and neither Party will disclose any Confidential Information of the other Party to any other person or entity.  For the avoidance of doubt, the term "Confidential Information" shall include (i) the terms of this Agreement, including M-III's retention by the Client, (ii) all non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models and (iii) any work product relating to the business of either party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants.  Notwithstanding the foregoing, the term "Confidential Information" shall not include information that (a) is or becomes publicly available other than as a result of disclosure by the receiving Party, (b) was already known to the receiving Party or (c) was independently acquired or developed by the receiving Party from a source not known by it to be bound by a confidentiality requirement with respect to such information.  In performing the Services, M-III will use and rely primarily on the Confidential Information and on information available from public sources without having independently verified any of such information.

(b)  The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, M-III from making such disclosures of Confidential Information that M-III reasonably believes are required by law or any regulatory requirement or authority, or to clear client conflicts.  M-III also may disclose Confidential Information to its partners, directors, officers, employees, independent contractors and agents who have a need to know the Confidential Information for the proper performance of the Services or otherwise in connection with the Engagement.

(c) The provisions of this Section shall survive for a period of two years following the termination or expiration of this Agreement and shall supersede any separate confidentiality or analogous agreement between M-III and the Client.

10. <u>Intellectual Property</u>.  Upon payment in full of all amounts owing to M-III hereunder, the Client will own all Deliverables furnished by M-III to the Client in connection with the Services, *provided* that M-III will retain ownership of (a) all concepts, analyses, know-how, tools, frameworks, models and industry perspectives used and/or developed by M-III in connection with the Services and (b) all other intellectual property not containing Confidential Information which has been developed by M-III outside of the provision of the Services (the "***M-III Tools***"), it being understood that M-III will have no ownership right to, and will maintain in accordance with the provisions of this Agreement the confidentiality of, any Confidential Information contained in the M-III Tools.  To the extent that the Deliverables include any M-III Tools, M-III hereby grants the Client a non-exclusive, non-transferable, non-sublicensable worldwide, royalty-free license to use and copy the M-III Tools solely as part of the Deliverables and subject to the confidentiality provisions contained in this Agreement; *provided* that, in the event that a Case is commenced, nothing contained herein shall be deemed to restrict the transfer of the Company's license to the M-III Tools to any successor to the Company approved by the Court.  The Client acknowledges and agrees that the M-III Tools are provided to the Client on an "as is" basis and without any warranty or condition of any kind (whether express, implied or otherwise), and including without limitation any implied warranty of merchantability or fitness for a particular purpose. The provisions of this Section shall survive the termination or expiration of this Agreement.

11. <u>Indemnification</u>.  The Client hereby agrees to indemnify and hold harmless M-III and its affiliates, equity holders, partners, directors, employees, agents, representatives and contractors to the extent described in Annex I to this Agreement, with such Annex I being incorporated herein by reference and constituting an integral and enforceable part of this Agreement.  The provisions of this Section (including, without limitation, the provisions of Annex I) shall survive the termination or expiration of this Agreement.

12. <u>Limitation on Damages</u>.  In no event shall M-III or any other Indemnitee be liable to the Client or its affiliates, successors, or any person claiming on behalf of or in the right of the Client (including the Client's owners, parents, affiliates, directors, officers, employees, agents, security holders, or creditors) for (i) any amount which, when taken together with all losses for which M-III and the Indemnitee are liable in connection with this Agreement or the Engagement, would exceed the amount of fees for the Services actually received by M-III from the Client in connection with the Engagement during the immediately preceding 12 months or (ii) any special, consequential, incidental or exemplary damages or loss (or any lost profits, savings or business opportunity) (collectively, the "***Liability Cap***").  This paragraph shall apply regardless of the nature of any claim(s) (including claims based on contract, statute, negligence, tort, strict liability or otherwise), regardless of any failure of the essential purpose of any remedy and whether or not M-III was advised of the possibility of the damage or loss asserted, but shall not apply to the extent finally determined by final and non-appealable judgment of a court of competent jurisdiction to be prohibited by applicable law.  For the avoidance of doubt, the Parties hereby irrevocably agree that the Liability Cap is intended to be the total limit of liability for M-III and all other Indemnitee in

the aggregate for any and all claims or demand by anyone in connection with this Agreement, the Services and the Engagement, including without limitation any liability to the Client and to any others making claims relating to the Services and the Engagement. Any such claimants shall allocate among themselves any amounts payable by M-III, but the failure of the claimants to reach such an agreement shall not affect the enforceability of the Liability Cap. Under no circumstances shall the collective liability of M-III and the other Indemnitee in connection with this Agreement exceed the Liability Cap. The provisions of this Section shall survive the termination or expiration of this Agreement.

