| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| | § | Case No. 20-81688-CRJ11 |
| REMINGTON OUTDOOR COMPANY, | § | |
| INC. *et al*.,[1] | § | Jointly Administered |
| | § | |
| | § | |
| Debtors. | § | |
| | § | |

## OBJECTION OF THE SANDY HOOK FAMILIES TO DEBTORS' MOTION FOR (I) AN ORDER ESTABLISHING BIDDING PROCEDURES AND GRANTING RELATED RELIEF AND (II) AN ORDER OR ORDERS APPROVING THE SALE OF THE DEBTORS' ASSETS

Donna L. Soto, Ian and Nicole Hockley, David C. Wheeler, Mary A. D'Avino, Mark and Jacqueline Barden, William D. Sherlach, Neil Heslin and Scarlett Lewis, Leonard Pozner, and Gilles J. Rousseau (the "**Sandy Hook Families**")[2] as creditors in these chapter 11 cases (these "**Chapter 11 Cases**") respectfully submit this objection (the "**Objection**") to *Debtors' Motion for (i) an Order Establishing Bidding Procedures and Granting Related Relief and (ii) an Order or Orders Approving the Sale of the Debtors' Assets* [ECF No. 29] (the "**Bidding Procedures Motion**"; and the procedures annexed thereto, the "**Bidding Procedures**"). The Sandy Hook Families respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405) (collectively, the "Debtors"). The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms that are not defined herein have the meanings given to them in the Bidding Procedures Motion or, if not defined therein, in the *Declaration of Ken D'Arcy in Support of Chapter 11 Petitions and First Day Pleadings of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors-in-Possession* (the "D'Arcy Declaration").

1

## PRELIMINARY STATEMENT

1.  Only two weeks after having commenced these Chapter 11 Cases, the Debtors ask the Court to approve a "fast track" sale process that will have substantial and wide-ranging impacts on the Debtors and their creditors. While the Debtors have not disclosed the anticipated purchase price nor the amount of their stalking horse bid, they make references throughout the Bidding Procedures Motion and Cash Collateral Motion to "wind down" costs covering only certain administrative costs, and even these, the Debtors suggest, might need to be assumed by the buyer. Left unsaid is what, if anything, would be available for the Debtors' unsecured creditors. If the Debtors intend to sell their assets and leave nothing for their unsecured creditors, then the Court's approval of the Debtors' sale process may cement that outcome only weeks into the case, with many critical issues left unexamined and unresolved. The Sandy Hook Families ask the Debtors to slow down, so that more information can be collected and considered by all parties-in-interest before the Debtors take, and the Court approves, actions that are both dispositive and irreversible.

2.  The Sandy Hook Families lost nine loved ones—many as young as six years old—in the December 2012 Sandy Hook Elementary School shooting. In December 2014, they brought nine wrongful death claims against Bushmaster, Remington, and certain of their affiliates (the "**Remington Defendants**"). Their claims seek millions of dollars in damages to account for the hundreds of years of life collectively taken from their loved ones by a shooter brandishing an AR-15 manufactured and marketed by the Remington Defendants. Further, the pursuit of these claims will help the Families—and society as a whole—learn through discovery exactly how the Remington Defendants for years have marketed weapons of war to a civilian population. In particular, their claims investigate how the Remington Defendants touted and

Case 20-81688-CRJ11    Doc 243    Filed 08/07/20    Entered 08/07/20 16:44:20    Desc
Main Document      Page 2 of 30

encouraged the assaultive use of AR-15s in their marketing, often courting the youth market in the process. These claims, moreover, have been considered and authorized to proceed by Connecticut's Supreme Court, which determined that the case was well pleaded, a decision which the U.S. Supreme Court then declined to review.

3.     After countless procedural and discovery motions, the Sandy Hook Families' claims were finally set for trial in front of a Connecticut jury in September 2021. The Debtors' bankruptcy filing has brought a halt to progress in the case, one in which the parties were deep into document discovery and depositions, several of which were set to occur in the first week of August. The Bidding Procedures Motion threatens to further undermine the Sandy Hook Families' claims against the Remington Defendants and prevent Remington from ever answering for its role in the wrongful marketing of the weapon and that marketing's causal role in the devastating loss of life at Sandy Hook Elementary School.

4.     The Debtors seek to sell substantially all of their assets free and clear only 45 days after filing these Chapter 11 Cases. While bankruptcy courts have, from time to time, approved section 363 sales on similar timelines, such cases are—and should be—the exception rather than the rule. That exception should apply in cases where, as one court put it, there is a "material risk that, if [the] court defers the sale, the patient will die on the operating table." The Sandy Hook Families have not been provided with sufficient information to yet know whether or not this case presents such a situation; they seek adequate time and information to understand the circumstances of the Debtors filing for chapter 11 relief and whether a section 363 sale will truly maximize value for all creditors. The Sandy Hook Families' request is based on the Debtors' recent history and the information they have provided so far in this Court, which raises more questions than it answers.

3

5.      To begin with, the Debtors recently completed a significant restructuring in May 2018 that eliminated $620 million in debt from its balance sheet.[3]  At that time, the Debtors projected substantial increases in net sales and adjusted EBITDA in 2018 and continuing through 2022.  Despite emerging from that restructuring in May 2018, the Debtors' finances appear to have changed remarkably in the months that followed.  Later that year, the Debtors appear to have borrowed the full amount under the ABL Facility, which they previously projected to remain undrawn.[4]  The Debtors then began efforts to refinance that loan in "late 2018" and engaged Ducera in March 2019.  (D'Arcy Decl. ¶¶ 24, 41.)  The Debtors then started considering a sale of their business in December 2019—a year and a half after emerging from bankruptcy, and, conspicuously, three weeks after the U.S. Supreme Court denied the Remington Defendants' petition for a writ of certiorari pertaining to the Sandy Hook Families' lawsuit, their last hope of preventing the Sandy Hook Families' wrongful death claims from proceeding to trial.

6.      Two years after their 2018 bankruptcy, and in the midst of discovery and depositions in the Sandy Hook lawsuit, the Debtors commenced these cases, and pursuant to the Bid Procedures Motion, seek to sell their assets "free and clear" of liabilities such as the claims asserted by the Sandy Hook Families.  The Debtors, however, have offered vague and incomplete information regarding their current financial situation.  The only evidence presented to this Court appears in the D'Arcy Declaration [ECF No. 6], which provides that the Debtors' bankruptcy filing was due to "unfavorable business trends" and an "inability to purchase raw

---

[3]      *See* Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, at 2 [ECF No. 14], *In re Remington Outdoor Company Inc., et al.*, Case No. 18-10684 (BLS) (Bankr. D. Del. 2018) (the "2018 Disclosure Statement") (attached as Exhibit A to the Declaration of Tazewell T. Shepard IV accompanying this Objection (the "Shepard Decl.").

