**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY, INC.,<br>*et al.*,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 20-81688-CRJ11<br><br>Jointly Administered |

### DEBTORS' LIMITED RESPONSE TO MOTION OF THE SANDY HOOK FAMILIES, PURSUANT TO 11 U.S.C. §§ 105(a) AND 1102(a)(4), TO RECONSTITUTE THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Remington Outdoor Company, Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases, hereby file their limited response (this "**Response**") to the *Motion of the Sandy Hook Families, Pursuant to 11 U.S.C. §§ 105(a) and 1102(a)(4), to Reconstitute the Official Committee of Unsecured Creditors* (the "**Motion to Reconstitute**") [Docket No. 311] filed by Donna L. Soto, Ian and Nicole Hockley, David C. Wheeler, Mary A. D'Avino, Mark and Jacqueline Barden, William D. Sherlach, Neil and Scarlett Lewis, Leonard Pozer, and Gilles J. Rousseau (collectively, the "**Sandy Hook Plaintiffs**"). In support of this Response, the Debtors respectfully state as follows:

       1.       In the Motion to Reconstitute, the Sandy Hook Plaintiffs request that the Court direct the United States Bankruptcy Administrator for the Northern District of Alabama (the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

]
43975883 v1

"**Bankruptcy Administrator**") to reconstitute the Official Committee of Unsecured Creditors of the Debtors (the "**Committee**") to include tort and/or wrongful death claimants like the Sandy Hook Plaintiffs, or, in the alternative, to appoint an official committee of tort claimants.

2.      The Debtors do not believe that appointment of an official committee of tort claimants is necessary or appropriate in these chapter 11 cases.  Among other things, the Committee, which has fiduciary duties to all of the Debtors' unsecured creditors, is fully able to address the interests of the Debtors' unsecured creditors as a whole.  Additionally, the budget for the Debtors' use of cash collateral, which was heavily negotiated between the Debtors and their pre-petition senior secured lenders, is not sufficient to support another committee.

3.      However, the Debtors take no position on the composition of the Committee and/or whether the Sandy Hook Plaintiffs or any other tort or wrongful death claimants should be included on the Committee.  That issue is best addressed by the Court based upon input from the Bankruptcy Administrator and the Committee.

4.      The Debtors do dispute, however, the Sandy Hook Plaintiffs' characterization in the Motion to Reconstitute of their claims, the Debtors' liability with respect to such claims, and the Debtors' intentions with respect to the Debtors' list of creditors with the forty (40) largest unsecured claims (the "**Top 40 Largest Unsecured Claims**").  The Debtors note that the Court has already addressed the Sandy Hook Plaintiffs' objection on the merits of the Top 40 Largest Unsecured Claims, which objection was overruled.  *See* Docket Nos. 192, 214.

5.      Finally, this is not the time nor the process for addressing the merits of the Sandy Hook Plaintiffs' claims.  The Debtors will leave that to the claims resolution process.  However, for the Court's reference, attached are certain filings which more fully set forth the positions regarding the Sandy Hook Plaintiffs' claims (and the appellate record), including the following:

43975883 v1

a.    The Connecticut Supreme Court's decision on the Sandy Hook Plaintiffs' appeal of the dismissal of their first amended complaint, attached hereto as **Exhibit 1**;

b.    *Revised Second Amended Complaint*, attached hereto as **Exhibit 2**;

c.    *Defendants' Motion to Strike Revised Second Amended Complaint*, attached hereto as **Exhibit 3**; and

d.    *Defendants' Memorandum of Law in Support of Motion to Strike Revised Second Amended Complaint*, attached hereto as **Exhibit 4**.

6.    The Debtors reserve all of their rights and defenses with respect to the claims asserted by the Sandy Hook Plaintiffs, both in these chapter 11 cases and otherwise.

Dated: August 14, 2020

*/s/ Derek F. Meek*

**BURR & FORMAN LLP**
Derek F. Meek
Hanna Lahr
420 20th Street North, Suite 3400
Birmingham, AL 35203
Telephone:    (205) 251-3000
Facsimile:    (205) 458-5100
Email: dmeek@burr.com
          hlahr@burr.com

- and -

**O'MELVENY & MYERS LLP**
Stephen H. Warren (admitted *pro hac vice*)
Karen Rinehart (admitted *pro hac vice*)
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:    (213) 430-6000
Facsimile:    (213) 430-6407
Email: swarren@omm.com
          krinehart@omm.com

*Attorneys for the Debtors and Debtors in Possession*

3

43975883 v1

**<u>Exhibit 1</u>**

KeyCite Yellow Flag - Negative Treatment

Distinguished by Phillips-Moldex Company v. Beaulieu Company, LLC, Conn.Super., December 6, 2019

331 Conn. 53

Supreme Court of Connecticut.

Donna L. SOTO, Administratrix

(Estate of Victoria L. Soto), et al.

v.

BUSHMASTER FIREARMS

INTERNATIONAL, LLC, et al.

(SC 19832), (SC 19833)

|

Argued November 14, 2017

|

Officially released March 19, 2019

**Synopsis**

**Background:** Administrators of estates of elementary school students and faculty filed suit against manufacturers, distributors, and sellers of assault rifle used by shooter to commit mass school shooting, seeking damages and injunctive relief based on claims for negligent entrustment and wrongful death based on unfair trade practices in sale and marketing of assault rifle, in violation of Connecticut Unfair Trade Practices Act (CUTPA). Defendants filed motion to strike complaint. The Superior Court, Judicial District of Fairfield, 2016 WL 8115354, granted motion in its entirety, and administrators appealed.

**Holdings:** The Supreme Court, Palmer, J., held that:

[1] administrators did not state claim for negligent entrustment that would come within predicate exception to defendants' immunity from civil liability for crimes committed by third person with firearm, under Protection of Lawful Commerce in Arms Act (PLCAA);

[2] administrators did not lack standing to assert claim for injuries and wrongful death as result of unfair trade practice, under CUTPA, as would bring claim within predicate exception to defendants' immunity from liability under PLCAA;

[3] claim for wrongful death based on unfair trade practice arising out of sale of assault rifle was governed by three-year limitations period governing claims under CUTPA;

[4] claim for wrongful death based on unfair trade practice arising out of sale of rifle under CUTPA began to run on date that rifle was sold to shooter's mother;

[5] claim for wrongful death based on unfair trade practice arising out of defendants marketing of assault rifle to civil market was not time-barred under CUTPA;

[6] exclusivity of remedy for product defect under Product Liability Act did not apply to bar claim under CUTPA for unfair trade practice based on alleged unlawful marketing of assault rifle;

[7] personal injuries sustained by students and faculty that ultimately led to their deaths were "actual damages" cognizable under CUTPA;

[8] CUTPA was "statute applicable to sale or marketing of firearm," within meaning of predicate exception to defendants' immunity from civil liability under PLCAA;

[9] alleged unfair trade practice based on unlawful marketing of assault rifle came within predicate exception to immunity from civil liability for crimes committed by third person using assault rifle, under PLCAA;

[10] CUPTA claim did not implicate commercial speech protected under First Amendment; and

[11] application of PLCAA's predicate exception to defendants' immunity from civil liability was not to be narrowly construed.

Affirmed in part; reversed in part; remanded.

Robinson, J., filed opinion dissenting in part, in which Vertefeuille and Elgo, JJ., joined.

West Headnotes (53)

**[1]**    **Products Liability** 🔑 Defenses in general

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document   Page 5 of 119

**Products Liability** 🔑 Weapons and Ammunition

With limited exceptions, the Protection of Lawful Commerce in Arms Act (PLCAA) immunizes firearms manufacturers, distributors, and dealers from civil liability for crimes committed by third parties using their weapons. 15 U.S.C.A. §§ 7902(a), 7903(5).

1 Cases that cite this headnote

**[2]** **Pleading** 🔑 Insufficient allegations or denials

A motion to strike attacks the legal sufficiency of the allegations in a pleading.

1 Cases that cite this headnote

**[3]** **Pleading** 🔑 Insufficient allegations or denials

**Pleading** 🔑 Application and proceedings thereon

In reviewing the sufficiency of the allegations in a complaint on a motion to strike, courts are to assume the truth of the facts pleaded therein, and to determine whether those facts establish a valid cause of action.

1 Cases that cite this headnote

**[4]** **Pleading** 🔑 Insufficient allegations or denials

If facts provable in the complaint would support a cause of action, a motion to strike must be denied.

1 Cases that cite this headnote

**[5]** **Pleading** 🔑 Application and proceedings thereon

On a motion to strike, the court assumes the truth of both the specific factual allegations and any facts fairly provable thereunder.

**[6]** **Appeal and Error** 🔑 Striking out

Because a motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court,

appellate review of the trial court's ruling on the motion is plenary.

**[7]** **Negligence** 🔑 Negligent Entrustment

The cause of action for negligent entrustment represents a departure from the general rule that an individual cannot be held liable for the conduct of others.

1 Cases that cite this headnote

**[8]** **Automobiles** 🔑 Permitting operation by incompetent person

**Negligence** 🔑 Knowledge of danger

**Weapons** 🔑 Negligent entrustment

The primary question that the court must resolve on a claim for negligent entrustment is whether the principle that a person in possession of a dangerous instrument, such as a firearm or automobile, should bear the responsibility of exercising care when entrusting that instrument to another, given the serious risk to society, applies only when the entrustor believes or has specific reason to believe that the direct entrustee is likely to use the item unsafely or, rather, whether it also applies when it is reasonably foreseeable that the entrustment ultimately will lead to injurious use, whether by the direct entrustee or by some unknown third party; if the former, then the trial court should find for the entrustor as a matter of law, but if the latter, then the plaintiff's claim presents an issue of fact to be decided by a jury.

**[9]** **Negligence** 🔑 Elements in general

In order to prove negligent entrustment, a plaintiff must demonstrate that (1) the defendant has entrusted a potentially dangerous instrumentality to a third person (2) whom the entrustor knows or should know intends or is likely to use the instrumentality in a manner that involves unreasonable risk of physical harm, and (3) such use does in fact cause harm to the entrustee or others. Restatement (Second), of Torts § 308.

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc
Main Document Page 6 of 119

3 Cases that cite this headnote

**[10]** **Products Liability** ⚷ Joint tortfeasors in general

**Products Liability** ⚷ Weapons and Ammunition

**Weapons** ⚷ Negligent entrustment

Administrators of estates of elementary school students and faculty who were victims of mass school shooting did not allege tort of negligent entrustment against manufacturer, distributors, and retailer of assault rifle that shooter used to commit crimes, such that claim would come within statutory exception to defendants' immunity from civil liability, under Protection of Lawful Commerce in Arms Act (PLCAA), for crimes committed by third person using their firearm, where negligent entrustment required proof that entrustor defendants knew or had reason to know that direct entrustee would likely use dangerous instrumentality in unsafe manner, and there was no allegation that defendants knew or had reason to know that direct entrustee to whom assault rifle was sold, specifically, shooter's mother, was likely to use it in unsafe manner. 15 U.S.C.A. § 7903(5) (A) (ii); Restatement (Second), of Torts § 308.

2 Cases that cite this headnote

**[11]** **Antitrust and Trade Regulation** ⚷ Private entities or individuals

Administrators of estates of elementary school children and faculty did not lack standing to assert claim for injuries and wrongful death as result of unfair trade practice, under Connecticut Unfair Trade Practices Act (CUTPA), against manufacturers, distributors, and seller of assault rifle ultimately used by shooter to commit mass school shooting, due to administrators' lack of direct business or consumer relationship with defendants, as would bar CUTPA claim from coming within scope of statutory exception to immunity from civil liability for crimes committed by third persons using firearm, under Protection of Lawful Commerce in Arms Act (PLCAA), for claims alleging violation of statute

applicable to sale or marketing of firearm, where cause of action under CUTPA for injuries sustained as result of unfair trade practice did not require proof of direct business or consumer relationship with defendants, CUTPA conferred cause of action on "[a]ny person who suffer[ed] any ascertainable loss or money or property ... as a result of [prohibited practice]," administrators alleged that defendants promoted use of assault rifle by civilians for offensive, military style attack missions, and if administrators could prove that such was case, and that defendants' marketing and advertising of assault rifle did in fact inspire or intensify massacre, then shooting victims were direct victims of unfair trade practice. 15 U.S.C.A. § 7903(5) (A) (iii); Conn. Gen. Stat. Ann. § 42-110g(a).

1 Cases that cite this headnote

**[12]** **Death** ⚷ Right of action of person injured

In Connecticut, a wrongful death action will lie only when the deceased person could have brought a valid claim for the injuries that resulted in death if he or she had survived.

**[13]** **Antitrust and Trade Regulation** ⚷ Advertising, marketing, and promotion

Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors, or business associates, a party directly injured by conduct resulting from such advertising can bring an action pursuant to the Connecticut Unfair Trade Practices Act (CUTPA) even in the absence of a business relationship with the defendant. Conn. Gen. Stat. Ann. § 42-110g(a).

**[14]** **Statutes** ⚷ Plain Language; Plain, Ordinary, or Common Meaning

When interpreting a statute, the plain meaning of the statutory text must be the lodestar.

**[15]** **Action** 👈 Statutory rights of action

**Antitrust and Trade Regulation** 👈 Private entities or individuals

The Connecticut Unfair Trade Practices Act (CUTPA) creates a private right of action for persons injured by unfair trade practices; it authorizes anyone who has suffered an ascertainable financial loss as a result of an unfair trade practice to bring an action. Conn. Gen. Stat. Ann. § 42-110ga et seq.

4 Cases that cite this headnote

**[16]** **Action** 👈 Statutory rights of action

**Antitrust and Trade Regulation** 👈 Private entities or individuals

The right of action to recover for injuries sustained as a result of an unfair trade practice under the Connecticut Unfair Trade Practices Act (CUTPA) is not enjoyed only by persons who have done business of some sort with a defendant. Conn. Gen. Stat. Ann. § 42-110g(a).

3 Cases that cite this headnote

**[17]** **Antitrust and Trade Regulation** 👈 Private entities or individuals

Standing to bring a claim under the Connecticut Unfair Trade Practices Act (CUTPA) will lie only when the purportedly unfair trade practice is alleged to have directly and proximately caused the plaintiff's injuries. Conn. Gen. Stat. Ann. § 42-110g(a).

**[18]** **Action** 👈 Persons entitled to sue

Standing to sue is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions that may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented.

**[19]** **Antitrust and Trade Regulation** 👈 Advertising, marketing, and promotion

The gravamen of a wrongful advertising claim under the Connecticut Unfair Trade Practices Act (CUTPA) is that an advertisement models or encourages illegal or unsafe behavior, and in such instances, the immediate victims are just as likely to be third parties who are not customers, whether it be individuals who engage in inappropriate conduct inspired by the advertisements or the direct victims of that conduct. Conn. Gen. Stat. Ann. § 42-110a et seq.

**[20]** **Death** 👈 Special limitations

In the ordinary case, when an action for wrongful death is predicated on an underlying theory of liability, the wrongful death statute supplies the controlling statute of limitations, regardless of the underlying theory of liability. Conn. Gen. Stat. Ann. § 52-555(a).

**[21]** **Limitation of Actions** 👈 Construction of Limitation Laws in General

**Limitation of Actions** 👈 Operation as to rights or remedies in general

When a statute creates a cause of action that did not exist at common law, the liability and the remedy are created by the same statutes, and the limitations of the remedy are, therefore, to be treated as limitations of the right; it follows then that the statutory provision or provisions prescribing the limitation must be strictly observed if liability is to attach to the claimed offender, and a plaintiff's failure to show such observance results in a failure to show the existence of a good cause of action.

1 Cases that cite this headnote

**[22]** **Death** 👈 Application of general statutes of limitations

Claim by administrators of estates of elementary school students and faculty against manufacturer, distributor, and seller of assault rifle used

in school mass shooting for wrongful death predicated on theory that sale to civilian market of military-style assault rifle for offensive use was inherently unreasonable and dangerous, and thus constituted unfair trade practice, in violation of Connecticut Unfair Trade Practices Act (CUTPA), was governed by CUTPA three-year limitations period, for purposes of determination whether alleged CUTPA violation came within statutory exception to immunity from civil liability accorded to defendants for crimes committed by third person using their firearms, under Protection of Lawful Commerce in Arms Act (PLCAA), for claims alleging violation of statute applicable to sale or marketing of firearm. 15 U.S.C.A. § 7903(5) (A) (iii); Conn. Gen. Stat. Ann. §§ 42-110g(f), 52-555.

1 Cases that cite this headnote

**[23]**  **Death**  ⚷  Computation of period of limitation

**Limitation of Actions**  ⚷  Consumer protection; unfair trade practices

Three-year limitations period under Connecticut Unfair Trade Practices Act (CUTPA) governing claim for wrongful death brought by administrators of estates of elementary school students and faculty against manufacturer, distributor, and retailer of assault rifle used by shooter to commit mass shooting at school, predicated on theory that sale to civilian market of military-style assault weapon was inherently unreasonable and dangerous, and thus constituted unfair trade practice, began to run from date that rifle was sold to shooter's mother, for purposes of determining whether alleged CUTPA violation served as statutory exception to immunity from civil liability accorded to defendants for crimes committed by third person using their firearm, under Protection of Lawful Commerce in Arms Act (PLCAA), for claims alleging violation of statute applicable to sale or marketing of firearm. 15 U.S.C.A. § 7903(5) (A) (iii); Conn. Gen. Stat. Ann. § 42-110g(f).

**[24]**  **Death**  ⚷  Creation of new cause of action

**Death**  ⚷  Elements of Compensation

Connecticut's wrongful death statute does not create a new cause of action, independent of any claims that the decedent might have had during his or her life; rather, the wrongful death statute merely allows the administrator of an estate to append to an already valid claim an additional element of damages consisting of costs associated with the decedent's death. Conn. Gen. Stat. Ann. § 52-555.

1 Cases that cite this headnote

**[25]**  **Antitrust and Trade Regulation**  ⚷  Nature and Elements

**Death**  ⚷  Grounds of Action

A cause of action for wrongful death predicated on a violation of the Connecticut Unfair Trade Practices Act (CUTPA) will lie only insofar as the decedent, had he or she survived, could have satisfied all of the essential elements of the CUTPA claim. Conn. Gen. Stat. Ann. §§ 42-110a et seq., 52-555.

1 Cases that cite this headnote

**[26]**  **Death**  ⚷  Computation of period of limitation

**Limitation of Actions**  ⚷  Consumer protection; unfair trade practices

Allegations by administrators of estates of elementary school students and faculty that manufacturer, distributor, and retailer of assault rifle used in mass school shooting advertised and marketed rifle in unethical, oppressive, immoral, and unscrupulous manner by extolling rifle's militaristic and assaultive qualities, specifically, its suitability for offensive combat and intent that rifle be used to kill, and that shooter specifically used rifle to commit school mass shooting, as opposed to other weapons in his home, because of rifle's "marketed association with the military," could be understood to allege that defendants' marketing and advertising activities remained in place on date that shooter used rifle to commit mass school shooting, for purposes of three-year limitations period under Connecticut Unfair Trade Practices Act (CUTPA) governing claim for wrongful death predicated on unfair trade practice, as required for CUTPA violation

to serve as statutory exception to immunity from liability accorded to defendants for crimes committed by third person with their firearm, under Protection of Lawful Commerce in Arms Act (PLCAA), for claims alleging violation of statute applicable to sale or marketing of firearm. 15 U.S.C.A. § 7903(5) (A) (iii); Conn. Gen. Stat. Ann. § 42-110g(f).

1 Cases that cite this headnote

**[27]    Antitrust and Trade Regulation**  ⟜ **Persons liable**

**Products Liability**  ⟜ **Weapons and Ammunition**

**Products Liability**  ⟜ **Nature and form of remedy**

Exclusivity of remedy for product defect under Product Liability Act did not apply to bar claim for wrongful death by administrators of estates of elementary school students and faculty against manufacturer, distributor, and retailer of assault rifle used in mass school shooting, predicated on theory that defendants committed unfair trade practice, in violation of Connecticut Unfair Trade Practices Act (CUTPA), by advertising and marketing rifle to civilian market in unethical, oppressive, immoral, and unscrupulous manner, for purposes of determining whether alleged CUTPA violation served as statutory exception to immunity from liability accorded to defendants for crimes committed by third person using their firearm, under Protection of Lawful Commerce in Arms Act (PLCAA), for claims alleging violation of statute applicable to sale or marketing of firearm; defendants offered no explanation as to why allegation that they wrongfully marketed rifle by promoting its use for illegal purposes, i.e., offensive, military style assault mission constituted product defect or that rifle contained inadequate warnings that made it unreasonably dangerous. 15 U.S.C.A. § 7903(5) (A) (iii); Conn. Gen. Stat. Ann. §§ 42-110g(a), 52-572n(a).

2 Cases that cite this headnote

**[28]    Products Liability**  ⟜ **Nature and form of remedy**

Although a product liability claim includes all claims or actions brought for personal injury, death or property damage caused by, among other things, the marketing of any product, the exclusivity provision of the Product Liability Act applies only to those claims seeking to recover damages caused by a defective product. Conn. Gen. Stat. Ann. § 52-572n(a).

2 Cases that cite this headnote

**[29]    Antitrust and Trade Regulation**  ⟜ **Particular cases**

Personal injuries sustained by elementary school students and faculty in mass shooting that ultimately resulted in their deaths were "actual damages" cognizable under Connecticut Unfair Trade Practices Act (CUTPA), based on claim by administrators of estates of students and faculty for alleged unfair trade practice, predicated on alleged advertising and marketing of assault rifle by manufacturer, distributor, and retailer of rifle to civilian market in manner that was unethical, oppressive, immoral, and unscrupulous, thus rendering rifle inherently and unreasonably dangerous, for purposes of determining whether CUTPA claim served as statutory exception to immunity from civil liability accorded to defendants for crimes committed by third person using their firearm, under Protection of Lawful Commerce in Arms Act (PLCAA), for claims alleging violation of statute applicable to sale or marketing of firearm. 15 U.S.C.A. § 7903(5) (A) (iii); Conn. Gen. Stat. Ann. § 42-110g(a).

2 Cases that cite this headnote

**[30]    Antitrust and Trade Regulation**  ⟜ **Private entities or individuals**

The Connecticut Unfair Trade Practices Act (CUTPA) permits the recovery of damages for personal injuries sustained as a direct result of wrongful advertising practices. Conn. Gen. Stat. Ann. § 42-110g(a).

**[31]** **Death** 🔑 Nature and form of remedy

Death and its direct consequences can constitute recoverable elements of damages only if, and to the extent that, they are made so by statute.

**[32]** **Death** 🔑 Nature and form of remedy

The wrongful death statute is the sole basis on which an action that includes as an element of damages a person's death or its consequences can be brought. Conn. Gen. Stat. Ann. § 52-555.

**[33]** **Statutes** 🔑 Purpose and intent; determination thereof

**Statutes** 🔑 Extrinsic Aids to Construction

When a statute is ambiguous, the court may properly look to extratextual sources to ascertain the intent of the legislature.

**[34]** **Antitrust and Trade Regulation** 🔑 Measure and amount

The right of action under the Connecticut Unfair Trade Practices Act (CUTPA) for the recovery of "any ascertainable loss of money or property, real or personal," as a result of an unfair trade practice in no way restricts the damages that are available to plaintiffs who have been directly and personally injured by an unfair trade practice. Conn. Gen. Stat. Ann. § 42-110g(a).

4 Cases that cite this headnote

**[35]** **Antitrust and Trade Regulation** 🔑 Advertising, marketing, and promotion

Whereas unfair trade practices under the Connecticut Unfair Trade Practices Act (CUTPA) such as false advertising and other forms of commercial deception tend to result primarily in financial harm, a principal evil associated with unethical and unscrupulous advertising is that viewers or innocent third parties will be physically injured as a result of dangerous or illegal conduct depicted in

the advertisements. Conn. Gen. Stat. Ann. § 42-110g(a).

**[36]** **Antitrust and Trade Regulation** 🔑 Advertising, marketing, and promotion

Wrongful advertising that poses a genuine risk of physical harm falls under the broad purview of the Federal Trade Commission (FTC) Act and, by incorporation, the Connecticut Unfair Trade Practices Act (CUTPA). Federal Trade Commission Act § 1, 15 U.S.C.A. § 41 et seq.; Conn. Gen. Stat. Ann. § 42-110a et seq.

**[37]** **Antitrust and Trade Regulation** 🔑 Persons liable

Connecticut Unfair Trade Practices Act (CUTPA), which made it unfair trade practice to engage in wrongful marketing or advertising of dangerous product, was "statute applicable to sale or marketing of firearm," within meaning of predicate exception to immunity from liability accorded to manufacturers, distributors, and sellers of firearms arising out of criminal or unlawful use of firearm by third party, under Protection of Lawful Commerce in Arms Act (PLCAA), when manufacturer, distributor, and/or seller "knowingly violates a State or federal statute applicable to the sale or marketing of" firearm, and violation was proximate cause of harm for which relief was sought. 15 U.S.C.A. §§ 7902(a), 7903(5) (A) (iii); Conn. Gen. Stat. Ann. § 42-110a et seq.

**[38]** **Statutes** 🔑 Federal and state law

With respect to the construction and application of federal statutes, principles of comity and consistency require Connecticut courts to follow the federal "plain meaning" rule, which provides that a federal statute's legislative history and other tools of interpretation may be relied on only if the terms of the statute are ambiguous.

**[39]** **Statutes** 🗝 Clarity and Ambiguity; Multiple Meanings

**Statutes** 🗝 Purpose and intent; determination thereof

Under the federal "plain meaning" rule, if the text of a federal statute is ambiguous, then the court must construct an interpretation consistent with the primary purpose of the statute as a whole; thus, the interpretive process will begin by inquiring whether the plain language of the statute, when given its ordinary, common meaning, is ambiguous.

**[40]** **Statutes** 🗝 What constitutes ambiguity; how determined

**Statutes** 🗝 Context

In assessing ambiguity of a federal statute, for the purposes of interpreting the statute under the "plain meaning" rule, the meaning of the statute must be evaluated not only by reference to the language itself but also in the specific context in which that language is used, as well as in the broader context of the statute as a whole.

**[41]** **Antitrust and Trade Regulation** 🗝 Persons liable

Claim by administrators of estates of elementary school students and faculty that manufacturer, distributor, and retailer of assault rifle used by shooter to commit mass school shooting committed unfair trade practice, in violation of Connecticut Unfair Trade Practices Act (CUTPA), by illegally marketing assault rifle to civilian markets by promoting use of assault rifle for illegal offensive civilian assaults, came within predicate exception to immunity from civil liability for crimes committed by third person using assault rifle, under Protection of Lawful Commerce in Arms Act (PLCAA), when defendants "knowingly violate a state or federal statute applicable to the sale or marketing of" firearm, and violation was proximate cause of harm suffered; nothing in PLCAA indicated clear intent of Congress to restrict power of states to regulate wrongful marketing or advertising of

firearm that encouraged egregious criminal use of firearms. 15 U.S.C.A. § 7903(5) (A); Conn. Gen. Stat. Ann. § 42-110a et seq.

**[42]** **Statutes** 🗝 Undefined terms

**Statutes** 🗝 Dictionaries

When construing a federal law in which key terms are undefined, under the "plain meaning" rule, the court begins with the ordinary, dictionary meaning of the statutory language.

**[43]** **Statutes** 🗝 Language

**Statutes** 🗝 Plain language; plain, ordinary, common, or literal meaning

When construing a federal statute, under the "plain meaning" rule, the court must assume that the drafters selected their language with conscious intent and that the use of a specific term is meant to import a distinct meaning.

**[44]** **Antitrust and Trade Regulation** 🗝 Advertising, marketing, and promotion

**Constitutional Law** 🗝 Unfair trade practices

Claim by administrators of estate for elementary school students and faculty that manufacturer, distributor, and retailer of assault rifle used by shooter to commit mass school shooting committed unfair trade practice, under Connecticut Unfair Trade Practices Act (CUTPA), by illegally marketing assault rifle to civilian markets by promoting use of assault rifle for illegal offensive civilian assaults did not implicate commercial speech protected under First Amendment. U.S. Const. Amend. 1; Conn. Gen. Stat. Ann. § 42-110a et seq.

1 Cases that cite this headnote

**[45]** **Constitutional Law** 🗝 What is "commercial speech"

**Constitutional Law** 🗝 Unlawful speech or activities

Advertisement and marketing of goods is a quintessential form of commercial speech; however, commercial speech that proposes an illegal transaction or that promotes or encourages an unlawful activity does not enjoy the protection of the First Amendment. U.S. Const. Amend. 1.

[46]  **Statutes**  ⚷  In general; factors considered

**Statutes**  ⚷  Plain, literal, or clear meaning; ambiguity

Under the law of the Second Circuit, if the plain language of a federal statute is ambiguous, the court then considers whether any ambiguities may be resolved by the application of canons of statutory construction and, failing that, through review of the legislative history.

[47]  **States**  ⚷  State police power

A federal law is not to be construed to have superseded the historic police powers of the States unless that was the clearly expressed and manifest purpose of Congress.

[48]  **States**  ⚷  Police power

The regulation of advertising that threatens the public health, safety, and morals is a core exercise of the states' police powers.

[49]  **States**  ⚷  Preemption in general

It is presumed that federal statutes do not preempt state law.

[50]  **Antitrust and Trade Regulation**  ⚷  Persons liable

Predicate exception to immunity from civil liability accorded to manufacturers, distributors, and sellers of firearms for criminal use of firearm by third party, under Protection of Lawful Commerce in Arms Act (PLCAA), when manufacturer, distributor, or seller knowingly violates state or federal law applicable to sale or marketing of firearm, was not subject to

narrow construction. Therefore, under doctrine of ejusdem generis, only similar types of firearms statutes would qualify, such that claim for unfair trade practices under Connecticut Unfair Trade practices Act (CUTPA) brought by administrators of estates of elementary school students and faculty based on unlawful marketing and advertising of assault rifle used in school mass shooting would not come within exception to immunity, in action against manufacturer, distributor, and seller of assault rifle, even if PLCAA cited examples of two statutes regulating sale and use of firearms that would qualify for exception. Statutes cited by Congress that would come within predicate exception were not meant to define, clarify, or narrow universe of laws that qualified as predicate statutes, but rather were included to emphasize Congress's response to another high-profile shooting, and to demonstrate how those statutes would have barred snipers in that case from obtaining weapons used in that shooting. 15 U.S.C.A. § 7903(5) (A) (iii); Conn. Gen. Stat. Ann. § 42-110a et seq.

1 Cases that cite this headnote

[51]  **Statutes**  ⚷  General and specific terms and provisions; ejusdem generis

The canon of statutory construction "ejusdem generis" applies when a statute sets forth a general category of persons or things and then enumerates specific examples thereof.

[52]  **Statutes**  ⚷  General and specific terms and provisions; ejusdem generis

The canon "ejusdem generis," like other canons of construction, is merely a tool to assist the court in gleaning the legislative intent; it should not be applied in the face of a contrary manifestation of legislative intent.

[53]  **Products Liability**  ⚷  Defenses in general

**Products Liability**  ⚷  Weapons and Ammunition

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 13 of 119

It is not the primary purpose of the federal Protection of Lawful Commerce in Arms Act (PLCAA), which immunizes a seller of a firearm from liability for the criminal use of a firearm by third persons, to shield firearms sellers from liability for wrongful or illegal conduct. 15 U.S.C.A. § 7903(5) (A).

**Attorneys and Law Firms**

**\*\*270** Joshua D. Koskoff, with whom were Alinor C. Sterling and Katherine Mesner-Hage, Bridgeport, for the appellants (plaintiffs).

James Vogts, pro hac vice, and Christopher Renzulli, with whom were Scott M. Harrington, Stamford, and, on the brief, Andrew A. Lothson, pro hac vice, Scott C. Allan, Hartford, Jonathan P. Whitcomb, Stamford, and Peter M. Berry, for the appellees (defendants').

Howard Zelbo, Evan A. Davis, pro hac vice, and Elizabeth Vicens, pro hac vice, filed a brief for Trinity Church Wall Street as amicus curiae.

James J. Healy, Hartford, filed a brief for Nora Freeman Engstrom et al. as amici curiae.

Matthew H. Geelan, Guilford, Michael J. Dell, pro hac vice, and Rebecca T. Dell, pro hac vice, filed a brief for Katie Bakes et al. as amici curiae.

Vaughan Finn, Hartford, and Thomas H. Zellerbach, pro hac vice, filed a brief for The Brady Center To Prevent Gun Violence as amicus curiae.

John J. Kennedy, Jr., Brendan K. Nelligan, New Haven, Brad S. Karp, pro hac vice, H. Christopher Boehning, pro hac vice, and Amy J. Beaux, pro hac vice, filed a brief for the Law Center To Prevent Gun Violence as amicus curiae.

George Jepsen, former attorney general, Perry Zinn Rowthorn, former deputy attorney general, Kimberly Massicotte, associate attorney general, and Jeremy Pearlman, assistant attorney general, filed a brief for the State of Connecticut et al. as amici curiae.

Daniel J. Klau filed a brief for CT Against Gun Violence et al. as amici curiae.

David N. Rosen and Alexander Taubes, New Haven, filed a brief for Newtown Action Alliance et al. as amici curiae.

Kenneth R. Slater Jr., Hartford, David H. Thompson, pro hac vice, Peter A. Patterson, pro hac vice, and John D. Ohlendorf, pro hac vice, filed a brief for the Connecticut Citizens Defense League, Inc., as amicus curiae.

Lawrence G. Keane, Newtown, and Victor E. Schwartz, pro hac vice, filed a brief for the National Shooting Sports Foundation as amicus curiae.

Robert J. Chomiak, Hartford, filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

Kenneth R. Slater, Jr., Hartford, Paul D. Clement, pro hac vice, and Erin E. Murphy, pro hac vice, filed a brief for the National Rifle Association of America, Inc., as amicus curiae.

Joseph P. Secola, Brookfield, filed a brief for Gun Owners of America, Inc., et al. as amicus curiae.

Palmer, McDonald, Robinson, Vertefeuille, Mullins, Kahn and Elgo, Js. [*]

*Opinion*

PALMER, J.

**\*\*271  \*64** TABLE OF CONTENTS

*Page*

I. PROCEDURAL HISTORY...273

II. ALLEGED FACTS...275

III. NEGLIGENT ENTRUSTMENT...278

IV. WRONGFUL DEATH AND CUTPA: ISSUES OF STATE LAW...283
A. CUTPA Standing ...285

B. Statute of Limitations...291

   1. Procedural History...292

   2. Legal Principles...293

C. Connecticut Product Liability Act Preemption...295

D. CUTPA Personal Injury Damages...296

V. WRONGFUL DEATH AND CUTPA: ISSUES OF FEDERAL LAW...300

A. PLCAA Overview...300

B. The Plain Language of the Statute...301

  1. The Predicate Exception...302

  **272 2. The Statutory Framework...303

  3. The Statement of Findings and Purposes...308

  4. Absurd Result...311

C. Extrinsic Evidence of Congressional Intent...312

  1. Canons of Statutory Construction...312

    a. Clear Statement Requirement...312

    b. Ejusdem Generis...313

    c. Statutory Exceptions To Be Construed Narrowly...317

  2. Related Legislation......317

  3. The Legislative History of PLCAA... 318

VI. CONCLUSION...324

 [1]  On December 14, 2012, twenty year old Adam Lanza forced his way into Sandy Hook Elementary School in Newtown and, during the course of 264 seconds, fatally shot twenty first grade children and six staff members, and wounded two other staff members. *65 Lanza carried out this massacre using a Bushmaster XM15-E2S semiautomatic rifle that was allegedly manufactured, distributed, and ultimately sold to Lanza's mother by the various defendants' in this case. There is no doubt that Lanza was directly and primarily responsible for this appalling series of crimes. In this action, however, the plaintiffs—administrators of the estates of nine of the decedents—contend that the defendants' also bear some of the blame. The plaintiffs assert a number of different legal theories as to why the defendants' should be held partly responsible for the tragedy. The defendants' counter that all of the plaintiffs' legal theories are not only barred under Connecticut law, but also precluded by a federal statute, the Protection of Lawful Commerce in Arms Act

(PLCAA), Pub. L. No. 109-92, 119 Stat. 2095 (2005), codified at 15 U.S.C. §§ 7901 through 7903 (2012), which, with limited exceptions, immunizes firearms manufacturers, distributors, and dealers from civil liability for crimes committed by third parties using their weapons. See 15 U.S.C. §§ 7902 (a) and 7903 (5) (2012).

For the reasons set forth in this opinion, we agree with the defendants' that most of the plaintiffs' claims and legal theories are precluded by established Connecticut law and/ or PLCAA. For example, we expressly reject the plaintiffs' theory that, merely by selling semiautomatic rifles—which were legal at the time [1]—to the civilian population, the defendants' became responsible for any crimes committed with those weapons.

The plaintiffs have offered one narrow legal theory, however, that is recognized under established Connecticut law. Specifically, they allege that the defendants' knowingly marketed, advertised, and promoted the XM15-E2S for civilians to use to carry out offensive, *66 military style combat missions against their perceived enemies. Such use of the XM15-E2S, or any weapon for that matter, would be illegal, and Connecticut law does not permit advertisements that promote or encourage violent, criminal behavior. Following a scrupulous review of the text and legislative history of PLCAA, we also conclude that Congress has not clearly manifested an intent to extinguish the traditional authority of our legislature and our courts to protect the people of Connecticut from the pernicious practices alleged in the present case. The **273 regulation of advertising that threatens the public's health, safety, and morals has long been considered a core exercise of the states' police powers. Accordingly, on the basis of that limited theory, we conclude that the plaintiffs have pleaded allegations sufficient to survive a motion to strike and are entitled to have the opportunity to prove their wrongful marketing allegations. We affirm the trial court's judgment insofar as that court struck the plaintiffs' claims predicated on all other legal theories.

I

PROCEDURAL HISTORY

The plaintiffs brought the present action in 2014, seeking damages and unspecified injunctive relief. [2] The *67 defendants' include the Bushmaster

defendants' (Remington),[3] one or more of which is alleged to have manufactured the Bushmaster XM15-E2S semiautomatic rifle that was used in the crimes; the Camfour defendants',[4] distributors that allegedly purchased the rifle from Remington and resold it to the Riverview defendants'; and the Riverview defendants',[5] retailers that allegedly sold the rifle to Adam Lanza's mother, Nancy Lanza, in March, 2010.[6] The gravamen of the plaintiffs' claims, which are brought pursuant to this state's wrongful death statute, General Statutes § 52-555,[7] is that the defendants' (1) negligently entrusted to civilian consumers an AR-15 style assault rifle[8] that is suitable **274 for use only by military and law enforcement personnel, and (2) violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.,[9] through the sale or wrongful marketing of the rifle.

The defendants' moved to strike the plaintiffs' complaint, contending that all of the plaintiffs' claims are *68 barred by PLCAA. The defendants' also argued that, to the extent that the plaintiffs' claims sound in negligent entrustment, the plaintiffs failed to state a legally valid negligent entrustment claim under Connecticut common law, and, to the extent that their claims are predicated on alleged CUTPA violations, they are legally insufficient because, among other things, (1) the plaintiffs lack standing to bring a CUTPA action, (2) the plaintiffs' claims are time barred by CUTPA's three year statute of limitations; see General Statutes § 42-110g (f); (3) personal injuries and death are not cognizable CUTPA damages, and (4) the plaintiffs' CUTPA claims are simply veiled product liability claims and, therefore, are barred by General Statutes § 52-572n (a), the exclusivity provision of the Connecticut Product Liability Act (Product Liability Act).[10]

In response, the plaintiffs argued that PLCAA does not confer immunity on the defendants' for purposes of this case because two statutory exceptions to PLCAA immunity—for claims alleging negligent entrustment (negligent entrustment exception)[11] and for claims alleging a violation of a statute applicable to the sale or marketing of firearms (predicate exception)[12]—apply to their claims. The plaintiffs further argued that, for various reasons, the defendants' state law negligent entrustment and CUTPA arguments were ill founded.

Although the trial court rejected most of the defendants' arguments, the court concluded that (1) the plaintiffs' allegations do not fit within the common-law tort of negligent entrustment, (2) PLCAA bars the plaintiffs' claims insofar as those claims sound in negligent *69 entrustment, and (3) the plaintiffs lack standing to bring wrongful death claims predicated on CUTPA violations because they never entered into a business relationship with the defendants'. Accordingly, the court granted in their entirety the defendants' motions to strike the plaintiffs' amended complaint.

On appeal, the plaintiffs challenge each of those conclusions.[13] For their part, the **275 defendants' contend, as alternative grounds for affirmance, that the trial court improperly rejected their other CUTPA arguments. We conclude that the majority of the plaintiffs' claims were properly struck insofar as those claims are predicated on the theory that the sale of the XM15-E2S rifle to Lanza's mother or to the civilian market generally constituted either negligent entrustment; see part III of this opinion; or an unfair trade practice. See part IV B of this opinion. We also conclude, however, that the plaintiffs have standing to prosecute their CUTPA claims under *70 Connecticut law. See part IV A of this opinion. We further conclude that PLCAA does not bar the plaintiffs from proceeding on the single, limited theory that the defendants' violated CUTPA by marketing the XM15-E2S to civilians for criminal purposes, and that this wrongful marketing tactics caused or contributed to the Sandy Hook massacre.[14] See part V of this opinion. Accordingly, we affirm in part and reverse in part the judgment of the trial court and remand the case for further proceedings.

II

ALLEGED FACTS

 [2]   [3]   [4]   [5]   [6]  Because we are reviewing the judgment of the trial court rendered on a motion to strike, we must assume the truth of the following facts, as alleged by the plaintiffs.[15] Lanza carried out the Sandy Hook massacre using a Bushmaster XM15-E2S rifle. That rifle is Remington's version of the AR-15 assault rifle, which is substantially similar to the standard issue M16 military service rifle used by the United States Army and other nations' armed forces, but fires only in semiautomatic mode.

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document   Page 16 of 119

**\*\*276** **\*71** The AR-15 and M16 are highly lethal weapons that are engineered to deliver maximum carnage with extreme efficiency. Several features make these rifles especially well suited for combat and enable a shooter to inflict unparalleled carnage. Rapid semiautomatic fire "unleashes a torrent of bullets in a matter of seconds." The ability to accommodate large capacity magazines allows for prolonged assaults. Exceptional muzzle velocity makes each hit catastrophic. Indeed, the plaintiffs contend, bullets fired from these rifles travel at such a high velocity that they cause a shockwave to pass through the body upon impact, resulting in catastrophic injuries even in areas remote to the direct wound. Finally, the fact that the AR-15 and M16 are lightweight, air-cooled, gas-operated, and magazine fed, enabling rapid fire with limited recoil, means that their lethality is not dependent on good aim or ideal combat conditions.

These features endow the AR-15 with a lethality that surpasses even that of other semiautomatic weapons. "The net effect is more wounds, of greater severity, in more victims, in less time." That lethality, combined with the ease with which criminals and mentally unstable individuals can acquire an AR-15, has made the rifle the weapon of choice for mass shootings, including school shootings.

The particular weapon at issue in this case was manufactured and sold by the Bushmaster defendants'. Sometime prior to March, 2010, the Bushmaster defendants' sold the rifle to the Camfour defendants'. The Camfour defendants' subsequently sold the rifle to the Riverview defendants', who operate a retail gun store located in the town of East Windsor.

In March, 2010, Lanza's mother purchased the rifle from the Riverview defendants'. Lanza, who was seventeen years old at the time, had expressed a desire to join the elite United States Army Rangers unit. His mother **\*72** bought the rifle to give to or share with him in order to connect with him. However, when Lanza turned eighteen on April 22, 2010, he did not enlist in the military. Still, he gained unfettered access to a military style assault rifle.

Eight months later, on the morning of December 14, 2012, Lanza retrieved the rifle and ten 30 round magazines. Using a technique taught in the first person shooter video games that he played, he taped several of those magazines together to allow for faster reloading. He then drove to Sandy Hook Elementary School.

Just before 9:30 a.m., Lanza shot his way into the locked school using the XM15-E2S. He immediately shot and killed Mary Joy Sherlach as well as the school's principal. He subsequently shot and wounded two staff members.

Lanza next entered Classroom 8, where he used the rifle to kill two adults and fifteen first grade children, including five of the plaintiffs. Finally, he entered Classroom 10, where he used the rifle to kill two adults and five first grade children, including three of the plaintiffs. Nine children from Classroom 10 were able to escape when Lanza paused to reload with another magazine.

In total, the attack lasted less than four and one-half minutes, during which Lanza fired at least 154 rounds from the XM15-E2S, killing twenty-six and wounding two others. [16]

**\*\*277** The plaintiffs filed the present action in 2014 seeking damages and injunctive relief. Each of the counts in **\*73** the operative first amended complaint is predicated on two distinct theories of liability. First, the plaintiffs contend that the AR-15 is a military grade weapon that is "grossly ill-suited" for legitimate civilian purposes such as self-defense and recreation. They also allege that the AR-15 has become the weapon of choice for mass shootings and, therefore, that the risks associated with selling the weapon to the civilian market far outweigh any potential benefits. The defendants' continued to sell the XM15-E2S despite their knowledge of these facts. Therefore, the plaintiffs contend, it was both negligent and an unfair trade practice for each of the defendants' to sell the weapon, knowing that it eventually would be purchased by a civilian customer who might share it with other civilian users.

The plaintiffs' second theory of liability is that the defendants' advertised and marketed the XM15-E2S in an unethical, oppressive, immoral and unscrupulous manner. They contend that the defendants' have sought to grow the AR-15 market by extolling the militaristic and assaultive qualities of their AR-15 rifles and, specifically, the weapon's suitability for offensive combat missions. The plaintiffs argue that the defendants' militaristic marketing reinforces the image of the AR-15 as a combat weapon that is intended to be used for the purposes of waging war and killing human beings. Consistent with that image, the defendants' further promoted the XM15-E2S as a combat weapon system by designating in their product catalogues that the rifle comes "standard" with a 30 round magazine which, the plaintiffs allege, differs from

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc
Main Document Page 17 of 119

how the defendants' promote and sell rifles for legal civilian purposes such as hunting and sport shooting. [17]

**\*74** The plaintiffs further contend that the defendants' unethically promoted their assault weapons for offensive, military style missions by publishing advertisements and distributing product catalogs that (1) promote the AR-15 as "the uncompromising choice when you demand a rifle as mission adaptable as you are," (2) depict soldiers moving on patrol through jungles, armed with Bushmaster rifles, (3) feature the slogan "[w]hen you need to perform under pressure, Bushmaster delivers," superimposed over the silhouette of a soldier holding his helmet against the backdrop of an American flag, (4) tout the "military proven performance" of firearms like the XM15-E2S, (5) promote civilian rifles as "the ultimate combat weapons system," (6) invoke the unparalleled destructive power of their AR-15 rifles, (7) claim that the most elite branches of the United States military, including the United States Navy **\*\*278** SEALs, the United States Army Green Berets and Army Rangers, and other special forces, have used the AR-15, and (8) depict a close-up of an AR-15 with the following slogan: "Forces of opposition, bow down. You are single-handedly outnumbered."

Finally, with respect to this second, wrongful marketing theory of liability, the plaintiffs contend that the defendants' marketing of the XM15-E2S to civilians for offensive assault missions was a substantial factor in causing the plaintiffs' injuries. Specifically, they contend that Lanza had dreamed as a child of joining the elite Army Rangers unit of the United States Army and was, therefore, especially susceptible to militaristic marketing. They further contend that he selected the **\*75** XM15-E2S for his assault from among an arsenal that included various less lethal arms—at least three handguns, one shotgun, two bolt action rifles, and three samurai swords—and that he specifically chose the XM15-E2S not only for its functional capabilities, including its assaultive qualities and efficiency in inflicting mass casualties, but also because of its marketed association with the military. [18] Finally, they contend that Lanza was a devoted player of first person shooter games featuring variants of the XM15-E2S and that he employed techniques taught in those games to enhance the lethality of his assault on the school. In other words, the plaintiffs allege that the attack, had it occurred at all, would have been less lethal and the carnage less grievous if Lanza had not been encouraged by the defendants' marketing campaign to select the XM15-E2S as his weapon of choice and taught by violent video games how

to kill with it most efficiently. Additional facts and procedural history will be set forth as necessary.

### III

### NEGLIGENT ENTRUSTMENT

In opposition to the defendants' motions to strike, the plaintiffs argued that their claims were not barred by PLCAA because the claims are predicated on allegations of negligent entrustment and CUTPA violations, both of which satisfy statutory exceptions to PLCAA immunity. In this part of the opinion, we consider whether the trial court correctly concluded that the plaintiffs' claims were legally insufficient to the extent that those claims are predicated on a theory of negligent entrustment. The trial court concluded both that the **\*76** plaintiffs had not sufficiently pleaded a cause of action in negligent entrustment under Connecticut common law and, in the alternative, that the plaintiffs' allegations did not satisfy PLCAA's statutory definition of negligent entrustment. See 15 U.S.C. § 7903 (5) (B) (2012). [19] The plaintiffs challenge both conclusions on appeal. Because we agree with the trial court that the plaintiffs have not pleaded a legally sufficient cause of action in negligent entrustment under our state's common law, we need not consider whether negligent entrustment claims must meet stricter requirements in **\*\*279** order to satisfy the federal statutory exception.

The following additional procedural history is relevant to this issue. In response to the defendants' motions to strike, the plaintiffs argued that their claims are not precluded by PLCAA because each of their claims is predicated in part on a theory of negligent entrustment and PLCAA does not confer immunity on sellers of firearms in actions for negligent entrustment. See 15 U.S.C. § 7903 (5) (A) (ii) (2012). [20] In its decision granting the defendants' motions to strike, the trial court concluded that an action for negligent entrustment will lie only when the supplier of a dangerous instrumentality such as a firearm knows or has reason to know that the *direct entrustee* is likely to use the item unsafely. Because the plaintiffs did not allege that there was any specific reason to believe that the Camfour **\*77** defendants' (as direct entrustees of the Remington defendants'), the Riverview defendants' (as direct entrustees of the Camfour defendants'), or Lanza's mother (as a direct entrustee of the Riverview defendants') was incompetent to operate the XM15-E2S or had a propensity to use the weapon in an unsafe manner, the

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 18 of 119

court granted all of the defendants' motions to strike with respect to the plaintiffs' negligent entrustment theories of liability.

**[7]** **[8]** We commence our review of this issue with a brief discussion of the history of and principles that animate the tort of negligent entrustment. The cause of action for negligent entrustment represents a departure from the general rule that an individual cannot be held liable for the conduct of others. It reflects a legitimate societal concern that a person in possession of a dangerous instrument should bear the responsibility of exercising care when entrusting that instrument to another, given the serious risk to society if items like firearms or automobiles should fall into unfit hands. See J. Fisher, Comment, "So How Do You Hold This Thing Again?: Why the Texas Supreme Court Should Turn the Safety off the Negligent Entrustment of a Firearm Cause of Action," 46 Tex. Tech. L. Rev. 489, 495, 501 (2014). The primary question that we must resolve is whether these principles apply only when the entrustor believes or has specific reason to believe that the *direct entrustee* is likely to use the item unsafely or, rather, whether they also apply when it is reasonably foreseeable that the entrustment ultimately will lead to injurious use, whether by the direct entrustee or by some unknown third party. [21] If the former, then the trial court properly **\*78** found for the defendants' on this issue as a matter of law; if the latter, then the plaintiffs are correct that the plaintiffs' claim presents an issue of fact to be decided by a jury.

Although the idea that it may be wrong to entrust a weapon or other dangerous item to one likely to misuse it is as old as civilization, [22] the common-law tort of negligent **\*\*280** entrustment traces its origins to *Dixon* v. *Bell*, 105 Eng. Rep. 1023 (K.B. 1816). See B. Todd, "Negligent Entrustment of Firearms," 6 Hamline L. Rev. 467, 467 and n.1 (1983). In *Dixon*, the defendant sent a preadolescent girl to retrieve a loaded gun, resulting in the accidental shooting of the plaintiff's son. See *Dixon* v. *Bell*, supra, 1023. In upholding a verdict for the plaintiff that the defendant was liable for entrusting the girl with the care and custody of the weapon, the court recognized that "he well [knew] that the said [girl] was too young, and an unfit and improper person to be sent for the gun ...." Id.

American courts began applying the doctrine of negligent entrustment in the 1920s, following the advent of the mass produced automobile; see J. Fisher, supra, 46 Tex. Tech. L. Rev. 493; and Connecticut first recognized the common-law

cause of action in *Turner* v. *American District Telegraph & Messenger Co.*, 94 Conn. 707, 110 A. 540 (1920). In that case, the defendant security company entrusted a loaded pistol to an employee who later instigated a fight with and ultimately shot the plaintiff, a customer's night watchman. Id., at 708–11, 110 A. 540 (preliminary statement of facts). This court held that there was insufficient evidence to support a verdict for the plaintiff on his negligent entrustment claim because there was not "even a scintilla of evidence that the defendant had or **\*79** ought to have had knowledge or even suspicion that [its employee] possessed any of the traits ... attributed to him by the plaintiff," including that "he was a reckless person, liable to fall into a passion, and unfit to be [e]ntrusted with a deadly weapon ...." Id., at 716, 110 A. 540. "Without this vitally important fact," the court concluded, "the plaintiff's claim falls to the ground ...." Id.

Other Connecticut cases decided in the early twentieth century, although not always expressly resolved under the rubric of negligent entrustment, also suggested that a person can be held liable for third-party injuries resulting from another's use of a dangerous item only if the entrustment of that item was made with actual or constructive knowledge that misuse by the entrustee was foreseeable. In *Wood* v. *O'Neil*, 90 Conn. 497, 97 A. 753 (1916), for example, this court held that no cause of action in negligence could be maintained against the parents of a fifteen year old boy who accidentally shot a companion with a shotgun because the parents, in permitting the boy to use the gun, had no specific knowledge that he "was possessed of a marked careless disposition." Id., at 500, 97 A. 753.

Subsequently, in *Greeley* v. *Cunningham*, 116 Conn. 515, 165 A. 678 (1933), we articulated the standards that govern a negligent entrustment action in the context of automobiles, which since has become the primary context in which such claims have arisen. See generally J. Fisher, supra, 46 Tex. Tech. L. Rev. 489. In *Greeley*, the plaintiff alleged that the defendant had been negligent in entrusting his car to an unlicensed driver, who subsequently caused an accident while attempting to pass the plaintiff's vehicle. See *Greeley* v. *Cunningham*, supra, at 517–18, 165 A. 678. "[Although] liability cannot be imposed [on] an owner merely because he [e]ntrusts [his automobile] to another to drive [on] the highways," the court explained, "[i]t is ... coming to be generally held that **\*80** the owner may be liable for injury resulting from the operation of an automobile **\*\*281** he loans to another when he knows or ought reasonably to know that *the one to whom he [e ]ntrusts it* is so incompetent to

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 19 of 119

operate it, by reason of inexperience or other cause, that the owner ought reasonably to anticipate the likelihood that in its operation injury will be done to others." (Emphasis added.) Id., at 518, 165 A. 678. This court proceeded to set forth the elements of a cause of action sounding in negligent entrustment of an automobile: (1) the owner of an automobile entrusts it to another person (2) whom the owner knows or should reasonably know is so incompetent to operate it that injury to others should reasonably be anticipated, and (3) such incompetence results in injury. Id., at 520, 165 A. 678.

Since this court decided Wood, Turner, and Greeley, it never has suggested that a cause of action for negligent entrustment—whether involving a vehicle, a weapon, or some other dangerous item—will lie in the absence of evidence that the direct entrustee is likely to use the item unsafely. Most jurisdictions that have recognized a cause of action in negligent entrustment likewise require that the actor have actual or constructive knowledge that the specific person to whom a dangerous instrumentality is directly entrusted is unfit to use it properly. See, e.g., J. Fisher, supra, 46 Tex. Tech. L. Rev. 496; B. Todd, supra, 6 Hamline L. Rev. 467; S. Beal, "Saving Negligent Entrustment Claims," Trial, February, 2007, p. 35.

 [9]   In accordance with the majority view, this also is the rule set forth in the Restatement (Second) of Torts. Section 308 of the Restatement (Second) provides that "[i]t is negligence to permit a third person to use a thing ... [that] is under the control of the actor, if the actor knows or should know that *such person* intends or is likely to use the thing ... in such a manner as to create an unreasonable risk of harm to others." (Emphasis **\*81** added.) 2 Restatement (Second), Torts § 308, p. 100 (1965). Section 390, which further defines the tort of negligent entrustment, provides that "[o]ne who supplies ... a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of harm to himself and others ... is subject to liability for physical harm resulting to them." 2 id., § 390, p. 314; see also B. Todd, supra, 6 Hamline L. Rev. 467 and n.5. We take it as well established, then, that, in order to prove negligent entrustment, a plaintiff must demonstrate that (1) the defendant has entrusted a potentially dangerous instrumentality to a third person (2) whom the entrustor knows or should know intends or is likely to use the instrumentality in a manner that involves unreasonable risk of physical harm, and (3) such use does in fact cause harm to the entrustee or others.

 [10]   The rule that a cause of action for negligent entrustment will lie only when the entrustor knows or has reason to know that the direct entrustee is likely to use a dangerous instrumentality in an unsafe manner would bar the plaintiffs' negligent entrustment claims. Specifically, there is no allegation in this case that there was any reason to expect that Lanza's mother was likely to use the rifle in an unsafe manner. [23]

The plaintiffs, recognizing that they cannot prevail under this rule, invite us to adopt a different framework, one "that focuses on the existence of a nexus between the defendant and the dangerous **\*\*282** user—rather than the number of steps between them ...." In other words, their proposal is that a party alleging negligent entrustment need prove only that it was reasonably foreseeable that, following the initial entrustment of a **\*82** dangerous instrumentality, that instrumentality ultimately would come into the possession of someone who would use it in an unsafe manner. A jury could find that standard satisfied in this case, they contend, because (1) Remington allegedly marketed its assault rifles to young men who play violent, first person shooter video games and who, as a class, have a history of using such rifles in real mass shootings, and (2) there is evidence that individuals who legally purchase weapons such as the AR-15 often share the weapons with family members, including young men.

We decline the plaintiffs' invitation to stretch the doctrine of negligent entrustment so far beyond its historical moorings. We recognize that some of our sister state courts have permitted negligent entrustment actions to proceed when, although there was no indication that the direct entrustee was incompetent to use a dangerous item, there was reason to believe that the entrustee would in turn share the item with a *specific* third party who would misuse it. This has been the case, for example, when a parent or other agent purchased a weapon or vehicle for a child who was present at the place and time of sale. [24] We need not decide whether and to what extent Connecticut would recognize a cause of action for negligent entrustment under such circumstances, however, because, in the present case, the plaintiffs do not allege that any of the defendants' possessed any knowledge or had any specific reason to believe either that Lanza's mother would share the XM15-E2S with her son or that he was especially likely to operate it unsafely or illegally. In any event, the plaintiffs have failed to cite to a single case, from any **\*83** jurisdiction, that allowed an action for negligent entrustment to proceed when the nexus between a manufacturer of a

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document      Page 20 of 119

product and the person who ultimately used that product in an unsafe manner was as attenuated as it is in the present case. [25]

We also recognize that there is authority for the proposition that entrustment may be deemed negligent when the entrustor has no specific knowledge regarding the entrustee's personal competence or character but knows that the entrustee is a member of a class that is notoriously unfit to safely utilize the entrusted item. See 2 Restatement (Second), supra, § 308, comment **283 (b), p. 100. The plaintiffs argue that we should apply that principle in this case because (1) gun buyers as a class are known to sometimes share their weapons with family members, including young males, and (2) young males, in turn, are known to sometimes use assault weapons to commit mass shootings. Once again, we decline the invitation to so dramatically expand the scope of negligent entrustment liability.

As we noted, the tort of negligent entrustment saw its florescence, if not its modern genesis, in the advent of the mass produced automobile. See B. Todd, supra, 6 Hamline L. Rev. 467; A. Cholodofsky, Note, " *84 Torts: Does the Negligent Entrustment Doctrine Apply to Sellers?" 39 U. Fla. L. Rev. 925, 928 (1987). In some instances, a person may be unsuited to drive an automobile because he is reckless, or inebriated, or otherwise distinctly unfit to drive safely on the public roads. See A. Cholodofsky, supra, 926 and nn. 5–6. It also is a matter of common sense and common knowledge, however, that certain classes of people—e.g., young children and blind persons—are inherently unfit to drive. Our laws recognize as much. See General Statutes § 14-36 (c) and (e) (establishing, among other things, age and vision screening requirements for motor vehicle operator's permit or license). Accordingly, one may be negligent for entrusting an automobile to such users even in the absence of any particular knowledge about their individual driving skills, experience, or temperament. A jury reasonably might conclude that the same is true with respect to firearms and other weapons and dangerous equipment. See B. Todd, supra, 468–69.

The plaintiffs' theory, however, is fundamentally different. They do not contend that all gun buyers such as Lanza's mother, or young men such as Lanza, are incapable of safely operating an AR-15. The plaintiffs do not even contend that such users usually or even frequently operate such weapons unsafely or unlawfully. Rather, the plaintiffs contend that it is objectively unreasonable to legally sell an assault weapon to an adult buyer, for no other reason than that some small subset of buyers will share weapons with their young adult sons and some much smaller subset of young adult males will use those weapons to commit terrible, random crimes. The only plausible way to construe that claim—and we do not understand the plaintiffs to deny this—is that any commercial sale of assault weapons to civilian users constitutes negligent entrustment because the social costs of such sales outweigh the perceived benefits. Other courts have rejected such a *85 theory, as do we. See, e.g., McCarthy v. Sturm, Ruger & Co., 916 F.Supp. 366, 370 (S.D.N.Y. 1996), aff'd sub nom. McCarthy v. Olin Corp., 119 F.3d 148 (2d Cir. 1997); Merrill v. Navegar, Inc., 26 Cal. 4th 465, 483–84, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001); see also Phillips v. Lucky Gunner, LLC, 84 F.Supp.3d 1216, 1226 (D. Colo. 2015) (rejecting theory that unmediated online sales of hazardous items represent negligent entrustment), appeal dismissed, United States Circuit Court of Appeals, Docket No. 15-1153 (10th Cir. July 21, 2015). Accordingly, the plaintiffs' action cannot proceed under the negligent entrustment exception to immunity under PLCAA.

IV

WRONGFUL DEATH AND
CUTPA: ISSUES OF STATE LAW

We turn next to the question of whether the trial court properly granted the defendants' motion to strike the plaintiffs' wrongful death claims insofar as those claims are predicated on alleged CUTPA violations. Because we have concluded that **284 the plaintiffs have not pleaded a legally sufficient negligent entrustment claim under Connecticut common law, PLCAA will bar the present action unless (1) the plaintiffs have pleaded a cognizable CUTPA violation, and (2) CUTPA constitutes a predicate statute for purposes of 15 U.S.C. § 7903 (5) (A) (iii).

In their motions to strike, the defendants argued, among other things, that (1) the plaintiffs' claims were barred by CUTPA's three year statute of limitations, (2) damages for personal injuries and death resulting therefrom are not cognizable under CUTPA, (3) the plaintiffs' CUTPA claims are precluded by the Product Liability Act; see General Statutes § 52-572n (a); and (4) CUTPA is not a valid predicate statute for purposes of PLCAA. The trial court rejected each of these arguments. The court agreed with the defendants', however, *86 that CUTPA does not afford protection to persons who do not have a consumer or other commercial relationship with

Case 20-81688-CRJ11  Doc 341  Filed 08/14/20  Entered 08/14/20 09:22:49  Desc
Main Document  Page 21 of 119

the alleged wrongdoer. Accordingly, the court concluded that the plaintiffs lacked standing to pursue wrongful death claims predicated on CUTPA violations.

On appeal, the plaintiffs contend that the trial court improperly struck their claims for lack of standing to pursue them under CUTPA. For their part, the defendants' claim that the trial court's judgment can be affirmed on the alternative ground that the court's other determinations were improper.

As an initial matter, we reiterate that the plaintiffs' CUTPA based wrongful death claims are predicated on at least two fundamentally distinct theories of liability. First, the plaintiffs contend that the defendants' violated CUTPA by selling the XM15-E2S to the civilian market despite their knowledge that there is no legitimate civilian use for such a weapon, that assault weapons such as the AR-15 pose unreasonable risks when used by civilians, and that individuals unfit to operate such weapons likely would gain access to them. In other words, the plaintiffs allege, in essence, that any sale of any assault weapon to any civilian purchaser in Connecticut is, ipso facto, an unfair trade practice under CUTPA.

Second, the plaintiffs contend that the defendants' violated CUTPA by advertising and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner that promoted illegal offensive use of the rifle. Specifically, they allege that the defendants':

• promoted use of the XM15-E2S for offensive, assaultive purposes—specifically, for "waging war and killing human beings"—and not solely for self-defense, hunting, target practice, collection, or other legitimate civilian firearm uses

**\*87** • extolled the militaristic qualities of the XM15-E2S

• advertised the XM15-E2S as a weapon that allows a single individual to force his multiple opponents to "bow down"

• marketed and promoted the sale of the XM15-E2S with the expectation and intent that it would be transferred to family members and other unscreened, unsafe users after its purchase.

The plaintiffs further allege in this regard that such promotional tactics were causally related to some or all of the injuries that were inflicted during the Sandy Hook massacre.

For the reasons that follow, we conclude that the trial court improperly granted the defendants' motion to strike these allegations in their entirety. We agree with the plaintiffs that the trial court improperly concluded that they lack standing to pursue **\*\*285** any of their CUTPA claims against the defendants'. With respect to the plaintiffs' first theory of CUTPA liability—that the sale of AR-15s to the civilian population is ipso facto unfair—we agree with the defendants' that the trial court's judgment can be affirmed on the alternative ground that the plaintiffs' claim is time barred under the CUTPA statute of limitations. Cf. footnote 14 of this opinion. However, with respect to the plaintiffs' second theory of liability—that the defendants' wrongful marketing of the XM15-E2S for illegal, offensive purposes was a causal factor in increasing the casualties of the Sandy Hook massacre—we find the defendants' various alternative bases for affirmance unpersuasive.

**\*88** A

CUTPA Standing

[11] [12] [13] Although the plaintiffs brought their claims pursuant to the wrongful death statute; General Statutes § 52-555; a wrongful death action will lie only when the deceased person could have brought a valid claim for the injuries that resulted in death if he or she had survived. See part IV B of this opinion. Accordingly, to survive a motion to strike, the plaintiffs must be able to establish that they have standing to pursue a CUTPA claim for their injuries. We first consider whether the trial court properly concluded that the plaintiffs lacked standing to bring the present action under CUTPA because they were third-party victims who did not have a direct consumer, commercial, or competitor relationship (business relationship or privity requirement) with the defendants'. Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors, or business associates, we hold that a party directly injured by conduct resulting from such advertising can bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant. Accordingly, we agree with the plaintiffs that the trial court improperly struck their CUTPA based wrongful death claims.

[14] Whether one must have entered into a consumer or commercial relationship with an alleged wrongdoer in order

to have standing to bring a CUTPA action presents a question of statutory interpretation. The plain meaning of the statutory text must be our lodestar. See General Statutes § 1-2z.

**[15]** **[16]** General Statutes § 42-110g (a) creates a private right of action for persons injured by unfair trade practices and provides in relevant part: "*Any person* who suffers **\*89** any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action ... to recover actual damages...." (Emphasis added.) On its face, the statute plainly and unambiguously authorizes *anyone* who has suffered an ascertainable financial loss as a result of an unfair trade practice to bring a CUTPA action. Nothing in the text of the statute indicates that the right afforded by § 42-110g (a) is enjoyed only by persons who have done business of some sort with a defendant.

Even if we were to conclude that the statute is ambiguous in this regard, we perceive nothing in the legislative history or purpose of the statute that would support the defendants' theory that something more than an ascertainable financial loss caused by a prohibited act is necessary to confer standing under CUTPA. When CUTPA originally was enacted in 1973, the statute authorized private actions for "[a]ny person who *purchases or leases* **\*\*286** *goods or services from a seller or lessor primarily for personal, family or household purposes and thereby* suffers any ascertainable loss of money or property, real or personal, as a result ...." (Emphasis added.) Public Acts 1973, No. 73-615, § 7 (P.A. 73-615), codified as amended at General Statutes (Rev. to 1975) § 42-110g (a). It is clear, then, that a direct consumer relationship initially was required in order to bring a CUTPA action.

Over the following decade, however, a series of amendments eliminated that privity requirement. Of particular note are the 1975 and 1979 amendments. In 1975, the legislature amended the statute to confer standing on two distinct classes of plaintiffs. See Public Acts 1975, No. 75-618, § 5 (P.A. 75-618). As amended, the statute provided that CUTPA actions can be brought either by "any person who purchases or leases goods or services from a seller or lessor primarily for personal, **\*90** family or household purposes and thereby suffers any ascertainable loss ... as a result" or by "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result [of a prohibited practice] ...." P.A. 75-618, § 5, codified as amended at General Statutes (Rev. to 1977) § 42-110g (a). In other words, the legislature conferred standing on an additional

category of plaintiffs, namely, those whose injuries were not the result of a direct consumer purchase or lease of goods or services. Presumably recognizing that the original category of CUTPA plaintiffs (consumer direct purchasers and lessors) had become redundant insofar as it was merely a subset of the new, broader category that had been added in the 1975 amendments—i.e., any person who suffers an injury as a result of a prohibited practice—the legislature amended the statute again in 1979 to eliminate the reference to direct purchasers. See Public Acts 1979, No. 79-210, § 1, codified at General Statutes (Rev. to 1981) § 42-110g (a). As we previously have explained; see *Vacco v. Microsoft Corp.*, 260 Conn. 59, 86–87 and n.30, 793 A.2d 1048 (2002); it is clear from this history that, although a business relationship initially was required to bring a CUTPA action, the legislature chose to eliminate that privity requirement and instead conferred standing on any person who could establish an ascertainable loss as a result of an unfair trade practice.

This conclusion finds additional support in the legislative proceedings pertaining to the various 1970s amendments. From the start, CUTPA prohibited unfair trade practices associated not only with the actual sale and distribution of products and services, but also with the advertising and offering of those products and services for sale.[26] **\*91** However, when the House of Representatives debated Substitute House Bill No. 5613, the bill that ultimately became No. 78346 of the 1978 Public Acts, several representatives expressed concerns that the original file copy of that bill might be understood to mean that unfair advertising would no longer constitute a prohibited trade practice. In explaining the need to amend the bill, Representative Raymond C. Ferrari cautioned that CUTPA should not be watered down so as to "require the actual sale of an item as opposed to simply allow[ing] the enforcement under an advertisement ...." 21 H.R. Proc., Pt. 10, 1978 Sess., p. 3987. Representative Robert F. Frankel expressed similar sentiments. **\*\*287** See 21 H.R. Proc., Pt. 11, 1978 Sess., p. 4319 ("we would actually be rolling back some of the coverage of [CUTPA] wherein we would be requiring a sale of advertised products before the Commissioner [of Consumer Protection] could become involved"). The fact that the legislature sought to ensure that advertising alone—even advertising that never results in a sale—could constitute a prohibited practice suggests that an actual business relationship was not deemed to be a precondition for a CUTPA action following the 1975 amendments.

It is true that the primary concern of those representatives during the 1978 hearings was to prevent the Department of Consumer Protection (department) from being stripped of its authority to aggressively enforce CUTPA violations relating to false or misleading advertising. It is, of course, possible that the legislature wanted the department to be able to curtail wrongful advertising campaigns at their inception, without having to wait until consumers were harmed before taking legal action, but intended that private individuals not have standing to sue unless and until they had purchased goods or services in reliance on such advertisements. It bears emphasis, however, that the legislative history of CUTPA is replete not only with references **\*92** to the broad scope and remedial nature of the act [27] but also with statements specifically indicating a legislative awareness that the department and the Office of the Attorney General were not equipped to prosecute every unfair trade practice and a concomitant belief that it was important to incentivize broad enforcement action by private litigants. [28] See, e.g., *Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 615 and nn. 4–5, 618, 440 A.2d 810 (1981).

More directly on point is the testimony of Assistant Attorney General Arnold Feigen, which was offered on behalf of Attorney General Carl Ajello and Commissioner of Consumer Protection Mary Heslin, before the General Law Committee. See Conn. Joint Standing Committee Hearings, General Law, Pt. 4, 1979 Sess., p. 1159. Testifying in favor of the 1979 amendment that eliminated the direct purchaser requirement language, Feigen explained that "[n]umerous arguments have been raised in both state and federal courts that [a] plaintiff, in order to sue, must be a purchaser or a lessee of a seller ...." Id. "The amendment," he opined, "will now allow a suit by any person who suffers any ascertainable loss of money or property." Id. Those statements, although not dispositive of the question before us, provide support for the plaintiffs' theory that the legislature intended to eliminate the business relationship requirement when it amended CUTPA. See *Vacco v. Microsoft Corp.*, supra, 260 Conn. at 86–87 and n.30, 793 A.2d 1048.

The defendants', while implicitly acknowledging that the plain language of § 42-110g (a) no longer imposes a business relationship requirement, offer two arguments **\*93** as to why we should continue to read such a requirement into the statute. First, they contend that the trial court properly concluded that our prior cases and those of the Appellate Court have recognized a business relationship requirement and that principles of stare decisis and legislative acquiescence counsel against departing from those decisions. **\*\*288**

Second, the defendants' contend that prudential concerns support limiting CUTPA standing to persons who have a direct business relationship with the alleged wrongdoer. We consider each argument in turn.

In support of its conclusion that our cases impose a business relationship requirement, the trial court relied on this court's decisions in *Vacco v. Microsoft Corp.*, supra, 260 Conn. at 59, 793 A.2d 1048, and *Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S.Ct. 1913, 164 L.Ed.2d 664 (2006). Neither decision compels such a result.

[17] In *Vacco*, we recognized that the legislature, by " 'deleting all references to "purchasers, sellers, lessors, or lessees" ' " in § 42-110g (a) in 1979, had eliminated CUTPA's privity requirement. *Vacco v. Microsoft Corp.*, supra, 260 Conn. at 88, 793 A.2d 1048. We proceeded to clarify, however, that the elimination of the privity requirement did not mean that *anyone* could bring a CUTPA action, no matter how attenuated the connection between his or her injuries and a defendant's allegedly unfair trade practices. "Notwithstanding the elimination of the privity requirement," we explained, "it strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any ascertainable harm, caused by any person in the conduct of any trade or commerce." (Internal quotation marks omitted.) Id. We further observed, however, that CUTPA liability could reasonably be cabined in the same manner as with common-law tort actions: "[N]otwithstanding the broad language and remedial purpose of CUTPA, we have applied traditional **\*94** common-law principles of remoteness and proximate causation to determine whether a party has standing to bring an action under CUTPA." (Footnote omitted.) Id. Notably, we cited *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98 (2001), as an example of a case in which the alleged harms suffered by the plaintiffs—the city of Bridgeport and its mayor—as a result of gun violence were "too remote and derivative" with respect to the challenged conduct for the plaintiffs to have standing to bring a CUTPA claim. *Vacco v. Microsoft Corp.*, supra, at 88–89, 793 A.2d 1048, citing *Ganim v. Smith & Wesson Corp.*, supra, at 344, 365, 780 A.2d 98. We proceeded in *Vacco* to apply the same three part remoteness analysis that we had applied in *Ganim*, ultimately concluding that the plaintiff lacked standing because his injuries were too remote in relation to the defendant's allegedly anticompetitive conduct. *Vacco v. Microsoft Corp.*, supra, at 90–92, 793 A.2d 1048; see *Ganim v. Smith & Wesson Corp.*, supra, at 353, 780 A.2d 98. Accordingly, *Vacco* stands

for the proposition that standing to bring a CUTPA claim will lie only when the purportedly unfair trade practice is alleged to have directly and proximately caused the plaintiff's injuries. This remoteness requirement serves the same function as a privity requirement, as it mitigates any concerns associated with imposing limitless liability on CUTPA defendants'.

Although our decision in *Ventres* could be read to suggest that the plaintiff must have a business relationship with the defendant, a closer review indicates that it does not stand for this sweeping proposition. In that case, a land trust and a conservancy (property owners) alleged that the named defendant, Goodspeed Airport, LLC, among other defendants', had violated CUTPA by trespassing on the property owners' land. See *Ventres* v. *Goodspeed Airport, LLC*, supra, 275 Conn. at 109, 112, 881 A.2d 937. We concluded, as a matter of law, that, even if the property owners had been able to prove their allegations, **\*95  \*\*289** none of the alleged conduct would have risen to the level of a CUTPA violation. See *id., at 156–58, 881 A.2d 937.*

As an alternative, independent basis for upholding the trial court's decision to strike the property owners' CUTPA claims, we briefly considered the property owners' contention that a CUTPA plaintiff is not required to allege any business relationship with a defendant, summarily rejecting that claim on the ground that the property owners had provided no authority for the proposition. *Id., at 157–58, 881 A.2d 937.* Significantly, in contrast to the present case, *Ventres* did not involve allegations that a business relationship between the defendants' and a third party had resulted in the harm alleged. Therefore, we had no occasion to discuss or apply the proximate cause analysis set forth in *Vacco.* See *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. at 90–92, 793 A.2d 1048. In other words, there was no business relationship that could result in any causal connection to the injury alleged.

Accordingly, the court in *Ventres* did not hold that every CUTPA claim requires a business relationship between a plaintiff and a defendant. Indeed, we did not analyze that issue, and at no point did we examine either the text or the legislative history of the statute, both of which, as we previously explained, strongly suggest that the legislature did not intend to impose a privity requirement. We thus conclude that the principles of stare decisis and legislative acquiescence do not preclude us from construing § 42-110g (a) de novo in the present case to address this question. See *Igartua* v. *Obama*, 842 F.3d 149, 160 (1st Cir. 2016) (Torruella, J., concurring in part and dissenting in part) ("[c]onsidering the

cursory treatment given to this issue by the ... panel [in the prior decision], our hands are not tied by stare decisis"), cert. denied sub nom. *Igartua* v. *Trump*, —— U.S. ——, 138 S.Ct. 2649, 201 L.Ed.2d 1050 (2018).

**\*96** Next, we consider the defendants' argument that this court has, for prudential reasons, set various limitations on the types of parties that may bring CUTPA claims. The defendants' contend that similar policy rationales counsel in favor of imposing a business relationship requirement. In two of the cases that the defendants' cite in support of this proposition, however, this court concluded that CUTPA simply did not govern the conduct at issue, and, therefore, we did not consider the question of standing. See *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964 (1997) (medical malpractice claims are not subject to CUTPA); *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 180, 510 A.2d 972 (1986) (CUTPA does not apply to deceptive practices in purchase and sale of securities). In the third case on which the defendants' rely, namely, *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 627 A.2d 374 (1993), this court concluded that third parties lacked CUTPA standing only in the context of the unique professional relationship between attorneys and their clients. See *id., at 729, 627 A.2d 374.* Accordingly, the cases that the defendants' cite, which address unique professional service contexts and relationships, provide little support for the general proposition that CUTPA does not confer standing outside the limited confines of a business relationship between the CUTPA plaintiff and defendant.

**[18]** We need not decide today whether there are other contexts or situations in which parties who do not share a consumer, commercial, or competitor relationship with an alleged wrongdoer may be barred, for prudential or policy reasons, from bringing a CUTPA action. What is clear is that none of the rationales that underlie the standing doctrine, either generally or **\*\*290** in the specific context of unfair trade practice litigation, supports the denial of standing to the plaintiffs in this case. "Standing ... is a practical concept designed to ensure that courts and parties are not vexed by suits brought to **\*97** vindicate nonjusticiable interests and that judicial decisions [that] may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Slimp* v. *Dept. of Liquor Control*, 239 Conn. 599, 609, 687 A.2d 123 (1996). As we explained in *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. at 313, 780 A.2d 98, there are several reasons why standing traditionally

Case 20-81688-CRJ11  Doc 341  Filed 08/14/20  Entered 08/14/20 09:22:49  Desc
Main Document  Page 25 of 119

has been restricted to those parties directly injured by a defendant's conduct: "First, the more indirect an injury is, the more difficult it becomes to determine the amount of [the] plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary [when] there are directly injured parties who can remedy the harm without these attendant problems." (Internal quotation marks omitted.) Id., at 353, 780 A.2d 98.

Ganim, in fact, provides an instructive contrast to the present case. In Ganim, the mayor and the city of Bridgeport brought an action against handgun manufacturers, trade associations, and retail gun sellers to recoup various municipal costs associated with gun violence, including increased police and emergency services, loss of investment, and victimization of Bridgeport's citizens. Id., at 315–16, 326–27, 780 A.2d 98. We concluded that the municipal plaintiffs lacked standing under CUTPA because the "harms claimed ... [were too] indirect, remote and derivative with respect to the defendants' conduct ...." Id., at 353, 780 A.2d 98. Moreover, we observed that one easily could identify several sets of potential plaintiffs who were more directly harmed by the defendants' alleged misconduct than was the city: "[A]ll [of] the **\*98** homeowners in Bridgeport who have been deceived by the defendants' misleading advertising, all of the persons who have been assaulted or killed by the misuse of the handguns, and all of the families of the persons who committed suicide using those handguns." Id., at 359, 780 A.2d 98.

In the present case, by contrast, the plaintiffs allege that the defendants' wrongful advertising magnified the lethality of the Sandy Hook massacre by inspiring Lanza or causing him to select a more efficiently deadly weapon for his attack. Proving such a causal link at trial may prove to be a Herculean task.[29] But if it can be proven—and the posture in which this case reaches us requires that we assume it can[30]—the link between the allegedly **\*\*291** wrongful conduct and the plaintiffs' injuries would be far more direct and less attenuated than in Ganim.

More fundamentally, in this case, unlike in Ganim, it is the direct victims of gun violence who are challenging **\*99** the defendants' conduct; no private party is better situated than the plaintiffs to bring the action. A claim

that a defendant's advertisements unethically promote illegal conduct is fundamentally different from one alleging false or misleading advertising. The primary harm associated with the latter is that a consumer will rely to his or her detriment on the advertiser's representations; it is in the misinformed purchase of the product or service that the wrong becomes fully manifest. Actual customers, then, typically will be the parties most directly and adversely impacted by the alleged wrong.

 [19] The gravamen of a wrongful advertising claim, by contrast, is that an advertisement models or encourages illegal or unsafe behavior. In such instances, the immediate victims are just as likely to be third parties who are not customers, whether it be individuals who engage in inappropriate conduct inspired by the advertisements or the direct victims of that conduct. For example, when an especially racy sports car commercial disclaims, "professional driver, closed course, do not attempt this at home," the perceived risk is not merely— or even primarily—that viewers will purchase that particular vehicle and drive it unsafely as a result of the commercial. Of at least equal concern is the possibility that noncustomer viewers will emulate the commercial when driving their own vehicles, violating motor vehicle laws, and possibly causing injury to themselves or others, including passengers or pedestrians.

In the present case, the wrong charged is that the defendants' promoted the use of their civilian assault rifles for offensive, military style attack missions. The most directly foreseeable harm associated with such advertising is that innocent third parties could be shot as a result. The decedents are the ones who got shot.

If the defendants' marketing materials did in fact inspire or intensify the massacre, then there are no **\*100** more direct victims than these plaintiffs; nor is there any customer of the defendants' with a better claim to standing. That is to say, if these plaintiffs cannot test the legality of the defendants' advertisements pursuant to § 42-110g, then no one can. For these reasons, we conclude that the trial court improperly determined that the plaintiffs lack standing to assert wrongful death claims predicated on the defendants' alleged CUTPA violations.

B

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document      Page 26 of 119

Statute of Limitations

Having concluded that the plaintiffs have standing to bring the present action, we must turn our attention to whether the judgment of the trial court dismissing the plaintiffs' action may be affirmed on an alternative ground. Although its determination that the plaintiffs lacked standing to **292 bring wrongful death claims predicated on alleged CUTPA violations disposed of the case before it, the trial court considered, in the interest of completeness, the defendants' arguments regarding the legal sufficiency of the plaintiffs' CUTPA claims. We first consider the defendants' argument that the plaintiffs' claims are time barred because they did not comply with CUTPA's three year statute of limitations.

1

Procedural History

The following additional procedural history is relevant to this claim. The complaint alleges that Lanza's mother purchased the rifle in question in March, 2010, and that it was manufactured and distributed sometime prior to that date. Lanza carried out the Sandy Hook massacre on December 14, 2012, on which date all of the decedents died. The plaintiffs delivered their summons and complaint to a state marshal on December 13, 2014.

*101 The defendants' moved to strike the plaintiffs' wrongful death claims on the theory that those claims are predicated on underlying CUTPA violations and that private actions brought pursuant to CUTPA are subject to a three year statute of limitations. See General Statutes § 42-110g (f). [31] They argued that, because all of the relevant transfers of the rifle occurred no later than March, 2010, and because the present action was not initiated until more than four years later, in December, 2014, the plaintiffs' CUTPA claims are time barred.

The trial court, like the defendants', proceeded on the theory that the date of the alleged CUTPA violations was, at the very latest, March, 2010, when the Riverview defendants' sold the rifle to Lanza's mother. The court was not persuaded, however, that CUTPA is the controlling statute of limitations for purposes of the present action. Rather, the court emphasized that, although the plaintiffs' claims were

predicated on a theory of liability sounding in unfair trade practices, those claims were *brought* pursuant to § 52-555, the wrongful death statute. That statute has its own statute of limitations, which requires that a wrongful death action "be brought ... within two years from the date of death," and its own statute of repose, which requires that a wrongful death action "be brought [no] more than five years from the date of the act or omission complained of." General Statutes § 52-555 (a). Because process was served within two years of the date of the decedents' deaths and within five years of the date on which the rifle was sold, the court concluded that the action would not be time barred if the statute of limitations contained in § 52-555 (a) controls.

The trial court therefore sought to resolve the apparent conflict between the statutes of limitations contained *102 in §§ 42-110g (f) and 52-555 (a). Relying on the decision of the Appellate Court in *Pellecchia* v. *Connecticut Light & Power Co.*, 139 Conn. App. 88, 90, 54 A.3d 658 (2012) (adopting trial court's memorandum of decision in *Pellecchia* v. *Connecticut Light & Power Co.*, 52 Conn. Supp. 435, 54 A.3d 1080 [2011] ), cert. denied, 307 Conn. 950, 60 A.3d 740 (2013), the trial court concluded that, when a wrongful death claim is predicated on an underlying theory of liability that is subject to its own statute of limitations, it is the wrongful death statute of limitations that controls. Because the court concluded that the CUTPA statute of limitations did not apply, and because the action was brought within two years of the **293 decedents' deaths and within five years of the initial sale of the rifle, the court also concluded that the plaintiffs' wrongful death claims were timely. Accordingly, the court did not have reason to consider whether the plaintiffs' claims predicated on a wrongful advertising theory of liability, which could be premised on conduct postdating the sale of the rifle, were timely.

2

Legal Principles

[20] Turning to the governing legal principles, we first consider whether the trial court correctly determined that, when a wrongful death claim is predicated on an underlying theory of liability that is subject to its own statute of limitations, the plaintiffs need only satisfy the statute of limitations contained in § 52-555 (a). The trial court was correct that, in the ordinary case, § 52-555 (a) supplies the controlling statute of limitations regardless of the underlying

theory of liability. This court applied that rule in *Giambozi* v. *Peters*, 127 Conn. 380, 16 A.2d 833 (1940), overruled in part on other grounds by *Foran* v. *Carangelo*, 153 Conn. 356, 216 A.2d 638 (1966), in which the court held that the statute of limitations of the predecessor wrongful death statute, **\*103** rather than the limitations provision applicable to medical malpractice claims, governed in a wrongful death action based on malpractice. Id., at 385, 16 A.2d 833; see also *Ecker* v. *West Hartford*, 205 Conn. 219, 245, 530 A.2d 1056 (1987) (suggesting that statute of limitations contained in § 52-555 may control in wrongful death actions predicated on contract and warranty theories of liability). The legislative history of the 1991 amendments to the wrongful death statute reflecting the current statutory language; Public Acts 1991, No. 91-238, § 1; makes clear that *Giambozi* continues to accurately reflect the intent of the legislature in this respect. See 34 H.R. Proc., Pt. 14, 1991 Sess., pp. 5170–72, remarks of Representative Michael P. Lawlor (expressing view that there would be cases in which plaintiffs would be able to maintain wrongful death action under 1991 amendment to § 52-555 even though statute of limitations applicable to underlying medical malpractice would have run).

[21] As the defendants' emphasize, however, it is well established that different rules apply to statutes, such as CUTPA, that create a right of action that did not exist at common law. See *Greco* v. *United Technologies Corp.*, 277 Conn. 337, 345 n.12, 890 A.2d 1269 (2006). For such statutes, we have said that the limitations provision "embodies an essential element of the cause of action created—a condition attached to the right to sue at all. The liability and the remedy are created by the same statutes, and the limitations of the remedy are, therefore, to be treated as limitations of the right.... It follows that the statutory provision or provisions prescribing the limitation must be strictly observed if liability is to attach to the claimed offender. Failure to show such observance results in a failure to show the existence of a good cause of action." (Internal quotation marks omitted.) *Blakely* v. *Danbury Hospital*, 323 Conn. 741, 748–49, 150 A.3d 1109 (2016); see also id., at 749, 150 A.3d 1109 (time limitation is "essential and integral" to existence **\*104** of cause of action); *Avon Meadow Condominium Assn., Inc.* v. *Bank of Boston Connecticut*, 50 Conn. App. 688, 699–700, 719 A.2d 66 (time limitation that is contained within statute that creates right of action that did not exist at common law is limitation of liability itself, and, accordingly, CUTPA statute of limitations is jurisdictional), cert. denied, 247 Conn. 946, 723 A.2d 320 (1998), and cert. denied, 247 Conn. 946, 723 A.2d 320 (1998).

**\*\*294** [22] The plaintiffs respond that, regardless of whether the statute of limitations contained in § 42-110g (f) amounts to an essential element of a CUTPA cause of action, it need not be satisfied in the present case because this is not a CUTPA action. Rather, their claims are wrongful death claims, for which CUTPA merely provides the underlying theory of wrongfulness.

[23] [24] [25] That argument, although perhaps facially attractive, is precluded by a long line of cases holding that Connecticut's wrongful death statute does not create a new cause of action, independent of any claims that the decedent might have had during his or her life. Rather, the wrongful death statute merely allows the administrator of an estate to append to an already valid claim an additional element of damages consisting of costs associated with the decedent's death. See, e.g., *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 149, 491 A.2d 389 (1985); *Foran* v. *Carangelo*, supra, 153 Conn. at 360, 216 A.2d 638; *Shaker* v. *Shaker*, 129 Conn. 518, 520–21, 29 A.2d 765 (1942); see also *Kling* v. *Torello*, 87 Conn. 301, 305–306, 87 A. 987 (1913). A necessary consequence of this principle is that a cause of action for wrongful death predicated on a CUTPA violation will lie only insofar as the decedent, had he or she survived, could have satisfied all of the essential elements of the CUTPA claim. See, e.g., *Roque* v. *United States*, 676 F.Supp.2d 36, 42 (D. Conn. 2009) (plaintiff must prove elements of negligence claim in wrongful death action predicated **\*105** on negligence); *Nolan* v. *Morelli*, 154 Conn. 432, 435, 226 A.2d 383 (1967) (plaintiff must establish that decedent could recover damages under Dram Shop Act in wrongful death action predicated on that statute); see also *Schwarder* v. *United States*, 974 F.2d 1118, 1129 (9th Cir. 1992) (Alarcon, J., concurring in part and dissenting in part) ("[a] majority of the state courts that have considered the question have held that a survivor cannot bring a wrongful death action if the decedent was barred from [bringing a claim for his injuries] in his lifetime, because the wrongful death claim is essentially derivative of the injury to the decedent"); W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 127, p. 955 ("[t]he wrongful death action for the benefit of survivors is, like other actions based on injuries to others, derivative in nature, arising out of and dependent [on] the wrong done to the injured person and thus barred when his claim would be barred" [footnote omitted] ). It is clear, then, that the plaintiffs' wrongful death claims must comply not only with the statute of limitations that governs wrongful death actions but also with CUTPA's statute of limitations. Accordingly, because it is undisputed that the manufacture,

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document     Page 28 of 119

distribution, and final sale of the rifle to Lanza's mother all occurred at least three years prior to the commencement of the present action, we conclude that the trial court should have struck as time barred the plaintiffs' wrongful death claims predicated on a theory that any sale to the civilian market of military style assault weapons such as the AR-15 represents an unfair trade practice. Cf. footnote 14 of this opinion.

**[26]** That determination, however, is not fatal to all of the plaintiffs' claims. As we discussed, the plaintiffs also pleaded, in the alternative, that the defendants' violated CUTPA by advertising and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner. Although the complaint does not specifically **\*106** allege on what dates or over what period of time such marketing activities occurred, most of the plaintiffs' wrongful marketing claims are phrased in the present tense and, therefore, may be understood **\*\*295** to allege that those activities continued through the time the complaint was filed. In addition, the plaintiffs' allegation that Lanza selected the XM15-E2S on the morning of the assault "because of its marketed association with the military" reasonably could be interpreted to mean that such marketing schemes remained in place at the time of the massacre, during the limitation period. Accordingly, because we are compelled to construe the complaint liberally, in the manner most favorable to sustaining its legal sufficiency, we conclude that, for present purposes, the plaintiffs' wrongful advertising theory is not barred by CUTPA's statute of limitations. [32]

C

Connecticut Product Liability Act Preemption

We next consider whether the trial court correctly determined that [§ 52-572n (a)](), the exclusivity provision of the Product Liability Act, does not bar the plaintiffs' CUTPA claims. Section 52-572n (a) provides that "[a] product liability claim as provided in [the Product Liability Act] may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." The defendants' contend that all of the plaintiffs' CUTPA claims ultimately boil down to the argument that the XM15-E2S is unreasonably dangerous for sale to the civilian market and, therefore, that manufacturers and distributors of that weapon should be held strictly liable for any injuries resulting **\*107** from its misuse. They contend that this is "nothing more than a [P]roduct

[L]iability [A]ct claim dressed in the robes of CUTPA"; *Gerrity v. R.J. Reynolds Tobacco Co.*, 263 Conn. 120, 129, 818 A.2d 769 (2003); and that, pursuant to [§ 52-572n (a)](), the Product Liability Act provides the exclusive remedy. We are not persuaded.

As we have explained, the plaintiffs' wrongful death claims are predicated on two distinct theories of unfair trade practice: (1) the sale of assault rifles such as the XM15-E2S to the civilian market is inherently unreasonable and dangerous; and (2) the defendants' marketed and promoted the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner. The defendants' primary argument with respect to the Product Liability Act relates to the plaintiffs' first theory of liability. Because we have concluded that claims predicated on the plaintiffs' first CUTPA based theory of liability are time barred, however, we need not determine whether those claims also are precluded by [§ 52-572n (a)](). Cf. footnote 14 of this opinion.

**[27]** **[28]** With respect to the plaintiffs' second theory of liability, the defendants' fail to offer any explanation as to why the allegation that they wrongfully marketed the XM15-E2S by promoting the gun's use for illegal purposes—offensive, military style assault missions—amounts to a product defect claim. [33] There is no allegation in **\*\*296** the present case, for example, that the marketing for the XM15-E2S contained inadequate warnings that made the weapon unreasonably dangerous.

The defendants' sole argument in this regard is their contention that, in **\*108** *Merrill v. Navegar, Inc.*, supra, 26 Cal. 4th at 465, 110 Cal.Rptr.2d 370, 28 P.3d 116, the California Supreme Court rejected allegations of wrongful firearms marketing as disguised product liability claims. We read *Merrill* differently. It is true that the California Supreme Court concluded that many of the negligent marketing and distribution claims at issue in that case were barred by a California statute that provided that a gun manufacturer may not be held liable in a product liability action on the basis that the benefits of its product fail to outweigh the product's risk of injury when discharged. Id., at 470, 110 Cal.Rptr.2d 370, 28 P.3d 116; see Cal. Civ. Code § 1714.4 (a) (Deering 1994) (repealed in 2002). But the claims in *Merrill*, while dressed in terms of negligent marketing and distribution, were substantially similar to the claims of the plaintiffs in the present case, namely, that the sale of assault weapons to the civilian market is inherently unreasonable because those weapons have no legitimate civilian purpose. See *Merrill v.*

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc
Main Document Page 29 of 119

*Navegar, Inc.*, supra, at 470, 480–81, 110 Cal.Rptr.2d 370, 28 P.3d 116.

The only claims at issue in *Merrill* that were akin to the plaintiffs' immoral advertising claims were their allegations that Navegar, Inc. (Navegar), a gun manufacturer, advertised its semiautomatic assault pistols "as tough as your toughest customer" and as featuring "excellent resistance to finger prints," which might have suggested that the weapons were especially well suited for criminal use. (Internal quotation marks omitted.) Id., at 471, 110 Cal.Rptr.2d 370, 28 P.3d 116. In holding that the trial court had properly granted Navegar's motion for summary judgment with respect to those "more inflammatory aspects of Navegar's advertising"; id., at 489, 110 Cal.Rptr.2d 370, 28 P.3d 116; however, the California Supreme Court relied not on the immunity provision in California's product liability statute but, rather, on the facts that (1) the plaintiffs in *Merrill* expressly disavowed any claims based on the specific content of Navegar's advertising; id., at 474, 487–88, 110 Cal.Rptr.2d 370, 28 P.3d 116; and (2) there was no evidence that the shooter in that case ever had seen, let alone had been inspired by, any of Navegar's **\*109** allegedly inappropriate promotional materials. Id., at 471, 473, 488–91, 110 Cal.Rptr.2d 370, 28 P.3d 116. Accordingly, we do not read *Merrill* as supporting the defendants' contention that the wrongful advertising claims in the present case are merely masked product defect claims.

The defendants' have offered no other arguments as to why the plaintiffs' wrongful advertising claims represent veiled product liability claims. Accordingly, we conclude that those claims are not precluded by § 52-572n (a). See *Gerrity v. R.J. Reynolds Tobacco Co.*, supra, 263 Conn. at 124, 128, 818 A.2d 769 (analyzing language of exclusivity provision and concluding that claim that tobacco companies violated CUTPA by targeting minors with their cigarette advertising did not allege product defect and, therefore, was not precluded by Product Liability Act).

D

CUTPA Personal Injury Damages

**[29]  [30]  [31]  [32]**  We next consider the defendants' argument that personal injuries resulting in death do not give rise to cognizable **\*\*297** damages for purposes of CUTPA. [34]  As we explained, an action for wrongful death

will lie only if the deceased, had he or she survived, would have had a valid claim for the injuries that resulted in death. See part IV B of this opinion. For that reason, the plaintiffs **\*110** can prevail on their CUTPA based wrongful death claims only if CUTPA permits the recovery of damages for the decedents' injuries. As a matter of first impression, we hold that CUTPA permits recovery for personal injuries that result directly from wrongful advertising practices. [35]

Whether personal injuries give rise to cognizable CUTPA damages presents a question of statutory interpretation. We begin by setting forth the relevant statutory language. Subsection (a) of § 42-110g contains two clauses potentially relevant to the issue before us. First, subsection (a) creates a private right of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b ...." This provision is known as the ascertainable loss clause. Second, subsection (a) provides that any person so injured "may bring an action ... to recover actual damages." This provision of subsection (a) is known as the actual damages clause.

The view of the plaintiffs is that these two clauses serve distinct, independent functions within the statute and that only the actual damages clause restricts the types of damages that are available. Specifically, they contend that, although one must suffer some ascertainable loss of money or property in order to have *standing* to bring a CUTPA action, once the standing requirements set by the ascertainable loss clause have been satisfied, a successful plaintiff may *recover* not only for those financial losses but for any and all actual damages. Relying on *DiNapoli* v. *Cooke*, 43 Conn. App. 419, 427, 682 A.2d 603, cert. denied, 239 Conn. 951, 686 A.2d 124 (1996), cert. denied, 520 U.S. 1213, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997), the plaintiffs further contend **\*111** that the term "actual damages" is synonymous with compensatory or general damages and excludes only special damages such as nominal and punitive damages. Certainly, they contend, that term is sufficiently expansive to encompass personal injuries.

**[33]**  The defendants', by contrast, argue that the ascertainable loss clause modifies and cabins the meaning of the actual damages clause. In their view, the fact that a plaintiff must have suffered some manner of financial loss to bring a CUTPA action implies that the legislature intended to limit recovery to damages of that sort. Insofar as both of these interpretations of the statutory language are facially

plausible, [36] we conclude that the statute is ambiguous **\*\*298** and that we may properly look to extratextual sources to ascertain the intent of the legislature. See General Statutes § 1-2z.

The legislative histories of CUTPA and of the model legislation on which CUTPA is based are largely silent with respect to the question of personal injury damages. R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2018–19 Ed.) § 6.7, pp. 849, 851. Nevertheless, four considerations persuade us that the legislature did not intend to bar plaintiffs from recovering for personal injuries resulting from unfair trade practices, at least under circumstances such as those presented here.

First, although both the plaintiffs' and the defendants' interpretations of the statutory language are facially plausible, the plaintiffs' reading of § 42-110g (a) is more reasonable. While the term "actual damages" is not defined in CUTPA, the term is used in other statutes in such a manner as to leave no doubt that actual damages include personal injuries. For example, **\*112** General Statutes § 53-452 (a) provides in relevant part that "[a]ny person whose property *or person* is injured by [a computer crime committed in violation of] section 53-451 may bring a civil action in the Superior Court to enjoin further violations and to recover the *actual damages* sustained by reason of such violation ...." (Emphasis added.)

**[34]** In addition, the plaintiffs' interpretation of the statute better comports with our analysis in *Hinchliffe* v. *American Motors Corp.*, supra, 184 Conn. at 612–20, 440 A.2d 810. In that case, we considered the closely related question of whether the "ascertainable loss" requirement means that a CUTPA plaintiff must be able to prove that he or she has suffered actual damages in a particular amount. Id., at 612–13, 440 A.2d 810. We rejected that reading of the statute, concluding that the ascertainable loss and actual damage clauses of § 42-110g (a) serve distinct purposes and that the legislature did not intend the term "ascertainable" to modify "actual damages." Id., at 613–15, 440 A.2d 810. We also cited favorably the view of one legal scholar that "the only function served by a threshold 'loss' requirement in a consumer protection statute is to guard against vicarious suits by self-constituted attorneys general when they spot an apparently deceptive advertisement in the newspaper, on television or in a store window." Id., 615 n.6, 440 A.2d 810, citing D. Rice, "New Private Remedies for Consumers: The Amendment of Chapter 93A," 54 Mass. L.Q. 307, 314 (1969).

That view, if correct, strongly supports the conclusion that the presence of the ascertainable loss clause in the statute in no way restricts the damages that are available to plaintiffs who have been directly and personally injured by an unfair trade practice.

**[35]** Second, we frequently have remarked that "CUTPA's coverage is broad and its purpose remedial." (Internal quotation marks omitted.) **\*113** *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 113–14, 612 A.2d 1130 (1992); see also 12 R. Langer et al., supra, § 2.5, p. 81. As we explained in part IV A of this opinion, whereas unfair trade practices such as false advertising and other forms of commercial deception tend to result primarily in financial harm, a principal evil associated with unethical and unscrupulous advertising is that viewers or innocent third parties will be physically injured as a result of dangerous or illegal conduct depicted **\*\*299** in the advertisements. See, e.g., *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 556–61, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001). That is precisely what the plaintiffs in the present case allege. If personal injuries are not recoverable under those circumstances, then no recovery will be available for a substantial category of unfair trade practices, and the threat of private litigation will not serve as a deterrent to such conduct. That outcome would be inconsistent with the stated intent of the legislature to provide broad protection from unfair trade practices and to incentivize private enforcement of the law.

Third, it is well established that the legislature intended that Federal Trade Commission (FTC) rulings and cases decided under the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 41 et seq. (2012 and Supp. V 2017), would "serve as a lodestar" for interpreting CUTPA's open-ended language. [37] *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 179, 510 A.2d 972 (1986). [38] **\*114** Notably, the FTC itself has construed the FTC Act as prohibiting practices that are physically dangerous to consumers. See J. Beales III, "Advertising to Kids and the FTC: A Regulatory Retrospective That Advises the Present," 12 Geo. Mason L. Rev. 873, 876 (2004). In *In re International Harvester Co.*, 104 F.T.C. 949 (1984), for example, the FTC held that a manufacturer's failure to adequately disclose safety risks associated with fuel geysering in its tractors represented an unfair trade practice that violated the FTC Act. See id., 1066–67. In reaching this conclusion, the FTC relied on the fact that fuel geysering is a hazard that creates a substantial risk of injury or death: "There clearly has been serious consumer injury. At least one person has

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc
Main Document Page 31 of 119

been killed and eleven others burned.... Many of the burn injuries have been major ones, moreover, resulting in mobility limitations, lasting psychological harm, and disfigurement.... These injuries are of a kind that satisfies the ... unfairness test. It is true that they involve physical rather than economic injury, but the [u]nfairness [s]tatement reaches such matters." (Citations omitted.) *Id., at 1064;* see also *In re LabMD, Inc.,* Docket No. 9357, 2016 WL 521327, \*12 (F.T.C. January 14, 2016)* ("unquantifiable health and safety risks" can give rise to unfair trade practice injuries).

Of particular relevance to the present action, the FTC has, on multiple occasions, found violations of the FTC Act when companies have advertised or promoted their products in a manner that is likely to result in physical injury, even in the absence of product sales. For example, the FTC has required companies to refrain from advertising that depicts young children operating bicycles and tricycles in an unsafe or unlawful manner; *In re AMF, Inc.,* 95 F.T.C. 310, 313–15 (1980);* advertising the use of electric hairdryers by children in close proximity to a filled bathroom \*\*300 sink; See *In re Mego International, Inc.,* 92 F.T.C. 186, 187, 189–90 (1978);* and advertising that depicts children attempting to \*115 cook food without close adult supervision; *In re Uncle Ben's, Inc.,* 89 F.T.C. 131, 136 (1977);* as well as promotional giveaways that expose young children to unguarded razor blades. See *In re Philip Morris, Inc.,* 82 F.T.C. 16, 19 (1973).* The FTC concluded that such marketing activities had the tendency to induce behavior that involves an unreasonable risk of harm to person or property and, therefore, constituted unfair trade practices.

[36] In 1997, Federal Trade Commissioner Roscoe B. Starek III underscored the FTC's interest in combating unfair trade practices that may result in physical injuries to children: "Although injury must be both substantial and likely" to draw the FTC's attention, "unwarranted health or safety risks can suffice." R. Starek III, "The ABCs at the FTC: Marketing and Advertising to Children," Address at the Minnesota Institute of Legal Education (July 25, 1997), available at https://www.ftc.gov/public-statements/1997/07/abcs-ftc-marketing-and-advertising-children (last visited March 8, 2019). More recently, the FTC has taken an interest in the marketing of violent movies, songs, and video games to children. See, e.g., Federal Trade Commission, Report to Congress, "Marketing Violent Entertainment to Children: A Sixth Follow-up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries (December, 2009), available at 2009 WL 5427633.* It is clear,

then, that wrongful advertising that poses a genuine risk of physical harm falls under the broad purview of the FTC Act and, by incorporation, CUTPA.

Fourth, we observe that courts in several of our sister states have concluded that victims of unfair trade practices may recover for personal injuries. See, e.g., *Pope v. Rollins Protective Services Co.,* 703 F.2d 197, 203 (5th Cir. 1983) (applying Texas law);* \*116 *Maurer v. Cerkvenik-Anderson Travel, Inc.,* 181 Ariz. 294, 297–98, 890 P.2d 69 (App. 1994);* *Maillet v. ATF-Davidson Co.,* 407 Mass. 185, 192, 552 N.E.2d 95 (1990).* Although we recognize that the statutory language at issue in those cases was not identical to the language at issue in this case, we nevertheless find it significant that sister courts have understood personal injuries to fall within the scope of the harms to which broadly worded consumer protection statutes are directed. In addition, we note that a majority of Connecticut trial courts addressing the issue have concluded that damages for personal injuries can be recovered under CUTPA. 12 R. Langer et al., supra, § 6.7, p. 850. For all of these reasons, we conclude that, at least with respect to wrongful advertising claims, personal injuries alleged to have resulted directly from such advertisements are cognizable under CUTPA.

V

WRONGFUL DEATH AND CUTPA:
ISSUES OF FEDERAL LAW

Having concluded that the plaintiffs have pleaded legally cognizable CUTPA claims sounding in wrongful marketing, we next consider whether the trial court properly determined that PLCAA does not bar the plaintiffs' wrongful death claims. Our review of the federal statute persuades us that the trial court correctly concluded that CUTPA, as applied to the plaintiffs' allegations, falls within one of PLCAA's exceptions.

A

PLCAA Overview

[37] PLCAA generally affords manufacturers \*\*301 and sellers of firearms [39] immunity from civil liability arising from the criminal or unlawful use of their products by

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc
Main Document Page 32 of 119

third **\*117** parties. 15 U.S.C. §§ 7902 (a) and 7903 (5) (A) (2012).[40] Congress carved out six exceptions to this immunity, pursuant to which firearms sellers may be held liable for third-party crimes committed with their products. See 15 U.S.C. § 7903 (5) (A) (2012). The exception at issue in the present case, the predicate exception; see footnote 12 of this opinion and accompanying text; permits civil actions alleging that "a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or marketing of the [firearm], and the violation was a proximate cause of the harm for which relief is sought ...." 15 U.S.C. § 7903 (5) (A) (iii) (2012). The question presented by this appeal is whether CUTPA qualifies as such a predicate statute, that is, a "statute *applicable* to the sale or marketing of [firearms] ...." (Emphasis added.) 15 U.S.C. § 7903 (5) (A) (iii) (2012). The answer to this question necessarily hinges on the meaning and scope of the statutory term "applicable." See *Ileto* v. *Glock, Inc.,* 565 F.3d 1126, 1133 (9th Cir. 2009), cert. denied, 560 U.S. 924, 130 S.Ct. 3320, 176 L.Ed.2d 1219 (2010).

[38] [39] [40] "[W]e begin by setting forth the rules and principles that govern our interpretation of federal law. With respect to the construction and application of federal statutes, principles of comity and consistency require us to follow the plain meaning rule ...." (Internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.,* 327 Conn. 114, 140, 172 A.3d 1228 (2017). "Under the [federal] plain meaning rule, [l]egislative history and other tools of interpretation **\*118** may be relied [on] only if the terms of the statute are ambiguous." (Internal quotation marks omitted.) *Webster* v. *Oakley,* 265 Conn. 539, 555, 830 A.2d 139 (2003), cert. denied, 541 U.S. 903, 124 S.Ct. 1603, 158 L.Ed.2d 244 (2004). "If the text of a statute is ambiguous, then we must construct an interpretation consistent with the primary purpose of the statute as a whole.... Thus, our interpretive process will begin by inquiring whether the plain language of [the] statute, when given its ordinary, common meaning ... is ambiguous." (Citations omitted; internal quotation marks omitted.) Id., at 555–56, 830 A.2d 139. In assessing ambiguity, the meaning of the statute must be evaluated not only by reference to the language itself but also in the specific context in which that language is used, as well as in the broader context of the statute as a whole. *New York* v. *Beretta U.S.A. Corp.,* 524 F.3d 384, 400 (2d Cir. 2008), cert. denied, 556 U.S. 1104, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009).

B

The Plain Language of the Statute

[41] Both the plaintiffs and the defendants' contend that the plain language of **\*\*302** the predicate exception, read in the context of the broader statute, unambiguously favors their position. In this part of the opinion, we explain why the plaintiffs' interpretation of the statutory language is plainly the more reasonable one. We consider the text of the predicate exception itself, the broader statutory framework, the congressional statement of findings and purposes, and the defendants' argument that treating CUTPA as a predicate statute would lead to absurd results.

Although we agree with the plaintiffs that their reading of the statutory language is the better one, we recognize that the defendants' interpretation is not implausible. Therefore, in part V C of the opinion, we also **\*119** review various extrinsic sources of congressional intent to resolve any ambiguities. Our review of both the statutory language and these extrinsic sources persuades us that Congress did not mean to preclude actions alleging that firearms companies violated state consumer protection laws by promoting their weapons for illegal, criminal purposes.

1

The Predicate Exception

[42] When construing a federal law in which key terms are undefined, we begin with the ordinary, dictionary meaning of the statutory language. See, e.g., *Maslenjak* v. *United States,* ––– U.S. ––––, 137 S.Ct. 1918, 1924, 198 L.Ed.2d 460 (2017). Looking to dictionaries that were in print around the time PLCAA was enacted, we find that the principal definition of "applicable" is simply "[c]apable of being applied ...." Black's Law Dictionary (10th Ed. 2014) p. 120; accord Webster's Third New International Dictionary (2002) p. 105.

If Congress had intended to create an exception to PLCAA for actions alleging a violation of any law that is capable of being applied to the sale and marketing of firearms, then there is little doubt that state consumer protection statutes such as CUTPA would qualify as predicate statutes.

CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of *any trade or commerce*." (Emphasis added.) General Statutes § 42-110b (a). Accordingly, the statute clearly is capable of being applied to the sale and marketing of firearms. The only state appellate court to have reviewed the predicate exception construed it in this manner; see *Smith & Wesson Corp.* v. *Gary*, 875 N.E.2d 422, 431, 434–35 and n.12 (Ind. App. 2007) (predicate exception unambiguously applies to any state law capable of being applied to sale or marketing of firearms), transfer denied, 915 N.E.2d 978 (Ind. 2009).

*120 It is true that secondary dictionary definitions of "applicable" might support a narrower reading of the predicate exception. Webster's Third New International Dictionary, for example, also defines "applicable" as "fit, suitable, or right to be applied: appropriate ... relevant ...." Webster's Third New International Dictionary, supra, p. 105. Pursuant to such definitions, the Ninth Circuit concluded, it would not be unreasonable to read PLCAA to exempt only those state laws that are *exclusively* relevant to the sale or marketing of firearms. See *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1134.

If Congress had intended to limit the scope of the predicate exception to violations of statutes that are *directly*, *expressly*, or *exclusively* applicable to firearms, however, it easily could have used such language, as it has on other occasions.[41] **303 The fact that the drafters opted instead to use only the term "applicable," which is susceptible to a broad reading, further supports the plaintiffs' interpretation. See, e.g., *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 219, 38 A.3d 1183 ("the legislature knows how to ... use broader or limiting terms when it chooses to do so" [citation omitted] ), cert. denied, 568 U.S. 940, 133 S.Ct. 425, 184 L.Ed.2d 255 (2012).

*121 2

The Statutory Framework

In construing the predicate exception, we also must consider the broader statutory framework. The plaintiffs' contention that CUTPA qualifies as a predicate statute as applied to their wrongful marketing claims finds additional support in the repeated statutory references to laws that govern the marketing of firearms.

[43] There is no doubt that statutes that govern the advertising and marketing of firearms potentially qualify as predicate statutes. The predicate exception expressly provides that the "qualified civil liability actions" from which firearms sellers are immune shall not include "an action in which a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or *marketing* of the [firearm] ...."[42] (Emphasis added.) 15 U.S.C. § 7903 (5) (A) (iii) (2012).

**304 Importantly, however, at the time PLCAA was enacted, no federal statutes directly or specifically *122 regulated the marketing or advertising of firearms. In addition, only a handful of states have enacted firearm specific laws that address in any way the marketing function, and none of those purports to comprehensively regulate the advertising of firearms.[43] It would have made little sense for the drafters of the legislation to carve out an exception for violations of laws applicable to the marketing of firearms if no such laws existed.[44]

*123 If Congress intended the predicate exception to encompass laws that prohibit the wrongful marketing of firearms, and if no laws expressly and directly do so, then the only logical reading of the statute is that Congress had some other type of law in mind. What type? At both the federal and state levels, false, deceptive, and other forms of wrongful advertising are regulated principally through unfair trade practice laws such as the FTC Act and its state analogues.[45] We must presume that Congress was aware, when it enacted PLCAA, that both the FTC Act and state analogues such as CUTPA have long been among the primary vehicles for litigating claims that sellers of potentially dangerous products such as firearms have marketed those products in an unsafe and unscrupulous manner. See *Goodyear Atomic Corp.* v. *Miller*, 486 U.S. 174, 185, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988) (Congress is presumptively knowledgeable about pertinent federal and state law). CUTPA, for example, has long been construed to incorporate the FTC's traditional "cigarette rule," **305 which prohibits as unfair advertising that is, among other things, "immoral, unethical, oppressive and unscrupulous."[46] *124 *Ivey, Barnum & O'Mara* v. *Indian Harbor Properties, Inc.*, 190 Conn. 528, 539 and n.13, 461 A.2d 1369 (1983).

Reading the predicate exception to encompass actions brought to remedy illegal and unscrupulous marketing

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc
Main Document Page 34 of 119

practices under state consumer protection laws is consistent with the approach followed by the United States Court of Appeals for the Second Circuit, **\*125** whose decisions "carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts." (Internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, supra, 327 Conn. at 140, 172 A.3d 1228. In *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d at 384, the Second Circuit considered whether PLCAA barred the municipal plaintiffs' action alleging that distribution practices of the defendant firearms manufactures **\*\*306** and sellers violated a New York criminal nuisance statute; see N.Y. Penal Law § 240.45 (McKinney 2008); by marketing guns to legitimate buyers with the knowledge that those guns will be diverted into illegal markets. See *New York* v. *Beretta U.S.A. Corp.*, supra, at 389–90. The court concluded that the action should have been dismissed because the nuisance statute was a law of general applicability that had never been applied to the firearms trade and simply did not "encompass the conduct of firearms manufacturers of which the [municipal plaintiffs] complain[ed]." Id., at 400. Notably, in reaching that conclusion, the Second Circuit held that the predicate exception encompasses not only laws that expressly regulate commerce in firearms but also those that "clearly can be said to implicate the purchase and sale of firearms," as well as laws of general applicability that "courts have applied to the sale and marketing of firearms ...." [47] Id., at 404. CUTPA falls squarely into both of these categories.

**\*126** Statutes such as the FTC Act and state analogues that prohibit the wrongful marketing of dangerous consumer products such as firearms represent precisely the types of statutes that implicate and have been applied to the sale and marketing of firearms. In the early 1970s, for example, the FTC entered into consent decrees with three firearms sellers relating to allegations that they had precluded their dealers from advertising their guns at lower than established retail prices. [48] A few years later, the FTC ordered Emdeko International, Inc., a marketing company, to refrain from predatory and misleading advertising regarding various consumer products, including firearms. See *In re National Housewares, Inc.*, 90 F.T.C. 512, 516, 587–88, 601–603 (1977).

CUTPA also has been applied to the sale of firearms. For example, in *Salomonson* v. *Billistics, Inc.*, Superior Court, Judicial District of New London, Docket No. CV-88-508292, 1991 WL 204385 (September 27, 1991), the plaintiff prevailed on his claim that the defendant gun dealer's sales

practices relating to the sale of a Ruger pistol and three remanufactured semiautomatic rifles violated CUTPA. [49] **\*127** Id. The **\*\*307** court specifically found that the defendant's conduct was "oppressive" and, therefore, violated the second prong of the cigarette rule, the same standard at issue in the present case. Id.

Equally important, regulation of firearms advertising in our sister states frequently has been accomplished under the auspices of state consumer protection and unfair trade practice laws. [50] It is clear, therefore, that consumer protection statutes such as CUTPA long have been an established mechanism for regulating the marketing and advertising schemes of firearms vendors.

**\*128** The FTC Act and its various state analogues also have been applied in numerous instances to the wrongful marketing of other potentially dangerous consumer products, especially with respect to advertisements that promote unsafe or illegal conduct. [51] See S. Calkins, " **\*\*308** FTC Unfairness: An Essay," 46 Wayne L. Rev. 1935, 1962, 1974 (2000). Although Congress temporarily curtailed the FTC's authority to regulate unfair commercial advertising in 1980, that authority was reinstated in 1994. Id., 1954–55.

Subsequently, just a few years before Congress began considering predecessor legislation to PLCAA, the FTC entered into a new consent decree addressing wrongful advertising. In *In re Beck's North America, Inc.*, 127 F.T.C. 379 (1999), the commission prohibited the publication of advertisements that portrayed young adult passengers consuming alcohol while sailing, in a manner that was unsafe and depicted activities that "may also violate federal and state boating safety laws." Id., at 380. The consent decree prohibited the "future dissemination ... of **\*129** any ... advertisement that ... depicts activities that would violate [federal laws that make] it illegal to operate a vessel under the influence of alcohol or illegal drugs." (Citations omitted.) *In re Beck's North America, Inc.*, File No. 982-3092, 1998 FTC LEXIS 83, \*15–16, 1998 WL 456483, \*6-7 (F.T.C. August 6, 1998). More generally, the FTC cautioned that it "ha[d] substantial concern about advertising that depicts conduct that poses a high risk to health and safety. As a result, the [FTC] will closely scrutinize such advertisements in the future." Id., at \*6, 1998 FTC LEXIS 83, at \*15. [52]

Because Congress clearly intended that laws governing the marketing of firearms would qualify as predicate statutes, and

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc
Main Document Page 35 of 119

because Congress is presumed to be aware that the wrongful marketing of dangerous items such as firearms for unsafe or illegal purposes traditionally has been and continues to be regulated primarily by consumer protection and unfair trade practice laws rather than by firearms specific statutes, we conclude that the most reasonable reading of the statutory framework, in light of the decision of the Second Circuit in *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d at 384, is that laws such as CUTPA qualify as predicate statutes, insofar as they apply to wrongful advertising claims.[53]

*\*130* **3**

**The Statement of Findings and Purposes**

When it drafted PLCAA, Congress included a statement of findings and purposes. **\*\*309** See 15 U.S.C. § 7901 (2012). In his dissenting opinion, Justice Robinson reads this statement to support the position of the defendants'. On balance, however, we conclude, for the following reasons, that the congressional findings and purposes also lend support to the plaintiffs' interpretation of the statute.

First, Title 15 of the 2012 edition of the United States Code, § 7901 (a) (4), provides that "[t]he *manufacture, importation, possession, sale, and use* of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws ... [s]uch [as] ... the Gun Control Act of 1968, the National Firearms Act ... and the Arms Export Control Act ...." (Citations omitted; emphasis added.) Notably, this provision, which expressly references various firearms specific laws, makes no mention of the marketing function. By contrast, the very next finding expressly references the "lawful ... marketing ... of firearms ...."[54] 15 U.S.C. § 7901 (a) (5) (2012). Reading these two findings in concert, it is clear that Congress chose not to abrogate the well established duty of firearms sellers to market their wares legally and responsibly, even though no federal laws specifically govern the marketing of firearms.

 *\*131* Second, although the findings indicate that Congress sought to immunize the firearms industry from liability for third-party criminal conduct, they emphasize that that immunity extended only to "harm that is *solely* caused by others ...." (Emphasis added.) 15 U.S.C. § 7901 (a) (6) (2012); see also 15 U.S.C. § 7901 (b) (1) (2012) (principal purpose of PLCAA is to prohibit causes of action "for the harm

*solely* caused by the criminal or unlawful misuse of firearm products" [emphasis added] ); *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1158 (Berzon, J., concurring in part and dissenting in part) (same). The statement of findings and purposes further provides that the purpose of PLCAA is "[t]o preserve a citizen's access to a supply of firearms and ammunition for all *lawful* purposes, including hunting, self-defense, collecting, and competitive or recreational shooting." (Emphasis added.) 15 U.S.C. § 7901 (b) (2) (2012). In the present case, the plaintiffs allege that the defendants *illegally* marketed the XM15-E2S by promoting its criminal use for offensive civilian assaults, and that this wrongful advertising was a direct cause of the Sandy Hook massacre. At no time and in no way does the congressional statement indicate that firearm sellers should evade liability for the injuries that result if they promote the illegal use of their products.

Third, the findings make clear that Congress sought to preclude only novel civil actions that are "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law," recognition of which "would expand civil liability in a manner never contemplated ... by Congress ... or by the legislatures of the several States." 15 U.S.C. § 7901 (a) (7) (2012). As we previously discussed, however, it is well established that the FTC act and state analogues such as CUTPA not only govern the marketing of firearms, but **\*\*310** also prohibit advertisements *\*132* that promote or model the unsafe or illegal use of potentially dangerous products. Accordingly, there is simply no reason to think that the present action represents the sort of novel civil action that Congress sought to bar.[55]

The dissent relies on one other provision of the statement of findings and purposes that purportedly disqualifies CUTPA, as applied to the plaintiffs' wrongful marketing theory, as a potential predicate statute. Specifically, the statement emphasizes the importance of preserving the rights enshrined in the second amendment to the United States constitution. See 15 U.S.C. § 7901 (a) (1), (2) and (6) (2012).

 **[44]  [45]** There is no doubt that congressional supporters of PLCAA were committed to Americans' second amendment freedoms and sought to secure those freedoms by immunizing firearms companies from frivolous lawsuits. It is not at all clear, however, that the second *\*133* amendment's protections even extend to the types of quasi-military, semiautomatic assault rifles at issue in the present case.

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document      Page 36 of 119

See *District of Columbia* v. *Heller*, 554 U.S. 570, 627, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (indicating that second amendment's protection does not extend to " 'dangerous and unusual weapons' " and, therefore, that M16s and related military style rifles may be banned); *Kolbe* v. *Hogan*, 849 F.3d 114, 143 (4th Cir.) (reading *Heller* to mean that second amendment does not protect right to possess assault weapons featuring high capacity magazines, such as AR-15), cert. denied, —— U.S. ——, 138 S.Ct. 469, 199 L.Ed.2d 374 (2017); *New York State Rifle & Pistol Assn., Inc.* v. *Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015) (assuming for sake of argument that second amendment does apply to semiautomatic assault weapons such as AR-15 but upholding outright prohibitions against civilian ownership of such weapons), cert. denied sub nom. *Shew* v. *Malloy*, —— U.S. ——, 136 S.Ct. 2486, 195 L.Ed.2d 822 (2016); see also *Friedman* v. *Highland Park*, 784 F.3d 406, 410–12 (7th Cir.), cert. denied, —— U.S. ——, 136 S.Ct. 447, 193 L.Ed.2d 483 (2015); *Fyock* v. *Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015); *Heller* v. *District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). Accordingly, we conclude that, on balance, PLCAA's statement of findings and purposes also bears out the plaintiffs' interpretation of the statute, **\*\*311** namely, that illegal marketing is not protected. [56]

**\*134** 4

Absurd Result

We next address the defendants' argument that construing a statute of general applicability such as CUTPA to be a predicate statute would lead to an absurd result. As one judge has articulated, "the predicate exception cannot possibly encompass every statute that might be 'capable of being applied' to the sale or manufacture of firearms; if it did, the exception would swallow the rule, and no civil lawsuits would ever be subject to dismissal under … PLCAA." (Emphasis omitted.) *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1155 (Berzon, J., concurring in part and dissenting in part).

Of course, to surmount PLCAA immunity via the predicate exception, there must be at least a colorable claim that a defendant has, in fact, violated some statute, resulting in harm to the plaintiff. Accordingly, Judge Berzon's argument appears to be predicated on the assumptions that (1) most states have public nuisance statutes or similar laws, such as the California nuisance statutes at issue in *Ileto*, and (2)

virtually any action seeking to hold firearms sellers liable for third-party gun violence could allege a colorable violation of those statutes because the mere act of selling the weapons involved might be deemed to create a public nuisance.

**\*135** We will assume, without deciding, that Judge Berzon is correct that, as a general matter, the predicate exception cannot be so expansive as to fully encompass laws such as public nuisance statutes insofar as those laws reasonably might be implicated in any civil action arising from gun violence. [57] Although we believe that **\*\*312** the plaintiffs' primary allegations—that any sale of assault weapons to the civilian market constitutes an unfair trade practice—would falter on this shoal, we need not address that issue more fully in light of our determination that those allegations are time barred. See part IV B of this opinion. What is clear, however, is that the plaintiffs' wrongful marketing allegations may proceed without crippling PLCAA. Those claims allege only that one specific family of firearms sellers advertised one particular line of assault weapons in a uniquely unscrupulous manner, promoting their suitability for illegal, offensive assaults. As we have stated throughout this opinion, we do not know whether the plaintiffs will be able to prove those allegations to a jury. But we are confident that this sort of specific, narrowly framed wrongful marketing claim alleges precisely the sort of illegal conduct that Congress did not intend to immunize. For this reason, CUTPA's prohibition against such conduct appears to fall squarely within the predicate exception and does not lead to an absurd result.

**\*136** C

Extrinsic Evidence of Congressional Intent

Other courts that have construed the predicate exception are divided as to whether the exception unambiguously encompasses laws, such as CUTPA, that do not expressly regulate firearms sales and marketing but are nevertheless capable of being and have been applied thereto. Compare *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1133–35 (predicate exception is ambiguous), and *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d at 401 (same), with *Smith & Wesson Corp.* v. *Gary*, 875 N.E.2d 422, 431, 434 and n.12 (Ind.App. 2007) (predicate exception unambiguously applies), and *New York* v. *Beretta U.S.A. Corp.*, supra, at 405–407 (Katzmann, J., dissenting) (same). In part V B of this opinion, we explained why the plain text of 15 U.S.C. § 7903 (5) (A) (iii) strongly

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 37 of 119

suggests that CUTPA, as applied to the plaintiffs' claims, qualifies as a predicate statute. In this part, we explain why extrinsic indicia of congressional intent support the same conclusion. These indicia include canons of statutory construction, closely related legislation, and the legislative history of PLCAA.

1

Canons of Statutory Construction

[46] Under the law of the Second Circuit, if the plain language of a statute is ambiguous, we then consider whether any ambiguities may be resolved by the application of canons of statutory construction and, failing that, through review of the legislative history. E.g., *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016), cert. denied, ––– U.S. ––––, 137 S.Ct. 1330, 197 L.Ed. 2d 517 (2017). In the present case, three canons of construction are potentially relevant.

**\*137** a

Clear Statement Requirement

[47] [48] [49] We begin with the well established canon that a federal law is not to be construed to have superseded the historic police powers of the states unless that was the clearly expressed and manifest purpose of Congress. E.g., **\*\*313** *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *Federal Housing Finance Agency v. Nomura Holding America, Inc.*, 873 F.3d 85, 112 n.30 (2d Cir. 2017), cert. denied, ––– U.S. ––––, 138 S.Ct. 2679, 201 L.Ed.2d 1073 (2018), and cert. denied sub nom. *Findlay v. Federal Housing Finance Agency*, ––– U.S. ––––, 138 S.Ct. 2697, 201 L.Ed.2d 1073 (2018). The regulation of advertising that threatens the public health, safety, and morals has long been considered a core exercise of the states' police powers. See, e.g., *Altria Group, Inc. v. Good*, 555 U.S. 70, 77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008); *Semler v. Oregon State Board of Dental Examiners*, 294 U.S. 608, 611–12, 55 S.Ct. 570, 79 L.Ed. 1086 (1935); *Varney & Green v. Williams*, 155 Cal. 318, 321, 100 P. 867 (1909), overruled in part on other grounds by *Metromedia, Inc. v. San Diego*, 26 Cal. 3d 848, 164 Cal.Rptr. 510, 610 P.2d 407 (1980); *State v. Certain Contraceptive*

*Materials*, 7 Conn. Supp. 264, 277–78 (1939), rev'd on other grounds, 126 Conn. 428, 11 A.2d 863 (1940). Accordingly, we will find the plaintiffs' CUTPA action to be superseded by PLCAA only if that is the clearly expressed intent of Congress. [58]

**\*138** In the case of PLCAA, there is no indication in the statutory text or statement of findings and purposes that Congress intended to restrict the power of the states to regulate wrongful advertising, particularly advertising that encourages consumers to engage in egregious criminal conduct. Indeed, sponsors of the legislation repeatedly emphasized during the legislative hearings that they did *not* intend to abrogate well established legal principles. [59] Accordingly, in the absence of a clear statement in the statutory text or legislative history that Congress intended to supersede the states' traditional authority to regulate the wrongful advertising of dangerous products such as firearms, we are compelled to resolve any textual ambiguities in favor of the plaintiffs.

b

Ejusdem Generis

[50] The defendants' contend that a different canon of construction, namely, ejusdem generis, essentially resolves any statutory ambiguity in their favor. Specifically, from the fact that PLCAA provides two examples of predicate federal statutes, **\*\*314** both of which specifically relate to firearms, the defendants' infer that all predicate **\*139** statutes must be of that same ilk. [60] We are not persuaded.

When it drafted the predicate exception, Congress set forth two examples of statutes that are applicable to the sale or marketing of firearms. PLCAA provides that entities engaged in the firearms business are not immune from liability with respect to "an action in which a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or marketing of the [firearm] ... including—

"(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the [firearm], or aided, abetted, or conspired with any person in making any false or fictitious oral or written

statement with respect to any fact material to the lawfulness of the sale or other disposition of a [firearm]; or

"(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a [firearm], knowing, or having reasonable cause to believe, that the actual buyer of the [firearm] was prohibited from possessing or receiving a firearm ... under subsection (g) or (n) of section 922 of title 18 [of the United States Code] ...." [61] 15 U.S.C. § 7903 (5) (A) (iii) (2012) (setting forth record keeping and unlawful buyer exceptions).

**\*140** **[51]** The defendants' argue that we can discern the scope of the predicate exception by applying ejusdem generis. That canon applies when a statute sets forth a general category of persons or things and then enumerates specific examples thereof. In those cases, when the scope of the general category is unclear, a presumption, albeit a rebuttable one, may arise that the general category encompasses only things similar in nature to the specific examples that follow. See, e.g., 2A N. Singer & S. Singer, Statutes and Statutory Construction (7th Ed. 2014) § 47:17, pp. 364–68. Several courts have acknowledged the potential relevance of the canon when construing the predicate exception. See, e.g., New York v. Beretta U.S.A. Corp., supra, 524 F.3d at 401–402.

**[52]** It is well established, however, that ejusdem generis, like other canons of construction, is merely a tool to assist us in gleaning the intent of Congress; it should not be applied in the face of a contrary **\*\*315** manifestation of legislative intent. Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 88–89, 55 S.Ct. 50, 79 L.Ed. 211 (1934); 2A N. Singer & S. Singer, supra, § 47:22, pp. 400–404. This is particularly true, for example, when the legislative history of a statute reveals a contrary intent. See 2A N. Singer & S. Singer, supra, § 47:22, pp. 404–405.

In the case of PLCAA, the legislative history of the statute makes clear why Congress specifically chose to include the record keeping and unlawful buyer exceptions when drafting the final version of the predicate **\*141** exception. Bills substantially similar to PLCAA had been introduced in both the 107th Congress and the 108th Congress. See S. 1805, 108th Cong. (2003); H.R. 1036, 108th Cong. (2003); H.R. 2037, 107th Cong. (2001). Those bills contained the same exemption for "State or Federal statute[s] applicable to the sale or marketing of [firearms]" that ultimately was codified at 15 U.S.C. § 7903 (5) (A) (iii). H.R. 2037, supra, § 4; accord

S. 1805, supra, § 4; H.R. 1036, supra, § 4. Notably, however, they did not include the record keeping or the unlawful buyer exception. Indeed, they did not offer any specific examples of predicate statutes.

The legislative history indicates that the record keeping and unlawful buyer illustrations were added to the bill that became law during the 109th Congress not to define or clarify the narrow scope of the exception but, rather, because, in 2002, two snipers had terrorized the District of Columbia and surrounding areas. One of the snipers allegedly stole a Bushmaster XM-15 semiautomatic rifle identical or similar to the one at issue in the present case from a gun dealer with a history of lax inventory control procedures. [62] In 2003, the families of the victims of the sniper attacks brought a civil action against the gun dealer that ultimately resulted in a $ 2.5 million settlement. [63] During the legislative debates, many of the members who spoke in opposition to the bill that ultimately became PLCAA argued that the bill would have prevented victims of the sniper attacks from bringing an action against that gun dealer, even though the dealer's carelessness had allowed the snipers to obtain the assault weapon. [64] Indeed, it was in part for **\*142** that very reason, and the public outcry over the sniper attacks, that prior versions of the bill failed to pass. [65]

To deflect these potent political attacks, the author and other supporters of the 2005 incarnation of the bill pointed to the recently added record keeping and illegal buyer exception language as evidence that victims of the sniper attacks would not have been barred from pursuing their action under the predicate exception. [66] Indeed, **\*\*316** several legislators strongly suggested that these examples of predicate statutes were specifically added to PLCAA to make clear that the lawsuits arising from the sniper attacks would not have been barred by PLCAA. [67]

The most reasonable interpretation of this legislative history, then, is that the record keeping and unlawful **\*143** buyer illustrations were included in the final version of PLCAA not in an effort to define, clarify, or narrow the universe of laws that qualify as predicate statutes but, rather, simply to stave off the politically potent attack that PLCAA would have barred lawsuits like the one that had arisen from the widely reported Beltway sniper attacks. There is no other plausible explanation for why Congress chose to modify the predicate exception language contained in the 2001 and 2003 bills, which otherwise was "virtually identical" to the language in

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 39 of 119

PLCAA. 151 Cong. Rec. 2561 (2005), remarks of Senator Larry Edwin Craig; see also id., 18,096, remarks of Senator Craig (indicating that bill is same for all intents and purposes as version introduced during 108th Congress, with addition of clarifying examples).

This conclusion is bolstered by the fact that Congress was fully aware that there are many types of federal statutes and regulations, filling "hundreds of pages," that specifically govern the firearms industry. 151 Cong. Rec. 18,059 (2005), remarks of Senator Thomas Allen Coburn. Indeed, 18 U.S.C. § 922 is dedicated to delineating dozens of different unlawful acts relating to the production, distribution, and sale of firearms. Congress could have simply identified 18 U.S.C. § 922, or the other federal firearms laws to which Senator Coburn alluded, as examples of predicate statutes. Instead, the author of PLCAA opted to highlight only the two specific subsections of 18 U.S.C. § 922—subsection (g) and (n)—that would have barred the Beltway snipers from obtaining the weapon used in the shootings.

Under similar circumstances, when it is clear that examples have been included in a statute for purposes of emphasis or in response to recent, high profile events, rather than to restrict the scope of coverage, both the United States Supreme Court and the lower federal courts have declined to apply canons, including ejusdem generis, to construe a statutory provision overly **\*144** narrowly. [68] For similar reasons, we conclude that the ejusdem generis **\*\*317** canon is not applicable to the predicate exception.

c

Statutory Exceptions To Be Construed Narrowly

**[53]** Citing *Commissioner of Internal Revenue v. Clark,* 489 U.S. 726, 739, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989), the defendants' rely on another canon, contending that the predicate exception, like other statutory exceptions, must be construed narrowly to preserve the primary purpose of PLCAA. As we explained, however, our review of the statutory language strongly suggests that the defendants' have misperceived the primary purpose of PLCAA, which is not to shield firearms sellers from liability for wrongful or illegal conduct. If Congress had intended to supersede state actions of this sort, it was required to make that purpose clear. [69]

2

Related Legislation

We also find it instructive that, in early 2005, at approximately the same time that the proposed legislation that ultimately became PLCAA was introduced, bills were introduced in both the House of Representatives **\*145** and the Senate that would have bestowed PLCAA-type immunity on fast food restaurant companies to protect them from lawsuits seeking to hold them liable for consumers' obesity and related health problems. [70] Both bills contained language that was substantially similar to PLCAA's predicate exception: "A qualified civil liability action shall not include ... an action based on allegations that ... a manufacturer or seller of [food] knowingly violated a Federal or State statute applicable to the marketing, advertisement, or labeling of [food] with intent for a person to rely on that violation ...." S. 908, 109th Cong. § 4 (2005); accord H.R. 554, 109th Cong. § 4 (2005). The House Report accompanying H.R. 554 made clear that "applicable" statutes for purposes of that bill were not limited to laws, such as the Federal Food, Drug and Cosmetic Act; 21 U.S.C. § 301 et seq. (2012); that directly and specifically regulate the food industry. Rather, the report indicated that state consumer protection laws, such as CUTPA, also qualified as predicate statutes, even though they are laws of general applicability that do not expressly address food and beverage marketing or labeling: "Every state has its own deceptive trade practices laws, and a knowing violation of any of such state laws could allow suits to go forward under the legislation if the criteria specified ... are met." [71] H.R. Rep. No. 109-130, p. 8 (2005).

**\*\*318** We recognize that these bills never became law and also that food and firearms are different types of products that implicate different risks and concerns. Nevertheless, **\*146** we cannot ignore the fact that PLCAA and the fast food bills were introduced at essentially the same time, with substantially similar language and structure. [72] See 2B N. Singer & J. Singer, Statutes and Statutory Construction (7th Ed. 2012) § 51:4, pp. 275–76 (vetoed bills and repealed statutes may be construed in pari materia to assist in interpreting ambiguous legislation). In light of this fact, there is good reason to believe that legislators would have understood the term "statute applicable to" in 15 U.S.C. § 7903 (5) (A) (iii) as similarly encompassing an action under CUTPA against a company that unethically markets firearms for illegal purposes.

3

The Legislative History of PLCAA

Finally, to the extent that any ambiguities remain unresolved, we consider the legislative history of PLCAA. Although the extensive history of the statute presents something of a mixed bag, our review persuades us that Congress did not intend to limit the scope of the predicate exception to violations of firearms specific laws or to confer immunity from all claims alleging that firearms sellers violated unfair trade practice laws.

During the legislative debates, opponents of the proposed legislation that became PLCAA repeatedly questioned why it was necessary to confer immunity on the firearms industry when, in their view, only a very small number of gun violence related lawsuits had been filed against firearms manufacturers and distributors, most of which had been dismissed at the trial court level. [73] **\*147** In response, PLCAA's sponsor and several of PLCAA's cosponsors described the specific types of lawsuits that the legislation was intended to prohibit. See footnotes 74 and 76 of this opinion. They emphasized that their primary concern was not with lawsuits such as the present action, in which individual plaintiffs who have been harmed in a specific incident of gun violence seek to hold the sellers responsible for their specific misconduct in selling the weapons involved. See id. Many proponents indicated that their intent was to preclude the rising number of instances in which municipalities and "anti-gun activists" filed "junk" or "frivolous" lawsuits targeting the entire firearms industry. [74] As one cosponsor of the legislation explained, "[t]his bill is only intended to protect law-abiding members of the firearms industry from nuisance suits that have no basis in current law, that are only intended to regulate the industry or harass the industry or put it out **\*\*319** of business ... which are [not] appropriate purposes for a lawsuit." [75] 151 Cong. Rec. 18,104 (2005), remarks of Senator Max Sieben Baucus. [76] In the present action, by contrast, **\*148** the private victims of one specific incident of gun violence seek compensation from the producers and distributors of a single firearm on the basis of alleged misconduct in the specific marketing of that firearm. Few if any of the bill's sponsors indicated that cases of this sort were what PLCAA was intended to preclude.

In addition, during the course of the legislative debates, many legislators either expressly stated or clearly implied that the only actions that would be barred by PLCAA would be ones in which a defendant bore absolutely no responsibility or blame for a plaintiff's injuries and was, in essence, being held strictly liable for crimes committed with firearms that it had merely produced or distributed. See *Ileto v. Glock, Inc., supra, 565 F.3d at 1159* (Berzon, J., concurring in part and dissenting in part). One cosponsor, for example, emphasized that "the heart of this bill" was that one can be held liable for violating a statute during the production, distribution, or sale of firearms, "[b]ut we are not going to extend it to a concept where you are responsible, *after you have done everything right,* for what somebody else may do who bought your product and they did it wrong and it is their fault, not yours." (Emphasis added.) 151 Cong. Rec. 18,920 (2005), remarks of Senator Lindsey O. Graham. Another cosponsor explained the essential evil to which the bill was directed: "It is out of that fear and concern that we have mayors and cities passing laws that create strict liability .... [Firearms sellers have] become ... insurer[s] against criminal activity by criminals." Id., 18,924, remarks of Senator Jefferson Beauregard Sessions III. Senator Sessions added: "That is what we are trying to curtail here— this utilization of the legal system ...." Id.

**\*149** A common theme running through supporters' statements was that holding a firearms seller liable for third-party gun violence for which the seller is wholly blameless is no different from holding producers of products such as automobiles, matches, baseball bats, and knives strictly liable when those ubiquitous but potentially dangerous items are inappropriately or illegally used to commit crimes. As the author of PLCAA, Senator Craig, explained: "If a gun manufacturer is held liable for the harm done by a criminal who misuses a gun, then there is nothing to stop the manufacturers of any product used in crimes from having to bear the costs resulting from the actions of those criminals. So as I mentioned earlier, automobile manufacturers will have to take the blame for the death of a bystander who gets in the way of the drunk driver. The local hardware store will have to be held responsible for a kitchen knife it sold, if later that knife is used in the commission **\*\*320** of a rape. The baseball team whose bat was used to bludgeon a victim will have to pay the cost of the crime. The list goes on and on." Id., 18,085. The implication of this argument is that legislators' primary concern was that liability should not be imposed in situations in which the producer or distributor of a consumer product bears absolutely no responsibility for the misuse of that product in the commission of a crime. There is

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document      Page 41 of 119

no indication that the sponsors of PLCAA believed that sellers of those consumer products should be shielded from liability if, for example, an automobile manufacturer advertised that the safety features of its vehicles made them ideally suited for drunk driving, or if a sporting goods dealer ran advertisements encouraging high school baseball players to hurl their bats at the opposing pitcher in retaliation for an errant pitch. That is, in essence, what the plaintiffs have alleged in the present case.

To the extent that supporters of PLCAA were concerned with lawsuits other than those seeking to hold **\*150** firearms sellers strictly liable for gun violence, they consistently expressed that their intention was to foreclose novel legal theories that had been developed by anti-gun activists with the goal of putting firearms sellers out of business.[77] The author of the legislation explained as follows: "As we have stressed repeatedly, this legislation will not bar the courthouse doors to victims who have been harmed by the negligence or misdeeds of anyone in the gun industry. Well recognized causes of action are protected by the bill. Plaintiffs can still argue their cases for violations of law .... The only lawsuits this legislation seeks to prevent are novel causes of action that have no history or grounding in legal principle." Id., 18,096, remarks of Senator Craig. In addition, a number of lawmakers emphasized that the legislation was primarily directed at heading off unprecedented *tort* theories,[78] which explains why the predicate exception expressly preserved liability for statutory violations. See *Ileto* v. *Glock, Inc., supra, 565 F.3d at 1135* ("Congress clearly intended to preempt common-law claims, such as general tort theories of liability"); *id., at 1160–61* (Berzon, J., concurring in part and dissenting in part) ("[PLCAA] was viewed essentially as a [tort reform] measure, aimed at restraining the supposed expansion of tort liability").

As we discussed previously, the plaintiffs' theory of liability is not novel; nor does it sound in tort.[79] The **\*151** plaintiffs **\*\*321** allege that the defendants engaged in unfair trade practices in violation of CUTPA, a statute that was enacted in 1973. See P.A. 73-615. Furthermore, CUTPA, by its express terms, is modeled on the FTC Act; see General Statutes § 42-110b (b); which has been in effect for more than one century. See Act of September 26, 1914, Pub. L. No. 63-203, 38 Stat. 717. As we explained, the FTC Act and its state counterparts have long been used to regulate not only the sale and marketing of firearms but also claims that sellers of other dangerous products have advertised their wares in a manner that modeled or promoted unsafe behavior and created an

unreasonable risk that viewers would engage in unsafe or illegal conduct.[80]

**\*152** The defendants', purporting to rely on the decision of the Ninth Circuit in *Ileto*, argue that the legislative history of PLCAA supports a more restrictive view of the scope of the predicate exception. We read *Ileto* differently. As we noted; see footnote 47 of this opinion; the court in that case concluded that "congressional speakers' statements concerning the scope of ... PLCAA reflected the understanding that manufacturers and sellers of firearms would be liable only for statutory violations concerning firearm[s] regulations *or sales and marketing regulations*." (Emphasis added.) *Ileto* v. *Glock, Inc., supra, 565 F.3d at 1137*. Because CUTPA specifically regulates commercial sales and marketing activities such as those at issue in the present case; see, e.g., *Izzarelli* v. *R.J. Reynolds Tobacco Co., 117 F.Supp.2d 167, 178 (D. Conn. 2000);* it falls squarely within the predicate exception, as *Ileto* construed the legislative history.

**\*\*322** We do not dispute that, over the course of the hundreds of pages of coverage of the legislative debates, a few congressional supporters of PLCAA made a few brief references to predicate statutes as being firearms specific.[81] What the defendants' have overlooked, however, **\*153** are the dozens of statements by PLCAA's drafter and cosponsors that imply or directly state that the predicate exception applies far more broadly, such that firearms companies may be held liable for violation of *any* applicable law, and not only those laws that specifically govern the firearms trade. Indeed, in the vast majority of instances in which the predicate exception was discussed during the legislative debates, proponents spoke in broad, general terms, indicating that the bill would not immunize firearms companies that had engaged in *any* illegal activity.[82]

**\*154** Several cosponsors of the bill that became PLCAA specifically explained that it would not preclude victims of gun violence from holding firearms companies accountable for injuries resulting from their **\*\*323** gross negligence or reckless conduct, because, essentially, any such conduct would be in violation of some state or federal law. See, e.g., 151 Cong. Rec. 18,919 (2005), remarks of Senator Jon Llewellyn Kyl ("[M]ost of the acts that would meet the definition of gross negligence would already be in violation of law. And if they are in violation of law, they are not exempted from this legislation. We don't try to exempt any gun manufacturer for conduct [that] is in violation of law. So

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc Main Document Page 42 of 119

by definition have an exemption from the provisions of the bill .... The bottom line here is that if there really is a problem, that is to say, the conduct is so bad that it is a violation of law, no lawsuit is precluded under our bill in any way.... So in fact if the gross negligence or reckless conduct of a person was the proximate cause of death or injury—that is the allegation—you are in court irrespective of this bill ....''); id., 18,922, remarks of Senator Orrin Grant Hatch (''[v]irtually any act that would meet the definition of gross negligence ... would already be a violation of [f]ederal, [s]tate or local law, and therefore would not receive the protection of this law anyway''). The clear implication of these comments is that the **\*155** predicate exception extends beyond firearms specific laws and encompasses laws such as CUTPA, which prohibit wholly irresponsible conduct such as the wrongful advertising of potentially dangerous products for criminal or illegal purposes.

The strongest support for the defendants' reading of the legislative history is a passing statement by the author of PLCAA, Senator Craig, that ''[t]his bill does not shield ... [those who] have violated existing law ... and I am referring to the [f]ederal firearms laws ....'' Id., 18,085. That statement was made, however, in the context of a discussion of the federal record keeping requirements that govern sales of firearms, requirements that are indisputably specific to that industry. At no point did Senator Craig suggest that, in his opinion, the only *state* laws that qualify as predicate statutes are those that specifically regulate the firearms industry. Rather, on numerous occasions during the legislative debates, Senator Craig categorically stated that the bill was intended to protect only law abiding firearms companies that had not violated *any* federal or state law.[83] ''As we have stressed repeatedly,'' **\*\*324** Senator **\*156** Craig emphasized, ''this legislation will not bar the courthouse doors to victims who have been harmed by the negligence or misdeeds of anyone in the gun industry. Well recognized causes of action are protected by the bill. Plaintiffs can still argue their cases for violations of law ....''[84] Id., 18,096. Accordingly, we conclude that the legislative history of PLCAA does not support the defendants' contention that Congress intended to shield them from potential liability for the types of CUTPA violations that the plaintiffs have alleged.

VI

CONCLUSION

It is, of course, possible that Congress intended to broadly immunize firearms sellers from liability for the sort of egregious misconduct that the plaintiffs have alleged but failed to effectively express that intent in the language of PLCAA or during the legislative hearings. If that is the case, and in light of the difficulties that **\*157** the federal courts have faced in attempting to distill a clear rule or guiding principle from the predicate exception, Congress may wish to revisit the issue and clarify its intentions.

We are confident, however, that, if there were credible allegations that a firearms seller had run explicit advertisements depicting and glorifying school shootings, and promoted its products in video games, such as ''School Shooting,'' that glorify and reward such unlawful conduct,[85] and if a troubled young man who watched those advertisements and played those games were inspired thereby to commit a terrible crime like the ones involved in the Sandy Hook massacre, then even the most ardent sponsors of PLCAA would not have wanted to bar a consumer protection lawsuit seeking to hold the supplier accountable for the injuries wrought by such unscrupulous marketing practices. That is not this case, and yet the underlying legal principles are no different. Once we accept the premise that Congress did not intend to immunize firearms suppliers who engage in truly unethical and irresponsible marketing practices promoting criminal conduct, and given that statutes such as CUTPA are the only means available to address those types of wrongs, it falls to a jury to decide whether the promotional schemes alleged in the present case rise to the level of illegal trade practices and whether fault for the tragedy can be laid at their feet.

**\*\*325** For the foregoing reasons, we conclude that the trial court properly determined that, although most of the plaintiffs' claims should have been dismissed, PLCAA does not bar the plaintiffs' wrongful marketing claims and that, at least to the extent that it prohibits the unethical advertising of dangerous products for illegal **\*158** purposes, CUTPA qualifies as a predicate statute. Specifically, if the defendants' did indeed seek to expand the market for their assault weapons through advertising campaigns that encouraged consumers to use the weapons not for legal purposes such as self-defense, hunting, collecting, or target practice, but to launch offensive assaults against their perceived enemies, then we are aware of nothing in the text or legislative history of PLCAA to indicate that

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 43 of 119

Congress intended to shield the defendants' from liability for the tragedy that resulted.

The judgment is reversed with respect to the trial court's ruling that the plaintiffs lack standing to bring a CUTPA claim and its conclusion that the plaintiffs' wrongful death claims predicated on the theory that any sale of military style assault weapons to the civilian market represents an unfair trade practice were not barred under the applicable statute of limitations, and the case is remanded for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion McDONALD, MULLINS and KAHN, Js., concurred.

DISSENT

ROBINSON, J., with whom VERTEFEUILLE and ELGO, Js., join, dissenting in part.

**\*159**

In 2005, Congress enacted the Protection of Lawful Commerce in Arms Act (arms act), 15 U.S.C. § 7901 et seq., to preempt what it had deemed to be frivolous lawsuits against the firearms industry arising from the proliferation of gun related deaths resulting from criminal activity in cities and towns across the country. See 15 U.S.C. § 7901 (2012) (articulating findings and purposes underlying arms act). [1] **\*\*326** That preemption is not, however, unconditional, as there are six exceptions to the definition of "qualified civil liability action" set forth in **\*160** 15 U.S.C. § 7903 (5) (A) [2] **\*\*327** that narrow the category of cases proscribed **\*161** by the arms act. See 15 U.S.C. § 7902 (2012). [3] One such exception, for "an action in which a manufacturer or seller of a [firearm, ammunition, or component part] knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought"; 15 U.S.C. § 7903 (5) (A) (iii) (2012); "has come to be known as the 'predicate exception,' because a plaintiff not only must present a cognizable claim, he or she also must allege a knowing violation of a 'predicate statute.' " Ileto v. Glock, Inc., 565 F.3d 1126, 1132 (9th Cir. 2009), cert. denied, 560 U.S. 924, 130 S.Ct. 3320, 176 L.Ed.2d 1219 (2010). In part V of its opinion, the majority

concludes that the claims made by the plaintiffs [4] under the Connecticut Unfair Trade **\*162** Practices Act (CUTPA), General Statutes § 42-110a et seq., which are founded on a theory that wrongful and unscrupulous advertising by the defendants', [5] who manufactured, distributed, and sold the Bushmaster AR-15 rifle, Model XM15-E2S, was a substantial factor in the criminal activity of the shooter at the Sandy Hook School on December 14, 2012, are not preempted by the arms act because CUTPA is a predicate statute for purposes of the predicate exception. Having considered the text and legislative history of the arms act, I adopt a contrary answer to this national question of first impression, and conclude that the predicate exception encompasses only those statutes that govern the sale and marketing **\*\*328** of firearms and ammunition specifically, as opposed to generalized unfair trade practices statutes that, like CUTPA, govern a broad array of commercial activities. Because the distastefulness of a federal law does not diminish its preemptive effect, I would affirm the judgment of the trial court striking the plaintiff's complaint in its entirety. Accordingly, I respectfully dissent from part V of the majority opinion.

I begin by noting my agreement with the facts, procedural history, and plenary standard of review as stated by the majority. See, e.g., Byrne v. Avery Center for Obstetrics & Gynecology, P.C., 314 Conn. 433, 447, 102 A.3d 32 (2014) ("[w]hether state causes of action are preempted by federal statutes and regulations is a question of law over which our review is plenary"). I also assume, without deciding, that the majority properly concludes in part IV D of its opinion that, "at least **\*163** with respect to wrongful advertising claims, personal injuries alleged to have resulted directly from such advertisements are cognizable under CUTPA." Accordingly, I now turn to the pivotal question of whether the predicate exception saves such claims under CUTPA from preemption by the arms act.

I

GENERAL PRINCIPLES OF PREEMPTION
AND STATUTORY CONSTRUCTION

I recognize that the supremacy clause of the United States constitution declares that "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. "As a

consequence, state and local laws are preempted [when] they conflict with the dictates of federal law, and must yield to those dictates.... Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose....

"[When] a federal statute expressly preempts state or local law, analysis of the scope of the [preemption] statute must begin with its text.... And, we must also start with the assumption that the historic police powers of the [s]tates [are] not to be superseded ... unless that was the clear and manifest purpose of Congress.... As such, Congress' purpose is the ultimate touchstone of preemption analysis." (Citation omitted; internal quotation marks omitted.) *Modzelewski's Towing & Recovery, Inc.* v. *Commissioner of Motor Vehicles*, 322 Conn. 20, 28–29, 139 A.3d 594 (2016), cert. denied, ––– U.S. ––––, 137 S.Ct. 1396, 197 L.Ed.2d 554 (2017).

In determining whether Congress intended the arms act to preempt the CUTPA claims in the present case, **\*164** I turn to the principles that govern our "construction and application of federal statutes," under which "principles of comity and consistency require us to follow the plain meaning rule .... Moreover, it is well settled that the decisions of [t]he [United States Court of Appeals for the] Second Circuit ... carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts." (Internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, 327 Conn. 114, 140, 172 A.3d 1228 (2017); see also, e.g., *Modzelewski's Towing & Recovery, Inc.* v. *Commissioner of Motor Vehicles*, supra, 322 Conn. at 32, 139 A.3d 594.

"Accordingly, our analysis of the federal statutes in the present case begins with the plain meaning of the statute.... If the **\*\*329** text of a statute is ambiguous, then we must construct an interpretation consistent with the primary purpose of the statute as a whole.... Under the plain meaning rule, [l]egislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous.... Thus, our interpretive process will begin by inquiring whether the plain language of [each] statute, when given its ordinary, common meaning ... is ambiguous." (Citations omitted; internal quotation marks omitted.) *Szewczyk* v. *Dept. of Social Services*, 275 Conn. 464, 476, 881 A.2d 259 (2005). "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *State* v. *Agron*, 323 Conn. 629, 634, 148 A.3d 1052 (2016); see also,

e.g., *United States* v. *Peterson*, 394 F.3d 98, 105 (2d Cir. 2005); *United States* v. *Dauray*, 215 F.3d 257, 262 (2d Cir. 2000).

If a federal statute is ambiguous, the federal courts do not consider all extratextual sources to be of equal value in resolving that ambiguity. Instead, the Second Circuit first "turn[s] to canons of statutory construction for assistance in interpreting the statute.... [That **\*165** court] resort[s] to legislative history only if, after consulting canons of statutory instruction, the meaning remains ambiguous." (Citation omitted; internal quotation marks omitted.) *United States* v. *Rowland*, 826 F.3d 100, 108 (2d Cir. 2016), cert. denied, ––– U.S. ––––, 137 S.Ct. 1330, 197 L.Ed. 2d 517 (2017).

Accordingly, I begin with a review of the text of the relevant provisions of the arms act. The preemption provision provides that "[a] qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. § 7902 (a) (2012); see also 15 U.S.C. § 7902 (b) (2012) ("[a] qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending"). The arms act defines a "qualified civil liability action" in relevant part as "a civil action or proceeding ... brought by any person against a manufacturer or seller of a qualified product, [6] or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party ...." (Footnote added.) 15 U.S.C. § 7903 (5) (A) (2012). The arms act then provides six exceptions to the definition of qualified civil liability action; see footnote 2 of this dissenting opinion; including the predicate exception, which is defined as "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a **\*166** proximate cause of the harm for which relief is sought, including—

"(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness **\*\*330** of the sale or other disposition of a qualified product; or

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 45 of 119

"(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18 ...." 15 U.S.C. § 7903 (5) (A) (iii) (2012).

Resolving whether CUTPA is a state statute "applicable to the sale or marketing of [firearms]"; 15 U.S.C. § 7903 (5) (A) (iii) (2012); begins with the plain meaning of the word "applicable," which Congress did not define within the arms act. "In the absence of a definition of terms in the statute itself, [w]e may presume ... that the legislature intended [a word] to have its ordinary meaning in the English language, as gleaned from the context of its use.... Under such circumstances, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Middlebury v. Connecticut Siting Council*, 326 Conn. 40, 49, 161 A.3d 537 (2017). Merriam Webster's Collegiate Dictionary defines "applicable" as "capable of or suitable for being applied: appropriate." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003), p. 60; see id., p. 61 (defining "appropriate" as "especially suitable or compatible"). Considering **\*167** this definition, I agree with the plaintiffs' argument that CUTPA reasonably could be deemed "applicable" to the "sale or marketing of [firearms]"; 15 U.S.C. § 7903 (5) (A) (iii) (2012); insofar as it is a broad statute that is "capable of" being applied to that—and nearly every other—business. The reasonableness of this reading is bolstered by Congress' use of the word "including" to set off its list of example predicate statutes, insofar as "the word 'including' may be used either as a word of enlargement or of limitation." *Wood v. Zoning Board of Appeals*, 258 Conn. 691, 700 n.11, 784 A.2d 354 (2001); see also, e.g., *State v. DeFrancesco*, 235 Conn. 426, 435, 668 A.2d 348 (1995) (" '[t]here is some ambiguity concerning whether the word "including" ... was intended as a word of limitation ... or one of enlargement' "); accord *Samantar v. Yousuf*, 560 U.S. 305, 317, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010) (stating that "use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive," but noting that " '[a] word may be known by the company it keeps' "); but see *Mahoney v. Lensink*, 213 Conn. 548, 569, 569 A.2d 518 (1990) (suggesting that phrase "shall include" is limiting, but use of word "include" or "including" omitting word "shall" is intended to be broader, with "the listed rights ... a vehicle

for enlargement rather than limitation," given purpose of statutory patients' bill of rights).

The defendants' reading of the predicate exception is, however, equally reasonable, particularly given the more technical definition of "applicable" in Black's Law Dictionary as it relates to laws or regulations. See Black's Law Dictionary (10th Ed. 2014) (defining "applicable" in references to "a rule, regulation, law, etc.," as "affecting or relating to a particular person, group, or situation; having direct relevance"). The principle of noscitur a sociis, namely, that the "meaning of a statutory word may be indicated, controlled or made clear **\*168** by the words with which it is associated in the statute"; (internal quotation marks omitted) *State v. Agron*, supra, 323 Conn. at 635–36, 148 A.3d 1052; allows us to view the example predicates, which describe statutes specifically applicable to the firearms trade, as cabining the more expansive reading of the word "applicable." See also, e.g., **\*\*331** *Bilski v. Kappos*, 561 U.S. 593, 604, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010). Consistent with the two United States Courts of Appeal that have considered the meaning of the predicate exception; see *Ileto v. Glock, Inc.*, supra, 565 F.3d at 1133–34; *New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008), cert. denied, 556 U.S. 1104, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009); I conclude that there is more than one reasonable reading of the predicate exception, rendering it ambiguous. I turn, therefore, to extratextual evidence, namely, the canons of statutory construction and, if necessary, the legislative history, to answer the question of whether CUTPA constitutes a predicate statute for purposes of 15 U.S.C. § 7903 (5) (A) (iii).

II

REVIEW OF FEDERAL CIRCUIT COURT PRECEDENT

In determining whether CUTPA is a predicate statute under the arms act, I do not write on a blank slate. Two of the United States Circuit Courts of Appeal, including the Second Circuit that we ordinarily find especially persuasive in deciding questions of federal law; see, e.g., *CCT Communications, Inc. v. Zone Telecom, Inc.*, supra, 327 Conn. at 140, 172 A.3d 1228; have considered whether state statutes of general applicability may be predicate statutes.

In *New York v. Beretta U.S.A. Corp.*, supra, 524 F.3d at 389–91, the city of New York claimed that the defendants', certain firearms manufacturers and distributors, "market[ed]

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc
Main Document Page 46 of 119

guns to legitimate buyers with the knowledge that those guns [would] be diverted through various *169 mechanisms into illegal markets" and sought injunctive relief requiring those defendants' "to take assorted measures that would effectively inhibit the flow of firearms into illegal markets." The Second Circuit considered whether a state criminal public nuisance statute; see N.Y. Penal Law § 240.45 (McKinney 2008); [7] constituted a predicate statute that would allow the city's claim to avoid preemption under the arms act. *New York* v. *Beretta U.S.A. Corp.*, supra, at 399; see also id. ("[i]t is not disputed that [the criminal nuisance statute] is a statute of general applicability that has never been applied to firearms suppliers for conduct like that complained of by the [c]ity"). The city argued that the predicate exception saved its action "because [the criminal nuisance statute] is a statute 'applicable to the sale or marketing of [firearms].' The [defendants'] disagree[d], arguing that the predicate exception was intended to include statutes that specifically and expressly regulate the firearms industry." Id.

After engaging in a contextual analysis of the predicate exception and, in particular, the meaning of the term "applicable," the Second Circuit concluded that the predicate exception "does not encompass" the criminal nuisance statute, but "does encompass statutes [1] that expressly regulate firearms, or [2] that courts have applied to the sale and marketing of firearms; and ... [3] that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of **332 firearms." Id., at 404. In reaching that conclusion, the court stated that it found "nothing in the [arms act] *170 that requires any express language regarding firearms to be included in a statute in order for that statute to fall within the predicate exception" and declined "to foreclose the possibility that, under certain circumstances, state courts may apply a statute of general applicability to the type of conduct that the [c]ity complains of, in which case such a statute might qualify as a predicate statute." Id., at 399–400. Accordingly, the court concluded that "while the mere absence in [the criminal nuisance statute] of any express reference to firearms does not, in and of itself, preclude that statute's eligibility to serve as a predicate statute under the [arms act, the criminal nuisance statute] is a statute of general applicability that does not encompass the conduct of firearms manufacturers of which the [c]ity complains. It therefore does not fall within the predicate exception to the claim restricting provisions of the [arms act]." Id., at 400.

My review of the relevant statutory text and legislative history reveal no support for the Second Circuit's expansive holding

that the predicate exception includes statutes "that courts have applied to the sale and marketing of firearms" and "that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." Id., at 404. This ultimate conclusion is simply inconsistent with the court's more detailed analysis of the relevant statutory text and legislative history, which suggests a narrower reading of that exception. Specifically, the court considered the statements of purpose, as well as the list of example predicate statutes set forth in 15 U.S.C. § 7903 (5) (A) (iii) (I) and (II), which are "said to include statutes regulating [record keeping] and those prohibiting participation in direct illegal sales," and stated that "construing the term 'applicable to' to mean statutes that clearly can be said to regulate the firearms industry more accurately reflects the intent of Congress. *171 Id., at 402. The court also rejected the dictionary definition of "applicable" as "lead[ing] to a far [too] broad reading of the predicate exception" that "would allow the predicate exception to swallow the statute ...." Id., at 403. Finally, the court cited the legislative history of the arms act as "support [for] the view that the predicate exception was meant to apply only to statutes that actually regulate the firearms industry, in light of the statements' consistency amongst each other and with the general language of the statute itself." Id., at 404.

Indeed, Judge Robert Katzmann authored a dissenting opinion aptly criticizing the majority's analysis as inconsistent with the plain language of the statute, particularly with respect to recognizing those statutes that courts had previously applied to the sale and manufacture of firearms, and further observed that the majority had provided no guidance with respect to when a statute of general applicability could, in fact, be deemed applicable to firearms, rendering that aspect of the majority opinion entirely unpersuasive.[8] See id., at 406. **333 *172 Accordingly, I decline to follow the analysis of the Second Circuit's ultimately unpersuasive decision, particularly given that any concerns regarding different outcomes in federal court; see *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000) (declining to follow Second Circuit precedent would create "bizarre result" when federal district court, located "only a few blocks away," would be bound under same facts); as a result of such a departure would be minimized because that case did not specifically involve a claim raised under a state unfair trade practices law.[9]

Although it too is not directly on point, my review of the predicate exception's text and legislative history indicates that the analysis of the United States Court of Appeals for the

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 47 of 119

Ninth Circuit in *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1126, is more instructive. [10] In Ileto, the Ninth Circuit considered whether the predicate exception saved the plaintiff's claims of "knowing violations" of negligence, nuisance, and public nuisance under "California's general tort law [that] is codified in its civil code." Id., at 1132–33. Observing "that the term 'applicable' has a spectrum of meanings, including the two poles identified by the parties," the Ninth Circuit considered the context of Congress' use of the word "applicable," as well as "the broader context of the statute as **\*173** a whole." (Internal quotation marks omitted.) Id., at 1134. The court stated that the "illustrative predicate statutes pertain specifically to sales and manufacturing activities, and most also target the firearms industry specifically. Those examples suggest that [the] [p]laintiffs' proposed all-encompassing meaning of the term 'applicable' is incorrect, because each of the examples has—at the very least—a direct connection with sales or manufacturing. Indeed, if *any* statute that 'could be applied' to the sales and manufacturing of firearms qualified as a predicate statute, there would be no need to list examples at all. Similarly, the examples suggest that [the] [d]efendants' asserted narrow meaning is incorrect, because some of the examples do not pertain exclusively to the firearms industry." (Emphasis in original.) Id.

Determining that the "text of the statute alone is inconclusive as to Congress' intent," **\*\*334** the court then considered "the additional indicators of congressional intent." Id., at 1135. In particular, the court observed that the express purpose of the arms act is to " 'prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.' " Id., quoting 15 U.S.C. § 7901 (b) (1) (2006). The court determined that, in "view of [the] congressional findings and that statement of purpose, Congress clearly intended to preempt common-law claims, such as general tort theories of liability. [The] [p]laintiffs' claims—'classic negligence and nuisance'—[are] general tort theories of liability that traditionally have been embodied in the common law." (Citation omitted; footnote omitted.) *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1135. The court emphasized that the California legislature did not intend **\*174** to supplant the common law by enacting its civil code, but rather "to announce and formulate existing common law principles and definitions for purposes of orderly and concise presentation and with a distinct view toward continuing judicial evolution.... In other words, although California has

codified its common law, the evolution of those statutes is nevertheless subject to the same judicial evolution as ordinary common-law claims in jurisdictions that have not codified common law. That judicial evolution was precisely the target of the [arms act]." (Citation omitted; internal quotation marks omitted.) Id., at 1136. The Ninth Circuit deemed it "more likely that Congress had in mind only these types of statutes —statutes that regulate manufacturing, importing, selling, marketing, and using firearms or that regulate the firearms industry—rather than general tort theories that happened to have been codified by a given jurisdiction." Id.

The Ninth Circuit then examined the "extensive" legislative history, and made "two general observations .... First, all of the congressional speakers' statements concerning the scope of the [arms act] reflected the understanding that manufacturers and sellers of firearms would be liable only for statutory violations concerning firearm regulations or sales and marketing regulations." Id., at 1136–37. Second, the court observed that the "very case" before it was exactly "the type of case they meant the [arms act] to preempt," along with other "novel" cases. (Emphasis omitted.) Id., at 1137. Ultimately, the court held that "Congress intended to preempt general tort law claims ... even though California has codified those claims in its civil code." [11] Id., at 1138. **\*\*335** Unlike the Second Circuit, however, the Ninth **\*175** Circuit expressly demurred to state "any view on the scope of the predicate exception with respect to any other statute." Id., at 1138 n.9; see also *District of Columbia* v. *Beretta U.S.A. Corp.*, 940 A.2d 163, 170–72 (D.C. 2008) (concluding that District of Columbia's Assault Weapons Manufacturing Strict Liability Act, D.C. Code § 7-2551.01 et seq. [2001], is not predicate statute because it is pure strict liability, and does not provide "a prohibition against, or standards of, conduct that are being violated," with plaintiffs' claims preempted because they did not allege that "defendants' knowingly violated any proscriptions or requirements of local or federal law governing the sale or possession of firearms"), cert. denied sub nom. *Lawson* v. *Beretta U.S.A. Corp.*, 556 U.S. 1104, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009).

With this case law in mind, I now turn to the canons of statutory interpretation and legislative history to **\*176** determine whether the predicate exception encompasses unfair trade practices statutes that, like CUTPA, are not specific to the firearms industry.

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document      Page 48 of 119

III

CANONS OF CONSTRUCTION

With respect to the canons of statutory construction, I first observe that the predicate exception is exactly that—an *exception* to the arms act. It is well settled that, "when a statute sets forth exceptions to a general rule, we generally construe the exceptions narrowly in order to preserve the primary operation of the [provision]." (Internal quotation marks omitted.) *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 90–91 (2d Cir. 2016), cert. denied, ––– U.S. ––––, 137 S.Ct. 1374, 197 L.Ed.2d 554 (2017). This "proposition ... is supported by commonsense logic. When a statute sets forth a general principle, coupled with an exception to it, it is logical to assume, in the face of ambiguity in the exception, that the legislature did not intend the exception to be so broad as to leave nothing of the general principle." *Id.*, at 91; see also *Commissioner of Internal Revenue v. Clark*, 489 U.S. 726, 739, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989) ("[g]iven that Congress has enacted a general rule that treats boot as capital gain, we should not eviscerate that legislative judgment through an expansive reading of a somewhat ambiguous exception"); *A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945) ("[t]o extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people"). In the absence of clear direction from Congress to construe the predicate exception differently, I disagree with the majority's suggestion that we should read the arms act narrowly and its predicate exception more **\*177** broadly.[12] See **\*\*336** *Reves v. Ernst & Young*, 507 U.S. 170, 183–84, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (" '[L]iberal construction' " clause in Racketeer Influenced and Corrupt Organizations Act [RICO], 18 U.S.C. § 1961 et seq. [1988], which "obviously seeks to ensure that Congress' intent is not frustrated by an overly narrow reading of the statute ... is not an invitation to apply RICO to new purposes that Congress never intended. Nor does the clause help us to determine what purposes Congress had in mind. Those must be gleaned from the statute through the normal means of interpretation. The clause only serves as an aid for resolving an ambiguity; **\*178** it is not to be used to beget one." [Internal quotation marks omitted.] ).

Beyond the narrow construction that we should afford the exceptions to the arms act, the related doctrines of noscitur a sociis and avoiding legislative superfluity also inform the meaning of the phrase "State or Federal statute applicable to the sale or marketing of [firearms]"; 15 U.S.C. § 7903 (5) (A) (iii) (2012); and suggest that the examples of federal laws provided therein indicate the type of statutory violations that would sustain invocation of the predicate exception. Under the canon of noscitur a sociis, "an ambiguous term may be given more precise content by the neighboring words with which it is associated."[13] (Internal quotation marks omitted.) *Bilski v. Kappos, supra*, 561 U.S. at 604, 130 S.Ct. 3218; see also *Yates v. United States*, ––– U.S. ––––, 135 S.Ct. 1074, 1085, 191 L.Ed.2d 64 (2015) ("we rely on the principle of noscitur a sociis—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the [a]cts of Congress" [internal quotation **\*\*337** marks omitted] ). "By using this interpretive aid, the meaning of a statutory word may be indicated, controlled or made clear by the words with which it is associated in the statute." (Internal quotation marks omitted.) *State v. Agron, supra*, 323 Conn. at 636, 148 A.3d 1052. "As a result, broader terms, when used together with more narrow terms, may have a more restricted meaning than if they stand alone." *Dattco, Inc. v. Commissioner of Transportation*, 324 Conn. 39, 48, 151 A.3d 823 (2016). This is particularly so, given this canon's relationship **\*179** to the doctrine that "the [c]ourt will avoid a reading which renders some words altogether redundant." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); accord *Lopa v. Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010) ("[b]ecause [e]very word and phrase [of a statute] is presumed to have meaning [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant" [internal quotation marks omitted] ).

The very specific examples of firearms laws that Congress provides in the predicate exception strongly suggest that it intended only those statutes that are specific to the firearms trade to be considered "applicable to the sale or marketing of the product ...." 15 U.S.C. § 7903 (5) (A) (iii) (2012). The first example is "any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 20-81688-CRJ11     Doc 341     Filed 08/14/20     Entered 08/14/20 09:22:49     Desc
Main Document           Page 49 of 119

to any fact material to the lawfulness of the sale or other disposition of a qualified product ...." 15 U.S.C. § 7903 (5) (A) (iii) (I) (2012). The second is "any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18 ...." 15 U.S.C. § 7903 (5) (A) (iii) (II) (2012). Had Congress intended the predicate exception to broadly encompass any statute capable of application to the manufacture or sale of anything, the inclusion of those firearms-specific **\*180** examples would be superfluous. [14] See **\*\*338** *Yates* v. *United States*, supra, 135 S.Ct. at 1087 ("Had Congress intended 'tangible object' in [18 U.S.C.] § 1519 to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to 'record' or 'document.' The Government's unbounded reading of 'tangible object' would render those words misleading surplusage."); *Gustafson* v. *Alloyd Co.*, supra, 513 U.S. at 574–75, 115 S.Ct. 1061 (interpreting Securities Act of 1933 and stating that "[i]f 'communication' included every written communication, it would render 'notice, circular, advertisement, [and] letter' redundant, since each of these are forms of written communication as well"); **\*181** *Dattco, Inc. v. Commissioner of Transportation*, supra, 324 Conn. at 48–49, 151 A.3d 823 ("The legislature's grouping [in General Statutes (Rev. to 2015) § 13b-36 (a) ] of the term 'facilities' with other nouns that all denote tangible objects favors a conclusion that the term 'facilities' also refers to tangible objects other than land, buildings, and equipment that might be used in a transportation system. Moreover, interpreting 'facilities' to mean only tangible items does not render it superfluous or redundant with respect to the terms 'land,' 'buildings,' or 'equipment,' as the commissioner suggests. The term 'facilities' embraces numerous tangible items—other than land, buildings, or equipment—including bridges ... docks ... side railroad tracks that are part of a rail system ... dams and reservoirs ... and even horses." [Citations omitted.] ). Although a reading of the predicate exception that is informed by the canons of construction strongly favors the defendants', the plaintiffs' proffered reading of the statute remains reasonable, insofar as "we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase." *Ali* v. *Federal Bureau of Prisons*, 552 U.S. 214, 227, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008). Accordingly, I continue to consider the legislative

history of the arms act in determining whether a predicate statute must specifically relate to the firearms industry.

IV

LEGISLATIVE HISTORY

The legislative history also supports a narrow reading of the predicate exception as limited only to those statutes that govern the sale and marketing of firearms specifically. I agree with the majority's description of the legislative history of the arms act as "extensive" and **\*182** "present[ing] something of a mixed bag." [15] I disagree, however, with the majority's conclusion that the legislative history demonstrates that "Congress did not intend to limit the scope of the predicate exception to violations of firearms specific **\*\*339** laws or to confer immunity from all claims alleging that firearms sellers violated unfair trade practice laws." Consistent with the purpose of the arms act as set forth in 15 U.S.C. § 7901; see footnote 1 of this dissenting opinion; much of the legislative history consists of broad statements by supporters of the arms act about saving the American firearms industry from "predatory," "abusive," and "frivolous" lawsuits, sanctioned by "sympathetic activist judges," seeking "damages resulting from the criminal or unlawful misuse of a firearm or ammunition by a third party." [16] **\*183** 151 Cong. Rec. 18,057–58 (2005), remarks of Senator Larry Edwin Craig and Senator Thomas Allen Coburn; see, e.g., id., 2315–16, remarks of Representative Clifford Bundy Stearns (introducing House bill); id., 18,057, remarks of Senator Craig ("[t]hese predatory lawsuits are aimed at bankrupting the firearms industry" and "all seek the same goal of forcing law-abiding businesses selling a legal product to pay for damages from the criminal misuse of that product," which would threaten "a domestic industry that is critical to our national defense" and jeopardize "hundreds of thousands of good paying jobs"); id., 18,058, remarks of Senator Coburn ("[A]nti-gun activists have found another way to constrict the right to bear arms and attack the Bill of Rights and attack the [United States] [c]onstitution, and that is through frivolous litigation.... [These] novel lawsuits ... are not intended to create a solution. They are intended to drive the gun industry out of business by holding manufacturers and dealers liable for the intentional and criminal act[s] of third parties over whom they have absolutely no control."); see also id., 18,070, remarks of Senator William H. Frist; id., 18,072–73, remarks of Senator Lindsey Graham; id., 18,073,

remarks of Senator Orrin Grant Hatch; id., 18,914, remarks of Senator Kathryn Ann Bailey Hutchison; id., 18,924, remarks of Senator Jefferson Beauregard Sessions III.

Turning beyond the more sweeping remarks, to the extent that there is legislative history illuminating the **\*184** meaning of the predicate exception, it "reflect[s] the understanding that manufacturers and **\*\*340** sellers of firearms would be liable only for statutory violations concerning firearm regulations or sales and marketing regulations." *Ileto v. Glock, Inc., supra,* 565 F.3d at 1137. Thus, the legislative debate, much of which was intended to provide assurances that the arms act would not preempt claims against the dealers who violated numerous firearms sale laws in selling the Bushmaster rifle used in the beltway snipers; see, e.g., H.R. Rep. No. 109-124, p. 92 (2005), remarks of Representative Melvin L. Watt; supports an interpretation of predicate statutes as those specifically regulating the sale or marketing of firearms, such as those governing the tracking of inventory by firearms dealers. [17] For example, Senator Craig explained that the "bill does not shut the courthouse door," insofar as "plaintiffs will have the opportunity to argue that their case falls under the exception, such as violations of [f]ederal and [s]tate law ... that **\*185** you have knowingly sold a firearm to a person who cannot legally have it or who you have reason to believe could use it for a purpose other than intended. That all comes under the current definition of [f]ederal law." 151 Cong. Rec. 18,057–58 (2005). In contending that the arms act does not reduce "personal accountability" for firearms manufacturers, given its exceptions, Senator Coburn emphasized that "gun manufacturers and sellers are already policed enough, too much, through hundreds of pages of statutes, hundreds of pages of regulations. To name a few sources of regulations of guns and ammunition: the Internal Revenue Code, including the National Firearms Act postal regulations restricting shipping of handguns; [f]ederal explosive law; regulations for gunpowder and ammunition manufacture; the Arms Export Control Act; the Commerce Department export regulations; the Department of Transportation regulations on ammunition explosives and hazardous material transport. In addition to keeping explicit records that can be inspected by ... the Bureau of Alcohol, Tobacco, Firearms, and Explosives, licensed dealers have to conduct a [f]ederal criminal background check .... All retail gun buyers are screened to the best of the [g]overnment's ability." Id., 18,059–60; see also id., 19,119, remarks of Senator Sessions (emphasizing that arms act "allows lawsuits for violation of contract, for negligence, in not following the rules and regulations and for violating any law or regulation that is part of the complex rules

that control sellers **\*\*341** and manufacturers of firearms"). Similarly, when introducing the final Senate bill in the House, Representative Phil Gingrey explained that the predicate exception "would specifically allow lawsuits against firearms dealers such as the dealer whose firearm ended up in the hands of the [beltway] snipers who failed to maintain a required inventory list necessary to ensure that they are alerted to any firearm thefts." Id., 23,020.

**\*186** Moreover, the majority does not cite, and my independent research has not revealed, any legislative history indicating that state unfair trade practice statutes were within the contemplation of Congress in enacting the predicate exception. Other statements indicate that such statutes were not contemplated as predicates, and that supporters of the arms act specifically rejected the viability of claims arising from the advertising of firearms. For example, arguing in support of the arms act, Senator Hatch criticized pending actions against gun manufacturers, observing that these "lawsuits, *citing deceptive marketing or some other pretext*, continue to be filed in a number of [s]tates, and they continue to be unsound. *These lawsuits claim that sellers give the false impression that gun ownership enhances personal safety or that sellers should know that certain guns will be used illegally.* That is pure bunk. Let's look at the truth. The fact is that none of these lawsuits are aimed at the actual wrongdoer who kills or injures another with a gun—none. Instead, the lawsuits are focused on legitimate, law-abiding businesses." [18] (Emphasis added.) 151 Cong. Rec. 18,073; see also id. (noting that arms act "provides carefully **\*187** tailored protections for legitimate lawsuits, such as those where there are knowing violations of gun sale laws").

Finally, congressional concerns about vague standards leading to liability also support a reading of the predicate exception that is limited to firearms industry-specific statutes, rather than statutes of general applicability such as CUTPA. For example, in arguing in the House Judiciary Committee— seemingly inexplicably—*against* an amendment that would clarify that the arms act allows actions against gun dealers who knowingly sell firearms to a person who is on the violent gang and terrorist watch list maintained by the Department of Justice, Representative Christopher B. Cannon argued that "the vast number of cosponsors of this bill would agree that the burden here should be on the [g]overnment to identify people and not create a vague standard that could be used again to destroy gun manufacturers with lawsuits that don't have clarity, but cost a great deal of money." H.R. Rep. No. 109-124, supra, p. 126. Likewise, arguing in **\*\*342** support

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document   Page 51 of 119

of the arms act, Senator John Thune emphasized that the exceptions, including for violating the law in the production or sale of a firearm, "are not arbitrary standards ...." 151 Cong. Rec. 19,119 (2005).

Similarly, in opposing a bill amendment that would provide an exception to the arms act for "gross negligence" or "reckless conduct," Senator John Cornyn argued that the breadth of those terms "would actually gut the very underlying purpose of this legislation" because the pleading of such claims would broaden the scope of the discovery involved, and allow for greater harassment of the manufacturers via the litigation process. Id., 18,918. Senator Jon Llewellyn Kyl described the amendment as "a poison pill for the entire bill because, in effect ... if you allege gross negligence or recklessness, then the exemption the bill provides **\*188** evaporates. So you are a lawyer. All you do is allege gross negligence or recklessness and, bingo, you are back in court again. So it totally undercuts the purpose of this legislation."[19] Id., 18,919; see also id., 18,921, remarks of Senator Craig (arguing that gross negligence exception would render arms act "relatively meaningless as to where we are in relation to the kind of junk or dilatory lawsuits that are currently being filed against gun manufacturers and gun dealers who not only produce a legal product to the market but sell it in the legal context"). Senator Graham similarly emphasized how statutes affect a manufacturer's duty of care, stating that the arms act "doesn't let a seller or a distributor off the hook for violating a statute or making a sale illegally because it says, if you violate the law that exists, then you have broken a duty. Duty can be established by relationships. It can [also] be established by a statute. So this bill does not allow someone to sell a gun without following the procedures that we have set out to sell a gun. It doesn't allow someone to make a gun that is unsafe. You are on the hook, and you can be held accountable based on a simple negligence theory or a **\*189** negligence per se theory if you violate a specific statute during the sale of a gun or manufacturing of a gun. But what this bill prevents, and I think rightfully so, is establishing a duty along this line: That you have a responsibility, even if you do a lawful transaction or make a safe gun, for an event that you can't control, which is the intentional misuse of a weapon in a criminal fashion by another person. That is the heart of this bill. It doesn't relieve you of duties that the law imposes upon you to safely manufacture and to carefully sell. But we are not going to extend it to a concept where you are responsible, after you have done everything right, for what **\*\*343** somebody else may do who bought your product and they did it wrong and it is their fault, not yours.

So it does not matter whether you use a gross negligence standard, a simple negligence standard, you have blown by the concept of the bill in my opinion. The debate should be, is there a duty owed in this country for people who follow the law, manufacture safely, sell within the confines of the laws we have written at the [s]tate and [f]ederal level to the public at large if an injury results from the criminal act of another? If that ever happens, this country has made a major change in the way we relate to each other and a major change in the law." Id., 18,920. Accordingly, I conclude that the legislative history demonstrates that Congress contemplated that only those statutes providing clear standards with respect to the sale and marketing of firearms would serve as predicate statutes.

V

CONCLUSION

On the basis of my review of the text, case law, canons of construction, and legislative history, I conclude that predicate statutes under the predicate exception to the arms act, [15 U.S.C. § 7903 (5) (A) (iii)](#), are limited to **\*190** those specific to the sale and manufacture of firearms. Compare *[Phillips v. Lucky Gunner, LLC](#)*, 84 F.Supp.3d 1216, 1219–20, 1224 (D. Colo. 2015) (concluding in case arising from movie theater mass shooting that plaintiffs had not pleaded facts against ammunition sellers indicating knowledge of shooter's conduct and mental condition before shootings, and had not claimed that firearms sellers engaged in "noncompliance with the regulatory requirements applicable to [over the **\*191** counter] sales," or that "the **\*\*344** ... defendants' had any knowledge of the sales made by the others or by the local firearms dealers"), and *[Jefferies v. District of Columbia](#)*, 916 F.Supp.2d 42, 45–46 (D.D.C. 2013) (claims against assault rifle manufacturer arising from shooting by third party are preempted by arms act when only statute pleaded was District of Columbia's Assault Weapons Manufacturing Strict Liability Act, D.C. Code § 7-2551 [2001] ), with *[Corporan v. Wal-Mart Stores East, LP](#)*, United States District Court, Docket No. 16-2305-JWL (JWL), 2016 WL 3881341 (D. Kan. July 18, 2016) (concluding that proposed amendments to complaint saved it from preemption because allegations supported "plausible claim" that defendants' "knowingly violated certain specific provisions of the Gun Control Act of 1968," [18 U.S.C. § 921 et seq.](#), with respect to straw purchase of firearm used in shooting), *[New York v. A-1 Jewelry &](#)*

Case 20-81688-CRJ11 Doc 341 Filed 08/14/20 Entered 08/14/20 09:22:49 Desc Main Document Page 52 of 119

*Pawn, Inc.*, 252 F.R.D. 130, 132 (E.D.N.Y. 2008) (concluding that arms act preemption was inapplicable because "there are alleged in the instant action substantial violations of specific federal laws applicable to the sale and marketing of firearms which allegedly proximately cause harm to the [plaintiff]" including prohibitions on straw purchasing and violation of state nuisance statute specifically applicable to firearms [emphasis omitted] ), and *Williams* v. *Beemiller, Inc.*, 100 App. Div. 3d 143, 148–50, 952 N.Y.S.2d 333 (2012) (concluding that plaintiffs "sufficiently alleged that defendants' knowingly violated various federal and state statutes applicable to the sale or marketing of firearms within the meaning of the ... predicate exception" when they alleged that federally licensed firearms dealer knowingly sold multiple handguns to straw purchaser under circumstances suggesting "trafficking in the criminal market rather than for their personal use because [1] they had purchased multiple guns on prior occasions; [2] they paid for the guns in cash; and [3] **\*192** they selected Hi-Point 9mm handguns, which are 'disproportionately used in crime' and have 'no collector value or interest,' " with accomplice claims stated based on government notifications that "over 13,000 guns they sold had been used in crimes").

To determine whether CUTPA is a predicate statute under this standard, I consider that, as a matter of state law, "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.... [CUTPA] provides for more robust remedies than those available under analogous common-law causes of action, including punitive damages ... and attorney's fees and costs, and, in addition to damages or in lieu of damages, injunctive or other equitable relief.... To give effect to its provisions, [General Statutes] § 42-110g (a) of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by [General Statutes §] 42-110b ...." (Internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 623, 119 A.3d 1139 (2015).

"[Section] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining

when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, **\*\*345** the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether **\*193** it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.... Thus a violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 409–10, 78 A.3d 76 (2013).

"CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of [that] act, § 42-110b (a), states merely that '[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' Trade or commerce, in turn, is broadly defined as 'the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution *of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.*' General Statutes § 42-110a (4). The entire act is remedial in character; General Statutes § 42-110b (d); *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615 n.4, 440 A.2d 810 (1981); and must 'be liberally construed in favor of those whom the legislature intended to benefit.' " (Emphasis added; footnote omitted.) *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 492, 656 A.2d 1009 (1995). "CUTPA, like equity, reaches beyond traditional common law precepts in establishing a fairness standard designed to grow and broaden and mold [itself] to meet circumstances as they arise .... The resolution of claims requiring the application of broadly defined and deeply rooted public values such as the statute's elusive, but [legislatively] mandated standard **\*194** of fairness ... has historically been the function of a court of equity."[21] (Citations **\*\*346** omitted; internal quotation marks omitted.) *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 159, 645 A.2d 505 (1994); see also *id.*, at 161–62, 645 A.2d 505 (no state constitutional right to jury trial of CUTPA claim).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document      Page 53 of 119

In summary, whether this court agrees with Congress or not, in adopting the arms act, Congress adopted **195 findings and statements of purpose in 15 U.S.C. § 7901; see footnote 1 of this dissenting opinion; which made very clear its intent to absolve defendants' like these—gun manufacturers and distributors—from liability for criminal use of firearms by third parties except in the most limited and narrow circumstances and, particularly, to shield them from novel or vague standards of liability. [22] This court is obligated, therefore, to construe the predicate exception to the arms act, 15 U.S.C. § 7903 (5) (A) (iii), narrowly in light of that clear expression of congressional intent. See, e.g., *Trinity Christian School v. Commission on Human Rights & Opportunities*, 329 Conn. 684, 697–98, 189 A.3d 79 (2018) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate ... a [particular] policy, even if we were to agree ... that it is a better **196 policy than the one endorsed by the legislature as reflected in its statutory language" [internal quotation marks omitted] ). Put differently, "[w]hen we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do." (Internal quotation marks omitted.) *State v. Salamon*, 287 Conn. 509, 520, 949 A.2d 1092 (2008). My analysis of the relevant statutory text, case law, canons of **347 construction, and legislative history demonstrates that Congress intended to limit predicate statutes under that

exception to those statutes that relate specifically to the sale and manufacture of firearms. [23] Consequently, I strongly disagree with the majority's conclusion that CUTPA, which is a broadly **197 drafted state unfair trade practices statute applicable to all commercial entities in a variety of factual circumstances, comes within that exception. [24] Instead, I would conclude that, because CUTPA, both in its statutory text and in its implementation under the cigarette rule, reaches a range of commercial conduct that far exceeds the manufacture, marketing, and sale of firearms, it is not by itself a predicate statute. That state unfair trade practices statutes had not been used to hold firearms manufacturers civilly liable to crime victims [25] renders the **349 plaintiffs' CUTPA claims particularly novel in the contemplation of Congress; see **198 15 U.S.C. § 7901 (a) (7) (2012); and, thus, subject to preclusion under the arms **199 act. [26] I conclude, therefore, that the arms act preempts **200 the plaintiffs' claims of immoral advertising in violation of CUTPA. [27] I, therefore, respectfully disagree with part V of the majority's opinion, and I **350 would affirm the judgment of the trial court in its entirety.

Accordingly, I respectfully dissent.

**All Citations**

331 Conn. 53, 202 A.3d 262, 364 Ed. Law Rep. 430

Footnotes

* This case originally was scheduled to be argued before a panel of this court consisting of Justices Palmer, McDonald, Robinson, Mullins, Kahn, Vertefeuille and Elgo. Although Justices Robinson and Kahn were not present when the case was argued before the court, they have read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.
  The listing of justices reflects their seniority status on this court as of date of oral argument.

1 Following the Sandy Hook massacre, the legislature added the Bushmaster XM15, among many other assault rifles, to the list of firearms the sale or transfer of which is prohibited in Connecticut. See Public Acts 2013, No. 13-3, § 25, codified at General Statutes (2014 Supp.) § 53-202a (1) (B) (xxi).

2 The plaintiffs are Donna L. Soto, administratrix of the estate of Victoria L. Soto; Ian Hockley and Nicole Hockley, coadministrators of the estate of Dylan C. Hockley; David C. Wheeler, administrator of the estate of Benjamin A. Wheeler; Mary D'Avino, administratrix of the estate of Rachel M. D'Avino; Mark Barden and Jacqueline Barden, coadministrators of the estate of Daniel G. Barden; William D. Sherlach, executor of the estate of Mary Joy Sherlach; Neil Heslin and Scarlett Lewis, coadministrators of the estate of Jesse McCord Lewis; Leonard Pozner, administrator of the estate of Noah S. Pozner; and Gilles J. Rousseau, administrator of the estate of Lauren G. Rousseau. For convenience, we refer to these plaintiffs simply as "the decedents" with respect to claims brought by the administrators in their fiduciary capacity.
  We note that one administrator, William D. Sherlach, also filed suit in his individual capacity, seeking damages for loss of consortium. The parties have not specifically briefed and we do not separately address William D. Sherlach's loss of consortium claims in this opinion.

We further note that Natalie Hammond, a staff member who was wounded in but survived the attack, also was named as a plaintiff. Hammond has abandoned her claims and, therefore, is not a party to this appeal.

3    The Bushmaster defendants' are Bushmaster Firearms; Bushmaster Firearms, Inc.; Bushmaster Firearms International, LLC; Remington Outdoor Company, Inc.; Remington Arms Company, LLC; Bushmaster Holdings, LLC; and Freedom Group, Inc.

4    The Camfour defendants' are Camfour, Inc., and Camfour Holding, LLP, also known as Camfour Holding, Inc.

5    The Riverview defendants' are Riverview Sales, Inc., and David LaGuercia.

6    We will refer to Adam Lanza as Lanza and to Nancy Lanza as his mother.

7    General Statutes § 52-555 provides in relevant part: "(a) In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses, provided no action shall be brought to recover such damages and disbursements but within two years from the date of death, and except that no such action may be brought more than five years from the date of the act or omission complained of...."

8    The parties and the amici disagree as to whether the term "assault rifle" is an appropriate moniker for this class of weapons. We use the term because it is how the General Assembly has chosen to refer to semiautomatic firearms. See General Statutes § 53-202a (1) (B) (xxi); see also *Merrill* v. *Navegar, Inc.*, 26 Cal. 4th 465, 470 n.3, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001) (term has become widely accepted in law).

9    General Statutes § 42-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."
     Other relevant provisions of CUTPA are set forth in part IV of this opinion.

10   The referenced statutory provisions are set forth in part IV of this opinion.

11   See 15 U.S.C. § 7903 (5) (A) (ii) (2012).

12   See 15 U.S.C. § 7903 (5) (A) (iii) (2012). This exception has come to be known as the predicate exception because a plaintiff must allege a knowing violation of a predicate statute.

13   The plaintiffs appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.
     We granted permission to thirteen groups to appear and file amicus curiae briefs in this appeal. Five of the amici have filed briefs in support of the defendants' position: (1) Connecticut Citizens Defense League, Inc.; (2) Connecticut Defense Lawyers Association; (3) Gun Owners of America, Inc., Gun Owners Foundation, United States Justice Foundation, The Heller Foundation, and Conservative Legal Defense and Education Fund; (4) National Rifle Association of America, Inc.; and (5) National Shooting Sports Foundation. Eight of the amici have filed briefs in support of the plaintiffs' position: (1) medical doctors Katie Bakes, William Begg, Barbara Blok, Kathleen Clem, Christopher Colwell, Marie Crandall, Michael Hirsh, Stacy Reynolds, Jeffrey Sankoff, and Comilla Sasson (physicians amici); (2) The Brady Center to Prevent Gun Violence; (3) CT Against Gun Violence and Tom Diaz; (4) Law Center to Prevent Gun Violence; (5) Newtown Action Alliance and the Connecticut Association of Public School Superintendents; (6) law professors Nora Freeman Engstrom, Alexandra D. Lahav, Anita Bernstein, John J. Donohue III, Michael D. Green, Gregory C. Keating, James Kwak, Douglas Kysar, Stephan Landsman, Anthony J. Sebok, W. Bradley Wendel, John Fabian Witt, and Adam Zimmerman; (7) the State of Connecticut and the Department of Consumer Protection; and (8) Trinity Church Wall Street.

14   Although our conclusion that the plaintiffs' primary theory—that the legal sale of the AR-15 assault rifle to the civilian market constitutes an unfair trade practice—is barred by the relevant statute of limitations disposes of that theory; see part IV B of this opinion; we believe that that theory, if timely presented, also would be barred by PLCAA immunity and/ or the Product Liability Act, General Statutes § 52-572n (a).

15   The standard of review regarding motions to strike is well established. "A motion to strike attacks the legal sufficiency of the allegations in a pleading.... In reviewing the sufficiency of the allegations in a complaint, courts are to assume the truth of the facts pleaded therein, and to determine whether those facts establish a valid cause of action.... [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied.... Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder.... Because a motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court, our review of the court's ruling [on a motion to strike] is plenary." (Citations omitted; internal quotation marks omitted.) *Himmelstein* v. *Windsor*, 304 Conn. 298, 307, 39 A.3d 1065 (2012).

16   Although the plaintiffs do not specifically allege it, an investigation revealed that Lanza killed his mother in their home prior to the massacre and that the massacre ended when he took his own life in the school. Both of those killings apparently

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 55 of 119

were carried out with other firearms and are not at issue in this case. See Division of Criminal Justice, State of Connecticut, Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012 (November 25, 2013) p. 2.

17   In addition to alleging that the defendants' promoted the XM15-E2S for illegal, offensive use by civilians, the plaintiffs contended in their briefs and at oral argument before this court that the defendants' marketing was unethical and unscrupulous insofar as they (1) marketed the weapon to unstable, or even mentally ill, teenaged boys who were likely to use the rifle to commit violent assaults, (2) attempted to circumvent firearms sales laws by marketing the weapon to legal buyers who would foreseeably transfer them to family members who could not legally purchase such weapons, and (3) further promoted the weapons for offensive use by unstable young men by licensing them for placement in violent video games that promote illegal civilian uses of military type assault rifles. Because these legal theories are not clearly articulated in the operative complaint, however, we do not consider them for purposes of this opinion.

18   Although the plaintiffs do not expressly allege it in their complaint, the physicians amici contend that, according to the medical literature, assault weapon advertisements may activate people who are predisposed to violence.

19   Title 15 of the 2012 edition of the United States Code, § 7903 (5) (B), provides in relevant part: "[T]he term 'negligent entrustment' means the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others."

20   Title 15 of the 2012 edition of the United States Code, § 7903 (5) (A), provides in relevant part: "The term 'qualified civil liability action' ... shall not include—

* * *

"(ii) an action brought against a seller for negligent entrustment ...."

21   As we explain hereinafter, there is, of course, a third option: it may be foreseeable that the direct entrustee will share the dangerous item with a specific, identifiable third party who is incompetent to use it safely. The present case does not require us to determine whether and when an action for negligent entrustment will lie under those circumstances, when the nexus between the entrustor and the ultimate user is less attenuated than it is in the present case.

22   See, e.g., The Republic of Plato (H. Davis trans., M. Walter Dunne 1901) c. 5, p. 33 (arguing that, having taken temporary possession of weapons from friend who was then in his right mind, it would be unjust to return those weapons if friend, having since gone mad, demanded them back).

23   The plaintiffs expressly disclaim any allegation that Riverview's employees were careless in their decision to sell the rifle to Lanza's mother.

24   See, e.g., *Dillon* v. *Suburban Motors, Inc.*, 166 Cal.App.3d 233, 212 Cal.Rptr. 360, 362–67, cause dismissed, 218 Cal.Rptr. 584, 705 P.2d 1260 (Cal. 1985); *Semeniuk* v. *Chentis*, 1 Ill. App. 2d 508, 510, 117 N.E.2d 883 (1954); *Sickles* v. *Montgomery Ward & Co.*, 6 Misc. 2d 1000, 1001, 167 N.Y.S.2d 977 (1957); *Corey* v. *Kaufman & Chernick, Inc.*, 70 R.I. 27, 30–31, 36 A.2d 103 (1944).

25   The plaintiffs have drawn our attention to several cases in which the dangerous instrumentality at issue was misused by someone other than the direct entrustee. In each of those cases, however, the defendants' had specific reason to know or believe that the direct entrustee should not be trusted with the instrumentality. See, e.g., *Collins* v. *Arkansas Cement Co.*, 453 F.2d 512, 513–14 (8th Cir. 1972) (defendant's employee who gave explosive to children had history of horseplay with such explosives); *LeClaire* v. *Commercial Siding & Maintenance Co.*, 308 Ark. 580, 581–82, 826 S.W.2d 247 (1992) (defendant knew that employee, who allowed another driver to use defendant's vehicle, leading to accident, had history of intoxication and moving violations); *Rios* v. *Smith*, 95 N.Y.2d 647, 653, 722 N.Y.S.2d 220, 744 N.E.2d 1156 (2001) (defendant knew that son often drove defendant's all-terrain vehicle [ATV] in unsafe manner and that son's friend, whose misuse of ATV injured plaintiff, was frequent visitor and previously had ridden ATV with son).

26   General Statutes (Rev. to 1975) § 42-110b (a) provided in relevant part: "No person shall engage in unfair methods of competition ... in the conduct of any trade or commerce...." General Statutes (Rev. to 1975) § 42-110a (4) defined "trade and commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property ...."

27   See, e.g., 19 H.R. Proc., Pt. 6, 1976 Sess., pp. 2186–87, remarks of Representative Ferrari.

28   See, e.g., 22 S. Proc., Pt. 8, 1979 Sess., p. 2575, remarks of Senator Steven C. Casey; 19 S. Proc., Pt. 6, 1976 Sess., pp. 2276–78, remarks of Senator Louis Ciccarello.

29   See, e.g., *Bubalo* v. *Navegar, Inc.*, Docket No. 96 C 3664, 1997 WL 337218, *9 (N.D. Ill. June 13, 1997), modified on other grounds, 1998 WL 142359 (N.D. Ill. March 20, 1998); S. Calkins, "FTC Unfairness: An Essay," 46 Wayne L. Rev. 1935, 1975–76 n.182 (2000); T. Lytton, "*Halberstam* v. *Daniel* and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers," 64 Brook. L. Rev. 681, 704–705 (1998).

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document   Page 56 of 119

30  We note that other courts and commentators have deemed this to be a plausible theory of causation. See *Friedman* v. *Highland Park*, 784 F.3d 406, 411 (7th Cir.) (ban on assault weapons and large capacity magazines may reduce carnage if mass shooting occurs), cert. denied, ––– U.S. ––––, 136 S.Ct. 447, 193 L.Ed.2d 483 (2015); *Merrill* v. *Navegar, Inc.*, supra, 26 Cal. 4th at 517, 110 Cal.Rptr.2d 370, 28 P.3d 116 (Werdegar, J., dissenting) (reasonable juror could find that features of assault pistol allowed shooter to kill and injure more victims than would have been possible with conventional weapons); T. Lytton, "*Halberstam* v. *Daniel* and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers," 64 Brook. L. Rev. 681, 706 (1998) ("[i]f plaintiffs can somehow prove that a defendant's marketing efforts create a new market among individuals known to be likely to engage in criminal activity who, but for the defendant's efforts, would be less likely to purchase a weapon ... with the firepower of the defendant's, then [those] plaintiffs may be able to convince a jury on the issues of breach and causation").

31  General Statutes § 42-110g (f) provides: "An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."

32  Of course, on remand the defendants' are not foreclosed from attempting to demonstrate, in the context of a motion for summary judgment, that they did not engage in any of the allegedly wrongful marketing activities within three years prior to the date of the massacre.

33  We note that, although a " '[p]roduct liability claim' includes all claims or actions brought for personal injury, death or property damage caused by [among other things] the ... marketing ... of any product"; General Statutes § 52-572m (b); it is well established that the exclusivity provision of the Product Liability Act applies only to those claims seeking to recover damages caused by a *defective* product. *Gerrity* v. *R.J. Reynolds Tobacco Co.*, supra, 263 Conn. at 128, 818 A.2d 769.

34  Although the defendants' frame the issue as whether damages for wrongful death are recoverable under CUTPA, the issue is more accurately characterized as whether CUTPA permits recovery for personal injuries, fatal or otherwise. Because death itself was not a recognized type of damage at common law, "[d]eath and its direct consequences can constitute recoverable elements of damages only if, and to the extent that, they are made so by statute." *Lynn* v. *Haybuster Mfg., Inc.*, 226 Conn. 282, 295, 627 A.2d 1288 (1993). In fact, "[t]he wrongful death statute ... is the sole basis [on] which an action that includes as an element of damages a person's death or its consequences can be brought." (Citation omitted.) *Id.* There is no question, then, that CUTPA itself does not authorize the recovery of damages for wrongful death.

35  We express no opinion as to under what other circumstances CUTPA may allow recovery for personal injuries.

36  See R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2018–19 Ed.) § 6.7, p. 850 (noting that Connecticut's trial courts are divided on this question).

37  General Statutes § 42-110b (b) provides in relevant part that "[i]t is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act ...."

38  We recognize that the FTC Act does not authorize a private right of action and, therefore, that neither the FTC nor the federal courts, in construing the FTC Act, have confronted the issue of whether a plaintiff harmed by immoral marketing practices may recover for resulting personal injuries. Nevertheless, we find it instructive that the FTC Act has been construed to apply to unethical and unscrupulous marketing and other unfair trade practices that are likely to result in primarily physical harms. See, e.g., *In re International Harvester Co.*, supra, 104 F.T.C. at 1064.

39  The statute applies to sales of both firearms and ammunition. See, e.g., 15 U.S.C. § 7903 (4) (2012). In the interest of simplicity, we use the term "firearm" to encompass ammunition as well.

40  The law provides that "[a] qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. § 7902 (a) (2012). "The term 'qualified civil liability action' means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a [firearm], or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a [firearm] by the person or a third party ...." 15 U.S.C. § 7903 (5) (A) (2012).

41  See, e.g., 15 U.S.C. § 6211 (9) (2012) (for purposes of international antitrust enforcement assistance, defining "regional economic integration organization" as "an organization that is constituted by, and composed of, foreign states, and on which such foreign states have conferred sovereign authority to make decisions that are ... directly applicable to and binding on persons within such foreign states"); 22 U.S.C. § 283ii (a) (2012) ("securities guaranteed by the [Inter-American Investment] Corporation as to both principal and interest to which the commitment in article II, section 2 (e) of the agreement [establishing that Corporation] is expressly applicable," are exempt from rules governing domestic securities); 26 U.S.C. § 833 (c) (4) (B) (i) (2012) (health insurance organization is treated as existing Blue Cross or Blue Shield organization for tax purposes if it is "organized under, and governed by, State laws which are specifically and exclusively applicable to not-for-profit health insurance or health service type organizations").

Case 20-81688-CRJ11  Doc 341  Filed 08/14/20  Entered 08/14/20 09:22:49  Desc
Main Document    Page 57 of 119

42    We recognize that the term "marketing" is facially ambiguous. One dictionary in print at the time the statute was enacted defines "marketing" as follows: "1. The act or process of buying and selling in a market. 2. The commercial functions involved in transferring goods from producer to consumer. 3. The promotion of sales of a product, as by advertising and packaging." The American Heritage College Dictionary (4th Ed. 2007) p. 847. Notably, whereas the first two definitions are roughly synonymous with the general concepts of distribution and sales, the third is limited to advertising and other purely promotional functions.

In context, however, it is clear that the term "marketing" is used in PLCAA in the third, narrower sense. As we noted, the predicate exception refers to statutes "applicable to the sale or marketing of" firearms. 15 U.S.C. § 7903 (5) (A) (iii) (2012). Elsewhere, PLCAA refers to "[b]usinesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products ...." 15 U.S.C. § 7901 (a) (5) (2012). If the term "marketing" had been meant to encompass sales and distribution, as well as advertising and the like, then Congress' inclusion of the terms "sale" and "distribution" would be superfluous. See, e.g., *Milner* v. *Dept. of the Navy*, 562 U.S. 562, 575, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011) (citing *TRW, Inc.* v. *Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001), for proposition that statutes should be read to avoid making any provision superfluous).

In addition, there are several other provisions of the statute in which the drafters referred to the "sale" and "distribution" of firearms but did not mention "marketing." See, e.g., 15 U.S.C. § 7901 (a) (4) (2012); 15 U.S.C. § 7903 (1) (2012). We must assume that the drafters selected their language with conscious intent, and that the use of the additional term "marketing" in the predicate exception is meant to import a distinct meaning. See, e.g., *Russello* v. *United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

Our conclusion that the meaning of the term "marketing" is limited to advertising and promotional functions in the context of PLCAA finds additional support in the 2018 edition of 22 C.F.R. § 123.4 (a) (3), which permits the temporary importation of certain defense articles, including arms, if an item "[i]s imported for the purpose of exhibition, demonstration or marketing in the United States and is subsequently returned to the country from which it was imported ...." This is consistent with the more restrictive definition of "marketing" in other federal regulations. See, e.g., 45 C.F.R. § 164.501 (2018). Several recently proposed federal bills that would have regulated the firearms industry provide further support. H.R. 5093, 113th Cong. (2014), for example, which would have directed the FTC to "promulgate rules ... to prohibit any person from marketing firearms to children"; id., § 2 (a); barred advertising practices such as "the use of cartoon characters to promote firearms and firearms products." Id., § 2 (a) (1). Also instructive is H.R. 2089, 115th Cong. (2017). One provision of that bill would have prohibited "the manufacture, importation, sale, or purchase by civilians of the Five-seveN Pistol ...." Id., § 2 (b) (2). Another provision references "the current or historical marketing of the firearm's capabilities ...." Id., § 3 (b).

43    See Cal. Bus. & Prof. Code § 5272.1 (c) (2) (Deering Supp. 2018) (prohibiting firearms advertisements at public, multimodal transit facilities); N.J. Admin. Code § 13:54-5.6 (2007) (establishing requirements for newspaper advertisements of machine guns, assault firearms, and semiautomatic rifles); R.I. Gen. Laws § 11-47-40 (b) (2002) (regulating advertisement of concealable firearms).

44    Clearly, as one original cosponsor of the bill that became PLCAA; S. 397, 109th Cong. (2005); explained, legislators were of the view that such laws do exist: "[P]laintiffs are demanding colossal monetary damages and a broad range of injunctive relief .... These injunctions would relate to the design, manufacture, distribution, *marketing*, and the sale of firearms. *We already have laws that cover all of that.*" (Emphasis added.) 151 Cong. Rec. 17,371 (2005), remarks of Senator Jefferson Beauregard Sessions III.

45    See, e.g., R. Petty, "Supplanting Government Regulation with Competitor Lawsuits: The Case of Controlling False Advertising," 25 Ind. L. Rev. 351, 359 (1991); M. Meaden, Comment, "Joe Camel and the Targeting of Minors in Tobacco Advertising: Before and After *44 Liquormart* v. *Rhode Island*," 31 New Eng. L. Rev. 1011, 1026–27 (1997).

46    The plaintiffs' CUTPA claim is predicated on their contention that the defendants' "unethically, oppressively, immorally, and unscrupulously promoted" the XM15-E2S. Commonly known as the "cigarette rule," that standard originated in a policy statement of the Federal Trade Commission issued more than one-half century ago; see Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (July 2, 1964); and rose to prominence when mentioned in a footnote in *Federal Trade Commission* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). The decades since have seen a move away from the cigarette rule at the federal level. See *Ulbrich* v. *Groth*, 310 Conn. 375, 474–77, 78 A.3d 76 (2013) (*Zarella, J.*, concurring in part and dissenting in part); 12 R. Langer et al., supra, § 2.2, pp. 39–45. That move culminated with a revision of the FTC Act by Congress in 1994, which codified the limitations on the FTC's authority to regulate unfair practices. See Federal Trade Commission Act Amendments of 1994, Pub. L. No. 103-312, § 9, 108 Stat. 1691, 1695, codified at 15

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 58 of 119

[U.S.C. § 45 (n) (1994).](#) This court has characterized the federal standard for unfair trade practices contained therein as "a more stringent test known as the substantial unjustified injury test," under which "an act or practice is unfair if it causes substantial injury, it is not outweighed by countervailing benefits to consumers or competition, and consumers themselves could not reasonably have avoided it." *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 622 n.13, 119 A.3d 1139 (2015).

The defendants' have not asked us to reexamine our continued application of the cigarette rule as the standard governing unfair trade practice claims brought under CUTPA, and, therefore, the issue is not presently before us. We recognize, however, that a question exists as to whether the cigarette rule should remain the guiding rule as a matter of state law. See, e.g., *id.*, ("[i]n light of our conclusion ... that the plaintiffs' CUTPA claim fails even under the more lenient cigarette rule, it is unnecessary for us to decide whether that rule should be abandoned in favor of the federal test"); *Ulbrich* v. *Groth,* supra, 310 Conn. at 429, 78 A.3d 76 (declining to review "the defendants' unpreserved claim that the cigarette rule should be abandoned in favor of the substantial unjustified injury test"); *State* v. *Acordia, Inc.*, 310 Conn. 1, 29 n.8, 73 A.3d 711 (2013) (declining to "address the issue of the viability of the cigarette rule until it squarely has been presented"). At the same time, notwithstanding the questions raised in those decisions, we have continued to apply the cigarette rule as the law of Connecticut; see, e.g., *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 880, 124 A.3d 847 (2015); and, even though we have flagged the issue for reexamination by the legislature; see *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, supra, 317 Conn. at 622 n.13, 119 A.3d 1139; the legislature has continued to acquiesce in our application of the cigarette rule.

In any event, even if we were to adopt the current federal standard governing unfair advertising, it would not bar the plaintiffs' CUTPA claims, as they have alleged that the defendants' engaged in trade practices that caused substantial, unavoidable injury and that were not outweighed by countervailing benefits. Still, on remand, the defendants' are not foreclosed from arguing that a different standard should govern the plaintiffs' CUTPA claims.

47    Although the Ninth Circuit construed the predicate exception more narrowly, that court also rejected a reading that would limit predicate statutes to those that pertain exclusively to the sale or marketing of firearms, recognizing that other statutes that regulate "sales and manufacturing activities" could qualify. *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1134; see also *id.*, at 1137 (legislative history indicates intent to restrict liability to "statutory violations concerning firearm[s] regulations *or sales and marketing regulations* " [emphasis added] ). In *Ileto*, the Ninth Circuit held that the California laws at issue did not qualify as predicate statutes, but it reached that conclusion primarily because (1) California had codified its common law of tort, which remained subject to judicial evolution; *id.*, at 1135–36; and (2) during the legislative debates, members of Congress had referenced that very case as an example of one that PLCAA would preclude. *Id.*, at 1137. In other words, the fact the California statutes at issue were, in a sense, merely general tort theories masquerading as statutes meant that the plaintiffs' claims were precisely the sort that Congress intended to preempt.

48    See *In re Colt Industries Operating Corp.*, 84 F.T.C. 58, 61–62 (1974); *In re Browning Arms Co.*, 80 F.T.C. 749, 752 (1972); *In re Ithaca Gun Co.*, 78 F.T.C. 1104, 1107–1108 (1971).

49    In another Connecticut case, *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. at 313, 780 A.2d 98, the plaintiffs asserted CUTPA claims similar to those at issue in the present case, alleging, among other things, that misleading and unscrupulous firearms advertising contributed to gun violence. *Id.*, at 334–35, 780 A.2d 98. Because the municipal plaintiffs lacked standing, however, we did not rule on the validity of their CUTPA claims. See *id.*, at 343, 373, 780 A.2d 98. A CUTPA violation also was alleged on the basis of conduct similar to that at issue in the present case in *Wilson* v. *Midway Games, Inc.*, 198 F.Supp.2d 167 (D. Conn. 2002). In that case, the plaintiff's son had been stabbed to death by a friend who had become obsessed with a violent interactive video game. *Id.*, at 169. The plaintiff alleged, among other things, that the defendant manufacturer of that game violated CUTPA by aggressively and inappropriately marketing the game to a vulnerable adolescent audience. See *id.*, at 175–76. The court dismissed the CUTPA claim for failure to comply with CUTPA's statute of limitations. *Id.*, at 176. In *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 117 F.Supp.2d 167, 170–71 (D. Conn. 2000), by contrast, the court denied a motion to dismiss the plaintiff's claim that the defendant violated CUTPA by unethically marketing tobacco products to minors.

50    See, e.g., *Melton* v. *Century Arms, Inc.*, 243 F.Supp.3d 1290, 1306 (S.D. Fla. 2017) (defective design action in which plaintiffs stated cognizable claim under Florida unfair trade practice law that, among other things, advertising falsely represented that AK-47 rifles are safe); *Beretta U.S.A. Corp.* v. *Federal Ins. Co.*, 117 F.Supp.2d 489, 490, 492 (D. Md. 2000) (firearms manufacturer sought defense and indemnification in underlying state actions alleging, among other things, that manufacturer falsely advertised that gun ownership and possession increased one's security), aff'd, 17 Fed. Appx. 250 (4th Cir. 2001); *People* v. *Arcadia Machine & Tool, Inc.*, Docket No. 4095, 2003 WL 21184117, *15, 22, 26–27 (Cal. Super. April 10, 2003) (granting summary judgment for defendant manufacturers because plaintiffs failed to present

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc Main Document    Page 59 of 119

evidence that [1] reasonable consumers would be misled by defendants' advertisements, or [2] California public policy disapproved of marketing firearms to children, but allowing case to proceed against defendant distributors accused of advertising banned assault weapons), aff'd sub nom. *In re Firearm Cases*, 126 Cal. App. 4th 959, 992, 24 Cal.Rptr.3d 659 (2005); Opinions, N.M. Atty. Gen. No. 77-23 (July 19, 1977) p. 149 (advertising illegal sale of firearms in liquor establishment would constitute unfair or deceptive trade practice); see also *FN Herstal, S.A.* v. *Clyde Armory, Inc.*, 123 F.Supp.3d 1356, 1376 (M.D. Ga. 2015) (trademark infringement action), aff'd, 838 F.3d 1071 (11th Cir. 2016), cert. denied, ––– U.S. ––––, 137 S.Ct. 1436, 197 L.Ed.2d 649 (2017); *American Shooting Sports Council, Inc.* v. *Attorney General*, 429 Mass. 871, 875, 711 N.E.2d 899 (1999) (attorney general may regulate firearms sales and marketing pursuant to state unfair trade practice law in order to address sale of products that do not perform as warranted, including those that pose safety and performance issues, as well as those that legislature has defined as unlawful).

51  See, e.g., *In re MACE Security International, Inc.*, 117 F.T.C. 168, 169–72, 181–84 (1994) (advertisements made unsubstantiable claims that single, poorly directed spray of self-defense chemical would instantly stop assailants); *In re Benton & Bowles, Inc.*, 96 F.T.C. 619, 622–24 (1980) (advertisements depicting children riding bicycles unsafely or illegally); *In re AMF, Inc.*, supra, 95 F.T.C. at 313–15 (advertisements representing young children riding bicycles and tricycles in improper, unsafe or unlawful manner); *In re Mego International, Inc.*, supra, 92 F.T.C. at 189–90 (advertisements depicting children using electrical toys and appliances near water without adult supervision); *In re Uncle Ben's, Inc.*, supra, 89 F.T.C. at 136 (advertisements depicting children attempting to cooking food without close adult supervision); *In re Hudson Pharmaceutical Corp.*, 89 F.T.C. 82, 86–89 (1977) (advertisements that might induce children to take excessive amounts of vitamin supplements); *In re General Foods Corp.*, 86 F.T.C. 831, 839–40 (1975) (advertisements depicting consumption of raw plants growing in wild or natural surroundings); but see J. Vernick et al., "Regulating Firearm Advertisements That Promise Home Protection: A Public Health Intervention," 277 JAMA 1391, 1396 (1997) (for unstated reasons, FTC did not act on request by various advocacy groups to adopt rules regulating firearm advertising).

52  Since that time, the FTC also has taken an interest in the marketing of violent video games to children. See generally Federal Trade Commission, Report to Congress, supra, 2009 WL 5427633.

53  As we previously noted; see footnote 47 of this opinion; although the Ninth Circuit has construed the predicate exception more narrowly than has the Second Circuit, CUTPA also might well qualify as a predicate statute under the standard articulated in the Ninth Circuit's decision in *Ileto*. Specifically, the court suggested that a predicate statute must either concern "firearm[s] regulations *or sales and marketing regulations*." (Emphasis added.) *Ileto* v. *Glock, Inc.*, 565 F.3d at 1137; see also *id.*, at 1134 (statutory examples of predicate statutes "target the firearms industry specifically" or "pertain specifically to sales and manufacturing activities"). Accordingly, insofar as CUTPA specifically regulates commercial sales activities and is, therefore, narrower in scope and more directly applicable than the general tort and nuisance statutes at issue in *Ileto*, it arguably qualifies as a predicate statute under the standards articulated by each of the three appellate courts to have construed the federal statute.

54  Title 15 of the 2012 edition of the United States Code, § 7901 (a) (5), provides: "Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended."

55  The standards embodied in the cigarette rule have been established law—first federal, and then state—for nearly six decades. As one legal scholar has explained, "at one time challenges to the depiction of unsafe practices in advertisements [were] a staple of [FTC] unfairness enforcement ...." (Footnote omitted.) S. Calkins, supra, 46 Wayne L. Rev. 1974. Moreover, even under the current federal unfairness standard, one of the FTC's primary areas of focus in challenging unfair trade practices has been "advertising that promotes unsafe practices." Id., 1962. The plaintiffs merely seek to apply these established legal principles to the marketing of assault weapons, products that are at least as dangerous as any that have been the subject of prior FTC enforcement actions.

During the legislative debates, the author of PLCAA made clear that all the law sought to preclude was novel causes of action, rather than specific applications of established legal principles: "Plaintiffs can still argue their cases for violations of law .... The only lawsuits this legislation seeks to prevent are novel causes of action that have no history or grounding in legal principle." 151 Cong. Rec. 18,096 (2005), remarks of Senator Larry Edwin Craig. In fact, the plaintiffs' claims invoke a statutory cause of action that falls squarely within established consumer protection law. See, e.g., *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 117 F.Supp.2d 167, 170–71, 178 (D. Conn. 2000) (denying motion to dismiss claim that

Case 20-81688-CRJ11  Doc 341  Filed 08/14/20  Entered 08/14/20 09:22:49  Desc
Main Document  Page 60 of 119

defendant violated CUTPA by unethically and unscrupulously marketing cigarettes to underage smokers and encouraging minors to violate law).

56     We further note that among the stated purposes of PLCAA was "[t]o protect the right, under the First Amendment to the Constitution, of manufacturers, distributors, dealers, and importers of firearms or ammunition products, and trade associations, to speak freely ...." 15 U.S.C. § 7901 (b) (5) (2012). We recognize that the advertisement and marketing of goods is a quintessential form of commercial speech under established first amendment jurisprudence. See, e.g., *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626, 637, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). At the same time, it is equally well settled that commercial speech that proposes an illegal transaction or that promotes or encourages an unlawful activity does not enjoy the protection of the first amendment. See, e.g., *Village of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Pittsburgh Press Co.* v. *Pittsburgh Commission on Human Relations*, 413 U.S. 376, 388–89, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973); see also *Thompson* v. *Western States Medical Center*, 535 U.S. 357, 367, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002); *Lamar Outdoor Advertising, Inc.* v. *Mississippi State Tax Commission*, 701 F.2d 314, 321–22 (5th Cir. 1983). In reviewing the propriety of a motion to strike, we are obligated to assume the truth of the facts pleaded in the operative complaint. See, e.g., *Himmelstein* v. *Windsor*, supra, 304 Conn. at 307, 39 A.3d 1065. The plaintiffs' complaint in the present case alleges that the marketing in question promoted unlawful activity, namely, the civilian use of the XM15-E2S "as a combat weapon ... for the purpose of waging war and killing human beings." Accordingly, the first amendment is not implicated by the claims as set forth by the plaintiffs in their complaint.

57     We note that the Second Circuit, in considering whether a criminal nuisance statute of general applicability qualified as a predicate statute, indicated that the relevant legal question is whether a statute is applicable to the sale or marketing of firearms as applied to the particular circumstances of the case at issue, rather than facially applicable. See *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d at 401 (discussing whether state statute at issue had been applied to firearms suppliers "for conduct like that complained of by the [plaintiff]"); id., at 400–401 n.4 (in future, another statute of general applicability may be found to govern specific conduct complained of and, thus, qualify as predicate statute). We agree that that is the proper lens through which to consider the question, especially with respect to a statute such as CUTPA, which authorizes a cause of action that encompasses a number of distinct legal theories and principles. See 12 R. Langer et al., supra, § 2.1, p. 13.

58     Similar principles and presumptions apply if the issue is framed in terms of whether PLCAA preempts the plaintiffs' CUTPA action. As the United States Supreme Court recently explained, "[a]mong the background principles of construction that our cases have recognized are those grounded in the relationship between the [f]ederal [g]overnment and the [s]tates under [the United States] [c]onstitution. It has long been settled, for example, that we presume federal statutes do not ... preempt state law ...." (Citations omitted.) *Bond* v. *United States*, 572 U.S. 844, 857–58, 134 S.Ct. 2077, 189 L.Ed.2d 1 (2014). The court further explained: "Closely related ... is the [well established] principle that it is incumbent [on] the ... courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers.... [W]hen legislation affect[s] the federal balance, the requirement of clear statement [ensures] that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." (Citations omitted; internal quotation marks omitted.) Id., at 858, 134 S.Ct. 2077. These principles apply with particular force to congressional legislation that potentially intrudes into a field, such as advertising, that traditionally has been occupied by the states. See *Altria Group, Inc.* v. *Good*, supra, 555 U.S. at 77, 129 S.Ct. 538.

59     See, e.g., 151 Cong. Rec. 19,119 (2005), remarks of Senator John Thune; id., 19,120, remarks of Senator Larry Edwin Craig.

60     In part III of his dissenting opinion, Justice Robinson makes a similar point, although framed in terms of the closely related canon of noscitur a sociis.

61     With respect to the unlawful buyer exception set forth in 15 U.S.C. § 7903 (5) (A) (iii) (II), the referenced subsections of 18 U.S.C. § 922 prohibit various persons, including convicted felons, illegal immigrants, and individuals indicted for felonies or addicted to controlled substances, from shipping, transporting, or receiving firearms in interstate commerce. 18 U.S.C. §§ 922 (g) and (n) (2012). The unlawful buyer exception thus directly references federal statutes that specifically regulate trade in firearms. Although the record keeping exception set forth in 15 U.S.C. § 7903 (5) (A) (iii) (I) does not expressly reference any specific statute, the language of that provision closely mirrors that of 18 U.S.C. § 922 (m), which mandates compliance with the record keeping requirements that govern federally licensed firearms dealers. Moreover, the legislative history indicates that Congress drafted 15 U.S.C. § 7903 (5) (A) (iii) (I) with an eye toward regulations such as 27 C.F.R. § 478.39a (a) (1), which mandates that licensed firearms dealers report lost or stolen weapons to the federal

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document     Page 61 of 119

Bureau of Alcohol, Tobacco, Firearms and Explosives no more than forty-eight hours after the loss or theft is discovered. See 151 Cong. Rec. 18,937–38 (2005), remarks of Senator Larry Edwin Craig.

62    See 151 Cong. Rec. 23,262 (2005), remarks of Representative Christopher Van Hollen; see also id., 23261 remarks of Representative Frank James Sensenbrenner, Jr.

63    151 Cong. Rec. 23,263 (2005), remarks of Representative Christopher Van Hollen.

64    See, e.g., 151 Cong. Rec. 19,131 (2005), remarks of Senator Barbara Boxer; id., 23,278, remarks of Representative Rahm Emanuel.

65    See 151 Cong. Rec. 17,372–73 (2005), remarks of Senator John Reed; id., 23,263, remarks of Representative Christopher Van Hollen; H.R. Rep. No. 108-59, p. 98 (2003); J. Jiang, "Regulating Litigation Under the Protection of Lawful Commerce in Arms Act: Economic Activity or Regulatory Nullity?," 70 Alb. L. Rev. 537, 539–40 (2007).

66    See, e.g., 151 Cong. Rec. 18,937 (2005), remarks of Senator Larry Edwin Craig (dealer violated federal record keeping laws); id., 19,128, remarks of Senator Kathryn Ann Bailey Hutchison (dealer violated laws); id., 23,261, remarks of Representative Frank James Sensenbrenner, Jr. (arguing that plaintiffs could have established record keeping violations and noting that federal Bureau of Alcohol, Tobacco, Firearms and Explosives report documented more than 300 such violations by dealer); see also id., 18,112, remarks of Senator John William Warner (noting that both snipers were legally barred from purchasing firearms).

67    See, e.g., 151 Cong. Rec. 23,020 (2005), remarks of Representative Phil Gingrey ("[t]his exception would specifically allow lawsuits against firearms dealers such as the dealer whose firearm ended up in the hands of the [Beltway] snipers who failed to maintain a required inventory list necessary to ensure that they are alerted to any firearm thefts"); id., 23,273, remarks of Representative Frank James Sensenbrenner, Jr. ("this exception would specifically allow lawsuits against firearms dealers such as the dealer whose firearm ended up in the hands of the [Beltway] snipers"); see also id., 18,066, remarks of Senator Dianne Feinstein (acknowledging that "new modifications" to legislation were directed toward sniper case); id., 18,941, remarks of Senator Barbara Ann Mikulski (alluding to Beltway snipers in debating legislation).

68    See, e.g., Ali v. Federal Bureau of Prisons, 552 U.S. 214, 226–27, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008); Watt v. Western Nuclear, Inc., 462 U.S. 36, 44 n.5, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983); Millsap v. Andrus, 717 F.2d 1326, 1329 n.5 (10th Cir. 1983); United States v. Kaluza, Docket No. 12-265, 2013 WL 6490341, *21–23 (E.D. La. December 10, 2013), aff'd, 780 F.3d 647 (5th Cir. 2015).

69    We further observe that, during the legislative debates surrounding PLCAA, the author and various cosponsors of the proposed legislation repeatedly emphasized that it must be narrowly construed and that it protects only those firearms sellers who have not engaged in any illegal or irresponsible conduct. See, e.g., 151 Cong. Rec. 17,371 (2005), remarks of Senator Jefferson Beauregard Sessions III, id., 18,044, remarks of Senator Craig; id., 18,911, remarks of Senator Craig; id., 19,137, remarks of Senator Craig; id., 23,266, remarks of Representative Clifford Bundy Stearns.

70    See S. 908, 109th Cong. (2005); H.R. 554, 109th Cong. (2005).

71    See 1 N. Singer & J. Singer, Statutes and Statutory Construction (New Ed. 2010) § 11:14, p. 565 ("[committee] report is of great significance for purposes of statutory interpretation"); 2A N. Singer & S. Singer, supra, § 48:6, p. 585 ("courts generally view committee reports as the 'most persuasive indicia' of legislative intent"); 2A N. Singer & S. Singer, supra, § 48:6, pp. 588–89 (legislative intent clearly expressed in committee report trumps rules of textual construction, such as ejusdem generis).

72    Notably, all but one of the thirty-two sponsors and cosponsors of S. 908 also cosponsored S. 397, 109th Cong. (2005), the bill that ultimately became PLCAA, and the sponsor of each bill cosponsored the other.

73    See, e.g., 151 Cong. Rec. 18,099 (2005), remarks of Senator Christopher John Dodd.

74    151 Cong. Rec. 18,058 (2005), remarks of Senator Coburn; id., 18,084, 18,100, 19,135, remarks of Senator Craig; id., 18,941–42, remarks of Senator Richard John Santorum; id., 19,118–19, remarks of Senator John Thune; id., 19,119, remarks of Senator Jefferson Beauregard Sessions III; id., 23,268, remarks of Representative Robert William Goodlatte; id., 23,278, remarks of Representative John J. H. Schwarz; see also Cincinnati v. Beretta U.S.A. Corp., 95 Ohio St. 3d 416, 417, 768 N.E.2d 1136 (2002) (recognizing "[the] growing number of lawsuits brought by municipalities against gun manufacturers and their trade associations to recover damages associated with the costs of firearm violence incurred by the municipalities").

75    The House report on a substantially similar bill introduced during the 107th Congress explained the need for the legislation as follows: "There are a number of legal theories under which plaintiffs are arguing [that] the firearms industry should be held responsible, including improper or defective distribution, unsafe design or product liability, and public nuisance. To date, every case that has been litigated to conclusion has been dismissed ...." H.R. Rep. No. 107-727, pt. 1, p. 4

(2002). Notably, wrongful marketing claims are not identified among the category of legal theories that Congress sought to preclude.

76    The cosponsors further emphasized that plaintiffs in the cases of concern were seeking legislative type equitable remedies, such as purchase limits or restrictions on sales to small gun dealers. See, e.g., 151 Cong. Rec. 18,103 (2005), remarks of Senator Baucus; see also id., 18,059, remarks of Senator Coburn.

77    See, e.g., 151 Cong. Rec. 17,370 (2005), remarks of Senator Sessions; id., 18,942, remarks of Senator Richard John Santorum; id., 19,119, 19,129, remarks of Senator Orrin Grant Hatch; id., 19,120, remarks of Senator Craig;

78    See, e.g., 151 Cong. Rec. 19,120 (2005), remarks of Senator Craig; id., 23,267, remarks of Representative Mike Pence; id., 23,273, remarks of Representative Frank James Sensenbrenner, Jr.

79    We note, however, that there also is ample precedent for recognizing wrongful marketing claims of this sort predicated on tort theories of liability. See, e.g., *Braun* v. *Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1112, 1114, 1122 (11th Cir. 1992) (affirming judgment for plaintiff under Georgia common law when defendants' published advertisement in which "mercenary" offered "[discreet] gun for hire," resulting in murder of plaintiffs' decedent), cert. denied, 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993); *Merrill* v. *Navegar, Inc.*, supra, 26 Cal. 4th at 491 and n.9, 110 Cal.Rptr.2d 370, 28 P.3d 116 (leaving open possibility that California law recognizes cause of action for negligent advertising premised on immoral promotion of criminal use of firearms); *Bubalo* v. *Navegar, Inc.*, Docket No. 96 C 3664, 1997 WL 337218, *9 (N.D. Ill. June 13, 1997) (determining that Illinois law recognizes cause of action for negligent marketing of assault pistols for criminal purposes but holding that plaintiffs had failed to plead sufficient facts to establish causation), modified on other grounds, 1998 WL 142359 (N.D. Ill. March 20, 1998); *Moning* v. *Alfono*, 400 Mich. 425, 432, 254 N.W.2d 759 (1977) (question of whether marketing slingshots directly to children creates unreasonable risk of harm was for jury to resolve).

80    We further observe that, during the legislative debates, supporters of the bill that became PLCAA frequently stated that more than one half of the states in the country already had adopted similar laws and that PLCAA was necessary primarily to establish uniform national standards and to ensure that frivolous actions were not filed in the minority of jurisdictions that had not enacted such protections. See, e.g., 151 Cong. Rec. 17,370 (2005), remarks of Senator Sessions; id., 23,020, remarks of Representative Phil Gingrey; id., 23,024, remarks of Representative Charles Foster Bass; id., 23,265, remarks of Representative Frederick C. Boucher; see also *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1136 (noting "Congress' intention to create national uniformity" in enacting PLCAA). As the author of a virtually identical House bill explained, "[t]he bill we are considering today is designed to simply mirror these [s]tates and what they have done to provide a unified system of laws ...." 151 Cong. Rec. 23,266, remarks of Representative Clifford Bundy Stearns.
Notably, most of the state laws to which PLCAA was analogized, by their terms, bar only actions against firearms sellers brought by municipalities and other public entities. See H.R. Rep. No. 108-59, p. 16 (2003). Indeed, legislators recognized that "[m]any [states'] immunity statutes only limit the ability of cities, counties, and other local governments to sue [gun manufacturers and sellers]." Id. Moreover, of the state laws that provide broader immunity to firearms sellers, many govern only product liability actions; see, e.g., Idaho Code Ann. § 6-1410 (2004); N.C. Gen. Stat. § 99B-11 (2017); S.C. Code Ann. § 15-73-40 (2005); Tex. Civ. Prac. & Rem. Code Ann. § 82.006 (b) (West 2017); Wn. Rev. Code Ann. § 7.72.030 (1) (a) (West 2017); whereas others permit actions alleging the violation of any state law. See, e.g., Ohio Rev. Code Ann. § 2305.401 (B) (3) (West 2017); see also Mich. Comp. Laws Serv. § 28.435 (7) (LexisNexis 2015) ("[a] federally licensed firearms dealer is not liable for damages arising from the use or misuse of a firearm if the sale complies with this section, any other applicable law of this state, and applicable federal law"). Accordingly, very few of the state laws on which legislators purported to model PLCAA would even potentially bar the types of wrongful marketing claims at issue in the present action.

81    See, e.g., 151 Cong. Rec. 18,085 (2005), remarks of Senator Craig; id., 18,914, remarks of Senator Kathryn Ann Bailey Hutchison; id., 18,942, remarks of Senator Richard John Santorum.

82    See, e.g., 151 Cong. Rec. 17,370–71 (2005), remarks of Senator Sessions ("Why would the manufacturer or seller of a gun who is not negligent, who obeys all of the applicable laws—we have a host of them—be held accountable ... ? ... I don't understand how ... [a product that is] sold according to the laws of the United States [can create legal liability] for an intervening criminal act."); id., 17,371, remarks of Senator Sessions ("Manufacturers and sellers are still responsible for their own negligent or criminal conduct and must operate entirely within the complex [s]tate and [f]ederal laws.... Plaintiffs can go to court if the gun dealers do not follow the law ...."); id., 17,377, remarks of Senator Sessions ("Under this bill, I think it is very important to note that you can sue gun sellers and manufacturers who violate the law. It is crystal clear in the statute that this is so."); id., 17,390, remarks of Senator Orrin Grant Hatch ("This bill is not a license for the gun industry to act irresponsibly. If a manufacturer or seller does not operate *entirely* within [f]ederal or [s]tate law, it is not entitled to the protection of this legislation." [Emphasis added.] ); id., 18,059, remarks of Senator Coburn

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 63 of 119

("[m]anufacturers and sellers are still responsible for their own negligent or criminal conduct and must operate *entirely* within the [f]ederal and [s]tate laws" [emphasis added] ); id., 18,103, remarks of Senator Baucus (bill confers immunity on "[b]usinesses that comply with *all* applicable [f]ederal and [s]tate laws" [emphasis added] ); id., remarks of Senator Baucus ("This bill ... will not shield the industry from its own wrongdoing or from its negligence .... For example, the bill will not require dismissal of a lawsuit if a member of the industry breaks the law ...."); id., 18,942, remarks of Senator Richard John Santorum (PLCAA is "narrowly crafted" law that continues to hold responsible "individuals and companies that knowingly violate the law"); id., 19,118–19, remarks of Senator John Thune ("This bill ... [protects] innocent ... gun manufacturers and gun dealers ... who have abided by the law ... [but] allows suits against manufacturers ... for violating a law in the production or sale of a firearm .... These are not arbitrary standards .... They are established legal principles that apply across the board to all industries."); id., 23,020, remarks of Representative Phil Gingrey (exception applies to violations of "a [s]tate or [f]ederal statute applicable to sales or marketing"); id., 23,265, remarks of Representative Frederick C. Boucher ("[t]he bill ... does not affect suits against anyone who has violated other [s]tate or [f]ederal laws"); id., 23,266, remarks of Representative Clifford Bundy Stearns ("[T]his legislation is very narrowly tailored to allow suits against any bad actors to proceed. It includes carefully crafted exceptions ... for ... criminal behavior by a gun maker or seller ...."); id., 23,274, remarks of Representative Frank James Sensenbrenner, Jr. ("This is a carefully crafted bill. It provides immunity for people who have not done anything wrong ... but it does allow lawsuits to proceed against the bad actors."); id., remarks of Representative Steny Hamilton Hoyer (bill provides immunity "unless a manufacturer or seller of arms acts in some wrongful or criminal way").

83  See, e.g., 151 Cong. Rec. 2561 (2005) ("These lawsuits are based [on] the notion that even though a business complies with *all* laws and sells a legitimate product, it should be held responsible .... [PLCAA] specifically provides that actions based on the wrongful conduct of those involved in the business of manufacturing and selling firearms would not be affected by this legislation. The bill is solely directed to stopping abusive, politically driven litigation ...." [Emphasis added.] ); id., 18,057 ("[t]his bill gives specific examples of lawsuits not prohibited ... lawsuits based on violations of [state] and [f]ederal law"); id., 18,057–58 ("Any manufacturer, distributor, or dealer who knowingly violates *any* [s]tate or [f]ederal law can be held civilly liable under the bill. This bill does not shut the courthouse door.... Current cases [in which] a manufacturer, distributor, or dealer knowingly violates a [s]tate or [f]ederal law will not be thrown out." [Emphasis added.] ); id., 18,061 ("[This bill] does not protect firearms ... manufacturers, sellers or trade associations from any lawsuits based on their own negligence or criminal conduct. The bill gives specific examples of lawsuits not prohibited. Let me repeat, not prohibited: Product liability ... [n]egligence or negligent entrustment, breach of contract, lawsuits based on a violation of [s]tate and [f]ederal law, it is very straightforward, and we think it is very clear."); id., 18,085 ("Finally, this bill does not protect any member of the gun industry from lawsuits for harm resulting from *any illegal actions* they have committed. Let me repeat it. If a gun dealer or manufacturer violates the law, this bill is not going to protect them ...." [Emphasis added.] ); id., 18,096 ("[i]f manufacturers or dealers break the law or commit negligence, they are still liable"); id., 18,911 ("this legislation [has come] to the floor to limit the ability of junk or abusive kinds of lawsuits in a very narrow and defined way, but in no way—and I have said it very clearly—denying the recognition that if a gun dealer or a manufacturer acted in an illegal or irresponsible way ... this bill would not preempt or in any way protect them"); id., 19,136–37 ("[t]his bill will not prevent a single victim from obtaining relief for wrongs done to them by anyone in the gun industry"); id., 19,137 ("This bill is intended to do one thing, and that is to end the abuse that is now going on in the court system of America against law-abiding American businesses when they violate *no* law.... But if that law-abiding citizen violates the law ... then they are liable." [Emphasis added.] ).

84  Indeed, Senator Craig suggested during the legislative debates that a law as broadly applicable as a local zoning regulation could qualify as a predicate statute. See 151 Cong. Rec. 18,096 (2005).

85  As the amici Newtown Action Alliance and Connecticut Association of Public School Superintendents stated in their amicus brief, at the time of the Sandy Hook massacre, Lanza owned a computer game entitled "School Shooting," in which the player enters a school and shoots at students.

1  Section 7901 of title 15 of the United States Code provides: "(a) Findings "Congress finds the following:

   "(1) The Second Amendment to the United States Constitution provides that the right of the people to keep and bear arms shall not be infringed.

   "(2) The Second Amendment to the United States Constitution protects the rights of individuals, including those who are not members of a militia or engaged in military service or training, to keep and bear arms.

   "(3) Lawsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(4) The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws. Such Federal laws include the Gun Control Act of 1968, the National Firearms Act [26 U.S.C. § 5801 et seq.], and the Arms Export Control Act [22 U.S.C. § 2751 et seq.].

"(5) Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

"(6) The possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States.

"(7) The liability actions commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law. The possible sustaining of these actions by a maverick judicial officer or petit jury would expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States. Such an expansion of liability would constitute a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States under the Fourteenth Amendment to the United States Constitution.

"(8) The liability actions commenced or contemplated by the Federal Government, States, municipalities, private interest groups and others attempt to use the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce through judgments and judicial decrees thereby threatening the Separation of Powers doctrine and weakening and undermining important principles of federalism, State sovereignty and comity between the sister States.

"(b) Purposes

"The purposes of [the arms act] are as follows:

"(1) To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

"(2) To preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting.

"(3) To guarantee a citizen's rights, privileges, and immunities, as applied to the States, under the Fourteenth Amendment to the United States Constitution, pursuant to section 5 of that Amendment.

"(4) To prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce.

"(5) To protect the right, under the First Amendment to the Constitution, of manufacturers, distributors, dealers, and importers of firearms or ammunition products, and trade associations, to speak freely, to assemble peaceably, and to petition the Government for a redress of their grievances.

"(6) To preserve and protect the Separation of Powers doctrine and important principles of federalism, State sovereignty and comity between sister States.

"(7) To exercise congressional power under article IV, section 1 (the Full Faith and Credit Clause) of the United States Constitution."

2    Section 7903 (5) (A) of title 15 of the United States Code provides: "In general

"The term 'qualified civil liability action' means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include—

"(i) an action brought against a transferor convicted under section 924 (h) of title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;

"(ii) an action brought against a seller for negligent entrustment or negligence per se;

"(iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—

"(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

"(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18;

"(iv) an action for breach of contract or warranty in connection with the purchase of the product;

"(v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or

"(vi) an action or proceeding commenced by the Attorney General to enforce the provisions of chapter 44 of title 18 or chapter 53 of title 26."

3   Section 7902 of title 15 of the United States Code provides: "(a) In general "A qualified civil liability action may not be brought in any Federal or State court.

   "(b) Dismissal of pending actions

"A qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending."

4   The plaintiffs at issue in the present appeal are as follows: Donna L. Soto, administratrix of the estate of Victoria L. Soto; Ian Hockley and Nicole Hockley, coadministrators of the estate of Dylan C. Hockley; William D. Sherlach, executor of the estate of Mary Joy Sherlach; Leonard Pozner, administrator of the estate of Noah S. Pozner; Gilles J. Rousseau, administrator of the estate of Lauren G. Rousseau; David C. Wheeler, administrator of the estate of Benjamin A. Wheeler; Neil Heslin and Scarlett Lewis, coadministrators of the estate of Jesse McCord Lewis; Mark Barden and Jacqueline Barden, coadministrators of the estate of Daniel G. Barden; and Mary D'Avino, administratrix of the estate of Rachel M. D'Avino. See also footnote 2 of the majority opinion.

5   The defendants' are as follows: Bushmaster Firearms International, LLC; Freedom Group, Inc.; Bushmaster Firearms; Bushmaster Firearms, Inc.; Bushmaster Holdings, LLC; Remington Arms Company, LLC; Remington Outdoor Company, Inc.; Camfour, Inc.; Camfour Holding, LLP; Riverview Sales, Inc.; and David LaGuercia.

6   It is not disputed that the AR-15 is a "qualified product" under the arms act. See 15 U.S.C. § 7903 (4) (2012) (defining " 'qualified product' " as "firearm ... ammunition ... or component part ... that has been shipped or transported in interstate or foreign commerce"). For the sake of convenience and clarity, I use the word "firearm" in describing the reach of the arms act, understanding that word to be synonymous with the definition of "qualified product" under 15 U.S.C. § 7903 (4).

7   Section 240.45 of New York's Penal Law (McKinney 2008) provided in relevant part: "A person is guilty of criminal nuisance in the second degree when:

   "1. By conduct either unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons; or

   "2. He knowingly conducts or maintains any premises, place or resort where persons gather for purposes of engaging in unlawful conduct ...."

8   Judge Katzmann also observed that this approach creates a "Catch-22," insofar as "the apparently insurmountable obstacle for the plaintiffs here is that the New York courts have not yet addressed the question—as such, the majority feels free to conclude that [the criminal nuisance statute] is not 'applicable' to the sale and marketing of firearms. Unlike, say, a fruit, which is edible long before someone has eaten it, or gasoline, which is flammable even before someone has ignited it, the majority finds that a state law is not applicable until a state court actually applies it." *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d at 406–407. Judge Katzmann criticized this as inconsistent with the plain meaning of the word "applicable," and observed that it invited forum shopping in order for parties first to obtain a state court interpretation of the potentially applicable state law. Id., at 407. Instead, Judge Katzmann would follow what he deemed to be the "plain meaning" of the predicate exception, concluding that [the] criminal nuisance statute could be applied to firearms by its general terms, and he would have certified to the New York Court of Appeals a question of state law, namely, "whether the ... criminal nuisance statute ... is in fact 'applicable to the sale and marketing of firearms.' " (Citation omitted.) Id. Although I disagree with Judge Katzmann's ultimate conclusion with respect to the plain meaning of the relevant statutory language, I nevertheless share his other concerns with respect to the interpretation of the predicate exception.

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document   Page 66 of 119

9   I also find unpersuasive the decision of the Indiana Court of Appeals in *Smith & Wesson Corp.* v. *Gary*, 875 N.E.2d 422, 431 (Ind. App. 2007), transfer denied, 915 N.E.2d 978 (Ind. 2009), to the extent that it concluded that the plain language of the predicate exception did not bar a city's claim of public nuisance against a gun manufacturer insofar as the nuisance statute is "capable of being applied" to the sale and marketing of firearms. I note, however, that the court emphasized that the allegations in the complaint satisfied the manufacturers' more restrictive reading of the predicate exception, because they claimed numerous violations of "statute[s] directly applicable to the sale or marketing of a firearm ...." *Id.*, at 432.

10  I note that the plaintiffs in the present case have candidly acknowledged that the approach adopted by the Ninth Circuit in *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1126, is "more restrictive" than the Second Circuit's approach in *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d at 404.

11  The decision of the Ninth Circuit in *Ileto* was not unanimous. In dissent, Judge Marsha S. Berzon concluded that the plaintiffs' claims alleging violations of the California Civil Code were, in fact, saved by the predicate exception. See *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1146–47. Judge Berzon first observed that "the predicate exception cannot possibly encompass *every* statute that might be 'capable of being applied' to the sale or manufacture of firearms; if it did, the exception would swallow the rule, and no civil lawsuits would ever be subject to dismissal under the [arms act]. I therefore agree with the majority that a limiting principle must be found, and that rather than trying to locate it in the word 'applicable' itself, we must look to the predicate exception's surrounding words." (Emphasis in original.) *Id.*, at 1155. Judge Berzon determined that "the key to interpreting the predicate exception is [Congress'] use of the word 'knowingly' "; *id.*; insofar as "[a]pplying the [arms act's] predicate exception as written—that is, as applying to all statutes capable of being applied to the sale or marketing of firearms, but imposing an actual knowledge requirement—would prohibit a swath of lawsuits against firearms manufacturers and sellers, including those brought by municipalities for violations of no-fault or absolute liability statutes or those brought by individuals alleging vicarious liability under state tort law for the conduct of third parties of which the gun manufacturers or sellers were not aware." *Id.*, at 1163. Judge Berzon concluded that the various allegations in the plaintiffs' complaint supported their claim that the defendants' "knowingly committed a range of acts in violation of California negligence and nuisance law" by engaging in sales and marketing practices that created "distribution channels that they *know* regularly provide guns to criminals and underage end users [and, despite information from government crime trace reports,] *knowingly* supply a range of disreputable distributors, dealers, gun shops, pawnshops, gun shows, and telemarketers in the [s]tate of California ...." (Emphasis in original; internal quotation marks omitted.) *Id.*, at 1156.

12  The majority states that Congress intended that the arms act itself be narrowly construed, insofar as its proponents described it as a " 'narrow' " exemption intended only to curb " 'junk or abusive' " lawsuits seeking to charge the firearms industry liable for the acts of third parties who are beyond their control. See, e.g., 151 Cong. Rec. 18,084, 18,911, 19,137 (2005), remarks of Senator Larry Edwin Craig. I disagree with the majority that this generalized legislative history indicates any desire by Congress to depart from the usual rules of statutory construction. Indeed, in arguing in support of the arms act, Representative Cliff Stearns, its sponsor in the House of Representatives, suggested that it would "eliminate predatory lawsuits that would otherwise cripple an entire industry," and described numerous pending cases against manufacturers and dealers arising from criminal shootings, based on theories such as public nuisance and strict liability statutes; he emphasized that he "made these remarks to ensure that anyone trying to evade the letter and spirit of this legislation will have as little 'wiggle room' as possible." Id., 23,279–80.

    I also note that frivolity remains in the eye of the beholder, and that the proponents of the arms act appear from their remarks, discussed in greater detail in part IV of this dissenting opinion, to employ that term in a manner different than its well established legal meaning. See, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 254–55, 828 A.2d 64 (2003) ("an action is frivolous ... if the client desires to have the action taken primarily for the purpose of harassing or maliciously injuring a person or if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law" [emphasis omitted; internal quotation marks omitted] ); cf. *Mareno* v. *Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990) (discussing rule 11 of Federal Rules of Civil Procedure), cert. denied, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). Accordingly, I emphasize that I do not view the plaintiffs' claims in the present case as frivolous in any way.

13  I note that a related canon often applied is "ejusdem generis, or the principle that when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." (Internal quotation marks omitted.) *Ali* v. *Federal Bureau of Prisons*, 552 U.S. 214, 223, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008).

14  The majority relies on portions of the legislative history as indicating that "the record keeping and unlawful buyer illustrations were included in the final version of [the arms act] not in an effort to define, clarify, or narrow the universe of laws that qualify as predicate statutes but, rather, simply to stave off the politically potent attack that [the arms act]

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document      Page 67 of 119

would have barred lawsuits like the one that had arisen from the widely reported beltway sniper attacks. There is no other plausible explanation for why Congress chose to modify the predicate exception language contained in the 2001 and 2003 bills, which otherwise was 'virtually identical' to the language in [the arms act]. 151 Cong. Rec. 2561 (2005), remarks of Senator Larry Edwin Craig; see also id., 18,096, remarks of Senator Craig (indicating that bill is same for all intents and purposes as version introduced during 108th Congress, with addition of clarifying examples)." The majority further notes that this "conclusion is bolstered by the fact that Congress was fully aware that there are many types of federal statutes and regulations, filling 'hundreds of pages,' that specifically govern the firearms industry. 151 Cong. Rec. 18,059 (2005), remarks of Senator Thomas Allen Coburn."

I respectfully disagree with this reading of the legislative history with respect to the import of the illustrative statutes in the predicate exception. Although I agree that the vitality of the beltway sniper lawsuit was a powerful political consideration during the enactment of the arms act, I view that action's basis in concrete record keeping and unlawful buyer violations simply as an exemplar of what Congress did not intend the arms act to preclude. With those exemplars included in the final version of the predicate exception, I am not at liberty simply to ignore their import in the construction of the statute as a whole. See, e.g., *United States* v. *Dauray*, supra, 215 F.3d at 264 ("our role as a court is to apply the provision as written, not as we would write it" [internal quotation marks omitted] ).

15  As a general matter, I also agree with the observation of Judge Marsha S. Berzon, in her dissenting opinion in *Ileto v. Glock, Inc.*, supra, 565 F.3d at 1126, that much of the legislative history of the arms act needs to be taken with a grain of salt. Judge Berzon aptly observed that "individual legislators at times suggested divergent views of what sorts of lawsuits the [arms act] would affect if it were passed into law. Some of those views appear perhaps implausibly narrow or implausibly broad, likely because the bill excited strong emotions from both its supporters and its opponents. As courts have long cautioned, however, the statements of single lawmakers do not establish congressional intent." (Footnote omitted.) Id., at 1161–62.

16  In contrast, opponents of the arms act roundly criticized it as a gift to the gun lobby that would deprive injured persons of the opportunity to hold the firearms industry responsible for turning a blind eye to criminal activity in the name of profits. See, e.g., 151 Cong. Rec. 18,065 (2005), remarks of Senator Dianne Feinstein ("[The arms act] has nothing to do with protecting lawful commerce; rather, it protects one segment of industry against the lawful interests of our [s]tates in remedying and deterring negligent conduct.... Its proponents argue that lawsuits need to be stopped in order to defend their view of the [s]econd [a]mendment. But that is pretense. This bill is a simple giveaway to one industry—the gun lobby. It is a special interest windfall."); id., 18,902, remarks of Senator Edward Moore Kennedy ("Instead of addressing the real issues that can make our country and our communities safer, we are considering a bill that will close the courthouse door to victims of gun crimes and give a free pass to the handful of gun dealers and gun manufacturers who sell firearms to terrorists and criminals. We are doing it to appease the special interests of the [National Rifle Association]."); id., 23,021, remarks of Representative James P. McGovern ("While the proponents of this bill claim that the intent of this legislation is to protect jobs at mom-and-pop gun stores from reckless lawsuits, the truth is that the bill is all about protecting profits for the gun industry. Ensuring its yearly profits, not protecting jobs nor safeguarding gun sales, is atop the priorities of the gun industry."); id., 19,217, remarks of Senator Charles Ellis Schumer ("[I]t is shocking that we would spend our time giving unwarranted and unprecedented immunity to an industry whose products, when allowed into the hands of the wrong people, do incredible harm to innocent Americans. We even put off working on a defense bill to do this favor to the gun lobby.").

17  I disagree with the majority's circular reliance on statements of legislators indicating that the arms act protects " 'law-abiding' " gun dealers and manufacturers, as suggesting that encompasses those who do not engage in violations of unfair trade practices acts. See, e.g., 151 Cong. Rec. 18,057 (2005), remarks of Senator Craig (observing that actions against firearms industry "all seek the same goal of forcing law-abiding businesses selling a legal product to pay for damages from the criminal misuse of that product"); id., 19,137, remarks of Senator Craig ("[w]hat we have crafted is a very narrow exemption from predatory lawsuits seeking to hold legitimate, law-abiding people responsible for the harm done by the misdeeds of people over whom they have no control"); id., 23,024, remarks of Representative Charles Foster Bass (arguing that arms act "protects licensed and law abiding firearms and ammunitions manufacturers and sellers from lawsuits that seek to hold them responsible for the crimes that third party criminals commit"). These statements, which are ambiguous and no more illuminating than the purpose of eliminating "frivolous" lawsuits, prove too much, as the arms act by its very terms shields gun manufacturers and dealers from the consequences of violating numerous laws, both common and statutory in nature, such as California's general tort statutes. See *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1136–38. Put differently, these remarks do nothing to answer the core question in the present appeal, which requires this court to consider whether such laws are indeed within the contemplation of the predicate exception.

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document      Page 68 of 119

**18**    I recognize that the statements of opponents may be of limited value in discerning legislative intent. See, e.g., *National Woodwork Manufacturers Assn.* v. *National Labor Relations Board*, 386 U.S. 612, 639–40, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967) ("[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach." [Internal quotation marks omitted.] ). I find it telling, however, that Senator Edward Kennedy, in opposing the arms act, expressly recognized that it would protect firearms manufacturers who engage in just the kind of advertising that the plaintiffs in the present case claim is immoral in violation of CUTPA. Senator Kennedy stated that the "bill will even protect manufacturers that promote military-style weapons for use in battle in urban scenarios against any foe at any range. It protects manufacturers who brag about their weapons of war and spread them to our streets." 151 Cong. Rec. 19,121–22; see also id. ("Look at this advertisement from Vulcan: 'Vulcan Armament, the weapons of the special forces. From Afghanistan to Iraq, the guns of the special forces are now on sale in America.").

**19**    Opponents of the proposed amendment to provide an exception to the arms act for "gross negligence" or "reckless conduct" also described it as unnecessary because they viewed such acts as likely to violate an existing federal or state statute. See 151 Cong. Rec. 18,919 (2005), remarks of Senator Kyl ("[Firearm manufacture and sale] is a highly regulated industry by law, by [f]ederal law and [s]tate law and even some local laws. And most of the acts that would meet the definition of gross negligence would already be in violation of law. And if they are in violation of law, they are not exempted from this legislation. We don't try to exempt any gun manufacturer for conduct which is in violation of law."); id., 18,922, remarks of Senator Hatch ("[v]irtually any act that would meet the definition of gross negligence referenced in this amendment would already be a violation of [f]ederal, [s]tate or local law, and therefore would not receive the protection of this law anyway"); id., 19,118, remarks of Senator Craig (discussing rejection of gross negligence exception and arguing that arms act "does not take away the standards of law and the specifications within the [f]ederal law today as it relates to the responsible and legal operation and performance of a gun manufacturer or a licensed [f]ederal firearms dealer").

**20**    My research indicates that the limited academic commentary on this issue also supports this interpretation of the predicate exception. See K. Armstrong, "Nigh-Impenetrable: Firearm Manufacturer Liability under the Protection of Lawful Commerce in Arms Act in a Post-*Heller* World," 28 Geo. Mason U. C.R. L.J. 173, 195 (2018) ("[s]tatutes qualifying for the predicate exception must not be of general applicability and cannot be codified general tort claims"); R. Sorensen, "The Ninth Circuit Forecloses a Bullet Sized Hole in the PLCAA in *Ileto* v. *Glock*, 565 F.3d 1126 (9th Cir. 2009)," 35 S. Ill. U. L.J. 573, 595 (2011) ("[F]uture courts should only find statutes expressly regulating the firearm industry to be 'applicable to the sale or marketing of firearms.' It is through this narrow definition that the [arms act's] intended goal is realized."); see also J. Sonner, "A Crack in the Floodgates: New York's Fourth Department, the PLCAA, and the Future of Gun Litigation After *Williams* v. *Beemiller*," 61 Buff. L. Rev. 969, 984 (2013) ("The elusive definition remains—a law applicable to gun sales or marketing whose solution proximately causes harm for which relief is sought—without any clarification of 'applicable.' The Second Circuit hinted at a [less strict] approach, but no clear standard has emerged to determine whether a law or regulation *indirectly* concerning the gun industry may serve as a predicate statute." [Emphasis in original; footnote omitted.] ); S. Wagman, "No One Ever Died from Copyright Infringement: The Inducement Doctrine's Applicability to Firearms Manufacturer Liability," 32 Cardozo L. Rev. 689, 720 (2010) ("While it is apparent that the [arms act] is meant to protect firearms manufacturers from third party liability in instances of unintentional support of third party gun violence, instances in which manufacturers have induced harm should not be barred under [the arms act]. When manufacturers either intentionally or recklessly support illegal firearms markets, they are inducing a public nuisance; therefore the predicate exception should be triggered and claims should be allowed to proceed."); but see J. Selkowitz, Note, "Guns, Public Nuisance, and the PLCAA: A Public Health-Inspired Legal Analysis of the Predicate Exception," 83 Temp. L. Rev. 793, 827–28 (2011) (suggesting that examples in predicate exception are consistent with promotion of public health, permitting maintenance of statutory public nuisance action "alleging that the gun industry, in violation of statute, created an environment dangerous to the public's health").

**21**    I also strongly disagree with the majority's contention that the theory of liability underlying the plaintiffs' CUTPA claims "is not novel" and "does [not] sound in tort," and, therefore, are not within the scope of claims that the arms act seeks to preempt. The Second Circuit has aptly observed that "[u]nfair trade practices found their origin in the common law of torts ...." *United States* v. *Meldish*, 722 F.2d 26, 28 (2d Cir. 1983), cert. denied, 465 U.S. 1101, 104 S.Ct. 1597, 80 L.Ed.2d 128 (1984); see also, e.g., *Kenney* v. *Independent Order of Foresters*, 744 F.3d 901, 907 (4th Cir. 2014) (West Virginia unfair trade practices act claim "sounds in tort" given type of relief available under statute and sought in complaint); *Ins. Co. of North America* v. *Della Industries, Inc.*, 998 F.Supp. 159, 164 (D. Conn. 1998) (CUTPA is tort claim for purposes of assignment under Uniform Commercial Code), vacated on other grounds, 229 F.3d 1135 (2d Cir. 1999); R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2018) § 2.1,

Case 20-81688-CRJ11   Doc 341   Filed 08/14/20   Entered 08/14/20 09:22:49   Desc
Main Document    Page 69 of 119

p. 13 (noting that CUTPA "has brought both expanded remedies and broad and indefinite substantive standards to the law of business torts").

Given the potential for liability and remedy available under CUTPA, which is broader than that available at common law; see, e.g., *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 159, 645 A.2d 1005 (1994); I disagree with the logic behind the majority's premise that Congress intended the arms act to preempt state common-law claims, but leave undisturbed even broader sources of liability under state unfair trade practice statutes like CUTPA. See *District of Columbia* v. *Beretta U.S.A. Corp.*, supra, 940 A.2d at 171 n.6 (court relied on findings in 15 U.S.C. § 7901 [a] [3] and [7], and rejected plaintiffs' reliance on congressional expression of "concern with liability actions 'without foundation in hundreds of years of the common law' and that 'do not represent a bona fide expansion of the common law' " as standing for proposition that "Congress was substantially less troubled by the existence of statutory liability actions reflecting judgments 'by the legislatures of the several [s]tates' " because "[n]o such distinction ... is reflected either in the definition of a 'qualified civil liability action' or in the enumerated actions excluded therefrom, including the predicate exception; and to posit one all the same would ignore [Congress'] objection to '[l]awsuits' as a class [unless excepted] that 'seek money damages and other relief [against manufacturers and sellers] for the harm caused by the misuse of firearms by third parties, including criminals' " [emphasis omitted] ).

22  I disagree with the majority's argument that the sponsors of the arms act "emphasized that their primary concern was *not with lawsuits such as the present action*, in which individual plaintiffs who have been harmed in a specific incident of gun violence seek to hold the sellers responsible for their specific misconduct in selling the weapons involved.... Many proponents indicated that their intent was to preclude the rising number of instances in which municipalities and 'anti-gun activists' filed 'junk' or 'frivolous' lawsuits targeting the entire firearms industry." (Citation omitted; emphasis added.) The majority's assertion that the sponsors of the arms act did not desire to foreclose claims by individual plaintiffs who had suffered specific harm from an instance of gun violence is an overly generous reading of the legislative history. The legislative history indeed indicates that Congress specifically rejected proposed amendments that would have provided two groups of politically sympathetic individual plaintiffs, namely children and law enforcement officers injured in the line of duty, with relief from the strictures of the arms act. See 151 Cong. Rec. 19,116–17 (2005), remarks of Senator Frank Raleigh Lautenberg (proposing exception for children); id., 19,125–26, remarks of Senator Jon Stevens Corzine (proposing law enforcement exception); H.R. Rep. No. 109-124, supra, pp. 64–65, remarks of Representative Sheila Jackson Lee (proposing exemption for children); H.R. Rep. No. 109-124, supra, pp. 110–11, remarks of Representative Zoe Lofgren (describing potential effect of arms act on case of New Jersey police officers who brought action against gun dealer who sold weapons to straw buyer despite his suspicions).

23  I agree with the majority that the "regulation of advertising that threatens the public health, safety, and morals has long been considered a core exercise of the states' police powers." See, e.g., *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 541–42, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001). Nevertheless, I find overbroad the majority's reliance on the well established presumption that "Congress does not intend to supersede the historic police powers of the [s]tates absent clear intent ...." (Internal quotation marks omitted.) *Federal Housing Finance Agency* v. *Nomura Holding America, Inc.*, 873 F.3d 85, 112 n.30 (2d Cir. 2017); see also, e.g., *Altria Group, Inc.* v. *Good*, 555 U.S. 70, 77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008); *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). The majority's heavy reliance on this presumption elevates it beyond the more holistic preemption inquiry undertaken when the statutory language is ambiguous, as we consider the statute's "structure and purpose ... as a whole ... as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (Citation omitted; internal quotation marks omitted.) *Medtronic, Inc.* v. *Lohr*, supra, at 486, 116 S.Ct. 2240. In contrast, my review of the legislative history, and particularly the remarks of members of Congress expressing their concerns over the breadth of a gross negligence exception and the potential for vague standards of liability, indicates that Congress would not have contemplated letting a broadly worded state unfair trade practice statute like CUTPA be used to eviscerate its intent to protect firearms manufacturers and dealers from litigation arising from shootings perpetrated by third parties. See part IV of this dissenting opinion.

24  I also note that the majority observes that certain members of Congress "were committed to Americans' second amendment freedoms and sought to secure those freedoms by immunizing firearms companies from frivolous lawsuits." Citing recent federal cases considering the constitutionality of bans on "assault weapons" and "high capacity magazines," the majority also notes, however, that "[i]t is not at all clear ... that the second amendment's protections even extend to the types of quasi-military, semiautomatic assault rifles at issue in the present case." See, e.g., *Kolbe* v. *Hogan*, 849 F.3d 114, 136 (4th Cir.) (AR-15 with high capacity magazine is "weapon of war" excluded from second amendment coverage), cert.

denied, ––– U.S. ––––, 138 S.Ct. 469, 199 L.Ed.2d 374 (2017); *New York State Rifle & Pistol Assn., Inc.* v. *Cuomo*, 804 F.3d 242, 257–61 (2d Cir. 2015) (assuming, arguendo, that second amendment protections extend to assault rifles, but concluding that ban on such weapons survives intermediate scrutiny). My review of the legislative history and statutory text does not indicate any intent by Congress to identify predicate statutes by examining various nuances of second amendment law. Because the degree to which the second amendment protects the AR-15 is, therefore, not at issue in this appeal, I do not consider that question further.

25  The majority states that it "must [be] presum[ed] that Congress was aware, when it enacted [the arms act], that both the [Federal Trade Commission] Act and state analogues such as CUTPA have long been among the primary vehicles for litigating claims that sellers of potentially dangerous products such as firearms have marketed these products in an unsafe and unscrupulous manner." The majority then cites cases from this state for the proposition that "CUTPA ... has been applied to the sale of firearms," and decisions from other jurisdictions for the proposition that "regulation of firearms advertising in our sister states frequently has been accomplished under the auspices of state consumer protection and unfair trade practice laws." In my view, these decisions stand only for the proposition that wide reaching unfair trade practice statutes are as applicable to the firearms industry as they are to any other business; they have nothing at all to do with the arms act or the predicate statute analysis. See *Melton* v. *Century Arms, Inc.*, 243 F.Supp.3d 1290, 1296–97, 1305–1306 (S.D. Fla. 2017) (rifle owners brought, inter alia, Florida unfair trade practices act claim arising from advertising and sale of AK-47 rifles with known design defect that allows accidental discharge); *FN Herstal, S.A.* v. *Clyde Armory, Inc.*, 123 F.Supp.3d 1356, 1375–76 and n.105 (M.D. Ga. 2015) (firearms manufacturer brought trademark infringement claims against firearms distributor and retailer under federal Lanham Act and Georgia deceptive trade practices law), aff'd, 838 F.3d 1071 (11th Cir. 2016), cert. denied, ––– U.S. ––––, 137 S.Ct. 1436, 197 L.Ed.2d 649 (2017); *Beretta U.S.A. Corp.* v. *Federal Ins. Co.*, 117 F.Supp.2d 489, 492 (D. Md. 2000) (whether products hazard liability exclusion in commercial general liability policy relieved insurer of duty to defend and indemnify firearms manufacturer against claims of violations of state unfair trade practices statutes arising from "deceptive marketing and advertising of its products, by promoting the false notion that gun ownership and possession of handguns in the home increases one's security"), aff'd, 17 Fed. Appx. 250 (4th Cir. 2001); *People* v. *Arcadia Machine & Tool, Inc.*, Docket No. 4095 (VPD), 2003 WL 21184117, *26 (Cal. Super. April 10, 2003) (denying summary judgment in pre-arms act case on claim that Ohio gun distributor engaged in deceptive advertising "by advertising banned assault weapons in a manner that is likely to mislead potential California purchasers to believe that purchase and possession of such weapons is lawful, thereby creating an illegal market for such firearms in California"), aff'd sub nom. *In re Firearm Cases*, 126 Cal. App. 4th 959, 24 Cal.Rptr.3d 659 (2005); *American Shooting Sports Council, Inc.* v. *Attorney General*, 429 Mass. 871, 882, 711 N.E.2d 899 (1999) ("[T]he Attorney General's regulatory authority under [state unfair trade practices act] regarding defective products is not limited to marketing and disclosure issues as the plaintiffs contend. His authority properly extends to regulating the sale of a product as unfair or deceptive when the product is defective in ways which a purchaser would not anticipate or the product is not as warranted, and to regulating in a manner which coordinates [unfair trade practices] liability with legislation declaring certain acts unlawful."); Opinions, N.M. Atty. Gen. No. 77-23 (July 19, 1977) p. 149 ("There is nothing in [statute prohibiting carrying of firearms in liquor establishment] which makes it unlawful to advertise the sale of firearms in a liquor establishment, but since the liquor establishment cannot sell firearms, the advertising of the sale of firearms in the liquor establishment would constitute false advertising and an unfair or deceptive trade practice.... Of course, this is not meant to mean that the advertising of firearms as a general principle is forbidden in liquor establishments, but that any business establishment could not advertise something that it does not sell since that would be in violation of the statutes cited." [Citations omitted.] ).

The majority's reliance on two Connecticut cases, namely, *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98 (2001), and *Salomonson* v. *Billistics, Inc.*, Superior Court, judicial district of New London, Docket No. CV-88-508292, 1991 WL 204385 (September 27, 1991), for the proposition that CUTPA has been previously applied to the sale and marketing of firearms is similarly unavailing. As the majority recognizes, this court's decision in *Ganim* was limited to a conclusion that municipalities lacked standing to pursue claims against firearms manufacturers and sellers for harms arising from gun violence. *Ganim* v. *Smith & Wesson Corp.*, at 365, 780 A.2d 98. Indeed, the court specifically declined to address the substantive legal issues presented in that case, including whether firearms manufacturers and sellers may be held liable under CUTPA for "unfair and deceptive advertising" and "unfair and deceptive sales practices," as supported by allegations that the firearms manufacturers and dealers "marketed and sold their handguns in a manner that causes harm to individuals, especially young children in Bridgeport; marketed and sold their handguns in a manner that contributes to homicides, suicides and accidental deaths in Bridgeport; and engaged in a campaign of misrepresentation concerning the dangers of their handguns" and that they "sell excessive numbers of guns to individual buyers, knowing

Case 20-81688-CRJ11  Doc 341  Filed 08/14/20  Entered 08/14/20 09:22:49  Desc Main Document  Page 71 of 119

or having reason to know that some or all of those guns are not for personal use, and are likely to be resold illegally and used to commit crimes; and sell guns that fail to incorporate feasible safety devices that would prevent misuse by unauthorized and unintended users." *Id.*, at 334–36. Accordingly, this court's decision in *Ganim* about the plaintiffs' standing in that case has absolutely no precedential value with respect to the viability of a CUTPA claim founded on the "immoral advertising" of firearms.

The Superior Court's decision in *Salomonson* is even more inapposite than *Ganim*. *Salomonson*, which is a report of an attorney trial referee rather than a decision of a judge of the Superior Court, does not involve crime or victims of crime, but instead is a routine business dispute, in which the court held that a gun fabricator violated CUTPA by failing to perform under a contract to convert three semi-automatic rifles to fully automatic weapons, including by obtaining necessary federal regulatory approvals. See *Salomonson* v. *Billistics, Inc.*, supra, Superior Court, Docket No. CV-88-508292.

26 The majority speculates about what Congress would have intended with respect to preemption in relation to an elaborate hypothetical about a "terrible crime like the ones involved in the Sandy Hook massacre" perpetrated by a "troubled young man" who had watched a firearms seller's "explicit advertisements depicting and glorifying school shootings, and pro-mot[ing] its products in video games, such as 'School Shooting,' that glorify and reward such unlawful conduct." The majority posits that "even the most ardent sponsors of [the arms act] would not have wanted to bar a consumer protection lawsuit seeking to hold the supplier accountable for the injuries wrought by such unscrupulous marketing practices." The majority then observes "that is not this case, and yet the underlying legal principles are no different. Once we accept the premise that Congress did not intend to immunize firearms suppliers who engage in truly unethical and irresponsible marketing practices promoting criminal conduct, and given that statutes such as CUTPA are the only means available to address those types of wrongs, it falls to a jury to decide whether the promotional schemes alleged in the present case rise to the level of illegal trade practices and whether fault for the tragedy can be laid at their feet." I do not share the majority's apparent optimism about the 109th Congress, which passed the arms act; specifically, until those who ply their judicial craft at One First Street tell me differently, I do not believe that they would have been inclined to allow the use of a broadly drafted statute like CUTPA to hold a firearm manufacturer or seller involved in such a hypothetical liable for anything more than thoughts and prayers. Put differently, the arms act would preempt recourse unless the immoral and repugnant practices described by the majority violated a statute or regulation specifically governing the manner in which firearms may be advertised or marketed, as opposed to a more broadly applicable statute like CUTPA.

27 I emphasize that my conclusion is limited to CUTPA claims that do not rely on firearms-specific statutes as their source of public policy, insofar as I conclude only that CUTPA itself is not a predicate statute. Put differently, I do not conclude that the arms act preempts all CUTPA causes of action, but only that the predicate exception does not save those that do not allege the violation of a firearms-specific regulation or statute. See *Ileto* v. *Glock, Inc.*, supra, 565 F.3d at 1133 (noting distinction between right of action and predicate statute for purposes of arms act); cf. *Sturm* v. *Harb Development, LLC*, 298 Conn. 124, 139, 2 A.3d 859 (2010) ("[a]lthough CUTPA is primarily a statutory cause of action ... it equally is recognized that CUTPA claims may arise from underlying causes of action, such as contract violations or torts, provided the additional CUTPA elements are pleaded" [citation omitted] ).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Exhibit 2**

| NO. X06 CV15 6050025 S | : | SUPERIOR COURT |
|---|---|---|
| | : | |
| DONNA L. SOTO, ADMINISTRATRIX | : | |
| OF THE ESTATE OF | : | COMPLEX LITIGATION |
| VICTORIA L. SOTO, ET AL. | : | DOCKET |
| | : | |
| V. | : | AT WATERBURY |
| | : | |
| BUSHMASTER FIREARMS | : | |
| INTERNATIONAL, LLC, ET AL. | : | MAY 19, 2020 |

## REVISED SECOND AMENDED COMPLAINT

### COUNT ONE: § 52-555 Wrongful Death/Violation of Connecticut Unfair
### Trade Practices Act
### (Estate of Victoria L. Soto v. Remington)

1.  This is a civil action for damages and injunctive relief stemming from the shooting at Sandy Hook Elementary School on December 14, 2012.

2.  Defendant Bushmaster Firearms, also known as B.F.I. and B.F.I., Inc., was a Maine corporation created in 1973 and located in Windham, Maine.  At all relevant times, Bushmaster Firearms manufactured, marketed and sold AR-15s.

3.  Defendant Bushmaster Firearms, Inc. was another Maine corporation that manufactured, marketed and sold AR-15s.  Upon information and belief, Bushmaster Firearms, Inc. manufactured, marketed and sold AR-15s.

4.  Defendant Bushmaster Firearms International, LLC was a Delaware corporation that was formed in 2006.  (When originally created, it was named Rambo Acquisition, LLC.)  According to corporate filings, Bushmaster Firearms International, LLC was merged into Remington Arms Company, LLC in 2011.

5.  At all relevant times, Bushmaster Firearms International, LLC manufactured, marketed and sold AR-15s.

6.  Upon information and belief, Bushmaster Firearms International, LLC manufactured the XM15-E2S that was used in the shooting at Sandy Hook Elementary School on December 14, 2012.

7.  Defendant Remington Arms Company, LLC is a Delaware limited liability corporation.  Defendant Bushmaster Firearms International, LLC was merged into Defendant Remington Arms Company, LLC in 2011.  At all relevant times, Remington Arms Company, LLC manufactured, marketed and sold AR-15s.

1

8.      Defendant Bushmaster Holdings, LLC was incorporated in 2006 and operated as a holding company for Bushmaster Firearms International, Inc.  Bushmaster Holdings, LLC merged into Freedom Group, Inc. in 2009.

9.      Defendant Freedom Group, Inc., which is also sometimes called Freedom Group and Freedom Group, LLC is a Delaware corporation originally formed under another name in 2007.  Freedom Group, Inc. is one of the world's largest manufacturers and dealers in firearms, ammunition, and related accessories.

10.     Upon information and belief, from 2006 on, Freedom Group, Inc. controlled, marketed and sold the Bushmaster brand.  Upon information and belief, during this time period Freedom Group, Inc. sold Bushmaster brand products directly to retail stores.

11.     Defendant Remington Outdoor Company, Inc. is a corporation formed in 2009 that is engaged in the business of manufacturing, marketing and selling AR-15s.  Freedom Group, Inc., which upon information and belief at all relevant times controlled the Bushmaster brand, was renamed Remington Outdoor Company, Inc.

12.     Upon information and belief, Defendants Bushmaster Firearms; Bushmaster Firearms, Inc.; Bushmaster Firearms International, LLC; Remington Arms Company, LLC; Bushmaster Holdings, LLC; Freedom Group, Inc.; and Remington Outdoor Company, Inc. are functionally one entity and are hereinafter referred to as "Remington."

13.      Remington manufactured, marketed and sold firearms and ammunition under the Bushmaster brand name.

14.     Remington manufactured, marketed and sold the Bushmaster XM15-E2S rifle that was used in the shooting at Sandy Hook Elementary School on December 14, 2012.

15.     On February 7, 2013, Plaintiff Donna L. Soto was appointed Administratrix of the Estate of Victoria Leigh Soto.  A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit A.

16.     On December 3, 2014, Plaintiffs Ian and Nicole Hockley were appointed Co-Administrators of the Estate of Dylan Christopher Jack Hockley.  A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit B.

17.     On December 4, 2014, Plaintiff David C. Wheeler was appointed Administrator of the Estate of Benjamin A. Wheeler.  A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit C.

18.     On January 22, 2013, Plaintiff Mary A. D'Avino was appointed Administratrix of the Estate of Rachel Marie D'Avino a/k/a Rachel M. D'Avino.  A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit D.

19.     On December 8, 2014, Plaintiffs Mark and Jacqueline Barden were appointed Co-Administrators of the Estate of Daniel G. Barden.  A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit E.

20.     On March 7, 2013, Plaintiff William D. Sherlach was appointed Executor of the Estate of Mary Joy Sherlach.  A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit F.  Mr. Sherlach also brings this action in his individual capacity for loss of consortium.

21.     On December 9, 2014, Plaintiffs Neil Heslin and Scarlett Lewis were appointed Co-Administrators of the Estate of Jesse McCord Lewis.  A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit G.

22.     On December 10, 2014, Plaintiff Leonard Pozner was appointed Administrator of the Estate of Noah Samuel Pozner.  A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit H.

23.     On January 3, 2013, Plaintiff Gilles J. Rousseau was appointed Administrator of the Estate of Lauren G. Rousseau.  A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit I.

## REMINGTON'S MARKETING AND PROMOTION OF ITS AR-15S VIOLATED THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

24.     Born out of the exigencies of modern combat, the AR-15 was designed for the United States Military to be used in combat.

25.     The AR-15 was designed with features that were chosen to maximize casualties and engineered to deliver maximum carnage with extreme efficiency on the battlefield.

26.     The AR-15's combination of features resulted in a weapon so lethal that the United States Military adopted the AR-15 as its standard-issue service rifle, renaming it the M16.

27.     The AR-15 remains the United States Military's weapon of choice today.

28.     Remington is the largest purveyor of AR-15s to the civilian market.

29.     Remington's AR-15s, including the Bushmaster XM15-E2S, maintain the design, functionality and appearance of its military counterpart, the M16.

30.     AR-15s have become the weapon of choice for mass shooters.

31.     Remington marketed its AR-15s, including the XM15-E2S, by promoting their militaristic and assaultive uses.

32.     Remington's militaristic marketing promoted the image of its AR-15s as combat weapons used for the purpose of waging war and killing human beings.

3

33.     Remington marketed its sporting and competition rifles with five- and ten-round magazines while marketing its AR-15 rifles with thirty-round magazines.

34.     Remington's marketing glorified the lone gunman.

35.     Remington's marketing promoted lone gunman assaults.

36.     Remington's marketing glorified the military design, functionality and appearance of its AR-15s.

37.     Remington's marketing promoted its AR-15s for mass casualty assaults.

38.     Remington's marketing promoted criminal use of its AR-15s by its target market.

39.     Remington's marketing targeted high-risk users.

40.     Remington marketed its AR-15s knowing that they would be accessed by unscreened consumers.

41.     Remington continued to market AR-15s in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

42.     Remington marketed its AR-15s without regard for public safety.

43.     Remington's marketing was unethical.

44.     Remington's marketing was immoral.

45.     Remington's marketing was unscrupulous.

46.     Remington's marketing was oppressive.

47.     Remington's marketing was reckless.

48.     Remington marketed in the above manner directly and through third parties.

49.     Remington's conduct, as set forth above, occurred prior to and continued through December 14, 2012, and after.

50.     Remington's conduct as previously alleged, in whole or in part, constituted a knowing violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes Section 42-110a *et seq*.

51.     Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Victoria Soto.

4

52.     On December 14, 2012, Victoria Soto suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.     As a result of the injuries and death of Victoria Soto, the Estate of Victoria Soto incurred funeral expenses to its financial loss.

## COUNT TWO: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
## (Estate of Dylan C. Hockley v. Remington)

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.     Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Dylan C. Hockley.

52.     On December 14, 2012, Dylan C. Hockley suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.     As a result of the injuries and death of Dylan C. Hockley, the Estate of Dylan C. Hockley incurred funeral expenses to its financial loss.

## COUNT THREE: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
## (Estate of Mary Joy Sherlach v. Remington)

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.     Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Mary Joy Sherlach.

52.     On December 14, 2012, Mary Joy Sherlach suffered the following injuries and losses:

a. Terror;
b. ante-mortem pain and suffering;
c. destruction of the ability to enjoy life's activities;
d. destruction of earning capacity; and
e. death.

53.    As a result of the injuries and death of Mary Joy Sherlach, the Estate Mary Joy Sherlach incurred funeral expenses to its financial loss.

**COUNT FOUR: Loss of Consortium**
**(William D. Sherlach v. Remington)**

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Mary Joy Sherlach.

52.    At all times mentioned herein, the plaintiff William D. Sherlach was the husband of Mary Joy Sherlach.

53.    As a result of the aforesaid occurrences to Mary Joy Sherlach, the plaintiff William Sherlach has been deprived of the companionship and society of his wife, all to his damage.

**COUNT FIVE: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act**
**(Estate of Noah S. Pozner v. Remington)**

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Noah S. Pozner.

52.    On December 14, 2012, Noah Pozner suffered the following injuries and losses:

a. Terror;
b. ante-mortem pain and suffering;
c. destruction of the ability to enjoy life's activities;
d. destruction of earning capacity; and
e. death.

53.    As a result of the injuries and death of Noah S. Pozner, the Estate of Noah S. Pozner incurred funeral expenses to its financial loss.

6

**COUNT SIX: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act**
**(Estate of Lauren E. Rousseau v. Remington)**

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Lauren E. Rousseau.

52.    On December 14, 2012, Lauren E. Rousseau suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.    As a result of the injuries and death of Lauren E. Rousseau, the Estate of Lauren E. Rousseau incurred funeral expenses to its financial loss.

**COUNT SEVEN: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act**
**(Estate of Benjamin A. Wheeler v. Remington)**

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Benjamin A. Wheeler.

52.    On December 14, 2012, Benjamin A. Wheeler suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.    As a result of the injuries and death of Benjamin A. Wheeler, the Estate of Benjamin A. Wheeler incurred funeral expenses to its financial loss.

7

**COUNT EIGHT: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act**
**(Estate of Jesse McCord Lewis v. Remington)**

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Jesse McCord Lewis.

52.    On December 14, 2012, Jesse McCord Lewis suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.    As a result of the injuries and death of Jesse McCord Lewis, the Estate of Jesse McCord Lewis incurred funeral expenses to its financial loss.

**COUNT NINE: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act**
**(Estate of Daniel G. Barden v. Remington)**

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Daniel G. Barden.

52.    On December 14, 2012, Daniel G. Barden suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.    As a result of the injuries and death of Daniel G. Barden, the Estate of Daniel G. Barden incurred funeral expenses to its financial loss.

8

**COUNT TEN: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
(Estate of Rachel M. D'Avino v. Remington)**

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Rachel M. D'Avino.

52.    On December 14, 2012, Rachel M. D'Avino suffered the following injuries and losses:

      a.   Terror;
      b.   ante-mortem pain and suffering;
      c.   destruction of the ability to enjoy life's activities;
      d.   destruction of earning capacity; and
      e.   death.

53.    As a result of the injuries and death of Rachel M. D'Avino, the Estate of Rachel M. D'Avino incurred funeral expenses to its financial loss.

9

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

A.     Monetary damages;

B.     Punitive damages;

C.     Attorneys' fees;

D.     Costs.

This matter is within the jurisdiction of this court.

10

Dated at Bridgeport, Connecticut, this 19th day of May, 2020.


                              THE PLAINTIFFS,


                              By:     /s/ Joshua D. Koskoff
                                      Joshua D. Koskoff
                                      Alinor C. Sterling
                                      Jeffrey W. Wisner
                                      KOSKOFF KOSKOFF & BIEDER, PC
                                      350 Fairfield Avenue
                                      Bridgeport, CT 06604
                                      Tel. (203) 336-4421
                                      Fax: (203) 368-3244
                                      jkoskoff@koskoff.com
                                      asterling@koskoff.com
                                      jwisner@koskoff.com

                                      H. Christopher Boehning (*pro hac vice*)
                                      Jacobus J. Schutte (*pro hac vice*)
                                      1285 Avenue of the Americas
                                      New York, NY 10019-6064
                                      cboehning@paulweiss.com
                                      jschutte@paulweiss.com

                                      *Their Attorneys*

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing has been emailed this day to all counsel of record as follows:

**COUNSEL FOR:**

BUSHMASTER FIREARMS INTERNATIONAL LLC, A/K/A;
FREEDOM GROUP, INC., A/K/A;
BUSHMASTER FIREARMS, A/K/A;
BUSHMASTER FIREARMS, INC., A/K/A;
BUSHMASTER HOLDINGS, INC., A/K/A
REMINGTON ARMS COMPANY, LLC, A/K/A;
REMINGTON OUTDOOR COMPANY, INC., A/K/A


Paul D. Williams
James H. Rotondo
Jeffrey P. Mueller
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
pdwilliams@daypitney.com
jhrotondo@daypitney.com
jmueller@daypitney.com

James B. Vogts (*pro hac vice*)
Andrew A. Lothson (*pro hac vice*)
SWANSON MARTIN & BELL, LLP
330 North Wabash, #3300
Chicago, IL 60611
jvogts@smbtrials.com
alothson@smbtrials.com

/s/ *Joshua D. Koskoff*
Joshua D. Koskoff
Alinor C. Sterling
Jeffrey W. Wisner

12

**Exhibit 3**

| No. X06-UWY-CV15-6050025-S | : | SUPERIOR COURT |
|---|---|---|
| | : | |
| DONNA L. SOTO, ADMINISTRATRIX OF | : | COMPLEX LITIGATION DOCKET |
| THE ESTATE OF VICTORIA L. SOTO, ET AL. | : | |
| | : | AT WATERBURY |
| V. | : | |
| | : | |
| BUSHMASTER FIREARMS | : | JUNE 17, 2020 |
| INTERNATIONAL, LLC, ET AL. | : | |

## DEFENDANTS' MOTION TO STRIKE REVISED SECOND AMENDED COMPLAINT

Pursuant to Connecticut Practice Book § 10-39 (2020), Defendants Remington Arms Company, LLC and Remington Outdoor Company, Inc. (collectively, "Remington") hereby move to strike the Revised Second Amended Complaint filed by Plaintiffs on May 19, 2020 (the "Revised SAC") (Entry No. 301.00).

As set forth more fully in the accompanying Memorandum of Law in support of this motion, the Revised SAC must be stricken because it violates the law of the case set forth in the Connecticut Supreme Court's decision in this action and fails to plead facts necessary to allege an essential element of Plaintiffs' claim—causation.  Specifically, the Revised SAC fails to allege *any* facts necessary to establish that Remington's alleged conduct was both (1) the cause in fact (or *but for* cause) and (2) the proximate cause of the harm suffered by Plaintiffs.

WHEREFORE, the Court should grant Remington's motion to strike the Revised SAC.

DEFENDANTS REMINGTON ARMS
COMPANY LLC AND REMINGTON
OUTDOOR COMPANY, INC.

By: */s/ Jeffrey P. Mueller*
Jeffrey P. Mueller
Paul D. Williams
James H. Rotondo
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Juris No. 14229

James B. Vogts *(pro hac vice)*
Andrew A. Lothson *(pro hac vice)*
SWANSON MARTIN & BELL, LLP
330 North Wabash, #3300
Chicago, IL 60611
Phone: (312) 321-9100
Fax: (312) 321-0990

Their Attorneys

# CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing has been emailed this day to all counsel of record as follows:

Joshua D. Koskoff
Alinor C. Sterling
Jeffrey W. Wisner
KOSKOFF KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604
jkoskoff@koskoff.com
asterling@koskoff.com
jwisner@koskoff.com


H. Christopher Boehning *(pro hac vice)*
Jacobus J. Schutte *(pro hac vice)*
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
cboehning@paulweiss.com
jschutte@paulweiss.com

*/s/ Jeffrey P. Mueller*
Jeffrey P. Mueller

**Exhibit 4**

No. X06-UWY-CV15-6050025-S     :   SUPERIOR COURT

                                 :

DONNA L. SOTO, ADMINISTRATRIX OF    :   COMPLEX LITIGATION DOCKET
THE ESTATE OF VICTORIA L. SOTO, ET AL.   :

                                 :   AT WATERBURY
V.                                 :

                                 :

BUSHMASTER FIREARMS            :   JUNE 17, 2020
INTERNATIONAL, LLC, ET AL.         :


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO STRIKE REVISED SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

    I.    The Connecticut Supreme Court's Decision.................................................3

    II.   Plaintiffs' Revised Second Amended Complaint ........................................4

LEGAL STANDARD ........................................................................................................5

ARGUMENT ..................................................................................................................5

    I.    The Revised SAC Must Be Stricken Because It Violates the Law of the Case...............5

    II.   The Revised SAC Must Be Stricken Because It Fails to State a Claim ..........................7

        A.   Connecticut Is a Fact Pleading State................................................7

        B.   Plaintiffs Must Plead Facts to Support Causation.................................8

        C.   Plaintiffs Fail to Allege Causation-In-Fact.......................................9

        D.   Plaintiffs Fail to Allege Facts In Support of Proximate Causation......................13

CONCLUSION................................................................................................................17

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document    Page 92 of 119

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abrahams v. Young & Rubicam, Inc.*,
  240 Conn. 300 (1997) .............................................................................................2, 8, 13, 15

*Alexander v. Town of Vernon*,
  101 Conn. App. 477 (2007) ..................................................................................9, 11, 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................................8

*Aspiazu v. Orgera*,
  205 Conn. 623 (1987) .....................................................................................................11

*Barnes v. Conn. Podiatry Group, P.C.*,
  195 Conn. App. 212 (2020) ............................................................................................11

*Boehm v. Kish*,
  201 Conn. 385 (1986) .......................................................................................................9

*Bonner v. City of New Haven*,
  No. CV156058987S, 2017 WL 6030702 (Conn. Super. Ct. Nov. 16, 2017) ...................8

*Bridgeport Harbour Place I, LLC v. Ganim*,
  303 Conn. 205 (2011) .......................................................................................................7

*Bubalo v. Navegar, Inc.*,
  No. 96C3664, 1997 WL 337218 (N.D. Ill. June 13, 1997) ..............................................4

*Buchanan v. Greenwich Hospital*,
  No. X06CV106007415S, 2011 WL 7064250 (Conn. Super. Ct. Dec. 28, 2011)...........16

*Builes v. Kashinevsky*,
  No. CV095022520S, 2009 WL 3366265 (Conn. Super. Ct. Sept. 15, 2009) ...................9

*Cahill v. Board of Education of City of Stamford*,
  198 Conn. 229 (1985) .......................................................................................................8

*Calandro v. Allstate Insurance Co.*,
  63 Conn. App. 602 (2001) ..............................................................................................10

*Carter v. Edge Fitness Gym*,
  No. CV165031410S, 2017 WL 951676 (Conn. Super. Ct. Feb. 16, 2017) .............11, 12

-ii-

*Coleman v. Commisioner of Correction*,
137 Conn. App. 51 (2012) ...................................................................7

*Comcast Corp. v. National Ass'n of African American-Owned Media*,
140 S. Ct. 1009 (2020) .......................................................................9

*Coste v. Riverside Motors, Inc.*,
24 Conn. App. 109 (1991) ...........................................................9, 14, 15

*D'Angelo Development & Construction Corp. v. Cordovano*,
121 Conn. App. 165 (2010) ................................................................14

*Detar v. Coast Venture XXVX, Inc.*,
91 Conn. App. 263 (2005) ..................................................................6

*Edelman v. Laux*,
No. CV115005710, 2013 WL 4504793 (Conn. Super. Ct. July 26, 2013).............7

*Faulkner v. United Technologies Corp.*,
240 Conn. 576 (1997) ......................................................................5

*Fort Trumbull Conservancy, LLC v. Alves*,
262 Conn. 480 (2003) ......................................................................5

*Ganim v. Smith & Wesson Corp*,
258 Conn. 313 (2001) ......................................................................4

*Haesche v. Kissner*,
229 Conn. 213 (1994) ...................................................................8, 10

*Heath v. Micropatent*,
No. CV 97401481, 1999 WL 1328140 (Conn. Super. Ct. Dec.30, 1999) ...............16

*Hull v. Nicholas*,
No. FSTCV030194538, 2005 WL 2741845 (Conn. Super. Ct. Oct. 7, 2005)...........16

*Kent v. Sartiano*,
No. 386702, 1998 WL 661520 (Conn. Super. Ct. Sept. 11, 1998)......................17

*Klein v. Norwalk Hospital*,
299 Conn. 241 (2010) .....................................................................11

*Kumah v. Brown*,
130 Conn. App. 343 (2011) ................................................................14

*Martinez v. Oliphant-Hines*,
No. CV166009002S, 2018 WL 1474960 (Conn. Super. Ct. Feb. 26, 2018) ...........12

*Melfi v. City of Danbury*,
70 Conn. App. 679 (2002) .................................................................12

-iii-

*Merrill v. Navegar, Inc.*,
   26 Cal. 4th 465 (2001) ...................................................................................4

*Nwachukwu v. Liberty Bank*,
   257 F. Supp. 3d 280 (D. Conn. 2017) ...........................................................15

*Paige v. Saint Andrew's Roman Catholic Church Corp.*,
   250 Conn. 14 (1999) ..........................................................................9, 13, 14

*Patterson v. Sullo*,
   No. CV116008633S, 2012 WL 4040259 (Conn. Super. Ct. Aug. 20, 2012) ...........16

*Perugini v. Giuliano*,
   148 Conn. App. 861 (2014) ............................................................................6

*Pike v. Bugbee*,
   115 Conn. App. 820 (2009) .......................................................................7, 8

*Podesser v. Lambert & Barr, LLC*,
   No. CV065000689S, 2007 WL 2363310 (Conn. Super. Ct. July 25, 2007)............16

*Rosenlicht v. Bradley*,
   No. HHBCV054003001S, 2006 WL 1461096 (Conn. Super. Ct. May 8, 2006) ...................12

*Ruther v. Continental Insurance Co.*,
   No. CV 960155186, 1998 WL 211953 (Conn. Super. Ct. Apr. 23, 1998) ...............12

*Snell v. Norwalk Yellow Cab, Inc.*
   332 Conn. 720 (Aug. 13, 2019) ..............................................................11, 13, 14

*Soto v. Bushmaster Firearms Int'l, LLC*,
   331 Conn. 53 (2019) ...............................................................1, 3, 4, 6, 10

*Stevenson Lumber Co.-Suffield, Inc. v. Chase Associates, Inc.*,
   284 Conn. 205 (2007) .................................................................................10

*Stewart v. Federated Dep't Stores, Inc.*,
   234 Conn. 597 (1995) ........................................................................9, 10, 13

*Suarez v. Sordo*,
   43 Conn. App. 756 (1996) ...........................................................................13

*Travelers Indemnity Co. v. Cephalon, Inc.*,
   620 F. App'x 82 (3d Cir. 2015) ....................................................................15

*Von Pein v. Magic Bristles, LLC*,
   No. CV126008266S, 2013 WL 453048 (Conn. Super. Ct. Jan. 8. 2013)...............16

*Ward v. Greene*,
   267 Conn. 539 (2004) ...................................................................................8

**Rules**

Connecticut Practice Book § 10-1 ...........................................................................5, 7

Connecticut Practice Book § 10-39 ...........................................................................5

Case 20-81688-CRJ11    Doc 341    Filed 08/14/20    Entered 08/14/20 09:22:49    Desc
Main Document        Page 96 of 119

Defendants Remington Arms Company, LLC and Remington Outdoor Company, Inc. (collectively, "Remington") respectfully submit this memorandum of law in support of their motion to strike the Revised Second Amended Complaint filed by Plaintiffs on May 19, 2020 (the "Revised SAC") (Entry No. 301.00).

## PRELIMINARY STATEMENT

The Revised SAC should be stricken because it fails to plead *facts* necessary to establish an essential element of Plaintiffs' CUTPA claim—a causal link between Remington's alleged conduct in advertising the rifle used in the shooting and Plaintiffs' damages.

The Connecticut Supreme Court allowed Plaintiffs to proceed with a CUTPA claim based on the "narrow" and "limited" theory that Remington wrongfully marketed the rifle used in the Sandy Hook Elementary School shooting by promoting its use by civilians for criminal purposes (offensive, military style attack missions) and that such marketing motivated Adam Lanza to commit his crimes. The Court affirmed dismissal of their claim that Remington violated CUTPA by merely marketing and selling the rifle for civilian use. *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 65-66, 69-70, 74-75, 87 (2019). Thus, Plaintiffs' remaining claim is focused narrowly on the specific content of any advertisement for the rifle that was seen by Lanza and whether any such advertisement in fact caused him to commit his horrific criminal acts.

In allowing the narrow CUTPA claim to proceed, the Court considered Plaintiffs' allegations in the First Amended Complaint ("FAC") that certain specifically described firearm advertisement slogans and images inspired Lanza's criminal acts. But the Revised SAC fails to identify any advertisements at all and, importantly, fails to plead the essential factual allegations that (1) Lanza saw an offending advertisement and (2) *but for* seeing the advertisement, he would not have planned and carried out his crimes. Plaintiffs' lone allegation touching on causation is a

conclusory claim that Remington's marketing conduct was a "substantial factor" in their resulting injuries. But that allegation is plainly insufficient under the law of causation. To adequately allege and prove causation under CUTPA and Connecticut law generally, Plaintiffs must plead and prove *facts* to establish *both* "cause in fact" *and* "proximate cause." *Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 306-309 (1997). The Revised SAC fails to plead facts to support *either* causation element.

*First*, Plaintiffs have not even attempted to allege in a conclusory way that Remington's conduct was the *cause in fact* (or *but for* cause) of their damages—much less plead *facts* to support such an allegation. The Revised SAC does not allege that Plaintiffs' decedents would not been murdered by Lanza *but for* Remington's publication of advertisements for the rifle. It contains no factual allegations that Remington's advertisements in fact motivated Lanza to commit his crimes or that he even viewed Remington advertisements. Indeed, Lanza is *not even mentioned* in the Revised SAC.

*Second*, Plaintiffs have failed to plead *any facts* necessary to support a finding that Remington's conduct was the *proximate cause* of their damages. The Revised SAC merely states the *legal conclusion* that Remington's conduct was a "substantial factor" in their resulting injuries. But mere legal conclusions are insufficient to satisfy Plaintiffs' obligation to plead *facts* to support proximate cause, and no such facts are included in the Revised SAC.[1]

Accordingly, the Court should grant Remington's motion to strike the Revised SAC.

---

[1] It is now clear that Plaintiffs lacked a good-faith factual basis to assert their claim that Remington's advertisements caused their losses. Plaintiffs have admitted in their responses to Remington's discovery requests that they do not have any evidence that Lanza even saw Remington's advertisements or marketing materials—much less was inspired by them to commit murder. (*See* Ex. A.)

## STATEMENT OF FACTS

### I. The Connecticut Supreme Court's Decision

On March 19, 2019, the Connecticut Supreme Court issued its decision in this case affirming in part and reversing in part this Court's decision striking Plaintiffs' FAC. The Connecticut Supreme Court recognized that "[t]here is no doubt that Lanza was directly and primarily responsible for this appalling series of crimes." *Soto*, 331 Conn. at 65. The Court nevertheless permitted Plaintiffs to proceed with a CUTPA claim based solely on the single "narrow" and "limited" theory that Remington wrongfully advertised the rifle used in the shooting by promoting its criminal use by civilians to commit assaults and that such advertising was the cause of the shooting. *Id.* at 65-66, 69-70, 74-75, 87. The Court repeatedly emphasized that its decision to allow Plaintiffs to proceed with this theory was expressly based on Plaintiffs' allegations in the FAC that Remington's marketing of the rifle used in the shooting caused or motivated Lanza to commit his crimes. *Id.* at 74-75, 98-100.

After reviewing Plaintiffs' allegations in the FAC of Remington's alleged "unethical" promotion of the rifle with certain slogans and images, the Court observed that Plaintiffs had alleged that Remington's "wrongful marketing" of the rifle promoted the rifle's use by civilians "for offensive assault missions" and that the marketing of the rifle "was a substantial factor in causing plaintiffs' injuries." *Id*. at 74. The Court made clear that the FAC's allegations concerning the effect of Remington's advertisements on Lanza were necessary to plead causation on this theory and to assert a viable wrongful marketing claim:

- The Court emphasized that Plaintiffs could only establish a causal link between Remington's conduct and the alleged harm "[i]f defendants' marketing materials did in fact inspire or intensify the massacre" or if the "individuals who engage in inappropriate conduct [were] inspired by the advertisements." *Id.* at 99-100.

- The Court distinguished one of its own cases that held that the causal link between the allegedly wrongful conduct by the defendant and the injuries suffered by the plaintiffs was too attenuated by concluding that "[i]n the present case, by contrast," Plaintiffs had alleged that Remington's advertising "inspir[ed] Lanza" to commit his crimes. *Id.* at 98 (distinguishing *Ganim v. Smith & Wesson Corp*, 258 Conn. 313 (2001)).

- The Court also distinguished a California Supreme Court decision dismissing a case by noting that the plaintiffs there "expressly disavowed any claims based on the specific content of [the defendant's] advertising" and that "there was no evidence that the shooter in that case ever had seen, let alone had been inspired by, any of [the defendant's] allegedly inappropriate promotional materials." *Id.* at 108-109 (distinguishing *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465 (2001)).

- The Court also cited a federal court decision holding that "a party's reliance on or inducement by the allegedly negligent marketing techniques is the only rational means on establishing a causal connection" for a wrongful marketing claim. *Bubalo v. Navegar, Inc.*, No. 96C3664, 1997 WL 337218, at *9 (N.D. Ill. June 13, 1997) (cited by *Soto*, 331 Conn. at 98 n.29).

Thus, the Connecticut Supreme Court allowed Plaintiffs' narrow "wrongful marketing" claim to proceed as alleged in the FAC and clearly recognized that Plaintiffs would be required to allege and prove that Lanza was exposed to a Remington advertisement for the rifle, the advertisement seen by Lanza promoted criminal use of the rifle, and the advertisement Lanza saw motivated him to carry out an offensive assault at Sandy Hook Elementary School.

## II.     Plaintiffs' Revised Second Amended Complaint

On May 19, 2020, Plaintiffs filed the Revised SAC, deleting essential factual allegations that were necessary to plead causation under the Connecticut Supreme Court's decision. (Entry No. 301.00.) The Revised SAC merely alleges in conclusory fashion that Remington's advertisements of the Bushmaster XM15-E2S rifle that was used in the shooting violated CUTPA and that "Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of [decedents]." (*Id.* ¶¶ 14, 31-51) The Revised SAC does not identify any such advertisements, does not allege that Lanza saw a Remington advertisement,

and does not allege that any Remington's advertisement in fact caused or motivated Lanza to commit his crimes. Indeed, Lanza is *not even mentioned* in the Revised SAC.[2]

## LEGAL STANDARD

A motion to strike tests the legal sufficiency of a pleading "to state a claim upon which relief can be granted." Practice Book § 10-39(a). To survive a motion to strike, a pleading must set forth a "plain and concise statement of the material facts" to support the elements of the claims asserted. *Id.* § 10-1. "A motion to strike admits all *facts* well pleaded; it does not admit *legal conclusions or the truth or accuracy of opinions* stated in the pleadings." *Faulkner v. United Techs. Corp.*, 240 Conn. 576, 588 (1997) (internal quotation marks omitted). "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." *Fort Trumbull Conservancy, LLC v. Alves*, 262 Conn. 480 (2003) (internal quotation marks omitted).

## ARGUMENT

## I. The Revised SAC Must Be Stricken Because It Violates the Law of the Case

As an initial matter, the Revised SAC must be stricken because it violates the law of the case set forth in the Connecticut Supreme Court decision. The Connecticut Supreme Court's decision allowing Plaintiffs' CUTPA claim to survive was premised on the existence of factual allegations necessary to establish causation, and those essential allegations are entirely missing from the Revised SAC.

---

[2] Plaintiffs' failure to plead factual allegations necessary to causation in the Revised SAC is no coincidence. After this Court overruled their objections and Plaintiffs were compelled to respond to Remington's interrogatories and requests for production, Plaintiffs acknowledged that they had no factual basis to allege that Lanza viewed any Remington advertisements in the first place. (Ex. A.) As a logical corollary, Plaintiff had no factual basis to allege that *but for* Lanza's exposure to Remington's advertisements, he would not have committed his crimes.

The Connecticut Supreme Court's decision constitutes the law of the case and binds both the parties and the trial court on remand. *See Detar v. Coast Venture XXVX, Inc.*, 91 Conn. App. 263, 267 (2005) (holding that "the court, on remand, was bound by the law of the case doctrine" and that "the opinion of an appellate court, so far as it is applicable, establishes the law of the case upon a retrial, and is equally obligatory upon the parties to the action and upon the trial court") (internal quotations marks omitted).

The Connecticut Supreme Court allowed Plaintiffs to proceed with their CUTPA claim based on the factual allegations in the FAC that Remington's advertisements were causally related to the shooting because their content motivated or inspired Lanza to commit his crimes. The Connecticut Supreme Court expressly relied on the FAC's allegations concerning the effect of Remington's advertisements on Lanza in finding that Plaintiffs had alleged a viable CUTPA claim. *See Soto*, 331 Conn. at 74-75, 98-100. Yet Plaintiffs have stripped the Revised SAC of the essential factual allegations on which the Court relied in allowing that narrow remaining claim to survive. (*See* Entry No. 276, Redlined FAC ¶¶ 184-91.)

In contrast to the FAC, the Revised SAC is entirely devoid of any allegations that Lanza even saw Remington's advertisements—much less was inspired by them to commit murder. Because Plaintiffs have replaced the FAC with an improper Revised SAC that omits the factual allegations necessary to state a viable CUTPA claim under the Connecticut Supreme Court's decision, it violates the law of the case and must be stricken. *See Perugini v. Giuliano*, 148 Conn. App. 861, 877 n.10 (2014) ("Our Supreme Court has found it appropriate for a defendant to file either a motion to strike or a request to revise when an allegedly improper revised complaint replaces a stricken complaint.").

---

Accordingly, Plaintiffs never had a good faith basis to plead the very allegations that persuaded

## II.     The Revised SAC Must Be Stricken Because It Fails to State a Claim

Even apart from the law of the case doctrine, the Revised SAC fails to state a viable cause of action because it does not plead *any facts* necessary to establish causation—an essential element of Plaintiffs' CUTPA claim.

### A.     Connecticut Is a Fact Pleading State

"Connecticut is a fact pleading state." *Bridgeport Harbour Place I, LLC v. Ganim*, 303 Conn. 205, 213 n.7 (2011); *accord Pike v. Bugbee*, 115 Conn. App. 820, 828 n.5 (2009) ("It is a well established principle that Connecticut is a fact pleading jurisdiction."). "Each pleading shall contain a plain and concise statement of the material facts on which the pleader relies." Practice Book § 10-1.

Because Connecticut is a fact pleading state, Connecticut courts have relied upon federal standards requiring plaintiffs to plead sufficient *facts* to state a *plausible* claim for relief. *See Bridgeport Harbour Place I, LLC*, 303 Conn. at 213 & n.7 (reciting federal standards that "a formulaic recitation of the elements of a cause of action will not do" and "[f]actual allegations must be enough to raise a right to relief above the speculative level" and recognizing their pertinence to a motion to strike "because Connecticut is a fact pleading state") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Coleman v. Comm'r of Corr.*, 137 Conn. App. 51, 57 & n.2 (2012) (stating that "[e]ven under our permissive reading of the petition, we cannot conclude, absent speculation, that the petitioner has plausibly alleged" an entitlement to relief) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Edelman v. Laux*, No. CV115005710, 2013 WL 4504793, at \*20 (Conn. Super. Ct. July 26, 2013) (applying federal plausibility standard to motion to strike because "[o]ur Supreme Court has recognized that a motion to strike is similar in

---

the Connecticut Supreme Court to allow their sole remaining claim to survive.

purpose and in practice to the federal dismissal rule" and "the motion therefore benefits from being considered according to the same standards"); *Bonner v. City of New Haven*, No. CV156058987S, 2017 WL 6030702, at *4 n.3 (Conn. Super. Ct. Nov. 16, 2017) (striking complaint because the plaintiff's allegations, "as stated in *Iqbal*, are no 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation'" and "'naked assertion[s]' devoid of 'further factual enhancement'") (quoting *Iqbal*, 556 U.S. at 678) (alteration in original).

In considering a motion to strike a complaint, the Court "cannot read additional allegations into the pleading." *Pike*, 115 Conn. App. at 828 n.5. Moreover, "essential allegations may not be supplied by conjecture or remote implication." *Cahill v. Bd. of Educ. of City of Stamford*, 198 Conn. 229, 236 (1985) (internal quotation marks omitted).

**B.  Plaintiffs Must Plead Facts to Support Causation**

Causation is a necessary element of Plaintiffs' claims under CUTPA. *See Ward v. Greene*, 267 Conn. 539, 546–47 (2004) ("A causal relation between the defendant's wrongful conduct and the plaintiff's injuries is a fundamental element without which a plaintiff has no case.") (internal quotation marks omitted); *Abrahams*, 240 Conn. at 306 ("[I]n order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, 'as a result of' this act, the plaintiff suffered an injury. The language 'as a result of' requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff."); *Haesche v. Kissner*, 229 Conn. 213, 223-24 (1994) (stating that CUTPA requires that "the plaintiff suffer an ascertainable loss that was caused by the alleged unfair trade practice").

To plead causation, Plaintiffs must allege *facts* to establish that Remington's alleged conduct was *both* (1) the *cause in fact* (or *but for* cause) and (2) the *proximate cause* of the harm suffered by Plaintiffs. *See Abrahams*, 240 Conn. at 306–09 (holding that plaintiffs must allege

both "but for causation" and proximate causation in order to state a CUTPA claim); *Coste v. Riverside Motors, Inc.*, 24 Conn. App. 109, 113 (1991) ("In order for legal causation to exist, actual cause or cause in fact, as well as proximate cause, must be present."); *Boehm v. Kish*, 201 Conn. 385, 390 (1986) ("A prerequisite to a determination of proximate causation is a finding of causation in fact."); *Builes v. Kashinevsky*, No. CV095022520S, 2009 WL 3366265, at *4 (Conn. Super. Ct. Sept. 15, 2009) (recognizing the requirement of pleading facts to establish proximate causation when asserting a CUTPA claim) (Bellis, J.).

### C. Plaintiffs Fail to Allege Causation-In-Fact

"The first component of legal cause is causation in fact. Causation in fact is the purest legal application of legal cause." *See Paige v. Saint Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 24-25 (1999) (internal quotation marks and alteration omitted). "Cause in fact, occasionally referred to as actual cause, asks whether the defendant's conduct 'caused' the plaintiff's injury." *Stewart v. Federated Dep't Stores, Inc.*, 234 Conn. 597, 605 (1995).

Causation in fact, "or 'but for' causation, explores whether the injury would have occurred in the absence of the defendants' negligent act or omission." *Alexander v. Town of Vernon*, 101 Conn. App. 477, 488 (2007). "The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct." *Paige*, 250 Conn. at 25. "[I]f the plaintiff's injury would not have occurred 'but for' the defendant's conduct, then the defendant's conduct is a cause in fact of the plaintiff's injury. Conversely, if the plaintiff's injury would have occurred regardless of the defendant's conduct, then the defendant's conduct was not a cause in fact of the plaintiff's injury." *Stewart*, 234 Conn. at 605; *accord Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) ("It is 'textbook tort law' that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation. Under this

standard, a plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred.") (internal citation omitted).[3]

A plaintiff's failure to plead and establish that it would not have suffered the alleged injury *but for* the defendant's conduct is therefore fatal to a CUTPA claim. *See Haesche*, 229 Conn. at 222, 224 (holding that defendant gun manufacturer was entitled to judgment as a matter of law on CUTPA claim because "the alleged failure to warn that the plaintiff claims is an unfair trade practice was not the cause of his injuries" and "a fair and reasonable person could not conclude that a warning would have altered [his] behavior"); *Stevenson Lumber Co.-Suffield, Inc. v. Chase Assocs., Inc.*, 284 Conn. 205, 214–15 (2007) (holding that trial court improperly found that defendant violated CUTPA because plaintiff failed to present any evidence its loss would not have occurred "but for" defendant's conduct); *Calandro v. Allstate Ins. Co.*, 63 Conn. App. 602, 612 (2001) (finding that alleged unfair trade practice did not cause any injury because plaintiffs failed to prove that its losses would not have occurred "but for" defendant's conduct).[4]

---

[3] Pleading and proving cause in fact in most personal injury cases is not typically difficult because in most cases a defendant's alleged tortious conduct—such as improperly maintaining premises, providing negligent medical care, or driving a car dangerously—is obviously linked to a plaintiff's injury. But in other cases, where alleged causal connections are attenuated, as is the alleged connection between an advertisement and Lanza's decision to kill and injure innocent persons, Plaintiffs must be held to their burden of pleading facts demonstrating that their injuries would not have occurred "but for" a Remington advertisement. *See Stewart*, 234 Conn. at 605. Pleading and establishing cause-in-fact is not merely a hyper-technical requirement. Indeed, a trial court *must* inform "the jury of its duty to find that the defendant's actions were a 'cause in fact' of the plaintiff's injury" in order to impose liability and instruct the jury that "it could not find that the defendant's actions were a cause in fact of the plaintiff's injury, unless it found that, in the absence of the defendant's conduct, the injury would not have occurred." *Id.* at 607.

[4] Any suggestion that the Connecticut Supreme Court in *Soto* determined that Plaintiffs need not plead cause in fact in this case based on its observation that Plaintiffs had alleged that Remington's wrongful marketing was a substantial factor in their injuries would be misplaced. The Court in *Soto* did not fundamentally change the law of causation and eliminate the burden to plead and prove cause in fact. Indeed, the Court has continued to recognize cause in fact as an

-10-

Here, Plaintiffs *do not even attempt* to plead cause in fact in the Revised SAC. Nowhere do Plaintiffs allege that their injuries would not have occurred *but for* a Remington advertisement. They do not even allege that Lanza saw a Remington advertisement, and thus they cannot allege that his exposure to advertisements inspired him to commit his crimes. Indeed, Plaintiffs have acknowledged they lack a good-faith factual basis to make such allegations. And Plaintiffs cannot meet their burden of pleading causation in fact based solely on speculation or conjecture. *See Alexander*, 101 Conn. App. at 490-91 (affirming entry of judgment in favor of defendant for failure to establish causation because "there are too many variables involved to state with any degree of certainty that the victim's murder would not have occurred in the absence of the officers' alleged negligence or recklessness" and "a determination of causation on the basis of conjecture or speculation is precisely what we cannot permit").[5]

Indeed, this Court in *Carter v. Edge Fitness Gym*, No. CV165031410S, 2017 WL 951676 (Conn. Super. Ct. Feb. 16, 2017) granted a motion to strike for precisely the same reason—the failure of the plaintiff to plead facts to support *but for* causation. This Court held that the plaintiff's conclusory allegation that it suffered harm "as a direct result" of the defendant's conduct was insufficient to allege causation in fact:

> Notwithstanding the plaintiff's conclusory allegations that the police officer violated his rights by unlawfully entering his residence without a warrant 'as a

---

essential element of causation. *See Snell v. Norwalk Yellow Cab, Inc.* 332 Conn. 720, 743 (Aug. 13, 2019); *see also Barnes v. Conn. Podiatry Grp., P.C.*, 195 Conn. App. 212, 241 (2020).

[5] Even if Plaintiffs had made factual allegations demonstrating cause in fact, their problem proving causation would remain, and it cannot be solved with expert opinion testimony unsupported by factual evidence that Lanza saw an offending advertisement and that but for the advertisement, Lanza would not have acted criminally. *See Aspiazu v. Orgera,* 205 Conn. 623, 632 (1987) (stating that an expert opinion cannot be based on conjecture or surmise); *Klein v. Norwalk Hosp.*, 299 Conn. 241, 262-63 (2010) (rejecting expert witness testimony as nothing more than his own *ipse dixit*—an assertion made but not proven).

direct result' of the personal information obtained from the defendant, *the plaintiff has not alleged any facts in support of this allegation*. The facts alleged do not support an inference that, but for the defendant's employee's disclosure of the plaintiff's personal information, the plaintiff would not have been arrested and subsequently incarcerated for his conduct. *No facts are alleged to demonstrate either but-for causation or proximate causation between the defendant's alleged disclosure and the alleged harm suffered.*

*Id.* at *6. (emphasis added) (Bellis, J.). Here, Plaintiffs have not even made conclusory allegations of *but for* causation—much less allege facts in support of that required element of their claim. Indeed, not only have Plaintiffs failed to allege facts to support causation-in-fact, they have *expressly disavowed* any obligation to plead them. (*See* Entry No. 292.00, Objections to Request to Revise at 24 n.8 (admitting that such allegations are not in the complaint and claiming that "there is no requirement to allege them")).[6]

---

[6] Although this Court previously denied Remington's request to revise Plaintiffs' SAC based on Plaintiffs' failure to plead causation, the denial of a request to revise has no bearing on a court's consideration of a motion to strike attacking the *legal sufficiency* of allegations in a complaint. *See Melfi v. City of Danbury*, 70 Conn. App. 679, 684 (2002) ("Although the request to revise may not ordinarily be used to substantively challenge a pleading, it may be used to delete otherwise improper allegations from a complaint. The motion to strike, on the other hand, challenges the legal sufficiency of the pleading by testing whether the complaint states a cause of action on which relief can be granted.") (internal quotation marks and ellipses omitted); *Martinez v. Oliphant-Hines*, No. CV166009002S, 2018 WL 1474960, at *1 n.1 (Conn. Super. Ct. Feb. 26, 2018) (noting "[t]he disposition of the request to revise has no bearing on the present motion to strike attacking the *legal sufficiency* of the allegations the plaintiff was not required to remove"); *Rosenlicht v. Bradley*, No. HHBCV054003001S, 2006 WL 1461096, at *4 (Conn. Super. Ct. May 8, 2006) (holding that ruling on request to revise was not the law of the case and proceeding to address the merits of a motion to strike because a "motion to strike is the proper method to challenge the *legal sufficiency* of a complaint" and a "request to revise is not the procedural vehicle by which to mount such a challenge"); *Ruther v. Cont'l Ins. Co.*, No. CV 960155186, 1998 WL 211953, at *1 (Conn. Super. Ct. Apr. 23, 1998) ("The court's decision regarding the request to revise the amended complaint did not address the legal sufficiency of the complaint. This court is now faced with a motion to strike which does contest the legal sufficiency of the complaint. The decision on the request to revise, therefore, has no bearing on this court.") (internal citations omitted)).

## D. Plaintiffs Fail to Allege Facts In Support of Proximate Causation

"The second component of legal cause is proximate cause."  *Paige*, 250 Conn. at 25 (1999) (internal quotation marks omitted).  "[T]he legal construct of proximate cause serves to establish how far down the causal continuum tortfeasors will be held liable for the consequences of their actions." *Snell v. Norwalk Yellow Cab, Inc.*, 332 Conn. 720, 744 (2019) (internal quotation marks omitted).  "Proximate cause establishes a reasonable connection between an act or omission of a defendant and the harm suffered by a plaintiff."  *Stewart*, 234 Conn. at 606.  "[P]roximate cause results from a sequence of events unbroken by a superseding cause, so that its causal viability continued until the moment of injury or at least until the advent of the immediate injurious force." *Snell*, 332 Conn. at 744–45 (internal quotation marks omitted).

"[P]roximate cause is an actual cause that is a substantial factor in the resulting harm." *Abrahams*, 240 Conn. at 306 (internal quotation marks omitted).  "The question to be asked in ascertaining whether proximate cause exists is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act."  *Id.* (internal quotation marks omitted).  "Yet, more than abstract foresee-ability is necessary to justify imposing liability on the defendants for their acts and omissions.  Satisfaction of the proximate cause element requires proof that the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence."  *Alexander*, 101 Conn. App. at 486 (internal quotation marks omitted).  "As a general rule, the act of a third person in committing an intentional act or crime is a superseding cause of harm to another resulting therefrom.  In such a case, the third person has deliberately assumed control of the situation, and all responsibility for the consequences of his act is shifted to him."  *Suarez v. Sordo*, 43 Conn. App. 756, 762–63 (1996) (internal quotation marks and citations omitted).  "[A] finding that conduct constitutes a

superseding cause renders the original negligence so insignificant in relation to that superseding cause that the original negligence cannot be deemed to be a proximate cause of the injuries." *Snell*, 332 Conn. at 754 n.11.

Allegations of proximate cause "must be based upon more than conjecture and surmise." *Paige*, 250 Conn. at 26 (1999) (internal quotation marks omitted); *accord Kumah v. Brown*, 130 Conn. App. 343, 351–53 (2011) (holding that plaintiff could not establish proximate cause because "connecting [defendant's] alleged negligent acts to the harm suffered by the plaintiffs would require similar conjecture"); *D'Angelo Dev. & Constr. Corp. v. Cordovano*, 121 Conn. App. 165, 181–84 (2010) (finding that "CUTPA violation was not the proximate cause of any ascertainable loss to the [plaintiffs]" because that determination "would require speculation"); *Coste.*, 24 Conn. App. at 114–15 ("The allegations of the complaint must equate to a damage to the plaintiff that is not overly remote to the conduct of the defendant and establishes a causal relationship between the harm and the conduct that is not conjectural.").

Even assuming that Plaintiffs have alleged causation in fact in the Revised SAC (they do not), their conclusory allegation that Remington's conduct was a "substantial factor" in the resulting harm to Plaintiffs is plainly insufficient to plead proximate cause. (*See* Entry No. 301.00, Revised SAC ¶ 51.) Pleading that Remington's conduct was a substantial factor in the harm suffered by Plaintiffs harm is a *legal conclusion* that is unsupported by facts or an explanation of *how* Remington's conducted contributed to Plaintiffs' harm. Without pleading such facts, Plaintiffs cannot establish the necessary causal connection between Remington's alleged conduct and Plaintiffs' injuries. Indeed, there can be *no* plausible causal connection between the publication of an advertisement and the deaths of Plaintiffs' decedents in the absence of such factual allegations.

The Connecticut Supreme Court has held that conclusory allegations similar to those found in the Revised SAC are insufficient to survive a motion to strike a CUTPA claim. In *Abrahams*, the Connecticut Supreme Court concluded that the plaintiff could not state a cause of action under CUTPA because it failed to allege *facts* to support proximate causation:

> The plaintiff has not alleged, nor can it be reasonably inferred from the plaintiff's allegations, that [the defendant] either intended or could have foreseen that, as a result of its attempt to bribe the plaintiff, he would be injured by an erroneous indictment for bribery or by publication of the incorrect accusations therein. In other words, [the defendant's] conduct in attempting to bribe the plaintiff was not a substantial factor reasonably foreseeable as likely to bring about the plaintiff's indictment on false charges and his resulting damages. The plaintiff was neither the intended target nor victim of [defendant's] illegal activities.

240 Conn. at 307 (emphasis added) (internal quotation marks omitted). Similarly, the Connecticut Appellate Court has concluded that a complaint should be stricken where "[t]he plaintiff's complaint is riddled with proximate cause gaps because the allegations of the complaint leave breaks in the chain of causation" and "[t]he defendant's conduct is too inconsequential to the ultimate harm to the plaintiff, considering the many other variables, to rise to the level of proximate cause." *Coste*, 24 Conn. App. at 115.

Many courts have similarly held that the bare legal conclusions of the Revised SAC are insufficient to allege the causation element of a CUTPA claim. *See Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 87 (3d Cir. 2015) ("Here, the allegations in the Amended Complaint fail to establish proximate cause. Indeed, Plaintiffs did not allege that any doctor relied on Defendants' alleged misrepresentations in prescribing [medications], or that these prescriptions would not have been written if these physicians had not received the allegedly fraudulent information from [defendant]. Thus, Plaintiffs have not sufficiently pleaded causation, as required by CUTPA, and we will affirm the District Court's dismissal of the CUTPA claims."); *Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 303 (D. Conn. 2017)

(holding that an allegation that plaintiff suffered economic loss "as a result" of the bank account's closing was insufficient to state a CUTPA claim because "[t]he proposed pleading contains no allegations describing how the bank's conduct caused Plaintiff an economic loss") (internal quotation marks omitted)); *Von Pein v. Magic Bristles, LLC*, No. CV126008266S, 2013 WL 453048, at *7 (Conn. Super. Ct. Jan. 8, 2013) (holding that plaintiffs "merely state the legal conclusion that this violation caused their injury" and failed to "allege facts demonstrating any type of causal relationship between this violation of the Home Improvement Act" and their alleged injury); *Patterson v. Sullo*, No. CV116008633S, 2012 WL 4040259, at *6 (Conn. Super. Ct. Aug. 20, 2012) (holding that "[t]he allegation that the plaintiffs suffered monetary losses and damages 'as a direct and proximate result of the defendant's acts' is a legal conclusion that lacks the factual support to establish an ascertainable loss by or as a result of the alleged misrepresentation itself"); *Buchanan v. Greenwich Hosp.*, No. X06CV106007415S, 2011 WL 7064250, at *3 (Conn. Super. Ct. Dec. 28, 2011) (granting motion to strike CUTPA claim because the acts "alleged in the complaint lack any causal connection between the hospital's alleged wrongdoing and any resulting harm, beyond pure speculation"); *Podesser v. Lambert & Barr, LLC*, No. CV065000689S, 2007 WL 2363310, at *1–2 (Conn. Super. Ct. July 25, 2007) (concluding that "the plaintiff has failed to plead sufficient facts to support the causation element of her claims that the defendants violated CUTPA"); *Hull v. Nicholas*, No. FSTCV030194538, 2005 WL 2741845, at *2 (Conn. Super. Ct. Oct. 7, 2005) (striking CUTPA claim because plaintiffs "have not alleged facts to establish a causal link between Coldwell Banker's action or inaction and the plaintiff's failure to be compensated"); *Heath v. Micropatent*, No. CV 97401481, 1999 WL 1328140, at *3 (Conn. Super. Ct. Dec.30, 1999) (holding that plaintiffs failed to allege specific facts showing a causal nexus between defendant's conduct and their alleged economic

injuries); *Kent v. Sartiano*, No. 386702, 1998 WL 661520, at *6 (Conn. Super. Ct. Sept. 11, 1998) (granting motion to strike CUTPA claim because "the proximate cause of the plaintiff's losses was not [defendant's] fraud and illegal insurance practices").

Plaintiffs' conclusory "substantial factor" allegation therefore is not a sufficient substitute for factual allegations and subsequent proof that a Remington advertisement was the proximate cause of their damages. This Court, however, need not even consider the adequacy of Plaintiffs' proximate cause allegation because Plaintiffs have completely failed to make any allegation—conclusory or factual—supporting their initial burden of pleading that *but for* a Remington advertisement that was seen by Lanza, the shooting would not have occurred.

## CONCLUSION

For the reasons set forth above, the Court should grant Remington's motion to strike the Revised SAC in its entirety.

DEFENDANTS REMINGTON ARMS
COMPANY LLC AND REMINGTON
OUTDOOR COMPANY, INC.

By: */s/ Jeffrey P. Mueller*
Jeffrey P. Mueller
Paul D. Williams
James H. Rotondo
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Juris No. 14229

James B. Vogts *(pro hac vice)*
Andrew A. Lothson *(pro hac vice)*
SWANSON MARTIN & BELL, LLP
330 North Wabash, #3300
Chicago, IL 60611
Phone: (312) 321-9100
Fax: (312) 321-0990

Their Attorneys

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing has been emailed this day to all counsel of record as follows:

Joshua D. Koskoff
Alinor C. Sterling
Jeffrey W. Wisner
KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604
jkoskoff@koskoff.com
asterling@koskoff.com
jwisner@koskoff.com


H. Christopher Boehning *(pro hac vice)*
Jacobus J. Schutte *(pro hac vice)*
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
cboehning@paulweiss.com
jschutte@paulweiss.com

*/s/ Jeffrey P. Mueller*
Jeffrey P. Mueller

# EXHIBIT A

NO.  UWY-CV15 6050025 S  :  SUPERIOR COURT
                          :
DONNA L. SOTO, ADMINISTRATRIX :
OF THE ESTATE OF          :  COMPLEX LITIGATION
VICTORIA L. SOTO, ET AL   :  DOCKET
                          :
V.                        :  AT WATERBURY
                          :
BUSHMASTER FIREARMS       :  MAY 26, 2020
INTERNATIONAL, LLC, ET AL :

## PLAINTIFFS' RESPONSES TO DEFENDANTS' INTERROGATORIES AND SECOND REQUESTS FOR PRODUCTION

Pursuant to Practice Book §§ 13-7 and 13-10, plaintiffs hereby respond to defendants'

Interrogatories and Second Requests for Production of Documents dated December 11, 2019.

## INTERROGATORIES

3.  Identify each Bushmaster advertisement, marketing activity and promotional activity that was seen by Adam Lanza. With respect to each such advertisement, marketing activity and promotional activity, identify the following:

  (a)  When did Adam Lanza see the advertisement, marketing activity and promotional activity; and

  (b)  Where, how or in what medium did Adam Lanza see the advertisement, marketing activity and promotional activity.

**COURT'S RULING:**  **"[Plaintiffs' Objections to] #3 and 7 overruled in part; they must be responded to for those documents that are not part of the shared, governmental agency documents."**

**ANSWER:**  **Interrogatory #3 asks plaintiffs to identify when and how the shooter saw the Remington defendants' "advertisement[s], marketing activity and promotional activity." The Court's order limits this Interrogatory to documents that are "not part of the shared, governmental agency documents." Plaintiffs are unable to identify any such documents at this time.**

7.  Identify each document demonstrating that Adam Lanza saw a Bushmaster advertisement, marketing activity and promotional activity.

**COURT'S RULING:**  **"[Plaintiffs' Objections to] #3 and 7 overruled in part; they must be responded to for those documents that are not part of the shared, governmental agency documents."**

1

**ANSWER:**     **Interrogatory #7 asks plaintiffs to identify documents demonstrating the shooter "saw a Bushmaster advertisement, marketing activity and promotional activity." The Court's order limits this Interrogatory to documents that are "not part of the shared, governmental agency documents." Plaintiffs are unable to identify any such documents at this time.**

<u>REQUESTS FOR PRODUCTION</u>

3.    Each Bushmaster advertisement, marketing activity and promotional activity that was seen by Adam Lanza.

**COURT'S RULING: "See rulings above."**

**ANSWER: Not applicable.**

THE PLAINTIFFS,

By:    */s/ Joshua D. Koskoff*
    Joshua D. Koskoff
    Alinor C. Sterling
    Jeffrey W. Wisner
    KOSKOFF KOSKOFF & BIEDER
    350 Fairfield Avenue
    Bridgeport, CT 06604
    Tel. (203) 336-4421
    Fax: (203) 368-3244
    jkoskoff@koskoff.com
    asterling@koskoff.com
    jwisner@koskoff.com

    Jacobus J. Schutte, Esq., (*pro hac vice*)
    H. Christopher Boehning (pro hac vice)
    1285 Avenue of the Americas
    New York, NY 10019-6064
    jschutte@paulweiss.com
    cboehning@paulweiss.com

    Their Attorneys

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing has been emailed this day to all counsel of record as follows:

**COUNSEL FOR:**

BUSHMASTER FIREARMS INTERNATIONAL LLC, A/K/A;
FREEDOM GROUP, INC., A/K/A;
BUSHMASTER FIREARMS, A/K/A;
BUSHMASTER FIREARMS, INC., A/K/A;
BUSHMASTER HOLDINGS, INC., A/K/A
REMINGTON ARMS COMPANY, LLC, A/K/A;
REMINGTON OUTDOOR COMPANY, INC., A/K/A

Paul D. Williams
James H. Rotondo
Jeffrey P. Mueller
DAY PITNEYLLP
242 Trumbull Street
Hartford, Connecticut 06103
pdwilliams@daypitney.com
jhrotondo@daypitney.com
jmueller@daypitney.com

James B. Vogts, (p*ro hac vice*)
Andrew A. Lothson, (*pro hac vice*)
SWANSON MARTIN & BELL, LLP
330 North Wabash, #3300
Chicago, IL 60611
jvogts@smbtrials.com
alothson@smbtrials.com

Dated: May 26, 2020

/s/ Joshua D. Koskoff
Joshua D. Koskoff
Alinor C. Sterling
Jeffrey W. Wisner

3