# AMENDED AND RESTATED

# LICENSE AGREEMENT

**This Amended and Restated License Agreement** (this "*Agreement*"), effective as of January 23, 2008 (the "Effective Date"), by and between Magpul Industries Corp., a Colorado corporation with a mailing address at Magpul Industries Corp, 400 Young Ct Unit 1, Erie, CO 80516-8441 ("Licensor" or Magpul), and Bushmaster Firearms International, LLC., a Delaware limited liability company with its mailing address at 999 Roosevelt Trail Road, Windham, Maine 04062 ("Licensee" or "Bushmaster"), is amended and restated as of the 5th day of March 2010. Collectively, Licensor and Licensee are referred to as "Party" or "Parties" as the sense of the text requires.

## RECITALS

**WHEREAS,** Licensor is the owner of certain patent applications regarding a Gas Piston experimental firearm design that Licensor currently calls MASADA;

**WHEREAS,** Licensor wishes to grant Licensee a license to use the Licensed Technology in accordance with the terms of this Agreement; and Licensee desires to obtain such license;

**WHEREAS,** this Agreement amends and restates in its entirety that certain License Agreement (the "*Original License Agreement*") that the Parties entered into on the Effective Date, which was amended by the Parties pursuant to Amendment No. 1 to the Original License Agreement ("*Amendment No. 1*") dated December 16, 2008;

**WHEREAS,** pursuant to Section 11.5 of the Original License Agreement, as amended, the Parties desire to further modify and amend certain provisions of the the Original License Agreement, as amended, and to restate the Original License Agreement, as amended, in its entirety as set forth herein.

NOW, THEREFORE, Licensor and Licensee hereby agree as follows:

1. Definitions.

   1.1. "Firearm" means a firearm that may be chambered for various cartridges within the following limits: Cartridge Overall Loaded Length (COL) as specified by either creator of said cartridge or the governing body of said cartridge of not less than 1.750 inches and not more than 2.270 inches; Cartridge Rim Size as specified by either creator of said cartridge or the governing body of said cartridge of not less than .368 inch diameter and not more than .450 inch diameter; and cartridge that does *not* use a rebated rim design (provided that Licensee *may* chamber the Firearm for the .450 Bushmaster cartridge).

   1.2. "Licensed Know-How" means the know-how, trade secrets, specifications, drawings, ideas, discoveries, inventions, processes, methods, formulas, programs, other works of authorship, improvements, developments, designs and techniques, other than as embodied in the

1

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 1 of 14

Licensed Patents, existing on the Effective Date that are owned or controlled by Licensor and that are necessary or desirable to use the Licensed Patents and/or design, develop or manufacture a Licensed Product or portion thereof.

**1.3.** "Licensed Patents" means those patent applications listed in *Exhibit A* attached hereto, any patent issuing thereon, and any divisional, continuation, or continuation-in-part application to the extent the claims are directed to subject matter specifically described therein, as well as any patent issued thereon and any reissue or reexamination of such patent, and any foreign counterparts to such patent and patent applications.

**1.4.** "Licensed Product" means (a) with respect to any substantially complete Firearm, any such Firearm employing the Licensed Technology or (b) with respect to any part for a Firearm, any such part employing the Licensed Technology.

**1.5.** "Licensed Service" means any service that is covered by one or more claims in a Licensed Patent or is provided as part of the Licensed Know-How and is used in connection with a Licensed Product.

**1.6.** "Transferred Technology" means the subject matter that Licensor (as of the Effective Date) calls MASADA™ and includes without limitation all technology embodied in the Licensed Patents and Licensed Know-How.

**1.7.** "Sale" (or "Sold") means the sale, lease or rental of any Licensed Product or any Licensed Service, or other distribution of any Licensed Product or any Licensed Service without sale or other dispositions whether invoiced or not, to any third party by Licensee, directly or through one or more tiers of sublicensees.

**1.8.** "Territory" means worldwide.

**1.9.** "Supplied Inventory" means components to be supplied by Licensor

**2.** Grant of Rights and Licensor Obligations.

**2.1.** Licensed Patents License Grant. Subject to the terms of this Agreement, Licensor hereby grants to Licensee a license under the Licensed Patents to develop, make, have made, use, sell, commercialize, exploit, market, export and import Licensed Products, and to practice and perform Licensed Services, in the Territory (collectively, the "Patent License"). The Patent License will be exclusive for so long as Licensee meets the minimums set forth in Exhibit B (Exclusivity Minimums) attached hereto.

