**Exhibit C**

ASSET PURCHASE AGREEMENT

by and among

ROUNDHILL GROUP, LLC

as Buyer,

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.,

as Seller

SET FORTH ON THE SIGNATURE PAGES HERETO

Dated as of September 26, 2020

# TABLE OF CONTENTS

**Page**

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS ................................... 6

    Section 1.1    Transfer of Acquired Assets ................................................. 6
    Section 1.2    Excluded Assets ................................................................. 9
    Section 1.3    Assumption of Liabilities ................................................... 12
    Section 1.4    Retention of Liabilities ..................................................... 12
    Section 1.5    Assumed Leases and Assumed Contracts; Cure Amount ................. 13
    Section 1.6    Non-Assignment of Acquired Assets ................................. 14
    Section 1.7    Further Conveyances and Assumptions ............................. 15

ARTICLE 2. CONSIDERATION ........................................................................ 16

    Section 2.1    Consideration ................................................................. 16
    Section 2.2    Good Faith Deposit ......................................................... 16

ARTICLE 3. CLOSING AND DELIVERIES ......................................................... 16

    Section 3.1    Closing ......................................................................... 16
    Section 3.2    Seller's Deliveries .......................................................... 16
    Section 3.3    Buyer's Deliveries .......................................................... 18

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ..................................... 18

    Section 4.1    Representations and Warranties of Seller ........................... 18
    Section 4.2    Representations and Warranties of Buyer ........................... 21
    Section 4.3    Warranties Exclusive; Schedules ..................................... 23
    Section 4.4    Survival of Representations and Warranties ....................... 23

ARTICLE 5. COVENANTS OF THE PARTIES ................................................... 23

    Section 5.1    Covenants of Seller ........................................................ 23
    Section 5.2    Covenants of Buyer ........................................................ 25

ARTICLE 6. ADDITIONAL AGREEMENTS ....................................................... 27

    Section 6.1    Bankruptcy Matters ........................................................ 27
    Section 6.2    Transition Arrangements .................................................. 27
    Section 6.3    Further Assurances ......................................................... 28

ARTICLE 7. EMPLOYEES AND EMPLOYEE BENEFITS ................................... 28

    Section 7.1    Transferred Employees .................................................... 28
    Section 7.2    Employment Tax Reporting .............................................. 29
    Section 7.3    Benefits ........................................................................ 29
    Section 7.4    WARN Act .................................................................... 29
    Section 7.5    Third Party Beneficiary ................................................... 29

ARTICLE 8. TAXES ...................................................................................... 30

    Section 8.1    Taxes Related to Purchase of Assets ................................. 30
    Section 8.2    Cooperation on Tax Matters ............................................. 30
    Section 8.3    Allocation of Purchase Price ............................................ 31

ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ................. 31

# TABLE OF CONTENTS
### (continued)

| | | | |
|---|---|---|---|
| Section 9.1 | Conditions Precedent to Performance by Seller | | 31 |
| Section 9.2 | Conditions Precedent to Performance by Buyer | | 33 |

**ARTICLE 10. TERMINATION** ................................................................... 34

| | | | |
|---|---|---|---|
| Section 10.1 | Conditions of Termination | | 34 |
| Section 10.2 | Effect of Termination; Remedies | | 35 |

**ARTICLE 11. MISCELLANEOUS** ............................................................. 36

| | | | |
|---|---|---|---|
| Section 11.1 | Successors and Assigns | | 36 |
| Section 11.2 | Governing Law; Jurisdiction | | 36 |
| Section 11.3 | WAIVER OF JURY TRIAL | | 36 |
| Section 11.4 | Expenses | | 37 |
| Section 11.5 | Broker's and Finder's Fees | | 37 |
| Section 11.6 | Severability | | 37 |
| Section 11.7 | Notices | | 37 |
| Section 11.8 | Amendments; Waivers | | 38 |
| Section 11.9 | Time of Essence | | 38 |
| Section 11.10 | Public Announcements | | 39 |
| Section 11.11 | Entire Agreement | | 39 |
| Section 11.12 | Parties in Interest | | 39 |
| Section 11.13 | Bulk Sales Laws | | 40 |
| Section 11.14 | Construction | | 40 |
| Section 11.15 | Counterparts and Facsimile | | 40 |

**ARTICLE 12. DEFINITIONS** ................................................................... 40

| | | | |
|---|---|---|---|
| Section 12.1 | Certain Terms Defined | | 40 |
| Section 12.2 | All Terms Cross-Referenced | | 48 |

## SCHEDULES

| | | |
|---|---|---|
| Schedule 1.1(i) | - | Assumed Business Contracts |
| Schedule 1.2(q) | - | Excluded Assets |
| Schedule 1.3(b) | - | Assumed Liabilities |
| Schedule 1.4(n) | - | Excluded Liabilities |
| Schedule 1.5(a) | - | Estimated Cure Amount |
| Schedule 4.1(g) | - | Compliance with Law |
| Schedule 4.1(h) | - | Contracts |
| Schedule 4.1(i) | - | Material Permits |
| Schedule 4.1(j) | - | Acquired Intellectual Property |
| Schedule 11.5 | - | Brokers and Finders |
| Schedule 12.1(a) | - | Tradenames |
| Schedule 12.1(b) | - | Permitted Liens |

**EXHIBIT**

Exhibit 1     -     Bidding Procedures Order
Exhibit 2     -     Trademark License Agreement

4

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of September 26, 2020 (the "<u>Effective Date</u>"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("<u>ROC</u>"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (collectively with ROC, "<u>Seller</u>"), and the Roundhill Group, LLC ("<u>Buyer</u>"), or a Buyer Acquisition Vehicle as assignee in accordance with <u>Section 11.1</u>. Capitalized terms used in this Agreement are defined or cross-referenced in <u>Article 12</u>.

## *RECITALS*

A.      Seller is engaged in the manufacture, design, marketing and sale of shotguns, rifles, handguns and modular firearms and related components and accessories other than the Marlin Business (the "<u>Business</u>"). On July 27, 2020 (the "<u>Petition Date</u>"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Alabama (the "<u>Bankruptcy Court</u>" and the case arising under such petition, the "<u>Bankruptcy Case</u>").

B.      On the Petition Date, Seller filed a Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets (the "<u>Bidding Procedures Motion</u>") pursuant to which Seller sought, and the Bankruptcy Court approved, the Bidding Procedures Order attached hereto as Exhibit 1 (the "<u>Bidding Procedures Order</u>").

C.      Buyer desires to purchase the Acquired Assets free and clear of Liens, Claims and Interests (other than Permitted Liens), except for assumption of the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Buyer, the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

D.      Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Seller.

E.      The Acquired Assets and Assumed Liabilities are assets and liabilities of Seller, which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "<u>Sale Order</u>"), which order will include the authorization for the assumption by Seller and assignment to Buyer of certain executory contracts and unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code. The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

F.      This Agreement is conditioned upon Vista Outdoor, Inc. ("Vista") being the

5

successful bidder for Debtors' ammunition business and related assets.

*STATEMENT OF AGREEMENT*

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

ARTICLE 1. <u>PURCHASE AND SALE OF THE ACQUIRED ASSETS</u>.

Section 1.1 <u>Transfer of Acquired Assets</u>. At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities). For all purposes under this Agreement, the term "Acquired Assets" shall not include any Excluded Assets, and shall mean all of the other properties, assets, Interests and rights of Seller existing as of the Closing Date, of any kind or nature, real or personal, tangible or intangible, that in each case primarily relate to the ownership, operation and management of the Business, including, but not limited to:

(a) The following real property (the "<u>Owned Real Property</u>"):

1. Gun Factory
14 Hoefler Avenue[1]
Ilion, NY 13357

2. Steam Plant Parcel
Accessible via Commerce Street[2]
Ilion, NY 13357

3. Handgun Barrel Factory
5900 Highway 321 North
Lenoir City, TN 37771

4. Auxiliary Property
6035 Hwy 321
Lenoir City, TN 37771

(b) all Leases pursuant to which Seller has the right to possess, use, lease or occupy (or grant others the right to possess, use, lease or occupy) any Leased Real Property used in Seller's ownership, operation and management of the Business,

---

[1] Parcel Nos.: 120.37-4-1, 120.37-4-3, 120.37-4-29, 120.37-4-71, 120.37-4-77, 120.37-4-81, 120.37-5-8, 120.37-5-16, 120.37-5-36, 120.45-1-20.1

[2] Parcel No.: 119.36-1-13.3

6

together with all security and other deposits related thereto, prepaid rent and appurtenances thereto and associated therewith (collectively, the "Assumed Leases");

(c)     all Leasehold Improvements of Seller located on the Leased Real Property that is subject to the Assumed Leases (the "Assumed Leased Real Property");

(d)     all of Seller's owned (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property (including without limitation consumables located at the premises of the Business) that is in any of the foregoing cases primarily used for the ownership, operation or management of the Business (the "Owned FF&E"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E;

(e)     all of Seller's (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts primarily used for the ownership, operation or management of the Business, that are in each case leased pursuant to any Contract (the "Assumed FF&E Leases" and the equipment, machinery, furniture, fixtures and improvements, tooling and spare parts so leased, the "Leased FF&E"), (ii) rights under the Assumed FF&E Leases, and (iii) to the extent assignable, rights to any warranties and licenses received from manufacturers and lessors of the Leased FF&E;

(f)     all of Seller's (i) owned cars, trucks and other motor vehicles primarily used in connection with the Business (the "Owned Motor Vehicles"), and (ii) rights to the warranties and licenses received from manufacturers and sellers of the Owned Motor Vehicles;

(g)     (ii) all proceeds and recoveries from, policies (but not, for the avoidance of doubt, any Insurance Policies themselves) to the extent attributable to any of the Acquired Assets only to the extent in respect of periods on or after the Effective Date) (the rights described in this Section 1.1(h) being collectively the "Assumed Policy Rights");

(h)     all Contracts set forth on Schedule 1.1(i) (collectively, the "Assumed Business Contracts" and, together with the Assumed FF&E Leases, the Assumed Inbound IP Licenses, the Assumed Outbound IP Licenses, and the Assumed Motor Vehicle Leases, the "Assumed Contracts");

(i)     to the extent transferable under applicable Law, all Permits issued to Seller that are primarily used in connection with the ownership, operation and/or management of the Business, and all pending applications therefor;

(j)     all (i) registered and unregistered Intellectual Property owned and primarily used by Seller in connection with the ownership, operation and/or management of the Business, other than Excluded Intellectual Property, and any and all corresponding rights that, now or hereafter, may be secured throughout the world (collectively, the "Acquired Intellectual Property"), and (ii) to the extent transferable under applicable Law, all agreements under which Intellectual Property is licensed to Seller and used

7

primarily in connection with the ownership, operation and/or management of the Business, other than the Trademark License Agreement (collectively, the "Assumed Inbound IP Licenses");

(k)     the agreements listed on Schedule 1.1(k) under which Seller has granted licenses, sublicenses, or similar rights, permissions or franchises to use any Acquired Intellectual Property (the "Assumed Outbound IP Licenses");

(l)     all sales orders or other commitments of Seller to purchasers of goods, services or products produced or sold by the Business (the "Customer Orders");

(m)     all right, title and interest in and to all inventory, supplies and finished goods within the scope of the operations of the Business and located on the Owned Real Property and the Leased Real Property or (to the extent within the scope of the operations of the Business) in the possession of any third-party bailees (collectively, the "Inventory");

(n)     all (i) rights to refunds relating to, and prepaid expenses and deposits attributable to, any Purchase Orders, Customer Orders, Assumed Contracts and Inventory, and all rights under credit card merchant accounts, (ii) prepaid charges and deposits in respect of telephone, electricity, water and sewer and other utilities provided to the above-referenced Owned Real Property and the Assumed Leased Real Property, (iii) prepaid common area maintenance expenses relating to any Assumed Lease to the extent in respect of periods on or after the Closing Date and security deposits for any Assumed Lease, (iv) ordinary holdbacks (including ordinary credit card holdback payments or protection reserves) in connection with or relating to any Acquired Asset and (v) other deposits, prepaid charges and expenses paid by Seller and other rights of Seller in connection with or primarily relating to any Acquired Asset;

(o)     all goodwill, including all goodwill associated with the Business, with the Acquired Intellectual Property, and with any of the other Acquired Assets;

(p)     Claims held by Seller that relate to Acquired Assets;

(q)     all other tangible or intangible assets of Seller primarily used in connection with the ownership, operation and/or management of the Business;

(r)     to the extent permitted by applicable Law (and other than all Documents of Seller held by Seller or Seller's counsel related to the Retained Litigation), all Documents that are primarily used in, held for use in or intended to be used in, or that primarily relate to, the Acquired Assets, the Assumed Liabilities or the Business; provided, that Buyer shall provide Seller with reasonable access (during business hours with reasonable prior notice and without cost to Seller) to the same following the Closing to the extent reasonably necessary to permit Seller to wind-down and liquidate its estate after the Closing; and provided, further, that Seller shall keep such information confidential in accordance with all requirements of applicable Law;

8

(s)        all contents of the Remington Museum including all firearms of every nature which are owned by Seller, including but not limited to all antique, collectible, and historic firearms owned by Seller whether located at the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere;

(t)        all antique, collectible, and historic firearms owned by Seller whether not considered part of the Ilion, NY Remington Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere;

(u)        all antique, collectible, and historic firearms owned by Seller not considered part of the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere;

(v)        all rights and title to the shares of capital stock (and any other equity interests or rights convertible into equity interests) (the "RLC Shares") of Remington Licensing Corporation, a Delaware corporation, that are owned by RA Brands, L.L.C., a Delaware limited liability company (provided, that, Buyer reserves the right, in its sole discretion to assign to a third party or classify the assets described in this subsection (h) as an Excluded Asset at any time prior to the Closing Date; provided further that any such deduction shall have no effect on the Purchase Price); and

(t)        all artwork owned by Seller wherever located, including all artwork on loan or display outside the company including but not limited to all artwork located at the Remington Arms Museum location including artwork on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere.

Section 1.2        Excluded Assets.  Except as provided in Section 1.1, the Acquired Assets shall not include any right, title or interest of any Person other than Seller in any property or asset, or Seller's right, title and interest in, to and under properties and assets not used in connection with the ownership, operation and/or management of the Business, and shall specifically exclude the following properties, Contracts, Leases, and other assets, interests and rights of Seller (all such items not being acquired by Buyer being referred to in this Agreement as the "Excluded Assets"):

(a)        all rights of every nature and description (other than Assumed Policy Rights) under or arising out of all insurance policies of Seller (the "Insurance Policies"), including without limitation (i) with respect to Claims arising prior to the Effective Date (ii) to the extent of coverage of any Excluded Liabilities, (iii) under those insurance policies covering any tort liabilities that are not Assumed Liabilities, (iv) under the D&O Insurance, and (v) under those insurance policies covering liabilities and Claims against Seller and its affiliates relating to the Excluded Employee Liabilities);

9

(b)     any asset that is not owned or leased by Seller or not used or held for use in connection with the ownership, operation and management of the Business;

(c)     any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that (i)Seller shall provide Buyer with reasonable access to the same following the Closing to the extent relating to the Acquired Assets and when reasonably requested by Buyer; and (ii) Buyer shall be entitled upon reasonable request to be provided with copies of all such records, at its own expense, and provided, further, that Seller shall notify Buyer before disposing of any such records and upon Buyer's reasonable request shall transfer them to Buyer;

(d)     all (i) prepaid premiums in respect of all Insurance Policies, (ii) retainers, prepayments or on-account cash paid to Seller's professionals and advisors, including any carve-out under any DIP Facility or cash collateral arrangements (whether retained in the Bankruptcy Case or otherwise), and (iii) other deposits, prepaid charges and expenses paid by Seller to the extent in connection with or relating to any Excluded Asset;

(e)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes for any Straddle Period, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(f)     all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller entity;

(g)     all Documents exclusively relating to any Excluded Asset provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then- applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(h)     all Documents exclusively relating to any Employees who do not become Transferred Employees; provided that, to the extent permitted by applicable Law, Seller shall make copies of such Documents available to Buyer if reasonably related to addressing or defending any such Employees' claims against Buyer;

(i)     subject to Section 1.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities pursuant to Section 1.4(a));

10

(j)      all Employee Benefit Plans and all assets of, and Contracts exclusively relating to or associated with such plans;

(k)      all Cash and all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(l)      any rights of Seller under this Agreement or any Ancillary Agreement to which Seller is a party, including without limitation any rights relating to the Purchase Price;

(m)      copies of all Historic Firearms Books and Records of Seller provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then- applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(n)      all Documents of Seller held by Seller or Seller's counsel relating to (i) any litigation against Seller or (ii) the Excluded Employee Liabilities;

(o)      the D&O Insurance, and all proceeds thereof;

(p)      all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

(q)      any properties, Contracts, Leases, or other assets, interests and rights of Seller that (i) do not relate to the ownership, operation or management of the Business or (ii) are otherwise set forth on Schedule 1.2(q);

(r)      all Avoidance Actions;

(s)      Claims held by Seller against any party that are covered by, relate to or are based upon any Insurance Policies (including the D&O Insurance);

(t)      all assets subject to an Ammunitions Business Bid (as defined in the Bidding Procedures Order);

(u)      all assets primarily used in the Marlin Business, including all trademarks, service marks and logos containing Marlin or an abbreviation or derivation thereof;

(v)      all trademarks, service marks and logos containing Remington or an abbreviation or derivation thereof;

(w)      all trademarks, service marks, logos and domain names related to the Non-Core Brands, and all Intellectual Property exclusively used in connection with the products and services manufactured and sold under the Non-Core Brands;

11

(x)     the list of "Licensed Trademarks" affixed as Appendix B to the Trademark License Agreement between Vista Outdoor, Inc. and Buyer in substantially the form set forth in Exhibit 2 (the "<u>Trademark License Agreement</u>"); and

(y)     any real property owned by of Seller other than the Owned Real Property.

Section 1.3     <u>Assumption of Liabilities</u>.  At the Closing, Buyer shall assume, and Buyer agrees to thereafter pay, perform and discharge when due, and indemnify, defend and hold harmless Seller, its Affiliates and all of their respective Related Persons from and against, the following liabilities (all items in this <u>Section 1.3</u> being, collectively, the "<u>Assumed Liabilities</u>"):

(a)     all liabilities and unperformed and unfulfilled obligations of Seller under the terms of any Assumed Contract or Assumed Lease (including all premium finance arrangements of Seller for Assumed Contracts), and the Cure Amount in connection with the assignment of the Assumed Leases and the Assumed Contracts to, and the assumption of the Assumed Leases and the Assumed Contracts by, Buyer;

(b)     all liabilities and obligations of Seller set forth on <u>Schedule 1.3(b);</u>

(c)     all liabilities and obligations for Post-Closing Taxes (including those relating to any Straddle Period);

(d)     all liabilities and obligations for Transaction Taxes; and

(e)     all liabilities under the CBA, as revised and amended to reflect the terms of <u>Section 7.1</u> herein and to exclude any liability for unpaid wages, benefits or Pension Plan obligations.

