**Exhibit D**

ASSET PURCHASE AGREEMENT

BY AND AMONG

HUNTSMAN HOLDINGS, LLC

AS BUYER,

REMINGTON OUTDOOR COMPANY, INC.

AND EACH OF THE OTHER SELLERS SET FORTH ON THE SIGNATURE PAGES
HERETO,

EFFECTIVE AS OF SEPTEMBER 26, 2020

# TABLE OF CONTENTS

**Page**

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS ................................... 6

    Section 1.1     Transfer of Acquired Assets ................................ 6
    Section 1.2     Excluded Assets ................................................ 7
    Section 1.3     Assumption of Liabilities ................................ 10
    Section 1.4     Retention of Liabilities ................................... 10
    Section 1.5     Assumed License Agreements. ............................ 12
    Section 1.6     Non-Assignment of Acquired Assets .................... 13
    Section 1.7     Further Conveyances and Assumptions ................. 13
    Section 1.8     Conflicts with Other Bidders ............................ 14

ARTICLE 2. CONSIDERATION ................................................................. 14

    Section 2.1     Consideration ................................................ 14
    Section 2.2     Good Faith Deposit ......................................... 14

ARTICLE 3. CLOSING AND DELIVERIES ................................................. 15

    Section 3.1     Closing ........................................................ 15
    Section 3.2     Sellers' Deliveries .......................................... 15
    Section 3.3     Buyer's Deliveries ......................................... 16

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ................................... 17

    Section 4.1     Representations and Warranties of Sellers ............. 17
    Section 4.2     Representations and Warranties of Buyer ................ 18
    Section 4.3     Warranties Exclusive; Schedules ......................... 20
    Section 4.4     Survival of Representations and Warranties ............. 20

ARTICLE 5. COVENANTS OF THE PARTIES .............................................. 21

    Section 5.1     Covenants of Sellers ....................................... 21
    Section 5.2     Covenants of Buyer ........................................ 22

ARTICLE 6. ADDITIONAL AGREEMENTS ................................................ 23

    Section 6.1     Bankruptcy Matters ........................................ 23
    Section 6.2     Transitional Arrangements ................................ 24
    Section 6.3     Further Assurances ......................................... 24

ARTICLE 7. TAXES ........................................................................... 24

    Section 7.1     Taxes Related to Purchase of Assets ..................... 24
    Section 7.2     Cooperation on Tax Matters .............................. 25
    Section 7.3     Allocation of Purchase Price .............................. 25

ARTICLE 8. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ................. 26

    Section 8.1     Conditions Precedent to Performance by Sellers ............. 26
    Section 8.2     Conditions Precedent to Performance by Buyer ............. 26

ARTICLE 9. TERMINATION ................................................................. 27

    Section 9.1     Conditions of Termination ................................ 27
    Section 9.2     Effect of Termination; Remedies ........................ 28

# TABLE OF CONTENTS
### (continued)

**Page**

ARTICLE 10. MISCELLANEOUS ............................................................................... 29

Section 10.1    Successors and Assigns................................................................ 29
Section 10.2    Governing Law; Jurisdiction....................................................... 29
Section 10.3    WAIVER OF JURY TRIAL....................................................... 30
Section 10.4    Expenses ..................................................................................... 30
Section 10.5    Broker's and Finder's Fees ......................................................... 30
Section 10.6    Severability ................................................................................. 30
Section 10.7    Notices ........................................................................................ 31
Section 10.8    Amendments; Waivers................................................................. 31
Section 10.9    Time of Essence .......................................................................... 32
Section 10.10   Public Announcements ................................................................ 32
Section 10.11   Entire Agreement........................................................................ 32
Section 10.12   Parties in Interest........................................................................ 32
Section 10.13   Bulk Sales Laws.......................................................................... 32
Section 10.14   Construction................................................................................ 32
Section 10.15   Counterparts and Facsimile........................................................ 33

ARTICLE 11. DEFINITIONS ..................................................................................... 33

Section 11.1    Certain Terms Defined................................................................ 33
Section 11.2    All Terms Cross-Referenced....................................................... 40

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 4 of 143

## SCHEDULES

Section 1.1(b)   -   Owned Trademarks
Section 1.1(c)   -   Owned Intellectual Property
Section 1.5(a)   -   Executory Contracts
Section 1.5(b)   -   Estimated Cure Amount
Section 4.1(g)   -   Intellectual Property
Section 11.1(a)  -   Business Names / Tradenames

## EXHIBIT

Exhibit 1        -   Bidding Procedures Order

4

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), effective as of September 26, 2020 (the "<u>Effective Date</u>"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("<u>ROC</u>"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (with ROC, each a "<u>Seller</u>" and, collectively, the "<u>Sellers</u>") and Huntsman Holdings, LLC, a Delaware limited liability company ("<u>Buyer</u>"). Buyer and the Sellers are sometimes referred to herein, individually, as a "<u>Party</u>" and, collectively, as the "<u>Parties</u>".

## *RECITALS*

A.     On July 27, 2020 (the "<u>Petition Date</u>"), Sellers filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Alabama (the "<u>Bankruptcy Court</u>" and the case arising under such petition, the "<u>Bankruptcy Case</u>").

B.     Pursuant to the Sellers' Bankruptcy Case, Buyer desires to purchase from Sellers certain Trademarks and certain other Intellectual Property, in each case, related to or associated with Sellers' Remington brand, logos, Business Names, Copyrights and Trademarks (collectively, the "<u>Remington Brand</u>"), described in greater detail herein as the Acquired Assets, free and clear of any and all Liens, Claims and Interests (other than Permitted Liens), except for assumption of the Assumed Liabilities, and Sellers desire to sell, convey, assign and transfer to Buyer, the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

C.     Buyer does not desire to purchase from Sellers any other assets or liabilities, which are described in greater detail herein as the Excluded Assets and Excluded Liabilities, and Sellers do not desire to sell, convey, assign or transfer any such Excluded Assets or Excluded Liabilities to Buyer.

D.     Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Sellers.

E.     The Acquired Assets and Assumed Liabilities are assets and liabilities of Sellers to be sold to and assumed by Buyer pursuant to an order of the Bankruptcy Court, in form and substance acceptable to Buyer, approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "<u>Sale Order</u>"), which order will include the authorization for the assumption by Sellers and assignment to Buyer of certain executory contracts and unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code. The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

## *STATEMENT OF AGREEMENT*

NOW, THEREFORE, in consideration of the foregoing and their respective

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 6 of 143

representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE 1. <u>PURCHASE AND SALE OF THE ACQUIRED ASSETS</u>.

Section 1.1 <u>Transfer of Acquired Assets</u>. At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Sellers shall sell to Buyer, and Buyer shall acquire from Sellers, all of Sellers' right, title and interest in and to the following assets, free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities) (the "<u>Acquired Assets</u>"):

(a) an agreement, in form and substance reasonably satisfactory to Buyer and SIG Sauer, pursuant to which Buyer will receive from SIG Sauer a license for the use of certain Remington Brand-related Trademarks, which are not Owned Trademarks, for Buyer's continued use in segments of the Business outside of the Ammunitions Business following the Closing (the "<u>SIG Sauer License</u>");

(b) the Trademarks set forth on <u>Section 1.1(b)</u> of the Disclosure Schedules (the "<u>Owned Trademarks</u>");

(c) all other Intellectual Property, not used primarily in the Ammunitions Business, which is set forth on Section 1.1(c) of the Disclosure Schedules, owned or purported to be owned by any Sellers or any of their respective Subsidiaries constituting or associated with the Remington Brand, primarily used or primarily held for use in the operation of the Business, and any and all corresponding rights, including in any Contracts related to the development or creation of such Intellectual Property provided herein, in respect thereof that, now or hereafter, may be secured throughout the world, including, in each case, all moral rights and goodwill associated therewith (the Intellectual Property described in this clause (c), together with the Owned Trademarks, the "<u>Owned Intellectual Property</u>");

(d) all licenses, sublicenses, or similar rights, permissions or franchises to use any Owned Intellectual Property, including all licenses, sublicenses, contract rights, permits or franchises with respect thereto (the "<u>Assumed License Agreements</u>"), and any and all corresponding rights in respect thereof that, now or hereafter, may be secured throughout the world, including, in each case, all moral rights and goodwill associated therewith (the "<u>Licensed Intellectual Property</u>" and, together with the Owned Intellectual Property, collectively, the "<u>Acquired Intellectual Property</u>");

(e) all proceeds and recoveries from policies (but not, for the avoidance of doubt, any Insurance Policies themselves) to the extent attributable to any of the Acquired Assets only to the extent in respect of period on or after the Effective Date ("<u>Assumed Policy Rights</u>");

(f) Claims held by Sellers that relate to the Acquired Assets and/or Assumed Liabilities;

(g) to the extent permitted by applicable Law (and other than all Books and Records of Sellers held by Sellers or their counsel related to litigation or Claims for the Excluded

6

Liabilities), all Books and Records that are used in, held for use in or intended to be used in, or that reasonably relate to, the Acquired Assets or the Assumed Liabilities; provided, that Buyer shall provide Sellers with reasonable access (during business hours with reasonable prior notice and without cost to Sellers) to the same following the Closing to the extent reasonably necessary to permit Sellers to wind-down and liquidate their estate after the Closing; provided, further, that Buyer shall provide any other buyer of Sellers' lines of business or assets pursuant to the auction contemplated by the Bidding Procedures Order (an "Other Buyer") with reasonable access at such Other Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same to the extent reasonably related to the assets of Sellers purchased by such Other Buyer; and provided, further, that Sellers and each such Other Buyer shall keep such information confidential in accordance with this Agreement and all requirements of applicable Law (or in the case of any such Other Buyer, a confidentiality agreement reasonably acceptable to Buyer);

(h)     all rights and title to the shares of capital stock (and any other equity interests or rights convertible into equity interests) (the "RLC Shares") of Remington Licensing Corporation, a Delaware corporation, that are owned by RA Brands, L.L.C., a Delaware limited liability company (provided, that, Buyer reserves the right, in its sole discretion to assign to a third party or classify the assets described in this subsection (h) as an Excluded Asset at any time prior to the Closing Date; provided, however, that such assignment or classification of such assets as Excluded Assets shall not result in a reduction to the Purchase Price contained herein);

(i)     all goodwill and other intangible assets associated with the Acquired Intellectual Property;

(j)     all contents of the Ilion, NY Remington Arms Museum including all artwork and firearms of every nature which are owned by Sellers, including but not limited to all antique, collectible, and historic firearms owned by Sellers whether located at the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere; and

(k)     all antiques, collectibles, and historic firearms, including all artwork or firearms of every nature, owned by Sellers whether or not considered part of the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere.

Section 1.2     Excluded Assets.  Notwithstanding any provision to the contrary in Section 1.1, the Acquired Assets shall not include the following properties, Contracts, Leases, and other assets, interests and rights of Sellers (all such items not being acquired by Buyer being referred to in this Agreement as the "Excluded Assets"):

(a)     the Marlin brand, and all Intellectual Property (i) owned or used by Sellers in connection with the ownership, operation and/or management of the Business, other than the Acquired Intellectual Property, however used or held for use in the operation of the Business (including, for example, Trademarks related solely to a Non-Core Brand) and (ii) licensed to

7

Case 20-81688-CRJ11     Doc 821-4     Filed 09/27/20     Entered 09/27/20 08:34:20     Desc
Exhibit Ex. D - Huntsman Holdings     LLC     Page 8 of 143

Sellers in connection with the ownership, operation and/or management of the Business, other than the Acquired Intellectual Property, however used or held for use in the operation of the Business, including, in each case, all moral rights and goodwill associated therewith;

(b)     all Owned Real Property;

(c)     all Leases and all Leasehold Improvements of Sellers located on Leased Real Property;

(d)     all Contracts of the Business, except to the extent an Assumed License Agreement or if the transfer of a Contract would otherwise be required to transfer the Acquired Assets;

(e)     all of Sellers' owned or leased equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property and any rights to any warranties and licenses received from manufacturers and sellers related thereto;

(f)     all of Sellers' leased or owned cars, trucks and other motor vehicles and all rights to the warranties and licenses received from manufacturers and sellers related thereto;

(g)     all right, title and interest in and to all inventory, raw materials, works in process, parts (including spare and replacement parts), subassemblies, supplies and finished goods;

(h)     all servers, computers, hardware, networks, data communication lines, routers, hubs, switches and all other information technology equipment, and all associated documentation owned, leased, or used (or held for use) by Sellers;

(i)     all trade and non-trade accounts receivable, notes receivable and negotiable instruments of Sellers;

(j)     all sales orders or other commitments of Sellers to purchasers of goods, services or products produced, marketed or sold by the Business;

(k)     all outstanding purchase orders or other commitments of Sellers to suppliers of goods and services for materials, supplies or other items;

(l)     all Employee Liabilities;

(m)     all Employee Benefit Plans, together with all funding arrangements relating thereto (including, but not limited to, all assets, trusts, insurance policies and administration service contracts related thereto);

(n)     that certain Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan, as amended from time to time the "Pension Plan");

(o)     subject to Section 1.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving

8

effect to the entry of the Sale Order and any other Final Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities pursuant to Section 1.4(a));

(p)     all cash and cash equivalents held by Sellers, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities, in each case as of immediately prior to the Closing (and including without limitation (i) the Good Faith Deposit, (ii) the Net Closing Cash Payment, (iii) any fee reserves or escrows established by Sellers, and (iv) any cash in the Dominion Account (as defined in the Priority Term Loan)), in each case other than to the extent constituting an Acquired Asset;

(q)     all rights of every nature and description (other than Assumed Policy Rights) under or arising out of all insurance policies of Seller (the "Insurance Policies"), including without limitation (i) with respect to Claims arising prior to the Effective Date (ii) to the extent of coverage of any Excluded Liabilities, (iii) under those Insurance Policies covering any tort liabilities that are not Assumed Liabilities, (iv) under the D&O Insurance, and (v) under those Insurance Policies covering liabilities and Claims against Seller and its affiliates relating to the Excluded Employee Liabilities;

(r)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes for any Straddle Period, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(s)     except for the RLC Shares, all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller;

(t)     all Books and Records (i) which Sellers are required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that Sellers shall provide Buyer with access to the same following the Closing to the extent relating to the Acquired Assets and when requested by Buyer (at no cost to Buyer); (ii) exclusively relating to any Excluded Asset or Excluded Liability; and (iii) held by Sellers or Sellers' counsel relating to any litigation against any Seller or the Employee Liabilities;

(u)     any rights of Sellers under this Agreement or any Ancillary Agreement to which a Seller is a party, including, without limitation, any rights relating to the Purchase Price;

(v)     all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

(w)     all claims and remedies of Sellers under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code (each, an "Avoidance Action"); and

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 10 of 143

(x)     Claims held by Sellers against any party that are covered by, relate to or are based upon any Insurance Policies (including the D&O Insurance).

Section 1.3     Assumption of Liabilities.  At the Closing, Buyer shall assume, and Buyer agrees to thereafter pay, perform and discharge when due, and indemnify, defend and hold harmless Sellers, their Affiliates and all of their respective Related Persons from and against, (a) all liabilities arising out of ownership of the Acquired Assets by Buyer after the Closing to the extent such liabilities arise solely out of any matter, occurrence, action, omission or circumstance that first occurred or existed after the Closing and (b) all pre-petition cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code solely in connection with the assumption and assignment of the Assumed License Agreements including the cost of obtaining consents in respect thereof (the "Cure Amount").

Section 1.4     Retention of Liabilities.  Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Sellers (all such liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities").  Sellers and their Affiliates shall pay, perform and discharge when due each of the Excluded Liabilities, and indemnify, defend and hold harmless Buyer, its Affiliates and all of its Related Persons from and against, any and all liabilities, Claims and obligations arising out of or relating to the ownership, operation or management of the Excluded Assets and the Excluded Liabilities.  The Excluded Liabilities include, without limitation, the following:

(a)     all liabilities and obligations arising out of, relating to or otherwise in respect of the Acquired Assets arising prior to the Closing;

(b)     all liabilities and obligations under or relating to or otherwise arising, whether before, on or after Closing, out of, or in connection with, any of the Excluded Assets;

(c)     all liabilities and obligations under that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022) (the "UMWA"), as amended or otherwise modified from time to time;

(d)     all liabilities and obligations under the Pension Plan;

(e)     all liabilities and obligations relating to any withdrawal from a "multiemployer plan", as defined in Section 3(37) of ERISA;

(f)     all liabilities and obligations related to the Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses, to the extent applicable, for any action resulting from Employees' separation of employment prior to or on the Closing Date;

(g)     all liabilities arising under (i) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Sellers, as amended or

10

otherwise modified from time to time, (ii) that certain note issued by Sellers to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000 and (iii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Sellers in favor of the City of Huntsville;

(h)     all liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time;

(i)     all liabilities and obligations of Sellers under or relating to the DIP Facility, Priority Term Loan, the FILO Facility, the Exit Term Loan, the Intercompany Note or any other indebtedness (including all intercompany indebtedness among the Sellers and all guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit), except to the extent expressly included as an Assumed Liability;

(j)     all liabilities and obligations with respect to employment or other provision of services, compensation, severance, benefits or payments of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller (or any beneficiary or dependent of any such individual), whether or not employed by Buyer or any of its Affiliates after the Closing, that (i) arises out of or relates to the employment, service provider or other relationship between any Seller and any such individual, including but not limited to the termination of such relationship; (ii) arises out of or relates to any Employee Benefit Plan; or (iii) arises out of or relates to events or conditions occurring on or before the Closing Date;

(k)     all liabilities and obligations for Pre-Closing Taxes;

(l)     all liabilities and obligations in respect of drafts or checks outstanding at the Closing;

(m)     all liabilities and obligations under any futures contracts, options on futures, swap agreements or forward sale agreements;

(n)     all liabilities and obligations arising out of or relating to any business, asset or property formerly owned or operated by Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by Sellers;

(o)     all liabilities and obligations of Sellers arising under or incurred in connection with the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which any Seller is a party and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(p)     all liabilities and obligations of, and Claims against, Sellers arising from and in connection with grants of restricted common unit/share awards and stock options by Sellers; and

(q)     any liabilities and obligations of Sellers under this Agreement, or under any Ancillary Agreement to which a Seller is a party.

11

Section 1.5    Assumed License Agreements.

(a)    Section 1.5(a) of the Disclosure Schedules sets forth a list of all executory Contracts to which, to Sellers' Knowledge, one or more Seller is party and which are to be included in the Assumed License Agreements. From and after the Effective Date until two (2) Business Days prior to Closing, subject to the limitations set forth in Section 1.5(e), Sellers shall make such deletions to Section 1.5(a) of the Disclosure Schedules as Buyer shall, in its sole discretion, request in writing. Any such deleted Contract shall be deemed to no longer be an Assumed License Agreement. From and after the Effective Date until two (2) Business Days prior to Closing, Sellers shall make such additions to Section 1.5(a) of the Disclosure Schedules as Buyer shall reasonably request in writing. All Contracts of Sellers that are not listed on Section 1.5(a) of the Disclosure Schedules shall not be considered an Acquired Asset and shall instead be deemed "Rejected Contracts."

(b)    Buyer may request certain modifications and amendments to any Contract as a condition to such Contract becoming an Assumed License Agreement, and Sellers shall use their commercially reasonable efforts to obtain such modifications or amendments. If Sellers are unable to obtain such modifications or amendments, Buyer may, in its sole discretion, subject to the limitations set forth in Section 1.5(e), designate the Contract as a Rejected Contract. At such time as is specified in the Sale Order, pursuant to Section 365 of the Bankruptcy Code, Sellers shall take all actions required to assume and assign to Buyer (other than payment of Cure Amounts, which Cure Amounts shall be Assumed Liabilities) and Buyer shall assume from Sellers, the Assumed License Agreement. The Cure Amount shall be paid by Buyer, in each case as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order and this Agreement. Section 1.5(b) of the Disclosure Schedules contains Sellers' good faith estimate of the Cure Amount as of the Closing Date. Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, if at the time of the Closing there is a pending dispute over the Cure Amount associated with any Assumed License Agreement, Buyer may, in its sole discretion and at any time whether before or after the Closing, deem any such Contract subject to the dispute a Rejected Contracts and, will not be responsible for any costs associated with the applicable Rejected Contract.

(c)    As of the date hereof, Sellers have timely served the motion seeking entry of the Sale Order to all parties to Contracts. Subject to Section 1.6 and the performance of Buyer's obligations in Section 5.2, Sellers shall use commercially reasonable efforts to cause the Assumed License Agreement to be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and Sellers shall comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign and delegate to Buyer all of Sellers' rights and obligations under the Assumed License Agreement.

(d)    Notwithstanding any provision in this Agreement to the contrary, if for any reason Buyer fails to pay the Cure Amount in respect of any Assumed License Agreement when due and payable pursuant to this Agreement, the Sale Order or any other Order of the Bankruptcy Court, (i) Sellers shall be under no obligation whatsoever to pay or otherwise satisfy such Cure Amount or any other liability or obligation under such Assumed License Agreement, (ii) Buyer shall indemnify and hold harmless Sellers in respect of such Cure Amount, liability or obligation as well as any expenses (including legal fees and expenses) reasonably incurred by Sellers in

12

defending any claim for payment of the Cure Amount or any other liability or obligation arising under such Contract asserted by the counterparty thereto and (iii) Sellers may reject, and nothing in this Agreement shall prohibit Sellers from rejecting, such Contract.

(e)     Notwithstanding any provision in this Agreement to the contrary, at any time prior to the date of a final hearing to approve the sale of the Acquired Assets, Buyer may designate in writing to Seller any Contract or Lease as an Excluded Liability, only if the rejection of such Contract or Lease would not give rise to a Claim in favor of the counterparty thereto having administrative priority or any other priority senior to a general unsecured Claim against the bankruptcy estate of Sellers (the "Qualifying Excluded Contracts and Leases"); provided, that, for the avoidance of doubt, a Contract or Lease shall be considered a Qualifying Excluded Contract and Lease, and Buyer may reject such a Contract or Lease, if Buyer agrees to pay the entire amount of such Claim giving rise to an administrative priority or other priority senior to a general unsecured Claim against the bankruptcy estate of Sellers. Sellers may reject, and nothing in this Agreement shall prohibit Seller from rejecting, the Qualifying Excluded Contracts and Leases.

