**<u>Exhibit F</u>**

ASSET PURCHASE AGREEMENT

by and among

SIERRA BULLETS, L.L.C.

as Buyer, and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.,
AS SET FORTH ON THE SIGNATURE PAGES HERETO

as Seller

Dated as of September 26, 2020

# TABLE OF CONTENTS

**Page**

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS ...................................2
    Section 1.1     Transfer of Acquired Assets ...............................................2
    Section 1.2     Excluded Assets .................................................................5
    Section 1.3     Assumption of Liabilities ...................................................7
    Section 1.4     Retention of Liabilities .......................................................7
    Section 1.5     Assumed Lease and Assumed Contracts; Cure Amount ....................8
    Section 1.6     Non-Assignment of Acquired Assets................................10
    Section 1.7     Further Conveyances and Assumptions................................10
ARTICLE 2. CONSIDERATION .............................................................................11
    Section 2.1     Consideration ...................................................................11
    Section 2.2     Good Faith Deposit ...........................................................11
ARTICLE 3. CLOSING AND DELIVERIES.................................................................11
    Section 3.1     Closing ............................................................................11
    Section 3.2     Seller's Deliveries.............................................................12
    Section 3.3     Buyer's Deliveries ............................................................13
ARTICLE 4. REPRESENTATIONS AND WARRANTIES .............................................13
    Section 4.1     Representations and Warranties of Seller .............................13
    Section 4.2     Representations and Warranties of Buyer.............................15
    Section 4.3     Warranties Exclusive; Schedules.........................................17
    Section 4.4     Survival of Representations and Warranties.........................18
ARTICLE 5. COVENANTS OF THE PARTIES ...........................................................18
    Section 5.1     Covenants of Seller ...........................................................18
    Section 5.2     Covenants of Buyer...........................................................19
    Section 5.3     HSR Act...........................................................................21
ARTICLE 6. ADDITIONAL AGREEMENTS ...............................................................22
    Section 6.1     Bankruptcy Matters...........................................................22
    Section 6.2     Transition Arrangements ...................................................22
    Section 6.3     Further Assurances............................................................23
ARTICLE 7. EMPLOYEES AND EMPLOYEE BENEFITS .............................................23
    Section 7.1     Transferred Employees ......................................................23
    Section 7.2     Employment Tax Reporting................................................24
    Section 7.3     Benefits ...........................................................................24
    Section 7.4     WARN Act.......................................................................24
    Section 7.5     Third Party Beneficiary......................................................25
ARTICLE 8. TAXES..............................................................................................25
    Section 8.1     Taxes Related to Purchase of Assets ...................................25
    Section 8.2     Cooperation on Tax Matters ...............................................25
    Section 8.3     Allocation of Purchase Price...............................................26
ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES .................26
    Section 9.1     Conditions Precedent to Performance by Seller ................26
    Section 9.2     Conditions Precedent to Performance by Buyer.................27
ARTICLE 10. TERMINATION .................................................................................28
    Section 10.1    Conditions of Termination .................................................28

i

Section 10.2    Effect of Termination; Remedies......................................30
ARTICLE 11. MISCELLANEOUS.................................................................31
Section 11.1    Successors and Assigns..................................................31
Section 11.2    Governing Law; Jurisdition...........................................31
Section 11.3    WAIVER OF JURY TRIAL.............................................31
Section 11.4    Expenses.............................................................................31
Section 11.5    Broker's and Finder's Fees...........................................32
Section 11.6    Severability........................................................................32
Section 11.7    Notices................................................................................32
Section 11.8    Amendments; Waivers......................................................33
Section 11.9    Time of Essence................................................................33
Section 11.10   Public Announcements....................................................33
Section 11.11   Entire Agreement..............................................................34
Section 11.12   Parties in Interest..............................................................34
Section 11.13   Bulk Sales Laws................................................................34
Section 11.14   Construction......................................................................34
Section 11.15   Counterparts and Facsimile...........................................34
ARTICLE 12. DEFINITIONS......................................................................34
Section 12.1    Certain Terms Defined....................................................34
Section 12.2    All Terms Cross-Referenced..........................................43

## SCHEDULES

Schedule 1.1(h) - Assumed Benefit Plans
Schedule 1.1(i) - Assumed Business Contracts
Schedule 1.1(k) - Intellectual Property
Schedule 1.2(r) - Excluded Assets
Schedule 1.3(h) - Assumed Liabilities
Schedule 1.4(o) - Excluded Liabilities
Schedule 1.5(a) - Estimated Cure Amount
Schedule 4.1(g) - Compliance with Law
Schedule 4.1(h) - Contracts
Schedule 4.1(i) - Material Permits
Schedule 11.5 - Brokers and Finders
Schedule 12.1(a) - Brand Name

## EXHIBITS

Exhibit 1 - Bidding Procedures Order
Exhibit 2 - Transition Services Agreement
Exhibit 3 - Proposed Sales Order

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 26, 2020 (the "Effective Date"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (collectively with ROC, "Seller"), and Sierra Bullets, L.L.C. ("Buyer"), or a Buyer Acquisition Vehicle as assignee in accordance with Section 11.1. Capitalized terms used in this Agreement are defined or cross-referenced in Article 12.

## *RECITALS*

A. Seller is engaged in the manufacturing and sale of ammunition, cartridges, shotshells, blanks, bullets, pellets, shot, caps, primers, wads and parts thereof at the Assumed Leased Real Property under the Barnes Bullets brand (the "Business"), and owns various assets related to the Business. On July 27, 2020 (the "Petition Date") Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court" and the case arising under such petition, the "Bankruptcy Case").

B. On the Petition Date, Seller filed a Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets pursuant to which Seller sought, and the Bankruptcy Court approved, the Bidding Procedures Order attached hereto as Exhibit 1 (the "Bidding Procedures Order").

C. Buyer desires to purchase the Acquired Assets free and clear of Liens, Claims and Interests (other than Permitted Liens), except for assumption of the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Buyer, the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

D. Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Seller.

E. The Acquired Assets and Assumed Liabilities are assets and liabilities of Seller, which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "Sale Order"), which order will include the authorization for the assumption by Seller and assignment to Buyer of certain executory contracts and unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code. The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

1

*STATEMENT OF AGREEMENT*

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

ARTICLE 1. <u>PURCHASE AND SALE OF THE ACQUIRED ASSETS</u>.

Section 1.1 <u>Transfer of Acquired Assets</u>. At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities). For all purposes under this Agreement, the term "<u>Acquired Assets</u>" shall (i) not include any Excluded Assets, (ii) include the Brand Name and (iii) mean all of the other properties, assets, Interests and rights of Seller existing as of the Closing Date, of any kind or nature, real or personal, tangible or intangible, that in each case in this *clause (iii)* primarily relate to the ownership, operation and management of the Business, including, but not limited to the assets listed in <u>Section 1.1(a)</u> to <u>(s)</u> below.

(a)     *[intentionally omitted]*;

(b)     the Utah Lease, together with all security and other deposits related thereto, prepaid rent and appurtenances thereto and associated therewith (the "<u>Assumed Lease</u>");

(c)     all Leasehold Improvements of Seller located on the Leased Real Property that is subject to the Assumed Lease (the "<u>Assumed Leased Real Property</u>");

(d)     all of Seller's owned (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible property located at the Assumed Leased Real Property (including, in each case, any consumables located thereon) or that is otherwise primarily used or primarily held for use in the ownership, operation or management of the Business (the "<u>Owned FF&E</u>"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E;

(e)     all of Seller's (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible property located at the Assumed Leased Real Property or that is otherwise primarily used or primarily held for use in the ownership, operation or management of the Business, that are in each case leased pursuant to any Contract (the "<u>Assumed FF&E Leases</u>" and the equipment, machinery, furniture, fixtures and improvements, tooling and spare parts so leased, the "<u>Leased FF&E</u>"), (ii) rights under the Assumed FF&E Leases, and (iii) to the extent assignable, rights to any warranties and licenses received from manufacturers and lessors of the Leased FF&E;

2

(f)     all of Seller's (i) owned cars, trucks and other motor vehicles primarily used in connection with the Business at the Assumed Leased Real Property (the "Owned Motor Vehicles"), and (ii) rights to the warranties and licenses received from manufacturers and sellers of the Owned Motor Vehicles;

(g)     all of Seller's (i) cars, trucks and other motor vehicles that are leased pursuant to any Contract and primarily used for the ownership, operation of management of the Business at the Assumed Leased Real Property (the "Assumed Motor Vehicle Leases" and the cars, trucks and other motor vehicles so leased, the "Leased Motor Vehicles"), (ii) rights under the Assumed Motor Vehicle Leases, and (iii) rights to the warranties and licenses received from manufacturers and lessors of the Leased Motor Vehicles;

(h)     all proceeds and recoveries form, policies (but not, for the avoidance of doubt, any Insurance Policies themselves) to the extent attributable to any of the Acquired Assets, only to the extent in respect of periods on or after the Effective Date) (the rights described in this Section 1.1(h) being collectively the "Assumed Policies"), provided, however, only those Employee Benefit Plans set forth on Schedule 1.1(h) shall be deemed to be "Assumed Policies";

(i)     all Contracts set forth on Schedule 1.1(i) (collectively, the "Assumed Business Contracts" and, together with the Assumed FF&E Leases, the Assumed Motor Vehicle Leases, the "Assumed Contracts");

(j)     to the extent transferable under applicable Law, all Permits issued to Seller that are primarily used in connection with the ownership, operation and/or management of the Business, and all pending applications therefor, including, without limitation, any of the foregoing listed on Schedule 4.1(i);

(k)     all (i) registered and unregistered Intellectual Property owned and/or primarily used by Seller in connection with the ownership, operation and/or management of the Business, including but not limited to (A) the Intellectual Property listed on Schedule 1.1(k), (B) all Intellectual Property owned by Seller in the all-copper and powdered metallurgy ammunition field, and the exclusive use of such Intellectual Property, and (C) and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including without limitation the name "Barnes Bullets", and (ii) to the extent transferable under applicable Law, Intellectual Property licensed to Seller primarily in connection with the ownership, operation and/or management of the Business (all the aforementioned, together with the Brand Name, the "Acquired Intellectual Property");

(l)     all sales orders or other commitments of Seller to purchasers of goods, services or products produced or sold by the Business (the "Customer Orders");

(m)     all outstanding purchase orders or other commitments of Seller to suppliers of goods and services for materials, supplies or other items exclusively used in connection with the ownership, operation and/or management of the Business (the "Purchase Orders");

3

(n)     all right, title and interest in and to all inventory, supplies and finished goods within the scope of the operations of the Business and located on the Leased Real Property or (to the extent within the scope of the operations of the Business) in the possession of any third-party bailees (collectively, the "Inventory");

(o)     all (i) rights to refunds relating to, and prepaid expenses and deposits attributable to, any Purchase Orders, Customer Orders, Assumed Contracts and Inventory, and all rights under credit card merchant accounts, (ii) prepaid charges and deposits in respect of telephone, electricity, water and sewer and other utilities provided to the Assumed Leased Real Property, (iii) prepaid common area maintenance expenses relating to any Assumed Lease and security deposits for any Assumed Lease, (iv) ordinary holdbacks (including ordinary credit card holdback payments or protection reserves) in connection with or relating to any Acquired Asset and (v) other deposits, prepaid charges and expenses paid by Seller and other rights of Seller in connection with or primarily relating to any Acquired Asset;

(p)     all goodwill, including all goodwill associated with the Business, with the Acquired Intellectual Property, and with any of the other Acquired Assets;

(q)     Claims held by Seller that relate to Acquired Assets;

(r)     all other tangible or intangible assets of Seller primarily used in connection with the ownership, operation and/or management of the Business; and

(s)     to the extent permitted by applicable Law (and other than all Documents of Seller held by Seller or Seller's counsel related to the Retained Litigation), all Documents that are primarily used in or primarily held for use in, or that primarily relate to, the Acquired Assets, the Assumed Liabilities or the Business; provided, that Buyer shall provide (i) Seller with reasonable access at Seller's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same following the Closing to the extent reasonably necessary to permit Seller to wind-down and liquidate its estate after the Closing and (ii) any other buyer of ROC's lines of business or assets pursuant to the auction contemplated by the Bidding Procedures Order (an "Other Buyer") reasonable access at such Other Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same to the extent reasonably related to the assets of ROC purchased by such Other Buyer; and provided, further, that as a condition to such access, Seller and each such Other Buyer shall each keep such information confidential in accordance with all contractual requirements and any applicable Laws (or in the case of any such Other Buyer, a confidentiality agreement reasonably acceptable to Buyer).

Section 1.2 Excluded Assets. Except as provided in Section 1.1, the Acquired Assets shall not include any right, title or interest of any Person other than Seller in any property or asset, or Seller's right, title and interest in, to and under properties and assets not used in connection with the ownership, operation and/or to management of the Business, and shall specifically exclude the following properties, Contracts, Leases, and other assets, interests and rights of Seller (all such items not being acquired by Buyer being referred to in this Agreement as the "Excluded Assets"):

4

(a)     all rights of every nature and description (other than Assumed Policies under or arising out of all insurance policies of Seller ("Insurance Policies"), including without limitation (i) with respect to Claims arising prior to the Effective Date; (ii) to the extent of coverage of any Excluded Liabilities, (iii) under those insurance policies covering any tort liabilities that are not Assumed Liabilities, (iv) under the D&O Insurance, and (v) under those insurance policies covering liabilities and Claims against Seller and its affiliates relating to the Excluded Employee Liabilities;

(b)     all Owned Real Property;

(c)     any asset that is not owned or leased by Seller or not used or held for use in connection with the ownership, operation and management of the Business;

(d)     any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that (i) Seller shall provide Buyer with reasonable access to the same following the Closing to the extent relating to the Acquired Assets and when reasonably requested by Buyer and (ii) Buyer shall be entitled upon reasonable request to be provided with copies of all such records, at its own expense, and provided, further, that Seller shall notify Buyer before disposing of any such records and upon Buyer's reasonable request shall transfer them to Buyer;

(e)     all (i) prepaid premiums in respect of all Excluded Insurance Policies, (ii) retainers, prepayments or on-account cash paid to Seller's professionals and advisors, including any carve-out under any DIP Facility or cash collateral arrangements (whether retained in the Bankruptcy Case or otherwise), and (iii) other deposits, prepaid charges and expenses paid by Seller to the extent in connection with or relating to any Excluded Asset;

(f)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes for any Straddle Period, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(g)     all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller entity;

(h)     all Documents exclusively relating to any Excluded Asset; provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(i)     all Documents exclusively relating to any Employees who do not become Transferred Employees; provided that, to the extent permitted by applicable Law, Seller shall make copies of such Documents available to Buyer if reasonably related to addressing or defending any

5

such Employees' claims against Buyer;

(j)      subject to Section 1.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities pursuant to Section 1.4(a));

(k)      all Employee Benefit Plans and all assets of, and Contracts exclusively relating to or associated with such plans;

(l)      all Cash and all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(m)      any rights of Seller under this Agreement or any Ancillary Agreement to which Seller is a party, including without limitation any rights relating to the Purchase Price;

(n)      copies of all Historic Firearms Books and Records of Seller; provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(o)      all Documents of Seller held by Seller or Seller's counsel relating to (i) any litigation against Seller or (ii) the Excluded Employee Liabilities;

(p)      the D&O Insurance, and all proceeds thereof;

(q)      all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

(r)      any properties, Contracts, Leases, or other assets, interests and rights of Seller that (i) do not relate to the ownership, operation or management of the Business or (ii) are otherwise set forth on Schedule 1.2(r);

(s)      all Avoidance Actions; and

(t)      Claims held by Seller against any party that are covered by, relate to or are based upon any Insurance Policies (including the D&O Insurance).

Notwithstanding any provision to the contrary in this Section 1.2, "Excluded Assets" does not include the Brand Name.

Section 1.3 Assumption of Liabilities. At the Closing, Buyer shall assume, and

6

Buyer agrees to thereafter pay, perform and discharge when due, and indemnify, defend and hold harmless Seller, its Affiliates and all of their respective Related Persons from and against, the following liabilities (all items in this <u>Section 1.3</u> being, collectively, the "<u>Assumed Liabilities</u>"):

(a)     Except as set forth in <u>Section 1.5</u>, all liabilities and unperformed and unfulfilled obligations of Seller under the terms of any Assumed Contract or Assumed Lease (including all premium finance arrangements of Seller for Assumed Contracts), and the Buyer's Cure Amount in connection with the assignment of the Assumed Lease and the Assumed Contracts to, and the assumption of the Assumed Lease and the Assumed Contracts by, Buyer;

(b)     all liabilities and obligations of Seller under the Customer Orders and the Purchase Orders (including liabilities in respect of customer deposits, security deposits and prepaid items);

(c)     all liabilities and obligations for Post-Closing Taxes (including those relating to any Straddle Period);

(d)     all liabilities and obligations for Transaction Taxes;

(e)     all Employee Liabilities relating to Transferred Employees (other than the Excluded Employee Liabilities);

(f)     all liabilities and obligations (including under applicable Environmental Laws and other Laws) arising out of or relating to Buyer's ownership or operation of the Business and the Acquired Assets after the Closing;

(g)     all liabilities and obligations to indemnify and hold harmless any Transferred Employees; and

(h)     all liabilities and obligations of Seller set forth on <u>Schedule 1.3(h)</u>.

Section 1.4 <u>Retention of Liabilities</u>. Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter. All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Seller (all such liabilities and obligations not being assumed being herein referred to as the "<u>Excluded Liabilities</u>"). The Excluded Liabilities include, without limitation, the following liabilities and obligations (but in each case except as specifically assumed in <u>Section 1.3</u>):

(a)     all liabilities and obligations under or relating to the Excluded Assets;

(b)     all liabilities and obligations of Seller under or relating to the Priority Term Loan, the FILO Facility, the Exit Term Loan or the Intercompany Note;

(c)     all liabilities and obligations relating to any Employee Benefit (the "<u>Excluded Employee Liabilities</u>");

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 11 of 149

(d)     all liabilities and obligations for Pre-Closing Taxes;

(e)     all liabilities and obligations of Seller arising under or incurred in connection with the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which Seller is a party and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(f)     all liabilities of, and Claims against, Seller arising from and in connection with grants of restricted common unit/share awards and stock options by Seller;

(g)     any liabilities and obligations of Seller under this Agreement, or under any Ancillary Agreement to which Seller is a party;

(h)     all liabilities under any Qualifying Excluded Contracts and Leases;

(i)     all State of Alabama Project Development Liabilities;

(j)     the Retained Litigation;

(k)     all other liabilities and obligations arising out of or relating to Seller's ownership, operation or management of the Business and the Acquired Assets prior to the Closing;

(l)     all liabilities and obligations under the CBA;

(m)     all liabilities and obligations under the Pension Plan;

(n)     all City of Huntsville Project Development Liabilities; and

(o)     all of Seller's other liabilities and obligations that are not Assumed Liabilities, including, without limitation, liabilities set forth on Schedule 1.4(o).

Section 1.5     Assumed Lease and Assumed Contracts; Cure Amount.

(a)     At such time as is specified in the Sale Order, pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Buyer and Buyer shall assume from Seller, the Assumed Lease and the Assumed Contracts. The amounts necessary, pursuant to Section 365 of the Bankruptcy Code, to cure any and all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults under any Assumed Lease or Assumed Contract, in each case as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order and this Agreement (such aggregate amount, the "Cure Amount") shall be paid by Buyer; provided however that (a) Buyer shall have no obligation to pay more than an aggregate amount of $53,233 (the "Buyer's Cure Amount") for all Assumed Leases and Assumed Contracts listed on Schedule 1.1(i) as of the Effective Date plus any Cure Amount for Assumed Leases and Assumed Contracts that may be added to Schedule 1.1(i) after the Effective Date in accordance with the terms below, in each case as and when finally determined by the Bankruptcy Court

8

pursuant to the procedures set forth in the Sale Order and this Agreement and (b) Seller shall be responsible for paying any difference (such difference, the "Seller's Cure Amount") between the Buyer's Cure Amount and the Cure Amount that is necessary, pursuant to Section 365 of the Bankruptcy Code, to cure any and all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults only under any Assumed Lease or Assumed Contract that is listed on Schedule 1.1(i) as of the Effective Date. Schedule 1.5(a) contains Seller's estimate as of the Effective Date of the Cure Amount. Subject to the prior written consent of Seller in Seller's sole discretion, Buyer may amend Schedule 1.1(i) to add any executory contracts of Seller at any time prior to the date of a final hearing to approve the sale of the Acquired Assets (the "Sale Hearing"). Subject to the limitations set forth in Section 1.5(d) and upon written notice to Seller, Buyer may amend Schedule 1.1(i) and Schedule 1.2(r) to reject any executory contracts of Seller at any time prior to the date of the Sale Hearing; provided that the definition or interpretation of (i) "Acquired Assets" for the purposes of Section 1.3 only and (ii) "Assumed Liabilities" and "Excluded Liabilities" for any purposes under this Agreement, shall not reflect any such amendment without the prior written consent of Seller. For the avoidance of doubt and notwithstanding anything to the contrary in this Section 1.5(a), Seller shall have no liability under this Agreement in respect of any Cure Amounts relating to Assumed Contracts that are not listed on Schedule 1.1(i) as of the Effective Date.

(b)     Seller shall timely serve the motion seeking entry of the Sale Order to all parties to Leases and Contracts and, subject to Section 1.6 and the performance of Buyer's obligations in Section 5.2, Seller shall use commercially reasonable efforts to cause the Assumed Lease and Assumed Contracts to be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and Seller shall comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign and delegate to Buyer all of Seller's rights and obligations under the Assumed Lease and Assumed Contracts.

