# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1]<br><br><div align="center">Debtors.</div> | Chapter 11<br><br>Case No. 20-81688-CRJ11<br><br>Jointly Administered |

## NOTICE OF FILING ASSET PURCHASE AGREEMENTS FOR CERTAIN OF THE DEBTORS' NON-CORE IP ASSETS

**PLEASE TAKE NOTICE** that, on August 20, 2020, the United States Bankruptcy Court for the Northern District of Alabama (the "**Bankruptcy Court**") entered an order [Doc. 411] (the "**Bidding Procedures Order**"): (i) approving the proposed bidding procedures (the "**Bidding Procedures**") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of their assets (the "**Acquired Assets**") through one or more sales of the Acquired Assets (each, a "**Sale Transaction**" or "**Sale**"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**"); (iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements, including the Debtors' selection of one or more stalking horse bidders (each, a "**Stalking Horse Bidder**"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (iv) scheduling (a) an auction (the "**Auction**") if the Debtors receive two (2) or more timely and acceptable Qualified Bids (as defined below), and (b) a final hearing (the "**Sale Hearing**") to approve one or more Sales of the Acquired Assets; and (v) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, starting on September 17, 2020 at 10:00 a.m. (prevailing Central Time), pursuant to the Bidding Procedures Order, the Debtors conducted the Auction with respect to certain of the Acquired Assets, including certain of the Debtors non-core intellectual property assets (the "**Non-Core IP Assets**"). The Auction was suspended on September 24, 2020.

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, AL 35824.

PLEASE TAKE FURTHER NOTICE that, on September 29, 2020, at 9:00 a.m. (prevailing Central Time), the Bankruptcy Court conducted the Sale Hearing (as defined in the Bidding Procedures Order).

PLEASE TAKE FURTHER NOTICE that, on October 7, 2020, the Bankruptcy Court entered an order [Doc. 954] (the "**IP APA Process Order**") authorizing the Debtors to file with the Bankruptcy Court a copy of each asset purchase agreement related to the Non-Core IP Assets (each an "**IP APA**") upon finalization thereof (the date of such filing, the "**IP APA Service Date**").

PLEASE TAKE FURTHER NOTICE that the Debtors, in consultation with their professionals and the Bid Consultation Parties and in accordance with the IP APA Process Order, hereby file the following IP APAs:

- Asset Purchase Agreement by and among Franklin Armory Holdings, Inc., as buyer, and Remington Outdoor Company, Inc. and each of its subsidiaries party thereto, as sellers, attached hereto as Exhibit A; and

- Asset Purchase Agreement by and among Sportsman's Warehouse, Inc., as buyer, and Remington Outdoor Company, Inc. and each of its subsidiaries party thereto, as sellers, attached hereto as Exhibit B.

**PLEASE TAKE FURTHER NOTICE that any objection to any IP APA attached hereto must (i) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is five (5) business days after the date hereof (the "IP Sale Objection Deadline"), (ii) be limited to the proposed terms of the applicable IP APA (and may not include any objection to the sale generally, including those overruled at the Sale Hearing), and (iii) state with specificity the legal and factual basis thereof (an "IP Sale Objection").**

PLEASE TAKE FURTHER NOTICE that each IP Sale Objection must be timely filed and served on (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, California 90071, Attn: Steve Warren (swarren@omm.com) and Jennifer Taylor (jtaylor@omm.com); (ii) cocounsel for the Debtors, Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203, Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr (hlahr@burr.com); (iii) counsel for the Restructuring Committee, Akin Gump Strauss Hauer & Feld LLP, 2300 N. Field Street, Suite 1800, Dallas, Texas 75201, Attn: Sarah Schultz (sschultz@akingump.com); (iv) counsel for the Committee, Fox Rothschild LLP, 345 California Street, Suite 2200, San Francisco, California 94104, Attn: Michael A. Sweet (msweet@foxrothschild.com) and Baker Donelson Bearman Caldwell & Berkowitz, P.C., 420 20th Street North, Birmingham, Alabama 35203, Attn: Matthew Cahill (mcahill@bakerdonelson.com) and Rita Hullett (rhullett@bakerdonelson.com); (v) the Bankruptcy Administrator, 400 Well Street, Decatur, Alabama 35602, Attn: Richard Blythe (richard_blythe@alnba.uscourts.gov); (vi) counsel to the FILO Lenders, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998, Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com) and Andrew V. Alfano (andrew.alfano@pillsburylaw.com); (vii) counsel to Whitebox Advisors LLC, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Andreas Andromalos (aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com); (viii) all

parties that have requested notice in these Chapter 11 cases; and (ix) counsel to the Successful Bidder(s) related to the applicable IP APA (collectively (i)–(ix), the "**Objection Recipients**") no later than the IP Sale Objection Deadline.

       **PLEASE TAKE FURTHER NOTICE** that, if no timely IP Sale Objection is filed by the IP Sale Objection Deadline applicable to the IP APAs attached hereto, the Debtors shall file a certification of no objection and file a form of order approving the final sale of the Non-Core IP Assets under the terms of such IP APA without further hearings before the Bankruptcy Court.

       **PLEASE TAKE FURTHER NOTICE** that, if a timely IP Sale Objection is filed, the Debtors may seek an expedited hearing before the Bankruptcy Court to resolve any outstanding IP Sale Objections.

       **PLEASE TAKE FURTHER NOTICE** that this Notice of Filing Asset Purchase Agreements for Certain of the Debtors' Non-Core IP Assets is subject to the terms and conditions of the Motion, the Bidding Procedures Order, and the IP APA Process Order with such orders controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Non-Core IP Assets and/or copies of any related document may make a written request to: Ducera Partners, Attn: Bradley Meyer (bmeyer@ducerpartners.com) and Kishan Patel (kpatel@ducerapartners.com) and O'Melveny & Myers LLP, Attn: Steve Warren (swarren@omm.com) and Jennifer Taylor (jtaylor@omm.com). In addition, copies of the Motion, the Bidding Procedures Order, the IP APA Process Order, and this Notice may be examined by interested parties (i) free of charge at the website established for these Chapter 11 cases by the Debtors' claims agent, Prime Clerk, at https://cases.primeclerk.com/RemingtonOutdoor, or (ii) on the Bankruptcy Court's electronic docket for the Debtors' Chapter 11 cases, which is posted on the Internet at www.alnb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).

*(Remainder of page intentionally left blank)*

44331646 v1

Dated:     October 7, 2020

/s/ Derek F. Meek

**BURR & FORMAN LLP**
Derek F. Meek
Hanna Lahr
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone:   (205) 251-3000
Facsimile:    (205) 458-5100
Email: dmeek@burr.com
          hlahr@burr.com

- and -

**O'MELVENY & MYERS LLP**
Stephen H. Warren (admitted *pro hac vice*)
Karen Rinehart (admitted *pro hac vice*)
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:   (213) 430-6000
Facsimile:    (213) 430-6407

Jennifer Taylor (admitted *pro hac vice*)
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111
Telephone:   (415) 984-8700
Facsimile:    (415) 984-8701

*Attorneys for the*
*Debtors and Debtors in Possession*

4

**Exhibit A**

ASSET PURCHASE AGREEMENT

by and among

FRANKLIN ARMORY HOLDINGS, INC.

as Buyer,

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.
SET FORTH ON THE SIGNATURE PAGES HERETO,

as Seller

Dated as of October 7, 2020

# TABLE OF CONTENTS

**Page**

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS ................................... 5

    Section 1.1       Transfer of Acquired Assets ................................. 5
    Section 1.2       Excluded Assets ................................................... 5
    Section 1.3       Assumption of Liabilities ..................................... 8
    Section 1.4       Retention of Liabilities ........................................ 8
    Section 1.5       Assumed Licensing Agreements .......................... 10
    Section 1.6       Non-Assignment of Acquired Assets .................. 10
    Section 1.7       Further Conveyances and Assumptions ............... 10

ARTICLE 2. CONSIDERATION .................................................................................... 11

    Section 2.1       Consideration ..................................................... 11
    Section 2.2       Good Faith Deposit ........................................... 11

ARTICLE 3. CLOSING AND DELIVERIES ................................................................... 11

    Section 3.1       Closing .............................................................. 11
    Section 3.2       Seller's Deliveries ............................................. 11
    Section 3.3       Buyer's Deliveries ............................................ 12

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ............................................. 12

    Section 4.1       Representations and Warranties of Seller ........... 12
    Section 4.2       Representations and Warranties of Buyer ........... 13
    Section 4.3       Warranties Exclusive; Schedules ....................... 15
    Section 4.4       Survival of Representations and Warranties ....... 15

ARTICLE 5. COVENANTS OF THE PARTIES .............................................................. 16

    Section 5.1       Covenants of Seller ........................................... 16
    Section 5.2       Covenants of Buyer ........................................... 16

ARTICLE 6. ADDITIONAL AGREEMENTS ................................................................. 17

    Section 6.1       Bankruptcy Matters ........................................... 17
    Section 6.2       Transition Arrangements .................................... 18
    Section 6.3       Further Assurances ............................................ 18

ARTICLE 7. OMITTED ................................................................................................. 18

ARTICLE 8. TAXES ....................................................................................................... 18

    Section 8.1       Taxes Related to Purchase of Assets ................. 18
    Section 8.2       Cooperation on Tax Matters .............................. 19
    Section 8.3       Allocation of Purchase Price ............................. 19

ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ................. 20

    Section 9.1       Conditions Precedent to Performance by Seller ................. 20
    Section 9.2       Conditions Precedent to Performance by Buyer ................. 21

ARTICLE 10. TERMINATION ........................................................................................ 21

    Section 10.1      Conditions of Termination ................................. 21

Section 10.2    Effect of Termination; Remedies ...................................................... 23

ARTICLE 11. MISCELLANEOUS ............................................................................. 23

Section 11.1    Successors and Assigns.................................................................. 23
Section 11.2    Governing Law; Jurisdiction........................................................ 24
Section 11.3    WAIVER OF JURY TRIAL......................................................... 24
Section 11.4    Expenses ......................................................................................... 24
Section 11.5    Broker's and Finder's Fees .......................................................... 24
Section 11.6    Severability ................................................................................... 25
Section 11.7    Notices ........................................................................................... 25
Section 11.8    Amendments; Waivers.................................................................. 26
Section 11.9    Time of Essence ............................................................................ 26
Section 11.10   Specific Performance.................................................................... 26
Section 11.11   Public Announcements ................................................................. 26
Section 11.12   Entire Agreement.......................................................................... 27
Section 11.13   Parties in Interest.......................................................................... 27
Section 11.14   Bulk Sales Laws............................................................................ 27
Section 11.15   Construction................................................................................... 27
Section 11.16   Counterparts and Facsimile.......................................................... 27

ARTICLE 12. DEFINITIONS ..................................................................................... 28

Section 12.1    Certain Terms Defined.................................................................. 28
Section 12.2    All Terms Cross-Referenced........................................................ 35

# SCHEDULES

Schedule 1.1(a)    -    Acquired Intellectual Property
Schedule 1.1(b)    -    Other Assets
Schedule 1.2(q)    -    Excluded Assets
Schedule 1.3(c)    -    Assumed Liabilities
Schedule 1.4(v)    -    Excluded Liabilities
Schedule 4.1(e)    -    Compliance with Law
Schedule 12.1(a)   -    Permitted Liens

# EXHIBIT

Exhibit 1    -    Bidding Procedures Order

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of October 7, 2020 (the "<u>Effective Date</u>"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("<u>ROC</u>"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (collectively with ROC, "<u>Seller</u>"), and Franklin Armory Holdings, Inc., or a Buyer Acquisition Vehicle as assignee in accordance with <u>Section 11.1</u> ("<u>Buyer</u>"). Capitalized terms used in this Agreement are defined or cross-referenced in <u>Article 12</u>.

## *RECITALS*

A.      Seller is engaged in the manufacture and sale of firearms and firearm accessories at 1816 Remington Circle SW, Huntsville, AL 35824 (the "<u>Business</u>"). On July 27, 2020 (the "<u>Petition Date</u>") Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq*. (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Alabama (the "<u>Bankruptcy Court</u>" and the case arising under such petition, the "<u>Bankruptcy Case</u>").

B.      On the Petition Date, Seller filed a Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets pursuant to which Seller sought, and the Bankruptcy Court approved, the Bidding Procedures Order attached hereto as Exhibit 1 (the "<u>Bidding Procedures Order</u>").

C.      Buyer desires to purchase the Acquired Assets from Seller and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

D.      Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Seller.

E.      The Acquired Assets and Assumed Liabilities are assets and liabilities of Seller, which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "<u>Sale Order</u>"), which order will include the authorization for the assumption by Seller and assignment to Buyer of certain executory contracts and unexpired liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code. The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

## *STATEMENT OF AGREEMENT*

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

4

## ARTICLE 1. <u>PURCHASE AND SALE OF THE ACQUIRED ASSETS.</u>

Section 1.1    <u>Transfer of Acquired Assets</u>.  At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities) to the fully extent allowable under the law pursuant to 11 U.S.C. § 363(f).  For all purposes under this Agreement, the term "<u>Acquired Assets</u>" shall not include any Excluded Assets, and shall mean all of the following:

(a)    any and all Intellectual Property owned or purported to be owned by Seller that is set forth on <u>Schedule 1.1(a)</u> (the "<u>Acquired Intellectual Property</u>");

(b)    all information and assets that is set forth on <u>Schedule 1.1(b)</u> (the "<u>Other Assets</u>);

(c)    Claims (other than to the extent set forth in <u>Section 1.2</u>, including without limitation <u>Section 1.2(s)</u> or <u>Section 1.2(t)</u>) that are held by Seller that primarily relate to the Acquired Assets;

(d)    To the extent permitted by applicable Law (and other than all Documents of Seller held by Seller or Seller's counsel related to litigation or Claims for the Excluded Liabilities), all Documents that are primarily used in, held for use in or intended to be used in, or that primarily relate to, the Acquired Assets; <u>provided</u>, <u>however</u>, that Buyer shall provide Seller with reasonable access (during regular business hours with reasonable prior notice and without cost to Seller) to the same following the Closing to the extent reasonably necessary to permit Seller to wind-down and liquidate its estate after the Closing; and <u>provided</u>, <u>further</u>, that Seller shall keep such information confidential in accordance with all requirements of applicable Law.

Section 1.2    <u>Excluded Assets</u>.  Notwithstanding any provision to the contrary in <u>Section 1.1</u>, the Acquired Assets shall not include any right, title or interest of any Person other than Seller in any property or asset, or Seller's right, title and interest in, to and under properties and assets not used in connection with the ownership, operation and/or management of the Acquired Assets, and shall specifically exclude the following properties, Contracts, Leases, and other assets, interests and rights of Seller (all such items not being acquired by Buyer being referred to in this Agreement as the "<u>Excluded Assets</u>"):

(a)    all Intellectual Property other than the Acquired Intellectual Property, including all moral rights and goodwill associated therewith;

(b)    all rights of every nature and description under or arising out of (including rights to refunds or adjustments relating to, and proceeds and recoveries from): (i) all insurance policies of Seller; and (ii) all Benefit Plans (the foregoing clauses (i) and (ii) collectively, the "<u>Excluded Insurance Policies</u>");

(c)    any asset that is not owned or leased by Seller or not used or held for use in connection with the ownership, operation and management of the Acquired Assets;

5

(d)     any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that Seller shall provide Buyer with reasonable access to the same following the Closing to the extent relating to the Acquired Assets and when reasonably requested by Buyer;

(e)     all (i) prepaid premiums in respect of all Excluded Insurance Policies, (ii) retainers, prepayments or on-account cash paid to Seller's professionals and advisors, including any carve-out under any DIP Facility or cash collateral arrangements (whether retained in the Bankruptcy Case or otherwise), and (iii) other deposits, prepaid charges and expenses paid by Seller to the extent in connection with or relating to any Excluded Asset;

(f)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes (including Pre-Closing Income Taxes), including any refunds, overpayments or rebates of Pre-Closing Taxes (including Pre-Closing Income Taxes) for the pre-Closing portion of any Straddle Period, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(g)     all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller entity;

(h)     all Documents exclusively relating to any Excluded Asset;

(i)     all Documents exclusively relating to any Employees;

(j)     subject to Section 1.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities pursuant to Section 1.4(a));

(k)     all Employee Benefit Plans and all assets of, and Contracts exclusively relating to or associated with such plans;

(l)     all Cash and all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(m)     any rights of Seller under this Agreement or any Ancillary Agreement to which Seller is a party, including without limitation any rights relating to the Purchase Price;

(n)     copies of all Historic Firearms Books and Records of Seller;

(o)     all Documents of Seller held by Seller or Seller's counsel relating to (i) any litigation against Seller or (ii) the Excluded Employee Liabilities;

(p)     the D&O Insurance, and all proceeds thereof;

6

(q)    all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counterclaims, cross-claims and defenses related to any Excluded Liability;

(r)    any properties, Contracts, Leases, or other assets, interests and rights of Seller that (i) do not relate to the ownership, operation or management of the Acquired Assets or (ii) are otherwise set forth on Schedule 1.2(r)

(s)    all Avoidance Actions;

(t)    Claims held by Seller against any party that are covered by, relate to or are based upon any Excluded Insurance Policy or the D&O Insurance;

(u)    all Owned Real Property;

(v)    all Leases pursuant to which Seller has the right to possess, use, lease or occupy (or grant others the right to possess, use, lease or occupy) any Leased Real Property used in Seller's ownership, operation and management of the Business, together with all security and other deposits related thereto, prepaid rent and appurtenances thereto and associated therewith (collectively, the "Leases");

(w)    all Leasehold Improvements of Seller located on the Leased Real Property that is subject to the Leases (the "Leased Real Property");

(x)    all of Seller's owned (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property (including without limitation consumables located at the premises of the Business) that are not Acquired Assets (the "Owned FF&E"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E;

(y)    all of Seller's (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts used for the ownership, operation or management of the Business, that are in each case leased pursuant to any Contract (the "FF&E Leases" and the equipment, machinery, furniture, fixtures and improvements, tooling and spare parts so leased, the "Leased FF&E"), (ii) rights under the FF&E Leases, and (iii) to the extent assignable, rights to any warranties and licenses received from manufacturers and lessors of the Leased FF&E;

(z)    all of Seller's (i) owned cars, trucks and other motor vehicles (the "Owned Motor Vehicles"), and (ii) rights to the warranties and licenses received from manufacturers and sellers of the Owned Motor Vehicles;

(aa)    all of Seller's (i) cars, trucks and other motor vehicles that are leased pursuant to any Contract (the "Motor Vehicle Leases" and the cars, trucks and other motor vehicles so leased, the "Leased Motor Vehicles"), (ii) rights under the Motor Vehicle Leases, and (iii) rights to the warranties and licenses received from manufacturers and lessors of the Leased Motor Vehicles;

7

(bb)    all Employee Benefit Plans and all assets of, and Contracts relating to or associated with, such Employee Benefit Plans;

(cc)    all contracts, leases, licenses or other agreements (whether written or unwritten) (collectively, the "Business Contracts" and, together with the FF&E Leases, the Motor Vehicle Leases and the Benefit Plans, the "Contracts"); and

(dd)    all right, title and interest in and to all inventory, parts, supplies and finished goods related to the products or within the scope of the operations of the Business, whether in located at Seller's Owned Real Property, Leased Real Property or (to the extent within the scope of the operations of the Business) in the possession of any third-party bailees (collectively, the "Inventory").

