THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. THE DEBTORS MAY NOT SOLICIT ACCEPTANCES OR REJECTIONS UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE SUBMITTING THIS DISCLOSURE STATEMENT FOR APPROVAL, BUT THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT. THE DEBTORS MAY REVISE THIS DISCLOSURE STATEMENT TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF, BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT.

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-81688-CRJ11<br><br>Jointly Administered |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN
## OF THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## AND EXIT TERM LOAN LENDERS

**O'MELVENY & MYERS LLP**
Co-Counsel for the Debtors and
Debtors in Possession
400 South Hope Street
Los Angeles, CA 90071-2899

**BURR & FORMAN LLP**
Co-Counsel for the Debtors and
Debtors in Possession
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Co-Counsel for the Franklin Managed Entities
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998

**CHRISTIAN & SMALL LLP**
Co-Counsel for the Franklin Managed Entities
1800 Financial Center, 505 N. 20th Street
Birmingham, AL 35203

**FOX ROTHSCHILD LLP**
Co-Counsel for the Committee
345 California Street, Suite 2200
San Francisco, CA 94104

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
Co-Counsel for the Committee
420 20th Street North, Suite 1400
Birmingham, AL 35203

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' principal offices and assets are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

## IMPORTANT INFORMATION FOR YOU TO READ

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE *JOINT CHAPTER 11 PLAN OF THE DEBTORS', THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND EXIT TERM LOAN LENDERS* (THE "PLAN"). THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101-1532 *ET SEQ.* (THE "BANKRUPTCY CODE"). NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEADLINE TO VOTE ON THE PLAN IS FEBRUARY 23, 2021 AT 4:00 P.M. CENTRAL TIME (THE "VOTING DEADLINE"). FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY PRIME CLERK LLC BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE PLAN PROPONENTS IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN

RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

A COPY OF THE PLAN IS ATTACHED AS <u>EXHIBIT A</u> HERETO. ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, AND THE RISK FACTORS DESCRIBED IN SECTION VIII BELOW BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUMMARIES OF THE PLAN AND OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. UNLESS OTHERWISE SPECIFIED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. THE DEBTORS URGE EACH HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TREATMENTS CONTEMPLATED THEREIN.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT. THE PLAN ADMINISTRATOR (AS DEFINED IN THE PLAN) MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE PLAN ADMINISTRATOR THE RIGHT TO PROSECUTE ESTATE CAUSES OF ACTION AGAINST ANY ENTITY, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN.

Case 20-81688-CRJ11    Doc 1369    Filed 01/25/21    Entered 01/25/21 12:53:40    Desc
Main Document      Page 3 of 180

**THE PLAN IS SUPPORTED BY THE PLAN PROPONENTS, INCLUDING THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND CERTAIN EXIT TERM LOAN LENDERS. THE PLAN PROPONENTS BELIEVE THAT ACCEPTANCE OF THE PLAN DESCRIBED IN THIS DOCUMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, THEIR CREDITORS, AND ALL OTHER PARTIES IN INTEREST. ACCORDINGLY, THE PLAN PROPONENTS RECOMMEND THAT YOU <u>VOTE</u> <u>IN</u> <u>FAVOR</u> OF THE PLAN.**

## AGGREGATE GIFT TO JUNIOR CREDITORS

The Plan includes distributions and transfers based upon the Aggregate Gift to Junior Creditors provided by the Exit Term Loan Lenders. Holders of Allowed Exit Term Loan Claims have agreed to forgo receipt of, fund, and/or gift to Junior Creditors amounts consisting of (1) Cash from the Primary Asset Sale Proceeds utilized pursuant to the Plan for (a) satisfaction of (i) Allowed General Administrative Expenses, (ii) Allowed Priority Tax Claims (subject to the limits provided in the Plan), and (iii) Allowed Priority Non-Tax Claims, (b) funding of (i) the Plan Professional Fee Reserve, (ii) the Plan Administrator Operating Expense Funded Amount, and (iii) any other reserves established under the Plan, (2) the Unsecured Creditor Recovery Amount and the payments to the Tort Convenience Class Claims, if any and (3) the amount of the Adequate Protection Superpriority Claim, which shall be waived as of the occurrence of the Effective Date. In addition to the foregoing, the GL Insurance Assets will be retained for the benefit of the Tort Claims (other than the Tort Convenience Class Claims) in the Tort Claim Sub-Trust and will not be cancelled or sold. But for the foregoing concessions, the Junior Creditors who benefit from the Aggregate Gift to Junior Creditors would likely receive no recovery. Under the Plan, Junior Creditors including holders of Allowed Priority Tax Claims, Tort Convenience Class Claims and General Unsecured Claims will receive recoveries, while the GL Insurance Assets will be preserved for Tort Claims (other than Tort Convenience Class Claims). The Debtors and the other Plan Proponents believe that none of these recoveries would be achievable in a Chapter 7 liquidation or under an alternative plan.

The amount of the Aggregate Gift to Junior Creditors from the Exit Term Loan Lenders is significant and is only available if the Plan is confirmed and becomes effective. In all other scenarios, the Debtors believe that there will be no recovery for Claims in other Classes, with the exception of certain Secured Claims to the extent and only to the extent that their Liens are senior to the those of the Exit Term Loan Secured Creditors up to the value of the Debtors' interest in the applicable Collateral. Only a small number of Secured Claims, if any, would likely satisfy those requirements.

The Debtors estimate that the cash portion of the Aggregate Gift to Junior Creditors ranges in value from approximately $22 million to $30 million, depending upon (i) the ultimate recovery on asset sales, (ii) the amount of the Allowed Administrative, Priority and Tort Convenience Class Claims and (iii) other funded expenses. In addition to the cash portion of the Aggregate Gift to Junior Creditors, the Exit Term Loan Lenders would waive their Adequate Protection Superpriority Claim under Bankruptcy Code Section 507(b) and the Final Cash Collateral Order. The Debtors estimate that the Adequate Protection Superpriority Claim of the Exit Term Loan Lenders may be in the range of approximately $25 million to $35 million based upon the diminution of Cash Collateral predominantly related to Chapter 11 expenses. The Exit Term Loan

Secured Creditors assert that their Adequate Protection Superpriority Claim is potentially as high as $55 million, thus there may be significant variance depending upon how any diminution of Collateral value is measured. As such, the Debtors believe that the Exit Term Loan Lenders' Adequate Protection Superpriority Claim would consume the entirety of any net value of any asset that is not already the Collateral of the Exit Term Loan Secured Creditors in any alternative plan or a Chapter 7 liquidation.

Furthermore, the Plan and the Aggregate Gift to Junior Creditors provides other significant benefits only achievable if the Plan is confirmed. It will provide for the payment of Allowed Tort Convenience Class Claims up to the capped amounts, placing a floor under the recovery for holders of Allowed Tort Claims, including those that may not otherwise have recourse to the GL Insurance Assets. Moreover, the Plan provides that GL Insurance Assets will be held in the Tort Claim Sub-Trust for the benefit of the holders of Allowed Tort Claims (other than Tort Convenience Class Claims). The GL Insurance Assets may not be sold or terminated to generate proceeds to be used for other purposes. Under the Plan, the Exit Term Loan Lenders waive any right to assert that the GL Insurance Assets or net proceeds thereof are their Collateral.

The Exit Term Loan Lenders are anticipated to a have a substantial unsecured deficiency claim, which is estimated at approximately $70 million for purposes of voting under the Plan. The actual deficiency claim will depend upon the amount of Collateral Proceeds ultimately achieved, the final amounts of payments permitted under the Plan, and other factors.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact Prime Clerk LLC, by (i) visiting the Debtors' case website at https://cases.primeclerk.com/RemingtonOutdoor, (ii) calling (877) 755-3450 (for U.S./Canada callers) or (347) 338-6538 (for international callers), or (iii) sending e-mail correspondence to RemingtonBallots@primeclerk.com.

# TABLE OF CONTENTS

Page

SECTION I. INTRODUCTION AND OVERVIEW ...................................................... 1

    A.    Purpose Limitations, and Structure of This Disclosure Statement ........................ 2

    B.    Summary of Classification and Estimated Recoveries of Claims and Interests Under Plan ............................................................................................................ 3

    C.    Plan Solicitation ........................................................................................................ 4

        1.    Classes Entitled to Vote on the Plan ................................................ 4

        2.    Vote Required for Acceptance of the Plan by a Class .............................. 5

        3.    Voting Procedures, Ballots, and Voting Deadline ...................................... 5

        4.    Inquiries ...................................................................................................... 6

SECTION II. HISTORICAL INFORMATION ............................................................. 6

    A.    Remington's Businesses and Operations ................................................................ 6

    B.    Corporate History and Organizational Structure .................................................. 7

    C.    Prepetition Indebtedness and Capital Structure .................................................... 8

        1.    Priority Term Loan Facility ...................................................................... 9

        2.    FILO Term Loan Facility .......................................................................... 10

        3.    Exit Term Loan Facility ............................................................................ 10

        4.    Huntsville Secured Note ............................................................................ 11

        5.    Intercompany Note .................................................................................... 11

        6.    Other Liabilities ........................................................................................ 12

        7.    ROC Common Stock .................................................................................. 12

    D.    Key Events Leading to the Chapter 11 Cases ........................................................ 12

    E.    The Sale Process ...................................................................................................... 14

        1.    Prepetition Marketing Process .................................................................. 14

SECTION III. EVENTS DURING CHAPTER 11 CASES ........................................... 15

    A.    Overview of the Chapter 11 Cases ........................................................................ 15

    B.    First-Day Pleadings ................................................................................................ 16

    C.    Retention of Advisors for the Debtors .................................................................. 17

    D.    Bar Date .................................................................................................................. 17

    E.    Cash Collateral ...................................................................................................... 18

    F.    Sale Process. ............................................................................................................ 18

SECTION IV. THE PLAN ............................................................................................ 19

    A.    Administrative Expenses and Other Unclassified Claims .................................... 20

i

|  |  |  |  |
|---|---|---|---|
|  | 1. | General Administrative Expenses | 20 |
|  | 2. | General Administrative Expense Bar Date | 20 |
|  | 3. | Professional Fees | 20 |
|  | 4. | Priority Tax Claims | 21 |
|  | 5. | Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses | 22 |
|  | 6. | Aggregate Gift to Junior Creditors from the Exit Term Loan Lenders | 22 |
|  | 7. | Tax Claims, Including the TTB Claim | 24 |
| B. | Classification and Treatment of Claims and Interests | | 24 |
|  | 1. | Classification of Claims and Interests | 24 |
|  | 2. | Treatment of Claims and Interests | 25 |
|  | 3. | Special Provision Governing Unimpaired Claims | 30 |
| C. | Acceptance or Rejection of the Plan | | 31 |
|  | 1. | Voting Classes | 31 |
|  | 2. | Presumed Acceptance of the Plan | 31 |
|  | 3. | Non-Consensual Confirmation | 31 |
|  | 4. | Elimination of Vacant Classes | 31 |
|  | 5. | Subordinated Claims | 31 |
| D. | Means for Implementation of the Plan | | 32 |
|  | 1. | General Settlement of Claims and Interests | 32 |
|  | 2. | Procedural Consolidation of Debtors for Plan Purposes Only | 32 |
|  | 3. | Sources of Cash for Plan Distributions | 33 |
|  | 4. | Continued Corporate Existence; Vesting of Assets | 33 |
|  | 5. | Establishment of Creditor Trust | 33 |
|  | 6. | General Liability Insurance and the Tort Convenience Class Option | 34 |
|  | 7. | Tort Claims and the Establishment of the Tort Claim Sub-Trust | 36 |
|  | 8. | Powers and Duties of the Plan Administrator | 37 |
|  | 9. | Costs and Expenses of the Plan Administrator | 40 |
|  | 10. | Corporate Action | 41 |
|  | 11. | Winding Down of Affairs | 42 |
|  | 12. | Closing of the Chapter 11 Cases | 42 |

Case 20-81688-CRJ11   Doc 1369   Filed 01/25/21   Entered 01/25/21 12:53:40   Desc
Main Document     Page 7 of 180

13. Dissolution of the Debtors ........................................................... 43

14. Cancellation of Loans, Securities, and Agreements ................................. 43

15. Effectuating Documents; Further Transactions ......................................... 44

16. Section 1146 Exemption ................................................................ 44

17. Preservation of Estate Causes of Action ............................................... 44

E. Treatment of Executory Contracts and Unexpired Leases .................................. 45

1. Executory Contracts and Unexpired Leases ............................................. 45

2. Rejection Damages Bar Date ........................................................... 46

3. Effect of Post-Confirmation Rejection ................................................. 46

4. Non-Occurrence of Effective Date ..................................................... 46

5. Indemnification Obligations; Insurance Policies ....................................... 46

6. Excluded Employee Liabilities, Retiree Plan and Pension Plan .......................... 47

7. Reservation of Rights ................................................................. 47

F. Provisions Governing Distributions ..................................................... 47

1. Plan Distributions ................................................................... 47

2. Distribution Record Date ............................................................. 48

3. Objections to Claims; Estimation of Claims ........................................... 48

4. No Distribution Pending Allowance .................................................... 49

5. Reserve of Cash Distributions ........................................................ 49

6. Distribution After Allowance ......................................................... 49

7. No Recourse .......................................................................... 49

8. Application of Distributions ......................................................... 50

9. Undeliverable Distributions and Unclaimed Property ................................... 50

10. Compliance with Tax Requirements ..................................................... 50

11. No Postpetition Interest on Claims and Interests ..................................... 51

12. Foreign Currency Exchange Rate ....................................................... 51

13. Setoffs and Recoupment ............................................................... 51

14. Distributions Free and Clear ......................................................... 51

15. De-Minimis Distributions and Donation ................................................ 51

16. Claims Paid or Payable by Third Parties .............................................. 51

G. Effects of Plan Confirmation .......................................................... 52

iii

1. Injunction ...................................................................... 52

2. Exculpation and Limitation of Liability ...................................... 53

3. Release of Debtors, Plan Administrator, Restructuring Committee, Exit Term Loan Agent, Exit Term Loan Lenders, the FILO Term Loan Agent, FILO Term Loan Lenders, and Directors and Officers................ 54

4. Term of Injunctions or Stays.................................................. 54

H. Conditions to Confirmation and Effective Date ................................. 55

1. Conditions to Effective Date................................................. 55

2. Waiver of Conditions ....................................................... 56

3. Substantial Consummation .................................................. 56

I. Modification, Revocation or Withdrawal of the Plan........................... 56

1. Modification and Amendments............................................... 56

2. Effect of Confirmation on Modifications ................................... 56

3. Revocation or Withdrawal of Plan; Effect of Non-Occurrence of Confirmation date or Effective Date........................................ 56

J. Retention of Jurisdiction .................................................... 57

SECTION V. VOTING PROCEDURES AND REQUIREMENTS ................................ 59

A. Voting Deadline........................................................... 60

B. Voting Record Date ....................................................... 60

C. Parties Entitled to Vote ................................................. 60

D. Ballots ................................................................... 61

E. Agreements Upon Furnishing Ballots ....................................... 62

F. Withdrawal or Change of Votes on Plan .................................... 62

G. Fiduciaries and Other Representatives..................................... 62

H. Waivers of Defects, Irregularities, etc. ................................. 63

I. Further Information, Additional Copies ................................... 63

J. Requirements for Acceptance by Impaired Class of Claims ................. 63

SECTION VI. CONFIRMATION OF the PLAN ....................................... 63

A. Confirmation Hearing ..................................................... 63

B. Requirements of Section 1129(a) of the Bankruptcy Code ................. 64

1. Feasibility................................................................ 65

2. Best Interests Test........................................................ 65

iv

# TABLE OF CONTENTS
## (Continued)

C.     Requirements of Section 1129(b) of the Bankruptcy Code ................................. 67

     1.     Unfair Discrimination ................................................. 67

     2.     Fair and Equitable Test ................................................. 67

SECTION VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .... 68

A.     U.S. Federal Income Tax Consequences to the Debtors ....................................... 69

B.     Certain U.S. Federal Income Tax Treatment With Respect to U.S. Holders of Allowed Claims ....................................................... 71

     1.     Character of Gain or Loss ................................................. 72

     2.     Distributions in Respect of Accrued But Unpaid Interest or OID ............ 72

C.     Certain U.S. Federal Income Tax Treatment With Respect to Non-U.S. Holders of Allowed Claims ....................................................... 73

     1.     Gain Recognition. ................................................. 73

     2.     FIRPTA. ................................................. 74

     3.     FATCA. ................................................. 74

D.     Withholding on Distributions and Information Reporting ..................................... 75

SECTION VIII. RISK FACTORS AND OTHER CONSIDERATIONS ................................... 76

A.     Certain Bankruptcy Considerations ................................................. 76

B.     COVID-19 Disruptions ................................................. 77

C.     Buyer Fails to Honor Transition Services Obligations ......................................... 77

D.     Delay In Liquidating Estate Causes of Action ...................................................... 77

E.     Plan Administrator Budget May Prove Inadequate ............................................ 77

F.     No Duty to Update Disclosures ................................................. 77

SECTION IX. ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF PLAN ....................................................... 78

SECTION X. CONCLUSION AND RECOMMENDATION ...................................................... 78

v

**TABLE OF CONTENTS**
**(Continued)**

EXHIBITS

EXHIBIT A          Debtors' Joint Plan Under Chapter 11 of the Bankruptcy Code

EXHIBIT B          Insurance Report

EXHIBIT C          Liquidation Analysis

# SECTION I.
## INTRODUCTION AND OVERVIEW

Remington Outdoor Company, Inc. ("ROC") and its subsidiaries FGI Holding Company, LLC ("FGI Holding"), FGI Operating Company, LLC ("FGI OpCo"), Remington Arms Company, LLC, Barnes Bullets, LLC, TMRI, Inc., RA Brands, L.L.C., FGI Finance Inc., Remington Arms Distribution Company, LLC, Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC, and Outdoor Services, LLC, as debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors" or "Remington"), together with certain of the Exit Term Loan Lenders and Committee (each as defined below and collectively, the "Plan Proponents") submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 *et seq.* (as amended, the "Bankruptcy Code") for use in the solicitation of votes on the *Debtors' Joint Plan Under Chapter 11 of the Bankruptcy Code*, dated as of January 25, 2021, as it may be amended, supplemented, restated, or modified from time to time (the "Plan"). A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.

**Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement will have the meanings used in the Plan. Headings are for convenience of reference and will not affect the meaning or interpretation of the Disclosure Statement.**

The purpose of the Plan is to distribute the net proceeds from the sales of the Debtors' businesses, provide for the termination the Debtors' remaining business operations, liquidate the Debtors' remaining assets, and wind-down the Debtors' affairs in an orderly process. The Plan provides for the distribution of the Sales proceeds and any assets excluded from the Sales in accordance with the terms of the Plan and the priorities set forth in the Bankruptcy Code. Upon the final distribution of remaining assets under the Plan, the Plan Administrator shall wind down the Debtors' Estates and seek approval to close the Chapter 11 Cases.

Solicitation is being conducted at this time in order to obtain sufficient acceptances to enable the Plan to be confirmed by the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court"). The Plan sets forth, among other things, how Claims against and Interests in the Debtors will be treated after consummation of the Sales and the wind-down of the Debtors' Estates. This Disclosure Statement describes certain aspects of the Plan, the Debtors' business operations, significant events leading to their Chapter 11 cases (the "Chapter 11 Cases"), and related matters. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THEIR RELATED EXHIBITS AND SCHEDULES IN THEIR ENTIRETY.**

This Disclosure Statement is part of the solicitation package ("Solicitation Package") distributed to all holders of Claims in the Voting Classes and contains the following:

- a copy of the notice of the Confirmation Hearing (as defined below);

- a copy of this Disclosure Statement together with the exhibits thereto, including the Plan;

1

- a copy of the order entered by the Bankruptcy Court that conditionally approved this Disclosure Statement, established the voting procedures, scheduled a Confirmation Hearing, and set the voting deadline and the deadline for objecting to confirmation of the Plan; and

- an appropriate form Ballot (as defined below), instructions on how to complete the Ballot, and a pre-paid, pre-addressed Ballot return envelope.

A. *Purpose Limitations, and Structure of This Disclosure Statement*

The purpose of this Disclosure Statement is to provide the holders of Claims against the Debtors who are entitled to vote on the Plan with adequate information to make an informed decision as to whether to accept or reject the Plan. The information in this Disclosure Statement may not be relied upon for any other purpose, and nothing contained in this Disclosure Statement will constitute an admission of any fact or liability or as a stipulation or waiver by any party, or be deemed conclusive advice on the tax or other legal effects of the Plan.

On [_____], 2021, after notice and a hearing, the Bankruptcy Court issued an order conditionally approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical in each Class of Claims being solicited to make an informed judgment whether to accept or reject the Plan. **CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN**.

Unless otherwise specified herein, the statements contained in this Disclosure Statement are made only as of January 20, 2021. Delivery of this Disclosure Statement after January 20, 2021 does not mean that the information set forth in this Disclosure Statement remains unchanged since such date or the date of the materials relied upon in preparing this Disclosure Statement, and, except to the extent required by the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors have no duty to update any information contained herein. The Debtors have prepared the information contained in this Disclosure Statement in good faith, based upon the information then available to them. Moreover, certain of the statements contained in this Disclosure Statement, by their nature, contain estimates and assumptions, and there can be no assurance that these estimates and assumptions will be correct at any later date. Except as otherwise expressly stated, no audit of the financial information contained in this Disclosure Statement has been conducted. Except as otherwise expressly provided herein, all references to "$" or "dollars" are deemed references to the lawful money of the United States of America.

The description of the Plan contained in this Disclosure Statement is intended only as a summary, and is qualified in its entirety by reference to the Plan itself. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan will govern. The Plan is a legally binding agreement and should be read in its entirety. Each holder of a Claim that is classified in an Impaired Class should read, consider, and carefully analyze the terms and provisions of the Plan as well as the information contained in this Disclosure Statement and the other documents provided herewith.

2

If you are eligible to vote on the Plan, this Disclosure Statement and all of its schedules and exhibits should have been delivered to you. There are certain documents and other materials identified in this Disclosure Statement and the Plan that are not attached to this Disclosure Statement or the Plan (such documents and materials, the "Plan Supplement"). The Plan Supplement is to be filed with the Bankruptcy Court no later than three (3) days prior to the Confirmation Hearing. Once it is filed, the Plan Supplement may be accessed on the docket electronically maintained by the Clerk of the Bankruptcy Court or inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. You may obtain a copy of the Plan Supplement once it is filed, or any of the schedules and exhibits to this Disclosure Statement, by accessing the website maintained by the Debtors' balloting agent, Prime Clerk LLC (the "Balloting Agent"), at https://cases.primeclerk.com/RemingtonOutdoor or by contacting the Balloting Agent at the phone numbers and email below.

If you have any questions about the packet of materials you have received, you may contact the Balloting Agent by (i) calling (877) 755-3450 (for U.S./Canada callers) or (347) 338-6538 (for international callers) or (ii) sending e-mail correspondence to RemingtonBallots@primeclerk.com.

B.   *Summary of Classification and Estimated Recoveries of Claims and Interests Under Plan*

The following table summarizes the classification and estimated recoveries to holders of Allowed Claims and Interests under the Plan. All numbers illustrated herein represent estimates by the Debtors, with assistance from their financial and legal advisors, as of the point in time of January 23, 2021. The Debtors and their financial and legal advisors reserve all rights to review, revise and update the estimated recoveries upon obtaining any new information relevant to the outcomes of the estimated recoveries.

Although every reasonable effort was made to be accurate, the projections of recoveries are only estimates. The final amounts of Claims or Interests allowed by the Bankruptcy Court may vary materially from the estimates in this Disclosure Statement. As a result of the foregoing and other uncertainties inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary materially from the actual recoveries realized. In addition, the ability to receive distributions under the Plan depends upon, among other things, the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan.

| Class | Claims or Interests | Status | Voting Rights | Estimated Recovery |
|-------|---------------------|--------|---------------|--------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept | 100% |

3

| Class | Claims or Interests | Status | Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| 3 | Exit Term Loan Claims | Impaired | Entitled to vote | 23.8 – 57.8% |
| 4 | Huntsville Note Claim | Unimpaired | Deemed to accept | 100% |
| 5 | General Unsecured Claims | Impaired | Entitled to vote | 0.2 – 1.1%[2] |
| 6 | Tort Convenience Class Claims | Impaired | Entitled to vote | 2.0%[3] |
| 7 | Tort Claims | Impaired | Entitled to vote | *** |
| 8 | Intercompany Claims | Impaired | Deemed to reject | No distribution |
| 9 | Interests in the Debtors | Impaired | Deemed to reject | No distribution |

*** Recovery amount to be determined based upon the Allowed amount of the Tort Claim and the resulting recovery from GL Insurance Assets. For more information regarding Class 7 Tort Claims and coverage issues, please refer to Section IV.D.7 herein.

C.    *Plan Solicitation*

1.    Classes Entitled to Vote on the Plan

Under the Bankruptcy Code, only holders of Claims or Interests that are Impaired under the Plan are entitled to vote to accept or reject the Plan. Holders of Claims or Interests that are Unimpaired under the Plan are, in accordance with section 1126(f) of the Bankruptcy Code, conclusively presumed to accept the Plan, and the solicitation with respect to such holders is not

---

[2] This estimate does not include potential recoveries on avoidance actions, which are unknown and contingent.

[3] Total recovery for class capped at $250,000; *see* Section IV.D.6 herein.

4

required.  The Debtors therefore are soliciting votes only from holders of Impaired Claims or Interests (to the extent eligible to vote, as described below) and not from any holders of Unimpaired Claims or Interests.

Classes 3, 5, 6 and 7 are Impaired under the Plan and, therefore, holders of Claims in such Classes are entitled to vote to accept or reject the Plan.  In contrast, Classes 1, 2, and 4 are Unimpaired under the Plan.  Holders of Claims in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.  Classes 8 and 9 are Impaired under the Plan, but the holders of Claims or Interests in Classes 8 and 9 are not expected to receive any distributions under the Plan; consequently, Classes 8 and 9 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and the members of Classes 8 and 9 are not entitled to vote to accept or reject the Plan.

Only holders of record of Claims as of February 5, 2021 (the "Voting Record Date") that otherwise are entitled to vote to accept or reject the Plan have been sent a copy of this Disclosure Statement and an appropriately customized ballot (a "Ballot").

2.      Vote Required for Acceptance of the Plan by a Class

The Bankruptcy Code defines acceptance of a plan by a class of claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims or interests of that class that cast ballots for acceptance or rejection of the plan.  Thus, for each of Classes 3, 5, 6 and 7 under the Plan, the Class will have accepted the Plan if, of the total number of Class members that vote, more than one-half vote to accept the Plan, and such majority of voters holds at least two-thirds of the total dollar amount of the Claims in that Class.

3.      Voting Procedures, Ballots, and Voting Deadline

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement. If you are entitled to vote in more than one Class, you will receive separate Ballots for each Claim entitled to vote, which must be used for each separate Claim.  You should review the Ballot carefully.

The Debtors, with the approval of the Bankruptcy Court, have engaged the Balloting Agent to assist in the solicitation process.  The Balloting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.  The Balloting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is 4:00 p.m., Central time on February 23, 2021 (the "Voting Deadline").  Ballots received after the Voting Deadline may not be counted.  A Ballot will be deemed delivered only when the Balloting Agent actually receives the original executed Ballot. Delivery of a Ballot to the Balloting Agent by facsimile, e-mail, or any other electronic means with the exception of the Balloting Agent's online voting platform, will not be accepted.  No Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Balloting Agent), or the Debtors' financial or legal advisors.  The Debtors expressly reserve the right to amend from time

5

to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications).

Please vote and return your Ballot(s) in accordance with the instructions set forth herein and in the instructions accompanying your Ballot(s) to:

Remington Outdoor Company Ballots
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165

**TO BE COUNTED, YOUR ORIGINAL, EXECUTED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN, WHETHER SUBMITTED BY PAPER COPY OR THROUGH THE BALLOTING AGENT'S E-BALLOT PLATFORM, MUST BE RECEIVED AT THE ADDRESS ABOVE NO LATER THAN 4:00 P.M. CENTRAL TIME ON THE VOTING DEADLINE. ANY BALLOT THAT IS EXECUTED AND RETURNED, BUT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN, WILL BE NOT BE COUNTED EITHER AS A VOTE TO ACCEPT OR A VOTE TO REJECT THE PLAN. DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT. BALLOTS SENT BY FACSIMILE, E-MAIL, OR ANY OTHER ELECTRONIC MEANS, WITH THE EXCEPTION OF THE BALLOTING AGENT'S ONLINE VOTING PLATFORM, WILL NOT BE ACCEPTED.**

4.      Inquiries

If you are a holder of a Claim entitled to vote on the Plan and either did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have questions about the procedures for voting your Claim, or about the packet of materials that you received, please contact the Debtors' Balloting Agent by (i) calling (877) 755-3450 (for U.S./Canada callers) or (347) 338-6538 (for international callers) or (ii) sending e-mail correspondence to RemingtonBallots@primeclerk.com. The Balloting Agent is not able to provide you with legal advice. If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, please contact the Balloting Agent.

**SECTION II.**
**HISTORICAL INFORMATION**

A.      *Remington's Businesses and Operations*

The Debtors are among America's oldest and largest manufacturers of firearms, ammunition, and related products for commercial, military, and law enforcement customers throughout the world. The Debtors held a diverse portfolio of category-defining brands, including Remington, Marlin, Bushmaster, Barnes Bullets, Advanced Armament Corp., and DPMS.

6

Since 2008, the Debtors held leading market positions in the United States in a variety of firearms and ammunition categories. The Debtors had several key strengths that provided them with a significant competitive advantage in the firearm and ammunition markets, including, among other things, (i) category defining brands, (ii) a broad product portfolio, (iii) multiple distribution channels designed to reach diverse end markets, and (iv) a differentiated, customer-focused management, sales, and marketing approach. In addition, the Debtors were the only U.S. company that manufactured both firearms and ammunition, which provided them with a unique servicing edge, supported their market leading positions, and added recurring revenue component to sales.

The Debtors manufactured their products in seven different facilities located across the United States with an aggregate 2.5 million square feet of manufacturing space, enabling them to deliver products throughout the United States and globally to approximately 39 countries. The majority of the Debtors' revenue was derived from two key firearms facilities located in Huntsville, Alabama and Ilion, New York, and two primary ammunition facilities in Lonoke, Arkansas and Mona, Utah. The Debtors' principal customers were various mass market retail chains (*e.g.*, Wal-Mart), specialty retail stores (*e.g.*, Bass Pro Shops and Cabela's) and wholesale distributors (*e.g.*, Sports South). As of the Petition Date, the Debtors employed approximately 2,100 full-time employees, with an additional work force of temporary employees engaged during peak production schedules at certain of their manufacturing facilities.

B.    *Corporate History and Organizational Structure*

Formed in 2007, ROC is a holding company that is currently majority owned by a disparate group of shareholders.[4] The Debtors believe that a majority of these shareholders acquired their equity positions as distributions made to them during the Debtors' prior Chapter 11 cases, which are discussed in greater detail below.

ROC was previously known as Freedom Group, Inc. ("FGI"), which was formed principally for the purpose of acquiring Remington Arms Company, LLC[5] ("RAC") in 2007. On December 12, 2007, through a series of transactions, Bushmaster Firearms International, LLC and RAC became wholly owned subsidiaries of FGI.

ROC, FGI Holding, and FGI OpCo principally serve as holding companies. ROC owns 100% of the equity interests in FGI Holding, which in turn owns 100% of the equity interests in FGI OpCo.

FGI OpCo owns 100% of the equity interests in RAC, Barnes Bullets, LLC ("Barnes"), RA Brands, L.L.C. ("RA Brands"), FGI Finance, Inc. ("FGI Finance"), and Outdoor Services, LLC. RAC, in turn, owns 100% of the equity interests in Remington Arms Distribution Company,

---

[4] The substantial majority of the common stock of ROC is held through the Depository Trust Company, making the precise identity of the ROC shareholders at any given time not subject to ready access by the Debtors.

[5] Formerly known as Remington Arms Company, Inc.

7

LLC ("RAD"), TMRI, Inc. ("TMRI"), Huntsville Holdings LLC, 32E Productions, LLC, and Great Outdoors Holdco, LLC.

Debtors RAC, Barnes, TMRI, and RAD were the principal operating companies within the Debtors' corporate enterprise and the owners of the Debtors' principal manufacturing plants. Brief descriptions of certain of the operating entities' historical functions are outlined below:

- Remington Arms Company, LLC – manufacturer of firearms, ammunition, and related products.

- Barnes Bullets, LLC – manufacturer of ammunition and ammunition components for the Barnes Bullets brand.

- RA Brands, L.L.C. – owner of the Debtors' core brand trademarks and charges a royalty to other Debtors for use of those brands.

- TMRI, Inc. – manufacturer of barrel components with certain Debtors as primary customers.

- Remington Arms Distribution Company, LLC – distributor of the Debtors' products to retail chains/dealers.

Debtors FGI Finance, Inc., Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC and Outdoor Services, LLC are inactive shell entities that do not have any material assets but are obligors in connection with the Prepetition Facilities (as defined and more fully described below).

The Debtors' principal offices and main corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824. In addition, the Debtors' plant in Huntsville, Alabama constituted a plurality of the Debtors' tangible assets as of the Petition Date.

C.    *Prepetition Indebtedness and Capital Structure*[6]

The Debtors previously filed for Chapter 11 relief on March 25, 2018, in the United States Bankruptcy Court for the District of Delaware under the jointly administered case number 18-10684 (the "Prior Cases") to implement a comprehensive balance sheet restructuring pursuant to a prepackaged plan of reorganization. The Debtors confirmed their *Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and its Affiliated Debtors and Debtors in Possession* on May 4, 2018.

The Debtors emerged from the Prior Cases on May 15, 2018, with a more streamlined capital structure consisting of: (i) an asset-based loan facility (the "Exit ABL Facility") that was

---

[6] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

8

subsequently refinanced with the proceeds of a priority term loan facility (the "Priority Term Loan Facility"), (ii) a first-lien-last-out term loan facility (the "FILO Term Loan Facility"), (iii) an exit term loan facility (the "Exit Term Loan Facility"), and (iv) a real property-secured promissory note owed to the City of Huntsville, Alabama (the "Huntsville Note", and together with the Exit Term Loan Facility, Priority Term Loan Facility and the FILO Term Loan Facility, collectively, the "Prepetition Facilities"). A summary of these debt facilities and the Debtors' other debt facilities is provided below.

1.    Priority Term Loan Facility

FGI OpCo was the borrower under the Priority Term Loan Facility, in an original principal amount of up to $85.5 million, which was memorialized pursuant to that certain *Loan and Security Agreement*, dated as of April 18, 2019 ((i) as amended by that certain (a) Amendment No. 1 dated May 1, 2019, (b) Amendment No. 2 dated June 24, 2019, (c) Amendment No. 3 dated August 15, 2019, (d) Amendment No. 4 dated October 11, 2019, (e) Amendment No. 5 dated February 21, 2020, (f) Amendment No. 6 dated March 27, 2020, (g) Amendment No. 7 dated June 18, 2020, (h) Amendment No. 8 dated June 26, 2020, (i) Amendment No. 9 dated July 7, 2020, and (j) the Final Cash Collateral Order, and (ii) as further amended, restated, amended, modified, supplemented, or restated from time to time, the "Priority Term Loan Agreement" and together with all other documents entered into in connection therewith, the "Priority Term Loan Documents"), by and among FGI OpCo, as borrower, the other Debtors, as guarantors, Cantor Fitzgerald Securities, as administrative agent (the "Priority Term Loan Agent"), and the lenders from time to time party thereto (the "Priority Term Loan Lenders"). The Debtors other than FGI OpCo were guarantors of the Priority Term Loan Facility (together with FGI OpCo, the "Priority Term Loan Parties"). The proceeds of the Priority Term Loan Facility were used, in part, to refinance the Exit ABL Facility. The maturity date for the Priority Term Loan Facility was April 18, 2022.

The Priority Term Loan Parties' obligations under the Priority Term Loan Facility were secured by first priority liens on (a) certain of the Priority Term Loan Parties' collateral, including, but not limited to, accounts receivable, intellectual property, inventory, and proceeds thereof and (b) liens on substantially all other assets of the Priority Term Loan Parties; *provided*, *however*, that the liens securing the obligations under the Priority Term Loan were perfected first priority liens on the type of assets in this clause (b) after giving effect to the Final Cash Collateral Order, only up to the first $31 million of the value and/or proceeds thereof and, upon recovery of such amount from such collateral referenced in clause (b), the liens of the Priority Term Loan Lenders on this type of collateral would have third priority (the collateral subject to a first priority lien of the Priority Term Loan Agent, the "ABL Priority Collateral," and the collateral subject to a third priority lien of the Priority Term Loan Agent, the "TL Priority Collateral" and together with the ABL Priority Collateral, the "Prepetition Collateral" and liens granted to the Priority Term Loan Agent thereon, the "Priority Term Loan Liens").

The Priority Term Loan Facility included a collateral base floor requirement. Under the Priority Term Loan Documents, a collateral base floor of $105 million was initially established, was subsequently reduced to $87.5 million prior to the Petition Date, and reduced to $67.5 million pursuant to the Final Cash Collateral Order. To the extent that the Debtors' borrowing base (comprised of certain eligible accounts receivable and eligible inventory) was less than the collateral base floor, the Debtors were required to either prepay the Priority Term Loan Facility or

cash collateralize the Priority Term Loan Facility in the amount of the difference. Because prepayments under the Priority Term Loan Facility were required to be accompanied by a prepayment fee of 1.5% and an exit fee of 2.0%, the Debtors historically elected to cash collateralize any deficiency. That cash collateral (the "Dominion Cash") was held in a blocked deposit account ("Dominion Account") that the Debtors were not permitted to access. As of the Petition Date, the amount of such cash collateral was approximately $38.7 million.

As of the Petition Date, the aggregate outstanding principal balance under the Priority Term Loan Facility was approximately $75.5 million, plus any accrued and unpaid interest, fees, expenses, and other amounts due and owing pursuant to the terms of the Priority Term Loan Documents. As of the Petition Date, the approximate amount of the pre-payment penalty payable on the outstanding principal balance of the Priority Term Loan Document was $1.2 million and the approximate amount of the exit fee was $1.5 million. The Priority Term Loan Facility was repaid in full during the Chapter 11 Cases with the Primary Asset Sale Proceeds.

2.      FILO Term Loan Facility

FGI OpCo is the borrower under the FILO Term Loan Facility, which is memorialized pursuant to that certain *First Lien Last-Out Term Loan Agreement*, dated as of May 15, 2018 ((i) as amended by that certain (a) Amendment No. 1 dated April 18, 2019, (b) Amendment No. 2 dated May 1, 2019, (c) Amendment No. 3 dated August 15, 2019, (d) Amendment No. 4 dated October 11, 2019, (e) Amendment No. 5 dated February 21, 2020, (f) Amendment No. 6 dated March 27, 2020, and (g) the Final Cash Collateral Order, and (ii) as further amended, modified, supplemented, or restated from time to time, the "FILO Term Loan Agreement" and together with all other agreements entered into or documents delivered in connection therewith, the "FILO Term Loan Documents") by and between FGI OpCo, as borrower, the other Debtors, as guarantors, Ankura Trust Company, LLC, as administrative agent (the "FILO Term Loan Agent"), and the lenders from time to time party thereto (the "FILO Term Loan Lenders"). The Debtors other than FGI OpCo are guarantors under the FILO Term Loan Facility (together with FGI OpCo, the "FILO Loan Parties"). The maturity date for the FILO Term Loan Facility was May 15, 2021.

After giving effect to the payoff of the Priority Term Loan Facility, the FILO Loan Parties' obligations under the FILO Term Loan Facility are secured by first priority security interests in and liens on the Prepetition Collateral (the "FILO Term Loan Liens").

As of the Petition Date, the aggregate outstanding principal balance under the FILO Term Loan Facility was approximately $55 million, plus any accrued and unpaid interest, fees, expenses, and other amounts due and owing pursuant to the terms of the FILO Term Loan Documents. On January 13, 2021, the FILO Term Loan Facility was repaid in full with the Primary Asset Sale Proceeds.

3.      Exit Term Loan Facility

FGI OpCco is the borrower under the Exit Term Loan Facility, in an original principal amount of $100 million, which increased due to PIK elections to a principal amount as of the Petition Date of $110.7 million, which is memorialized pursuant to that certain *Term Loan Agreement*, dated as of May 15, 2018 ((i) as amended by that certain (a) Amendment No. 1 dated

April 18, 2019, (b) Amendment No. 2 dated May 1, 2019, (c) Amendment No. 3 dated August 15, 2019, (d) Amendment No. 4 dated February 21, 2020, (e) Amendment No. 5 dated March 27, 2020, and (f) the Final Cash Collateral Order, and (ii) as further amended, modified, supplemented, or restated from time to time, the "Exit Term Loan Agreement" and together with the other agreements entered into and documents delivered in connection therewith, the "Exit Term Loan Documents") by and between FGI OpCo, as borrower, the other Debtors, as guarantors, Ankura Trust Company, LLC, as administrative agent (the "Exit Term Loan Agent" and together with the Priority Term Loan Agent and the FILO Term Loan Agent, the "Prepetition Agents"), and the lenders from time to time party thereto (the "Exit Term Loan Lenders" and together with the Priority Term Loan Lenders and the FILO Lenders, the "Prepetition Lenders"; and the Prepetition Lenders together with the Prepetition Agents, the "Prepetition Secured Creditors"). The Debtors other than FGI OpCo are guarantors under the Exit Term Loan Facility (together with FGI OpCo, the "Exit Term Loan Parties"). The maturity date for the Exit Term Loan Facility is May 15, 2022.

After giving effect to the payoff of the Priority Term Loan Facility and the FILO Term Loan Facility, the Exit Term Loan Parties' obligations under the Exit Term Loan Facility are secured by first priority security interests in and liens on the Prepetition Collateral (collectively, the "Exit Term Loan Liens").

As of the Petition Date, the aggregate outstanding principal balance under the Exit Term Loan Facility was approximately $110.7 million, plus any accrued and unpaid interest, fees, expenses, and other amounts due and owing pursuant to the terms of the Exit Term Loan Documents.

4.     Huntsville Secured Note

In February 2014, RAC obtained a $12.5 million loan from the City of Huntsville, Alabama (the "City of Huntsville") in order to improve its manufacturing facility there. The loan is evidenced by a promissory note executed by RAC in favor of the City of Huntsville and secured by a first priority mortgage on the Debtors' firearm facilities in Huntsville. The Huntsville Note has an eleven-year term with annual amortization payments due each year beginning on the second anniversary of the issuance equal to ten percent (10%) of the original principal balance, provided that if RAC meets certain employment goals for the year preceding the principal and interest payment dates, the annual principal and related interest for that payment period will be forgiven, subject to reinstatement if RAC closes the facility or relocates substantially all operations conducted at the facility to a location outside of Huntsville, Alabama. The Debtors were not in compliance with the employment goal for the annual test period most recently ended. As of the Petition Date, the aggregate outstanding principal balance under the Huntsville Note was approximately $12.5 million.

5.     Intercompany Note

In addition to the above debt facilities, on April 18, 2019, RAC issued FGI OpCo an *Amended and Restated Promissory Note* ("Intercompany Note") in the original principal amount of $100 million. The Intercompany Note restated a promissory note originally issued by RAC to FGI OpCo on December 30, 2018. The Intercompany Note evidences loans made by FGI OpCo to RAC for the purposes of funding RAC's and its various subsidiaries' working capital needs. As

11

of the Petition Date, the principal and accrued interest amount of approximately $105 million was outstanding under the Intercompany Note. Pursuant to Article V.B of the Plan, all Claims related to or arising under the Intercompany Note will be cancelled with any conversion thereof or distribution with respect thereto and released by the Debtors on the Effective Date.

6.      Other Liabilities

As of the Petition Date, the Debtors had approximately $30 million in outstanding claims owed to their various vendors, suppliers, and service providers, including claims reflected in the Debtors' current accounts payable or otherwise accrued and/or attributable to the period prior to the Petition Date. Additionally, the Debtors are party to various litigation matters, including products liability actions. The claims associated with such litigation matters are disputed, contingent, and/or unliquidated as of the Petition Date.

7.      ROC Common Stock

ROC has 13,272,325 shares of common stock (including restricted stock units) issued and outstanding. ROC also has 2,342,175 warrants outstanding (each, a "Warrant" and, collectively, the "Warrants").[7] Each Warrant gives the holder thereof the right to purchase one share of common stock, par value $0.01 per share, of ROC at an exercise price, subject to adjustment, of $35.05 per share. The Warrants expire at 5:00 p.m., New York City time, on May 15, 2022. The Warrants were rejected pursuant to the Order Approving Debtors' First Omnibus Motion for Entry of an Order Approving Rejection of Certain Executory Contracts and Unexpired Nonresidential Real Property Leases [Docket No. 1150].

D.      *Key Events Leading to the Chapter 11 Cases*

The Debtors filed the Prior Cases primarily because they had experienced a significant decline in sales and revenues. Although the Prior Cases restructured their balance sheet, the Debtors emerged from the Prior Cases with an elevated level of inventory and a wide range of brands that extended the Debtors beyond their core focus. Most importantly, the unfavorable business trends continued after the Debtors' exit from the Prior Cases.

In order to provide new capital, in late 2018 and early 2019, the Debtors commenced a robust process to refinance the Exit ABL Facility. The Debtors engaged Ducera Partners LLC and, where appropriate, Ducera Securities LLC (collectively, "Ducera"), to advise the Debtors and market the investment. As part of the refinancing process, Ducera contacted over 60 potential lenders to solicit financing interest. The Debtors received three non-binding indications of interest. Ultimately, the Debtors moved forward with Whitebox Advisors, and the Priority Term Loan Facility was entered into in April 2019, refinancing the Exit ABL Facility, resolving covenant concerns that existed at the time, and providing incremental liquidity to the Debtors.

---

[7] The Warrants are held through the Depository Trust Company, making the precise identity of warrant holders at any given time not subject to ready access by the Debtors.

The Debtors appointed a new chief executive officer, chief financial officer, and chief operating officer in 2019. After these appointments, the Debtors undertook an analysis of their strategic priorities, various cost-cutting measures, and financing alternatives. The Debtors initiated reductions of excess inventory and sought increased profitability via continued improvements in operational efficiencies, growth in international and dealer sales channels, and growth in defense and law enforcement channels.

Despite the Debtors' efforts, which resulted in significantly improved efficiencies and savings, their financial performance continued to deteriorate, owing in large part to the inability to purchase raw materials at the required level to grow revenues. At the conclusion of 2019, the Debtors had realized approximately $437.5 million in total net sales and an adjusted EBITDA of $(74.7) million. In comparison, in 2015 and 2016, the Debtors had achieved approximately $808.9 million and $865.1 million in sales and $64 million and $119.8 million in adjusted EBITDA, respectively.

The Debtors also continued to face liquidity pressure and were increasingly challenged to meet the collateral base floor requirements imposed under the Priority Term Loan Agreement. That limited availability of the credit line under the Priority Term Loan Facility and triggered an obligation to post cash collateral in the amount of any difference between the Debtors' borrowing base and the collateral base floor. In February 2020, the Debtors negotiated an amendment to the Priority Term Loan Documents that reduced the collateral base floor by $7.5 million and deferred a $5.0 million amortization payment for a month and a half, but the amendment did not provide a permanent liquidity solution.

The COVID-19 pandemic sparked increased demand for the Debtors' core products. The Debtors, however, were unable to meet such demand because of (i) the need to suspend operations temporarily to respond to the pandemic, and (ii) insufficient liquidity to fund raw material purchases needed to scale up production. As a result, the Debtors' liquidity as of the Petition Date remained challenged.

To preserve liquidity, the Debtors took several steps including deferring payment of the firearms and ammunition excise tax under 26 U.S.C. § 4181 (the "Excise Tax") in compliance with the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

The Debtors took advantage of emergency COVID-19 relief measures authorized by Treasury Secretary Mnuchin to defer payment of Excise Taxes that would otherwise have been paid prior to the Petition Date. The Alcohol and Tobacco Tax Trade Bureau (the "TTB"), which enforces and administers the Excise Tax, has filed proofs of claim against the Debtors in the aggregate amount of $15,028,309, including approximately $14.96 million of Priority Tax Claims. The Plan provides for a settlement with the TTB through a payment in the amount of two million dollars ($2,000,000) in the aggregate in full and final satisfaction of such Claim. The resolution of the TTB Claim is a condition to the Plan becoming effective as further described in the Plan.

E.      *The Sale Process*

1.      Prepetition Marketing Process

In late 2019, the Debtors embarked on a process to explore strategic alternatives. Among the options considered were a potential recapitalization of the Prepetition Facilities, a potential refinancing of the Priority Term Loan Facility, a potential equity raise, and a potential sale of the Debtors' assets or a merger. The Debtors were willing to entertain both in-court and out-of-court options during this process.

In furtherance of this process, on December 2, 2019, the Debtors re-engaged Ducera to advise them in connection with exploring strategic alternatives. Ducera contacted over 200 potential new investors regarding engaging in a potential transaction with the Debtors, including over 20 potential lenders regarding a possible refinancing of the Priority Term Loan Facility. Of these, approximately 40 parties entered into confidentiality agreements and engaged in further dialogue and diligence with Ducera and the Debtors. Ultimately, approximately five potential investors submitted non-binding indications of intent with proposed investment terms. One of those proposals was a proposal by an affiliate of the Navajo Nation (the "Potential Bidder") to purchase the Debtors' businesses as a going concern.

For most of February 2020 and into March 2020, the Debtors, with the assistance of Ducera and their other advisors negotiated over terms of potential transactions with these parties. While some of these parties were forced to halt their participation in the process due to the impacts on their businesses from the COVID-19 pandemic, among other reasons, the bid to acquire the businesses by the Potential Bidder emerged as the lead bid.

Ducera also concurrently engaged in in-depth discussions with all of the Debtors' major stakeholders, including the Priority Term Loan Lenders, FILO Term Loan Lenders, certain of the Exit Term Loan Lenders, and the Debtors' major shareholders, to investigate the viability of a consensual out-of-court restructuring. None of these stakeholders, however, offered a proposal that was feasible.

In April 2020, the board of directors of ROC formed a special restructuring committee comprised of solely independent and disinterested directors (the "Restructuring Committee") to, among other things, review and evaluate, with the assistance of legal counsel, financial and other advisors, any and all possible transactions available to the Debtors.

While the Company negotiated the terms of a potential transaction with the Potential Bidder, in May and June 2020, the Debtors, with the assistance of Ducera and the Debtors' other advisors, continued to solicit additional bids for the Debtors' assets in order to maximize the value of the Debtors' estates and to serve as back-ups in the event the negotiations with the Potential Bidder did not result in a transaction.. The Debtors and their advisors engaged a number of parties including private equity firms and strategics to evaluate interest in an asset sale transaction. The Debtors set a response deadline of June 8, 2020 and received bids through June 15, 2020. During the solicitation period, parties were requested to provide indications of interest on any potential asset sale transactions including both segment and enterprise level transactions.

14

The Debtors and the Potential Bidder's representatives negotiated a substantially final purchase agreement and debtor in possession financing agreement on or about June 18, 2020, which remained subject to final internal approval by the Potential Bidder's regulatory and legal oversight committees. Among other things, the negotiated transaction provided for the assumption by the Potential Bidder of many ordinary course pre-petition liabilities including taxes (including excise and employment taxes) and trade accounts payable. While the negotiated transaction received certain of the required regulatory approvals from the Potential Bidder's oversight committee, the transaction with the Potential Bidder became the subject of public reports and the final approval by the Potential Bidder's governing bodies expected in mid-July 2020 was not obtained within the timeframe necessary to move forward with the transaction. The Debtors and the Restructuring Committee concluded that they could no longer wait to see if the Potential Bidder could successfully complete the governance approval process, whether based upon the negotiated transaction or some modification of that agreement. The Debtors extended deadlines for the Potential Bidder and other bidders and then worked to develop their options.

Multiple parties continued diligence efforts and provided indications of interest. The Debtors received asset purchase agreement mark-ups from four bidders in addition to the Potential Bidder, and the Debtors continued to receive expressions of interest from still other potential bidders who continued to conduct diligence as of the Petition Date. The Debtors proceeded to negotiate with each of these bidders. While negotiations progressed, the Debtors had not yet finalized the terms of these sales by the time that their liquidity position necessitated the commencement of the Chapter 11 Cases.

## SECTION III.
## EVENTS DURING CHAPTER 11 CASES

A.    *Overview of the Chapter 11 Cases*

Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to liquidate its assets for the benefit of its creditors and estates. In addition to permitting the liquidation of a debtor, another goal of Chapter 11 is to promote the equality of treatment of similarly-situated creditors and equity interest holders with respect to the distribution of a debtor's assets. In furtherance of these two goals, section 362 of the Bankruptcy Code generally provides for, upon the filing of a petition for relief under Chapter 11, an automatic stay of substantially all acts and proceedings against a debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's Chapter 11 case.

The commencement of a case under Chapter 11 creates an estate comprising all of the debtor's legal and equitable interests as of the petition date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan is the principal objective of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding, subject to the occurrence of an effective date, upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions

15

and the terms of the plan, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

## B. *First-Day Pleadings*

On the Petition Date, the Debtors filed a number of "first day" motions and other pleadings (the "First Day Pleadings"). These were proposed to ensure the Debtors' orderly transition into Chapter 11. The following table describes the most significant First Day Pleadings.

| First Day Pleading | Description of Relief Granted |
|---|---|
| Joint Administration Motion [ECF No. 2] | Authorization to procedurally consolidate and jointly administer the Chapter 11 Cases. |
| Prime Clerk Retention Application [ECF No. 20] | Authorization to appoint and retain Prime Clerk LLC as the Claims and Noticing Agent in the Chapter 11 Cases. The Debtors also sought to retain Prime Clerk LLC as the Balloting Agent for the solicitation of the Plan, as further described herein. |
| Creditor Matrix Motion [ECF No. 5] | Authorization to maintain a single consolidated list of creditors, instead of filing a separate matrix for each Debtor. |
| Cash Collateral Motion [ECF No. 7] | Authorization to access cash collateral (as further described below). |
| Cash Management Motion [ECF No. 14] | Authorization to continue operating the Debtors' cash management system, to honor and pay associated bank fees, to continue and pay all obligations under the Debtors' purchase card system, maintain existing business forms, and to continue performing intercompany transactions in the ordinary course of business. The Debtors also requested a 45-day extension to comply with the investment requirements of section 345(b) of the Bankruptcy Code. |
| Employee Wages Motion [ECF No. 8] | Authorization to pay prepetition employee obligations to their employees and to continue existing employee benefit programs for their current employees in the normal course. |
| Insurance Motion [ECF No. 9] | Authorization to maintain and continue to honor certain insurance policies, and pay insurance obligations, whether such obligations relate to the period prior to or |

16

| | after the commencement of the Chapter 11 Cases, in the ordinary course of business. |
|---|---|
| Taxes Motion [ECF No. 10] | Authorization to pay certain prepetition taxes, governmental assessments, and fees as those obligations become due in the normal course (the order granting such authorization, the "Tax Order"). |
| Utilities Motion [ECF No. 15] | Authorization to prohibit utility companies from altering, refusing, or discontinuing services and to establish procedures for determining adequate assurance of payment for future utility services. |
| Consumer and Customer Programs Motion [ECF No. 11] | Authorization to continue the customer and consumer programs and to honor and pay certain prepetition obligations related to the customer and consumer programs. |
| Consolidated Committee Motion [ECF No. 16] | Authorization for the Bankruptcy Administrator to solicit and form one consolidated unsecured creditors' committee in the Debtors' Chapter 11 Cases. |
| Bidding Procedures Motion [ECF No. 29] | Approval of the proposed bidding procedures, procedures for the assumption and assignment of executory contracts and unexpired leases, and authorization for the Debtors to select a stalking horse bidder and provide bid protections. The Debtors also requested to schedule an auction if the Debtors received two or more timely and acceptable bids and a final hearing to approve the Sale. |

*C.     Retention of Advisors for the Debtors*

The Debtors obtained approval to employ and/or to compensate the following professional firms in the Chapter 11 Cases: (i) O'Melveny & Myers LLP, as co-counsel to the Debtors; (ii) Burr & Forman LLP, as co-counsel to the Debtors; (iii) Akin Gump Strauss Hauer & Feld LLP, as counsel to the Restructuring Committee; (iv) M-III Advisory Partners, LP, as financial advisor to the Debtors; (v) Ducera Securities LLC, as investment banker to the Debtors; (vi) Prime Clerk LLC, as notice, claims, and balloting agent to the Debtors; (vii) B. Riley, as real estate broker to the Debtors, and (viii) other ordinary course professionals as deemed necessary to assist the Debtors in carrying out their duties under the Bankruptcy Code.

*D.     Bar Date*

The Debtors obtained authorization from the Bankruptcy Court to establish December 10, 2020 at 5:00 p.m. (prevailing Central Time) (the "Bar Date") as the deadline to file proofs of Claim against the Debtors. Once the proofs of Claim were filed in accordance therewith, the Debtors (or, after the Effective Date, the Plan Administrator) and their respective professionals commenced

17

conducting a review of the proofs of Claim submitted in the Chapter 11 Cases, including any supporting documentation, and compared the Claims asserted in the proofs of Claim with the Debtors' books and records to determine the validity of such Claims. This review forms the basis of allowing or disallowing Claims under the Plan, if necessary.

E.      Cash Collateral[8]

Pursuant to the Cash Collateral Motion, the Debtors obtained entry of the Final Cash Collateral Order approving the Debtors' use of the cash collateral of the Prepetition Secured Creditors (the "Cash Collateral").

As part of the agreement negotiated with the Potential Bidder, the Potential Bidder was to extend debtor in possession financing to the Debtors. When it became clear that the transaction with the Potential Bidder was not likely to be finalized on the Debtors' requisite timeframe and after assessing all other financing alternatives available, the Debtors reached agreement with the Prepetition Secured Creditors to make their Cash Collateral available to fund the Chapter 11 Cases including a substantial part of the Dominion Cash. The Prepetition Secured Creditors consented to the Debtors using their operating cash and to advance $23.5 million of funds, which consent was subsequently increased by an additional $12.5 million, from the Dominion Cash that was otherwise required to be maintained in the blocked Dominion Account as cash collateral solely to secure the obligations owing to the Prepetition Secured Creditors and to which the Debtors did not otherwise have access.

Under the terms negotiated with the Prepetition Secured Creditors, the Debtors gained access to $23.5 million in additional liquidity--with consent to access an additional $12.5 million--to fund the Chapter 11 Cases and continued operations. The Prepetition Secured Creditors received replacement liens and super-priority administrative expense treatment pursuant to the terms and conditions of the Final Cash Collateral Order.

F.      Sale Process.

Pursuant to the Bidding Procedures Motion, the Debtors sought and obtained approval of bidding procedures by which the Debtors commenced the solicitation and selection of the highest or otherwise best offer for the sale of substantially all of their assets. The Bankruptcy Court set September 4, 2020 as the deadline for interested bidders to submit qualified bids for all or a portion of the Debtors' assets. In addition, the Bankruptcy Court authorized procedures for the designation of one or more stalking horse bidders and the provision of bid protections to a stalking horse bidder.

On September 8, 2020, the Debtors filed a notice with the Bankruptcy Court, designating JJE Capital Holdings, LLC as the stalking horse bidder with a bid of $65 million for the Debtors' ammunitions business and intellectual property. This bid served as a springboard for an active auction involving over a dozen bidders that took place over eight days from September 17, 2020

---

[8] The following summary is qualified in its entirety by reference to the motion to approve the Debtors' use of Cash Collateral, and the relevant operative documents, agreements, schedules, and exhibits.

through September 24, 2020. The final results for the auction for the Debtors' core business assets and the auction for the Debtors' non-core intellectual property auction raised approximately $157 million in proceeds and left valuable assets with the estates, including real estate and accounts receivable. The Debtors, in consultation with their professionals and their consultation parties, selected four successful bidders for their core businesses and five back-up bidders in addition to three successful bidders for their non-core brands. The Debtors promptly documented these separate agreements, and the Bankruptcy Court approved the sales. The Debtors have closed all of these sales as of the date hereof.

The Debtors have engaged B. Riley Real Estate, LLC as broker to market their remaining real property assets, including real property in Huntsville, Alabama and Madison, North Carolina. In addition, the Debtors are pursuing sales of all other assets.

With authorization from the Bankruptcy Court, certain Primary Asset Sale Proceeds were applied to repay the Priority Term Loan Facility and the FILO Term Loan Facility in full. Further, with the consent of the Prepetition Secured Creditors, pursuant to the Final Cash Collateral Order, Primary Asset Sale Proceeds in the amount of $17.9 million were utilized or will be reserved to satisfy wind-down expenses of the ROC Liquidation Estates, including to fund the Plan Administrator Budget. An additional $394,450.00 was reserved on account of a consent fee reduction that was negotiated by the Committee as part of the Final Cash Collateral Order and has been made available for distribution to holders of Allowed General Unsecured Claims pursuant to the Plan. The remaining Primary Asset Sale Proceeds and Remaining Asset Proceeds will be distributed in accordance with the Plan.

## SECTION IV.
## THE PLAN

THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS **EXHIBIT A** TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

*A.*      *Administrative Expenses and Other Unclassified Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.      General Administrative Expenses

Except to the extent that a holder of an Allowed General Administrative Expense Claim agrees to different treatment of such General Administrative Expense Claim, the holder of such Allowed General Administrative Expense Claim shall receive Cash in an amount equal to such Allowed General Administrative Expense Claim on (i) the Effective Date or (ii) if such Claim is not an Allowed General Administrative Expense Claim as of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Claim becomes an Allowed General Administrative Expense Claim or as soon thereafter as is reasonably practicable. To the extent a General Administrative Expense Claim has not been Allowed as of the Effective Date of the Plan, the Plan Administrator shall reserve sufficient amounts from the Plan Assets for the resolution of such Claim.

2.      General Administrative Expense Bar Date

Except as provided below for Professionals requesting compensation or reimbursement for Claims for Professional Fees, requests for payment of General Administrative Expenses must be filed no later than thirty (30) days after the notice of the Effective Date is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court. Holders of General Administrative Expenses who are required to file a request for payment of General Administrative Expense and who do not file such request by the General Administrative Expense Bar Date, shall be forever barred from asserting such General Administrative Expense against the Debtors or their respective property, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover such General Administrative Expense.

3.      Professional Fees

a. Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and all other parties that have requested notice in the Chapter 11 Cases by no later than forty-five (45) days after the Effective Date. Objections to Professional Fees must be filed with the Bankruptcy Court and served on the applicable Professional no later than seventy-five (75) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Plan Professional Fee Reserve; *provided, however,* that if the funds in the Plan Professional Fee Reserve are insufficient to pay the full Allowed amounts of

Case 20-81688-CRJ11    Doc 1369    Filed 01/25/21    Entered 01/25/21 12:53:40    Desc
Main Document      Page 31 of 180

the Professional Fees, the Plan Administrator shall promptly pay any remaining Allowed amounts from Cash on hand, including any Collateral Proceeds received on or after the Effective Date.

b. Plan Professional Fee Reserve

Prior to the Effective Date, the Debtors shall establish a Plan Professional Fee Reserve in an amount equal to all asserted Claims for Professional Fees accrued and unpaid through the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts payable by the Debtors), which may be maintained in an interest-bearing account. The Plan Professional Fee Reserve shall be administered by the Plan Administrator in accordance with the Creditor Trust Agreement; *provided, however*, amounts held in the Plan Professional Fee Reserve shall not constitute property of the Creditor Trust. In the event there is a remaining balance in the Plan Professional Fee Reserve following payment to all holders of Allowed Claims for Professional Fees under the Plan, any such amounts shall be distributed pro rata to holders of Allowed Exit Term Loan Claims. Nothing herein constitutes a waiver of any priority or other right accorded to Professional Fee Claims provided in the Final Cash Collateral Order.

Professionals shall estimate their unpaid Claims for Professional Fees incurred through the projected Effective Date and shall deliver such estimate to counsel for the Debtors no later than forty-eight (48) hours before the projected Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of any Professional's final request for payment of filed Professional Fee Claims. To the extent that Allowed Professional Fee Claims exceed the amount of any estimate, the Plan Professional Fee Reserve shall be supplemented to account for such amount, with such supplemental funds being taken from Collateral Proceeds. If a Professional does not provide an estimate, the Debtors, in consultation with the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and Committee, shall estimate the unpaid and unbilled fees and expenses of such Professional for the purpose of funding the Plan Professional Fee Reserve on the Effective Date.

4. Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, as determined by the Debtors with the consent of the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders in their sole and absolute discretion, either (a) on, or as soon thereafter as is reasonably practicable, the Effective Date or, if such Allowed Priority Tax Claim is not allowed as of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Effective Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim plus interest at a rate determined in accordance with section 511 of the Bankruptcy Code.

Where the Allowed Amount of a Priority Tax Claim is provided for under the Plan as part of a negotiated or proposed settlement (including the TTB Claim), that amount shall be paid in Cash under option (a) above, in full and final satisfaction of such Priority Tax Claim, and the Debtors will not elect to make deferred cash payments under option (b) above. The Debtors and

Case 20-81688-CRJ11    Doc 1369    Filed 01/25/21    Entered 01/25/21 12:53:40    Desc
Main Document    Page 32 of 180

the Plan Administrator, subject to the written consent of the Exit Term Loan Required Lenders, are authorized to enter such further agreements and documentation with the TTB as may be necessary or appropriate to further the settlement and resolution of the TTB Claim on the terms provided in the Plan.

To the extent not previously set, the Confirmation Order shall establish a deadline for filing proofs of claim or requests for payment of Priority Tax Claims. To the extent a Priority Tax Claim has not been Allowed as of the Effective Date of the Plan, the Plan Administrator shall reserve from the Plan Assets sufficient amounts for the resolution of such Claim. In the event there is a remaining balance in such reserve following payment in full of all Allowed Priority Tax Claims under the Plan, any such amounts shall be distributed pro rata to the holders of Allowed Exit Term Loan Claims.

5.     Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses

Any outstanding and unpaid Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date without the requirement to file a fee application with the Bankruptcy Court or comply with any guidelines of the Bankruptcy Administrator, and without any requirement for review or approval by the Bankruptcy Court or any other party. All Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses to be paid on the Effective Date shall be estimated, as necessary, prior to and as of the Effective Date and such estimate shall be delivered to the Debtors; *provided* that such estimate shall not be considered an admission or limitation with respect to such Franklin Managed Entities Expenses or the Exit Term Loan Agent. In addition, the Debtors or the Plan Administrator shall continue to pay the Franklin Managed Entities Expenses and the Exit Term Loan Agent Expenses, as necessary, after the Effective Date promptly within six (6) Business Days of receipt by the Plan Administrator of a summary invoice from the respective professional, which invoice shall contain the aggregate number of hours billed and a summary description of such professional's services and expenses in the ordinary course solely to the extent related to implementation, consummation, and defense of the Plan, whether incurred before, on or after the Effective Date, without any requirement for review or approval by the Bankruptcy Court or any other party other than the Plan Administrator; *provided*, *however*, that any Franklin Managed Entities Expenses incurred after the Effective Date shall not exceed $50,000 in the aggregate. Any objections raised by the Plan Administrator with respect to such invoices shall be (a) transmitted via email to the respective professional within five (5) Business Days of the receipt of the applicable invoice, (b) limited solely to the reasonableness of the disputed fees, and (c) absent a consensual resolution or other agreement between the Plan Administrator and respective professional, submitted to the Bankruptcy Court for resolution (a "Post-Effective Date Fee Objection"). In the event that a Fee Objection is timely and properly transmitted in accordance herewith, then the Debtors or the Plan Administrator shall promptly pay any undisputed portion of the applicable professional's outstanding fees and expenses within five (5) Business Days of the receipt of the Post-Effective Date Fee Objection.

6.     Aggregate Gift to Junior Creditors from the Exit Term Loan Lenders

The Plan includes distributions and transfers based upon the Aggregate Gift to Junior Creditors provided by the Exit Term Loan Lenders. Holders of Allowed Exit Term Loan Claims

22

have agreed to forgo receipt of, fund, and/or gift to Junior Creditors amounts consisting of (1) Cash from the Primary Asset Sale Proceeds utilized pursuant to the Plan for (a) satisfaction of (i) Allowed General Administrative Expenses, (ii) Allowed Priority Tax Claims (subject to the limits provided in the Plan), and (iii) Allowed Priority Non-Tax Claims, (b) funding of (i) the Plan Professional Fee Reserve, (ii) the Plan Administrator Operating Expense Funded Amount, and (iii) any other reserves established under the Plan, (2) the Unsecured Creditor Recovery Amount and the payments to the Tort Convenience Class Claims, if any and (3) the amount of the Adequate Protection Superpriority Claim, which shall be waived as of the occurrence of the Effective Date. In addition to the foregoing, the GL Insurance Assets will be retained for the benefit of the Tort Claims (other than the Tort Convenience Class Claims) in the Tort Claim Sub-Trust and will not be cancelled or sold. But for the foregoing concessions, the Junior Creditors who benefit from the gift amounts and terms would likely receive no recovery. Under the Plan, Junior Creditors including holders of Allowed Priority Tax Claims, Tort Convenience Class Claims and General Unsecured Claims will receive recoveries, while the GL Insurance Assets will be preserved for Tort Claims (other than Tort Convenience Class Claims). The Debtors and the other Plan Proponents believe that none of these recoveries would be achievable in a Chapter 7 liquidation or under an alternative plan.

The amount of the Aggregate Gift to Junior Creditors from the Exit Term Loan Lenders is significant and is only available if the Plan is confirmed and becomes effective. In all other scenarios, the Debtors believe that there will be no recovery for Claims in other Classes, with the exception of certain Secured Claims to the extent and only to the extent that their Liens are senior to the those of the Exit Term Loan Secured Creditors up to the value of the Debtors' interest in the applicable collateral. Only a small number of Secured Claims would likely satisfy those requirements.

The Debtors estimate that the cash portion of the Aggregate Gift to Junior Creditors ranges in value from approximately $22 million to $30 million depending upon (i) the ultimate recovery on asset sales, (ii) the amount of the Allowed Administrative, Priority and Tort Convenience Class Claims and (iii) other funded expenses. In addition to the cash portion of the Aggregate Gift to Junior Creditors, the Exit Term Loan Lenders would waive their Adequate Protection Superpriority Claim under Bankruptcy Code Section 507(b) and the Final Cash Collateral Order. The Debtors estimate that the Adequate Protection Superpriority Claim of the Exit Term Loan Lenders may be in the range of approximately $25 million to $35 million based upon the diminution of Cash Collateral, predominantly related to Chapter 11 expenses and operating losses. The Exit Term Loan Secured Creditors assert that their Adequate Protection Superpriority Claim is potentially as high as $55 million, thus there may be significant variance depending upon how any diminution of Collateral value is measured. As such, the Debtors believe that the Exit Term Loan Lenders' Adequate Protection Superpriority Claim would consume the net value of any asset that is not already the Collateral of the Exit Term Loan Secured Creditors in any alternative plan or a Chapter 7 liquidation.

Furthermore, the Plan and the Aggregate Gift to Junior Creditors provide other significant benefits. It will provide for the payment of Allowed Tort Convenience Class Claims up to the capped amounts, placing a floor under the recovery for holders of Allowed Tort Claims, including those that may not otherwise have recourse to the GL Insurance Assets. Moreover, the Plan provides that GL Insurance Assets will be held in the Tort Claim Sub-Trust for the benefit of the

23

holders of Allowed Tort Claims (other than Tort Convenience Class Claims). The GL Insurance Assets may not be sold or terminated to generate proceeds to be used for other purposes. Under the Plan, the Exit Term Loan Lenders waive any right to assert that the GL Insurance Assets or net proceeds thereof are their Collateral.

The Exit Term Loan Lenders are anticipated to a have a substantial unsecured deficiency claim, which is estimated at approximately $70 million for purposes of voting under the Plan. The actual deficiency claim will depend upon the results of the Sales, the final amounts of payments permitted under the Plan, and other factors.

       7.      Tax Claims, Including the TTB Claim

The TTB Claim is the Debtors' primary Priority Tax Claim. The Debtors believe that a majority of their other Tax Claims are real property taxes that predominantly became due post-petition (payable under the Tax Order) and/or are secured or could become secured with the passage of time. Certain property taxes may relate to real property assets that the Debtors have already sold or intend to sell under the Plan. The Debtors do not anticipate the receipt of any other material Tax Claims.

The Effective Date of the Plan is conditioned on the amount payable to TTB on account of the TTB Claim being Allowed in the amount of no more than $2 million. The Plan includes the proposed treatment of the TTB Claim as a settlement that would constitute full and final satisfaction of the TTB Claim. The filed amount of the TTB Claim is an aggregate amount of $15,028,309, including approximately $14.96 million of Priority Tax Claims. The Debtors have engaged in extensive negotiations with the TTB concerning the TTB Claim. But for the Aggregate Gift to Junior Creditors, the Debtors believe that no amount would be paid to the TTB on account of its eighth Priority Tax Claims. The Plan includes the proposed settlement of the TTB Claim as described therein. If the Plan is confirmed, the TTB Claim would automatically be Allowed in the amount of $2 million and paid in Cash following the Effective Date. The Debtors would waive the right to pay the TTB Claim over time through deferred payments as provided in Bankruptcy Code Section 1129(a)(9)(C). In a Chapter 7 liquidation the results applicable to the TTB Claim could vary materially compared to the treatment proposed under the Plan. The treatment of the TTB Claim and the $2 million settlement amount are further described in the Plan.

**B.**     *Classification and Treatment of Claims and Interests*

       1.      Classification of Claims and Interests

Claims and Interests, except for Administrative Expenses and Priority Tax Claims are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class. To the extent a specified Class ultimately does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist. To the extent that a particular Claim does

not qualify within the description of any Class and the Plan otherwise fails to classify such Claim or specify its treatment, then such Claim shall be deemed to be part of Class 5; *provided, however,* that all rights of the holder(s) of such Claim(s), including the right to object to such classification, and the Debtors' rights and defenses thereto, are reserved.

The Plan is premised upon the procedural consolidation of the Debtors for Plan purposes only. Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3 | Exit Term Loan Claims | Impaired | Entitled to vote |
| 4 | Huntsville Note Claim | Unimpaired | Deemed to accept |
| 5 | General Unsecured Claims | Impaired | Entitled to vote |
| 6 | Tort Convenience Class Claims | Impaired | Entitled to vote |
| 7 | Tort Claims | Impaired | Entitled to vote |
| 8 | Intercompany Claims | Impaired | Deemed to reject |
| 9 | Interests in the Debtors | Impaired | Deemed to reject |

2.      Treatment of Claims and Interests

1.      Class 1 – Priority Non-Tax Claims

    a.      *Classification*: Class 1 consists of all Allowed Priority Non-Tax Claims.

    b.      *Treatment*: Except to the extent previously satisfied during the Chapter 11 Cases or that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim, each such holder, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Non-Tax Claim, shall receive Cash in the amount equal to 100% of the Allowed amount of such Priority Non-Tax Claim, on or as soon as reasonably practicable after the latest of (x) the Effective Date, (y) the date such Claim becomes Allowed and (z) the date such Claim becomes due and payable in the ordinary course of business. To the extent a Priority Non-Tax Claim has not been Allowed as of the Effective Date of the Plan, the Plan Administrator shall reserve sufficient amounts from the Plan Assets for the resolution of such Claim. In the event there is a remaining balance in such reserve following payment in full of all Allowed Priority Non-Tax Claims under the Plan, any such amounts shall be distributed pro rata to the holders of Allowed Exit Term Loan Claims.

25

c.    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

a.    *Classification*: Class 2 consists of all Allowed Other Secured Claims.

b.    *Treatment*:  Except to the extent previously satisfied during the Chapter 11 Cases (including through assumption or payment of such Other Secured Claim in connection with the consummation of the Asset Purchase Agreements) or such holder agrees to less favorable treatment on account of such Other Secured Claim, each holder of an Allowed Other Secured Claim shall (i) receive, in full and final satisfaction, settlement, and release of, and in exchange for, its Other Secured Claim, Cash payment equal to the Allowed amount of such Other Secured Claim on the later of the Effective Date, the date such Claim becomes an Allowed Other Secured Claim or as soon as practicable thereafter, unless otherwise agreed by the holder of such Other Secured Claim and the applicable Debtor or the Plan Administrator, as applicable, (ii) be satisfied by the surrender of the Collateral securing such Secured Claim, or (iii) be otherwise rendered Unimpaired.

c.    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

1.    Class 3 – Exit Term Loan Claims

a.    *Classification*: Class 3 consists of all Allowed Claims arising under the Exit Term Loan Documents that remain unpaid and outstanding as of the Effective Date.[9]

b.    *Allowance*:  Except to the extent previously satisfied during the Chapter 11 Cases, The Exit Term Loan Claims shall be Allowed in the aggregate principal amount of $110,710,000, plus any prepetition interest, fees, costs, expenses, and other amounts accrued prior to the Petition Date pursuant to or secured by the terms of the Exit Term Loan Documents, plus any Exit Term Loan Adequate Protection Payments (as defined in the Final Cash Collateral Order), in each case, due and owing as of the Effective Date.

---

[9] The Debtors reserve the right to treat the Exit Term Loan Claims as a single claim for purposes of numerosity and/or treat the funds and accounts that share a common manager as holding a single claim for purposes of numerosity.

Case 20-81688-CRJ11    Doc 1369    Filed 01/25/21    Entered 01/25/21 12:53:40    Desc
Main Document      Page 37 of 180

Neither the Exit Term Loan Agent nor the Exit Term Loan Lenders shall be required to file proofs of Claim on account of any Exit Term Loan Claims.

c. *Deficiency Claim:* Each holder of an Allowed Exit Term Loan Claim shall also hold its respective pro rata share of Exit Term Loan Deficiency Claims to the extent that the Exit Term Loan Claim of such holder is not paid in full under the Plan from the Collateral Proceeds. The Exit Term Loan Deficiency Claims shall not be waived, but instead shall constitute Allowed General Unsecured Claims.

d. *Treatment*: Each holder of an Allowed Exit Term Loan Secured Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, its Exit Term Loan Secured Claim, Cash from the Collateral Proceeds in the amount equal to its pro rata share of the Collateral Proceeds remaining after the funding of the distributions and/or reserves set forth under the Plan, including Allowed General Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, the Plan Professional Fee Reserve, the Plan Administrator Operating Expense Funded Amount, the Unsecured Creditor Recovery Amount and the distributions to the Tort Convenience Class Claims. For the avoidance of doubt, the Collateral Proceeds shall include (i) the Net Cash Proceeds of the Collateral securing Exit Term Loan Claims (including, among other Collateral, the Huntsville Property) whether received before or after the Effective Date, which, except as provided in the immediately preceding sentence, shall be distributed by the Plan Administrator to the holders of Allowed Exit Term Loan Claims on a pro rata basis on the later of the Effective Date and the closing date of the sale or other disposition of such Collateral, and (ii) the excess amount of any reserves established under the Plan remaining after the satisfaction in full of the Allowed Claims for which such reserve is established, which excess shall promptly, upon such satisfaction in full, be distributed by the Plan Administrator to the holders of Allowed Exit Term Loan Claims on a pro rata basis. Any Adequate Protection Superpriority Claim shall be deemed waived as of the occurrence of the Effective Date. Further, except as otherwise provided under the Plan, all distributions to the Exit Term Loan Lenders shall be made through the Exit Term Loan Agent as contemplated under the Exit Term Loan Agreement; and all other rights of the Exit Term Loan Agent with respect to the Exit Term Loan Lenders are expressly preserved.

e. *Voting*: Class 3 is Impaired under the Plan. Therefore, holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan. For voting purposes only, the aggregate amount of the Exit Term Loan Secured Claims shall be estimated at $40,000,000 and the aggregate amount of the Exit Term Loan Deficiency Claims shall be estimated at $70,710,000.

f. *Confirmation of Aggregate Gift to Junior Creditors*: Holders of Allowed Exit Term Loan Claims have agreed to forgo receipt of, fund, and/or gift to

27

Junior Creditors amounts consisting of (1) Cash from the Primary Asset Sale Proceeds utilized pursuant to the Plan for (a) satisfaction of (i) Allowed General Administrative Expenses, (ii) Allowed Priority Tax Claims, and (iii) Allowed Priority Non-Tax Claims, (b) funding of (i) the Plan Professional Fee Reserve, (ii) the Plan Administrator Operating Expense Funded Amount, and (iii) any other reserves established under the Plan, (2) the Unsecured Creditor Recovery Amount and the payments to the Tort Convenience Class Claims, and (3) the amount of the Adequate Protection Superpriority Claim, which shall be waived as of the occurrence of the Effective Date (collectively, the "Aggregate Gift to Junior Creditors").

2.    Class 4 – Huntsville Note Claim

a.    *Classification*: Class 4 consists of the Allowed Huntsville Note Claim.

b.    *Treatment*: Except to the extent previously satisfied during the Chapter 11 Cases (including through assumption or payment of such Claim in connection with the sale of the Huntsville Property) or such holder agrees to less favorable treatment on account of such Claim, the holder of an Allowed Huntsville Note Claim shall (i) receive, in full and final satisfaction, settlement, and release of, and in exchange for, the Huntsville Note Claim, payment equal to the Allowed amount of such Secured Claim, together with post-Effective Date interest to the extent required to render such Secured Claim unimpaired, in Cash, on the latest of the Effective Date, the date such Claim becomes an Allowed Claim or as soon as practicable after the sale of the Huntsville Property, unless otherwise agreed by such holder and the Plan Administrator with the consent of the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, (ii) be satisfied by the surrender of the Collateral securing the Allowed Huntsville Note Claim, (iii) be satisfied by the assumption and assignment of the Huntsville Note by any buyer of the Huntsville Property, including the retention of the holder's Liens on the Collateral securing the Allowed Huntsville Note Claim, or (iv) be otherwise rendered Unimpaired.

c.    *Voting*: Class 4 is Unimpaired under the Plan. Therefore, holders of Allowed Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.    Class 5 – General Unsecured Claims

a.    *Classification*: Class 5 consists of all General Unsecured Claims.

b.    *Treatment*: Except to the extent previously satisfied during the Chapter 11 Cases (including through the assumption and/or payment of such Claim in accordance with their respective terms in connection with the consummation of the Sales or a subsequent sale transaction), each holder of

28

an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, its pro rata share of the Creditor Trust Interests; *provided, however*, that the first $894,451.00 of the Unsecured Claims Distribution in respect of the Creditor Trust Interests shall be distributed pro rata to holders of Allowed General Unsecured Claims other than holders of the Exit Term Loan Deficiency Claims.

c.   *Voting*:  Class 5 is Impaired under the Plan.  Therefore, holders of Claims in Class 5 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan.  For voting purposes only, each unliquidated General Unsecured Claims shall be deemed to hold a General Unsecured Claim equal to $1.

4.   Class 6 – Tort Convenience Class Claims

a.   *Classification*: Class 6 consists of all Tort Claims where all of the holder(s) of such Claims arising from a single incident or occurrence have collectively elected to be treated as a Tort Convenience Class Claim.

b.   *Treatment*: Each holder of an Allowed Tort Convenience Class Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Tort Convenience Class Claim, Cash equal to two percent (2%) of the Allowed Amount of such Claim not to collectively exceed twenty thousand dollars ($20,000) per incident or occurrence.  Holders of Tort Convenience Class Claims arising from a single incident or occurrence must collectively elect to participate in the Class.  The total Cash payments to all Allowed Tort Convenience Class Claims are collectively subject to a $250,000 aggregate maximum recovery.

c.   *Voting*:  Class 6 is Impaired under the Plan.  Therefore, holders of Claims in Class 6 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan. For voting purposes only, each holder of an unliquidated Tort Convenience Class Claim shall be deemed to hold a Claim equal to $1.

5.   Class 7 – Tort Claims

a.   *Classification*: Class 7 consists of all Tort Claims; *provided, however*, that holders of Tort Claims that elect to be treated as Tort Convenience Class Claims shall not be included within Class 7.

b.   *Treatment*:  Except to the extent previously satisfied during the Chapter 11 Cases, each holder of an Allowed Tort Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Tort Claim, a beneficial interest in the Tort Claim Sub-Trust (collectively, the "Tort Claim Sub-Trust Interests") reflecting a right to receive such holder's respective share of the proceeds of the GL Insurance

29

Assets providing coverage applicable to such Tort Claim as may be determined pursuant to the terms and conditions of the Plan.

    c.    *Voting*: Class 7 is Impaired under the Plan. Therefore, holders of Claims in Class 7 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan. For voting purposes only, each holder of an unliquidated Tort Claim shall be deemed to hold a Claim equal to $1.

  6.     Class 8 – Intercompany Claims

    a.    *Classification*: Class 8 consists of all Intercompany Claims.

    b.    *Treatment*: On the Effective Date, the Intercompany Claims will be cancelled without any conversion thereof or distribution with respect thereto.

    c.    *Voting*: Class 8 is Impaired under the Plan. Each holder of a Claim in Class 8 shall be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote.

  7.     Class 9 – Interests in the Debtors

    a.    *Classification*: Class 9 consists of all Interests in the Debtors.

    b.    *Treatment*: Each holder of an Interest in a Debtor shall not receive anything on account of such Interest.

    c.    *Voting*: Class 9 is Impaired under the Plan. Each holder of an Interest in Class 9 shall be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote.

  3.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect (i) the Debtors' or the Plan Administrator's rights and defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims or (ii) the rights and defenses of any holder of Unimpaired Claims in respect of its Unimpaired Claims. Without limiting the generality of the foregoing, the Debtors reserve the right to cure any past default or any failure to satisfy any condition that resulted in the material modification of their liabilities related to such Unimpaired Obligation, whether occurring prior to or after the Petition Date and to reinstate the obligations related to any Unimpaired Claim as they existed prior to default, acceleration or the occurrence of, or failure to satisfy, any condition that resulted in the material modification of their liabilities related to such Unimpaired Obligation.

30

*C.*     *Acceptance or Rejection of the Plan*

1.     Voting Classes

Classes 3, 5, 6, and 7 are Impaired under the Plan and, therefore, holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Claims that are Allowed or temporarily Allowed for voting purposes held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Claims that are Allowed or temporarily Allowed for voting purposes held by holders who actually voted in such Class have voted to accept the Plan.

2.     Presumed Acceptance of the Plan

Classes 1, 2, and 4 are Unimpaired under the Plan. Holders of Claims in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.     Non-Consensual Confirmation

Classes 8 and 9 are Impaired and will not receive a distribution under the Plan. Accordingly, Classes 8 and 9 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Because Classes 8 and 9 are deemed to reject the Plan, the Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Classes and any other class that is entitled to vote and rejects the Plan. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any document in the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

4.     Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5.     Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

31

*D.*     *Means for Implementation of the Plan*

1.     General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims in any Class in accordance with the Plan are intended to be, and shall be, final.

Upon the occurrence of the Effective Date, each Debtor and its successors and assigns hereby waive and release each other and all of their respective successors from any and all Intercompany Claims and Causes of Action among and between any or all of the Debtors, which waiver and release shall be effective as a bar to all actions, Causes of Actions, suits, Claims, Liens, or demands of any kind with respect to any Intercompany Claim or Causes of Action among or between any or all of the Debtors
.

2.     Procedural Consolidation of Debtors for Plan Purposes Only

The Plan provides for the procedural consolidation of the Debtors for Plan purposes only and shall serve as a motion by the Debtors for entry of an order of the Bankruptcy Court granting such relief.  The Debtors propose procedural consolidation to avoid the inefficiency of proposing, voting on, and making distributions in respect of entity-specific claims.  Accordingly, except with respect to the Huntsville Note Claim and Other Secured Claims, on the Effective Date, all of the Debtors and their estates shall, for purposes of the Plan only, be treated as though they were merged and (a) all Assets and liabilities of the Debtors shall, for purposes of the Plan only, be treated as though they were merged, (b) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtor shall be eliminated and canceled, (c) all joint or duplicate obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint or duplicate obligations, shall be considered a single claim against the Debtors (including for purposes of distributions and reserves) without the need for further action by the Debtors or the Plan Administrator, and (d) any Claim filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date.  Unless otherwise set forth herein, such consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors or (ii) the substantive rights of any creditor.  If any party in interest challenges the proposed procedural consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by-entity basis.

Without limiting the generality of the foregoing, if and to the extent that the Bankruptcy Court so orders after notice and a hearing, holders of Claims owed by multiple Debtors (other than those who voluntarily elect to participate in the Tort Convenience Class) may receive a supplemental Claim under the Plan to compensate them for the value of any additional recovery that would have otherwise been made to them if they had maintained their additional separate

Claims against the Debtors, excluding any benefit related to the Aggregate Gift to Junior Creditors set forth in Article III.B.3.f of the Plan.
.

3.    Sources of Cash for Plan Distributions

The Debtors shall fund distributions under the Plan with: (a) Cash on hand (which, for the avoidance of doubt, shall be Cash on hand, if any, that is available after the consummation of the Sales); (b) the Primary Asset Proceeds and the Remaining Asset Proceeds; and (c) all other proceeds, if any, generated from the liquidation of the Plan Assets. Notwithstanding anything herein to the contrary, the Plan Administrator shall fully fund (i) the Professional Fee Reserve and any reserve for Plan Administrator Operating Expenses, subject to the Plan Administrator Budget and (ii) any other reserves contemplated by the Plan or the Creditor Trust Agreement, prior to making any distributions of Plan Assets under the terms of the Plan.

4.    Continued Corporate Existence; Vesting of Assets

On and after the Effective Date, subject to the requirements of the Plan, the ROC Liquidation Estates will continue to exist as separate companies and shall retain all of their powers under applicable non-bankruptcy law, and without prejudice to any right to amend their respective constituent documents, dissolve, merge, or convert into another form of business entity, or to alter or terminate their existence.  The Interests of the Debtors shall be deemed to be held through the Plan Administrator under applicable non-bankruptcy law and the Plan Administrator shall be authorized to exercise all of the rights and powers of a sole member as provided by the Plan.

Except as otherwise provided in the Plan, on and after the Effective Date, all Plan Assets and property of the Debtors and their Estates, including any interests in subsidiaries and affiliates, but excluding assets to be vested in the Creditor Trust or the Tort Claim Sub-Trust, will vest in the ROC Liquidation Estates free and clear of all Claims, Liens, charges, other encumbrances and interest; *provided*, *however*, that the Plan Administrator may abandon or otherwise not accept any Plan Assets that the Plan Administrator believes, in good faith, to have no value to, or will be unduly burdensome to, the ROC Liquidation Estates. Any Plan Assets that the Plan Administrator so abandons or otherwise does not accept shall not be property of the ROC Liquidation Estates. Neither the occurrence of the Effective Date, nor the effectiveness of the Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of any of the Debtors that are limited liability companies, which shall be continued as limited liability companies following the Effective Date subject to the terms of the Plan.

5.    Establishment of Creditor Trust

On the Effective Date, the Debtors shall establish a Creditor Trust, which shall, among other things and as more fully set forth in the Creditor Trust Agreement: (i) administer the resolution, asset administration, and distribution process for Allowed Claims, (ii) prosecute the Litigation Assets, and (iii) liquidate any assets transferred to the Creditor Trust.

Under section 1141(b) of the Bankruptcy Code, the Creditor Trust Assets shall be assigned, transferred, and vest in the Creditor Trust upon the occurrence of the Effective Date free and clear of all Claims, Liens and interests; *provided*, *however*, that the Plan Administrator may abandon or

33

otherwise not accept any assets that the Plan Administrator believes, in good faith, to have no value to, or will be unduly burdensome to, the Creditor Trust in accordance with the terms of the Creditor Trust Agreement. Any assets that the Plan Administrator so abandons (whether before or after the Effective Date) or otherwise does not accept shall not be property of the Creditor Trust. The Creditor Trust shall qualify as a liquidating trust as described in Treasury Regulation section 301.7701 – 4(d) and shall be treated as a grantor trust for United States federal income tax purposes.

The Creditor Trust Agreement shall be in form and substance satisfactory to the Debtors, the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and the Committee. The operations of the Creditor Trust shall be supervised by the Plan Administrator in consultation with the GUC Oversight Administrator. The Plan Administrator alone shall have the authority to manage the day-to-day operations of the Creditor Trust, including, without limitation, by disposing of the assets of the Creditor Trust, appearing as a party in interest, prosecuting the Litigation Assets, prosecuting objections to, settling or otherwise resolving General Unsecured Claims and other Claims, calculating distributions, paying taxes and such other matters as more particularly described in the Creditor Trust Agreement. Notwithstanding anything herein to the contrary, the Plan Administrator shall be responsible for making distributions from the Creditor Trust to Holders of Allowed General Unsecured Claims in satisfaction of Creditor Trust Interests. Expenses and fees of the Creditor Trust, including the expenses of the Plan Administrator and its representatives and professionals, will constitute Plan Administrator Operating Expenses payable from Plan Assets in accordance with the Plan Administrator Budget as further set forth in the Creditor Trust Agreement. The Plan Administrator shall consult in good faith with the GUC Oversight Administrator on those specific matters, if any, where the interests of holders of Allowed General Unsecured Claims and holders of Allowed Claims other than Allowed General Unsecured Claims diverge, all in accordance with the terms and conditions of the Creditor Trust Agreement.

The Bankruptcy Court and the District Court shall retain jurisdiction to administer the Creditor Trust Assets.

6.      General Liability Insurance and the Tort Convenience Class Option

Personal injury Tort Claims in various amounts have been asserted against the Debtors. The Personal Injury Tort Claims that were subject to pending litigation prior to the Petition Date are identified and summarized in the Official Committee of Unsecured Creditors' Status Report Concerning Insurance Issues dated October 16, 2020 [Docket No. 1007] (the "Insurance Report"), attached hereto as **Exhibit B**. Proofs of claims for certain additional Tort Claims have been filed. In all, the Debtors believe that the filed proofs of claim for Tort Claims relate to approximately 26 separate incidents or occurrences, a number of which involve claims that are either unliquidated in amount or that collectively assert aggregate damages in excess of $1 million in the related proofs of claim.

The Debtors maintained GL Insurance Assets covering Tort Claims throughout the pre-petition and post-petition periods. The coverage limits and terms of the GL Insurance Assets were summarized in the Insurance Report. The GL Insurance Assets include self-insured retention ("SIR") provisions, which generally required the Debtors to pay a minimum amount prior to receiving coverage from their carriers. Generally, the Debtors' GL Insurance Assets included a

per occurrence SIR of $1 million, with and additional annual "corridor" SIR of $1 million per year. The legal issues related to the SIR limits are potentially complex and raise potential uncertainties regarding how the Debtors' bankruptcy and insolvency impact the SIR and coverage. The Debtors incurred and paid significant defense costs related to cases that had been pending in the tort system prior to the bankruptcy filing. For claims in one or more years, the Debtors assert that the corridor SIR may have been exhausted by previously paid indemnity amounts and/or defense costs. The Debtors are informed and believe that certain GL Insurers contest whether expenditures for defense costs apply for purposes of the SIR. In some cases, both the individual occurrence and corridor SIRs may still be unexhausted. If and to the extent that the SIRs remain unexhausted with respect to any Tort Claim, the insurers may assert a defense to coverage and/or seek a credit to any claim in the amount of the applicable SIR(s). Holders of Tort Claims may likely contest all of those positions and defenses.

Under the Plan, Tort Claims (unless they elect to be classified in the Tort Convenience Class) would be eligible to recover on their Allowed Claims against the Debtors' GL Insurance Assets, subject to the terms and conditions of those policies, which policies shall be held in the Tort Claims Sub-Trust. The GL Insurance Assets may not be sold or terminated by the Plan Administrator. The Debtors have conducted extensive discussions with Ironshore Insurance Company, one of their primary insurers providing coverage for a number of years as described in the Insurance Report, to provide a defense to the applicable Tort Claims. The Debtors may, but are not required to, enter (or the Bankruptcy Court may order) Supplemental Insurance Procedures concerning the liquidation and/or defense of Tort Claims. The Plan Administrator retains all rights and authority to resolve Tort Claims unless expressly waived thereby. The provisions regarding the Tort Claims are described in more detail in the Plan.

The Plan also includes insurance neutrality provisions designed to preserve parties' respective rights related to the GL Insurance Assets. Among other things, the Plan preserves rights that parties including the Debtors, the Plan Administrator, the insurers and holders of Tort Claims (other than Tort Convenience Class Claims) may have to commence or seek leave to commence actions in the Bankruptcy Court concerning the GL Insurance Assets and/or to oppose such actions. This includes potential actions related to the SIRs and other policy provisions. No parties, including the Plan Administrator, are obligated to commence such actions.

If and to the extent that indemnification for a Tort Claim is subject to one or more of the SIRs, there may not be insurance coverage for such claim or the insurance recovery on such claim may be significantly reduced. This may be a particular consideration for holders of Tort Claims related to incidents or occurrences with potential liability of less than $1 million who believe that the applicable SIR would be enforceable by insurers to eliminate their recovery against the GL Insurance Assets. Conversely, holders of Tort Claims may contest the insurers' rights to enforce the terms of the SIRs. The Plan includes an option for Tort Claims to elect to be classified as a Tort Convenience Class Claim. Holders who elect such treatment are entitled to receive a two percent (2%) Cash recovery on the Allowed, liquidated amount of their Claims not to collectively exceed $20,000 per incident or occurrence in the aggregate in full and final satisfaction of their Tort Claims. The $20,000 per incident cap is calculated based on two percent multiplied by the $1 million SIR figure discussed above. Tort Convenience Class Claims will not recover under the Debtors' GL Insurance Assets or the Tort Claims Sub-Trust and are therefore not subject to the SIRs. In order to elect to be classified as a Tort Convenience Class Claim, all holders of Tort

35

Claims arising from a single incident or occurrence must elect such treatment and will collectively be subject to the $20,000 cap. The total payout for the Tort Convenience Class is limited to $250,000 absent consent of the Exit Term Loan Required Lenders. The Debtors believe that the $250,000 cap will exceed the total payout for Tort Claims that would likely elect to participate in the Tort Convenience Class given the damages alleged on a per incident basis in the filed proofs of claim. Holders of Tort Claims are encouraged to consult with their counsel concerning the GL Insurance Assets, SIRs and the Tort Convenience Class option.

       7.       Tort Claims and the Establishment of the Tort Claim Sub-Trust

On the Effective Date, the Debtors shall establish a Tort Claim Sub-Trust, which shall administer the resolution, asset administration, and distribution process for Tort Claims (other than Tort Convenience Class Claims). The resolution of the Tort Claims and the administration of the Tort Claim Sub-Trust shall be subject to the terms of the Plan. The Plan Administrator is authorized to obtain agreement of the primary insurer under the GL Insurance Assets (or to the extent the primary layer is exhausted, the secondary layer or layers) to pay for the Estate's defense concerning the Tort Claims (other than Tort Convenience Class Claims) covered thereby pursuant to any Supplemental Insurance Procedures. Notwithstanding anything to the contrary herein, unless the Debtors or Plan Administrator expressly waives or agrees to forebear from exercising any rights or powers concerning the resolution of Tort Claims (other than Tort Convenience Class Claims) in the Supplemental Insurance Procedures, the Debtors and Plan Administrator retain all such rights and powers, including without limitation, the power to (i) stipulate that the holder of such Tort Claim (other than Tort Convenience Class Claims) be granted relief by the Bankruptcy Court from any stay or injunction (including those provided or preserved in the Plan) to pursue and recover on account of its Tort Claims (other than Tort Convenience Class Claims) (other than Tort Convenience Class Claims) solely against and from the GL Insurance Assets or (ii) otherwise object to, oppose, resolve or settle the applicable Tort Claim. For the avoidance of doubt, nothing herein or otherwise shall obligate the Debtors or the Plan Administrator to (i) object to any Claim or (ii) defend against any Claim to the extent that relief from Plan stays and injunctions is granted by the Bankruptcy Court to pursue recovery under the GL Insurance Assets. Nothing herein shall require the Debtors or the Plan Administrator to propose or accept any Supplemental Insurance Procedures.

Any payment from the GL Insurance Assets to any holder of a Tort Claim (other than Tort Convenience Class Claims) in excess of two million dollars ($2,000,000) remains subject to notice and a hearing in the Bankruptcy Court to allow the Court to consider the impact of the payment on the Debtors' remaining GL Insurance Assets and other Tort Claims (other than Tort Convenience Class Claims) covered by the same policies.

Under section 1141(b) of the Bankruptcy Code, all GL Insurance Assets and rights and defenses thereunder with respect to the Tort Claims shall be assigned, transferred, and vest in the Tort Claim Sub-Trust upon the occurrence of the Effective Date free and clear of all Claims, Liens and interests. The Tort Claim Sub-Trust shall qualify as a liquidating trust as described in Treasury Regulation section 301.7701 – 4(d) and shall be treated as a grantor trust for United States federal income tax purposes. Absent further order of the Bankruptcy Court, the Plan Administrator shall not sell or otherwise transfer or cancel the GL Insurance Assets, which are held in the Tort Claim Sub-Trust.

The Document Preservation Order shall remain in effect subject to further order of the Bankruptcy Court modifying or terminating such order, which the Plan Administrator shall have authority to seek.

The terms of the Tort Claim Sub-Trust shall be included in the Creditor Trust Agreement. The operations of the Tort Claim Sub-Trust shall be supervised by the Plan Administrator, who shall have the authority to manage the day-to-day operations of the Tort Claim Sub-Trust including appearing as a party in interest, reviewing issues related to distributions made from the GL Insurance Assets and such other matters as more particularly described in the Creditor Trust Agreement. Expenses and fees of the Tort Claim Sub-Trust, including the expenses of the Plan Administrator and its representatives and professionals, will constitute Plan Administrator Operating Expenses payable from Plan Assets in accordance with the Plan Administrator Budget.

The Bankruptcy Court and the District Court shall retain jurisdiction to administer the GL Insurance Assets and to approve and enforce any Supplemental Insurance Procedures. Without limiting the generality of the foregoing, all parties (including the insurers under the GL Insurance Assets, the Debtors, the Plan Administrator and the holders of Tort Claims (other than Tort Convenience Class Claims)) retain any rights they may have to (i) initiate litigation in the Bankruptcy Court concerning the self-insured retention provisions and other provisions of the GL Insurance Assets; (ii) seek leave of the Bankruptcy Court to pursue such litigation in another forum; and (iii) oppose any of the foregoing relief. The Bankruptcy Court retains the power to authorize third parties (including the holders of Tort Claims (other than Tort Convenience Class Claims)) to derivatively assert the rights of the Debtors and their estates concerning the GL Insurance Assets in the foregoing proceedings and otherwise to grant relief from the stay and injunctions hereunder to do so. However, no party, including the Plan Administrator, is required to initiate any such litigation.

For the avoidance of doubt, the interests of the beneficiaries in the Creditor Trust and the Tort Claim Sub-Trust shall be uncertificated and shall be nontransferable except upon death of the interest holder or by operation of law.

8.    Powers and Duties of the Plan Administrator

On the Effective Date, the Plan Administrator shall begin acting for the ROC Liquidation Estates in a fiduciary capacity implementing such liquidation and wind-down as contemplated under the Plan, subject to the provisions hereof. The Plan Administrator shall serve in such capacity through the earlier of the date the Debtors are dissolved in accordance with the Plan and the date such Plan Administrator resigns, is terminated, or otherwise unable to serve; *provided*, *however*, that any successor Plan Administrator appointed pursuant to the Plan shall serve in such capacity after the effective date of such person's appointment as Plan Administrator.

The qualifications and proposed compensation of and other disclosures regarding the Plan Administrator, including the Plan Administrator Budget, shall be set forth as part of the Plan Supplement; such compensation may be paid from the Plan Assets on hand, subject to the Plan Administrator Budget, without further notice or order of the Bankruptcy Court. The Plan Administrator shall deposit and hold all Plan Assets in trust for the benefit of holders of Allowed

Case 20-81688-CRJ11    Doc 1369    Filed 01/25/21    Entered 01/25/21 12:53:40    Desc
Main Document      Page 48 of 180

Claims (including Professionals) receiving distributions under, and in accordance with the terms of, the Plan.

The powers, rights, and responsibilities of the Plan Administrator, all of which shall arise upon the occurrence of the Effective Date, shall include, but not be limited to:

(i) collecting and liquidating the Plan Assets under the jurisdiction of the Bankruptcy Court;

(ii) asserting, prosecuting, objecting to, pursuing, compromising and settling in accordance with the Plan Administrator's reasonable business judgment, all matters affecting the Estates, including Disputed Claims, and/or other Litigation Assets related thereto, without further order of the Bankruptcy Court;

(iii) asserting and enforcing all legal or equitable remedies and defenses belonging to the Debtors or their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code;

(iv) acting on behalf of the Debtors in all adversary proceedings and contested matters then pending or that can be commenced in the Bankruptcy Court and in all actions and proceedings pending or commenced elsewhere, and to settle, retain, enforce, dispute, or adjust any Claim and otherwise pursue actions involving Assets of the Debtors that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise, waived, relinquished or transferred in the Plan;

(v) taking such actions the Plan Administrator deems appropriate in its reasonable business judgment against any Person with respect to a Claim or Estate Cause of Action and commencing any process or proceeding in the Bankruptcy Court or in any court of competent jurisdiction in accordance with applicable laws;

(vi) making Distributions to holders of all Allowed Claims, including Allowed Claims for Professional Fees, in accordance with the Plan;

(vii) proceeding with and employing all discovery devices permitted under applicable law, including Rule 2004 of the Bankruptcy Rules, in order to investigate any Claims, Litigation Assets, or GL Insurance Assets;

(viii) employing, without further order of the Bankruptcy Court, professionals or other Persons to assist it in carrying out its duties hereunder and compensating and reimbursing the expenses of those professionals and other Persons, on the terms to be agreed to by the Plan Administrator and such professionals and other Persons, without further order of the Bankruptcy Court;

(ix) investing Cash in accordance with section 345 of the Bankruptcy Code, withdrawing and making Distributions of Cash to holders of Allowed Claims and paying taxes and other obligations owed by the Debtors or incurred by the Plan Administrator in accordance with the Plan;

38

(x) coordinating the turnover of property, if any, subject to rejected Executory Contracts or abandonment or liquidation of any Assets and disposing of, and delivering title to others of, or otherwise realizing value of, all the Assets;

(xi) deducting, reserving and/or paying from the proceeds of the Sales or any other asset sale any related fees, costs and taxes (including transfer or income taxes) in connection with such sale;

(xii) overseeing compliance with the Debtors' accounting, finance, and reporting obligations and the filing of final tax returns, refund requests, audits, and other corporate dissolution documents, if required;

(xiii) preparing financial statements and post-confirmation quarterly reports, until such time such time as the Bankruptcy Court enters an order (a) dismissing the Chapter 11 Cases, (b) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, or (c) approving a final decree closing the Chapter 11 Cases;

(xiv) paying all other expenses for winding down the affairs of the Debtors, and in the event of a dispute that cannot be resolved, resolving such dispute in the Bankruptcy Court, subject to the terms of the Plan;

(xv) executing and delivering all documents, and taking all actions, necessary to consummate the Plan and wind down the Debtors' businesses, including termination of the Pension Plan;

(xvi) establishing and managing reserves for the payment of any Claims or Administrative Expenses Allowed after the Effective Date or the Plan Administrator Operating Expenses, subject to the Plan Administrator Budget;

(xvii) implementing and/or enforcing all provisions of the Plan;

(xviii) performing all other duties required by the Bankruptcy Code, including those related to the Pension Plan;

(xix) entering and complying with any Supplemental Insurance Procedures; and

(xx) such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan, other Bankruptcy Court order, or as may be needed or appropriate to carry out the provisions of the Plan.

The Plan Administrator and the GUC Oversight Administrator may be removed by the Bankruptcy Court upon application for good cause shown. In the event of the resignation, removal, death, or incapacity of the Plan Administrator or the GUC Oversight Administrator, the Bankruptcy Court shall, upon motion or *sua sponte*, appoint another Person to become Plan Administrator or the GUC Oversight Administrator, as the case may be. Any successor Plan Administrator or the GUC Oversight Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor.

39

No recourse will ever be had, directly or indirectly, against the Plan Administrator, the GUC Oversight Administrator, their members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Creditor Trust under the Plan or by reason of the creation of any indebtedness by the Creditor Trust, the Plan Administrator, or the GUC Oversight Administrator, under the Plan. All such liabilities under the Plan will be enforceable only against, and will be satisfied only out of, the Creditor Trust Assets. The Plan Administrator, the GUC Oversight Administrator, and their respective agents shall not be deemed to be the agents for any holder of a Claim in connection with Distributions made under the Plan. The Creditor Trust, the Plan Administrator, the GUC Oversight Administrator, and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do, hereunder in good faith and in the exercise of their sound judgment; *provided, however*, that this section will not apply to any gross negligence or willful misconduct by the Creditor Trust, the Plan Administrator, the GUC Oversight Administrator, or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns. Furthermore, the releases set forth above do not release any Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

9.      Costs and Expenses of the Plan Administrator

All Plan Administrator Operating Expenses shall be the responsibility of and paid by the Plan Administrator from Plan Assets, subject to the Plan Administrator Budget, without further notice to holders of Claims or approval of the Bankruptcy Court; *provided* that (i) to the extent the overhead and other operational expenses of the Plan Administrator in connection with its administration of the Creditor Trust exceed any remaining Plan Administrator Operating Expense Funded Amount, such fees and expenses shall be payable solely from the assets of the Creditor Trust and its proceeds, as set forth in the Creditor Trust Agreement; (ii) to the extent the overhead and other operational expenses of the Plan Administrator in connection with its administration of the Tort Claim Sub-Trust exceed any remaining Plan Administrator Operating Expense Funded Amount, such fees and expenses shall be payable solely from the assets of the Tort Claim Sub-Trust and its proceeds, as set forth in the Creditor Trust Agreement, absent Final Order of the Bankruptcy Court; and (iii) the Plan Administrator shall not be obligated to take action that would result in the incurrence of any costs or expenses in excess of the lesser of the remaining Plan Assets available therefor and the amount provided therefor in the Plan Administrator Operating Budget. In the event there is a remaining balance in any reserve established for the payment of Plan Administrator Operating Expenses following the payment in full of all such expenses, any such amounts shall be transferred to the ROC Liquidation Estates for the benefit of holders of Allowed Exit Term Loan Claims and distributed in accordance with Article III of the Plan. For avoidance of doubt, the Plan Administrator shall not have the authority nor be obligated to incur costs and expenses not explicitly provided for in the Plan Administrator Budget.

The initial Plan Administrator Budget shall be prepared in consultation with the Plan Proponents and will be included in the Plan Supplement. The Plan Administrator shall provide the Exit Term Loan Required Lenders or their respective post-Effective Date representative(s) with

40

three (3) Business Days' notice of any proposed amendments to the Plan Administrator Budget; *provided*, *however*, that any such amendment shall under no circumstances seek that additional funds be expended in excess of the Maximum GUC Oversight Administrator Expenses and $50,000 in the aggregate for the Franklin Managed Entities Expenses incurred after the Effective Date. If any of the Exit Term Loan Required Lenders or their respective post-Effective Date representative(s) does not advise the Plan Administrator in writing (which may include an email) within three (3) Business Days of receipt of the notice of the proposed amendment that it objects to such amendment, the proposed amendment(s) shall be deemed approved with no further action required. If the Plan Administrator receives an objection to a proposed amendment to the Plan Administrator Budget, the Bankruptcy Court may resolve such dispute on shortened notice to the Plan Administrator and the Plan Proponents or their respective post-Effective Date representative(s).

For the avoidance of doubt, the Plan Administrator does not have the authority to utilize funds from any source to pay any amount of GUC Oversight Administrator expenses in excess of the Maximum GUC Oversight Administrator Expenses or to pay more than $50,000 for the Franklin Managed Entities Expenses incurred after the Effective Date. Moreover, no party shall have any authority whatsoever to request amendment of the Plan Administrator Budget or otherwise seek to utilize any Plan Assets, any amounts in the Plan Professional Fee Reserve, any Creditor Trust Assets, any assets of the Tort Claim Sub-Trust, or any funds reserved for Plan Administrator Operating Expenses in accordance with the Plan Administrator Budget, or proceeds from any of the foregoing sources for the purpose of exceeding the Maximum GUC Oversight Administrator Expenses or $50,000 for the Franklin Managed Entities Expenses incurred after the Effective Date. Any such request shall be deemed null and void when made without the need for any party to respond.

10.     Corporate Action

On the Effective Date, all matters under the Plan involving or requiring action of the directors, members, managers, or officers of the Debtors, including, but not limited to, actions requiring a vote or other approval of the board of directors or any of the members or officers of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date, without any further action by the Bankruptcy Court or the directors, members, managers, or officers of the Debtors.

Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, (i) any existing director, manager, or officer of the Debtors will be deemed to have resigned on the Effective Date without any further corporate action, (ii) the Plan Administrator shall be deemed the sole manager, officer, and representative of the ROC Liquidation Estates to exercise the rights, power, and authority of the ROC Liquidation Estates under applicable provisions of the Plan and bankruptcy and non-bankruptcy law, and (iii) all matters provided under the Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order shall modify the Debtors' constituent documents such that the provisions of the Plan can be effectuated. The Plan shall be administered by the Plan Administrator, and all actions taken thereunder in the name of the ROC Liquidation Estates shall be taken through the Plan Administrator. All corporate governance

41

activities of the ROC Liquidation Estates shall be exercised by the Plan Administrator in its, its discretion, subject to the terms of the Plan.

### 11. Winding Down of Affairs

On and after the Effective Date, subject to the requirements of the Plan, the ROC Liquidation Estates shall be permitted to conduct their business (to the extent permitted by the Plan), reconcile Claims, use and dispose of assets, prosecute litigation, make required tax filings, and otherwise take any and all actions as may be appropriate to implement the Plan and wind down their business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules. The ROC Liquidation Estates shall be authorized, without limitation, to use and dispose of the Plan Assets, to investigate and pursue any Litigation Assets, as the representative of the Debtors' Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer their affairs. On and after the Effective Date, the Plan Administrator may, in the name of the ROC Liquidation Estates, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order or as otherwise set forth in the Creditor Trust Agreement.

### 12. Closing of the Chapter 11 Cases

As soon as practicable after the Plan Administrator exhausts substantially all of the Plan Assets by making the final distributions under the Plan, the Plan Administrator shall, at the expense of the ROC Liquidation Estates, (a) provide for the retention and storage of the Debtors' and ROC Liquidation Estates' books and records that shall have been delivered to or created by the Plan Administrator until such time as all such books and records are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books and records are being stored, (b) file a motion for entry of a final decree closing the Chapter 11 Cases that have not been already closed in accordance with the Bankruptcy Code and the Bankruptcy Rules and stating that the assets of the ROC Liquidation Estates have been exhausted and final distributions have been made under the Plan, (c) file the necessary paperwork in the respective jurisdictions to effectuate the dissolution of the ROC Liquidation Estates in accordance with the laws of such jurisdiction, and (d) resign as the sole officer, director, and manager, as applicable, of the ROC Liquidation Estates. Upon the Bankruptcy Court's entry of a Final Order granting the motion described in clause (b) of the preceding sentence, the ROC Liquidation Estates shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the ROC Liquidation Estates or payments to be made in connection therewith, and the remaining Chapter 11 Cases shall be closed on the date that the Bankruptcy Court has entered such Final Order.

Notwithstanding the immediately preceding paragraph, if the Plan Administrator deems it appropriate, the Plan Administrator may seek authority from the Bankruptcy Court to close any of the Chapter 11 Cases and dissolve or merge any of the ROC Liquidation Estates prior to all final distributions having been made under the Plan.

42

13. Dissolution of the Debtors

Upon the distribution of all Plan Assets, the ROC Liquidation Estates shall be dissolved for all purposes by the Plan Administrator without the necessity for any other or further actions to be taken by or on behalf of any ROC Liquidation Estates or payments to be made in connection therewith; *provided*, *however*, that, without the need of any further approval, the Plan Administrator in its discretion may execute and file documents and take all other actions as he or she deems appropriate relating to the dissolution of the ROC Liquidation Estates under applicable law, and in such event, all applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the ROC Liquidation Estates as provided herein, without the payment of any fee, tax, or charge and without need for the filing of any certificates.

14. Cancellation of Loans, Securities, and Agreements

Except as otherwise provided in the Plan, on the Effective Date: (i) the Exit Term Loan Documents, any Interests in the Debtors, any intercompany notes, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest, shall be deemed cancelled and surrendered as to the Debtors without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and the Debtors shall not have any continuing obligations thereunder or in any way related thereto; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors shall be deemed satisfied in full and released without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity; *provided*, *however*, that notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive distributions under the Plan; *provided further* that the Exit Term Loan Documents and the FILO Term Loan Documents shall continue in effect with respect to any obligations thereunder governing the relationship between, with respect to the Exit Term Loan Documents, the Exit Term Loan Agent and the Exit Term Loan Lenders, and, with respect to the FILO Term Loan Documents, the FILO Term Loan Agent and the FILO Term Loan Lenders (including those provisions relating to the Exit Term Loan Agent and FILO Term Loan Agent's rights to expense reimbursement, indemnification, and similar amounts from the Exit Term Loan Lenders or FILO Term Loan Lenders) or that may survive termination of the Exit Term Loan Documents or FILO Term Loan Documents in accordance with the terms thereof.

Unless otherwise specifically set forth in or provided for under the Plan, the Exit Term Loan Agent, FILO Term Loan Agent, and their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall be relieved of all further duties and responsibilities related to the Exit Term Loan Documents and FILO Term Loan Documents, respectively, except with respect to such other rights of the Exit Term Loan Agent and FILO Term Loan Agent that survive the termination of the Exit Term Loan Documents and FILO Term Loan

Case 20-81688-CRJ11    Doc 1369    Filed 01/25/21    Entered 01/25/21 12:53:40    Desc
Main Document    Page 54 of 180

Documents, respectively, pursuant to the terms thereof. Subsequent to the performance by the Exit Term Loan Agent and FILO Term Loan Agent of their obligations under the Plan, the Exit Term Loan Agent, FILO Term Loan Agent and their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall be relieved of all further duties and responsibilities related to the Exit Term Loan Documents and FILO Term Loan Documents, respectively.

Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Exit Term Loan Documents and FILO Term Loan Documents shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or the Confirmation Order and on and after the Effective Date, the ROC Liquidation Estates shall be liable for any Claims asserted under such indemnity obligations; *provided, however*, that no payment on account of such obligations shall be made from the Plan Professional Fee Reserve, the Creditor Trust Assets, the assets of the Tort Claim Sub-Trust or the funds reserved for Plan Administrator Operating Expenses in accordance with the Plan Administrator Budget. For the avoidance of doubt, the finality of any distribution made by the Debtors, the Plan Administrator and the ROC Liquidation Estates shall not be affected by any indemnity obligations under the Exit Term Loan Documents and FILO Term Loan Documents that are not asserted prior to the date that such distributions are made in accordance with the Plan.

15. Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Administrator is authorized to, and may issue, execute, deliver, file, or record, such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan.

16. Section 1146 Exemption

To the maximum extent permitted pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, sales and use taxes, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

17. Preservation of Estate Causes of Action

Unless any Estate Causes of Action against an Entity are expressly waived, relinquished, transferred, exculpated, released, compromised, or settled in the Plan, or the Confirmation Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and the Plan Administrator shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Estate Causes of Action (including all Estate Causes of Action related to the Litigation Assets and the GL Insurance Assets), whether arising before or after the Petition Date,

Case 20-81688-CRJ11   Doc 1369   Filed 01/25/21   Entered 01/25/21 12:53:40   Desc
Main Document    Page 55 of 180

and the Debtors' rights to commence, prosecute or settle such Litigation Assets and GL Insurance Assets shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Confirmation Order to any Estate Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Estate Causes of Action against them. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Litigation Assets against any entity, except as otherwise expressly provided herein. Unless any Estate Causes of Action against an entity are expressly waived, relinquished, transferred, exculpated, released, compromised, or settled in the Plan, the Confirmation Order or the Asset Purchase Agreements, the Debtors and the Plan Administrator expressly reserve all Estate Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Estate Causes of Action upon, after, or as a consequence of the confirmation of the Plan. For the avoidance of doubt, nothing in the Plan shall require the Debtors or the Plan Administrator to commence or pursue litigation concerning any Estate Cause of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Estate Causes of Action preserved pursuant to Article V.P of the Plan that any of the Debtors may hold against any Entity shall be transferred to the ROC Liquidation Estates upon the occurrence of the Effective Date. Except as otherwise provided in the Plan, the Plan Administrator, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Estate Causes of Action. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Estate Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, except for as otherwise expressly set forth in the Plan. Estate Causes of Action related to the GL Insurance Assets may be subject to the terms of any Supplemental Insurance Procedures if and to the extent accepted by the Debtors or the Plan Administrator and approved by the Bankruptcy Court.

E.      *Treatment of Executory Contracts and Unexpired Leases*

1.      Executory Contracts and Unexpired Leases

On the Confirmation Date, but subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtors entered into prior to the Petition Date (subject to the provisions of Article VI of the Plan) that (i) have not previously been assumed or rejected, (ii) have not been assumed and assigned under any of the Sales, or (iii) are not listed for assumption by the Debtors as of the Effective Date in the Plan Supplement, shall be deemed rejected by the Debtors pursuant to the provisions of section 365 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease rejections described above, as of the Confirmation Date.

45

2.       Rejection Damages Bar Date

All Claims arising from the rejection of executory contracts and unexpired leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Plan Administrator on or before the date that is thirty (30) days after the later of (a) the Effective Date and (b) the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, the Plan Administrator, and the Plan Assets. A Claim for rejection damages shall be classified and treated in Class 5 (General Unsecured Claims).

3.       Effect of Post-Confirmation Rejection

The entry by the Bankruptcy Court on or after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease of the Debtors entered into prior to the Petition Date shall result in such rejection being a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code.

4.       Non-Occurrence of Effective Date

In the event that the Effective Date does not occur prior to such time as the applicable Chapter 11 Cases are closed, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

5.       Indemnification Obligations; Insurance Policies

Any obligations of any Debtor pursuant to its certificate of incorporation and bylaws, or organizational documents, as applicable, or any other agreements entered into by such Debtor at any time prior to the Effective Date, to indemnify current and/or former directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings against such Debtor or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of such Debtor, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Petition Date shall not be discharged or Impaired by confirmation of the Plan. Such obligations shall be deemed and treated as executory contract to be assumed by the Debtors under the Plan and shall continue as obligations of the Creditor Trust.

Except to the extent an affected party may otherwise agree, nothing in the Plan, the Plan Documents, the Confirmation Order, or the Creditor Trust Agreement, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights and obligations of the Debtors (and their Estates), the Tort Claimants (solely with respect to the GL Insurance Assets) and the Debtors' insurers (and third-party claims administrators) under any of the Debtors' insurance policies (including any D&O Insurance or GL Insurance Assets) or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the insurance policies. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Debtors' insurance policies shall control. For the avoidance of doubt, nothing herein (i) constitutes

a rejection of any insurance policy (including the D&O Insurance or the GL Insurance Assets) or (ii) relieves any party from any injunction or stay created or preserved under the Plan.

6.       Excluded Employee Liabilities, Retiree Plan and Pension Plan

As of the closing of the Sales and transfer of the Ilion Facility, the Debtors no longer employ any employees covered by the CBA and so have no future obligations under the CBA and are unable to offer benefits under the Supplemental Retirement Plan, the Equity Incentive Plan, and the Pension Plan. Prospective obligations under the CBA were assumed by Roundhill as modified under the Sales and related orders of the Court. The only remaining unresolved matters related to the CBA are certain alleged claims for previously accrued wages and benefits that were not assumed by Roundhill. Those claims have been filed by the UMWA. The Debtors intend to negotiate a consensual agreement with UMWA relating to those matters; provided that, if the Debtors are unable to reach a consensual agreement with UMWA, they reserve their rights and the rights of the Plan Administrator to object to the UMWA Claims and otherwise seek relief in accordance with sections 1113 and 1114 of the Bankruptcy Code and other applicable law prior to or after the Effective Date. The Debtors, their Estates and the Plan Administrator reserve all objections to any Claims filed by employees covered by the CBA or the UMWA, including any employment-related Claims asserted under or related to the CBA, and all other defenses including those based upon waiver as provided in the Roundhill Asset Purchase Agreement and based upon the Bankruptcy Code.

The Retiree Plans and any retiree benefits provided thereunder shall be deemed to have been terminated immediately upon the occurrence of the Effective Date. The Debtors and the Plan Administrator are authorized to take any and all actions necessary to terminate the Pension Plan and the Retiree Plans.

7.       Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtors that any executory contract or unexpired lease is, in fact, an executory contract or unexpired lease or that the Debtors have any liability thereunder.

F.     *Provisions Governing Distributions*

1.       Plan Distributions

The Plan Administrator shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan. Plan distributions to holders of Allowed Exit Term Loan Claims shall be made through the Exit Term Loan Agent and deemed completed when made to the Exit Term Loan Agent. All reasonable and documented fees and expenses of the Exit Term Loan Agent (including the reasonable and documented fees and expenses of its counsel and agents) incurred in connection with such distributions shall be paid by the Plan Administrator (on behalf of the ROC Liquidation Estates) from the Plan Assets.

2.      Distribution Record Date

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors or the Exit Term Loan Agent, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date. The Debtors shall have no obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. The Debtors and the Plan Administrator, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable. The Exit Term Loan Agent may, in its sole discretion, limit the further assignment of the applicable Exit Term Loan Claims to allow for the accurate recording of the holders of such Claims as of the Distribution Record Date.

**PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM. IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM.**

3.      Objections to Claims; Estimation of Claims

Except insofar as a Claim is Allowed under the Plan, the Plan Administrator, and any other party in interest to the extent permitted under section 502(a) of the Bankruptcy Code, shall be entitled to object to Claims. Any objections to Claims shall be served and filed on or before (a) the one-hundred eightieth (180th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as may be fixed by the Bankruptcy Court upon the request of the Plan Administrator (the "Claims Objection Deadline"). Nothing herein shall require the Debtors or the Plan Administrator to object to any Claim.

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any Claim not expressly Allowed by the terms of the Plan and otherwise subject to estimation under section 502(c) of the Bankruptcy Code and for which the Debtors may be liable under the Plan, including any Claim for taxes, to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim pursuant to section 502(c) of the Bankruptcy Code at any time prior to the time that such Claim becomes an Allowed Claim. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. The foregoing objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated by the Bankruptcy Court and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

The Debtors, their Estates and the Plan Administrator shall be entitled to assert and reserve any and all defenses to the allowance of Claims other than the Exit Term Loan Claims and the TTB Claim, which shall be Allowed as set forth herein. Without limiting the generality of the

48

foregoing, they shall be entitled to assert any defense based upon waiver as provided in the Asset Purchase Agreements concerning any employment-related claims, including any claims related to the CBA. Furthermore, and for the avoidance of doubt, they reserve the right to contest the value of any putative collateral and the validity of any lien related to a Secured Claim (other than the Exit Term Loan Secured Claims).

4. No Distribution Pending Allowance

Notwithstanding any other provision of the Plan to the contrary, no distribution of Cash or property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by the Plan. The procedures with respect to the resolution of Disputed Claims shall be set forth in the Plan Supplement. For the avoidance of doubt, to the extent a class of claims will be entitled to no distributions under the Plan, such Claims will not be subject to reconciliation by the Plan Administrator.

5. Reserve of Cash Distributions

On any date that distributions are to be made under the terms of the Plan, the Plan Administrator shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto. Such Cash or property shall be held in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto.

6. Distribution After Allowance

Within the later of (i) seven (7) Business Days after such Claim becomes an Allowed Claim and (ii) thirty (30) days after the expiration of the Claims Objection Deadline, the Plan Administrator shall distribute, to the extent available, all distributable Cash or other property, including any interest, dividends, or proceeds thereof, to which a holder of an Allowed Claim is then entitled in accordance with Article II or Article III of the Plan; *provided* that, to the extent any Plan Assets have not yet been collected or liquidated by the Plan Administrator, such Plan Assets shall be distributed to holders of Allowed Claims as soon as reasonably practicable following the collection and liquidation thereof; *provided further* that the Plan Administrator shall make distributions to (or retain property for the benefit of) holders of Allowed General Unsecured Claims, Allowed Tort Convenience Class Claims and Allowed Tort Claims (other than Tort Convenience Class Claims) in accordance with the provisions of the Creditor Trust Agreement and the Tort Claims Sub-Trust as and to the extent applicable.

7. No Recourse

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Debtors, the Estates, the

Case 20-81688-CRJ11   Doc 1369   Filed 01/25/21   Entered 01/25/21 12:53:40   Desc
Main Document      Page 60 of 180

Plan Administrator, or any of their respective professionals, consultants, officers, directors, or members or their successors or assigns, or any of their respective property. Except as specifically stated otherwise in the Plan, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

8.      Application of Distributions

Any distribution made under the Plan on account of an Allowed Claim shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to any portion of such Claim for accrued but unpaid interest.

9.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Plan Administrator has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date on which such distribution was attempted to be made; *provided further*, that Plan Administrator shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to the Plan Administrator automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be forever barred.

10.     Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. The Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances, *provided that* the Debtors and the Plan Administrator, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan, *provided that* if the recipient provides the required information or otherwise satisfies

50

the Plan Administrator that withholding is not required within 180 days after the request is made, such withheld amount shall then be distributed to the recipient.

11. No Postpetition Interest on Claims and Interests

Unless otherwise specifically provided for in the Plan, Confirmation Order or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

12. Foreign Currency Exchange Rate

Except as specifically provided for in the Plan or an order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the then applicable noon spot rate for such non-U.S. currency as of the Petition Date for all purposes under the Plan, including voting, allowance, and distribution.

13. Setoffs and Recoupment

The Debtors and/or the Plan Administrator are authorized to set off against or recoup from any Claims (to the extent not released pursuant to the Plan) of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administrator of any such claim they may have against the holder of such Claim.

14. Distributions Free and Clear

Except as may be otherwise provided in the Plan, all distributions hereunder shall be free and clear of any Liens, Claims, encumbrances, and other interests.

15. De-Minimis Distributions and Donation

There shall be no distributions on account of Allowed General Unsecured Claims to the extent such distribution will result in a payment of less than $50.00 to the holder of such Claim, and such amount otherwise payable upon such Claim shall revert back to the ROC Liquidation Estates. Unless otherwise set forth in the Plan, the Plan Administrator may donate any remaining Plan Assets to a charitable institution if the distribution of such assets is too costly, too burdensome, or impracticable.

16. Claims Paid or Payable by Third Parties

a. Claims Paid by Third Parties

The Debtors or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that

51

is not a Debtor. To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Debtor or Plan Administrator, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Plan Administrator annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

b.      Claims Payable by Third Parties

To the extent that one or more of the Debtors' insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to a Debtor insurer, and such holder in fact repays all or a portion of the Claim to such insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or the Plan Administrator, as applicable, and the holder of such Claim.

c.      Applicability of Insurance Policies

Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Plan Administrator and any holders of Claims, may hold against any other Entity under any insurance policies.

G.      *Effects of Plan Confirmation*

1.      Injunction

**Except as otherwise expressly provided in the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all Entities who have held, hold or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Creditor Trust, or their successors and assignees or any of their assets and property, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates the Creditor Trust, or their successors and assignees, or any of their assets and property, with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, the Creditor Trust, or their successors and assignees or any of their assets and property, with respect to any such Claim or Interest; (d) asserting, directly or indirectly, any setoff, or**

52

recoupment of any kind against any obligation due the Debtors, the Estates, the Creditor Trust, or their successors and assignees or any of their assets and, with respect to any such Claim or Interest, unless approved by the Bankruptcy Court; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest.  Without limiting the foregoing, the automatic stay provided under section 362(a) of the Bankruptcy Code shall remain in effect until the Chapter 11 Cases are closed.  Nothing contained in Article VIII.A of the Plan shall prohibit the holder of a timely-filed proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the holder of such Claim or Interest of any of the obligations of the Debtors or the Plan Administrator under the Plan. Furthermore, the releases set forth above do not release any non-Debtor fiduciary from Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

      2.      Exculpation and Limitation of Liability

On the Effective Date, the Debtors, the Restructuring Committee, the Committee, the FILO Term Loan Lenders, the FILO Term Loan Agent, the Exit Term Loan Lenders, the Exit Term Loan Agent, in all such parties capacities, and  any such parties' respective current and former (i) members, (ii) officers, (iii) directors, (iv) affiliates, (v) employees, (vi) advisors, (vii) attorneys, (viii) representatives, (ix) financial advisors, (x)  investment bankers, or (xi) agents and any of such parties' successors and assigns (collectively, the "Exculpated Parties"), shall not have or incur, and are hereby released from, any claim, obligation, Causes of Action, or liability to one another or to any holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act taken or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of (i) the Chapter 11 Cases, (ii) formulation, negotiation,  and filing of the Plan, (iii) filing the Chapter 11 Cases, (iv)  the pursuit of confirmation of the Plan, (v) the consummation and implementation of the Plan, (vi) or the administration of the Plan or the property to be distributed under the Plan, (vii) the marketing, negotiation, approval and consummation of the Sales and the definitive documents evidencing such Sales or (viii) any other post-petition act taken or omission originating or occurring in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors, except for their fraud, willful misconduct, or gross negligence as determined by a Final Order. Notwithstanding the foregoing, the releases set forth in the immediately preceding sentence shall exclude (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases and (ii) the Debtors' indemnification obligations or other contractual obligations to officers and directors.  For the avoidance of doubt, nothing herein shall affect any rights concerning the payment of Professional Fees.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability.  The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated

pursuant to Article VIII.B of the Plan.  Furthermore, the releases set forth above do not release any non-Debtor fiduciary from Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

3. Release of Debtors, Plan Administrator, Restructuring Committee, Exit Term Loan Agent, Exit Term Loan Lenders, the FILO Term Loan Agent, FILO Term Loan Lenders, and Directors and Officers

On the Effective Date, except as otherwise provided in the Plan, the Debtors, the Restructuring Committee, the Exit Term Loan Agent, the Exit Term Loan Lenders, the FILO Term Loan Agent, the FILO Term Loan Lenders, in all such parties capacities, and any such parties' respective current and former (i) members, (ii) officers, (iii) directors, (iv) affiliates, (v) employees, (vi) advisors, (vii) attorneys, (viii) representatives, (ix) financial advisors, (x) investment bankers, or (xi) agents and any of such parties' successors and assigns, shall not have or incur, and are hereby, to the fullest extent permitted under applicable law, forever released from any claims, Claims,  obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise to one another or to any holder of a Claim or Interest to the extent claiming through them or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any claims, Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be related, in whole or in part, to the Debtors, the Chapter 11 Cases, the Sales or the Estates, except for their fraud, willful misconduct, or gross negligence as determined by a Final Order. Notwithstanding the foregoing, the releases set forth in the immediately preceding sentence shall exclude (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases and (ii) the Debtors' indemnification obligations or other contractual obligations to officers and directors.  For the avoidance of doubt, nothing herein shall affect any rights concerning the payment of Professional Fees. Furthermore, the releases set forth above do not release any non-Debtor fiduciary from Causes of Action, if any,  held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

4. Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

54

*H.*      *Conditions to Confirmation and Effective Date*

1.      Conditions to Effective Date

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article IX.B of the Plan:

(i)      The Confirmation Order shall have become a Final Order in full force and effect and shall not subject to any stay of effectiveness;

(ii)     the Confirmation Date shall have occurred and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

(iii)    all Statutory Fees incurred for periods arising prior to the Effective Date shall be paid by the Debtors or placed in a reserve for such purpose;

(iv)     the Insurance Condition is satisfied;

(v)      except as otherwise expressly provided herein, all documents to be executed, delivered, assumed, or performed upon or in connection with consummation of the Plan shall have been executed, delivered, assumed, or performed, as the case may be, and any conditions contained therein (other than consummation of the Plan or notice of consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement;

(vi)     all other actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered, as the case may be, to the appropriate parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable law;

(vii)    there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

(viii)   the Plan Professional Fee Reserve shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan; and

(ix)     the Allowed amount of the TTB Claim shall have been resolved and require Cash payments to the TTB from the Estates of no more than two million dollars ($2,000,000) in the aggregate in full and final satisfaction of such Claim, unless otherwise authorized pursuant to the prior written consent of the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders; and

(x)      All Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses have been paid in full as provided in Article II.E of the Plan.

55

2.      Waiver of Conditions

The conditions to confirmation of the Plan and the Effective Date set forth in Article IX of the Plan may be waived only by the written agreement of the Debtors and the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders in their sole and absolute discretion, in whole or in part, without notice, leave, or order of the Bankruptcy Court.

3.      Substantial Consummation

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

*I.      Modification, Revocation or Withdrawal of the Plan*

1.      Modification and Amendments

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek confirmation of the Plan consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each Debtor expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Debtor, one or more times, after the Confirmation Date, to the extent necessary to carry out the purposes and intent of the Plan. Each Debtor may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

2.      Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.      Revocation or Withdrawal of Plan; Effect of Non-Occurrence of Confirmation date or Effective Date

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all of the Debtors prior to the Confirmation Date and to file a subsequent plan.  If the Debtors revoke or withdraw the Plan, the Confirmation Date does not occur, or the Effective Date does not occur within ninety (90) days of the Confirmation Date (or such other extended deadline as may be ordered by the Bankruptcy Court), then:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of executory contracts or unexpired leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any

other Entity (including the Exit Term Loan Agent, Exit Term Loan Lenders, or holder(s) of the Huntsville Note); or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity (including the Exit Term Loan Agent, Exit Term Loan Lenders, or holder(s) of the Huntsville Note).

*J.*     *Retention of Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(i)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(ii)    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

(iii)   resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which the Debtors may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(iv)    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including any distributions to holders of Allowed General Unsecured Claims pursuant to Article V.E of the Plan;

(v)     adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(vi)    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(vii)   enter and enforce any order and related agreements for the sale or transfer of property and obligations thereunder pursuant to, *inter alia*, sections 363, 1123, or 1146(a) of the Bankruptcy Code including the Asset Purchase Agreements;

57

(viii)  decide and resolve all matters related to the Sales and Asset Purchase Agreements, including any dispute in connection with amounts or other obligations owed to (or covenants incurred for the benefit of ) the Estate, or involving any other Asset;

(ix)    resolve any cases, controversies, suits, disputes (including any disputes related to the Plan Administrator Budget other than a request to exceed the Maximum GUC Oversight Administrator Expenses or $50,000 for the Franklin Managed Entities Expenses incurred after the Effective Date**)** or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(x)     issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan and ensure compliance with the Plan;

(xi)    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

(xii)   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.P.1 of the Plan;

(xiii)  resolve any disputes regarding the CBA, including any matter raised pursuant to section 1113 of the Bankruptcy Code;

(xiv)   resolve any disputes regarding the Retiree Plans and the Pension Plan;

(xv)    enforce or resolve any dispute related to the GL Insurance Assets and any Supplemental Insurance Procedures (including jurisdiction to approve any Supplemental Insurance Procedures);

(xvi)   enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xvii)  determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(xviii) enter an order or final decree concluding or closing the Chapter 11 Cases;

(xix)   adjudicate any and all disputes arising from or relating to distributions under the Plan;

(xx)  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(xxi)  determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(xxii)  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(xxiii)  hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xxiv)  hear and determine all disputes that arise out of the transfer of the Plan Assets to the ROC Liquidation Estates, the Creditor Trust, or the Tort Claim Sub-Trust, as applicable, on the Effective Date;

(xxv)  enforce all orders previously entered by the Bankruptcy Court; and

(xxvi)  hear any other matter as to which the Bankruptcy Court has jurisdiction;

*provided, however*, that the Bankruptcy Court shall not retain exclusive jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents. For the avoidance of doubt, the foregoing does not create jurisdiction over Pension Plan disputes where the Bankruptcy Court otherwise lacks jurisdiction.

## SECTION V.
## VOTING PROCEDURES AND REQUIREMENTS

This Section describes in summary fashion the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate ballots, which must be used for each separate Class of Claims. If you are entitled to vote and did not receive a Ballot, received a damaged Ballot, or lost your ballot please contact the Balloting Agent by e-mail at RemingtonBallots@primeclerk.com or by phone at (877) 755-3450 (for U.S./Canada callers) or (347) 338-6538 (for international callers).

**Before voting to accept or reject the Plan, each eligible holder of a Claim should carefully review the Plan attached hereto as <u>Exhibit A</u> and described in Section IV herein entitled, "The Plan."**

*A.     Voting Deadline*

To be considered for purposes of accepting or rejecting the Plan, all ballots must be **actually received** by the Balloting Agent no later than the Voting Deadline of **4:00 p.m., Central Time, on February 23, 2021**, unless the Debtors extend the Voting Deadline. **The Debtors expressly reserve the absolute right to extend, by oral or written notice to the Balloting Agent, the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, until the necessary Ballots have been received. The Debtors will not have any obligation to publish, advertise, or otherwise communicate any such extension, other than by filing a notice of such extension on the Bankruptcy Court docket and posting a notice on the Debtors' case website maintained by the Balloting Agent at https://cases.primeclerk.com/RemingtonOutdoor. There can be no assurance that the Debtors will exercise any right to extend the solicitation period and deadline for the receipt of Ballots.**

Except to the extent requested by the Debtors, in their sole discretion, or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018, Ballots received by the Balloting Agent after the Voting Deadline will not be counted or otherwise used in connection with the Debtors' request for confirmation of the Plan (or any permitted modification thereof).

You must complete and return your Ballot(s) in accordance with the instructions set forth on your applicable Ballot(s). Votes may not be transmitted by facsimile, e-mail, or any other electronic means with the exception of the Balloting Agent's online voting platform. Accordingly, you are urged to return your signed and completed Ballot(s) promptly.

*B.     Voting Record Date*

Consistent with the provisions of Bankruptcy Rule 3018(b), the Debtors have fixed February 5, 2021 as the Voting Record Date for the determination of holders of record of Claims entitled to vote to accept or reject the Plan. Only holders of record are entitled to vote to accept or reject the Plan.

*C.     Parties Entitled to Vote*

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a Chapter 11 plan. Creditors or interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "Impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Creditors and interest holders whose claims or interests are impaired by a plan, but who will not receive a distribution under a plan, are also not entitled to vote because they are deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code.

60

As mentioned above, the Debtors are soliciting votes on the Plan from the holders of Allowed Claims in Class 3 (Exit Term Loan Claims), Class 5 (General Unsecured Claims), Class 6 (Tort Convenience Class Claims) and Class 7 (Tort Claims) which Classes are deemed to be Impaired, as follows:

- Holders of the Class 3 Exit Term Loan Claims whose names appear as of the Voting Record Date in the list of Exit Term Loan Lenders maintained by the Exit Term Loan Agent;

- Holders of Class 5 General Unsecured Claims whose names appear as of the Voting Record Date in the claims registry maintained by Prime Clerk;

- Holders of Class 7 Tort Claims whose names appear as of the Voting Record Date on the claims registry maintained by Prime Clerk, but whom elect on or before the Voting Deadline to be treated as a holder of a Class 6 Tort Convenience Class Claim; and

- Holders of Class 7 Tort Claims whose names appear as of the Voting Record Date in the claims registry maintained by Prime Clerk.

Holders of Claims that are entitled to vote should receive Ballots with their Solicitation Package, which Ballots should be used to submit their vote.

D. *Ballots*

Each Ballot enclosed with the Solicitation Packages is marked with the Class into which the Claim has been placed under the Plan. All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed Ballot designated for such Class in accordance with the instructions set forth on the applicable Ballot. Holders of Claims voting on the Plan should complete and sign their Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "ACCEPT (VOTE FOR) THE PLAN" or "REJECT (VOTE AGAINST) THE PLAN;" provided, however, that Ballots for Class 6 and Class 7 constitute a single ballot, whereby holders can opt into Class 6 (Tort Class Convenience Claims) and check the box entitled "ACCEPT (VOTE FOR) THE PLAN" or be placed in Class 7 (Tort Claims) and check the appropriate box entitled "ACCEPT (VOTE FOR) THE PLAN" or "REJECT (VOTE AGAINST) THE PLAN." Any executed Ballot that does not indicate either acceptance or rejection of the Plan, or that indicates both acceptance and rejection of the Plan, will not be counted.

To the extent a holder of Claims holds multiple Claims within a particular Class, the Debtors may, in their discretion, instruct the Balloting Agent to aggregate, to the extent possible, such holder's Claims (as applicable) for purposes of counting votes.

Ballots must be delivered to the Balloting Agent in accordance with the instructions set forth on the applicable Ballot and **actually received** by the Voting Deadline.

THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER. If such delivery is by mail, it is recommended that voters use an air courier with a

guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Balloting Agent by e-mail at RemingtonBallots@primeclerk.com or by phone at (877) 755-3450 (toll free) or (347) 338-6538 (international).

E.    *Agreements Upon Furnishing Ballots*

The delivery of a Ballot to the Balloting Agent by a holder of a Claim voting to accept the Plan will constitute the agreement of such holder to accept (i) all of the terms of, and conditions to, the solicitation, and (ii) the terms of the Plan; *provided*, *however*, that all parties-in-interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code in accordance with any applicable order of the Bankruptcy Court.

In addition, a vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

F.    *Withdrawal or Change of Votes on Plan*

Except as may be otherwise provided in the Plan or directed by the Bankruptcy Court, after the Voting Deadline, no vote may be withdrawn without the prior consent of the Debtors, which consent shall be provided in the Debtors' sole discretion.

Any holder who has submitted a properly completed Ballot to the Balloting Agent prior to the Voting Deadline may change its vote by submitting to the Balloting Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.  If more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Balloting Agent determines in its sole discretion was the last to be received.

G.    *Fiduciaries and Other Representatives*

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other Entity acting in a fiduciary or representative capacity, such Entity should indicate such capacity when signing and, if requested by the Debtors, will be required to submit proper evidence satisfactory to the Debtors of authority to so act.  Authorized signatories should submit the separate ballot of each holder for whom they are voting.

UNLESS THE BALLOT BEING FURNISHED IS **ACTUALLY RECEIVED** BY THE BALLOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; *PROVIDED*, *HOWEVER*, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO ACCEPT AND COUNT ANY SUCH LATE

BALLOT. IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE BALLOTING AGENT.

### H.     Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, which determination will be final and binding. As indicated above, effective withdrawals of Ballots must be delivered to the Balloting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The Debtors further reserve the right to accept any Ballot received after the Voting Deadline, in solely its own discretion, including allowing holders of Tort Claims to opt into Class 6 after the Voting Deadline. The interpretation (including the Ballot and the applicable instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### I.     Further Information, Additional Copies

If you have any questions or require further information about the voting procedures or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Balloting Agent by e-mail at RemingtonBallots@primeclerk.com or by phone at (877) 755-3450 (toll free) or (347) 338-6538 (international).

### J.     Requirements for Acceptance by Impaired Class of Claims

An Impaired Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan.

## SECTION VI.
## CONFIRMATION OF THE PLAN

### A.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). As set forth in the order conditionally approving the Disclosure Statement (the "Disclosure Statement Order"),

the Confirmation Hearing has been scheduled for [_____], 2021, commencing at [___]:00 [__].m. (Central Time), before the Honorable Clifton R. Jessup, Jr., United States Bankruptcy Judge, of the United States Bankruptcy Court for the Northern District of Alabama, Northern Division. The Confirmation Hearing will be held telephonically via AT&T call-in number. The dial-in number is **1-877-336-1280**. When prompted, enter the access code **#2749965**. There is no security code, and please do not select any other feature. Participants should call in **five minutes** prior to the start of the hearing. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing and filed with the Bankruptcy Court.

Objections, if any, to the final approval of this Disclosure Statement and confirmation of the Plan must be filed and served so that they are received on or before February 23, 2021, at 4:00 p.m. (Central Time). Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. Objections must be timely served upon the following parties: (i) co-counsels to the Debtors; (ii) the Bankruptcy Administrator; (iii) counsel to the Committee; (iv) counsel to the Exit Term Loan Lenders; and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

B. *Requirements of Section 1129(a) of the Bankruptcy Code*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors have complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means proscribed by law;

- Any payment made or promised by the Debtors or by an entity acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 cases, or in connection with the Plan and incident to the Chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy;

64

- With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test," below;

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and Priority Non-Tax Claims will be paid in full, in Cash, on the Effective Date and that holders of Priority Tax Claims may receive on account of such Claims deferred Cash payments, over a period not exceeding five (5) years after the Petition Date, of a value as of the Effective Date, equal to the Allowed amount of such Claims with interest from the Effective Date;

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor of the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility," below; and

- All Statutory Fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

1. Feasibility

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a bankruptcy court must determine, among other things, that confirmation of a Chapter 11 plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtors or any successors to the debtors under the plan unless such liquidation or reorganization is proposed in the plan. This condition is often referred to as the "feasibility" of a plan.

By its terms, the Plan is a liquidation plan that provides for the winding-up of the Debtors' affairs and the distribution of the Primary Asset Sale Proceeds and the Remaining Asset Proceeds after the closing of transactions contemplated involving the Remaining Assets. Accordingly, the Plan specifically provides for the liquidation of the Debtors' assets in accordance with section 1129(a)(11) and the Bankruptcy Court's confirmation of the Plan will not be followed by an unanticipated liquidation or the need for any further reorganization.

2. Best Interests Test

Unless each Impaired class of claims and interests under a Chapter 11 plan unanimously accepts the plan, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to determine that the plan is in the best interests of all holders of claims and interests in such Classes.

Case 20-81688-CRJ11    Doc 1369    Filed 01/25/21    Entered 01/25/21 12:53:40    Desc
Main Document    Page 76 of 180

This "best interests" test must show that each holder of Impaired claims or interests will receive property with a value not less than the amount such holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. As discussed below, the Debtors believe that under the Plan, holders of Impaired Claims will receive property with a value equal to or in excess of the value such holders would receive in a Chapter 7 liquidation.

The Debtors are seeking confirmation of the Plan in connection with the Sales, which resulted in sale transactions with seven separate bidders yielding the Primary Asset Sale Proceeds. The Remaining Assets remain in, and are expected to generate additional value upon disposition for, the Debtors' estates. As such, the Debtors anticipate that confirmation of the Plan will provide a faster, and through the elimination of costs and expenses attendant in a Chapter 7 case, a greater distribution to creditors under the Plan than through a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

The distributions contemplated under the Plan could not occur in a Chapter 7 liquidation as the Exit Term Loan Lenders have agreed to gift a portion of the Collateral Proceeds otherwise available to satisfy the Exit Term Loan Secured Claims to the payment of certain administrative, priority and general unsecured claims. Under Chapter 7 of the Bankruptcy Code, the Exit Term Loan Lenders would not be required to make such a gift from their Collateral Proceeds, and because the Collateral Proceeds are insufficient to satisfy the Exit Term Loan Claims in full in Cash, the holders of administrative, priority and general unsecured claims would not be entitled to receive any distribution. The Debtors will file a final liquidation analysis with the Bankruptcy Court, a current form of which is attached hereto as **Exhibit C**, demonstrating that the distributions under the Plan will exceed the estimated proceeds from a hypothetical liquidation and distribution of the Debtors remaining assets under Chapter 7.[10] As such, the Debtors believe that the distributions proposed under the Plan will lead to a greater distribution to holders of Impaired Claims under the Plan than they would receive pursuant to a liquidation under Chapter 7.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 cases, including: the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; and the substantial increases in claims that would be satisfied on a priority basis or on a parity with creditors in the Chapter 11 Cases, the Debtors determined that confirmation of the Plan will provide each creditor with a recovery that is not less than it would receive pursuant to a liquidation under Chapter 7 of the Bankruptcy Code. Moreover, the Debtors believe that the value of any distributions from the Collateral Proceeds to each Class of Allowed Claims in a Chapter 7 proceeding would be further impaired as compared to the value of distributions under the Plan because such distributions in Chapter 7 may not occur for a substantial period of time. Therefore, the Debtors believe that the Plan satisfies the requirements of the "best interests" test.

---

[10] The Debtors reserve the right to update and modify the liquidation analysis through the date of the Confirmation Hearing.

66

*C.      Requirements of Section 1129(b) of the Bankruptcy Code*

As set forth above, Classes 8 and 9 are deemed to reject the Plan. Accordingly, the Debtors will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code (*i.e.,* a non-consensual confirmation).

The Bankruptcy Code permits a bankruptcy court to confirm a Chapter 11 plan over the dissent of any Impaired class of claims as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes — often referred to as "cramdown" — is an important part of the Chapter 11 process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

A bankruptcy court may confirm a Chapter 11 plan over the rejection or deemed rejection by any impaired class of claims or interests if, among other requirements, the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

1.      Unfair Discrimination

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a Chapter 11 plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.,* classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, the Plan could treat two Classes of unsecured creditors differently without unfairly discriminating against either Class. This test only applies to Classes that reject or are deemed to reject the Plan.

2.      Fair and Equitable Test

A Chapter 11 plan is only fair and equitable with respect to a dissenting class if no class senior to such dissenting class receives more than it is entitled to on account of such senior claims or interests. The "fair and equitable" test also imposes certain requirements that depend on the type of claims or interests in the dissenting class.

To be fair and equitable with respect to a dissenting class of Impaired secured creditors, a Chapter 11 plan must provide that each holder in such class either (a) retains its liens on the property subject to such liens (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of consummation of the Chapter 11 plan, of at least such allowed amount or (b) receives the "indubitable equivalent" of its secured claim.

To be fair and equitable with respect to a dissenting class of Impaired unsecured creditors, a Chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the Chapter 11 plan, equal to the allowed amount of its unsecured claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the Chapter 11 plan.

67

To be fair and equitable with respect to a dissenting class of Impaired interest holders, a Chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the Chapter 11 plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference or fixed redemption price of its interest and (ii) the value of its interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the Chapter 11 plan.

The Debtors are requesting that the Bankruptcy Court confirm the Plan notwithstanding the deemed rejection of the Plan Classes 8 and 9. Thus the "cramdown" requirements will need to be satisfied with respect to such Classes. In addition, if any voting Class votes to reject the Plan, the "cramdown" requirements will also need to be satisfied with respect to such Class. The Debtors believe that the Plan is structured in a way that does not "discriminate unfairly" and satisfies the "fair and equitable" requirement for "cramdown" under section 1129(b) of the Bankruptcy Code with respect to each Class of Claims and Interests. The Debtors also may amend the Plan in accordance with Article X.A of the Plan and applicable provisions of the Bankruptcy Code to ensure compliance with the "cramdown" requirements.

## SECTION VII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a general discussion based upon present law of certain U.S. federal income tax considerations relevant to the implementation of the Plan to holders of Claims entitled to vote on the Plan. This discussion is based on the current provisions of Title 26 of the United States Code (the "Tax Code"), applicable Treasury Regulations, judicial authority, and current administrative rulings and pronouncements of the Internal Revenue Service (the "IRS"). There can be no assurance that the IRS will not take a contrary view, no ruling from the IRS has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below. This discussion does not address the federal income tax consequences to holders of Claims or Interests who are Unimpaired, or holders who are not entitled to vote because they are deemed to accept or reject the Plan or holders subject to special treatment under U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, holders that have a "functional currency" other than the United States dollar, holders that hold Claims as a position in a "straddle" or as part of a "synthetic currency," "hedging," "conversion," or other integrated transaction, or holders that have acquired Claims in connection with the performance of services. In addition, this discussion does not address U.S. federal taxes other than income taxes.

Legislative, judicial, or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the holders of Claims or the Debtors. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

This summary is not a comprehensive description of all of the U.S. federal tax consequences that may be relevant with respect to the Plan. We urge you to consult your own tax

68

advisor regarding your particular circumstances and the U.S. federal tax consequences to you with respect to the Plan, as well as any tax consequences arising under the laws of any state, local, or foreign tax jurisdiction and the possible effects of changes in U.S. federal or other tax laws. The following summary assumes that the Claims are held by holders as "capital assets" within the meaning of section 1221 of the Tax Code and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of holders of Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the distributions provided for under the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the holder in exchange for the Claim and whether the holder receives distributions hereunder in more than one taxable year; (iii) whether the holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder. Therefore, each holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

**The following discussion is intended only as a summary of certain U.S. federal tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The following discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a holder's particular circumstances. Accordingly, each holder is strongly urged to consult its tax advisor regarding the U.S. federal, state, local, and applicable non-U.S. income and other tax consequences of the Plan.**

A.     *U.S. Federal Income Tax Consequences to the Debtors*

In general, absent an exception, a debtor will realize and recognize cancellation of debt ("COD") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. Under section 108 of the Tax Code, subject to limited exceptions, COD income of a debtor generally is excluded from gross income if the debtor is under the jurisdiction of a court in a case under Chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. As a consequence of such exclusion, a debtor generally must reduce its tax attributes by the amount of COD income that it excluded from gross income. In general, tax attributes of the debtor are reduced in the following order: (a) net operating losses ("NOLs"); (b) general business credit carryovers; (c) alternative minimum tax credit carryovers;

69

(d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. In applying this attribute reduction rule to the tax basis in assets, the tax law limits the reduction in tax basis to the amount by which the tax basis exceeds the debtor's liabilities after the Effective Date (often referred to as the "liability floor"). If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. If the amount of excluded COD income exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax and has no other U.S. federal income tax impact. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group must also be reduced. Any reduction in tax attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

Under the Plan, holders of certain Allowed Claims are expected to receive less than full payment on their Claims. As a result, the Debtors' liability to holders of such Claims in excess of the amount satisfied by distributions under the Plan will be canceled, and therefore will result in COD income to the Debtors. Certain COD income triggered under the Plan will not be recognized as income under section 108 of the Tax Code and the Debtors must reduce their tax attributes by the amount of such excluded income. As a result, the Debtors' tax attributes are expected to be substantially reduced or potentially eliminated; provided, however, such reduction in tax attributes will not occur until the end of the Debtors' taxable year. The Debtors also expect to recognize COD income that is not excludable under Section 108, which COD income may be significant. The Debtors expect that any such non-excludable COD income will be offset by current losses, NOLs and other available tax attributes, although there can be no assurance that Debtors will not be subject to tax which may reduce the amount available to distribute to holders of Allowed Claims.

Under the Tax Code, any NOL carryforwards, disallowed interest expense carryforwards and certain other tax attributes of a corporation (collectively, "Pre-Change Losses") may be subject to an annual limitation if the corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the COD arising in connection with the Plan. Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally are subject to an annual limitation.

The Debtors estimate that they had approximately $118 million of NOLs as of December 31, 2019 and have generated significant additional losses prior to the confirmation of the Plan. The cancellation of the Interests in the Debtors could result in an ownership change, which would have the effect of limiting the NOLs available to offset income from the disposition of assets. For tax years beginning on or after January 1, 2021, corporate taxpayers may offset up to 80% of their taxable income with NOL carryforwards. Based on the Debtors' anticipated remaining transactions and existing IRS guidelines, the Debtors do not expect to recognize material taxable income in any such tax years or to become subject to any adverse limitations against their use of NOL carryforwards.

Following the Effective Date, the Debtors may recognize corporate entity-level income or gain in connection with administering the Plan, winding down the Debtors, and disposing of any remaining assets. Although any such amounts are expected to be *de minimis*, such amounts may be taxable to the Debtors and, if applicable would reduce the amount of cash available to distribute to holders. Such gain or income may be offset, in part (or potentially in whole), by expenses of the Debtors and other Debtor tax attributes available to offset gain, including any current losses or NOLs. However, the availability of the Debtors' tax attributes is expected to be limited as a result of the reductions described above as well as certain other limitations under the Tax Code that may result from the Plan and accordingly, the Debtors may be subject to tax. On final wind-up, the Debtors are not expected to recognize and be taxable on any additional COD income, due to either the bankruptcy exception referenced above or a similar exception when the debtor is insolvent, which is expected to apply following the completion of the liquidation of the Debtors.

B.    *Certain U.S. Federal Income Tax Treatment With Respect to U.S. Holders of Allowed Claims*

As used in discussion herein, the term "U.S. Holder" means a beneficial owner of an Allowed Claim that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;
- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;
- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or
- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds an Allowed Claim, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. Partners in a partnership holding any such instruments are urged to consult their own tax advisors.

A U.S. Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the U.S. Holder's adjusted basis in its Allowed Claim and the amount realized by the U.S. Holder in respect of its Allowed Claim. Over time and on a cumulative basis, the amount realized generally will equal the aggregate amount of the cash (and the fair market value of property, if any) distributed to the U.S. holder by the Plan Administrator, less the amount, if any, attributable to accrued but unpaid interest. However, in the event that a U.S. Holder of an Allowed Claim receives distributions over more than one tax year, the timing of such U.S. Holder's recognition of such gain or loss is not free from doubt. For instance, there may be circumstances in which a U.S. Holder of an Allowed Claim (i) may recognize gain only after distributions have been made to the U.S. Holder in excess of such U.S. Holder's basis in its Allowed Claim or (ii) or allocate a portion of distributions in a given year between a return of basis and gain or loss. Alternatively, a U.S. Holder of an Allowed Claim may be required to recognize gain or loss on the

Effective Date even if there is not complete certainty as to the full amount of distributions that will be received by such U.S. Holder pursuant to the Plan. In this case, such U.S. Holder could then be required to adjust the amount of gain or loss ultimately realized when the full amount of the distribution has been made and the full calculation of total gain or loss can be completed. These rules are complex and U.S. Holders of Allowed Claims are advised to consult with their own tax advisors as to the timing rules described above in connection with the Plan and the tax consequences to them under such rules. Any person who is not a "U.S. Holder" as used herein is strongly urged to consult its tax advisor regarding the U.S. federal, state, local, and applicable non-U.S. income and other tax consequences of the Plan.

1. Character of Gain or Loss

The character of any gain or loss that is recognized as such will depend upon a number of factors, including the status of the U.S. Holder, the nature of the Allowed Claim in the U.S. Holder's hands, whether the Allowed Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the U.S. Holder's holding period of the Allowed Claim. If the Allowed Claim in the U.S. Holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the U.S. Holder held such Allowed Claim for longer than one year, or short-term capital gain or loss if the U.S. Holder held such Allowed Claim for one year or less.

A U.S. Holder of an Allowed Claim that purchased its claim from a prior holder would be considered to have purchased such Allowed Claim with "market discount" if the U.S. Holder's adjusted tax basis in the Allowed Claim is less than the adjusted issue price of such Claim by at least a statutorily defined *de minimis* amount. Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally would be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder of an Allowed Claim did not elect to include market discount in income as it accrued and, thus, under these rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Allowed Claim, such deferred amounts would in the case of a fully taxable exchange become deductible at the time of the exchange.

2. Distributions in Respect of Accrued But Unpaid Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of an Allowed Claim is received in satisfaction of accrued interest during the U.S. Holder's holding period, such amount would be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder of an Allowed Claim generally recognizes a deductible loss to the extent any accrued interest or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a U.S. Holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued but unpaid OID. Accordingly, it is also unclear whether, in similar circumstances or by analogy, any U.S. Holder of an Allowed Claim

72

would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID with respect to such Claim that is not paid in full.

The Plan provides that, unless otherwise required by law, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claim for accrued but unpaid interest. *See* Section VII.H of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration and the inclusion and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

A U.S. Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of cash or property received (or deemed received) under the Plan is attributable to interest or OID that accrued on an Allowed Claim but was not previously paid by the Debtors or included in income by the U.S. Holder of the Allowed Claim. A U.S. Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

Certain U.S. Holders of an Allowed Claim who receive, in respect of the U.S. Holder's Allowed Claim, an amount that is less than that U.S. Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under Code Section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor, and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction. A U.S. Holder that has previously recognized a loss or deduction in respect of that U.S. Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the U.S. Holder's adjusted basis in such Allowed Claim.

C.    *Certain U.S. Federal Income Tax Treatment With Respect to Non-U.S. Holders of Allowed Claims*

For purposes of this discussion, a "Non-U.S. Holder" is any holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes). The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

1.    Gain Recognition.

Any gain realized by a Non-U.S. Holder on the exchange of its Allowed Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the

Effective Date occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.    FIRPTA.

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as ECI that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation. The Debtors do not believe they have been a USRPHC during the relevant testing period, but based on the timing of the liquidation of certain Plan Assets relative to the timing of any distributions from the Debtors, they may become a USRPHC. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FIRPTA withholding rules on such Non-U.S. Holder.

3.    FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

74

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future prior to the Debtor's final distribution to Non-US Holders. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

## D. Withholding on Distributions and Information Reporting

All distributions to U.S. Holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding (if applicable). Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. A Non-U.S. Holder should submit an IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable IRS Form W-8) attesting to such Non-U.S. Holder's exempt foreign status in order to qualify for an exemption from information reporting and backup withholding.

Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Non-U.S. Holder of an Allowed Claim may be subject to up to 30% withholding, depending on, among other things, the particular type of income at issue and whether the type of income is subject to a lower treaty rate. As to certain Allowed Claims, it is possible that withholding may be required with respect to distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. Non-U.S. Holders are urged to consult their tax advisors regarding potential withholdings on distributions by the Debtors.

Treasury Regulations may also require participation of certain transactions to be disclosed by a U.S. Holder on its U.S. federal income tax return, including, among other types of transactions, transactions that result in the U.S. Holder claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these rules.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## SECTION VIII.
## RISK FACTORS AND OTHER CONSIDERATIONS

The implementation of the Plan is subject to a number of material risks, including those summarized below. However, this summary of risks and considerations is not exhaustive. Prior to deciding whether and how to vote on the Plan, holders of Claims entitled to vote should read and consider carefully all of the information in the Plan and this Disclosure Statement, as well as all other information referenced or incorporated by reference into this Disclosure Statement.

*A.      Certain Bankruptcy Considerations*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent specified in Article IX of the Plan, and there can be no assurance that such conditions will be satisfied or waived. In the event such conditions precedent have not been satisfied or waived (to the extent possible hereunder) within ninety (90) days of the Confirmation Date, then the Confirmation Order may be vacated, no distributions will be made under the Plan, and the Debtors and all holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

While the Debtors believe that there are sufficient Plan Assets to make distributions to the beneficiaries of the ROC Liquidation Estates, there can be no assurance that the Plan Assets will

be sufficient to pay all Plan Administrator Operating Expenses or make distributions to the beneficiaries of the ROC Liquidation Estates.

B.    *COVID-19 Disruptions*

The continued spread of COVID-19 could have a significant impact on the Plan Administrator's ability to wind down the ROC Liquidation Estates and liquidate the Plan Assets. Mandatory quarantines and the shutdown of certain courts may delay the Plan Administrator's ability to pursue any Estate Causes of Action, which could lead to an indefinite postponement of distributions under the Plan. Further, sustained reductions in worldwide economic growth and economic activity could ultimately lead to a global recession. In a global recession, the demand for the Remaining Assets would likely decline, and in turn, negatively impact the Plan Administrator's ability to monetize such assets for the benefit of holders of Allowed Claims under the Plan.

C.    *Buyer Fails to Honor Transition Services Obligations*

Pursuant to the Asset Purchase Agreements, certain purchasers are required to provide certain transition services to the Debtors as reasonably necessary to permit the Debtors to monetize any Excluded Assets and otherwise liquidate the ROC Liquidation Estates after the Closing. The failure by these purchasers to honor and timely perform such obligations may jeopardize the Plan Administrator's ability to liquidate the Plan Assets and make distributions to holders of Allowed Claims as contemplated by the Plan.

D.    *Delay In Liquidating Estate Causes of Action*

Distributions to holders of Allowed Claims under the Plan are partly dependent on the Plan Administrator's ability to litigate to judgment and/or settle the Estate Causes of Action. The Debtors cannot predict the ultimate outcome regarding the liquidation and/or settlement of the Estate Causes of Action. Even if the Estate Causes of Action are ultimately liquidated and/or settled, the Debtors cannot predict the time necessary to accomplish that result. Any delay in liquidating and/or the Plan Administrator's inability to liquidate the Estate Causes of Action may negatively impact distributions to holders of Allowed Claims under the Plan.

E.    *Plan Administrator Budget May Prove Inadequate*

In connection with confirmation of the Plan, the Plan Administrator has estimated the Plan Administrator Operating Expenses as set forth in the Plan Administrator Budget. In the event that the winding down of the ROC Liquidation Estates takes longer than anticipated, the Plan Administrator Operating Expenses may exceed the amounts allocated under the Plan Administrator Budget. In such event, the Plan Administrator may need to utilize Plan Assets to satisfy the Plan Administrator Operating Expenses or the Plan Professional Fee Reserve, which may negatively impact distributions to holders of Allowed Claims under the Plan.

F.    *No Duty to Update Disclosures*

The Debtors have no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtors are required to do so

under an order of the Bankruptcy Court. Delivery of this Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

# SECTION IX.
## ALTERNATIVE TO CONFIRMATION AND
## CONSUMMATION OF PLAN

If the Plan is not confirmed, the Debtors or any other party in interest (if, under section 1121 of the Bankruptcy Code, the Debtors have not filed a plan within the time period prescribed under the Bankruptcy Code) could attempt to formulate and propose a different plan. Such a plan likely would result in additional costs, including, among other things, additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expenses (subject to allowance). The Debtors believe that the Plan, which is the result of extensive negotiations with the other Plan Proponents and other parties in interest provides for an orderly and efficient liquidation of the Debtors' remaining assets and enables creditors to realize the best return under the circumstances.

If a plan under Chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Cases may be converted to liquidation cases under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, under applicable provisions of Chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective holders of Claims or Interests, the Debtors believe that in a Chapter 7 liquidation, before creditors received any distributions, additional Administrative Expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured Claims that would be expected, would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation by the trustee.

**THE DEBTORS BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS THAN WOULD LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

# SECTION X.
## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors because it provides the greatest distributions and opportunity for distributions to such holders. In addition, any alternative to confirmation of the Plan could result in extensive delays and substantially increased Administrative Expenses.

Accordingly, the Debtors urge all holders of Claims who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be **actually received** by the Balloting Agent no later than 4:00 p.m., Central Time, on February 23, 2021.

78

Dated:  [          ], 2021

Respectfully submitted,

REMINGTON OUTDOOR COMPANY,
INC., on its own behalf and on behalf of its
affiliated debtors and debtors in possession


By: _/s/_____
      Name:
      Title:

# **EXHIBIT A**

Debtors' Joint Plan Under Chapter 11 of the Bankruptcy Code

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY, INC., *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 20-81688-CRJ11<br><br>Jointly Administered |

## <u>JOINT CHAPTER 11 PLAN OF THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND EXIT TERM LOAN LENDERS</u>

| | |
|---|---|
| **O'MELVENY & MYERS LLP**<br>Co-Counsel for the Debtors and<br>Debtors in Possession<br>400 South Hope Street<br>Los Angeles, CA 90071-2899 | **BURR & FORMAN LLP**<br>Co-Counsel for the Debtors and<br>Debtors in Possession<br>420 North 20th Street, Suite 3400<br>Birmingham, Alabama 35203 |
| **PILLSBURY WINTHROP SHAW PITTMAN LLP**<br>Co-Counsel for the Franklin Managed Entities<br>Four Embarcadero Center, 22nd Floor<br>San Francisco, CA 94111-5998 | **CHRISTIAN & SMALL LLP**<br>Co-Counsel for the Franklin Managed Entities<br>1800 Financial Center, 505 N. 20th Street<br>Birmingham, AL 35203 |
| **FOX ROTHSCHILD LLP**<br>Co-Counsel for the Committee<br>345 California Street, Suite 2200<br>San Francisco, CA 94104 | **BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**<br>Co-Counsel for the Committee<br>420 20th Street North, Suite 1400<br>Birmingham, AL 35203 |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' principal offices and assets are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION,
    COMPUTATION OF TIME, AND GOVERNING LAW ................................... 2

A.     Defined Terms ........................................................................................... 2

B.     Rules of Interpretation ............................................................................ 16

C.     Computation of Time ............................................................................... 16

D.     Governing Law ........................................................................................ 16

E.     Reference to Monetary Figures ............................................................... 17

ARTICLE II ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED
    CLAIMS ................................................................................................... 17

A.     General Administrative Expenses ........................................................... 17

B.     General Administrative Expense Bar Date ............................................. 17

C.     Professional Fees .................................................................................... 17

1.     Final Fee Applications ............................................................................ 17

2.     Plan Professional Fee Reserve ................................................................ 18

D.     Priority Tax Claims ................................................................................. 18

E.     Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses ....... 19

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND
    INTERESTS .............................................................................................. 20

A.     Classification of Claims and Interests .................................................... 20

B.     Treatment of Claims and Interests ......................................................... 21

1.     Class 1 – Priority Non-Tax Claims ......................................................... 21

2.     Class 2 – Other Secured Claims ............................................................. 21

3.     Class 3 – Exit Term Loan Claims ........................................................... 22

4.     Class 4 – Huntsville Note Claim ............................................................. 23

5.     Class 5 – General Unsecured Claims ...................................................... 24

6.     Class 6 – Tort Convenience Class Claims .............................................. 24

7.     Class 7 – Tort Claims ............................................................................. 25

8.     Class 8 – Intercompany Claims .............................................................. 25

9.     Class 9 – Interests in the Debtors ........................................................... 25

C.     Special Provision Governing Unimpaired Claims .................................. 26

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN ................................. 26

A.     Voting Classes ........................................................................................ 26

B.     Presumed Acceptance of the Plan ........................................................... 26

C. Non-Consensual Confirmation ....................................................... 26

D. Elimination of Vacant Classes ..................................................... 27

E. Subordinated Claims .................................................................. 27

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ............................ 27

A. General Settlement of Claims and Interests ................................. 27

B. Procedural Consolidation of Debtors for Plan Purposes Only .......... 27

C. Sources of Cash for Plan Distributions ....................................... 28

D. Continued Corporate Existence; Vesting of Assets ....................... 28

E. Establishment of Creditor Trust ................................................ 29

F. Tort Claims and the Establishment of the Tort Claim Sub-Trust ...... 30

G. Powers and Duties of the Plan Administrator .............................. 31

H. Corporate Action ..................................................................... 34

I. Winding Down of Affairs ........................................................... 34

J. Closing of the Chapter 11 Cases ............................................... 35

K. Dissolution of the Debtors ........................................................ 35

L. Costs and Expenses of the Plan Administrator ............................ 36

M. Cancellation of Loans, Securities and Agreements ....................... 37

N. Effectuating Documents; Further Transactions ............................ 38

O. Section 1146 Exemption ........................................................... 38

P. Preservation of Estate Causes of Action .................................... 38

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES .................................................................. 39

A. Executory Contracts and Unexpired Leases ................................ 39

B. Rejection Damages Bar Date ..................................................... 39

C. Effect of Post-Confirmation Rejection ....................................... 40

D. Non-Occurrence of Effective Date ............................................. 40

E. Indemnification Obligations; Insurance Policies ........................... 40

F. Excluded Employee Liabilities, Retiree Plan and Pension Plan ........ 40

G. Reservation of Rights ............................................................... 41

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ............................. 41

A. Plan Distributions .................................................................... 41

B. Distribution Record Date .......................................................... 41

# TABLE OF CONTENTS
## (continued)

C.  Objections to Claims; Estimation of Claims ...................................... 42

D.  No Distributions Pending Allowance ................................................ 42

E.  Reserve of Cash Distributions ........................................................ 43

F.  Distribution After Allowance .......................................................... 43

G.  No Recourse ................................................................................... 43

H.  Application of Distributions ........................................................... 43

I.  Undeliverable Distributions and Unclaimed Property ..................... 44

J.  Compliance with Tax Requirements ............................................... 44

K.  No Postpetition Interest on Claims and Interests ........................... 44

L.  Foreign Currency Exchange Rate ................................................... 45

M.  Setoffs and Recoupment ................................................................ 45

N.  Distributions Free and Clear .......................................................... 45

O.  De-Minimis Distributions and Donation ........................................ 45

P.  Claims Paid or Payable by Third Parties ........................................ 45

1.  Claims Paid by Third Parties ......................................................... 45

2.  Claims Payable by Third Parties .................................................... 46

3.  Applicability of Insurance Policies ................................................ 46

ARTICLE VIII EFFECTS OF PLAN CONFIRMATION ................................... 46

A.  Injunction ...................................................................................... 46

B.  Exculpation and Limitation of Liability ......................................... 47

C.  Release of Debtors, Restructuring Committee, Exit Term Loan Agent, Exit Term Loan Lenders, the FILO Term Loan Agent, FILO Term Loan Lenders, and Directors and Officers ........................................ 48

D.  Term of Injunctions or Stays .......................................................... 48

ARTICLE IX CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ......... 48

A.  Conditions to the Effective Date ..................................................... 48

B.  Waiver of Conditions ..................................................................... 49

C.  Substantial Consummation ............................................................. 50

ARTICLE X MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN ........................................................................................................ 50

A.  Modification and Amendments ....................................................... 50

B.  Effect of Confirmation on Modifications ....................................... 50

# TABLE OF CONTENTS
## (continued)

C.     Revocation or Withdrawal of Plan; Effect of Non-Occurrence of Confirmation Date or Effective Date .................................................................... 50

ARTICLE XI RETENTION OF JURISDICTION ............................................................ 51

ARTICLE XII MISCELLANEOUS PROVISIONS ......................................................... 53

A.     Immediate Binding Effect ................................................................................. 53

B.     Additional Documents ...................................................................................... 53

C.     Filing of Monthly and Quarterly Reports and Payment of Statutory Fees .......... 54

D.     Reservation of Rights ....................................................................................... 54

E.     Successors and Assigns .................................................................................... 54

F.     Notices ............................................................................................................. 54

G.     Term of Injunctions or Stays ............................................................................ 55

H.     Entire Agreement ............................................................................................. 55

I.     Exhibits ............................................................................................................ 55

J.     Nonseverability of Plan Provisions ................................................................... 56

K.     Votes Solicited in Good Faith ........................................................................... 56

L.     Closing of the Chapter 11 Cases ....................................................................... 56

M.     Document Retention ......................................................................................... 56

N.     Conflicts .......................................................................................................... 56

**<u>Introduction</u>**

Remington Outdoor Company, Inc. ("<u>ROC</u>") and its subsidiaries FGI Holding Company, LLC, FGI Operating Company, LLC, Remington Arms Company, LLC, Barnes Bullets, LLC, TMRI, Inc., RA Brands, L.L.C., FGI Finance Inc., Remington Arms Distribution Company, LLC, Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC, and Outdoor Services, LLC, as debtors and debtors in possession (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>"), together with the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases,[2] and certain Exit Term Loan Lenders, jointly propose this plan (together with the Plan Supplement, and as the same may be modified, amended, or supplemented in accordance with the terms hereof, the "<u>Plan</u>") in connection with the conclusion of a comprehensive sale process for Collateral including certain core and non-core assets (collectively, the "<u>Sales</u>"), which resulted in sale transactions with seven separate buyers yielding an aggregate net purchase price in the amount of approximately $157 million (the "<u>Primary Asset Sale Proceeds</u>"). Certain significant assets that constitute Collateral of the Exit Term Loan Secured Creditors but were not included in the Sales (the "<u>Remaining Assets</u>") remain in the Debtors' estates and are expected to generate additional value upon disposition (the "<u>Remaining Asset Proceeds</u>," together with the Primary Asset Sale Proceeds and all other Cash on hand constituting Cash Collateral of the Prepetition Secured Creditors, the "<u>Collateral Proceeds</u>") for the benefit of the Exit Term Loan Secured Creditors and the Debtors' estates.

This Plan contemplates the distribution of the Collateral Proceeds and the unencumbered assets of the Debtors' estates, if any, in accordance with the priority scheme contemplated under the Bankruptcy Code (the "<u>Liquidation</u>") and requirements for plan confirmation. The Liquidation will be consummated pursuant the Plan to be confirmed by the Bankruptcy Court. The Liquidation will provide for the termination of the Debtors' business operations, the disposition of the Debtors' remaining assets (including the Remaining Assets), and the wind-down of the Debtors' affairs in an orderly process under chapter 11 of the Bankruptcy Code.

Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, and historical financial information, as well as a summary and description of the Plan.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below:

---

[2] All undefined capitalized terms in this Introduction are defined in Article I.A.

"*Adequate Protection Superpriority Claim*" means a Claim in the amount equal to any diminution in value of the Exit Term Loan Secured Creditors' respective Liens on and interests in the Collateral securing their respective Exit Term Loan Claims.

"*Administrative Expense*" means any cost or expense of administration of the Estates entitled to priority pursuant to sections 503(b) (including Claims arising under section 503(b)(9)), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates; (b) professional compensation and reimbursement awarded or allowed pursuant to sections 330(a) or 331 of the Bankruptcy Code, including the Professional Fees or otherwise allowed under section 503(b) of the Bankruptcy Code; (c) any indebtedness or obligations incurred or assumed by the Debtors after the Petition Date and through the Effective Date; and (d) any and all fees and charges assessed against the Estates pursuant to section 1930 of title 28 of the United States Code; *provided*, *however,* that except as otherwise provided herein, "Administrative Expense" shall not include any Exit Term Loan Claims, or the Huntsville Note Claim.

"*Aggregate Gift to Junior Creditors*" has the meaning set forth in Article III.B.3(f).

"*Allowed*" means, with respect to any Claim or Interest, such Claim or Interest or portion thereof against or in any Debtor: (a) that has been listed by such Debtor in the Schedules as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (b) as to which the deadline for objecting or seeking estimation has passed, and no objection or request for estimation has been filed; (c) as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn, or denied by a Final Order; or (d) that is allowed pursuant to the terms of (i) a Final Order, (ii) an agreement in writing by and among the holder of such Claim or Interest and the Debtors or the Plan Administrator, as applicable, or (iii) the Plan.

"*Article*" refers to an article of the Plan.

"*Asset Purchase Agreements*" means (i) the Roundhill Asset Purchase Agreement; (ii) that certain Asset Purchase Agreement, dated as of September 26, 2020, by and among the Debtors and Vista Outdoor Inc.; (iii) that certain Asset Purchase Agreement, dated as September 26, 2020, by and among the Debtors and Sturm, Ruger & Company, Inc.; (iv) that certain Asset Purchase Agreement, dated as of September 30, 2020, by and among the Debtors and Sierra Bullets, L.L.C.; (v) that certain Asset Purchase Agreement, dated as of October 7, 2020, by and among the Debtors and Sportsman's Warehouse, Inc.; (vi) that certain Asset Purchase Agreement, dated as of October 7, 2020, by and among the Debtors and Crotalus Holdings, Inc.; (vii) that certain Asset Purchase Agreement, dated as of October 23, 2020, by and among the Debtors and JJE Capital Holdings, LLC; and (viii) that certain Asset Purchase Agreement, dated as of October 23, 2020, by and among the Debtors and JJE Capital Holdings, LLC.

"*Assets*" means all assets of the Debtors of any nature whatsoever, including all property of the Estates pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of all of the foregoing.

"*Bankruptcy Administrator*" means the Office of the Bankruptcy Administrator for the Bankruptcy Court.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532 *et seq.*

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Alabama or any other court having jurisdiction over the Chapter 11 Cases.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated pursuant to 28 U.S.C. § 2075 and the general, local, and chamber rules of the Bankruptcy Court.

"*Bidding Procedures Order*" means the *Order Establishing Bidding Procedures Relating to the Sales of All or a Portion of the Debtors' Assets* entered by the Bankruptcy Court on August 20, 2020 [Docket No. 411].

"*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"*Cash*" means cash and cash equivalents in U.S. dollars.

"*Cash Collateral*" means all property of the Debtors that constitutes cash collateral in which the Exit Term Loan Agent, on behalf of the applicable Exit Term Loan Secured Creditors, has an interest as provided in section 363(a) of the Bankruptcy Code or any order of the Bankruptcy Court, and shall include the balances of funds in the Debtors' prepetition and postpetition bank accounts, Cash, income, offspring, products, proceeds and profits from the Debtors' business operations, all Cash proceeds arising from the collection, sale, lease, or other disposition, use or conversion of any Collateral securing the Exit Term Loan Claims or pursuant to an order of the Bankruptcy Court or applicable law or otherwise, whether such property that has been converted to Cash, existed prior to or after the Petition Date; and all of the respective deposits, refund claims, and rights of the Debtors upon which the Exit Term Loan Secured Creditors hold a Lien or replacement Lien, whether as part of their Collateral or pursuant to an order of the Bankruptcy Court or applicable law or otherwise; *provided* that Cash Collateral shall not include any Cash in the Plan Professional Fee Reserve or amounts reserved for Plan Administrator Operating Expenses except to the extent of the Exit Term Loan Secured Creditors' and/or the Debtors' reversionary interests therein.

"*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, action, remedy, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date and that are or may be pending or existing on the Effective Date against any Entity, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any counterclaim or defense, including

3

fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any equitable remedy, including any claim for equitable subordination, equitable disallowance, or unjust enrichment; and (f) any cause of action or claim arising under any state or foreign fraudulent transfer law.

"*CBA*" means that certain collective bargaining agreement between UMWA and Remington Arms Company, LLC effective December 16, 2016.

"*Chapter 11 Case*" means, with respect to a particular Debtor, the case under chapter 11 of the Bankruptcy Code pending for such Debtor in the Bankruptcy Court, jointly administered with each other Debtor's Chapter 11 Case under Case No. 20-81688-CRJ-11, and the "*Chapter 11 Cases*" means each Debtor's Chapter 11 Case, collectively.

"*Claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code.

"*Claims Objection Deadline*" has the meaning set forth in Article VII.C.

"*Class*" means a class of Claims or Interests designated in Article III, pursuant to section 1123(a)(1) of the Bankruptcy Code.

"*Collateral*" means any property or interest in property of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable nonbankruptcy law.

"*Collateral Proceeds*" has the meaning specified in the Introduction hereto.

"*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

"*Committee Stipulations*" means the *Stipulations Between the Official Committee of Unsecured Creditors, Prepetition Agents, and Prepetition Secured Creditors Regarding Committee Investigation and Final Cash Collateral Order* filed with the Bankruptcy Court on October 5, 2020 [Docket Number 937].

"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

"*Confirmation Order*" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and granting other related relief.

"*Creditor Trust*" means that certain trust established pursuant to the terms set forth in Article V.E.

"*Creditor Trust Agreement*" has the meaning set forth in Article V.E and attached to the Plan Supplement.

"*Creditor Trust Assets*" means (i) $394,451.00 in Cash, representing the difference between the "Consent Fee" as defined in the Final Cash Collateral Order and the "Consent Fee" as defined in the Interim Cash Collateral Order; (ii) the Distribution Contribution (clauses (i) and (ii) of this definition, the "Unsecured Creditor Recovery Amount"); (iii) the Litigation Assets; and (iv) any unencumbered assets of the Debtors' estates not previously liquidated other than Litigation Assets, which are agreed by the Debtors and Committee to be limited to the assets identified in Paragraph 1 of the Committee Stipulations; it being agreed and acknowledged that the Unsecured Creditor Recovery Amount shall be gifted in Cash from the Collateral Proceeds otherwise available to satisfy the Exit Term Loan Secured Claims. For the avoidance of doubt, Creditor Trust Assets shall not include (1) any other reserves established under the Plan or (2) the GL Insurance Assets.

"*Creditor Trust Interests*" means the beneficial interests in the Creditor Trust.

"*D&O Insurance*" means all primary and excess insurance policies that provide coverage for the Debtors' former and current directors and officers, including all "tail" or "runoff" coverage for such policies.

"*Debtors*" has the meaning specified in the Introduction hereto.

"*Deficiency Claim*" means a Claim in the amount by which an Allowed Secured Claim exceeds the value of any Collateral securing such Claim, determined in accordance with section 506(a) of the Bankruptcy Code.

"*Disallowed*" means, with respect to a Claim or Interest or portion thereof, that such Claim or Interest or portion thereof that is not Allowed and (a) has been disallowed by a Final Order, (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no proof of claim or request for payment of an Administrative Expense has been timely filed or deemed timely filed with the Bankruptcy Court, (c) is not listed in the Schedules and as to which no proof of claim or request for payment of an Administrative Expense has been timely filed or deemed timely filed with the Bankruptcy Court, (d) has been withdrawn by agreement of the applicable Debtor or the Plan Administrator, as applicable, and the holder thereof, or (e) has been withdrawn by the holder thereof.

"*Disclosure Statement*" means that certain disclosure statement relating to the Plan, including all exhibits, appendices, and schedules thereto, as amended, supplemented, or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"*Disputed*" means any Claim or Interest that is not Allowed or Disallowed.

"*Distribution Contribution*" means five percent (5.0%) of the Exit Term Loan Secured Recovery in excess of thirty-eight million dollars ($38,000,000); *provided, however*, that the Distribution Contribution shall not exceed two million dollars ($2,000,000).

5

"*Distribution Record Date*" means the Confirmation Date or such other date acceptable to the Debtors and the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders; *provided*, *however*, that there is no Distribution Record Date for the Debtors' publicly traded securities.

"*District Court*" means the United States District Court for the District of Northern Alabama.

"*Document Preservation Order*" means that certain *Order Approving Motion for Preservation Order* entered by the Bankruptcy Court on October 30, 2020 [Docket No. 1059], as such order may be modified or amended by the Bankruptcy Court.

"*Effective Date*" means the date selected by the Debtors, in consultation with the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and the Committee, that is the first Business Day after the Confirmation Date on which date all conditions to the Effective Date specified in Article IX.A have been satisfied or waived in accordance with Article IX.B.

"*Entity*" means any "entity," as such term is defined in section 101(15) of the Bankruptcy Code.

"*Equity Incentive Plan*" means ROC's 2018 Equity Incentive Plan and all outstanding awards granted thereunder.

"*Estate*" means, with respect to a particular Debtor, the estate created for such Debtor upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and the "*Estates*" means every Debtor's Estate, collectively.

"*Estate Causes of Action*" means any and all Causes of Action that may be asserted by the Estates.

"*Excise Taxes*" means the firearms and ammunition excise tax payable under 26 U.S.C. § 4181.

"*Excluded Employee Liabilities*" means the Pension Plan, Supplemental Retirement Plan, and the Equity Incentive Plan.

"*Excluded Liabilities*" means the liabilities of the Debtors that were not assumed by the buyers under the Asset Purchase Agreements.

"*Exit Term Loan Agent*" means, collectively, Ankura Trust Company, LLC, in its capacities as administrative agent and collateral agent under the Exit Term Loan Documents, together with any successor agent thereto and any sub-agent appointed by such administrative agent or collateral agent, including Cantor Fitzgerald Securities in such capacity.

"*Exit Term Loan Agent Expenses*" means, collectively, (i) all reasonable and documented fees and expenses of (A) Davis Polk & Wardwell LLP, as primary counsel to the Exit Term Loan Agent, and (B) Hand Arendall Harrison Sale LLC, as local counsel to the Exit Term Loan Agent,

6

and (ii) all reasonable and documented fees and expenses (including, without limitation, fees due to the Exit Term Loan Agent under the Exit Term Loan Documents) of the Exit Term Loan Agent.

"*Exit Term Loan Agreement*" means the Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020), by and among FGI Operating Company, LLC, the other loan parties party thereto from time to time, the Exit Term Loan Agent and the Exit Term Loan Lenders.

"*Exit Term Loan Claims*" means all Claims of the Exit Term Loan Secured Creditors arising under or relating to the Exit Term Loan Documents that remain unpaid and outstanding as of the Effective Date.

"*Exit Term Loan Deficiency Claims*" means all Unsecured Claims in an amount equal to the amount of Exit Term Loan Claims *less* the amount of the Exit Term Loan Secured Claims *plus* the Unsecured Creditor Recovery Amount.

"*Exit Term Loan Documents*" means the Exit Term Loan Agreement and all other related documents, guarantees, and agreements, including security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments, or certificates executed in connection with the Exit Term Loan Agreement.

"*Exit Term Loan Lenders*" means those financial institution(s) party from time to time to the Exit Term Loan Agreement as lenders, in their respective capacities as such.

"*Exit Term Loan Required Lenders*" means "Required Lenders" as such term is defined in the Exit Term Loan Agreement.

"*Exit Term Loan Secured Claims*" means the aggregate portion of the Exit Term Loan Claims constituting Secured Claims.

"*Exit Term Loan Secured Creditors*" means, collectively, the Exit Term Loan Lenders and the Exit Term Loan Agent.

"*Exit Term Loan Secured Recovery*" means the aggregate amount of Cash distributed under the Plan to the Exit Term Loan Lenders on account of the Exit Term Loan Secured Claims.

"*FILO Term Loan Agent*" means collectively, Ankura Trust Company, LLC, in its capacities as administrative agent and collateral agent under the FILO Term Loan Documents, together with any successor agent thereto and any sub-agent appointed by such administrative agent or collateral agent, including Cantor Fitzgerald Securities in such capacity.

"*FILO Term Loan Agreement*" means the First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of

March 27, 2020), by and among FGI Operating Company, LLC, the other loan parties party thereto from time to time, the FILO Term Loan Agent and the FILO Term Loan Lenders, which has been repaid in full and terminated prior to the filing of this Plan.

"*FILO Term Loan Documents*" means the FILO Term Loan Agreement and all other related documents, guarantees, and agreements, including security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments, or certificates executed in connection with the FILO Term Loan Agreement.

"*FILO Term Loan Lenders*" means those financial institution(s) party from time to time to the FILO Term Loan Agreement as lenders, in their respective capacities as such.

"*FILO Term Loan Secured Creditors*" means, collectively, the FILO Term Loan Lenders and the FILO Term Loan Agent.

"*Final Cash Collateral Order*" means that certain *Final Order Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on August 20, 2020 [Docket No. 410], as amended by that certain *Order Amending Final Order Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on October 8, 2020 [Docket No. 970], as further modified by that certain Letter re: Extension of Cash Collateral Termination Date, dated December 30, 2020, Letter re: Extension of Cash Collateral Termination Date, dated January 8, 2021, Letter re: Extension of Cash Collateral Termination Date, dated January 15, 2021, Letter re: Extension of Cash Collateral Termination Date, dated January 22, 2021, and any further extensions thereto.

"*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or (b) any appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, petitioned, or moved.

"*Franklin Managed Entities*" means, collectively, the separate funds and accounts managed by Franklin Advisers, Inc. that are Exit Term Loan Lenders.

"*Franklin Managed Entities Expenses*" means, collectively, all reasonable and documented fees and expenses of (i) Pillsbury Winthrop Shaw Pittman LLP, as primary counsel to the Franklin Managed Entities, and (ii) Christian & Small LLP, as local counsel to the Franklin Managed Entities.

"*General Administrative Expense*" means any Administrative Expense other than Professional Fees.

"*General Administrative Expense Bar Date*" means the first Business Day that is thirty (30) days after the notice of the Effective Date is filed with the Bankruptcy Court or such other date as may be established by order of the Bankruptcy Court.

"*General Unsecured Claim*" means any Claim against a Debtor that is not an Administrative Expense, Exit Term Loan Claims (other than the Exit Term Loan Deficiency Claims), Huntsville Note Claim, Priority Claim, Intercompany Claim, Other Secured Claim, Tort Convenience Class Claim or Tort Claim. For the avoidance of doubt, General Unsecured Claims shall include (a) Claims for rejection damages pursuant to section 365 of the Bankruptcy Code related to an Executory Contract or Unexpired Lease, (b) Claims arising under or relating to the Excluded Employee Liabilities (except to the extent such Claims are or were earned after the Petition Date or during the 180-day period prior to the Petition Date, Administrative Claims or Priority Claims), (c) Claims arising under or relating to any other Excluded Liability not otherwise classified or provided for under the Plan, and (d) Deficiency Claims, including any Exit Term Loan Deficiency Claims.

"*GL Insurance Assets*" means the general liability insurance policies that provide coverage for any Tort Claims and all Causes of Action, rights, and proceeds in connection therewith.

"*Governmental Unit*" means any "governmental unit," as such term is defined in section 101(27) of the Bankruptcy Code.

"*GUC Oversight Administrator*" means the oversight administrator appointed pursuant to the Creditor Trust Agreement to carry out the oversight duties and responsibilities set forth therein. The initial GUC Oversight Administrator shall be (i) disclosed in the Plan Supplement, (ii) acceptable to the Debtors, the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and the Committee, and (iii) approved by the Bankruptcy Court in connection with confirmation of the Plan.

"*Huntsville Note*" means that certain Company Note in the initial principal amount of $12,500,000 issued by Remington Arms Company, LLC, as assignee of ROC, in favor of the City of Huntsville, Alabama and secured by a mortgage on the Huntsville Property.

"*Huntsville Note Claim*" means all Secured Claims arising under or relating to the Huntsville Note that remain unpaid and outstanding as of the Effective Date.

"*Huntsville Property*" means that certain real property located at 100 Electronics Blvd. SW (a/k/a 1816 Remington Circle SW), Huntsville, Alabama, together with all Fixtures (as defined in the Uniform Commercial Code), Instruments (as defined in the Uniform Commercial Code), Equipment (as defined in the Uniform Commercial Code) and any facilities (including, for the avoidance of doubt, the approximately 843,715 square foot facility (known as the "Old Chrysler Building")) located thereon.

"*Ilion Facility*" means the firearms factory located in Ilion, New York sold to Roundhill pursuant to the Roundhill Asset Purchase Agreement.

"*Impaired*" means, with respect to (a) a Class, Claim, or Interest, that such Class, Claim, or Interest is "impaired" within the meaning of section 1124 of the Bankruptcy Code and (b) the

9

holder of a Claim or Interest, that such Claim or Interest is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Insurance Condition*" means the condition pursuant to which the D&O Insurance and such other insurance as may be reasonably necessary for the ROC Liquidation Estates and the Plan Administrator to perform under the Plan shall be and remain in full force and effect and the premiums therefor shall be paid in full.

"*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

"*Interest*" means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Debtor, including any share of common or preferred stock, membership interest, partnership unit, or other evidence of ownership of, or a similar interest in, a Debtor, and any option, warrant, or right, contractual or otherwise, to purchase, sell, subscribe, or acquire any such equity security or other equity interest in a Debtor, whether or not transferable, issued or unissued, authorized, or outstanding.

"*Interim Cash Collateral Order*" means that certain *Interim Order Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on July 30, 2020 [Docket No. 90].

"*Junior Creditors*" means holders of General Administrative Expense Claims, holders of Priority Tax Claims, holders of Priority Non-Tax Claims, holders of claims for Professional Fees, holders of General Unsecured Claims, and holders of Tort Convenience Class Claims.

"*Lien*" means a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

"*Liquidation*" has the meaning specified in the Introduction hereto.

"*Litigation Assets*" means all Estate Causes of Action, including avoidance actions, other than any Causes of Action (i) against the released parties hereunder or otherwise waived, released or compromised in the Plan or other order of the Bankruptcy Court, (ii) acquired by any buyer as part of the Sales, or (iii) Estate Causes of Action constituting GL Insurance Assets.

"*Maximum GUC Oversight Administrator Expenses*" has the meaning set forth in the definition of Plan Administrator Operating Expenses.

"*Net Cash Proceeds*" means, with respect to the sale of any Collateral securing the Exit Term Loan Claims, the cash sale proceeds of the sale of such Collateral net of (i) any bona fide direct costs incurred in connection with such sale, including any applicable transfer taxes or recording charges payable by the Debtors as a result of any gain recognized in connection with such sale, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any indebtedness that is secured by a Lien on such Collateral solely to the extent that such Lien is senior to the Liens in favor of the Exit Term Loan Secured Creditors, and (iii) any reasonable investment banker or broker fees payable in connection with such sale to the extent previously approved by Final Order of the Bankruptcy Court.

"*Other Secured Claim*" means any Secured Claim other than an Exit Term Loan Secured Claim or a Huntsville Note Claim.

"*Pension Plan*" means Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), whereby the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan) was merged into the Remington Arms Company, LLC Pension and Retirement Plan.

"*Petition Date*" means July 27, 2020.

"*Person*" means any individual, corporation, partnership, association, joint venture, limited liability company, limited liability partnership, estate, trust, unincorporated organization or governmental unit or subdivision thereof or other entity.

"*Plan*" has the meaning specified in the Introduction hereto.

"*Plan Administrator*" means the administrator appointed pursuant to Article V.G. The initial Plan Administrator shall be (i) disclosed in the Plan Supplement, (ii) acceptable to the Debtors, the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and the Committee, and (iii) approved by the Bankruptcy Court in connection with confirmation of the Plan.

"*Plan Administrator Budget*" means the budget for the Plan Administrator Operating Expenses. The initial Plan Administrator Budget shall be approved by the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders in writing in their sole and absolute discretion, otherwise prepared in consultation with the Plan Proponents, and will be included in the Plan Supplement.

"*Plan Administrator Operating Expense Funded Amount*" means an amount to be set forth in the Plan Administrator Budget (or such larger amount that the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders may agree in writing in their sole and absolute discretion) for the sole purpose of funding Plan Administrator Operating Expenses in accordance with the Plan Administrator Budget.

"*Plan Administrator Operating Expenses*" means the overhead and other operational expenses of the Plan Administrator in connection with its administration of the Plan including, but not limited to, (i) reasonable compensation for the Plan Administrator, (ii) reasonable and documented out-of-pocket costs and expenses incurred by the Plan Administrator in administering the Plan, (iii) Statutory Fees incurred after the Effective Date to the Bankruptcy Administrator, (iv) any reasonable and documented out-of-pocket fees and expenses payable to any agents, employees, attorneys, advisors, and other professionals retained by the Plan Administrator, and (v)(a) reasonable compensation for the GUC Oversight Administrator, (b) reasonable and documented out-of-pocket costs and expenses incurred by the GUC Oversight Administrator in administering the Plan, and (c) any reasonable and documented out-of-pocket fees and expenses payable to any agents, employees, attorneys, advisors, and other professionals retained by the GUC Oversight Administrator, all which shall be subject to approval by the Plan Administrator and not under any circumstances exceed $10,000 in the aggregate (subparagraphs (v)(a)–(c) above, collectively, the "Maximum GUC Oversight Administrator Expenses"), *provided*, *however*, that

11

all of the foregoing shall be subject to the Plan Administrator Budget and funded from the proceeds of Plan Assets.

"*Plan Assets*" means all Assets of the Debtors available for distribution under the Plan, including all Assets that were not disposed of pursuant to the Sales, the Collateral Proceeds, the Creditor Trust Assets, and the GL Insurance Assets.

"*Plan Professional Fee Reserve*" means the escrow account to be established by the Debtors on the Effective Date, and administered thereafter by the Plan Administrator, in an amount equal to the aggregate amount of unpaid fees for all Professionals through the Effective Date, as estimated pursuant to Article II.C.2.

"*Plan Proponents*" means the Debtors, the Committee, and the holders of more than a majority in amount of the Exit Term Loan Claims.

"*Plan Supplement*" means the compilation of documents (or forms thereof), schedules, and exhibits hereto to be filed with the Bankruptcy Court and any other documents, agreements, schedules, and exhibits, specified herein, to be filed with the Bankruptcy Court no later than three (3) days prior to the Confirmation Hearing, provided that the Debtors may amend such Plan Supplement at any time prior to the Effective Date, subject to the written approval of the Exit Term Loan Required Lenders, and the Committee. The Plan Supplement shall include (a) the identification of the Plan Administrator; (b) the Plan Administrator Budget; (c) a statement of the Collateral Proceeds available for distribution hereunder; (d) a schedule of unexpired leases and/or executory contracts to be assumed hereunder, if any (including any cure amount with respect to such lease or contract); (f) a description of any additional Estate Causes of Action not otherwise identified herein; (g) the Creditor Trust Agreement; (h) any then-existing Supplemental Insurance Procedures; and (i) the identification of the GUC Oversight Administrator.

"*Prepetition Secured Creditors*" means the Exit Term Loan Secured Creditors, the FILO Term Loan Secured Creditors, and the Priority Term Loan Secured Creditors.

"*Primary Asset Sale Proceeds*" has the meaning specified in the Introduction hereto.

"*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

"*Priority Non-Tax Claim*" means any Claim against any Debtor entitled to priority in payment as specified in sections 507(a)(3), (4), (5), (6), (7) and (9) of the Bankruptcy Code.

"*Priority Tax Claim*" means any Claim of a Governmental Unit against any Debtor entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

"*Priority Term Loan Agent*" means Cantor Fitzgerald Securities, in its capacities as administrative agent and collateral agent under the Priority Term Loan Documents.

"*Priority Term Loan Documents*" means the Priority Term Loan Agreement and all other related documents, guarantees, and agreements, including security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments, or certificates executed in connection with the Priority Term Loan Agreement.

12

"*Priority Term Loan Agreement*" means that certain Loan and Security Agreement, dated as of April 18, 2018 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, that certain Amendment No. 6, dated March 27, 2020, that certain Amendment No. 7, dated June 18, 2020, that certain Amendment No. 8, dated June 26, 2020, and that certain Amendment No. 9 dated July 7, 2020), by and among FGI Operating Company, LLC, the guarantors party thereto, the Priority Term Loan Agent and the Priority Term Loan Lenders, which has been repaid in full and terminated prior to the filing of this Plan.

"*Priority Term Loan Lenders*" means the financial institution(s) party from time to time to the Priority Term Loan Agreement as lenders, in their respective capacities as such.

"*Priority Term Loan Secured Creditors*" means, collectively, the Priority Term Loan Lenders and the Priority Term Loan Agent.

"*Pro Rata*" means, for the holder of an Allowed Claim or Interest in a particular Class, proportional to the ratio of the amount of such Allowed Claim or Interest to the amount of all Allowed Claims or Interests (as applicable) in the same Class.

"*Professional*" means any professional of the Debtors, the Restructuring Committee, or the Committee or such other professional that is, by Final Order of the Bankruptcy Court: (a) employed for legal, financial advisory, accounting, or other professional services during the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code and to be compensated and reimbursed therefor in accordance with sections 327, 328, 329, 330, 331, and/or 1103 of the Bankruptcy Code; (b) whose fees and expenses the Debtors are authorized to pay pursuant to an order entered by the Bankruptcy Court under section 363 of the Bankruptcy Code; or (c) allowed compensation and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code upon a motion on notice; *provided*, *however*, that "Professional" shall not include any professional-service Entity that the Debtors are authorized to employ, compensate, and reimburse in the ordinary course of its businesses.

"*Professional Fees*" means the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement for expenses incurred, by Professionals, that: (a) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Effective Date; (b) have not been denied by the Bankruptcy Court by Final Order; (c) have not been previously paid (regardless of whether a fee application has been filed for any such amount); and (d) remain outstanding after applying any retainer that has been provided to such Professional. To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order of the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

"*Remaining Asset Proceeds*" has the meaning specified in the Introduction hereto.

"*Remaining Assets*" has the meaning specified in the Introduction hereto.

13

"*Retiree Plans*" means each plan, fund or program (through the purchase of insurance or otherwise) maintained or established for the purpose of providing or reimbursement payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death and includes any plan providing "retiree benefits" as defined under Bankruptcy Code Section 1114(a). For the avoidance of doubt, this definition excludes the Pension Plan.

"*Restructuring Committee*" means the committee of independent and disinterested directors of the board of directors of ROC.

"*Retained Litigation*" has the meanings collectively ascribed in the Asset Purchase Agreements.

"*ROC*" has the meaning specified in the Introduction hereto.

"*ROC Liquidation Estates*" means the Debtors after the Effective Date.

"*Roundhill*" means Roundhill Group, LLC.

"*Roundhill Asset Purchase Agreement*" means that certain Amended and Restated Asset Purchase Agreement, dated as of October 7, 2020, by and among the Debtors and Roundhill.

"*Sales*" has the meaning specified in the Introduction hereto.

"*Secured Claim*" means any Claim to the extent and only to the extent that is (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by Final Order of the Bankruptcy Court, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan or Final Order of the Bankruptcy Court as a Secured Claim.

"*Statutory Fees*" has the meaning set forth in Article XII.C.

"*Supplemental Insurance Procedures*" means any supplemental procedures for liquidating the Tort Claims other than the Tort Convenience Class Claims and determining coverage of the GL Insurance Assets thereto, as ordered by the Bankruptcy Court or as agreed in writing among the Debtors or the Plan Administrator and the insurers providing the insurance policies that constitute GL Insurance Assets subject to Bankruptcy Court Approval, which may also be included in the Plan Supplement or a subsequent filing with the Bankruptcy Court.

"*Supplemental Retirement Plan*" means the Remington Supplemental Retirement Plan.

"*Tort Claim*" means all prepetition unsecured non-priority Claims against the Debtors arising as a result of allegedly tortious conduct of the Debtors for personal injury or wrongful death Claims.

14

"*Tort Convenience Class Claim*" means any Tort Claims the holder of which elects on or before the Voting Deadline, subject to the Debtors' discretion with written approval of the Exit Term Loan Required Lenders to allow additional opt-ins after the Voting Deadline, to accept treatment as a Tort Convenience Class Claim; *provided* that holders of Tort Claims arising from a single incident or occurrence must elect jointly to accept treatment as a Tort Convenience Class Claim and are collectively subject to the maximum recovery provided for a Tort Convenience Class Claim.

"*Tort Claim Sub-Trust Interest*" has the meaning set forth in Article III.B.7.c.

"*Tort Claim Sub-Trust*" means that certain trust established pursuant to the terms outlined in Article V.F.

"*TTB*" means the Alcohol and Tobacco Tax Trade Bureau.

"*TTB Claim*" means the Claim held by the TTB for Excise Taxes, which shall be Allowed as a settlement under the Plan for all purposes in the amount of two million dollars ($2,000,000), unless otherwise authorized pursuant to the prior written consent of the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders. The Allowed Amount of the TTB Claim provided as a proposed settlement may not be altered without the written consent the Exit Term Loan Required Lenders.

"*UMWA*" means the International Union, United Mine Workers of America labor union.

"*UMWA Claims*" means any Claim or Claims held by the UMWA in its own capacity or as representative for members of the collective bargaining unit pursuant to the CBA.

"*Unimpaired*" means, with respect to a Class, Claim, Interest, or a holder of a Claim or Interest, that such Class, Claim, Interest, or holder is not Impaired.

"*Unsecured Creditor Recovery Amount*" has the meaning set forth in the definition of Creditor Trust Assets.

"*Voting Deadline*" means February 23, 2021 at 4:00 p.m. (CT).

"*Voting Record Date*" means February 5, 2021.

B.    *Rules of Interpretation*

For purposes of the Plan and unless otherwise specified herein: (i) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (ii) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (iii) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (iv) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (v) all references to articles or Articles are references to the Articles hereof; (vi) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the

Case 20-81688-CRJ11    Doc 1369    Filed 01/25/21    Entered 01/25/21 12:53:40    Desc
Main Document    Page 111 of 180

interpretation of, the Plan; (vii) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (viii) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule or exhibit, as it may thereafter be amended, restated, modified, or supplemented; (ix) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (x) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as specifically provided herein; (xi) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (xii) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (xiii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (xiv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.     *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.     *Governing Law*

Unless federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, and unless specifically stated otherwise, the laws of the State of Alabama, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or entity governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or organization of the relevant Debtor, as applicable.

E.     *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II
## ADMINISTRATIVE EXPENSES AND
## OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.     *General Administrative Expenses*

Except to the extent that a holder of an Allowed General Administrative Expense Claim agrees to different treatment of such General Administrative Expense Claim, the holder of such Allowed General Administrative Expense Claim shall receive Cash in an amount equal to such Allowed General Administrative Expense Claim on (i) the Effective Date or (ii) if such Claim is not an Allowed General Administrative Expense Claim as of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Claim becomes an Allowed General Administrative Expense Claim or as soon thereafter as is reasonably practicable.  To the extent a General Administrative Expense Claim has not been Allowed as of the Effective Date of the Plan, the Plan Administrator shall reserve sufficient amounts from the Plan Assets for the resolution of such Claim.

B.     *General Administrative Expense Bar Date*

Except as provided below for Professionals requesting compensation or reimbursement for Claims for Professional Fees, requests for payment of General Administrative Expenses must be filed no later than thirty (30) days after the notice of the Effective Date is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court. Holders of General Administrative Expenses who are required to file a request for payment of General Administrative Expense and who do not file such request by the General Administrative Expense Bar Date, shall be forever barred from asserting such General Administrative Expense against the Debtors or their respective property, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover such General Administrative Expense.

C.     *Professional Fees*

1.     Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and all other parties that have requested notice in the Chapter 11 Cases by no later than forty-five (45) days after the Effective Date. Objections to Professional Fees must be filed with the Bankruptcy Court and served on the applicable Professional no later than seventy-five (75) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Plan Professional Fee Reserve; *provided, however,* that if the funds in the Plan Professional Fee Reserve are insufficient to pay the full Allowed amounts of

17

the Professional Fees, the Plan Administrator shall promptly pay any remaining Allowed amounts from Cash on hand, including any Collateral Proceeds received on or after the Effective Date.

2.    Plan Professional Fee Reserve

Prior to the Effective Date, the Debtors shall establish a Plan Professional Fee Reserve in an amount equal to all asserted Claims for Professional Fees accrued and unpaid through the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts payable by the Debtors), which may be maintained in an interest-bearing account. The Plan Professional Fee Reserve shall be administered by the Plan Administrator in accordance with the Creditor Trust Agreement; *provided, however*, amounts held in the Plan Professional Fee Reserve shall not constitute property of the Creditor Trust. In the event there is a remaining balance in the Plan Professional Fee Reserve following payment to all holders of Allowed Claims for Professional Fees under the Plan, any such amounts shall be distributed pro rata to holders of Allowed Exit Term Loan Claims. Nothing herein constitutes a waiver of any priority or other right accorded to Professional Fee Claims provided in the Final Cash Collateral Order.

Professionals shall estimate their unpaid Claims for Professional Fees incurred through the projected Effective Date and shall deliver such estimate to counsel for the Debtors no later than forty-eight (48) hours before the projected Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of any Professional's final request for payment of filed Professional Fee Claims. To the extent that Allowed Professional Fee Claims exceed the amount of any estimate, the Plan Professional Fee Reserve shall be supplemented to account for such amount, with such supplemental funds being taken from Collateral Proceeds. If a Professional does not provide an estimate, the Debtors, in consultation with the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and Committee, shall estimate the unpaid and unbilled fees and expenses of such Professional for the purpose of funding the Plan Professional Fee Reserve on the Effective Date.

D.    *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, as determined by the Debtors with the consent of the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders in their sole and absolute discretion, either (a) on, or as soon thereafter as is reasonably practicable, the Effective Date or, if such Allowed Priority Tax Claim is not allowed as of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Effective Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim <u>plus</u> interest at a rate determined in accordance with section 511 of the Bankruptcy Code.

Where the Allowed Amount of a Priority Tax Claim is provided for under the Plan as part of a negotiated or proposed settlement (including the TTB Claim), that amount shall be paid in Cash under option (a) above, in full and final satisfaction of such Priority Tax Claim, and the Debtors will not elect to make deferred cash payments under option (b) above. The Debtors and

18

the Plan Administrator, subject to the written consent of the Exit Term Loan Required Lenders, are authorized to enter such further agreements and documentation with the TTB as may be necessary or appropriate to further the settlement and resolution of the TTB Claim on the terms provided in the Plan.

To the extent not previously set, the Confirmation Order shall establish a deadline for filing proofs of claim or requests for payment of Priority Tax Claims. To the extent a Priority Tax Claim has not been Allowed as of the Effective Date of the Plan, the Plan Administrator shall reserve from the Plan Assets sufficient amounts for the resolution of such Claim. In the event there is a remaining balance in such reserve following payment in full of all Allowed Priority Tax Claims under the Plan, any such amounts shall be distributed pro rata to the holders of Allowed Exit Term Loan Claims.

E.   *Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses*

Any outstanding and unpaid Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date without the requirement to file a fee application with the Bankruptcy Court or comply with any guidelines of the Bankruptcy Administrator, and without any requirement for review or approval by the Bankruptcy Court or any other party. All Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses to be paid on the Effective Date shall be estimated, as necessary, prior to and as of the Effective Date and such estimate shall be delivered to the Debtors; *provided* that such estimate shall not be considered an admission or limitation with respect to such Franklin Managed Entities Expenses or the Exit Term Loan Agent. In addition, the Debtors or the Plan Administrator shall continue to pay the Franklin Managed Entities Expenses and the Exit Term Loan Agent Expenses, as necessary, after the Effective Date promptly within six (6) Business Days of receipt by the Plan Administrator of a summary invoice from the respective professional, which invoice shall contain the aggregate number of hours billed and a summary description of such professional's services and expenses in the ordinary course solely to the extent related to implementation, consummation, and defense of the Plan, whether incurred before, on or after the Effective Date, without any requirement for review or approval by the Bankruptcy Court or any other party other than the Plan Administrator; *provided*, *however*, that any Franklin Managed Entities Expenses incurred after the Effective Date shall not exceed $50,000 in the aggregate. Any objections raised by the Plan Administrator with respect to such invoices shall be (a) transmitted via email to the respective professional within five (5) Business Days of the receipt of the applicable invoice, (b) limited solely to the reasonableness of the disputed fees, and (c) absent a consensual resolution or other agreement between the Plan Administrator and respective professional, submitted to the Bankruptcy Court for resolution (a "Post-Effective Date Fee Objection"). In the event that a Post-Effective Date Fee Objection is timely and properly transmitted in accordance herewith, then the Debtors or the Plan Administrator shall promptly pay any undisputed portion of the applicable professional's outstanding fees and expenses within five (5) Business Days of the receipt of the Post-Effective Date Fee Objection.

19

# ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.     *Classification of Claims and Interests*

Claims and Interests, except for Administrative Expenses and Priority Tax Claims are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class.  To the extent a specified Class ultimately does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.  To the extent that a particular Claim does not qualify within the description of any Class and the Plan otherwise fails to classify such Claim or specify its treatment, then such Claim shall be deemed to be part of Class 5; *provided*, *however*, that all rights of the holder(s) of such Claim(s), including the right to object to such classification, and the Debtors' rights and defenses thereto, are reserved.

The Plan is premised upon the procedural consolidation of the Debtors for Plan purposes only.  Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3 | Exit Term Loan Claims | Impaired | Entitled to vote |
| 4 | Huntsville Note Claim | Unimpaired | Deemed to accept |
| 5 | General Unsecured Claims | Impaired | Entitled to vote |
| 6 | Tort Convenience Class Claims | Impaired | Entitled to vote |
| 7 | Tort Claims | Impaired | Entitled to vote |
| 8 | Intercompany Claims | Impaired | Deemed to reject |
| 9 | Interests in the Debtors | Impaired | Deemed to reject |

20

B.   *Treatment of Claims and Interests*

1.   Class 1 – Priority Non-Tax Claims

a.   *Classification*: Class 1 consists of all Allowed Priority Non-Tax Claims.

b.   *Treatment*:  Except to the extent previously satisfied during the Chapter 11 Cases or that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim, each such holder, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Non-Tax Claim, shall receive Cash in the amount equal to 100% of the Allowed amount of such Priority Non-Tax Claim, on or as soon as reasonably practicable after the latest of (x) the Effective Date, (y) the date such Claim becomes Allowed and (z) the date such Claim becomes due and payable in the ordinary course of business.  To the extent a Priority Non-Tax Claim has not been Allowed as of the Effective Date of the Plan, the Plan Administrator shall reserve sufficient amounts from the Plan Assets for the resolution of such Claim.  In the event there is a remaining balance in such reserve following payment in full of all Allowed Priority Non-Tax Claims under the Plan, any such amounts shall be distributed pro rata to the holders of Allowed Exit Term Loan Claims.

c.   *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Secured Claims

a.   *Classification*: Class 2 consists of all Allowed Other Secured Claims.

b.   *Treatment*:  Except to the extent previously satisfied during the Chapter 11 Cases (including through assumption or payment of such Other Secured Claim in connection with the consummation of the Asset Purchase Agreements) or such holder agrees to less favorable treatment on account of such Other Secured Claim, each holder of an Allowed Other Secured Claim shall (i) receive, in full and final satisfaction, settlement, and release of, and in exchange for, its Other Secured Claim, Cash payment equal to the Allowed amount of such Other Secured Claim on the later of the Effective Date, the date such Other Secured Claim becomes an Allowed Other Secured Claim or as soon as practicable thereafter, unless otherwise agreed by the holder of such Other Secured Claim and the applicable Debtor or the Plan Administrator, as applicable, (ii) be satisfied by the surrender of the Collateral securing such Secured Claim, or (iii) be otherwise rendered Unimpaired.

c.   *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to

21

section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.     Class 3 – Exit Term Loan Claims

a.     *Classification*: Class 3 consists of all Allowed Claims arising under the Exit Term Loan Documents that remain unpaid and outstanding as of the Effective Date.[3]

b.     *Allowance*: Except to the extent previously satisfied during the Chapter 11 Cases, Exit Term Loan Claims shall be Allowed in the aggregate principal amount of $110,710,000, plus any prepetition interest, fees, costs, expenses, and other amounts accrued prior to the Petition Date pursuant to or secured by the terms of the Exit Term Loan Documents, plus any Exit Term Loan Adequate Protection Payments (as defined in the Final Cash Collateral Order), in each case, due and owing as of the Effective Date. Neither the Exit Term Loan Agent nor the Exit Term Loan Lenders shall be required to file proofs of Claim on account of any Exit Term Loan Claims.

c.     *Deficiency Claim:* Each holder of an Allowed Exit Term Loan Claim shall also hold its respective pro rata share of the Exit Term Loan Deficiency Claims to the extent that the Exit Term Loan Claim of such holder is not paid in full under the Plan from the Collateral Proceeds. The Exit Term Loan Deficiency Claims shall not be waived, but instead shall constitute Allowed General Unsecured Claims.

d.     *Treatment*: Each holder of an Allowed Exit Term Loan Secured Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, its Exit Term Loan Secured Claim, Cash from the Collateral Proceeds in the amount equal to its pro rata share of the Collateral Proceeds remaining after the funding of the distributions and/or reserves set forth under the Plan, including Allowed General Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, the Plan Professional Fee Reserve, the Plan Administrator Operating Expense Funded Amount, the Unsecured Creditor Recovery Amount and the distributions to the Tort Convenience Class Claims. For the avoidance of doubt, the Collateral Proceeds shall include (i) the Net Cash Proceeds of the Collateral securing the Exit Term Loan Claims (including, among other Collateral, the Huntsville Property) whether received before or after the Effective Date, which, except as provided in the immediately preceding sentence, shall be distributed by the Plan Administrator to the holders of Allowed Exit Term Loan Claims on a pro rata basis on the later of the Effective Date and the closing date of the sale or other disposition of such

---

[3] The Debtors reserve the right to treat the Exit Term Loan Claims as a single claim for purposes of numerosity and/or treat the funds and accounts that share a common manager as holding a single claim for purposes of numerosity.

22

Collateral, and (ii) the excess amount of any reserves established under the Plan remaining after the satisfaction in full of the Allowed Claims for which such reserve is established, which excess shall promptly, upon such satisfaction in full, be distributed by the Plan Administrator to the holders of Allowed Exit Term Loan Claims on a pro rata basis. Any Adequate Protection Superpriority Claim shall be deemed waived as of the occurrence of the Effective Date. Further, except as otherwise provided under the Plan, all distributions to the Exit Term Loan Lenders shall be made through the Exit Term Loan Agent as contemplated under the Exit Term Loan Agreement; and all other rights of the Exit Term Loan Agent with respect to the Exit Term Loan Lenders are expressly preserved.

e.   *Voting*: Class 3 is Impaired under the Plan. Therefore, holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan. For voting purposes only, the aggregate amount of the Exit Term Loan Secured Claims shall be estimated at $40,000,000 and the aggregate amount of the Exit Term Loan Deficiency Claims shall be estimated at $70,710,000.

f.   *Confirmation of Aggregate Gift to Junior Creditors*: Holders of Allowed Exit Term Loan Claims have agreed to forgo receipt of, fund, and/or gift to Junior Creditors amounts consisting of (1) Cash from the Primary Asset Sale Proceeds utilized pursuant to the Plan for (a) satisfaction of (i) Allowed General Administrative Expenses, (ii) Allowed Priority Tax Claims, and (iii) Allowed Priority Non-Tax Claims, (b) funding of (i) the Plan Professional Fee Reserve, (ii) the Plan Administrator Operating Expense Funded Amount, and (iii) any other reserves established under the Plan, (2) the Unsecured Creditor Recovery Amount and the payments to the Tort Convenience Class Claims, and (3) the amount of the Adequate Protection Superpriority Claim, which shall be waived as of the occurrence of the Effective Date (collectively, the "Aggregate Gift to Junior Creditors").

4.   Class 4 – Huntsville Note Claim

a.   *Classification*: Class 4 consists of the Allowed Huntsville Note Claim.

b.   *Treatment*: Except to the extent previously satisfied during the Chapter 11 Cases (including through assumption or payment of such Claim in connection with the sale of the Huntsville Property) or such holder agrees to less favorable treatment on account of such Claim, the holder of an Allowed Huntsville Note Claim shall (i) receive, in full and final satisfaction, settlement, and release of, and in exchange for, the Huntsville Note Claim, payment equal to the Allowed amount of such Secured Claim, together with post-Effective Date interest to the extent required to render such Secured Claim unimpaired, in Cash, on the latest of the Effective Date, the date such Claim becomes an Allowed Claim or as soon as practicable after the sale of the Huntsville Property, unless otherwise agreed by such holder and the Plan Administrator with the consent of the Exit Term Loan

23

Agent at the direction of the Exit Term Loan Required Lenders, (ii) be satisfied by the surrender of the Collateral securing the Allowed Huntsville Note Claim, (iii) be satisfied by the assumption and assignment of the Huntsville Note by any buyer of the Huntsville Property, including the retention of the holder's Liens on the Collateral securing the Allowed Huntsville Note Claim, or (iv) be otherwise rendered Unimpaired.

    c.    *Voting*: Class 4 is Unimpaired under the Plan. Therefore, holders of Allowed Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

5.    Class 5 – General Unsecured Claims

    a.    *Classification*: Class 5 consists of all General Unsecured Claims.

    b.    *Treatment*: Except to the extent previously satisfied during the Chapter 11 Cases (including through the assumption and/or payment of such Claim in accordance with their respective terms in connection with the consummation of the Sales or a subsequent sale transaction), each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, its pro rata share of the Creditor Trust Interests; *provided, however*, that the first $894,451.00 of the Unsecured Claims Distribution in respect of the Creditor Trust Interests shall be distributed pro rata to holders of Allowed General Unsecured Claims other than holders of the Exit Term Loan Deficiency Claims.

    c.    *Voting*: Class 5 is Impaired under the Plan. Therefore, holders of Claims in Class 5 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan. For voting purposes only, each unliquidated General Unsecured Claims shall be deemed to hold a General Unsecured Claim equal to $1.

6.    Class 6 – Tort Convenience Class Claims

    a.    *Classification*: Class 6 consists of all Tort Claims where all of the holder(s) of such Claims arising from a single incident or occurrence have collectively elected to be treated as a Tort Convenience Class Claim.

    b.    *Treatment*: Each holder of an Allowed Tort Convenience Class Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Tort Convenience Class Claim, Cash equal to two percent (2%) of the Allowed Amount of such Claim not to collectively exceed twenty thousand dollars ($20,000) per incident or occurrence. Holders of Tort Convenience Class Claims arising from a single incident or occurrence must collectively elect to participate in the

24

Class.  The total Cash payments to all Allowed Tort Convenience Class Claims are collectively subject to a $250,000 aggregate maximum recovery.

    c.    *Voting*:  Class 6 is Impaired under the Plan.  Therefore, holders of Claims in Class 6 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan. For voting purposes only, each holder of an unliquidated Tort Convenience Class Claim shall be deemed to hold a Claim equal to $1.

7.    Class 7 – Tort Claims

    a.    *Classification*: Class 7 consists of all Tort Claims; *provided, however*, that holders of Tort Claims that elect to be treated as Tort Convenience Class Claims shall not be included within Class 7.

    b.    *Treatment*:  Except to the extent previously satisfied during the Chapter 11 Cases, each holder of an Allowed Tort Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Tort Claim, a beneficial interest in the Tort Claim Sub-Trust (collectively, the "Tort Claim Sub-Trust Interests") reflecting a right to receive such holder's respective share of the proceeds of the GL Insurance Assets providing coverage applicable to such Tort Claim as may be determined pursuant to the terms and conditions of the Plan.

    c.    *Voting*:  Class 7 is Impaired under the Plan.  Therefore, holders of Claims in Class 7 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan. For voting purposes only, each holder of an unliquidated Tort Claim shall be deemed to hold a Claim equal to $1.

8.    Class 8 – Intercompany Claims

    a.    *Classification*: Class 8 consists of all Intercompany Claims.

    b.    *Treatment*: On the Effective Date, the Intercompany Claims will be cancelled without any conversion thereof or distribution with respect thereto.

    c.    *Voting*:  Class 8 is Impaired under the Plan. Each holder of a Claim in Class 8 shall be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote

9.    Class 9 – Interests in the Debtors

    a.    *Classification*: Class 9 consists of all Interests in the Debtors.

    b.    *Treatment*:  Each holder of an Interest in a Debtor shall not receive anything on account of such Interest.

c. *Voting*: Class 9 is Impaired under the Plan. Each holder of an Interest in Class 9 shall be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote.

C. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect (i) the Debtors' or the Plan Administrator's rights and defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims or (ii) the rights and defenses of any holder of Unimpaired Claims in respect of its Unimpaired Claims. Without limiting the generality of the foregoing, the Debtors reserve the right to cure any past default or any failure to satisfy any condition that resulted in the material modification of their liabilities related to such Unimpaired Obligation, whether occurring prior to or after the Petition Date and to reinstate the obligations related to any Unimpaired Claim as they existed prior to default, acceleration or the occurrence of, or failure to satisfy, any condition that resulted in the material modification of their liabilities related to such Unimpaired Obligation.

# ARTICLE IV
# ACCEPTANCE OR REJECTION OF THE PLAN

A. *Voting Classes*

Classes 3, 5, 6, and 7 are Impaired under the Plan and, therefore, holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Claims that are Allowed or temporarily Allowed for voting purposes held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Claims that are Allowed or temporarily Allowed for voting purposes held by holders who actually voted in such Class have voted to accept the Plan.

B. *Presumed Acceptance of the Plan*

Classes 1, 2, and 4 are Unimpaired under the Plan. Holders of Claims in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C. *Non-Consensual Confirmation*

Classes 8 and 9 are Impaired and will not receive a distribution under the Plan. Accordingly, Classes 8 and 9 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Because Classes 8 and 9 are deemed to reject the Plan, the Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Classes and any other class that is entitled to vote and rejects the Plan. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

26

D.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

**ARTICLE V**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *General Settlement of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims in any Class in accordance with the Plan are intended to be, and shall be, final.

Upon the occurrence of the Effective Date, each Debtor and its successors and assigns hereby waive and release each other and all of their respective successors from any and all Intercompany Claims and Causes of Action among and between any or all of the Debtors, which waiver and release shall be effective as a bar to all actions, Causes of Actions, suits, Claims, Liens, or demands of any kind with respect to any Intercompany Claim or Causes of Action among or between any or all of the Debtors.

B.    *Procedural Consolidation of Debtors for Plan Purposes Only*

The Plan provides for the procedural consolidation of the Debtors for Plan purposes only and shall serve as a motion by the Debtors for entry of an order of the Bankruptcy Court granting such relief. The Debtors propose procedural consolidation to avoid the inefficiency of proposing, voting on, and making distributions in respect of entity-specific claims. Accordingly, except with respect to the Huntsville Note Claim and Other Secured Claims, on the Effective Date, all of the Debtors and their estates shall, for purposes of the Plan only, be treated as though they were merged and (a) all Assets and liabilities of the Debtors shall, for purposes of the Plan only, be treated as though they were merged, (b) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtor shall be eliminated and canceled, (c) all joint or duplicate

27

obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint or duplicate obligations, shall be considered a single claim against the Debtors (including for purposes of distributions and reserves) without the need for further action by the Debtors or the Plan Administrator, and (d) any Claim filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Unless otherwise set forth herein, such consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors or (ii) the substantive rights of any creditor. If any party in interest challenges the proposed procedural consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by-entity basis.

Without limiting the generality of the foregoing, if and to the extent that the Bankruptcy Court so orders after notice and a hearing, holders of Claims owed by multiple Debtors (other than those who voluntarily elect to participate in the Tort Convenience Class) may receive a supplemental Claim under the Plan to compensate them for the value of any additional recovery that would have otherwise been made to them if they had maintained their additional separate Claims against the Debtors, excluding any benefit related to the Aggregate Gift to Junior Creditors set forth in Article III.B.3.f.

C.    *Sources of Cash for Plan Distributions*

The Debtors shall fund distributions under the Plan with: (a) Cash on hand (which, for the avoidance of doubt, shall be Cash on hand, if any, that is available after the consummation of the Sales); (b) the Primary Asset Proceeds and the Remaining Asset Proceeds; and (c) all other proceeds, if any, generated from the liquidation of the Plan Assets. Notwithstanding anything herein to the contrary, the Plan Administrator shall fully fund (i) the Professional Fees Reserve and any reserve for Plan Administrator Operating Expenses, subject to the Plan Administrator Budget and (ii) any other reserves contemplated by the Plan, the Plan Administrator Budget, or the Creditor Trust Agreement prior to making any distributions of Plan Assets under the terms of the Plan.

D.    *Continued Corporate Existence; Vesting of Assets*

On and after the Effective Date, subject to the requirements of the Plan, the ROC Liquidation Estates will continue to exist as separate companies and shall retain all of their powers under applicable non-bankruptcy law, and without prejudice to any right to amend their respective constituent documents, dissolve, merge, or convert into another form of business entity, or to alter or terminate their existence. The Interests of the Debtors shall be deemed to be held through the Plan Administrator under applicable non-bankruptcy law and the Plan Administrator shall be authorized to exercise all of the rights and powers of a sole member as provided by the Plan.

Except as otherwise provided in the Plan, on and after the Effective Date, all Plan Assets and property of the Debtors and their Estates, including any interests in subsidiaries and affiliates, but excluding assets to be vested in the Creditor Trust or the Tort Claim Sub-Trust, will vest in the ROC Liquidation Estates free and clear of all Claims, Liens, charges, other encumbrances and interest; *provided*, *however*, that the Plan Administrator may abandon or otherwise not accept any Plan Assets that the Plan Administrator believes, in good faith, to have no value to, or will be

28

unduly burdensome to, the ROC Liquidation Estates. Any Plan Assets that the Plan Administrator so abandons or otherwise does not accept shall not be property of the ROC Liquidation Estates. Neither the occurrence of the Effective Date, nor the effectiveness of this Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of any of the Debtors that are limited liability companies, which shall be continued as limited liability companies following the Effective Date subject to the terms of the Plan.

E.  *Establishment of Creditor Trust*

On the Effective Date, the Debtors shall establish a Creditor Trust, which shall, among other things and as more fully set forth in the Creditor Trust Agreement: (i) administer the resolution, asset administration, and distribution process for Allowed Claims, (ii) prosecute the Litigation Assets, and (iii) liquidate any assets transferred to the Creditor Trust.

Under section 1141(b) of the Bankruptcy Code, the Creditor Trust Assets shall be assigned, transferred, and vest in the Creditor Trust upon the occurrence of the Effective Date free and clear of all Claims, Liens and interests; *provided*, *however*, that the Plan Administrator may abandon or otherwise not accept any assets that the Plan Administrator believes, in good faith, to have no value to, or will be unduly burdensome to, the Creditor Trust in accordance with the terms of the Creditor Trust Agreement. Any assets that the Plan Administrator so abandons (whether before or after the Effective Date) or otherwise does not accept shall not be property of the Creditor Trust. The Creditor Trust shall qualify as a liquidating trust as described in Treasury Regulation section 301.7701 – 4(d) and shall be treated as a grantor trust for United States federal income tax purposes.

The Creditor Trust Agreement shall be in form and substance satisfactory to the Debtors, the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and the Committee. The operations of the Creditor Trust shall be supervised by the Plan Administrator in consultation with the GUC Oversight Administrator. The Plan Administrator alone shall have the authority to manage the day-to-day operations of the Creditor Trust, including, without limitation, by disposing of the assets of the Creditor Trust, appearing as a party in interest, prosecuting the Litigation Assets, prosecuting objections to, settling or otherwise resolving General Unsecured Claims and other Claims, calculating distributions, paying taxes and such other matters as more particularly described in the Creditor Trust Agreement. Notwithstanding anything herein to the contrary, the Plan Administrator shall be responsible for making distributions from the Creditor Trust to Holders of Allowed General Unsecured Claims in satisfaction of Creditor Trust Interests. Expenses and fees of the Creditor Trust, including the expenses of the Plan Administrator and its representatives and professionals, will constitute Plan Administrator Operating Expenses payable from Plan Assets in accordance with the Plan Administrator Budget as further set forth in the Creditor Trust Agreement. The Plan Administrator shall consult in good faith with the GUC Oversight Administrator on those specific matters, if any, where the interests of holders of Allowed General Unsecured Claims and holders of Allowed Claims other than Allowed General Unsecured Claims diverge, all in accordance with the terms and conditions of the Creditor Trust Agreement.

The Bankruptcy Court and the District Court shall retain jurisdiction to administer the Creditor Trust Assets.

F.      *Tort Claims and the Establishment of the Tort Claim Sub-Trust*

On the Effective Date, the Debtors shall establish a Tort Claim Sub-Trust, which shall administer the resolution, asset administration, and distribution process for Tort Claims (other than Tort Convenience Class Claims).  The resolution of the Tort Claims and the administration of the Tort Claim Sub-Trust shall be subject to the terms of the Plan. The Plan Administrator is authorized to obtain agreement of the primary insurer under the GL Insurance Assets (or to the extent the primary layer is exhausted, the secondary layer or layers) to pay for the Estate's defense concerning the Tort Claims (other than Tort Convenience Class Claims) covered thereby pursuant to any Supplemental Insurance Procedures.  Notwithstanding anything to the contrary herein, unless the Debtors or Plan Administrator expressly waives or agrees to forebear from exercising any rights or powers concerning the resolution of Tort Claims (other than Tort Convenience Class Claims) in the Supplemental Insurance Procedures, the Debtors and Plan Administrator retain all such rights and powers, including without limitation, the power to (i) stipulate that the holder of such Tort Claim (other than Tort Convenience Class Claims) be granted relief by the Bankruptcy Court from any stay or injunction (including those provided or preserved in the Plan) to pursue and recover on account of its Tort Claims (other than Tort Convenience Class Claims) (other than Tort Convenience Class Claims) solely against and from the GL Insurance Assets or (ii) otherwise object to, oppose, resolve or settle the applicable Tort Claim.  For the avoidance of doubt, nothing herein or otherwise shall obligate the Debtors or the Plan Administrator to (i) object to any Claim or (ii) defend against any Claim to the extent that relief from Plan stays and injunctions is granted by the Bankruptcy Court to pursue recovery under the GL Insurance Assets. Nothing herein shall require the Debtors or the Plan Administrator to propose or accept any Supplemental Insurance Procedures.

Any payment from the GL Insurance Assets to any holder of a Tort Claim (other than Tort Convenience Class Claims) in excess of two million dollars ($2,000,000) remains subject to notice and a hearing in the Bankruptcy Court to allow the Court to consider the impact of the payment on the Debtors' remaining GL Insurance Assets and other Tort Claims (other than Tort Convenience Class Claims) covered by the same policies.

Under section 1141(b) of the Bankruptcy Code, all GL Insurance Assets and rights and defenses thereunder with respect to the Tort Claims shall be assigned, transferred, and vest in the Tort Claim Sub-Trust upon the occurrence of the Effective Date free and clear of all Claims, Liens and interests. The Tort Claim Sub-Trust shall qualify as a liquidating trust as described in Treasury Regulation section 301.7701 – 4(d) and shall be treated as a grantor trust for United States federal income tax purposes.  Absent further order of the Bankruptcy Court, the Plan Administrator shall not sell or otherwise transfer or cancel the GL Insurance Assets, which are held in the Tort Claim Sub-Trust.

The Document Preservation Order shall remain in effect subject to further order of the Bankruptcy Court modifying or terminating such order, which the Plan Administrator shall have authority to seek.

The terms of the Tort Claim Sub-Trust shall be included in the Creditor Trust Agreement. The operations of the Tort Claim Sub-Trust shall be supervised by the Plan Administrator, who shall have the authority to manage the day-to-day operations of the Tort Claim Sub-Trust including

30

appearing as a party in interest, reviewing issues related to distributions made from the GL Insurance Assets and such other matters as more particularly described in the Creditor Trust Agreement. Expenses and fees of the Tort Claim Sub-Trust, including the expenses of the Plan Administrator and its representatives and professionals, will constitute Plan Administrator Operating Expenses payable from Plan Assets in accordance with the Plan Administrator Budget.

The Bankruptcy Court and the District Court shall retain jurisdiction to administer the GL Insurance Assets and to approve and enforce any Supplemental Insurance Procedures. Without limiting the generality of the foregoing, all parties (including the insurers under the GL Insurance Assets, the Debtors, the Plan Administrator and the holders of Tort Claims (other than Tort Convenience Class Claims)) retain any rights they may have to (i) initiate litigation in the Bankruptcy Court concerning the self-insured retention provisions and other provisions of the GL Insurance Assets; (ii) seek leave of the Bankruptcy Court to pursue such litigation in another forum; and (iii) oppose any of the foregoing relief. The Bankruptcy Court retains the power to authorize third parties (including the holders of Tort Claims (other than Tort Convenience Class Claims)) to derivatively assert the rights of the Debtors and their estates concerning the GL Insurance Assets in the foregoing proceedings and otherwise to grant relief from the stay and injunctions hereunder to do so. However, no party, including the Plan Administrator, is required to initiate any such litigation.

For the avoidance of doubt, the interests of the beneficiaries in the Creditor Trust and the Tort Claim Sub-Trust shall be uncertificated and shall be nontransferable except upon death of the interest holder or by operation of law.

G.    *Powers and Duties of the Plan Administrator*

On the Effective Date, the Plan Administrator shall begin acting for the ROC Liquidation Estates in a fiduciary capacity implementing such liquidation and wind-down as contemplated under this Plan, subject to the provisions hereof. The Plan Administrator shall serve in such capacity through the earlier of the date the Debtors are dissolved in accordance with this Plan and the date such Plan Administrator resigns, is terminated, or otherwise unable to serve; *provided*, *however*, that any successor Plan Administrator appointed pursuant to the Plan shall serve in such capacity after the effective date of such person's appointment as Plan Administrator.

The qualifications and proposed compensation of and other disclosures regarding the Plan Administrator, including the Plan Administrator Budget, shall be set forth as part of the Plan Supplement; such compensation may be paid from the Plan Assets on hand, subject to the Plan Administrator Budget, without further notice or order of the Bankruptcy Court. The Plan Administrator shall deposit and hold all Plan Assets in trust for the benefit of holders of Allowed Claims (including Professionals) receiving distributions under, and in accordance with the terms of, the Plan.

The powers, rights, and responsibilities of the Plan Administrator, all of which shall arise upon the occurrence of the Effective Date, shall include, but not be limited to:

(i) collecting and liquidating the Plan Assets under the jurisdiction of the Bankruptcy Court;

31

(ii) asserting, prosecuting, objecting to, pursuing, compromising and settling in accordance with the Plan Administrator's reasonable business judgment, all matters affecting the Estates, including Disputed Claims, and/or other Litigation Assets related thereto, without further order of the Bankruptcy Court;

(iii) asserting and enforcing all legal or equitable remedies and defenses belonging to the Debtors or their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code;

(iv) acting on behalf of the Debtors in all adversary proceedings and contested matters then pending or that can be commenced in the Bankruptcy Court and in all actions and proceedings pending or commenced elsewhere, and to settle, retain, enforce, dispute, or adjust any Claim and otherwise pursue actions involving Assets of the Debtors that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise, waived, relinquished or transferred in the Plan;

(v) taking such actions the Plan Administrator deems appropriate in its reasonable business judgment against any Person with respect to a Claim or Estate Cause of Action and commencing any process or proceeding in the Bankruptcy Court or in any court of competent jurisdiction in accordance with applicable laws;

(vi) making Distributions to holders of all Allowed Claims, including Allowed Claims for Professional Fees, in accordance with the Plan;

(vii) proceeding with and employing all discovery devices permitted under applicable law, including Rule 2004 of the Bankruptcy Rules, in order to investigate any Claims, Litigation Assets, or GL Insurance Assets;

(viii) employing, without further order of the Bankruptcy Court, professionals or other Persons to assist it in carrying out its duties hereunder and compensating and reimbursing the expenses of those professionals and other Persons, on the terms to be agreed to by the Plan Administrator and such professionals and other Persons, without further order of the Bankruptcy Court;

(ix) investing Cash in accordance with section 345 of the Bankruptcy Code, withdrawing and making Distributions of Cash to holders of Allowed Claims and paying taxes and other obligations owed by the Debtors or incurred by the Plan Administrator in accordance with the Plan;

(x) coordinating the turnover of property, if any, subject to rejected Executory Contracts or abandonment or liquidation of any Assets and disposing of, and delivering title to others of, or otherwise realizing value of, all the Assets;

(xi) deducting, reserving and/or paying from the proceeds of the Sales or any other asset sale any related fees, costs and taxes (including transfer or income taxes) in connection with such sale;

32

(xii) overseeing compliance with the Debtors' accounting, finance, and reporting obligations and the filing of final tax returns, refund requests, audits, and other corporate dissolution documents, if required;

(xiii) preparing financial statements and post-confirmation quarterly reports, until such time such time as the Bankruptcy Court enters an order (a) dismissing the Chapter 11 Cases, (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (c) approving a final decree closing the Chapter 11 Cases;

(xiv) paying all other expenses for winding down the affairs of the Debtors, and in the event of a dispute that cannot be resolved, resolving such dispute in the Bankruptcy Court, subject to the terms of the Plan;

(xv) executing and delivering all documents, and taking all actions, necessary to consummate the Plan and wind down the Debtors' businesses, including termination of the Pension Plan;

(xvi) establishing and managing reserves for the payment of any Claims or Administrative Expenses Allowed after the Effective Date or the Plan Administrator Operating Expenses, subject to the Plan Administrator Budget;

(xvii) implementing and/or enforcing all provisions of the Plan;

(xviii) performing all other duties required by the Bankruptcy Code, including those related to the Pension Plan;

(xix) entering and complying with any Supplemental Insurance Procedures; and

(xx) such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan, other Bankruptcy Court order, or as may be needed or appropriate to carry out the provisions of the Plan.

The Plan Administrator and the GUC Oversight Administrator may be removed by the Bankruptcy Court upon application for good cause shown. In the event of the resignation, removal, death, or incapacity of the Plan Administrator or the GUC Oversight Administrator, the Bankruptcy Court shall, upon motion or *sua sponte*, appoint another Person to become Plan Administrator or the GUC Oversight Administrator, as the case may be. Any successor Plan Administrator or the GUC Oversight Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor.

No recourse will ever be had, directly or indirectly, against the Plan Administrator, the GUC Oversight Administrator, their members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Creditor Trust under this Plan or by reason of the creation of any indebtedness by the Creditor Trust, the Plan Administrator, or the GUC Oversight Administrator, under this Plan. All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the Creditor

33

Trust Assets. The Plan Administrator, the GUC Oversight Administrator, and their respective agents shall not be deemed to be the agents for any holder of a Claim in connection with Distributions made under this Plan. The Creditor Trust, the Plan Administrator, the GUC Oversight Administrator, and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do, hereunder in good faith and in the exercise of their sound judgment; *provided, however,* that this section will not apply to any gross negligence or willful misconduct by the Creditor Trust, the Plan Administrator, the GUC Oversight Administrator, or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns. Furthermore, the releases set forth above do not release any Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

H.      *Corporate Action*

On the Effective Date, all matters under the Plan involving or requiring action of the directors, members, managers, or officers of the Debtors, including, but not limited to, actions requiring a vote or other approval of the board of directors or any of the members or officers of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date, without any further action by the Bankruptcy Court or the directors, members, managers, or officers of the Debtors.

Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, (i) any existing director, manager, or officer of the Debtors will be deemed to have resigned on the Effective Date without any further corporate action, (ii) the Plan Administrator shall be deemed the sole manager, officer, and representative of the ROC Liquidation Estates to exercise the rights, power, and authority of the ROC Liquidation Estates under applicable provisions of this Plan and bankruptcy and non-bankruptcy law, and (iii) all matters provided under this Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order shall modify the Debtors' constituent documents such that the provisions of this Plan can be effectuated. The Plan shall be administered by the Plan Administrator, and all actions taken thereunder in the name of the ROC Liquidation Estates shall be taken through the Plan Administrator. All corporate governance activities of the ROC Liquidation Estates shall be exercised by the Plan Administrator in its, its discretion, subject to the terms of this Plan.

I.      *Winding Down of Affairs*

On and after the Effective Date, subject to the requirements of the Plan, the ROC Liquidation Estates shall be permitted to conduct their business (to the extent permitted by the Plan), reconcile Claims, use and dispose of assets, prosecute litigation, make required tax filings, and otherwise take any and all actions as may be appropriate to implement the Plan and wind down their business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules. The ROC Liquidation Estates shall be authorized, without limitation, to use and dispose of the Plan Assets, to investigate and pursue any Litigation Assets, as the representative of the Debtors' Estates pursuant to section 1123(b)(3)(B) of the

34

Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer their affairs. On and after the Effective Date, the Plan Administrator may, in the name of the ROC Liquidation Estates, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order or as otherwise set forth in the Creditor Trust Agreement.

J.      *Closing of the Chapter 11 Cases*

As soon as practicable after the Plan Administrator exhausts substantially all of the Plan Assets by making the final distributions under the Plan, the Plan Administrator shall, at the expense of the ROC Liquidation Estates, (a) provide for the retention and storage of the Debtors' and ROC Liquidation Estates' books and records that shall have been delivered to or created by the Plan Administrator until such time as all such books and records are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books and records are being stored, (b) file a motion for entry of a final decree closing the Chapter 11 Cases that have not been already closed in accordance with the Bankruptcy Code and the Bankruptcy Rules and stating that the assets of the ROC Liquidation Estates have been exhausted and final distributions have been made under the Plan, (c) file the necessary paperwork in the respective jurisdictions to effectuate the dissolution of the ROC Liquidation Estates in accordance with the laws of such jurisdiction, and (d) resign as the sole officer, director, and manager, as applicable, of the ROC Liquidation Estates. Upon the Bankruptcy Court's entry of a Final Order granting the motion described in clause (b) of the preceding sentence, the ROC Liquidation Estates shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the ROC Liquidation Estates or payments to be made in connection therewith, and the remaining Chapter 11 Cases shall be closed on the date that the Bankruptcy Court has entered such Final Order.

Notwithstanding the immediately preceding paragraph, if the Plan Administrator deems it appropriate, the Plan Administrator may seek authority from the Bankruptcy Court to close any of the Chapter 11 Cases and dissolve or merge any of the ROC Liquidation Estates prior to all final distributions having been made under the Plan.

K.      *Dissolution of the Debtors*

Upon the distribution of all Plan Assets, the ROC Liquidation Estates shall be dissolved for all purposes by the Plan Administrator without the necessity for any other or further actions to be taken by or on behalf of any ROC Liquidation Estates or payments to be made in connection therewith; *provided*, *however*, that, without the need of any further approval, the Plan Administrator in its discretion may execute and file documents and take all other actions as he or she deems appropriate relating to the dissolution of the ROC Liquidation Estates under applicable law, and in such event, all applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the ROC Liquidation Estates as provided herein, without the payment of any fee, tax, or charge and without need for the filing of any certificates.

35

L.    *Costs and Expenses of the Plan Administrator*

All Plan Administrator Operating Expenses shall be the responsibility of and paid by the Plan Administrator from Plan Assets, subject to the Plan Administrator Budget, without further notice to holders of Claims or approval of the Bankruptcy Court; *provided* that (i) to the extent the overhead and other operational expenses of the Plan Administrator in connection with its administration of the Creditor Trust exceed any remaining Plan Administrator Operating Expense Funded Amount, such fees and expenses shall be payable solely from the assets of the Creditor Trust and its proceeds, as set forth in the Creditor Trust Agreement; (ii) to the extent the overhead and other operational expenses of the Plan Administrator in connection with its administration of the Tort Claim Sub-Trust exceed any remaining Plan Administrator Operating Expense Funded Amount, such fees and expenses shall be payable solely from the assets of the Tort Claim Sub-Trust and its proceeds, as set forth in the Creditor Trust Agreement, absent Final Order of the Bankruptcy Court; and (iii) the Plan Administrator shall not be obligated to take action that would result in the incurrence of any costs or expenses in excess of the lesser of the remaining Plan Assets available therefor and the amount provided therefor in the Plan Administrator Operating Budget. In the event there is a remaining balance in any reserve established for the payment of Plan Administrator Operating Expenses following the payment in full of all such expenses, any such amounts shall be transferred to the ROC Liquidation Estates for the benefit of holders of Allowed Exit Term Loan Claims and distributed in accordance with Article III. For avoidance of doubt, the Plan Administrator shall not have the authority nor be obligated to incur costs and expenses not explicitly provided for in the Plan Administrator Budget.

The initial Plan Administrator Budget shall be prepared in consultation with the Plan Proponents and will be included in the Plan Supplement. The Plan Administrator shall provide the Exit Term Loan Required Lenders or their respective post-Effective Date representative(s) with three (3) Business Days' notice of any proposed amendments to the Plan Administrator Budget; *provided*, *however*, that any such amendment shall under no circumstances seek that additional funds be expended in excess of the Maximum GUC Oversight Administrator Expenses and $50,000 in the aggregate for the Franklin Managed Entities Expenses incurred after the Effective Date. If any of the Exit Term Loan Required Lenders or their respective post-Effective Date representative(s) does not advise the Plan Administrator in writing (which may include an email) within three (3) Business Days of receipt of the notice of the proposed amendment that it objects to such amendment, the proposed amendment(s) shall be deemed approved with no further action required. If the Plan Administrator receives an objection to a proposed amendment to the Plan Administrator Budget, the Bankruptcy Court may resolve such dispute on shortened notice to the Plan Administrator and the Plan Proponents or their respective post-Effective Date representative(s).

For the avoidance of doubt, the Plan Administrator does not have the authority to utilize funds from any source to pay any amount of GUC Oversight Administrator expenses in excess of the Maximum GUC Oversight Administrator Expenses or to pay more than $50,000 for the Franklin Managed Entities Expenses incurred after the Effective Date. Moreover, no party shall have any authority whatsoever to request amendment of the Plan Administrator Budget or otherwise seek to utilize any Plan Assets, any amounts in the Plan Professional Fee Reserve, any Creditor Trust Assets, any assets of the Tort Claim Sub-Trust, or any funds reserved for Plan Administrator Operating Expenses in accordance with the Plan Administrator Budget, or proceeds

36

from any of the foregoing sources for the purpose of exceeding the Maximum GUC Oversight Administrator Expenses or $50,000 for the Franklin Managed Entities Expenses incurred after the Effective Date. Any such request shall be deemed null and void when made without the need for any party to respond.

M.    *Cancellation of Loans, Securities and Agreements*

Except as otherwise provided in the Plan, on the Effective Date: (i) the Exit Term Loan Documents, any Interests in the Debtors, any intercompany notes, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest, shall be deemed cancelled and surrendered as to the Debtors without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and the Debtors shall not have any continuing obligations thereunder or in any way related thereto; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors shall be deemed satisfied in full and released without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity; *provided*, *however*, that notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive distributions under the Plan; *provided further* that the Exit Term Loan Documents and the FILO Term Loan Documents shall continue in effect with respect to any obligations thereunder governing the relationship between, with respect to the Exit Term Loan Documents, the Exit Term Loan Agent and the Exit Term Loan Lenders, and, with respect to the FILO Term Loan Documents, the FILO Term Loan Agent and the FILO Term Loan Lenders (including those provisions relating to the Exit Term Loan Agent and FILO Term Loan Agent's rights to expense reimbursement, indemnification, and similar amounts from the Exit Term Loan Lenders or FILO Term Loan Lenders) or that may survive termination of the Exit Term Loan Documents or FILO Term Loan Documents in accordance with the terms thereof.

Unless otherwise specifically set forth in or provided for under the Plan, the Exit Term Loan Agent, FILO Term Loan Agent, and their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall be relieved of all further duties and responsibilities related to the Exit Term Loan Documents and FILO Term Loan Documents, respectively, except with respect to such other rights of the Exit Term Loan Agent and FILO Term Loan Agent that survive the termination of the Exit Term Loan Documents and FILO Term Loan Documents, respectively, pursuant to the terms thereof. Subsequent to the performance by the Exit Term Loan Agent and FILO Term Loan Agent of their obligations under the Plan, the Exit Term Loan Agent, FILO Term Loan Agent and their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall be relieved of all further duties and responsibilities related to the Exit Term Loan Documents and FILO Term Loan Documents, respectively.

Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Exit Term Loan Documents and FILO Term Loan Documents shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or the Confirmation Order and on and after the Effective Date, the ROC Liquidation Estates shall be liable for any Claims asserted under such indemnity obligations; *provided, however*, that no payment on account of such obligations shall be made from the Plan Professional Fee Reserve, the Creditor Trust Assets, the assets of the Tort Claim Sub-Trust or the funds reserved for Plan Administrator Operating Expenses in accordance with the Plan Administrator Budget. For the avoidance of doubt, the finality of any distribution made by the Debtors, the Plan Administrator and the ROC Liquidation Estates shall not be affected by any indemnity obligations under the Exit Term Loan Documents and FILO Term Loan Documents that are not asserted prior to the date that such distributions are made in accordance with the Plan.

N.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator is authorized to, and may issue, execute, deliver, file, or record, such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan.

O.    *Section 1146 Exemption*

To the maximum extent permitted pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, sales and use taxes, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

P.    *Preservation of Estate Causes of Action*

Unless any Estate Causes of Action against an Entity are expressly waived, relinquished, transferred, exculpated, released, compromised, or settled in this Plan, or the Confirmation Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and the Plan Administrator shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Estate Causes of Action (including all Estate Causes of Action related to the Litigation Assets and the GL Insurance Assets), whether arising before or after the Petition Date, and the Debtors' rights to commence, prosecute or settle such Litigation Assets and GL Insurance Assets shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Confirmation Order to any Estate Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Estate Causes of Action against them. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Litigation Assets against any entity, except as otherwise expressly provided herein. Unless any Estate Causes

38

of Action against an entity are expressly waived, relinquished, transferred, exculpated, released, compromised, or settled in this Plan, the Confirmation Order or the Asset Purchase Agreements, the Debtors and the Plan Administrator expressly reserve all Estate Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Estate Causes of Action upon, after, or as a consequence of the confirmation of the Plan. For the avoidance of doubt, nothing in the Plan shall require the Debtors or the Plan Administrator to commence or pursue litigation concerning any Estate Cause of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Estate Causes of Action preserved pursuant to this Article V.P that any of the Debtors may hold against any Entity shall be transferred to the ROC Liquidation Estates upon the occurrence of the Effective Date. Except as otherwise provided in the Plan, the Plan Administrator, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Estate Causes of Action. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Estate Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, except for as otherwise expressly set forth in the Plan. Estate Causes of Action related to the GL Insurance Assets may be subject to the terms of any Supplemental Insurance Procedures if and to the extent accepted by the Debtors or the Plan Administrator and approved by the Bankruptcy Court.

## ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

A.    *Executory Contracts and Unexpired Leases*

On the Confirmation Date, but subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtors entered into prior to the Petition Date (subject to the provisions of this Article VI) that (i) have not previously been assumed or rejected, (ii) have not been assumed and assigned under any of the Sales, or (iii) are not listed for assumption by the Debtors as of the Effective Date in the Plan Supplement, shall be deemed rejected by the Debtors pursuant to the provisions of section 365 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease rejections described above, as of the Confirmation Date.

B.    *Rejection Damages Bar Date*

All Claims arising from the rejection of executory contracts and unexpired leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Plan Administrator on or before the date that is thirty (30) days after the later of (a) the Effective Date and (b) the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, the Plan

39

Administrator, and the Plan Assets. A Claim for rejection damages shall be classified and treated in Class 5 (General Unsecured Claims).

C.      *Effect of Post-Confirmation Rejection*

The entry by the Bankruptcy Court on or after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease of the Debtors entered into prior to the Petition Date shall result in such rejection being a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code.

D.      *Non-Occurrence of Effective Date*

In the event that the Effective Date does not occur prior to such time as the applicable Chapter 11 Cases are closed, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

E.      *Indemnification Obligations; Insurance Policies*

Any obligations of any Debtor pursuant to its certificate of incorporation and bylaws, or organizational documents, as applicable, or any other agreements entered into by such Debtor at any time prior to the Effective Date, to indemnify current and/or former directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings against such Debtor or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of such Debtor, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Petition Date shall not be discharged or Impaired by confirmation of the Plan. Such obligations shall be deemed and treated as executory contract to be assumed by the Debtors under the Plan and shall continue as obligations of the Creditor Trust.

Except to the extent an affected party may otherwise agree, nothing in the Plan, the Plan Documents, the Confirmation Order, or the Creditor Trust Agreement, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights and obligations of the Debtors (and their Estates), the Tort Claimants (solely with respect to the GL Insurance Assets) and the Debtors' insurers (and third-party claims administrators) under any of the Debtors' insurance policies (including any D&O Insurance or GL Insurance Assets) or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the insurance policies. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Debtors' insurance policies shall control. For the avoidance of doubt, nothing herein (i) constitutes a rejection of any insurance policy (including the D&O Insurance or the GL Insurance Assets) or (ii) relieves any party from any injunction or stay created or preserved under the Plan.

F.      *Excluded Employee Liabilities, Retiree Plan and Pension Plan*

As of the closing of the Sales and transfer of the Ilion Facility, the Debtors no longer employ any employees covered by the CBA and so have no future obligations under the CBA and are unable to offer benefits under the Supplemental Retirement Plan, the Equity Incentive Plan, and the Pension Plan. Prospective obligations under the CBA were assumed by Roundhill as

40

modified under the Sales and related orders of the Court. The only remaining unresolved matters related to the CBA are certain alleged claims for previously accrued wages and benefits that were not assumed by Roundhill. Those claims have been filed by the UMWA. The Debtors intend to negotiate a consensual agreement with UMWA relating to those matters; provided that, if the Debtors are unable to reach a consensual agreement with UMWA, they reserve their rights and the rights of the Plan Administrator to object to the UMWA Claims and otherwise seek relief in accordance with sections 1113 and 1114 of the Bankruptcy Code and other applicable law prior to or after the Effective Date. The Debtors, their Estates and the Plan Administrator reserve all objections to any Claims filed by employees covered by the CBA or the UMWA, including any employment-related Claims asserted under or related to the CBA, and all other defenses including those based upon waiver as provided in the Roundhill Asset Purchase Agreement and based upon the Bankruptcy Code.

The Retiree Plans and any retiree benefits provided thereunder shall be deemed to have been terminated immediately upon the occurrence of the Effective Date. The Debtors and the Plan Administrator are authorized to take any and all actions necessary to terminate the Pension Plan and the Retiree Plans.

G.     *Reservation of Rights*

Nothing contained in this Plan shall constitute an admission by the Debtors that any executory contract or unexpired lease is, in fact, an executory contract or unexpired lease or that the Debtors have any liability thereunder.

### ARTICLE VII
### PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Plan Distributions*

The Plan Administrator shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan. Plan distributions to holders of Allowed Exit Term Loan Claims shall be made through the Exit Term Loan Agent and deemed completed when made to the Exit Term Loan Agent. All reasonable and documented fees and expenses of the Exit Term Loan Agent (including the reasonable and documented fees and expenses of its counsel and agents) incurred in connection with such distributions shall be paid by the Plan Administrator (on behalf of the ROC Liquidation Estates) from the Plan Assets.

B.     *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors or the Exit Term Loan Agent, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date. The Debtors shall have no obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. The Debtors and the Plan Administrator, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable. The Exit Term Loan Agent may, in its sole

41

discretion, limit the further assignment of the Exit Term Loan Claims to allow for the accurate recording of the holders of such Claims as of the Distribution Record Date.

**PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM. IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM.**

C.    *Objections to Claims; Estimation of Claims*

Except insofar as a Claim is Allowed under the Plan, the Plan Administrator, and any other party in interest to the extent permitted under section 502(a) of the Bankruptcy Code, shall be entitled to object to Claims. Any objections to Claims shall be served and filed on or before (a) the one-hundred eightieth (180th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as may be fixed by the Bankruptcy Court upon the request of the Plan Administrator (the "Claims Objection Deadline"). Nothing herein shall require the Debtors or the Plan Administrator to object to any Claim.

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any Claim not expressly Allowed by the terms of the Plan and otherwise subject to estimation under section 502(c) of the Bankruptcy Code and for which the Debtors may be liable under the Plan, including any Claim for taxes, to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim pursuant to section 502(c) of the Bankruptcy Code at any time prior to the time that such Claim becomes an Allowed Claim. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. The foregoing objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated by the Bankruptcy Court and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

The Debtors, their Estates and the Plan Administrator shall be entitled to assert and reserve any and all defenses to the allowance of Claims other than the Exit Term Loan Claims and the TTB Claim, which shall be Allowed as set forth herein. Without limiting the generality of the foregoing, they shall be entitled to assert any defense based upon waiver as provided in the Asset Purchase Agreements concerning any employment-related claims, including any claims related to the CBA. Furthermore, and for the avoidance of doubt, they reserve the right to contest the value of any putative collateral and the validity of any lien related to a Secured Claim (other than the Exit Term Loan Claims).

D.    *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no distribution of Cash or property shall be made with respect to any portion of a Disputed Claim unless and until all

42

objections to such Claim are resolved by Final Order or as otherwise permitted by this Plan. The procedures with respect to the resolution of Disputed Claims shall be set forth in the Plan Supplement. For the avoidance of doubt, to the extent a class of claims will be entitled to no distributions under the Plan, such Claims will not be subject to reconciliation by the Plan Administrator.

E.    *Reserve of Cash Distributions*

On any date that distributions are to be made under the terms of this Plan, the Plan Administrator shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto. Such Cash or property shall be held in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto.

F.    *Distribution After Allowance*

Within the later of (i) seven (7) Business Days after such Claim becomes an Allowed Claim and (ii) thirty (30) days after the expiration of the Claims Objection Deadline, the Plan Administrator shall distribute, to the extent available, all distributable Cash or other property, including any interest, dividends, or proceeds thereof, to which a holder of an Allowed Claim is then entitled in accordance with Article II or Article III; *provided* that, to the extent any Plan Assets have not yet been collected or liquidated by the Plan Administrator, such Plan Assets shall be distributed to holders of Allowed Claims as soon as reasonably practicable following the collection and liquidation thereof; *provided further* that the Plan Administrator shall make distributions to (or retain property for the benefit of) holders of Allowed General Unsecured Claims, Allowed Tort Convenience Class Claims and Allowed Tort Claims (other than Tort Convenience Class Claims) in accordance with the provisions of the Creditor Trust Agreement and the Tort Claims Sub-Trust as and to the extent applicable.

G.    *No Recourse*

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Debtors, the Estates, the Plan Administrator, or any of their respective professionals, consultants, officers, directors, or members or their successors or assigns, or any of their respective property. Except as specifically stated otherwise in the Plan, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

H.    *Application of Distributions*

Any distribution made under the Plan on account of an Allowed Claim shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to any portion of such Claim for accrued but unpaid interest.

43

I.    *Undeliverable Distributions and Unclaimed Property*

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Plan Administrator has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date on which such distribution was attempted to be made; *provided further* that Plan Administrator shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to the Plan Administrator automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be forever barred.

J.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances, *provided that* the Debtors and the Plan Administrator, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan, *provided that* if the recipient provides the required information or otherwise satisfies the Plan Administrator that withholding is not required within 180 days after the request is made, such withheld amount shall then be distributed to the recipient.

In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.

K.    *No Postpetition Interest on Claims and Interests*

Unless otherwise specifically provided for in the Plan, Confirmation Order or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

L. *Foreign Currency Exchange Rate*

Except as specifically provided for in the Plan or an order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the then applicable noon spot rate for such non-U.S. currency as of the Petition Date for all purposes under the Plan, including voting, allowance, and distribution.

M. *Setoffs and Recoupment*

The Debtors and/or the Plan Administrator are authorized to set off against or recoup from any Claims (to the extent not released pursuant to the Plan) of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administrator of any such claim they may have against the holder of such Claim.

N. *Distributions Free and Clear*

Except as may be otherwise provided in this Plan, all distributions hereunder shall be free and clear of any Liens, Claims, encumbrances, and other interests.

O. *De-Minimis Distributions and Donation*

There shall be no distributions on account of Allowed General Unsecured Claims to the extent such distribution will result in a payment of less than $50.00 to the holder of such Claim, and such amount otherwise payable upon such Claim shall revert back to the ROC Liquidation Estates. Unless otherwise set forth in this Plan, the Plan Administrator may donate any remaining Plan Assets to a charitable institution if the distribution of such assets is too costly, too burdensome, or impracticable.

P. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

The Debtors or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Debtor. To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Debtor or Plan Administrator, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Plan Administrator annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

45

2. Claims Payable by Third Parties

To the extent that one or more of the Debtors' insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to a Debtor insurer, and such holder in fact repays all or a portion of the Claim to such insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or the Plan Administrator, as applicable, and the holder of such Claim.

3. Applicability of Insurance Policies

Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Plan Administrator and any holders of Claims, may hold against any other Entity under any insurance policies.

## ARTICLE VIII
## EFFECTS OF PLAN CONFIRMATION

A. *Injunction*

**Except as otherwise expressly provided in this Plan, and except in connection with the enforcement of the terms of this Plan or any documents provided for or contemplated in this Plan, all Entities who have held, hold or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Creditor Trust, or their successors and assignees or any of their assets and property, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates the Creditor Trust, or their successors and assignees, or any of their assets and property, with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, the Creditor Trust, or their successors and assignees or any of their assets and property, with respect to any such Claim or Interest; (d) asserting, directly or indirectly, any setoff, or recoupment of any kind against any obligation due the Debtors, the Estates, the Creditor Trust, or their successors and assignees or any of their assets and, with respect to any such Claim or Interest, unless approved by the Bankruptcy Court; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Without limiting the foregoing, the automatic stay provided under section 362(a) of the Bankruptcy Code shall remain in effect until the Chapter 11 Cases are closed. Nothing contained in this Article VIII.A shall prohibit the holder of a timely-filed proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Plan, or enjoin or prohibit the interpretation or enforcement by the holder of such Claim or**

46

Interest of any of the obligations of the Debtors or the Plan Administrator under this Plan. Furthermore, the releases set forth above do not release any non-Debtor fiduciary from Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

B.      *Exculpation and Limitation of Liability*

On the Effective Date, the Debtors, the Restructuring Committee, the Committee, the FILO Term Loan Lenders, the FILO Term Loan Agent, the Exit Term Loan Lenders, the Exit Term Loan Agent, in all such parties capacities, and any such parties' respective current and former (i) members, (ii) officers, (iii) directors, (iv) affiliates, (v) employees, (vi) advisors, (vii) attorneys, (viii) representatives, (ix) financial advisors, (x) investment bankers, or (xi) agents and any of such parties' successors and assigns (collectively, the "<u>Exculpated Parties</u>"), shall not have or incur, and are hereby released from, any claim, obligation, Causes of Action, or liability to one another or to any holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act taken or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of (i) the Chapter 11 Cases, (ii) formulation, negotiation, and filing of this Plan, (iii) filing the Chapter 11 Cases, (iv) the pursuit of confirmation of this Plan, (v) the consummation and implementation of this Plan, (vi) or the administration of this Plan or the property to be distributed under this Plan, (vii) the marketing, negotiation, approval and consummation of the Sales and the definitive documents evidencing such Sales or (viii) any other post-petition act taken or omission originating or occurring in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors, except for their fraud, willful misconduct, or gross negligence as determined by a Final Order. Notwithstanding the foregoing, the releases set forth in the immediately preceding sentence shall exclude (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases and (ii) the Debtors' indemnification obligations or other contractual obligations to officers and directors. For the avoidance of doubt, nothing herein shall affect any rights concerning the payment of Professional Fees. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability. The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to this Article VIII.B. Furthermore, the releases set forth above do not release any non-Debtor fiduciary from Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

Case 20-81688-CRJ11    Doc 1369    Filed 01/25/21    Entered 01/25/21 12:53:40    Desc
Main Document    Page 143 of 180

C.    *Release of Debtors, Restructuring Committee, Exit Term Loan Agent, Exit Term Loan Lenders, the FILO Term Loan Agent, FILO Term Loan Lenders, and Directors and Officers*

**On the Effective Date, except as otherwise provided in this Plan, the Debtors, the Restructuring Committee, the Exit Term Loan Agent, the Exit Term Loan Lenders, the FILO Term Loan Agent, the FILO Term Loan Lenders, in all such parties capacities, and any such parties' respective current and former (i) members, (ii) officers, (iii) directors, (iv) affiliates, (v) employees, (vi) advisors, (vii) attorneys, (viii) representatives, (ix) financial advisors, (x) investment bankers, or (xi) agents and any of such parties' successors and assigns, shall not have or incur, and are hereby, to the fullest extent permitted under applicable law, forever released from any claims, Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise to one another or to any holder of a Claim or Interest to the extent claiming through them or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any claims, Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be related, in whole or in part, to the Debtors, the Chapter 11 Cases, the Sales or the Estates, except for their fraud, willful misconduct, or gross negligence as determined by a Final Order. Notwithstanding the foregoing, the releases set forth in the immediately preceding sentence shall exclude (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases and (ii) the Debtors' indemnification obligations or other contractual obligations to officers and directors. For the avoidance of doubt, nothing herein shall affect any rights concerning the payment of Professional Fees. Furthermore, the releases set forth above do not release any non-Debtor fiduciary from Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.**

D.    *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.**

48

# ARTICLE IX
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

A.    *Conditions to the Effective Date*

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article IX.B:

(i)     The Confirmation Order shall have become a Final Order in full force and effect and shall not subject to any stay of effectiveness;

(ii)    the Confirmation Date shall have occurred and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

(iii)   all Statutory Fees incurred for periods arising prior to the Effective Date shall be paid by the Debtors or placed in a reserve for such purpose;

(iv)    the Insurance Condition is satisfied;

(v)     except as otherwise expressly provided herein, all documents to be executed, delivered, assumed, or performed upon or in connection with consummation of the Plan shall have been executed, delivered, assumed, or performed, as the case may be, and any conditions contained therein (other than consummation of the Plan or notice of consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement;

(vi)    all other actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered, as the case may be, to the appropriate parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable law;

(vii)   there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

(viii)  the Plan Professional Fee Reserve shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan; and

(ix)    the Allowed amount of the TTB Claim shall have been resolved and require Cash payments to the TTB from the Estates of no more than two million dollars ($2,000,000) in the aggregate in full and final satisfaction of such Claim, unless otherwise authorized pursuant to the prior written consent of the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders; and

(x)     All Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses have been paid in full as provided in Article II.E.

49

B.    *Waiver of Conditions*

The conditions to confirmation of the Plan and the Effective Date set forth in this Article IX may be waived only by the written agreement of the Debtors and the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders in their sole and absolute discretion, in whole or in part, without notice, leave, or order of the Bankruptcy Court.

C.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE X
## MODIFICATION, REVOCATION OR
## WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek confirmation of the Plan consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each Debtor expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Debtor, one or more times, after the Confirmation Date, to the extent necessary to carry out the purposes and intent of the Plan. Each Debtor may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan; Effect of Non-Occurrence of Confirmation Date or Effective Date*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all of the Debtors prior to the Confirmation Date and to file a subsequent plan.  If the Debtors revoke or withdraw the Plan, the Confirmation Date does not occur, or the Effective Date does not occur within ninety (90) days of the Confirmation Date (or such other extended deadline as may be ordered by the Bankruptcy Court), then:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of executory contracts or unexpired leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be

deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity (including the Exit Term Loan Agent, Exit Term Loan Lenders, or holder(s) of the Huntsville Note); or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity (including the Exit Term Loan Agent, Exit Term Loan Lenders, or holder(s) of the Huntsville Note).

## ARTICLE XI
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the fullest extent permissible, including jurisdiction to:

(i) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(ii) decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

(iii) resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which the Debtors may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(iv) ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including any distributions to holders of Allowed General Unsecured Claims pursuant to Article V.E;

(v) adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(vi) enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

51

(vii)     enter and enforce any order and related agreements for the sale or transfer of property and obligations thereunder pursuant to, *inter alia*, sections 363, 1123, or 1146(a) of the Bankruptcy Code including the Asset Purchase Agreements;

(viii)    decide and resolve all matters related to the Sales and Asset Purchase Agreements, including any dispute in connection with amounts or other obligations owed to (or covenants incurred for the benefit of the Estate, or involving any other Asset;

(ix)      resolve any cases, controversies, suits, disputes (including any disputes related to the Plan Administrator Budget other than a request to exceed the Maximum GUC Oversight Administrator Expenses or $50,000 for the Franklin Managed Entities Expenses incurred after the Effective Date**)** or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(x)       issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan and ensure compliance with the Plan;

(xi)      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

(xii)     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.P.1;

(xiii)    resolve any disputes regarding the CBA, including any matter raised pursuant to section 1113 of the Bankruptcy Code;

(xiv)     resolve any disputes regarding the Retiree Plans and the Pension Plan;

(xv)      enforce or resolve any dispute related to the GL Insurance Assets and any Supplemental Insurance Procedures (including jurisdiction to approve any Supplemental Insurance Procedures);

(xvi)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xvii)    determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(xviii)   enter an order or final decree concluding or closing the Chapter 11 Cases;

(xix)   adjudicate any and all disputes arising from or relating to distributions under the Plan;

(xx)   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(xxi)   determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(xxii)   hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(xxiii)   hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xxiv)   hear and determine all disputes that arise out of the transfer of the Plan Assets to the ROC Liquidation Estates, the Creditor Trust, or the Tort Claim Sub-Trust, as applicable, on the Effective Date;

(xxv)   enforce all orders previously entered by the Bankruptcy Court; and

(xxvi)   hear any other matter as to which the Bankruptcy Court has jurisdiction;

*provided, however*, that the Bankruptcy Court shall not retain exclusive jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents. For the avoidance of doubt, the foregoing does not create jurisdiction over Pension Plan disputes where the Bankruptcy Court otherwise lacks jurisdiction.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

A.   *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Debtors' counterparties to executory contracts, unexpired leases, and any other prepetition agreements.

53

B. *Additional Documents*

On or before the Effective Date, the Debtors may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Filing of Monthly and Quarterly Reports and Payment of Statutory Fees*

The filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly ROC Liquidation Estates reports shall be the responsibility of the Plan Administrator. All monthly operating reports covering pre-Effective Date periods shall be prepared and filed by the Debtors. All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Statutory Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date. Statutory Fees relating to any period of time after the occurrence of the Effective Date shall be paid by the Plan Administrator. All Statutory Fees shall be payable as set forth above and such obligations shall continue until the earliest of each particular Debtor's case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

D. *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before the Effective Date.

E. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F. *Notices*

All notices, requests, and demands to or upon the Debtors shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors, to:

>	Remington Outdoor Company, Inc.
>	100 Electronics Boulevard SW
>	Huntsville, AL 35824
>	Attn:  Ken D'Arcy

with copies to:

>	O'Melveny & Myers LLP
>	400 South Hope Street
>	Los Angeles, CA 90071-2899
>	Attn: Steve Warren (swarren@omm.com)
>
>	and
>
>	Burr & Forman LLP
>	420 North 20th Street
>	Suite 3400
>	Birmingham, Alabama 35203
>	Attn: Derek F. Meek (dmeek@burr.com)

If to the Plan Administrator to:

>	To be set forth in the Plan Supplement.

If to the GUC Administrator to:

>	To be set forth in the Plan Supplement.

In the notice of the Effective Date, the Debtors shall notify all Entities that, in order to continue to receive documents after the Effective Date pursuant to Bankruptcy Rule 2002, such Entity (excluding the Bankruptcy Administrator) must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After service of the notice of the Effective Date, the Plan Administrator shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the Bankruptcy Administrator and those Entities who have filed such renewed requests.

G.	*Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  For the avoidance of doubt, (i) upon the occurrence of the Effective Date, the automatic stay pursuant to section 362 of the Bankruptcy Code of any litigation proceedings

against or involving the Debtors shall terminate and (ii) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at https://www.alnb.uscourts.gov/ or the website of the Debtors' notice and voting agent at https://cases.primeclerk.com/RemingtonOutdoor.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan shall control.

J.      *Nonseverability of Plan Provisions*

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent of the Debtors; and (iii) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and therefore, neither the Debtors nor the Plan Administrator will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

L.      *Closing of the Chapter 11 Cases*

The Plan Administrator shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, any

56

applicable Local Rules, and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M. *Document Retention*

On and after the Effective Date, the Plan Administrator shall maintain documents pursuant to the Document Preservation Order and, to the extent not inconsistent therewith, pursuant to its current document retention policy, as may be altered, amended, modified, or supplemented by the Plan Administrator. The Plan Administrator retains the right to seek further order of the Bankruptcy Court concerning records retention, including amendments and modifications of the Document Preservation Order.

N. *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, Plan Supplement, or any other document (but excluding, for the avoidance of doubt, the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan (without reference to the Plan Supplement), the Plan (without reference to the Plan Supplement) shall govern and control.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

57

Dated: [        ], 2021

Respectfully submitted,

DEBTORS:

REMINGTON OUTDOOR COMPANY, INC.

By: _____
     Name:
     Title:


FGI HOLDING COMPANY, LLC

By: _____
     Name:
     Title:


FGI OPERATING COMPANY, LLC

By: _____
     Name:
     Title:


BARNES BULLETS, LLC

By: _____
     Name:
     Title:


REMINGTON ARMS COMPANY, LLC

By: _____
     Name:
     Title:


HUNTSVILLE HOLDINGS LLC

By: _____
     Name:
     Title:

58

TMRI, INC.

By: _____
      Name:
      Title:


REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
      Name:
      Title:


32E PRODUCTIONS, LLC

By: _____
      Name:
      Title:


GREAT OUTDOORS HOLDCO, LLC

By: _____
      Name:
      Title:


RA BRANDS, L.L.C.

By: _____
      Name:
      Title:


FGI FINANCE, INC.

By: _____
      Name:
      Title:


OUTDOOR SERVICES, LLC

By: _____
      Name:
      Title:

59

EXIT TERM LOAN LENDERS:

By: _____
     Name:
     Title:

COMMITTEE:

By: _____
Name:
Title:

# **EXHIBIT B**

Insurance Report

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |
|---|---|
| *In re:* | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*[1] | Case No. 20-81688-CRJ-11 |
| *Debtors.* | Jointly Administered |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## STATUS REPORT CONCERNING INSURANCE ISSUES

The Official Committee of Unsecured Creditors (the "Committee"), by its undersigned counsel, hereby provides its Status Report Concerning Insurance Issues in advance of the Status Conference scheduled for October 19, 2020 at 10:00 a.m., as follows:

1.  <u>2004 Order</u>.  On August 28, 2020, the Court entered the *Order Regarding The Sandy Hook Families' Motion For Leave To Conduct Discovery Pursuant To Bankruptcy Rule 2004* (Doc. 499 – the "<u>2004 Order</u>").  Among other things, the Court ordered the Debtors to produce to the Committee "[d]ocuments relating to any insurance policies applicable to the Sandy Hook Wrongful Death Action, including any policies under which they have provided notice of claims, and all Communications with insurance companies regarding any notice of claims." *Id*.

2.  <u>Status Conference</u>.  At the conclusion of the September 29, 2020 hearing on the Debtors' sale of certain assets, the Court set a status conference for the Committee to report on

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc.(3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

115274749.v2

insurance issues, including how the asset sales may impact insurance coverage for the various tort claims.

3.　　In response to the Court's inquiry, and based on the information received to date, the Committee believes that the sales should not adversely affect insurance coverage for tort claims.  The following is a summary of the information obtained by the Committee and the issues considered by the Committee to date.   The Committee's investigation is ongoing and the Committee reserves the right to amend and supplement this status report as appropriate.

4.　　Debtors' Production.   In accordance with the 2004 Order and the Committee's additional document requests, the Debtors produced the following documents to the Committee in September 2020: (i) the DuPont Asset Purchase Agreement; (ii) a list of claims for which they were being indemnified by DuPont; (iii) all liability insurance policies and endorsements in the Debtors' possession for the 2012 through 2020 policy periods; (iv) a summary of product liability cases; and (v) communications between the Debtors and primarily liability insurer regarding the Sandy Hook Families' claims.  Subsequently, the Committee requested additional documents from the Debtors relating to insurance coverage for other years (i.e., not only the 2012-2013 policy year which encompasses the Sandy Hook claim).  The Debtors have responded to these requests with some documents and report that they are continuing their effort to gather documents including from third parties, such as outside counsel and insurance brokers, and that a rolling production is ongoing.

5.　　Liability Insurance Policies.   The Committee has reviewed the Debtors' liability insurance policies.  As reflected in Appendix A hereto, the Debtors maintained occurrence-based liability insurance policies, which provided the following coverage:

2

a. $76 million in aggregate coverage during the December 1, 2012 through May 22, 2013 partial policy period and $101 million in aggregate coverage during the May 23, 2013 through December 1, 2013 partial policy period;

b. $101 million in aggregate coverage during the December 1, 2013 through December 1, 2014 policy period;

c. $101 million in aggregate coverage during the December 1, 2014 through December 1, 2015 policy period;

d. $101 million in aggregate coverage during the December 1, 2015 through December 1, 2016 policy period;

e. $101 million in aggregate coverage during the December 1, 2016 through December 1, 2017 policy period;

f. $101 million in aggregate coverage during the December 1, 2017 through December 1, 2018 policy period;

g. $101 million in aggregate coverage during the December 1, 2018 through December 1, 2019 policy period; and

h. $21 million in aggregate coverage during the December 1, 2019 through December 1, 2020 policy period.[2]

The currently pending claims that have been asserted against the Debtors are reflected in <u>Appendix B</u> hereto. The coverage available to satisfy such claims is subject to the exclusions, terms, and conditions set forth in the applicable policies.

6. <u>Existing Coverage</u>. The Debtors have represented that to the best of their knowledge all liability insurance policies are in force and that no action, agreement, or court order has vitiated, reduced, or otherwise impaired coverage under the liability insurance policies. The Committee has requested, and the Debtors have stated that they are attempting to provide on a rolling basis, documents in support of these representations. Pursuant to the sale orders entered

---

[2] The Committee's assessment of the December 1, 2019 through December 1, 2020 policy period is based on its analysis of documents produced by the Debtors to date. The Committee reserves the right to provide updated information based upon additional documents produced by the Debtors subsequent to the date hereof.

115274749.v2

by the Court in this case, the Court ruled that nothing in the applicable asset purchase agreements or the Court's Orders had impaired the insurance policies covering excluded liabilities. *See., e.g., Order Approving the Sale of the Debtors' Lonoke Ammunition Business and Certain of the Debtors' Intellectual Property Assets Free and Clear of all Claims, Liens, and Interests*, ¶ 52 [904].

7.      <u>Premiums</u>.  The Debtors have represented that they believe that they have paid all liability insurance premiums.  The Committee has requested, and the Debtors are attempting to provide on a rolling basis, documents in support of these representations.

8.      <u>Claims & Defenses</u>.  According to the Debtors, there were sixteen (16) open tort claims as of the petition date, July 27, 2020.  A listing of those claims is attached as <u>Appendix B</u>.  The Debtors have represented that they believe they timely notified the relevant liability insurers of those suits.  The Debtors have also represented that those suits were being actively defended at the time of the bankruptcy filing.  The Committee has requested, and the Debtors are reviewing their records for relevant documents in support of these representations.

9.      <u>Self-Insured Retentions</u>.  The Debtors have asserted that the per occurrence self-insured retention and self-insured corridor retention (the "<u>SIRs</u>") under one or more of the liability insurance policies for the year the Sandy Hook related claims arose have been satisfied through indemnity and/or defense cost payments.  However, the primary liability insurer has taken the position that the SIRs for that year are satisfied only through indemnity payments.  The SIRs for other policy years remains under review.

10.     <u>Loss-Run Reports</u>.  The Committee has requested from the Debtors loss-run reports reflecting the claims made against the polices, loss report dates, dates of claim, dates they were reported, whether the SIRs were satisfied and to what degree, the amounts paid to date by the carriers in legal or defense costs, and any amounts paid by the insurers in settlement costs.  The Debtors appear to have been represented by AON Risk Services Northeast, Inc. ("<u>AON</u>") as their

115274749.v2

insurance broker for all policies in question. The Debtors have reported to the Committee that they have been engaged in efforts to obtain loss-run reports for the subject liability insurance policies. While the Committee is hopeful that such information will be produced informally, the Committee may soon request an order from the Court authorizing Rule 2004 discovery from AON and the insurance carriers.

11. <u>Communications with Tort Claimants</u>. The Committee has been engaged in an ongoing dialogue with the representatives of the Sandy Hook Families as well as tort claimants Sharon Teague and Wilma Blanton concerning pertinent insurance issues.

12. <u>Document Preservation</u>. The Debtors have provided the following information to the Committee concerning the preservation of documents:

    a)    Debtors' primary defense counsel, Swanson, Martin & Bell, LLP ("<u>SMB</u>"), has documents that include those that have been produced in underlying tort cases. SMB is preserving those documents.

    b)    Debtors have backed up their internal business information and data systems and other electronic records as of the date of the most recent sale closing and are archiving other media.

    c)    Under the asset purchase agreements, the Debtors retained ownership of records that may be relevant, and, to the extent copies or records are in the possession of buyers, the Debtors will maintain access to those records or copies thereof as provided under the terms of the asset purchase agreements.[3]

    d)    Debtors have not waived (and are not waiving) any privilege covering any documents. Under the terms of each of the Bankruptcy Court's orders approving the sales of certain of the Debtors' assets, the Debtors preserve their control over any privilege covering documents and leave in place their document retention guidelines.

    e)    Debtors are interviewing vendors for possible assistance in preserving electronic and paper documents (and physical objects). The vendor will assist in maintaining and preserving such documents and physical objects.

---

[3] *See*, *e.g.*, Exhibit 1 (Sections 1.2(n) and 1.1(r) to *Order Amending Order Approving the Sale of Certain of the Debtors' Assets Free and Clear of all Claims, Liens, and Interests* [983],

115274749.v2

13.     <u>Other Insurance Policies</u>:  In addition to the Debtors' general liability policies, the Debtors have the following lines of coverage:  global property (boiler and machinery), automobile, workers compensation & employers' liability, international liability, aviation, marine cargo, business travel, Directors' and Officers' ("<u>D&O</u>"), employee practices liability, fiduciary (employee benefit plan), and crime.  Because the Committee believes that – independent of the tort claims – the Debtors' D&O coverage might relate to claims the Committee could bring in the cases, the Committee previously confirmed that the Debtors' multiple D&O policies are in place and that all premiums have been paid.  These are claims-made policies which are in force through May 15, 2021.  The Committee has not reached a conclusion as to whether any of the factual allegations or claims asserted in any of the various pending tort actions against the Debtors trigger coverage under the Debtors' D&O policies.  The Committee has no reason to believe that the Debtors' other insurance policies would provide coverage for the tort claimants' claims and has therefore not requested copies of said policies or undertaken an evaluation of the coverage.

14.     <u>Next Steps</u>.  The Committee will continue its efforts to obtain correct and complete Loss-Run Reports from the Debtors, AON, and any other brokers or third-parties who might have them.  In the event the Committee is unable to obtain the Loss-Run Reports promptly, the Committee will seek Rule 2004 discovery from AON and other appropriate parties.  The Committee will also endeavor to obtain resolution of the Self-Insured Retention issue either consensually or through litigation.

15.     Should the Court decide to conduct further status conferences on insurance issues, the Committee suggests that a subsequent hearing be set for late November or early December.

115274749.v2

Dated: October 16, 2020

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ PC**

*/s/ Matthew M. Cahill*
Matthew M. Cahill
Rita L. Hullett
420 20th Street North, Suite 1600
Birmingham, AL 35203
Telephone: 205-244-3839
rhullett@bakerdonelson.com
mcahill@bakerdonelson.com

Jan M. Hayden
201 St. Charles Avenue, Suite 3600
New Orleans, LA 70170
Telephone: 504-566-8645
jhayden@bakerdonelson.com

**-and-**

**FOX ROTHSCHILD LLP**

Gordon E. Gouveia
321 N. Clark Street, Suite 1600
Chicago, IL 60654
Telephone: (312) 980-3816
ggouveia@foxrothschild.com

Michael A. Sweet
325 California St., Suite 2200
San Francisco, CA 94104-2670
Telephone: (415) 364-5560
msweet@foxrothschild.com

Robert F. Elgidely
One Biscayne Tower
2 South Biscayne Boulevard, Suite 2750
Miami, FL 33131
Telephone: (305) 442-6543
relgidely@foxrothschild.com

7

# APPENDIX A

## 2012-13 Policy Period

The tower of insurance available to Freedom Group, Inc. / Remington Outdoor Company, Inc. for the 2012-13 policy period is structured in 6 policies—one primary general liability policy and five layers of excess umbrella coverage—that total $101 million in coverage. Notably, the last layer of coverage in the tower is $25 million in coverage and is only available for claims that occurred during the effective dates of that policy, May 23, 2013 to December 1, 2013. The first five layers of coverage apply to claims that occurred between December 1, 2012 and December 1, 2013. According to the Debtors' records, this policy is potentially applicable to claims asserted by: (1) the Sandy Hook Families (Soto, et al.); (2) Joann Harris and Benjamin Harris; and (3) Precious Seguin.

The primary first layer of coverage is an occurrence-based general liability policy provided by Ironshore Specialty Insurance Company. The primary policy provides limits of $1 million occurrence / $3 million aggregate, subject to a $1 million per occurrence Self-Insured Retention and an additional $1 million occurrence / $1 million aggregate Corridor Retention.

The coverage provided by the primary Ironshore policy is subject to additional exclusions, terms, and conditions that we are currently analyzing in conjunction with the Debtors' claim history applicable to the policy.

The remaining layers of excess coverage are a mix of excess and umbrella policies that make up the total tower of insurance. The second layer of coverage is a $10 million excess policy provided by James River Insurance Company on a following-form basis. The James River second layer excess policy has a $1 million per occurrence Self-Insured Retention. Similarly, the third layer of coverage is a $25 million policy provided by Ironshore Specialty Insurance Company on an umbrella form, that includes a $25,000 each occurrence Self-Insured Retention. Layer four is a $25 million excess policy provided by ACE Property and Casualty Insurance Company that does not include a Self-Insured Retention. Layer five is a $15 million excess policy provided by North American Capacity Insurance Company that does not include a Self-Insured Retention. The final sixth layer, only effective for claims occurring between May 23, 2013 to December 1, 2013, is a $25 million excess policy provided by Westchester Surplus Lines Insurance that does not include Self-Insured Retention.

Again, we are currently reviewing Remington's claims history to determine the availability of the coverage provided by the policies making up Remington's 2012-13 tower of insurance.

## 2013-14 Policy Period

The tower of insurance available to Remington Outdoor Company, Inc. for the 2013-14 policy period is structured in 6 policies—one primary general liability policy and five layers of excess umbrella coverage—that total $101 million in coverage. All layers of the coverage apply to claims that occurred between December 1, 2013 and December 1, 2014.

115221386.v2

The primary first layer of coverage is an occurrence-based general liability policy provided by Ironshore Specialty Insurance Company. The primary policy provides limits of $1 million occurrence / $3 million aggregate, subject to a $1 million per occurrence Self-Insured Retention and an additional $1 million occurrence / $1 million aggregate Corridor Retention.

The coverage provided by the primary Ironshore policy is subject to additional exclusions, terms, and conditions that we are currently analyzing in conjunction with the Debtors' claim history applicable to the policy.

The remaining layers of excess coverage are a mix of excess and umbrella policies that make up the total tower of insurance. The second layer of coverage is a $10 million excess policy provided by James River Insurance Company on a following-form basis. The James River second layer excess policy has a $1 million per occurrence Self-Insured Retention. Similarly, the third layer of coverage is a $25 million policy provided by Ironshore Specialty Insurance Company on an umbrella form, that includes a $25,000 each occurrence Self-Insured Retention. Layer four is a $25 million excess policy provided by ACE Property and Casualty Insurance Company that does not include a Self-Insured Retention. Layer five is a $15 million excess policy provided by National Fire & Marine Insurance Company that does not include a Self-Insured Retention. The final sixth layer is a $25 million excess policy provided by Westchester Surplus Lines Insurance that does not include Self-Insured Retention.

## 2014-15 Policy Period

The tower of insurance available to Remington Outdoor Company, Inc. for the 2014-15 policy period is structured in 6 policies—one primary general liability policy and five layers of excess umbrella coverage—that total $101 million in coverage. All layers of the coverage apply to claims that occurred between December 1, 2014 and December 1, 2015. According to the Debtors' records, this policy is potentially applicable to claims asserted by: (1) Ryan Carr and Jessica Carr; (2) Cody Shearouse; and (3) Sharon Teague.

The primary first layer of coverage is an occurrence-based general liability policy provided by Ironshore Specialty Insurance Company. The primary policy provides limits of $1 million occurrence / $3 million aggregate, subject to a $1 million per occurrence Self-Insured Retention and an additional $1 million occurrence / $1 million aggregate Corridor Retention.

The coverage provided by the primary Ironshore policy is subject to additional exclusions, terms, and conditions that we are currently analyzing in conjunction with the Debtors' claim history applicable to the policy.

The remaining layers of excess coverage are a mix of excess and umbrella policies that make up the total tower of insurance. The second layer of coverage is a $10 million umbrella policy provided by Berkshire Hathaway Specialty Insurance on a following-form basis. The Berkshire Hathaway second layer umbrella policy has a $10,000 per occurrence SIR. The third layer of coverage is a $10 million excess policy provided by James River Insurance Company, that does not include an SIR. Layer four is a $30 million excess policy provided by Ironshore Specialty Insurance Company that does not include an SIR. Layer five is a $25 million excess policy

115221386.v2

provided by National Fire & Marine Insurance Company that does not include an SIR. The final sixth layer is a $25 million excess policy provided by XL Insurance America, Inc. that does not include Self-Insured Retention.

## 2015-16 Policy Period

The tower of insurance available to Remington Outdoor Company, Inc. for the 2015-16 policy period is structured in 5 policies—one primary general liability policy and four layers of excess umbrella coverage—that total $101 million in coverage. All layers of the coverage apply to claims that occurred between December 1, 2015 and December 1, 2016. According to the Debtors' records, this policy is potentially applicable to claims asserted by: (1) Vincent Tate; (2) Miguel Angeles; and (3) Travis Walton and Terry Walton.

The primary first layer of coverage is an occurrence-based general liability policy provided by Ironshore Specialty Insurance Company. The primary policy provides limits of $1 million occurrence / $3 million aggregate, subject to a $1 million per occurrence Self-Insured Retention and an additional $1 million occurrence  / $1 million aggregate Corridor Retention.

The coverage provided by the primary Ironshore policy is subject to additional exclusions, terms, and conditions that we are currently analyzing in conjunction with the Debtors' claim history applicable to the policy.

The remaining layers of excess coverage are a mix of excess and umbrella policies that make up the total tower of insurance. The second layer of coverage is a $20 million umbrella policy provided by Berkshire Hathaway Specialty Insurance on a following-form basis. The Berkshire Hathaway second layer umbrella policy has a $10,000 per occurrence SIR. The third layer of coverage is a $30 million excess policy provided by Ironshore Specialty Insurance Company, that does not include an SIR. Layer four is a $25 million excess policy provided by Aspen Specialty Insurance Company that does not include an SIR. The final fifth layer is a $25 million excess policy provided by XL Insurance America, Inc. that does not include Self-Insured Retention.

## 2016-17 Policy Period

The tower of insurance available to Remington Outdoor Company, Inc. for the 2016-17 policy period is structured in 5 policies—one primary general liability policy and four layers of excess umbrella coverage—that total $101 million in coverage. All layers of the coverage apply to claims that occurred between December 1, 2016 and December 1, 2017. According to the Debtors' records, this policy is potentially applicable to claims asserted by: (1) James Scott; and (2) Steven Wharton and Janice Johndrow.

The primary first layer of coverage is an occurrence-based general liability policy provided by National Fire & Marine Insurance Company. The primary policy provides limits of $1 million occurrence / $3 million aggregate, subject to a $1 million per occurrence Self-Insured Retention and an additional $1 million occurrence  / $1 million aggregate Corridor Retention.

3

115221386.v2

The coverage provided by the primary National Fire & Marine policy is subject to additional exclusions, terms, and conditions that we are currently analyzing in conjunction with the Debtors' claim history applicable to the policy.

The remaining layers of excess coverage are a mix of excess and umbrella policies that make up the total tower of insurance. The second layer of coverage is a $20 million umbrella policy provided by Berkshire Hathaway Specialty Insurance on a following-form basis. The Berkshire Hathaway second layer umbrella policy has a $10,000 per occurrence SIR. The third layer of coverage is a $30 million excess policy provided by Ironshore Specialty Insurance Company, that does not include an SIR. Layer four is a $25 million excess policy provided by Lloyd's of London syndicates that does not include an SIR. The final fifth layer is a $25 million excess policy provided by XL Insurance America, Inc. that does not include Self-Insured Retention.

## 2017-18 Policy Period

The tower of insurance available to Remington Outdoor Company, Inc. for the 2017-18 policy period is structured in 5 policies—one primary general liability policy and four layers of excess umbrella coverage—that total $101 million in coverage. All layers of the coverage apply to claims that occurred between December 1, 2017 and December 1, 2018. According to the Debtors' records, this policy is potentially applicable to claims asserted by: (1) Brett Nielsen; and (2) Starla Clay.

The primary first layer of coverage is an occurrence-based general liability policy provided by National Fire & Marine Insurance Company. The primary policy provides limits of $1 million occurrence / $3 million aggregate, subject to a $1 million per occurrence Self-Insured Retention and an additional $1 million occurrence / $1 million aggregate Corridor Retention.

The coverage provided by the primary National Fire & Marine policy is subject to additional exclusions, terms, and conditions that we are currently analyzing in conjunction with the Debtors' claim history applicable to the policy.

The remaining layers of excess coverage are a mix of excess and umbrella policies that make up the total tower of insurance. The second layer of coverage is a $20 million umbrella policy provided by Berkshire Hathaway Specialty Insurance on a following-form basis. The Berkshire Hathaway second layer umbrella policy has a $10,000 per occurrence SIR. The third layer of coverage is a $30 million excess policy provided by Ironshore Specialty Insurance Company, that does not include an SIR. Layer four is a $25 million excess policy provided by Lloyd's of London syndicates that does not include an SIR. The final fifth layer is a $25 million excess policy provided by XL Insurance America, Inc. that does not include Self-Insured Retention.

## 2018-19 Policy Period

The tower of insurance available to Remington Outdoor Company, Inc. for the 2018-19 policy period is structured in 5 policies—one primary general liability policy and four layers of excess umbrella coverage—that total $101 million in coverage. All layers of the coverage apply to claims that occurred between December 1, 2018 and December 1, 2019. According to the

115221386.v2

Debtors' records, this policy is potentially applicable to claims asserted by: (1) Wilma Blanton; and (2) Jessica Olinick.

The primary first layer of coverage is an occurrence-based general liability policy provided by National Fire & Marine Insurance Company. The primary policy provides limits of $1 million occurrence / $3 million aggregate, subject to a $1 million per occurrence Self-Insured Retention and an additional $1 million occurrence / $1 million aggregate Corridor Retention.

The coverage provided by the primary National Fire & Marine policy is subject to additional exclusions, terms, and conditions that we are currently analyzing in conjunction with the Debtors' claim history applicable to the policy.

The remaining layers of excess coverage are a mix of excess and umbrella policies that make up the total tower of insurance. The second layer of coverage is a $20 million umbrella policy provided by Berkshire Hathaway Specialty Insurance on a following-form basis. The Berkshire Hathaway second layer umbrella policy has a $10,000 per occurrence SIR. The third layer of coverage is a $25 million excess policy provided by Ironshore Specialty Insurance Company, that does not include an SIR. Layer four is a $30 million excess policy provided by Lloyd's of London syndicates that does not include an SIR. The final fifth layer is a $25 million excess policy provided by XL Insurance America, Inc. that does not include Self-Insured Retention.

## 2019-20 Policy Period

Based on the documents provided by the Debtor, the insurance available to Remington Outdoor Company, Inc. for the 2019-20 policy period is structured in 2 policies—one primary general liability policy and one umbrella policy over the primary policy. In total, the two policies provide $21 million in coverage. Both policies apply to claims that occurred between December 1, 2019 and December 1, 2020.

The primary first layer of coverage is an occurrence-based general liability policy provided by National Fire & Marine Insurance Company. The primary policy provides limits of $1 million occurrence / $3 million aggregate, subject to a $1 million per occurrence Self-Insured Retention and an additional $1 million occurrence / $1 million aggregate Corridor Retention.

The coverage provided by the primary National Fire & Marine policy is subject to additional exclusions, terms, and conditions that we are currently analyzing in conjunction with the Debtors' claim history applicable to the policy.

The second layer of coverage is a $20 million umbrella policy provided by Berkshire Hathaway Specialty Insurance on a following-form basis. The Berkshire Hathaway second layer umbrella policy has a $10,000 per occurrence SIR.

115221386.v2

# APPENDIX B

Product Liability Litigation
Defendants 9/2020

| Plaintiffs | Court | Case No. (Trial Court) | Date of Incident | Defendants |
|---|---|---|---|---|
| Joann Harris; Benjamin Harris | U.S. Dist. Court, W.D. of Oklahoma U.S. Court of Appeals, 8th Circuit | 5:15-CV-1375 | 2013 . 11 . 28 | Remington Arms Co., LLC., Wal-Mart |
| Ryan Carr; Jessica Carr | U.S. Dist. Court, W.D. of Oklahoma | 5:16-CV-01153-SLP | 2015 . 09 . 12 | Remington Arms Co., LLC |
| Cody Shearouse | U.S. Dist. Court, S.D. of Georgia | 4:17-CV-00107 | 2015 . 07 . 26 | Remington Arms Co., LLC |
| Vincent Tate | Circuit Court, County of Henrico, Virginia | 087CL17004633-00 | 2015 . 12 . 31 | Remington Arms Co., LLC |
| Roger Stringer; et al. | U.S. Dist. Court, S.D. of Mississippi    U.S. Court of Appeals, 5th Circuit | 2:18-CV-00059-KS-MTP | 2011 . 06 . 11 | Remington Arms Co., LLC, Sporting Goods Properties, Inc., E.I. Du Pont De Nemours |
| Sharon Teague, etc.; et al. | U.S. Dist. Court, D. of Montana | 9:18-CV-00184 DLL | 2015 . 11 . 03 | Remington Arms Co., LLC, Remington Outdoor Co., Inc., Sporting Goods Properties, Inc., E.I. Du Pont De Nemours |
| Brett Nielsen | U.S. Dist. Court, D. of Utah | 2:20-CV-00011 | 2018 . 01 . 15 | Remington Arms Co., LLC |
| Starla Clay, etc. | Circuit Court, St. Clair County, Alabama | CV2018-900221 | 2017 . 12 . 15 | [unable to locate information on-line] |
| James Scott, etc. | U.S. Dist. Court, N.D. Alabama | 19-CV-01891 | 2017 . 11 . 13 | Remington Arms Co., LLC |
| Steven Wharton; Janice Johndrow | Superior Court, State of California, County of San Diego, Central Division | 37-2019-000121144-CU-PL-CTL | 2017 . 03 . 11 | Remington Arms Co., LLC, Remington Arms Co., Inc., Remington Arms Distribution Co., LLC; *Marlin Firearms Company [dismissed];* Able's Sporting, Inc., H&R 1871 LLC; Past and Present Collectibles, Inc., PRVI Partizan AD; TacServ, LLC; TR&Z USA Trading Corporation |
| Miguel Angeles; et al. | Superior Court, State of California, County of Santa Barbara | 18cv04922 | 2016 . 10 . 08 | *Remington Arms Company LLC; Prvi Partizan; TR&Z USA Trading Corporation; Goodland Guns; Dodge City Shooters Supply* |
| Travis Walton; Terry Walton | Superior Court, State of California; County of Los Angeles, Central District | BC723793 | 2016 . 10 . 05 | Remington Arms Co., LLC, Remington Arms Co., Inc., Remington Outdoor Co., Inc.; Marlin Firearms Company; Ventura Munitions; PPU; Turner's Outdoorsman; PRVI Partizan AD; TR&Z USA Trading Corporation |
| Precious Seguin | U.S. Dist. Court, E.D. of Louisiana U.S. Court of Appeals, 5th Circuit | 2:14-CV-02442 | 2013 . 10 . 28 | Remington Arms Co., LLC, *Sporting Goods Properties, Inc. [Terminated 3/12/15 – voluntary dismissal without prejudice], E.I. Du Pont De Nemours [Terminated 3/12/15 –* |

Case 20-81688-CRJ11    Doc 1069    Filed 00/26/20    Entered 00/26/20 18:53:46    Desc
Main Document    Page 171 of 180

ROC_COMM-0002360

# APPENDIX B

Product Liability Litigation
Defendants 9/2020

| | | | | |
|---|---|---|---|---|
| | | | | *voluntary dismissal without prejudice]* |
| Wilma Blanton, etc.; et al. | U.S. Dist. Court, E.D. of Kentucky | 7:20-CV-00071-REW-EBA | 2019 . 02 . 18 | Remington Arms Co., LLC; Remington Outdoor Co., Inc. |
| Jessica Olinick, etc.; et al. | U.S. Dist. Court, M.D. of Pennsylvania | 1:20-CV-01164-YK | 2018 . 12 . 01 | Remington Arms Co., LLC; Remington Outdoor Co., Inc.; Sporting Goods Properties, Inc.; E.I. DuPont de Nemours & Co. |
| SOTO (Donna L. Soto (Estate of Victoria L. Soto); et al. | Superior Court, Judicial District of Fairfield, at Bridgeport, Connecticut | FBT-CV15-6048103-S | 2012 . 12 . 14 | Remington Outdoor Co., Inc. (with DBAs); Camfour, Inc.; Camfour Holding, LLP; Riverview Sales, Inc., David LaGuercia |

ROC_COMM-0002361

# **EXHIBIT C**

Liquidation Analysis

**LIQUIDATION ANALYSIS**
**REMINGTON OUTDOOR COMPANY[1]**

## I.  Best Interests Test

Under the "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization ("Plan") unless each holder of a claim or interest either (i) accepts the Plan or (ii) received or retains under the Plan, property of value, as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. Accordingly, to demonstrate that the proposed Plan satisfies the "best interests" test, the Debtors have prepared the following hypothetical liquidation analysis (the "Liquidation Analysis"), which is based on certain assumptions discussed in the Debtors' disclosure statement ("Disclosure Statement") and in the accompanying notes to the Liquidation Analysis.

The Liquidation Analysis estimates potential cash distributions to holders of claims which would be approved by the Bankruptcy Court ("Allowed Claims") in a hypothetical chapter 7 liquidation of the Debtors' assets (the "Assets").  Asset recoveries discussed in the Liquidation Analysis, in some instances, may differ from values described in the Plan and Disclosure Statements.  The Debtors prepared the Liquidation Analysis with assistance from their financial and legal advisors.

## II.  Approach and Statement of Limitations

The determination of the proceeds and costs of a hypothetical liquidation of the Debtors' assets in chapter 7 cases is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis may not materialize (either in whole or in part) in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. Although the Debtors consider the estimates and assumptions set forth herein to be reasonable under the circumstances, such estimates and assumptions are inherently subject to significant uncertainties and contingencies beyond the Debtors' control. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable and good faith estimate of the recoveries that would result if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code over a 9 month period and is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled, examined, audited or reviewed by GRANT THORNTON LLP, the external audit firm for REMINGTON OUTDOOR COMPANY, or any other independent accountants. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements and business judgement from management. In addition, the Liquidation

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' principal offices and assets are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

1

Analysis includes estimates for claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 administrative claims and chapter 7 administrative claims such as wind-down costs, chapter 7 trustee fees, the chapter 7 trustee's professionals' fees and tax liabilities. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION OR ALLOWANCE BY THE DEBTORS (OR ANY OTHER PARTY) OF ANY CLAIMS BY OR AGAINST THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN ANY BANKRUPTCY CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY OR AMEND THE ANALYSIS SET FORTH HEREIN.

### III.  Global Assumptions

The Liquidation Analysis should be read in conjunction with the following global assumptions:

### a.  Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 11 cases are converted to chapter 7 cases on March 31, 2021 (the "Conversion Date"). The asset values shown herein are based on the Debtors' unaudited consolidated balance sheets as of January 1, 2021. The unaudited financial statements used to produce this analysis have been derived from the books and records of the Debtors; however, this information has not been subject to certain procedures that would typically be applied to financial information in accordance with Generally Accepted Accounting Principles ("GAAP"), and upon application of such procedures the financial information could be subject to material change. The Liquidation Analysis does not purport to represent financial statements prepared in accordance with GAAP, nor is it intended to fully reconcile to any financial statements prepared by the Debtors. Moreover, all numbers illustrated herein represent estimates by the Debtors, with assistance from their financial and legal advisors, as of the point in time of January 23, 2021, and therefore are subject in all respects to ongoing revision as the Debtors' bankruptcy process ensues.

The liquidation analysis was prepared on a consolidated basis.  Based upon the structure of operations, assets, assumed claims and collateral rights of secured lenders, the Debtors believe this approach is reasonable.

### b.  Chapter 7 Process

On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates, during which time all major assets of the Debtors' would be sold and the cash proceeds, net of liquidation-related costs, would be distributed to creditors in accordance with applicable law. There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously as is compatible with the best interests of parties-in-interest. The Debtors have assumed that asset liquidation would occur over approximately 9 months.  The general timeline of 9 months would afford time to market and sell assets and wind-down the Debtors' estates.

The cessation of business in a liquidation may trigger certain claims that otherwise would not exist under a reorganized company or sale of the business.

### c. Distribution of Net Proceeds

The Liquidation Analysis assumes that proceeds would be distributed in accordance with section 726 of the Bankruptcy Code. If the Debtors were liquidated pursuant to chapter 7 proceedings, the amount of liquidation value available to creditors would be reduced, first, by the costs of the liquidation, which include wind-down costs, post-conversion cash flows, fees and expenses of the chapter 7 Trustee and fees and expenses of other professionals retained to assist with the liquidation; second, by Secured Claims; third, any Administrative and Priority Claims; and fourth, General Unsecured Claims, in each case in accordance with the distribution waterfall set forth in section 726 of the Bankruptcy Code.

### d. Avoidance Actions

No recovery attributable to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions, are assumed within this analysis.

## IV. Conclusion

The Debtors have determined, as summarized in the following analysis, that confirmation of the Plan will provide creditors with a recovery that is not less than what the creditors would otherwise receive in connection with a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

| *($ in MM)* | Chapter 11 Plan Est. Recovery (%) | | | Chapter 7 Liquidation Est. Recovery (%) | | |
|---|---|---|---|---|---|---|
| | Low | Mid | High | Low | Mid | High |
| **Estimated Creditor Recoveries** | | | | | | |
| Secured Claims (Excluding Exit Term)[1] | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Exit Term Loan Claims | 23.8% | 33.2% | 57.8% | 20.0% | 30.5% | 56.8% |
| Admin and Priority Claims[2] | 100.0% | 100.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| General Unsecured Claims | 0.2% | 0.3% | 1.1% | 0.0% | 0.0% | 0.0% |
| Tort Convenience Class Claims[3] | 2.0% | 2.0% | 2.0% | | See Note Five | |
| Tort Claims[4] | | See Note Four | | | See Note Five | |

[1]Secured Claims are limited to the value of the estate's interest in the underlying collateral, which may be less than the total amount of asserted Claims, the balance of which would be an unsecured deficiency claims. Where the estate's interest in the asserted collateral is zero, there will be no Secured Claim.

[2]Assumes amounts are paid based upon asserted claim amounts unless a settlement has been reached otherwise.

[3]Pursuant to the Chapter 11 plan, each holder of an Allowed Tort Convenience Class Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Tort Convenience Class Claim, Cash equal to two percent (2%) of the Allowed Amount of such Claim not to collectively exceed twenty thousand dollars ($20,000) per incident or occurrence. Holders of Tort Convenience Class Claims arising from a single incident or occurrence must collectively elect to participate in the Class and are collectively subject to the maximum recovery. The Tort Claims may have a range of recoveries which may reach as high as one hundred percent (100%) to the extent the claim is fully covered by insurance. Tort Claims have a floor recovery of 2%, as the recovery analysis assumes any Tort Claim that would receive a lower recovery from insurance will instead opt to be treated as a Tort Convenience Class Claim.

(4)Pursuant to the Chapter 11 plan, except to the extent previously satisfied during the Chapter 11 Cases, each holder of an Allowed Tort Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Tort Claim, a beneficial interest in the Tort Claim Sub-Trust (collectively, the "Tort Claim Sub-Trust Interests") reflecting a right to receive such holder's share of the proceeds of the GL Insurance Assets providing coverage applicable to such Tort Claim.

[5]In a Chapter 7 Liquidation, there would be no floor to the recovery on Tort Claims as provided by the Tort Convenience Class. Moreover, there would be no assurance that a Chapter 7 Trustee would retain the GL insurance Assets for the benefit of Tort Claims. A Chapter 7 Trustee may also decide to immediately abandon records and other materials. No other value is likely to be available for Tort Claims in a Chapter 7. Accordingly, the Debtors have determined the Tort Claimants would not obtain a higher recovery in a Chapter 7.

3

## V.  Liquidation Analysis

*($ in MM)*

| | Asset / Claim at 1/1/2021 | Chapter 7 Liquidation | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|
| | | Est. Recovery ($) | | | Est. Recovery (%) | | | |
| | | Low | Mid | High | Low | Mid | High | |
| **Assets** | | | | | | | | |
| Cash and Cash Equivalents | $ 52.6 | $ 52.6 | $ 52.6 | $ 52.6 | 100.0% | 100.0% | 100.0% | (1) |
| Restricted Cash and Collateral | 9.5 | 0.8 | 1.1 | 1.3 | 8.7% | 11.1% | 13.5% | (2) |
| Accounts Receivable | 1.1 | 0.3 | 0.6 | 0.8 | 30.0% | 50.0% | 70.0% | (3) |
| Huntsville Real Estate | 16.0 | 16.0 | 25.6 | 54.3 | 100.0% | 159.7% | 338.8% | (4) |
| Madison Real Estate | 0.9 | 0.9 | 1.4 | 1.9 | 100.0% | 152.8% | 205.7% | (5) |
| Other Remaining Assets | 0.03 | 0.03 | 0.03 | 0.03 | 100.0% | 100.0% | 100.0% | (6) |
| **Total Assets** | **$ 80.2** | **$ 70.7** | **$ 81.2** | **$ 110.9** | | | | |
| | | | | | | | | |
| **Less: Administrative Fees** | | | | | | | | |
| Chapter 7 Professional Fees | | $ (5.4) | $ (3.6) | $ (1.8) | | | | (7) |
| Chapter 7 Trustee Fees | | (2.1) | (2.5) | (3.3) | | | | (8) |
| Chapter 7 Litigation | | (3.5) | (3.0) | (2.5) | | | | (9) |
| Pre-Conversion Administrative Expenses | | (15.3) | (15.3) | (15.3) | | | | (10) |
| Post-Conversion Wind-Down Costs | | (6.9) | (6.9) | (6.9) | | | | (11) |
| **Total Administrative Fees** | | **$ (33.3)** | **$ (31.3)** | **$ (29.9)** | | | | |
| | | | | | | | | |
| **Net Proceeds Available For Distribution** | | **$ 37.4** | **$ 49.9** | **$ 81.0** | | | | |
| | | | | | | | | |
| **Estimated Creditor Recoveries** | | | | | | | | |
| Secured Claims | | | | | | | | |
| Huntsville Mortgage | $ 13.5 | $ 13.5 | $ 13.5 | $ 13.5 | 100.0% | 100.0% | 100.0% | (12) |
| Other Secured Claims | 0.3 | 0.3 | 0.3 | 0.3 | 100.0% | 100.0% | 100.0% | (13) |
| Exit Term Loan Claims | 118.4 | 23.7 | 36.2 | 67.2 | 20.0% | 30.5% | 56.8% | (14) |
| **Total Secured Claims** | **$ 132.2** | **$ 37.4** | **$ 49.9** | **$ 81.0** | | | | |
| | | | | | | | | |
| **Net Proceeds Available after Secured Claims Recovery** | | **$ -** | **$ -** | **$ -** | | | | |
| | | | | | | | | |
| Administrative and Priority Claims | $ 2.6 | $ - | $ - | $ - | 0.0% | 0.0% | 0.0% | (15) |
| General Unsecured Claims | 158.6 | - | - | - | 0.0% | 0.0% | 0.0% | (16) |
| Tort Convenience Class Claims | n/a | See Note 17 | | | See Note 17 | | | (17) |
| Tort Claims | n/a | See Note 17 | | | See Note 17 | | | (17) |

4

## VI. Notes to the Liquidation Analysis

**Assets:**

1. Cash and Cash Equivalents

   a) Consists of unrestricted cash in the Debtors' bank accounts.
   b) The estimated recovery from this asset category is 100%.

2. Restricted Cash and Collateral

   a) Includes restricted cash which serves as collateral for various Letters of Credit and amounts which were reserved for pursuant to the previous sale closings, including items such as transaction taxes, post-petition excise taxes and other transaction related reserves.
   b) This $9.5MM estimate does not include $6.2MM of professional fee reserves.
   c) The estimated recovery from this asset category ranges from a low of 8.7% to a high of 13.5%.

3. Accounts Receivable

   a) Consists of gross accounts receivable.
   b) The estimated recovery from this asset category is 30 – 70%.

4. Huntsville Real Estate

   a) Represents the Debtors' corporate headquarters and production facility located in Huntsville, Alabama.
   b) The estimated proceeds from this facility sale range from a low of $16.0MM to a high of $54.3MM, and is based on a range of sale prices, net of certain reserves, broker fees and other expenses.
      i. The low and mid estimates reflect stressed sale prices; the high reflects a full market process.
      ii. Proceeds exclude the outstanding Huntsville mortgage of $13.5MM, which is assumed to be paid as a secured claim.
   c) Amounts assume recoveries are consistent with those reflected in the Chapter 11 plan; a Chapter 7 could materially harm the sale process and ultimate recoveries.

5. Madison Real Estate

   a) Represents the Debtors' corporate office building in Madison, North Carolina.
   b) The estimated proceeds from this sale range from a low of $0.9MM to a high of $1.9MM, and is based on a range of sale prices, net of broker fees and other expenses.
   c) Amounts assume recoveries are consistent with those reflected in the Chapter 11 plan; a Chapter 7 could materially harm the sale process and ultimate recoveries.

6. Other Remaining Assets

   a) Includes the sale of approximately 280 shares of Walmart stock owned by the Debtors, based on a share price using the prevailing 52-week low of $102.00.
   b) The Debtors may have other assets however they are assumed to be immaterial.

**Administrative Fees:**

The Liquidation Analysis assumes a chapter 7 proceeding takes approximately 9 months from the Conversion Date. This timeline would afford time to complete the sale of assets (mainly the real estate) and wind-down of the Debtors' estates.

7. Chapter 7 Professional Fees

5

a) Chapter 7 professional fees include fees payable to legal, financial and other professional advisors required to facilitate the liquidation and wind-down process.

b) Chapter 7 professional fees have been estimated based on a range of costs per month from a high of $600,000 to a low of $200,000 over the 9 month liquidation period.

8. Chapter 7 Trustee Fees

a) Trustee fees include all fees that would be paid to the chapter 7 trustee, consistent with the Bankruptcy Code requirements.

b) The chapter 7 trustee fees are estimated using a graduating scale, as set forth in section 326 of the Bankruptcy Code, ranging from 25% on the first distribution of $5,000 to 3.0% for the distribution in excess of $1,000,000.

9. Chapter 7 Litigation

a) Absent a Chapter 11 plan, in a Chapter 7 liquidation it is likely the Estate would bear the responsibility of substantial litigation costs related to certain Tort Claims, Tax Claims and potential other creditor assertions to challenge secured liens.

10. Pre-Conversion Administrative Expenses

a) Includes post-petition costs assumed to be incurred and paid between January 1, 2021 to March 31, 2021.

11. Post-Conversion Wind-Down Costs

a) Includes on-going payroll, facility, professional, software, document retention, taxes, general & administrative, and contingency expenses starting April 1, 2021 through the liquidation period of December 31, 2021.
Key assumptions include:

i. *Payroll:* To maximize recoveries and to ensure an orderly liquidation, it is assumed the Trustee will need to continue to employ certain existing employees or contractors during the liquidation period. These individuals will be responsible for maintaining the operations of the Debtors during the liquidation period and providing guidance to the chapter 7 Trustee regarding the businesses and assets.

ii. *Facility Expenses:* To maximize value of the Debtors', it is assumed the Trustee will continue to pay expenses related to the real estate assets of Huntsville and Madison through the period while they are being marketed and sold.

iii. *Professional fees – recurring, software, document retention, taxes and G&A expenses:* to ensure continuity of services for the Debtors' day-to-day operations.

b) Also included herein is an amount for a claim from the Alcohol and Tobacco Tax and Trade Bureau ("TTB"). The TTB have asserted a priority claim amount of $14,959,121.23 related to firearms and ammunition excise tax ("FAET"). In this analysis we have included a $2MM reserve based on the proposed settlement amount, assuming that the TTB settlement may also apply in a Chapter 7 liquidation. However, results could vary significantly in a Chapter 7.

**Claims:**

12. Secured Claims – Huntsville Mortgage

a) The Debtors estimate the Huntsville mortgage claim to be $13,494,791.67, which includes principal and interest. Collateral which secures the facility is assumed to be limited to the Huntsville facility.

i. The estimated recovery from this asset category is 100%.

13. Secured Claims – Other Secured claims

6

a) The Debtors estimate other miscellaneous secured claims of $256,513.49. For purposes of this analysis it is assumed the value of the collateral equals or exceeds these claims, and these claims have rights to certain collateral or are senior to the Exit Term Loan.

b) Secured Claims are limited to the value of the estate's interest in the underlying collateral, which may be less than the total amount of asserted Claims, the balance of which would be an unsecured deficiency claims. Where the estate's interest in the asserted collateral is zero, there will be no Secured Claim.

    i. The estimated recovery from this asset category is 100%.

14. Secured Claims – Exit Term Loan Claim

a) The Debtors estimate the Exit Term Loan Claim to be $118,420,202.08. This amount includes principal and accrued interest as of the Petition Date. It is assumed they have a first priority lien on any and all assets of the Company, subject potentially as to priority to the claims noted in numbers 12 and 13.

    i. Recovery is estimated to be between 20.0% and 56.8%.

15. Administrative and Priority Claims

a) Includes administrative and priority tax and priority non-tax claims.

    i. Does not include the TTB claim of $15MM; see note 11b) for additional detail regarding TTB treatment for purposes of this analysis.

    ii. These claims are estimated to receive no recovery in a Chapter 7 liquidation.

    iii. This amount is subject to material change due to ongoing review and revision by the Debtors.

16. General Unsecured Claims

a) The Debtors estimate the General Unsecured Claim ("GUC") pool using a midpoint of a low to high range of $134MM to $184MM, respectively.

    i. These claims are estimated to receive no recovery in a Chapter 7 liquidation.

    ii. This amount is subject to material change due to ongoing review and revision by the Debtors.

17. Tort Convenience Class Claims and Tort Claims

a) These claims have defined recoveries under the Chapter 11 plan.

b) In a Chapter 7 Liquidation, there would be no floor to the recovery on Tort Claims as provided by the Tort Convenience Class. Moreover, there would be no assurance that a Chapter 7 Trustee would retain the GL insurance Assets for the benefit of Tort Claims. A Chapter 7 Trustee may also decide to immediately abandon records and other materials. No other value is likely to be available for Tort Claims in a Chapter 7. Accordingly, the Debtors have determined the Tort Claimants would not obtain a higher recovery in a Chapter 7.