13. <u>Client Acknowledgement</u>. The Client hereby acknowledges and agrees that M-III may, in the ordinary course of its business, serve clients who are competitive with, or have conflicting interests with, the Client. Consistent with its confidentiality obligations hereunder and its confidentiality obligations to its other clients, M-III will not advise or consult to the Client with respect to any aspect of M-III's engagement or potential engagement with any other client, potential client or former client. Similarly, M-III will not advise or consult to any other client, potential client or former client with respect to any aspect of the Engagement. M-III will maintain the confidentiality of the Confidential Information in accordance with the terms of this Agreement and, similarly, will not share confidential information of any client, potential client or former client of M-III with the Client. The provisions of this Section shall survive the termination or expiration of this Agreement.

14. <u>Miscellaneous</u>. (a) This Agreement (i) constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements (both written and oral) among the parties with respect to the subject matter hereof, and (ii) may be modified, amended or supplemented only by prior written agreement of each of the Parties.

(b) M-III acknowledges that, in the event that a Case is commenced, (i) the continued retention of M-III by the Company will be subject to the approval of the Court and (ii) the Court may require changes in the terms of this Agreement as a condition to providing its approval. Any such changes will be subject to M-III's approval, which shall not be unreasonably withheld.

(c) The invalidity, illegality, or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality, or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction. If feasible, any such offending provision shall be deemed modified to be within the limits of enforceability or validity; *provided* that, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

(d) M-III's services hereunder are personal in nature and may not be assigned without the written consent of the Client. The obligations of M-III hereunder are owing only to the Client and there shall be no third-party beneficiaries of the obligations of M-III hereunder.

(e)  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument, and all signatures need not appear on any one counterpart.

(f)  This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts to be executed and performed within such state.  The Parties hereby submit to the exclusive jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement. Notwithstanding the foregoing, during such time as the Court has jurisdiction over the Case, the Court shall have exclusive jurisdiction and venue with respect to any such dispute.  The provisions of this paragraph shall survive the termination or expiration of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

This Agreement shall be binding upon the Parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

M-III ADVISORY PARTNERS, LP

By _____

Name: Mohsin Y. Meghji
Title: Managing Member

ACCEPTED AND AGREED
as of the date first set forth above:

REMINGTON ARMS COMPANY, LLC

By: _____

Name: Ken D'Arcy
Title: CEO



## Annex I

### AGREEMENTS REGARDING INDEMNIFICATION

In consideration of M-III performing the Services for the benefit of the Client, the Client (the "***Indemnitor***") shall indemnify M-III and its affiliates, equity holders, partners, directors, employees, agents, representatives and contractors, including past, present or future partners, principals and personnel of each (collectively hereinafter called the "***Indemnitees***") against all costs, fees, expenses, damages, and liabilities (including defense costs) associated with any pending or threatened third party claim, action or proceeding (a "***Claim***") relating to or arising as a result of the Engagement or the provision of the Services, the Client's use or disclosure of the Deliverables, or this Agreement ("***Losses***"). This provision is intended to apply regardless of the nature of any Claim (including contract, statute, any form of negligence, whether of the Client, M-III, or others, tort, strict liability or otherwise), except to the extent such Losses are determined to be the result of M-III's bad faith, gross negligence or willful misconduct.