[4]      *See* Shepard Decl. Ex. A [2018 Disclosure Statement], at Exhibit C.

materials at the required level to grow revenues." (*Id.* ¶¶ 40-43.) The only financial information provided is net sales and "adjusted EBITDA" results for 2019, which the Debtors compare to 2015 and 2016 results. The Debtors do not provide information concerning 2017, 2018, or 2020 year-to-date results. On the other hand, the Debtors' acknowledge that recent world events have "sparked increased demand for the Debtors' core products." (*Id.* ¶ 46.) And Remington's debt appears to be trading at or above par.[5]

7.      All of this raises fundamental questions about the purported urgency here, and whether a fast track sale is truly the best way to maximize value for all creditors in this case. How did a company that eliminated $620 million of debt in 2018, borrowed an additional $85 million sometime later in 2018, and is enjoying increased demand for its products in 2020, end up in such purportedly dire circumstances?

8.       These questions are compounded by the absence of important information in the Motion itself. The Debtors ask the Court to approve, and creditors to support, a sale process although the Debtors have not disclosed the identity of the stalking horse, the amount of the stalking horse bid, and the form of the asset purchase agreement. Further, what liabilities are the Debtors trying to leave behind: they say that a deal with a "Potential Bidder" would have "provided for the assumption by the buyer of many ordinary course pre-petition liabilities including taxes . . . and trade accounts payables," which, based on the Debtors' Top 40 Creditors list, appears to account for nearly all of the Debtors' unsecured creditors. (*Id.* ¶ 53.) The only thing that the Debtors make clear is that the company must be sold, and quickly, free and clear of claims such as those asserted by the Sandy Hook families.

9.      In light of this, the Sandy Hook Families ask for a reasonable delay to enable their

---

[5]      *See* Shepard Decl. Ex. D [Bloomberg Terminal screen captures].

representatives, and the official committee of unsecured creditors, to evaluate the Debtors'

rationale for its chosen path and to investigate several important topics. For example, the

Debtors presume that the Prepetition Secured Parties have valid liens solely because of the 2018

bankruptcy, but the Priority Term Loan Facility was executed a year later, on April 18,

2019. (*Id.* ¶ 24.) Because the Debtors contemplate allowing the Prepetition Secured Parties to

credit bid their claims, there must be a proper investigation into their claims and

conduct. Moreover, there must be a better understanding of the Debtors' current financial

condition, the need, if any, for an urgent sale, and why the Debtors elected not to obtain debtor-

in-possession financing, even though they had initially planned to do so, and appear to have

received a number of financing proposals. (*Id.* ¶¶ 55-57.) Finally, the Sandy Hook Families,

whose claims have faced obstruction and delay by Remington for years, are entitled to know

what role, if any, the Sandy Hook lawsuit played in the Debtors' decision-making

process. Addressing these issues upfront, rather than rushing through a sale process during the

first weeks of the case, would ensure a transparent, fair, and value maximizing sale process.

10.     Putting aside the Debtors' proposed timeline, the bidding procedures themselves

are not reasonable. The Debtors ask this Court to approve their ability to select a stalking horse

bidder who has not yet been identified, on deal terms they have not yet announced, without any

oversight or finding by this Court that the stalking horse's bid was accretive to the sale

process.  As the Debtors' concede, they have already engaged with multiple bidders without

having a stalking horse. In other words, the Debtors seek a blank check from this Court to

provide stalking horse bid protections in unlimited amounts without having to explain why those

stalking horse bid protections fit the facts.

11.     At bottom, the Sandy Hook Families have significant concerns about the Debtors'

proposed sale process, and its potential effect on unsecured creditors and their individual claims. The Sandy Hook Families have won their day in court through many years' persistence, but the process being pursued here appears designed to prevent that from happening. They will therefore vigorously protect their rights in connection with any sale, including their right to continue uncovering the Remington Defendants' sales and marketing practices pursuant to discovery that was cut short by the filing of these cases. Regardless of who owns the Debtors' assets, that information must be provided so that the Sandy Hook Families can bring to account the Remington Defendants' role in a mass shooting that left elementary school children and educators dead.

12. The Court should reject the Debtors' Bidding Procedures Motion, and impose a more reasonable timeline consistent with the interests at stake in this case.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the Bidding Procedures Motion and this Objection pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1), (b)(2)(A), (M), (N) and (O). Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409(a). The Sandy Hook Families consent to entry of a final order by this Court solely with respect to this Objection. For the avoidance of doubt, the Sandy Hook Families do not consent to the jurisdiction of this Court over any of their claims relating to the Sandy Hook Wrongful Death Action.

## RELEVANT FACTUAL BACKGROUND

### A.    The Sandy Hook Families' Action Against Debtors

14. On December 12, 2012, the Sandy Hook Families lost their loved ones, some as young as six years old, in a school shooting perpetrated with an AR-15 manufactured and marketed by the Remington Defendants, which are debtors in the above-captioned cases. On

7

December 13, 2014, the Sandy Hook Families brought wrongful death claims against the Remington Defendants on behalf of those loved ones in Connecticut state court (the "**Sandy Hook Wrongful Death Action**").

15. The Sandy Hook Families' claims seek justice for their loved ones, and to hold Remington accountable for its role in their deaths. Their claims have been reviewed and allowed to proceed to discovery and trial by the highest courts in the country. On March 19, 2019, the Connecticut Supreme Court affirmed the validity of the legal theories at the heart of the Sandy Hook Wrongful Death Action under Connecticut state law, and ordered that the wrongful death claims should proceed to discovery and trial. *See Soto* v. *Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 273 (Conn. 2019) (attached as Ex. B to the Shepard Decl.). The Connecticut Supreme Court's opinion makes clear that the Sandy Hook Families are the right plaintiffs—perhaps the only plaintiffs—who can bring these claims:

> In the present case, the wrong charged is that the defendants' promoted the use of their civilian assault rifles for offensive, military style attack missions. The most directly foreseeable harm associated with such advertising is that innocent third parties could be shot as a result. The decedents are the ones who got shot.
>
> If the defendants' marketing materials did in fact inspire or intensify the massacre, then there are no more direct victims than these plaintiffs; nor is there any customer of the defendants' with a better claim to standing.