**2.2.** Licensed Know-How License Grant. Subject to the terms of this Agreement, Licensor also grants to Licensee a license under the Licensed Know-How to develop, make, have made, use, sell, commercialize, exploit, market, export and import Licensed Products, and to practice and perform Licensed Services, in the Territory (collectively, the "Know-How License"). The Know-How License will be exclusive for so long as Licensee meets the minimums set forth in Exhibit B (Exclusivity Minimums) attached hereto. The Licensed Know-How shall be Licensor's

2
Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 2 of 14

Confidential Information (as defined in Section 8.1 (Obligations) below) and maintained by Licensee in accordance with Section 8 (Confidential Information) below.

**2.3.** <u>No Implied Licenses</u>. The Licensed Patents and Licensed Know-How are licensed and not sold to Licensee. Licensee acknowledges that use of the Licensed Technology is limited to the scope of Patent License and Know-How License (collectively, "<u>Licenses</u>") and that there are no implied licenses; all rights and licenses not expressly granted under the Licenses are reserved by Licensor.

**2.4.** <u>Delivery of Know-How and Test Data</u>. Licensor will provide to Licensee copies of existing, relevant documentation of the Licensed Know-How and all previously conducted test data and results for informational purposes within 15 business days of the Effective Date.

**2.5.** <u>Suppliers</u>. Licensor will assign to Licensee all of its right, title and interest in and to four (4) extrusion dies manufactured by Richardson Metals, located at 1080 Ford Street, Colorado Springs, Colorado 80915, for the production of certain metal components of the Licensed Product.

**2.6.** <u>Right to Sublicense</u>. Licensee shall have the right to grant sublicenses under this Agreement, provided that Licensor first enters into a binding, written agreement with the proposed sublicensee that includes provisions that are at least as protective of Licensor, including without limitation provisions related to intellectual property, Confidential Information, warranty limitations, indemnity, liability disclaimers and audit rights as those set forth in this Agreement. Licensee acknowledges and agrees that any breach of this Agreement by sublicensees will be deemed a breach of the Agreement by Licensee.

**2.7.** <u>Technical Support.</u> Licensor agrees to provide a reasonable amount of "no-cost" services in support of this Agreement that would be limited to assisting in resolving technical issues with respect to the Licensed Technology and would not include any new product development or manufacturing services.

**2.8.** <u>Supplied Components</u>. Licensor agrees to provide Licensee certain supplied inventory to complete prototypes, sales demonstration units and production units. Purchase orders will be issued by Licensee and Licensor will provide mutually agreed upon components within 30 days of purchase order. Licensee shall be responsible for shipping cost.

**2.9.** <u>Licensor Program Manager</u>. Licensor agrees to appoint a Program Manager to act as the liaison with Licensee to coordinate all features of the program including but not limited to Licensed Product design, features, materials, funding, testing, marketing, sales and communications between the Parties. Licensor's designated Program Manager is:

> Magpul Industries Corp.
> 400 Young Ct. Unit 1,
> Erie, Colorado 80516
> Attn:_____
> Tele: _____

3

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 3 of 14

Fax: _____
E-Mail: _____

Licensor Program Manager and Licensee's Program Manager and Design Support Manager will mutually establish a regular schedule of meetings or telephone conferences, as they deem desirable, to ensure effective communications between the Parties during the term of this Agreement. The Parties will make good faith efforts to have the first such schedule be weekly; subject to change by mutual agreement of the above Managers. Licensor may change its designated Program Manager from time to time, as it deems desirable, by notice to Licensee.

    **2.10.** Licensor Sourcing of Components. Licensee agrees to provide to Licensor the opportunity to supply components ("Licensor Supplied Components") for Licensee's assembly of Licensed Product. Licensee is not obligated to source any components from Licensor and the supply of any such components is subject to competitive pricing, delivery, quality and technology as well as Licensee other requirements.