Section 1.4     <u>Retention of Liabilities</u>.  Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Seller (all such liabilities and obligations not being assumed being herein referred to as the "<u>Excluded Liabilities</u>").  The Excluded Liabilities include, without limitation, the following liabilities and obligations:

(a)     all liabilities and obligations under or relating to the Excluded Assets;

(b)     all liabilities and obligations of Seller under or relating to the Priority Term Loan, the FILO Facility, the Exit Term Loan or the Intercompany Note;

(c)     all liabilities and obligations relating to any Employee Benefit Plans (the "<u>Excluded Employee Liabilities</u>");

(d)     all liabilities and obligations for Pre-Closing Income Taxes;

12

(e)     all liabilities and obligations of Seller arising under or incurred in connection with the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which Seller is a party and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(f)     all liabilities of, and Claims against, Seller arising from and in connection with grants of restricted common unit/share awards and stock options by Seller;

(g)     any liabilities and obligations of Seller under this Agreement, or under any Ancillary Agreement to which Seller is a party;

(h)     all liabilities under any Qualifying Excluded Contracts and Leases;

(i)     all State of Alabama Project Development Liabilities;

(j)     all City of Huntsville Project Development Liabilities;

(k)     the Retained Litigation;

(l)     all other liabilities and obligations arising out of or relating to Seller's ownership, operation or management of the Business and the Acquired Assets prior to the Closing;

(m)     all liabilities and obligations under the Pension Plan and otherwise payable to employees not retained by Buyer; and

(n)     all liabilities set forth on Schedule 1.4(n).

Section 1.5     Assumed Leases and Assumed Contracts; Cure Amount.

(a)     At such time as is specified in the Sale Order, pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Buyer and Buyer shall assume from Seller, the Assumed Leases and the Assumed Contracts. The amounts necessary, pursuant to Section 365 of the Bankruptcy Code, to cure any and all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults under any Assumed Lease or Assumed Contract (such aggregate amount, the "Cure Amount") shall be paid by Buyer, in each case as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order and this Agreement. Schedule 1.5(a) contains Seller's estimate as of the Effective Date of the Cure Amount. Buyer may, in its sole discretion (but subject to the limitations in Section 1.5(d)), amend Schedule 1.2(q) to indicate the rejection of any executory contracts at any time prior to the date of a final hearing to approve the sale of the Acquired Assets (the "Sale Hearing"), upon written notice to Seller; provided that the definition or interpretation of (i) "Acquired Assets" for the purposes of Section 1.3 only and (ii) "Assumed Liabilities"

13

and "Excluded Liabilities" for any purposes under this Agreement, shall not reflect any such amendment without the prior written consent of Seller.

(b)  Seller shall timely serve the motion seeking entry of the Sale Order to all parties to Leases and Contracts and, subject to <u>Section 1.6</u> and the performance of Buyer's obligations in <u>Section 5.2</u>, Seller shall use commercially reasonable efforts to cause the Assumed Leases and Assumed Contracts to be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and Seller shall comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign and delegate to Buyer all of Seller's rights and obligations under the Assumed Leases and Assumed Contracts.

(c)  Notwithstanding any provision in this Agreement to the contrary, if for any reason Buyer fails to pay the Cure Amount in respect of any Assumed Contract or Assumed Lease when due and payable pursuant to this Agreement, the Sale Order or any other Order of the Bankruptcy Court, (i) Seller shall be under no obligation whatsoever to pay or otherwise satisfy such Cure Amount or any other liability or obligation under such Assumed Contract or Assumed Lease, (ii) Buyer shall indemnify and hold harmless Seller in respect of such Cure Amount, liability or obligation as well as any expenses (including legal fees and expenses) incurred by Seller in defending any claim for payment of the Cure Amount or any other liability or obligation arising under such Contract or Lease asserted by the counterparty thereto and (iii) Seller may reject, and nothing in this Agreement shall prohibit Seller from rejecting, such Contract or Lease.

(d)  Notwithstanding any provision in this Agreement to the contrary, at any time prior to the Sale Hearing, Buyer may designate in writing to Seller any Contract or Lease as an Excluded Liability (and amend <u>Schedule 1.2(q)</u> for such purposes only), only if the rejection of such Contract or Lease would not give rise to a Claim in favor of the counterparty thereto having administrative priority or any other priority senior to a general unsecured Claim against the bankruptcy estate of Seller (the "<u>Qualifying Excluded Contracts and Leases</u>").  Seller may reject, and nothing in this Agreement shall prohibit Seller from rejecting, the Qualifying Excluded Contracts and Leases.

Section 1.6  <u>Non-Assignment of Acquired Assets</u>.  Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof (after giving effect to any waiver by the applicable counterparty, or any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent.  In

14

such event, Seller and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to Seller or Buyer, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Seller would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Seller's obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Seller thereunder.

Section 1.7    Further Conveyances and Assumptions.

(a)    Seller shall deliver to Buyer at the Closing such Employee Records as is reasonably necessary for Buyer to transition the Transferred Employees into Buyer's records, as well as all other Documents included in the Acquired Assets.

(b)    At the Closing, and from time to time thereafter, Seller and Buyer shall, and Seller and Buyer shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

Section 1.8    Conflicts with Other Bidders. In the event of any conflict regarding the Acquired Assets or Assumed Liabilities between this Agreement and agreements governing other sales of the Seller's assets in the Bankruptcy Case (the "Other Agreements") defined herein or therein, Buyer shall cooperate in good faith with any other purchasers of Seller's assets pursuant to the Other Agreements, whether before or after the Closing Date, to ensure all assets or liabilities are adequately apportioned between the parties in order to reflect the intent of Buyer and any such other purchasers hereunder and thereunder. Without limitation to the foregoing, at the Closing, Buyer shall receive a non-exclusive, perpetual, worldwide, royalty-free license to use Patents Nos. 10,254,063 and 10,718,584 in the Business.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 16 of 121

## ARTICLE 2. CONSIDERATION

Section 2.1 Consideration. The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets (the "Purchase Price") shall be:

(a) Thirteen Million United States Dollars (US $13,000,000.00) (the "Gross Closing Cash Payment"), to be adjusted pursuant to Section 2.2(b), and paid and delivered in accordance with Section 3.3(a); and

(b) assumption of the Assumed Liabilities.

Section 2.2 Good Faith Deposit.

(a) Buyer has paid to Seller the amount of Five Million United States Dollars (US $5,000,000.00) by wire transfer of immediately-available funds (the "Good Faith Deposit"). The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Seller or Buyer and shall be deposited in a segregated deposit account of Seller and held in trust to be administered solely in accordance with the terms of this Agreement and the Bidding Procedures Order. Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b) If the Closing occurs, the Gross Closing Cash Payment shall be reduced by the amount of the Good Faith Deposit (such resulting amount, the "Net Closing Cash Payment"), to be paid and delivered in accordance with Section 3.3(a).

(c) If this Agreement is terminated pursuant to Section 10.1, the Good Faith Deposit shall be repaid to Buyer or retained by Seller in the amounts and at the times set forth in Section 10.2(a) through Section 10.2(c).

## ARTICLE 3. CLOSING AND DELIVERIES

Section 3.1 Closing. Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Pacific Time, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in Article IX of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by Seller and Buyer, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "Closing Date").

Section 3.2 Seller's Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a) With the exception of all firearm-related Acquired Assets requiring Buyer to hold certain licenses or permits (the "Permitted Assets"), including

16

but not limited to a Federal Firearms License, or similar license, issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives, all of the Acquired Assets, together with one or more duly executed bills of sale, endorsed certificates of title and other evidence of transfer of motor vehicles and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller; provided that Seller's conveyance of deliverables relating to the Owned Real Property shall be governed by Section 3.2(g). Seller shall maintain possession of the Permitted Assets until a point-in-time when Buyer holds all requisite permits and/or licenses necessary to take possession of the Permitted Assets. No later than five (5) Business days after Buyer holds permits and/or licenses required under applicable Law to take possession of the Permitted Assets, Buyer shall deliver written notice of obtaining such permits and Seller shall turn over all Permitted Assets to Buyer upon receipt of such notice. Notwithstanding anything to the contrary in this Agreement, if Buyer is unable to obtain all requisite Permits sufficient under applicable Law to take possession of the Permitted Assets within seventy-five (75) days after the Effective Date (the "FFL Cutoff Date"), unless Buyer shall within 2 Business Days after the FFL Cutoff Day pay to Seller in immediately available funds the sum of Two Hundred and Fifty Thousand United States Dollars (US$ 250,000), in which event the FFL Cutoff Date shall for all purposes under this Agreement be one hundred (100) days after the Effective Date, then Seller may terminate this Agreement and retain the Good Faith Deposit, and if the Closing has already occurred, (1) Seller may in its sole discretion retain the Gross Closing Cash Payment as forfeited by Buyer and (2) Buyer shall either (a) return all of the Permitted Assets to Seller previously delivered by Seller to Buyer or (b) transfer all of the Permitted Assets to a third-party designee of Buyer with all requisite Permits sufficient under applicable Law to take possession of the Permitted Assets;

(b)     one or more duly executed assignment and assumption agreements for the Assumed Contracts and the Assumed Liabilities, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Assignment and Assumption Agreement");

(c)     one or more duly executed assignment and assumption agreements for the Assumed Leases, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Assignment and Assumption of Lease");

(d)     one or more duly executed assignments of (i) the trademark and patent registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States), (ii) the Internet domain name registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for filing with all applicable domain name registries, and (iii) general assignments of all other Acquired Intellectual Property, in each case in form and substance customary for transactions of

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 18 of 121

this nature and reasonably acceptable to Buyer and Seller (each, an "Acquired Intellectual Property Assignment");

(e)     the officer's certificate required to be delivered pursuant to Section 9.2(a) and Section 9.2(b);

(f)     one or more affidavits executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(g)     quitclaim deeds, or their equivalent in the applicable state, for the Owned Real Property, executed by Seller; and

(h)     a duly executed Limited Power of Attorney to enable Buyer to execute on Seller's behalf any further documents necessary to record the assignment to Buyer of Acquired Intellectual Property.

Section 3.3     Buyer's Deliveries.  At the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a)     cash in an amount equal to the Net Closing Cash Payment, by wire transfer of immediately available funds to the account or accounts of Seller identified by Seller in writing reasonably in advance of the Closing;

(b)     one or more duly executed Assignment and Assumption Agreements;

(c)     one or more duly executed Acquired Intellectual Property Assignments;

(d)     the officer's certificate required to be delivered pursuant to Section 9.1(a) and Section 9.1(b); and

(e)     such other documents, instruments and certificates as Seller may reasonably request to transfer, assign and delegate the Assumed Liabilities to Buyer in accordance with the terms and conditions hereof.

ARTICLE 4. REPRESENTATIONS AND WARRANTIES

Section 4.1     Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows:

(a)     Corporate Organization.  Each entity comprising Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of domicile.  Subject to any necessary authority from the Bankruptcy Court, each entity comprising Seller has the requisite corporate or limited liability company power and authority to conduct the Business as now being conducted and to carry out its obligations under this Agreement.

18

(b) <u>Qualification to do Business</u>. Each entity comprising Seller is duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c) <u>Authorization and Validity</u>. Each entity comprising Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement to which Seller is a party and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement has been duly authorized, and at or before Closing the execution and delivery of the Ancillary Agreements to which Seller is a party will be duly authorized, by all necessary corporate or limited liability company action by the boards of directors or managers of Seller, and no other corporate or limited liability company proceedings are necessary for the performance by Seller of its obligations under this Agreement or the consummation by Seller of the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by Seller, and at Closing the Ancillary Agreement to which Seller is a party will be duly and validly executed and delivered by Seller, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, is the Agreement is, and each of the Ancillary Agreements to which Seller is a party will be at Closing, is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(d) <u>No Conflict or Violation</u>. Neither the execution and delivery by Seller of this Agreement or any of the Ancillary Agreements to which Seller is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order) the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements to which Seller is a party, nor compliance by Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any breach of any provision of the respective certificates of incorporation or formation of Seller or the respective by-laws or operating agreements of Seller, or (y) violate any provision of law, regulation, rule or other legal requirement of any Government ("<u>Law</u>") or any order, judgment or decree of any court or Government ("<u>Order</u>") applicable to Seller or any of its properties or assets, except, in either of the foregoing cases (x) and (y), for any conflict or violation as would not reasonably be expected to cause a Material Adverse Effect.

(e) <u>Consents and Approvals</u>. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Seller is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Seller after the Closing in order for Buyer to own or operate any of the Acquired Assets; (ii) the entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

19

(f) <u>Title and Ownership</u>.  Except as would not have a Material Adverse Effect, Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets.  Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

(g) <u>Compliance with Law</u>.  Except as set forth on <u>Schedule 4.1(g)</u> or would not otherwise reasonably be expected to cause a Material Adverse Effect, (i) Seller has operated the Business in material compliance with all applicable Laws, and (ii) except as may result from the Bankruptcy Case, Seller has not received written notice of any violation of any applicable Laws, nor is Seller in default with respect to any Order applicable to the Acquired Assets.

(h) <u>Contracts and Leases</u>.  As of the Effective Date, other than as set forth on <u>Schedule 4.1(h)</u> or in motions or other pleadings or similar items filed with the Bankruptcy Court, neither Seller nor, to Seller's Knowledge, any other party to any of the Assumed Contracts or Assumed Leases has commenced any action against any of the parties to such Assumed Contracts or Assumed Leases or given or received any written notice of any material default or violation under any Assumed Contract or Assumed Lease that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assumed Contracts and Assumed Leases).  Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assumed Contracts and Assumed Leases is, or will be at the Closing, valid, binding and in full force and effect against Seller, except as otherwise set forth on <u>Schedule 4.1(h)</u>.

(i) <u>Permits</u>.  <u>Schedule 4.1(i)</u> sets forth a complete and correct list of all material Permits currently held by Seller in connection with the Business ("<u>Material Permits</u>"), and all such Material Permits at the current locations of the Business are, except as would not cause a Material Adverse Effect, in full force and effect.

(j) <u>Intellectual Property</u>.  <u>Schedule 4.1(j)</u> sets forth an accurate and complete list of all registrations and applications for Acquired Intellectual Property owned by the Sellers. The Sellers are the sole and exclusive owners of the Acquired Intellectual Property owned by the Sellers (including as set forth on <u>Schedule 4.1(j)</u>) free and clear of all Liens pursuant to the Sale Order.  Except as limited by section 365(c)(1)(A) of the Bankruptcy Code, Sellers own all right, title and interest to, or are valid licensees with respect to, the Acquired Intellectual Property, and, at Closing, will convey the Acquired Intellectual Property to Buyer free and clear of Liens pursuant to the Sale Order.  To the Sellers' Knowledge, (i) no Person is engaging in any activity that materially infringes, dilutes, misappropriates or violates any Acquired Intellectual Property and (ii) no claim has been asserted to any Seller in writing that the use of any Acquired Intellectual Property or the operation of the Business infringes, dilutes, misappropriates or violates the Intellectual Property of any third party.

20

Section 4.2    Representations and Warranties of Buyer.  Buyer represents and warrants to Seller as follows:

(a)    Corporate Organization.  Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation.  Buyer has the requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b)    Qualification to do Business.  Buyer will as of the Closing Date be duly qualified to do business as a foreign limited liability company in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c)    Authorization and Validity.  Buyer has the requisite corporate power and authority necessary to enter into this Agreement and each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby.  This Agreement and each of the Ancillary Agreements to which Buyer is a party have been duly and validly executed and delivered by Buyer, and at Closing each Ancillary Agreement will be duly and are validly executed and delivered by Buyer, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Seller, the Agreement is, and each of the Ancillary Agreements will be at Closing, a valid and binding obligations of Buyer enforceable against it in accordance with their respective terms. Scott Soura is the sole member of Buyer and has as of the Closing ensured that Buyer and any Buyer Acquisition Vehicle has sufficient funds necessary to consummate the transactions contemplated by this Agreement.

(d)    No Conflict or Violation.  Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order) the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract,

indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject, except as would not materially and adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement or any of the Ancillary Agreements.

(e) <u>Consents and Approvals</u>. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f) <u>Adequate Assurances Regarding Assumed Contracts and Assumed Leases</u>. Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Leases.

(g) <u>Financial Capability</u>. Buyer and any Buyer Acquisition Vehicle currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor (i) to Seller of the Purchase Price and (ii) of any Cure Amount, and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(h) <u>Investigation by Buyer</u>. Buyer has conducted its own independent review and analysis of the Business, the Acquired Assets and the Assumed Liabilities, operations, technology, assets, liabilities, financial condition and prospects of the Business as formerly carried on by Seller and acknowledges that Seller has provided Buyer with reasonable access to the personnel, properties, premises and records of the Business for this purpose. Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither Seller nor any of its Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in <u>Section 4.1</u> (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Seller, its Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 23 of 121

misrepresentation or concealment arising from actual fraud of Seller) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in Section 4.1 and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3    Warranties Exclusive; Schedules.

(a)    The representations and warranties contained in Article 4 are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed.  Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed.  WITHOUT LIMITING THE FOREGOING, SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (D) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS.  SELLER AND SELLER'S AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATIONS OR WARRANTIES IN ANY OTHER AGREEMENT.

(b)    The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

Section 4.4    Survival of Representations and Warranties.  None of the representations or warranties of Seller set forth in this Agreement or any Ancillary Agreement or in any certificate delivered pursuant to Section 9.2(a) or Section 9.2(b) shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement or any Ancillary Agreement shall survive in accordance with their respective terms).

ARTICLE 5. COVENANTS OF THE PARTIES

Section 5.1    Covenants of Seller.  Seller covenants as follows:

(a)    Commercially Reasonable Efforts.  Between the Effective Date and the Closing Date, Seller shall use commercially reasonable efforts to (except as may be disclosed to Buyer) (i) obtain all necessary consents, waivers, authorizations and

23

approvals of all Governments, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party, (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) maintain the Acquired Assets substantially in accordance with Seller's current practices and procedures (as adjusted for the effects of any COVID Restrictions).

(b)     <u>Access to Properties and Documents; Confidentiality</u>.  Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access (subject to any COVID Restrictions) during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10) to all Documents of Seller relating to the Acquired Assets and the Assumed Liabilities.  Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account any COVID Restrictions and Seller's resources and other commitments, during normal business hours, to all Acquired Assets, and to Seller's executive officers, accountants, counsel, employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 10).  The rights of access contained in this <u>Section 5.1(b)</u> are granted subject to, and on, the following terms and conditions:  (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this <u>Section 5.1(b)</u> or otherwise) will be governed and protected by the Confidentiality Agreement, dated as of September 8, 2020, by and between Buyer and ROC (the "<u>Confidentiality Agreement</u>"); and (iii) such rights of access shall not affect or modify the conditions set forth in Article 9 in any way. Buyer shall indemnify, defend and hold harmless (i) Seller, (ii) the lessors of any Leased Real Property, and (iii) Seller's and such lessors' respective Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or its accountants, counsel and representatives entry upon the Leased Real Property in connection with their exercise of the right of access pursuant to this <u>Section 5.1(b)</u>, and (B) any and all other activities undertaken by Buyer or its accountants, counsel and representatives with respect to any such Leased Real Property in connection with their exercise of the right of access pursuant to this <u>Section 5.1(b)</u>.