Section 1.6     Non-Assignment of Acquired Assets.     Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer, and shall not effect the assignment or transfer of any Acquired Asset, if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Sellers (each such action, a "Necessary Consent"), would constitute a breach thereof (after giving effect to any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent.  In such event, the Parties will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Sellers thereunder so that Buyer would not in fact receive all such rights, the Parties will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to Sellers or Buyer, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Sellers would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Sellers' obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Sellers thereunder.

Section 1.7     Further Conveyances and Assumptions.  At the Closing, and from time to time thereafter, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate

13

Case 20-81688-CRJ11     Doc 821-4     Filed 09/27/20     Entered 09/27/20 08:34:20     Desc
Exhibit Ex. D - Huntsman Holdings     LLC     Page 14 of 143

to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Sellers and their successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

Section 1.8    Conflicts with Other Bidders.  In the event of any conflict between this Agreement and any other bidder or bidders for Sellers' assets relating to the Acquired Assets or the Assumed Liabilities as defined herein or in the applicable asset purchase agreement or agreements by and between Sellers and such other bidder or bidders (an "Other APA"), Buyer shall cooperate in good faith with any such other bidder or bidders, whether before or after the Closing Date, to ensure that all assets or liabilities are appropriately apportioned between Buyer and such bidder or bidders in order to reflect the intent of Buyer and any such other bidder or bidders under this Agreement and each applicable Other APA.

ARTICLE 2. <u>CONSIDERATION</u>

Section 2.1    Consideration.  The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets (the "Purchase Price") shall be:

(a)    Thirty Five Million United States Dollars (US $35,000,000) (such amount, the "Gross Closing Cash Payment"), to be adjusted pursuant to Section 2.2(b), and paid and delivered in accordance with Section 3.3(a), which shall be allocated as follows:

(i)    (A) Ten Million Five Hundred Thousand United States Dollars (US $10,500,000), if there is a "going concern" buyer, as shall be determined by Sellers in their sole discretion, of the Sellers' Ilion, New York facility that assumes the CBA (the "Going Concern Buyer"), in order for such Going Concern Buyer to fund modernization costs of the Ilion, New York facility; or (B) Fifteen Million United States Dollars (US $15,000,000) in the event there is no Going Concern Buyer, as shall be determined by Seller in its sole discretion, of the Sellers' Ilion, New York facility, eligible employees of Sellers under the CBA, for the payment of all severance obligations and termination benefits and the employer portion of payroll taxes in respect of such severance obligations and termination benefits (the applicable amount escrowed pursuant to clause (A) or (B), the "Escrowed Amount"); provided, that, if the applicable Escrowed Amount is not used in full by the Going Concern Buyer or by Sellers in satisfaction of all severance-related benefits for employees of Sellers under the CBA, as applicable, such remaining Escrowed Amount shall be released to Sellers as amount payable to the estate;

(ii)    the remaining portion of the Gross Closing Cash Payment, allocated to Sellers; and

(b)    assumption of the Assumed Liabilities (including, without limitation, payment of the Cure Amount).

Section 2.2    Good Faith Deposit.

14

(a)     On or prior to the execution and delivery of this Agreement by Buyer, Buyer shall pay to Sellers the amount of Three Million Five Hundred Thousand United States Dollars (US $3,500,000) by wire transfer of immediately available funds (the "Good Faith Deposit").  The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Sellers or Buyer and shall be deposited in a segregated deposit account of Sellers and held in trust to be administered solely in accordance with the terms of this Agreement and the Bidding Procedures Order attached hereto as Exhibit 1 (the "Bidding Procedures").  Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b)     If the Closing occurs, the Gross Closing Cash Payment shall be reduced by the amount of the Good Faith Deposit (such resulting amount, the "Net Closing Cash Payment"), to be paid and delivered in accordance with Section 3.3(a).

(c)     If this Agreement is terminated pursuant to Section 9.1, the Good Faith Deposit shall be repaid to Buyer or retained by Sellers in the amounts and at the times set forth in Section 9.2 hereof.

ARTICLE 3. CLOSING AND DELIVERIES

Section 3.1     Closing.  Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Pacific Time, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in Article 8 of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by the Parties, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "Closing Date").

Section 3.2     Sellers' Deliveries.  At the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(a)     all of the Acquired Assets, together with one or more duly executed bills of sale, endorsed certificates of title and other evidence of transfer and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller;

(b)     one or more duly executed assignment and assumption agreements for the Assumed License Agreements, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer (each, an "Assignment and Assumption Agreement");

(c)     one or more duly executed assignments of (i) the trademark and patent registrations and applications included in the Acquired Intellectual Property registered in the name of Sellers, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States), (ii) the Internet domain name registrations and

15

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 16 of 143

applications included in the Acquired Intellectual Property registered in the name of Sellers, in a form suitable for filing with all applicable domain name registries, and (iii) general assignments of all other Acquired Intellectual Property, in each case in form and substance customary for transactions of this nature and reasonably acceptable to Buyer, an any additional documents required to effectuate the assignment (each, an "Acquired Intellectual Property Assignment");

(d)     the officer's certificate required to be delivered pursuant to Section 8.2(a) and Section 8.2(b);

(e)     a duly executed Asset Purchase Agreement entered into by and between Seller and by SIG Sauer Inc. ("SIG Sauer" and such Asset Purchase Agreement, the "SIG Sauer APA") in connection with the auction held under the Bidding Procedures Order; and

(f)     one or more affidavits executed by Sellers, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that each Seller is not a foreign person within the meaning of Section 1445(f)(3) and Section 1446 of the Code.

Section 3.3     Buyer's Deliveries.  At the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(a)     cash in an amount equal to the Net Closing Cash Payment, by wire transfer of immediately available funds to the U.S. bank account or accounts of Sellers identified by Sellers in writing reasonably in advance of the Closing;

(b)     one or more duly executed Assignment and Assumption Agreements;

(c)     one or more duly executed Acquired Intellectual Property Assignments;

(d)     the officer's certificate required to be delivered pursuant to Section 8.1(a) and Section 8.1(b);

(e)     the SIG Sauer License;

(f)     if applicable, one or more agreements, in form and substance reasonably satisfactory to Buyer and the Going Concern Buyer, pursuant to which, among other things, Buyer will grant Going Concern Buyer a license for the use of certain Remington Brand-related Trademarks for Going Concern Buyer to manufacture firearms and firearms products to Buyer and other customers, retailers and sellers in the Firearms Business following the Closing, which license will terminate upon the earliest to occur of Going Concern Buyer's failure to (i) continue the manufacture of Remington firearms at the Ilion, New York facility, (ii) employ an agreed upon number of UMWA employees and (iii) meet minimum financial covenants  (the "Going Concern Buyer License"); and

(g)     such other documents, instruments and certificates as Sellers may reasonably request to transfer, assign and delegate the Assumed Liabilities to Buyer in accordance with terms and conditions hereof.

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 17 of 143

## ARTICLE 4. REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of Sellers.  Each Seller represents and warrants to Buyer as follows:

(a)    Corporate Organization.  Each Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of incorporation or formation.  Subject to any necessary authority from the Bankruptcy Court, each Seller has the requisite corporate or limited liability company power and authority to use, own and operate the Acquired Assets and to carry out its obligations under this Agreement.  Each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Authorization and Validity.  Each Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement has been duly authorized by all necessary corporate or limited liability company action by the boards of directors or managers of each Seller, and no other corporate or limited liability company proceedings are necessary for the performance by each Seller of its obligations under this Agreement or the consummation by such Seller of the transactions contemplated by this Agreement.  This Agreement has been duly and validly executed and delivered by each Seller and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, is a valid and binding obligation of each Seller enforceable against such Seller in accordance with its terms.

(c)    No Conflict or Violation.  Neither the execution and delivery by any Seller of this Agreement or any of the Ancillary Agreements to which any Seller is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order), the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements, nor compliance by such Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any material breach of any provision of the respective certificates of incorporation or formation of such Seller or the by-laws or operating agreements of such Seller, or (y) materially violate any provision of law, regulation, rule or other legal requirement of any Governmental Authority ("Law") or any order, judgment or decree of any court or Governmental Authority ("Order") applicable to such Seller, any of such Seller's Affiliates or any of their respective properties or assets.

(d)    Title and Ownership.  Sellers have good and valid title to, or right by license, lease or other agreement to use, the Acquired Assets.  Subject to the entry of the Sale Order, at the Closing, Sellers will have the right to transfer, and Buyer will acquire good and marketable title to, in and under, the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

(e)    Compliance with Law. (i) Sellers have operated the Business in material compliance with all applicable Laws, and (ii) except as may result from the Bankruptcy Case,

17

Sellers have not received written notice of any violation of any applicable Laws, nor are Sellers in default with respect to any Order applicable to the Acquired Assets.

(f)   License Agreements.  As of the Effective Date, other than as set forth on Section 4.1(f) of the Disclosure Schedules or in motions or other pleadings or similar items filed with the Bankruptcy Court, no Seller nor, to such Seller's Knowledge, any other party to any of the Assumed License Agreements has commenced any action against any of the parties to such Assumed License Agreements or given or received any written notice of any material default or violation under any Assumed License Agreement that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assumed License Agreements).  Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assumed License Agreements is, and will be at the Closing, valid, binding and in full force and effect against each Seller, except as otherwise set forth on Section 4.1(f) of the Disclosure Schedules.

(g)   Intellectual Property. Section 4.1(g) of the Disclosure Schedules sets forth an accurate and complete list of all Acquired Intellectual Property. The Sellers are the sole and exclusive owners of the Owned Intellectual Property free and clear of all Liens pursuant to the Sale Order. Except as limited by section 365(c)(1)(A) of the Bankruptcy Code, Sellers own all right, title and interest to, or are valid licensees with respect to, the Acquired Intellectual Property, and, at Closing, will convey the Acquired Intellectual Property to Buyer free and clear of Liens pursuant to the Sale Order.  To the Sellers' Knowledge, (i) no Person is engaging in any activity that infringes, dilutes, misappropriates or violates any Acquired Intellectual Property and (ii) no claim has been asserted to any Seller that the use of any Acquired Intellectual Property or the operation of the Business infringes, dilutes, misappropriates or violates the Intellectual Property of any third party

Section 4.2   Representations and Warranties of Buyer.  Buyer represents and warrants to each Seller as follows:

(a)   Corporate Organization.  Buyer is an entity duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation.  Buyer has the requisite power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b)   Qualification to do Business.  Buyer is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which Buyer is a party.

(c)   Authorization and Validity.  Buyer has the requisite corporate power and authority necessary to enter into this Agreement and each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder.  The execution and

18

delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby. This Agreement and each of the Ancillary Agreements to which Buyer is a party have been duly and validly executed and delivered by it and are valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

(d) <u>No Conflict or Violation</u>. Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

(e) <u>Consents and Approvals</u>. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Governmental Authority or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f) <u>Adequate Assurances Regarding Assumed License Agreements</u>. Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed License Agreements.

(g) <u>Financial Capability</u>. Buyer currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor to Sellers of the Purchase Price (including the Cure Amount), and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(h) <u>Investigation by Buyer</u>. Buyer has conducted its own independent review and analysis of the Acquired Assets and the Assumed Liabilities, operations, technology, assets, liabilities, financial condition and prospects of the Business as carried on by Sellers and acknowledges that Sellers have provided Buyer with reasonable access to the personnel, properties, premises and records for this purpose. Buyer has conducted its own independent

19

review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations, warranties and covenants of Sellers contained herein and in the Ancillary Agreements, and Buyer (i) acknowledges that none of Sellers or their Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in Section 4.1 and Section 10.5 (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Sellers, their Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding misrepresentation or concealment arising from actual fraud of Sellers) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Sellers set forth in this Agreement, except, with regard to Sellers, for the representations and warranties contained in Section 4.1 and Section 10.5 and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3    Warranties Exclusive; Schedules.

(a)    The representations and warranties contained in Article 4 and Section 10.5 are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed. Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, SELLERS AND THEIR RESPECTIVE AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, OR (C) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS.

(b)    The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

Section 4.4    Survival of Representations and Warranties.    None of the representations or warranties of Sellers set forth in this Agreement or in any certificate delivered pursuant to Section 8.2(a) and Section 8.2(b) shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement and each Ancillary Agreement shall survive in accordance with their respective terms).

20

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 21 of 143

## ARTICLE 5. COVENANTS OF THE PARTIES

Section 5.1    Covenants of Sellers.  Each Seller covenants as follows:

(a)    Commercially Reasonable Efforts.  Between the Effective Date and the Closing Date, Seller shall use commercially reasonable efforts to, and, as applicable, cause its Affiliates and Related Persons to, (i) obtain all Necessary Consents, waivers, authorizations and approvals of all Governmental Authorities, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party; (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements; and (iii) maintain and preserve the Acquired Assets substantially in accordance with Sellers' current practices and procedures.

(b)    Access to Properties and Books and Records; Confidentiality.  Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to Article 9) to all Books and Records of Seller relating to the Acquired Assets and the Assumed Liabilities.  Upon reasonable prior notice, Seller shall also afford Buyer reasonable access during normal business hours, to all Acquired Assets, and to Sellers' executive officers, accountants, counsel, Employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 9).  The rights of access contained in this Section 5.1(b) are granted subject to, and on, the following terms and conditions:  (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Sellers or their agents or representatives (whether pursuant to this Section 5.1(b) or otherwise) will be governed and protected by the Confidentiality Agreement, dated as of July 29, 2020 by and between Out O' Site, LLC and ROC (the "Confidentiality Agreement"); and (iii) such rights of access shall not affect or modify the conditions set forth in Article 8 in any way.

(c)    Operation of the Business.  Except (i) as otherwise contemplated or permitted by this Agreement or the Ancillary Agreements, (ii) with the prior consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or (iii) in connection with any Order relating to the Bankruptcy Case, between the Effective Date and the Closing Date, Sellers shall, and, as applicable, cause their Affiliates and Related Persons to, (A) use commercially reasonable efforts to safeguard and maintain the Acquired Assets in their condition as of the Effective Date (except for ordinary wear and tear) and prevent any destruction thereof or material damage thereto between the Effective Date and the Closing Date and (B) notify Buyer of any notices relating to or proposed changes affecting Sellers' Assumed Policy Rights covering any of the Acquired Assets.  Notwithstanding the foregoing, nothing in this Agreement shall restrict Seller from rejecting any (x) Contract or Lease that is not an Assumed License Agreement or (y) Qualifying Excluded Contracts and Leases.

(d)    Discontinuation of Remington Brand by Non-Core Brand Buyer.  Sellers agree that for any of Non-Core Brand that Sellers assign, sell or convey to a third party on or after

21

the Effective Date, Sellers will require the buyer of any such Non-Core Brand to discontinue all use of any Remington Brand Trademarks, whether registered or common-law, on any product, marketing materials, promotional items, websites, manufacturing facilities, service offerings, trade name, trademarks, and all other business-related materials that include, incorporate, reference or use the Trademark within ninety (90) days of the date of the executed purchase agreement for such Non-Core Brand. Sellers acknowledge and agree that Buyer will be an express third-party beneficiary of the covenant imposed on the buyer of the Non-Core Brand in any sale, assignment or transfer agreement executed by any Seller and such buyer.

Section 5.2    Covenants of Buyer.  Buyer covenants as follows:

(a)    Commercially Reasonable Efforts.  Buyer shall use all commercially reasonable efforts to (i) obtain all consents and approvals of all Governmental Authorities, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    Adequate Assurances Regarding Assumed License Agreements.  With respect to each Assumed License Agreement, Buyer shall provide adequate assurance of the future performance of such Assumed License Agreement by Buyer; provided that, for clarity the failure to provide adequate assurance shall not be a breach of this Section 5.2(b) if Buyer has undertaken reasonable efforts to provide such assurance. Buyer agrees that it will promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

(c)    Cure of Defaults.  Buyer shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed License Agreement for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing, then immediately following the entry of such Order, cure any and all defaults under the Assumed License Agreement, including paying the applicable Cure Amount, which defaults are required to be cured under the Bankruptcy Code, so that such Assumed License Agreement may be assumed by Sellers and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d)    Released Claims.  Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired Assets to the extent such Claims have been released by or on behalf of Sellers or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise, or (ii) pursue, prosecute or assert any rights related to any Avoidance Actions or Claims against Employees, officers of directors of Sellers, including by way of offset or recoupment.

22

(e)    Discontinuation of Non-Core Brand Trademarks. Within ninety (90) days after assignment of the Owned Trademarks has been recorded at each of the respective worldwide trademark offices, Buyer agrees that it will file a Notice of Abandonment for any Trademarks that include both the Remington Brand and a Non-Core Brand and Buyer agrees that it will not seek registration, use, or license to or for any Non-Core Brand for any purpose thereafter.

## ARTICLE 6. ADDITIONAL AGREEMENTS

Section 6.1    Bankruptcy Matters.

(a)    Backup Bidder.  In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction.  Notwithstanding anything to the contrary in this Agreement, Sellers may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the inventory and the other assets of Sellers, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)    Notice to Holders of Liens, Claims and Interests.  Sellers have provided notice of the Sale to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)    Entry of Sale Order.  Sellers have filed or will file with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order.  The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement (including any Assumed License Agreement), Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability.  The Parties shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement and the Ancillary Agreements, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and the Ancillary Agreements.  In the event that any Orders of the Bankruptcy Court relating to this Agreement and the Ancillary Agreements shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), the Parties will cooperate in determining and pursuing the response to any such appeal, petition or motion and the Parties shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.  For purposes of this Section 6.1(c) only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

23

Section 6.2    Transitional Arrangements.

(a)    Access Covenant.  Upon reasonable request from Sellers, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will following the Closing Date provide to Sellers, and the accountants, counsel and representatives of Sellers, including any administrator of the Plan or Sellers' estate, such access to the pre-closing books and records as are reasonably necessary to permit Sellers to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation of claims and making of distributions contemplated under the Plan.  Such services will include (i) reasonable access to Buyer's personnel, information technology systems and books and records and (ii) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Sellers engaged in such wind-down and liquidation process.  Buyer will provide such services free of any charges, fees or rents, provided that Sellers will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Sellers' employees engaged in the liquidation).

(b)    Transitional License.  Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days, Buyer shall, without limitation to the terms of the SIG Sauer License or the Going Concern Buyer License, grant Sellers a non-exclusive, royalty-free, non-transferrable, non-extendable right and license to use the Acquired Intellectual Property, including the Business Names, solely in connection with the wind-down and liquidation of Sellers' estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.  Thereafter, Sellers shall, and shall cause their Affiliates, to cease all further use of the Acquired Intellectual Property and Business Names, including with respect to company names.

Section 6.3    Further Assurances.  At the request and the sole expense of the requesting Party, Buyer or Sellers shall, at any time after the Closing Date, execute and deliver such documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

## ARTICLE 7. TAXES.

Section 7.1    Taxes Related to Purchase of Assets.  All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Sellers as a result of the sale of the Acquired Assets (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(c) of the Bankruptcy Code, shall be paid by Buyer.  The Parties agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement and the Ancillary Agreements, and Buyer agrees to reasonably

24

assist Sellers in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 7.2    Cooperation on Tax Matters.

(a)    The Parties agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)    From and after the Closing Date, Buyer agrees that it will provide access to Sellers and their attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to the Books and Records relating to the Acquired Assets or the Assumed Liabilities as Sellers may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases of Sellers under Chapter 11 of the Bankruptcy Code. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities.

(c)    Sellers shall prepare and file all Income Tax Returns of Sellers, whether or not such Tax Returns are required to be filed prior to or after the Closing Date, and Sellers shall timely pay all Taxes reflected on such Tax Returns.

Section 7.3    Allocation of Purchase Price.  Promptly (and in any event within ninety (90) days) following the Closing Date, Sellers shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "Allocation").  The Parties will cooperate to resolve any disputes regarding the Allocation and to file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement.  If the Parties are not able to agree to the Allocation within forty-five (45) days after receipt of such Allocation by Sellers, the Parties shall retain an independent accounting firm (the "Independent Accounting Firm") to resolve their dispute. The determination of the Independent Accounting Firm shall be final and binding on all parties hereto. The cost of the Independent Accounting Firm shall be shared equally by Sellers, on the one hand, and Buyer, on the other hand. In the event that the Allocation is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation. No Party will take any position that is contrary to or inconsistent with the Allocation for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns).

25

ARTICLE 8. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES</u>.

Section 8.1    <u>Conditions Precedent to Performance by Sellers</u>.  The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in Section 8.1(c)) may be waived by Sellers in their sole discretion:

(a)    <u>Representations and Warranties of Buyer</u>.    All representations and warranties made by Buyer in Section 4.2 and Section 10.5 shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Sellers shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity, to that effect.

(b)    <u>Performance of the Obligations of Buyer</u>.  Buyer shall have performed, in all material respects, all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Sellers shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity, to that effect.

(c)    <u>Consents and Approvals</u>.  The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)    <u>Cure of Defaults</u>.  At or prior to the Closing, Buyer shall have cured, or made arrangements, reasonably satisfactory to Sellers, to promptly cure, any and all defaults under the Assumed License Agreements that are required to be cured under the Bankruptcy Code, so that such Assumed License Agreements may be assumed by Sellers and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(f)    <u>SIG Sauer Closing</u>.  The Closing, as defined in the SIG Sauer APA, shall have been consummated.

(g)    <u>Buyer's Deliveries</u>.  Buyer shall have delivered to Seller all of the items set forth in Section 3.3.