(c)     Notwithstanding any provision in this Agreement to the contrary, if for any reason Buyer fails to pay the Buyer's Cure Amount or Seller fails to pay the Seller's Cure Amount in respect of any Assumed Contract or Assumed Lease when due and payable pursuant to this Agreement, the Sale Order or any other Order of the Bankruptcy Court, (i) the other party may pay or otherwise satisfy such Cure Amount or any other liability or obligation under such Assumed Contract or Assumed Lease and shall be reimbursed by the party responsible to make such payment within five (5) Business Days of notice of such payment (ii) each party shall indemnify and hold harmless the other party in respect of such Cure Amount, liability or obligation as well as any expenses (including legal fees and expenses) incurred by the other in defending any claim for payment of the Cure Amount or any other liability or obligation arising under such Contract or Lease asserted by the counterparty thereto and (iii) Seller or Buyer may reject, and nothing in this Agreement shall prohibit Seller or Buyer from rejecting, such Contract or Lease.

(d)     Notwithstanding any provision in this Agreement to the contrary, at any time prior to the Sale Hearing, Buyer may designate in writing to Seller any Contract or Lease as an Excluded Liability (and amend Schedule 1.2(r) for such purposes only), only if the rejection of such Contract or Lease would not give rise to a Claim in favor of the counterparty thereto having administrative priority or any other priority senior to a general unsecured Claim against the bankruptcy estate of Seller (the "Qualifying Excluded Contracts and Leases"). Seller may reject,

9

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 13 of 149

and nothing in this Agreement shall prohibit Seller from rejecting, the Qualifying Excluded Contracts and Leases.

Section 1.6 <u>Non-Assignment of Acquired Assets</u>. Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof (after giving effect to any waiver by the applicable counterparty, or any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent. In such event, Seller and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to Seller or Buyer, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Seller would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Seller's obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Seller thereunder.

Section 1.7 <u>Further Conveyances and Assumptions</u>.

(a) Seller shall deliver to Buyer at the Closing such Employee Records as is reasonably necessary for Buyer to transition the Transferred Employees into Buyer's records, as well as all other Documents included in the Acquired Assets.

(b) At the Closing, and from time to time thereafter, Seller and Buyer shall, and Seller and Buyer shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 14 of 149

Section 1.8    Conflicts with Other Bidders.  In the event of any conflict regarding the Acquired Assets or the Assumed Liabilities between this Agreement and agreements governing other sales of the Seller's assets in the Bankruptcy Case (the "Other Agreements"), Buyer shall cooperate in good faith with any other purchasers of Seller's assets pursuant to such Other Agreements, whether before or after the Closing Date, to ensure that all assets or liabilities are appropriately apportioned between Buyer and such other purchasers in order to reflect the intent of Buyer and such other purchasers hereunder and thereunder.

## ARTICLE 2. CONSIDERATION

Section 2.1 Consideration. The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets (the "Purchase Price") shall be:

(a)    Thirty Million Five Hundred Thousand United States Dollars (US$ 30,500,000) (the "Gross Closing Cash Payment"), to be adjusted pursuant to Section 2.2(b), and paid and delivered in accordance with Section 3.3(a); and

(b)    assumption of the Assumed Liabilities.

Section 2.2 Good Faith Deposit.

(a)    Concurrently with or prior to the execution and delivery of this Agreement, notwithstanding anything to the contrary in this Agreement, Buyer shall have deposited with Seller an amount equal to Thirty Million Five Hundred Thousand United States Dollars (US$ 30,500,000) by wire transfer of immediately-available funds (the "Good Faith Deposit"). The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Seller or Buyer and shall be deposited in a segregated deposit account of Seller and held in trust to be administered solely in accordance with the terms of this Agreement and the Bidding Procedures Order. Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b)    If the Closing occurs, the Gross Closing Cash Payment shall be reduced by the amount of the Good Faith Deposit (such resulting amount, the "Net Closing Cash Payment"), to be paid and delivered in accordance with Section 3.3(a).

(c)    If this Agreement is terminated pursuant to Section 10.1, the Good Faith Deposit shall, other than if a release of the Good Faith Deposit to Seller shall have previously occurred in accordance with Section 2.2(d), be repaid to Buyer or retained by Seller in the amounts and at the times set forth in Section 10.2(a) through Section 10.2(c).

(d)    Unless otherwise provided in Section 10.2(b), upon entry of the Sale Order, the Good Faith Deposit shall become non-refundable and shall be retained by the Seller.

(e)    Notwithstanding any provision herein to the contrary, in the event that the Closing does not occur on or before the seventh (7th) calendar day from the date of entry of the Sale Order by the Bankruptcy Court, Five Hundred Thousand United States Dollars ($500,000) of

11

the Good Faith Deposit shall, within three (3) Business Days of such seventh (7th) calendar day, be returned by Seller to Buyer; provided, however, that such failure to occur of the Closing shall not have resulted from Buyer's material breach of its obligations under this Agreement.

## ARTICLE 3. CLOSING AND DELIVERIES

Section 3.1 Closing. Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Central Time, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in Article 9 of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by Seller and Buyer, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "Closing Date").

Section 3.2 Seller's Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a)     all of the Acquired Assets, together with one or more duly executed bills of sale, endorsed certificates of title and other evidence of transfer of motor vehicles and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller;

(b)     one or more duly executed assignment and assumption agreements for the Assumed Contracts and the Assumed Liabilities, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Assignment and Assumption Agreement");

(c)     one or more duly executed assignment and assumption agreements for the Assumed Lease, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Assignment and Assumption of Lease");

(d)     duly executed, and notarized where indicated, assignments of (i) the registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in forms suitable for recording in the U.S. Patent and Trademark Office and equivalent offices in jurisdictions outside the United States, (ii) the Internet domain name registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for filing with all applicable domain name registries, together with all relevant authorization codes for the transfer of such domain name registrations and applications and confirmation that the same have been unlocked, and (iii) general assignments of all other Acquired Intellectual Property, in each case in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Acquired Intellectual Property Assignment");

12

(e)    the officer's certificate required to be delivered pursuant to Section 9.2(a) and Section 9.2(b);

(f)    one or more affidavits executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) and Section 1446 of the Code;

(g)    a duly executed Limited Power of Attorney to enable Buyer to execute on Seller's behalf any further documents necessary to record the assignment to Buyer of Acquired Intellectual Property.

Section 3.3 Buyer's Deliveries. At the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a)    cash in an amount equal to the Net Closing Cash Payment, by wire transfer of immediately available funds to the account or accounts of Seller identified by Seller in writing reasonably in advance of the Closing;

(b)    one or more duly executed Assignment and Assumption Agreements;

(c)    the officer's certificate required to be delivered pursuant to Section 9.1(a) and Section 9.1(b); and

(d)    such other documents, instruments and certificates as Seller may reasonably request to transfer, assign and delegate the Assumed Liabilities to Buyer in accordance with the terms and conditions hereof.

ARTICLE 4. REPRESENTATIONS AND WARRANTIES

Section 4.1 Representations and Warranties of Seller. Seller represents and warrants to Buyer as follows:

(a)    Corporate Organization. Each entity comprising Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of domicile. Subject to any necessary authority from the Bankruptcy Court, each entity comprising Seller has the requisite corporate or limited liability company power and authority to conduct the Business as now being conducted and to carry out its obligations under this Agreement.

(b)    Qualification to do Business. Each entity comprising Seller is duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c)    Authorization and Validity. Each entity comprising Seller has the corporate

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 17 of 149

or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement to which Seller is a party and, subject to (i) the Bankruptcy Court's entry of the Sale Order, and (ii) the termination or expiration of the waiting period under the HSR Act (if applicable), to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement has been duly authorized, and at or before Closing the execution and delivery of the Ancillary Agreements to which Seller is a party will be duly authorized, by all necessary corporate or limited liability company action by the boards of directors or managers of Seller, and no other corporate or limited liability company proceedings are necessary for the performance by Seller of its obligations under this Agreement or the consummation by Seller of the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by Seller, and at Closing the Ancillary Agreement to which Seller is a party will be duly and validly executed and delivered by Seller, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, the Agreement is, and each of the Ancillary Agreements to which Seller is a party will be at Closing, a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(d)     No Conflict or Violation. Neither the execution and delivery by Seller of this Agreement or any of the Ancillary Agreements to which Seller is a party, nor (subject to (i) the Bankruptcy Court's entry of the Sale Order, and (ii) the termination or expiration of the waiting period under the HSR Act (if applicable)) the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements to which Seller is a party, nor compliance by Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any breach of any provision of the respective certificates of incorporation or formation of Seller or the respective by-laws or operating agreements of Seller, or (y) violate any provision of law, regulation, rule or other legal requirement of any Government ("Law") or any order, judgment or decree of any court or Government ("Order") applicable to Seller or any of its properties or assets, except, in either of the foregoing cases (x) and (y), for any conflict or violation as would not reasonably be expected to cause a Material Adverse Effect.

(e)     Consents and Approvals. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Seller is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Seller after the Closing in order for Buyer to own or operate any of the Acquired Assets; (ii) as required pursuant to the HSR Act, if applicable; (iii) the entry of the Sale Order by the Bankruptcy Court; or (iv) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)     Title and Ownership. Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets. Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

(g)     Compliance with Law. Except as set forth on Schedule 4.1(g), (i) Seller has operated the Business in material compliance with all applicable Laws, and (ii) except as may

14

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 18 of 149

result from the Bankruptcy Case, Seller has not received written notice of any violation of any applicable Laws, nor is Seller in default with respect to any Order applicable to the Acquired Assets.

(h)     Contracts and Leases. As of the Effective Date, other than as set forth on Schedule 4.1(h) or in motions or other pleadings or similar items filed with the Bankruptcy Court, neither Seller nor, to Seller's Knowledge, any other party to any of the Assumed Contracts or Assumed Lease has commenced any action against any of the parties to such Assumed Contracts or Assumed Lease or given or received any written notice of any material default or violation under any Assumed Contract or Assumed Lease that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assumed Contracts and Assumed Lease). Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assumed Contracts and Assumed Lease is, or will be at the Closing, valid, binding and in full force and effect against Seller, except as otherwise set forth on Schedule 4.1(h).

(i)     Permits. Schedule 4.1(i) sets forth a complete and correct list of all material Permits currently held by Seller in connection with the Business ("Material Permits"), and all Material Permits at the current locations of the Business are, except as would not cause a Material Adverse Effect, in full force and effect.

(j)     Intellectual Property. Schedule 1.1(k) sets forth a complete and correct list of all registrations and applications of the trademarks, patents and domain names owned and primarily used by Seller in connection with the Business.

(k)     Brand Name. Schedule 12.1(a) sets forth a complete and correct list of all registrations and applications for trademarks and service marks for the Brand Name.

(l)     Seller Not a Foreign Person. Seller is not a "foreign person" within the meaning of Section 1445 or 1446 of the Code.

Section 4.2 Representations and Warranties of Buyer. Buyer represents and warrants to Seller as follows:

(a)     Corporate Organization. Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation. Buyer has the requisite limited liability company power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b)     Qualification to do Business. Buyer is duly qualified to do business as an entity and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c)     Authorization and Validity. Buyer has the requisite company power and

15

authority necessary to enter into this Agreement, and at Closing will have the requisite company power and authority necessary to enter into each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder, subject to (i) the Bankruptcy Court's entry of the Sale Order, and (ii) the termination or expiration of the waiting period under the HSR Act (if applicable), to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary company action by the board of directors (or equivalent), and no other company proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and delivered by Buyer, and at Closing each Ancillary Agreement will be duly and validly executed and delivered by Buyer, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Seller, the Agreement is, and each of the Ancillary Agreements will be at Closing, a valid and binding obligation of Buyer enforceable against it in accordance with its terms.

(d)     <u>No Conflict or Violation</u>. Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor (subject to (x) the Bankruptcy Court's entry of the Sale Order, and (y) the termination or expiration of the waiting period under the HSR Act (if applicable)) the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject, except as would not materially and adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement or any of the Ancillary Agreements.

(e)     <u>Consents and Approvals</u>. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) as required pursuant to the HSR Act, if applicable; (iii) for entry of the Sale Order by the Bankruptcy Court; or (iv) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)     <u>Adequate Assurances Regarding Assumed Contracts and Assumed Lease</u>. Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Lease.

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 20 of 149

(g)     Financial Capability. Buyer and any Buyer Acquisition Vehicle currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor (i) to Seller of the Purchase Price and (ii) of any Buyer's Cure Amount, and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(h)     Investigation by Buyer. Buyer has conducted its own independent review and analysis of the Business, the Acquired Assets and the Assumed Liabilities, operations, technology, assets, liabilities, financial condition and prospects of the Business as formerly carried on by Seller and acknowledges that Seller has provided Buyer with reasonable access to the personnel, properties, premises and records of the Business for this purpose. Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither Seller nor any of its Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in Section 4.1 (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Seller, its Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding misrepresentation or concealment arising from actual fraud of Seller) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in Section 4.1 and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3     Warranties Exclusive; Schedules.

(a)     The representations and warranties contained in Article 4 are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed. Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) ANY OTHER INFORMATION OR DOCUMENTS

17

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 21 of 149

MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (D) THE CONDITION OF THE ACQUIRED ASSETS, INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS. SELLER AND SELLER'S AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATIONS OR WARRANTIES IN ANY OTHER AGREEMENT.

(b)     The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

Section 4.4    <u>Survival of Representations and Warranties</u>. None of the representations or warranties of Buyer or Seller set forth in this Agreement or any Ancillary Agreement to which Buyer or Seller is a party or in any certificate delivered pursuant to <u>Section 9.1(a)</u>, <u>Section 9.1(b)</u>, <u>Section 9.2(a)</u> or <u>Section 9.2(b)</u> shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement or any Ancillary Agreement to which Buyer or Seller is a party shall survive in accordance with their respective terms).

## ARTICLE 5. <u>COVENANTS OF THE PARTIES</u>

Section 5.1    <u>Covenants of Seller</u>. Seller covenants as follows:

(a)     <u>Commercially Reasonable Efforts</u>. Between the Effective Date and the Closing Date, Seller shall use all commercially reasonable efforts to (except as may be disclosed to Buyer) (i) obtain all necessary consents, waivers, authorizations and approvals of all Governments, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party, (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) maintain the Acquired Assets substantially in accordance with Seller's current practices and procedures (as adjusted for the effects of any COVID Restrictions).

(b)     <u>Access to Properties and Documents; Confidentiality</u>. Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access (subject to any COVID Restrictions) during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to <u>Article 10</u>) to all Documents of Seller relating to the Acquired Assets and the Assumed Liabilities. Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account any COVID Restrictions and Seller's resources and other commitments, during normal business hours, to all Acquired Assets, and to Seller's executive officers, accountants, counsel, employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to <u>Article 10</u>). The rights of access contained in this <u>Section 5.1(b)</u> are granted subject to, and on, the following terms and conditions: (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this <u>Section 5.1(b)</u> or otherwise) will be governed and

18

protected by the Confidentiality Agreement, dated as of August 5, 2020 by and between Buyer and ROC (the "Confidentiality Agreement"); and (iii) such rights of access shall not affect or modify the conditions set forth in Article 9 in any way. Buyer shall indemnify, defend and hold harmless (i) Seller, (ii) the lessors of any Leased Real Property, and (iii) Seller's and such lessors' respective Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or its accountants, counsel and representatives entry upon the Leased Real Property in connection with their exercise of the right of access pursuant to this Section 5.1(b), and (B) any and all other activities undertaken by Buyer or its accountants, counsel and representatives with respect to any such Leased Real Property in connection with their exercise of the right of access pursuant to this Section 5.1(b).

(c)     Cure of Defaults. Seller shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed Lease or Assumed Contract for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing, then immediately following the entry of such Order, pay the applicable Seller's Cure Amount.

(d)     Operation of the Business. Except (i) as otherwise contemplated or permitted by this Agreement or the Ancillary Agreements, (ii) with the prior consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or (iii) in connection with any Order relating to the Bankruptcy Case, between the Effective Date and the Closing Date, Seller shall (A) use its commercially reasonable efforts to operate the Business in all material respects in the ordinary course consistent with current practices (after taking into account Seller's status as a debtor-in- possession and any COVID Restrictions), (B) not enter into, materially amend or terminate any Assumed Contract or Assumed Lease outside of the ordinary course of business where such amendment or termination would have a material and adverse effect on the value of the Acquired Assets taken as a whole, (C) not remove from the Assumed Lease Real Property any Owned FF&E, other than Inventory; and (D) notify Buyer of any notices relating to or proposed changes affecting Seller's insurance policies covering any of the Acquired Assets. Notwithstanding the foregoing, nothing in this Agreement shall restrict Seller from rejecting any (x) Contract or Lease that is not an Assumed Contract or Assumed Lease or (y) Qualifying Excluded Contracts and Leases.

Section 5.2     Covenants of Buyer. Buyer covenants as follows:

(a)     Commercially Reasonable Efforts. Buyer shall use all commercially reasonable efforts to (except with Seller's prior written consent, in Seller's sole discretion) (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)     Adequate Assurances Regarding Assumed Contracts and Assumed Lease. With respect to each Assumed Contract and Assumed Lease that (i) is not a Qualifying Excluded

19

Case 20-81688-CRJ11     Doc 821-6     Filed 09/27/20     Entered 09/27/20 08:34:20     Desc
Exhibit Ex. F - Sierra Bullets     L.L.C.     Page 23 of 149

Contract and Lease, Buyer shall provide adequate assurance of the future performance of such Assumed Contract or Assumed Lease by Buyer and (ii) is a Qualifying Excluded Contract and Lease, Buyer shall undertake reasonable efforts to provide adequate assurance of the future performance of such Assumed Contract or Assumed Lease by Buyer; provided that, for clarity the failure to provide adequate assurance shall not be a breach of this Section 5.2(b)(ii) if Buyer has undertaken reasonable efforts to provide such assurance. Buyer agrees that it will promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

(c)     Cure of Defaults. Buyer shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed Lease or Assumed Contract for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing, then immediately following the entry of such Order, cure any and all defaults under the Assumed Contracts and Assumed Lease (other than Qualifying Excluded Contracts and Leases), including paying the applicable Buyer's Cure Amount, which defaults are required to be cured under the Bankruptcy Code, so that such Assumed Contracts and Assumed Lease may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d)     Performance under Assumed Contracts and Assumed Lease. Buyer shall (i) from and after the Closing Date, assume all obligations and liabilities of Seller under the Assumed Contracts and Assumed Lease, (ii) from and after the Closing Date, take all actions necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Assumed Contracts and Assumed Lease, and (iii) indemnify, defend and hold harmless Seller, Seller's Affiliates, and all of their respective Related Persons from and against any damages, losses, costs, expenses and other liabilities arising out of a breach of this Section 5.2(d) or any of Buyer's other covenants contained in this Agreement or any Ancillary Agreements to which Buyer is a party.

(e)     Indemnification for Use of Real Property. Buyer shall indemnify, defend and hold harmless (i) Seller, and (ii) Seller's Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or Buyer's agents' or representatives' entry upon the Leased Real Property in connection with their exercise of the right of access pursuant to Section 5.1(b), and (B) any and all other activities undertaken by Buyer or Buyer's agents or representatives with respect to any such Leased Real Property.

(f)     Released Claims. Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired Assets to the extent such Claims have been, or are at any time thereafter, released by or on behalf of Seller or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise or (ii) pursue, prosecute or assert any rights related to any Claims against employees, officers, directors, counsel and other advisors of Seller, including by way of offset or recoupment.

20

Section 5.3    HSR Act.

(a)    Subject to the terms and conditions of this Agreement, each of the parties will (i) use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Antitrust Laws to consummate the transactions contemplated by this Agreement, (ii) if the transactions contemplated hereby require a Notification and Report Form pursuant to the HSR Act, use commercially reasonable efforts to file such Notification and Report Form with respect to the transactions contemplated by this Agreement within ten (10) Business Days following the Effective Date, supplying as promptly as practicable any additional information and documentary material that may be requested pursuant to the HSR Act and (iii) use commercially reasonable efforts to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable.

(b)    In connection with the efforts referenced in Section 5.3(a) to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under the HSR Act or any other Antitrust Law, each of the parties shall use commercially reasonable efforts to (i) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, (ii) keep the other parties informed in all material respects of any material communication received by such party from, or given by such party to, the Federal Trade Commission (the "FTC"), the Antitrust Division of the Department of Justice (the "DOJ") or any other Government authority and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated by this Agreement and (iii) permit the other parties to review any material communication given to it by, and consult with each other in advance of any meeting or conference with, the FTC, the DOJ or any other Government authority in connection with any proceeding by a private party. The foregoing obligations in this Section 5.3(b) shall be subject to the Confidentiality Agreement with respect to the confidential information of Buyer and Seller, and any attorney-client, work product or other privilege, and each of the parties to this Agreement will coordinate and cooperate fully with the other parties to this Agreement in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under the HSR Act. Any competitively sensitive information that is disclosed pursuant to this Section 5.3(b) will be limited to each party's respective counsel and economists pursuant to a separate customary confidentiality agreement.

(c)    Notwithstanding anything in this Agreement to the contrary, in no event will Buyer be obligated to propose or agree to accept any undertaking or condition, to enter into any consent decree, to make any divestiture, to accept any operational restriction, or take any other action that, in the reasonable judgment of Buyer, could be expected to limit the right of Buyer to own or operate all or any portion of their respective businesses or assets. Neither Seller nor any of its Affiliates shall, without Buyer's written consent, in Buyer's sole discretion, discuss or commit to any divestiture transaction, or discuss or commit to alter its businesses or commercial practices in any way, or otherwise take or commit to take any action that limits Buyer's freedom of action with respect to, or Buyer's ability to retain any of the businesses, product lines or assets of, the Business to be acquired or otherwise receive the full benefits of this Agreement.

21

## ARTICLE 6. ADDITIONAL AGREEMENTS

Section 6.1    Bankruptcy Matters.