Section 1.3    Assumption of Liabilities.  At the Closing, Buyer shall assume, and Buyer agrees to thereafter pay, perform and discharge when due, and indemnify, defend and hold harmless Seller, its Affiliates and all of their respective Related Persons from and against, any and all liabilities, Claims and obligations arising out of or relating to the ownership, operation or management of the Acquired Assets on or after the Closing, other than the Excluded Liabilities, including, without limitation, all of the following liabilities (all items in this Section 1.3 being, collectively, the "Assumed Liabilities"):

(a)    all Post-Closing Taxes (including those related to the post-Closing portion of any Straddle Period);

(b)    all liabilities and obligations for Transaction Taxes; and

(c)    all liabilities and obligations of Seller set forth on Schedule 1.3(c).

Section 1.4    Retention of Liabilities.  Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter.  All liabilities and obligations other than the Assumed Liabilities shall be retained by and remain liabilities and obligations of Seller (all such liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities").  The Excluded Liabilities include, without limitation, the following liabilities and obligations:

(a)    all liabilities and unperformed and unfulfilled obligations of Seller under the terms of any Contract (including all premium finance arrangements of Seller for contracts), and the Cure Amount in connection with the assignment of the Contracts to, and assumption by, Buyer;

(b)    all liabilities and obligations of Seller under the "Customer Orders" (hereinafter referred to as all sales orders to purchasers of goods, services, or products produced or sold by Business) and the "Purchase Orders" (hereinafter referred to as all outstanding purchase orders or other commitments of Seller to suppliers of goods and services for materials, supplies or other items used in connection with the ownership, operation, and/or management of the Business) (including liabilities in respect of customer deposits, security deposits and prepaid items);

8

(c)     all liabilities and obligations for all Pre-Closing Taxes (including those relating to the pre-Closing portion of any Straddle Period) including all Pre-Closing Income Taxes;

(d)     all liabilities and obligations under the CBA;

(e)     all liabilities and obligations under the Pension Plan;

(f)     all Employee Liabilities relating to Transferred Employees (the "Excluded Employee Liabilities");

(g)     all liabilities and obligations (including under applicable Environmental Laws and other Laws) arising out of or relating to Buyer's ownership or operation of the Acquired Assets prior to the Closing;

(h)     all City of Huntsville Project Development Liabilities;

(i)     all liabilities and obligations to indemnify and hold harmless any Seller D&Os or Transferred Employees; and

(j)     all liabilities and obligations under or relating to the Excluded Assets;

(k)     all liabilities and obligations of Seller under or relating to the Priority Term Loan, the FILO Facility, the Exit Term Loan or the Intercompany Note;

(l)     all Excluded Employee Liabilities;

(m)     all liabilities and obligations of Seller arising under or incurred in connection with the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which Seller is a party and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(n)     all liabilities of, and Claims against, Seller arising from and in connection with grants of restricted common unit/share awards and stock options by Seller;

(o)     any liabilities and obligations of Seller under this Agreement, or under any Ancillary Agreement to which Seller is a party;

(p)     all liabilities under any Contracts;

(q)     all State of Alabama Project Development Liabilities;

(r)     the Retained Litigation;

(s)     all other liabilities and obligations arising out of or relating to Seller's ownership, operation or management of the Acquired Assets prior to the Closing;

(t)     all liabilities arising out of transactions performed in accordance with Section 6.2; and

9

(u)    all liabilities set forth on <u>Schedule 1.4(u)</u>.

Section 1.5    [RESERVED].

Section 1.6    <u>Non-Assignment of Acquired Assets</u>.    Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof (after giving effect to any waiver by the applicable counterparty, or any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent.  In such event, Seller and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; <u>provided</u>, <u>however</u>, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained by the Closing, the applicable unassigned contract shall be deemed an Excluded Asset for all purposes under this Agreement, with no adjustment to the Purchase Price.

Section 1.7    <u>Further Conveyances and Assumptions</u>.  At the Closing, and from time to time thereafter, Seller and Buyer shall, and Seller and Buyer shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

Section 1.8    <u>Conflicts with Other Bidders</u>. In the event of any conflict between this Agreement and any other bidder or bidders for Sellers' assets relating to the Acquired Assets or the Assumed Liabilities as defined herein or in the applicable asset purchase agreement or agreements by and between Sellers and such other bidder or bidders (an "<u>Other APA</u>"), Buyer shall cooperate in good faith with any such other bidder or bidders, whether before or after the Closing Date, to ensure that all assets or liabilities are appropriately apportioned between Buyer and such bidder or bidders in order to reflect the intent of Buyer and any such other bidder or bidders under this Agreement and each applicable Other APA.

10

## ARTICLE 2. <u>CONSIDERATION</u>

Section 2.1 <u>Consideration</u>. The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets (the "<u>Purchase Price</u>") shall be One Million Seven Hundred Thousand United States Dollars (US $1,700,000) (the "<u>Gross Closing Cash Payment</u>"), to be adjusted pursuant to Section 2.2(b), and paid and delivered in accordance with <u>Section 3.3(a)</u>, plus the assumption by Buyer of the Assumed Liabilities.

Section 2.2 <u>Good Faith Deposit</u>.

(a) Prior to the execution and delivery of this Agreement, notwithstanding anything to the contrary in this Agreement, Buyer paid to Seller the amount of One Hundred Seventy Thousand United States Dollars (US $170,000) by wire transfer of immediately-available funds (the "<u>Good Faith Deposit</u>"). The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Seller or Buyer and shall be deposited in a segregated deposit account of Seller and held in trust to be administered solely in accordance with the terms of this Agreement and the Bidding Procedures Order. Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b) If the Closing occurs, the Gross Closing Cash Payment shall be reduced by the amount of the Good Faith Deposit (such resulting amount, the "<u>Net Closing Cash Payment</u>"), to be paid and delivered in accordance with <u>Section 3.3(a)</u>.

(c) If this Agreement is terminated pursuant to <u>Section 10.1</u>, the Good Faith Deposit shall be repaid to Buyer or retained by Seller in the amounts and at the times set forth in <u>Section 10.2(a)</u> through <u>Section 10.2(c)</u>.

## ARTICLE 3. <u>CLOSING AND DELIVERIES</u>

Section 3.1 <u>Closing</u>. Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Pacific Time, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in <u>Article 9</u> of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by Seller and Buyer, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "<u>Closing Date</u>").

Section 3.2 <u>Seller's Deliveries</u>. At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a) all of the Acquired Assets, together with one or more instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably

11

acceptable to Buyer and Seller, and, where applicable, log-in credentials necessary to access and effectuate the transfer of any Acquired Assets;

(b)　　one or more duly executed assignments of (i) the trademark and patent registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States), (ii) the Internet domain name registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for filing with all applicable domain name registries, and (iii) general assignments of all other Acquired Intellectual Property, in each case in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Acquired Intellectual Property Assignment"); and

(c)　　the officer's certificate required to be delivered pursuant to Section 9.2(a) and Section 9.2(b).

Section 3.3　　Buyer's Deliveries.  At the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a)　　cash in an amount equal to the Net Closing Cash Payment, by wire transfer of immediately available funds to the account or accounts of Seller identified by Seller in writing reasonably in advance of the Closing;

(b)　　written authorization to release the Good Faith Deposit to Seller;

(c)　　one or more duly executed Acquired Intellectual Property Assignments;

(d)　　the officer's certificate required to be delivered pursuant to Section 9.1(a) and Section 9.1(b); and

(e)　　such other documents, instruments and certificates as Seller may reasonably request to transfer, assign and delegate the Assumed Liabilities to Buyer in accordance with the terms and conditions hereof.

ARTICLE 4. REPRESENTATIONS AND WARRANTIES

Section 4.1　　Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows:

(a)　　Corporate Organization.  Each entity comprising Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of domicile.  Subject to any necessary authority from the Bankruptcy Court, each applicable entity comprising Seller has the requisite corporate or limited liability company power and authority to possess the Acquired Assets and to carry out its obligations under this Agreement.

(b)　　Authorization and Validity. Each entity comprising Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement and, subject to (i) the Bankruptcy Court's entry of the Sale Order, to carry

12

out its obligations hereunder and thereunder. The execution and delivery of this Agreement has been duly authorized by all necessary corporate or limited liability company action by the boards of directors or managers of Seller, and no other corporate or limited liability company proceedings are necessary for the performance by Seller of its obligations under this Agreement or the consummation by Seller of the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by Seller and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(c)    <u>No Conflict or Violation</u>. Neither the execution and delivery by Seller of this Agreement or any of the Ancillary Agreements to which Seller is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order) the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements, nor compliance by Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any breach of any provision of the respective certificates of incorporation or formation of Seller or the respective by-laws or operating agreements of Seller, or (y) violate any provision of law, regulation, rule or other legal requirement of any Government ("<u>Law</u>") or any order, judgment or decree of any court or Government ("<u>Order</u>") applicable to Seller or any of its properties or assets, except, in either of the foregoing cases (x) and (y), for any conflict or violation as would not reasonably be expected to cause a Material Adverse Effect.

(d)    <u>Title and Ownership</u>. Except for Permitted Liens or as would not have a Material Adverse Effect, Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets. Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

(e)    <u>Compliance with Law</u>. Except as set forth on <u>Schedule 4.1(e)</u>, as would not otherwise reasonably be expected to cause a Material Adverse Effect, or as may result from the Bankruptcy Case, Seller has not received written notice of any violation of any applicable Laws, nor is Seller in default with respect to any Order applicable to the Acquired Assets.

Section 4.2    <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller as follows:

(a)    <u>Corporate Organization</u>. Buyer is a Corporation duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation. Buyer, and its assign, if any, has the requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b)    <u>Qualification to do Business</u>. Buyer and its assign, if any, is duly qualified to do business as a corporation and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

13

(c)  <u>Authorization and Validity</u>.  Buyer has the requisite corporate power and authority necessary to enter into this Agreement and each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby.  This Agreement and each of the Ancillary Agreements to which Buyer is a party have been duly and validly executed and delivered by it and are valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

(d)  <u>No Conflict or Violation</u>.  Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

(e)  <u>Consents and Approvals</u>.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)  <u>Financial Capability</u>.  Buyer and any Buyer Acquisition Vehicle currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor to Seller of the Purchase Price and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(g)  <u>Investigation by Buyer</u>.  Buyer has conducted its own independent review and analysis of the Acquired Assets and the Assumed Liabilities and acknowledges that Seller has provided Buyer with reasonable access to the personnel, properties, premises and records of the Acquired Assets and Assumed Liabilities for this purpose.  Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case.  In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither

14

Seller nor any of its Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in Section 4.1 (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Seller, its Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding misrepresentation or concealment arising from actual fraud of Seller) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in Section 4.1 and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3    Warranties Exclusive; Schedules.

(a)    The representations and warranties contained in Article 4 are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed. Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (D) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS. SELLER AND SELLER'S AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATIONS OR WARRANTIES IN ANY OTHER AGREEMENT.

(b)    The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

Section 4.4    Survival of Representations and Warranties. None of the representations or warranties of Seller set forth in this Agreement or any Ancillary Agreement or in any certificate delivered pursuant to Section 9.2(a) or Section 9.2(b) shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement or any Ancillary Agreement shall survive in accordance with their respective terms).

15

ARTICLE 5. <u>COVENANTS OF THE PARTIES</u>

Section 5.1    <u>Covenants of Seller</u>.  Seller covenants as follows:

(a)    <u>Commercially Reasonable Efforts</u>.  Between the Effective Date and the Closing Date, Seller shall use commercially reasonable efforts to (except as may be disclosed to Buyer) (i) obtain all necessary consents, waivers, authorizations and approvals of all Governments, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party, (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) maintain the Acquired Assets substantially in accordance with Seller's practices and procedures as of the Effective Date (as adjusted for the effects of any COVID Restrictions).

(b)    <u>Access to Properties and Documents; Confidentiality</u>.  Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access (including digital access only) (subject to any COVID Restrictions) during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to <u>Article 10</u>) to copies of all Documents of Seller relating to the Acquired Assets and the Assumed Liabilities.  Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account any COVID Restrictions and Seller's resources and other commitments, during normal business hours, to all Acquired Assets, and to Seller's executive officers, accountants, counsel, employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 10).  The rights of access contained in this <u>Section 5.1(b)</u> are granted subject to, and on, the following terms and conditions:  (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this <u>Section 5.1(b)</u> or otherwise) will be governed and protected by the Confidentiality Agreement, dated as of August 3, 2020 by and between Buyer and ROC (the "<u>Confidentiality Agreement</u>"); and (iii) such rights of access shall not affect or modify the conditions set forth in <u>Article 9</u> in any way.

Section 5.2    <u>Covenants of Buyer</u>.  Buyer covenants as follows:

(a)    <u>Commercially Reasonable Efforts</u>.  Buyer shall use all commercially reasonable efforts to (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    <u>Released Claims</u>.  Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired

16

Assets to the extent such Claims have been, or are at any time thereafter, released by or on behalf of Seller or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise or (ii) pursue, prosecute or assert any rights related to any Claims against advisors, employees, officers or directors of Seller, including by way of offset or recoupment.

(c) <u>Discontinuation of Remington Brand</u>. Buyer shall discontinue all use of any Remington Trademarks, whether registered or common-law, on any product, marketing materials, promotional items, websites, manufacturing facilities, service offerings, trade name, trademarks, and all other business-related materials that include, incorporate, reference or use the Remington Trademarks within ninety (90) days following the Effective Date. Vista Outdoor, Inc. is an intended third-party beneficiary this covenant entitled to enforce it according to its terms.

ARTICLE 6. <u>ADDITIONAL AGREEMENTS</u>

Section 6.1 <u>Bankruptcy Matters</u>.

(a) <u>Backup Bidder</u>. In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures Order, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures Order) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction. Notwithstanding anything to the contrary in this Agreement, Seller may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b) <u>Notice to Holders of Liens, Claims and Interests</u>. Seller has provided notice of the intent to seek entry of the Sale Order to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c) <u>Entry of Sale Order</u>. Seller has filed or will file with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order. The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement, Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability. Seller and Buyer shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement. In the event that any Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Buyer will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion. For purposes of this <u>Section 6.1(c)</u> only, commercially reasonable efforts shall, without limitation, require each party to this Agreement to pay its costs and expenses reasonably required in

17

connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

Section 6.2     Transition Arrangements.

(a)     Access Covenant.  Upon reasonable request from Seller, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will following the Closing Date provide to Seller, and the accountants, counsel and representatives of Seller, including any administrator of the Plan or Seller's estate, such access to the pre-closing books and records primarily relating to the Acquired Assets as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation and litigation of claims and making of distributions contemplated under the Plan or otherwise. Such access will include (a) reasonable access to Buyer's personnel, information technology systems and books and records and (b) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Seller engaged in such wind-down and liquidation process.  Buyer will provide such services free of any charges, fees or rents, provided that Seller will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Seller's employees engaged in the liquidation).

(b)     Transitional License.  Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days, Buyer shall grant Seller a non-exclusive, royalty-free right and license to use the Acquired Intellectual Property in connection with the wind-down and liquidation of Seller's estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.

Section 6.3     Further Assurances.  At the request and the sole expense of the requesting party, either party shall, at any time after the Closing Date, execute and deliver such documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

ARTICLE 7. OMITTED

ARTICLE 8. TAXES.

Section 8.1     Taxes Related to Purchase of Assets.  All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Seller as a result of the sale of the Acquired Assets (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(a) of the Bankruptcy Code, shall be paid by Buyer.  Buyer and Seller agree to

18

cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and Seller agrees to assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 8.2    Cooperation on Tax Matters.

(a)    Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)    Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period of at least six (6) years from the Closing Date, and will give Seller notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period.  In addition, from and after the Closing Date, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to the books, records, documents and other information relating to the Acquired Assets or the Assumed Liabilities as Seller may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Seller.  Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities.

(c)    If Seller receives any refund, overpayment or rebate of Pre-Closing Taxes (including any refund, overpayment or rebate relating to the pre-Closing portion of any Straddle Period) that is attributable to Taxes paid by Buyer, it shall promptly, and in no case later than ten (10) Business Days after receipt thereof, pay such refund, overpayment or rebate over to Buyer net of any reasonable cost or expense incurred in connection with such refund, overpayment or rebate.

(d)    Seller shall prepare and file all Income Tax Returns for any Pre-Closing Taxes (including any Pre-Closing Income Taxes) of Seller, whether or not such Tax Returns are required to be filed after the Closing Date, and Seller shall timely pay all Taxes reflected on such Tax Returns.  Buyer and Seller shall reasonably cooperate in the preparation of any Tax Returns described in this Section 8.2(d).

Section 8.3    Allocation of Purchase Price.  Promptly (and in any event within sixty (60) days) following the Closing Date, Seller shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "Allocation").  Seller and Buyer will cooperate to

19

resolve any disputes regarding the Allocation and to file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement. If the Parties are not able to agree to the Allocation within forty-five (45) days after receipt of such Allocation by Sellers, the Parties shall retain an independent accounting firm (the "Independent Accounting Firm") to resolve their dispute. The determination of the Independent Accounting Firm shall be final and binding on all parties hereto. The cost of the Independent Accounting Firm shall be shared equally by Sellers, on the one hand, and Buyer, on the other hand. In the event that the Allocation is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation. No Party will take any position that is contrary to or inconsistent with the Allocation for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns).

## ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES.

Section 9.1  Conditions Precedent to Performance by Seller.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in Section 9.1(c)(i) and Section 9.1(c)(ii)) may be waived by Seller in its sole discretion:

(a)  Representations and Warranties of Buyer.  All representations and warranties made by Buyer in Section 4.2 shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(b)  Performance of the Obligations of Buyer.  Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(c)  Consents and Approvals.  The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)    No Violation of Orders.  No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)    Buyer's Deliveries.  Buyer shall have delivered to Seller all of the items set forth in Section 3.3.

Section 9.2    Conditions Precedent to Performance by Buyer.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:

(a)    Representations and Warranties of Seller.    All representations and warranties made by Seller in Section 4.1 shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(b)    Performance of the Obligations of Seller.  Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance (i) that do not result in a Material Adverse Effect or (ii) under those obligations of Seller set forth in Section 6.2(c), and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(c)    Consents and Approvals.  The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)    No Violation of Orders.  No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)    Seller's Deliveries.  Seller shall have delivered to Buyer all of the items set forth in Section 3.2.

ARTICLE 10. TERMINATION.

Section 10.1    Conditions of Termination.  This Agreement may be terminated at any time before the Closing:

(a)    By mutual written consent of Seller and Buyer;

(b)    By Seller, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Warranty Termination Date"), if the condition contained in Section 9.1(a) has not been satisfied or waived; provided however, that Seller shall not have the right to

21

terminate this Agreement under this <u>Section 10.1(b)</u> if Seller is then in material breach of this Agreement;

(c)     By Seller, by notice to Buyer, if Seller has previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant; <u>provided</u>, <u>however</u>, that Seller shall not have the right to terminate this Agreement under this <u>Section 10.1(c)</u> if Seller is then in material breach of this Agreement;

(d)     By Seller, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "<u>Approval Termination Date</u>"), if any condition contained in <u>Section 9.1(c)</u> or <u>Section 9.1(d)</u> has not been satisfied or waived; <u>provided however</u>, that Seller shall not have the right to terminate this Agreement under this <u>Section 10.1(d)</u> if Seller is then in material breach of this Agreement;

(e)     By Buyer, by notice to Seller, on or after the Warranty Termination Date, if the condition contained in <u>Section 9.2(a)</u> has not been satisfied or waived; <u>provided</u>, <u>however</u>, that Buyer shall not have the right to terminate this Agreement under this <u>Section 10.1(e)</u> if Buyer is then in material breach of this Agreement;

(f)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with written notice of a failure to perform any material covenant of Seller contained in this Agreement and Seller has failed within five (5) days after such notice to perform such covenant; <u>provided</u>, <u>however</u>, that Buyer shall not have the right to terminate this Agreement under this <u>Section 10.1(f)</u> if Buyer is then in material breach of this Agreement;

(g)     By Buyer, by notice to Seller, after the Approval Termination Date, if any condition contained in <u>Section 9.2(c)</u> or <u>Section 9.2(d)</u> has not been satisfied or waived; <u>provided</u>, <u>however</u>, that Buyer shall not have the right to terminate this Agreement under this <u>Section 10.1(g)</u> if Buyer is then in material breach of this Agreement;

(h)     By Buyer, by notice to Seller, or by Seller, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the business as currently conducted by Seller (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)     By Seller, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 60 calendar days after the Petition Date; and

(j)     Automatically, upon the earlier of (i) Seller consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction.

Section 10.2    Effect of Termination; Remedies.

(a)    In the event of termination pursuant to Section 10.1, this Agreement shall become null and void and have no effect (other than Article 10, Article 11, and Article 12, which shall survive termination), with no liability on the part of Seller or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 11.4, (ii) the obligation of Buyer under Section 6.1(a) and (iii) any liability provided for in Section 10.2(b) through Section 10.2(d), inclusive.

(b)    If this Agreement is terminated pursuant to Section 10.1(a), Section 10.1(d), Section 10.1(e), Section 10.1(f), Section 10.1(g), Section 10.1(h), Section 10.1(i) or Section 10.1(j), then the Good Faith Deposit shall, within three (3) Business Days, be returned by Seller to Buyer.

(c)    If this Agreement is terminated pursuant to Section 10.1(b) or Section 10.1(c), then Seller may, at its sole election (i) within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee"), or (ii) without limitation to Seller's remedies under clause (i) of this Section 10.2(c) require Buyer to specifically perform under the terms of this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(d)    Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article VI (if the Closing shall have occurred) (i) Seller's entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Seller retains such amount, then notwithstanding anything to the contrary contained herein, such Break Fee shall be the sole and exclusive remedy available to Seller and any other Person against Buyer, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Seller, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Seller, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby.  Each Party acknowledges that the agreements contained in this Section 10.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

ARTICLE 11. MISCELLANEOUS.

Section 11.1    Successors and Assigns.  Prior to the Closing, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other, and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided, however, that if Buyer wishes, upon prior written

23

notice to Seller, to assign its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to a Buyer Acquisition Vehicle, such prior written consent of Seller shall not unreasonably be withheld.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 11.2    Governing Law; Jurisdiction.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

Section 11.3    WAIVER OF JURY TRIAL.    EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.3.

Section 11.4    Expenses.  Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated.  Buyer shall pay the cost of any surveys (without limitation to the restriction in Section 5.1(b)(i)), title insurance policies and title reports ordered by Buyer.  For all purposes under this Agreement, unless otherwise specified in the applicable clause, any obligation of Seller to exercise commercially reasonable efforts shall not require the incurrence of any out-of-pocket expenses by Seller.

Section 11.5    Broker's and Finder's Fees.  Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than, in the case of Seller, Ducera Partners, whose fees and expenses shall, as between the parties to this Agreement, be the responsibility of Sellers, and, to such party's Knowledge, no other broker or other Person is entitled to any

24

commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 11.6  Severability. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 11.7  Notices.

(a)  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

    Remington Outdoor Company, Inc.
    100 Electronics Blvd., SW
    Huntsville, Alabama 35824
    Attention: Ken D'Arcy
    Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

    O'Melveny & Myers LLP
    400 South Hope Street
    Los Angeles, California  90071
    Attention: John Paul Motley, Esq., and Stephen H. Warren, Esq.
    Phone: (213) 430-6100 and (213) 430-7875, respectively
    Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

    Franklin Armory Holdings, Inc.
    2246 Park Place, Suite B
    Minden, Nevada 89423
    Attention: Jay Jacobson, President
    Email: JJacobson@franklinarmory.com

With a copy to (which copy alone shall not constitute notice):

The Davis Law Firm
27201 Puerta Real
Mission Viejo, California 92691
Attention: Jason Davis, Esq.
Email: Jason@calgunlawyers.com

(b)     Any party may change its address for the purpose of this <u>Section 11.7</u> by giving the other party written notice of its new address in the manner set forth above.

Section 11.8     <u>Amendments; Waivers</u>.     This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 11.9     <u>Time of Essence</u>.  Time is of the essence in the performance of each and every term of this Agreement.

Section 11.10 <u>Specific Performance</u>.     The provisions of this Agreement are uniquely related to Seller's and its Affiliates' desire to consummate the transactions contemplated by this Agreement, and such transactions represent a unique business opportunity at a unique time for Seller and its Affiliates.  As a result, irreparable damage would occur to Seller and its Affiliates in the event that any of the obligations of Buyer under this Agreement were not performed in accordance with their specific terms.  Although liquidated or other monetary damages may be available for the breach of covenants and undertakings contained in this Agreement, monetary damages would be difficult to ascertain and an inadequate remedy therefor.  Accordingly, if Buyer breaches or threatens to breach any provision of this Agreement, then without limitation to Seller's rights under clause (i) of <u>Section 10.2(c)</u> Seller shall be entitled to an injunction or injunctions, specific performance and any and all other equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, this being in addition to any other remedies to which it is entitled at Law or equity.  If Seller seeks an injunction or injunctions to prevent breaches of this Agreement or seeking to enforce specifically the terms and provisions of this Agreement, Seller shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such Order or injunction.  Buyer irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security.  If any action or proceeding should be brought in equity to enforce the provisions of this Agreement, Buyer shall not allege, and hereby waives the defense, that there is an adequate remedy at Law.

Section 11.11 <u>Public Announcements</u>.  Promptly after the execution and delivery of this Agreement, the parties shall make a joint press release in form and substance reasonably

26

satisfactory to both of them regarding the transactions contemplated herein. Thereafter, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing party agrees to give the non-disclosing party prior notice of, and an opportunity to comment on, the proposed disclosure. Notwithstanding anything to the contrary in this Section 11.11, Seller (a) shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equity holders and lenders to the extent required by the provisions of any of Seller's bylaws, credit agreements and other pre-existing contractual obligations.

Section 11.12 Entire Agreement. This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

Section 11.13 Parties in Interest. Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to Seller or Buyer. This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 11.14 Bulk Sales Laws. Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

Section 11.15 Construction. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

Section 11.16 Counterparts and Facsimiles. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same

Case 20-81688-CRJ11    Doc 964    Filed 10/07/20    Entered 10/07/20 20:53:18    Desc
Main Document    Page 32 of 141

instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

ARTICLE 12. <u>DEFINITIONS.</u>

Section 12.1    <u>Certain Terms Defined</u>.  As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"<u>Alternative Transaction</u>" means Seller consummating one or more transactions or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of all or substantially all of the Acquired Assets by Seller to a purchaser or purchasers other than Buyer.

"<u>Ancillary Agreements</u>" means, collectively, the Acquired Intellectual Property Assignments, quitclaim deeds, and other certificates, affidavits and releases delivered pursuant to <u>Article 3</u>.

"<u>Avoidance Actions</u>" means any and all claims and remedies of Seller under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or other governmental action to close.

"<u>Buyer Acquisition Vehicle</u>" means either (a) Crotalus Holdings, Inc., which Buyer shall ensure has adequate funds to consummate the transaction, or (b) a Creditworthy entity that is wholly-owned and controlled by Franklin Armory Holdings, Inc.

"<u>Cash</u>" means all cash and cash equivalents held by Seller, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities, in each case as of immediately prior to the Closing (and including without limitation (i) the Good Faith Deposit, (ii) the Net Closing Cash Payment, (iii) any fee reserves or escrows established by Seller, and (iv) any cash in the Dominion Account (as defined in the Priority Term Loan)).

"<u>CBA</u>" means that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"<u>City of Huntsville Project Development Liabilities</u>" means all liabilities arising under (i) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Seller, as amended or otherwise modified from time to time, (ii) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000 and (iii) that certain Mortgage and Security Agreement dated as of February 27,

28

2014, by Seller in favor of the City of Huntsville.

"Claims" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or unasserted actions against Seller or any of its Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Seller is a party; provided that Contracts do not include any Lease or any employment or similar Contracts.

"Creditworthy" means sufficiently capitalized, to the reasonable satisfaction of Seller upon provision to Seller of substantiating documentary evidence, to be able to pay the Purchase Price.

"D&O Insurance" means the policy in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Seller, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"DIP Facility" means any debtor-in-possession financing advanced to Seller in the Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and

29

(c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies or arrangements that provide for compensation for employee benefits as to which Seller has any obligation or liability, contingent or otherwise.

"<u>Employee Liabilities</u>" means all liabilities of Seller to or with respect to all Employees whenever arising and liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Seller.

"<u>Employee Records</u>" means all employment and benefit records (in whatever form maintained) in the possession of Seller or its agents and pertaining to any Transferred Employee, or any spouse, dependent or other beneficiary of any such Transferred Employee.

"<u>Employees</u>" means all individuals, as of the date of this Agreement, who are employed by Seller (including Employees who are absent due to COVID Restrictions or vacation, family leave, short-term disability, COVID 19-related furloughs or absences or other approved leave of absence) in connection with the ownership, operation and management of the Business.

"<u>Environmental Laws</u>" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>Exit Term Loan</u>" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"<u>FILO Facility</u>" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"Government" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents thereof.

"Historic Firearms Books and Records" means all historic books and records relating to the sale of firearms included in the Acquired Assets, including all records required to be kept pursuant to parts 447, 478, and, 479 of title 27, Code of Federal Regulations.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

"Income Tax Return" means any Tax Return with respect to Income Taxes.

"Intellectual Property" means, in each case other than any intellectual property licenses, including without limitation inbound and outbound intellectual property licenses, (1) all intellectual property arising from or in respect of the following: (a) all patents and applications therefore, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (b) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (c) copyrights and registrations and applications therefore and works of authorship, and mask work rights, (d) all Software of Seller, (e) confidential information, know-how, trade secrets and inventions, and (f) all other intellectual property, (2) Seller's rights pursuant to any Contract with Remington Licensing Corporation and (3) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of Seller's rights or interests in intellectual property that is not an Excluded Asset and any related remedies, including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including, without limitation, security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, Permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests

31

may also be Liens or Claims).

"Knowledge" or any other similar term or knowledge qualification means, with respect to (i) Seller, the actual conscious knowledge of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement and (ii) Buyer, the actual conscious knowledge of Jay Jacobson (President), as of the date the applicable representation or warranty is made or deemed made under this Agreement.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property, in each of the foregoing cases, to the extent possessed, used or occupied in connection with the Business.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"Leases" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"Licensing Agreement" means any inbound or outbound license, sublicense, consent to use agreement, settlement, coexistence agreement, covenant not to sue, waiver, release, commercially available off-the-shelf software or click-wrap licenses or other software licenses, or any other express grants or right to use for the benefit of Seller or by which Seller has granted to any third party.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; and (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy or use of an asset.

"Material Adverse Effect" means a state of facts, event, change or effect on the value of the Acquired Assets that results in a material and adverse effect on the value of the Acquired Assets taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy Case; (B) any action of Seller taken pursuant to, or any failure of Seller to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which Seller is a party; (C) the public disclosure

of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby, (D) changes, after the Effective Date, in United States generally accepted accounting principles, (E) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Seller operates the Business, (F) changes in the firearms, ammunition or sporting goods industries in general, (G) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared) or (H) any occurrence, outbreak, escalation or worsening of, or furloughs or Government actions (including any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other applicable Law, order, directive, guideline or recommendation by any Government of competent jurisdiction (collectively, "COVID Restrictions")) instituted in response to, any epidemic, pandemic or other disease (including without limitation the COVID-19 virus).

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Seller.

"Pension Plan" means Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), as amended from time to time, whereby the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan), as amended from time to time, was merged into the Remington Arms Company, LLC Pension and Retirement Plan.

"Permit" means any permit, license, authorization, registration or certificate obtained from any Government.

"Permitted Liens" mean: (a) all Liens set forth on Schedule 12.1(a); (b) Liens and Interests consisting of (X) current Taxes and assessments, Liens for Taxes that are not yet delinquent or that are being contested in good faith, reservations in patents, and all easements, rights-of-way, encumbrances, Liens, covenants, conditions, restrictions, obligations, liabilities and other matters as may appear on record, and similar matters that would be disclosed by an accurate ALTA/ACSM survey of the Owned Real Property, and (Y) the applicable zoning and use regulations or other Laws of any Government; (c) purchase money Liens securing payments under capital lease arrangements; (d) all terms, conditions and restrictions under any Permit; (e) Liens that will attach to the proceeds of the sale under this Agreement pursuant to Section 363 of the Bankruptcy Code or that will not survive the Closing and (g) Liens that Buyer agrees in writing to accept.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"Plan" means a Joint Chapter 11 Plan filed by Seller with the Bankruptcy Court.

"Post-Closing Taxes" means any Taxes, other than Transaction Taxes, imposed on the Acquired Assets in respect of a taxable period (or portion thereof) beginning after the close of business on the day prior to the Closing Date.

"Pre-Closing Income Taxes" means any Income Taxes paid, payable, or that become

33

payable, in connection with Seller or any of its Affiliates or relating to the Business, in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Pre-Closing Taxes" means any Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the current business of Seller (including any excise taxes (whether or not deferred)), in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Priority Term Loan" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Retained Litigation" means all litigation and Claims arising or related to events prior to the Closing.

"Seller D&Os" means the current or former directors and officers insured under the D&O Insurance.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Documents related to any of the foregoing.

"State of Alabama Project Development Liabilities" means all liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time.

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a

34

Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and "Tax" shall mean any one of them.

Section 12.2    All Terms Cross-Referenced. Each of the following terms is defined in the Section set forth opposite such term:

**Term**                                                                                                      **Section**

Acquired Assets ........................................................................................................... Section 1.1
Acquired Intellectual Property ...................................................................................Section 1.1(k)
Acquired Intellectual Property Assignment............................................................Section 3.2(d)
Affiliate ..................................................................................................................... Section 12.1
Agreement.......................................................................................................................*Preamble*
Allocation................................................................................................................... Section 8.3
Alternative Transaction............................................................................................... Section 12.1
Approval Termination Date .................................................................................Section 10.1(d)
Benefit Plans ..........................................................................................................Section 1.1(c)
Assumed Liabilities ................................................................................................... Section 1.3
Avoidance Actions..................................................................................................... Section 12.1
Bankruptcy Case ....................................................................................................... *Recitals*
Bankruptcy Code ....................................................................................................... *Recitals*
Bankruptcy Court....................................................................................................... *Recitals*
Bidding Procedures Motion ...................................................................................... *Recitals*
Bidding Procedures Order.......................................................................................... *Recitals*
Break Fee .................................................................................................................Section 10.2(c)
Business Day............................................................................................................... Section 12.1
Buyer.......................................................................................................................... Preamble
Buyer Acquisition Vehicle......................................................................................... Section 12.1
Buyer Plans ................................................................................................................ Section 7.3
Cash........................................................................................................................... Section 12.1
CBA ........................................................................................................................... Section 12.1
City of Huntsville Project Development Liabilities.................................................... Section 12.1
Claims ....................................................................................................................... Section 12.1

35

Closing ................................................................................................ Section 3.1
Closing Date......................................................................................... Section 3.1
Code ................................................................................................... Section 12.1
Confidentiality Agreement.................................................................Section 5.1(b)
Contract............................................................................................... Section 12.1
COVID Restrictions ............................................................................ Section 12.1
Creditworthy ...................................................................................... Section 12.1
Cure Amount.....................................................................................Section 1.5(a)
Customer Order..................................................................................Section 1.4(b)
Documents ........................................................................................ Section 12.1
Effective Date ...............................................................................................*Preamble*
Employee Benefit Plans ...................................................................... Section 12.1
Employee Liabilities ........................................................................... Section 12.1
Employee Records .............................................................................. Section 12.1
Employees........................................................................................... Section 12.1
Environmental Laws ........................................................................... Section 12.1
ERISA ................................................................................................ Section 12.1
Excluded Assets ................................................................................... Section 1.2
Excluded Employee Liabilities .........................................................Section 1.2(a)
Excluded Liabilities ............................................................................. Section 1.4
Final Order ......................................................................................... Section 12.1
Good Faith Deposit ...........................................................................Section 2.2(a)
Government ........................................................................................ Section 12.1
Gross Closing Cash Payment .............................................................Section 2.1(a)
Intellectual Property .......................................................................... Section 12.1
Intercompany Note.............................................................................. Section 12.1
Interests .............................................................................................. Section 12.1
Inventory ..........................................................................................Section 1.2(cc)
Law .................................................................................................. Section 4.1(c)
Leased FF&E ....................................................................................Section 1.1(x)
Leased Motor Vehicles .......................................................................Section 1.2(z)
Leased Real Property .......................................................................... Section 12.1
Leasehold Improvements .................................................................... Section 12.1
Leases................................................................................................. Section 12.1
Lien .................................................................................................... Section 12.1
Material Adverse Effect ...................................................................... Section 12.1
Necessary Consent ............................................................................... Section 1.6
Net Closing Cash Payment ................................................................Section 2.2(b)
Order ................................................................................................Section 4.1(c)
Owned FF&E ....................................................................................Section 1.1(w)
Owned Motor Vehicles ......................................................................Section 1.2(y)
Owned Real Property .......................................................................... Section 12.1
Pension Plan ....................................................................................... Section 12.1
Person................................................................................................. Section 12.1
Petition Date....................................................................................... *Recitals*
Plan .................................................................................................... Section 12.1

36

Pre-Closing Income Taxes ........................................................................................ Section 12.1
Priority Term Loan .................................................................................................. Section 12.1
Purchase Orders ...................................................................................................Section 1.4(b)
Purchase Price ........................................................................................................... Section 2.1
Related Person ......................................................................................................... Section 12.1
Retained Litigation ................................................................................................. Section 12.1
ROC .............................................................................................................................. Preamble
Sale Order .................................................................................................................... *Recitals*
Seller ............................................................................................................................ Preamble
Seller's Knowledge .................................................................................................. Section 12.1
Software .................................................................................................................... Section 12.1
State of Alabama Project Development Liabilities................................................ Section 12.1
Subsidiary(ies) ........................................................................................................ Section 12.1
Tax Return ............................................................................................................... Section 12.1
Taxes ........................................................................................................................ Section 12.1
Transaction Taxes ...................................................................................................... Section 8.1
Warranty Termination Date ..................................................................................Section 10.1(b)

*[Signatures are on the following pages.]*

37

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER**

FRANKLIN ARMORY HOLDINGS, INC.