The Indemnitor shall not, without M-III's prior written consent (which will not be unreasonably withheld) settle, compromise, or consent to the entry of any judgment in any pending or threatened Claim in respect of which indemnification could reasonably be sought hereunder (whether or not M-III or any other Indemnitee is an actual or potential party to such Claim), if such settlement, compromise, or consent does not include an unconditional release of each Indemnitee from all liability arising out of such Claim; *provided*, *however*, that the Indemnitor shall not enter into any such settlement, compromise or consent of a Claim without M-III's prior written consent (which may be granted or withheld in M-III's sole discretion) if such settlement, compromise or proceeding provides for injunctive relief against an Indemnitee or an admission of liability by an Indemnitee. The Indemnitor shall not be liable hereunder to any Indemnitee for any amount paid or payable in the settlement of any action, proceeding or investigation entered into by such Indemnitee without the Indemnitor's written consent.

Upon receipt by an Indemnitee of actual notice of a Claim against such Indemnitee in respect of which indemnity may be sought hereunder, such Indemnitee shall promptly notify the Indemnitor with respect thereto. In addition, an Indemnitee shall promptly notify the Indemnitor after any action is commenced (by way of service with a summons or other legal process giving information as to the nature and basis of the claim) against such Indemnitee in respect of which indemnity may be sought hereunder. In any event, failure to notify the Indemnitor shall not relieve the Indemnitor from any liability which the Indemnitor may have on account of this indemnity or otherwise, except to the extent, and only to the extent, that the Indemnitor shall have been materially prejudiced by such failure.

Indemnitor shall advance all expenses indemnifiable hereunder that are reasonably incurred by or on behalf of each Indemnitee in connection with any Claim within thirty (30) days after receipt by Indemnitor of a statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Claim. Such statement or statements shall reasonably evidence the expenses incurred by Indemnitee and shall include or be preceded or accompanied by a written undertaking by or on behalf of Indemnitee to repay any expenses advanced if it shall ultimately be determined that Indemnitee is not entitled to be

indemnified against such expenses. Any advances and undertakings to repay pursuant to this paragraph shall be unsecured and interest free.

To the extent that the Indemnitor so elects, it shall be entitled to assume the defense, with counsel selected by the Indemnitor (and approved by M-III, with such approval not to be unreasonably withheld), of any action that is the subject of the proceeding in respect of which indemnity may be sought. After notice to the Indemnitees of its election to assume the defense thereof, the Indemnitor will not be liable to the Indemnitee under this Agreement for any expenses subsequently incurred by such Indemnitee in connection with the defense thereof except as otherwise provided below. Such Indemnitee shall have the right to employ counsel of its choice in such Claim, but the fees and expenses of such counsel incurred after notice from the Indemnitor of the assumption of the defense thereof shall be at the expense of the Indemnitee unless the employment of counsel by the Indemnitee has been authorized by the Indemnitor, in which case the reasonably incurred fees and expenses of such counsel of the Indemnitee shall be at the expense of the Indemnitor.

The Client agrees that neither M-III nor any other Indemnitee shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Client or any person or entity asserting claims on behalf of or in right of the Client caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, except for losses, claims, damages, penalties or liabilities incurred by the Client which are finally determined by a non-appealable judgment of a court of competent jurisdiction to have resulted primarily and directly from the bad faith, willful misconduct or gross negligence of M-III or any other Indemnites and do not exceed the Liability Cap.

In the event that any M-III personnel are requested or required to appear as a witness in connection with any claim, action or proceeding relating to or arising as a result of the Engagement or the provision of the Services, the Client's use or disclosure of the Deliverables, or this Agreement, the Indemnitor shall, to the extent permitted by applicable law, reimburse M-III for all reasonable and documented out-of-pocket expenses incurred by it in connection with such personnel appearing and preparing to appear as a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel, and to compensate M-III at a rate equal to M-III's then standard hourly rate for the relevant personnel for each day that such personnel is involved in preparation, discovery proceedings or testimony pertaining to such Claim. Additionally, M-III will have the right to obtain advice from independent legal counsel with respect to its actual or potential obligations and liability hereunder and the Client will promptly reimburse M-III for the reasonable out-of-pocket fees and expenses paid by M-III on account thereof.

The provisions of this Annex I shall be deemed to be an integral part of this Agreement to which this Annex I is affixed and shall survive the termination or expiration of this Agreement for any reason. The provisions of this Annex I shall be binding upon the Client and its successors and assigns.