*Id.* at 291.

16. On November 12, 2019, the U.S. Supreme Court denied the Remington Defendants' petition for a writ of certiorari challenging that decision. *See Remington Arms Co., LLC* v. *Soto*, 140 S. Ct. 513 (2019) (attached as Ex. C to the Shepard Decl.). The case returned to the Connecticut trial court for discovery and trial. Within weeks of losing their bid to dispose of these claims in the Supreme Court, on December 2, 2019, Debtors began looking for "strategic alternatives" to sell their businesses, which ultimately led to this bankruptcy filing and

the Debtors' proposed sale free and clear of the Sandy Hook liabilities. (D'Arcy Decl. ¶ 48.)

17. There is also no question regarding the nature of the Sandy Hook Families' interests in these bankruptcy cases. Contrary to the position taken by the Remington Defendants—purportedly valuing the loss of life by six-year-olds and school educators at $15,000—courts routinely assign far greater value to the loss of human life. Damages in such cases under Connecticut law are intended to account for lost enjoyment of life and lost earnings—in this case, across all victims, totaling hundreds of years—and compensate for the terror, pain, and suffering these children and educators endured just prior to their deaths while a shooter armed with an AR-15 roamed their elementary school halls.

18. Connecticut juries regularly award damages for individual victims in wrongful death cases in the millions of dollars.[6] Here, of course, damages could be exponentially larger given the number of victims, their ages, and the nature of the Remington Defendants' culpability. The Remington Defendants surely know this—they are represented in the wrongful death cases by multiple law firms and have paid them collectively well over a million dollars in legal fees to defend the cases, and filed dozens procedural and discovery motions meant to obstruct the progress of the case. (*See* Connecticut Superior Court Docket, attached as Ex. M to the Shepard Decl.) The assertion at the August 6 status conference that Remington interprets a jurisdictional allegation in the amended complaint—one which merely keeps the case out of the small claims

---

[6]     *See, e.g.*, *Iannantuoni* v. *Florio*, CV11-6024700-S (Conn. Super. Apr. 22, 2016) ($12,032,500 award) (attached as Ex. I to the Shepard Decl.); *Morrin* v. *Koplin*, UWY-CV11-6012598-SDN 373 (Conn. Super. Dec. 19, 2013) ($8,008,500 award) (attached as Ex. J to the Shepard Decl.); *Regina Canty as Adminstratrix of the Estate of Shamaia L. Smith* v. *Kenneth J. Otto, Sr.*, No. HHD-CV07-5010481-S, 2013 Jury Verdicts LEXIS 14693 (Nov. 18, 2013) ($9,158,233 award) (attached as Ex. F to the Shepard Decl.); *Ahmed Oadeh, Administrator of the Estate of Fira Oadeh* v. *Maria Fagan and Kenneth Fagan, Personal Representatives of the Estate of Timothy E. Fagan*, No. CV13-6046339-S, 2016 Jury Verdicts LEXIS 5078 (Apr. 25, 2016) ($7,767,046 award) (attached as Ex. G to the Shepard Decl.); *Demetria Rogers as Administratrix of the Estate of William Rogers, Jr.* v. *American Chair Car Services Inc. and Herbert Perry*, No. CV03-0402592-S, 2006 Jury Verdicts LEXIS 45406 (Feb. 26, 2006) ($3,200,000 award) (attached as Ex. H to the Shepard Decl.).

docket and in the Superior Court—to mean that the Sandy Hook Families are seeking $15,000 dollars in damages is both offensive and not credible. (*See* Am. Compl., attached as Ex. L to the Shepard Decl.) After all, if this case was worth only $15,000, the Debtors would not have petitioned the U.S. Supreme Court for review or spent in excess of one million dollars in legal fees to defend it.

19.     When the Debtors commenced these Chapter 11 Cases, the parties had been engaged in discovery for nearly 10 months. During that time, they had exchanged thousands of documents and the Sandy Hook Families had prevailed in multiple discovery disputes. Six depositions had been taken, and two more were scheduled for the week of August 3, 2020. A trial date was set for September 2021. The case has now been stayed as a result of the bankruptcy filing.

**B.     Debtors' Pre-Petition Finances and Chapter 11 Proceedings**

20.     The Debtors filed a prepackaged chapter 11 case in March 2018 in the Bankruptcy Court for the District of Delaware. *In re Remington Outdoor Company Inc., et al.,* Case No. 18-10684 (BLS) (Bankr. D. Del. 2018). As a result of that restructuring—the Debtors quickly emerged in May 2018—the Debtors eliminated approximately $620 million of debt and emerged with "a more streamlined capital structure." (2018 Disclosure Statement at 2; D'Arcy Decl. ¶ 22.) At the time of the 2018 bankruptcy filing, the Debtors had successfully dismissed the Sandy Hook Families' claims in Connecticut State Court, and that decision was being appealed to the Connecticut Supreme Court (which reversed the lower court and held that the claims were legally viable). Coincidentally, the Debtors' prepackaged 2018 bankruptcy left all unsecured creditors unimpaired.

21.     In connection with the 2018 bankruptcy filing, the Debtors made numerous financial projections in order to demonstrate to the Delaware Bankruptcy Court that their plan

10

was feasible. In particular, the Debtors made the following income projections:

| Period Ending | | 2018 (7 Months) | | 2019 (12 Months) | | 2020 (12 Months) | | 2021 (12 Months) | | 2022 (12 Months) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Projected Income Statement** | | | | | | | | | | |
| Sales | $ | 395.9 | $ | 732.2 | $ | 795.8 | $ | 825.6 | $ | 855.0 |
| Cost of Goods Sold | | (322.2) | | (561.4) | | (584.8) | | (600.2) | | (614.9) |
| Gross Profit | | 73.7 | | 170.9 | | 211.0 | | 225.4 | | 240.0 |
| Operating Expenses | | (68.7) | | (121.5) | | (125.4) | | (127.8) | | (130.3) |
| **EBITDA (Adjusted)** | $ | 5.0 | $ | 49.4 | $ | 85.6 | $ | 97.6 | $ | 109.7 |

(*See* Shepard Decl. Ex. A [2018 Disclosure Statement], at Exhibit C.)