**3.**     Licensee Obligations.

    **3.1.**     Fees and Royalties.

        (a)     As partial consideration for the Licenses granted under this Agreement, Licensee will pay Licensor a one-time, upfront, non-refundable (except in accordance with Section 6.3) license fee (the "License Fee") of One Hundred and Fifty Thousand Dollars (U.S. $150,000) upon the Effective Date.

        (b)     As partial consideration for the Licenses granted under this Agreement, in addition to the License Fee, Licensee will pay Licensor royalty fees ("Royalty Fees") of eight and one half percent of Gross Sales of any Licensed Product and Licensed Service.

        (c)     For purposes of this Agreement, "Gross Sales" means the total gross receipts for Sales by or on behalf of Licensee and its sub-licensees, less amounts paid for Federal excise tax, the actual amounts paid by Licensee for Licensor Supplied Components and included in the Licensed Product, the actual amounts paid by Licensee for auxiliary third-party components not critical to the actual functioning of a finished Firearm and included in the Licensed Product and the amount paid by Licensee for actual returns (to the extent it has been included in Gross Sales). No deductions shall be made for commissions, the costs of collections or the like. Gross Sales also includes the fair market value of any non-cash consideration received by Licensee or sublicensees for the Sale of any Licensed Product or any Licensed Service, which non-cash consideration shall include the fair market value of items bartered or exchanged for and purchase price reductions or promotional discounts granted on or promotional giveaways of Licensed Products or Licensed Services.

    **3.2.**     Taxes. Licensee will bear and pay all taxes, including without limitation sales and value added taxes imposed by the U.S. federal government and any other government, as the result

4

of the Sale of any of the Licensed Products, provided that Licensee will not bear or pay any taxes based upon or calculated by Licensor's net income.

3.3. <u>Payments and Reports</u>. Licensee will provide an accounting of units of Licensed Product Sold and pay Royalty Fees due from Sales monthly, within thirty (30) days after the end of each applicable month during the term of this Agreement.

3.4. <u>Marking of Licensed Products and Services</u>. To the extent commercially feasible and consistent with prevailing business practices, Licensee shall mark, and shall cause its sublicensees to mark, all Licensed Products and Licensed Services that are manufactured or Sold or provided under this Agreement with the number of each issued patent (or alternatively, as applicable, to reflect that a patent is pending) as applied to such Licensed Product or Licensed Services. If it is not feasible to mark physical product, then marking shall be made on associated packaging and instructions.

3.5. <u>Product Liability Insurance</u>. Licensee shall carry product liability insurance of no less than the highest level that it has in force as of the Effective Date, which insurance shall apply to Licensed Products. Licensee will include the Licensor as a co-insured for such Licensed Products.

3.6. <u>Sales to Licensor</u>. Licensee shall sell Licensed Products to Licensor at the standard price offered to dealers less the royalty payment.

3.7. <u>Licensee Program Manager</u>. Licensee agrees to appoint a Program Manager to act as the business liaison with Licensor to coordinate communications between the Parties. Licensee's designated Program Manager is:

> Bushmaster Firearms International, LLC
> 999 Roosevelt Trail Road
> Windham, Maine 04062
> Attn:_____
> Tele: _____
> Fax: _____
> E-Mail:_____

Licensor Program Manager and Licensee's Program Manager and Design Support Manager will mutually establish a regular schedule of meetings or telephone conferences, as they deem desirable, to ensure effective communications between the Parties during the term of this Agreement. The Parties will make good faith efforts to have the first such schedule be weekly; subject to change by mutual agreement of the above managers. Licensee may change its designated Program Manager from time to time, as it deems desirable, by notice to Licensor.

3.8. <u>Licensee Design Support Manager</u>. Licensee agrees to appoint a Design Support Manager to act as the engineering and design liaison with Licensor to coordinate features of the program including but not limited to Licensed Product design, features, materials, testing and other engineering communications between the Parties. Licensee's designated Design Support Manager is:

5

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 5 of 14

Bushmaster Firearms International, LLC
999 Roosevelt Trail Road
Windham, Maine 04062
Attn: _____
Tele: _____
Fax: _____
E-Mail:_____

Licensor Program Manager and Licensee's Program Manager and Design Support Manager will mutually establish a regular schedule of meetings or telephone conferences, as they deem desirable, to ensure effective communications between the Parties during the term of this Agreement. The Parties will make good faith efforts to have the first such schedule be weekly; subject to change by mutual agreement of the above managers. Licensee may change its designated Design Support Manager from time to time, as it deems desirable, by notice to Licensor.