(c)     <u>Operation of the Business</u>.  Except as otherwise contemplated or permitted by this Agreement or the Ancillary Agreements, would not constitute a Material Adverse Effect, or with the prior consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or in connection with any Order relating to the Bankruptcy Case, between the Effective Date and the Closing Date, Seller shall (i) use commercially reasonable efforts to safeguard and maintain the Acquired Assets in their condition as of the Effective Date (except for ordinary wear and tear) and prevent any destruction thereof or material damage thereto between the Effective Date and the Closing Date, (ii) not enter into, materially amend or terminate any Assumed Contract or Assumed FF&E Lease outside of the ordinary course of business where such amendment or termination would have a material and adverse effect on the

24

value of the Acquired Assets taken as a whole and (iii) notify Buyer of any notices relating to or proposed changes affecting Seller's insurance policies covering any of the Acquired Assets. Notwithstanding the foregoing, nothing in this Agreement shall restrict Seller from rejecting any Contract or Lease that is not an Assumed Contract or Assumed FF&E Lease.

Section 5.2 <u>Covenants of Buyer</u>. Buyer covenants as follows:

(a) <u>Commercially Reasonable Efforts</u>. Buyer shall use all commercially reasonable efforts to (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(b) <u>Adequate Assurances Regarding Assumed Contracts and Assumed Leases</u>. With respect to each Assumed Contract and Assumed Lease that (i) is <u>not</u> a Qualifying Excluded Contract and Lease, Buyer shall provide adequate assurance of the future performance of such Assumed Contract or Assumed Lease by Buyer and (ii) <u>is</u> a Qualifying Excluded Contract and Lease, Buyer shall undertake reasonable efforts to provide adequate assurance of the future performance of such Assumed Contract or Assumed Lease by Buyer; <u>provided</u> that, for clarity the failure to provide adequate assurance shall not be a breach of this <u>Section 5.2(b)(ii)</u> if Buyer has undertaken reasonable efforts to provide such assurance. Buyer agrees that it will promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

(c) <u>Cure of Defaults</u>. Buyer shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed Lease or Assumed Contract for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing, then immediately following the entry of such Order, cure any and all defaults under the Assumed Contracts and Assumed Leases (other than Qualifying Excluded Contracts and Leases), including paying the applicable Cure Amount, which defaults are required to be cured under the Bankruptcy Code, so that such Assumed Contracts and Assumed Leases may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d) <u>Performance under Assumed Contracts and Assumed Leases</u>. Buyer shall (i) from and after the Closing Date, assume all obligations and liabilities of Seller under the Assumed Contracts and Assumed Leases, (ii) from and after the Closing Date, take all actions necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Assumed Contracts and Assumed Leases, and (iii) indemnify, defend and hold harmless Seller, Seller's Affiliates, and all of their

25

respective Related Persons from and against any damages, losses, costs, expenses and other liabilities arising out of a breach of this Section 5.2(d) or any of Buyer's other covenants contained in this Agreement or any Ancillary Agreements to which Buyer is a party.

(e)     Indemnification for Use of Real Property.  Buyer shall indemnify, defend and hold harmless (i) Seller, (ii) the lessors of any Leased Real Property, and (iii) Seller's and such lessors' respective Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or Buyer's agents' or representatives' entry upon the Owned Real Property or the Leased Real Property in connection with their exercise of the right of access pursuant to Section 5.1(b), and (B) any and all other activities undertaken by Buyer or Buyer's agents or representatives with respect to any such Owned Real Property or Leased Real Property.

(f)     Released Claims.  Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired Assets to the extent such Claims have been, or are at any time thereafter, released by or on behalf of Seller or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise or (ii) pursue, prosecute or assert any rights related to any Claims against employees, officers of directors of Seller, including by way of offset or recoupment.

Section 5.3     Real Property Matters. From and after the Effective Date until the Closing (or the earlier termination of this Agreement pursuant to Article 10), Seller shall, at no out-of-pocket cost or expense to Seller, use commercially reasonable efforts to assist Buyer in obtaining the following:

(a)     a commitment for a 2006 ALTA Owner's Title Insurance Policy for all real property to be purchased by Buyer (such policy together with a copy of all documents referenced therein, the "Title Commitment"), issued by a title insurance company satisfactory to Buyer (the "Title Company"), provided that, (A) any failure to obtain the Title Commitment for any reason other than Seller's failure to assist Buyer pursuant to this Section 5.3 shall not be a breach of or default under of this Agreement, and (B) Buyer obtaining the Title Commitment or a title insurance policy ("Title Policy") resulting therefrom, or any other form of title insurance, shall not be a condition to Buyer's performance of its obligations under this Agreement or Buyer's consummation of the transactions contemplated by this Agreement; and

(b)     a survey for all real property to be purchased by Buyer, dated no earlier than the Effective Date, prepared by a surveyor licensed in the jurisdiction where each real property to be acquired by Buyer is located and conforming to 2016 ALTA/ACSM Minimum Detail Requirements for Land Title Surveys (the "Survey").

26

## ARTICLE 6. ADDITIONAL AGREEMENTS

Section 6.1    Bankruptcy Matters.

(a)    Backup Bidder.  In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures Order, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures Order) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction.  Notwithstanding anything to the contrary in this Agreement, Seller may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the Inventory and the other assets of Seller, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)    Notice to Holders of Liens, Claims and Interests.  Seller has provided notice of the intent to seek entry of the Sale Order to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)    Entry of Sale Order.  Seller has filed with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order.  The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement (including any Assumed Contract), Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability.  Seller and Buyer shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement.  In the event that any Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Buyer will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.  For purposes of this Section 6.1(c) only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

Section 6.2    Transition Arrangements.

(a)    Access Covenant.  Upon reasonable request from Seller, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will

27

for a period of two (2) years following the Closing Date provide to Seller, and the accountants, counsel and representatives of Seller, including any administrator of the Plan or Seller's estate, such access to the pre-closing books and records relating to the Business as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation and litigation of claims and making of distributions contemplated under the Plan or otherwise. Such access will include (a) reasonable access to Buyer's personnel, information technology systems and books and records and (b) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Seller engaged in such wind-down and liquidation process. Buyer will provide such services free of any charges, fees or rents, provided that Seller will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Seller's employees engaged in the liquidation).

(b) <u>Transitional License</u>. Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days, Buyer shall grant Seller a non-exclusive, royalty-free right and license to use the Acquired Intellectual Property, including the Business Name, in connection with the wind-down and liquidation of Seller's estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.

(c) <u>Transitional Regulatory Matters</u>. From the Effective Date until the Closing Date, Buyer and Seller shall each use commercially reasonable efforts to cooperate in the registration of Buyer as licensee, as of and conditional upon the Closing, under the ATF Licenses. Without limitation to the foregoing, Buyer shall file all required applications for the ATF Licenses by the close of business on the date that is seven (7) calendar days after the date of entry of the Sale Order, and shall within one Business Day thereafter provide Buyer reasonable evidence of same.

Section 6.3 <u>Further Assurances</u>. At the request and the sole expense of the requesting party, either party shall, at any time after the Closing Date, execute and deliver such documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

ARTICLE 7. <u>EMPLOYEES AND EMPLOYEE BENEFITS</u>

Section 7.1 <u>Transferred Employees</u>. Within seventy-five (75) days after entry of the Sale Order, Buyer shall offer employment to at least two hundred (200) union Employees related to Debtors' non-Marlin-related firearms business at the Ilion facility. Each such offer shall include a waiver of any costs related to the termination of employment of such Employees by Seller in connection with the transactions contemplated by this Agreement (including without

28

limitation any severance or WARN Act payments), as against Buyer, Seller and their respective Affiliates. If the Closing occurs, any such Employees who accept any such offer no later than five (5) days after the Closing Date are referred to in this Agreement as the "Transferred Employees".

Section 7.2   Employment Tax Reporting.   With respect to Transferred Employees, Buyer and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment Tax reporting.

Section 7.3   Benefits.   From and after the Closing (or with respect to any Transferred Employee who is on an approved leave of absence as of the Closing, from and after his or her return to work), Buyer shall, or shall cause an Affiliate of Buyer to, provide (whether under existing or newly-established Buyer compensation or benefits plans (collectively, the "Buyer Plans")) to each Transferred Employee and their eligible dependents benefits under the Buyer Plans that are no less favorable to the applicable Transferred Employee in the aggregate than the practice, plans, policies or Contracts in effect for such Transferred Employee immediately prior to the Closing, provided that Buyer shall not assume any unpaid or unfunded liabilities which may be owed to Transferred Employees for periods prior to retention or employment by Buyer. If applicable, for purposes of eligibility, vesting and the calculation of the eligibility for and amount of vacation, sick pay, severance or other benefits under the Buyer Plans providing benefits to Transferred Employees, Buyer shall credit each Transferred Employee with his or her years of service with Seller to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan; provided, however, that no such service recognition shall result in any duplication of benefits or apply to any defined benefit pension plans. In addition, to the extent it has the right to do so, Buyer shall use commercially reasonable efforts to (a) waive under any health or welfare plans maintained by Buyer for Transferred Employees any pre-existing condition limitations and eligibility waiting periods for Transferred Employees and their eligible dependents (but only to the extent such pre-existing condition limitations, eligibility waiting periods and evidence of insurability requirements were satisfied under Seller's comparable health plans as of the Closing Date), and (b) provide that dollar amount of all eligible expenses incurred by Transferred Employees and their eligible dependents during the calendar year in which the Closing Date occurs shall be taken into account for purposes of satisfying the applicable deductibles, co-payments or out-of-pocket limitations for such calendar year under the relevant Buyer's health or welfare plans.

Section 7.4   WARN Act. Buyer and Seller agree that:

(a)   Except as provided under the terms of the amended and modified CBA referenced hereinabove, Buyer shall not, at any time prior to ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" (as those terms are defined in the WARN Act) affecting the Transferred Employees without complying in full with the WARN Act.

Section 7.5   Third Party Beneficiary.   No provision of this Article 7 shall (a) create any third party beneficiary or other rights in any Employee or former employee (including any beneficiary or dependent thereof) of Seller, Buyer or any other Person,

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 30 of 121

(b) constitute or create, or be deemed to constitute or create, an employment agreement or employee benefit plan, (c) constitute or be deemed to constitute an amendment to any employee benefit plan sponsored or maintained by Seller or Buyer, or (d) alter or change the employment at-will status of any Employees.

ARTICLE 8. <u>TAXES</u>.

Section 8.1     <u>Taxes Related to Purchase of Assets</u>.  All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Seller as a result of the sale of the Acquired Assets (collectively, "<u>Transaction Taxes</u>"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(c) of the Bankruptcy Code, shall be paid by Buyer. Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and Seller agrees to assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 8.2     <u>Cooperation on Tax Matters</u>.

(a)     Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)     Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period of at least six (6) years from the Closing Date, and will give Seller notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to those portions of books, records, documents and other information that relate solely to the Acquired Assets or the Assumed Liabilities as Seller may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Seller. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities as they

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 31 of 121

existed on or before the Closing, unless such access cannot be limited to the appropriate information, in which case, Buyer may, at its reasonable discretion, retrieve electronic data compilations of the appropriate information.

(c)     If Seller receives any refund, overpayment or rebate of Taxes (including any refund, overpayment or rebate relating to any Straddle Period) that is attributable to Taxes paid by Buyer, it shall promptly, and in no case later than ten (10) Business Days after receipt thereof, pay such refund, overpayment or rebate over to Buyer net of any reasonable cost or expense incurred in connection with such refund, overpayment or rebate.

(d)     Seller shall prepare and file all Income Tax Returns for any Pre-Closing Taxes , whether or not such Tax Returns are required to be filed after the Closing Date, and Seller shall timely pay all Taxes reflected on such Tax Returns. Buyer shall prepare and file, or cause to be prepared and filed (with Seller's reasonable cooperation) all Tax Returns with respect to Post-Closing Taxes. Buyer and Seller shall reasonably cooperate in the preparation of any Tax Returns described in this <u>Section 8.2(d)</u>.

(e)     Buyer and Seller will cooperate and Buyer shall use commercially reasonable efforts to cause the Buyer or any Buyer Acquisition Vehicle to be registered with the Alcohol and Tobacco Tax and Trade Bureau as a "manufacturer" for purposes of the Firearms Ammunition and Excise Tax on or before the Closing Date.

Section 8.3     <u>Allocation of Purchase Price</u>.  Promptly (and in any event within sixty (60) days) following the Closing Date, Seller shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "<u>Allocation</u>").  Seller and Buyer will cooperate to resolve any disputes regarding the Allocation and to file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement.

ARTICLE 9. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES</u>.

Section 9.1     <u>Conditions Precedent to Performance by Seller</u>.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 9.1(c)(i)</u> and <u>Section 9.1(c)(ii)</u>) may be waived by Seller in its sole discretion:

(a)     <u>Trademark License Agreement</u>.  This Agreement is conditioned upon entry into the Trademark License Agreement, pursuant to which Vista will provide an exclusive license the use of certain Remington Brand-related Trademarks, for Buyer's continued use in segments of the Business outside of the Ammunitions Business following the Closing (such agreement or agreements being collectively, the "<u>IP Back-License</u>"), including Buyer's development, manufacture, marketing and/or sale of (1) Firearms; (2) Receivers; (3) Barrels; (4) Stocks; (5) Grips;

31

(6) Rails; (7) Butts; (8) Triggers; (9) Safeties; (10) Iron Sights (excluding any electronic, or optical sights, and any scopes); (11) Flash suppressors; (12) Recoil compensators; (13) Heatshields; (14) Silencers; (15) Sight adjustment tools; (16) Gunsmithing tools and kits; (17) Books and manuals (firearms related); (18) Magazines; (19) Gun Cases and (20) anything that is or can be affixed to or installed within a firearm of any kind.

(b)    Representations and Warranties of Buyer.  All representations and warranties made by Buyer in Section 4.2 shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(c)    Performance of the Obligations of Buyer.  Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(d)    Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(e)    No Violation of Orders.  No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(f)    Cure of Defaults.  At or prior to the Closing, any and all defaults under the Assumed Contracts and Assumed Leases (other than Qualifying Excluded Contracts and Leases) that are required to be cured under the Bankruptcy Code shall have been cured, so that such Assumed Contracts and Assumed Leases may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(g)    Vista Closing.  The Closing, as defined in that certain Asset Purchase Agreement entered into by and between Seller and Vista Outdoor Inc. in connection with the auction held under the Bidding Procedures Order, shall have been consummated

(h)    Ilion Investment Reserve.  On or prior to Closing, Buyer shall have deposited no less than Two Million Dollars (US$2,000,000) (the "Reserve Amount") into a segregated reserve account, which Reserve Amount shall be used only

32

to fund either (a) capital improvements and modernization costs of the Ilion, New York facility or (b) payment of salaries, wages, benefits, and the employer portion of payroll taxes in respect of such obligations and benefits for employees located at the Ilion, New York facility.

(i)    <u>Buyer's Deliveries</u>.  Buyer shall have delivered to Seller all of the items set forth in <u>Section 3.3</u>.

Section 9.2    <u>Conditions Precedent to Performance by Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 9.2(c)(i)</u> and <u>Section 9.2(c)(ii)</u>) may be waived by Buyer in its sole discretion:

(a)    <u>Representations and Warranties of Seller</u>.  All representations and warranties made by Seller in <u>Section 4.1</u> shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(b)    <u>Performance of the Obligations of Seller</u>.  Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance (i) that do not result in a Material Adverse Effect or (ii) under those obligations of Seller set forth in <u>Section 6.2(c)</u>, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(c)    <u>Consents and Approvals</u>.  The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)    <u>Trademark License Agreement</u>.    Buyer and Vista shall enter into the Trademark License Agreement, which provides for, among other things, use by Buyer of all (i) registered and unregistered Intellectual Property owned or used by Seller in connection with the ownership, operation and/or management of the Business and any and all corresponding rights that, now or hereafter, may be secured throughout the world, and (ii) to the extent transferable under applicable Law, Intellectual Property licensed to Seller in connection with the ownership, operation and/or management of the Business (collectively, the "<u>Vista Acquired Intellectual Property</u>").

33

(f)     Seller's Deliveries.  Seller shall have delivered to Buyer all of the items set forth in Section 3.2.

ARTICLE 10. TERMINATION.

Section 10.1     Conditions of Termination.  This Agreement may be terminated at any time before the Closing:

(a)     By mutual written consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Warranty Termination Date"), if the condition contained in Section 9.1(a) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(b) if Seller is then in material breach of this Agreement;

(c)     By Seller, by notice to Buyer, if Seller has previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(c) if Seller is then in material breach of this Agreement;

(d)     By Seller, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Approval Termination Date"), if any condition contained in Section 9.1(c) or Section 9.1(d) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(d) if Seller is then in material breach of this Agreement;

(e)     By Buyer, by notice to Seller, on or after the Warranty Termination Date, if the condition contained in Section 9.2(a) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(e) if Buyer is then in material breach of this Agreement;

(f)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with written notice of a failure to perform any material covenant of Seller contained in this Agreement and Seller has failed within five (5) days after such notice to perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(f) if Buyer is then in material breach of this Agreement;

(g)     By Buyer, by notice to Seller, after the Approval Termination Date, if any condition contained in Section 9.2(c) or Section 9.2(d) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(g) if Buyer is then in material breach of this Agreement;

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 35 of 121

(h)    By Buyer, by notice to Seller, or by Seller, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)    By Seller, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 60    calendar days after the Petition Date;

(j)    Automatically, upon the earlier of (i) Seller consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction; and

(k)    As provided for in Section 3.2(a).

Section 10.2    Effect of Termination; Remedies.

(a)    In the event of termination pursuant to Section 10.1, this Agreement shall become null and void and have no effect (other than Article 10, Article 11, and Article 12, which shall survive termination), with no liability on the part of Seller or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 11.4, (ii) the obligation of Buyer under Section 6.1(a) and (iii) any liability provided for in Section 10.2(b) through Section 10.2(d), inclusive.

(b)    If this Agreement is terminated pursuant to Section 10.1(a), Section 10.1(d), Section 10.1(e), Section 10.1(f), Section 10.1(g), Section 10.1(h), Section 10.1(i) or  Section 10.1(j), then the Good Faith Deposit shall, within three (3) Business Days, be returned by Seller to Buyer.

(c)    If this Agreement is terminated pursuant to Section 10.1(b), Section 10.1(c) or Section 3.2(a), then Seller may, at its sole election (i) within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee"), or (ii) without limitation to Seller's remedies under clause (i) of this Section 10.2(c) require Buyer to specifically perform under the terms of this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(d)    Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article VI (if the Closing shall have occurred) or the provisions of Section 3.2(a), (i) Seller's entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Seller retains such amount, then notwithstanding anything to the contrary contained herein, such Break Fee shall be the sole and exclusive remedy available to Seller and any other Person against Buyer, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions

35

contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Seller, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Seller, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby. Each Party acknowledges that the agreements contained in this <u>Section 10.2</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

ARTICLE 11. <u>MISCELLANEOUS</u>.