Section 8.2    <u>Conditions Precedent to Performance by Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which

26

(other than the conditions contained in Section 8.2(c)) may be waived by Buyer in its sole discretion:

(a)     Representations and Warranties of Sellers.    All representations and warranties made by Sellers in Section 4.1 and Section 10.5 shall be accurate in all material respects on and as of the Closing Date as if again made by Sellers on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of each Seller, solely in such capacity, to that effect.

(b)     Performance of the Obligations of Sellers.    Sellers shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of each Seller, solely in such capacity, to that effect.

(c)     Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)     No Violation of Orders.    No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)     Sellers' Deliveries.    Sellers shall have delivered to Buyer all of the items set forth in Section 3.2.

## ARTICLE 9. TERMINATION.

Section 9.1     Conditions of Termination.    This Agreement may be terminated at any time before the Closing:

(a)     By mutual written consent of Sellers and Buyer;

(b)     By Sellers, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Warranty Termination Date"), if the condition contained in Section 8.1(a) has not been satisfied or waived; provided, however, that Sellers shall not have the right to terminate this Agreement under this Section 9.1(b) if Sellers are then in material breach of this Agreement;

(c)     By Sellers, by notice to Buyer, if Sellers have previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant; provided, however, that Sellers shall not have the right to terminate this Agreement under this Section 9.1(c) if Sellers are then in material breach of this Agreement;

27

(d)     By Sellers, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Approval Termination Date"), if any condition contained in Section 8.1(c) or Section 8.1(d) has not been satisfied or waived; provided, however, that Sellers shall not have the right to terminate this Agreement under this Section 9.1(d) if Sellers are then in material breach of this Agreement;

(e)     By Buyer, by notice to Sellers, on or after the Warranty Termination Date, if the condition contained in Section 8.2(a) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 9.1(e) if Buyer is then in material breach of this Agreement;

(f)     By Buyer, by notice to Sellers, if Buyer has previously provided Sellers with written notice of a failure to perform any material covenant of Sellers contained in this Agreement and Sellers have failed within five (5) days after such notice to perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 9.1(f) if Buyer is then in material breach of this Agreement;

(g)     By Buyer, by notice to Sellers, after the Approval Termination Date, if any condition contained in Section 8.2(c) or Section 8.2(d) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 9.1(g) if Buyer is then in material breach of this Agreement;

(h)     By Buyer, by notice to Sellers, or by Sellers, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)     By Sellers, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 60 calendar days after the Petition Date;

(j)     By Buyer or Seller, on notice to the other, if the SIG Sauer APA is validly terminated in accordance with its terms; and

(k)     Automatically, subject to the payment of the Break Fee, upon the earlier of (i) Sellers consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction.

Section 9.2     Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 9.1, this Agreement shall become null and void and have no effect (other than Article 9, Article 10 and Article 11, which shall survive termination), with no liability on the part of Sellers or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 10.4, (ii) the obligation of Buyer under Section 6.1(a) and (iii) any liability provided for in Section 9.2, inclusive.

28

(b)    If this Agreement is terminated pursuant to Section 9.1(a), Section 9.1(d), Section 9.1(e), Section 9.1(f), Section 9.1(g), Section 9.1(h), Section 9.1(i), Section 9.1(j) and Section 9.1(k), then the Good Faith Deposit shall, within three (3) Business Days, be returned by Sellers to Buyer.

(c)    If this Agreement is terminated pursuant to Section 9.1(b) or Section 9.1(c), then Sellers may, at its sole election within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee").

(d)    Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article 6 (if the Closing shall have occurred) (i) Sellers' entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Sellers retain such amount, then notwithstanding anything to the contrary contained herein, such Break Fee shall be the sole and exclusive remedy available to Sellers and any other Person against Buyer, their Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) and the Break Fee shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Sellers, their Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Sellers, their Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby. Each Party acknowledges that the agreements contained in this Section 9.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

ARTICLE 10. <u>MISCELLANEOUS</u>.

Section 10.1    <u>Successors and Assigns</u>.  Prior to the Closing, no Party shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other Parties, and any such attempted assignment without such prior written consent shall be void and of no force and effect; <u>provided</u> that Buyer wishes may assign its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to an Affiliate without Sellers' prior written consent.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 10.2    <u>Governing Law; Jurisdiction</u>.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Sellers are

no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

Section 10.3  WAIVER OF JURY TRIAL.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 10.3.

Section 10.4  Expenses.  Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated.  For all purposes under this Agreement, unless otherwise specified in the applicable clause, any obligation of Sellers to exercise commercially reasonable efforts shall not require the incurrence of any out-of-pocket expenses by Sellers.

Section 10.5  Broker's and Finder's Fees.  Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than, in the case of Sellers, Ducera Partners, and in the case of Buyer, Moelis & Company, whose respective fees and expenses shall, as between the parties to this Agreement, be the responsibility of Sellers or Buyer, as applicable, and, to such party's knowledge, no other broker or other Person is entitled to any commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 10.6  Severability.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 10.7   Notices.

(a)      All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Sellers:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW
Huntsville, Alabama 35824
Attention: Ken D'Arcy
Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California  90071
Attention: John A. Laco, Esq., and Stephen H. Warren, Esq.
Phone: (213) 430-6544 and (213) 430-7875, respectively
Email: jlaco@omm.com and swarren@omm.com, respectively

If to Buyer:

Huntsman Holdings, LLC
c/o King & Spalding LLP
353 N. Clark St., 12th Floor
Chicago, IL 60654
Contacts: Matt Warren & Keith Townsend
Email: mwarren@kslaw.com; ktownsend@kslaw.com

(b)      Any party may change its address for the purpose of this Section 10.7 by giving the other party written notice of its new address in the manner set forth above.

Section 10.8   Amendments; Waivers.   This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing

31

waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 10.9   <u>Time of Essence</u>.  Time is of the essence in the performance of each and every term of this Agreement.

Section 10.10   <u>Public Announcements</u>.  Promptly after the execution and delivery of this Agreement, the Parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein.  Thereafter, no Party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court.  If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing Party agrees to give the nondisclosing Party prior notice of, and an opportunity to comment on, the proposed disclosure.  Notwithstanding anything to the contrary in this Section 10.10, Sellers (a) shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equityholders and lenders to the extent required by the provisions of any of Sellers' bylaws or other governing documents, credit agreements and other contractual obligations in effect as of the date of this Agreement.

Section 10.11   <u>Entire Agreement</u>.   This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

Section 10.12   <u>Parties in Interest</u>.  Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Parties and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to the Parties.  This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against the Parties.

Section 10.13   <u>Bulk Sales Laws</u>.  The Parties waive compliance with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

Section 10.14   <u>Construction</u>.   The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement.   In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties hereto and no presumptions or

burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

Section 10.15 <u>Counterparts and Facsimiles</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

## ARTICLE 11. <u>DEFINITIONS</u>.

Section 11.1 <u>Certain Terms Defined</u>. As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"<u>Alternative Transaction</u>" means any transaction or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale, transfer, license, lease or other disposition of the Business or any of the Acquired Assets, or any right or interest therein, to an acquiror other than Buyer (other than sales of inventory in the Ordinary Course of Business).

"<u>Ancillary Agreements</u>" means, collectively, the Assignment and Assumption Agreements, the SIG Sauer APA, the SIG Sauer License, the Going Concern Buyer License, Acquired Intellectual Property Assignments and other certificates, affidavits and releases delivered pursuant to Article 3.

"<u>Books and Records</u>" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"<u>Business</u>" means the design, manufacture, distribution, marketing and sale of (a) ammunitions and related components and accessories under the Remington Brand and Barnes brands and Trademarks (the "<u>Ammunitions Business</u>"); (b) sporting and hunting firearms, including shotguns and rifles, and related components and accessories under the Remington and Dakota Arms brands and Trademarks; (c) handguns, tactical, military and defense firearms including under the Bushmaster, DPMS, Tapco and AAC brands and Trademarks (clauses (b) and (c), together, the "<u>Firearms Business</u>"); and (d) apparel, accessories, cleaning solutions and supplies under the Business Names and other Trademarks and trade names.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 34 of 143

other governmental action to close.

"Business Names" means "Remington" either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trade mark, corporate name, service mark and domain name, social media including without limitation those set forth on Section 11.1(a) of the Disclosure Schedules, and any confusingly similar variation, derivative or transaction thereof.

"CBA" means that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"Claims" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or unasserted actions against Sellers or any of their Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Sellers are a party; provided that Contracts do not include any Lease for Leased Real Property or any employment or similar Contracts.

"D&O Insurance" means the policy in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Sellers, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"DIP Facility" means any debtor-in-possession financing advanced to Sellers in the Bankruptcy Case.

"Disclosure Schedules" means the Disclosure Schedules delivered by Sellers concurrently with the execution and delivery of this Agreement.

34

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies or arrangements that provide for compensation for employee benefits as to which Sellers have any obligation or liability, contingent or otherwise.

"Employee Liabilities" means all liabilities of Sellers to or with respect to all Employees whenever arising and liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Sellers.

"Employees" means all individuals, as of the Effective Date, who are employed by Sellers (including employees who are absent due to vacation, family leave, short-term disability, COVID 19-related furloughs or absences or other approved leave of absence) in connection with the ownership, operation and management of the Business.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exit Term Loan" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"FILO Facility" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction

35

that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"Governmental Authority" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents thereof.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

"Income Tax Return" means any Tax Return with respect to Income Taxes.

"Intellectual Property" means (a) all intellectual property arising from or in respect of the following: (i) all letters patent, applications for letters patent, statutory invention registrations, registered designs, drawings, and similar or equivalent rights in inventions, designs and drawings, issued patents and patent applications therefore in the United States Patent and Trademark Office, the World Intellectual Property Organization, or any similar office or agency in any other jurisdiction, including continuations, divisionals, provisionals, continuations, continuations-in-part, renewals, extensions, substitutions, restorations, reexaminations, reissues or extensions of patent applications and patents issuing thereon ("Patents"), (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, source identifier, business identifier, Internet domain names, corporate names, and designs and general intangibles of a like nature, including the Business Names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency in the United States, any State thereof, or any other jurisdiction, and all extensions or renewals of any of the foregoing ("Trademarks"), (iii) any copyrights, any copyrightable work, any work of authorship, any moral rights related to any of the foregoing, any registration or recording of any copyright, copyrightable work or work of authorship, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and any renewal of any of the foregoing ("Copyrights"), (iv) all Software of Sellers, (v) confidential information, rights in data and databases, know-how, trade secrets and inventions (whether patentable or not), and (vi) all other intellectual property, (b) Sellers' rights pursuant to any Contract with Remington Licensing Corporation and (c) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of Sellers' rights or interests in intellectual property that is not an Excluded Asset and any related remedies, including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including, without limitation,

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 37 of 143

security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"<u>Knowledge</u>" or any other similar term or knowledge qualification means, with respect to Sellers, the actual knowledge, after reasonably inquiry of the applicable personnel, of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement.

"<u>Leased Real Property</u>" means all leasehold or subleasehold estates and other rights of Sellers to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property, in each of the foregoing cases, to the extent possessed, used or occupied in connection with the Business.

"<u>Leasehold Improvements</u>" means all buildings, structures, improvements and fixtures that are owned by Sellers and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"<u>Leases</u>" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Sellers have the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"<u>Lien</u>" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; and (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy or use of an asset.

"<u>Material Adverse Effect</u>" means a state of facts, event, change or effect on the value of the Acquired Assets that results in (a) a material adverse effect on Sellers ability to timely perform its obligations under the Agreement and the Ancillary Agreements and to timely consummate the transactions contemplated hereby and thereby or (b) a material and adverse effect on the value of the Acquired Assets taken as a whole, but for the purposes of clause (b) hereto excludes any state of facts, event, change or effect caused by events, changes or developments relating to (i) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 38 of 143

Case; (ii) any action of Sellers taken pursuant to, or any failure of Sellers to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which a Seller is a party; (iii) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby; (iv) changes, after the Effective Date, in United States generally accepted accounting principles; (v) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Sellers operate the Business; (vi) changes in the firearms, ammunition or sporting goods industries in general; or (vii) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared); provided, however, that any fact, event, occurrence, or effect referred to in clauses (v) and (vi) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"Non-Core Brands" means, collectively, "Bushmaster", "DPMS", "Tapco", "AAC", "Dakota", "H&R", "Para Ordnance" and "Nesika" either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trade mark, corporate name, service mark and domain name.

"Ordinary Course of Business" means, with respect to any Person, the ordinary course of business consistent with past practice, including in respect of timing, frequency and magnitude, of such Person on or prior to the date hereof.

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Sellers and used in the ownership, operation or management of the Business.

"Permitted Liens" mean: (a) Liens and Interests consisting of (i) current Taxes and assessments, Liens for Taxes that are not yet delinquent or that are being contested in good faith, reservations in patents, and all easements, rights-of-way, encumbrances, Liens, covenants, conditions, restrictions, obligations, liabilities and other matters as may appear on record, and similar matters that would be disclosed by an accurate ALTA/ACSM survey of the Owned Real Property, and (ii) the applicable zoning and use regulations or other Laws of any Governmental Authority; (b) purchase money Liens securing payments under capital lease arrangements; (c) all terms, conditions and restrictions under any Permit; (d) Liens that will attach to the proceeds of the sale under this Agreement pursuant to Section 363 of the Bankruptcy Code or that will not survive the Closing and (e) Liens that Buyer agrees in writing to accept.

"Person" means any means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, joint venture, trust, association, union, entity, or other form of business organization or any Governmental Authority.

"Plan" means a Joint Chapter 11 Plan filed by Sellers with the Bankruptcy Court.

38

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 39 of 143

"Pre-Closing Taxes" means any Taxes paid, payable, or that become payable, in connection with Sellers or any of their Affiliates or relating to the Business (other than any excise taxes (whether or not deferred)), in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Priority Term Loan" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"Public Software" means any software that contains, or is derived in any manner (in whole or in part) from, any software that is distributed as free software, "copyleft," open source code software (e.g., Linux) or similar licensing or distribution models, including software licensed or distributed under any of the following licenses or distribution models, or licenses or distribution models similar to any of the following: (a) GNU General Public License (GPL) or Lesser/Library GPL (LGPL), (b) the Artistic License, (c) the Mozilla Public License, (d) the Netscape Public License, (e) the Sun Community Source License (SCSL), (f) the Sun Industry Standards Source License (SISSL), (g) the BSD License, (h) the Apache License, or (i) any other license described by the Open Source Initiative as set forth at www.opensource.org.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Books and Records related to any of the foregoing.

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise (whether or not deferred), franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and "Tax" shall mean any one of them.

Section 11.2    All Terms Cross-Referenced. Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| Acquired Assets | Section 1.1 |
| Acquired Intellectual Property | Section 1.1(a) |
| Acquired Intellectual Property Assignment | Section 3.2(c) |
| Affiliate | Section 11.1 |
| Agreement | *Preamble* |
| Allocation | Section 7.3 |
| Alternative Transaction | Section 11.1 |
| Ammunitions Business | Section 11.1 |
| Approval Termination Date | Section 9.1(d) |
| Assumed Liabilities | Section 1.3 |
| Assumed License Agreements | Section 1.1(a) |
| Assumed Policy Rights | Section 1.1(e) |
| Avoidance Actions | Section 1.2(w) |
| Bankruptcy Case | *Recitals* |
| Bankruptcy Code | *Recitals* |
| Bankruptcy Court | *Recitals* |
| Bidding Procedures | Section 2.2(a) |
| Books and Records | Section 11.1 |
| Break Fee | Section 9.2(c) |
| Business | Section 11.1 |
| Business Day | Section 11.1 |
| Business Names | Section 11.1 |
| Buyer | Preamble |
| Claims | Section 11.1 |
| Closing | Section 3.1 |
| Closing Date | Section 3.1 |
| Code | Section 11.1 |

Confidentiality Agreement.................................................................Section 5.1(b)
Contract................................................................................................ Section 11.1
Copyrights........................................................................................... Section 11.1
Cure Amount........................................................................................ Section 1.3
Disclosure Schedules ......................................................................... Section 11.1
Effective Date ..........................................................................................Preamble
Employee Benefit Plans ..................................................................... Section 11.1
Employee Liabilities ..........................................................................Section 1.2(d)
Employees ........................................................................................... Section 11.1
Environmental Laws ........................................................................... Section 11.1
ERISA ................................................................................................. Section 11.1
Escrowed Amounts ........................................................................ Section 2.1(a)(i)
Excluded Assets ................................................................................. Section 1.2
Insurance Policies ..............................................................................Section 1.2(q)
Excluded Liabilities ........................................................................... Section 1.4
Final Order ......................................................................................... Section 11.1
Firearms Business .............................................................................. Section 11.1
Going Concern Buyer ..................................................................... Section 2.1(a)(i)
Going Concern Buyer License .......................................................... Section 3.3(f)
Good Faith Deposit ...........................................................................Section 2.2(a)
Governmental Authority .................................................................... Section 11.1
Gross Closing Cash Payment ...........................................................Section 2.1(a)
Independent Accounting Firm ........................................................... Section 7.3
Intellectual Property .......................................................................... Section 11.1
Intercompany Note............................................................................. Section 11.1
Interests .............................................................................................. Section 11.1
Inventory .............................................................................................Section 1.2(g)
Jefferson River ......................................................................................... Recitals
Jefferson River APA ................................................................................ Recitals
Law ......................................................................................................Section 4.1(c)
Leased Real Property ......................................................................... Section 11.1
Leasehold Improvements ................................................................... Section 11.1
Leases ................................................................................................. Section 11.1
Licensed Intellectual Property ..........................................................Section 1.1(a)
Lien ..................................................................................................... Section 11.1
Material Adverse Effect ..................................................................... Section 11.1
Necessary Consent ............................................................................. Section 1.6
Net Closing Cash Payment ................................................................Section 2.2(b)
Non-Core Brand.................................................................................. Section 11.1
Order ...................................................................................................Section 4.1(c)
Ordinary Course of Business ............................................................. Section 11.1
Other APA ........................................................................................... Section 1.8
Owned Intellectual Property ..............................................................Section 1.1(c)
Owned Real Property .......................................................................... Section 11.1
Owned Trademarks.............................................................................Section 1.1(a)
Party or Parties .......................................................................................Preamble

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 42 of 143

Patents ........................................................................................................ Section 11.1
Pension Plan ............................................................................................ Section 1.2(n)
Person ......................................................................................................... Section 11.1
Plan ............................................................................................................ Section 11.1
Pre-Closing Income Taxes ........................................................................ Section 11.1
Priority Term Loan .................................................................................... Section 11.1
Public Software ......................................................................................... Section 11.1
Purchase Price .............................................................................................. Section 2.1
Qualifying Excluded Contracts and Leases ............................................... Section 1.5(e)
RA Brands .................................................................................................. Section 1.1(g)
Rejected Contract ...................................................................................... Section 1.5(a)
Related Person ........................................................................................... Section 11.1
Remington Brand ............................................................................................. *Recitals*
RLC Shares ................................................................................................ Section 1.1(h)
ROC ................................................................................................................. Preamble
Sale Order .......................................................................................................... *Recitals*
Sellers ......................................................................................................... *Preamble*
SIG Sauer ................................................................................................... Section 3.2(e)
SIG Sauer APA ......................................................................................... Section 3.2(e)
SIG Sauer License ..................................................................................... Section 3.3(e)
Knowledge .................................................................................................... Section 11.1
Software ...................................................................................................... Section 11.1
Sporting and Hunting Business ................................................................... Section 11.1
Subsidiary(ies) ........................................................................................... Section 11.1
Tax Return .................................................................................................. Section 11.1
Taxes .......................................................................................................... Section 11.1
Trademarks ................................................................................................ Section 11.1
Transaction Taxes ......................................................................................... Section 7.1
UMWA ....................................................................................................... Section 1.4(c)
Warranty Termination Date ........................................................................ Section 9.1(b)

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER:**

HUNTSMAN HOLDINGS, LLC

By: _____
    Name: Kevin Maliszewski
    Title: Chief Financial Officer

**SELLERS:**

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By: _____
     Name:
     Title:

**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By:_____
     Name:
     Title:

FGI HOLDING COMPANY, LLC

By: _____
     Name:
     Title:

BARNES BULLETS, LLC

By: _____
     Name:
     Title:

REMINGTON ARMS COMPANY, LLC

By: _____
     Name:
     Title:

RA BRANDS, L.L.C.

By: _____
     Name:
     Title:

OUTDOOR SERVICES, LLC

By: _____
     Name:

Title:

FGI FINANCE INC.

By: _____
    Name:
    Title:

HUNTSVILLE HOLDINGS LLC

By: _____
    Name:
    Title:

TMRI, INC.

By: _____
    Name:
    Title:

REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
    Name:
    Title:

32E PRODUCTIONS, LLC

By: _____
    Name:
    Title:

GREAT OUTDOORS HOLDCO, LLC

By: _____

Name:
Title:

## REMINGTON OUTDOOR COMPANY, INC.
## ASSET PURCHASE AGREEMENT
## DISCLOSURE SCHEDULES

These Disclosure Schedules (these "Schedules" and each a "Schedule") are furnished pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of September 26, 2020, by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to the Agreement (collectively with ROC, "Sellers"), Huntsman Holdings, LLC, a Delaware limited liability company ("Buyer"). All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement, unless the context otherwise requires.

These Schedules are hereby incorporated in and made a part of the Agreement as if set forth in full therein and are an integral part of the Agreement. The information contained in these Schedules is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party to the Agreement to any third party of any matter whatsoever (including any violation of law or breach of contract). These Schedules and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties or covenants of the Sellers contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. In disclosing the information in these Schedules, Sellers do not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. The disclosures in these Schedules are to be taken as relating to the representations and warranties as a whole, notwithstanding the fact that these Schedules are arranged by sections corresponding to the sections in the Agreement, or that a particular section of the Agreement makes reference to a specific section of the Schedules, and notwithstanding that a particular representation and warranty may not make a reference to the Schedules. Disclosure of an item on one Schedule shall be deemed disclosure on all other Schedules.