(a)    Backup Bidder. In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures Order, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures Order) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction. Notwithstanding anything to the contrary in this Agreement, Seller may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the Inventory and the other assets of Seller, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)    Notice to Holders of Liens, Claims and Interests. Seller has provided notice of the Sale Order to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)    Entry of Sale Order. Seller has filed with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order. The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement (including any Assumed Contract), Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability. Seller and Buyer shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement. In the event that any Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Buyer will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion. For purposes of this Section 6.1(c) only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

Section 6.2    Transition Arrangements.

(a)    Transition Services Agreement. To facilitate the transactions contemplated by this Agreement, Seller and Buyer shall, as of the Closing, enter into a Transition Services Agreement in substantially the same form as attached as Exhibit 2 setting forth certain transition services that Buyer and Seller will provide to each other. Buyer is also interested in entering into a transition services agreement with the Other Buyer on mutually agreeable terms.

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 26 of 149

(b)     Access Covenant. Upon reasonable request from Seller, and including without limitation as further set forth in the Transition Services Agreement, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will following the Closing Date provide to Seller, and the accountants, counsel and representatives of Seller, including any administrator of the Plan or Seller's estate, such access to the pre-closing books and records relating to the Business as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation and litigation of claims and making of distributions contemplated under the Plan, or otherwise. Such access will include (a) reasonable access to Buyer's personnel, information technology systems and books and records and (b) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Seller engaged in such wind-down and liquidation process. Buyer will provide such services free of any charges, fees or rents, provided that Seller will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Seller's employees engaged in the liquidation).

(c)     Transitional License. Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days, Buyer shall grant Seller a non-exclusive, royalty-free right and license to use the Acquired Intellectual Property, including the Business Name, in connection with the wind-down and liquidation of Seller's estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.

(d)     Transitional Regulatory Matters. From the Effective Date until the Closing Date, Buyer and Seller shall each use reasonable best efforts to cooperate in the registration of Buyer as licensee, as of and conditional upon the Closing, under the ATF Licenses.

Section 6.3  Further Assurances. At the request and the sole expense of the requesting party, either party shall, at any time after the Closing Date, execute and deliver such documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

ARTICLE 7. EMPLOYEES AND EMPLOYEE BENEFITS

Section 7.1  Transferred Employees. Within two (2) days after entry of the Sale Order, Buyer shall offer employment, effective as of the Closing, to a significant portion of the Employees. Each such offer shall include a waiver of any costs related to the termination of employment of such Employees by Seller in connection with the transactions contemplated by this Agreement (including without limitation any severance or WARN Act payments), as against Buyer, Seller and their respective Affiliates. If the Closing occurs, any such Employees who accept

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 27 of 149

any such offer no later than five (5) days after the Closing Date are referred to in this Agreement as the "Transferred Employees".

Section 7.2 Employment Tax Reporting. With respect to Transferred Employees, Buyer and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment Tax reporting.

Section 7.3 Benefits. From and after the Closing (or with respect to any Transferred Employee who is on an approved leave of absence as of the Closing, from and after his or her return to work), Buyer shall, or shall cause an Affiliate of Buyer to, provide (whether under existing or newly-established Buyer compensation or benefits plans (collectively, the "Buyer Plans")) to each Transferred Employee, and to their eligible dependents, benefits under the Buyer Plans that are no less favorable to the applicable Transferred Employee in the aggregate than the practice, plans, policies or Contracts in effect for such Transferred Employee immediately prior to the Closing. If applicable, for purposes of eligibility, vesting and the calculation of the eligibility for and amount of vacation, sick pay, severance or other benefits under the Buyer Plans providing benefits to Transferred Employees, Buyer shall credit each Transferred Employee with his or her years of service with Seller to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan; provided, however, that no such service recognition shall result in any duplication of benefits or apply to any defined benefit pension plans. In addition, to the extent it has the right to do so, Buyer shall use commercially reasonable efforts to (a) waive under any health or welfare plans maintained by Buyer for Transferred Employees any pre-existing condition limitations and eligibility waiting periods for Transferred Employees and their eligible dependents (but only to the extent such pre- existing condition limitations, eligibility waiting periods and evidence of insurability requirements were satisfied under Seller's comparable health plans as of the Closing Date), and (b) provide that dollar amount of all eligible expenses incurred by Transferred Employees and their eligible dependents during the calendar year in which the Closing Date occurs shall be taken into account for purposes of satisfying the applicable deductibles, co-payments or out-of-pocket limitations for such calendar year under the relevant Buyer's health or welfare plans.

Section 7.4 WARN Act. Buyer and Seller agree that:

(a) Buyer shall assume all obligations and liabilities for provision of notice or payment in lieu of notice or any applicable penalties under the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any similar state or local law arising on account of Buyer's acquisition of the Acquired Assets or termination of any of the Transferred Employees. Buyer will indemnify Seller and its Affiliates and their respective Related Persons against and hold each of them harmless from any and all damages incurred or suffered by Seller or any of its Affiliates or any of their respective Related Persons with respect to the WARN Act or any similar state or local Law, arising as a result of Buyer's acquisition of the Acquired Assets or otherwise related to the Transferred Employees, that would constitute administrative and priority claims in the Bankruptcy Case. For the avoidance of doubt, Buyer does not assume obligations and liabilities for WARN Act compliance with respect to Excluded Assets or Seller's disposition thereof.

24

(b)     Buyer shall not, at any time prior to ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" (as those terms are defined in the WARN Act) affecting the Transferred Employees without complying in full with the WARN Act.

Section 7.5     Third Party Beneficiary. No provision of this Article 7 shall:

(a)     create any third party beneficiary or other rights in any Employee or former employee (including any beneficiary or dependent thereof) of Seller, Buyer or any other Person;

(b)     constitute or create, or be deemed to constitute or create, an employment agreement or employee benefit plan;

(c)     constitute or be deemed to constitute an amendment to any employee benefit plan sponsored or maintained by Seller or Buyer; or

(d)     alter or change the employment at-will status of any Employees.

## ARTICLE 8. TAXES.

Section 8.1 Taxes Related to Purchase of Assets. All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Seller as a result of the sale of the Acquired Assets (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(c) of the Bankruptcy Code, shall be paid by Buyer. Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and Seller agrees to assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 8.2     Cooperation on Tax Matters.

(a)     Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)     Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period of at least six (6) years from the Closing

25

Date, and will give Seller notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to those portions of books, records, documents and other information that relate solely to the Acquired Assets or the Assumed Liabilities and time periods on or prior to Closing as Seller may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Seller. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities as they existed on or before the Closing, unless such access cannot be limited to the appropriate information, in which case, Buyer may, at its reasonable discretion, retrieve electronic data compilations of the appropriate information.

(c) If Seller receives any refund, overpayment or rebate of Taxes (including any refund, overpayment or rebate relating to any Straddle Period) that is attributable to Taxes paid by Buyer, it shall promptly, and in no case later than ten (10) Business Days after receipt thereof, pay such refund, overpayment or rebate over to Buyer net of any reasonable cost or expense incurred in connection with such refund, overpayment or rebate.

(d) Seller shall prepare and file all Income Tax Returns for any Pre-Closing Taxes, whether or not such Tax Returns are required to be filed after the Closing Date, and Seller shall timely pay all Taxes reflected on such Tax Returns. Buyer shall prepare and file, or cause to be prepared and filed (with Seller's reasonable cooperation) all Tax Returns with respect to Post-Closing Taxes. Buyer and Seller shall reasonably cooperate in the preparation of any Tax Returns described in this Section 8.2(d).

(e) Buyer and Seller will cooperate and Buyer shall use commercially reasonable efforts to cause the Buyer or any Buyer Acquisition Vehicle to be registered with the Alcohol and Tobacco Tax and Trade Bureau as a "manufacturer" for purposes of the Firearms Ammunition and Excise Tax on or before the Closing Date.

Section 8.3 Allocation of Purchase Price. Promptly (and in any event within sixty (60) days) following the Closing Date, Seller shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "Allocation"). Seller and Buyer will cooperate to resolve any disputes regarding the Allocation and to file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement.

ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES.

Section 9.1 Conditions Precedent to Performance by Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the

26

conditions contained in <u>Section 9.1(c)(i)</u> and <u>Section 9.1(c)(ii)</u>) may be waived by Seller in its sole discretion:

(a)     <u>Representations and Warranties of Buyer</u>. All representations and warranties made by Buyer in <u>Section 4.2</u> shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(b)     <u>Performance of the Obligations of Buyer</u>. Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(c)     <u>Consents and Approvals</u>.

(i)     The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(ii)     The applicable waiting period under the HSR Act, if applicable, shall have expired or terminated.

(d)     <u>No Violation of Orders</u>. No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)     <u>Cure of Defaults</u>. At or prior to the Closing, any and all defaults under the Assumed Contracts and Assumed Lease (other than Qualifying Excluded Contracts and Leases) that are required to be cured under the Bankruptcy Code shall have been cured, so that such Assumed Contracts and Assumed Lease may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(f)     <u>Buyer's Deliveries</u>. Buyer shall have delivered to Seller all of the items set forth in <u>Section 3.3</u>.

Section 9.2 <u>Conditions Precedent to Performance by Buyer</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 9.2(c)(i)</u> and <u>Section 9.2(c)(ii)</u>) may be waived by Buyer in its sole discretion:

(a)     Representations and Warranties of Seller. All representations and warranties made by Seller in Section 4.1 shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(b)     Performance of the Obligations of Seller. Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance (i) that do not result in a Material Adverse Effect or (ii) under those obligations of Seller set forth in Section 6.2(d), and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(c)     Consents and Approvals.

(i)     The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(ii)     The applicable waiting period under the HSR Act, if applicable shall have expired or terminated.

(d)     No Violation of Orders. No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)     Seller's Deliveries. Seller shall have delivered to Buyer all of the items set forth in Section 3.2.

ARTICLE 10. TERMINATION.

Section 10.1 Conditions of Termination. This Agreement may be terminated at any time before the Closing:

(a)     By mutual written consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, on or after October 31, 2020 (the "Outside Date"), if the condition contained in Section 9.1(a) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(b) if Seller is then in material breach of this Agreement;

(c)     By Seller, by notice to Buyer, if Seller has previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant;

28

provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(c) if Seller is then in material breach of this Agreement;

(d)     By Seller, by notice to Buyer, on or after the Outside Date, if any condition contained in Section 9.1(c) or Section 9.1(d) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(d) if Seller is then in material breach of this Agreement;

(e)     By Buyer, by notice to Seller, on or after the Outside Date, if the condition contained in Section 9.2(a) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(e) if Buyer is then in material breach of this Agreement;

(f)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with written notice of a failure to perform any material covenant of Seller contained in this Agreement, which shall include, without limitation, Seller's obligation to deliver all of the items (other than immaterial exceptions) set forth in Section 3.2(a) through Section 3.2(d), and Seller has failed within five (5) days after such notice to perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(f) if Buyer is then in material breach of this Agreement;

(g)     By Buyer, by notice to Seller, after the Outside Date, if any condition contained in Section 9.2(c) or Section 9.2(d) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(g) if Buyer is then in material breach of this Agreement;

(h)     By Buyer, by notice to Seller, or by Seller, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)     By Seller, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 60 calendar days after the Petition Date; and

(j)     Automatically, upon the earlier of (i) Seller consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction.

Section 10.2     Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 10.1, this Agreement shall become null and void and have no effect (other than Article 10, Article 11, and Article 12, which shall survive termination), with no liability on the part of Seller or Buyer, or their respective

29

Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 11.4, (ii) the obligation of Buyer under Section 6.1(a) and (iii) any liability provided for in Section 10.2(b) through Section 10.2(d), inclusive.

(b)     If this Agreement is terminated pursuant to Section 10.1(a), Section 10.1(d) (other than a termination due to the condition contained in Section 9.1(c)(ii)), Section 10.1(e), Section 10.1(f), Section 10.1(g) (other than a termination due to the conditions contained in Section 9.2(c)(ii)), Section 10.1(h), Section 10.1(i), or Section 10.1(j) then the Good Faith Deposit shall, within three (3) Business Days, be returned by Seller to Buyer.

(c)     If this Agreement is terminated pursuant to Section 10.1(b), Section 10.1(c), Section 10.1(d) (other than a termination due to the conditions contained in Section 9.1(c)(i) or Section 9.1(d)), or Section 10.1(g) (other than a termination due to the conditions contained in Section 9.2(c)(i) or Section 9.2(d)), then Seller may, at its sole election (i) within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee") or (ii) without limitation to Seller's remedies under clause (i) of this Section 10.2(c) require Buyer to specifically perform under the terms of this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(d)     The provisions of this Agreement are uniquely related to Seller's and its Affiliates' desire to consummate the transactions contemplated by this Agreement, and such transactions represent a unique business opportunity at a unique time for the Seller and its Affiliates. As a result, irreparable damage would occur to Seller and its Affiliates in the event that any of the obligations of Buyer under this Agreement were not performed in accordance with their specific terms. Although liquidated or other monetary damages may be available for the breach of covenants and undertakings contained in this Agreement, monetary damages would be difficult to ascertain and an inadequate remedy therefor. Accordingly, if Buyer breaches or threatens to breach any provision of this Agreement, then without limitation to Seller's rights under clause (i) of Section 10.2(c) Seller shall be entitled to an injunction or injunctions, specific performance and any and all other equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, this being in addition to any other remedies to which it is entitled at Law or equity. If Seller seeks an injunction or injunctions to prevent breaches of this Agreement or seeking to enforce specifically the terms and provisions of this Agreement, Seller shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such Order or injunction. Buyer irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. If any action or proceeding should be brought in equity to enforce the provisions of this Agreement, Buyer shall not allege, and hereby waives the defense, that there is an adequate remedy at Law.

(e)     Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article 6 (if the Closing shall have occurred) (i) Seller's entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Seller retains such amount, then notwithstanding anything to the contrary contained herein, such Break Fee shall be the sole and exclusive remedy available to Seller and any other Person against Buyer, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including

30

as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Seller, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Seller, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby. Each party acknowledges that the agreements contained in this <u>Section 10.2</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such party would not have entered into this Agreement.

ARTICLE 11. <u>MISCELLANEOUS</u>.

Section 11.1 <u>Successors and Assigns</u>. Prior to the Closing, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other, and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided that if Buyer wishes, upon prior written notice to Seller, to assign its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to a Buyer Acquisition Vehicle, such prior written consent of Seller shall not unreasonably be withheld, conditioned or delayed. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 11.2 <u>Governing Law; Jurisdiction</u>. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

Section 11.3 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS

31

CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.3</u>.

Section 11.4 <u>Expenses</u>. Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated. Buyer shall pay the cost of any surveys (without limitation to the restriction in <u>Section 5.1(b)(i)</u>), title insurance policies and title reports ordered by Buyer.

Section 11.5 <u>Broker's and Finder's Fees</u>. Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than as set forth on <u>Schedule 11.5</u>, whose fees and expenses shall, as between the parties to this Agreement, be the responsibility of the party indicated on <u>Schedule 11.5</u>, and, to such party's Knowledge, no other broker or other Person is entitled to any commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 11.6 <u>Severability</u>. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 11.7   <u>Notices</u>.

(a)      All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW
Huntsville, Alabama 35824
Attention: Ken D'Arcy

Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071
Attention: John Paul Motley, Esq., and Stephen H. Warren, Esq.
Phone: (213) 430-6100 and (213) 430-7875, respectively
Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

Sierra Bullets, L.L.C.
1400 W Henry Street
Sedalia, MO 65301
Attention: Aaron Kuehne, Secretary
Email: aaron.kuehne@sierrabullets.com

With a copy to (which copy alone shall not constitute notice):

Kane Kessler, P.C.
666 Third Avenue, 23rd Floor
New York, NY 10017
Attention: Robert L. Lawrence, Esq.
Email: rlawrence@kanekessler.com

(b)     Any party may change its address for the purpose of this Section 11.7 by giving the other party written notice of its new address in the manner set forth above.

Section 11.8  Amendments; Waivers. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 11.9  Time of Essence. Time is of the essence in the performance of each and every term of this Agreement.

Section 11.10  Public Announcements. Promptly after the execution and delivery of

33

this Agreement, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein. Thereafter, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing party agrees to give the nondisclosing party prior notice of, and an opportunity to comment on, the proposed disclosure. Notwithstanding anything to the contrary in this Section 11.10, Seller (a) shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equityholders and lenders to the extent required by the provisions of any of Seller's bylaws, credit agreements and other pre-existing contractual obligations.

Section 11.11 Entire Agreement. This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

Section 11.12 Parties in Interest. Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns; provided that, an Other Buyer shall have the right to access certain records in accordance with Section 1.1(s). Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to Seller or Buyer. This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 11.13 Bulk Sales Laws. Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

Section 11.14 Construction. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

Section 11.15 Counterparts and Facsimiles. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

## ARTICLE 12. DEFINITIONS.

Section 12.1 Certain Terms Defined. As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"Alternative Transaction" means Seller consummating one or more transaction or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of all or substantially all of the Business or the Acquired Assets by Seller to a purchaser or purchasers other than Buyer.

"Ancillary Agreements" means, collectively, the Assignment and Assumption Agreements, Assignment and Assumption of Lease, Acquired Intellectual Property Assignments, quitclaim deeds, and other certificates, affidavits and releases delivered pursuant to Article 3.

"Antitrust Law" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other Laws and Orders, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"ATF" means the United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

"ATF Licenses" means all of those licenses issued by ATF as provided by the GCA and the GCA's implementing regulations that are necessary for Buyer to conduct the Business as currently conducted.

"Avoidance Actions" means any and all claims and remedies of Seller under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"Brand Name" means the trademarks listed on Schedule 12.1(a), alone and in combination with other words, graphics and designs, and all variations, derivatives, abbreviations, transliterations, and translations thereof, and including all rights throughout the world in said terms as trade names, trademarks, corporate names, business names and service marks, together with all registered and unregistered rights in the aforementioned and the goodwill associated with all of the foregoing, including without limitation the trademark and domain name registrations set forth on Schedule 1.1(k).

35

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or other governmental action to close.

"Buyer Acquisition Vehicle" means a Creditworthy entity that is wholly-owned and controlled by Sierra Bullets, L.L.C.

"Cash" means all cash and cash equivalents held by Seller, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities, in each case as of immediately prior to the Closing (and including without limitation (i) the Good Faith Deposit, (ii) the Net Closing Cash Payment, (iii) any fee reserves or escrows established by Seller, and (iv) any cash in the Dominion Account (as defined in the Priority Term Loan)).

"CBA" means that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"City of Huntsville Project Development Liabilities" means all liabilities arising under (i) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Seller, as amended or otherwise modified from time to time, (ii) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000 and (iii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Seller in favor of the City of Huntsville.

"Claims" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or unasserted actions against Seller or any of its Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Code" means the Internal Revenue Code of 1986, as amended.

36

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 40 of 149

"<u>Contract</u>" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Seller is a party; <u>provided</u> that Contracts do not include any Lease or any employment or similar Contracts.

"<u>Creditworthy</u>" means sufficiently capitalized, to the reasonable satisfaction of Seller upon provision to Seller of substantiating documentary evidence, to be able to pay the Purchase Price.

"<u>D&O Insurance</u>" means the policies in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Seller, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"<u>DIP Facility</u>" means any debtor-in-possession financing advanced to Seller in the Bankruptcy Case.

"<u>Documents</u>" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"<u>Employee Benefit Plans</u>" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies or arrangements that provide for compensation for employee benefits as to which Seller has any obligation or liability, contingent or otherwise.

"<u>Employee Liabilities</u>" means all liabilities of Seller to or with respect to all Employees whenever arising and liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Seller.

"<u>Employee Records</u>" means all employment and benefit records (in whatever form maintained) in the possession of Seller or its agents and pertaining to any Transferred Employee, or any spouse, dependent or other beneficiary of any such Transferred Employee.

"<u>Employees</u>" means all individuals, as of the date of this Agreement, who are employed by Seller at the Assumed Leased Real Property (including Employees who are absent due to COVID Restrictions or vacation, family leave, short-term disability, COVID 19-related furloughs or absences or other approved leave of absence) in connection with the ownership, operation and management of the Business.

37

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 41 of 149

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exit Term Loan" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"FILO Facility" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"GCA" means Gun Control Act of 1968 (Chapter 44 of Title 18, United States Code § 921 et seq).

"Government" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents thereof.

"Historic Firearms Books and Records" means all historic books and records relating to the sale of firearms included in the Acquired Assets, including all records required to be kept pursuant to parts 447, 478, and, 479 of title 27, Code of Federal Regulations.

38

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

"Income Tax Return" means any Tax Return with respect to Income Taxes.

"Intellectual Property" means throughout the world (1) all intellectual property arising from or in respect of the following: (a) all patents and applications therefore, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (b) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names, websites, social media accounts and handles, and corporate names and general intangibles of a like nature, including the Brand Name, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (c) copyrights and registrations and applications therefore and works of authorship, and mask work rights, (d) all Software of Seller, (e) confidential information, know-how, negative know-how, research and development work product, trade secrets and inventions, and (f) all other intellectual property, (2) Seller's rights pursuant to any Contract with Remington Licensing Corporation and (3) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of Seller's rights or interests in intellectual property that is not an Excluded Asset and any related remedies, including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including, without limitation, security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"Knowledge" or any other similar term or knowledge qualification means, with respect to (i) Seller, the actual conscious knowledge of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement and (ii) Buyer, the actual conscious knowledge of Aaron Kuehne (Secretary and Manager of Buyer) and Zach Michelson (Director - Corporate Development of Buyer) as of the date the applicable representation or warranty is made or deemed made under this Agreement.

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 43 of 149

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property, in each of the foregoing cases, to the extent possessed, used or occupied in connection with the Business.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"Leases" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases.

"Material Adverse Effect" means a state of facts, event, change or effect on the value of the Acquired Assets that results in a material and adverse effect on the value of the Acquired Assets taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy Case; (B) any action of Seller taken pursuant to, or any failure of Seller to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which Seller is a party; (C) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby, (D) changes, after the Effective Date, in United States generally accepted accounting principles, (E) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Seller operates the Business, (F) changes in the firearms, ammunition or sporting goods industries in general, (G) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared) or (H) any occurrence, outbreak, escalation or worsening of, or furloughs or Government actions (including any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other applicable Law, order, directive, guideline or recommendation by any Government of competent jurisdiction (collectively, "COVID Restrictions")) instituted in response to, any epidemic, pandemic or other disease (including without limitation the COVID-19 virus).