By: _____

Name: Jay Jacobson
Title: President

S-1

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By: _____
     Name:
     Title:

**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By:_____
     Name:
     Title:

FGI HOLDING COMPANY, LLC

By: _____
     Name:
     Title:

BARNES BULLETS, LLC

By: _____
     Name:
     Title:

REMINGTON ARMS COMPANY, LLC

By: _____
     Name:
     Title:

RA BRANDS, L.L.C.

By: _____
     Name:
     Title:

OUTDOOR SERVICES, LLC

By: _____
     Name:
     Title:

S-2

FGI FINANCE INC.

By: _____
    Name:
    Title:


HUNTSVILLE HOLDINGS LLC

By: _____
    Name:
    Title:


TMRI, INC.

By: _____
    Name:
    Title:


REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
    Name:
    Title:


32E PRODUCTIONS, LLC

By: _____
    Name:
    Title:


GREAT OUTDOORS HOLDCO, LLC

By: _____
    Name:
    Title:

S-3

DISCLOSURE SCHEDULES

to

ASSET PURCHASE AGREEMENT

by and among

FRANKLIN ARMORY HOLDINGS, INC.

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.

Dated as of October 7, 2020

OMM_US:79067183

These Disclosure Schedules (these "Schedules" and each a "Schedule") are furnished pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of October 7, 2020, by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to the Agreement (collectively with ROC, "Seller"), and Franklin Armory Holdings, Inc. or a Buyer Acquisition Vehicle as assignee in accordance with Section 11.1 ("Buyer"). All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement, unless the context otherwise requires.

These Schedules are hereby incorporated in and made a part of the Agreement as if set forth in full therein and are an integral part of the Agreement. The information contained in these Schedules is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party to the Agreement to any third party of any matter whatsoever (including any violation of law or breach of contract). These Schedules and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties or covenants of the Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. In disclosing the information in these Schedules, Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. The disclosures in these Schedules are to be taken as relating to the representations and warranties as a whole, notwithstanding the fact that these Schedules are arranged by sections corresponding to the sections in the Agreement, or that a particular section of the Agreement makes reference to a specific section of the Schedules, and notwithstanding that a particular representation and warranty may not make a reference to the Schedules. Disclosure of an item on one Schedule shall be deemed disclosure on all other Schedules.

Neither the specification of any dollar amount in any representation or warranty nor the disclosure of a document or information in these Schedules is intended, or shall be construed or offered in any dispute between the parties to the Agreement as evidence of, the materiality of such dollar amount, document or information, nor does it establish any standard of materiality upon which to judge the inclusion or omission of any similar documents or information in such Schedule or any other Schedule. The headings and descriptions of the disclosures herein are for convenience of reference only and are not intended and do not alter the meaning of any provision of the Agreement or these Schedules.

**TRADEMARKS**

| County | Mark | Reg. No. | Owner |
|---|---|---|---|
| United States of America | BUSHMASTER (Stylized and Design) | 1,521,311 | Remington Arms Company, LLC |
| Canada | BUSHMASTER FIREARMS & DESIGN | Appln. No. 1,502,128 (Pending) | Remington Arms Company, LLC |
| Mexico | BUSHMASTER FIREARMS & DESIGN | 1205199 | Remington Arms Company, LLC |
| Mexico | BUSHMASTER FIREARMS & DESIGN | 1205200 | Remington Arms Company, LLC |
| Mexico | BUSHMASTER FIREARMS & DESIGN | 1205201 | Remington Arms Company, LLC |
| Oman | BUSHMASTER FIREARMS & Design | 87214 | RA Brands, L.L.C. |
| Oman | BUSHMASTER FIREARMS & Design | 87215 | RA Brands, L.L.C. |
| United States of America | BUSHMASTER FIREARMS (Stylized and Design) | 3,614,317 | Remington Arms Company, LLC |
| United States of America | ACR | 4,019,998 | RA Brands, L.L.C. |
| United States of America | ADAPTIVE COMBAT RIFLE | 3,946,418 | RA Brands, L.L.C. |
| United States of America | CARBON-15* | 4,476,859 | RA Brands, L.L.C. |
| Canada | ACR | TMA826670 | RA Brands, L.L.C. |
| Canada | BACR | TMA849550 | RA Brands, L.L.C. |

**PATENTS**

None.

**Domain Name Registrations**
bushmaster.com

---

[1] Trademarks with an asterisk (*) have expired, lapsed and/or were never registered. Seller makes no representations about such trademarks.

3

**Social Media Accounts**

All rights to manage, use, access, or control any social media account, whether active, inactive, or deactivated, that is in each case primarily associated with Bushmaster Firearms or www.bushmasters.com, including but not limited to the Bushmaster Firearms Facebook page and Youtube channel.

4

OMM_US:79067183

"Other Assets" shall mean exclusively the following information and assets in this Schedule 1.1(b), in each case only to the extent available to Seller after Seller's good faith and commercially reasonable investigation prior to the Closing:

1. Technical Data Package ("**TDP**") for 2017-2019 production of Bushmaster Branded Products (hereinafter "**BFP**", inclusive of products utilizing any Bushmaster Firearms marks) (except the Adaptive Combat Rifle ("**ACR**"), including but not limited to:

   a. All technical specifications on all models:

      i. All computer models

      ii. All part drawings

      iii. All Computer Aided Design ("**CAD**") files, regardless of format or program used to create said files, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files

      iv. All CAD files, regardless of format or program used to create said files, for the physical molds, jigs, fixtures and tooling, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files.

   b. Compete Bill of Material ("**BOM**") identification for each BFP product Stock Keeping Unit ("**SKU**"), including but not limited to Carbon 15 C15 products.

2. TDP for M17S, including but not limited to:

   a. All technical specifications on all models:

      i. All computer models

      ii. All part drawings

      iii. All CAD files, regardless of format or program used to create said files, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files

      iv. All CAD files, regardless of format or program used to create said files, for the physical molds, jigs, fixtures and tooling, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files.

   b. Complete M17S BOM identification for each product SKU.

5

3. TDP for Arm Pistol, including but not limited to:

    a. All technical specifications on all models:

        i. All computer models

        ii. All part drawings

        iii. All CAD files, regardless of format or program used to create said files, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files

        iv. All CAD files, regardless of format or program used to create said files, for the physical molds, jigs, fixtures and tooling, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files.

    b. Complete Arm Pistol BOM identification for each product SKU

4. TDP for Carbon 15 and Carbon 22, including but not limited to:

    a. All technical specifications on all models:

        i. All computer models

        ii. All part drawings

        iii. All CAD files, regardless of format or program used to create said files, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files

        iv. All CAD files, regardless of format or program used to create said files, for the physical molds, jigs, fixtures and tooling, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files.

5. To the extent available, all TDP for any other Bushmaster firearm not set forth above (except the ACR), including but not limited to:

    a. All technical specifications on all models:

        i. All computer models

        ii. All part drawings

        iii. All CAD files , regardless of format or program used to create said files, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files

OMM_US:79067183

      iv.  All CAD files, regardless of format or program used to create said files, for the physical molds, jigs, fixtures and tooling, including but not limited to all .dwg, .blend, .x_t, .sldprt, .sldasm, ipt, .iam, .skp, .stl, .amf, .stp, .step, .obj, .3mf, .iges, .3ds, .dae, and .x3d files.

6. Bushmaster Branded Products historic sales and customer data, including but not limited to:

    a.  Customer lists;

      i.  Specific contact lists for each customer, including phone numbers, addresses, and emails

      ii.  sales information demonstrating the volume, quantities, and final pricing for each customer

      in each of (i) and (ii) above, for a minimum of a 10-year history.

    b.  BFP historic vendor list data, including but not limited to:

      i.  Cost of Goods Sold ("**COGS**") for all current production parts

      ii.  vendor name for each item in the COGS

      iii.  historic vendor data including Purchase Orders ("**PO**"), bills, QA reports, and payments

      in each of (i) through (iii) above, for a minimum of a 10-year history.

7. Rights and access to the GS1 UPC registration.

OMM_US:79067183

**Schedule 1.2(r)**
**Excluded Assets**

1.  None.

8

OMM_US:79067183

**<u>Schedule 1.3(c)</u>**
**<u>Assumed Liabilities</u>**

1. None.

OMM_US:79067183

**Schedule 1.4(v)**
**Excluded Liabilities**

1.  None.

10

OMM_US:79067183

**<u>Schedule 4.1(e)</u>**
**<u>Compliance with Law</u>**

1. The Arkansas Department of Environmental Quality Consent Administrative Order No. LIS-15-051 (2015) (which, by its terms, incorporates by reference the Amended Consent Administrative Order 07-078-001 (2012), the Second Amended Consent Administrative Order 07-078-002 (2012), and the Third Amendment to Consent Administrative Order 07-078-003 (2013)), issued to Remington Arms Company, LLC, as further amended by Consent Administrative Order 15-051-001 (2017) and Consent Administrative Order 15-051-002 (2018).

2. Administrative Settlement, Agreement and Order on Consent for Remedial Investigation/Feasibility Study in the matter of Chemetco, Inc. Superfund Site, Hartford, Illinois, CERCLA Docket V-W-15-C-019 (2015).

3. Administrative Order on Consent, issued by the Missouri Department of Natural Resources to Remington Arms Company, LLC, No. 14-HW-E005 with regard to hazardous materials handling, storage and disposal.

4. Notice of Violation issued by the Arkansas Department of Environmental Quality on December 13, 2019, with regard to permitted effluent limitation violations.

5. In March 2020, the Company received a pre-litigation settlement offer from Trex Properties LLC concerning the Detrex Corporation facility located in Charlotte, NC. The offer names Para USA LLC (a Company subsidiary) is a potentially responsible party pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) for alleged transport or disposal of hazardous materials at the Detrex facility. The offer demanded a $12,000 payment to release all CERCLA, state and natural resource damage claims. Because the Company could not confirm that Para USA LLC actually deposited waste at the Trex facility, it did not accept the offer; however, the Company cannot rule out potential liability as a potentially responsible party.

6. Citation and Notification of Penalty regarding inspection number 1350744 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated March 26, 2019 (Ilion, NY).

7. Citation and Notification of Penalty regarding inspection number 1353904 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated March 26, 2019 (Ilion, NY).

8. Citation and Notification of Penalty regarding inspection number 1286782 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated July 2, 2018 (Lonoke, AR).

9. Citation and Notification of Penalty regarding inspection number 1206048 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated June 6, 2017 (Lonoke, AR).

10. Citation and Notification of Penalty regarding inspection number 1130012 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated June 8, 2016 (Lexington, MO).

11. Citation and Notification of Penalty regarding inspection number 314352477 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated November 4, 2011 (Ilion, NY).

12. Citation and Notification of Penalty regarding inspection number 315538082 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated August 31, 2011 (Lexington, MO).

11

OMM_US:79067183

Case 20-81688-CRJ11    Doc 964    Filed 10/07/20    Entered 10/07/20 20:53:18    Desc
Main Document    Page 56 of 141

13. Notice of Alleged Safety or Health Hazards issued by the U.S. Department of Labor, Occupational Safety and Health Administration, regarding Complaint Number 850727 (Lexington, MO).

12

OMM_US:79067183

**<u>Schedule 12.1(a)</u>**
**<u>Permitted Liens</u>**

1. None.

**<u>EXHIBIT 1</u>**

(*See* attached form of Bidding Procedures Order)

S-1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1] | Case No. 20-81688-11 |
| Debtors. | Joint Administration Requested |

## ORDER ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALES OF ALL OR A PORTION OF THE DEBTORS' ASSETS

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively, the "**Chapter 11 Cases**"), seeking entry of this order (this "**Bidding Procedures Order**") (i) approving the proposed bidding procedures attached hereto as <u>Exhibit 1</u> (the "**Bidding Procedures**") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of their assets (the "**Acquired Assets**") through one or more sales of the Acquired Assets (each, a "**Sale Transaction**" or "**Sale**"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

(iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto, including the procedures for the Debtors' selection of one or more stalking horse bidders (each, a "**Stalking Horse Bidder**"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (iv) scheduling (a) an auction (the "**Auction**") if the Debtors receive two (2) or more timely and acceptable Qualified Bids (as defined below), and (b) a final hearing (the "**Sale Hearing**") to approve one or more Sales of the Acquired Assets; and (v) granting related relief; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984, as amended on July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

OMM_US:78645958.8

C.     The notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Bidding Procedures Order is necessary or required.

D.     The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) approve the Bidding Procedures, including the procedures for selecting one or more Stalking Horse Bidders and the provision of the Bid Protections to be determined, (ii) establish the Assumption and Assignment Procedures, (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached hereto, (iv) schedule a date for the (a) Auction and (b) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, including the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Meyer Declaration**") and the *Declaration of Colin M. Adams in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Adams Declaration**") are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

E.     The Bidding Procedures, substantially in the form attached hereto as Exhibit 1 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

OMM_US:78645958.8

F.    The Debtors are authorized to pay the break-up fee and expense reimbursement comprising the Bid Protections. The Bid Protections, to the extent payable under any Stalking Horse APA, (a)(x) are actual and necessary costs and expenses of preserving the Debtors' estate within the meaning of Section 503(b) of the Bankruptcy Code, and (y) shall be treated as allowed administrative claims against the Debtors' estates pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code, are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Acquired Assets, and the efforts that have been and will be expended by the Stalking Horse Bidders. The Bid Protections are a material inducement for, and condition of, each Stalking Horse Bidder's execution of the applicable Stalking Horse APA. Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidders are unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under its Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

G.    The Sale Notice and the Publication Notice, substantially in the forms attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Acquired Assets, including the sale of Acquired Assets free and clear of all liens, claims, and encumbrances, the Sale Transaction(s), the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

4

OMM_US:78645958.8

H.    The Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s), and no other or further notice is required.

I.    The Assumption and Assignment Notice, substantially in the form attached hereto as <u>Exhibit 5</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Costs, and no other or further notice is required.

J.    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted as set forth herein.[3]

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

---

[3] Notwithstanding anything to the contrary herein, the consummation of any Sale Transaction(s) is subject to entry of the Sale Order(s).

OMM_US:78645958.8

## I. The Timeline for the Sale

3. The Debtors are authorized to proceed with the Sale Transaction(s) in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

4. Deadline

| Deadline | **Action** |
|---|---|
| August 18, 2020 at 10:00 a.m. (prevailing Central Time) | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| August 21, 2020 | Sale Notice Mailing Date |
| August 21, 2020 | Assumption and Assignment Service Date |
| September 1, 2020 at 4:00 p.m. (prevailing Central Time) | Sale Objection Deadline (defined below) excluding any objection based on identity of Stalking Horse Bidders, Successful Bidder or Backup Bidder or the form or substance of the Stalking Horse Bid, Successful Bid or Backup Bid |
| September 4, 2020 at 5:00 p.m. (prevailing Central Time) | Bid Deadline |
| September 8, 2020 at 12:00 p.m. (prevailing Central Time) | Reply Deadline (defined below) |
| September 8, 2020 by 4:00 p.m. (prevailing Central Time) or 14 days following service of the Supplemental Notice of Assumption and Assignment | Assumption and Assignment Objection Deadline (defined below) excluding any objection related to adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or Backup Bidder |
| September 17, 2020 at 10:00 a.m. (prevailing Central Time) | Auction |
| September 21, 2020 | Post-Auction Notice |
| September 23, 2020 at 10:00 a.m. (prevailing Central Time) | Sale Hearing |

OMM_US:78645958.8

5.     For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "**Modifications**") in accordance with the provisions of the Bidding Procedures; *provided, however*, that the Debtors shall consult with the Consultation Parties or, to the extent provided therein, the Bid Consultation Parties, with respect to any Modifications. The Committee's right to request an extension of the above timeline for cause is expressly reserved.

## II.     The Bidding Procedures

6.     The Bidding Procedures are approved in their entirety. The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith. The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

7.     The Debtors are authorized, in accordance with the Bidding Procedures, to require Diligence Parties to submit written indications of interest specifying, among other things, the Acquired Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party.