22.     In addition, in May 2018, the Debtors made the following liquidity projections:

| **Projected Key Balance Sheet Items** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| New ABL Facility: Revolver | $ | - | $ | - | $ | - | $ | - | $ | - |
| New ABL Facility: FILO Amount | | 55.0 | | 55.0 | | 55.0 | | 55.0 | | 55.0 |
| New Term Loan Facility | | 101.8 | | 103.6 | | 104.7 | | 105.7 | | 106.8 |
| **Total Debt** | $ | 156.8 | $ | 158.6 | $ | 159.7 | $ | 160.7 | $ | 161.8 |
| | | | | | | | | | | |
| New ABL Facility: Revolver Availability | $ | 67.3 | $ | 60.1 | $ | 60.7 | $ | 60.8 | $ | 61.4 |
| Ending Cash | | 35.2 | | 26.1 | | 61.1 | | 107.9 | | 165.3 |
| **Total Liquidity** | $ | 102.5 | $ | 86.1 | $ | 121.8 | $ | 168.7 | $ | 226.6 |

(*Id.*)

23.     Notwithstanding these projections, the Debtors appear to have fully drawn on their ABL Revolver Facility sometime later in 2018, borrowing and spending as much as $85 million that the Debtors then sought to immediately refinance. The Debtors' ultimately refinanced that loan by entering into the Priority Term Loan Facility with Whitebox in April 2019. (D'Arcy Decl. ¶¶ 24, 41.)

24.     The Debtors' financial performance appears to have inexplicably missed their May 2018 projections by several orders of magnitude. The only current financial information provided in the D'Arcy Declaration is that 2019 net sales totaled $437.5 million and 2019 adjusted EBITDA totaled $(74.7) million. (*Id.* ¶ 43.) The Debtors do not disclose results for 2018 or year-to-date results (or projections) for 2020.

11

25.     The Debtors explain these missed projections as resulting from, among things, "unfavorable business trends," an "elevated level of inventory," and an "inability to purchase raw materials at the required level to grow revenues." (*Id.* ¶¶ 40–43.)

26.     The Debtors have admitted that the "COVID-19 pandemic has recently sparked an increased demand" for their products, and that they have "several key strengths that provide them with a significant competitive advantage in the firearm and ammunition markets." (*Id.* ¶¶ 12, 46.)  This is also an election year and a time of widespread social unrest, factors which historically have been indicators of increased demand in the Debtors' industry. *See, e.g.*, Catherine Leffert, *Gun demand is off the charts in U.S. even for an election year*, BANGOR DAILY NEWS (July 4, 2020), https://bangordailynews.com/2020/07/04/national-business/gun-demand-is-off-the-charts-in-u-s-even-for-an-election-year/ ("U.S. consumers are rushing to buy guns as the COVID-19 pandemic and protests over police brutality combine with U.S. presidential politics to fuel *unprecedented demand*.") (emphasis added) (attached as Ex. K to the Shepard Decl.).  The Debtors contend, however, that they cannot capitalize on these favorable business trends due to "insufficient liquidity to fund raw material purchases needed to scale up production." (D'Arcy Decl. ¶ 46.)

27.     Given the Debtors' professed liquidity constraints, they initially sought, in connection with an anonymous "Potential Bidder," to secure debtor-in-possession financing ("**DIP Financing**"). (*Id.* at ¶ 55.)  After the transaction with the Potential Bidder failed to close within the timeframe the Debtors hoped for, the Debtors solicited—and apparently received—DIP Financing proposals from various financial institutions. (*Id.* ¶ 57.)  The Debtors are silent on why none of these particular proposals were pursued, asserting only in conclusory fashion that the cash collateral financing with the Prepetition Secured Creditors was the "best

12

alternative." (*Id*.) That financing, of course, requires the Debtors to pursue a sale of substantially all of their assets on the expedited timeline proposed in the Motion, and was specifically negotiated for the purpose of funding a sale-only process designed to shed the company of the Sandy Hook families' claims. (*Id*. ¶ 108.) Because the Debtors ask the Court to authorize the Debtors to immediately use any sale proceeds to repay the Prepetition Secured Parties, it is no surprise that such parties fully support the sale process with no regard for what happens to the Sandy Hook Families or their claims. (*Id*. ¶ 107.)

28. On July 27, 2020 (the "**Petition Date**"), the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the Northern District of Alabama. The Chapter 11 Cases are being jointly administered for procedural purposes pursuant to Bankruptcy Rule 1015(b). The Debtors are continuing to manage their financial affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. At the time of this filing, the Debtors' secured debt is trading above par. (*See* Shepard Decl. Ex. D [Bloomberg Terminal screen captures].)

### C. The Proposed Bidding Procedures Motion

29. On July 28, 2020, Debtors filed the Bidding Procedures Motion. The motion seeks an order (i) approving proposed bidding procedures, (ii) authorizing Debtors' entry into agreements with one or more stalking horse bidders, and (iii) authorizing the Debtors to use the sale proceeds to immediately repay the Prepetition Secured Creditors before the Court were to confirm any plan of liquidation.

30. The Bidding Procedures provide for an extremely expedited sale process with the following deadlines:

- **August 24, 2020** (29 days from the Petition Date): deadline for objections to the sale ("Sale Objection Deadline").

13

- **September 1, 2020** (37 days from the Petition Date): deadline for bids to be submitted (the "Bid Deadline").

- **September 8, 2020** (43 days from the Petition Date): Auction date.

- **September 10, 2020** (45 days from the Petition Date): Sale Hearing date.

(Bidding Procedures Motion ¶ 31.)

31.     The Bidding Procedures Motion was filed without a DIP motion, a business plan, a form of asset purchase agreement, the identification of any potential purchaser or Stalking Horse Bidder, the expected purchase price or Stalking Horse bid amount, or any declaration or affidavit from Ducera. Further, under the Bid Procedures Motion, the Prepetition Secured Creditors have the right to credit bid their allowed secured claims at an auction pursuant to section 363(k) of the Bankruptcy Code. (*See id.* ¶ 33.)

32.     The Bidding Procedures Motion does not say which liabilities the Debtors are negotiating to be assumed pursuant to the sale. However, the Debtors concede that, in negotiations with the Potential Bidder, the transaction "provided for the assumption by the buyer of many ordinary course pre-petition liabilities including taxes (including excise any employment taxes) and trade accounts payable." (*Id.* ¶ 53.) Yet the Debtors have not identified any pre-petition litigation claims—not even the Sandy Hook lawsuit—and their consolidated list of Top 40 creditors includes almost entirely such prepetition trade and tax claims.