4. Right of Inspection.

Licensee will keep accurate and complete records of the Licensed Products Sold and Licensed Services Sold in sufficient detail to enable the Royalty Fees payable to Licensor hereunder and the Royalty Fee Amount and Gross Sales (for any particular calendar year) to be determined and will permit its books and records to be examined by an independent auditor appointed by Licensor not more than twice a year during reasonable business hours at Licensor's expense, provided that if an examination of such records discloses that the Royalty Fees actually paid by Licensee with respect to any payment period are less than the Royalty Fees due and owing, Licensee will promptly pay to Licensor the Royalty Fees still due and owed to Licensor and, if Royalty Fees actually paid are ninety-five percent (95%) or less of the Royalty Fees due and owing, then Licensee will also pay the cost to Licensor of such examination.

5. Enforcement of Licensed Patents.

Licensor retains the sole and exclusive right, in its absolute discretion, to bring or not bring any enforcement actions against any actual or alleged infringers of any Licensed Patent, and to retain any and all damages recovered on such actions. Licensee agree to promptly notify Licensor of any infringement concerning Licensed Patents of which Licensee becomes aware, and to cooperate reasonably with Licensor, at Licensor's expense, in any enforcement actions by Licensor under this Section 5. Licensor will advise Licensee of any patent enforcement actions it undertakes and will periodically provide status reports regarding such actions. Licensee may, in its sole discretion, support such enforcement activities, but shall have no obligation to do so.

6. Term and Termination.

**6.1.** Term. This Agreement shall commence on the Effective Date and shall remain in effect until the expiration of all Licensed Patents.

6

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 6 of 14

**6.2. Termination.**

(a) Licensor may terminate the Agreement by giving written notice to Licensee if there are no sales of any Licensed Product prior to January 1, 2011. .

(b) In the event that either party commits a material breach of its obligations under this Agreement and fails to cure that breach within sixty (60) days after receiving written notice thereof, the other party may terminate this Agreement immediately upon written notice to the party in breach.

**6.3. Effects of Termination.** Any termination of this Agreement also terminates Licensee's licenses under this Agreement, including without limitation the right to manufacture and sell products based on the design and manufacturing know how provided to Licensee by Licensor. If Licensee terminates this Agreement within the first twelve months following the Effective Date for the material breach of Licensor pursuant to Section 6.2(b), then Licensor will provide to Licensee a pro-rata refund of the License Fee that Licensee paid upfront to Licensor, pro-rated on a straight-line, 12-month basis. Sections 1 (Definitions), 3.5 (Product Liability Insurance), 6.3 (Effects of Termination), 7 (Ownership of Licensed Technology and Improvements), 8 (Confidential Information), 9.3, 9.4, 10 (Indemnity) and 11 (Miscellaneous) shall survive the expiration or termination of this Agreement.

**7. Ownership of Licensed Technology and Improvements.**

**7.1. Licensed Technology.** As between Licensor and Licensee, Licensor is and will remain sole and exclusive owner of all right, title and interest in and to the Licensed Patents and Licensed Know-How, including without limitation all intellectual property rights embodied therein.

**7.2. Improvements.** In the event that either party shall develop any inventions, material product improvements, modifications, designs, engineering or useful know-how relating to the Licensed Technology ("Improvements"), that party shall retain all right and title to such Improvements; provided however, that the Licensee shall pay the Licensor for the Licensed Technology as provided hereunder irrespective of any Improvements thereto.

**8. Confidential Information.**

**8.1. Obligations.** For purposes of this Agreement, "Confidential Information" means information that is marked "confidential," "proprietary" or similarly or that, by its nature or the circumstances surrounding its disclosure, ought in good faith be considered confidential, including without limitation the disclosing party's non-public technical, business, financial, customer and other information and management know-how and techniques, methodologies, systems and programs. The party receiving Confidential Information ("Receiving Party") from the other party ("Disclosing Party") will use the Confidential Information of the Disclosing Party only for purposes expressly permitted by this Agreement, and will disclose the Confidential Information of the Disclosing Party only to the employees or contractors of the Receiving Party who have a need to know such Confidential Information for purposes of this Agreement and who have signed a written

7

agreement imposing a duty of confidentiality no less restrictive than the Receiving Party's duty hereunder. The Receiving Party will keep confidential and protect the Disclosing Party's Confidential Information from unauthorized use, access or disclosure in the same manner as the Receiving Party protects its own confidential or proprietary information of a similar nature and with no less than a reasonable degree of care.