Section 11.1  <u>Successors and Assigns</u>.  Prior to the Closing, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other, and any such attempted assignment without such prior written consent shall be void and of no force and effect; <u>provided</u> that if Buyer wishes, upon prior written notice to Seller, to assign its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to a Buyer Acquisition Vehicle, such prior written consent of Seller shall not unreasonably be withheld.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 11.2  <u>Governing Law; Jurisdiction</u>.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

Section 11.3  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF

36

LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.3.

Section 11.4    Expenses.  Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated.  Buyer shall pay the cost of any surveys (without limitation to the restriction in Section 5.1(b)(i)), title insurance policies and title reports ordered by Buyer.

Section 11.5    Broker's and Finder's Fees.  Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than as set forth on Schedule 11.5, whose fees and expenses shall, as between the parties to this Agreement, be the responsibility of the party indicated on Schedule 11.5, and, to such party's Knowledge, no other broker or other Person is entitled to any commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 11.6    Severability.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 11.7    Notices.

(a)    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW

37

Huntsville, Alabama 35824
Attention: Ken D'Arcy
Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California  90071
Attention: John-Paul Motley, Esq., and Stephen H. Warren, Esq.
Phone: (213) 430-6100 and (213) 430-7875, respectively
Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

Attention: Scott Soura
Email: soura@roundhillgroup.com
888 SE 3 Avenue, Suite 500
Fort Lauderdale, FL 33316

With a copy to (which copy alone shall not constitute notice):

Shulman Bastian Friedman & Bui, LLP
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Attention: James C. Bastian, Jr., Esq.
Email: jbastian@shulmanbastian.com

(b)     Any party may change its address for the purpose of this Section 11.7 by giving the other party written notice of its new address in the manner set forth above.

Section 11.8     Amendments; Waivers.     This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 11.9     Time of Essence.     Time is of the essence in the performance of each and every term of this Agreement.

Section 11.10     Specific Performance.     The provisions of this Agreement are uniquely related to Seller's and its Affiliates' desire to consummate the transactions contemplated by this Agreement, and such transactions represent a unique business opportunity at a unique

38

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 39 of 121

time for the Seller and its Affiliates.  As a result, irreparable damage would occur to Seller and its Affiliates in the event that any of the obligations of Buyer under this Agreement were not performed in accordance with their specific terms.  Although liquidated or other monetary damages may be available for the breach of covenants and undertakings contained in this Agreement, monetary damages would be difficult to ascertain and an inadequate remedy therefor.  Accordingly, if Buyer breaches or threatens to breach any provision of this Agreement, then without limitation to Seller's rights under clause (i) of Section 10.2(c) Seller shall be entitled to an injunction or injunctions, specific performance and any and all other equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, this being in addition to any other remedies to which it is entitled at Law or equity.  If Seller seeks an injunction or injunctions to prevent breaches of this Agreement or seeking to enforce specifically the terms and provisions of this Agreement, Seller shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such Order or injunction.  Buyer irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security.  If any action or proceeding should be brought in equity to enforce the provisions of this Agreement, Buyer shall not allege, and hereby waives the defense, that there is an adequate remedy at Law.

Section 11.11  <u>Public Announcements</u>.  Promptly after the execution and delivery of this Agreement, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein.  Thereafter, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court.  If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing party agrees to give the nondisclosing party prior notice of, and an opportunity to comment on, the proposed disclosure.  Notwithstanding anything to the contrary in this <u>Section 11.11</u>, Seller (a) shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equityholders and lenders to the extent required by the provisions of any of Seller's bylaws, credit agreements and other pre-existing contractual obligations.

Section 11.12  <u>Entire Agreement</u>.   This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

Section 11.13  <u>Parties in Interest</u>.  Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 40 of 121

Persons to Seller or Buyer. This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 11.14 <u>Bulk Sales Laws</u>. Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

Section 11.15 <u>Construction</u>. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

Section 11.16 <u>Counterparts and Facsimiles</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

## ARTICLE 12. <u>DEFINITIONS</u>.

Section 12.1 <u>Certain Terms Defined</u>. As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"<u>Alternative Transaction</u>" means Seller consummating one or more transactions or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of all or substantially all of the Business or the Acquired Assets by Seller to a purchaser or purchasers other than Buyer.

"<u>Ancillary Agreements</u>" means, collectively, the Assignment and Assumption Agreements, Assignment and Assumption of Leases, Acquired Intellectual Property Assignments, quitclaim deeds, and other certificates, affidavits and releases delivered pursuant to <u>Article 3</u>.

"<u>ATF</u>" means the United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

"<u>ATF Licenses</u>" means all of those licenses issued by ATF as provided by the GCA and the GCA's implementing regulations that are necessary for Buyer to conduct the Business as

40

currently conducted.

"Avoidance Actions" means any and all claims and remedies of Seller under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or other governmental action to close.

"Business Name" means "Remington," either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trade mark, corporate name, service mark and domain name, including without limitation those set forth on Schedule 12.1(a), and any confusingly similar variation, derivative or transaction thereof.

"Buyer Acquisition Vehicle" means a Creditworthy entity that is wholly-owned and controlled by Buyer's parent entity.

"Cash" means all cash and cash equivalents held by Seller, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities, in each case as of immediately prior to the Closing (and including without limitation (i) the Good Faith Deposit, (ii) the Net Closing Cash Payment, (iii) any fee reserves or escrows established by Seller, and (iv) any cash in the Dominion Account (as defined in the Priority Term Loan)).

"CBA" means that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"City of Huntsville Project Development Liabilities" means all liabilities arising under (i) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Seller, as amended or otherwise modified from time to time, (ii) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000 and (iii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Seller in favor of the City of Huntsville.

"Claims" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or

41

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 42 of 121

unasserted actions against Seller or any of its Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Seller is a party; provided that Contracts do not include any Lease or any employment or similar Contracts.

"Creditworthy" means sufficiently capitalized, to the reasonable satisfaction of Seller upon provision to Seller of substantiating documentary evidence, to be able to pay the Purchase Price.

"D&O Insurance" means the policy in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Seller, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"DIP Facility" means any debtor-in-possession financing advanced to Seller in the Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies or arrangements that provide for compensation for employee benefits as to which Seller has any obligation or liability, contingent or otherwise.

"Employee Liabilities" means all liabilities of Seller to or with respect to all Employees whenever arising and liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Seller, including, for the avoidance of doubt, under the CBA.

"Employee Records" means all employment and benefit records (in whatever form

maintained) in the possession of Seller or its agents and pertaining to any Transferred Employee, or any spouse, dependent or other beneficiary of any such Transferred Employee.

"Employees" means all individuals, as of the date of this Agreement, who are employed by Seller (including Employees who are absent due to COVID Restrictions or vacation, family leave, short-term disability, COVID 19-related furloughs or absences or other approved leave of absence) in connection with the ownership, operation and management of the Business.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exit Term Loan" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"FILO Facility" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"GCA" means Gun Control Act of 1968 (Chapter 44 of Title 18, United States Code § 921 et seq).

"Government" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents

43

thereof.

"Historic Firearms Books and Records" means all historic books and records relating to the sale of firearms included in the Acquired Assets, including all records required to be kept pursuant to parts 447, 478, and, 479 of title 27, Code of Federal Regulations.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

"Income Tax Return" means any Tax Return with respect to Income Taxes.

"Intellectual Property" means (1) all intellectual property arising from or in respect of the following: (a) all patents and applications therefore, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (b) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, including the Business Name, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (c) copyrights and registrations and applications therefore and works of authorship, and mask work rights, (d) all Software of Seller, (e) confidential information, know-how, trade secrets and inventions, and (f) all other intellectual property, (2) Seller's rights pursuant to any Contract with Remington Licensing Corporation and (3) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of Seller's rights or interests in intellectual property that is not an Excluded Asset and any related remedies, including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including, without limitation, security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, Permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"Knowledge" or any other similar term or knowledge qualification means, with respect to (i) Seller, the actual conscious knowledge of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement and (ii) Buyer, the actual conscious knowledge of Scott Soura (Manager of Buyer), as of the date the applicable representation or warranty is made or deemed made under this

44

Agreement.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property, in each of the foregoing cases, to the extent possessed, used or occupied in connection with the Business.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"Leases" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; and (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy or use of an asset.

"Marlin Business" means the design, development, testing, manufacture, marketing, sale and distribution of Marlin brand products (including discontinued products and those yet to be launched) using the Marlin name.

"Material Adverse Effect" means a state of facts, event, change or effect on the value of the Acquired Assets that results in a material and adverse effect on the value of the Acquired Assets taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy Case; (B) any action of Seller taken pursuant to, or any failure of Seller to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which Seller is a party; (C) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby, (D) changes, after the Effective Date, in United States generally accepted accounting principles, (E) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Seller operates the Business, (F) changes in the firearms, ammunition or sporting goods industries in general, (G) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared) or (H) any occurrence, outbreak, escalation or worsening of, or furloughs or Government actions (including any

45

quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other applicable Law, order, directive, guideline or recommendation by any Government of competent jurisdiction (collectively, "COVID Restrictions")) instituted in response to, any epidemic, pandemic or other disease (including without limitation the COVID-19 virus).

"Non-Core Brands" means Bushmaster, DPMS, Dakota, Tapco, H & R, Stormlake, AAC and Parker.

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Seller and used in the ownership, operation or management of the Business, but only to the extent set forth in Section 1.1(a).

"Pension Plan" means Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), as amended from time to time, whereby the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan), as amended from time to time, was merged into the Remington Arms Company, LLC Pension and Retirement Plan.

"Permit" means any permit, license, authorization, registration or certificate obtained from any Government.

"Permitted Liens" mean: (a) all Liens set forth on Schedule 12.1(b); (b) Liens and Interests consisting of (X) current Taxes and assessments, Liens for Taxes that are not yet delinquent or that are being contested in good faith, reservations in patents, and all easements, rights-of-way, encumbrances, Liens, covenants, conditions, restrictions, obligations, liabilities and other matters as may appear on record, and similar matters that would be disclosed by an accurate ALTA/ACSM survey of the Owned Real Property, and (Y) the applicable zoning and use regulations or other Laws of any Government; (c) purchase money Liens securing payments under capital lease arrangements; (d) all terms, conditions and restrictions under any applicable Permits; and (e) the rights under the Acquired Intellectual Property granted under (1) that certain Trademark License Agreement, by and between RA Brands and Crossman Corporation, a Delaware corporation, dated as of January 18, 2016, as amended by Amendment #1 to Trademark License Agreement, dated as of June 4, 2019 and as amended, supplemented and modified from time to time, (2) that certain Trademark License Agreement, by and between RA Brands and Gator Cases Inc., a Florida corporation, dated as of November 5, 2019, as amended by Amendment #1 to Trademark License Agreement, dated as of August 19, 2020 and as amended, supplemented and modified from time to time, and (3) that certain Exclusive Trademark License Agreement, by and between RA Brands and Buck Knives, Inc., a Nevada corporation, dated as of January 18, 2017, as amended, supplemented and modified from time to time.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

46

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 47 of 121

"Plan" means a Joint Chapter 11 Plan filed by Seller with the Bankruptcy Court.

"Post-Closing Taxes" means any (i) Taxes, other than Transaction Taxes, imposed on the Acquired Assets in respect of a taxable period (or portion thereof) beginning after the close of business on the day prior to the Closing Date and (ii) excise taxes of Seller attributable to the Business whether or not deferred and whether or not relating to periods before or after Closing.

"Pre-Closing Income Taxes" means any Income Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business, in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Pre-Closing Taxes" means any Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business (other than any excise taxes (whether or not deferred)), in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Priority Term Loan" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Retained Litigation" means all litigation and Claims arising or related to events prior to the Closing.

"Seller D&Os" means the current or former directors and officers insured under the D&O Insurance.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Documents related to any of the foregoing.

"State of Alabama Project Development Liabilities" means all liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 48 of 121

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise (whether or not deferred), franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and "Tax" shall mean any one of them.

Section 12.2   All Terms Cross-Referenced.   Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Acquired Assets | Section 1.1 |
| Acquired Intellectual Property | Section 1.1(k) |
| Acquired Intellectual Property Assignment | Section 3.2(d) |
| Affiliate | Section 12.1 |
| Agreement | Preamble |
| Allocation | Section 8.3 |
| Alternative Transaction | Section 12.1 |
| Approval Termination Date | Section 10.1(d) |
| Assignment and Assumption Agreement | Section 3.2(b) |
| Assignment and Assumption of Lease | Section 3.2(c) |
| Assumed Business Contracts | Section 1.1(i) |
| Assumed Contracts | Section 1.1(i) |
| Assumed FF&E Leases | Section 1.1(e) |
| Assumed Leased Real Property | Section 1.1(c) |
| Assumed Leases | Section 1.1(b) |
| Assumed Liabilities | Section 1.3 |

48

Case 20-81688-CRJ11   Doc 821-3   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. C - Roundhill Group   LLC   Page 49 of 121

Assumed Motor Vehicle Leases ..................................................................Section 1.1(g)
Assumed Policy Rights .............................................................................Section 1.1(h)
Avoidance Actions ....................................................................................... Section 12.1
Bankruptcy Case ............................................................................................... *Recitals*
Bankruptcy Code ............................................................................................... *Recitals*
Bankruptcy Court............................................................................................... *Recitals*
Bidding Procedures Motion .............................................................................. *Recitals*
Bidding Procedures Order................................................................................. *Recitals*
Break Fee ...............................................................................................Section 10.2(c)
Business ............................................................................................................. *Recitals*
Business Day.................................................................................................. Section 12.1
Business Name................................................................................................ Section 12.1
Buyer............................................................................................................... Preamble
Buyer Acquisition Vehicle............................................................................. Section 12.1
Buyer Plans .......................................................................................................Section 7.3
Cash.................................................................................................................Section 12.1
CBA .................................................................................................................Section 12.1
City of Huntsville Project Development Liabilities........................................ Section 12.1
Claims ............................................................................................................. Section 12.1
Closing ............................................................................................................... Section 3.1
Closing Date..................................................................................................... Section 3.1
Code ................................................................................................................ Section 12.1
Confidentiality Agreement...............................................................................Section 5.1(b)
Contract........................................................................................................... Section 12.1
COVID Restrictions........................................................................................ Section 12.1
Creditworthy ................................................................................................... Section 12.1
Cure Amount ..................................................................................................Section 1.5(a)
Customer Order................................................................................................Section 1.1(l)
Documents ....................................................................................................... Section 12.1
Effective Date ...................................................................................................*Preamble*
Employee Benefit Plans .................................................................................. Section 12.1
Employee Liabilities ....................................................................................... Section 12.1
Employee Records ........................................................................................... Section 12.1
Employees ....................................................................................................... Section 12.1
Environmental Laws ........................................................................................ Section 12.1
ERISA ............................................................................................................. Section 12.1
Excluded Assets .............................................................................................. Section 1.2
Excluded Employee Liabilities ....................................................................... Section 1.3(f)
Excluded Liabilities ........................................................................................ Section 1.4
Final Order ...................................................................................................... Section 12.1
FFL Cutoff Date...............................................................................................Section 3.2(a)
Good Faith Deposit..........................................................................................Section 2.2(a)
Government...................................................................................................... Section 12.1
Gross Closing Cash Payment...........................................................................Section 2.1(a)
Intellectual Property........................................................................................ Section 12.1
Intercompany Note........................................................................................... Section 12.1

Case 20-81688-CRJ11   Doc 821-3   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. C - Roundhill Group   LLC   Page 50 of 121

Interests .................................................................................................... Section 12.1
Inventory ................................................................................................ Section 1.1(n)
Insurance Polcies ..................................................................................Section 1.2(a)
Law .......................................................................................................Section 4.1(c)
Leased FF&E .........................................................................................Section 1.1(e)
Leased Motor Vehicles ..........................................................................Section 1.1(g)
Leased Real Property .............................................................................. Section 12.1
Leasehold Improvements ....................................................................... Section 12.1
Leases.................................................................................................... Section 12.1
Lien ...................................................................................................... Section 12.1
Material Adverse Effect .......................................................................... Section 12.1
Material Permits.....................................................................................Section 4.1(g)
Necessary Consent ................................................................................. Section 1.6
Net Closing Cash Payment .....................................................................Section 2.2(b)
Order ....................................................................................................Section 4.1(c)
Owned FF&E ........................................................................................Section 1.1(d)
Other Agreements .................................................................................. Section 1.8
Owned Motor Vehicles .......................................................................... Section 1.1(f)
Owned Real Property .............................................................................. Section 12.1
Pension Plan........................................................................................... Section 12.1
Permitted Liens ...................................................................................... Section 12.1
Person.................................................................................................... Section 12.1
Petition Date.......................................................................................... *Recitals*
Plan ....................................................................................................... Section 12.1
Pre-Closing Income Taxes ..................................................................... Section 12.1
Priority Term Loan ................................................................................ Section 12.1
Purchase Orders .....................................................................................Section 1.1(m)
Purchase Price ....................................................................................... Section 2.1
Qualifying Excluded Contracts and Leases ...........................................Section 1.5(d)
Related Person ....................................................................................... Section 12.1
Reserve Amount.....................................................................................Section 9.2(b)(iii)
Retained Litigation ................................................................................ Section 12.1
ROC ......................................................................................................Preamble
Sale Hearing..........................................................................................Section 1.5(a)
Sale Order ............................................................................................. *Recitals*
Seller ..................................................................................................... Preamble
Seller's Knowledge ................................................................................ Section 12.1
Software ................................................................................................ Section 12.1
State of Alabama Project Development Liabilities.................................. Section 12.1
Subsidiary(ies) ...................................................................................... Section 12.1
Tax Return ............................................................................................. Section 12.1
Taxes ..................................................................................................... Section 12.1
Transaction Taxes .................................................................................. Section 8.1
Transferred Employees .......................................................................... Section 7.1
WARN Act.............................................................................................Section 7.4(a)
Warranty Termination Date ...................................................................Section 10.1(b)

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 51 of 121

*[Signatures are on the following pages.]*

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 52 of 121

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER**

The Roundhill Group, LLC

By: _____
Name: Scott Sovra
Title: Manager

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 53 of 121

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By: _____
    Name:
    Title:

**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By: _____
    Name:
    Title:

FGI HOLDING COMPANY, LLC

By: _____
    Name:
    Title:

BARNES BULLETS, LLC

By: _____
    Name:
    Title:

REMINGTON ARMS COMPANY, LLC

By: _____
    Name:
    Title:

RA BRANDS, L.L.C.

By: _____
    Name:
    Title:

OUTDOOR SERVICES, LLC

By: _____
    Name:
    Title:

Case 20-81688-CRJ11   Doc 821-3   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. C - Roundhill Group    LLC   Page 54 of 121

FGI FINANCE INC.

By: _____
     Name:
     Title:

HUNTSVILLE HOLDINGS LLC

By: _____
     Name:
     Title:

TMRI, INC.