Neither the specification of any dollar amount in any representation or warranty nor the disclosure of a document or information in these Schedules is intended, or shall be construed or offered in any dispute between the parties to the Agreement as evidence of, the materiality of such dollar amount, document or information, nor does it establish any standard of materiality upon which to judge the inclusion or omission of any similar documents or information in such Schedule or any other Schedule. The headings and descriptions of the disclosures herein are for convenience of reference only and are not intended and do not alter the meaning of any provision of the Agreement or these Schedules.

# Section 1.1(b)

# Owned Trademarks

## I. TRADEMARKS

(1) Remington Arms Distribution Company, LLC

**UNITED STATES TRADEMARKS:** None.

(2) Remington Arms Company, LLC

**UNITED STATES TRADEMARKS:**

| OWNER | REGISTRATION NUMBER | TRADEMARK | |
|---|---|---|---|
| Remington Arms Company, LLC | 1,624,731 | Design Only (Bull's Eye Design) | Rifles and Shotguns |
| Remington Arms Company, LLC | 4,576,467 | Laredo | Accessories for firearms, namely grips for pistols |
| Remington Arms Company, LLC | 4,576,468 | Lariat | Accessories for firearms, namely grips for pistols |
| Remington Arms Company, LLC | 1,866,917 | MICRO-GROOVE | Rifles and barrels therefor |
| Remington Arms Company, LLC | 1,540,397 | PARDNER | Shotguns |
| Remington Arms Company, LLC | 3,069,212 | PARDNER PUMP | Firearms |
| Remington Arms Company, LLC | 3,873,248 | RAZR | Gun and rifle parts and accessories, namely, muzzle devices sold as a component or part of firearms; muzzle devices for firearms, namely, muzzle attachments for firearms, muzzle |

| OWNER | REGISTRATION NUMBER | TRADEMARK | |
|---|---|---|---|
| | | | brakes for firearms, flash hiders for firearms, mounts for firearms to attach muzzle devices and accessories |
| Remington Arms Company, LLC | 1,842,873 | TAMER | Firearms |
| Remington Arms Company, LLC | 4,018,024 | TIMBERSMITH | Gun and rifle stock systems comprising of gun and rifle wooden stocks; wooden stock system for firearms comprising of pistol grips, vertical forend grips, handguards, and collapsible butt stock; firearm stocks; gun stock sold as component or part of a firearm; butt plates for rifles and shotguns; firearm hand guards; mounting rails to attach firearm accessories; firearm accessories, namely, covers for firearms |
| Remington Arms Company, LLC | 1,754,497 | TOPPER | Firearms, namely, revolvers, rifles, shotguns and pistols |
| Remington Arms Company, LLC | 3,195,936 | ULTIMATE MUZZLE-LOADER | Firearms |
| Remington Arms Company, LLC | 4,576,469 | VETERAN | Accessories for firearms, namely grips for pistols |

(3) RA Brands, L.L.C.

**UNITED STATES TRADEMARKS**:

| OWNER | REGISTRATION NUMBER | TRADEMARK | Goods |
|---|---|---|---|
| RA Brands, L.L.C. | 4,548,428 | 1816 | |
| RA Brands, L.L.C. | 4,693,025 | 2020 | |
| RA Brands, L.L.C. | 4,693,072 | 2020 & Design | |
| RA Brands, L.L.C. | 4,019,998 | ACR | Firearms |
| RA Brands, L.L.C. | 3,946,418 | ADAPTIVE COMBAT RIFLE | Firearms |
| RA Brands, L.L.C. | 4,548,395 | BIG SHOT | |
| RA Brands, L.L.C. | 3,746,510 | BLACKOUT | Flash suppressors for firearms |
| RA Brands, L.L.C. | 5,079,077 | BLASTOUT | Muzzle attachments for firearms, namely, recoil compensators and flash suppressors |
| RA Brands, L.L.C. | 3,954,435 | BRAKEOUT | Combined recoil compensator and flash suppressor for firearms |
| RA Brands, L.L.C. | 3,055,409 | BULLET (Word) | Cutlery, namely, knives |
| RA Brands, L.L.C. | 3,198,065 | BULLET DESIGN | Cutlery, namely, knives |
| RA Brands, L.L.C. | 4,476,859 | CARBON-15 | Firearms |
| RA Brands, L.L.C. | 4,606,403 | CLAW | Lubricant for firearms, outdoor sports and marine equipment; oil for cleaning, lubrication and corrosion protection of firearms, outdoor sports and marine equipment |
| RA Brands, L.L.C. | 2,031,473 | EXPRESS | Firearms, namely shotguns |
| RA Brands, L.L.C. | 4,507,951 | EXPRESS | Air Guns |
| RA Brands, L.L.C. | 4,611,225 | EXPRESS BIT | Hand operated tools used to repair and maintain firearms, namely, screwdrivers with mountable bits |
| RA Brands, L.L.C. | 346,422 | FIELDMASTER | Firearms, particularly sporting |

| OWNER | REGISTRATION NUMBER | TRADEMARK | Goods |
|---|---|---|---|
| | | | shotguns and rifles |
| RA Brands, L.L.C. | 2,843,452 | FIELDMASTER | Cleaning kits for firearms consisting primarily of cleaning solutions, brushes, swabs, rods, and patches |
| RA Brands, L.L.C. | 4,548,427 | FIRST IN THE FIELD | |
| RA Brands, L.L.C. | 4,258,888 | FLIP THE SWITCH | Firearms |
| RA Brands, L.L.C. | 2,498,142 | GREAT EASTERN | Sport shooting competitions and educational events, namely conducting seminar in the field of wildlife conservation, fun safety and sport shooting regulations and competitions |
| RA Brands, L.L.C. | 5,341,554 | HALCYON | Silencers for firearms |
| RA Brands, L.L.C. | 3,601,911 | HYPOSONE | Baffle module sound reduction feature sold as an integral component of silencers for firearms |
| RA Brands, L.L.C. | 4,905,498 | ILLUSION | Silencers for firearms |
| RA Brands, L.L.C. | 2,329,006 | LDA | |
| RA Brands, L.L.C. | 2,059,534 | MARINE MAGNUM | Firearms, namely, shotguns and parts thereof |
| RA Brands, L.L.C. | 4,531,854 | MODEL 700 | Firearms |
| RA Brands, L.L.C. | 4,531,855 | MODEL 870 | Firearms |
| RA Brands, L.L.C. | 4,142,044 | MOISTUREGUARD | Gun cleaning cloths |
| RA Brands, L.L.C. | 4,026,621 | MSR | Firearms |
| RA Brands, L.L.C. | 4,729,388 | MZL | Gun-cleaning preparations; Gun cleaning lubricants; Gun cleaning patches |
| RA Brands, L.L.C. | 4,756,634 | NESIKA | Firearms |
| RA Brands, L.L.C. | 1,882,081 | P & Design | Goods: Firearms, die-marking pistols, and parts therefor |
| RA Brands, L.L.C. | 2,716,330 | PARA | Firearms, and replacement and |

| OWNER | REGISTRATION NUMBER | TRADEMARK | Goods |
|---|---|---|---|
| | | | structural parts therefore |
| RA Brands, L.L.C. | 2,614,687 | PARKER | Shotguns and replacement parts therefore |
| RA Brands, L.L.C. | 3,248,505 | PROBORE | Choke tubes for firearms |
| RA Brands, L.L.C. | 2,211,023 | R (Stylized) | Clothing, namely hats and shirts |
| RA Brands, L.L.C. | 5,042,485 | R-25 GII | Firearms |
| RA Brands, L.L.C. | 88/842,808 (Serial Number) | R2Mi | Firearms |
| RA Brands, L.L.C. | 4,614,494 | R51 | Firearms |
| RA Brands, L.L.C. | 336,055 | RANGEMASTER | Firearms, particularly sporting shotguns and rifles |
| RA Brands, L.L.C. | 1,960,454 | REM | Lubricant for firearms, outdoor sports and marine equipment; oil for cleaning, lubrication and corrosion protection of firearms, outdoor sports and marine equipment |
| RA Brands, L.L.C. | 4,240,074 | REM | Gun cleaning preparations, namely, gun cleaning solvent; Cleaning implements for firearms, namely, barrel cleaning brushes, barrel cleaning mops, muzzle loader patch pullers to remove cleaning pads, gun cleaning squeegees; and firearm parts, namely, gun chokes; Cleaning implements for firearms, namely, gun cleaning cloths, gun cleaning pads |
| RA Brands, L.L.C. | 4,552,751 | REM ALL IN | Lubricant for firearms, outdoor sports and marine equipment; oil for cleaning, lubrication and corrosion protection of firearms, outdoor sports and marine equipment |

| OWNER | REGISTRATION NUMBER | TRADEMARK | Goods |
|---|---|---|---|
| RA Brands, L.L.C. | 3,080,581 | REM DRI | Dehumidifying desiccants for gun safes, gun cabinets, and gun closets |
| RA Brands, L.L.C. | 1,843,652 | REMINGTON | Hiking and sporting goods; namely, hikers' backpacks and hunters' camouflage all-purpose tote |
| RA Brands, L.L.C. | 1,908,358 | REMINGTON | Industrial guns for use in kilns, mining and inseismic exploration |
| RA Brands, L.L.C. | 2,019,103 | REMINGTON | Gun locks |
| RA Brands, L.L.C. | 2,091,798 | REMINGTON | Gun cleaning kits composed of cleaning rods and brass jags for use with the cleaning rods, brushes, patches, gun oils, revolver firing pin shields, patch pullers for pulling cleaning cloths through gun barrels all sold as a unit therefor |
| RA Brands, L.L.C. | 2,282,454 | REMINGTON | Belt buckles not of precious metal for clothing; award and decorative cloth patches for use on clothing items such as shooter's vests, jackets, hats and other wearing apparel |
| RA Brands, L.L.C. | 2,377,947 | REMINGTON | Hunting equipment, namely, tree stands, climbing stands, climbing sticks, ladders and platforms |
| RA Brands, L.L.C. | 4,614,361 | REMINGTON | Books having a hunting or outdoor activity theme |
| RA Brands, L.L.C. | 4,405,929 | REMINGTON | Knives |
| RA Brands, L.L.C. | 4,473,605 | REMINGTON | Calendars and stationary items in the nature of stationary |
| RA Brands, L.L.C. | 4,468,908 | REMINGTON | Apparel, namely, hats, gloves, jackets, pants, T-shirts |

| OWNER | REGISTRATION NUMBER | TRADEMARK | Goods |
|---|---|---|---|
| RA Brands, L.L.C. | 5,151,390 | REMINGTON | Apparel, namely, belts |
| RA Brands, L.L.C. | 2,035,984 | REMINGTON (Stylized) | Cleaning preparations for the cleaning and degreasing of mechanical assemblies for rifles, shotguns, pistols, revolvers and other |
| RA Brands, L.L.C. | 2,792,880 | REMINGTON (Stylized) | Animal scent lures |
| RA Brands, L.L.C. | 2,821,830 | REMINGTON (Stylized) | Dog training equipment, namely, whistles, call bells; dog training equipment, namely, electronic animal confinement systems comprising electric fencing using radio waves, and collars used in connection therewith; prerecorded videos on dog training |
| RA Brands, L.L.C. | 2,824,186 | REMINGTON (Stylized) | Nonmedicated grooming preparations for dogs, namely, shampoo, detangler, deburr spray, and skunk deodorizer |
| RA Brands, L.L.C. | 2,824,188 | REMINGTON (Stylized) | Grooming supplies for dogs, namely, nail clippers |
| RA Brands, L.L.C. | 2,824,189 | REMINGTON (Stylized) | Dog collars, dog leads and dog leashes, dog harnesses and dog check cords; dog clothing, namely, boots, vests and sweaters |
| RA Brands, L.L.C. | 2,824,191 | REMINGTON (Stylized) | Grooming supplies for dogs, namely, brushes and combs; dog bowls |
| RA Brands, L.L.C. | 2,312,404 | REM-LITE | Lightweight clothing, namely, shirts, pants, shorts, and wind suits |
| RA Brands, L.L.C. | 5,214,339 | RP | Firearms |
| RA Brands, L.L.C. | 3,693,073 *(Allow to lapse;* | SHOOT LIKE A GIRL . . . IF YOU CAN ! | |

| OWNER | REGISTRATION NUMBER | TRADEMARK | Goods |
|---|---|---|---|
| | <mark>*valid through April 6, 2020)*</mark> | | |
| RA Brands, L.L.C. | 3,954,432 | SILENT ARMY | Shirts; T-shirts |
| RA Brands, L.L.C. | 336,054 | SPEEDMASTER | Firearms, particularly sporting shotguns and rifles |
| RA Brands, L.L.C. | 3,998,213 | SPORTSMAN | Shotguns |
| RA Brands, L.L.C. | 279,904 | SPORTSMAN (Stylized) | Firearms, especially shotguns |
| RA Brands, L.L.C. | 4,364,262 | SUPER CELL | Recoil pads |
| RA Brands, L.L.C. | 3,924,798 | SUPER MAG | Firearms |
| RA Brands, L.L.C. | 3,687,791 | SUPER SLUG | Firearms |
| RA Brands, L.L.C. | 3,684,692 | SUPER SLUG (Stylized) | Firearms |
| RA Brands, L.L.C. | 3,954,433 | Ti-RANT | Silencers for firearms |
| RA Brands, L.L.C. | 3,644,916 | TRINYTE | Protective coating sold as an integral component of firearms,in the nature of an engineered metallurgical coating which is a combination of a base coat of plating with a top coat of a metal material applied by vapor transport process to improve corrosion resistance and resistance to wear and marring for exterior and interior use on firearms, excluding coil coatings |
| RA Brands, L.L.C. | 5,301,793 | V3 | Firearms |
| RA Brands, L.L.C. | 4,029,749 | VERSA MAX | Firearms |
| RA Brands, L.L.C. | 3,935,038 | VERSAMAX | Firearms |
| RA Brands, L.L.C. | 4,007,056 | VERSAPORT | Component of firearms, namely, a self-regulating gas operating system that regulates cycling pressure based on shell length |
| RA Brands, L.L.C. | 541,094 | WINGMASTER (Stylized) | Firearms, particularly sporting shotguns and rifles and parts |

| OWNER | REGISTRATION NUMBER | TRADEMARK | Goods |
|---|---|---|---|
| | | | thereof |
| RA Brands, L.L.C. | 4,602,778 | WOOD TECH | Stocks for firearms with simulated wood grain, sold as a component part of firearms |
| RA Brands, L.L.C. | 3,540,721 | X-MARK PRO | Trigger assemblies for firearms |

Applications:

| Country | Trademark | Application Number | Owner |
|---|---|---|---|
| Canada | MSR & Design (Vista Outdoor Operations, Inc.) | 87/295,939-944 | RA Brands, L.L.C. |

(4) Remington Outdoor Company, Inc.

**UNITED STATES TRADEMARKS:** None.

## II. CANADIAN TRADEMARKS

(1) Remington Arms Distribution Company, LLC

None.

(2) Remington Arms Company, LLC

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Canada | HANDI GRIP | TMA867719 | Remington Arms Company, LLC | Component of firearms, namely, buttstocks |
| Canada | PARDNER | TMA361998 | Remington Arms Company, LLC | Shotguns |
| Canada | SOFT TECH | TMA877048 | Remington Arms Company, LLC | Recoil pads for firearms sold as an integral component of |

| | | | | firearms; recoil pads for firearms |
|---|---|---|---|---|

(3) RA Brands, L.L.C.

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Canada | ACR | TMA826670 | RA BRANDS, L.L.C. | Firearms |
| Canada | ARMORLOKT | TMA805337 | RA BRANDS, L.L.C. | Protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms |
| Canada | BACR | TMA849550 | RA BRANDS, L.L.C. | Firearms |
| Canada | BULLET DESIGN | TMA701604 | RA BRANDS, L.L.C. | Cutlery, namely, knives |
| Canada | CUSTOM CARRY | TMA720656 | RA BRANDS, L.L.C. | Hunting knives; pocket knives |
| Canada | ECHO | TMA720267 | RA BRANDS, L.L.C. | Knives, namely, tactical knives |
| Canada | ELITE HUNTER | TMA730154 | RA BRANDS, L.L.C. | Hunting knives; pocket knives |
| Canada | ERPC | TMA814526 | RA BRANDS, L.L.C. | Firearms |
| Canada | EXCURSION | TMA733840 | RA BRANDS, L.L.C. | Hunting knives; pocket knives |
| Canada | F.A.S.T. | TMA759472 | RA BRANDS, L.L.C. | Cutlery, namely, knives |
| Canada | FAST ACTION SOFT TOUCH | TMA759917 | RA BRANDS, L.L.C. | huning knives and pocket knives |
| Canada | R DESIGN | TMA497716 | RA BRANDS, L.L.C. | Clothing, namely, hats and shirts |

| Country | Trademark | Registration Number | Owner | Goods |
|---------|-----------|---------------------|-------|-------|
| Canada | REM DRI | TMA683782 | RA BRANDS, L.L.C. | Dehumidifying desiccants for gun safes, gun cabinets, and gun closets |
| Canada | REMINGTON | TMA468948 | RA BRANDS, L.L.C. | Bed throws |
| Canada | Remington | TMA875,652 | RA BRANDS, L.L.C. | Clothing, namely, pants, shorts, T-shirts, sweatshirts, jackets, parkas, rainwear, hunting vests, shooting vests, safety vests for camouflage and reflective safety vests; moisture management shirts and thermal bottoms; gloves and mittens; hats; balaclavas and face masks for hunting and outdoor recreation; neck gaiters; bandanas; belts; clothing, namely, pants, jackets, moisture management shirts; shoes, namely hunting boots and hiking shoes |
| Canada | Remington | TMA907,567 | RA BRANDS, L.L.C. | Sporting knives not for household use |

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Canada | Remington (Stylized) Design | TMA669968 | RA BRANDS, L.L.C. | (1) Nonmedicated grooming preparations for dogs, namely, shampoo, detangler, deburr spray, and skunk deodorizer; (2) Medicated grooming preparations for dogs, namely, flea & tick shampoo, flea & tick mists, flea & tick spot-on application, flea & tick dips, flea & tick foggers; first aid kits; veterinary medications for dogs, namely, dewormer tablets, dewormer paste, and canine acetylsalicylic acid and vitamins; (3) Grooming supplies for dogs, namely, nail clippers; (4) Dog training equipment, namely, whistles, call bells, dog training equipment, namely, electronic animal confinement systems comprising electric fencing using radio waves, and collars used in connection therewith; prerecorded videos on dog training; (5) Dog collars, dog leads and leashes, dog braces, harnesses and check cords; dog clothing; namely, boots, vests and sweaters; dog carriers; (6) Dog kennels and dog beds; (7) Grooming supplies for dogs, namely, brushes and combs; dog bowls; (8) Decoys for hunting and fishing; animal scent lures; hunting game calls |

| Country | Trademark | Registration Number | Owner | Goods |
|---------|-----------|---------------------|-------|-------|
| Canada | REMINGTON (Stylized) Design | TMA681490 | RA BRANDS, L.L.C. | Clay targets |
| Canada | REMINGTON DESIGN | TMA489314 | RA BRANDS, L.L.C. | Optical scopes or sights; Traps for throwing targets and archery products, namely bows, arrows, arrow rests, quivers and cases and accessories for the foregoing |
| Canada | REMINGTON Design | TMA752771 | RA BRANDS, L.L.C. | Metal safes |
| Canada | REMTECH 2.0 | TMA717940 | RA BRANDS, L.L.C. | Clothing namely, knit shirts, shirts, sports shirts, t-shirts, tank tops, thermal underwear, underclothes,undergarments, undershirts, underwear |
| Canada | SHOOT LIKE A GIRL...IF YOU CAN! | TMA784901 | RA BRANDS, L.L.C. | Firearms |
| Canada | STS | TMA681491 | RA BRANDS, L.L.C. | Clay targets |
| Canada | SUPER CELL | TMA899946 | RA BRANDS, L.L.C. | Recoil pads |
| Canada | SWIFT-LOKT | TMA698747 | RA BRANDS, L.L.C. | Knives |
| Canada | TANGO | TMA750646 | RA BRANDS, L.L.C. | Knives, namely, hunting knives, pocket knives, and tactical knives |
| Canada | THE VETERAN | TMA753455 | RA BRANDS, L.L.C. | Cutlery, namely, hunting knives, pocket knives, and tactical knives |

| Country | Trademark | Registration Number | Owner | Goods |
|---------|-----------|---------------------|-------|-------|
| Canada | TRINYTE | TMA791056 | RA BRANDS, L.L.C. | Protective coating sold as an integral component of firearms, in the nature of an engineered metallurgical coating which is a combination of a base coat of plating with a top coat of a metal material applied by vapour transport process to improve corrosion resistance and resistance to wear and marring for exterior and interior use on firearms, excluding coil coatings |
| Canada | VERSAMAX | TMA834026 | RA BRANDS, L.L.C. | Firearms |
| Canada | VERSAPORT | TMA826341 | RA BRANDS, L.L.C. | Component of firearms, namely, a gas operating system that regulates cycling pressure based on shell length |
| Canada | VORTEX | TMA555666 | RA BRANDS, L.L.C. | Cleaning preparations for the cleaning and degreasing of mechanical assemblies, for gun barrels, gun parts and knives |
| Canada | WINGMASTER | TMA799817 | RA BRANDS, L.L.C. | Multi-function hand tool for hunters comprised of knives and one or more of shears, gut hooks, saws, wrenches, screwdrivers, rulers, and lights |
| Canada | WOODSMASTER | TMA774728 | RA BRANDS, L.L.C. | Firearms |
| Canada | ZULU | TMA750647 | RA BRANDS, L.L.C. | Knives, namely, hunting knives, pocket knives, and tactical knives |

(4) Remington Outdoor Company, Inc.