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Seller and used in the ownership, operation or management of the Business, but only to the extent set forth on Schedule

Case 20-81688-CRJ11   Doc 821-6   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. F - Sierra Bullets   L.L.C.   Page 44 of 149

1.1(a).

"<u>Pension Plan</u>" means Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), as amended from time to time, whereby the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan), as amended from time to time, was merged into the Remington Arms Company, LLC Pension and Retirement Plan.

"<u>Permit</u>" means any permit, license, authorization, registration or certificate obtained from any Government.

"<u>Permitted Liens</u>" mean: (a) Liens and Interests consisting of (i) current Taxes and assessments not yet due and payable, or Liens for Taxes that are being contested in good faith by appropriate legal proceedings and for which appropriate reserves under GAAP have been established in the Balance Sheets, (ii) all easements, rights-of-way, servitudes, covenants, conditions, restrictions, obligations and other similar matters of record affecting title to real property, (iii) statutory, common law or contractual liens of landlords, and (iv) the applicable zoning and use regulations or other Laws of any Government, in each case, that do not materially affect the current use of the underlying asset and are not violated in any material respect by the current use or occupancy of the Assumed Leased Real Property or the operation of the Business as currently conducted thereon; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy of use of an asset; and (d) all terms, conditions and restrictions under any applicable Permits.

"<u>Person</u>" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"<u>Plan</u>" means a Joint Chapter 11 Plan filed by Seller with the Bankruptcy Court.

"<u>Post-Closing Taxes</u>" means any Taxes, other than Transaction Taxes, imposed on the Acquired Assets in respect of a taxable period (or portion thereof) beginning after the close of business on the day prior to the Closing Date.

"<u>Pre-Closing Taxes</u>" means any Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business, in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"<u>Priority Term Loan</u>" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 45 of 149

further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Retained Litigation" means all litigation and Claims arising or related to events prior to the Closing.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Documents related to any of the foregoing.

"State of Alabama Project Development Liabilities" means all liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time.

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise (whether or not deferred), franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same

42

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 46 of 149

or a similar nature, whether arising before, on or after the Closing Date; and "Tax" shall mean any one of them.

"Utah Lease" means that certain leasehold interest in the real property of the Business located at 38 N. Frontage Road, Mona, Utah, 84645 pursuant to that certain Agreement of Lease dated December 31, 2009 by and between BCR Enterprises Ltd. and Barnes Bullets, LLC, as successor in interest to BB Acquisitions Holding, LLC, as amended by that certain Amendment No. 1 to Agreement of Lease dated December 1, 2019.

Section 12.2    All Terms Cross-Referenced. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Acquired Assets | Section 1.1 |
| Acquired Intellectual Property | Section 1.1(k) |
| Acquired Intellectual Property Assignment | Section 3.2(d) |
| Affiliate | Section 12.1 |
| Agreement | *Preamble* |
| Allocation | Section 8.3 |
| Alternative Transaction | Section 12.1 |
| Antitrust Law | Section 12.1 |
| Assignment and Assumption Agreement | Section 3.2(b) |
| Assignment and Assumption of Lease | Section 3.2(c) |
| Assumed Business Contracts | Section 1.1(i) |
| Assumed Contracts | Section 1.1(i) |
| Assumed FF&E Leases | Section 1.1(e) |
| Assumed Leased Real Property | Section 1.1(c) |
| Assumed Lease | Section 1.1(b) |
| Assumed Liabilities | Section 1.3 |
| Assumed Motor Vehicle Leases | Section 1.1(g) |
| Assumed Policies | Section 1.1(h) |
| Avoidance Actions | Section 12.1 |
| Bankruptcy Case | *Recitals* |
| Bankruptcy Code | *Recitals* |
| Bankruptcy Court | *Recitals* |
| Bidding Procedures Order | *Recitals* |
| Brand Name | Section 12.1 |
| Break Fee | Section 10.2(c) |
| Business | *Recitals* |
| Business Day | Section 12.1 |
| Buyer | Preamble |
| Buyer Acquisition Vehicle | Section 12.1 |
| Buyer Plans | Section 7.3 |
| Cash | Section 12.1 |
| CBA | Section 12.1 |

43

City of Huntsville Project Development Liabilities.................................................... Section 12.1
Claims ................................................................................................................. Section 12.1
Closing ................................................................................................................. Section 3.1
Closing Date......................................................................................................... Section 3.1
Code ..................................................................................................................... Section 12.1
Confidentiality Agreement...................................................................................Section 5.1(b)
Contract............................................................................................................... Section 12.1
COVID Restrictions............................................................................................ Section 12.1
Creditworthy ....................................................................................................... Section 12.1
Cure Amount....................................................................................................... Section 1.5(a)
Customer Order................................................................................................... Section 1.1(l)
Documents .......................................................................................................... Section 12.1
DOJ ..................................................................................................................... Section 5.3(b)
Effective Date ......................................................................................................Preamble
Employee Benefit Plans ...................................................................................... Section 12.1
Employee Liabilities ........................................................................................... Section 12.1
Employee Records .............................................................................................. Section 12.1
Employees............................................................................................................ Section 12.1
Environmental Laws ........................................................................................... Section 12.1
ERISA ................................................................................................................. Section 12.1
Excluded Assets .................................................................................................. Section 1.2
Excluded Employee Liabilities ...........................................................................Section 1.3(e)
Excluded Liabilities ............................................................................................ Section 1.4
Final Order .......................................................................................................... Section 12.1
FTC ..................................................................................................................... Section 5.3(b)
Good Faith Deposit............................................................................................. Section 2.2(a)
Government.......................................................................................................... Section 12.1
Gross Closing Cash Payment ..............................................................................Section 2.1(a)
HSR Act .............................................................................................................. Section 12.1
Insurance Policies ...............................................................................................Section 1.2(a)
Intellectual Property............................................................................................ Section 12.1
Intercompany Note.............................................................................................. Section 12.1
Interests ............................................................................................................... Section 12.1
Inventory ............................................................................................................. Section 1.1(n)
Law ..................................................................................................................... Section 4.1(c)
Leased FF&E ...................................................................................................... Section 1.1(e)
Leased Motor Vehicles .......................................................................................Section 1.1(g)
Leased Real Property .......................................................................................... Section 12.1
Leasehold Improvements .................................................................................... Section 12.1
Leases.................................................................................................................. Section 12.1
Lien ..................................................................................................................... Section 12.1
Material Adverse Effect ...................................................................................... Section 12.1
Necessary Consent .............................................................................................. Section 1.6
Net Closing Cash Payment .................................................................................Section 2.2(b)
Other Agreements ............................................................................................... Section 1.8
Other Buyer......................................................................................................... Section 1.1(t)

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 48 of 149

Order ................................................................................................. Section 4.1(c)
Outside Date ...................................................................................... Section 10.1(b)
Owned FF&E ...................................................................................... Section 1.1(d)
Owned Motor Vehicles ....................................................................... Section 1.1(f)
Owned Real Property .......................................................................... Section 12.1
Pension Plan ....................................................................................... Section 12.1
Permitted Liens .................................................................................. Section 12.1
Person ................................................................................................. Section 12.1
Petition Date ...................................................................................... *Recitals*
Plan .................................................................................................... Section 12.1
Priority Term Loan ............................................................................ Section 12.1
Purchase Orders ................................................................................. Section 1.1(m)
Purchase Price .................................................................................... Section 2.1
Qualifying Excluded Contracts and Leases ...................................... Section 1.5(d)
Related Person ................................................................................... Section 12.1
Retained Litigation ............................................................................ Section 12.1
ROC .................................................................................................... Preamble
Sale Hearing ...................................................................................... Section 1.5(a)
Sale Order ........................................................................................... *Recitals*
Seller .................................................................................................. Preamble
Seller's Knowledge ............................................................................ Section 12.1
Software ............................................................................................. Section 12.1
State of Alabama Project Development Liabilities ............................ Section 12.1
Subsidiary(ies) ................................................................................... Section 12.1
Tax Return .......................................................................................... Section 12.1
Taxes .................................................................................................. Section 12.1
Transaction Taxes .............................................................................. Section 8.1
Transferred Employees ...................................................................... Section 7.1
WARN Act .......................................................................................... Section 7.4(a)

*[Signatures are on the following pages.]*

Case 20-81688-CRJ11   Doc 821-6   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. F - Sierra Bullets   L.L.C.   Page 49 of 149

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER**

SIERRA BULLETS, L.L.C.

By: _____

    Name: Aaron Kuehne
    Title: Secretary

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 50 of 149

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By: _____
Name:
Title:

**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By: _____
Name:
Title:

FGI HOLDING COMPANY, LLC

By: _____
Name:
Title:

BARNES BULLETS, LLC

By: _____
Name:
Title:

REMINGTON ARMS COMPANY, LLC

By: _____
Name:
Title:

RA BRANDS, L.L.C.

By: _____
Name:
Title:

FGI FINANCE INC.

By: _____
Name:
Title:


HUNTSVILLE HOLDINGS LLC

By: _____
Name:
Title:


TMRI, INC.

By: _____
Name:
Title:


REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
Name:
Title:


32E PRODUCTIONS, LLC

By: _____
Name:
Title:

DISCLOSURE SCHEDULES

to

ASSET PURCHASE AGREEMENT

by and among

SIERRA BULLETS, L.L.C.

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.

Dated as of September 26, 2020

These Disclosure Schedules (these "Schedules" and each a "Schedule") are furnished pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of September 26, 2020, by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to the Agreement (collectively with ROC, "Seller"), and Sierra Bullets, L.L.C. ("Buyer"). All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement, unless the context otherwise requires.

These Schedules are hereby incorporated in and made a part of the Agreement as if set forth in full therein and are an integral part of the Agreement. The information contained in these Schedules is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party to the Agreement to any third party of any matter whatsoever (including any violation of law or breach of contract). These Schedules and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties or covenants of the Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. In disclosing the information in these Schedules, Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. The disclosures in these Schedules are to be taken as relating to the representations and warranties as a whole, notwithstanding the fact that these Schedules are arranged by sections corresponding to the sections in the Agreement, or that a particular section of the Agreement makes reference to a specific section of the Schedules, and notwithstanding that a particular representation and warranty may not make a reference to the Schedules. Disclosure of an item on one Schedule shall be deemed disclosure on all other Schedules to the extent that the relevance of such disclosure is readily apparent from its text.

Neither the specification of any dollar amount in any representation or warranty nor the disclosure of a document or information in these Schedules is intended, or shall be construed or offered in any dispute between the parties to the Agreement as evidence of, the materiality of such dollar amount, document or information, nor does it establish any standard of materiality upon which to judge the inclusion or omission of any similar documents or information in such Schedule or any other Schedule. The headings and descriptions of the disclosures herein are for convenience of reference only and are not intended and do not alter the meaning of any provision of the Agreement or these Schedules.

**<u>Schedule 1.1(h)</u>**
**<u>Assumed Benefit Plans</u>**

1. Barnes Bullets Reference Manual

**Schedule 1.1(i)**
**Assumed Business Contracts**

| Primarily Relates to | Location / Function | Contract Counter Party | Services Provided | Type | Inception Date | Expiration Date |
|---|---|---|---|---|---|---|
| Barnes | Barnes | BCR Enterprises Ltd | Lease agreement for the Mona, UT facility | Lease | 01/01/20 | 12/31/29 |
| Barnes | Sales | Norma Precision AB | International Sales Related | Contract | 08/05/19 | 10/31/29 |
| Barnes | Sales | Sako Ltd. | International Sales Related | Contract | 07/01/14 | 10/31/24 |

<u>**Schedule 1.1(k)**</u>
<u>**Intellectual Property**</u>

**1. Trademarks**

*See* attached Trademarks list.

**2. Patents**

| Owner | Patent Number | Description |
|---|---|---|
| RA Brands, LLC | 16/824,840 | AMMUNITION CARTRIDGE |

**3. Patent Applications**

| Owner | Application Number | Description |
|---|---|---|
| RA Brands, LLC | 63/017,129 | LOW DRAG, HIGH DENSITY CORE PROJECTILE |

**4. Domain Names**

barnesbullets.com

**5. Copyrights**

None.

**Schedule 1.2(r)**
**Excluded Assets**

1. Any and all of Seller's Contracts, Leases, locations and premises that Seller uses exclusively in its operations that are not included in the Business.

2. That certain Professional Employer Agreement by and between A Plus Benefits, Inc. and BB Acquisitions Holding, LLC dated as of January 1, 2010, providing for health insurance, voluntary dental insurance, group term life insurance, voluntary life insurance, long-term disability coverage, short-term disability coverage, supplemental medical coverage, flexible spending account plan, retirement plan, flexible spending account for dependent care, and health savings account, as restated in part by that certain Multiple Employer Participation Agreement, dated as of May 5, 2016.

3. Helpside Cafeteria Plan

4. Remington Arms Company, LLC Pension and Retirement Plan

5. Remington Arms Company 401(k) Plan

6. Remington Savings and Investment Plan

7. Remington Supplemental Retirement Plan

8. Remington Outdoor Company, Inc. 2018 Equity Incentive Plan

9. Remington Arms Company, LLC Welfare Plan

10. Remington Arms Company, LLC Consumer Driven Health Plan

11. Remington Arms Company, LA plus LC Medical Preferred Provider Plan

12. Remington Arms Company, LLC Union Medical PPO Plans – Options A, B and C

13. Remington Retiree Health and Welfare Plan

14. Any and all other pension, retirement, health, or welfare plans related to the Business

15. The following U.S. Patents: 8,752,484, 8,950,333, 9,207,052, and 9,366,512

16. All Contracts that are not (i) Assumed Contracts, (ii) licenses within the scope of Acquired Intellectual Property, (iii) Purchase Orders, (iv) Customer Orders, or (v) any rights to any warranties and licenses received from manufacturers, sellers or lessors, as applicable, in connection with the Acquired Assets

**<u>Schedule 1.3(h)</u>**
**<u>Assumed Liabilities</u>**

1. None

**Schedule 1.4(o)**
**Excluded Liabilities**

1. None.

**Schedule 1.5(a)**
**Estimated Cure Amount**

| Primarily Relates to | Location / Function | Contract Counter Party | Services Provided | Type | Inception Date | Expiration Date | Cure Costs [1] | Barnes Only AP Amount as of 09/24/20 [1] |
|---|---|---|---|---|---|---|---|---|
| Barnes | Barnes | BCR Enterprises Ltd | Lease agreement for the Mona, UT facility | Lease | 01/01/20 | 12/31/29 | N/A | N/A |
| Barnes | Sales | Norma Precision AB | International Sales Related | Contract | 08/05/19 | 10/31/29 | N/A | N/A |
| Barnes | Sales | Sako Ltd. | International Sales Related | Contract | 07/01/14 | 10/31/24 | N/A | N/A |

**Notes:**
[1] Amounts represent what has been recorded in the accounts payable ledger as of the September 24, 2020, noting that "N/A" means the Cure Cost is $0. These figures do not include (i) future commitments under the contracts, (ii) amounts due under development agreements, (iii) future commitments under any purchase orders and (iv) goods received and not invoiced. The Debtors are continuing to review and reconcile pre-petition liabilities and cure costs; all amounts are subject material change.

**Schedule 4.1(g)**
**Compliance with Law**

1. None

**<u>Schedule 4.1(h)</u>**
**<u>Contracts</u>**

1.  None.

## Schedule 4.1(i)
## Material Permits

a. Environmental

| Site | Type of Permit | Permit/ID # | Regulator (Agency) | Name of Permittee |
|------|----------------|-------------|--------------------|--------------------|
| Mona, UT | Storm Water - No exposure verification | DWQ-2018-003098 | State of Utah Division of Water Quality | Barnes Bullets |
| Mona, UT | Waste Water Permit Application | In-process | State of Utah Division of Water Quality | Barnes Bullets LLC |
| Mona, UT | Air Permit (Small source exemption) | DAQE-EN157070001-17 | State of Utah Department of Environmental Quality | Barnes Bullets |
| [Sturgis, SD | General Surface Water Discharge Permit | SDPG00020 | South Dakota Department of Environment and Natural Resources | Remington Arms dba Dakota Arms] |
| Mona, UT | Certificate of Occupancy | 776 | County of Juab | Barnes Bullets |

b. Special Tax Stamps and Federal Firearms Licenses

| Site | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|------|------------------------|------------------|--------------------|-----------------------|
| Mona, UT | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Barnes Bullets LLC |
| Mona, UT | Federal Firearms License | 9-87-023-10-2D-01362 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Barnes Bullets |
| Mona, UT | Federal Firearms License | 9-87-023-11-3E-02484 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Barnes Bullets |

## c. Import/Export

| Business Area | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ammunition | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202000369 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Barnes Bullets LLC |
| Ammunition | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 201905119 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Barnes Bullets LLC |
| Ammunition | Export License (Ruag Ammotec GmbH) | D1198672 | U.S. Dept. of Commerce, Bureau of Industry and Security | Remington Arms Company, LLC |
| Ammunition | Export License (Norma Precision AB) | D1199664 | U.S. Dept. of Commerce, Bureau of Industry and Security | Remington Arms Company, LLC |
| Ammunition | Export License (Sako Ltd) | D1197823 | U.S. Dept. of Commerce, Bureau of Industry and Security | Remington Arms Company, LLC |
| Ammunition | Annual Import Permit | PA074380/A | Natural Resources, Canada | Barnes Bullets LLC |

## d. Transportation

| Business Area | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ammunition | Classification of Explosives | EX2018012057 | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration | Barnes Bullets |

**<u>Schedule 11.5</u>**
**<u>Brokers and Finders</u>**

1.   Ducera Partners.

## Schedule 12.1(a)
## Brand Name

1.  The information in Schedule 1.1(k)(1) is hereby incorporated by reference.

# REMINGTON OUTDOOR COMPANY, INC.

## Barnes Bullets, LLC - Trademark Schedule

**Updated: September 25, 2020**

| Country | Trademark | Image | Record Owner | Status | Class | Goods | Appln. No. | Filing date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| United States | BARNES | | Barnes Bullets, LLC | Registered | 03 Int. | Cleaning preparations for use in cleaning firearms | 85/811,775 | 12/28/2012 | 4,387,530 | 8/20/2013 | 8/20/2023 |
| United States | BARNES | | Barnes Bullets, LLC | Registered | 13 Int. | Ammunition; bullets for reloading; gun cases | 85/811,776 | 12/28/2012 | 4,387,531 | 8/20/2013 | 8/20/2023 |
| United States | BARNES | | Barnes Bullets, LLC | Registered | 14 Int. | Paracord survival bracelets | 85/811,779 | 12/28/2012 | 4,595,248 | 9/2/2014 | 9/2/2024 |
| United States | BARNES | | Barnes Bullets, LLC | Registered | 16 Int. | Firearm ammunition reloading manuals | 85/811,780 | 12/28/2012 | 4,387,532 | 8/20/2013 | 8/20/2023 |
| United States | BARNES | | Barnes Bullets, LLC | Registered | 18 Int. | Sportsman's hunting bags | 85/811,782 | 12/28/2012 | 4,487,211 | 2/25/2014 | 2/25/2024 |
| United States | BARNES | | Barnes Bullets, LLC | Registered | 25 Int. | Hats, T-shirts, sweatshirts and hooded shirts | 85/811,785 | 12/28/2012 | 4,387,533 | 8/20/2013 | 8/20/2023 |
| United States | BARNES Logo | | Barnes Bullets, LLC | Registered | 03 Int. | Cleaning preparations for use in cleaning firearms | 85/811,786 | 12/28/2012 | 4,487,212 | 2/25/2014 | 2/25/2024 |
| United States | BARNES Logo | | Barnes Bullets, LLC | Registered | 13 Int. | Ammunition; bullets for reloading; gun cases | 85/811,788 | 12/28/2012 | 4,483,650 | 2/18/2014 | 2/18/2024 |
| United States | BARNES Logo | | Barnes Bullets, LLC | Registered | 16 Int. | Firearm ammunition reloading manuals | 85/811,792 | 12/28/2012 | 4,383,686 | 8/13/2013 | 8/13/2023 |
| United States | BARNES Logo | | Barnes Bullets, LLC | Registered | 18 Int. | Sportsman's hunting bags | 85/811,791 | 12/28/2012 | 4,383,685 | 8/13/2013 | 8/13/2023 |
| United States | BARNES Logo | | Barnes Bullets, LLC | Registered | 25 Int. | Hats, T-shirts, sweatshirts and hooded shirts | 85/811,774 | 12/28/2012 | 4,380,017 | 8/6/2013 | 8/6/2023 |
| United States | BARNES TSX | | Barnes Bullets, LLC | Registered | 13 Int. | Bullets | 77/786,189 | 7/21/2009 | 3,982,049 | 6/21/2011 | 6/21/2021 |
| United States | EXPANDER | | Barnes Bullets, LLC | Registered | 13 Int. | Ammunition | 78/730,460 | 10/11/2005 | 3,320,532 | 10/23/2007 | 10/23/2027 |
| United States | RANGE AR | | Barnes Bullets, LLC | Registered | 13 Int. | Ammunition | 86/494,262 | 1/2/2015 | 4,766,198 | 6/30/2015 | 6/30/2025 |
| United States | TAC-XPD | | Barnes Bullets, LLC | Registered | 13 Int. | Ammunition | 85/853,573 | 2/19/2013 | 4,503,058 | 3/25/2014 | 3/25/2024 |
| United States | TSX | | Barnes Bullets, LLC | Registered | 13 Int. | Bullets | 77/349,228 | 12/11/2007 | 3,753,578 | 3/2/2010 | 3/2/2030 |
| United States | VOR-TX | | Barnes Bullets, LLC | Registered | 13 Int. | Ammunition | 85/010,098 | 4/9/2010 | 3,982,498 | 6/21/2011 | 6/21/2021 |
| United States | X BULLET | | Barnes Bullets, LLC | Registered | 13 Int. | Bullets | 74/044,793 | 4/2/1990 | 1,632,289 | 1/22/1991 | 1/22/2021 |
| United States | VARMINT GRENADE | | Barnes Bullets, LLC | Registered | 13 Int. | Bullets; small arms projectiles; and ammunition | 77/197,245 | 6/4/2007 | 3,421,758 | 5/6/2008 | 5/6/2028 |

# **EXHIBIT 1**

(*See* attached Bidding Procedures Order)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-81688-11<br><br>Joint Administration Requested |

**ORDER ESTABLISHING BIDDING PROCEDURES RELATING
TO THE SALES OF ALL OR A PORTION OF THE DEBTORS' ASSETS**

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively, the "**Chapter 11 Cases**"), seeking entry of this order (this "**Bidding Procedures Order**") (i) approving the proposed bidding procedures attached hereto as <u>Exhibit 1</u> (the "**Bidding Procedures**") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of their assets (the "**Acquired Assets**") through one or more sales of the Acquired Assets (each, a "**Sale Transaction**" or "**Sale**"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama  35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

OMM_US:78645958.8

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 70 of 149

(iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto, including the procedures for the Debtors' selection of one or more stalking horse bidders (each, a "**Stalking Horse Bidder**"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (iv) scheduling (a) an auction (the "**Auction**") if the Debtors receive two (2) or more timely and acceptable Qualified Bids (as defined below), and (b) a final hearing (the "**Sale Hearing**") to approve one or more Sales of the Acquired Assets; and (v) granting related relief; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984, as amended on July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

OMM_US:78645958.8

C.     The notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Bidding Procedures Order is necessary or required.

D.     The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) approve the Bidding Procedures, including the procedures for selecting one or more Stalking Horse Bidders and the provision of the Bid Protections to be determined, (ii) establish the Assumption and Assignment Procedures, (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached hereto, (iv) schedule a date for the (a) Auction and (b) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, including the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Meyer Declaration**") and the *Declaration of Colin M. Adams in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Adams Declaration**") are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

E.     The Bidding Procedures, substantially in the form attached hereto as Exhibit 1 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

OMM_US:78645958.8

F.    The Debtors are authorized to pay the break-up fee and expense reimbursement comprising the Bid Protections.  The Bid Protections, to the extent payable under any Stalking Horse APA, (a)(x) are actual and necessary costs and expenses of preserving the Debtors' estate within the meaning of Section 503(b) of the Bankruptcy Code, and (y) shall be treated as allowed administrative claims against the Debtors' estates pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code, are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Acquired Assets, and the efforts that have been and will be expended by the Stalking Horse Bidders.  The Bid Protections are a material inducement for, and condition of, each Stalking Horse Bidder's execution of the applicable Stalking Horse APA.  Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidders are unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under its Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

G.    The Sale Notice and the Publication Notice, substantially in the forms attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Acquired Assets, including the sale of Acquired Assets free and clear of all liens, claims, and encumbrances, the Sale Transaction(s), the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

4

H. The Post-Auction Notice, substantially in the form attached hereto as Exhibit 4 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s), and no other or further notice is required.