8.     The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest. As further described in the Bidding Procedures, the Bid Deadline shall be **September 4, 2020 at 5:00 p.m. (prevailing Central Time)**. Any disputes or objections to the selection of Qualified Bid(s), Successful Bid(s), or Backup Bid(s) (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

OMM_US:78645958.8

9.     The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on **September 17, 2020 at 10:00 a.m. (prevailing Central Time)** virtually via video conferencing technology, or at such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

10.     The Prepetition Secured Creditors shall have the right, subject in all respects to the Bankruptcy Code and other applicable law and the satisfaction in cash or assumption of claims secured by senior liens, to credit bid all or any portion of their allowed secured claims pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable provisions of the Prepetition Credit Documents and any such credit bid shall be deemed a Qualified Bid subject to the Intercreditor Agreement (as defined in the D'Arcy Declaration); *provided*, *however*, that nothing herein or in the Bidding Procedures shall affect or in any way limit the right or ability of any party in interest, including the Committee, to object to the Prepetition Secured Creditors' right to credit bid, including the nature, amount, or scope of such credit bid, subject to the (a) applicable provisions of the Court's *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling A Final Hearing* Docket No. 90, including paragraph 20 and the Challenge Period (as defined therein), as the same may be modified in accordance with its terms and (b) Sale Objection Deadline (as defined below).

**III.     Stalking Horse Bidder and Bid Protections**

11.     In accordance with the Bidding Procedures, the Debtors may designate one or more Stalking Horse Bidders for the various segments of their business and may enter into an asset purchase agreement with each Stalking Horse Bidder (each, a "**Stalking Horse APA**"), subject to higher or otherwise better offers at the Auction, which establishes a minimum Qualified Bid at the Auction with respect to the assets that are the subject thereof.

OMM_US:78645958.8

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

OMM_US:78645958.8

parties expressing an interest in the Acquired Assets and all parties holding liens on such Acquired Assets, three (3) business days' notice and an opportunity to object to the determination of such Stalking Horse Bidder and disclosure of the Bid Protections set forth in the Stalking Horse APA, and absent objection, the Debtors selection of such Stalking Horse Bidder shall be deemed designated without further order of the Court. To the extent necessary, the Debtors' right to seek this Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby preserved.

## IV. Notice Procedures

15. The form of Sale Notice substantially in the form attached hereto as <u>Exhibit 2</u> is approved.

16. Within seven (7) days after the entry of this Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice and this Bidding Procedures Order, including the Bidding Procedures by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) any parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon or with respect to any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to FILO Lenders; (ix) counsel to

OMM_US:78645958.8

the Stalking Horse Bidder, if any; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; and (xvii) all known creditors of the Debtors, including their contract counterparties; *provided, however*, that to the extent email addresses are available, parties referenced in this paragraph 15 may be served by email.

17.     Service of the Sale Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

18.     The Publication Notice, substantially in the form attached hereto as <u>Exhibit 3</u>, is approved. The Debtors are directed to publish the Sale Notice, as modified for publication, in the *New York Times*, on one occasion on the Mailing Date or as soon as reasonably practicable thereafter. In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their case information website at https://cases.primeclerk.com/RemingtonOutdoor.

19.     Service of the Publication Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to all unknown parties.

20.     The form of the Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> is approved. As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, the Post-Auction Notice identifying any Successful Bidder(s).

## V.     Assumption and Assignment Procedures

21.     The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are approved.

OMM_US:78645958.8

22.     The Notice of Assumption and Assignment, substantially in the form attached hereto as Exhibit 5 is approved.

23.     On or before **August 21, 2020** (any such date, the "**Assumption and Assignment Service Date**"), the Debtors shall file with the Court, and post on the Case Website at https://cases.primeclerk.com/RemingtonOutdoor, the Notice of Assumption and Assignment and Designated Contracts List.  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice.   On the Assumption and Assignment Service Date, the Debtors shall serve, via first-class mail, a customized version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List, on all counterparties to the Designated Contracts.  In addition, the Debtors shall serve, via first-class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List on all parties on the Rule 2002 Notice List. Service of such Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

24.     Any objection by a counterparty to a Designated Contract (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; and (iii) include appropriate

12

OMM_US:78645958.8

documentation in support thereof. All Designated Contract Objections must be filed and served on (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, CA 90071, Attn: Steve Warren (swarren@omm.com) and Jennifer Taylor (jtaylor@omm.com); (ii) co-counsel for the Debtors, Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203, Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr (hlahr@burr.com); (iii) counsel for the Restructuring Committee, Akin Gump Strauss Hauer & Feld LLP, 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Schultz (sschultz@akingump.com); (iv) counsel for the Committee, Fox Rothschild LLP, 345 California Street, Suite 2200, San Francisco, California 94104, Attn: Michael A. Sweet (msweet@foxrothschild.com) and Baker Donelson Bearman Caldwell & Berkowitz, P.C., 420 20th Street North, Birmingham, Alabama 35203, Attn: Matthew Cahill (mcahill@bakerdonelson.com) and Rita Hullett (rhullett@bakerdonelson.com); (v) the Bankruptcy Administrator, 400 Well Street, Decatur, Alabama 35602, Attn: Richard Blythe (richard_blythe@alnba.uscourts.gov); (vi) counsel to the Stalking Horse Bidder, if any; (vii) counsel to the FILO Lenders, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998, Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com) and Andrew V. Alfano (andrew.alfano@pillsburylaw.com); (viii) counsel to Whitebox Advisors LLC, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Andreas Andromalos (aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com); (ix) all parties that have requested notice in the Chapter 11 Cases (collectively (i)–(ix), the "**Objection Recipients**"); and (x) counsel to any Successful Bidder(s), if known on the Sale Objection Deadline no later than 4:00 p.m. (prevailing Central Time) fourteen (14) days following the

OMM_US:78645958.8

Assumption and Assignment Service Date (the "**Assumption and Assignment Objection Deadline**").

25.     If a Designated Contract Objection is not consensually resolved before the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

26.     Any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, the Debtors reserve the right, and are authorized but not directed, to (i) supplement the Designated Contracts List with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

27.     In the event the Debtors exercise any of the rights listed above, the Debtors shall promptly serve the Supplemental Notice of Assumption and Assignment by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each Designated Contract listed on the Supplemental Notice of Assumption and Assignment at the last known address available to the Debtors.  Each Supplemental Notice of Assumption and Assignment shall set forth (i) the name and address of the counterparty to the Designated Contract listed thereon; (ii) the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder, if any, to withdraw such request for assumption and assignment of that Designated Contract prior to the closing of the applicable Sale Transaction); (iii) sufficient information to identify the Designated Contract; (iv) the Cure Costs, if any; and (v) proposed

OMM_US:78645958.8

adequate assurance, if known on the Assumption and Assignment Service Date. The Debtors are authorized, but not directed, to modify the Supplemental Notice of Assumption and Assignment as necessary and appropriate to provide customized individual notice to each Designated Contract counterparty. In addition, the Debtors are authorized, but not directed, to supplement the Designated Contract List on the Case Website with any additional Designated Contracts as the Debtors deem appropriate in their discretion. Service of such Supplemental Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

28. Any objection by a counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Supplemental Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; (iii) include appropriate documentation in support of the objection; and (iv) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment.

29. If a Supplemental Designated Contract Objection is not consensually resolved by the proposed effective date of assignment of the Designated Contract that is the subject of a Supplemental Designated Contract Objection, the Debtors shall seek an expedited hearing before

OMM_US:78645958.8

the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court, including by filing a certification of no objection, (a "**Supplemental Designated Contract Order**") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

30.     Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them, except with respect to adequate assurance of future performance by such Successful Bidder.  For the avoidance of doubt, any objections to the proposed form of adequate assurance of future performance of any Successful Bidder (other than a Stalking Horse Bidder) must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

31.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take

16

OMM_US:78645958.8

assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an "executory" contract. Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final purchase agreement with the Successful Bidder(s) (each, an "**Acquired Contract**") will be assumed and assigned to the Successful Bidder(s).

32. Assignment by the Debtors to the Successful Bidder of a contract, lease or any other liability assumed under Section 365 of the Bankruptcy Code or otherwise relieves the Debtors and their estates from any such liability so assigned.

## VI.    The Sale Hearing

33. A Sale Hearing to (i) approve a sale of a portion or substantially all of the Acquired Assets to the Successful Bidder(s) and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on **September 23, 2020 at 10:00 a.m. (prevailing Central Time)**, and may be adjourned or rescheduled without notice, subject to paragraph 4 of this Bidding Procedures Order. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid(s) and the Backup Bid(s) (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction(s) and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Bankruptcy Court.

OMM_US:78645958.8

34.     Any and all objections, if any, to any Sale Transaction (but excluding any objection based on the specific identity of any Stalking Horse Bidder, the form or substance of any Stalking Horse APA, the specific identity of the Successful Bidder or the Backup Bidder, or the form or substance of the Successful Bid or the Backup Bid) must be filed no later than **September 1, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**").  Any and all such objections must be served on the Objection Recipients and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.  All replies to such objections must be filed by **September 8, 2020 at 12:00 p.m.** (prevailing Central Time) (the "**Reply Deadline**").

35.     Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Debtors' Acquired Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

36.     Promptly following the Auction, the Debtors shall serve the Post-Auction Notice. The Debtors propose that any objections regarding the adequate assurance of future performance of the Successful Bidder or the Backup Bidder (other than the Stalking Horse Bidder) may be raised at the Sale Hearing.

**VII.    Other Provisions**

37.     Notwithstanding anything herein or in the Bidding Procedures to the contrary, the Debtors shall not be permitted to modify the consultation rights of the Consultation Parties or the Bid Consultation Parties in the Bidding Procedures absent further order of this Court or the consent of any affected Consultation or Bid Consultation Parties.

38.     Oneida's rights and priority in connection with any security interests it held in any assets of the Debtors pre-petition are hereby preserved and retained by Oneida to the extent they

OMM_US:78645958.8

existed pre-petition and any such security interests shall attach to proceeds of such assets with the same priority, extent, validity, avoidability and enforceability. Nothing herein shall constitute a finding or ruling by this Court that any such security interests are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such security interest.

39.     The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Bidding Procedures Order.

40.     This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

41.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

42.     To the extent this Bidding Procedures Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Bidding Procedures Order shall govern.

43.     To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

44.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

OMM_US:78645958.8

45.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse APA, and the implementation of this Bidding Procedures Order.


Dated: _____, 2020


_____
UNITED STATES BANKRUPTCY JUDGE

OMM_US:78645958.8

**<u>Exhibit B</u>**

2

ASSET PURCHASE AGREEMENT

by and among

SPORTSMAN'S WAREHOUSE, INC.

as Buyer,

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.,

SET FORTH ON THE SIGNATURE PAGES HERETO

as Seller

Dated as of October 7, 2020

44229187 v2

# TABLE OF CONTENTS

Page

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS .................................. 5

    Section 1.1      Transfer of Acquired Assets ............................................... 5
    Section 1.2      Excluded Assets ................................................................. 5
    Section 1.3      Assumption of Liabilities ................................................. 8
    Section 1.4      Retention of Liabilities .................................................... 8
    Section 1.5      [RESERVED] ..................................................................... 9
    Section 1.6      Non-Assignment of Acquired Assets................................. 9
    Section 1.7      Further Conveyances and Assumptions............................. 10
    Section 1.8      Conflicts with Other Bidders.  ......................................... 10

ARTICLE 2. CONSIDERATION .................................................................................. 10

    Section 2.1      Consideration ...................................................................... 10
    Section 2.2      Good Faith Deposit ............................................................ 10

ARTICLE 3. CLOSING AND DELIVERIES................................................................. 11

    Section 3.1      Closing ................................................................................ 11
    Section 3.2      Seller's Deliveries .............................................................. 11
    Section 3.3      Buyer's Deliveries .............................................................. 12

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ............................................ 12

    Section 4.1      Representations and Warranties of Seller........................... 12
    Section 4.2      Representations and Warranties of Buyer........................... 13
    Section 4.3      Warranties Exclusive; Schedules........................................ 15
    Section 4.4      Survival of Representations and Warranties....................... 15

ARTICLE 5. COVENANTS OF THE PARTIES ............................................................ 15

    Section 5.1      Covenants of Seller ............................................................. 15
    Section 5.2      Covenants of Buyer............................................................. 16

ARTICLE 6. ADDITIONAL AGREEMENTS ............................................................... 17

    Section 6.1      Bankruptcy Matters ............................................................ 17
    Section 6.2      Transitional Arrangements.................................................. 17
    (a)                 Access Covenant.  .............................................................. 17
    (b)                 Transitional License. ......................................................... 18
    Section 6.3      Further Assurances ............................................................. 18

ARTICLE 7. [RESERVED] ........................................................................................... 18

ARTICLE 8. TAXES....................................................................................................... 18

    Section 8.1      Taxes Related to Purchase of Assets ................................. 18
    Section 8.2      Cooperation on Tax Matters ............................................... 18
    Section 8.3      Allocation of Purchase Price.............................................. 19

ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ................. 20

    Section 9.1      Conditions Precedent to Performance by Seller ................. 20
    Section 9.2      Conditions Precedent to Performance by Buyer................. 20

44229187 v2

Case 20-81688-CRJ11    Doc 964    Filed 10/07/20    Entered 10/07/20 20:53:18    Desc
Main Document    Page 82 of 141

ARTICLE 10. TERMINATION ..................................................................................... 21

    Section 10.1      Conditions of Termination ....................................................... 21
    Section 10.2      Effect of Termination; Remedies ............................................ 22

ARTICLE 11. MISCELLANEOUS ............................................................................... 23

    Section 11.1      Successors and Assigns............................................................ 23
    Section 11.2      Governing Law; Jurisdiction.................................................... 23
    Section 11.3      WAIVER OF JURY TRIAL .................................................... 24
    Section 11.4      Expenses .................................................................................. 24
    Section 11.5      Broker's and Finder's Fees ...................................................... 24
    Section 11.6      Severability ............................................................................. 24
    Section 11.7      Notices .................................................................................... 24
    Section 11.8      Amendments; Waivers ............................................................. 25
    Section 11.9      Time of Essence ...................................................................... 26
    Section 11.10    Specific Performance .............................................................. 26
    Section 11.11    Public Announcements ............................................................ 26
    Section 11.12    Entire Agreement .................................................................... 26
    Section 11.13    Parties in Interest.................................................................... 27
    Section 11.14    Bulk Sales Laws...................................................................... 27
    Section 11.15    Construction............................................................................ 27
    Section 11.16    Counterparts and Facsimile..................................................... 27

ARTICLE 12. DEFINITIONS........................................................................................ 27

    Section 12.1      Certain Terms Defined............................................................. 27
    Section 12.2      All Terms Cross-Referenced................................................... 34

## SCHEDULES

Schedule 1.1(a)   -   Acquired Intellectual Property

## EXHIBIT

Exhibit 1       -   Bidding Procedures Order

44229187 v2

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of October 7, 2020 (the "Effective Date"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (collectively with ROC, "Seller"), and Sportsman's Warehouse, Inc., a Utah corporation ("Buyer"), or a Buyer Acquisition Vehicle as assignee in accordance with Section 11.1. Capitalized terms used in this Agreement are defined or cross-referenced in Article 12.

## *RECITALS*

A.      On July 27, 2020 (the "Petition Date") Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court" and the case arising under such petition, the "Bankruptcy Case").

B.      On the Petition Date, Seller filed a Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets (the "Bidding Procedures Motion") pursuant to which Seller sought, and the Bankruptcy Court approved, the Bidding Procedures Order attached hereto as Exhibit 1 (the "Bidding Procedures Order").

C.      Pursuant to the Sellers' Bankruptcy Case, Buyer desires to purchase from Sellers Intellectual Property, including Trademarks, primarily related to or associated with Sellers' TAPCO brand (collectively, the "Business"), described in greater detail herein as the Acquired Assets, free and clear of any and all Liens, Claims and Interests (other than Permitted Liens), except for assumption of the Assumed Liabilities, and Sellers desire to sell, convey, assign and transfer to Buyer, the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

D.      Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Seller.

E.      The Acquired Assets and Assumed Liabilities are assets and liabilities of Seller, which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code that is in form and substance acceptable to Buyer (the "Sale Order"), all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code. The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

## *STATEMENT OF AGREEMENT*

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and

44229187 v5

valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

ARTICLE 1. <u>PURCHASE AND SALE OF THE ACQUIRED ASSETS</u>.

Section 1.1    <u>Transfer of Acquired Assets</u>.  At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities). For all purposes under this Agreement, the term "Acquired Assets" shall not include any Excluded Assets and shall mean all of the following properties, assets, Interests and rights of Seller existing as of the Closing Date:

(a)    the Intellectual Property set forth on <u>Schedule 1.1(a)</u> (the "<u>Acquired Intellectual Property</u>");

(b)    all goodwill associated with the Acquired Intellectual Property;

(c)    Claims held by Seller that relate to Acquired Assets; and

(d)    to the extent permitted by applicable Law (and other than all Documents of Seller held by Seller or Seller's counsel related to the Retained Litigation), all Documents that are primarily used in, held for use in or intended to be used in, or that primarily relate to, the Acquired Assets, the Assumed Liabilities; <u>provided</u>, that Buyer shall provide Seller with reasonable access (during business hours with reasonable prior notice and without cost to Seller) to the same following the Closing to the extent reasonably necessary to permit Seller to wind-down and liquidate their estate after the Closing; <u>provided</u>, <u>further</u>, that Buyer shall provide any other buyer of Seller's lines of business or assets pursuant to the auction contemplated by the Bidding Procedures Order (an "<u>Other Buyer</u>") with reasonable access at such Other Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same to the extent reasonably related to the assets of Sellers purchased by such Other Buyer; and <u>provided</u>, <u>further</u>, that Seller and each such Other Buyer shall keep such information confidential in accordance with this Agreement and all requirements of applicable Law (or in the case of any such Other Buyer, a confidentiality agreement reasonably acceptable to Buyer);.