33.     The Bidding Procedures Motion seeks approval of the following Bid Protections in the event that the Debtors enter into a stalking horse bid agreement:

- **Uncapped Break-up Fee**: No more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder, without any limit or cap.

- **Uncapped Expense Reimbursement**: No more than 1.0% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder, without any limit or cap.

14

- **Minimum Overbid Increment**: To be set by the Stalking Horse Agreement.

(*Id.* ¶ 33.)

34.     If there is no Stalking Horse Agreement, the Debtors will sell all or substantially all of the Assets through one or more sales to Successful Bidders.  After the sale, the Debtors will liquidate their estates in full.  (*Id.* ¶ 33; D'Arcy Decl. ¶ 104.)

## OBJECTIONS

35.     The Court should not approve the proposed Bidding Procedures.  The "paramount goal" of any sale of property under section 363 of the Bankruptcy Code is to maximize the value of proceeds received by a debtor's estate.  *In re Dura Auto. Sys., Inc.*, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007). This Court has consistently held that a debtor in possession has a fiduciary duty to accomplish this goal.  *See, e.g.*, *In re Harp*, 166 B.R. 740, 746–47 (Bankr. N.D. Ala. 1993) ("'fiduciary responsibilities' . . . imply a special burden on debtors . . . to ensure that the resources that flow through the debtor-in-possession's hands are used to benefit the unsecured creditors and other parties in interest.").

36.     The bankruptcy court has wide discretion in assuring that value is maximized in the sale context.  *See In re Wintz Co.*, 219 F.3d 807, 812 (8th Cir. 2000) (stating that court has "ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets") (citation omitted); *In re Kjeld*, Case No. 04-04303, 2005 Bankr. LEXIS 2068 at *5 (Bankr. N.D. Iowa Oct. 26, 2005) (denying trustee's sale motion and stating that in structuring sales of estate assets, bankruptcy courts have "wide discretion" to ensure robust sale process).  Even in a case in which the debtor's business judgment is above reproach, the court must make an independent determination of what is "fair and reasonable."  *In re Am. Safety Razor Co., LLC*, Case No. 10-12351 (Bankr. D. Del), Sept. 30, 2011 Hr'g Tr. at 132:23-133:5 [ECF No. 318].

15

37.     This paramount goal requires "an open and fair public sale designed to maximize value for the estate."  *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).  That principle is undermined by the process proposed here by the Debtors.

**D.     The Debtors Have Not Demonstrated a Good Business Reason to Effect a Fast Track Section 363 Sale**

38.     It is well established that debtors seeking to effect a section 363 sale prior to the confirmation of a Chapter 11 plan must demonstrate a "good business reason" for doing so, taking into account all "salient factors pertaining to the proceeding."  *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *cf. In re Knott*, 60 Bank. Ct. Dec. 135, *2 (M.D. Fla. 2015) ("The prevailing standard [for a section 363(b) sale] requires the Trustee to 'establish sound business reasons.'").  Courts typically consider some or all of the following ten factors in making the determination as to whether debtors have demonstrated such a good business reason: (1) the proportionate value of the assets to the estate as a whole; (2) the amount of elapsed time since the filing; (3) the likelihood that a reorganization plan will be proposed and confirmed in the near future; (4) the effect of the proposed disposition on any future plans of reorganization; (5) the proceeds to be obtained from the disposition vis-a-vis any appraisals of property; (6) which of the alternatives of use, sale or lease the proposal envisions; (7) whether property is increasing or decreasing in value; (8) whether estate has the liquidity to survive until confirmation of plan; (9) whether the sales opportunity will still exist at time of plan confirmation and, if not, the likelihood of satisfactory alternative sales opportunities or a stand-alone plan alternative that is equally desirable, or better, for creditors; and (10) whether there is material risk that, if court defers the sale, the patient will die on operating table.  *In re Gen. Motors Corp.*, 407 B.R. 463, 490 (Bank. S.D.N.Y. 2009).

39.     None of these factors counsel in favor of Debtors' proposed pre-confirmation

quick sale under section 363:

- *First*, regarding the proportionate value of the assets to be sold, the Debtors seek to sell all of their assets. They therefore have only one chance to ensure they are maximizing the value of those assets for all of their creditors, and their failure to do so will irreparably prejudice the interests of unsecured creditors.

- *Second*, regarding the time elapsed since the filing, the Debtors filed bid procedures on the first day of this case, demonstrating that they have no intent on pursuing other alternative restructuring options.

- *Third* and *fourth*, the proposed sale ensures that there will not be a plan of reorganization, only a plan of liquidation, and further appears certain to ensure that unsecured creditors will receive little, if any, consideration under that plan of liquidation. D'Arcy Decl. ¶ 104.

- *Fifth* and *sixth*, regarding potential proceeds and alternatives of sale, Debtors have provided virtually no information regarding their worth or the alternatives they have considered, leaving creditors unable to conduct any meaningful diligence. Yet the fact that Debtors' secured debt is currently trading at or above par suggests there is real value for unsecured creditors.

- *Seventh* and perhaps "most importantly," *see id.*; *Esopus Creek Value* v. *Hauf*, 913 A.2d 593, 604 (Del. Ch. 2006), regarding the increasing or decreasing value of the assets, Debtors' own filings provide good reason to believe that the assets will <u>increase</u> in value moving forward. In particular, they have noted that the COVID-19 pandemic has resulted in a boom in the gun industry, and that they have certain "competitive advantages" that make them uniquely able to profit from that boom. D'Arcy Decl. ¶¶ 12, 46. This is also an election year, and a year of widespread social upheaval, both of which historically have increased sales in the gun industry by significant margins.[7] At the same time, the broader economic markets are facing unprecedented turmoil. Given this confluence of events, it is entirely possible that the Debtors could fetch a higher sale price once the markets rebound, and with the Debtors' products in higher demand.

- *Eighth*, regarding liquidity, parties-in-interest lack sufficient information to know whether the Debtors are truly facing a liquidity crisis, and recent events (including their 2018 bankruptcy and recent spike in demand) raise serious

---

[7]  *See, e.g.*, Stephanie Pagones, "First-time gun ownership skyrockets amid riots, increase violence across country: 'You can't really be too safe,'" FOX NEWS (Aug. 3, 2020), https://www.foxnews.com/us/first-time-gun-owners-safety-protection ("[A]pproximately 90 percent of retailers reported an increase in firearm and ammunition sales during the first half of 2020 versus the first half of 2019. How big are those increases? Responding retailers noted that they are seeing *a 95 percent increase in firearm sales* and *a 139 percent increase in ammunition sales* over the same period in 2019.") (emphasis added) (attached as Ex. E to the Shepard Decl.).

questions about the Debtors' purported liquidity constraints. That the Debtor solicited DIP Financing proposals but chose instead to rely solely on a cash collateral stipulation that requires the Debtors to pursue a quick sale raises still further questions.