    **8.2.** <u>Exceptions</u>. The Receiving Party's obligations under Section 8.1 (Obligations) above with respect to any Confidential Information of the Disclosing Party will terminate if and when the Receiving Party can document that such information: (a) was already lawfully known to the Receiving Party at the time of disclosure by the Disclosing Party; (b) is disclosed to the Receiving Party by a third party who had the right to make such disclosure without any confidentiality restrictions; (c) is, or through no fault of the Receiving Party has become, generally available to the public; or (d) is independently developed by the Receiving Party without access to, or use of, the Disclosing Party's Confidential Information. In addition, the Receiving Party will be allowed to disclose Confidential Information of the Disclosing Party to the extent that such disclosure is: (i) approved in writing by the Disclosing Party; (ii) necessary for the Receiving Party to enforce its rights under this Agreement in connection with a legal proceeding; or (iii) required by law or by the order of a court or similar judicial or administrative body, provided that the Receiving Party notifies the Disclosing Party of such required disclosure promptly and in writing and cooperates with the Disclosing Party, at the Disclosing Party's reasonable request and expense, in any lawful action to contest or limit the scope of such required disclosure.

    **8.3.** <u>Obligation to Return or Destroy</u>. The Receiving Party will return to the Disclosing Party or destroy all Confidential Information of the Disclosing Party in the Receiving Party's possession or control and permanently erase all electronic copies of such Confidential Information promptly upon the written request of the Disclosing Party or the expiration or termination of this Agreement, whichever comes first. At the Disclosing Party's request, the Receiving Party will certify in writing that it has fully complied with its obligations under this Section 8.3.

**9.**     <u>Representations, Warranties, Covenants and Disclaimers</u>.

    **9.1.** <u>By Licensor</u>. Licensor represents and warrants only that: (a) it owns the entire right, title, and interest in the Licensed Patents and Licensed Know-How; (b) this Agreement has been duly authorized and executed by Licensor, and represents the legal, valid and binding obligations of Licensor, and is enforceable against Licensor in accordance with its terms; and (c) the execution, delivery and performance by Licensor of this Agreement does not violate, conflict with or constitute a breach of any provision of the organizational documents of Licensor or any material agreement, contract, consent, decree, order or other instrument to which Licensor is a party or by which Licensor is bound.

    **9.2.** <u>By Licensee</u>. Licensee represents, warrants and covenants only that: (a) Licensee and its sublicensees shall comply with all local, state, federal, and international laws and regulations relating to the development, manufacture, use, provision and sale of Licensed Products and Licensed Services; (b) this Agreement has been duly authorized and executed by Licensee, and represents the legal, valid and binding obligations of Licensee, and is enforceable against Licensee in accordance with its terms; and (c) the execution, delivery and performance by Licensee of this

8

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 8 of 14

Agreement does not violate, conflict with or constitute a breach of any provision of any federal, state or local law applicable to Licensee, the organizational documents of Licensee or any material agreement, contract, consent, decree, order or other instrument to which Licensee is a party or by which Licensee is bound.

**9.3.** LICENSOR MAKES NO OTHER REPRESENTATIONS OR WARRANTIES CONCERNING THE LICENSED PATENTS OR RELATED TECHNOLOGY, INCLUDING WITHOUT LIMITATION ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE. Specifically, Licensor makes no warranty or representation (i) regarding the validity or scope of any Licensed Patent, (ii) that the exploitation of the Licensed Technology or any Licensed Product or Licensed Service will not infringe any patents or other intellectual property rights of a third party, or (iii) that any third party is not currently infringing or will not infringe any patent covering the Licensed Technology.

**9.4.** WITH THE EXCEPTIONS OF ANY ACT OR OMISSION BY EITHER PARTY THAT WOULD CONSTITUTE A BREACH OF SECTION 8 (CONFIDENTIAL INFORMATION), IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION LOSS OF PROFIT, SAVINGS OR REVENUE, OR THE CLAIMS OF THIRD PARTIES, WHETHER OR NOT ADVISED OF THE POSSIBILITY OF SUCH LOSS, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, ARISING OUT OF THIS AGREEMENT.