By: _____
     Name:
     Title:

REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
     Name:
     Title:

32E PRODUCTIONS, LLC

By: _____
     Name:
     Title:

GREAT OUTDOORS HOLDCO, LLC

By: _____
     Name:
     Title:

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 55 of 121

**DISCLOSURE SCHEDULES**

**to**

**ASSET PURCHASE AGREEMENT**

**by and among**

**ROUNDHILL GROUP, LLC**

**and**

**REMINGTON OUTDOOR COMPANY, INC.**

**and**

**EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.**

**Dated as of September 26 , 2020**

These Disclosure Schedules (these "Schedules" and each a "Schedule") are furnished pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of September 26, 2020, by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to the Agreement (collectively with ROC, "Seller"), and Roundhill Group, LLC ("Buyer"). All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement, unless the context otherwise requires.

These Schedules are hereby incorporated in and made a part of the Agreement as if set forth in full therein and are an integral part of the Agreement. The information contained in these Schedules is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party to the Agreement to any third party of any matter whatsoever (including any violation of law or breach of contract). These Schedules and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties or covenants of the Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. In disclosing the information in these Schedules, Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. The disclosures in these Schedules are to be taken as relating to the representations and warranties as a whole, notwithstanding the fact that these Schedules are arranged by sections corresponding to the sections in the Agreement, or that a particular section of the Agreement makes reference to a specific section of the Schedules, and notwithstanding that a particular representation and warranty may not make a reference to the Schedules. Disclosure of an item on one Schedule shall be deemed disclosure on all other Schedules.

Neither the specification of any dollar amount in any representation or warranty nor the disclosure of a document or information in these Schedules is intended, or shall be construed or offered in any dispute between the parties to the Agreement as evidence of, the materiality of such dollar amount, document or information, nor does it establish any standard of materiality upon which to judge the inclusion or omission of any similar documents or information in such Schedule or any other Schedule. The headings and descriptions of the disclosures herein are for convenience of reference only and are not intended and do not alter the meaning of any provision of the Agreement or these Schedules.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 57 of 121

**Schedule 1.1(i)**
**Assumed Business Contracts**

None.

3

## Schedule 1.2(q)
## Excluded Assets

1. None.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 59 of 121

## Schedule 1.3(b)
## Assumed Liabilities

1. None

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 60 of 121

**<u>Schedule 1.4(n)</u>**
**<u>Excluded Liabilities</u>**

1.  None

6

**Schedule 1.5(a)**
**Estimated Cure Amount**

None

7

**Schedule 4.1(g)**
**Compliance with Law**

1. Administrative Order on Consent, issued by the Missouri Department of Natural Resources to Remington Arms Company, LLC, No. 14-HW-E005 with regard to hazardous materials handling, storage and disposal.

2. In March 2020, the Company received a pre-litigation settlement offer from Trex Properties LLC concerning the Detrex Corporation facility located in Charlotte, NC. The offer names Para USA LLC (a Company subsidiary) is a potentially responsible party pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) for alleged transport or disposal of hazardous materials at the Detrex facility. The offer demanded a $12,000 payment to release all CERCLA, state and natural resource damage claims. Because the Company could not confirm that Para USA LLC actually deposited waste at the Trex facility, it did not accept the offer; however, the Company cannot rule out potential liability as a potentially responsible party.

3. Citation and Notification of Penalty regarding inspection number 1350744 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated March 26, 2019 (Ilion, NY).

4. Citation and Notification of Penalty regarding inspection number 1353904 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated March 26, 2019 (Ilion, NY).

5. Citation and Notification of Penalty regarding inspection number 1130012 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated June 8, 2016 (Lexington, MO).

6. Citation and Notification of Penalty regarding inspection number 314352477 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated November 4, 2011 (Ilion, NY).

7. Citation and Notification of Penalty regarding inspection number 315538082 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated August 31, 2011 (Lexington, MO).

8. Notice of Alleged Safety or Health Hazards issued by the U.S. Department of Labor, Occupational Safety and Health Administration, regarding Complaint Number 850727 (Lexington, MO).

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 63 of 121

**Schedule 4.1(h)**
**Contracts**

1. Seller received in August 2020 a proposed Settlement Agreement from the International Union, United Mine Workers of America regarding Grievance Nos. 32-2020 and 33-2020, alleging certain violations of the CBA.

9

**Schedule 4.1(i)**

**Material Permits**

a. Special Tax Stamps and Federal Firearms Licenses

| Site | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ilion, NY | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Huntsville, AL | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Sturgis, SD | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Lenoir City, TN | Federal Firearms License | 1-62-105-07-0A-07514 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Stormlake/Remington Arms |

b. Import/Export

| Business Area | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ammunition and Firearms | ITAR Registration | M23608 | U.S. Dept. of State, Office of Defense Trade Controls Compliance | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Borchers, S.A. Warehouse Distribution Agreement) | 050553995 (DA-0520-15) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Helmut Hofmann GMBH Warehouse Distribution Agreement) | 050672664 (DA-1349-18) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License | 050614380 (DA-2227-16) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |

10

| | | | | |
|---|---|---|---|---|
| | (Jaguar Gruppen A/S Warehouse Distribution Agreement) | | | |
| Ammunition and Firearms | Export License (Midarms, SPRL Warehouse Distribution Agreement) | 050583291 (DA-0001-16) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Norma Precision AB Warehouse Distribution Agreement) | 050698288 (DA-0788-19) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Raytrade Pty Ltd. Warehouse Distribution Agreement) | 050569321 (DA-1597-15) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Raytrade UK Limited Warehouse Distribution Agreement) | 050672127 (DA-1340-18) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Sako Ltd. Warehouse Distribution Agreement) | 050515421 (DA-1428-14) | U.S. Dept. of State | Remington Outdoor Company, Inc. Barnes Bullets, LLC |
| Ammunition and Firearms | Export License (Skenco Europe, Kft. Warehouse Distribution Agreement) | 050627594 (DA-0635-17) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001414 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001470 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |

11

| | | | | |
|---|---|---|---|---|
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001473 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001512 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001516 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202002302 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202002684 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202003611 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202004581 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202005830 (application pending) | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202006481 (application pending) | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Export License | 050715420 | U.S. Dept. of State | Remington Arms Company, LLC |

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 67 of 121

| | | | | |
|---|---|---|---|---|
| Firearms | Export License | 050710057 | U.S. Dept of State | Remington Arms Company, LLC |

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 68 of 121

## I. TRADEMARKS

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Canada | ACR | TMA826,670 | RA Brands, L.L.C. | Firearms |
| United States of America | ACR | 4,019,998 | RA Brands, L.L.C. | Firearms |
| United States of America | ADAPTIVE COMBAT RIFLE | 3,946,418 | RA Brands, L.L.C. | Firearms |
| United States of America | ADVANCED ARMAMENT CORP. | 3,491,907 | RA Brands, L.L.C. | Silencers for firearms |
| United States of America | ADVANCED ARMAMENT CORP. SILENCERS MADE IN THE USA & Design | 4,503,536 | RA Brands, L.L.C. | Silencers for firearms |
| Canada | BACR | TMA849,550 | RA Brands, L.L.C. | Firearms |
| United States of America | BLACKOUT | 3,746,510 | RA Brands, L.L.C. | Flash suppressors for firearms |
| United States of America | BLASTOUT | 5,079,077 | RA Brands, L.L.C. | Muzzle attachments for firearms, namely, recoil compensators and flash suppressors |
| United States of America | BRAKEOUT | 3,954,435 | RA Brands, L.L.C. | Combined recoil compensator and flash suppressor for firearms |
| United States of America | FLIP THE SWITCH | 4,258,888 | RA Brands, L.L.C. | Firearms |
| United States of America | HALCYON | 5,341,554 | RA Brands, L.L.C. | Silencers for firearms |
| United States of America | HARRINGTON & RICHARDSON | 1,749,367 | Remington Arms Company, LLC | Firearms, namely, revolvers, rifles, shotguns and pistols |
| United States of America | HYPOSONE | 3,601,911 | RA Brands, L.L.C. | Baffle module sound reduction feature sold as an integral component of silencers for firearms |
| United States of America | ILLUSION | 4,905,498 | RA Brands, L.L.C. | Silencers for firearms |
| United States of America | P & Design | 1,882,081 | RA Brands, L.L.C. | Firearms, die-marking pistols, and parts therefor; ammunition |
| United States of America | PANTHER | 3,713,769 | Remington Arms Company, LLC | Rifles |
| Brazil | PANTHER ARMS | 840491409 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Canada | PANTHER ARMS | TMA891,091 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Chile | PANTHER ARMS | 1095992 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Hong Kong | PANTHER ARMS | 302581272 | RA Brands, L.L.C. | Firearms and structural parts therefor |
| Int'l Registration - Madrid Protocol Only | PANTHER ARMS | IR1159142 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Korea, Republic of | PANTHER ARMS | IR1159142 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Malaysia | PANTHER ARMS | 2013053727 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Mexico | PANTHER ARMS | 1391990 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Panama | PANTHER ARMS | 222415-01 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Singapore | PANTHER ARMS | IR1159142 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| St. Lucia | PANTHER ARMS | TM/2013/000113 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Thailand | PANTHER ARMS | TM380212 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Trinidad and Tobago | PANTHER ARMS | 46753 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| United States of America | PANTHER ARMS | 4,435,058 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Uruguay | PANTHER ARMS | 444574 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |

| United States of America | PARA | 2,716,330 | RA Brands, L.L.C. | Firearms, and replacement and structural parts therefore |
|---|---|---|---|---|
| Canada | PARDNER | TMA361,998 | Remington Arms Company, LLC | Shotguns |
| United States of America | PARDNER | 1,540,397 | Remington Arms Company, LLC | Shotguns |
| United States of America | PARDNER PUMP | 3,069,212 | Remington Arms Company, LLC | Firearms |
| Canada | SHOOT LIKE A GIRL . . . IF YOU CAN ! | TMA784,901 | RA Brands, L.L.C. | Firearms |
| United States of America | TI-RANT | 3,954,433 | RA Brands, L.L.C. | Silencers for firearms |
| United States of America | TOPPER | 1,754,497 | Remington Arms Company, LLC | Firearms, namely, revolvers, rifles, shotguns and pistols |
| European Union (Community) | VETERAN | 11606399 | Remington Arms Company, LLC | Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; large calibre ammunition; medium calibre ammunition; small calibre ammunition; pellets; bullets; rockets; shells (projectiles); fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; accessories for firearms, namely grips for pistols; parts and fittings for firearms |
| Mexico | VETERAN | 1368618 | Remington Arms Company, LLC | Accessories for firearms, namely grips for pistols |
| United States of America | WOOD TECH | 4,602,778 | RA Brands, L.L.C. | Stocks for firearms with simulated wood grain, sold as a component part of firearms |

**PATENTS**

| Owner | Patent Number | Description |
|---|---|---|
| RA Brands LLC | 6,557,288 | COMPACT GOVERNMENT MODEL HANDGUN |
| RA Brands LLC | D562,931 | HANDGUN GRIP |
| RA Brands LLC | 7,530,191 | SEMI-AUTOMATIC HANDGUN, MAGAZINE, AND FOLLOWER |
| RA Brands, LLC | 8,726,557 | HAND GUARD ATTACHMENT SYSTEM FOR FIREARMS |
| RA Brands LLC | 6,070,512 | HANDGUN AND METHOD OF OPERATING HANDGUN |
| RA Brands LLC | 7,587,851 | RECEIVER GASKET |

**UNITED STATES COPYRIGHTS**

Case 20-81688-CRJ11   Doc 821-3   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. C - Roundhill Group   LLC   Page 70 of 121

(1) Remington Arms Distribution Company, LLC: None

(2) Remington Arms Company, LLC: None

(3) RA Brands, L.L.C.

| Reg. No. | Published | Registered | Description |
|---|---|---|---|
| GP99,836 | April 11, 1975 | July 11, 1975 | "PETERS BLUE BELT AWARD BELT BUCKLE" |
| GP99,826 | February 24, 1975 | July 10, 1975 | "PETERS LONG RUN AWARD BELT BUCKLE" |
| GP99,827 | February 24, 1975 | July 10, 1975 | "PETERS HIGH GUN TROPHY BELT BUCKLE" |
| GP99,828 | June 25, 1975 | July 10, 1975 | "PETERS GOLDEN DUCK BELT BUCKLE" |

## CANADIAN COPYRIGHTS AND INDUSTRIAL DESIGNS

(1) Remington Arms Distribution Company, LLC: None

(2) Remington Arms Company, LLC: None

(3) RA Brands, L.L.C.

Industrial Designs :

| Country | Title | Serial No. | Owner |
|---|---|---|---|

16

| Canada | BUTTSTOCK | 50133 | RA BRANDS, L.L.C. |
|---|---|---|---|

(4) Remington Outdoor Company, Inc.: None

**DOMAIN NAMES**

| Domain Name | Account No. | Points To | Expiration Date | Account Holder |
|---|---|---|---|---|
| pantherarms.com | 21043774 | ADNS Services | 4/9/2025 | Remington Arms Company, Inc. |
| para-usa.com | 21043774 | ns1.supercp.com\|ns2.supercp.com | 1/19/2022 | Remington Arms Company, Inc. |
| paraord.com | 21043774 | Under Construction Page | 10/10/2022 | Remington Arms Company, Inc. |

Case 20-81688-CRJ11   Doc 821-3   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. C - Roundhill Group   LLC   Page 72 of 121

**Schedule 11.5**
**Brokers and Finders**

1.  Ducera Partners.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 73 of 121

## Schedule 12.1(a)
## Tradenames

Schedule 4.1(j) is hereby incorporated by reference.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 74 of 121

**Schedule 12.1(b)**
**Permitted Liens**

1. Liens securing (i) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000, and (ii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Seller in favor of the City of Huntsville.

2. Excise Tax in the amount of $13,420,726 was due on July 29, 2020 has not been paid and the tax returns for such excise taxes have not been filed.

3. State of Alabama - Sales and Use Tax - Period 05/01/2014 through 04/30/2017. Current Status: Auditor is reviewing information provided by Seller.

4. TTB - Firearms and Ammunition Excise Tax - Period - Unknown. Current Status: The Seller received e-mail communication on July 23, 2020 from the TTB of intent to audit.

**EXHIBIT 1**

(*See* attached copy of Bidding Procedures Order)

Case 20-81688-CRJ11   Doc 821-3   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. C - Roundhill Group   LLC   Page 76 of 121

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY,<br>INC., *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-81688-11<br><br>Joint Administration Requested |

## ORDER ESTABLISHING BIDDING PROCEDURES RELATING
## TO THE SALES OF ALL OR A PORTION OF THE DEBTORS' ASSETS

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively, the "**Chapter 11 Cases**"), seeking entry of this order (this "**Bidding Procedures Order**") (i) approving the proposed bidding procedures attached hereto as <u>Exhibit 1</u> (the "**Bidding Procedures**") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of their assets (the "**Acquired Assets**") through one or more sales of the Acquired Assets (each, a "**Sale Transaction**" or "**Sale**"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama  35824.

[2]  Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

OMM_US:78645958.8

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 77 of 121

(iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto, including the procedures for the Debtors' selection of one or more stalking horse bidders (each, a "**Stalking Horse Bidder**"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (iv) scheduling (a) an auction (the "**Auction**") if the Debtors receive two (2) or more timely and acceptable Qualified Bids (as defined below), and (b) a final hearing (the "**Sale Hearing**") to approve one or more Sales of the Acquired Assets; and (v) granting related relief; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984, as amended on July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

OMM_US:78645958.8

C.     The notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Bidding Procedures Order is necessary or required.

D.     The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) approve the Bidding Procedures, including the procedures for selecting one or more Stalking Horse Bidders and the provision of the Bid Protections to be determined, (ii) establish the Assumption and Assignment Procedures, (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached hereto, (iv) schedule a date for the (a) Auction and (b) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, including the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Meyer Declaration**") and the *Declaration of Colin M. Adams in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Adams Declaration**") are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

E.     The Bidding Procedures, substantially in the form attached hereto as Exhibit 1 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

OMM_US:78645958.8

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 79 of 121

F.      The Debtors are authorized to pay the break-up fee and expense reimbursement comprising the Bid Protections.  The Bid Protections, to the extent payable under any Stalking Horse APA, (a)(x) are actual and necessary costs and expenses of preserving the Debtors' estate within the meaning of Section 503(b) of the Bankruptcy Code, and (y) shall be treated as allowed administrative claims against the Debtors' estates pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code, are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Acquired Assets, and the efforts that have been and will be expended by the Stalking Horse Bidders.  The Bid Protections are a material inducement for, and condition of, each Stalking Horse Bidder's execution of the applicable Stalking Horse APA.  Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidders are unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under its Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

G.      The Sale Notice and the Publication Notice, substantially in the forms attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Acquired Assets, including the sale of Acquired Assets free and clear of all liens, claims, and encumbrances, the Sale Transaction(s), the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

OMM_US:78645958.8

H. The Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s), and no other or further notice is required.

I. The Assumption and Assignment Notice, substantially in the form attached hereto as <u>Exhibit 5</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Costs, and no other or further notice is required.

J. The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motion is granted as set forth herein.[3]

2. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

---

[3] Notwithstanding anything to the contrary herein, the consummation of any Sale Transaction(s) is subject to entry of the Sale Order(s).

OMM_US:78645958.8

## I.     The Timeline for the Sale

3.     The Debtors are authorized to proceed with the Sale Transaction(s) in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

4.     Deadline                                                                    **Action**

| Deadline | Action |
| --- | --- |
| August 18, 2020 at 10:00 a.m. (prevailing Central Time) | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| August 21, 2020 | Sale Notice Mailing Date |
| August 21, 2020 | Assumption and Assignment Service Date |
| September 1, 2020 at 4:00 p.m. (prevailing Central Time) | Sale Objection Deadline (defined below) excluding any objection based on identity of Stalking Horse Bidders, Successful Bidder or Backup Bidder or the form or substance of the Stalking Horse Bid, Successful Bid or Backup Bid |
| September 4, 2020 at 5:00 p.m. (prevailing Central Time) | Bid Deadline |
| September 8, 2020 at 12:00 p.m. (prevailing Central Time) | Reply Deadline (defined below) |
| September 8, 2020 by 4:00 p.m. (prevailing Central Time) or 14 days following service of the Supplemental Notice of Assumption and Assignment | Assumption and Assignment Objection Deadline (defined below) excluding any objection related to adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or Backup Bidder |
| September 17, 2020 at 10:00 a.m. (prevailing Central Time) | Auction |
| September 21, 2020 | Post-Auction Notice |
| September 23, 2020 at 10:00 a.m. (prevailing Central Time) | Sale Hearing |

OMM_US:78645958.8

5.     For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "**Modifications**") in accordance with the provisions of the Bidding Procedures; *provided, however*, that the Debtors shall consult with the Consultation Parties or, to the extent provided therein, the Bid Consultation Parties, with respect to any Modifications.  The Committee's right to request an extension of the above timeline for cause is expressly reserved.

**II.     The Bidding Procedures**

6.     The Bidding Procedures are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

7.     The Debtors are authorized, in accordance with the Bidding Procedures, to require Diligence Parties to submit written indications of interest specifying, among other things, the Acquired Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party.