None.

## II. Other Foreign Trademarks

(1)    RA Brands, LLC

*See Attachment.*

**Section 1.1(c)**

**Other Owned Intellectual Property**

**PATENTS**

 (1) Remington Arms Distribution Company, LLC

**UNITED STATES PATENTS:** None.

(2) Remington Arms Company, LLC

**UNITED STATES PATENTS:**

| OWNER | PATENT NUMBER | DESCRIPTION |
|---|---|---|
| Remington Arms Company, LLC | 6,880,282 | LOCKABLE FIREARM SAFETY DEVICE |
| Remington Arms Company, LLC | 5,479,737 | FIREARM BARREL ASSEMBLY |
| Remington Arms Company, LLC | 5,487,232 | DETONATOR ASSEMBLY |
| Remington Arms Company, LLC | 5,606,825 | COCKING MECHANISM FOR A MUZZLE LOADING FIREARM |
| Remington Arms Company, LLC | RE37,968 | DETONATOR ASSEMBLY |
| Remington Arms Company, LLC | 6,761,101 | FIREARMS RECEIVER BLOCK AND METHOD OF USING SAME |
| Remington Arms Company, LLC | 6,283,006 | DOUBLE ACTION PISTOL |
| Remington Arms Company, LLC | 6,945,154 | FINNED CARBINE HANDGUARD ASSEMBLY |
| Remington Arms Company, LLC | D580,007 | RIFLE RECEIVER TRIGGER GASKET |

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 65 of 143

| Remington Arms Company, LLC | D595,385 | RIFLE RECEIVER TRIGGER GASKET |
|---|---|---|
| Remington Arms Company, LLC | 7,810,271 | MODULAR RIFLE SYSTEMS AND METHODS |

(3) RA Brands, LLC

**UNITED STATES PATENTS**:

| OWNER | PATENT NUMBER | DESCRIPTION |
|---|---|---|
| RA Brands LLC | 6,256,918 | FIRING PIN LOCKING ASSEMBLY FOR A SEMI-AUTOMATIC HANDGUN |
| RA Brands LLC | 6,341,442 | DOUBLE ACTION PISTOL |
| RA Brands LLC | 6,381,892 | DOUBLE ACTION PISTOL |
| RA Brands LLC | 6,415,702 | DOUBLE ACTION SEMI-AUTOMATIC HANDGUN |
| RA Brands LLC | 6,557,288 | COMPACT GOVERNMENT MODEL HANDGUN |
| RA Brands LLC | D 562,931 | HANDGUN GRIP |
| RA Brands LLC | 7,530,191 | SEMI-AUTOMATIC HANDGUN, MAGAZINE, AND FOLLOWER |

C -2

| | | |
|---|---|---|
| RA Brands LLC | 6,519,888 | LOCKABLE FIREARM SAFETY |
| RA Brands LLC | 6,141,896 | LOCKABLE FIREARM SAFETY |
| RA Brands LLC | 6,173,518 | LOCKABLE FIREARM SAFETY |
| RA Brands LLC | 6,804,906 | LOCKABLE FIREARM SAFETY DEVICE |
| RA Brands LLC | 6,694,659 | LOCKABLE FIREARM SAFETY DEVICE |
| RA Brands LLC | 6,293,040 | INTERCHANGEABLE WEAPON RECEIVER FOR ALTERNATE AMMUNITION |
| RA Brands LLC | D584,786 | SILENCER TUBE WITH REDUCED PROFILE |
| RA Brands LLC | D577,409 | FLASH HIDER |
| RA Brands LLC | 7,610,710 | INTERRUPTED THREAD MOUNT PRIMARILY FOR ATTACHING A NOISE SUPPRESSOR OR OTHER AUXILIARY DEVICE TO A FIREARM |
| RA Brands LLC | D598,066 | BLACK BOX PROFILE |
| RA Brands LLC | D582,502 | TUBE FOR A RIFLE SILENCER |
| RA Brands LLC | D591,382 | SILENCER TUBE PROFILE |
| RA Brands LLC | 7,905,171 | NOISE REDUCING BOOSTER INSERT |
| RA Brands LLC | 7,588,122 | ORIENTATION APPARATUS FOR ECCENTRIC FIREARM |

C -3

| | | |
|---|---|---|
| | | NOISE SUPPRESSOR AND ASSEMBLY METHOD |
| RA Brands LLC | 7,905,170 | FLASH SUPPRESSOR |
| RA Brands LLC | D584,787 | NOISE SUPPRESSOR TUBE |
| RA Brands LLC | D577,410 | BLACKOUT FLASH HIDER |
| RA Brands LLC | 7,600,606 | SILENCER TUBE WITH INTERNAL STEPPED PROFILE |
| RA Brands LLC | 7,987,944 | FIREARM SOUND SUPPRESSOR BAFFLE |
| RA Brands LLC | 7,891,282 | BOOSTER FOR HANDGUN SILENCERS |
| RA Brands LLC | D582,503 | SILENCER TUBE |
| RA Brands LLC | D585,518 | SILENCER TUBE |
| RA Brands LLC | 7,610,992 | METHOD OF ASSEMBLY FOR SOUND SUPPRESSORS |
| RA Brands LLC | 7,926,404 | GAS REGULATOR FLASH HIDER |
| RA Brands LLC | 7,743,693 | REDUNDANT LATCH SUPPRESSOR MOUNT |
| RA Brands LLC | 7,789,009 | OMNI INDEXING MOUNT PRIMARILY FOR ATTACHING A NOISE SUPPRESSOR OR OTHER AUXILIARY DEVICE TO A FIREARM |
| RA Brands LLC | 7,661,349 | MULTIFUNCTIONAL FIREARM MUZZLE ATTACHMENT SYSTEM PRIMARILY FOR ATTACHING A NOISE |

C -4

| | | |
|---|---|---|
| | | SUPPRESOR TO A FIREARM |
| RA Brands LLC | D610,221 | FLASH HIDER |
| RA Brands LLC | 7,587,969 | ASYMMETRIC FIREARM SILENCER WITH COAXIAL ELEMENTS |
| RA Brands LLC | 7,874,238 | ASYMMETRIC FIREARM SILENCER WITH COAXIAL ELEMENTS |
| RA Brands LLC | 8,096,222 | ASYMMETRIC FIREARM SILENCER WITH COAXIAL ELEMENTS |
| RA Brands LLC | 8,474,361 | PROCESS TO PRODUCE A SILENCER TUBE WITH MINIMAL WALL THICKNESS |
| RA Brands LLC | 9,057,574 | THUMB SAFETY FOR MODEL 1911 HANDGUN |
| RA Brands LLC | 5,706,598 | MUZZLE LOADING GUN AND ADAPTOR |
| RA Brands LLC | 9,921,019 | GAS VENT FOR FIREARM |
| RA Brands LLC | 10,151,546 | SHOTGUN WITH MAGAZINE LOADING SYSTEM |
| RA Brands LLC | 10,228,202 | MAGAZINE WITH SPACERS FOR ACCOMMODATING MULTIPLE CALIBER AND/OR LENGTH ROUNDS |
| RA Brands LLC | 10,254,063 | ROTARY MAGAZINE WITH |

C -5

| | | BOLT HOLD OPEN ASSEMBLY |
|---|---|---|
| RA Brands LLC | 10,281,233 | RECOIL REDUCER |
| RA Brands LLC | 10,458,739 | SILENCER BAFFLE ASSEMBLY |
| RA Brands LLC | 10,480,883 | SILENCER WITH IMPROVED MOUNT |
| RA Brands LLC | 10,480,884 | ADAPTER ASSEMBLY FOR FIREARM SILENCER |

| OWNER | PATENT NUMBER | DESCRIPTION |
|---|---|---|
| RA Brands, LLC | 6,131,515 | ELECTRIC PRIMER |
| RA Brands, LLC | 5,806,226 | BOLT ASSEMBLY FOR ELECTRONIC FIREARM (RA-0281) |
| RA Brands, LLC | 5,987,798 | BOLT ASSEMBLY FOR ELECTRONIC FIREARM (RA-0281A) |
| RA Brands, LLC | 6,668,700 | ACTUATOR ASSEMBLY |
| RA Brands, LLC | 6,651,542 | ACTUATOR ASSEMBLY |
| RA Brands, LLC | 7,131,366 | ACTUATOR ASSEMBLY |
| RA Brands, LLC | 5,755,056 | ELECTRONIC FIREARM AND PROCESS FOR CONTROLLING AN ELECTRONIC FIREARM |
| RA Brands, LLC | RE38,794 | ELECTRONIC FIREARM AND PROCESS FOR CONTROLLING AN ELECTRONIC FIREARM |

C -6

| | | |
|---|---|---|
| RA Brands, LLC | 6,785,996 | FIREARM ORIENTATION AND DROP SENSOR SYSTEM |
| RA Brands, LLC | 7,188,444 | FIREARM ORIENTATION AND DROP SENSOR SYSTEM |
| RA Brands, LLC | 6,478,903 | NON-TOXIC PRIMER MIX |
| RA Brands, LLC | 5,646,367 | CONDUCTIVE PRIMER MIX (RA-0272) |
| RA Brands, LLC | 5,799,433 | ROUND SENSING MECHANISM |
| RA Brands, LLC | 6,240,670 | LOCKING MECHANISM FOR FIREARMS |
| RA Brands, LLC | 6,256,917 | LOCKABLE SAFETY FOR FIREARMS |
| RA Brands, LLC | 6,052,935 | SHOTGUN CHOKE TUBE |
| RA Brands, LLC | 6,256,921 | ONE-PIECE SYNTHETIC UNDERCARRIAGE |
| RA Brands, LLC | 6,427,372 | ONE-PIECE SYNTHETIC UNDERCARRIAGE |
| RA Brands, LLC | 6,189,431 | SMALL CALIBER GUN BARREL |
| RA Brands, LLC | 5,551,180 | FIREARM BOLT LOCK MECHANISM |
| RA Brands, LLC | 5,664,355 | DETACHABLE AMMUNITION MAGAZINE |
| RA Brands, LLC | 5,718,074 | TRIGGER ASSEMBLY |
| RA Brands, LLC | 5,684,268 | LEAD-FREE PRIMER MIX |
| RA Brands, LLC | 5,606,817 | MUZZLE-LOADING FIREARMS |

Case 20-81688-CRJ11   Doc 821-4   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. D - Huntsman Holdings   LLC   Page 71 of 143

| RA Brands, LLC | 5,718,073 | MUZZLE LOADING RIFLE |
| --- | --- | --- |
| RA Brands, LLC | 5,907,919 | BARREL AND RECEIVER ASSEMBLY |
| RA Brands, LLC | 5,917,143 | FRANGIBLE POWDERED IRON PROJECTILES |
| RA Brands, LLC | 6,691,623 | FRANGIBLE POWDERED IRON PROJECTILES |
| RA Brands, LLC | 5,755,052 | MAGAZINE FOR RIMMED AMMUNITION |
| RA Brands, LLC | 6,073,560 | SABOT |
| RA Brands, LLC | 5,918,401 | BOLT ASSEMBLY COMPRISING EJECTION PORT COVER |
| RA Brands, LLC | 6,612,062 | CARRIER LOCKING DEVICE |
| RA Brands, LLC | 6,742,298 | CARRIER LOCKING DEVICE |
| RA Brands, LLC | 5,872,323 | GAS OPERATED FIREARM PISTON/PISTON SEAL ASSEMBLY |
| RA Brands, LLC | 6,305,115 | GEL RECOIL PAD |
| RA Brands, LLC | 7,201,104 | LEAD ATTACHED SABOT SLUG |
| RA Brands, LLC | 8,128,766 | BISMUTH-OXIDE PRIMER MIXTURE |
| RA Brands, LLC | 7,814,695 | COMPOSITE RECEIVER FOR FIREARMS |
| RA Brands, LLC | 7,219,461 | BOLT ASSEMBLY WITH LOCKING SYSTEM |

Case 20-81688-CRJ11   Doc 821-4   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. D - Huntsman Holdings   LLC   Page 72 of 143

| | | |
|---|---|---|
| RA Brands, LLC | 7,775,149 | ACTION RATE CONTROL SYSTEM |
| RA Brands, LLC | 7,181,880 | ROLLER SEAR/HAMMER INTERFACE FOR FIREARMS |
| RA Brands, LLC | 7,866,079 | MODULAR BARREL ASSEMBLY |
| RA Brands, LLC | 7,059,078 | PROCESS FOR IMPRINTING A COMPOSITE VENTILATED RIB |
| RA Brands, LLC | 7,334,364 | PROCESS FOR IMPRINTING A COMPOSITE VENTILATED RIB |
| RA Brands, LLC | 7,143,537 | FIRING PIN ASSEMBLY |
| RA Brands, LLC | 7,516,570 | FIRING PIN ASSEMBLY |
| RA Brands, LLC | 7,047,685 | FIRE CONTROL ADJUSTMENT SYSTEM |
| RA Brands, LLC | 7,162,823 | FIREARM STOCK CONNECTOR |
| RA Brands, LLC | 7,533,598 | SHELL STRIPPER ASSEMBLY |
| RA Brands, LLC | 8,112,930 | FIREARM WITH ENHANCED CORROSION AND WEAR RESISTANCE PROPERTIES |
| RA Brands, LLC | 8,065,949 | GAS-OPERATED FIREARM |
| RA Brands, LLC | 7,941,955 | PIVOTING, NON-DETACHABLE MAGAZINE |

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 73 of 143

| | | |
|---|---|---|
| RA Brands, LLC | 7,946,214 | GAS SYSTEM FOR FIREARMS |
| RA Brands, LLC | 8,109,194 | CLAMPED GAS BLOCK FOR BARREL |
| RA Brands, LLC | 8,109,025 | TRIGGER ENGAGEMENT LINK FOR FIREARM |
| RA Brands, LLC | D598,516 | BARREL |
| RA Brands, LLC | 8,061,260 | GAS PLUG RETENTION AND REMOVAL DEVICE |
| RA Brands, LLC | 6,272,993 | ELECTRIC PRIMER (RA-0290A) |
| RA Brands, LLC | 6,487,972 | ELECTRIC PRIMER |
| RA Brands, LLC | 6,892,647 | LEAD FREE POWDERED METAL PROJECTILES |
| RA Brands, LLC | 7,107,715 | BOLT ASSEMBLY WITH LOCKING SYSTEM |

| | | |
|---|---|---|
| RA Brands, LLC | 8,597,455 | BISMUTH-OXIDE PRIMER COMPOSITION |
| RA Brands, LLC | 13/348,349 | FIREARM WITH ENHANCED CORROSION AND WEAR RESISTANCE PROPERTIES |
| RA Brands, LLC | 9,052,174 | TIPPED PROJECTILES |
| Remington Arms Company LLC | 8,522,465 | MODULAR FIREARM SYSTEM |
| RA Brands, LLC | D661364 | GAS BLOCK |
| RA Brands LLC | 9,239,203 | MODULAR FIREARM SYSTEM |

C -10

| | | |
|---|---|---|
| RA Brands, LLC | 8,539,708 | BARREL MOUNTING AND RETENTION MECHANISM |
| RA Brands, LLC | 8,418,393 | MAGAZINE CAP RETENTION SYSTEM |
| RA Brands, LLC | D685873 | RECOIL REDUCER |
| RA Brands, LLC | 8,733,009 | MAGAZINE CUTOFF |
| RA Brands, LLC | 8,261,667 | LEAD ATTACHED SABOT SLUG |
| RA Brands, LLC | 8,784,583 | PRIMING MIXTURES FOR SMALL ARMS |
| RA Brands, LLC | 8,250,964 | GAS SYSTEM FOR FIREARMS |
| RA Brands, LLC | 8,220,393 | WAD WITH IGNITION CHAMBER |
| RA Brands, LLC | 8,726,557 | HAND GUARD ATTACHMENT SYSTEM FOR FIREARMS |
| RA Brands LLC | 6,070,512 | HANDGUN AND METHOD OF OPERATING HANDGUN |
| RA Brands LLC | 6,385,887 | MUZZLE LOADING FIREARM AND ADAPTOR |
| RA Brands LLC | 7,322,143 | SEMIAUTOMATIC HANDGUN |
| RA Brands LLC | 7,587,851 | RECEIVER GASKET |
| RA Brands LLC | 8,011,128 | APPARATUS AND METHOD OF USE FOR UNIFORM MUZZLE LOADING |
| Remington Arms Company LLC | 8,429,844 | MODULAR FIREARM STOCK SYSTEM |

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 75 of 143

| | | |
|---|---|---|
| RA Brands LLC | 8,272,306 | ADJUSTABLE SILENCER BOOSTER WITH SPOKED PISTON ENGAGEMENT SHOULDER |
| RA Brands LLC | 8,387,299 | RECOIL BOOSTER FOR FIREARM SOUND SUPPRESSORS |
| RA Brands LLC | 8,424,441 | FIREARM SUPPRESSOR BOOSTER SYSTEM |
| RA Brands LLC | 8,443,712 | GAS-OPERATED FIREARM |
| RA Brands LLC | 8,579,075 | BLACKOUT SILENCER |
| RA Brands LLC | 8,597,445 | BISMUTH OXIDE PRIMER COMPOSITION |
| RA Brands LLC | 8,713,834 | REINFORCEMENT CLIP FOR USE WITH A FIREARM MAGAZINE |
| RA Brands LLC | 8,782,943 | QUICK DETACH BARREL MOUNTING SYSTEM |
| RA Brands LLC | 8,800,422 | BOLT ASSEMBLY FOR FIREARMS |
| RA Brands LLC | 8,800,449 | WAD WITH IGNITION CHAMBER |
| RA Brands LLC | 8,844,185 | BUTTSTOCK ASSEMBLY |
| RA Brands LLC | 8,850,735 | UPPER RECEIVER AND HAND GUARD WITH CABLE ROUTING GUIDE |
| RA Brands LLC | 8,887,426 | ELASTOMERIC EXTRACTOR MEMBER |

C -12

| | | |
|---|---|---|
| RA Brands LLC | 8,887,616 | AUTO REGULATING GAS SYSTEM FOR SUPPRESSED WEAPONS |
| RA Brands LLC | 8,931,137 | BUSHING FOR A FIREARM GRIP SCREW |
| RA Brands LLC | 8,950,313 | SELF REGULATING GAS SYSTEM FOR SUPPRESSED WEAPONS |
| RA Brands LLC | 9,057,572 | FIREARM EXTRACTION SYSTEM |
| RA Brands LLC | 9,097,475 | GAS-OPERATED FIREARM WITH PRESSURE COMPENSATING GAS PISTON |
| RA Brands LLC | 9,212,856 | GAS CUT-OFF SYSTEM FOR FIREARMS |
| RA Brands LLC | 9,234,717 | QUICK DETACH BARREL MOUNTING SYSTEM |
| RA Brands LLC | 9,297,609 | FIREARM WITH FORWARD GRIP ATTACHMENT SYSTEM |
| RA Brands LLC | 9,328,981 | SELF REGULATING GAS SYSTEM FOR SUPPRESSED WEAPONS |
| RA Brands LLC | 9,347,719 | REPLACEABLE FEED RAMP |
| RA Brands LLC | 9,383,149 | GAS-OPERATED FIREARM WITH PRESSURE COMPENSATING GAS PISTON |
| RA Brands LLC | 9,383,154 | GAS VENT FOR FIREARM |

C -13

| | | |
|---|---|---|
| RA Brands LLC | 9,410,764 | BUTTSTOCK ASSEMBLY |
| RA Brands LLC | 9,417,019 | FIRE CONTROL FOR AUTO-LOADING SHOTGUN |
| RA Brands LLC | 9,464,865 | HAND GUARD INSTALLATION MECHANISM |
| RA Brands LLC | 9,500,423 | METHOD AND MECHANISM FOR AUTOMATIC REGULATION OF GAS FLOW WHEN MOUNTING A SUPPRESSOR TO A FIREARM |
| RA Brands LLC | 9,500,453 | WAD WITH IGNITION CHAMBER |
| RA Brands LLC | 9,506,710 | MODULAR SILENCER SYSTEM |
| RA Brands LLC | 9,506,731 | MULTIPLE PROJECTILE FIXED CARTRIDGE |
| RA Brands LLC | 9,534,876 | PROJECTILE AND MOLD TO CAST PROJECTILE |
| RA Brands LLC | 9,562,730 | REPLACEABLE FEED RAMP |
| RA Brands LLC | 9,658,019 | SILENCER AND MOUNTING SYSTEM |
| RA Brands LLC | 9,746,267 | MODULAR SILENCER |
| RA Brands LLC | 9,778,002 | SHOT CUP WAD |
| RA Brands LLC | 9,816,768 | GAS-OPERATED FIREARM WITH PRESSURE |

| | | COMPENSATING GAS PISTON |
|---|---|---|
| RA Brands LLC | D,702,792 | FIREARM |
| RA Brands LLC | D,702,793 | FIREARM |
| RA Brands LLC | D666883 | ARMORERS TOOL |
| RA Brands LLC | D704294 | BUTTSTOCK |
| RA Brands LLC | D715,885 | PORTION OF A FIREARM HANDGUARD |
| RA Brands LLC | D716403 | FIREARM STOCK |
| RA Brands LLC | D738,982 | PORTION OF A FLASH SUPPRESSOR FOR A FIREARM |
| RA Brands LLC | D741,978 | PORTION OF A FIREARM HANDGUARD |
| RA Brands LLC | D744058 | TARGET |
| RA Brands LLC | D747773 | PORTION OF A TARGET |
| RA Brands LLC | D750,727 | PORTION OF A TARGET |
| RA Brands LLC | D750192 | PORTION OF A FIREARM HANDGUARD |