I. The Assumption and Assignment Notice, substantially in the form attached hereto as Exhibit 5 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Costs, and no other or further notice is required.

J. The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motion is granted as set forth herein.[3]

2. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

---

[3] Notwithstanding anything to the contrary herein, the consummation of any Sale Transaction(s) is subject to entry of the Sale Order(s).

OMM_US:78645958.8

## I.  The Timeline for the Sale

3.  The Debtors are authorized to proceed with the Sale Transaction(s) in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

4.  Deadline

| Deadline | **Action** |
|---|---|
| August 18, 2020 at 10:00 a.m. (prevailing Central Time) | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| August 21, 2020 | Sale Notice Mailing Date |
| August 21, 2020 | Assumption and Assignment Service Date |
| September 1, 2020 at 4:00 p.m. (prevailing Central Time) | Sale Objection Deadline (defined below) excluding any objection based on identity of Stalking Horse Bidders, Successful Bidder or Backup Bidder or the form or substance of the Stalking Horse Bid, Successful Bid or Backup Bid |
| September 4, 2020 at 5:00 p.m. (prevailing Central Time) | Bid Deadline |
| September 8, 2020 at 12:00 p.m. (prevailing Central Time) | Reply Deadline (defined below) |
| September 8, 2020 by 4:00 p.m. (prevailing Central Time) or 14 days following service of the Supplemental Notice of Assumption and Assignment | Assumption and Assignment Objection Deadline (defined below) excluding any objection related to adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or Backup Bidder |
| September 17, 2020 at 10:00 a.m. (prevailing Central Time) | Auction |
| September 21, 2020 | Post-Auction Notice |
| September 23, 2020 at 10:00 a.m. (prevailing Central Time) | Sale Hearing |

6

OMM_US:78645958.8

5.      For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "**Modifications**") in accordance with the provisions of the Bidding Procedures; *provided, however*, that the Debtors shall consult with the Consultation Parties or, to the extent provided therein, the Bid Consultation Parties, with respect to any Modifications.  The Committee's right to request an extension of the above timeline for cause is expressly reserved.

**II.    The Bidding Procedures**

6.      The Bidding Procedures are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

7.      The Debtors are authorized, in accordance with the Bidding Procedures, to require Diligence Parties to submit written indications of interest specifying, among other things, the Acquired Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party.

8.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be **September 4, 2020 at 5:00 p.m. (prevailing Central Time)**.  Any disputes or objections to the selection of Qualified Bid(s), Successful Bid(s), or Backup Bid(s) (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

OMM_US:78645958.8

9.     The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on **September 17, 2020 at 10:00 a.m. (prevailing Central Time)** virtually via video conferencing technology, or at such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

10.     The Prepetition Secured Creditors shall have the right, subject in all respects to the Bankruptcy Code and other applicable law and the satisfaction in cash or assumption of claims secured by senior liens, to credit bid all or any portion of their allowed secured claims pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable provisions of the Prepetition Credit Documents and any such credit bid shall be deemed a Qualified Bid subject to the Intercreditor Agreement (as defined in the D'Arcy Declaration); *provided*, *however*, that nothing herein or in the Bidding Procedures shall affect or in any way limit the right or ability of any party in interest, including the Committee, to object to the Prepetition Secured Creditors' right to credit bid, including the nature, amount, or scope of such credit bid, subject to the (a) applicable provisions of the Court's *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling A Final Hearing* Docket No. 90, including paragraph 20 and the Challenge Period (as defined therein), as the same may be modified in accordance with its terms and (b) Sale Objection Deadline (as defined below).

## III.     Stalking Horse Bidder and Bid Protections

11.     In accordance with the Bidding Procedures, the Debtors may designate one or more Stalking Horse Bidders for the various segments of their business and may enter into an asset purchase agreement with each Stalking Horse Bidder (each, a "**Stalking Horse APA**"), subject to higher or otherwise better offers at the Auction, which establishes a minimum Qualified Bid at the Auction with respect to the assets that are the subject thereof.

OMM_US:78645958.8

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

OMM_US:78645958.8

parties expressing an interest in the Acquired Assets and all parties holding liens on such Acquired

Assets, three (3) business days' notice and an opportunity to object to the determination of such

Stalking Horse Bidder and disclosure of the Bid Protections set forth in the Stalking Horse APA,

and absent objection, the Debtors selection of such Stalking Horse Bidder shall be deemed

designated without further order of the Court. To the extent necessary, the Debtors' right to seek

this Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby

preserved.

## IV.    Notice Procedures

15.    The form of Sale Notice substantially in the form attached hereto as <u>Exhibit 2</u> is

approved.

16.    Within seven (7) days after the entry of this Bidding Procedures Order or as soon

as reasonably practicable thereafter, the Debtors shall serve the Sale Notice and this Bidding

Procedures Order, including the Bidding Procedures by first-class mail, postage prepaid, or, for

those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system,

by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with

respect to all or part of the Acquired Assets within the past two years; (ii) any parties identified by

AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest,

or encumbrance in or upon or with respect to any of the Acquired Assets; (iv) all federal, state,

and local regulatory or taxing authorities or recording offices which have a reasonably known

interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor

Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term

Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the

Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the

Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to FILO Lenders; (ix) counsel to

10

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 79 of 149

the Stalking Horse Bidder, if any; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; and (xvii) all known creditors of the Debtors, including their contract counterparties; *provided, however*, that to the extent email addresses are available, parties referenced in this paragraph 15 may be served by email.

17. Service of the Sale Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

18. The Publication Notice, substantially in the form attached hereto as <u>Exhibit 3</u>, is approved. The Debtors are directed to publish the Sale Notice, as modified for publication, in the *New York Times*, on one occasion on the Mailing Date or as soon as reasonably practicable thereafter. In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their case information website at https://cases.primeclerk.com/RemingtonOutdoor.

19. Service of the Publication Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to all unknown parties.

20. The form of the Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> is approved. As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, the Post-Auction Notice identifying any Successful Bidder(s).

## V. Assumption and Assignment Procedures

21. The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are approved.

OMM_US:78645958.8

22.     The Notice of Assumption and Assignment, substantially in the form attached hereto as Exhibit 5 is approved.

23.     On or before **August 21, 2020** (any such date, the "**Assumption and Assignment Service Date**"), the Debtors shall file with the Court, and post on the Case Website at https://cases.primeclerk.com/RemingtonOutdoor, the Notice of Assumption and Assignment and Designated Contracts List.  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice.   On the Assumption and Assignment Service Date, the Debtors shall serve, via first-class mail, a customized version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List, on all counterparties to the Designated Contracts.  In addition, the Debtors shall serve, via first-class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List on all parties on the Rule 2002 Notice List. Service of such Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

24.     Any objection by a counterparty to a Designated Contract (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; and (iii) include appropriate

OMM_US:78645958.8

documentation in support thereof. All Designated Contract Objections must be filed and served on (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, CA 90071, Attn: Steve Warren (swarren@omm.com) and Jennifer Taylor (jtaylor@omm.com); (ii) co-counsel for the Debtors, Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203, Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr (hlahr@burr.com); (iii) counsel for the Restructuring Committee, Akin Gump Strauss Hauer & Feld LLP, 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Schultz (sschultz@akingump.com); (iv) counsel for the Committee, Fox Rothschild LLP, 345 California Street, Suite 2200, San Francisco, California 94104, Attn: Michael A. Sweet (msweet@foxrothschild.com) and Baker Donelson Bearman Caldwell & Berkowitz, P.C., 420 20th Street North, Birmingham, Alabama 35203, Attn: Matthew Cahill (mcahill@bakerdonelson.com) and Rita Hullett (rhullett@bakerdonelson.com); (v) the Bankruptcy Administrator, 400 Well Street, Decatur, Alabama 35602, Attn: Richard Blythe (richard_blythe@alnba.uscourts.gov); (vi) counsel to the Stalking Horse Bidder, if any; (vii) counsel to the FILO Lenders, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998, Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com) and Andrew V. Alfano (andrew.alfano@pillsburylaw.com); (viii) counsel to Whitebox Advisors LLC, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Andreas Andromalos (aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com); (ix) all parties that have requested notice in the Chapter 11 Cases (collectively (i)–(ix), the "**Objection Recipients**"); and (x) counsel to any Successful Bidder(s), if known on the Sale Objection Deadline no later than 4:00 p.m. (prevailing Central Time) fourteen (14) days following the

13

Assumption and Assignment Service Date (the "**Assumption and Assignment Objection Deadline**").

25. If a Designated Contract Objection is not consensually resolved before the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

26. Any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, the Debtors reserve the right, and are authorized but not directed, to (i) supplement the Designated Contracts List with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

27. In the event the Debtors exercise any of the rights listed above, the Debtors shall promptly serve the Supplemental Notice of Assumption and Assignment by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each Designated Contract listed on the Supplemental Notice of Assumption and Assignment at the last known address available to the Debtors. Each Supplemental Notice of Assumption and Assignment shall set forth (i) the name and address of the counterparty to the Designated Contract listed thereon; (ii) the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder, if any, to withdraw such request for assumption and assignment of that Designated Contract prior to the closing of the applicable Sale Transaction); (iii) sufficient information to identify the Designated Contract; (iv) the Cure Costs, if any; and (v) proposed

OMM_US:78645958.8

adequate assurance, if known on the Assumption and Assignment Service Date. The Debtors are authorized, but not directed, to modify the Supplemental Notice of Assumption and Assignment as necessary and appropriate to provide customized individual notice to each Designated Contract counterparty. In addition, the Debtors are authorized, but not directed, to supplement the Designated Contract List on the Case Website with any additional Designated Contracts as the Debtors deem appropriate in their discretion. Service of such Supplemental Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

28. Any objection by a counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Supplemental Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; (iii) include appropriate documentation in support of the objection; and (iv) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment.

29. If a Supplemental Designated Contract Objection is not consensually resolved by the proposed effective date of assignment of the Designated Contract that is the subject of a Supplemental Designated Contract Objection, the Debtors shall seek an expedited hearing before

15

the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court, including by filing a certification of no objection, (a "**Supplemental Designated Contract Order**") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

30.     Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them, except with respect to adequate assurance of future performance by such Successful Bidder. For the avoidance of doubt, any objections to the proposed form of adequate assurance of future performance of any Successful Bidder (other than a Stalking Horse Bidder) must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

31.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take

16

assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an "executory" contract. Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final purchase agreement with the Successful Bidder(s) (each, an "**Acquired Contract**") will be assumed and assigned to the Successful Bidder(s).

32.     Assignment by the Debtors to the Successful Bidder of a contract, lease or any other liability assumed under Section 365 of the Bankruptcy Code or otherwise relieves the Debtors and their estates from any such liability so assigned.

## VI.     The Sale Hearing

33.     A Sale Hearing to (i) approve a sale of a portion or substantially all of the Acquired Assets to the Successful Bidder(s) and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on **September 23, 2020 at 10:00 a.m. (prevailing Central Time)**, and may be adjourned or rescheduled without notice, subject to paragraph 4 of this Bidding Procedures Order. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid(s) and the Backup Bid(s) (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction(s) and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Bankruptcy Court.

OMM_US:78645958.8

34.     Any and all objections, if any, to any Sale Transaction (but excluding any objection based on the specific identity of any Stalking Horse Bidder, the form or substance of any Stalking Horse APA, the specific identity of the Successful Bidder or the Backup Bidder, or the form or substance of the Successful Bid or the Backup Bid) must be filed no later than **September 1, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**").  Any and all such objections must be served on the Objection Recipients and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.  All replies to such objections must be filed by **September 8, 2020 at 12:00 p.m.** (prevailing Central Time) (the "**Reply Deadline**").

35.     Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Debtors' Acquired Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

36.     Promptly following the Auction, the Debtors shall serve the Post-Auction Notice. The Debtors propose that any objections regarding the adequate assurance of future performance of the Successful Bidder or the Backup Bidder (other than the Stalking Horse Bidder) may be raised at the Sale Hearing.

**VII.    Other Provisions**

37.     Notwithstanding anything herein or in the Bidding Procedures to the contrary, the Debtors shall not be permitted to modify the consultation rights of the Consultation Parties or the Bid Consultation Parties in the Bidding Procedures absent further order of this Court or the consent of any affected Consultation or Bid Consultation Parties.

38.     Oneida's rights and priority in connection with any security interests it held in any assets of the Debtors pre-petition are hereby preserved and retained by Oneida to the extent they

18

OMM_US:78645958.8

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 87 of 149

existed pre-petition and any such security interests shall attach to proceeds of such assets with the same priority, extent, validity, avoidability and enforceability. Nothing herein shall constitute a finding or ruling by this Court that any such security interests are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such security interest.

39.     The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Bidding Procedures Order.

40.     This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

41.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

42.     To the extent this Bidding Procedures Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Bidding Procedures Order shall govern.

43.     To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

44.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

OMM_US:78645958.8

45.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse APA, and the implementation of this Bidding Procedures Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

OMM_US:78645958.8

# **Exhibit 1**

## **Bidding Procedures**

OMM_US:78645958.8

# **EXHIBIT 2**

(*See* attached Transition Services Agreement)

EXHIBIT 2

## TRANSITION SERVICES AGREEMENT

**THIS TRANSITION SERVICES AGREEMENT** (this "<u>Agreement</u>"), dated as of this [●] day of [●], 2020, is entered into by and among Remington Outdoor Company, Inc. ("<u>ROC</u>", and together with the subsidiaries of ROC set forth on the signature pages hereto, "<u>Seller</u>"), and Sierra Bullets, L.L.C., a Delaware limited liability company ("<u>Buyer</u>", and together with Seller, the "<u>Parties</u>" and each a "<u>Party</u>"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

## <u>RECITALS</u>

**WHEREAS**, Seller and Buyer are parties to that certain Asset Purchase Agreement, dated as of September [●], 2020 (as amended from time to time in accordance with its terms, the "<u>Purchase Agreement</u>"), pursuant to which, among other things, Buyer will purchase and assume from Seller certain assets, properties and rights and certain specified liabilities and obligations of Seller;

**WHEREAS**, to facilitate the transactions contemplated by the Purchase Agreement, Seller and Buyer have agreed to provide each other certain Transition Services (as defined below); and

**WHEREAS**, the Parties are willing to provide such respective services upon the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants, promises, representations, and warranties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

ARTICLE 1

<u>SERVICES PROVIDED</u>

1.1.    During the Term (as defined below), Seller will provide, or cause to be provided, to Buyer those specific services as described and for up to the length of time specified on <u>Schedule 1</u> to this Agreement, upon the terms and subject to the conditions set forth in this Agreement (the "<u>Seller Transition Services</u>"); provided that Seller may delegate all or any portion of its obligations to perform Seller Transition Services hereunder to M-III Partners, LP or its affiliates, to former employees of Seller re-engaged as contractors for the benefit of the Seller's bankruptcy estate, or other third-party firms; and <u>provided</u> <u>further</u> that Seller Transition Services shall for all purposes under this Agreement include only those services that are both (a) related to the Business and (b) not already provided to Buyer by the Transferred Employees.

1.2.    During the Term, Buyer will provide, or cause to be provided, to Seller those specific services as described and for up to the length of time specified on <u>Schedule 2</u> to this Agreement, upon the terms and subject to the conditions set forth in this Agreement (the "<u>Buyer Transition Services</u>" and, together with Seller Transition Services, the "<u>Transition Services</u>").

1

1.3.    During the Term, a Party may request that the other Party (i) provide additional Transition Services that are not currently described on Schedule 1 or Schedule 2 and/or (ii) make modifications to existing Transition Services. Seller or Buyer, as applicable, will use commercially reasonable efforts to accommodate any such reasonable requests. The requesting Party shall submit a request in writing to the other Party specifying the nature of the additional or modified Transition Services; the Parties shall negotiate as to any such applicable changes, including, without limitation, pricing, scope and term; and Schedule 1 or Schedule 2, as applicable, shall be amended to incorporate such changes that are finally agreed upon pursuant to a written instrument signed by Seller and Buyer.

ARTICLE 2

TERM AND TERMINATION

2.1.    The term of this Agreement (the "Term") will commence on the Closing Date and continue until the date that is the earlier of (i) the date that is twelve (12) months following the Closing Date and (ii) the date that Seller has wound-down, ceased operations, or has no employees or contractors capable of performing this Agreement (such date that is the earlier of (i) and (ii), the "Termination Date").

(a)    Upon transition of a Seller Transition Service to Buyer or upon Buyer's determination, prior to the Termination Date, that it otherwise no longer requires one or more Seller Transition Services, Buyer may terminate one or more Seller Transition Service(s) (the "Seller Terminated Transition Services") by providing thirty (30) days advance written notice thereof to ROC (or such other notice period as specified on Schedule 1 for the particular Seller Transition Service). Upon expiration of the applicable notice period, Seller's obligation under this Agreement to provide such Seller Terminated Transition Services shall terminate, and Buyer shall no longer be obligated to make payment for such Seller Terminated Transition Services (except with respect to any amounts due and owing for any Seller Transition Service performed prior to such termination). For the avoidance of doubt, other than Seller Terminated Transition Services, all other Seller Transition Services shall continue in accordance with the terms hereof.

(b)    Upon transition of a Buyer Transition Service to Seller or upon Seller's determination, prior to the Termination Date, that it otherwise no longer requires one or more Buyer Transition Services, Seller may terminate one or more Buyer Transition Service(s) (the "Buyer Terminated Transition Services") by providing thirty (30) days advance written notice thereof to Buyer (or such other notice period as specified on Schedule 2 for the particular Buyer Transition Service). Upon expiration of the applicable notice period, Buyer's obligation under this Agreement to provide such Buyer Terminated Transition Services shall terminate, and Seller shall no longer be obligated to make payment for such Buyer Terminated Transition Services (except with respect to any amounts due and owing for any Buyer Transition Service performed prior to such termination). For the avoidance of doubt, other than Buyer Terminated Transition Services, all other Buyer Transition Services shall continue in accordance with the terms hereof.

2.2.    This Agreement shall terminate on the Termination Date, but may be terminated earlier:

2

(a)     Upon the written mutual agreement of Buyer and ROC; or

(b)     By Seller or Buyer:

(i)     if the other Party defaults in the payment when due of any invoiced amount payable pursuant to Article 3 and such default continues unremedied for fifteen (15) days after written notice of such default is delivered to the defaulting Party; or

(ii)     if the other Party materially breaches of any of its obligations under this Agreement (other than with respect to any failure to make payments for invoiced amounts) and such breach is not cured within thirty (30) days after written notice of such breach is delivered to the breaching Party.

(c)     Notwithstanding any provision herein to the contrary, this Section 2.2, ARTICLE 3, ARTICLE 5, ARTICLE 8 and ARTICLE 10 shall survive the termination of this Agreement and no such termination shall relieve either Party for any liability arising prior to the date of such termination, including with respect to any payment obligations.