Section 1.2    <u>Excluded Assets</u>.  Notwithstanding any provision to the contrary in <u>Section 1.1</u>, the Acquired Assets shall not include any right, title or interest of any Person other than Seller in any property or asset, or Seller's right, title and interest in, to and under properties and assets that are not Acquired Assets and shall specifically exclude the following properties, Contracts, Leases, and other assets, interests and rights of Seller (all such items not being acquired by Buyer being referred to in this Agreement as the "<u>Excluded Assets</u>"):

(a)    all Intellectual Property other than the Acquired Intellectual Property, including all moral rights and goodwill associated therewith;

(b)    all Owned Real Property;

44229187 v5

(c)     all Leases pursuant to which Seller has the right to possess, use, lease or occupy (or grant others the right to possess, use, lease or occupy) any Leased Real Property, together with all security and other deposits related thereto, prepaid rent and appurtenances thereto and associated therewith;

(d)     all Leasehold Improvements of Seller located on the Leased Real Property;

(e)     all rights of every nature and description under or arising out of (including rights to refunds or adjustments relating to, and proceeds and recoveries from): (i) all Insurance Policies; and (ii) all insurance policies to the extent of coverage of any Excluded Liabilities, including those insurance policies covering any tort liabilities that are not Assumed Liabilities (including, for the avoidance of doubt, those covering liabilities and Claims against Seller and its affiliates relating to the Employee Liabilities) (the foregoing clauses (i) to (ii) collectively, the "Insurance Policies");

(f)     all of Seller's owned or leased (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property (including without limitation consumables located at the premises of Seller), and (ii) rights to any warranties and licenses received from manufacturers, sellers or lessors of the foregoing;

(g)     all of Sellers' inventory, supplies and finished goods (the "Inventory");

(h)     all of Seller's (i) owned or leased cars, trucks and other motor vehicles, (ii) rights under any lease for any of the foregoing, and (iii) rights to the warranties and licenses received from manufacturers, lessors and sellers of the foregoing;

(i)     all Employee Benefit Plans and all assets of, and Contracts relating to or associated with, such Employee Benefit Plans (including, for the avoidance of doubt, the D&O Insurance and the Insurance Policies) and (ii) all policies that insure any of the assets of Seller, and all benefits and rights to proceeds thereunder (including rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses associated with such insurance policies), and all rights of every nature and description under or arising out of such policies (including rights to refunds or adjustments relating thereto and proceeds and recoveries therefrom);

(j)     all Intellectual Property that is not the Acquired Intellectual Property  or comprising the Acquired Assets;

(k)     all Contracts of Seller;

(l)     all Permits issued to Seller;

(m)     all sales orders or other commitments of Seller to purchasers of goods, services or products;

(n)     all outstanding purchase orders or other commitments of Seller to suppliers of goods and services for materials, supplies or other items;

44229187 v5

(o)     all goodwill associated with any asset that is not an Acquired Asset and any other intangible asset that is not an Acquired Asset;

(p)     any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings;

(q)     all (i) prepaid premiums in respect of all insurance policies of Seller, (ii) retainers, prepayments or on-account cash paid to Seller's professionals and advisors, including any carve-out under any DIP Facility or cash collateral arrangements (whether retained in the Bankruptcy Case or otherwise), and (iii) other rights to refunds relating to, deposits, prepaid charges and expenses paid by Seller to the extent in connection with or relating to any Excluded Asset;

(r)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes (including those relating to the pre-Closing portion of any Straddle Period), other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(s)     all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller entity;

(t)     all Documents exclusively relating to any Excluded Asset;

(u)     all Documents exclusively relating to any Employees;

(v)     subject to Section 1.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities pursuant to Section 1.4(a));

(w)     all Employee Benefit Plans and all assets of, and Contracts exclusively relating to or associated with such plans;

(x)     all Cash and all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(y)     any rights of Seller under this Agreement or any Ancillary Agreement to which Seller is a party, including without limitation any rights relating to the Purchase Price;

(z)     copies of all Historic Firearms Books and Records of Seller;

(aa)     all Documents of Seller held by Seller or Seller's counsel relating to (i) any litigation against Seller or (ii) the Employee Liabilities;

44229187 v5

(bb)    the D&O Insurance, and all proceeds thereof;

(cc)    all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

(dd)    any properties, Contracts, Leases, or other assets, interests and rights of Seller that are not Acquired Assets;

(ee)    all Avoidance Actions; and

(ff)    Claims held by Seller against any party that are covered by, relate to or are based upon any Insurance Policy or the D&O Insurance.

Section 1.3    <u>Assumption of Liabilities</u>  At the Closing, Buyer shall assume, and Buyer agrees to thereafter pay, perform and discharge when due, and indemnify, defend and hold harmless Seller, its Affiliates and all of their respective Related Persons from and against, any and all liabilities, Claims and obligations arising out of or relating to the ownership, operation or management of the Business or the Acquired Assets on or after the Closing, other than the Excluded Liabilities, including, without limitation, all of the following liabilities (all items in this Section 1.3 being, collectively, the "<u>Assumed Liabilities</u>"):

(a)    all liabilities and obligations for Post-Closing Taxes (including those relating to the post-Closing portion of any Straddle Period); and

(b)    all liabilities and obligations for Transaction Taxes.

Section 1.4    <u>Retention of Liabilities</u>.  Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Seller (all such liabilities and obligations not being assumed being herein referred to as the "<u>Excluded Liabilities</u>").  The Excluded Liabilities include, without limitation, the following liabilities and obligations:

(a)    all liabilities and obligations under or relating to the Excluded Assets;

(b)    all liabilities and obligations of Seller under or relating to the Priority Term Loan, the FILO Facility, the Exit Term Loan or the Intercompany Note;

(c)    all liabilities and obligations under the CBA;

(d)    all liabilities and obligations under the Pension Plan;

(e)    all Employee Liabilities;

(f)    all City of Huntsville Project Development Liabilities;

44229187 v5

(g)     all liabilities and obligations for Pre-Closing Taxes (including those relating to the pre-Closing portion of any Straddle Period);

(h)     all liabilities and obligations of Seller arising under or incurred in connection with the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which Seller is a party and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(i)     all liabilities of, and Claims against, Seller arising from and in connection with grants of restricted common unit/share awards and stock options by Seller;

(j)     any liabilities and obligations of Seller under this Agreement, or under any Ancillary Agreement to which Seller is a party;

(k)     all State of Alabama Project Development Liabilities;

(l)     the Retained Litigation; and

(m)     all other liabilities and obligations (including under applicable Environmental Laws and other Laws) arising out of or relating to Seller's ownership, operation or management of the Business (or any other business of Seller) and the Acquired Assets prior to the Closing.

Section 1.5     [RESERVED].

Section 1.6     Non-Assignment of Acquired Assets.     Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "Necessary Consent"), would constitute a breach thereof (after giving effect to any waiver by the applicable counterparty, or any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent.  In such event, Seller and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to Seller or Buyer,

9

under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Seller would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Seller's obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Seller thereunder.

    Section 1.7 <u>Further Conveyances and Assumptions</u>.

    (a) Seller shall deliver to Buyer at the Closing all Documents included in the Acquired Assets.

    (b) At the Closing, and from time to time thereafter, Seller and Buyer shall, and Seller and Buyer shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

    Section 1.8 <u>Conflicts with Other Bidders</u>.  In the event of any conflict between this Agreement and any other bidder or bidders for Seller's assets relating to the Acquired Assets or the Assumed Liabilities as defined herein or in the applicable asset purchase agreement or agreements by and between Seller and such other bidder or bidders (an "<u>Other APA</u>"), Buyer shall cooperate in good faith with any such other bidder or bidders, whether before or after the Closing Date, to ensure that all assets or liabilities are appropriately apportioned between Buyer and such bidder or bidders in order to reflect the intent of Buyer and any such other bidder or bidders under this Agreement and each applicable Other APA.

<div align="center">ARTICLE 2. <u>CONSIDERATION</u></div>

    Section 2.1 <u>Consideration</u>.  The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets (the "<u>Purchase Price</u>") shall be:

    (a) One Hundred Thousand United States Dollars (US$100,000) (the "<u>Gross Closing Cash Payment</u>"), to be adjusted pursuant to <u>Section 2.2(b)</u>, and paid and delivered in accordance with <u>Section 3.3(a)</u>; and

    (b) assumption of the Assumed Liabilities.

    Section 2.2 <u>Good Faith Deposit</u>.

    (a) Buyer has paid to Seller the amount of Forty Thousand United States Dollars (US $40,000) by wire transfer of immediately-available funds (the "<u>Good Faith Deposit</u>").  The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Seller or Buyer and shall be deposited in

44229187 v5

a segregated deposit account of Seller and held in trust to be administered solely in accordance with the terms of this Agreement and the Bidding Procedures Order.  Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b)     If the Closing occurs, the Gross Closing Cash Payment shall be reduced by the amount of the Good Faith Deposit (such resulting amount, the "Net Closing Cash Payment"), to  paid and delivered in accordance with Section 3.3(a).

(c)     If this Agreement is terminated pursuant to Section 10.1, the Good Faith Deposit shall be repaid to Buyer or retained by Seller in the amounts and at the times set forth in Section 10.2(a) through Section 10.2(c).

ARTICLE 3. CLOSING AND DELIVERIES

Section 3.1     Closing.  Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Pacific Time, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in Article 9 of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by Seller and Buyer, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "Closing Date").

Section 3.2     Seller's Deliveries.  At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a)     all of the Acquired Assets, together with one or more duly executed bills of sale, and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller;

(b)     one or more duly executed assignment and assumption agreements for the Assumed Liabilities, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Assignment and Assumption Agreement");

(c)     one or more duly executed assignments of (i) the trademark and patent registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States), (ii) the Internet domain name registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for filing with all applicable domain name registries, and (iii) general assignments of all other Acquired Intellectual Property, in each case in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Acquired Intellectual Property Assignment");

44229187 v5

(d)     the officer's certificate required to be delivered pursuant to <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u>.

Section 3.3     <u>Buyer's Deliveries</u>.  At the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a)     cash in an amount equal to the Net Closing Cash Payment, by wire transfer of immediately available funds to the account or accounts of Seller identified by Seller in writing reasonably in advance of the Closing;

(b)     written authorization to release the Good Faith Deposit to Seller;

(c)     one or more duly executed Assignment and Assumption Agreements;

(d)     one or more duly executed Acquired Intellectual Property Assignments;

(e)     the officer's certificate required to be delivered pursuant to <u>Section 9.1(a)</u> and <u>Section 9.1(b)</u>; and

(f)     such other documents, instruments and certificates as Seller may reasonably request to transfer, assign and delegate the Assumed Liabilities to Buyer in accordance with the terms and conditions hereof.

ARTICLE 4. <u>REPRESENTATIONS AND WARRANTIES</u>

Section 4.1     <u>Representations and Warranties of Seller</u>.  Seller represents and warrants to Buyer as follows:

(a)     <u>Corporate Organization</u>.  Each entity comprising Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of domicile.  Subject to any necessary authority from the Bankruptcy Court, each entity comprising Seller has the requisite corporate or limited liability company power and authority to conduct the Business as now being conducted and to carry out its obligations under this Agreement.

(b)     <u>Authorization and Validity</u>.   Each entity comprising Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement has been duly authorized by all necessary corporate or limited liability company action by the boards of directors or managers of Seller, and no other corporate or limited liability company proceedings are necessary for the performance by Seller of its obligations under this Agreement or the consummation by Seller of the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by Seller and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

44229187 v5

(c)     No Conflict or Violation.  Neither the execution and delivery by Seller of this Agreement or any of the Ancillary Agreements to which Seller is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order) the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements, nor compliance by Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any breach of any provision of the respective certificates of incorporation or formation of Seller or the respective by-laws or operating agreements of Seller, or (y) violate any provision of law, regulation, rule or other legal requirement of any Government ("Law") or any order, judgment or decree of any court or Government ("Order") applicable to Seller or any of its properties or assets, except, in either of the foregoing cases (x) and (y), for any conflict or violation as would not reasonably be expected to cause a Material Adverse Effect.

(d)     Title and Ownership.  Except as would not have a Material Adverse Effect, Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets.  Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens, other than Permitted Liens.

(e)     Compliance with Law.  Except as would not otherwise reasonably be expected to cause a Material Adverse Effect, (i) Seller has operated the Business in material compliance with all applicable Laws, and (ii) except as may result from the Bankruptcy Case, Seller has not received written notice of any violation of any applicable Laws, nor is Seller in default with respect to any Order applicable to the Acquired Assets.

Section 4.2     Representations and Warranties of Buyer.  Buyer represents and warrants to Seller as follows:

(a)     Corporate Organization.  Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation.  Buyer has the requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b)     Qualification to do Business.  Buyer is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary, other than where the failure to be so qualified or in good standing would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(c)     Authorization and Validity.  Buyer has the requisite corporate power and authority necessary to enter into this Agreement and each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the

13

consummation by Buyer of the transactions contemplated hereby or thereby. This Agreement and each of the Ancillary Agreements to which Buyer is a party have been duly and validly executed and delivered by it and are valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

(d)    No Conflict or Violation.  Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

(e)    Consents and Approvals.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)    Financial Capability.  Buyer and any Buyer Acquisition Vehicle currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor (i) to Seller of the Purchase Price and (ii) of any Cure Amount, and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(g)    Investigation by Buyer.  Buyer has conducted its own independent review and analysis of the Business, the Acquired Assets and the Assumed Liabilities, operations, technology, assets, liabilities, financial condition and prospects of the Business as formerly carried on by Seller and acknowledges that Seller has provided Buyer with reasonable access to the personnel, properties, premises and records of the Business for this purpose. Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither Seller nor any of its Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons,

14

except for the representations and warranties contained in <u>Section 4.1</u> (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Seller, its Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding misrepresentation or concealment arising from actual fraud of Seller) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in <u>Section 4.1</u> and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3     <u>Warranties Exclusive; Schedules</u>.

(a)     The representations and warranties contained in <u>Article 4</u> are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed. Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (D) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS. SELLER AND SELLER'S AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATIONS OR WARRANTIES IN ANY OTHER AGREEMENT.

(b)     The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

Section 4.4     <u>Survival of Representations and Warranties</u>. None of the representations or warranties of Seller set forth in this Agreement or any Ancillary Agreement or in any certificate delivered pursuant to <u>Section 9.2(a)</u> or <u>Section 9.2(b)</u> shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement or any Ancillary Agreement shall survive in accordance with their respective terms).

ARTICLE 5. <u>COVENANTS OF THE PARTIES</u>

Section 5.1     <u>Covenants of Seller</u>. Seller covenants as follows:

44229187 v5

(a)  Commercially Reasonable Efforts.  Between the Effective Date and the Closing Date, Seller shall use commercially reasonable efforts to (except as may be disclosed to Buyer) (i) obtain all necessary consents, waivers, authorizations and approvals of all Governments, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party, (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) maintain the Acquired Assets substantially in accordance with Seller's current practices and procedures (as adjusted for the effects of any COVID Restrictions).

(b)  Access to Properties and Documents; Confidentiality. Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access (subject to any COVID Restrictions) during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10) to all Documents of Seller relating to the Acquired Assets and the Assumed Liabilities.  Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account any COVID Restrictions and Seller's resources and other commitments, during normal business hours, to all Acquired Assets, and to Seller's executive officers, accountants, counsel, employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 10).  The rights of access contained in this Section 5.1(b) are granted subject to, and on, the following terms and conditions:  (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this Section 5.1(b) or otherwise) will be governed and protected by the Confidentiality Agreement, dated as of August 1, 2020 by and between Buyer and ROC (the "Confidentiality Agreement"); and (iii) such rights of access shall not affect or modify the conditions set forth in Article 9 in any way.

Section 5.2    Covenants of Buyer.  Buyer covenants as follows:

(a)  Commercially Reasonable Efforts.  Buyer shall use all commercially reasonable efforts to (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)  Released Claims.  Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired Assets to the extent such Claims have been, or are at any time thereafter, released by or on behalf of Seller or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise or (ii) pursue, prosecute or assert any rights related to any Avoidance Actions or Claims against employees, officers of directors of Seller, including by way of offset or recoupment.

16

44229187 v5

# ARTICLE 6. <u>ADDITIONAL AGREEMENTS</u>

Section 6.1    <u>Bankruptcy Matters</u>.

(a)    <u>Backup Bidder</u>.  In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures Order, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures Order) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction.  Notwithstanding anything to the contrary in this Agreement, Seller may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the Inventory and the other assets of Seller, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)    <u>Notice to Holders of Liens, Claims and Interests</u>.  Seller has provided notice of the intent to seek entry of the Sale Order to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)    <u>Entry of Sale Order</u>.  Seller has filed or will file with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order.  The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement, Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability.  Seller and Buyer shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement.  In the event that any Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Buyer will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.  For purposes of this <u>Section 6.1(c)</u> only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

Section 6.2    <u>Transitional Arrangements</u>.

(a)    <u>Access Covenant</u>.    Upon reasonable request from Sellers, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will following the Closing Date provide to Sellers, and the accountants, counsel and representatives of Sellers, including any administrator of the Plan or Sellers' estate, such access to the pre-closing books and records as are reasonably necessary to permit Sellers to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan

44229187 v5

and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation of claims and making of distributions contemplated under the Plan. Such services will include (i) reasonable access to Buyer's personnel, information technology systems and books and records and (ii) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Sellers engaged in such wind-down and liquidation process. Buyer will provide such services free of any charges, fees or rents, provided that Sellers will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Sellers' employees engaged in the liquidation).

(b)     Transitional License.  Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days, Buyer shall grant Sellers a non-exclusive, royalty-free, non-transferrable, non-extendable right and license to use the Acquired Intellectual Property, solely in connection with the wind-down and liquidation of Sellers' estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.  Thereafter, Sellers shall, and shall cause their Affiliates, to cease all further use of the Acquired Intellectual Property.

Section 6.3     Further Assurances.  At the request and the sole expense of the requesting party, either party shall, at any time after the Closing Date, execute and deliver such documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

ARTICLE 7. [RESERVED]

ARTICLE 8. TAXES.

Section 8.1     Taxes Related to Purchase of Assets.  All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Seller as a result of the sale of the Acquired Assets (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(a) of the Bankruptcy Code, shall be paid by Buyer. Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and Seller agrees to assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 8.2     Cooperation on Tax Matters.

(a)     Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return,

44229187 v5

claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)    Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period of at least six (6) years from the Closing Date, and will give Seller notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to the books, records, documents and other information relating to the Acquired Assets or the Assumed Liabilities as Seller may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Seller. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities.

(c)    Sellers shall prepare and file all Tax Returns of Sellers, whether or not such Tax Returns are required to be filed prior to or after the Closing Date, and Sellers shall timely pay all Taxes reflected on such Tax Returns.

Section 8.3    Allocation of Purchase Price.  Promptly (and in any event within ninety (90) days) following the Closing Date, Seller shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "Allocation").  Seller and Buyer will cooperate to resolve any disputes regarding the Allocation and to file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement. If the Parties are not able to agree to the Allocation within forty-five (45) days after receipt of such Allocation by Sellers, the Parties shall retain an independent accounting firm (the "Independent Accounting Firm") to resolve their dispute. The determination of the Independent Accounting Firm shall be final and binding on all parties hereto. The cost of the Independent Accounting Firm shall be shared equally by Sellers, on the one hand, and Buyer, on the other hand. In the event that the Allocation is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation. No Party will take any position that is contrary to or inconsistent with the Allocation for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns).