- ***Finally***, the record simply does not support the notion that "the patient [would] die on the operating table" if a sale were deferred. The Debtors have not demonstrated that there is an urgent need for a quick sale, much less one that rules out the possibility of a traditional chapter 11 process.

40. Before embarking on a fast track sale process that risks leaving certain creditors behind, while the Prepetition Secured Creditors get a quick cash-out and "ordinary course" tax and trade claims get assumed by the purchaser, this Court should pause to examine the true motivations of this process, and whether there is a "good business reason" for moving at such a break-neck speed.

### E. The Bidding Procedures Impose an Unduly Truncated Timeline on the Sale Process That Will Not Maximize Value

41. The Bidding Procedures establish an unreasonably aggressive timeline—45 days from filing to a sale of substantially all of their assets—that is insufficient to ensure value is maximized for all creditors. The Bidding Procedures Motion allots just three weeks from the hearing to approve these Bidding Procedures, on August 11, 2020, until bids are due on September 1, 2020. That would be followed by an auction on September 8, 2020.

42. This timeline guarantees that no party will participate in the auction other than the few unidentified parties that the Debtors allege they have been negotiating with prepetition. It is simply not reasonable to assume that any other potential purchaser could perform the necessary diligence on the Debtors to submit a competitive bid before September 1. This is especially true because the Debtors still have not announced a stalking horse bidder, but reserve the right to announce a stalking horse bidder "through the Bid Deadline." (*See* Bidding Procedures Motion at 13.) That means that any potential purchaser must consider whether to undertake the effort to

Case 20-81688-CRJ11   Doc 243   Filed 08/07/20   Entered 08/07/20 16:44:20   Desc
Main Document      Page 18 of 30

diligence the Debtors' business on an extremely aggressive timeline, without knowing anything about the terms of the stalking horse bid that the Debtors may announce at any time, or whether that stalking horse bid will be a credit bid from the Prepetition Secured Parties. (*Id.*) In short, a warp-speed process, without any baseline information provided to potential new entrants, guarantees there will not be any new bidders.

43. Even assuming any of the Debtors' justifications for the speed of their process are in fact legitimate—and the Sandy Hook Families have good reasons to doubt these justifications, as described above—the truncated timeline is not in anyone's interest, including the Debtors themselves. The purpose of any sale would be to maximize value for the Debtors and their estates. To that end, bidding procedures must be designed to ensure that the process does not discourage potential bidders from participating. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535–37 (3d Cir. 1999) (recognizing that more competitive bidding will bring greater benefit to the estate).

44. In circumstances such as these, courts have rejected similarly aggressive timelines. For example, in *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008), the court rejected an "emergency" sale to a DIP lender because, among other things, the debtors had provided only three weeks' notice and the creditors' committee's investigation "was conducted without discovery, with access to a very small universe of documents, and in the very short and insufficient time dictated by" an insider. *See also In re Crutcher Res. Corp.*, 72 B.R. 628, 632 (Bankr. N.D. Tex. 1987) ("[A] blatant attempt to place pressure on the Court only serves to raise additional suspicions concerning the 'cozy' relationship between the parent and the Lenders and to suggest that this case is being orchestrated not for the benefit of unsecured creditors . . . but rather for the benefit of the Lenders and the principals of the parent corporation."). Here, the

19

Debtors' proposed bidding procedures will give potential bidders only until early September to diligence the Debtors, without any knowledge of the terms of a stalking horse bid agreement or baseline information about Debtors' business.  As noted above, these circumstances foretell no active bidding by any party except the unidentified purchasers negotiating with Debtors prepetition.

45.    More time is also needed to allow the Debtors' advisors to properly market their assets.  *See, e.g., Siddiqui* v. *Gardner* (*In re Williamson*), 327 B.R. 578, 581 (Bankr. E.D. Va. 2005) ("The objective is to obtain the best price so as to assure the maximum distribution to creditors. This is accomplished, in part, by assuring that the marketing is full, fair and complete and that all prospective purchasers have a fair opportunity to participate in the process.").  The proposed pace sought by the Debtors is simply too aggressive, and would extinguish any meaningful opportunity to explore all possible purchasers who could potentially provide greater value to the estate.

46.    Even for a debtor with a simple capital structure, the proposed timeline would be ambitious.  Here, given the Debtors' complex corporate structure and the lack of information regarding the Debtors' assets, the proposed timeline is unrealistic if any potential bidder is to properly seek, obtain, and review due diligence materials, let alone submit a bid.  *See, e.g.*, Transcript of Hearing at 20:16-20, *In re Energy Future Holdings Corp.*, [Bid Proc. Hr'g Tr. at ECF No. 2699] (holding that "the proposed timelines must be stretched . . . to allow for sufficient time for any interested party to develop an alternative transaction").  The Court should extend the bidding process to permit parties other than prepetition potential purchasers time to fully diligence Debtors' businesses.

Case 20-81688-CRJ11    Doc 243    Filed 08/07/20    Entered 08/07/20 16:44:20    Desc
Main Document    Page 20 of 30

**F.     Additional Time Would Allow for a More Complete Investigation of Key Issues for the Sandy Hook Families**

47.     Further, the aggressively expedited sale process, as proposed, does not ensure an appropriately transparent and fair sale process because it leaves only three weeks for the Sandy Hook Families—and the UCC and other creditors—to conduct a proper investigation to protect their interests, which they are entitled to do.  *See* 11 U.S.C. §§ 341(a), 363(k), 1103(c)(2), (5); Fed. R. Bankr. P. 2004(b); *see also In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991) ("It somehow seems impractical and unfair to prevent the potentially largest claimant from an investigation of the parameters of its claims and possible defenses."). Indeed, the unsecured creditors committee—the essential body statutorily tasked with conducting a thorough investigation of the Debtors' assets—was just formed on August 6, has not yet retained advisors, and by the time of a hearing on these bid procedures, will have had a total of two business days to organize and respond to these procedures.