**10.** Indemnity.

**10.1.** By Licensor. Licensor will indemnify, defend and hold harmless Licensee from and against any third party claim to the extent that, if true, would constitute a breach of Licensor's representations or warranties set forth in Section 9.1 (Warranty – By Licensor) above (a "Claim").

**10.2.** By Licensee. Licensee will indemnify, defend and hold harmless Licensor from and against any: (a) third party claim that, to the extent true, would constitute a breach of Licensee's representations or warranties set forth in Section 9.2 (Warranty – By Licensee) above; and/or (b) third party claim that is related to, or arises in connection with, the Licensed Technology (each a "Claim").

**10.3.** Procedures. The party to be indemnified (the "Indemnified Party") will: (a) provide written notice to the party to indemnify (the "Indemnifying Party") of any Claim promptly, but in no event more than 10 business days after the Indemnified Party knows of such Claim; (b) permit the Indemnifying Party to assume full responsibility for the defense of such Claim, provided that the Indemnifying Party will not compromise or settle any such Claim without the Indemnified Party's prior written consent; and (c) assist the Indemnifying Party, at the Indemnifying Party's expense, in the defense of such Claim.

9

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 9 of 14

## 11. Miscellaneous.

**11.1. Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall be deemed to be one and the same instrument.

**11.2. Headings.** All headings are for convenience only and shall not affect the meaning of any provision of this Agreement.

**11.3. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns.

**11.4. Assignment.** This Agreement may not be assigned by either party without the prior written consent of the other party, which consent will not be unreasonably delayed, conditioned or withheld. Notwithstanding the preceding sentence, Licensor may assign this Agreement, without Licensee's consent, in connection with a merger with or into, or a sale of all or substantially all of Licensor's assets to, a third party (collectively referred to herein as a "Liquidity Event"), *provided that* upon Licensee's written request within thirty (30) days of the Liquidity Event, the assignee agrees in writing to be bound by all terms and conditions of this Agreement.

**11.5. Amendment and Waiver.** This Agreement may be amended, supplemented, or otherwise modified only by means of a written instrument signed by both parties. Any waiver of any rights or failure to act in a specific instance shall relate only to such instance and shall not be construed as an agreement to waive any rights or fail to act in any other instance, whether or not similar.

**11.6. Force Majeure.** Neither party will be responsible for delays resulting from causes beyond the reasonable control of such party, including without limitation fire, explosion, flood, war, strike, or riot, provided that the nonperforming party uses commercially reasonable efforts to avoid or remove such causes of nonperformance and continues performance under this Agreement with reasonable dispatch whenever such causes are removed.

**11.7. Governing Law and Forum.** This Agreement shall be governed by and construed in accordance with the laws of Maine irrespective of any conflicts of law principles.

**11.8. Notice.** Any notices required or permitted under this Agreement shall be in writing, shall specifically refer to this Agreement, and shall be sent by hand, recognized national overnight courier, confirmed facsimile transmission, confirmed electronic mail, or registered or certified mail, postage prepaid, return receipt requested, to the addresses first listed above. All notices under this Agreement shall be deemed effective upon receipt. A party may change its contact information immediately upon written notice to the other party in the manner provided in this Section.

**11.9. Severability.** In the event that any provision of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any other provision of this Agreement, and the parties shall negotiate in good faith to modify the Agreement to preserve (to the extent possible) their original intent. If the parties fail to reach a modified

10

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 10 of 14

agreement within sixty (60) days after the relevant provision is held invalid or unenforceable, then the court shall be authorized to modify the invalid provision to the extent and in the manner necessary to render it enforceable.

**11.10.** <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements or understandings between the parties relating to its subject matter.