8.     The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be **September 4, 2020 at 5:00 p.m. (prevailing Central Time)**.  Any disputes or objections to the selection of Qualified Bid(s), Successful Bid(s), or Backup Bid(s) (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

OMM_US:78645958.8

9.     The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on **September 17, 2020 at 10:00 a.m. (prevailing Central Time)** virtually via video conferencing technology, or at such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

10.     The Prepetition Secured Creditors shall have the right, subject in all respects to the Bankruptcy Code and other applicable law and the satisfaction in cash or assumption of claims secured by senior liens, to credit bid all or any portion of their allowed secured claims pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable provisions of the Prepetition Credit Documents and any such credit bid shall be deemed a Qualified Bid subject to the Intercreditor Agreement (as defined in the D'Arcy Declaration); *provided*, *however*, that nothing herein or in the Bidding Procedures shall affect or in any way limit the right or ability of any party in interest, including the Committee, to object to the Prepetition Secured Creditors' right to credit bid, including the nature, amount, or scope of such credit bid, subject to the (a) applicable provisions of the Court's *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling A Final Hearing* Docket No. 90, including paragraph 20 and the Challenge Period (as defined therein), as the same may be modified in accordance with its terms and (b) Sale Objection Deadline (as defined below).

### III.     Stalking Horse Bidder and Bid Protections

11.     In accordance with the Bidding Procedures, the Debtors may designate one or more Stalking Horse Bidders for the various segments of their business and may enter into an asset purchase agreement with each Stalking Horse Bidder (each, a "**Stalking Horse APA**"), subject to higher or otherwise better offers at the Auction, which establishes a minimum Qualified Bid at the Auction with respect to the assets that are the subject thereof.

OMM_US:78645958.8

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

9

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc Exhibit Ex. C - Roundhill Group    LLC    Page 85 of 121

parties expressing an interest in the Acquired Assets and all parties holding liens on such Acquired Assets, three (3) business days' notice and an opportunity to object to the determination of such Stalking Horse Bidder and disclosure of the Bid Protections set forth in the Stalking Horse APA, and absent objection, the Debtors selection of such Stalking Horse Bidder shall be deemed designated without further order of the Court. To the extent necessary, the Debtors' right to seek this Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby preserved.

## IV. Notice Procedures

15. The form of Sale Notice substantially in the form attached hereto as <u>Exhibit 2</u> is approved.

16. Within seven (7) days after the entry of this Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice and this Bidding Procedures Order, including the Bidding Procedures by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) any parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon or with respect to any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to FILO Lenders; (ix) counsel to

OMM_US:78645958.8

the Stalking Horse Bidder, if any; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; and (xvii) all known creditors of the Debtors, including their contract counterparties; *provided, however*, that to the extent email addresses are available, parties referenced in this paragraph 15 may be served by email.

17.     Service of the Sale Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

18.     The Publication Notice, substantially in the form attached hereto as <u>Exhibit 3</u>, is approved.  The Debtors are directed to publish the Sale Notice, as modified for publication, in the *New York Times*, on one occasion on the Mailing Date or as soon as reasonably practicable thereafter.  In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their case information website at https://cases.primeclerk.com/RemingtonOutdoor.

19.     Service of the Publication Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to all unknown parties.

20.     The form of the Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> is approved.  As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, the Post-Auction Notice identifying any Successful Bidder(s).

## V.     Assumption and Assignment Procedures

21.     The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are approved.

OMM_US:78645958.8

22.     The Notice of Assumption and Assignment, substantially in the form attached hereto as <u>Exhibit 5</u> is approved.

23.     On or before **August 21, 2020** (any such date, the "**Assumption and Assignment Service Date**"), the Debtors shall file with the Court, and post on the Case Website at https://cases.primeclerk.com/RemingtonOutdoor, the Notice of Assumption and Assignment and Designated Contracts List.  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice.   On the Assumption and Assignment Service Date, the Debtors shall serve, via first-class mail, a customized version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List, on all counterparties to the Designated Contracts.  In addition, the Debtors shall serve, via first-class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List on all parties on the Rule 2002 Notice List. Service of such Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

24.     Any objection by a counterparty to a Designated Contract (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; and (iii) include appropriate

OMM_US:78645958.8

documentation in support thereof. All Designated Contract Objections must be filed and served on (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, CA 90071, Attn: Steve Warren (swarren@omm.com) and Jennifer Taylor (jtaylor@omm.com); (ii) co-counsel for the Debtors, Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203, Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr (hlahr@burr.com); (iii) counsel for the Restructuring Committee, Akin Gump Strauss Hauer & Feld LLP, 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Schultz (sschultz@akingump.com); (iv) counsel for the Committee, Fox Rothschild LLP, 345 California Street, Suite 2200, San Francisco, California 94104, Attn: Michael A. Sweet (msweet@foxrothschild.com) and Baker Donelson Bearman Caldwell & Berkowitz, P.C., 420 20th Street North, Birmingham, Alabama 35203, Attn: Matthew Cahill (mcahill@bakerdonelson.com) and Rita Hullett (rhullett@bakerdonelson.com); (v) the Bankruptcy Administrator, 400 Well Street, Decatur, Alabama 35602, Attn: Richard Blythe (richard_blythe@alnba.uscourts.gov); (vi) counsel to the Stalking Horse Bidder, if any; (vii) counsel to the FILO Lenders, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998, Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com) and Andrew V. Alfano (andrew.alfano@pillsburylaw.com); (viii) counsel to Whitebox Advisors LLC, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Andreas Andromalos (aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com); (ix) all parties that have requested notice in the Chapter 11 Cases (collectively (i)–(ix), the "**Objection Recipients**"); and (x) counsel to any Successful Bidder(s), if known on the Sale Objection Deadline no later than 4:00 p.m. (prevailing Central Time) fourteen (14) days following the

13

Assumption and Assignment Service Date (the "**Assumption and Assignment Objection Deadline**").

25.     If a Designated Contract Objection is not consensually resolved before the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

26.     Any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, the Debtors reserve the right, and are authorized but not directed, to (i) supplement the Designated Contracts List with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

27.     In the event the Debtors exercise any of the rights listed above, the Debtors shall promptly serve the Supplemental Notice of Assumption and Assignment by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each Designated Contract listed on the Supplemental Notice of Assumption and Assignment at the last known address available to the Debtors.  Each Supplemental Notice of Assumption and Assignment shall set forth (i) the name and address of the counterparty to the Designated Contract listed thereon; (ii) the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder, if any, to withdraw such request for assumption and assignment of that Designated Contract prior to the closing of the applicable Sale Transaction); (iii) sufficient information to identify the Designated Contract; (iv) the Cure Costs, if any; and (v) proposed

OMM_US:78645958.8

adequate assurance, if known on the Assumption and Assignment Service Date. The Debtors are authorized, but not directed, to modify the Supplemental Notice of Assumption and Assignment as necessary and appropriate to provide customized individual notice to each Designated Contract counterparty. In addition, the Debtors are authorized, but not directed, to supplement the Designated Contract List on the Case Website with any additional Designated Contracts as the Debtors deem appropriate in their discretion. Service of such Supplemental Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

28. Any objection by a counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Supplemental Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; (iii) include appropriate documentation in support of the objection; and (iv) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment.

29. If a Supplemental Designated Contract Objection is not consensually resolved by the proposed effective date of assignment of the Designated Contract that is the subject of a Supplemental Designated Contract Objection, the Debtors shall seek an expedited hearing before

OMM_US:78645958.8

the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court, including by filing a certification of no objection, (a "**Supplemental Designated Contract Order**") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

30. Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them, except with respect to adequate assurance of future performance by such Successful Bidder. For the avoidance of doubt, any objections to the proposed form of adequate assurance of future performance of any Successful Bidder (other than a Stalking Horse Bidder) must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

31. The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take

16

OMM_US:78645958.8

assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an "executory" contract. Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final purchase agreement with the Successful Bidder(s) (each, an "**Acquired Contract**") will be assumed and assigned to the Successful Bidder(s).

32.     Assignment by the Debtors to the Successful Bidder of a contract, lease or any other liability assumed under Section 365 of the Bankruptcy Code or otherwise relieves the Debtors and their estates from any such liability so assigned.

## VI.     The Sale Hearing

33.     A Sale Hearing to (i) approve a sale of a portion or substantially all of the Acquired Assets to the Successful Bidder(s) and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on **September 23, 2020 at 10:00 a.m. (prevailing Central Time)**, and may be adjourned or rescheduled without notice, subject to paragraph 4 of this Bidding Procedures Order. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid(s) and the Backup Bid(s) (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction(s) and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Bankruptcy Court.

17

OMM_US:78645958.8

Case 20-81688-CRJ11     Doc 821-3     Filed 09/27/20     Entered 09/27/20 08:34:20     Desc
Exhibit Ex. C - Roundhill Group     LLC     Page 93 of 121

34.     Any and all objections, if any, to any Sale Transaction (but excluding any objection based on the specific identity of any Stalking Horse Bidder, the form or substance of any Stalking Horse APA, the specific identity of the Successful Bidder or the Backup Bidder, or the form or substance of the Successful Bid or the Backup Bid) must be filed no later than **September 1, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**").  Any and all such objections must be served on the Objection Recipients and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.  All replies to such objections must be filed by **September 8, 2020 at 12:00 p.m.** (prevailing Central Time) (the "**Reply Deadline**").

35.     Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Debtors' Acquired Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

36.     Promptly following the Auction, the Debtors shall serve the Post-Auction Notice. The Debtors propose that any objections regarding the adequate assurance of future performance of the Successful Bidder or the Backup Bidder (other than the Stalking Horse Bidder) may be raised at the Sale Hearing.

## VII.    Other Provisions

37.     Notwithstanding anything herein or in the Bidding Procedures to the contrary, the Debtors shall not be permitted to modify the consultation rights of the Consultation Parties or the Bid Consultation Parties in the Bidding Procedures absent further order of this Court or the consent of any affected Consultation or Bid Consultation Parties.

38.     Oneida's rights and priority in connection with any security interests it held in any assets of the Debtors pre-petition are hereby preserved and retained by Oneida to the extent they

OMM_US:78645958.8

existed pre-petition and any such security interests shall attach to proceeds of such assets with the same priority, extent, validity, avoidability and enforceability. Nothing herein shall constitute a finding or ruling by this Court that any such security interests are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such security interest.

39. The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Bidding Procedures Order.

40. This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

41. This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

42. To the extent this Bidding Procedures Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Bidding Procedures Order shall govern.

43. To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

44. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

OMM_US:78645958.8

45.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse APA, and the implementation of this Bidding Procedures Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

OMM_US:78645958.8

**<u>Exhibit 1</u>**

**Bidding Procedures**

OMM_US:78645958.8

**EXHIBIT 2**

(*See* attached form of Trademark License Agreement)

Case 20-81688-CRJ11   Doc 821-3   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. C - Roundhill Group   LLC   Page 98 of 121

**EXHIBIT 2**

<u>TRADEMARK LICENSE AGREEMENT</u>

This Trademark License Agreement ("<u>Agreement</u>"), dated as of September __, 2020, (the "<u>Effective Date</u>"), is entered into by and between Vista Outdoor Inc., a Delaware corporation located at 1 Vista Way, Anoka, MN 55303 ("<u>Licensor</u>"), and the Roundhill Group, LLC ("<u>Licensee</u>"). Licensor and Licensee are sometimes referred to herein individually as a "<u>Party</u>" and together as the "<u>Parties</u>".

RECITALS

WHEREAS, Licensor and Remington Outdoor Company, Inc., ("<u>ROC</u>") a Delaware corporation located at 100 Electronics Blvd., SW Huntsville, AL 35824 are, among others, parties to that certain Asset Purchase Agreement, dated September [●], 2020 (the "<u>Ammunition APA</u>"), pursuant to which Licensor, among other things, has acquired certain assets related to the ammunition business operated by ROC and certain of its Affiliates; and

WHEREAS, Licensee and ROC are, among others, parties to that certain Asset Purchase Agreement, dated September [●], 2020 (the "<u>Firearms APA</u>"), pursuant to which Licensee, among other things, has acquired certain assets (the "<u>Firearms Assets</u>") related to the firearms business operated by ROC and certain of its Affiliates; and

WHEREAS, in connection with the transactions contemplated by the Firearms APA, Licensee paid an aggregate purchase price of $12,500,000 to ROC in order to acquire the Firearms Assets; and

WHEREAS, following the Effective Date, Licensee has agreed to continue to invest in and otherwise develop the value of the brand and other intellectual property right included in the Licensed Trademarks; and

WHEREAS, Licensee's willingness to purchase the Firearms Assets and willingness to continue to invest in the Licensed Trademarks will have a direct and material benefit to Licensor, without which, Licensor would not have been willing to consummate the transactions contemplated by the Ammunition APA; and

WHEREAS, in connection with the transactions contemplated by the Ammunition APA and Firearms APA, Licensor has agreed, as of the Effective Date, to enter into this Agreement to enable use of the Licensed Trademarks (as defined below) in connection with Licensee's operation of the Firearms Business (as defined herein); and

WHEREAS, subject to the terms and conditions set forth herein, Licensor desires to exclusively license use of the Licensed Trademarks to License to manufacture, sell and/or distribute the Licensed Products;

WHEREAS, Licensee has the capability to perform such duties and desires to become an exclusive licensee of the Licensed Trademarks for said purpose; and

US_ACTIVE-154476691.21

Case 20-81688-CRJ11     Doc 821-3     Filed 09/27/20     Entered 09/27/20 08:34:20     Desc Exhibit Ex. C - Roundhill Group     LLC     Page 99 of 121

WHEREAS, Licensor is willing to grant an exclusive trademark license for this purpose to use the Licensed Trademarks on the terms set forth in this Agreement and the Appendices attached to and forming part of this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## DEFINITIONS

Capitalized terms used but not defined in this list herein shall have the meaning given them in the body of this Agreement.

"Affiliate" means, with respect to any Person, any other Person who, as of the Effective Date or subsequent thereto, controls, is controlled by, or is under common control with such Person, but any such other Person shall be deemed to be an Affiliate only as long as such control exists.

"Field of Use" means manufacture, distribution, advertising, promotion, offer for sale, sale, import, export, servicing, and support of Licensed Products.

"Firearms Business" means Licensee's business related to the manufacture, distribution, advertising, promotion, offer for sale, sale, servicing, and support of Licensed Products under the Licensed Trademarks, which business, for the avoidance of doubt, excludes any business related to the manufacturing, distribution and sale of ammunition and any products not listed on Appendix A.

"Licensed Products" means the products listed on Appendix A.

"Licensed Trademarks" means the trademarks used in the Firearms Business including those listed in Appendix B, as such Appendix may be updated by mutual written agreement of the Parties from time to time.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government.

"Restricted Product" means: (a) any semi-automatic rifles; (b) any rifle-caliber pistols; (c) receivers and partial receivers of the foregoing, and (d) pistols with arm braces.

"Subsidiary" means, with respect to any Person, any other Person who, as of the Effective Date or subsequent thereto, is controlled by such Person, but any such other Person shall be deemed to be a Subsidiary only as long as such control exists.

"Third Party" means any Person other than Licensor, Licensee, and their respective Affiliates and Subsidiaries.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 100 of 121

1.     LICENSE GRANT

A.     <u>Trademark License</u>. Licensor hereby grants to Licensee a non-transferable, exclusive (even as to Licensor), sublicensable (subject to <u>Section 1.F</u> herein), worldwide, royalty free, fully paid-up, right and license during the Term in the Field of Use to utilize the Licensed Trademarks solely (i) on all Licensed Products, (ii) the packaging accompanying Licensed Products, (iii) marketing materials and web site content relating to Licensed Products, and (iv) within a domain name (but, except as otherwise set forth herein) only in conjunction with the word "firearm", "firearms", "arms" or another word of similar meaning). For avoidance of doubt, neither the license in this <u>Section 1.A</u> herein nor any other provision of this Agreement shall restrict (or is intended to restrict) the right of Licensor to license the Licensed Trademarks to any other entity relating to any products or services outside the Field of Use. Licensee shall place on all packaging and marketing materials for Licensed Products appropriate trademark notices for the Licensed Trademarks and a notice indicating that the Licensed Trademarks are owned by Licensor and are used under license, and that Licensor is not a manufacturer, endorser, or seller of the Licensed Products.

B.     <u>Limitation on Licensee.</u> Notwithstanding anything to the contrary set forth herein, Licensee shall not (i) use the Licensed Trademarks on any Restricted Products (other than in connection with sales of Restricted Products to the military or a law enforcement agency), or (ii) otherwise market or sell Restricted Products under any other trademark on any web site or within any marketing materials that also include or reference the Licensed Trademarks or the Licensed Products marketed or sold using the Licensed Trademarks.

C.     <u>Exclusivity; Reservation of Rights</u>. The license granted hereunder is exclusive, except as otherwise contemplated hereby, even as to Licensor. Accordingly, during the Term, , Licensor shall not use or permit any Third Party to use any of the Licensed Trademarks on or in connection with the manufacture, distribution, advertising, promotion, offer for sale, sale, import, export, servicing, or support of Licensed Products, anywhere in the world. With the exception of the license specifically granted in this Agreement to the Licensed Trademarks, no license or rights beyond the scope set forth herein or under any other trademark, service mark, trade name, trade dress, domain name or any other intellectual property or other proprietary right of Licensor is granted by this Agreement. All rights not expressly granted by Licensor hereunder are expressly reserved by Licensor.

D.     <u>Trademark Usage Guidelines</u>. Licensee agrees to use the Licensed Trademarks in accordance with the Trademark Usage Guidelines included as <u>Appendix C</u> ("<u>Trademark Usage Guidelines</u>"). However, Licensee's continued use of the Licensed Trademarks in connection with the Licensed Products in the same or substantially the same manner as such Licensed Trademarks were previously used or are currently used shall be deemed to comply with the Trademark Usage Guidelines. If Licensee wishes to use the Licensed Trademarks in a manner that is not in accordance with the Trademark Usage Guidelines or in a manner that is not the same or substantially the same manner as such Licensed Trademarks were previously used or are currently used, Licensee must request Licensor's approval prior to such use. Requests for such approvals from Licensor in relation to the Licensed Trademarks under this Agreement are to be submitted in writing to the Licensor's authorized brand licensing representative designated to review and approve such uses; Licensor shall not unreasonably withhold its approval for any such use. Should

3

Licensor update or modify the Trademark Usage Guidelines, which must be reasonable and may not occur more than once per calendar year, such updates or modifications shall take effect ninety (90) days after written notice thereof is provided to Licensee, and Licensee shall implement any applicable changes within such timeframe or a commercially reasonable timeframe agreed by the Parties in writing; provided, however, that in no event may Licensor modify the Trademark Usage Guidelines in a manner that limits, eliminates or otherwise modifies the scope of the license granted to Licensee under <u>Section 1.D</u> or prohibits use of the Licensed Trademarks on and in connection with Licensed Products as used on the date hereof. For the avoidance of doubt, Licensee shall not be required to modify any Licensed Products or other materials and collateral existing prior to such effective date that were in compliance with the Trademark Usage Guidelines applicable as of their release. Licensee shall ensure that all Licensed Products sold by Licensee and all related quotations, specifications, and descriptive literature, and all other materials carrying the Licensed Trademarks, be marked with the appropriate trademark notices in accordance with the Trademark Usage Guidelines.