**US Applications:**

| OWNER | APPLICATION NUMBER | DESCRIPTION |
|---|---|---|
| RA Brands LLC | 15/816,085 | GAS OPERATING SYSTEM WITH EXHAUST SYSTEM |

| | | |
|---|---|---|
| RA Brands LLC | 15/233,477 | FIRE CONTROL FOR AUTO-LOADING SHOTGUN |
| RA Brands, LLC | 62/845,579 | FIRE CONTROL SYSTEM FOR FIREARMS |
| RA Brands, LLC | 62/849,551 | HINGE ASSEMBLY FOR A MOVEABLE FIREARM BUTTSTOCK |
| RA Brands, L.L.C. | 16/040,112 | SHOTGUN WITH MAGAZINE LOADING SYSTEM |
| RA Brands, L.L.C. | 16/141,543 | MOUNTING AND ATTACHMENT ASSEMBLY FOR FIREARM MUZZLE ACCESSORIES |
| RA Brands, LLC | 16/378,010 | ROTARY MAGAZINE WITH BOLT HOLD OPEN ASSEMBLY |

**UNITED STATES COPYRIGHTS**

(1) Remington Arms Distribution Company, LLC: None

(2) Remington Arms Company, LLC:

| Reg. No. | Published | Registered | Description |
|---|---|---|---|
| TX-5-852-739 | May 20, 2002 | August 1, 2002 | The Remington Guide to Shotgun Basics. |
| VA-1-167-453 | July 1, 2001 | June 11, 2002 | Remington Artwork (3 CD-ROMs) |

(3) RA Brands, L.L.C.

| Reg. No. | Published | Registered | Description |
|---|---|---|---|
| TX-4-508-826 | December 1, 1996 | April 8, 1997 | Remington Arms Company, Inc.: a Vision for American Industrial Enterprise" |
| TX-4-623-182 | April 30, 1996 | March 25, 1998 | Remington Country |
| TX-5-502-022 | April 1, 2001 | April 10, 2001 | www.remington.com |
| TX-5-549-172 | July 1, 2001 | July 13, 2001 | www.remington.com: July 2000 |
| TX-5-594-362 | August 1, 2002 | August 15, 2002 | www.remington.com: 08/01/02 |
| TX-5-629-853 | September 18, 2001 | November 2, 2001 | Remington Arms Guide to Shooting and Hunting Safety |
| TX-5-629-854 | October 1, 2001 | October 31, 2001 | www.remington.com |
| VA-846-724 | June 13, 1994 | April 3, 1997 | Fish logo |
| VAU-114-907 | N/A | August 11, 1987 | Remington Marsh Grass |
| GP99,836 | April 11, 1975 | July 11, 1975 | "PETERS BLUE BELT AWARD BELT BUCKLE" |
| H64,178 | March 16, 1976 | April 9, 1976 | "CANADIAN GEESE IN FLIGHT" |
| K222,150 | August 4, 1971 | September 16, 1971 | "KNOW YOUR DUCKS" POSTER |
| K226,376 | July 28, 1972 | September 26, 1972 | "KNOW YOUR UPLAND GAME BIRDS" POSTER |
| K231,173 | August 27, 1973 | October 4, 1973 | "KNOW YOUR BIG GAME OF NORTH AMERICA" POSTER |
| GP95,854 | August 16, 1974 | September 10, 1974 | "REMINGTON'S BELT BUCKLE FOR 75TH ANNIVERSARY OF GRAND AMERICAN HANDICAP" |
| GP99,826 | February 24, 1975 | July 10, 1975 | "PETERS LONG RUN AWARD BELT BUCKLE" |

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 81 of 143

| Reg. No. | Published | Registered | Description |
|---|---|---|---|
| GP99,827 | February 24, 1975 | July 10, 1975 | "PETERS HIGH GUN TROPHY BELT BUCKLE" |
| GP99,828 | June 25, 1975 | July 10, 1975 | "PETERS GOLDEN DUCK BELT BUCKLE" |
| AA186,575 | | August 3, 1979 | "ILLUSTRATED SKEET FUNDAMENTALS" |
| A215,733 | | | "THE MANUAL OF SPORTING AMMUNITION" |
| A249,243 | | | "REMINGTON ARMS IN AMERICAN HISTORY" |
| A369,076 | April 20, 1972 | September 20, 1972 | "OUTDOOR TIPS" |
| A461,872 | April 20, 1973 | June 8, 1973 | "REMINGTON ARMS IN AMERICAN HISTORY" |

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 82 of 143

**CANADIAN COPYRIGHTS AND INDUSTRIAL DESIGNS**

(1) Remington Arms Distribution Company, LLC: None

(2) Remington Arms Company, LLC: None

(3) RA Brands, L.L.C.

Industrial Designs :

| Country | Title | Serial No. | Owner |
|---------|-------|-----------|-------|
| Canada | BUTTSTOCK | 50133 | RA BRANDS, L.L.C. |

(4) Remington Outdoor Company, Inc.: None

**DOMAIN NAMES**

| Domain Name | Account No. | Points To | Expiration Date | Account Holder |
|-------------|-------------|-----------|-----------------|----------------|
| myremingtoncountry.com | 21043774 | Under Construction Page | 3/24/2022 | Remington Arms Company, Inc. |
| nesikafirearms.com | 21043774 | ns1.supercp.com\|ns2.supercp.com\|ns3.supercp.com | 8/6/2020 | Remington Arms Company, Inc. |
| outdoorserviceco.com | 21043774 | ADNS Services | 8/11/2020 | Remington Arms Company, Inc. |

C-19

| | | | | |
|---|---|---|---|---|
| outdoorsroadmap.org | 2104 3774 | Under Construction Page | 11/17/ 2022 | Remi ngton Arms Comp any, Inc. |
| pantherarms.com | 2104 3774 | ADNS Services | 4/9/20 25 | Remi ngton Arms Comp any, Inc. |
| para-usa.com | 2104 3774 | ns1.supercp.com\|ns2.supercp.com | 1/19/2 022 | Remi ngton Arms Comp any, Inc. |
| paraord.com | 2104 3774 | Under Construction Page | 10/10/ 2022 | Remi ngton Arms Comp any, Inc. |
| parkergun.com | 2104 3774 | ns1.supercp.com\|ns2.supercp.com\|ns3.s upercp.com | 12/20/ 2020 | Remi ngton Arms Comp any, Inc. |
| r1816f.org | 2104 3774 | ADNS Services | 1/8/20 23 | Remi ngton Arms Comp any, Inc. |
| remington-catalog.com | 2104 3774 | ns1.supercp.com\|ns2.supercp.com | 11/26/ 2022 | Remi ngton Arms Comp any, Inc. |
| remington-coop.com | 2104 3774 | Under Construction Page | 5/10/2 021 | Remi ngton Arms Comp |

| | | | | any, Inc. |
|---|---|---|---|---|
| remington-guns.com | 2104 3774 | ADNS Services | 7/2/20 20 | Remi ngton Arms Comp any, Inc. |
| remington.com | 2104 3774 | ADNS Services | 3/14/2 023 | Remi ngton Arms Comp any, Inc. |
| remington.info | 2104 3774 | Under Construction Page | 8/1/20 20 | Remi ngton Arms Comp any, Inc. |
| remington700.com | 2104 3774 | ns2.mediatemple.net\|ns1.mediatemple. net | 12/23/ 2022 | Remi ngton Arms Comp any, Inc. |
| remingtonairgun.com | 2104 3774 | ADNS Services | 8/28/2 022 | Remi ngton Arms Comp any, Inc. |
| remingtonairguns.com | 2104 3774 | ADNS Services | 1/7/20 21 | Remi ngton Arms Comp any, Inc. |
| remingtonarmericanbirdh unt.com | 2104 3774 | Under Construction Page | 10/2/2 024 | Remi ngton Arms Comp any, Inc. |
| remingtonarms.biz | 2104 3774 | Under Construction Page | 9/17/2 020 | Remi ngton |

| | | | | Arms Comp any, Inc. |
|---|---|---|---|---|
| remingtonarms.info | 2104 3774 | Under Construction Page | 9/17/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonarms.net | 2104 3774 | ns1.supercp.com\|ns2.supercp.com\|ns3.s upercp.com | 9/17/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonarms.org | 2104 3774 | Under Construction Page | 9/17/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonarmscompanyin c.biz | 2104 3774 | Under Construction Page | 9/17/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonarmscompanyin c.com | 2104 3774 | Under Construction Page | 9/17/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonarmscompanyin c.info | 2104 3774 | Under Construction Page | 9/17/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonarmscompanyin c.net | 2104 3774 | Under Construction Page | 9/17/2 020 | Remi ngton Arms Comp any, Inc. |

| | | | | |
|---|---|---|---|---|
| remingtonarmscompanyinc.org | 21043774 | Under Construction Page | 9/17/2020 | Remington Arms Company, Inc. |
| remingtonbirdhunt.com | 21043774 | ADNS Services | 10/2/2024 | Remington Arms Company, Inc. |
| remingtonboxorder.com | 21043774 | ns1.supercp.com\|ns2.supercp.com | 8/16/2020 | Remington Arms Company, Inc. |
| remingtoncampcooking.com | 21043774 | ADNS Services | 4/11/2023 | Remington Arms Company, Inc. |
| remingtonchristmas.com | 21043774 | Under Construction Page | 12/3/2020 | Remington Arms Company, Inc. |
| remingtoncoop.com | 21043774 | ns1.supercp.com\|ns2.supercp.com | 5/10/2021 | Remington Arms Company, Inc. |
| remingtoncountrystore.com | 21043774 | ADNS Services | 5/9/2025 | Remington Arms Company, Inc. |
| remingtoncustom.com | 21043774 | ADNS Services | 7/3/2022 | Remington Arms Comp |

| | | | | any, Inc. |
|---|---|---|---|---|
| remingtoncustomshop.com | 2104 3774 | Web Forwarding | 5/18/2 023 | Remi ngton Arms Comp any, Inc. |
| remingtoncutlery.biz | 2104 3774 | Under Construction Page | 6/29/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtoncutlery.com | 2104 3774 | ADNS Services | 6/29/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtoncutlery.info | 2104 3774 | Under Construction Page | 6/29/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtoncutlery.net | 2104 3774 | Under Construction Page | 6/29/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtoncutlery.org | 2104 3774 | Under Construction Page | 6/29/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtondeer.com | 2104 3774 | Under Construction Page | 12/3/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtondefense.com | 2104 3774 | ns1.supercp.com\|ns2.supercp.com | 11/16/ 2024 | Remi ngton |

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 88 of 143

| | | | | Arms Company, Inc. |
|---|---|---|---|---|
| remingtonducks.com | 2104 3774 | Under Construction Page | 12/3/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonfirearms.us | 2104 3774 | Under Construction Page | 6/14/2 022 | Remi ngton Arms Comp any, Inc. |
| remingtonfirearmsclassact ionsettlement.com | 2104 3774 | ADNS Services | 12/2/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtongamecalls.com | 2104 3774 | ADNS Services | 1/22/2 021 | Remi ngton Arms Comp any, Inc. |
| remingtongreatamerican.c om | 2104 3774 | Under Construction Page | 10/2/2 024 | Remi ngton Arms Comp any, Inc. |
| remingtongreatamericanbi rdhunt.com | 2104 3774 | Under Construction Page | 10/2/2 024 | Remi ngton Arms Comp any, Inc. |
| remingtonhandgun.com | 2104 3774 | ADNS Services | 4/13/2 023 | Remi ngton Arms Comp any, Inc. |

C -25

Case 20-81688-CRJ11   Doc 821-4   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. D - Huntsman Holdings   LLC   Page 89 of 143

| | | | | |
|---|---|---|---|---|
| remingtonhandgun.net | 2104 3774 | ns1.pendingrenewaldeletion.com\|ns2.p endingrenewaldeletion.com | Expire d on: 04/13/ 2020 | Remi ngton Arms Comp any, Inc. |
| remingtonhandgun.org | 2104 3774 | ns1.pendingrenewaldeletion.com\|ns2.p endingrenewaldeletion.com | Expire d on: 04/13/ 2020 | Remi ngton Arms Comp any, Inc. |
| remingtonhandguns.biz | 2104 3774 | ADNS Services | 12/10/ 2022 | Remi ngton Arms Comp any, Inc. |
| remingtonhandguns.co | 2104 3774 | ADNS Services | 12/10/ 2022 | Remi ngton Arms Comp any, Inc. |
| remingtonhandguns.com | 2104 3774 | ADNS Services | 4/13/2 023 | Remi ngton Arms Comp any, Inc. |
| remingtonhandguns.net | 2104 3774 | ADNS Services | 12/10/ 2022 | Remi ngton Arms Comp any, Inc. |
| remingtonhandguns.org | 2104 3774 | ADNS Services | 12/10/ 2022 | Remi ngton Arms Comp any, Inc. |
| remingtonhandguns.us | 2104 3774 | ADNS Services | 12/10/ 2022 | Remi ngton Arms Comp |

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings     LLC    Page 90 of 143

| | | | | |
|---|---|---|---|---|
| | | | | any, Inc. |
| remingtonhomedefense.com | 2104 3774 | Web Forwarding | 5/19/2 025 | Remi ngton Arms Comp any, Inc. |
| remingtonle.com | 2104 3774 | ns1.supercp.com\|ns2.supercp.com | 7/13/2 022 | Remi ngton Arms Comp any, Inc. |
| remingtonmil.com | 2104 3774 | Under Construction Page | 10/12/ 2024 | Remi ngton Arms Comp any, Inc. |
| remingtonmilitary.com | 2104 3774 | ns1.supercp.com\|ns2.supercp.com | 1/12/2 023 | Remi ngton Arms Comp any, Inc. |
| remingtonnewsletter.com | 2104 3774 | ns1.exacttarget.com\|ns2.exacttarget.com | 6/11/2 024 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoor.info | 2104 3774 | ADNS Services | 11/15/ 2022 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorco.biz | 2104 3774 | ADNS Services | 6/12/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorco.co | 2104 3774 | ADNS Services | 6/12/2 020 | Remi ngton |

C -27

| | | | | Arms Company, Inc. |
|---|---|---|---|---|
| remingtonoutdoorco.com | 2104 3774 | ADNS Services | 6/12/2 023 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorco.info | 2104 3774 | ADNS Services | 6/12/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorco.net | 2104 3774 | ADNS Services | 6/12/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorco.org | 2104 3774 | ADNS Services | 6/12/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorco.us | 2104 3774 | ADNS Services | 6/12/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorcompan y.biz | 2104 3774 | ADNS Services | 6/12/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorcompan y.co | 2104 3774 | ADNS Services | 6/12/2 023 | Remi ngton Arms Comp any, Inc. |

| | | | | |
|---|---|---|---|---|
| remingtonoutdoorcompany.com | 2104 3774 | ADNS Services | 6/12/2 023 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorcompany.info | 2104 3774 | ADNS Services | 6/12/2 023 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorcompany.net | 2104 3774 | ADNS Services | 6/12/2 023 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorcompany.org | 2104 3774 | ADNS Services | 6/12/2 023 | Remi ngton Arms Comp any, Inc. |
| remingtonoutdoorcompany.us | 2104 3774 | ADNS Services | 6/12/2 023 | Remi ngton Arms Comp any, Inc. |
| remingtonpartsstore.com | 2104 3774 | ADNS Services | 11/17/ 2024 | Remi ngton Arms Comp any, Inc. |
| remingtonrebates.com | 2104 3774 | Under Construction Page | 12/20/ 2020 | Remi ngton Arms Comp any, Inc. |
| remingtonrepairs.com | 2104 3774 | ns1.supercp.com\|ns2.supercp.com | 8/16/2 020 | Remi ngton Arms Comp |

Case 20-81688-CRJ11   Doc 821-4   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. D - Huntsman Holdings   LLC   Page 93 of 143

| | | | | any, Inc. |
|---|---|---|---|---|
| remingtonrewards.com | 2104 3774 | Web Forwarding | 12/6/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonshootingschool. com | 2104 3774 | ADNS Services | 7/13/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonsucks.com | 2104 3774 | ADNS Services | 7/25/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonturkey.com | 2104 3774 | Under Construction Page | 12/3/2 020 | Remi ngton Arms Comp any, Inc. |
| remingtonwaterfowl.com | 2104 3774 | Under Construction Page | 12/3/2 020 | Remi ngton Arms Comp any, Inc. |
| remlink.com | 2104 3774 | ADNS Services | 8/29/2 020 | Remi ngton Arms Comp any, Inc. |
| rempac.org | 2104 3774 | ADNS Services | 12/20/ 2020 | Remi ngton Arms Comp any, Inc. |
| thebest1911.com | 2104 3774 | Under Construction Page | 1/19/2 022 | Remi ngton |

| | | | | Arms Company, Inc. |
|---|---|---|---|---|
| theremington700.com | 2104 3774 | ns2.mediatemple.net\|ns1.mediatemple.net | 6/15/2 022 | Remi ngton Arms Comp any, Inc. |

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 95 of 143

**Section 1.5(a)**

**Executory Contracts**

1. Preferred Vendor Agreement (With Trademark License), made September 1, 2015, by and between Ducks Unlimited, Inc. and Remington Arms Company, LLC.

2. Copyright and Trademark License Agreement, made August 10, 2011, by and between Haas Outdoors, Inc. (a.k.a. Mossy Oak Brand Camo) and Remington Arms Company, LLC (as Licensee). Amendment executed November 1, 2015 to amend Schedule A.

3. License Agreement, made July 23, 2006, by and between Jordan Outdoor Enterprises, Ltd. and Remington Arms Company Inc. (as Licensee).

4. License Agreement, made July 23, 2009, by and between Jordan Outdoor Enterprises, Ltd. and Remington Arms Company Inc. (as Licensee) and related Manufacturer Terms, Restrictions and Conditions, by and between Jordan Outdoor Enterprises, Ltd. and Remington Arms Company Inc.

5. Ambidextrous Magazine Catch Manufacturing License Agreement, made November 23, 2011, by and between Norgon LLC and Remington Arms Company, LLC.

6. Trademark License Agreement, made July 12, 2018, by and between Veil Camo LLC and Remington Arms Company, LLC and affiliates.

7. Trademark License Agreement, made March 19, 2015, by and between RA Brands, L.L.C. and Ashgrove Marketing Ltd. (as Licensee).

8. Trademark License Agreement, made January 1, 2006, by and between RA Brands, L.L.C. and The Allen Company (as Licensee), as amended.

9. Trademark License Agreement, made April 2, 2014, by and between RA Brands, L.L.C. and AVT Leather Inc. (as Licensee), as amended.

10. Trademark License Agreement, made January 18, 2017, by and between RA Brands, L.L.C. and Buck Knives Inc. (as Licensee).

11. Exclusive Trademark License Agreement, made March 19, 2015, by and between RA Brands, L.L.C. and Ashgrove Marketing Ltd. (as Licensee).

12. Trademark License Agreement, made January 18, 2017, by and between RA Brands, L.L.C. and Coastal Pet Products, Inc. (as Licensee), as amended.

13. Trademark License Agreement, made January 18, 2016, by and between RA Brands, L.L.C. and its affiliates and Crosman Corporation (as Licensee).

14. Trademark License Agreement, made January 1, 2015, by and between RA Brands, L.L.C. and Desperate Enterprises, Inc. (as Licensee), as amended.

15. Trademark License Agreement, made November 5, 2019, by and between RA Brands, L.L.C. and Gator Cases Inc. (as Licensee).

16. Trademark License Agreement, made May 17, 2012, by and between RA Brands, L.L.C. and Hi-Performance Designs, Inc. (as Licensee), as amended.

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 96 of 143

17. Trademark License Agreement, made January 1, 2020, by and between RA Brands, L.L.C. and IRIS USA Inc. (as Licensee), as amended.

18. Trademark License Agreement, made May 22, 2012, by and between RA Brands, L.L.C. and Open Roads Brands, LLC (as Licensee), as amended.

19. Trademark License Agreement, made July 1, 2009, by and between RA Brands, L.L.C. and Outdoor Cap Company, Inc. (as Licensee), as amended.

20. Trademark License Agreement, made December 1, 2014, by and between RA Brands, L.L.C. and PEM America Company (as Licensee), as amended.

21. Trademark License Agreement, made October 14, 2016, by and between RA Brands, L.L.C. and L R Nash (SMK) LTD (as Licensee).

22. Trademark License Agreement, made March 29, 2017, by and between RA Brands, L.L.C. and Radiator Specialty Company DBA RSC Chemical Solutions (as Licensee).

23. Trademark License Agreement, made March 16, 2020, by and between RA Brands, L.L.C. and Southern Fried Cotton (as Licensee).

24. Trademark License Agreement, made September 1, 2015, by and between RA Brands, L.L.C. and Top Promotions, Inc. (as Licensee).

25. Trademark License Agreement, made January 1, 2017, by and between RA Brands, L.L.C. and P.L. Austin, Inc. d/b/a Vintage Editions (as Licensee), as amended.

26. Remington Arms – Remington Products Agreement, dated January 19, 1987, as amended, modified or supplemented from time to time.