ARTICLE 3

CHARGES FOR SERVICES

3.1.     Seller will provide Seller Transition Services to Buyer and Buyer will pay the fee(s) set forth for each such Seller Transition Service in Schedule 1 to this Agreement. In addition to such amount, in the event that Seller incurs reasonable and documented out-of-pocket expenses in the provision of any Seller Transition Services, Buyer shall reimburse Seller for all such out-of-pocket expenses. Seller shall invoice Buyer at the end of each month for the amounts owed in connection with Seller Transition Services and any other amounts that may be due hereunder. With respect to any amounts owed in connection with any Seller Terminated Transition Service, Buyer shall only be obligated to pay a *pro rata* portion of the applicable monthly fee for such Seller Terminated Transition Service, based on the number of days elapsed in the applicable month up to, and including, the effective termination date.

3.2.     Buyer will provide Buyer Transition Services to Seller and Seller will pay the fee(s) set forth for each such Buyer Transition Services in Schedule 2 to this Agreement. In addition to such amount, in the event that Buyer or any of its Affiliates incurs reasonable and documented out-of-pocket expenses in the provision of any Buyer Transition Services, Seller shall reimburse Buyer for all such out-of-pocket expenses. Buyer shall invoice Seller at the end of each month for the amounts owed in connection with Buyer Transition Services and any other amounts that may be due hereunder. With respect to any amounts owed in connection with any Buyer Terminated Transition Service, Seller shall only be obligated to pay a *pro rata* portion of the applicable monthly fee for such Buyer Terminated Transition Service, based on the number of days elapsed in the applicable month up to, and including, the effective termination date.

3.3.     Each Party acknowledges and agrees that the other Party, at its reasonable discretion, may employ third-party service providers to perform or provide any of the Transition Services or any secretarial, administrative, telephone, e-mail or other services necessary or ancillary to the Transition Services, all of which may be contracted for separately by the Party

3

providing such Transition Services through a third party. The Party providing such subcontracted Transition Services shall cause each such third-party service provider to comply with the terms of this Agreement as if it were an original party hereto and to provide the Transition Services or ancillary services, as applicable, in the same manner and with the same level and quality of service and degree of care as the Party responsible for providing such Transition Services is obligated to provide under this Agreement. The Party subcontracting such Transition Services shall be liable to the other Party for any breach by such third-party service provider of the terms and conditions of this Agreement. Any fees charged by such third-party service providers shall be included in the invoiced amounts sent to Buyer or Seller, as applicable.

3.4. All consideration under this Agreement is exclusive of any sales, transfer, goods or services taxes or similar gross receipts based tax (including any such taxes that are required to be withheld, but excluding all other taxes including taxes based upon or calculated by reference to income, receipts or capital) imposed against or on services and other amounts due under this Agreement ("Sales Taxes") and such Sales Taxes will be added to the consideration payable by the Party receiving the Transition Services, where applicable. Such Sales Taxes shall be separately stated on the relevant invoice.

3.5. All amounts due to Buyer or Seller, as applicable, under this Agreement will be due and payable by wire transfer of immediately available funds within fifteen (15) calendar days of Seller's receipt or Buyer's receipt, respectively, of the invoice therefor. Such invoice will set forth in reasonable detail the amounts due and owing in respect of the Transition Services provided during the period since the immediately preceding invoice was submitted to the applicable Party, including fees for the Transition Services, any out-of-pocket expenses, third-party costs and any applicable Sales Taxes thereon.

3.6. In connection with the performance of the Transition Services, no Party shall have any obligation to (a) purchase, renew, upgrade, enhance or otherwise modify any computer hardware, software, or network environment currently used, (b) provide any support or maintenance services for any computer hardware, software, or network environment that has been upgraded, enhanced or otherwise materially modified such that the cost of performing, or ability to perform, such services is materially increased from the computer hardware, software, or network environment that is currently used or (c) convert from one format to another any business data for use by any Party or any other Person in connection with the Transition Services or otherwise.

ARTICLE 4

PERFORMANCE STANDARD

4.1. Buyer acknowledges that Seller is not in the business of providing Seller Transition Services (or services of a like nature) to third parties, and that Seller Transition Services are being provided to Buyer by Seller as an accommodation to facilitate the transactions contemplated by the Purchase Agreement. As such, nothing in this Agreement will require or be interpreted to require Seller or its Affiliates to provide a Seller Transition Service to Buyer beyond the scope, manner, content and quality standard of such Seller Transition Service as performed by Seller as of immediately prior to the Closing Date. Seller will perform, or cause to be performed, each Seller Transition Service in good faith, in accordance with applicable Legal Requirements and in

4

substantially the same manner and with substantially the same level and quality of service and degree of care as Seller provides the same or similar services to its operations during the Term.

4.2. Seller acknowledges that Buyer is not in the business of providing Buyer Transition Services (or services of a like nature) to third parties, and that Buyer Transition Services are being provided to Seller by Buyer as an accommodation to facilitate the transactions contemplated by the Purchase Agreement. As such, nothing in this Agreement will require or be interpreted to require Buyer or its Affiliates to provide a Buyer Transition Services to Seller beyond the scope, manner, content and quality standard of such Buyer Transition Services as performed by Seller or its Affiliates as of immediately prior to the Closing Date. Buyer will perform, or cause to be performed, each Buyer Transition Services in good faith, in accordance with applicable Legal Requirements, and in substantially the same manner and with substantially the same level and quality of service and degree of care as Buyer provides the same or similar services to its operations during the Term; provided, however, to the extent that Buyer is not transferred all or any of the necessary assets to perform any of the Buyer Transition Services (for any reason), and Buyer, in good faith, is unable to perform any of the Buyer Transition Services as a result thereof, then Buyer shall not be required to perform any such Buyer Transition Services. For the avoidance of doubt, this inability to perform any such Buyer Transition Service shall not constitute a breach of this Agreement.

4.3. Seller and Buyer acknowledge that any Other Buyer (as defined below) shall be a third-party beneficiary of, with rights to enforce, this Agreement.

ARTICLE 5

NO WARRANTIES; MAXIMUM LIABILITY

5.1. NONE OF SELLER, BUYER OR THEIR RESPECTIVE SUBSIDIARIES OR AFFILIATES MAKES ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSITION SERVICES TO BE PROVIDED HEREUNDER. NONE OF SELLER, BUYER OR THEIR RESPECTIVE SUBSIDIARIES OR AFFILIATES SHALL HAVE ANY LIABILITY TO ANY OTHER PARTY HERETO, OTHER THAN IN THE CASE OF INTENTIONAL MISCONDUCT OR FRAUD ON THE PART OF SUCH PARTY WITH RESPECT TO THE TRANSITION SERVICES TO BE PROVIDED HEREUNDER, AND IN SUCH CASE, THE MAXIMUM LIABILITY OF THE PARTIES AND THEIR RESPECTIVE SUBSIDIARIES AND AFFILIATES UNDER, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT AND/OR THE TRANSITION SERVICES PROVIDED BY OR ON BEHALF OF SUCH PARTY, AND THE SOLE REMEDY OF THE OTHER PARTY UNDER, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT AND/OR THE SERVICES, SHALL BE A REFUND OF THE PRICE PAID FOR THE PARTICULAR TRANSITION SERVICE OR A RE-DELIVERY (OR DELIVERY) OF SUCH TRANSITION SERVICE. IN NO EVENT SHALL EITHER PARTY OR ITS RESPECTIVE SUBSIDIARIES OR AFFILIATES BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, SPECULATIVE, REMOTE, PUNITIVE OR EXEMPLARY DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER RESULTING FROM NEGLIGENCE OF SUCH PARTY OR ITS SUBSIDIARIES OR AFFILIATES, OR OTHERWISE. EXCEPT AS MAY BE SPECIFICALLY PROVIDED HEREIN, ALL TRANSITION SERVICES ARE PROVIDED ON AN "AS IS"

5

BASIS WITHOUT ANY WARRANTY, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 6

### ACCESS RIGHTS

6.1. <u>Buyer's Facility Access</u>. During the Term, Buyer and its employees and representatives shall be provided reasonable access, during regular business hours and upon reasonable prior request, to, and office space within, Seller's facilities set forth on <u>Schedule 1</u> for the purpose of providing Buyer Transition Services.

6.2. <u>Seller's Facility Access</u>. During the Term, Seller and its employees and representatives shall be provided reasonable access, during regular business hours and upon reasonable prior request, to, and office space within, Buyer's facilities set forth on <u>Schedule 2</u> for the purpose of providing Seller Transition Services.

6.3. <u>Compliance with Rules and Regulations</u>. Each Party will instruct its personnel, agents, subcontractors, and other representatives to comply with the safety standards, security regulations and other published policies of the other Party while on the other Party's premises for purposes related to the Transition Services. Each Party shall ensure that when entering or within the other Party's premises, all such Party's personnel, agents, subcontractors, and other representatives must establish their identity to the satisfaction of security personnel and comply with all directions given by them, including directions to display any identification cards provided by such other Party.

## ARTICLE 7

### RELATIONSHIP MANAGEMENT

7.1. Seller and Buyer will each appoint one (1) individual to have primary responsibility and oversight for the provision of all services under this Agreement and to be each Party's primary point of contact (each, a "<u>TSA Coordinator</u>"). The initial TSA Coordinator on behalf of Seller will be [●]. The initial TSA Coordinator on behalf of Buyer will be [●]. Each of ROC and Buyer may replace its respective TSA Coordinator by providing written notice to the other Party in accordance with <u>Section 10.4</u>.

7.2. The TSA Coordinators will hold meetings, from time to time, to discuss the performance of this Agreement and seek in good faith to resolve any disputes that may arise pertaining to this Agreement.

7.3. In the event that either Seller or Buyer, in good faith, disputes any charge set forth on an invoice provided to it by the other Party (a "<u>Dispute</u>"), Buyer or Seller, as applicable, shall deliver a written statement to such other Party no later than five (5) calendar days prior to the date payment is due on such invoice providing a reasonably detailed description of each disputed item. Amounts not so disputed shall be deemed accepted and shall be paid in accordance with <u>Section</u>

6

<u>3.5</u>. The Parties shall work in good faith to resolve all Disputes within thirty (30) days following the delivery of a written statement to either Party, and the applicable Party's obligation to pay such disputed amounts shall be tolled during the pendency of such Dispute. In the event that Buyer and Seller are unable to resolve any Dispute involving amounts that exceed One Hundred Thousand Dollars ($100,000), in the aggregate, during such thirty (30) day period, the Parties shall submit such Dispute at the earliest possible date to mediation conducted in accordance with the Commercial Mediation Procedures of the American Arbitration Association, which shall be held in New York, New York or such other place as the Parties may mutually agree. Each Party shall bear its own costs and expenses in connection with such mediation and the Parties shall equally bear the costs of the mediation. The Parties agree to participate in good faith in the mediation and negotiations related thereto for a period of thirty (30) days or such longer period as they may mutually agree following the initial mediation session. Buyer and Seller shall continue performing the Transition Services in accordance with this Agreement during the pendency of any Dispute; provided, however, that such Transition Services shall not extend beyond the Term.

ARTICLE 8

<u>CONFIDENTIALITY</u>

8.1.    During the Term and for a period of three (3) years thereafter, each Party shall, and shall cause its personnel, agents and subcontractors or any other Persons providing Transition Services on its behalf to, keep confidential and not make available or disclose any non-public information or material of the other Party that is or has been (a) disclosed or made available to such Persons under or in connection with this Agreement, whether orally, electronically, in writing or otherwise, including copies, or (b) learned, acquired, or generated by such Persons in connection with this Agreement (collectively, "<u>Confidential Material</u>"), without the prior written consent of the other Party. Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Material as it uses to protect its own Confidential Material of like nature. Notwithstanding the foregoing, Confidential Material may be disclosed on an as needed basis to personnel, subcontractors, agents or advisors of the receiving Party as necessary for the purpose of fulfilling the receiving Party's obligations under this Agreement; <u>provided</u> that (i) the receiving Party takes all reasonable steps to ensure that any such Confidential Material disclosed to any of its Affiliates, personnel, subcontractors, agents or any other Persons providing Transition Services on its behalf pursuant to this <u>Section 8.1</u> is treated as confidential by such Persons and (ii) the receiving Party remains liable for any breach of this <u>ARTICLE 8</u> by such Persons.

8.2.    The provisions of this <u>ARTICLE 8</u> shall not apply to any Confidential Material which: (a) is or becomes commonly known within the public domain other than by breach of this Agreement or by breach of another agreement; (b) is obtained from a third party who is lawfully authorized to disclose such information free from any obligation of confidentiality; (c) is independently developed without reference to any Confidential Material; (d) is disclosed or used with the prior written approval of the disclosing Party; or (e) is disclosed by the receiving Party in response to a legal mandate (*e.g.*, a subpoena or court order), after the receiving Party promptly notifies the disclosing Party (to the extent permitted by applicable law) and provides a reasonable opportunity to oppose such mandate (to the extent permitted by applicable law).

7

## ARTICLE 9

## SYSTEM ACCESS

9.1.     If a Party is given access to the other Party's computer systems or software (collectively, the "Systems") in connection with the Transition Services, the Party given access shall, and shall cause its personnel, agents and subcontractors to, comply with all of the other Party's commercially reasonable system security policies, procedures and requirements that have been provided to it in writing (collectively, "Security Policies"), and not tamper with, compromise or circumvent any security or audit measures employed by such other Party. The Party given access shall, and shall cause its personnel, agents and subcontractors to, access and use only those Systems of the other Party for which it has been granted the right to access and use.

9.2.     Each Party is responsible for performing commercially reasonable checks on its personnel, agents, subcontractors or any other Persons providing Transition Services on its behalf, before granting such Persons access to use the other Party's Systems.

9.3.     Each Party shall use commercially reasonable efforts to ensure that only those of its personnel, agents, or subcontractors who are specifically authorized to have access to the Systems of the other Party gain such access, and prevent unauthorized access, use, destruction, alteration or loss of information contained therein, including notifying its personnel, agents, or subcontractors of the restrictions set forth in this Agreement and of the Security Policies.

9.4.     If, at any time, a Party given access to the other Party's Systems determines that any of its personnel, agents, or subcontractors has sought to circumvent, or has circumvented, the Security Policies, gained unauthorized access, or has engaged in activities that may lead to the unauthorized access, use, destruction, alteration or loss of data, information or software of the other Party, the Party given access shall promptly terminate any such Person's access to the Systems and immediately notify the other Party. The Parties shall use commercially reasonable efforts to cooperate with each other in investigating any apparent unauthorized access to the other Party's Systems.

## ARTICLE 10

## MISCELLANEOUS

10.1.     Entire Agreement; Assignment. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof. The rights and obligations under this Agreement may not be assigned by either Party without the prior written consent of the other Party which shall not be unreasonably withheld, conditioned or delayed; provided, however, that (a) either Party may assign its rights and obligations hereunder without such consent to a Subsidiary or Affiliate of such Party and (b) Seller shall have the right to assign its rights and obligations hereunder pursuant to the last sentence of this Section 10.1. This Agreement will be binding upon, inure to the benefit of, and be enforceable by the successors and permitted assigns of the Parties and the name of a Party appearing herein will be deemed to include the names of such Party's successors and permitted assigns to the extent

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 99 of 149

necessary to carry out the intent of this Agreement. Notwithstanding anything to the contrary herein, in the event that Seller sells, assigns or conveys a significant part of those of its assets that are not purchased and assumed by Buyer, including in connection with the Bankruptcy Case or otherwise, to one Person or a group of affiliated Persons (other than to Buyer) (an "Other Buyer"), then Seller (i) shall require the Other Buyer to assume all obligations and liabilities of Seller related to the relevant Transition Services being provided by Seller under this Agreement as if the Other Buyer was an original party to this Agreement and (ii) may, without the consent of Buyer, freely assign this Agreement in whole and all of its rights under this Agreement, to the Other Buyer and, with respect to each applicable Transition Service under this Agreement, the term "Seller" shall be deemed to include the Other Buyer to the extent that the Other Buyer is an obligee of such applicable Transition Service.

10.2. Relationship between the Parties. Each Party's relationship with the other hereunder shall be solely that of an independent contractor, and there is no agency, joint venture, partnership, or any other relationship between the Parties. Each Party shall be solely responsible for all salary, employment, payroll and other benefits of and liabilities owed to, and compliance with immigration and visa laws and requirements in respect of, its personnel assigned to perform services. In performing their respective duties hereunder, all personnel engaged in providing Transition Services shall be under the direction, control and supervision of the providing Party; and the providing Party shall have the sole right to exercise all authority with respect to the employment (including termination of employment), assignment and compensation of such personnel. The employees of the providing Party engaged in providing Transition Services to the receiving Party shall not, by virtue thereof, become employees of the receiving Party.

10.3. Data Ownership. Financial and accounting data newly created pursuant to a Transition Service provided hereunder and on behalf of the Party receiving such Transition Service shall be owned by such receiving Party. The Parties hereby acknowledge and agree that, as between the Parties, any and all intellectual property and other properties and assets owned or licensed by any Party hereunder shall remain at all times the sole and exclusive property and assets of such Party; provided that nothing herein shall create, grant or imply to any Party providing Transition Services any licenses under any trademark, patent or copyright or any other intellectual property right in respect of any intellectual property of the Party receiving Transition Services or its Affiliates. No Party or any of its Affiliates will otherwise gain, by virtue of this Agreement, any rights of ownership or use for any patents, copyrights, trade secrets, trademarks or any other intellectual property rights owned by the other Party or its Affiliates.

10.4. Notices.

(a) All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the Party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the Party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the Party as follows:

9

If to Seller:

     Remington Outdoor Company, Inc.
     100 Electronics Blvd., SW
     Huntsville, Alabama 35824
     Attention: Ken D'Arcy
     Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

     O'Melveny & Myers LLP
     400 South Hope Street
     Los Angeles, California 90071
     Attention: John-Paul Motley, Esq., and Stephen H. Warren, Esq.
     Phone: (213) 430-6100 and (213) 430-7875, respectively
     Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

     Sierra Bullets, L.L.C.
     1400 W Henry Street
     Sedalia, MO 65301
     Attention: Aaron Kuehne, Secretary
     Email: aaron.kuehne@sierrabullets.com

With a copy to (which copy alone shall not constitute notice):

     Kane Kessler, P.C.
     666 Third Avenue, 23rd Floor
     New York, NY 10017
     Attention: Robert L. Lawrence, Esq.
     Email: rlawrence@kanekessler.com

(b)     Any Party may change its address for the purpose of this <u>Section 10.4</u> by giving the other Party written notice of its new address in the manner set forth above

10.5.   <u>Cooperation</u>. The Parties will reasonably cooperate with each other in all matters relating to the provision and receipt of Transition Services hereunder and to mitigate problems should they arise. Either Party may substitute any of their controlled Affiliates to provide a service; <u>provided</u>, in each case, any additional cost to the receiving Party for a service caused by, relating to or arising out of any such substitution shall be borne by the providing Party for that service and, the performance and quality of the services provided by such controlled Affiliate shall ultimately be the responsibility of the original Party to this Agreement. To the extent that any service is provided or received by an controlled Affiliate of a Party, such Party shall cause (and be liable for) its respective controlled Affiliates to comply with the terms and conditions of this Agreement relating to the provision and receipt of services, and the performance and quality thereof, including

10

providing necessary information and documentation, as if such controlled Affiliate or successor were a "Party" under this Agreement.

10.6.    <u>Governing Law; Jurisdiction</u>. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

10.7.    <u>Waiver of Jury Trial</u>. EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.7</u>.

10.8.    <u>Construction</u>. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The Parties have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement.

10.9.    <u>Schedules</u>. All Schedules to this Agreement are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement.

10.10.    <u>Severability</u>. If any term, provision, agreement, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, agreements, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

10.11.  <u>Amendments; Waiver</u>. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Parties, or in the case of a waiver, by the Party waiving compliance. Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

10.12.  <u>Force Majeure</u>. No Party shall be responsible for failure to perform its respective obligations hereunder during the pendency of a force majeure which shall include, but not be limited to: fires; floods; riots; strikes; labor disputes; freight embargoes or transportation delays (not caused by such Party); inability or delay attributable to acts of third parties to secure fuel, material, supplies, equipment, or power at reasonable prices or on account of shortages thereof; acts of God or of the public enemy; any existing or future laws, rules, regulations, or acts of any federal, state, or local government (including specifically, but not exclusively, any orders, rules, or regulations issued by any official or agency of any such government, including those relating to any declared pandemic) that would prohibit under applicable law, or otherwise render impossible, performance hereunder; or any other cause beyond the reasonable control of a Party. The Party claiming that its failure to perform is caused by force majeure shall give written notice to the Party receiving the affected Transition Services as soon as reasonably practicable, stating the date and the anticipated impact of such event. During the pendency of such force majeure, the Party whose performance is prevented shall use commercially reasonable efforts to fulfill its obligations hereunder by other means, shall perform all other obligations under this Agreement that are not subject to a force majeure and, in any event, shall upon termination of such force majeure, promptly cure the failure to perform as soon as possible. If performance has not been cured within ten (10) days, the other Party may arrange for such performance from a third party (and deduct any reasonable out-of-pocket costs payable to the third party in connection therewith from the amounts due hereunder for the applicable affected services) or terminate this Agreement with respect to the affected Transition Service(s).

10.13.  <u>Counterparts and Facsimiles</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

[*Signatures are on the following pages.*]

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 103 of 149

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date first above written.

**SELLER:**

**REMINGTON OUTDOOR COMPANY, INC.**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**FGI OPERATING COMPANY, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**FGI HOLDING COMPANY, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**BARNES BULLETS, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**REMINGTON ARMS COMPANY, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**RA BRANDS, L.L.C.**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**OUTDOOR SERVICES, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

SIGNATURE PAGE TO TRANSITION SERVICES AGREEMENT

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 104 of 149

**FGI FINANCE INC.**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**HUNTSVILLE HOLDINGS LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**TMRI, INC.**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**REMINGTON ARMS DISTRIBUTION COMPANY, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**32E PRODUCTIONS, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

**GREAT OUTDOORS HOLDCO, LLC**

By: _____
    Name: Ken D'Arcy
    Title: Chief Executive Officer

SIGNATURE PAGE TO TRANSITION SERVICES AGREEMENT

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 105 of 149

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date first above written.