44229187 v5

## ARTICLE 9. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES</u>.

Section 9.1 <u>Conditions Precedent to Performance by Seller</u>. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the condition contained in <u>Section 9.1(c)(i)</u>) may be waived by Seller in its sole discretion:

(a) <u>Representations and Warranties of Buyer</u>. All representations and warranties made by Buyer in <u>Section 4.2</u> shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(b) <u>Performance of the Obligations of Buyer</u>. Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(c) <u>Consents and Approvals</u>. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d) <u>No Violation of Orders</u>. No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e) <u>Buyer's Deliveries</u>. Buyer shall have delivered to Buyer all of the items set forth in <u>Section 3.3</u>.

Section 9.2 <u>Conditions Precedent to Performance by Buyer</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the condition contained in <u>Section 9.2(c)(i)</u>) may be waived by Buyer in its sole discretion:

(a) <u>Representations and Warranties of Seller</u>. All representations and warranties made by Seller in <u>Section 4.1</u> shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and

20

44229187 v5

Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(b)     <u>Performance of the Obligations of Seller</u>.  Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance (i) that do not result in a Material Adverse Effect or (ii) under those obligations of Seller set forth in <u>Section 6.2(c)</u>, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(c)     <u>Consents and Approvals</u>.

(i)     The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)     <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)     <u>Seller's Deliveries</u>.  Seller shall have delivered to Buyer all of the items set forth in <u>Section 3.2</u>.

ARTICLE 10. <u>TERMINATION</u>.

Section 10.1     <u>Conditions of Termination</u>.  This Agreement may be terminated at any time before the Closing:

(a)     By mutual written consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, on or after the date that is 120 calendar days after the Petition Date (the "<u>Warranty Termination Date</u>"), if the condition contained in <u>Section 9.1(a)</u> has not been satisfied or waived; <u>provided</u>, <u>however</u>, that Seller shall not have the right to terminate this Agreement under this <u>Section 10.1(b)</u> if Seller is then in material breach of this Agreement;

(c)     By Seller, by notice to Buyer, if Seller has previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant; <u>provided</u>, <u>however</u>, that Seller shall not have the right to terminate this Agreement under this <u>Section 10.1(c)</u> if Seller is then in material breach of this Agreement;

(d)     By Seller, by notice to Buyer, on or after the date that is 120 calendar days after the Petition Date (the "<u>Approval Termination Date</u>"), if any condition contained in <u>Section 9.1(c)</u> or <u>Section 9.1(d)</u> has not been satisfied or waived; <u>provided</u>, <u>however</u>, that Seller shall not have the right to terminate this Agreement under this <u>Section 10.1(d)</u> if Seller is then in material breach of this Agreement;

44229187 v5

(e)     By Buyer, by notice to Seller, on or after the Warranty Termination Date, if the condition contained in Section 9.2(a) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(e) if Buyer is then in material breach of this Agreement;

(f)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with written notice of a failure to perform any material covenant of Seller contained in this Agreement and Seller has failed within five (5) days after such notice to perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(f) if Buyer is then in material breach of this Agreement;

(g)     By Buyer, by notice to Seller, after the Approval Termination Date, if any condition contained in Section 9.2(c) or Section 9.2(d) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(g) if Buyer is then in material breach of this Agreement;

(h)     By Buyer, by notice to Seller, or by Seller, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)     By Seller, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 90 calendar days after the Petition Date; and

(j)     Automatically, upon the earlier of (i) Seller consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction.

Section 10.2    Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 10.1, this Agreement shall become null and void and have no effect (other than Article 10, Article 11, and Article 12, which shall survive termination), with no liability on the part of Seller or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 11.4, (ii) the obligation of Buyer under 0 and (iii) any liability provided for in Section 10.2(b) through Section 10.2(d), inclusive.

(b)     If this Agreement is terminated pursuant to Section 10.1(a), Section 10.1(d), Section 10.1(e), Section 10.1(f), Section 10.1(g), Section 10.1(h), Section 10.1(i) or Section 10.1(j), then the Good Faith Deposit shall, within three (3) Business Days, be returned by Seller to Buyer.

(c)     If this Agreement is terminated pursuant to Section 10.1(b) or Section 10.1(c), then Seller may, at its sole election (i) within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee"), or (ii) without limitation to Seller's

44229187 v5

Case 20-81688-CRJ11    Doc 964    Filed 10/07/20    Entered 10/07/20 20:53:18    Desc
Main Document    Page 102 of 141

remedies under clause (i) of this Section 10.2(c) require Buyer to specifically perform under the terms of this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(d)     Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article VI (if the Closing shall have occurred) (i) Seller's entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Seller retains such amount, then notwithstanding anything to the contrary contained herein, such Break Fee shall be the sole and exclusive remedy available to Seller and any other Person against Buyer, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Seller, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Seller, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby.  Each Party acknowledges that the agreements contained in this Section 10.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

ARTICLE 11. MISCELLANEOUS.

Section 11.1   Successors and Assigns.  Prior to the Closing, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other, and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided that if Buyer wishes, upon prior written notice to Seller, to assign its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to a Buyer Acquisition Vehicle, such prior written consent of Seller shall not unreasonably be withheld.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 11.2   Governing Law; Jurisdiction.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

23

Section 11.3  <u>WAIVER OF JURY TRIAL</u>.   EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.3</u>.

Section 11.4  <u>Expenses</u>.  Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated. For all purposes under this Agreement, unless otherwise specified in the applicable clause, any obligation of Seller to exercise commercially reasonable efforts shall not require the incurrence of any out-of-pocket expenses by Seller.

Section 11.5  <u>Broker's and Finder's Fees</u>.  Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than, in the case of Seller, Ducera Partners, whose fees and expenses shall, as between the parties to this Agreement, be the responsibility of Seller, and, to Seller's Knowledge, no other broker or other Person is entitled to any commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 11.6  <u>Severability</u>.   In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 11.7  <u>Notices</u>.

(a)     All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is

Case 20-81688-CRJ11    Doc 964    Filed 10/07/20    Entered 10/07/20 20:53:18    Desc
Main Document      Page 104 of 141

to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

> Remington Outdoor Company, Inc.
> 100 Electronics Blvd., SW
> Huntsville, Alabama 35824
> Attention: Ken D'Arcy
> Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

> O'Melveny & Myers LLP
> 400 South Hope Street
> Los Angeles, California 90071
> Attention: John Paul Motley, Esq., and Stephen H. Warren, Esq.
> Phone: (213) 430-6100 and (213) 430-7875, respectively
> Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

> Sportsman's Warehouse, Inc.
> 1475 West 9000 South, Suite A
> West Jordan, Utah 84088
> Attention: Robert K. Julian and Caitlin Howe
> Email: rjulian@sportsmans.com and chowe@sportsmans.com

With a copy to (which copy alone shall not constitute notice):

> Ballard Spahr LLP
> 2000 IDS Center
> 80 South 8th Street
> Minneapolis, Minnesota 55402
> Attention: George H. Singer, Esq. and April Hamlin, Esq.
> Email: singerg@ballardspahr.com and hamlina@ballardspahr.com

(b)     Any party may change its address for the purpose of this Section 11.7 by giving the other party written notice of its new address in the manner set forth above.

Section 11.8    Amendments; Waivers.   This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering

or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 11.9    Time of Essence.   Time is of the essence in the performance of each and every term of this Agreement.

Section 11.10 Specific Performance.   The provisions of this Agreement are uniquely related to Seller's and its Affiliates' desire to consummate the transactions contemplated by this Agreement, and such transactions represent a unique business opportunity at a unique time for the Seller and its Affiliates.  As a result, irreparable damage would occur to Seller and its Affiliates in the event that any of the obligations of Buyer under this Agreement were not performed in accordance with their specific terms.  Although liquidated or other monetary damages may be available for the breach of covenants and undertakings contained in this Agreement, monetary damages would be difficult to ascertain and an inadequate remedy therefor.  Accordingly, if Buyer breaches or threatens to breach any provision of this Agreement, then without limitation to Seller's rights under clause (i) of Section 10.2(c) Seller shall be entitled to an injunction or injunctions, specific performance and any and all other equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, this being in addition to any other remedies to which it is entitled at Law or equity.   If Seller seeks an injunction or injunctions to prevent breaches of this Agreement or seeking to enforce specifically the terms and provisions of this Agreement, Seller shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such Order or injunction.  Buyer irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security.  If any action or proceeding should be brought in equity to enforce the provisions of this Agreement, Buyer shall not allege, and hereby waives the defense, that there is an adequate remedy at Law.

Section 11.11 Public Announcements.  Promptly after the execution and delivery of this Agreement, the parties may make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein. Thereafter, no Party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court.  If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing Party agrees to give the nondisclosing Party prior notice of, and an opportunity to comment on, the proposed disclosure.  Notwithstanding anything to the contrary in this Section 11.11, Seller (a) shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equityholders and lenders to the extent required by the provisions of any of Seller's bylaws, credit agreements and other pre-existing contractual obligations.

Section 11.12 Entire Agreement.   This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  All schedules

44229187 v5

to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

        Section 11.13 <u>Parties in Interest</u>.  Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to Seller or Buyer.  This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

        Section 11.14 <u>Bulk Sales Laws</u>.  Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

        Section 11.15 <u>Construction</u>.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.  The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement.  In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement.  Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form.  As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

        Section 11.16 <u>Counterparts and Facsimiles</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.  Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

<div align="center">ARTICLE 12. <u>DEFINITIONS</u>.</div>

        Section 12.1   <u>Certain Terms Defined</u>.  As used in this Agreement, the following terms have the following meanings:"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

        "<u>Alternative Transaction</u>" means Seller consummating one or more transactions or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of any of the Acquired Assets by Seller to a purchaser or purchasers other than Buyer.

        "<u>Ancillary Agreements</u>" means, collectively, the Assignment and Assumption Agreements, Assignment and Assumption of Leases, Acquired Intellectual Property Assignments, quitclaim deeds, and other certificates, affidavits and releases delivered pursuant to

<div align="center">27</div>

<u>Article 3</u>.

"<u>Avoidance Actions</u>" means any and all claims and remedies of Seller under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or other governmental action to close.

"<u>Buyer Acquisition Vehicle</u>" means a Creditworthy entity that is wholly-owned and controlled by Sportsman's Warehouse Holdings, Inc.

"<u>Cash</u>" means all cash and cash equivalents held by Seller, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities, in each case as of immediately prior to the Closing (and including without limitation (i) the Good Faith Deposit, (ii) the Net Closing Cash Payment, (iii) any fee reserves or escrows established by Seller, and (iv) any cash in the Dominion Account (as defined in the Priority Term Loan)).

"<u>CBA</u>" means that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"<u>City of Huntsville Project Development Liabilities</u>" means all liabilities arising under (i) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Seller, as amended or otherwise modified from time to time, (ii) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000 and (iii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Seller in favor of the City of Huntsville.

"<u>Claims</u>" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or unasserted actions against Seller or any of its Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under

28

Case 20-81688-CRJ11    Doc 964    Filed 10/07/20    Entered 10/07/20 20:53:18    Desc
Main Document    Page 108 of 141

doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Seller is a party; provided that Contracts do not include any Lease or any employment or similar Contracts.

"Creditworthy" means sufficiently capitalized, to the reasonable satisfaction of Seller upon provision to Seller of substantiating documentary evidence, to be able to pay the Purchase Price.

"D&O Insurance" means the policy in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Seller, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"DIP Facility" means any debtor-in-possession financing advanced to Seller in the Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), designs, drawings, user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies or arrangements that provide for compensation for employee benefits as to which Seller has any obligation or liability, contingent or otherwise.

"Employee Liabilities" means all liabilities of Seller to or with respect to all Employees whenever arising and all liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Seller, including, for the avoidance of doubt, under the CBA.

"Employees" means all individuals who are or have been employed by or who are or have provided services to Seller in any capacity.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances,

44229187 v5

rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exit Term Loan" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"FILO Facility" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"Government" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents thereof.

"Historic Firearms Books and Records" means all historic books and records relating to the sale of firearms included in the Acquired Assets, including all records required to be kept pursuant to parts 447, 478, and, 479 of title 27, Code of Federal Regulations.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

"Intellectual Property" means (1) all intellectual property arising from or in respect of the following: (a) all patents and applications therefore, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (b) all

44229187 v5

trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (c) copyrights and registrations and applications therefore and works of authorship, and mask work rights, (d) all Software of Seller, (e) confidential information, know-how, trade secrets and inventions, (e) all social network or social media profiles and pages, and (f) all other intellectual property, (2) Seller's rights pursuant to any Contract with Remington Licensing Corporation and (3) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of Seller's rights or interests in intellectual property that is not an Excluded Asset and any related remedies, including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including, without limitation, security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, Permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"Knowledge" or any other similar term or knowledge qualification means, with respect to (i) Seller, the actual conscious knowledge of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement and (ii) Buyer, the actual conscious knowledge of Robert K. Julian (Chief Financial Officer of Sportsman's Warehouse Holdings, Inc.) or Caitlin Howe (Vice President, Corporate Development and Investor Relations of Sportsman's Warehouse Holdings, Inc.), as of the date the applicable representation or warranty is made or deemed made under this Agreement.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"Leases" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto,

Case 20-81688-CRJ11    Doc 964    Filed 10/07/20    Entered 10/07/20 20:53:18    Desc
Main Document    Page 111 of 141

pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; and (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy or use of an asset.

"Material Adverse Effect" means a state of facts, event, change or effect on the value of the Acquired Assets that results in a material and adverse effect on the value of the Acquired Assets taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy Case; (B) any action of Seller taken pursuant to, or any failure of Seller to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which Seller is a party; (C) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby, (D) changes, after the Effective Date, in United States generally accepted accounting principles, (E) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Seller operates the Business, (F) changes in the firearms, ammunition or sporting goods industries in general, (G) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared) or (H) any occurrence, outbreak, escalation or worsening of, or furloughs or Government actions (including any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other applicable Law, order, directive, guideline or recommendation by any Government of competent jurisdiction (collectively, "COVID Restrictions")) instituted in response to, any epidemic, pandemic or other disease (including without limitation the COVID-19 virus).

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Seller.

"Pension Plan" means Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), as amended from time to time, whereby the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan), as amended from time to time, was merged into the Remington Arms Company, LLC Pension and Retirement Plan.

"Permit" means any permit, license, authorization, registration or certificate obtained from any Government.

32

"Permitted Liens" mean Liens that will attach to the proceeds of the sale under this Agreement pursuant to Section 363 of the Bankruptcy Code or that will not survive the Closing.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"Plan" means a Joint Chapter 11 Plan filed by Seller with the Bankruptcy Court.

"Post-Closing Taxes" means any Taxes, other than Transaction Taxes, imposed on the Acquired Assets in respect of a taxable period (or portion thereof) beginning after the close of business on the day prior to the Closing Date.

"Pre-Closing Taxes" means any Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Priority Term Loan" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Retained Litigation" means all litigation and Claims arising or related to events prior to the Closing.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Documents related to any of the foregoing.

"State of Alabama Project Development Liabilities" means all liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time.

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other

44229187 v5

Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"<u>Tax Return</u>" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"<u>Taxes</u>" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all Income Taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and "<u>Tax</u>" shall mean any one of them.

Section 12.2        <u>All Terms Cross-Referenced</u>. Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| Acquired Assets | Section 1.1 |
| Acquired Intellectual Property | Section 1.1(a) |
| Acquired Intellectual Property Assignment | Section 3.2(d) |
| Affiliate | Section 12.1 |
| Agreement | *Preamble* |
| Allocation | Section 8.3 |
| Alternative Transaction | Section 12.1 |
| Approval Termination Date | Section 10.1(d) |
| Assignment and Assumption Agreement | Section 3.2(b) |
| Assignment and Assumption of Lease | Section 3.2(c) |
| Assumed Liabilities | Section 1.3 |
| Avoidance Actions | Section 12.1 |
| Bankruptcy Case | *Recitals* |
| Bankruptcy Code | *Recitals* |
| Bankruptcy Court | *Recitals* |
| Bidding Procedures Motion | *Recitals* |
| Bidding Procedures Order | *Recitals* |
| Break Fee | Section 10.2(c) |
| Business | *Recitals* |
| Business Day | Section 12.1 |
| Buyer | Preamble |

34

Buyer Acquisition Vehicle .................................................................... Section 12.1
Cash ................................................................................................. Section 12.1
Claims .............................................................................................. Section 12.1
Closing ............................................................................................. Section 3.1
Closing Date ...................................................................................... Section 3.1
Code ................................................................................................. Section 12.1
Confidentiality Agreement ................................................................. Section 5.1(b)
Contract ............................................................................................ Section 12.1
COVID Restrictions ........................................................................... Section 12.1
Creditworthy ...................................................................................... Section 12.1
Documents ........................................................................................ Section 12.1
Effective Date .................................................................................... *Preamble*
Employee Benefit Plans ..................................................................... Section 12.1
Employee Liabilities .......................................................................... Section 12.1
Environmental Laws .......................................................................... Section 12.1
ERISA ............................................................................................... Section 12.1
Excluded Assets ................................................................................ Section 1.2
Excluded Liabilities ........................................................................... Section 1.4
Final Order ........................................................................................ Section 12.1
Good Faith Deposit ............................................................................ Section 2.2(a)
Government ....................................................................................... Section 12.1
Gross Closing Cash Payment .............................................................. Section 2.1(a)
Intellectual Property .......................................................................... Section 12.1
Intercompany Note ............................................................................ Section 12.1
Interests ............................................................................................ Section 12.1
Insurance Policies ............................................................................. Section 1.2(d)
Inventory .......................................................................................... Section 1.2(f)
Law ................................................................................................... Section 4.1(c)
Leased Real Property ......................................................................... Section 12.1
Leasehold Improvements .................................................................... Section 12.1
Leases ............................................................................................... Section 12.1
Lien .................................................................................................. Section 12.1
Material Adverse Effect ...................................................................... Section 12.1
Necessary Consent ............................................................................. Section 1.6
Net Closing Cash Payment ................................................................. Section 2.2(b)
Order ................................................................................................ Section 4.1(c)
Owned Real Property ......................................................................... Section 12.1
Pension Plan ...................................................................................... Section 12.1
Permitted Liens ................................................................................. Section 12.1
Person ............................................................................................... Section 12.1
Petition Date ...................................................................................... *Recitals*
Plan .................................................................................................. Section 12.1
Priority Term Loan ............................................................................. Section 12.1
Purchase Price ................................................................................... Section 2.1
Related Person ................................................................................... Section 12.1
Retained Litigation ............................................................................ Section 12.1

35

44229187 v5

ROC .................................................................................................. Preamble
Sale Order ............................................................................................ *Recitals*
Seller ............................................................................................... Preamble
Seller's Knowledge ........................................................................ Section 12.1
Software ......................................................................................... Section 12.1
State of Alabama Project Development Liabilities.......................... Section 12.1
Subsidiary(ies) .............................................................................. Section 12.1
Tax Return ..................................................................................... Section 12.1
Taxes .............................................................................................. Section 12.1
Transaction Taxes ............................................................................ Section 8.1
Warranty Termination Date .......................................................... Section 10.1(b)

***[Signatures are on the following pages.]***

36

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER**

SPORTSMAN'S WAREHOUSE, INC.