48.     Here, the Sandy Hook Families need information concerning several key topics.

49.     *First*, the Sandy Hook Families need time to fully investigate and evaluate the Debtors' finances and their purported need for an expedited sale process.  As set forth above, there are significant questions surrounding how the Debtors have found themselves in such dire financial straits, especially given their prior balance sheet restructuring in May 2018 and the increased demand in their core products this year.  The limited information in the D'Arcy Declaration simply does not address these issues adequately.  Similarly, parties-in-interest, including the Sandy Hook Families, should be entitled to investigate and understand the Debtors' ability to obtain DIP Financing, their decision not to obtain such financing, and whether a longer chapter 11 process would inure to the benefit of all of the Debtors' stakeholders.

50.     *Second*, the Sandy Hook Families need time to investigate what role, if any, the

21

Sandy Hook Families' lawsuit played in these Chapter 11 Cases and the Debtors' desire for a quick free and clear sale under section 363.  The limited record available suggests that the Sandy Hook lawsuit did influence the Debtors' decision-making process.  First, the Debtors concede that they began pursuing a sale only weeks after the Supreme Court of the United States denied Remington's petition for certiorari review on November 12, 2019, and the trial court in Connecticut scheduled a status conference in the lawsuit for December 4, 2019.  That decision was the end of the line for the Remington Defendants and made clear that this case would proceed to discovery regarding the Remington Defendants' wrongful marketing conduct and then to trial.  Second, the Debtors have indicated that they would like a purchaser to assume most, if not all, of their prepetition unsecured liabilities, such as taxes and trade payables, but they intend to otherwise effectuate a sale "free and clear of successor liability."  (Bidding Procedures Motion ¶ 76.)  Because the Debtors have not disclosed any other significant prepetition liabilities, it is unclear what liabilities the sale is intended to be "free and clear" of, other than the Debtors' liability to the Sandy Hook Families.   The Sandy Hook Families require time to conduct proper discovery, including reviewing documents and taking the testimony of those involved in making these decisions, to understand the role of the Sandy Hook Families' claims played in the design of these Chapter 11 Cases and ensure the bankruptcy protects their interests.

51.     ***Third***, the Sandy Hook Families need time to investigate the Debtors' insurance arrangements, and the effect that any sale process may have on such insurance policies.  The Debtors state they maintain "14 insurance programs" each with "multiple policies."  (D'Arcy Decl. ¶ 71.)  The Sandy Hook Families require time to investigate these numerous policies to (1) determine what insurance coverage is available; (2) ascertain what other claims have been made

22

or will be made on the policies, and (3) understand what Debtors have done to ensure the continuing availability of potential insurance coverage for the Sandy Hook Families' claims. This investigation will also require conducting discovery.

52.     The Sandy Hook Families are entitled to protect their rights through a proper investigation of any sale process.  Approving Debtors' aggressive timeline for the sale process would seriously impinge on those rights.   The Bidding Procedures Motion should therefore be rejected and a new timeline negotiated by the various stakeholders in Debtors' estates.

**G.     If the Timeline Is Approved as Submitted, the Credit Bid Rights Provided in the Bid Procedures Could Chill Bidding**

53.     The Bidding Procedures provide the Prepetition Secured Creditors the right to credit bid all allowed claims at an auction pursuant to section 363(k) of the Bankruptcy Code. Notwithstanding the fact that this approach risks chilling potential bids and unfairly tipping the sale process in favor of the Prepetition Secured Creditors, the acceptance of such a bid would not generate any cash for the Debtors to distribute to their unsecured creditors.

54.     The expedited timeline allows the Prepetition Secured Creditors (who would have a head start in conducting diligence before bidding) the advantage of lingering in the background of these cases with an unknown credit bid in hand.  Under these circumstances, potential purchasers will have little interest or incentive under the current timeline to invest the time and money necessary to conduct due diligence, submit bids, or participate in an auction should the Prepetition Secured Creditors decide to act.  If the Debtors are going to permit credit bidding, the timeline must be lengthened to allow a more robust process that will generate competitive cash bids.  And if the Prepetition Secured Creditors intend to credit bid, they should make that intention clear now.

55.     Further, the Court should not accept the Debtors' *ipse dixit* assertions that the

Case 20-81688-CRJ11    Doc 243    Filed 08/07/20    Entered 08/07/20 16:44:20    Desc
Main Document      Page 23 of 30

Prepetition Secured Parties' liens are valid and enforceable. The Debtors base their assertion on the premise that all of the Prepetition Secured Parties' liens were granted pursuant to the confirmation order in their 2018 bankruptcy cases (D'Arcy Decl. ¶ 23), but the Priority Term Loan Facility was a new facility that the Debtors entered into in April 2019, and it is the Priority Term Loan Lender (Whitebox Advisors) that the Debtors ask to first repay from any sale proceeds. Rather than just assume that Whitebox has valid secured claims that can be credit bid in the auction, the Court should permit sufficient time for parties to investigate the April 2019 transactions and the conduct of the Prepetition Secured Parties.[8]

56.     In light of the foregoing, the Court need not approve the hasty sale timeline requested by the Debtors. Rather, the Court should adopt a reasonable timeline that will permit the proper investigation of the Prepetition Secured Parties and the solicitation of sufficient third-party bids to ensure that the winning bid maximize debtors' assets and value for the interests of *all* creditors.

> ## H. Approval of the Proposed Bid Protections and Selection of a Stalking Horse Bidder Without Any Proposed Bidder or Agreement Is Premature and Should Be Denied

57.     Pursuant to the Bidding Procedures Motion, the Debtors seek this Court's approval of their "selection of one or more stalking horse bidders" and bid protections for such stalking horse bidder, if selected. (Bidding Procedures Motion at 1; D'Arcy Decl. ¶ 106.) The Debtors, however, have not designated any specific stalking horse bidder for this Court's approval nor identified the potential stalking horse bidders. They also have not submitted any agreement with a purchase price or other key terms, or put forward any explanation for why a

---

[8]     The Sandy Hook Families reserve all rights to challenge any credit bid for cause under section 363(k) of the Bankruptcy Code.

particular stalking horse bid agreement will foster robust, competitive bidding. Debtors' request therefore boils down to a request for blank check approval from this Court of *any* stalking horse bidder on *any* terms. The request should be denied as premature.