**11.11.** <u>Arbitration</u>. Any controversy or claim arising under or related to this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association before a single arbitrator selected in accordance with those rules. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

**12.** <u>Cooperative Development</u>.

**12.1.** Licensor has informed Licensee that it intends to develop, test, manufacture and offer for sale a 7.62mmX51 ACR ("New Product") to compete for the emerging USMC requirement in 2008/2009 and other applications. Many of the components for use in the New Product are already manufactured by or in use in Licensor's products. Licensor has requested Licensee to provide certain assistance to it in the development and testing of the New Product. Licensee normally does not provide such assistance but is willing to do so within the following general parameters: (i) Licensor will not partner or work with a competitor of Licensee while Licensor and Licensee are working together on the New Product; (ii) Licensor will provide or cause to be provided to Licensee technical expertise and other capabilities as may be agreed to between the Parties; (iii) the timing, scope and cost to Licensee for testing by Licensee shall be agreed to between the Parties before testing is initiated; (iv) Licensee and Licensor will agree to the extent to which each will provide technical support to the development of the New Product; (v) Licensor grants to Licensee a Manufacturing Right of First Refusal (as defined below); and (vi) in partial consideration for Licensee providing the support to Licensor identified herein, Licensor hereby grants Licensee a Licensing Right of First Refusal (as defined below). For purposes of this Agreement, "Manufacturing Right of First Refusal" means Licensor must notify Licensee regarding any intention to manufacture the New Product before approaching other manufacturers and "Licensing Right of First Refusal" means Licensor must notify Licensee regarding any intention to grant a license to make, have made, develop, sell, commercialize, exploit, market, export and import, the New Product and offer Licensee an exclusive license regarding the same, *provided that* Licensee notifies Licensor in writing within ten business days of its intention to obtain such exclusive license from Licensor and *provided further that* both Parties amend the Agreement to include the New Product and Licensee pays Licensor an upfront licensing fee, in addition to negotiated royalty fees, of an amount not less than $250,000.00 as a New Product License Fee.

11

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 11 of 14

# EXHIBIT A

## Licensed Patents

| Application Serial No. | Filing Date | Title |
|---|---|---|
| 12/013,226 | 11-JAN-2008 | Adjustable Cheek Piece for a Firearm Butt Stock |
| 12/013,217 | 11-JAN-2008 | Ambidextrous Push-Button Magazine Release for Side-Locking Ammunition Magazines |
| 12/013,401 | 11-JAN-2008 | Quick Change Barrel System for a Firearm |
| 12/013,406 | 11-JAN-2008 | Charging Handle with Forward Assist Function |
| 29/302,198 | 11-JAN-2008 | Automatic Rifle |
| 29/302,199 | 11-JAN-2008 | Firearm Upper Receiver with Rail Hand Guard |
| 29/302,200 | 11-JAN-2008 | Firearm Upper Receiver with Long Forend |
| 29/302,203 | 11-JAN-2008 | Lower Grip Housing for a Firearm Using an M16 Magazine |
| 29/302,205 | 11-JAN-2008 | Lower Grip Housing for a Firearm Using an AK-47 Magazine |
| 29/302,206 | 11-JAN-2008 | Firearm Stock |
| PCT/US08/50938 | 11-JAN-2008 | Firearm |

A-1

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 12 of 14

# Exhibit B

## Exclusivity Minimums

At the end of each Period set forth below during the term of this Agreement, in the event that the actual annual Sales are less than the Exclusivity Floor set forth below, Bushmaster will have the option of (i) paying the difference between actual royalties and royalties owed on that number of units of the applicable Exclusivity Floor to retain exclusivity for the following year, or (ii) terminating exclusivity. In the event Bushmaster opts to forego exclusivity, Magpul shall have the ability to manufacture or partner to sell the MASADA in any manner it wishes in its absolute and sole discretion.

| Period | Exclusivity Floor (# of complete units) |
|---|---|
| Effective Date — December 31, 2009 | 0 |
| Calendar Year 2010 | 3000 |
| Calendar Year 2011 | 4,000 |
| Each Calendar Year Thereafter | 4,000 |

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**MAGPUL INDUSTRIES CORP.**

By: _____
Title: President
Name: Richard Fitzpatrick

**BUSHMASTER FIREARMS INTERNATIONAL, LLC**

By: John G. DeSantis
Title: President & GM
Name: John A. DeSantis

Signature Page

Case 20-81688-CRJ11    Doc 750-1    Filed 09/21/20    Entered 09/21/20 16:49:32    Desc
Exhibit Exhibit A - Bushmaster Royalty Agreement re the ACR    Page 14 of 14