E. <u>No Assignment</u>. Nothing in <u>Section 1.A</u> or <u>Section 1.C</u> of this Agreement is to be construed as an assignment or grant to Licensee of any right, title, or interest in the Licensed Trademarks or in any copyright, design, trademark, trade dress, domain name or other property right of Licensor beyond the license expressly granted.

F. <u>Sublicense Rights</u>. Licensee shall be permitted to freely sublicense the Licensed Trademarks in the Field of Use, provided that all sublicensees shall be bound to the terms and conditions herein and shall be required to fully comply with the terms of this Agreement (including the confidentiality provisions and all Licensee restrictions). Licensee shall be strictly liable for any breach of the terms of this Agreement by a sublicensee, and shall be responsible for enforcing the usage restrictions set forth in this Agreement with regard to the Licensed Trademarks against all of its sublicensees. Any Affiliate sublicensee shall be jointly and severally liable with Licensee under this Agreement. Licensee shall provide Licensor with an updated list of all active sublicense agreements including the scope of and parties to the relevant sublicenses at least once per calendar year and additionally upon Licensor's reasonable request.

G. <u>Remington Domain Name</u>. Notwithstanding anything to the contrary set forth herein, promptly following the Effective Date, the Parties shall cooperate in good faith and take all commercially reasonable measures to ensure that the "Remington.com" domain name (as well as any other domain names mutually agreed to by the Parties) link or otherwise provide access to separate websites for (i) the business of Licensor and its Affiliates (which, subject to the terms hereof, will be managed by Licensor) and (ii) the Firearms Business (which, subject to the terms hereof, will be managed by Licensee).

2. QUALITY STANDARDS, QUALITY CONTROL AND INSPECTION

A. <u>Suppliers</u>. Licensee will manufacture, or cause, direct, and supervise the manufacture of Licensed Products and will provide, or cause, direct and supervise, the provision of related services by the supplier(s) used by Licensee (or any other entity that controlled the Firearms Business) as of the Effective Date and such new suppliers as may be added from time to time by Licensee ("<u>Suppliers</u>"). Licensor and Licensee agree that such new Suppliers shall be of

4

at least comparable quality in terms of the products or services supplied as the Suppliers used by or on behalf of Licensor as of the Effective Date.

B.    <u>Product Standards</u>. Licensee shall make, label, distribute, offer, provide and sell Licensed Products in accordance with the Trademark Usage Guidelines and the general product/service quality standards established in the Firearms Business as of the Effective Date ("<u>Existing Standards</u>"). Quality standards for Licensed Products not in existence as of the Effective Date shall be at least of a level comparable with the Existing Standards to the extent applicable to such Licensed Product ("<u>Comparable Standards</u>"). Licensee will distribute and sell only Licensed Products that meet the Existing Standards or Comparable Standards. Each Party acknowledges that it is in the Parties' mutual interest that Licensee market, promote, and sell Licensed Products branded with the Licensed Trademarks at prices and on terms that reflect the high value and quality associated with the Licensed Trademarks to preserve and enhance the goodwill and reputation associated with the Licensed Trademarks for premium quality products. Each Party covenants that it shall not take any actions that would be reasonably likely to result in a diminution in value to the value of the brands or the quality of the products associated with the Licensed Trademarks.

C.    <u>Quality Verification</u>. Licensee will assure testing, inspection and auditing of the products sufficient to minimize the likelihood of defective products entering the stream of commerce and, (1) before first sale or distribution of any Licensed Products manufactured and launched after the Effective Date and (2) during the Term as reasonably required by Licensor from time to time but no more than once per calendar year, furnish to Licensor without charge a copy of Licensee's and, if applicable, its Suppliers', quality verification, auditing and testing data for Licensor's review.

D.    <u>Quality Control Records</u>. If requested in writing by Licensor, Licensee shall reasonably make available and provide to Licensor, for Licensor's review, inspection and retention, such reasonable reports or data relating to quality control systems or processes for the Licensed Products. Should Licensor provide written notice outlining a reasonable basis upon which it believes that one or more Licensed Products does not conform to the applicable Existing Standards or Comparable Standards in accordance with this Agreement, Licensee will carry out appropriate quality control tests reasonably requested in writing by Licensor to determine whether such Licensed Products conform to the Existing Standards or Comparable Standards and will make commercially reasonable modifications and correction to Licensed Products to conform them to the Existing Standard or Comparable Standard and promptly provide to Licensor confirmation of such compliance activities and results. Licensee will keep, and request its Suppliers and Affiliates to keep, reasonable testing and quality control records for up to three (3) years from creation which records shall be open to inspection, during regular business hours of Licensee or its Suppliers, as applicable, by Licensor, upon at least ten (10) business days' prior written notice by Licensor.

E.    <u>Audits</u>. Upon Licensor's written request, Licensee shall permit Licensor's authorized representatives to inspect and audit during any operational hours the facilities, operations, and procedures of Licensee once per calendar year at a mutually agreed date for the sole purposes of determining whether the Licensed Products conform to the terms of this Agreement (the "<u>Annual Inspection</u>"). Licensee shall make available to Licensor for its review during such Annual Inspection, any requested information for evaluation of Licensee's compliance

5

hereunder, the Licensed Products, including information related to the manufacturing, handling, processing, offering, sale, marketing and distribution of the Licensed Products to the extent necessary to confirm compliance with this Agreement. During the Annual Inspection, Licensee will provide access to quality verification and testing data and any requested samples of Licensed Products including packaging, tags, labels, marketing and advertising materials and collateral and claims substantiation data for the Licensed Products that is specifically requested by Licensor at least two (2) weeks in advance for Licensor to determine and ensure compliance with this Agreement. Licensee, its Affiliates and Suppliers will make commercially reasonable modifications or corrections to their operations, processes and procedures, brand uses, corporate identification practices, the Licensed Products that Licensor deems necessary to ensure the Licensed Products and Licensee's operations, processes and procedures, brand uses, corporate identification practices, meet and maintain the requirements of this Agreement provided that a formal request for any such modifications is submitted in writing to Licensee.

F. <u>Customer Service</u>. Licensee shall also include with Licensed Products appropriate contact information for customer service and support in each country where the Licensed Products are distributed and sold. If requested in writing by Licensor, Licensee shall provide to Licensor a general outline of Licensee's warranty and service processes.

G. <u>Confidentiality</u>. All of the products, information and materials provided or made available by Licensee or its Suppliers pursuant to this <u>Section 2</u> will be deemed Licensee's confidential information, are for Licensor's internal purposes, and shall be used only by Licensor for confirming Licensee's compliance with this Agreement; in no event shall any such materials be disclosed to any other Person or used for any other purpose without Licensee's prior written consent.

H. <u>Compliance with Laws</u>. Licensee shall use the Licensed Trademarks only in such manner as will comply with the provisions of applicable laws relating to the Licensed Products. Licensee shall affix to all Licensed Products and all materials that bear a Licensed Trademark, including, but not limited to all labels, packaging, advertising, and promotional materials, invoices, and other printed materials (i) notices, warnings, instructions and safety information in compliance with applicable law (including trademark law), and (ii) a conspicuous statement, and such other legend as Licensor may from time to time require on the packaging of the Licensed Products indicating that the Licensed Products are sold, distributed, or manufactured under license from Licensor.

3. LICENSOR BANKRUPTCY AND COMMERCIAL LENDING TRANSACTIONS

A. Licensor acknowledges that Licensee's rights hereunder are preserved notwithstanding any putative rejection thereof under Section 365 of the Bankruptcy Code pursuant to *Mission Product Holdings, Inc. v. Tempnology LLC*, 139 S.Ct. 165 (2019). In the event any repudiation, disclaimer, rejection, proposed repudiation, proposed disclaimer or proposed rejection of this Agreement by Licensor in any bankruptcy proceeding or liquidation whether compulsory or voluntary or compounds with its creditors or takes or suffers any similar action in consequence ("<u>Bankruptcy Event</u>"), Licensee shall have the right to retain and fully exercise all of its rights hereunder. Without limiting the generality of the foregoing, no putative rejection of this Agreement or other Bankruptcy Event shall terminate or rescind any right granted to the Licensee.

6

B.      In the event of a Bankruptcy Event, Licensee further reserves all rights to assert that Section 365(n) of the Bankruptcy Code or similar laws of another jurisdiction, shall be implicated. The Parties intend that the Licensed Trademarks shall constitute and have the protections afforded "intellectual property" as the term is defined in 11 U.S.C. Section 101(35A) of the United States Code or similar laws of another jurisdiction. All of the rights granted to Licensee under this Agreement shall be deemed to exist immediately before the occurrence of any Bankruptcy Event in which Licensor is a debtor. The Parties wish for the protections of Section 365(n) of the Bankruptcy Code to apply fully if Licensor commences or has commenced against it a bankruptcy case under the Bankruptcy Code and for the protections of similar laws in other jurisdictions to apply in a Bankruptcy Event of Licensor or its property. Licensor acknowledges that the rights and licenses granted to Licensee pursuant to this Agreement shall not be affected by the rejection or repudiation of this Agreement. Licensor waives all rights to object to the application of Section 365(n) of the Bankruptcy Code or similar laws of another jurisdiction or any request for relief pursuant to Section 365(n) or similar laws of another jurisdiction by or on behalf of Licensee.

C.      In the event Licensor enters into a commercial lending transaction through which its lender requires assignment of the Licensed Trademarks be pledged as collateral, Licensor shall request that such lender shall acknowledge the rights of licensee hereunder, in writing, and accord Licensee protections substantially similar, but in no event less than, to those set forth in sections (a) and (b); provided, however, that if such lender is not willing to grant such consent, Licensor shall cooperate with Licensee in good faith in an effort to ensure that Licensee obtains such protections (provided, that, in no event shall Licensor be required to engage in any litigation or incur any out of pocket expenses in connection therewith). For the avoidance of doubt, it is the intent of the Parties for the license granted pursuant to this Agreement to extend and survive notwithstanding the exercise of any rights of foreclosure and/or sale by a lender pursuant to Article IX of the Uniform Commercial Code, as made applicable by state law.

D.      Promptly following the Effective Date, the Parties shall record a summary of this Agreement, in form and substance substantially similar to that attached hereto as <u>Appendix D</u>, with the United States Patent and Trademark Office.

4.      PACKAGING, ADVERTISING MATERIALS AND SAMPLES

A.      All packaging and related materials shall conform to the Existing Standards or Comparable Standards and the Trademark Usage Guidelines. If Licensee wishes to use any packaging or related materials that do not conform to the Existing Standards or Comparable Standards and the Trademark Usage Guidelines, such uses must be previewed with Licensor prior to Licensee's use.

B.      Except as otherwise contemplated hereby, Licensee will have sole responsibility for advertising and marketing expenses relating to Licensed Products. Licensee will reimburse Licensor for Licensor's reasonable out-of-pocket costs of producing any artwork and related materials requested by Licensee that Licensor chooses to create on Licensee's request, upon the submission of appropriate documentation as to Licensor's out-of-pocket costs.    Licensor acknowledges that it will receive a direct economic benefit from Licensee's investment in the Licensed Trademarks and Licensed Products, including through Licensee's marketing efforts to

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 105 of 121

promote the shared brands. In furtherance of the foregoing, following the Effective Date, upon the written request of Licensee, Licensor shall promptly reimburse Licensee for up to Seven Million Five Hundred Thousand ($7,500,000) of its expenses incurred in connection with (i) the marketing, promotion or sale of the Licensed Products and/or (ii) Licensee's hiring of employees in connection with the operation of the Firearms Business and/or (iii) Licensee's reorganizing or modernizing the facilities used in the Firearms Business, which will be paid Licensor by wire transfer to an account designated by Licensee.

C.      Licensee shall not make any false claims or material misrepresentations about Licensed Products and agrees to include appropriate disclaimers or informational statements on packaging and in promotional materials for Licensed Products. Licensor assumes no liability to Licensee, its Affiliates, its customers, or any other Third Party, with respect to the performance of Licensed Products.

5.      OWNERSHIP AND PROTECTION OF RIGHTS

A.      Ownership. Licensee acknowledges that the Licensed Trademarks are inherently distinctive, that Licensor (and/or its Affiliates) is the owner of and has acquired a substantial and valuable goodwill in the Licensed Trademarks, and that all use thereof by Licensee and its Affiliates and Suppliers inures solely to the benefit of Licensor (and/or its Affiliates). Licensee agrees to put reasonable notice of such ownership that Licensor shall require on the tags or labels or packaging and/or advertising materials for the Licensed Products, including a trademark notice as applicable and in accordance with the Trademark Usage Guidelines.

B.      No Impairment; Undertakings. Licensee will not and will not permit its Affiliates or authorize its Suppliers or sublicensees to do anything that is intended to impair Licensor's proprietary rights in and to the Licensed Trademarks. Neither Licensee nor any of its Affiliates will claim any right or interest in the Licensed Trademarks, except such right as is expressly granted by this Agreement. Licensee and its Affiliates further agree not to dispute, or assist in disputing, directly or indirectly Licensor's right and title in the Licensed Trademarks. If, as a result of Licensee's use of the Licensed Trademarks, Licensee or any of its Affiliates are deemed by operation of law or otherwise to have acquired any title or other rights to any of the Licensed Trademarks or any of their components, Licensee agrees to and hereby does assign (and shall have its Affiliate(s) assign in writing, if applicable) the same to Licensor without the requirement of any further consideration. In furtherance of the above, Licensee shall ensure the concepts in Appendix E, to the extent reasonably practicable, are included in the relevant agreements between the Licensee and its Suppliers or sublicensees.

C.      Product Materials. Licensor acknowledges that Licensee owns all rights in all graphic designs and other creative works containing the Licensed Trademarks including in packaging, promotional materials, advertising, collateral materials and other merchandising materials prepared by or for Licensee for use in connection with the distribution of Licensed Products (apart from the Licensed Trademarks themselves).

D.      Obligation to Notify. Licensee shall promptly notify Licensor of any suspected infringement or misuse of any of the Licensed Trademarks that is brought to the attention of Licensee, and shall cooperate with Licensor, as Licensor shall reasonably require and at Licensor's

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 106 of 121

expense, in any action taken against such suspected infringement or misuse. Licensor agrees to keep Licensee reasonably informed of actual or suspected infringement or misuse of the Licensed Trademarks of which it is aware, upon Licensee's reasonable request.

E.    <u>Prosecution</u>. Licensee shall take reasonable steps that are necessary and prudent to maintain and protect Licensor's proprietary rights in the Licensed Trademarks during the Term. Accordingly, Licensee shall perform all reasonable actions and bear all costs and expenses incurred by Licensor associated with the prosecution and maintenance of the registrations for the Licensed Trademarks that are solely within the Field of Use, and shall promptly reimburse Licensor for any such costs and expenses within thirty (30) days of receiving Licensor's invoice therefore. For the avoidance of doubt, Licensor shall bear all costs and expenses associated with the prosecution and maintenance of the registrations for all trademarks acquired by Licensor under the Ammunition APA that are solely outside the Field of Use. With respect to registrations for Licensed Trademarks that are used both within and outside the Field of Use, Licensee and Licensor shall each pay one-half of all costs and expenses associated with the prosecution and maintenance of such registrations. Upon Licensee's reasonable request, Licensor shall cooperate with Licensee with respect to the filing and prosecution, and upon registration, maintenance, of any new trademarks that are the same or that are or could be deemed confusingly similar to any of the Licensed Trademarks in the existing territories or in new territories in order to further protect and/or expand existing trademark coverage relating to the Licensed Trademarks. In all such cases, Licensee shall be solely responsible for all of the costs and expenses related to such filing, prosecution, and maintenance, including Licensor's reasonable costs in relation thereto. All such applications and registrations shall be solely owned by Licensor and shall be deemed part of the Licensed Trademarks. In addition, Licensee shall cooperate with Licensor and execute any documents reasonably required by Licensor to protect the Licensed Trademarks.

F.    <u>License Enforcement</u>. Prior to bringing any claim or action against a Third Party under this <u>Section 5.F</u>, Licensee shall notify Licensor of the discovered suspected infringement or misuse that is the basis of such claim or action, and Licensor shall have the first right to elect to bring an enforcement action against such Third Party subject to <u>Section 5.G</u>. In the event that Licensor elects not to bring an action, or has not brought such action within sixty (60) days of receiving Licensee's notice, Licensee shall have the right to prosecute any such claims against such Third Party for infringement of the Licensed Trademarks within the Field of Use in Licensee's own name. Any such enforcement actions shall be brought against such Third Parties at Licensee's sole cost and expense. Licensee shall retain any recovery obtained from any such enforcement proceedings. If Licensor is required to be joined to any such proceeding (e.g., to establish standing), Licensor agrees to join such proceeding and Licensee agrees to reimburse Licensor for all of Licensor's reasonable costs and expenses associated with such proceedings (including attorney's fees). Licensor further agrees to provide documents and otherwise assist in such proceedings as may be reasonably requested by Licensee.

G.    Licensor may, in its sole discretion, take such steps to bring and/or prosecute such claims for infringement, misappropriation, or dilution of the Licensed Trademarks as Licensor may deem necessary both within and outside of the Field of Use. In the event Licensor elects to take such steps, Licensee shall cooperate fully with Licensor in such actions. Licensor shall have full control over any such enforcement action that it initiates or prosecutes, including, without limitation, the right to select counsel, to settle on any terms it deems advisable, to appeal any

adverse decision rendered in court, to discontinue any action taken by it, and to otherwise make any decision in respect thereto as Licensor deems advisable in its sole discretion. Licensor shall bear all expenses associated with any such actions brought by Licensor, provided, however, that Licensor shall also retain any recovery or settlement resulting from such enforcement actions. Licensor does not represent, warrant, or covenant that it will bring any enforcement action against any Third Party, and will bring such actions in Licensor's sole discretion. Licensor agrees to keep Licensee reasonably informed of any litigation brought by Licensor to enforce its rights in the Licensed Trademarks. For purpose of clarity, the entirety of this <u>Section 5.G</u> is subject <u>Section 5.F</u> above.

6.    INDEMNIFICATION

A.    Licensor agrees to defend, indemnify and hold harmless Licensee against all loss, expense and damage incurred and occasioned by any claim or action asserted by any Third Party (including any governmental agency) based on allegations that the Licensed Trademarks themselves (and not their uses) violate the intellectual property rights of any Third Party, provided that Licensor is reasonably notified of and tendered the defense to such claims solely with counsel of Licensor's own choosing, and no settlement is made without Licensor's prior written consent; and provided further that such indemnification obligation will not apply to third-party claims based on the use of the Licensed Trademark by Licensee in material violation of the terms and conditions of this Agreement. Licensee shall cooperate with Licensor in any such defense as Licensor shall request and at Licensor's expense. Except as expressly set forth in this Agreement, Licensor makes no warranties under this Agreement, either express or implied.