## Section 1.5(b)

## Estimated Cure Amount

| # | Category | Relates Primarily to | Location / Function | Contract Counter Party | Services Provided | Type | Inception Date | Expiration Date | AP Amount as of 7/27/20 [1] | Barnes Only AP Amount as of 7/27/20 [1] |
|---|----------|---------------------|---------------------|------------------------|-------------------|------|----------------|-----------------|------------------------------|------------------------------------------|
| 69 | Corporate | Corporate | Licensing | Buck Knives | Licensing - Outbound | Contract | 01/18/17 | 12/31/20 | - | - |
| 70 | Corporate | Corporate | Licensing | Coastal Pet | Licensing - Outbound | Contract | 01/18/17 | 12/31/21 | 1,341 | - |
| 71 | Corporate | Corporate | Licensing | Crosman / Velocity Outdoor | Licensing - Outbound | Contract | 12/17/16 | 12/31/25 | - | - |
| 72 | Corporate | Corporate | Licensing | Gator Cases 4 | Licensing - Outbound | Contract | 12/05/19 | 12/31/24 | - | - |
| 73 | Corporate | Other Firearms | Licensing | Haas Outdoors (Mossy Oak) | Licensing - Inbound | Contract | 08/08/11 | (See Footnote 4) | 1,252 | - |
| 75 | Corporate | Other Firearms | Licensing | Jordan Outdoor (Realtree) | Licensing - Inbound | Contract | 07/23/06 | (See Footnote 4) | 12,935 | - |
| 78 | Corporate | Corporate | Licensing | Spectrum / Remington Products, Inc. | Intellectual Property Licensing Agreement | Contract | 12/5/1986 | (See Footnote 4) | - | - |
| 79 | Corporate | Corporate | Licensing | VEIL CAMO LLC | Licensing - Inbound | Contract | 7/12/2018 | (See Footnote 4) | - | - |

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 98 of 143

**Section 4.1(g)**

**Intellectual Property**

1. The items set forth on Schedules 1.1(b), 1.1(c) and 1.5(a) are incorporated herein by reference.

Case 20-81688-CRJ11   Doc 821-4   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. D - Huntsman Holdings    LLC   Page 99 of 143

**Section 11.1(a)**

**Business Names / Tradenames**

1.      <u>Remington Brands</u>



2.

3.  REM

4.  REM ALL IN

5.  REM DRI

6.  REMINGTON

7.



8.  REMINGTON COUNTRY

9.  REMINGTON COUNTRY (design)

10. REMINGTON HTP HIGH TERMINAL PERFORMANCE REMINGTON UMC

11. REMINGTON HYPERSONIC



12.

13. R-P



14.

15. RP

Case 20-81688-CRJ11   Doc 821-4   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. D - Huntsman Holdings   LLC   Page 100 of 143

16.

*Remington*

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 101 of 143

**Client: RA Brands, L.L.C.**

| Country | Case Number / Trademark | Application Number / Filing Date | Registration Number / Registration Date | Status / Next Renewal |
|---|---|---|---|---|
| Australia | 00130<br>REMINGTON (Stylized and Underlined) | Unknown<br>04-Jun-1978 | 18407<br>04-Jun-1999 | Registered<br>04-Jun-2029 |

    **Classes:** 13 Int.
**Images/Links:**
    **Goods:** Rifles and guns

| Benelux | 00137<br>REMINGTON | 25648<br>23-Dec-1991 | 98650<br>23-Dec-1991 | Registered<br>23-Dec-2021 |

    **Classes:** 07 Int., 08 Int.
**Images/Links:**

    **Goods:** Powered chain saws (gasoline, pneumatic or electric), concrete rubbing machines, concrete vibrators, power trailers, concrete screeds, cut¬off saws and sail grinders, drills, screwdrivers, put setters, impact wrenches, grinders, sanders and circular saws, terrazzo grinders, flexible shaft grinders, sanders, polishers, brushes, parts, accessories and attachments for the aforesaid tools including chain saw guide bars, chain saw sprockets, saw chains, flexible shafts, spindles and electric motors but not included wheels, blades, discs and similar devices which are abrasive coated; powder actuated stud drivers, hole punchers, livestock stunning tools and 8 gauge industrial kiln guns, their parts, accessories and devices including studs, pins and mechanically held expansion bolts (not included in other classes); Hand manipulated chain saws, concrete vibrators, power trailers, concrete screeds, cut-off saws and sail grinders, drills, screwdrivers, put setters, impact wrenches, grinders, sanders and circular saws, terrazzo grinders, flexible shaft grinders, sanders, polishers, brushes, parts, accessories and attachments for the aforesaid tools including chain saw guide bars, chain saw sprockets, saw chains, flexible shafts, spindles and electric motors but not included wheels, blades, discs and similar devices which are abrasive coated; powder actuated stud drivers, hole punchers, livestock stunning tools and 8 gauge industrial kiln guns, their parts, accessories and devices including studs, pins and mechanically held expansion bolts (not included in other classes)

| Bolivia | 00110<br>REMINGTON | Unknown<br>09-Feb-1996 | 65258-A<br>09-Feb-1996 | Registered<br>28-Sep-2025 |

    **Classes:** 13 Int.
**Images/Links:**
    **Goods:** Gunpowder and explosives for all use, including industrial use, fireworks, cartridges, projectiles and firearms and war material in general

| Canada | REM0235<br>ACR | 1,471,923<br>26-Feb-2010 | TMA826,670<br>20-Jun-2012 | Registered<br>20-Jun-2027 |

    **Classes:** 13 Int.
**Images/Links:**
    **Goods:** Firearms

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Canada | REM0192<br>ARMORLOKT | 1,412,769<br>24-Sep-2008 | TMA805,337<br>26-Aug-2011 | Registered<br>26-Aug-2026 |

**Classes:** 02 Int.
**Images/Links:**
  **Goods:** Protective coating in the nature of a polymer sealant used to improve resistance to wear and marring for exterior use on firearms

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Canada | REM0249<br>BACR | 1,478,549<br>16-Apr-2010 | TMA849,550<br>26-Apr-2013 | Registered<br>26-Apr-2028 |

**Classes:** 13 Int.
**Images/Links:**
  **Goods:** Firearms

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Canada | REM0094<br>BULLET DESIGN | 1,256,899<br>02-May-2005 | TMA701,604<br>23-Nov-2007 | Registered<br>23-Nov-2022 |

**Classes:** 08 Int.
**Images/Links:**
  **Goods:** Cutlery, namely, knives

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Canada | REM0138<br>CUSTOM CARRY | 1,319,822<br>03-Oct-2006 | TMA720,656<br>12-Aug-2008 | Registered<br>12-Aug-2023 |

**Classes:** 08 Int.
**Images/Links:**
  **Goods:** Hunting knives; pocket knives

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Canada | REM0140<br>ELITE HUNTER | 1,319,824<br>03-Oct-2006 | TMA730,154<br>04-Dec-2008 | Registered<br>04-Dec-2023 |

**Classes:** 08 Int.
**Images/Links:**
Goods: Hunting knives; pocket knives

| Canada | REM0265<br>ERPC | 1,488,425<br>02-Jul-2010 | TMA814,526<br>21-Dec-2011 | Registered<br>21-Dec-2026 |

**Classes:** 13 Int.
**Images/Links:**
Goods: Firearms

| Canada | REM0141<br>EXCURSION | 1,319,825<br>03-Oct-2006 | TMA733,840<br>03-Feb-2009 | Registered<br>03-Feb-2024 |

**Classes:** 08 Int.
**Images/Links:**
Goods: Hunting knives; pocket knives

| Canada | REM0125<br>F.A.S.T. | 1,296,267<br>24-Mar-2006 | TMA759,472<br>15-Feb-2010 | Registered<br>15-Feb-2025 |

**Classes:** 08 Int.
**Images/Links:**
Goods: Cutlery, namely, knives

| Canada | REM0126<br>FAST ACTION SOFT TOUCH | 1,296,266<br>24-Mar-2006 | TMA759,917<br>19-Feb-2010 | Registered<br>19-Feb-2025 |

**Classes:** 08 Int.
**Images/Links:**
Goods: huning knives and pocket knives

| Canada | REM0139<br>ECHO | 1,319,823<br>03-Oct-2006 | TMA720,267<br>05-Aug-2008 | Registered 05-Aug-2023 |

**Classes:** 08 Int.
**Images/Links:**
Goods: Knives, namely, tactical knives

| Canada | REM0218 | 1,455,976 | TMA867,719 | Registered |
| | HANDI GRIP | 14-Oct-2009 | 19-Dec-2013 | 19-Dec-2028 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Component of firearms, namely, buttstocks

| Canada | REM0644 | | | Unfiled |
| | MODEL 700 | | | |

**Classes:**
**Images/Links:**
**Goods:**

| Canada | REM0647 | | | Unfiled |
| | MODEL 870 | | | |

**Classes:**
**Images/Links:**
**Goods:**

| Country | Case Number / Trademark | Application Number / Filing Date | Registration Number / Registration Date | Status / Next Renewal |
|---|---|---|---|---|
| Canada | REM0281 / PARDNER | 062059100 / 02-Dec-1988 | TMA361,998 / 03-Nov-1989 | Registered 03-Nov-2029 |

**Classes:** 13 Int.

**Images/Links:**

**Goods:** Shotguns

| Canada | 00507 / R (Stylized) | 856634 / 22-Sep-1997 | TMA497,716 / 24-Jul-1998 | Registered 24-Jul-2028 |
|---|---|---|---|---|

**Classes:** 25 Nat.

**Images/Links:**

**Goods:** Clothing, namely, hats and shirts

| Canada | REM0070 / REM DRI | 1,226,643 / 06-Aug-2004 | TMA683,782 / 15-Mar-2007 | Registered 15-Mar-2022 |
|---|---|---|---|---|

**Classes:** 01 Nat.

**Images/Links:**

**Goods:** Dehumidifying desiccants for gun safes, gun cabinets, and gun closets

| Canada | 00434 / REMINGTON | 784,789 / 09-Jun-1995 | TMA468,948 / 17-Jan-1997 | Registered 17-Jan-2027 |
|---|---|---|---|---|

**Images/Links:**

**Goods:** Bed throws

**Classes:** 25 Int

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Canada | REM0294<br>REMINGTON | 1,498,478<br>21-Sep-2010 | TMA875,652<br>14-Apr-2014 | Registered<br>14-Apr-2029 |

**Classes:** 25 Int.

**Images/Links:**

**Goods:** Clothing, namely, pants, shorts, T-shirts, sweatshirts, jackets, parkas, rainwear, hunting vests, shooting vests, safety vests for camouflage and reflective safety vests; moisture management shirts and thermal bottoms; gloves and mittens; hats; balaclavas and face masks for hunting and outdoor recreation; neck gaiters; bandanas; belts; clothing, namely, pants, jackets, moisture management shirts; shoes, namely hunting boots and hiking shoes

| | | | | |
|---|---|---|---|---|
| Canada | REM0622<br>REMINGTON | 1,626,427<br>13-May-2013 | TMA907,567<br>30-Jun-2015 | Registered<br>30-Jun-2030 |

**Classes:** 08 Int.

**Images/Links:**

**Goods:** Sporting knives not for household use

| | | | | |
|---|---|---|---|---|
| Canada | 00438<br>REMINGTON (Stylized) | 785,727<br>21-Jun-1995 | TMA489,314<br>04-Feb-1998 | Registered<br>04-Feb-2028 |

**Classes:** 09 Nat., 28 Nat.

**Images/Links:**

**Goods:** Optical scopes or sights; Traps for throwing targets and archery products, namely bows, arrows, arrow rests, quivers and cases and accessories for the foregoing

| | | | | |
|---|---|---|---|---|
| Canada | REM0032<br>REMINGTON (Stylized) | 1,139,893<br>06-May-2002 | TMA669,968<br>15-Aug-2006 | Registered<br>15-Aug-2021 |

**Classes:** 00 Nat.

**Images/Links:**

**Goods:** (1) Nonmedicated grooming preparations for dogs, namely, shampoo, detangler, deburr spray, and skunk deodorizer; (2) Medicated grooming preparations for dogs, namely, flea & tick shampoo, flea & tick mists, flea & tick spot-on application, flea & tick dips, flea & tick foggers; first aid kits; veterinary medications for dogs, namely, dewormer tablets, dewormer paste, and canine acetylsalicylic acid and vitamins; (3) Grooming supplies for dogs, namely, nail clippers; (4) Dog training equipment, namely, whistles, call bells, dog training equipment, namely, electronic animal confinement systems comprising electric fencing using radio waves, and collars used in connection therewith; prerecorded videos on dog training; (5) Dog collars, dog leads and leashes, dog braces, harnesses and check cords; dog clothing; namely, boots, vests and sweaters; dog carriers; (6) Dog kennels and dog beds; (7) Grooming supplies for dogs, namely, brushes and combs; dog bowls; (8) Decoys for hunting and fishing; animal scent lures; hunting game calls

| Country | Case Number / Trademark | Application Number / Filing Date | Registration Number / Registration Date | Status / Next Renewal |
|---|---|---|---|---|
| Canada | REM0071 <br> REMINGTON (Stylized) | 1,226,615 <br> 05-Aug-2004 | TMA681,490 <br> 12-Feb-2007 | Registered <br> 12-Feb-2022 |
| | **Classes:** 28 Int. <br> **Images/Links:** <br> **Goods:** Clay targets | | | |
| Canada | REM0110 <br> REMINGTON (Stylized) | 1,267,712 <br> 02-Aug-2005 | TMA752,771 <br> 10-Nov-2009 | Registered <br> 10-Nov-2024 |
| | **Classes:** 06 Int. <br> **Images/Links:** <br> **Goods:** Metal safes | | | |
| Canada | REM0087 <br> REMTECH 2.0 | 1,249,289 <br> 25-Feb-2005 | TMA717,940 <br> 04-Jul-2008 | Registered 04-Jul-2023 |
| | **Classes:** 25 Int. <br> **Images/Links:** <br> **Goods:** Clothing namely, knit shirts, shirts, sports shirts, t-shirts, tank tops, thermal underwear, underclothes,undergarments, undershirts, underwear | | | |
| Canada | REM0172 <br> SHOOT LIKE A GIRL . . . IF YOU CAN ! | 1,360,858 <br> 15-Aug-2007 | TMA784,901 <br> 14-Dec-2010 | Registered <br> 14-Dec-2025 |
| | **Classes:** 13 Int. <br> **Images/Links:** <br> **Goods:** Firearms | | | |

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Canada | REM0307<br>SOFT TECH | 1,505,888<br>23-Nov-2010 | TMA877,048<br>05-May-2014 | Registered<br>05-May-2029 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Recoil pads for firearms sold as an integral component of firearms; recoil pads for firearms

| Canada | REM0072<br>STS | 1.226,616<br>05-Aug-2004 | TMA681,491<br>12-Feb-2007 | Registered<br>12-Feb-2022 |
|---|---|---|---|---|

**Classes:** 28 Int.
**Images/Links:**
**Goods:** Clay targets

| Canada | REM0609<br>SUPER CELL | 1,624,976<br>01-May-2013 | TMA899,946<br>30-Mar-2015 | Registered<br>30-Mar-2030 |
|---|---|---|---|---|

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Recoil pads

| Canada | REM0088<br>SWIFT-LOKT | 1,249,290<br>25-Feb-2005 | TMA698,747<br>17-Oct-2007 | Registered<br>17-Oct-2022 |
|---|---|---|---|---|

**Classes:** 08 Int.
**Images/Links:**
**Goods:** Knives

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Canada | REM0143<br>TANGO | 1319827<br>03-Oct-2006 | TMA750,646<br>20-Oct-2009 | Registered<br>20-Oct-2024 |

**Classes:** 08 Int.
**Images/Links:**
**Goods:** Knives, namely, hunting knives, pocket knives, and tactical knives

| | | | | |
|---|---|---|---|---|
| Canada | REM0180<br>THE VETERAN | 1,371,651<br>05-Nov-2007 | TMA753,455<br>18-Nov-2009 | Registered<br>18-Nov-2024 |

**Classes:** 08 Int.
**Images/Links:**
**Goods:** Cutlery, namely, hunting knives, pocket knives, and tactical knives

| | | | | |
|---|---|---|---|---|
| Canada | REM0084<br>TRINYTE | 1,249,288<br>25-Feb-2005 | TMA791,056<br>17-Feb-2011 | Registered<br>17-Feb-2026 |

**Classes:** 02 Int.
**Images/Links:**
**Goods:** Protective coating sold as an integral component of firearms,in the nature of an engineered metallurgical coating which is a combination of a base coat of plating with a top coat of a metal material applied by vapour transport process to improve corrosion resistance and resistance to wear and marring for exterior and interior use on firearms, excluding coil coatings

| | | | | |
|---|---|---|---|---|
| Canada | REM0221<br>VERSAMAX | 1,455,975<br>14-Oct-2009 | TMA834,026<br>10-Oct-2012 | Registered<br>10-Oct-2027 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Firearms

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Canada | REM0288<br>VERSAPORT | 1,495,594<br>31-Aug-2010 | TMA826,341<br>14-Jun-2012 | Registered<br>14-Jun-2027 |

**Classes:** 13 Int.

**Images/Links:**

**Goods:** Component of firearms, namely, a gas operating system that regulates cycling pressure based on shell length

| | | | | |
|---|---|---|---|---|
| Canada | 00622<br>VORTEX | 1047991<br>24-Feb-2000 | TMA555,666<br>19-Dec-2001 | Registered<br>19-Dec-2031 |

**Classes:** 28 Int.

**Images/Links:**

**Goods:** Cleaning preparations for the cleaning and degreasing of mechanical assemblies, for gun barrels, gun parts and knives

| | | | | |
|---|---|---|---|---|
| Canada | REM0201<br>WINGMASTER | 1,430,568<br>03-Mar-2009 | TMA799,817<br>13-Jun-2011 | Registered<br>13-Jun-2026 |

**Classes:** 08 Int.

**Images/Links:**

**Goods:** Multi-function hand tool for hunters comprised of knives and one or more of shears, gut hooks, saws, wrenches, screwdrivers, rulers, and lights

| | | | | |
|---|---|---|---|---|
| Canada | REM0134<br>WOODSMASTER | 1,299,774<br>30-Mar-2006 | TMA774,728<br>17-Aug-2010 | Registered<br>17-Aug-2025 |

**Classes:** 13 Int.

**Images/Links:**

**Goods:** Firearms

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| Canada | REM0144<br>ZULU | 1319828<br>03-Oct-2006 | TMA750,647<br>20-Oct-2009 | Registered<br>20-Oct-2024 |

**Classes:** 08 Int.

**Images/Links:**

**Goods:** Knives, namely, hunting knives, pocket knives, and tactical knives

| | | | | |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| China (People's Republic) | 00152<br>REMINGTON | 92011111<br>20-Mar-1992 | 630750<br>20-Feb-1993 | Registered<br>19-Feb-2023 |

**Classes:** 18 Int.

**Images/Links:**

**Goods:** Backpacks

| | | | | |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| Colombia | REM0398<br>MICRO-GROOVE | Unknown<br>11-May-1981 | 96068<br>11-May-1981 | Registered<br>11-May-2021 |

**Classes:**

**Images/Links:**

**Goods:**

| | | | | |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| Costa Rica | 00157<br>REMINGTON | 1900-2174308<br>12-Aug-1989 | 21743<br>12-Aug-1989 | Registered<br>12-Aug-2029 |

**Classes:** 07 Int.

**Images/Links:**

**Goods:** Powder actuated tools particularly arranged to drive or propel a driving penetrating or other element by explosion of a propellant charge driving and driven element,s generators, pumps, trowels, earth borers, flexible shafts, spindles and accessories and attachments for such tools

| | | | | |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| European Union (Community) | REM0616<br>1816 | 011704608<br>02-Apr-2013 | 011704608<br>13-Aug-2013 | Registered<br>02-Apr-2023 |

**Classes:** 25 Int.

**Images/Links:**

**Goods:** Clothing; button-down shirts; shirts; jackets; trousers; pants; polo shirts; scarves; shorts; sweaters; vests; footwear; boots; shoes; headgear; hats

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| European Union (Community) | REM0619<br>FIRST IN THE FIELD | 011704558<br>02-Apr-2013 | 011704558<br>13-Aug-2013 | Registered<br>02-Apr-2023 |

**Classes:** 25 Int.

**Images/Links:**

**Goods:** Clothing; button-down shirts; shirts; jackets; trousers; pants; polo shirts; scarves; shorts; sweaters; vests; footwear; boots; shoes; headgear; hats

| | | | | |
|---|---|---|---|---|
| European Union (Community) | REM0296<br>REMINGTON | 009391525<br>21-Sep-2010 | 009391525<br>21-Sep-2010 | Registered 21-Sep-2020 |

**Classes:** 18 Int., 25 Int.

**Images/Links:**

**Goods:** Leather and imitations of leather, and goods made of these materials and not included in other classes; animal skins, hides; trunks and travelling bags; umbrellas, parasols and walking sticks; whips, harness and saddlery; bags; briefcases; shoulder bags; holdalls; rucksacks;duffel bags; ; Clothing; headgear; clothing, namely, pants, shorts, T-shirts, sweatshirts, jackets, parkas, rainwear, hunting vests, shooting vests, and safety vests; moisture management shirts and thermal bottoms; footwear; waders; gloves and mittens; hats; balaclavas and face masks for hunting and outdoor recreation; neck gaiters; bandanas; belts; suspenders; braces

| | | | | |
|---|---|---|---|---|
| European Union (Community) | REM0623<br>REMINGTON | 011803806<br>09-May-2013 | 011803806<br>09-May-2013 | Registered<br>09-May-2023 |

**Classes:** 08 Int.

**Images/Links:**

**Goods:** Knives; hunting knives; knives for hobby use; pen knives; pocket knives

| | | | | |
|---|---|---|---|---|
| Japan | REM0085<br>TRINYTE | 2005-026685<br>28-Mar-2005 | 4909352<br>18-Nov-2005 | Registered<br>18-Nov-2025 |

**Classes:** 02 Int.

**Images/Links:**

**Goods:** Protective coating for use in connection with firearms

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Malaysia | 00390<br>REMINGTON | 95/03574<br>18-Apr-1995 | 95/03574<br>23-Aug-2002 | Registered<br>18-Apr-2022 |

**Classes:** 25 Int.

**Images/Links:**

**Goods:** Firing trousers, jeans, vests, socks, gloves, hats, leather belts, sports uniforms, t-shirts, dress shirts, sport shirts, polo shirts, sweatshirts, undershirts, body shirts, short sleeve shirts, overcoats, short coats, raincoats, cloaks, jackets, parkas, shorts, sweatpants, track suits and slacks

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Mexico | REM0617<br>1816 | 1361316<br>01-Apr-2013 | 1386669<br>30-Jul-2013 | Registered<br>01-Apr-2023 |