**BUYER:**

**SIERRA BULLETS, L.L.C.**

By: _____
    Name: Aaron Kuehne
    Title: Secretary

SIGNATURE PAGE TO TRANSITION SERVICES AGREEMENT

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 106 of 149

**SCHEDULE 1**

**Seller Transition Services**

(See Attached)

## Seller Transition Services

| Services | Projected Fee for Service |
|---|---|
| Financial Services<br>• Financial Reporting and Accounting<br>• Accounts Payable Services<br>• Payroll and Payroll Tax Services | At cost |
| IT Services<br>• Email Services<br>• Telecommunication Services<br>   ○ Telephone Services<br>   ○ Voice Mail<br>• Computer Services<br>   ○ EDI<br>   ○ ERP/Financial Systems<br>   ○ Warehouse Management Systems<br>   ○ Ecommerce Systems<br>• Hosting/Backup/Storage Services (maintain system and file storage; access to cloud-based storage and shared drives)<br>   ○ Server-based storage<br>   ○ On-site user support for computers<br>• Data Security<br>• Data Migration Services<br>• Support and Maintenance | At cost |

Case 20-81688-CRJ11   Doc 821-6   Filed 09/27/20   Entered 09/27/20 08:34:20   Desc
Exhibit Ex. F - Sierra Bullets   L.L.C.   Page 108 of 149

| | |
|---|---|
| Wi-Fi and Wired Network Connectivity | At cost |
| Firewall/VPN Capability | At cost |
| The benefit of all third-party contracts associated with the above-listed services or as otherwise listed on Exhibit A attached (collectively, the "TSA Contracts") during the Term, until the earlier of (i) Buyer's termination of the Services related to the TSA Contracts or (ii) Seller's termination of the applicable TSA Contract. | At cost |

# Transition Services Agreement

## Exhibit A

| Category | Location / Function | Contract Counter Party | Services Provided |
|---|---|---|---|
| Corporate | HR | SAP Success Factors | Premium Content Management (PCM) |
| Corporate | IT | Ameri100 | S/4HANA and HCM Suite Products |
| Corporate | IT | CISCO SmartNet (via SHI) | Cisco Equipment Maintenance |
| Corporate | IT | DPSI | Scanner Maint. |
| Corporate | IT | Paymetric | Credit Card Tokenization |
| Corporate | IT | Elavon | Payment Processing Solutions |
| Corporate | IT | SEI | HP / EMC Maint. |
| Corporate | IT | Windstream | Global WAN |
| Corporate | IT | Panaya | Testing Automation |
| Corporate | IT | AT&T | IP Flex at Madison |
| Corporate | IT | DPSI | Printer Maint. |
| Corporate | IT | Microsoft EA & SCE | Microsoft Licensing; excludes subscription |
| Corporate | IT | ERP Maestro | SAP SOD |
| Corporate | IT | Sunview Software | Change Gear |
| Corporate | IT | NetBrain | Network Monitoring Tool |
| Corporate | IT | SAP / SuccessFactors | SAP S4/HANA and SF Licensing |
| Corporate | IT | SAP C4C | SAP C4C Licensing |
| Corporate | IT | Segra | Data Center Hosting |
| Corporate | IT | Darktrace | Network Packet AI |
| Corporate | Marketing | Zmags Corp | Digital Catalog Software |
| Corporate | Marketing | MODX System | Website Hosting |
| Corporate | Marketing | NRA Publications | ROC print and digital advertising |
| Corporate | Marketing | Oracle/Bronto | Email Distribution Software |
| Corporate | Marketing | Widen Enterprise | Asset Management Software |
| Corporate | Marketing | Magento/Adobe | Ecommerce Software |
| Corporate | Licensing | Velocity | Rebate Processor |

## SCHEDULE 2

### Buyer Transition Services

Access Covenant. Upon reasonable request from Seller, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will following the Closing Date provide to Seller, and the accountants, counsel and representatives of Seller, including any administrator of the Plan or Seller's estate, such access to the pre-closing books and records relating to the Business as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation and litigation of claims and making of distributions contemplated under the Plan, or otherwise. Such access will include (a) reasonable access to Buyer's personnel, information technology systems and books and records and (b) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Seller engaged in such wind-down and liquidation process. Buyer will provide such services free of any charges, fees or rents, provided that Seller will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Seller's employees engaged in the liquidation).

Transitional License.  Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days, Buyer shall grant Seller a non-exclusive, royalty-free, non-transferrable, non-extendable right and license to use the Brand Name in connection with the firearms business, solely in connection with the wind-down and liquidation of Seller's estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.

# **EXHIBIT 3**

(*See* attached Proposed Sale Order)

EXHIBIT 3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1] | Case No. 20-81688-CRJ11 |
| Debtors. | Joint Administration Requested |

**ORDER APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE
AND CLEAR OF ALL CLAIMS, LIENS, AND INTERESTS**

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington

Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors

in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases seeking entry

of this order (this "**Sale Order**") (a) authorizing the sale of the Acquired Assets (as defined in the

Asset Purchase Agreement (as defined below)) free and clear of all Interests (as defined below),

pursuant to that certain Asset Purchase Agreement, dated as of September [__], 2020, attached

hereto as Exhibit A (the "**Asset Purchase Agreement**"), by and among the Debtors and Sierra

Bullets, L.L.C. (the "**Buyer**"), and all other transaction documents related thereto; (b) authorizing

the assumption and assignment of certain executory contracts and unexpired leases; and (c)

granting the related relief contemplated therein; and the Court having found that (i) the Court has

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Asset Purchase Agreement, as applicable.

jurisdiction over this matter; (ii) venue is proper in this District; (iii) this is a core proceeding; (iv) the notice of the Motion and the Sale Hearing (as defined below) was sufficient under the circumstances; and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); and based on the statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at a hearing before this Court on September 29 [and 30], 2020 (the "**Sale Hearing**"); and it appearing that no other notice need be given; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     **Jurisdiction, Core Proceeding, Statutory Predicates, and Venue**.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984 as amended July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Bankruptcy Code Sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     **Just Cause**.  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

C.     **Notice**.  The notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, the transactions contemplated therein or in connection therewith and corresponding transactions documents (the "**Transactions**"), and the proposed entry of this Sale Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  A

2

US_ACTIVE-154466812.6

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 114 of 149

reasonable opportunity to object or be heard regarding the relief granted by this Sale Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Accordingly, no further notice of the Motion, the Sale Hearing, or this Sale Order is necessary or required.

D. Actual written notice of the Motion, the Bidding Procedures, the Bidding Procedures Hearing, the Auction, the Sale Hearing, the Assumption and Assignment Procedures, the proposed Cure Costs, the Sale and all Transactions, and all deadlines related thereto has been given to all interested persons and entities, including, without limitation: (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) any parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to the FILO Lenders; (ix) counsel to the Stalking Horse Bidder; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; (xvii) all counterparties to the Designated Contracts; and (xviii) all known creditors of the Debtors, including their contract counterparties. The foregoing constitutes proper, timely, adequate, and

US_ACTIVE-154466812.6

sufficient notice under the particular circumstances of these Chapter 11 Cases, and no further notice need be provided.

E.      The Publication Notice was published in the *New York Times* on August 24, 2020. Such Publication Notice was compliant with the Bidding Procedures Order, and was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

F.      **Extensive Efforts by Debtors**.  Since before the commencement of the Chapter 11 Cases, the Debtors worked with their counsel and financial advisors to implement a viable transaction that would allow them to maximize the value of the Acquired Assets.  The Sale Transaction that is the subject of this Sale Order is the result of the Debtors' extensive efforts seeking to maximize recoveries to the Debtors' estates for the benefit of the Debtors' creditors.

G.      **Business Justification**.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) authorize the sale of the Acquired Assets free and clear of Interests other than Permitted Liens (as defined in the Asset Purchase Agreement) and Assumed Liabilities (as defined in the Asset Purchase Agreement); (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases; and (iii) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Sale Hearing, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

H.      **Bidding Procedures Order**.  The Bidding Procedures Order [Docket No. 411] was entered by the Court on August 20, 2020, which, among other things (i) approved the Bidding Procedures; (ii) established the Assumption and Assignment Procedures; (iii) approved the form

US_ACTIVE-154466812.6

and manner of notice with respect to all procedures, protections, schedules, and agreements described in the Motion and attached thereto; and (iv) scheduled a date for the Auction and Sale Hearing. The Bidding Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets.

I.     **Auction; Successful Bidder**. The sale process was properly conducted by the Debtors in accordance with the Bidding Procedures Order and in a manner designed to result in the highest or otherwise best offer for the Acquired Assets. At the Auction, the Debtors agreed in a reasonable exercise of their business judgment, in consultation with their management, the Restructuring Committee, advisors and the Bid Consultation Parties, to enter into and consummate Asset Purchase Agreement with the Buyer. At the conclusion of the Auction, the Buyer was determined to be the Successful Bidder.

J.     **Asset Purchase Agreement**. The consummation of the Transactions contemplated by the Asset Purchase Agreement, the Motion, and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

K.     **Sale Hearing**. The Sale Hearing occurred on September 29 [and 30], 2020 in accordance with the Bidding Procedures Order.

L.     **Adequate Marketing; Highest or Otherwise Best Offer.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, including the *Declaration of Ken D'Arcy in Support of Chapter 11 Petitions and First Day Pleadings of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors-Possession* [Docket No. 6 and the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion*

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 117 of 149

*and Bidding Procedures Motion* [Docket No. 355]; and (ii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, (a) the Debtors have adequately marketed the Acquired Assets and conducted a sale process in a non-collusive, fair and good faith manner in compliance with the Bidding Procedures Order; (b) the process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any interested party to make the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (c) the consideration provided by the Buyer in the Asset Purchase Agreement constitutes the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (d) the consideration provided by the Buyer in the Asset Purchase Agreement provides fair and reasonable consideration for the Acquired Assets and the assumption of the Assumed Liabilities and constitutes reasonably equivalent value, fair value and reasonable market value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, the District of Columbia, or other applicable law; (e) the Sale will provide a greater recovery for the Debtors' creditors with respect to the Acquired Assets than would be provided by any other practically available alternative; (f) taking into consideration all relevant factors and circumstances, and after taking account of the Bid Protections, no other entity has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates; and (g) the Debtors' determination that the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

M.    **No Successor Liability.**  Neither the Buyer nor any of its affiliates, officers, directors, shareholders, members, partners, principals or any of their respective representatives, successors, or assigns is an "insider or "affiliate" of the Debtors, as those terms are defined in the

US_ACTIVE-154466812.6

Bankruptcy Code, and no common identity of incorporators, directors, or stockholders existed or exists between the Buyer and the Debtors. The transfer of the Acquired Assets to and the assumption of the Assumed Liabilities by the Buyer, except as otherwise set forth in the Asset Purchase Agreement, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the operation of the Debtors' businesses prior to the closing of the Sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee, or vicarious liability. Pursuant to the Asset Purchase Agreement, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Buyer is not holding itself out to the public as an *alter ego* or a continuation of the Debtors. The Sale does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors. There is no substantial continuity between the Buyer and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyer. The Buyer is not a mere continuation of the Debtors or the Debtors' estates, and the Buyer does not constitute a successor to the Debtors or the Debtors' estates. None of the Transactions, including, without limitation, the Sale or the assumption and assignment of the Assigned Contracts, is being undertaken for the purpose of escaping liability for any of the Debtors' debts or hindering, delaying, or defrauding creditors under the Bankruptcy Code or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

US_ACTIVE-154466812.6

N.	**Acquired Assets Property of the Estate.**  The Acquired Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

O.	**Sale in Best Interest/Fiduciary Duties**.  The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to enter into the Asset Purchase Agreement and sell the Acquired Assets and such actions are appropriate under the circumstances of these Chapter 11 Cases, are in the best interests of the Debtors, their estates and creditors, and other parties in interest, and represent a reasonable exercise of business judgment by the Debtors and the Restructuring Committee and their fulfillment of their fiduciary duties under applicable law.  Approval of the Asset Purchase Agreement, the Sale, and the Transactions at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.  Unless the sale is concluded expeditiously, the recoveries of all of the Debtors' estates and constituencies are likely to be adversely affected.

P.	**Not a _Sub Rosa_ Plan.**  The consummation of the Sale outside of a plan of reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Asset Purchase Agreement, the Sale and the transactions contemplated therein and associated therewith do not constitute an impermissible _sub rosa_ Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

Q.	**Arm's-Length Sale.**  The Asset Purchase Agreement, the Sale, and the Transactions were negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors, their insiders and affiliates, nor the Buyer have engaged in any conduct that would cause or permit the

US_ACTIVE-154466812.6

Asset Purchase Agreement, the Sale, or any part of the transactions thereby to be avoided under Bankruptcy Code Section 363(n).

R.     **Good Faith Buyer.**  The Buyer is a good faith purchaser under Bankruptcy Code Section 363(m) and, as such, is entitled to all of the protections afforded thereby.  Specifically: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Buyer complied in all respects with the provisions of the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Buyer in connection with the Sale have been disclosed; (v) no common identity of directors, officers or controlling stockholders exists among the Buyer and the Debtors; (vi) the negotiations and execution of the Asset Purchase Agreement was at arm's-length and in good faith, and at all times each of the Buyer and the Debtors were represented by competent counsel of their choosing; (vii) the Buyer did not in any way induce or cause the Chapter 11 filing of the Debtors; and (viii) the Buyer has not acted in a collusive manner with any person.  The Buyer will be acting in good faith within the meaning of Bankruptcy Code Section 363(m) in closing the transactions contemplated by the Asset Purchase Agreement.

S.     **Corporate Authority.**  Each Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Acquired Assets has been duly and validly authorized by all necessary corporate actions of each of the Debtors; (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement; (iii) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby; and (iv) needs no consents or approvals, other

9

US_ACTIVE-154466812.6

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 121 of 149

than those expressly provided for in the Asset Purchase Agreement, which may be waived in accordance with the terms therewith.

T. **Free and Clear Findings Required by the Buyer.** The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Acquired Assets to the Buyer and the assumption and assignment of Acquired Contracts, were not, pursuant to Bankruptcy Code Section 363(f), free and clear (except for Permitted Liens and Assumed Liabilities) of (i) all liens (statutory or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, licenses, indentures, instruments, conditional sale arrangements, (ii) all claims as defined in Bankruptcy Code Section 101(5), including all rights or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected,

US_ACTIVE-154466812.6

allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (excluding Permitted Liens and Assumed Liabilities, (i), (ii), and (iii) collectively, the "**Interests**"). Except as expressly provided in the Asset Purchase Agreement, the Sale shall be free and clear of, and the Buyer shall not be responsible for, any Interests, including, without limitation, in respect of the following: (i) any rights or Interests based on any successor or transferee liability, (ii) any Interests that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or termination of the Debtors' or the Buyer's interest in the Acquired Assets, or any similar rights; (iii) any labor or employment agreements; (iv) mortgages, deeds of trust, and security interests; (v) intercompany loans and receivables between the Debtors and any non-Debtor subsidiary; (vi) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget

US_ACTIVE-154466812.6

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 123 of 149

Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "**COBRA**"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (1) the WARN Act (29 U.S.C. §§2101 *et seq*.); (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (xii) any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract that will be assumed and assigned pursuant to this Sale Order and the Asset Purchase Agreement; (xiii) any other Excluded Liabilities as provided in the Asset Purchase Agreement. A sale of the Acquired Assets other than one free and clear of all Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the Asset Purchase Agreement and approved herein free and clear of all Interests, except for Permitted Liens and Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

U. **Valid and Binding Transfer.** The transfer of the Acquired Assets to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets and, except for the Permitted Liens and Assumed Liabilities, will vest the Buyer with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Interests and any liabilities of the Debtors.

V. **Satisfaction of Section 363(f) Standards.** The transfer of the Acquired Assets to the Buyer under the Asset Purchase Agreement shall be a legal, valid, and effective transfer of all the legal, equitable, and beneficial right, title and interest in and to the Acquired Assets free and clear of all Interests, other than the Assumed Liabilities and Permitted Liens. The Debtors may

US_ACTIVE-154466812.6

sell the Acquired Assets free and clear of all Interests, except for the Permitted Liens and the Assumed Liabilities, because, in each case, one or more of the standards set forth in Bankruptcy Code Section 363(f)(1) through (5) has been satisfied, with all such Liens and Interests to attach to the proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect that they had as against the Acquired Assets, and any claims and defenses the Debtors and their estates may possess with respect thereto. Those holders of Interests, and non-debtor parties to the Assigned Contracts who did not object, or who withdrew their objections, to the Motion are, without limitation, deemed to have consented pursuant to Bankruptcy Code Section 363(f)(2). In all cases, each such person with Interests in the Acquired Assets is enjoined from taking any action against the Buyer, the Buyer's affiliates, or any agent of the foregoing to recover any such Interest.

W.     **Necessity of Order.** The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction without all of the relief provided for in this Sale Order (including, but not limited to, that the transfer of the Acquired Assets to the Buyer be free and clear of all Interests (other than Permitted Liens and the Assumed Liabilities)). The consummation of the Sale Transaction pursuant to this Sale Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

X.     **Time of the Essence**. The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets. Therefore, time is of the essence in consummating the Sale, and the Debtors and the Buyer intend to close the Sale as soon as reasonably practicable.

US_ACTIVE-154466812.6

Y.     **Assigned Contracts.**  The Debtors have demonstrated that it is their sound business judgment to sell, assume, and assign the "Assumed Contracts" and "Assumed Leases" (as such terms are defined in the Asset Purchase Agreement), including, without limitation, the unexpired leases and executory contracts designated on Schedule 1.1(j) of the Asset Purchase Agreement (or in the case of the Backup Bid, Schedule 1.1(h) of the Backup Bid Agreement (as defined below)) (collectively, the "**Assigned Contracts**" and, individually, an "**Assigned Contract**") to the Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Assigned Contracts being assigned to the Buyer are an integral part of the Acquired Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Assigned Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' estates.  No section of any Assigned Contract that purports to prohibit, restrict, impose any penalty or fee on, or condition the use, consideration, or assignment of any such Assigned Contract in connection with the Transactions shall have any force or effect.

Z.     **Cure and Adequate Assurance.**  Through Buyer's commitment to pay the Buyer's Cure Amount related to the Assigned Contracts and upon the payment of the Buyer's Cure Amount by the Buyer and the Seller's Cure Amount, if any, pursuant to the terms of the Asset Purchase Agreement, the Debtors and the Buyer, as applicable, have cured or otherwise have demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Closing (as defined in the Asset Purchase Agreement) under any of the Assigned Contracts, within the meaning of Bankruptcy Code Section 365(b)(l)(A).  The proposed Cure Costs or any other cure amount reached by agreement after any objection by a counterparty to an Assigned Contract (an "**Assigned Contract Objection**") or otherwise are deemed the amounts necessary to "cure" all

14

US_ACTIVE-154466812.6

"defaults," each within the meaning of Bankruptcy Code Section 365(b), under such Assigned Contracts. The Buyer's promise to perform the obligations under the Assigned Contracts shall constitute adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of Bankruptcy Code Sections 365(b)(l) and 365(f)(2). Subject to the Bidding Procedures Order, all counterparties to the Assigned Contracts who did not file an Assigned Contract Objection or an objection to the assumption and assignment of the Assigned Contracts prior to the Sale Hearing, are deemed to consent to the assumption by the Debtors of their respective Assigned Contract and the assignment thereof to the Buyer. The filed objections of all counterparties to the Assigned Contracts that were heard at the Sale Hearing (to the extent not withdrawn or adjourned), were considered by the Court, and are overruled on the merits with prejudice. The Court finds that, with respect to all such Assigned Contracts, the payment of the proposed Cure Costs by the Buyer or the Seller, as applicable, in accordance with the terms of the Asset Purchase Agreement is appropriate and is deemed to fully satisfy the Debtors' obligations under Bankruptcy Code Section 365(b). Accordingly, and without limitation of the Buyer's right under Sections 1.5(a) of the Asset Purchase Agreement, all of the requirements of Bankruptcy Code Section 365(b) have been satisfied for the assumption and the assignment by the Debtors to the Buyer of each of the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of Bankruptcy Code Section 365, it shall be transferred to the Buyer in accordance with the terms of this Sale Order that are applicable to the Acquired Assets.

AA. **Unenforceability of Anti-Assignment Provisions.** Any provisions in any Assigned Contract that restrict, limit, prohibit or condition the assumption, assignment, and sale of the Assigned Contracts or that allow the counterparty so such Assigned Contract to terminate,

15

recapture, impose any penalty or fee, accelerate, increase any rate, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, should be deemed and found to be unenforceable anti-assignment provisions that are void and of no force and effect within the meaning of Bankruptcy Code Section 365(f).

BB.     **Objections are Overruled**.  All objections to the relief requested in the Motion that have not been withdrawn, waived, adjourned or settled as announced to the Court at the Sale Hearing or by stipulations filed with the Court are overruled except as otherwise set forth herein.

CC.     **Final Order**.  This Sale Order constitutes a final order within the meaning of 20 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

DD.     **Best Interest**.  Entry of this Sale Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

EE.     **Findings and Conclusions**.  The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

<u>**General Provisions**</u>

1.     The Motion is granted and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

2.     Any objections to the entry of this Sale Order or to the relief granted herein or the relief requested in the Motion, including any objections to the proposed Cure Costs or the

16

assumption and assignment of any Assigned Contracts, that have not been adjourned, withdrawn, waived, or settled, or not otherwise addressed or resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

**Approval of the Sale of the Acquired Assets**

3.     The Debtors are authorized to enter into the Asset Purchase Agreement (and all ancillary documents) and all the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects.  The transfer of the Acquired Assets by the Debtors to the Buyer shall be a legal, valid and effective transfer of the Acquired Assets.