By: _Caitlin Howe_____
　　Name: Caitlin Howe
　　Title: VP, Corporate Development &
　　IR

Case 20-81688-CRJ11    Doc 964    Filed 10/07/20    Entered 10/07/20 20:53:18    Desc
Main Document    Page 117 of 141

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By: _____
   Name:
   Title:

**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By:_____
   Name:
   Title:

FGI HOLDING COMPANY, LLC

By: _____
   Name:
   Title:

BARNES BULLETS, LLC

By: _____
   Name:
   Title:

REMINGTON ARMS COMPANY, LLC

By: _____
   Name:
   Title:

RA BRANDS, L.L.C.

By: _____
   Name:
   Title:

OUTDOOR SERVICES, LLC

By: _____
   Name:
   Title:

S-2

FGI FINANCE INC.

By: _____
     Name:
     Title:


HUNTSVILLE HOLDINGS LLC

By: _____
     Name:
     Title:


TMRI, INC.

By: _____
     Name:
     Title:


REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
     Name:
     Title:


32E PRODUCTIONS, LLC

By: _____
     Name:
     Title:


GREAT OUTDOORS HOLDCO, LLC

By: _____
     Name:
     Title:

S-3

**SCHEDULE 1.1(a)**
**Certain Acquired Intellectual Property**

| Country | Trademark | MGF Comments: | Record Owner | Status | Class | Goods | Appln. No. | Filing Date | Reg. No. | Reg. Date | Renewal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| United States of America | TAPCO | | Remington Arms Company, LLC | Registered | 13 Int. | Gun stocks; pistol grips; gun and rifle parts and accessories, namely, handguards, flashhiders, hammer, stocks, rails, mounts for firearms, magazine catch; pistons sold as a component or part of firearms; muzzle brakes for firearms; trigger mechanisms, namely, triggers, springs, roll pins, a disconnector, and adjustment screws sold as a component part of a firearm; magazine floor plates for firearms; gunstock recoil pads; butt plates for rifles and shotguns; sight mounts, gun stock recoil cushions; cleaning implements for firearms, namely, brushes, rods, and shell extractors; firearm sights; firearm hand guards; mounting rails to attach gun accessories; magazine catch | 77/167,333 | 4/27/2007 | 3,380,627 | 2/12/2008 | 2/12/2028 |
| | | | Remington Arms Company, LLC | | | Drawings and designs of all TAPCO branded parts and accessories | | | | | |

**<u>EXHIBIT 1</u>**

(*See* attached copy of Bidding Procedures Order)

S-3

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-81688-11<br><br>Joint Administration Requested |

## ORDER ESTABLISHING BIDDING PROCEDURES RELATING
## TO THE SALES OF ALL OR A PORTION OF THE DEBTORS' ASSETS

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington

Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors

in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively,

the "**Chapter 11 Cases**"), seeking entry of this order (this "**Bidding Procedures Order**") (i)

approving the proposed bidding procedures attached hereto as <u>Exhibit 1</u> (the "**Bidding

Procedures**") by which the Debtors will solicit and select the highest or otherwise best offer for

the sale of substantially all or a portion of their assets (the "**Acquired Assets**") through one or

more sales of the Acquired Assets (each, a "**Sale Transaction**" or "**Sale**"); (ii) establishing

procedures for the assumption and assignment of executory contracts and unexpired leases,

including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

(iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto, including the procedures for the Debtors' selection of one or more stalking horse bidders (each, a "**Stalking Horse Bidder**"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (iv) scheduling (a) an auction (the "**Auction**") if the Debtors receive two (2) or more timely and acceptable Qualified Bids (as defined below), and (b) a final hearing (the "**Sale Hearing**") to approve one or more Sales of the Acquired Assets; and (v) granting related relief; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984, as amended on July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

C.      The notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Bidding Procedures Order is necessary or required.

D.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) approve the Bidding Procedures, including the procedures for selecting one or more Stalking Horse Bidders and the provision of the Bid Protections to be determined, (ii) establish the Assumption and Assignment Procedures, (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached hereto, (iv) schedule a date for the (a) Auction and (b) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, including the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Meyer Declaration**") and the *Declaration of Colin M. Adams in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Adams Declaration**") are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

E.      The Bidding Procedures, substantially in the form attached hereto as Exhibit 1 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

OMM_US:78645958.8

F.     The Debtors are authorized to pay the break-up fee and expense reimbursement comprising the Bid Protections.  The Bid Protections, to the extent payable under any Stalking Horse APA, (a)(x) are actual and necessary costs and expenses of preserving the Debtors' estate within the meaning of Section 503(b) of the Bankruptcy Code, and (y) shall be treated as allowed administrative claims against the Debtors' estates pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code, are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Acquired Assets, and the efforts that have been and will be expended by the Stalking Horse Bidders.  The Bid Protections are a material inducement for, and condition of, each Stalking Horse Bidder's execution of the applicable Stalking Horse APA.  Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidders are unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under its Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

G.     The Sale Notice and the Publication Notice, substantially in the forms attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Acquired Assets, including the sale of Acquired Assets free and clear of all liens, claims, and encumbrances, the Sale Transaction(s), the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

OMM_US:78645958.8

H.      The Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s), and no other or further notice is required.

I.      The Assumption and Assignment Notice, substantially in the form attached hereto as <u>Exhibit 5</u> and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Costs, and no other or further notice is required.

J.      The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is granted as set forth herein.[3]

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

---

[3] Notwithstanding anything to the contrary herein, the consummation of any Sale Transaction(s) is subject to entry of the Sale Order(s).

OMM_US:78645958.8

## I. The Timeline for the Sale

3. The Debtors are authorized to proceed with the Sale Transaction(s) in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

4. Deadline                                               **<u>Action</u>**

| Deadline | Action |
|---|---|
| August 18, 2020 at 10:00 a.m. (prevailing Central Time) | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| August 21, 2020 | Sale Notice Mailing Date |
| August 21, 2020 | Assumption and Assignment Service Date |
| September 1, 2020 at 4:00 p.m. (prevailing Central Time) | Sale Objection Deadline (defined below) excluding any objection based on identity of Stalking Horse Bidders, Successful Bidder or Backup Bidder or the form or substance of the Stalking Horse Bid, Successful Bid or Backup Bid |
| September 4, 2020 at 5:00 p.m. (prevailing Central Time) | Bid Deadline |
| September 8, 2020 at 12:00 p.m. (prevailing Central Time) | Reply Deadline (defined below) |
| September 8, 2020 by 4:00 p.m. (prevailing Central Time) or 14 days following service of the Supplemental Notice of Assumption and Assignment | Assumption and Assignment Objection Deadline (defined below) excluding any objection related to adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or Backup Bidder |
| September 17, 2020 at 10:00 a.m. (prevailing Central Time) | Auction |
| September 21, 2020 | Post-Auction Notice |
| September 23, 2020 at 10:00 a.m. (prevailing Central Time) | Sale Hearing |

OMM_US:78645958.8

5.      For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "**Modifications**") in accordance with the provisions of the Bidding Procedures; *provided, however*, that the Debtors shall consult with the Consultation Parties or, to the extent provided therein, the Bid Consultation Parties, with respect to any Modifications.  The Committee's right to request an extension of the above timeline for cause is expressly reserved.

## II.      The Bidding Procedures

6.      The Bidding Procedures are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

7.      The Debtors are authorized, in accordance with the Bidding Procedures, to require Diligence Parties to submit written indications of interest specifying, among other things, the Acquired Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party.

8.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be **September 4, 2020 at 5:00 p.m. (prevailing Central Time)**.  Any disputes or objections to the selection of Qualified Bid(s), Successful Bid(s), or Backup Bid(s) (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

OMM_US:78645958.8

9.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on **September 17, 2020 at 10:00 a.m. (prevailing Central Time)** virtually via video conferencing technology, or at such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

10.     The Prepetition Secured Creditors shall have the right, subject in all respects to the Bankruptcy Code and other applicable law and the satisfaction in cash or assumption of claims secured by senior liens, to credit bid all or any portion of their allowed secured claims pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable provisions of the Prepetition Credit Documents and any such credit bid shall be deemed a Qualified Bid subject to the Intercreditor Agreement (as defined in the D'Arcy Declaration); *provided*, *however*, that nothing herein or in the Bidding Procedures shall affect or in any way limit the right or ability of any party in interest, including the Committee, to object to the Prepetition Secured Creditors' right to credit bid, including the nature, amount, or scope of such credit bid, subject to the (a) applicable provisions of the Court's *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling A Final Hearing* Docket No. 90, including paragraph 20 and the Challenge Period (as defined therein), as the same may be modified in accordance with its terms and (b) Sale Objection Deadline (as defined below).

## III.    Stalking Horse Bidder and Bid Protections

11.     In accordance with the Bidding Procedures, the Debtors may designate one or more Stalking Horse Bidders for the various segments of their business and may enter into an asset purchase agreement with each Stalking Horse Bidder (each, a "**Stalking Horse APA**"), subject to higher or otherwise better offers at the Auction, which establishes a minimum Qualified Bid at the Auction with respect to the assets that are the subject thereof.

OMM_US:78645958.8

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

9

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

9

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

9

parties expressing an interest in the Acquired Assets and all parties holding liens on such Acquired Assets, three (3) business days' notice and an opportunity to object to the determination of such Stalking Horse Bidder and disclosure of the Bid Protections set forth in the Stalking Horse APA, and absent objection, the Debtors selection of such Stalking Horse Bidder shall be deemed designated without further order of the Court. To the extent necessary, the Debtors' right to seek this Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby preserved.

**IV.    Notice Procedures**

15.    The form of Sale Notice substantially in the form attached hereto as <u>Exhibit 2</u> is approved.

16.    Within seven (7) days after the entry of this Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice and this Bidding Procedures Order, including the Bidding Procedures by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) any parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon or with respect to any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to FILO Lenders; (ix) counsel to

OMM_US:78645958.8

the Stalking Horse Bidder, if any; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; and (xvii) all known creditors of the Debtors, including their contract counterparties; *provided, however*, that to the extent email addresses are available, parties referenced in this paragraph 15 may be served by email.

17.     Service of the Sale Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

18.     The Publication Notice, substantially in the form attached hereto as <u>Exhibit 3</u>, is approved.  The Debtors are directed to publish the Sale Notice, as modified for publication, in the *New York Times*, on one occasion on the Mailing Date or as soon as reasonably practicable thereafter.  In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their case information website at https://cases.primeclerk.com/RemingtonOutdoor.

19.     Service of the Publication Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to all unknown parties.

20.     The form of the Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> is approved.  As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, the Post-Auction Notice identifying any Successful Bidder(s).

## V.     Assumption and Assignment Procedures

21.     The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are approved.

OMM_US:78645958.8

22.     The Notice of Assumption and Assignment, substantially in the form attached hereto as Exhibit 5 is approved.

23.     On or before **August 21, 2020** (any such date, the "**Assumption and Assignment Service Date**"), the Debtors shall file with the Court, and post on the Case Website at https://cases.primeclerk.com/RemingtonOutdoor, the Notice of Assumption and Assignment and Designated Contracts List.  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice.   On the Assumption and Assignment Service Date, the Debtors shall serve, via first-class mail, a customized version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List, on all counterparties to the Designated Contracts.  In addition, the Debtors shall serve, via first-class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List on all parties on the Rule 2002 Notice List. Service of such Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

24.     Any objection by a counterparty to a Designated Contract (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; and (iii) include appropriate

OMM_US:78645958.8

documentation in support thereof. All Designated Contract Objections must be filed and served on (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, CA 90071, Attn: Steve Warren (swarren@omm.com) and Jennifer Taylor (jtaylor@omm.com); (ii) co-counsel for the Debtors, Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203, Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr (hlahr@burr.com); (iii) counsel for the Restructuring Committee, Akin Gump Strauss Hauer & Feld LLP, 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Schultz (sschultz@akingump.com); (iv) counsel for the Committee, Fox Rothschild LLP, 345 California Street, Suite 2200, San Francisco, California 94104, Attn: Michael A. Sweet (msweet@foxrothschild.com) and Baker Donelson Bearman Caldwell & Berkowitz, P.C., 420 20th Street North, Birmingham, Alabama 35203, Attn: Matthew Cahill (mcahill@bakerdonelson.com) and Rita Hullett (rhullett@bakerdonelson.com); (v) the Bankruptcy Administrator, 400 Well Street, Decatur, Alabama 35602, Attn: Richard Blythe (richard_blythe@alnba.uscourts.gov); (vi) counsel to the Stalking Horse Bidder, if any; (vii) counsel to the FILO Lenders, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998, Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com) and Andrew V. Alfano (andrew.alfano@pillsburylaw.com); (viii) counsel to Whitebox Advisors LLC, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Andreas Andromalos (aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com); (ix) all parties that have requested notice in the Chapter 11 Cases (collectively (i)–(ix), the "**Objection Recipients**"); and (x) counsel to any Successful Bidder(s), if known on the Sale Objection Deadline no later than 4:00 p.m. (prevailing Central Time) fourteen (14) days following the

13

Assumption and Assignment Service Date (the "**Assumption and Assignment Objection Deadline**").

25.     If a Designated Contract Objection is not consensually resolved before the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

26.     Any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, the Debtors reserve the right, and are authorized but not directed, to (i) supplement the Designated Contracts List with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

27.     In the event the Debtors exercise any of the rights listed above, the Debtors shall promptly serve the Supplemental Notice of Assumption and Assignment by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each Designated Contract listed on the Supplemental Notice of Assumption and Assignment at the last known address available to the Debtors.  Each Supplemental Notice of Assumption and Assignment shall set forth (i) the name and address of the counterparty to the Designated Contract listed thereon; (ii) the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder, if any, to withdraw such request for assumption and assignment of that Designated Contract prior to the closing of the applicable Sale Transaction); (iii) sufficient information to identify the Designated Contract; (iv) the Cure Costs, if any; and (v) proposed

OMM_US:78645958.8

adequate assurance, if known on the Assumption and Assignment Service Date. The Debtors are authorized, but not directed, to modify the Supplemental Notice of Assumption and Assignment as necessary and appropriate to provide customized individual notice to each Designated Contract counterparty. In addition, the Debtors are authorized, but not directed, to supplement the Designated Contract List on the Case Website with any additional Designated Contracts as the Debtors deem appropriate in their discretion. Service of such Supplemental Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

28.     Any objection by a counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Supplemental Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; (iii) include appropriate documentation in support of the objection; and (iv) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment.

29.     If a Supplemental Designated Contract Objection is not consensually resolved by the proposed effective date of assignment of the Designated Contract that is the subject of a Supplemental Designated Contract Objection, the Debtors shall seek an expedited hearing before

OMM_US:78645958.8

the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court, including by filing a certification of no objection, (a "**Supplemental Designated Contract Order**") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

30. Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them, except with respect to adequate assurance of future performance by such Successful Bidder. For the avoidance of doubt, any objections to the proposed form of adequate assurance of future performance of any Successful Bidder (other than a Stalking Horse Bidder) must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

31. The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take

16

assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an "executory" contract. Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final purchase agreement with the Successful Bidder(s) (each, an "**Acquired Contract**") will be assumed and assigned to the Successful Bidder(s).

32.    Assignment by the Debtors to the Successful Bidder of a contract, lease or any other liability assumed under Section 365 of the Bankruptcy Code or otherwise relieves the Debtors and their estates from any such liability so assigned.

## VI.    The Sale Hearing

33.    A Sale Hearing to (i) approve a sale of a portion or substantially all of the Acquired Assets to the Successful Bidder(s) and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on **September 23, 2020 at 10:00 a.m. (prevailing Central Time)**, and may be adjourned or rescheduled without notice, subject to paragraph 4 of this Bidding Procedures Order. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid(s) and the Backup Bid(s) (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction(s) and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Bankruptcy Court.

17

34. Any and all objections, if any, to any Sale Transaction (but excluding any objection based on the specific identity of any Stalking Horse Bidder, the form or substance of any Stalking Horse APA, the specific identity of the Successful Bidder or the Backup Bidder, or the form or substance of the Successful Bid or the Backup Bid) must be filed no later than **September 1, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**"). Any and all such objections must be served on the Objection Recipients and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline. All replies to such objections must be filed by **September 8, 2020 at 12:00 p.m.** (prevailing Central Time) (the "**Reply Deadline**").

35. Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Debtors' Acquired Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

36. Promptly following the Auction, the Debtors shall serve the Post-Auction Notice. The Debtors propose that any objections regarding the adequate assurance of future performance of the Successful Bidder or the Backup Bidder (other than the Stalking Horse Bidder) may be raised at the Sale Hearing.

## VII.    Other Provisions

37. Notwithstanding anything herein or in the Bidding Procedures to the contrary, the Debtors shall not be permitted to modify the consultation rights of the Consultation Parties or the Bid Consultation Parties in the Bidding Procedures absent further order of this Court or the consent of any affected Consultation or Bid Consultation Parties.

38. Oneida's rights and priority in connection with any security interests it held in any assets of the Debtors pre-petition are hereby preserved and retained by Oneida to the extent they

OMM_US:78645958.8

existed pre-petition and any such security interests shall attach to proceeds of such assets with the same priority, extent, validity, avoidability and enforceability. Nothing herein shall constitute a finding or ruling by this Court that any such security interests are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such security interest.

39.     The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Bidding Procedures Order.

40.     This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

41.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

42.     To the extent this Bidding Procedures Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Bidding Procedures Order shall govern.

43.     To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

44.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

OMM_US:78645958.8

45. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse APA, and the implementation of this Bidding Procedures Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

OMM_US:78645958.8