58. The Debtors bear the burden of showing why a particular bid will maximize the value of their estates. *See Calpine Corp.* v. *O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 535-37 (3d Cir. 1999); *In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004). They must demonstrate that their stalking horse bid proposal "make[s] economic sense" and serves "the best interest[s] of the bankruptcy estate and its creditors." *See In re Wintz Companies*, 230 B.R. 840, 846-47 (8th Cir. 1999). Their barebones stalking horse bid proposal does not provide enough information to evaluate whether designating a stalking horse bidder is appropriate and value maximizing. Further, the Debtors concede that they have already engaged with several potential bidders notwithstanding their lack of a committed stalking horse bidder, which suggests that the stalking horse bid will not foster a competitive bidding process. And, as set forth above, the expedited timeline the Debtors propose guarantees that there cannot be any new bidders that the Debtors have not already engaged with. Under these circumstances, the Court cannot conclude that the stalking horse bid protections are necessary to maximize value.

59. The Debtors have not been transparent about the identity of the stalking horse bidder or who they are negotiating with to serve in that role. Rather, the Debtors only assert that they are "close to finalizing the terms of a sale with multiple potential stalking horse bidders." (D'Arcy Decl. ¶ 107.) However, without knowing *who* will be the stalking horse bidder and who was not selected and why, there is no reasonable manner of evaluating whether the stalking horse bidder is appropriate or value maximizing. *See In re Integrated Resources, Inc.*, 147 B.R. 650,

662 (S.D.N.Y. 1992) ("[a] break-up fee . . . should be reasonably related to the risk, effort, and expenses of the prospective purchaser").  Here, the bidders could be insiders, secured creditors with credit bids, or outsiders making cash offers, each of which would have different levels of entitlement to a break-up fee.  Stakeholders in this bankruptcy should know these facts before the Court approves the stalking horse protections.

60.     The Debtors' outline of a potential stalking horse bid is equally opaque.  The Debtors have not stated whether the stalking horse bid will include all of its assets or just a portion.  (*Id.* ¶ 106.)  They similarly have not disclosed a potential purchase price or, for that matter, any conditions a stalking horse bidder might impose on a sale, or the effect that such conditions might have on these Chapter 11 Cases.  The only terms Debtors have provided are that any stalking horse bidder may receive (i) a Break-Up Fee; (ii) an Expense Reimbursement; and (iii) a Minimum Overbid Increment.  (Bidding Procedures Motion ¶ 67.)  But Debtors do not say under what circumstances they will offer such bid protections or to whom.  Without such information, this Court cannot conclude that "that the fees were actually necessary to preserve the value of the estate."  *In re O'Brien*, 181 F.3d at 535; 11 U.S.C. § 503(b)(1)(A).  The Court should thus delay approving any stalking horse bid protections until the Debtors disclose to creditors the identity of the Stalking Horse Bidder and why such protections are necessary for that particular bidder.  Absent such information, other potential bidders lack necessary information to enable them to assess whether they should expend the time and resources necessary for their diligence.  This process risks an unfair sale process.

61.     Further, the Break-Up Fee and Expense Reimbursement are not appropriate. Initially, they are, by definition, not the result of any arms' length negotiations between the Debtors and the proposed stalking horse, but rather simply a proposal from the Debtors.  Neither

26

amount is capped, providing a virtually unlimited Break-Up Fee and Expense Reimbursement amount.  Further, in cases in which break-up fees are appropriate, they are traditionally set between 2-3% of the purchase price, yet the Debtors' propose a 3.5% break-up fee that is out of line with market practice.  And because the Court and parties in interest know nothing about the terms or conditions of the stalking horse bid, it is impossible to know the likelihood that such amounts will ultimately be paid.

62.     To ensure that the interests of all stakeholders are furthered by the stalking horse bidders, the Sandy Hook Families request that the bid protections be denied until the Debtors have signed a purchase agreement with the bidder or bidders, provided information to creditors regarding the negotiation process and the terms of the deal, and allowed a reasonable amount of time for creditors to analyze the propriety of such bid protections.

## RESERVATION OF RIGHTS

The Sandy Hook Families have significant concerns about the Debtors' proposed sale process, and intend to vigorously protect their rights in connection with any sale.  If the Court approves the Bid Procedures Motion, the Sandy Hook Families will carefully examine any proposed purchase agreement to ensure that it does not impair their rights, including their right to continue uncovering the Remington Defendants' sales and marketing practices pursuant to discovery that was cut short by the filing of these cases.  The Sandy Hook Families deserve their day in court, and that includes continuing to discover the facts of the Remington Defendants' historical and current marketing practices, and the relationship of those practices to a mass shooting that left elementary school children and educators dead.  That effort must continue regardless of whether the Debtors' assets are sold.

## **CONCLUSION**

For all of the reasons set forth above, the Sandy Hook Families respectfully request that the Court (a) sustain this objection, (b) deny approval of the Bidding Procedures Motion unless or until the issues raised above are resolved, and (c) grant the Sandy Hook Families such other or further relief as deems appropriate.

Dated: August 7, 2020
Huntsville, Alabama

Respectfully submitted,

By: /s/ Tazewell T. Shepard IV
Tazewell T. Shepard III
Tazewell T. Shepard IV
State Bar No. 24004246
**SPARKMAN, SHEPARD & MORRIS, P.C.**
P.O. Box 19045
Huntsville, AL 35804
Tel: (256) 512-9924
ty@ssmattorneys.com

**KOSKOFF KOSKOFF & BIEDER**
Joshua Koskoff (admitted *pro hac vice*)
Alinor Sterling (admitted *pro hac vice*)
David Bernard (admitted *pro hac vice*)
Jeffrey Wisner (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Tel: (203) 336-4421
jkoskoff@koskoff.com

- and -

**SELENDY & GAY PLLC**
Faith Gay (admitted *pro hac vice*)
1290 Avenue of the Americas,
New York, NY 10104
Tel. (212) 390-9000
fgay@selendygay.com

*Counsel for the Sandy Hook Families*

29

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the following by electronic mail on this, the 7th day of August, 2020.

O'Melveny & Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071,
Attn: Steve Warren (swarren@omm.com) and Jennifer Taylor (jtaylor@omm.com)

Burr & Forman LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr (hlahr@burr.com)

Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Attn: Sarah Schultz (sschultz@akingump.com)

Bankruptcy Administrator
400 Well Street
Decatur, Alabama 35602
Attn: Richard Blythe (richard_blythe@alnba.uscourts.gov)

Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com) and Andrew V. Alfano (andrew.alfano@pillsburylaw.com)

Whitebox Advisors LLC, Brown Rudnick LLP,
One Financial Center
Boston, Massachusetts 02111
Attn: Andreas Andromalos (aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com)

All parties that have requested notice in the Chapter 11 Cases.

    /s/ Tazewell T. Shepard IV    
    Tazewell T. Shepard IV

1