B.    Licensee agrees to defend, indemnify, and hold harmless Licensor and its Affiliates (including subsidiaries) and their parents, officers, directors, insurers, and agents against all loss, expense and damage incurred and occasioned by any claim or action asserted by any Third Party (including any governmental agency) arising out of or in any way related to the use, manufacture, distribution, offering, provision, marketing, or sale of the Licensed Products bearing or under the Licensed Trademarks (including product liability claims) and related marketing materials (including as described in <u>Section 4</u> herein) by Licensee or its Affiliates or its sublicensees (including, without limitation, any misuse of the Licensed Trademarks by such sublicensees), provided that Licensee is reasonably notified of and tendered the defense to such claims solely with counsel of the Licensee's own choosing and no settlement is made without the Licensee's prior written consent, not to be unreasonably withheld. Failure of Licensor to give prompt notice will not relieve Licensee of its obligations hereunder except to the extent such delayed notice materially prejudices Licensee. Licensor shall reasonably cooperate with Licensee in any such defense as Licensee shall request, at Licensee's expense.

C.    Licensor assumes no liability with respect to the Licensed Products. Licensee agrees to defend, indemnify and hold Licensor, its officers, agents, employees, successors or assigns harmless against any and all claims, demands, causes of action including, but not limited to, those relating to product liability, patent infringement and environmental law, and associated judgments, costs and expenses, including reasonable attorney's fees, arising out of (i) Licensee's manufacture, distribution, shipment, disposal, advertising, promotion or sale of the Licensed Products or (ii) any grossly negligent or willful act or omission by Licensee, agents or employees,

10

provided that Licensee receives prompt notice of such claim, demand or cause of action and is permitted to deal with it in Licensee's sole discretion.

D.     Licensee hereby agrees, and shall ensure that its Affiliates and sublicensees agree, to comply with all laws and regulations applicable to the manufacture, sale, marketing and distribution of Licensed Products bearing the Licensed Trademarks. Licensee shall provide a warranty to its end customers of the Licensed Products bearing the Licensed Trademarks against defects in design, materials, and workmanship that reflects the high quality of the Licensed Products bearing the Licensed Trademarks.

E.     Licensee will acquire and maintain at Licensee's sole expense throughout the Term and five (5) years thereafter, a policy of standard non-cancelable Commercial General Liability Insurance including coverage for Contractual Liability, Products Liability and Completed Operations on an occurrence basis. The limits of liability shall be $10,000,000 per occurrence, which may be satisfied through any combination of primary and excess or umbrella liability insurance. Licensor shall be named as an additional insured, and Licensee's insurance shall be primary and non-contributory to any insurance that may be carried by Licensor. Licensee's insurers shall be reasonably acceptable to Licensor. Licensee will direct the insurance company(ies) to furnish Licensor with a Certificate of Insurance evidencing such coverage on the Effective Date (or if not practicable, promptly thereafter), and to provide Licensor with at least thirty (30) days written notice prior to termination of coverage. For the avoidance of doubt, each Party's indemnification obligations under this <u>Section 6</u> herein include the obligation to defend the other indemnified Party against each applicable third-party claim, to pay all costs and expenses, including, without limitation, attorneys' fees, associated with such defense, and to pay all damages awarded (or settlement amounts agreed to) in connection with each such claim.

F.     The undertakings of this <u>Section 6</u> shall survive expiration or termination of this Agreement.

7.     TERM AND TERMINATION

A.     This Agreement will begin on the Effective Date and will continue in perpetuity unless terminated earlier in accordance with the terms hereof (the "<u>Term</u>").

B.     This Agreement may be terminated by Licensor upon written notice to Licensee under the following conditions:

  1)  if Licensee or its Affiliates or any its other sublicensees fails to comply with any of the material terms and conditions of this Agreement and, if curable, fails to cure or otherwise remedy such breach within one hundred twenty sixty (120) days after the Licensor provides written notice to Licensee thereof; or

  2)  if the Licensee enters into a bankruptcy proceeding or liquidation whether compulsory or voluntary (other than for the purpose of reorganization) or compounds with its creditors or takes or suffers any similar action in consequence and fails to operate the Firearms Business for a period of at least

11

twenty four (24) months following the date of such bankruptcy, liquidation or composition.

C.    All licenses and permissions granted by Licensor herein cease upon termination of this Agreement for any reason. After termination, Licensee shall and will continue thereafter to be obligated to assign to Licensor any rights Licensee may acquire in the Licensed Trademarks, if any, and to hold Licensor (and its Affiliates) harmless, and to defend and indemnify Licensor (and its Affiliates) as provided under <u>Section 6</u> of this Agreement. Licensee will promptly discontinue all use of and sale of Licensed Products incorporating the Licensed Trademarks and any materials using the Licensed Trademarks.

8.    MISCELLANEOUS

A.    <u>Independent Entities</u>. The Parties are independent and distinct entities. Licensee may not incur any obligation in Licensor's name or on its behalf. This Agreement will not be construed as constituting any joint venture, partnership, franchise or principal/agent relationship, nor will either Party do or permit any act that will be regarded as such.

B.    <u>Severability</u>. The declaration of any provision of this Agreement as invalid or not enforceable will not affect the remaining terms. The failure by either Party to enforce any provision of this Agreement will not affect that Party's right to enforce the same or any other provision of this Agreement.

C.    <u>Governing Law</u>. This Agreement is to be construed according to the laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the law any other jurisdiction.

D.    <u>LIMITATION OF LIABILITY</u>. EXCEPT FOR DAMAGES ARISING FROM THE INDEMNIFICATION AND INSURANCE OBLIGATIONS PURSUANT TO <u>SECTION 6</u> HEREIN, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR INDIRECT DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER UNDER THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

E.    <u>LIMIT ON WARRANTY</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

F.    <u>Force Majeure</u>. Notwithstanding anything to the contrary, neither Party will be liable (for any failure to perform or otherwise) under this Agreement in accordance with its terms if failure arises out of causes beyond the control of the Parties. Such causes may include, but are not limited to, acts of God or the public enemy, acts of civil or military authority, fires, floods, earthquakes, water disasters, strikes, sabotage, insurrection, epidemic, pandemic, nuclear incident, unavailability of energy or communications sources, materials or equipment not caused by the Parties, increase in component costs, riots, war or priorities resulting from the foregoing.

12

G.    <u>Delivery</u>. A written notice by either Party to the other will be deemed delivered if personally delivered or sent by an overnight international courier, or if sent registered or certified mail, return receipt requested, to the other Party at its address given in <u>Section 8.H</u>, or at the address specified by the other Party in the last notice of change of address, or otherwise provided under the terms of <u>Section 8.C</u> herein.

H.    <u>Notices</u>. Notices under this Agreement are to be addressed as follows:

If to Licensee:

    Attention: Scott Soura
    888 SE 3 Avenue, Suite 500
    Fort Lauderdale, FL 33316
    Email: soura@roundhillgroup.com

    With a copy to (which copy alone shall not constitute notice):

    Shulman Bastian Friedman & Bui, LLP
    100 Spectrum Center Drive, Suite 600
    Irvine, California 92618
    Attention: James C. Bastian, Jr., Esq.
    Email: jbastian@shulmanbastian.com

If to Licensor:

    Vista Outdoor Inc.
    1 Vista Way
    Anoka, MN 55303
    Attention: Dylan S. Ramsey
    Email: Dylan.Ramsey@VistaOutdoor.com

    With a copy to (which copy alone shall not constitute notice):

    Reed Smith LLP
    599 Lexington Avenue
    New York, NY 10022
    Attention: Christopher M. Sheaffer
    Email: Csheaffer@ReedSmith.com

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

I.    <u>Execution</u>. This Agreement may be executed by facsimile or PDF (electronic mail) copies in counterparts, each of which will be deemed an original and all of which together will constitute one and the same Agreement. Notwithstanding the foregoing, the Parties will deliver

original execution copies of this Agreement to one another as soon as practicable following execution thereof.

J.     Merger; Amendments. This Agreement, including all Appendices hereto, constitutes the entire understanding of the Parties with respect to the subject matter hereof, and will supersede any and all prior communications, negotiations, correspondence, course of dealings and other agreements between the Parties regarding such subject matter. This Agreement may only be amended or modified in a writing signed by both Parties. The terms and conditions of this Agreement will prevail notwithstanding any conflict with the terms and conditions of any purchase order, acknowledgment or other instrument submitted by Licensee.

K.     Assignment. Licensee may not directly or indirectly assign this Agreement or transfer any of its rights or obligations under this Agreement, in each case, operation of law or otherwise, without the prior written consent of Licensor which shall not be unreasonably withheld; provided, however, that Licensee shall have the right to assign, transfer, sell, or pledge its rights hereunder without any required consent to: (i) any Affiliate of Licensee ; (ii) to a third-party as part of a sale of substantially all of Licensee's business, whether through an asset purchase, stock purchase, merger, consolidation, or the like; and (iii) to any lending institution, for security purposes or as collateral, from which Licensee obtains financing, which right of assignment shall include any rights of Licensee as a third-party beneficiary. Licensor may assign this Agreement, any of the Licensed Trademarks (subject to the license granted to Licensee hereunder), and/or any of its rights and obligations under this Agreement without restriction. Nothing in this Agreement, express or implied, is intended to confer upon any Person or party other than Licensee or Licensor, or their respective successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

L.     Survival. The following Sections shall survive expiration or termination of this Agreement: Section 5, Section 6, and Section 8.

M.     Equitable Relief. Each Party acknowledges and agrees that a breach or threatened breach by the other Party of its obligations under this Agreement shall give rise to irreparable harm to such Party for which monetary damages shall not be an adequate remedy, and if such a breach or threatened breach occurs such Party will, in addition to any and all other rights and remedies that may be available to such Party under this Agreement, whether at law, at equity, or otherwise in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other equitable relief that may be available from a court of competent jurisdiction, without any requirement to (i) post a bond or other security, or (ii) prove that monetary damages will not afford an adequate remedy. Each Party agrees that it will not oppose or otherwise challenge the appropriateness of reasonably requested equitable relief with respect to a breach of this Agreement by such Party.

N.     To the extent that Licensee acquires the artwork of the Remington Museum (wherever located) pursuant to the terms of the Firearms APA, the Parties shall cooperate in good faith to ensure that such assets are split equally between the Parties based on value.

14

O.      To the extent Licensee receives any inventory related to the Dakota Arms business operated by ROC and its Affiliates, Licensee shall, following Licensor's written request, promptly transfer such inventory to Licensor.

[SIGNATURE PAGE FOLLOWS]

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 113 of 121

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the as of the date first above written.


LICENSOR


_____

Name:
Date:



LICENSEE


_____

Name:
Date:

[Signature Page to Trademark License Agreement]

## APPENDIX LIST

**Appendix A**: Accessories Included in Field of Use

**Appendix B**: Licensed Trademarks

**Appendix C**: Trademark Guidelines (relating to the Licensed Trademarks)

**Appendix D**: License Summary

**Appendix E**: Undertaking by Suppliers

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 115 of 121

## APPENDIX A
## Licensed Products

- Firearms

- Receivers

- Barrels

- Stocks

- Grips

- Rails

- Butts

- Triggers

- Safeties

- Iron Sights (excluding any electronic, or optical sights, and any scopes)

- Flash suppressors

- Recoil compensators

- Heatshields

- Silencers

- Sight adjustment tools

- Gunsmithing tools and kits

- Books and manuals (firearms related)

- Magazines

- Air Guns

- Paintball Guns

- Gun Cases; and

- Any other part or item not listed above that that can be affixed to or installed within a firearm and that was manufactured by ROC and sold under the Remington brand as part of a completed firearm as of the date of this Agreement.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 116 of 121

**APPENDIX B**
**Licensed Trademarks**[1]

AIRMASTER (*for airguns and paintball guns only)
EXPRESS (*for airguns and paintball guns only)
TYRANT (*for airguns and paintball guns only)
R (Stylized)
R DEFENSE Logo
REMINGTON
REMINGTON & Ball Device
REMINGTON (Ball Design)
REMINGTON (Script)
REMINGTON (Stylized and Underlined)
REMINGTON (Stylized)
REMINGTON HTP HIGH TERMINAL PERFORMANCE
REMINGTON HYPERSONIC
REMINGTON in Circle & Underlined
REMINGTON UMC
REMINGTON UMC and Design
REMINGTON UMC and Red Ball Design

---

[1] RS Note to Draft: Parties to agree on any additional trademarks.

US_ACTIVE-154476691.21

## APPENDIX C

### <u>Trademark Usage Guidelines (Relating to the Licensed Trademarks)</u>

1. Use of the Licensed Trademarks should include the appropriate trademark symbol, the ® or ™, in superscript following the most prominent occurrence in the relevant branding context. Every instance of use of a mark in running copy or otherwise must be capitalized, italicized, bolded, or otherwise treated with prominence.

2. Licensee shall clearly indicate on product packaging and advertising and promotional materials, that the Licensed Trademarks are used under license, and that Licensor is not a manufacturer, seller, distributor, or endorser of such products.

3. Licensee shall ensure that the Licensed Trademarks are displayed according to any specifications and/or brand standards which Licensor may provide or amend from time to time. It is Licensee's obligation to understand these restrictions and limitations.

4. Licensee shall not do anything inconsistent with Licensor's ownership of the Licensed Trademarks.

5. The Licensed Trademarks must be reproduced exactly as provided by Licensor. The Licensed Trademarks may not be altered, amended, distorted, or combined with any other symbols, words, images, or designs, and may not be incorporated into a tagline or slogan.

6. Any use of a Licensed Trademark which is not addressed in the guidelines set forth herein, must be approved by Licensor prior to its use. Submittals for approval should be faxed/emailed to the attention of the Licensor representative.

7. Usage of the Licensed Trademarks shall be in strict compliance with those restrictions set forth in that certain Trademark Settlement Agreement by and between Remington Arms Company, Inc. and Remington Products, Inc. dated December 5, 1986.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 118 of 121

**APPENDIX D**

**<u>License Summary</u>**

NOTICE OF LICENSE

This document provides notice of a License Agreement (the "<u>License Agreement</u>") by and between [Vista Outdoor Inc.] ("<u>Licensor</u>") and Roundhill Group, LLC ("<u>Licensee</u>"), dated October __, 2020.

The material terms of the License Agreement are set forth below. Any owner of the Licensed Trademarks (as defined below) takes such ownership subject to the rights granted under the License Agreement.

1) Licensor has granted Licensee a non-transferable, exclusive (even as to Licensor), sublicensable, worldwide, royalty free, fully paid-up, right and license to use the trademarks attached hereto as Exhibit A (the "<u>Licensed Trademarks</u>").

2) Licensee has the exclusive right (even as to Licensor) to use the Licensed Trademarks in connection with the manufacture, distribution, advertising, promotion, offer for sale, sale, import, export, servicing, and support of firearms products.

3) The license granted to Licensee pursuant to the terms of the License Agreement does not include the right to use the Licensed Trademarks in connection with the manufacturing, distribution and sale of ammunition products, as well as certain other product categories mutually agreed to by Licensor and Licensee.

4) The license granted under the License Agreement is perpetual unless terminated in accordance with the terms of the License Agreement.

21

**APPENDIX E**

**UNDERTAKING BY LICENSEE'S SUPPLIER(S)**

Licensee shall ensure that its suppliers and sublicensees agree to the following provisions:

**1.**    SUPPLIER ACKNOWLEDGES THAT THE TRADEMARKS (THE "PROPERTY RIGHTS") SPECIFIED BY LICENSEE AND/OR LICENSOR FOR USE ON _____ (THE "LICENSED PRODUCTS") ARE THE EXCLUSIVE PROPERTY OF LICENSOR AND ITS AFFILIATES AND THE LICENSED PRODUCTS ARE MADE BY US EXCLUSIVELY FOR LICENSEE AND FOR THE BENEFIT OF LICENSOR AND ITS AFFILIATES.

**2.**    SUPPLIER WILL NOT AT ANY TIME CLAIM ANY RIGHT, TITLE OR INTEREST OR IMPAIR THE RIGHTS OF LICENSOR OR ITS AFFILIATES OR LICENSEE IN THE PROPERTY RIGHTS. SUPPLIER AGREES TO EXECUTE SUCH ADDITIONAL UNDERTAKINGS OR OTHER DOCUMENTS AS LICENSOR MAY DEEM APPROPRIATE IN THIS RESPECT.

**3.**    SUPPLIER AGREES TO COMPLY WITH ALL LAWS AND REGULATIONS APPLICABLE TO THE MANUFACTURE OF LICENSED PRODUCTS.

**4.**    SUPPLIER WILL CARRY OUT ALL QUALITY CONTROL PROCEDURES DESIGNATED BY LICENSEE TO DETERMINE THAT THE LICENSED PRODUCTS CONFORM TO THE QUALITY CONTROL SPECIFICATIONS SPECIFIED BY LICENSOR. SUPPLIER WILL COMPLY WITH ANY GUIDELINES PROVIDED BY LICENSEE OR LICENSOR WITH RESPECT TO THE LICENSED PRODUCTS. ANY PRODUCT NOT MEETING THE PRESCRIBED QUALITY STANDARDS WILL NOT BE SOLD UNDER ANY OF THE PROPERTY RIGHTS.

**5.**    SUPPLIER WILL NOT SUBCONTRACT ANY ORDER OR PART THEREOF PLACED BY LICENSEE WITHOUT LICENSEE'S EXPRESS WRITTEN CONSENT.

**6.**    UPON NOTICE TO SUPPLIER BY LICENSEE, SUPPLIER WILL PROMPTLY DELIVER OR DESTROY ALL MATERIALS IN SUPPLIER'S POSSESSION BEARING ANY OF THE PROPERTY RIGHTS.

**7.**    WITHOUT LICENSOR'S EXPRESS WRITTEN CONSENT, SUPPLIER WILL NOT USE OR AUTHORIZE OTHERS TO USE LICENSOR'S OR ANY OF ITS AFFILIATES' NAMES OR ANY OF THE PROPERTY RIGHTS IN ADVERTISING OR PROMOTING ANY OF SUPPLIER'S ACTIVITIES, PRODUCTS OR SERVICES. NOTWITHSTANDING THE FOREGOING, SUPPLIER SHALL ENSURE THAT A

22

NOTICE INDICATING THAT THE PROPERTY RIGHTS ARE OWNED BY LICENSOR AND ARE USED UNDER LICENSE, AND THAT LICENSOR IS NOT A MANUFACTURER, ENDORSER, OR SELLER OF THE LICENSED PRODUCTS.

**8.** SUPPLIER AGREES AND CONFIRMS THAT LICENSOR HAS THE RIGHT TO ENFORCE THIS UNDERTAKING AGAINST SUPPLIER IN ANY APPROPRIATE LEGAL FORUM INDEPENDENTLY OF LICENSEE.

**9.** SUPPLIER'S AGREEMENT WITH LICENSEE SHALL BE CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF DELAWARE, U.S.A. AS APPLIED TO INSTRUMENTS EXECUTED AND PERFORMED IN DELAWARE.

Case 20-81688-CRJ11    Doc 821-3    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. C - Roundhill Group    LLC    Page 121 of 121