**Classes:** 25 Int.

**Images/Links:**

**Goods:** Clothing, namely, button-down shirts, hats, shirts, jackets, pants, polo shirts, scarves, shirts, shorts, sweaters, and vests; boots and shoes

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Mexico | REM0642<br>CLAW | 1396967<br>26-Jul-2013 | 1440090<br>19-Mar-2014 | Registered<br>26-Jul-2023 |

**Classes:** 04 Int.

**Goods:** Lubricant for firearms and outdoor sports and marine equipment; lubrication

**Client: RA Brands, L.L.C.**

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| Mexico | REM0267<br>ERPC | 1101716<br>02-Jul-2010 | 1176692<br>27-Aug-2010 | Registered<br>02-Jul-2020 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Firearms

| Mexico | REM0618<br>FIRST IN THE FIELD | 1361315<br>01-Apr-2013 | 1386668<br>30-Jul-2013 | Registered<br>01-Apr-2023 |

**Classes:** 25 Int.
**Images/Links:**

**Goods:** Clothing, namely, button-down shirts, hats, shirts, jackets, pants, polo shirts, scarves, shirts, shorts, sweaters, and vests; boots and shoes

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Mexico | REM0548<br>LAREDO | 1352370<br>26-Feb-2013 | 1368619<br>20-May-2013 | Registered<br>26-Feb-2023 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Accessories for firearms, namely grips for pistols

| Country | | | | |
|---|---|---|---|---|
| Mexico | REM0549<br>LARIAT | 1352371<br>26-Feb-2013 | 1368620<br>20-May-2013 | Registered<br>26-Feb-2023 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Accessories for firearms, namely grips for pistols

| Country | | | | |
|---|---|---|---|---|
| Mexico | REM0646<br>MODEL 700 | | | Unfiled |

**Classes:**
**Images/Links:**
**Goods:**

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Mexico | REM0649<br>MODEL 870 | | | Unfiled |

    **Classes:**
    **Images/Links:**
    **Goods:**

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Mexico | REM0665<br>NESIKA | 1458267<br>18-Feb-2014 | 1462538<br>16-Jun-2014 | Registered<br>18-Feb-2024 |

    **Classes:** 13 Int.
    **Images/Links:**
    **Goods:** Firearms

| Country | Case Number / Trademark | Application Number / Filing Date | Registration Number / Registration Date | Status / Next Renewal |
|---|---|---|---|---|
| Mexico | REM0614<br>R DEFENSE Logo | 1370230<br>02-May-2013 | 1388649<br>08-Aug-2013 | Registered<br>02-May-2023 |

**Classes:** 13 Int.

**Images/Links:**



R DEFENSE LOGO Drawing

**Goods:** Firearms

| Country | Case Number / Trademark | Application Number / Filing Date | Registration Number / Registration Date | Status / Next Renewal |
|---|---|---|---|---|
| Mexico | REM0295<br>REMINGTON | 1120858<br>21-Sep-2010 | 1317867<br>03-Oct-2012 | Registered<br>21-Sep-2020 |

**Classes:** 25 Int.

**Images/Links:**

**Goods:** Clothing, namely, pants, shorts, T-shirts, sweatshirts, jackets, parkas, rainwear, hunting vests, shooting vests, and safety vests; moisture management shirts and thermal bottoms; footwear; waders; gloves and mittens; hats; balaclavas and face masks for hunting and outdoor recreation; neck gaiters; bandanas; belts; suspenders

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Mexico | REM0624<br>REMINGTON | 1371911<br>09-May-2013 | 1468535<br>08-Jul-2014 | Registered<br>09-May-2023 |

**Classes:** 08 Int.
**Images/Links:**
**Goods:** Knives

| | | | | |
|---|---|---|---|---|
| Mexico | REM0309<br>SOFT TECH | 1137068<br>24-Nov-2010 | 1201600<br>24-Nov-2010 | Registered<br>24-Nov-2020 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Recoil pads for firearms

| | | | | |
|---|---|---|---|---|
| Mexico | REM0611<br>SUPER CELL | 1370229<br>02-May-2013 | 1396697<br>11-Sep-2013 | Registered<br>02-May-2023 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Recoil pads

| | | | | |
|---|---|---|---|---|
| Mexico | REM0290<br>VERSAPORT | 1116192<br>31-Aug-2010 | 1194717<br>15-Dec-2010 | Registered<br>31-Aug-2020 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Component of firearms, namely, a gas operating system

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| Mexico | REM0550<br>VETERAN | 1352372<br>26-Feb-2013 | 1368618<br>20-May-2013 | Registered<br>26-Feb-2023 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Accessories for firearms, namely grips for pistols

| | | | | |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| Nicaragua | REM0400<br>MICRO-GROOVE | Unknown<br>06-Aug-1999 | 45308<br>24-Nov-2000 | Registered<br>24-Nov-2020 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Firearms

| | | | | |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| Poland | 00394<br>REMINGTON | Z-143423<br>13-Feb-1995 | R-98155<br>17-Mar-1998 | Registered<br>13-Feb-2025 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Firearms

| | | | | |
|---------|--------------------------|-----------------------------------|------------------------------------------|------------------------|
| Portugal | 00224<br>REMINGTON | Unknown 07-Jun-1990 | 160158<br>07-Jun-1990 | Registered 07-Jun-2020 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Hunting guns, rifles, metallic shells, card shells for shots and cap guns

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Singapore | 00228<br>REMINGTON in Circle | 41062<br>14-Feb-1981 | T67/41062J<br>14-Feb-1988 | Registered<br>14-Feb-2022 |

**Classes:** 07 Int.
**Images/Links:**
**Goods:** Power operated tools

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Singapore | 00229<br>REMINGTON in Circle | 41063<br>14-Feb-1967 | T67/41063I<br>14-Feb-1967 | Registered<br>14-Feb-2022 |

**Classes:** 08 Int.
**Images/Links:**
**Goods:** Hand tools and instruments, except electric shaving instruments and parts thereof

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Spain | 00233<br>REMINGTON | Unknown<br>24-Jan-1936 | 107312<br>10-Jun-1976 | Registered<br>24-Jan-2026 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Shotguns, pistols and rifles

| Country | Case Number<br>Trademark | Application Number<br>Filing Date | Registration Number<br>Registration Date | Status<br>Next Renewal |
|---|---|---|---|---|
| Ukraine | 00404<br>REMINGTON | 95030591/T<br>01-Mar-1995 | 12980<br>19-Jul-1999 | Registered<br>01-Mar-2025 |

**Classes:** 13 Int.
**Images/Links:**
**Goods:** Firearms

# **EXHIBIT 1**

Bidding Procedures Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1] | Case No. 20-81688-11 |
| Debtors. | Joint Administration Requested |

**ORDER ESTABLISHING BIDDING PROCEDURES RELATING**
**TO THE SALES OF ALL OR A PORTION OF THE DEBTORS' ASSETS**

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively, the "**Chapter 11 Cases**"), seeking entry of this order (this "**Bidding Procedures Order**") (i) approving the proposed bidding procedures attached hereto as Exhibit 1 (the "**Bidding Procedures**") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of their assets (the "**Acquired Assets**") through one or more sales of the Acquired Assets (each, a "**Sale Transaction**" or "**Sale**"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC 9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

OMM_US:78645958.8

Case 20-81688-CRJ11   Doc 821-4   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. D - Huntsman Holdings   LLC   Page 123 of 143

(iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto, including the procedures for the Debtors' selection of one or more stalking horse bidders (each, a "**Stalking Horse Bidder**"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (iv) scheduling (a) an auction (the "**Auction**") if the Debtors receive two (2) or more timely and acceptable Qualified Bids (as defined below), and (b) a final hearing (the "**Sale Hearing**") to approve one or more Sales of the Acquired Assets; and (v) granting related relief; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984, as amended on July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

OMM_US:78645958.8

C.     The notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Bidding Procedures Order is necessary or required.

D.     The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) approve the Bidding Procedures, including the procedures for selecting one or more Stalking Horse Bidders and the provision of the Bid Protections to be determined, (ii) establish the Assumption and Assignment Procedures, (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached hereto, (iv) schedule a date for the (a) Auction and (b) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, including the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Meyer Declaration**") and the *Declaration of Colin M. Adams in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Adams Declaration**") are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

E.     The Bidding Procedures, substantially in the form attached hereto as Exhibit 1 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

3

F.      The Debtors are authorized to pay the break-up fee and expense reimbursement comprising the Bid Protections.  The Bid Protections, to the extent payable under any Stalking Horse APA, (a)(x) are actual and necessary costs and expenses of preserving the Debtors' estate within the meaning of Section 503(b) of the Bankruptcy Code, and (y) shall be treated as allowed administrative claims against the Debtors' estates pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code, are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Acquired Assets, and the efforts that have been and will be expended by the Stalking Horse Bidders.  The Bid Protections are a material inducement for, and condition of, each Stalking Horse Bidder's execution of the applicable Stalking Horse APA.  Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidders are unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under its Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

G.      The Sale Notice and the Publication Notice, substantially in the forms attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Acquired Assets, including the sale of Acquired Assets free and clear of all liens, claims, and encumbrances, the Sale Transaction(s), the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

OMM_US:78645958.8

H.    The Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s), and no other or further notice is required.

I.    The Assumption and Assignment Notice, substantially in the form attached hereto as <u>Exhibit 5</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Costs, and no other or further notice is required.

J.    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted as set forth herein.[3]

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

---

[3]  Notwithstanding anything to the contrary herein, the consummation of any Sale Transaction(s) is subject to entry of the Sale Order(s).

OMM_US:78645958.8

## I. The Timeline for the Sale

3. The Debtors are authorized to proceed with the Sale Transaction(s) in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

4. Deadline **Action**

| Deadline | Action |
|---|---|
| August 18, 2020 at 10:00 a.m. (prevailing Central Time) | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| August 21, 2020 | Sale Notice Mailing Date |
| August 21, 2020 | Assumption and Assignment Service Date |
| September 1, 2020 at 4:00 p.m. (prevailing Central Time) | Sale Objection Deadline (defined below) excluding any objection based on identity of Stalking Horse Bidders, Successful Bidder or Backup Bidder or the form or substance of the Stalking Horse Bid, Successful Bid or Backup Bid |
| September 4, 2020 at 5:00 p.m. (prevailing Central Time) | Bid Deadline |
| September 8, 2020 at 12:00 p.m. (prevailing Central Time) | Reply Deadline (defined below) |
| September 8, 2020 by 4:00 p.m. (prevailing Central Time) or 14 days following service of the Supplemental Notice of Assumption and Assignment | Assumption and Assignment Objection Deadline (defined below) excluding any objection related to adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or Backup Bidder |
| September 17, 2020 at 10:00 a.m. (prevailing Central Time) | Auction |
| September 21, 2020 | Post-Auction Notice |
| September 23, 2020 at 10:00 a.m. (prevailing Central Time) | Sale Hearing |

6

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 128 of 143

5.     For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "**Modifications**") in accordance with the provisions of the Bidding Procedures; *provided, however*, that the Debtors shall consult with the Consultation Parties or, to the extent provided therein, the Bid Consultation Parties, with respect to any Modifications.  The Committee's right to request an extension of the above timeline for cause is expressly reserved.

## II.     The Bidding Procedures

6.     The Bidding Procedures are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

7.     The Debtors are authorized, in accordance with the Bidding Procedures, to require Diligence Parties to submit written indications of interest specifying, among other things, the Acquired Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party.

8.     The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be **September 4, 2020 at 5:00 p.m. (prevailing Central Time)**.  Any disputes or objections to the selection of Qualified Bid(s), Successful Bid(s), or Backup Bid(s) (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

OMM_US:78645958.8

9.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on **September 17, 2020 at 10:00 a.m. (prevailing Central Time)** virtually via video conferencing technology, or at such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

10.      The Prepetition Secured Creditors shall have the right, subject in all respects to the Bankruptcy Code and other applicable law and the satisfaction in cash or assumption of claims secured by senior liens, to credit bid all or any portion of their allowed secured claims pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable provisions of the Prepetition Credit Documents and any such credit bid shall be deemed a Qualified Bid subject to the Intercreditor Agreement (as defined in the D'Arcy Declaration); *provided*, *however*, that nothing herein or in the Bidding Procedures shall affect or in any way limit the right or ability of any party in interest, including the Committee, to object to the Prepetition Secured Creditors' right to credit bid, including the nature, amount, or scope of such credit bid, subject to the (a) applicable provisions of the Court's *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling A Final Hearing* Docket No. 90, including paragraph 20 and the Challenge Period (as defined therein), as the same may be modified in accordance with its terms and (b) Sale Objection Deadline (as defined below).

**III.     Stalking Horse Bidder and Bid Protections**

11.      In accordance with the Bidding Procedures, the Debtors may designate one or more Stalking Horse Bidders for the various segments of their business and may enter into an asset purchase agreement with each Stalking Horse Bidder (each, a "**Stalking Horse APA**"), subject to higher or otherwise better offers at the Auction, which establishes a minimum Qualified Bid at the Auction with respect to the assets that are the subject thereof.

8

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

OMM_US:78645958.8

parties expressing an interest in the Acquired Assets and all parties holding liens on such Acquired Assets, three (3) business days' notice and an opportunity to object to the determination of such Stalking Horse Bidder and disclosure of the Bid Protections set forth in the Stalking Horse APA, and absent objection, the Debtors selection of such Stalking Horse Bidder shall be deemed designated without further order of the Court. To the extent necessary, the Debtors' right to seek this Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby preserved.

## IV.    Notice Procedures

15.    The form of Sale Notice substantially in the form attached hereto as <u>Exhibit 2</u> is approved.

16.    Within seven (7) days after the entry of this Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice and this Bidding Procedures Order, including the Bidding Procedures by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) any parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon or with respect to any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to FILO Lenders; (ix) counsel to

OMM_US:78645958.8

the Stalking Horse Bidder, if any; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; and (xvii) all known creditors of the Debtors, including their contract counterparties; *provided, however*, that to the extent email addresses are available, parties referenced in this paragraph 15 may be served by email.

17.     Service of the Sale Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

18.     The Publication Notice, substantially in the form attached hereto as <u>Exhibit 3</u>, is approved.  The Debtors are directed to publish the Sale Notice, as modified for publication, in the *New York Times*, on one occasion on the Mailing Date or as soon as reasonably practicable thereafter.  In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their case information website at https://cases.primeclerk.com/RemingtonOutdoor.

19.     Service of the Publication Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to all unknown parties.

20.     The form of the Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> is approved.  As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, the Post-Auction Notice identifying any Successful Bidder(s).

## V.     Assumption and Assignment Procedures

21.     The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are approved.

OMM_US:78645958.8

22.     The Notice of Assumption and Assignment, substantially in the form attached hereto as Exhibit 5 is approved.

23.     On or before **August 21, 2020** (any such date, the "**Assumption and Assignment Service Date**"), the Debtors shall file with the Court, and post on the Case Website at https://cases.primeclerk.com/RemingtonOutdoor, the Notice of Assumption and Assignment and Designated Contracts List.  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice.   On the Assumption and Assignment Service Date, the Debtors shall serve, via first-class mail, a customized version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List, on all counterparties to the Designated Contracts.  In addition, the Debtors shall serve, via first-class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List on all parties on the Rule 2002 Notice List. Service of such Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

24.     Any objection by a counterparty to a Designated Contract (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; and (iii) include appropriate

12

documentation in support thereof.  All Designated Contract Objections must be filed and served on (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, CA   90071, Attn:   Steve Warren (swarren@omm.com) and Jennifer Taylor (jtaylor@omm.com); (ii) co-counsel for the Debtors, Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203, Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr (hlahr@burr.com); (iii) counsel for the Restructuring Committee, Akin Gump Strauss Hauer & Feld LLP, 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Schultz (sschultz@akingump.com); (iv) counsel for the Committee, Fox Rothschild LLP, 345 California Street, Suite 2200, San Francisco, California 94104, Attn: Michael A. Sweet (msweet@foxrothschild.com) and Baker Donelson Bearman Caldwell & Berkowitz, P.C., 420 20th Street North, Birmingham, Alabama 35203, Attn: Matthew Cahill (mcahill@bakerdonelson.com) and Rita Hullett (rhullett@bakerdonelson.com); (v) the Bankruptcy Administrator, 400 Well Street, Decatur, Alabama 35602, Attn:  Richard Blythe (richard_blythe@alnba.uscourts.gov); (vi) counsel to the Stalking Horse Bidder, if any; (vii) counsel to the FILO Lenders, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998, Attn: Joshua D.   Morse   (joshua.morse@pillsburylaw.com)   and   Andrew   V.   Alfano (andrew.alfano@pillsburylaw.com); (viii) counsel to Whitebox Advisors LLC, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Andreas Andromalos (aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com); (ix) all parties that have requested notice in the Chapter 11 Cases  (collectively (i)–(ix), the "**Objection Recipients**"); and (x) counsel to any Successful Bidder(s), if known on the Sale Objection Deadline no later than 4:00 p.m. (prevailing Central Time) fourteen (14) days following the

OMM_US:78645958.8

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 135 of 143

Assumption and Assignment Service Date (the "**Assumption and Assignment Objection Deadline**").

25.     If a Designated Contract Objection is not consensually resolved before the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

26.     Any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, the Debtors reserve the right, and are authorized but not directed, to (i) supplement the Designated Contracts List with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

27.     In the event the Debtors exercise any of the rights listed above, the Debtors shall promptly serve the Supplemental Notice of Assumption and Assignment by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each Designated Contract listed on the Supplemental Notice of Assumption and Assignment at the last known address available to the Debtors.  Each Supplemental Notice of Assumption and Assignment shall set forth (i) the name and address of the counterparty to the Designated Contract listed thereon; (ii) the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder, if any, to withdraw such request for assumption and assignment of that Designated Contract prior to the closing of the applicable Sale Transaction); (iii) sufficient information to identify the Designated Contract; (iv) the Cure Costs, if any; and (v) proposed

OMM_US:78645958.8

adequate assurance, if known on the Assumption and Assignment Service Date. The Debtors are authorized, but not directed, to modify the Supplemental Notice of Assumption and Assignment as necessary and appropriate to provide customized individual notice to each Designated Contract counterparty. In addition, the Debtors are authorized, but not directed, to supplement the Designated Contract List on the Case Website with any additional Designated Contracts as the Debtors deem appropriate in their discretion. Service of such Supplemental Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

28. Any objection by a counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Supplemental Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; (iii) include appropriate documentation in support of the objection; and (iv) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment.

29. If a Supplemental Designated Contract Objection is not consensually resolved by the proposed effective date of assignment of the Designated Contract that is the subject of a Supplemental Designated Contract Objection, the Debtors shall seek an expedited hearing before

15

OMM_US:78645958.8

the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court, including by filing a certification of no objection, (a "**Supplemental Designated Contract Order**") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

30.     Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them, except with respect to adequate assurance of future performance by such Successful Bidder. For the avoidance of doubt, any objections to the proposed form of adequate assurance of future performance of any Successful Bidder (other than a Stalking Horse Bidder) must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

31.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take

16

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 138 of 143

assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an "executory" contract. Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final purchase agreement with the Successful Bidder(s) (each, an "**Acquired Contract**") will be assumed and assigned to the Successful Bidder(s).

32. Assignment by the Debtors to the Successful Bidder of a contract, lease or any other liability assumed under Section 365 of the Bankruptcy Code or otherwise relieves the Debtors and their estates from any such liability so assigned.

**VI.    The Sale Hearing**

33. A Sale Hearing to (i) approve a sale of a portion or substantially all of the Acquired Assets to the Successful Bidder(s) and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on **September 23, 2020 at 10:00 a.m. (prevailing Central Time)**, and may be adjourned or rescheduled without notice, subject to paragraph 4 of this Bidding Procedures Order. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid(s) and the Backup Bid(s) (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction(s) and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Bankruptcy Court.

OMM_US:78645958.8

34.    Any and all objections, if any, to any Sale Transaction (but excluding any objection based on the specific identity of any Stalking Horse Bidder, the form or substance of any Stalking Horse APA, the specific identity of the Successful Bidder or the Backup Bidder, or the form or substance of the Successful Bid or the Backup Bid) must be filed no later than **September 1, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**").  Any and all such objections must be served on the Objection Recipients and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.  All replies to such objections must be filed by **September 8, 2020 at 12:00 p.m.** (prevailing Central Time) (the "**Reply Deadline**").

35.    Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Debtors' Acquired Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

36.    Promptly following the Auction, the Debtors shall serve the Post-Auction Notice. The Debtors propose that any objections regarding the adequate assurance of future performance of the Successful Bidder or the Backup Bidder (other than the Stalking Horse Bidder) may be raised at the Sale Hearing.

## VII.    Other Provisions

37.    Notwithstanding anything herein or in the Bidding Procedures to the contrary, the Debtors shall not be permitted to modify the consultation rights of the Consultation Parties or the Bid Consultation Parties in the Bidding Procedures absent further order of this Court or the consent of any affected Consultation or Bid Consultation Parties.

38.    Oneida's rights and priority in connection with any security interests it held in any assets of the Debtors pre-petition are hereby preserved and retained by Oneida to the extent they

OMM_US:78645958.8

existed pre-petition and any such security interests shall attach to proceeds of such assets with the same priority, extent, validity, avoidability and enforceability. Nothing herein shall constitute a finding or ruling by this Court that any such security interests are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such security interest.

39.     The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Bidding Procedures Order.

40.     This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

41.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

42.     To the extent this Bidding Procedures Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Bidding Procedures Order shall govern.

43.     To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

44.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

19

OMM_US:78645958.8

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 141 of 143

45.	This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse APA, and the implementation of this Bidding Procedures Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

OMM_US:78645958.8

## **Exhibit 1**

**Bidding Procedures**

OMM_US:78645958.8

Case 20-81688-CRJ11    Doc 821-4    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. D - Huntsman Holdings    LLC    Page 143 of 143