4.     Pursuant to Bankruptcy Code Section 363(b), the sale of the Acquired Assets to the Buyer free and clear of all Interests (other than the Permitted Liens and the Assumed Liabilities), and the transactions contemplated thereby is approved in all respects.

**Sale and Transfer of the Acquired Assets**

5.     Pursuant to Bankruptcy Code Sections 105, 363, and 365, the Debtors are authorized to (a) take any and all actions necessary or appropriate to perform their obligations under, and comply with the terms of, the Asset Purchase Agreement and consummate the Sale and the Transactions pursuant to, and in accordance with, the terms and conditions of the Asset Purchase Agreement and this Sale Order, including, without limitation (i) executing, acknowledging, and delivering such deeds, assignments, conveyances and other assurances, documents, and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets and (ii) entering into the Ancillary Agreements, any transition services or operations support agreements with the Buyer and any other agreements related to implementing the Transactions and (b) take any and all further actions as may be necessary or appropriate to the performance of their obligations as contemplated by the Asset Purchase Agreement or this Sale

US_ACTIVE-154466812.6

Order.  The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any reasonable expenses or costs that are required to be paid to consummate the Transactions or perform their obligations under the Asset Purchase Agreement.

6.     Following the Closing, the Debtors or the Buyer and/or their respective designees are authorized to execute and file a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, liabilities, and Interests in the Acquired Assets of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities).  Upon the Closing and the Debtors' receipt of the Purchase Price, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Acquired Assets and a bill of sale transferring good and marketable title in the Acquired Assets to the Buyer free and clear of all Interests, except for the Permitted Liens and Assumed Liabilities. Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions.

7.     Except for the Permitted Liens, Assumed Liabilities or as expressly provided in the Asset Purchase Agreement, pursuant to Bankruptcy Code Sections 105(a) and 363(f), upon the Closing and the Debtors' receipt of the Purchase Price, the Acquired Assets shall be transferred to the Buyer as required under the Asset Purchase Agreement, and such transfer shall be free and clear of all Interests of any person, including, without limitation, all such Interests specifically enumerated in this Sale Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests to attach to the proceeds of the Sale

US_ACTIVE-154466812.6

ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

8.    The transfer of the Acquired Assets to the Buyer pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Interests of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

9.    All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; *provided* that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order, or from enforcing its rights under Bankruptcy Code Section 365 or relieve the Buyer of any Assumed Liability.

10.    Except as expressly permitted by the Asset Purchase Agreement or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, contract counterparties and other creditors, holding liens, claims encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, against or in a Debtor or

US_ACTIVE-154466812.6

the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts, are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its respective successors and assigns, its respective property and the Acquired Assets, such persons' or entities' liens, claims, encumbrances, or other Interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability, *provided* that nothing herein shall impair or otherwise affect any right under Bankruptcy Code Section 365 of a lease or contract counterparty to an Assigned Contract under its respective Assigned Contract(s), or relieve the Buyer of any Assumed Liability.

11. Upon the Closing, each of the Debtors' creditors and any other holder of an Interest is authorized and directed, without cost to the Debtors, to execute such documents and take all other actions as may be necessary to release its Interest in the Acquired Assets, if any, as such Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements or other documents or agreements evidencing an Interest in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests, which the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then the Buyer and its designees are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Acquired Assets and to file, register, or otherwise record a

US_ACTIVE-154466812.6

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 132 of 149

certified copy of this Sale Order, which shall constitute conclusive evidence of the release of all Interests of any kind or nature whatsoever in the Debtors or the Acquired Assets (other than the Permitted Liens and Assumed Liabilities). Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Sale Order.

12. Upon the Closing and the Debtors' receipt of the Purchase Price, all entities that are currently, or on the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer, unless the Buyer otherwise agrees.

13. This Sale Order is self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

14. To the maximum extent permitted by applicable non-bankruptcy law, (a) the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval (collectively, the "**Permits**") of the Debtors with respect to and included in the Acquired Assets, and (b) all Permits that are included in the Acquired Assets are deemed to have been, and hereby are directed to be, transferred to the Buyer as of the Closing Date. Nothing in this Sale Order, and nothing in the foregoing sentence, authorizes the transfer or assignment of any governmental Permit or the discontinuation of any obligation thereunder without compliance with all applicable legal requirements and approvals under police or regulatory law. To the extent any Permit cannot be transferred to the Buyer in accordance with this paragraph, the Buyer, with such assistance from the Debtors as is required under the Asset Purchase

US_ACTIVE-154466812.6

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 133 of 149

Agreement, will work promptly and diligently to apply for and secure all necessary government approvals for the transfer or new issuance of the Permit(s) to the Buyer, and the Debtors shall maintain the Permits to the extent required under and subject to the terms of the Asset Purchase Agreement. For the avoidance of doubt, while nothing in this Sale Order or the Asset Purchase Agreement releases, nullifies, limits, waives, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit, Buyer shall be entitled to operate under each state Permit currently held by or on behalf of the Debtors in relation to the Acquired Assets until such time as each such Permit is transferred to the Buyer and/or an equivalent Permit is issued to the Buyer.

15.     To the extent provided by Bankruptcy Code Section 525, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement and this Sale Order.

**Implementation of the Sale**

16.     On Closing, the Buyer shall (a) pay the Purchase Price to the Debtors; (b) pay the Cure Costs as more fully described in paragraph 30 of this Sale Order and the Asset Purchase Agreement; (c) assume the Assumed Liabilities; and (d) perform any other obligations required to be performed by Buyer on the Closing. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Sale Order.

US_ACTIVE-154466812.6

17.     Within three (3) business days of the Debtors' receipt of the Net Sale Proceeds (as defined in the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 410] (as it may be modified from time to time, the "**Cash Collateral Order**")) from the sale of the Acquired Assets, the Debtors shall pay the Net Sale Proceeds of the Acquired Assets to the Priority Term Loan Agent, for the account of the Priority Term Loan Secured Creditors, to the extent required under and in accordance with the terms of the Cash Collateral Order or such other order of the Court.  Upon the Priority Term Loan Agent's timely receipt of such payment, (a) the Priority Term Loan Obligations shall be paid and satisfied to the extent of the payment and (b) all liens and security interests against the Acquired Assets securing the Priority Term Loan Obligations shall be automatically released and discharged without further action by any person.  Upon the payment in full in cash of the Priority Term Loan Obligations and the occurrence of the Challenge Period Termination Date (as defined in the Cash Collateral Order), (w) the Debtors shall have no further indebtedness, liabilities or obligations owing under the Priority Term Loan Credit Agreement or the other "Financing Agreements" (as defined in the Priority Term Loan Agreement, the "**Priority Term Loan Documents**"), (x) other than any provisions thereof that survive pursuant to the terms thereof, the Priority Term Loan Credit Agreement and all other Priority Term Loan Documents (including, without limitation, any mortgages, guaranties and security agreements) and all of the Debtors' obligations thereunder shall terminate and be of no further force and effect, (y) all liens and security interests against the property and assets of the Debtors securing the Priority Term Loan Obligations shall be automatically fully released and discharged without further action by any person, and (z) each

US_ACTIVE-154466812.6

deposit account control agreement in respect of or other sweeps or blocks of any Debtor's deposit accounts or lockboxes in favor of any of the Priority Term Loan Secured Parties shall terminate.

18.     The Debtors shall pay the Net Sale Proceeds from the sale of the Acquired Assets to the FILO Agent, for the account of the FILO Term Loan Secured Creditors, to the extent required under and in accordance with the terms of the Cash Collateral Order or such other order of the Court.  For the avoidance of doubt, any further payment to the FILO Agent shall be subject to orders previously entered by this Court and any further orders of this Court or provided under the Debtors' Chapter 11 plan.

19.     All parties in interest in these Chapter 11 Cases expressly reserve their rights with respect to any allocation of the Purchase Price or value among the purchased Acquired Assets, and any allocation of the Purchase Price or value among the purchased Acquired Assets as determined by the Buyer shall not be determinative or binding on any party in interest in these Chapter 11 Cases except as ordered by the Court after notice and a hearing.

**No Successor Liability**

20.     Other than as expressly set forth in the Asset Purchase Agreement, the Buyer shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Interests, including under any theory of successor or transferee liability, *de facto* merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, including without limitation, with respect to any of the following: (i) any foreign, federal, state, or local revenue law, pension law, ERISA, COBRA, tax law, labor law, employment law, the WARN Act, antitrust law, CERCLA, and any other environmental, health and safety laws, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations); (ii)

US_ACTIVE-154466812.6

under any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) under any unfair trade practices law, rule, regulation or doctrine with respect to the Debtors' liability under such law, rule, regulation or doctrine, or under any unfair trade practices liability law or doctrine; (iv) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (v) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (vi) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (viii) any environmental liabilities, debts, claims fines, penalties, or obligations arising from conditions, facts or circumstances first existing or occurring on or prior to the Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties or obligations arising under CERCLA, or any other environmental, health, and safety laws; (viii) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (ix) any liabilities, debts, claims, fines, penalties, or

US_ACTIVE-154466812.6

obligations of or required to be paid by the Debtors under any labor, employment, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations); (x) any bulk sale law; and (xi) any litigation. The Buyer shall have no liability or obligation under the WARN Act simply by virtue of its purchase of assets from the Debtors.

21.     The Buyer has given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer and which shall be deemed to have been given in favor of the Buyer by all holders of Interests and liabilities (except for Permitted Liens and the Assumed Liabilities) in or against the Debtors, or the Acquired Assets. Without limiting the Buyer's obligation to pay and satisfy the Assumed Liabilities, upon consummation of the Sale, the Buyer shall not be deemed to (a) be the successor to the Debtors or their estates, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors under any theory of law or equity as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Acquired Assets.

22.     Effective upon the Closing, except with respect to Assumed Liabilities and Permitted Liens, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Buyer or its assets (including the Acquired Assets) with respect to any (a) Claim or Lien or (b) successor or transferee liability, including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching,

US_ACTIVE-154466812.6

Case 20-81688-CRJ11     Doc 821-6     Filed 09/27/20     Entered 09/27/20 08:34:20     Desc
Exhibit Ex. F - Sierra Bullets     L.L.C.     Page 138 of 149

collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or Claim; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, or failing or refusing to renew any License, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

**Good Faith**

23.     The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer without collusion and in good faith, as that term is used in Bankruptcy Code Section 363(m), and, accordingly, the reversal or modification on appeal of the authorization provided in this Sale Order to consummate the Sale and the Transactions shall not affect the validity of the transactions (including the assumption and assignment of any of the Assigned Contracts). The Buyer is a purchaser in good faith of the Acquired Assets and is entitled to all the protections afforded by Bankruptcy Code Section 363(m).

24.     As a good faith purchaser of the Acquired Assets, the Buyer has not entered into an agreement with any other potential bidders at the Auction, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Acquired Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Buyer, and the Sale may not be avoided pursuant to Section 363(n) of the Bankruptcy Code.

25.     The consideration provided by the Buyer for the Acquired Assets under the Asset Purchase Agreement constitutes reasonably equivalent value, fair value, reasonable market value

US_ACTIVE-154466812.6

and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia. The Sale may not be avoided under Bankruptcy Code Section 363(n). The Asset Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing. Neither the Debtors nor the Buyer have entered into the Asset Purchase Agreement or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities. No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Buyer. The Court's approval of the Motion and the Asset Purchase Agreement are in the best interests of the Debtors, the Debtors' estates, their creditors, and all other parties in interest.

26.     The Buyer is not an "insider" as that term is defined in Section 101(31) of the Bankruptcy Code.

**Assumption and Assignment of Assigned Contracts; Assumed Liabilities**

27.     Pursuant to Bankruptcy Code Sections 105(a), 363, and 365, the Bidding Procedures Order, and subject to and conditioned upon the Closing of the Sale, the Debtors' sale, assumption and assignment to the Buyer of the Assigned Contracts is approved, and the requirements of Bankruptcy Code Section 365(b)(1) with respect thereto are deemed satisfied.

US_ACTIVE-154466812.6

28.     The Debtors are authorized in accordance with Bankruptcy Code Sections 105(a) and 365 to (i) assume and assign to the Buyer, effective as of the Closing and at such other times as may be specified in accordance with the terms and conditions of the Asset Purchase Agreement, as provided by, and in accordance with, the Bidding Procedures Order and the Asset Purchase Agreement, the Assigned Contracts free and clear of all Interests of any kind or nature whatsoever, other than the Permitted Liens and Assumed Liabilities, and (ii) execute and deliver to the Buyer such documents or other instruments as the Buyer reasonably deems necessary to assign and transfer the Assigned Contracts to the Buyer.

29.     The Assigned Contracts shall be transferred and assigned to, pursuant to the Bidding Procedures Order and the Asset Purchase Agreement, and thereafter remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Assigned Contract (including, but not limited to, those of the type described in Bankruptcy Code Sections 365(b)(2), (e)(1), and (f)) that prohibits, restricts, or conditions such assignment or transfer.  The Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Buyer.  The Debtors may assign each Assigned Contract in accordance with Bankruptcy Code Sections 363 and 365, and any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contracts or terminate, recapture, impose any penalty, condition, renewal, or extension, or modify any term or condition upon the assignment of such Assigned Contracts, constitute unenforceable anti-assignment provisions which are void and of no force and effect.  All other requirements and conditions under Bankruptcy Code Sections 363 and 365 for the assumption by the Debtors and assignment to the Buyer of each Assigned Contract have been satisfied.

US_ACTIVE-154466812.6

30.     All defaults and all other obligations or liabilities under any Assigned Contract occurring, arising, or accruing prior to the date of the assignment or transfer to the Buyer shall be deemed cured or satisfied upon payment by the Buyer and/or the Debtors (in each case in accordance with Section 1.5 of the Asset Purchase Agreement) of the proposed Cure Cost, as set forth in the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and Assignment, or any other cure amount reached by agreement after an Assigned Contract Objection or otherwise, and, without limiting the foregoing, no effect shall be given to any default of the type set forth in Bankruptcy Code Section 365(b)(2), or the type of default concerning an unexpired lease of real property described in Bankruptcy Code Section 365(b)(1) whether or not such Assigned Contract is an executory contract within the meaning of Bankruptcy Code Section 365.

31.     Each non-Debtor counterparty to the Assigned Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors, the Buyer, or their respective property (including the Acquired Assets) any fee, acceleration, default, breach, Claim (including any counterclaim, defense, or setoff capable of being asserted against the Debtors), pecuniary loss, or condition to assignment existing, arising, or accruing as of the Closing Date, or arising by reason of the Closing, including any breach related to or arising out of any change-in-control provision in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts, and (b) asserting against the Buyer (or its property, including the Acquired Assets) any Claim or Lien, counterclaim, breach, condition or setoff asserted or capable of being asserted against the Debtors existing as of the Closing Date or arising by reason of the Closing except for the Assumed Liabilities and Permitted Liens.

32.     The Cure Costs amounts listed on the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and Assignment, or any other cure amount reached by

US_ACTIVE-154466812.6

agreement after an Assigned Contract Objection or otherwise, reflect the sole amounts necessary under Bankruptcy Code Section 365(b) to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due to the non-debtor parties in connection with the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts. Notwithstanding anything to the contrary herein, if the Cure Costs for an Assigned Contract is determined to be greater than the proposed Cure Costs asserted in the Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment, the Buyer may decide, in its discretion, not to assume that Assigned Contract. Notwithstanding anything to the contrary herein, in each case in accordance with Bidding Procedures Order and the terms and conditions of the Asset Purchase Agreement, the Buyer may decide (i) not to assume one or more unexpired leases and executory contracts designated on Schedule 1.1(i) of the Asset Purchase Agreement (or in the case of the Backup Bid, Schedule 1.1(h) of the Backup Bid Agreement), and (ii) to supplement Schedule 1.1(i) of the Asset Purchase Agreement (or in the case of the Backup Bid, Schedule 1.1(h) of the Backup Bid Agreement) by including any previously omitted unexpired lease or executory contract.

33. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Contracts.

34. Notwithstanding anything in the Asset Purchase Agreement or this Sale Order to the contrary and for the avoidance of doubt, the Acquired Assets shall not include any of the Excluded Assets as set forth in Section 1.2 of the Asset Purchase Agreement.

35. The Buyer shall be responsible for the satisfaction of the Assumed Liabilities under the Asset Purchase Agreement, including without limitation the Buyer's Cure Amount arising

31

US_ACTIVE-154466812.6

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 143 of 149

under the Assigned Contracts. Except as provided in the Asset Purchase Agreement or this Sale Order, after the Closing, the Debtors and their estates shall have no further liability or obligations with respect to any Assumed Liability, including those arising under the Assigned Contracts, and all holders of such claims are forever barred and estopped from asserting any claims under any Assumed Liability (including those arising under the Assigned Contracts) against the Debtors, their successors or assigns, and their estates.

**Backup Bidder**

36.     Barnes Acquisition LLC is hereby approved as the Backup Bidder and pursuant to Bankruptcy Code Sections 105, 363, and 365, the Asset Purchase Agreement attached hereto as Exhibit B (the "**Backup Bid Agreement**") submitted by Barnes Acquisition LLC (the "**Backup Bidder**"), the sale of the Acquired Assets and consummation of the Sale to the Backup Bidder are hereby approved as the Backup Bid. The Backup Bid on the terms set forth in the Backup Bid Agreement is hereby approved and authorized as a Backup Bid and shall remain open as a Backup Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the Auction. In the event that the Successful Bidder cannot or refuses to consummate the Sale because of a breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not directed, to close, and take all actions necessary to close, with the Backup Bidder on the Backup Bid without further order of the Court, and in such case the findings and other provisions of this Sale Order shall apply to the Backup Bidder and the Backup Bid Agreement to the same extent they do with respect to the Buyer and the Asset Purchase Agreement.

US_ACTIVE-154466812.6

**Other Provisions**

37.     Nothing in this Sale Order or in the Asset Purchase Agreement entered into pursuant to this Sale Order releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit.

38.     This Sale Order and the Asset Purchase Agreement shall be binding in all respects upon all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Interests, all counterparties to the Assigned Contracts, all counterparties to contracts that are not assumed or assigned, all successors and assigns of the Buyer, each Debtor and their affiliates and subsidiaries, the Acquired Assets, and any trustees appointed in the Chapter 11 Cases or upon a conversion to cases under Chapter 7 of the Bankruptcy Code, and this Sale Order shall not be subject to amendment or modification and the Asset Purchase Agreement shall not be subject to rejection.  Nothing contained in any Chapter 11 plan confirmed in any Debtor's bankruptcy case, any order confirming any such Chapter 11 plan, or any other order in the Chapter 11 Cases shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or this Sale Order.

39.     To the extent applicable, the automatic stay pursuant to Section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Buyer to give the Debtors any notice provided for in the Asset Purchase Agreement, and (b) to allow the Buyer to take any and all actions permitted by the Asset Purchase Agreement.

40.     No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the Asset Purchase Agreement, the Motion, and this Sale Order.

US_ACTIVE-154466812.6

41.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) enforce the terms of the Asset Purchase Agreement; (ii) compel delivery of the Acquired Assets to the Buyer; (iii) interpret, implement, and enforce the provisions of this Sale Order; (iii) protect the Buyer, any of the Buyer's affiliates, or any agent of the foregoing, against any Interests against the Debtors or the Acquired Assets of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, and (iv) enter any order under Bankruptcy Code Sections 363 and 365.

42.     No brokers were involved in consummation of the Sale, and no brokers' commissions are due to any person in connection with the Sale; *provided, however*, that this provision does not impact any transaction or other fees due to investment bankers or financial advisors employed (a) by the Debtors, including, but not limited to Ducera Partners LLC, or certain of their creditors for which the Debtors may be obligated to pay in accordance with an engagement letter with such professional(s), or (b) by the Buyers.

43.     To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

44.     The failure to specifically include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

US_ACTIVE-154466812.6

45.     The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, *provided* that the Debtors shall provide the Bid Consultation Parties with three (3) business days' notice thereof and *provided* further that any such modification, amendment, or supplement does not, based on the Debtors' judgment, have a material adverse effect on the Debtors' estates.

46.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Debtors and the Buyer are authorized to close the transaction immediately upon entry of this Sale Order.  Time is of the essence in closing the transactions referenced herein, and the Debtors and the Buyer intend to close the transactions as soon as practicable.  This Sale Order is a final, appealable order and the period in which an appeal must be filed shall commence upon the entry of this Sale Order.

47.     The provisions of the Asset Purchase Agreement and this Sale Order may be specifically enforced in accordance with the Asset Purchase Agreement notwithstanding the appointment of any Chapter 7 or Chapter 11 trustee after the Closing.

48.     Headings utilized in this Sale Order are for convenience of reference only, and do not constitute a part of this Sale Order for any other purpose.

49.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

50.     The provisions of this Sale Order are non-severable and mutually dependent.

51.     <u>All issues raised by</u> Oracle America, Inc. ("**Oracle**") in *Oracle's Limited Objection and Reservation of Rights Regarding (a) Debtors' Motion for (a) an Order Establishing Bidding*

US_ACTIVE-154466812.6

*Procedures and Granting Related Relief and (ii) an Order or Orders Approving the Sale of the Debtors' Assets; and (b) Notice of Executory Contracts and Unexpired Leases that May Be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto* (the "Oracle Objection") [Docket No. 529] are expressly reserved. The Oracle Objection may be set for hearing on an expedited basis upon the request of Oracle and/or the Debtors.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

US_ACTIVE-154466812.6

**<u>Exhibit A</u>**

**Asset Purchase Agreement**

US_ACTIVE-154466812.6

Case 20-81688-CRJ11    Doc 821-6    Filed 09/27/20    Entered 09/27/20 08:34:20    Desc
Exhibit Ex. F - Sierra Bullets    L.L.C.    Page 149 of 149