# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>REMINGTON OUTDOOR COMPANY, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-81688-CRJ11<br><br>Jointly Administered |

## JOINT CHAPTER 11 PLAN OF THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND EXIT TERM LOAN LENDERS

**O'MELVENY & MYERS LLP**
Co-Counsel for the Debtors and
Debtors in Possession
400 South Hope Street
Los Angeles, CA 90071-2899

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Co-Counsel for the Franklin Managed Entities
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998

**FOX ROTHSCHILD LLP**
Co-Counsel for the Committee
345 California Street, Suite 2200
San Francisco, CA 94104

**BURR & FORMAN LLP**
Co-Counsel for the Debtors and
Debtors in Possession
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203

**CHRISTIAN & SMALL LLP**
Co-Counsel for the Franklin Managed Entities
1800 Financial Center, 505 N. 20th Street
Birmingham, AL 35203

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
Co-Counsel for the Committee
420 20th Street North, Suite 1400
Birmingham, AL 35203

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' principal offices and assets are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ................................... 2

A. Defined Terms ........................................................................................... 2

B. Rules of Interpretation ............................................................................. 16

C. Computation of Time ............................................................................... 16

D. Governing Law ......................................................................................... 16

E. Reference to Monetary Figures ............................................................... 17

ARTICLE II ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED CLAIMS ................................................................................... 17

A. General Administrative Expenses ........................................................... 17

B. General Administrative Expense Bar Date .............................................. 17

C. Professional Fees ..................................................................................... 17

1. Final Fee Applications .............................................................................. 17

2. Plan Professional Fee Reserve ................................................................. 18

D. Priority Tax Claims .................................................................................. 18

E. Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses ....... 19

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................................................................ 20

A. Classification of Claims and Interests ..................................................... 20

B. Treatment of Claims and Interests .......................................................... 21

1. Class 1 – Priority Non-Tax Claims .......................................................... 21

2. Class 2 – Other Secured Claims ............................................................... 21

3. Class 3 – Exit Term Loan Claims ............................................................ 22

4. Class 4 – Huntsville Note Claim .............................................................. 23

5. Class 5 – General Unsecured Claims ....................................................... 24

6. Class 6 – Tort Convenience Class Claims ............................................... 24

7. Class 7 – Tort Claims ............................................................................... 25

8. Class 8 – Intercompany Claims ................................................................ 25

9. Class 9 – Interests in the Debtors ............................................................ 25

C. Special Provision Governing Unimpaired Claims ................................... 26

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN ............................... 26

A. Voting Classes .......................................................................................... 26

B. Presumed Acceptance of the Plan ........................................................... 26

C.      Non-Consensual Confirmation ............................................................... 26

D.      Elimination of Vacant Classes ............................................................. 27

E.      Subordinated Claims ........................................................................... 27

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ............................ 27

A.      General Settlement of Claims and Interests .......................................... 27

B.      Procedural Consolidation of Debtors for Plan Purposes Only ............................ 27

C.      Sources of Cash for Plan Distributions ................................................ 28

D.      Continued Corporate Existence; Vesting of Assets ............................................. 28

E.      Establishment of Creditor Trust .......................................................... 29

F.      Tort Claims and the Establishment of the Tort Claim Sub-Trust ....................... 30

G.      Powers and Duties of the Plan Administrator ...................................... 31

H.      Corporate Action ............................................................................... 34

I.      Winding Down of Affairs .................................................................... 34

J.      Closing of the Chapter 11 Cases .......................................................... 35

K.      Dissolution of the Debtors ................................................................. 35

L.      Costs and Expenses of the Plan Administrator ................................... 36

M.      Cancellation of Loans, Securities and Agreements ............................ 37

N.      Effectuating Documents; Further Transactions .................................... 38

O.      Section 1146 Exemption ..................................................................... 38

P.      Preservation of Estate Causes of Action .............................................. 38

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND
        UNEXPIRED LEASES ..................................................................... 39

A.      Executory Contracts and Unexpired Leases ...................................... 39

B.      Rejection Damages Bar Date ............................................................... 39

C.      Effect of Post-Confirmation Rejection ................................................ 40

D.      Non-Occurrence of Effective Date ...................................................... 40

E.      Indemnification Obligations; Insurance Policies ................................. 40

F.      Excluded Employee Liabilities, Retiree Plan and Pension Plan ......................... 40

G.      Reservation of Rights ......................................................................... 41

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ................................. 41

A.      Plan Distributions .............................................................................. 41

B.      Distribution Record Date .................................................................... 41

C.      Objections to Claims; Estimation of Claims ................................... 42

D.      No Distributions Pending Allowance ................................................ 42

E.      Reserve of Cash Distributions ......................................................... 43

F.      Distribution After Allowance ........................................................... 43

G.      No Recourse ...................................................................................... 43

H.      Application of Distributions ............................................................. 43

I.       Undeliverable Distributions and Unclaimed Property ...................... 44

J.       Compliance with Tax Requirements ................................................. 44

K.      No Postpetition Interest on Claims and Interests ............................. 44

L.      Foreign Currency Exchange Rate ..................................................... 45

M.      Setoffs and Recoupment ................................................................... 45

N.      Distributions Free and Clear ............................................................ 45

O.      De-Minimis Distributions and Donation .......................................... 45

P.      Claims Paid or Payable by Third Parties .......................................... 45

1.      Claims Paid by Third Parties ............................................................ 45

2.      Claims Payable by Third Parties ....................................................... 46

3.      Applicability of Insurance Policies ................................................... 46

ARTICLE VIII EFFECTS OF PLAN CONFIRMATION ................................... 46

A.      Injunction .......................................................................................... 46

B.      Exculpation and Limitation of Liability ........................................... 47

C.      Release of Debtors, Restructuring Committee, Exit Term Loan Agent, Exit Term Loan Lenders, the FILO Term Loan Agent, FILO Term Loan Lenders, and Directors and Officers ......................... 48

D.      Term of Injunctions or Stays ............................................................ 48

ARTICLE IX CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ......... 48

A.      Conditions to the Effective Date ...................................................... 48

B.      Waiver of Conditions ........................................................................ 49

C.      Substantial Consummation ............................................................... 50

ARTICLE X MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN ........................................................................................... 50

A.      Modification and Amendments ......................................................... 50

B.      Effect of Confirmation on Modifications ......................................... 50

## TABLE OF CONTENTS
### (continued)

C.    Revocation or Withdrawal of Plan; Effect of Non-Occurrence of Confirmation Date or Effective Date.................................................................. 50

ARTICLE XI RETENTION OF JURISDICTION.......................................................... 51

ARTICLE XII MISCELLANEOUS PROVISIONS ........................................................ 53

A.    Immediate Binding Effect.................................................................................... 53

B.    Additional Documents ......................................................................................... 53

C.    Filing of Monthly and Quarterly Reports and Payment of Statutory Fees .......... 54

D.    Reservation of Rights.......................................................................................... 54

E.    Successors and Assigns....................................................................................... 54

F.    Notices ................................................................................................................ 54

G.    Term of Injunctions or Stays............................................................................... 55

H.    Entire Agreement................................................................................................. 55

I.    Exhibits ............................................................................................................... 55

J.    Nonseverability of Plan Provisions..................................................................... 56

K.    Votes Solicited in Good Faith ............................................................................. 56

L.    Closing of the Chapter 11 Cases ......................................................................... 56

M.    Document Retention ........................................................................................... 56

N.    Conflicts.............................................................................................................. 56

## Introduction

Remington Outdoor Company, Inc. ("ROC") and its subsidiaries FGI Holding Company, LLC, FGI Operating Company, LLC, Remington Arms Company, LLC, Barnes Bullets, LLC, TMRI, Inc., RA Brands, L.L.C., FGI Finance Inc., Remington Arms Distribution Company, LLC, Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC, and Outdoor Services, LLC, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors"), together with the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases,[2] and certain Exit Term Loan Lenders, jointly propose this plan (together with the Plan Supplement, and as the same may be modified, amended, or supplemented in accordance with the terms hereof, the "Plan") in connection with the conclusion of a comprehensive sale process for Collateral including certain core and non-core assets (collectively, the "Sales"), which resulted in sale transactions with seven separate buyers yielding an aggregate net purchase price in the amount of approximately $157 million (the "Primary Asset Sale Proceeds"). Certain significant assets that constitute Collateral of the Exit Term Loan Secured Creditors but were not included in the Sales (the "Remaining Assets") remain in the Debtors' estates and are expected to generate additional value upon disposition (the "Remaining Asset Proceeds," together with the Primary Asset Sale Proceeds and all other Cash on hand constituting Cash Collateral of the Prepetition Secured Creditors, the "Collateral Proceeds") for the benefit of the Exit Term Loan Secured Creditors and the Debtors' estates.

This Plan contemplates the distribution of the Collateral Proceeds and the unencumbered assets of the Debtors' estates, if any, in accordance with the priority scheme contemplated under the Bankruptcy Code (the "Liquidation") and requirements for plan confirmation. The Liquidation will be consummated pursuant the Plan to be confirmed by the Bankruptcy Court. The Liquidation will provide for the termination of the Debtors' business operations, the disposition of the Debtors' remaining assets (including the Remaining Assets), and the wind-down of the Debtors' affairs in an orderly process under chapter 11 of the Bankruptcy Code.

Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, and historical financial information, as well as a summary and description of the Plan.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below:

---

[2] All undefined capitalized terms in this Introduction are defined in Article I.A.

"*Adequate Protection Superpriority Claim*" means a Claim in the amount equal to any diminution in value of the Exit Term Loan Secured Creditors' respective Liens on and interests in the Collateral securing their respective Exit Term Loan Claims.

"*Administrative Expense*" means any cost or expense of administration of the Estates entitled to priority pursuant to sections 503(b) (including Claims arising under section 503(b)(9)), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates; (b) professional compensation and reimbursement awarded or allowed pursuant to sections 330(a) or 331 of the Bankruptcy Code, including the Professional Fees or otherwise allowed under section 503(b) of the Bankruptcy Code; (c) any indebtedness or obligations incurred or assumed by the Debtors after the Petition Date and through the Effective Date; and (d) any and all fees and charges assessed against the Estates pursuant to section 1930 of title 28 of the United States Code; *provided*, *however,* that except as otherwise provided herein, "Administrative Expense" shall not include any Exit Term Loan Claims, or the Huntsville Note Claim.

"*Aggregate Gift to Junior Creditors*" has the meaning set forth in Article III.B.3(f).

"*Allowed*" means, with respect to any Claim or Interest, such Claim or Interest or portion thereof against or in any Debtor: (a) that has been listed by such Debtor in the Schedules as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (b) as to which the deadline for objecting or seeking estimation has passed, and no objection or request for estimation has been filed; (c) as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn, or denied by a Final Order; or (d) that is allowed pursuant to the terms of (i) a Final Order, (ii) an agreement in writing by and among the holder of such Claim or Interest and the Debtors or the Plan Administrator, as applicable, or (iii) the Plan.

"*Article*" refers to an article of the Plan.

"*Asset Purchase Agreements*" means (i) the Roundhill Asset Purchase Agreement; (ii) that certain Asset Purchase Agreement, dated as of September 26, 2020, by and among the Debtors and Vista Outdoor Inc.; (iii) that certain Asset Purchase Agreement, dated as September 26, 2020, by and among the Debtors and Sturm, Ruger & Company, Inc.; (iv) that certain Asset Purchase Agreement, dated as of September 30, 2020, by and among the Debtors and Sierra Bullets, L.L.C.; (v) that certain Asset Purchase Agreement, dated as of October 7, 2020, by and among the Debtors and Sportsman's Warehouse, Inc.; (vi) that certain Asset Purchase Agreement, dated as of October 7, 2020, by and among the Debtors and Crotalus Holdings, Inc.; (vii) that certain Asset Purchase Agreement, dated as of October 23, 2020, by and among the Debtors and JJE Capital Holdings, LLC; and (viii) that certain Asset Purchase Agreement, dated as of October 23, 2020, by and among the Debtors and JJE Capital Holdings, LLC.

"*Assets*" means all assets of the Debtors of any nature whatsoever, including all property of the Estates pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of all of the foregoing.

"*Bankruptcy Administrator*" means the Office of the Bankruptcy Administrator for the Bankruptcy Court.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532 *et seq.*

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Alabama or any other court having jurisdiction over the Chapter 11 Cases.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated pursuant to 28 U.S.C. § 2075 and the general, local, and chamber rules of the Bankruptcy Court.

"*Bidding Procedures Order*" means the *Order Establishing Bidding Procedures Relating to the Sales of All or a Portion of the Debtors' Assets* entered by the Bankruptcy Court on August 20, 2020 [Docket No. 411].

"*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"*Cash*" means cash and cash equivalents in U.S. dollars.

"*Cash Collateral*" means all property of the Debtors that constitutes cash collateral in which the Exit Term Loan Agent, on behalf of the applicable Exit Term Loan Secured Creditors, has an interest as provided in section 363(a) of the Bankruptcy Code or any order of the Bankruptcy Court, and shall include the balances of funds in the Debtors' prepetition and postpetition bank accounts, Cash, income, offspring, products, proceeds and profits from the Debtors' business operations, all Cash proceeds arising from the collection, sale, lease, or other disposition, use or conversion of any Collateral securing the Exit Term Loan Claims or pursuant to an order of the Bankruptcy Court or applicable law or otherwise, whether such property that has been converted to Cash, existed prior to or after the Petition Date; and all of the respective deposits, refund claims, and rights of the Debtors upon which the Exit Term Loan Secured Creditors hold a Lien or replacement Lien, whether as part of their Collateral or pursuant to an order of the Bankruptcy Court or applicable law or otherwise; *provided* that Cash Collateral shall not include any Cash in the Plan Professional Fee Reserve or amounts reserved for Plan Administrator Operating Expenses except to the extent of the Exit Term Loan Secured Creditors' and/or the Debtors' reversionary interests therein.

"*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, action, remedy, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date and that are or may be pending or existing on the Effective Date against any Entity, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any counterclaim or defense, including

3

fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any equitable remedy, including any claim for equitable subordination, equitable disallowance, or unjust enrichment; and (f) any cause of action or claim arising under any state or foreign fraudulent transfer law.

"*CBA*" means that certain collective bargaining agreement between UMWA and Remington Arms Company, LLC effective December 16, 2016.

"*Chapter 11 Case*" means, with respect to a particular Debtor, the case under chapter 11 of the Bankruptcy Code pending for such Debtor in the Bankruptcy Court, jointly administered with each other Debtor's Chapter 11 Case under Case No. 20-81688-CRJ-11, and the "*Chapter 11 Cases*" means each Debtor's Chapter 11 Case, collectively.

"*Claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code.

"*Claims Objection Deadline*" has the meaning set forth in Article VII.C.

"*Class*" means a class of Claims or Interests designated in Article III, pursuant to section 1123(a)(1) of the Bankruptcy Code.

"*Collateral*" means any property or interest in property of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable nonbankruptcy law.

"*Collateral Proceeds*" has the meaning specified in the Introduction hereto.

"*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

"*Committee Stipulations*" means the *Stipulations Between the Official Committee of Unsecured Creditors, Prepetition Agents, and Prepetition Secured Creditors Regarding Committee Investigation and Final Cash Collateral Order* filed with the Bankruptcy Court on October 5, 2020 [Docket Number 937].

"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

"*Confirmation Order*" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and granting other related relief.

"*Creditor Trust*" means that certain trust established pursuant to the terms set forth in Article V.E.

"*Creditor Trust Agreement*" has the meaning set forth in Article V.E and attached to the Plan Supplement.

"*Creditor Trust Assets*" means (i) $394,451.00 in Cash, representing the difference between the "Consent Fee" as defined in the Final Cash Collateral Order and the "Consent Fee" as defined in the Interim Cash Collateral Order; (ii) the Distribution Contribution (clauses (i) and (ii) of this definition, the "Unsecured Creditor Recovery Amount"); (iii) the Litigation Assets; and (iv) any unencumbered assets of the Debtors' estates not previously liquidated other than Litigation Assets, which are agreed by the Debtors and Committee to be limited to the assets identified in Paragraph 1 of the Committee Stipulations; it being agreed and acknowledged that the Unsecured Creditor Recovery Amount shall be gifted in Cash from the Collateral Proceeds otherwise available to satisfy the Exit Term Loan Secured Claims. For the avoidance of doubt, Creditor Trust Assets shall not include (1) any other reserves established under the Plan or (2) the GL Insurance Assets.

"*Creditor Trust Interests*" means the beneficial interests in the Creditor Trust.

"*D&O Insurance*" means all primary and excess insurance policies that provide coverage for the Debtors' former and current directors and officers, including all "tail" or "runoff" coverage for such policies.

"*Debtors*" has the meaning specified in the Introduction hereto.

"*Deficiency Claim*" means a Claim in the amount by which an Allowed Secured Claim exceeds the value of any Collateral securing such Claim, determined in accordance with section 506(a) of the Bankruptcy Code.

"*Disallowed*" means, with respect to a Claim or Interest or portion thereof, that such Claim or Interest or portion thereof that is not Allowed and (a) has been disallowed by a Final Order, (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no proof of claim or request for payment of an Administrative Expense has been timely filed or deemed timely filed with the Bankruptcy Court, (c) is not listed in the Schedules and as to which no proof of claim or request for payment of an Administrative Expense has been timely filed or deemed timely filed with the Bankruptcy Court, (d) has been withdrawn by agreement of the applicable Debtor or the Plan Administrator, as applicable, and the holder thereof, or (e) has been withdrawn by the holder thereof.

"*Disclosure Statement*" means that certain disclosure statement relating to the Plan, including all exhibits, appendices, and schedules thereto, as amended, supplemented, or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"*Disputed*" means any Claim or Interest that is not Allowed or Disallowed.

"*Distribution Contribution*" means five percent (5.0%) of the Exit Term Loan Secured Recovery in excess of thirty-eight million dollars ($38,000,000); *provided, however*, that the Distribution Contribution shall not exceed two million dollars ($2,000,000).

5

"*Distribution Record Date*" means the Confirmation Date or such other date acceptable to the Debtors and the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders; *provided*, *however*, that there is no Distribution Record Date for the Debtors' publicly traded securities.

"*District Court*" means the United States District Court for the District of Northern Alabama.

"*Document Preservation Order*" means that certain *Order Approving Motion for Preservation Order* entered by the Bankruptcy Court on October 30, 2020 [Docket No. 1059], as such order may be modified or amended by the Bankruptcy Court.

"*Effective Date*" means the date selected by the Debtors, in consultation with the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and the Committee, that is the first Business Day after the Confirmation Date on which date all conditions to the Effective Date specified in Article IX.A have been satisfied or waived in accordance with Article IX.B.

"*Entity*" means any "entity," as such term is defined in section 101(15) of the Bankruptcy Code.

"*Equity Incentive Plan*" means ROC's 2018 Equity Incentive Plan and all outstanding awards granted thereunder.

"*Estate*" means, with respect to a particular Debtor, the estate created for such Debtor upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and the "*Estates*" means every Debtor's Estate, collectively.

"*Estate Causes of Action*" means any and all Causes of Action that may be asserted by the Estates.

"*Excise Taxes*" means the firearms and ammunition excise tax payable under 26 U.S.C. § 4181.

"*Excluded Employee Liabilities*" means the Pension Plan, Supplemental Retirement Plan, and the Equity Incentive Plan.

"*Excluded Liabilities*" means the liabilities of the Debtors that were not assumed by the buyers under the Asset Purchase Agreements.

"*Exit Term Loan Agent*" means, collectively, Ankura Trust Company, LLC, in its capacities as administrative agent and collateral agent under the Exit Term Loan Documents, together with any successor agent thereto and any sub-agent appointed by such administrative agent or collateral agent, including Cantor Fitzgerald Securities in such capacity.

"*Exit Term Loan Agent Expenses*" means, collectively, (i) all reasonable and documented fees and expenses of (A) Davis Polk & Wardwell LLP, as primary counsel to the Exit Term Loan Agent, and (B) Hand Arendall Harrison Sale LLC, as local counsel to the Exit Term Loan Agent,

6

and (ii) all reasonable and documented fees and expenses (including, without limitation, fees due to the Exit Term Loan Agent under the Exit Term Loan Documents) of the Exit Term Loan Agent.

"*Exit Term Loan Agreement*" means the Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020), by and among FGI Operating Company, LLC, the other loan parties party thereto from time to time, the Exit Term Loan Agent and the Exit Term Loan Lenders.

"*Exit Term Loan Claims*" means all Claims of the Exit Term Loan Secured Creditors arising under or relating to the Exit Term Loan Documents that remain unpaid and outstanding as of the Effective Date.

"*Exit Term Loan Deficiency Claims*" means all Unsecured Claims in an amount equal to the amount of Exit Term Loan Claims *less* the amount of the Exit Term Loan Secured Claims *plus* the Unsecured Creditor Recovery Amount.

"*Exit Term Loan Documents*" means the Exit Term Loan Agreement and all other related documents, guarantees, and agreements, including security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments, or certificates executed in connection with the Exit Term Loan Agreement.

"*Exit Term Loan Lenders*" means those financial institution(s) party from time to time to the Exit Term Loan Agreement as lenders, in their respective capacities as such.

"*Exit Term Loan Required Lenders*" means "Required Lenders" as such term is defined in the Exit Term Loan Agreement.

"*Exit Term Loan Secured Claims*" means the aggregate portion of the Exit Term Loan Claims constituting Secured Claims.

"*Exit Term Loan Secured Creditors*" means, collectively, the Exit Term Loan Lenders and the Exit Term Loan Agent.

"*Exit Term Loan Secured Recovery*" means the aggregate amount of Cash distributed under the Plan to the Exit Term Loan Lenders on account of the Exit Term Loan Secured Claims.

"*FILO Term Loan Agent*" means collectively, Ankura Trust Company, LLC, in its capacities as administrative agent and collateral agent under the FILO Term Loan Documents, together with any successor agent thereto and any sub-agent appointed by such administrative agent or collateral agent, including Cantor Fitzgerald Securities in such capacity.

"*FILO Term Loan Agreement*" means the First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of

7

March 27, 2020), by and among FGI Operating Company, LLC, the other loan parties party thereto from time to time, the FILO Term Loan Agent and the FILO Term Loan Lenders, which has been repaid in full and terminated prior to the filing of this Plan.

"*FILO Term Loan Documents*" means the FILO Term Loan Agreement and all other related documents, guarantees, and agreements, including security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments, or certificates executed in connection with the FILO Term Loan Agreement.

"*FILO Term Loan Lenders*" means those financial institution(s) party from time to time to the FILO Term Loan Agreement as lenders, in their respective capacities as such.

"*FILO Term Loan Secured Creditors*" means, collectively, the FILO Term Loan Lenders and the FILO Term Loan Agent.

"*Final Cash Collateral Order*" means that certain *Final Order Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on August 20, 2020 [Docket No. 410], as amended by that certain *Order Amending Final Order Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on October 8, 2020 [Docket No. 970], as further modified by that certain Letter re: Extension of Cash Collateral Termination Date, dated December 30, 2020, Letter re: Extension of Cash Collateral Termination Date, dated January 8, 2021, Letter re: Extension of Cash Collateral Termination Date, dated January 15, 2021, Letter re: Extension of Cash Collateral Termination Date, dated January 22, 2021, and any further extensions thereto.

"*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or (b) any appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, petitioned, or moved.

"*Franklin Managed Entities*" means, collectively, the separate funds and accounts managed by Franklin Advisers, Inc. that are Exit Term Loan Lenders.

"*Franklin Managed Entities Expenses*" means, collectively, all reasonable and documented fees and expenses of (i) Pillsbury Winthrop Shaw Pittman LLP, as primary counsel to the Franklin Managed Entities, and (ii) Christian & Small LLP, as local counsel to the Franklin Managed Entities.

"*General Administrative Expense*" means any Administrative Expense other than Professional Fees.

"*General Administrative Expense Bar Date*" means the first Business Day that is thirty (30) days after the notice of the Effective Date is filed with the Bankruptcy Court or such other date as may be established by order of the Bankruptcy Court.

"*General Unsecured Claim*" means any Claim against a Debtor that is not an Administrative Expense, Exit Term Loan Claims (other than the Exit Term Loan Deficiency Claims), Huntsville Note Claim, Priority Claim, Intercompany Claim, Other Secured Claim, Tort Convenience Class Claim or Tort Claim. For the avoidance of doubt, General Unsecured Claims shall include (a) Claims for rejection damages pursuant to section 365 of the Bankruptcy Code related to an Executory Contract or Unexpired Lease, (b) Claims arising under or relating to the Excluded Employee Liabilities (except to the extent such Claims are or were earned after the Petition Date or during the 180-day period prior to the Petition Date, Administrative Claims or Priority Claims), (c) Claims arising under or relating to any other Excluded Liability not otherwise classified or provided for under the Plan, and (d) Deficiency Claims, including any Exit Term Loan Deficiency Claims.

"*GL Insurance Assets*" means the general liability insurance policies that provide coverage for any Tort Claims and all Causes of Action, rights, and proceeds in connection therewith.

"*Governmental Unit*" means any "governmental unit," as such term is defined in section 101(27) of the Bankruptcy Code.

"*GUC Oversight Administrator*" means the oversight administrator appointed pursuant to the Creditor Trust Agreement to carry out the oversight duties and responsibilities set forth therein. The initial GUC Oversight Administrator shall be (i) disclosed in the Plan Supplement, (ii) acceptable to the Debtors, the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and the Committee, and (iii) approved by the Bankruptcy Court in connection with confirmation of the Plan.

"*Huntsville Note*" means that certain Company Note in the initial principal amount of $12,500,000 issued by Remington Arms Company, LLC, as assignee of ROC, in favor of the City of Huntsville, Alabama and secured by a mortgage on the Huntsville Property.

"*Huntsville Note Claim*" means all Secured Claims arising under or relating to the Huntsville Note that remain unpaid and outstanding as of the Effective Date.

"*Huntsville Property*" means that certain real property located at 100 Electronics Blvd. SW (a/k/a 1816 Remington Circle SW), Huntsville, Alabama, together with all Fixtures (as defined in the Uniform Commercial Code), Instruments (as defined in the Uniform Commercial Code), Equipment (as defined in the Uniform Commercial Code) and any facilities (including, for the avoidance of doubt, the approximately 843,715 square foot facility (known as the "Old Chrysler Building")) located thereon.

"*Ilion Facility*" means the firearms factory located in Ilion, New York sold to Roundhill pursuant to the Roundhill Asset Purchase Agreement.

"*Impaired*" means, with respect to (a) a Class, Claim, or Interest, that such Class, Claim, or Interest is "impaired" within the meaning of section 1124 of the Bankruptcy Code and (b) the

9

holder of a Claim or Interest, that such Claim or Interest is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Insurance Condition*" means the condition pursuant to which the D&O Insurance and such other insurance as may be reasonably necessary for the ROC Liquidation Estates and the Plan Administrator to perform under the Plan shall be and remain in full force and effect and the premiums therefor shall be paid in full.

"*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

"*Interest*" means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Debtor, including any share of common or preferred stock, membership interest, partnership unit, or other evidence of ownership of, or a similar interest in, a Debtor, and any option, warrant, or right, contractual or otherwise, to purchase, sell, subscribe, or acquire any such equity security or other equity interest in a Debtor, whether or not transferable, issued or unissued, authorized, or outstanding.

"*Interim Cash Collateral Order*" means that certain *Interim Order Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on July 30, 2020 [Docket No. 90].

"*Junior Creditors*" means holders of General Administrative Expense Claims, holders of Priority Tax Claims, holders of Priority Non-Tax Claims, holders of claims for Professional Fees, holders of General Unsecured Claims, and holders of Tort Convenience Class Claims.

"*Lien*" means a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

"*Liquidation*" has the meaning specified in the Introduction hereto.

"*Litigation Assets*" means all Estate Causes of Action, including avoidance actions, other than any Causes of Action (i) against the released parties hereunder or otherwise waived, released or compromised in the Plan or other order of the Bankruptcy Court, (ii) acquired by any buyer as part of the Sales, or (iii) Estate Causes of Action constituting GL Insurance Assets.

"*Maximum GUC Oversight Administrator Expenses*" has the meaning set forth in the definition of Plan Administrator Operating Expenses.

"*Net Cash Proceeds*" means, with respect to the sale of any Collateral securing the Exit Term Loan Claims, the cash sale proceeds of the sale of such Collateral net of (i) any bona fide direct costs incurred in connection with such sale, including any applicable transfer taxes or recording charges payable by the Debtors as a result of any gain recognized in connection with such sale, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any indebtedness that is secured by a Lien on such Collateral solely to the extent that such Lien is senior to the Liens in favor of the Exit Term Loan Secured Creditors, and (iii) any reasonable investment banker or broker fees payable in connection with such sale to the extent previously approved by Final Order of the Bankruptcy Court.

Case 20-81688-CRJ11    Doc 1370    Filed 01/25/21    Entered 01/25/21 12:57:41    Desc
Main Document      Page 15 of 66

"*Other Secured Claim*" means any Secured Claim other than an Exit Term Loan Secured Claim or a Huntsville Note Claim.

"*Pension Plan*" means Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), whereby the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan) was merged into the Remington Arms Company, LLC Pension and Retirement Plan.

"*Petition Date*" means July 27, 2020.

"*Person*" means any individual, corporation, partnership, association, joint venture, limited liability company, limited liability partnership, estate, trust, unincorporated organization or governmental unit or subdivision thereof or other entity.

"*Plan*" has the meaning specified in the Introduction hereto.

"*Plan Administrator*" means the administrator appointed pursuant to Article V.G. The initial Plan Administrator shall be (i) disclosed in the Plan Supplement, (ii) acceptable to the Debtors, the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and the Committee, and (iii) approved by the Bankruptcy Court in connection with confirmation of the Plan.

"*Plan Administrator Budget*" means the budget for the Plan Administrator Operating Expenses. The initial Plan Administrator Budget shall be approved by the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders in writing in their sole and absolute discretion, otherwise prepared in consultation with the Plan Proponents, and will be included in the Plan Supplement.

"*Plan Administrator Operating Expense Funded Amount*" means an amount to be set forth in the Plan Administrator Budget (or such larger amount that the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders may agree in writing in their sole and absolute discretion) for the sole purpose of funding Plan Administrator Operating Expenses in accordance with the Plan Administrator Budget.

"*Plan Administrator Operating Expenses*" means the overhead and other operational expenses of the Plan Administrator in connection with its administration of the Plan including, but not limited to, (i) reasonable compensation for the Plan Administrator, (ii) reasonable and documented out-of-pocket costs and expenses incurred by the Plan Administrator in administering the Plan, (iii) Statutory Fees incurred after the Effective Date to the Bankruptcy Administrator, (iv) any reasonable and documented out-of-pocket fees and expenses payable to any agents, employees, attorneys, advisors, and other professionals retained by the Plan Administrator, and (v)(a) reasonable compensation for the GUC Oversight Administrator, (b) reasonable and documented out-of-pocket costs and expenses incurred by the GUC Oversight Administrator in administering the Plan, and (c) any reasonable and documented out-of-pocket fees and expenses payable to any agents, employees, attorneys, advisors, and other professionals retained by the GUC Oversight Administrator, all which shall be subject to approval by the Plan Administrator and not under any circumstances exceed $10,000 in the aggregate (subparagraphs (v)(a)–(c) above, collectively, the "Maximum GUC Oversight Administrator Expenses"), *provided*, *however*, that

11

all of the foregoing shall be subject to the Plan Administrator Budget and funded from the proceeds of Plan Assets.

"*Plan Assets*" means all Assets of the Debtors available for distribution under the Plan, including all Assets that were not disposed of pursuant to the Sales, the Collateral Proceeds, the Creditor Trust Assets, and the GL Insurance Assets.

"*Plan Professional Fee Reserve*" means the escrow account to be established by the Debtors on the Effective Date, and administered thereafter by the Plan Administrator, in an amount equal to the aggregate amount of unpaid fees for all Professionals through the Effective Date, as estimated pursuant to Article II.C.2.

"*Plan Proponents*" means the Debtors, the Committee, and the holders of more than a majority in amount of the Exit Term Loan Claims.

"*Plan Supplement*" means the compilation of documents (or forms thereof), schedules, and exhibits hereto to be filed with the Bankruptcy Court and any other documents, agreements, schedules, and exhibits, specified herein, to be filed with the Bankruptcy Court no later than three (3) days prior to the Confirmation Hearing, provided that the Debtors may amend such Plan Supplement at any time prior to the Effective Date, subject to the written approval of the Exit Term Loan Required Lenders, and the Committee. The Plan Supplement shall include (a) the identification of the Plan Administrator; (b) the Plan Administrator Budget; (c) a statement of the Collateral Proceeds available for distribution hereunder; (d) a schedule of unexpired leases and/or executory contracts to be assumed hereunder, if any (including any cure amount with respect to such lease or contract); (f) a description of any additional Estate Causes of Action not otherwise identified herein; (g) the Creditor Trust Agreement; (h) any then-existing Supplemental Insurance Procedures; and (i) the identification of the GUC Oversight Administrator.

"*Prepetition Secured Creditors*" means the Exit Term Loan Secured Creditors, the FILO Term Loan Secured Creditors, and the Priority Term Loan Secured Creditors.

"*Primary Asset Sale Proceeds*" has the meaning specified in the Introduction hereto.

"*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

"*Priority Non-Tax Claim*" means any Claim against any Debtor entitled to priority in payment as specified in sections 507(a)(3), (4), (5), (6), (7) and (9) of the Bankruptcy Code.

"*Priority Tax Claim*" means any Claim of a Governmental Unit against any Debtor entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

"*Priority Term Loan Agent*" means Cantor Fitzgerald Securities, in its capacities as administrative agent and collateral agent under the Priority Term Loan Documents.

"*Priority Term Loan Documents*" means the Priority Term Loan Agreement and all other related documents, guarantees, and agreements, including security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments, or certificates executed in connection with the Priority Term Loan Agreement.

12

"*Priority Term Loan Agreement*" means that certain Loan and Security Agreement, dated as of April 18, 2018 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, that certain Amendment No. 6, dated March 27, 2020, that certain Amendment No. 7, dated June 18, 2020, that certain Amendment No. 8, dated June 26, 2020, and that certain Amendment No. 9 dated July 7, 2020), by and among FGI Operating Company, LLC, the guarantors party thereto, the Priority Term Loan Agent and the Priority Term Loan Lenders, which has been repaid in full and terminated prior to the filing of this Plan.

"*Priority Term Loan Lenders*" means the financial institution(s) party from time to time to the Priority Term Loan Agreement as lenders, in their respective capacities as such.

"*Priority Term Loan Secured Creditors*" means, collectively, the Priority Term Loan Lenders and the Priority Term Loan Agent.

"*Pro Rata*" means, for the holder of an Allowed Claim or Interest in a particular Class, proportional to the ratio of the amount of such Allowed Claim or Interest to the amount of all Allowed Claims or Interests (as applicable) in the same Class.

"*Professional*" means any professional of the Debtors, the Restructuring Committee, or the Committee or such other professional that is, by Final Order of the Bankruptcy Court:  (a) employed for legal, financial advisory, accounting, or other professional services during the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code and to be compensated and reimbursed therefor in accordance with sections 327, 328, 329, 330, 331, and/or 1103 of the Bankruptcy Code; (b) whose fees and expenses the Debtors are authorized to pay pursuant to an order entered by the Bankruptcy Court under section 363 of the Bankruptcy Code; or (c) allowed compensation and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code upon a motion on notice; *provided*, *however*, that "Professional" shall not include any professional-service Entity that the Debtors are authorized to employ, compensate, and reimburse in the ordinary course of its businesses.

"*Professional Fees*" means the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement for expenses incurred, by Professionals, that:  (a) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Effective Date; (b) have not been denied by the Bankruptcy Court by Final Order; (c) have not been previously paid (regardless of whether a fee application has been filed for any such amount); and (d) remain outstanding after applying any retainer that has been provided to such Professional.  To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order of the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

"*Remaining Asset Proceeds*" has the meaning specified in the Introduction hereto.

"*Remaining Assets*" has the meaning specified in the Introduction hereto.

Case 20-81688-CRJ11    Doc 1370    Filed 01/25/21    Entered 01/25/21 12:57:41    Desc
Main Document      Page 18 of 66

"*Retiree Plans*" means each plan, fund or program (through the purchase of insurance or otherwise) maintained or established for the purpose of providing or reimbursement payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death and includes any plan providing "retiree benefits" as defined under Bankruptcy Code Section 1114(a). For the avoidance of doubt, this definition excludes the Pension Plan.

"*Restructuring Committee*" means the committee of independent and disinterested directors of the board of directors of ROC.

"*Retained Litigation*" has the meanings collectively ascribed in the Asset Purchase Agreements.

"*ROC*" has the meaning specified in the Introduction hereto.

"*ROC Liquidation Estates*" means the Debtors after the Effective Date.

"*Roundhill*" means Roundhill Group, LLC.

"*Roundhill Asset Purchase Agreement*" means that certain Amended and Restated Asset Purchase Agreement, dated as of October 7, 2020, by and among the Debtors and Roundhill.

"*Sales*" has the meaning specified in the Introduction hereto.

"*Secured Claim*" means any Claim to the extent and only to the extent that is (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by Final Order of the Bankruptcy Court, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan or Final Order of the Bankruptcy Court as a Secured Claim.

"*Statutory Fees*" has the meaning set forth in Article XII.C.

"*Supplemental Insurance Procedures*" means any supplemental procedures for liquidating the Tort Claims other than the Tort Convenience Class Claims and determining coverage of the GL Insurance Assets thereto, as ordered by the Bankruptcy Court or as agreed in writing among the Debtors or the Plan Administrator and the insurers providing the insurance policies that constitute GL Insurance Assets subject to Bankruptcy Court Approval, which may also be included in the Plan Supplement or a subsequent filing with the Bankruptcy Court.

"*Supplemental Retirement Plan*" means the Remington Supplemental Retirement Plan.

"*Tort Claim*" means all prepetition unsecured non-priority Claims against the Debtors arising as a result of allegedly tortious conduct of the Debtors for personal injury or wrongful death Claims.

14

"*Tort Convenience Class Claim*" means any Tort Claims the holder of which elects on or before the Voting Deadline, subject to the Debtors' discretion with written approval of the Exit Term Loan Required Lenders to allow additional opt-ins after the Voting Deadline, to accept treatment as a Tort Convenience Class Claim; *provided* that holders of Tort Claims arising from a single incident or occurrence must elect jointly to accept treatment as a Tort Convenience Class Claim and are collectively subject to the maximum recovery provided for a Tort Convenience Class Claim.

"*Tort Claim Sub-Trust Interest*" has the meaning set forth in Article III.B.7.c.

"*Tort Claim Sub-Trust*" means that certain trust established pursuant to the terms outlined in Article V.F.

"*TTB*" means the Alcohol and Tobacco Tax Trade Bureau.

"*TTB Claim*" means the Claim held by the TTB for Excise Taxes, which shall be Allowed as a settlement under the Plan for all purposes in the amount of two million dollars ($2,000,000), unless otherwise authorized pursuant to the prior written consent of the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders. The Allowed Amount of the TTB Claim provided as a proposed settlement may not be altered without the written consent the Exit Term Loan Required Lenders.

"*UMWA*" means the International Union, United Mine Workers of America labor union.

"*UMWA Claims*" means any Claim or Claims held by the UMWA in its own capacity or as representative for members of the collective bargaining unit pursuant to the CBA.

"*Unimpaired*" means, with respect to a Class, Claim, Interest, or a holder of a Claim or Interest, that such Class, Claim, Interest, or holder is not Impaired.

"*Unsecured Creditor Recovery Amount*" has the meaning set forth in the definition of Creditor Trust Assets.

"*Voting Deadline*" means February 23, 2021 at 4:00 p.m. (CT).

"*Voting Record Date*" means February 5, 2021.

B.     *Rules of Interpretation*

For purposes of the Plan and unless otherwise specified herein: (i) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (ii) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (iii) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (iv) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (v) all references to articles or Articles are references to the Articles hereof; (vi) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the

15

interpretation of, the Plan; (vii) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (viii) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule or exhibit, as it may thereafter be amended, restated, modified, or supplemented; (ix) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (x) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as specifically provided herein; (xi) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (xii) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (xiii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (xiv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      *Computation of Time*

        Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

        Unless federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, and unless specifically stated otherwise, the laws of the State of Alabama, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or entity governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or organization of the relevant Debtor, as applicable.

E.      *Reference to Monetary Figures*

        All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

# ARTICLE II
## ADMINISTRATIVE EXPENSES AND
## OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *General Administrative Expenses*

Except to the extent that a holder of an Allowed General Administrative Expense Claim agrees to different treatment of such General Administrative Expense Claim, the holder of such Allowed General Administrative Expense Claim shall receive Cash in an amount equal to such Allowed General Administrative Expense Claim on (i) the Effective Date or (ii) if such Claim is not an Allowed General Administrative Expense Claim as of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Claim becomes an Allowed General Administrative Expense Claim or as soon thereafter as is reasonably practicable.  To the extent a General Administrative Expense Claim has not been Allowed as of the Effective Date of the Plan, the Plan Administrator shall reserve sufficient amounts from the Plan Assets for the resolution of such Claim.

B.    *General Administrative Expense Bar Date*

Except as provided below for Professionals requesting compensation or reimbursement for Claims for Professional Fees, requests for payment of General Administrative Expenses must be filed no later than thirty (30) days after the notice of the Effective Date is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court. Holders of General Administrative Expenses who are required to file a request for payment of General Administrative Expense and who do not file such request by the General Administrative Expense Bar Date, shall be forever barred from asserting such General Administrative Expense against the Debtors or their respective property, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover such General Administrative Expense.

C.    *Professional Fees*

    1.    Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and all other parties that have requested notice in the Chapter 11 Cases by no later than forty-five (45) days after the Effective Date. Objections to Professional Fees must be filed with the Bankruptcy Court and served on the applicable Professional no later than seventy-five (75) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Plan Professional Fee Reserve; *provided, however,* that if the funds in the Plan Professional Fee Reserve are insufficient to pay the full Allowed amounts of

17

the Professional Fees, the Plan Administrator shall promptly pay any remaining Allowed amounts from Cash on hand, including any Collateral Proceeds received on or after the Effective Date.

2. Plan Professional Fee Reserve

Prior to the Effective Date, the Debtors shall establish a Plan Professional Fee Reserve in an amount equal to all asserted Claims for Professional Fees accrued and unpaid through the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts payable by the Debtors), which may be maintained in an interest-bearing account. The Plan Professional Fee Reserve shall be administered by the Plan Administrator in accordance with the Creditor Trust Agreement; *provided, however*, amounts held in the Plan Professional Fee Reserve shall not constitute property of the Creditor Trust. In the event there is a remaining balance in the Plan Professional Fee Reserve following payment to all holders of Allowed Claims for Professional Fees under the Plan, any such amounts shall be distributed pro rata to holders of Allowed Exit Term Loan Claims. Nothing herein constitutes a waiver of any priority or other right accorded to Professional Fee Claims provided in the Final Cash Collateral Order.

Professionals shall estimate their unpaid Claims for Professional Fees incurred through the projected Effective Date and shall deliver such estimate to counsel for the Debtors no later than forty-eight (48) hours before the projected Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of any Professional's final request for payment of filed Professional Fee Claims. To the extent that Allowed Professional Fee Claims exceed the amount of any estimate, the Plan Professional Fee Reserve shall be supplemented to account for such amount, with such supplemental funds being taken from Collateral Proceeds. If a Professional does not provide an estimate, the Debtors, in consultation with the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and Committee, shall estimate the unpaid and unbilled fees and expenses of such Professional for the purpose of funding the Plan Professional Fee Reserve on the Effective Date.

D. *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, as determined by the Debtors with the consent of the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders in their sole and absolute discretion, either (a) on, or as soon thereafter as is reasonably practicable, the Effective Date or, if such Allowed Priority Tax Claim is not allowed as of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Effective Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim plus interest at a rate determined in accordance with section 511 of the Bankruptcy Code.

Where the Allowed Amount of a Priority Tax Claim is provided for under the Plan as part of a negotiated or proposed settlement (including the TTB Claim), that amount shall be paid in Cash under option (a) above, in full and final satisfaction of such Priority Tax Claim, and the Debtors will not elect to make deferred cash payments under option (b) above. The Debtors and

18

the Plan Administrator, subject to the written consent of the Exit Term Loan Required Lenders, are authorized to enter such further agreements and documentation with the TTB as may be necessary or appropriate to further the settlement and resolution of the TTB Claim on the terms provided in the Plan.

To the extent not previously set, the Confirmation Order shall establish a deadline for filing proofs of claim or requests for payment of Priority Tax Claims. To the extent a Priority Tax Claim has not been Allowed as of the Effective Date of the Plan, the Plan Administrator shall reserve from the Plan Assets sufficient amounts for the resolution of such Claim. In the event there is a remaining balance in such reserve following payment in full of all Allowed Priority Tax Claims under the Plan, any such amounts shall be distributed pro rata to the holders of Allowed Exit Term Loan Claims.

E.     *Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses*

Any outstanding and unpaid Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date without the requirement to file a fee application with the Bankruptcy Court or comply with any guidelines of the Bankruptcy Administrator, and without any requirement for review or approval by the Bankruptcy Court or any other party. All Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses to be paid on the Effective Date shall be estimated, as necessary, prior to and as of the Effective Date and such estimate shall be delivered to the Debtors; *provided* that such estimate shall not be considered an admission or limitation with respect to such Franklin Managed Entities Expenses or the Exit Term Loan Agent. In addition, the Debtors or the Plan Administrator shall continue to pay the Franklin Managed Entities Expenses and the Exit Term Loan Agent Expenses, as necessary, after the Effective Date promptly within six (6) Business Days of receipt by the Plan Administrator of a summary invoice from the respective professional, which invoice shall contain the aggregate number of hours billed and a summary description of such professional's services and expenses in the ordinary course solely to the extent related to implementation, consummation, and defense of the Plan, whether incurred before, on or after the Effective Date, without any requirement for review or approval by the Bankruptcy Court or any other party other than the Plan Administrator; *provided*, *however*, that any Franklin Managed Entities Expenses incurred after the Effective Date shall not exceed $50,000 in the aggregate. Any objections raised by the Plan Administrator with respect to such invoices shall be (a) transmitted via email to the respective professional within five (5) Business Days of the receipt of the applicable invoice, (b) limited solely to the reasonableness of the disputed fees, and (c) absent a consensual resolution or other agreement between the Plan Administrator and respective professional, submitted to the Bankruptcy Court for resolution (a "Post-Effective Date Fee Objection"). In the event that a Post-Effective Date Fee Objection is timely and properly transmitted in accordance herewith, then the Debtors or the Plan Administrator shall promptly pay any undisputed portion of the applicable professional's outstanding fees and expenses within five (5) Business Days of the receipt of the Post-Effective Date Fee Objection.

19

# ARTICLE III
## CLASSIFICATION AND TREATMENT OF
## CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

Claims and Interests, except for Administrative Expenses and Priority Tax Claims are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class.  To the extent a specified Class ultimately does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.  To the extent that a particular Claim does not qualify within the description of any Class and the Plan otherwise fails to classify such Claim or specify its treatment, then such Claim shall be deemed to be part of Class 5; *provided*, *however*, that all rights of the holder(s) of such Claim(s), including the right to object to such classification, and the Debtors' rights and defenses thereto, are reserved.

The Plan is premised upon the procedural consolidation of the Debtors for Plan purposes only.  Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3 | Exit Term Loan Claims | Impaired | Entitled to vote |
| 4 | Huntsville Note Claim | Unimpaired | Deemed to accept |
| 5 | General Unsecured Claims | Impaired | Entitled to vote |
| 6 | Tort Convenience Class Claims | Impaired | Entitled to vote |
| 7 | Tort Claims | Impaired | Entitled to vote |
| 8 | Intercompany Claims | Impaired | Deemed to reject |
| 9 | Interests in the Debtors | Impaired | Deemed to reject |

20

B.  *Treatment of Claims and Interests*

  1.  Class 1 – Priority Non-Tax Claims

    a.  *Classification*: Class 1 consists of all Allowed Priority Non-Tax Claims.

    b.  *Treatment*:  Except to the extent previously satisfied during the Chapter 11 Cases or that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim, each such holder, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Non-Tax Claim, shall receive Cash in the amount equal to 100% of the Allowed amount of such Priority Non-Tax Claim, on or as soon as reasonably practicable after the latest of (x) the Effective Date, (y) the date such Claim becomes Allowed and (z) the date such Claim becomes due and payable in the ordinary course of business.  To the extent a Priority Non-Tax Claim has not been Allowed as of the Effective Date of the Plan, the Plan Administrator shall reserve sufficient amounts from the Plan Assets for the resolution of such Claim.  In the event there is a remaining balance in such reserve following payment in full of all Allowed Priority Non-Tax Claims under the Plan, any such amounts shall be distributed pro rata to the holders of Allowed Exit Term Loan Claims.

    c.  *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

  2.  Class 2 – Other Secured Claims

    a.  *Classification*: Class 2 consists of all Allowed Other Secured Claims.

    b.  *Treatment*:  Except to the extent previously satisfied during the Chapter 11 Cases (including through assumption or payment of such Other Secured Claim in connection with the consummation of the Asset Purchase Agreements) or such holder agrees to less favorable treatment on account of such Other Secured Claim, each holder of an Allowed Other Secured Claim shall (i) receive, in full and final satisfaction, settlement, and release of, and in exchange for, its Other Secured Claim, Cash payment equal to the Allowed amount of such Other Secured Claim on the later of the Effective Date, the date such Other Secured Claim becomes an Allowed Other Secured Claim or as soon as practicable thereafter, unless otherwise agreed by the holder of such Other Secured Claim and the applicable Debtor or the Plan Administrator, as applicable, (ii) be satisfied by the surrender of the Collateral securing such Secured Claim, or (iii) be otherwise rendered Unimpaired.

    c.  *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to

21

section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.  Class 3 – Exit Term Loan Claims

    a.  *Classification*: Class 3 consists of all Allowed Claims arising under the Exit Term Loan Documents that remain unpaid and outstanding as of the Effective Date.[3]

    b.  *Allowance*: Except to the extent previously satisfied during the Chapter 11 Cases, Exit Term Loan Claims shall be Allowed in the aggregate principal amount of $110,710,000, plus any prepetition interest, fees, costs, expenses, and other amounts accrued prior to the Petition Date pursuant to or secured by the terms of the Exit Term Loan Documents, plus any Exit Term Loan Adequate Protection Payments (as defined in the Final Cash Collateral Order), in each case, due and owing as of the Effective Date. Neither the Exit Term Loan Agent nor the Exit Term Loan Lenders shall be required to file proofs of Claim on account of any Exit Term Loan Claims.

    c.  *Deficiency Claim:* Each holder of an Allowed Exit Term Loan Claim shall also hold its respective pro rata share of the Exit Term Loan Deficiency Claims to the extent that the Exit Term Loan Claim of such holder is not paid in full under the Plan from the Collateral Proceeds. The Exit Term Loan Deficiency Claims shall not be waived, but instead shall constitute Allowed General Unsecured Claims.

    d.  *Treatment*: Each holder of an Allowed Exit Term Loan Secured Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, its Exit Term Loan Secured Claim, Cash from the Collateral Proceeds in the amount equal to its pro rata share of the Collateral Proceeds remaining after the funding of the distributions and/or reserves set forth under the Plan, including Allowed General Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, the Plan Professional Fee Reserve, the Plan Administrator Operating Expense Funded Amount, the Unsecured Creditor Recovery Amount and the distributions to the Tort Convenience Class Claims. For the avoidance of doubt, the Collateral Proceeds shall include (i) the Net Cash Proceeds of the Collateral securing the Exit Term Loan Claims (including, among other Collateral, the Huntsville Property) whether received before or after the Effective Date, which, except as provided in the immediately preceding sentence, shall be distributed by the Plan Administrator to the holders of Allowed Exit Term Loan Claims on a pro rata basis on the later of the Effective Date and the closing date of the sale or other disposition of such

---

[3] The Debtors reserve the right to treat the Exit Term Loan Claims as a single claim for purposes of numerosity and/or treat the funds and accounts that share a common manager as holding a single claim for purposes of numerosity.

Collateral, and (ii) the excess amount of any reserves established under the Plan remaining after the satisfaction in full of the Allowed Claims for which such reserve is established, which excess shall promptly, upon such satisfaction in full, be distributed by the Plan Administrator to the holders of Allowed Exit Term Loan Claims on a pro rata basis. Any Adequate Protection Superpriority Claim shall be deemed waived as of the occurrence of the Effective Date. Further, except as otherwise provided under the Plan, all distributions to the Exit Term Loan Lenders shall be made through the Exit Term Loan Agent as contemplated under the Exit Term Loan Agreement; and all other rights of the Exit Term Loan Agent with respect to the Exit Term Loan Lenders are expressly preserved.

e.      *Voting*:  Class 3 is Impaired under the Plan.  Therefore, holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan. For voting purposes only, the aggregate amount of the Exit Term Loan Secured Claims shall be estimated at $40,000,000 and the aggregate amount of the Exit Term Loan Deficiency Claims shall be estimated at $70,710,000.

f.      *Confirmation of Aggregate Gift to Junior Creditors*:  Holders of Allowed Exit Term Loan Claims have agreed to forgo receipt of, fund, and/or gift to Junior Creditors amounts consisting of (1) Cash from the Primary Asset Sale Proceeds utilized pursuant to the Plan for (a) satisfaction of (i) Allowed General Administrative Expenses, (ii) Allowed Priority Tax Claims, and (iii) Allowed Priority Non-Tax Claims, (b) funding of (i) the Plan Professional Fee Reserve, (ii) the Plan Administrator Operating Expense Funded Amount, and (iii) any other reserves established under the Plan, (2) the Unsecured Creditor Recovery Amount and the payments to the Tort Convenience Class Claims, and (3) the amount of the Adequate Protection Superpriority Claim, which shall be waived as of the occurrence of the Effective Date (collectively, the "Aggregate Gift to Junior Creditors").

4.      Class 4 – Huntsville Note Claim

a.      *Classification*: Class 4 consists of the Allowed Huntsville Note Claim.

b.      *Treatment*: Except to the extent previously satisfied during the Chapter 11 Cases (including through assumption or payment of such Claim in connection with the sale of the Huntsville Property) or such holder agrees to less favorable treatment on account of such Claim,  the holder of an Allowed Huntsville Note Claim shall (i) receive, in full and final satisfaction, settlement, and release of, and in exchange for, the Huntsville Note Claim, payment equal to the Allowed amount of such Secured Claim, together with post-Effective Date interest to the extent required to render such Secured Claim unimpaired, in Cash, on the latest of the Effective Date, the date such Claim becomes an Allowed Claim or as soon as practicable after the sale of the Huntsville Property, unless otherwise agreed by such holder and the Plan Administrator with the consent of the Exit Term Loan

23

Agent at the direction of the Exit Term Loan Required Lenders, (ii) be satisfied by the surrender of the Collateral securing the Allowed Huntsville Note Claim, (iii) be satisfied by the assumption and assignment of the Huntsville Note by any buyer of the Huntsville Property, including the retention of the holder's Liens on the Collateral securing the Allowed Huntsville Note Claim, or (iv) be otherwise rendered Unimpaired.

c. *Voting*: Class 4 is Unimpaired under the Plan. Therefore, holders of Allowed Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

5. Class 5 – General Unsecured Claims

a. *Classification*: Class 5 consists of all General Unsecured Claims.

b. *Treatment*: Except to the extent previously satisfied during the Chapter 11 Cases (including through the assumption and/or payment of such Claim in accordance with their respective terms in connection with the consummation of the Sales or a subsequent sale transaction), each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, its pro rata share of the Creditor Trust Interests; *provided, however*, that the first $894,451.00 of the Unsecured Claims Distribution in respect of the Creditor Trust Interests shall be distributed pro rata to holders of Allowed General Unsecured Claims other than holders of the Exit Term Loan Deficiency Claims.

c. *Voting*: Class 5 is Impaired under the Plan. Therefore, holders of Claims in Class 5 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan. For voting purposes only, each unliquidated General Unsecured Claims shall be deemed to hold a General Unsecured Claim equal to $1.

6. Class 6 – Tort Convenience Class Claims

a. *Classification*: Class 6 consists of all Tort Claims where all of the holder(s) of such Claims arising from a single incident or occurrence have collectively elected to be treated as a Tort Convenience Class Claim.

b. *Treatment*: Each holder of an Allowed Tort Convenience Class Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Tort Convenience Class Claim, Cash equal to two percent (2%) of the Allowed Amount of such Claim not to collectively exceed twenty thousand dollars ($20,000) per incident or occurrence. Holders of Tort Convenience Class Claims arising from a single incident or occurrence must collectively elect to participate in the

24

Class. The total Cash payments to all Allowed Tort Convenience Class Claims are collectively subject to a $250,000 aggregate maximum recovery.

c. *Voting*: Class 6 is Impaired under the Plan. Therefore, holders of Claims in Class 6 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan. For voting purposes only, each holder of an unliquidated Tort Convenience Class Claim shall be deemed to hold a Claim equal to $1.

7. Class 7 – Tort Claims

a. *Classification*: Class 7 consists of all Tort Claims; *provided, however*, that holders of Tort Claims that elect to be treated as Tort Convenience Class Claims shall not be included within Class 7.

b. *Treatment*: Except to the extent previously satisfied during the Chapter 11 Cases, each holder of an Allowed Tort Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Tort Claim, a beneficial interest in the Tort Claim Sub-Trust (collectively, the "Tort Claim Sub-Trust Interests") reflecting a right to receive such holder's respective share of the proceeds of the GL Insurance Assets providing coverage applicable to such Tort Claim as may be determined pursuant to the terms and conditions of the Plan.

c. *Voting*: Class 7 is Impaired under the Plan. Therefore, holders of Claims in Class 7 that are Allowed or temporarily Allowed for voting purposes are entitled to vote to accept or reject the Plan. For voting purposes only, each holder of an unliquidated Tort Claim shall be deemed to hold a Claim equal to $1.

8. Class 8 – Intercompany Claims

a. *Classification*: Class 8 consists of all Intercompany Claims.

b. *Treatment*: On the Effective Date, the Intercompany Claims will be cancelled without any conversion thereof or distribution with respect thereto.

c. *Voting*: Class 8 is Impaired under the Plan. Each holder of a Claim in Class 8 shall be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote

9. Class 9 – Interests in the Debtors

a. *Classification*: Class 9 consists of all Interests in the Debtors.

b. *Treatment*: Each holder of an Interest in a Debtor shall not receive anything on account of such Interest.

25

c. *Voting*:  Class 9 is Impaired under the Plan. Each holder of an Interest in Class 9 shall be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote.

C. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect (i) the Debtors' or the Plan Administrator's rights and defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims or (ii) the rights and defenses of any holder of Unimpaired Claims in respect of its Unimpaired Claims.  Without limiting the generality of the foregoing, the Debtors reserve the right to cure any past default or any failure to satisfy any condition that resulted in the material modification of their liabilities related to such Unimpaired Obligation, whether occurring prior to or after the Petition Date and to reinstate the obligations related to any Unimpaired Claim as they existed prior to default, acceleration or the occurrence of, or failure to satisfy, any condition that resulted in the material modification of their liabilities related to such Unimpaired Obligation.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THE PLAN

A. *Voting Classes*

Classes 3, 5, 6, and 7 are Impaired under the Plan and, therefore, holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Claims that are Allowed or temporarily Allowed for voting purposes held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Claims that are Allowed or temporarily Allowed for voting purposes held by holders who actually voted in such Class have voted to accept the Plan.

B. *Presumed Acceptance of the Plan*

Classes 1, 2, and 4 are Unimpaired under the Plan.  Holders of Claims in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C. *Non-Consensual Confirmation*

Classes 8 and 9 are Impaired and will not receive a distribution under the Plan. Accordingly, Classes 8 and 9 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Because Classes 8 and 9 are deemed to reject the Plan, the Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Classes and any other class that is entitled to vote and rejects the Plan. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

26

D.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

**ARTICLE V**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *General Settlement of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims in any Class in accordance with the Plan are intended to be, and shall be, final.

Upon the occurrence of the Effective Date, each Debtor and its successors and assigns hereby waive and release each other and all of their respective successors from any and all Intercompany Claims and Causes of Action among and between any or all of the Debtors, which waiver and release shall be effective as a bar to all actions, Causes of Actions, suits, Claims, Liens, or demands of any kind with respect to any Intercompany Claim or Causes of Action among or between any or all of the Debtors.

B.    *Procedural Consolidation of Debtors for Plan Purposes Only*

The Plan provides for the procedural consolidation of the Debtors for Plan purposes only and shall serve as a motion by the Debtors for entry of an order of the Bankruptcy Court granting such relief.  The Debtors propose procedural consolidation to avoid the inefficiency of proposing, voting on, and making distributions in respect of entity-specific claims.  Accordingly, except with respect to the Huntsville Note Claim and Other Secured Claims, on the Effective Date, all of the Debtors and their estates shall, for purposes of the Plan only, be treated as though they were merged and (a) all Assets and liabilities of the Debtors shall, for purposes of the Plan only, be treated as though they were merged, (b) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtor shall be eliminated and canceled, (c) all joint or duplicate

27

obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint or duplicate obligations, shall be considered a single claim against the Debtors (including for purposes of distributions and reserves) without the need for further action by the Debtors or the Plan Administrator, and (d) any Claim filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Unless otherwise set forth herein, such consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors or (ii) the substantive rights of any creditor. If any party in interest challenges the proposed procedural consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by-entity basis.

Without limiting the generality of the foregoing, if and to the extent that the Bankruptcy Court so orders after notice and a hearing, holders of Claims owed by multiple Debtors (other than those who voluntarily elect to participate in the Tort Convenience Class) may receive a supplemental Claim under the Plan to compensate them for the value of any additional recovery that would have otherwise been made to them if they had maintained their additional separate Claims against the Debtors, excluding any benefit related to the Aggregate Gift to Junior Creditors set forth in Article III.B.3.f.

C.    *Sources of Cash for Plan Distributions*

The Debtors shall fund distributions under the Plan with: (a) Cash on hand (which, for the avoidance of doubt, shall be Cash on hand, if any, that is available after the consummation of the Sales); (b) the Primary Asset Proceeds and the Remaining Asset Proceeds; and (c) all other proceeds, if any, generated from the liquidation of the Plan Assets. Notwithstanding anything herein to the contrary, the Plan Administrator shall fully fund (i) the Professional Fees Reserve and any reserve for Plan Administrator Operating Expenses, subject to the Plan Administrator Budget and (ii) any other reserves contemplated by the Plan, the Plan Administrator Budget, or the Creditor Trust Agreement prior to making any distributions of Plan Assets under the terms of the Plan.

D.    *Continued Corporate Existence; Vesting of Assets*

On and after the Effective Date, subject to the requirements of the Plan, the ROC Liquidation Estates will continue to exist as separate companies and shall retain all of their powers under applicable non-bankruptcy law, and without prejudice to any right to amend their respective constituent documents, dissolve, merge, or convert into another form of business entity, or to alter or terminate their existence. The Interests of the Debtors shall be deemed to be held through the Plan Administrator under applicable non-bankruptcy law and the Plan Administrator shall be authorized to exercise all of the rights and powers of a sole member as provided by the Plan.

Except as otherwise provided in the Plan, on and after the Effective Date, all Plan Assets and property of the Debtors and their Estates, including any interests in subsidiaries and affiliates, but excluding assets to be vested in the Creditor Trust or the Tort Claim Sub-Trust, will vest in the ROC Liquidation Estates free and clear of all Claims, Liens, charges, other encumbrances and interest; *provided*, *however*, that the Plan Administrator may abandon or otherwise not accept any Plan Assets that the Plan Administrator believes, in good faith, to have no value to, or will be

28

unduly burdensome to, the ROC Liquidation Estates. Any Plan Assets that the Plan Administrator so abandons or otherwise does not accept shall not be property of the ROC Liquidation Estates. Neither the occurrence of the Effective Date, nor the effectiveness of this Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of any of the Debtors that are limited liability companies, which shall be continued as limited liability companies following the Effective Date subject to the terms of the Plan.

E.    *Establishment of Creditor Trust*

On the Effective Date, the Debtors shall establish a Creditor Trust, which shall, among other things and as more fully set forth in the Creditor Trust Agreement: (i) administer the resolution, asset administration, and distribution process for Allowed Claims, (ii) prosecute the Litigation Assets, and (iii) liquidate any assets transferred to the Creditor Trust.

Under section 1141(b) of the Bankruptcy Code, the Creditor Trust Assets shall be assigned, transferred, and vest in the Creditor Trust upon the occurrence of the Effective Date free and clear of all Claims, Liens and interests; *provided*, *however*, that the Plan Administrator may abandon or otherwise not accept any assets that the Plan Administrator believes, in good faith, to have no value to, or will be unduly burdensome to, the Creditor Trust in accordance with the terms of the Creditor Trust Agreement. Any assets that the Plan Administrator so abandons (whether before or after the Effective Date) or otherwise does not accept shall not be property of the Creditor Trust.  The Creditor Trust shall qualify as a liquidating trust as described in Treasury Regulation section 301.7701 – 4(d) and shall be treated as a grantor trust for United States federal income tax purposes.

The Creditor Trust Agreement shall be in form and substance satisfactory to the Debtors, the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders, and the Committee.  The operations of the Creditor Trust shall be supervised by the Plan Administrator in consultation with the GUC Oversight Administrator.  The Plan Administrator alone shall have the authority to manage the day-to-day operations of the Creditor Trust, including, without limitation, by disposing of the assets of the Creditor Trust, appearing as a party in interest, prosecuting the Litigation Assets, prosecuting objections to, settling or otherwise resolving General Unsecured Claims and other Claims, calculating distributions, paying taxes and such other matters as more particularly described in the Creditor Trust Agreement.  Notwithstanding anything herein to the contrary, the Plan Administrator shall be responsible for making distributions from the Creditor Trust to Holders of Allowed General Unsecured Claims in satisfaction of Creditor Trust Interests. Expenses and fees of the Creditor Trust, including the expenses of the Plan Administrator and its representatives and professionals, will constitute Plan Administrator Operating Expenses payable from Plan Assets in accordance with the Plan Administrator Budget as further set forth in the Creditor Trust Agreement.  The Plan Administrator shall consult in good faith with the GUC Oversight Administrator on those specific matters, if any, where the interests of holders of Allowed General Unsecured Claims and holders of Allowed Claims other than Allowed General Unsecured Claims diverge, all in accordance with the terms and conditions of the Creditor Trust Agreement.

The Bankruptcy Court and the District Court shall retain jurisdiction to administer the Creditor Trust Assets.

F.   *Tort Claims and the Establishment of the Tort Claim Sub-Trust*

On the Effective Date, the Debtors shall establish a Tort Claim Sub-Trust, which shall administer the resolution, asset administration, and distribution process for Tort Claims (other than Tort Convenience Class Claims).  The resolution of the Tort Claims and the administration of the Tort Claim Sub-Trust shall be subject to the terms of the Plan. The Plan Administrator is authorized to obtain agreement of the primary insurer under the GL Insurance Assets (or to the extent the primary layer is exhausted, the secondary layer or layers) to pay for the Estate's defense concerning the Tort Claims (other than Tort Convenience Class Claims) covered thereby pursuant to any Supplemental Insurance Procedures.  Notwithstanding anything to the contrary herein, unless the Debtors or Plan Administrator expressly waives or agrees to forebear from exercising any rights or powers concerning the resolution of Tort Claims (other than Tort Convenience Class Claims) in the Supplemental Insurance Procedures, the Debtors and Plan Administrator retain all such rights and powers, including without limitation, the power to (i) stipulate that the holder of such Tort Claim (other than Tort Convenience Class Claims) be granted relief by the Bankruptcy Court from any stay or injunction (including those provided or preserved in the Plan) to pursue and recover on account of its Tort Claims (other than Tort Convenience Class Claims)  (other than Tort Convenience Class Claims) solely against and from the GL Insurance Assets or (ii) otherwise object to, oppose, resolve or settle the applicable Tort Claim.  For the avoidance of doubt, nothing herein or otherwise shall obligate the Debtors or the Plan Administrator to (i) object to any Claim or (ii) defend against any Claim to the extent that relief from Plan stays and injunctions is granted by the Bankruptcy Court to pursue recovery under the GL Insurance Assets. Nothing herein shall require the Debtors or the Plan Administrator to propose or accept any Supplemental Insurance Procedures.

Any payment from the GL Insurance Assets to any holder of a Tort Claim (other than Tort Convenience Class Claims) in excess of two million dollars ($2,000,000) remains subject to notice and a hearing in the Bankruptcy Court to allow the Court to consider the impact of the payment on the Debtors' remaining GL Insurance Assets and other Tort Claims (other than Tort Convenience Class Claims) covered by the same policies.

Under section 1141(b) of the Bankruptcy Code, all GL Insurance Assets and rights and defenses thereunder with respect to the Tort Claims shall be assigned, transferred, and vest in the Tort Claim Sub-Trust upon the occurrence of the Effective Date free and clear of all Claims, Liens and interests. The Tort Claim Sub-Trust shall qualify as a liquidating trust as described in Treasury Regulation section 301.7701 – 4(d) and shall be treated as a grantor trust for United States federal income tax purposes.  Absent further order of the Bankruptcy Court, the Plan Administrator shall not sell or otherwise transfer or cancel the GL Insurance Assets, which are held in the Tort Claim Sub-Trust.

The Document Preservation Order shall remain in effect subject to further order of the Bankruptcy Court modifying or terminating such order, which the Plan Administrator shall have authority to seek.

The terms of the Tort Claim Sub-Trust shall be included in the Creditor Trust Agreement. The operations of the Tort Claim Sub-Trust shall be supervised by the Plan Administrator, who shall have the authority to manage the day-to-day operations of the Tort Claim Sub-Trust including

30

appearing as a party in interest, reviewing issues related to distributions made from the GL Insurance Assets and such other matters as more particularly described in the Creditor Trust Agreement. Expenses and fees of the Tort Claim Sub-Trust, including the expenses of the Plan Administrator and its representatives and professionals, will constitute Plan Administrator Operating Expenses payable from Plan Assets in accordance with the Plan Administrator Budget.

The Bankruptcy Court and the District Court shall retain jurisdiction to administer the GL Insurance Assets and to approve and enforce any Supplemental Insurance Procedures. Without limiting the generality of the foregoing, all parties (including the insurers under the GL Insurance Assets, the Debtors, the Plan Administrator and the holders of Tort Claims (other than Tort Convenience Class Claims)) retain any rights they may have to (i) initiate litigation in the Bankruptcy Court concerning the self-insured retention provisions and other provisions of the GL Insurance Assets; (ii) seek leave of the Bankruptcy Court to pursue such litigation in another forum; and (iii) oppose any of the foregoing relief. The Bankruptcy Court retains the power to authorize third parties (including the holders of Tort Claims (other than Tort Convenience Class Claims)) to derivatively assert the rights of the Debtors and their estates concerning the GL Insurance Assets in the foregoing proceedings and otherwise to grant relief from the stay and injunctions hereunder to do so. However, no party, including the Plan Administrator, is required to initiate any such litigation.

For the avoidance of doubt, the interests of the beneficiaries in the Creditor Trust and the Tort Claim Sub-Trust shall be uncertificated and shall be nontransferable except upon death of the interest holder or by operation of law.

G.      *Powers and Duties of the Plan Administrator*

On the Effective Date, the Plan Administrator shall begin acting for the ROC Liquidation Estates in a fiduciary capacity implementing such liquidation and wind-down as contemplated under this Plan, subject to the provisions hereof. The Plan Administrator shall serve in such capacity through the earlier of the date the Debtors are dissolved in accordance with this Plan and the date such Plan Administrator resigns, is terminated, or otherwise unable to serve; *provided*, *however*, that any successor Plan Administrator appointed pursuant to the Plan shall serve in such capacity after the effective date of such person's appointment as Plan Administrator.

The qualifications and proposed compensation of and other disclosures regarding the Plan Administrator, including the Plan Administrator Budget, shall be set forth as part of the Plan Supplement; such compensation may be paid from the Plan Assets on hand, subject to the Plan Administrator Budget, without further notice or order of the Bankruptcy Court. The Plan Administrator shall deposit and hold all Plan Assets in trust for the benefit of holders of Allowed Claims (including Professionals) receiving distributions under, and in accordance with the terms of, the Plan.

The powers, rights, and responsibilities of the Plan Administrator, all of which shall arise upon the occurrence of the Effective Date, shall include, but not be limited to:

(i) collecting and liquidating the Plan Assets under the jurisdiction of the Bankruptcy Court;

31

(ii) asserting, prosecuting, objecting to, pursuing, compromising and settling in accordance with the Plan Administrator's reasonable business judgment, all matters affecting the Estates, including Disputed Claims, and/or other Litigation Assets related thereto, without further order of the Bankruptcy Court;

(iii) asserting and enforcing all legal or equitable remedies and defenses belonging to the Debtors or their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code;

(iv) acting on behalf of the Debtors in all adversary proceedings and contested matters then pending or that can be commenced in the Bankruptcy Court and in all actions and proceedings pending or commenced elsewhere, and to settle, retain, enforce, dispute, or adjust any Claim and otherwise pursue actions involving Assets of the Debtors that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise, waived, relinquished or transferred in the Plan;

(v) taking such actions the Plan Administrator deems appropriate in its reasonable business judgment against any Person with respect to a Claim or Estate Cause of Action and commencing any process or proceeding in the Bankruptcy Court or in any court of competent jurisdiction in accordance with applicable laws;

(vi) making Distributions to holders of all Allowed Claims, including Allowed Claims for Professional Fees, in accordance with the Plan;

(vii) proceeding with and employing all discovery devices permitted under applicable law, including Rule 2004 of the Bankruptcy Rules, in order to investigate any Claims, Litigation Assets, or GL Insurance Assets;

(viii) employing, without further order of the Bankruptcy Court, professionals or other Persons to assist it in carrying out its duties hereunder and compensating and reimbursing the expenses of those professionals and other Persons, on the terms to be agreed to by the Plan Administrator and such professionals and other Persons, without further order of the Bankruptcy Court;

(ix) investing Cash in accordance with section 345 of the Bankruptcy Code, withdrawing and making Distributions of Cash to holders of Allowed Claims and paying taxes and other obligations owed by the Debtors or incurred by the Plan Administrator in accordance with the Plan;

(x) coordinating the turnover of property, if any, subject to rejected Executory Contracts or abandonment or liquidation of any Assets and disposing of, and delivering title to others of, or otherwise realizing value of, all the Assets;

(xi) deducting, reserving and/or paying from the proceeds of the Sales or any other asset sale any related fees, costs and taxes (including transfer or income taxes) in connection with such sale;

(xii) overseeing compliance with the Debtors' accounting, finance, and reporting obligations and the filing of final tax returns, refund requests, audits, and other corporate dissolution documents, if required;

(xiii) preparing financial statements and post-confirmation quarterly reports, until such time such time as the Bankruptcy Court enters an order (a) dismissing the Chapter 11 Cases, (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (c) approving a final decree closing the Chapter 11 Cases;

(xiv) paying all other expenses for winding down the affairs of the Debtors, and in the event of a dispute that cannot be resolved, resolving such dispute in the Bankruptcy Court, subject to the terms of the Plan;

(xv) executing and delivering all documents, and taking all actions, necessary to consummate the Plan and wind down the Debtors' businesses, including termination of the Pension Plan;

(xvi) establishing and managing reserves for the payment of any Claims or Administrative Expenses Allowed after the Effective Date or the Plan Administrator Operating Expenses, subject to the Plan Administrator Budget;

(xvii) implementing and/or enforcing all provisions of the Plan;

(xviii) performing all other duties required by the Bankruptcy Code, including those related to the Pension Plan;

(xix) entering and complying with any Supplemental Insurance Procedures; and

(xx) such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan, other Bankruptcy Court order, or as may be needed or appropriate to carry out the provisions of the Plan.

The Plan Administrator and the GUC Oversight Administrator may be removed by the Bankruptcy Court upon application for good cause shown. In the event of the resignation, removal, death, or incapacity of the Plan Administrator or the GUC Oversight Administrator, the Bankruptcy Court shall, upon motion or *sua sponte*, appoint another Person to become Plan Administrator or the GUC Oversight Administrator, as the case may be. Any successor Plan Administrator or the GUC Oversight Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor.

No recourse will ever be had, directly or indirectly, against the Plan Administrator, the GUC Oversight Administrator, their members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Creditor Trust under this Plan or by reason of the creation of any indebtedness by the Creditor Trust, the Plan Administrator, or the GUC Oversight Administrator, under this Plan. All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the Creditor

33

Trust Assets. The Plan Administrator, the GUC Oversight Administrator, and their respective agents shall not be deemed to be the agents for any holder of a Claim in connection with Distributions made under this Plan. The Creditor Trust, the Plan Administrator, the GUC Oversight Administrator, and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do, hereunder in good faith and in the exercise of their sound judgment; *provided, however,* that this section will not apply to any gross negligence or willful misconduct by the Creditor Trust, the Plan Administrator, the GUC Oversight Administrator, or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns. Furthermore, the releases set forth above do not release any Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

H.     *Corporate Action*

On the Effective Date, all matters under the Plan involving or requiring action of the directors, members, managers, or officers of the Debtors, including, but not limited to, actions requiring a vote or other approval of the board of directors or any of the members or officers of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date, without any further action by the Bankruptcy Court or the directors, members, managers, or officers of the Debtors.

Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, (i) any existing director, manager, or officer of the Debtors will be deemed to have resigned on the Effective Date without any further corporate action, (ii) the Plan Administrator shall be deemed the sole manager, officer, and representative of the ROC Liquidation Estates to exercise the rights, power, and authority of the ROC Liquidation Estates under applicable provisions of this Plan and bankruptcy and non-bankruptcy law, and (iii) all matters provided under this Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order shall modify the Debtors' constituent documents such that the provisions of this Plan can be effectuated. The Plan shall be administered by the Plan Administrator, and all actions taken thereunder in the name of the ROC Liquidation Estates shall be taken through the Plan Administrator. All corporate governance activities of the ROC Liquidation Estates shall be exercised by the Plan Administrator in its, its discretion, subject to the terms of this Plan.

I.     *Winding Down of Affairs*

On and after the Effective Date, subject to the requirements of the Plan, the ROC Liquidation Estates shall be permitted to conduct their business (to the extent permitted by the Plan), reconcile Claims, use and dispose of assets, prosecute litigation, make required tax filings, and otherwise take any and all actions as may be appropriate to implement the Plan and wind down their business without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules. The ROC Liquidation Estates shall be authorized, without limitation, to use and dispose of the Plan Assets, to investigate and pursue any Litigation Assets, as the representative of the Debtors' Estates pursuant to section 1123(b)(3)(B) of the

34

Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer their affairs. On and after the Effective Date, the Plan Administrator may, in the name of the ROC Liquidation Estates, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order or as otherwise set forth in the Creditor Trust Agreement.

J.      *Closing of the Chapter 11 Cases*

As soon as practicable after the Plan Administrator exhausts substantially all of the Plan Assets by making the final distributions under the Plan, the Plan Administrator shall, at the expense of the ROC Liquidation Estates, (a) provide for the retention and storage of the Debtors' and ROC Liquidation Estates' books and records that shall have been delivered to or created by the Plan Administrator until such time as all such books and records are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books and records are being stored, (b) file a motion for entry of a final decree closing the Chapter 11 Cases that have not been already closed in accordance with the Bankruptcy Code and the Bankruptcy Rules and stating that the assets of the ROC Liquidation Estates have been exhausted and final distributions have been made under the Plan, (c) file the necessary paperwork in the respective jurisdictions to effectuate the dissolution of the ROC Liquidation Estates in accordance with the laws of such jurisdiction, and (d) resign as the sole officer, director, and manager, as applicable, of the ROC Liquidation Estates. Upon the Bankruptcy Court's entry of a Final Order granting the motion described in clause (b) of the preceding sentence, the ROC Liquidation Estates shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the ROC Liquidation Estates or payments to be made in connection therewith, and the remaining Chapter 11 Cases shall be closed on the date that the Bankruptcy Court has entered such Final Order.

Notwithstanding the immediately preceding paragraph, if the Plan Administrator deems it appropriate, the Plan Administrator may seek authority from the Bankruptcy Court to close any of the Chapter 11 Cases and dissolve or merge any of the ROC Liquidation Estates prior to all final distributions having been made under the Plan.

K.      *Dissolution of the Debtors*

Upon the distribution of all Plan Assets, the ROC Liquidation Estates shall be dissolved for all purposes by the Plan Administrator without the necessity for any other or further actions to be taken by or on behalf of any ROC Liquidation Estates or payments to be made in connection therewith; *provided*, *however*, that, without the need of any further approval, the Plan Administrator in its discretion may execute and file documents and take all other actions as he or she deems appropriate relating to the dissolution of the ROC Liquidation Estates under applicable law, and in such event, all applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the ROC Liquidation Estates as provided herein, without the payment of any fee, tax, or charge and without need for the filing of any certificates.

L.      *Costs and Expenses of the Plan Administrator*

All Plan Administrator Operating Expenses shall be the responsibility of and paid by the Plan Administrator from Plan Assets, subject to the Plan Administrator Budget, without further notice to holders of Claims or approval of the Bankruptcy Court; *provided* that (i) to the extent the overhead and other operational expenses of the Plan Administrator in connection with its administration of the Creditor Trust exceed any remaining Plan Administrator Operating Expense Funded Amount, such fees and expenses shall be payable solely from the assets of the Creditor Trust and its proceeds, as set forth in the Creditor Trust Agreement; (ii) to the extent the overhead and other operational expenses of the Plan Administrator in connection with its administration of the Tort Claim Sub-Trust exceed any remaining Plan Administrator Operating Expense Funded Amount, such fees and expenses shall be payable solely from the assets of the Tort Claim Sub-Trust and its proceeds, as set forth in the Creditor Trust Agreement, absent Final Order of the Bankruptcy Court; and (iii) the Plan Administrator shall not be obligated to take action that would result in the incurrence of any costs or expenses in excess of the lesser of the remaining Plan Assets available therefor and the amount provided therefor in the Plan Administrator Operating Budget. In the event there is a remaining balance in any reserve established for the payment of Plan Administrator Operating Expenses following the payment in full of all such expenses, any such amounts shall be transferred to the ROC Liquidation Estates for the benefit of holders of Allowed Exit Term Loan Claims and distributed in accordance with Article III. For avoidance of doubt, the Plan Administrator shall not have the authority nor be obligated to incur costs and expenses not explicitly provided for in the Plan Administrator Budget.

The initial Plan Administrator Budget shall be prepared in consultation with the Plan Proponents and will be included in the Plan Supplement. The Plan Administrator shall provide the Exit Term Loan Required Lenders or their respective post-Effective Date representative(s) with three (3) Business Days' notice of any proposed amendments to the Plan Administrator Budget; *provided*, *however*, that any such amendment shall under no circumstances seek that additional funds be expended in excess of the Maximum GUC Oversight Administrator Expenses and $50,000 in the aggregate for the Franklin Managed Entities Expenses incurred after the Effective Date. If any of the Exit Term Loan Required Lenders or their respective post-Effective Date representative(s) does not advise the Plan Administrator in writing (which may include an email) within three (3) Business Days of receipt of the notice of the proposed amendment that it objects to such amendment, the proposed amendment(s) shall be deemed approved with no further action required. If the Plan Administrator receives an objection to a proposed amendment to the Plan Administrator Budget, the Bankruptcy Court may resolve such dispute on shortened notice to the Plan Administrator and the Plan Proponents or their respective post-Effective Date representative(s).

For the avoidance of doubt, the Plan Administrator does not have the authority to utilize funds from any source to pay any amount of GUC Oversight Administrator expenses in excess of the Maximum GUC Oversight Administrator Expenses or to pay more than $50,000 for the Franklin Managed Entities Expenses incurred after the Effective Date. Moreover, no party shall have any authority whatsoever to request amendment of the Plan Administrator Budget or otherwise seek to utilize any Plan Assets, any amounts in the Plan Professional Fee Reserve, any Creditor Trust Assets, any assets of the Tort Claim Sub-Trust, or any funds reserved for Plan Administrator Operating Expenses in accordance with the Plan Administrator Budget, or proceeds

36

from any of the foregoing sources for the purpose of exceeding the Maximum GUC Oversight Administrator Expenses or $50,000 for the Franklin Managed Entities Expenses incurred after the Effective Date. Any such request shall be deemed null and void when made without the need for any party to respond.

M.    *Cancellation of Loans, Securities and Agreements*

Except as otherwise provided in the Plan, on the Effective Date: (i) the Exit Term Loan Documents, any Interests in the Debtors, any intercompany notes, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest, shall be deemed cancelled and surrendered as to the Debtors without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and the Debtors shall not have any continuing obligations thereunder or in any way related thereto; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors shall be deemed satisfied in full and released without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity; *provided*, *however*, that notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive distributions under the Plan; *provided further* that the Exit Term Loan Documents and the FILO Term Loan Documents shall continue in effect with respect to any obligations thereunder governing the relationship between, with respect to the Exit Term Loan Documents, the Exit Term Loan Agent and the Exit Term Loan Lenders, and, with respect to the FILO Term Loan Documents, the FILO Term Loan Agent and the FILO Term Loan Lenders (including those provisions relating to the Exit Term Loan Agent and FILO Term Loan Agent's rights to expense reimbursement, indemnification, and similar amounts from the Exit Term Loan Lenders or FILO Term Loan Lenders) or that may survive termination of the Exit Term Loan Documents or FILO Term Loan Documents in accordance with the terms thereof.

Unless otherwise specifically set forth in or provided for under the Plan, the Exit Term Loan Agent, FILO Term Loan Agent, and their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall be relieved of all further duties and responsibilities related to the Exit Term Loan Documents and FILO Term Loan Documents, respectively, except with respect to such other rights of the Exit Term Loan Agent and FILO Term Loan Agent that survive the termination of the Exit Term Loan Documents and FILO Term Loan Documents, respectively, pursuant to the terms thereof. Subsequent to the performance by the Exit Term Loan Agent and FILO Term Loan Agent of their obligations under the Plan, the Exit Term Loan Agent, FILO Term Loan Agent and their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall be relieved of all further duties and responsibilities related to the Exit Term Loan Documents and FILO Term Loan Documents, respectively.

Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Exit Term Loan Documents and FILO Term Loan Documents shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or the Confirmation Order and on and after the Effective Date, the ROC Liquidation Estates shall be liable for any Claims asserted under such indemnity obligations; *provided, however*, that no payment on account of such obligations shall be made from the Plan Professional Fee Reserve, the Creditor Trust Assets, the assets of the Tort Claim Sub-Trust or the funds reserved for Plan Administrator Operating Expenses in accordance with the Plan Administrator Budget. For the avoidance of doubt, the finality of any distribution made by the Debtors, the Plan Administrator and the ROC Liquidation Estates shall not be affected by any indemnity obligations under the Exit Term Loan Documents and FILO Term Loan Documents that are not asserted prior to the date that such distributions are made in accordance with the Plan.

N.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator is authorized to, and may issue, execute, deliver, file, or record, such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan.

O.      *Section 1146 Exemption*

To the maximum extent permitted pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, sales and use taxes, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

P.      *Preservation of Estate Causes of Action*

Unless any Estate Causes of Action against an Entity are expressly waived, relinquished, transferred, exculpated, released, compromised, or settled in this Plan, or the Confirmation Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and the Plan Administrator shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Estate Causes of Action (including all Estate Causes of Action related to the Litigation Assets and the GL Insurance Assets), whether arising before or after the Petition Date, and the Debtors' rights to commence, prosecute or settle such Litigation Assets and GL Insurance Assets shall be preserved notwithstanding the occurrence of the Effective Date.  No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Confirmation Order to any Estate Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Estate Causes of Action against them.  The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Litigation Assets against any entity, except as otherwise expressly provided herein. Unless any Estate Causes

38

of Action against an entity are expressly waived, relinquished, transferred, exculpated, released, compromised, or settled in this Plan, the Confirmation Order or the Asset Purchase Agreements, the Debtors and the Plan Administrator expressly reserve all Estate Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Estate Causes of Action upon, after, or as a consequence of the confirmation of the Plan. For the avoidance of doubt, nothing in the Plan shall require the Debtors or the Plan Administrator to commence or pursue litigation concerning any Estate Cause of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Estate Causes of Action preserved pursuant to this Article V.P that any of the Debtors may hold against any Entity shall be transferred to the ROC Liquidation Estates upon the occurrence of the Effective Date. Except as otherwise provided in the Plan, the Plan Administrator, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Estate Causes of Action. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Estate Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, except for as otherwise expressly set forth in the Plan. Estate Causes of Action related to the GL Insurance Assets may be subject to the terms of any Supplemental Insurance Procedures if and to the extent accepted by the Debtors or the Plan Administrator and approved by the Bankruptcy Court.

## ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

A.  *Executory Contracts and Unexpired Leases*

On the Confirmation Date, but subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtors entered into prior to the Petition Date (subject to the provisions of this Article VI) that (i) have not previously been assumed or rejected, (ii) have not been assumed and assigned under any of the Sales, or (iii) are not listed for assumption by the Debtors as of the Effective Date in the Plan Supplement, shall be deemed rejected by the Debtors pursuant to the provisions of section 365 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease rejections described above, as of the Confirmation Date.

B.  *Rejection Damages Bar Date*

All Claims arising from the rejection of executory contracts and unexpired leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Plan Administrator on or before the date that is thirty (30) days after the later of (a) the Effective Date and (b) the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, the Plan

39

Administrator, and the Plan Assets. A Claim for rejection damages shall be classified and treated in Class 5 (General Unsecured Claims).

C.    *Effect of Post-Confirmation Rejection*

The entry by the Bankruptcy Court on or after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease of the Debtors entered into prior to the Petition Date shall result in such rejection being a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code.

D.    *Non-Occurrence of Effective Date*

In the event that the Effective Date does not occur prior to such time as the applicable Chapter 11 Cases are closed, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

E.    *Indemnification Obligations; Insurance Policies*

Any obligations of any Debtor pursuant to its certificate of incorporation and bylaws, or organizational documents, as applicable, or any other agreements entered into by such Debtor at any time prior to the Effective Date, to indemnify current and/or former directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings against such Debtor or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of such Debtor, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Petition Date shall not be discharged or Impaired by confirmation of the Plan. Such obligations shall be deemed and treated as executory contract to be assumed by the Debtors under the Plan and shall continue as obligations of the Creditor Trust.

Except to the extent an affected party may otherwise agree, nothing in the Plan, the Plan Documents, the Confirmation Order, or the Creditor Trust Agreement, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights and obligations of the Debtors (and their Estates), the Tort Claimants (solely with respect to the GL Insurance Assets) and the Debtors' insurers (and third-party claims administrators) under any of the Debtors' insurance policies (including any D&O Insurance or GL Insurance Assets) or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the insurance policies. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Debtors' insurance policies shall control.  For the avoidance of doubt, nothing herein (i) constitutes a rejection of any insurance policy (including the D&O Insurance or the GL Insurance Assets) or (ii) relieves any party from any injunction or stay created or preserved under the Plan.

F.    *Excluded Employee Liabilities, Retiree Plan and Pension Plan*

As of the closing of the Sales and transfer of the Ilion Facility, the Debtors no longer employ any employees covered by the CBA and so have no future obligations under the CBA and are unable to offer benefits under the Supplemental Retirement Plan, the Equity Incentive Plan, and the Pension Plan.  Prospective obligations under the CBA were assumed by Roundhill as

modified under the Sales and related orders of the Court. The only remaining unresolved matters related to the CBA are certain alleged claims for previously accrued wages and benefits that were not assumed by Roundhill. Those claims have been filed by the UMWA. The Debtors intend to negotiate a consensual agreement with UMWA relating to those matters; provided that, if the Debtors are unable to reach a consensual agreement with UMWA, they reserve their rights and the rights of the Plan Administrator to object to the UMWA Claims and otherwise seek relief in accordance with sections 1113 and 1114 of the Bankruptcy Code and other applicable law prior to or after the Effective Date. The Debtors, their Estates and the Plan Administrator reserve all objections to any Claims filed by employees covered by the CBA or the UMWA, including any employment-related Claims asserted under or related to the CBA, and all other defenses including those based upon waiver as provided in the Roundhill Asset Purchase Agreement and based upon the Bankruptcy Code.

The Retiree Plans and any retiree benefits provided thereunder shall be deemed to have been terminated immediately upon the occurrence of the Effective Date. The Debtors and the Plan Administrator are authorized to take any and all actions necessary to terminate the Pension Plan and the Retiree Plans.

G.     *Reservation of Rights*

Nothing contained in this Plan shall constitute an admission by the Debtors that any executory contract or unexpired lease is, in fact, an executory contract or unexpired lease or that the Debtors have any liability thereunder.

## ARTICLE VII
## PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Plan Distributions*

The Plan Administrator shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan. Plan distributions to holders of Allowed Exit Term Loan Claims shall be made through the Exit Term Loan Agent and deemed completed when made to the Exit Term Loan Agent. All reasonable and documented fees and expenses of the Exit Term Loan Agent (including the reasonable and documented fees and expenses of its counsel and agents) incurred in connection with such distributions shall be paid by the Plan Administrator (on behalf of the ROC Liquidation Estates) from the Plan Assets.

B.     *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors or the Exit Term Loan Agent, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date. The Debtors shall have no obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. The Debtors and the Plan Administrator, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable. The Exit Term Loan Agent may, in its sole

Case 20-81688-CRJ11     Doc 1370     Filed 01/25/21     Entered 01/25/21 12:57:41     Desc
Main Document     Page 46 of 66

discretion, limit the further assignment of the Exit Term Loan Claims to allow for the accurate recording of the holders of such Claims as of the Distribution Record Date.

**PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM. IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM.**

C.      *Objections to Claims; Estimation of Claims*

Except insofar as a Claim is Allowed under the Plan, the Plan Administrator, and any other party in interest to the extent permitted under section 502(a) of the Bankruptcy Code, shall be entitled to object to Claims.  Any objections to Claims shall be served and filed on or before (a) the one-hundred eightieth (180th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as may be fixed by the Bankruptcy Court upon the request of the Plan Administrator (the "Claims Objection Deadline").  Nothing herein shall require the Debtors or the Plan Administrator to object to any Claim.

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any Claim not expressly Allowed by the terms of the Plan and otherwise subject to estimation under section 502(c) of the Bankruptcy Code and for which the Debtors may be liable under the Plan, including any Claim for taxes, to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim pursuant to section 502(c) of the Bankruptcy Code at any time prior to the time that such Claim becomes an Allowed Claim.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  The foregoing objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.  Claims may be estimated by the Bankruptcy Court and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

The Debtors, their Estates and the Plan Administrator shall be entitled to assert and reserve any and all defenses to the allowance of Claims other than the Exit Term Loan Claims and the TTB Claim, which shall be Allowed as set forth herein.  Without limiting the generality of the foregoing, they shall be entitled to assert any defense based upon waiver as provided in the Asset Purchase Agreements concerning any employment-related claims, including any claims related to the CBA.  Furthermore, and for the avoidance of doubt, they reserve the right to contest the value of any putative collateral and the validity of any lien related to a Secured Claim (other than the Exit Term Loan Claims).

D.      *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no distribution of Cash or property shall be made with respect to any portion of a Disputed Claim unless and until all

42

objections to such Claim are resolved by Final Order or as otherwise permitted by this Plan. The procedures with respect to the resolution of Disputed Claims shall be set forth in the Plan Supplement. For the avoidance of doubt, to the extent a class of claims will be entitled to no distributions under the Plan, such Claims will not be subject to reconciliation by the Plan Administrator.

E.      *Reserve of Cash Distributions*

On any date that distributions are to be made under the terms of this Plan, the Plan Administrator shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto. Such Cash or property shall be held in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto.

F.      *Distribution After Allowance*

Within the later of (i) seven (7) Business Days after such Claim becomes an Allowed Claim and (ii) thirty (30) days after the expiration of the Claims Objection Deadline, the Plan Administrator shall distribute, to the extent available, all distributable Cash or other property, including any interest, dividends, or proceeds thereof, to which a holder of an Allowed Claim is then entitled in accordance with Article II or Article III; *provided* that, to the extent any Plan Assets have not yet been collected or liquidated by the Plan Administrator, such Plan Assets shall be distributed to holders of Allowed Claims as soon as reasonably practicable following the collection and liquidation thereof; *provided further* that the Plan Administrator shall make distributions to (or retain property for the benefit of) holders of Allowed General Unsecured Claims, Allowed Tort Convenience Class Claims and Allowed Tort Claims (other than Tort Convenience Class Claims) in accordance with the provisions of the Creditor Trust Agreement and the Tort Claims Sub-Trust as and to the extent applicable.

G.      *No Recourse*

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Debtors, the Estates, the Plan Administrator, or any of their respective professionals, consultants, officers, directors, or members or their successors or assigns, or any of their respective property. Except as specifically stated otherwise in the Plan, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

H.      *Application of Distributions*

Any distribution made under the Plan on account of an Allowed Claim shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to any portion of such Claim for accrued but unpaid interest.

43

I. *Undeliverable Distributions and Unclaimed Property*

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Plan Administrator has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date on which such distribution was attempted to be made; *provided further* that Plan Administrator shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to the Plan Administrator automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be forever barred.

J. *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances, *provided that* the Debtors and the Plan Administrator, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan, *provided that* if the recipient provides the required information or otherwise satisfies the Plan Administrator that withholding is not required within 180 days after the request is made, such withheld amount shall then be distributed to the recipient.

In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.

K. *No Postpetition Interest on Claims and Interests*

Unless otherwise specifically provided for in the Plan, Confirmation Order or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

L.      *Foreign Currency Exchange Rate*

Except as specifically provided for in the Plan or an order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the then applicable noon spot rate for such non-U.S. currency as of the Petition Date for all purposes under the Plan, including voting, allowance, and distribution.

M.      *Setoffs and Recoupment*

The Debtors and/or the Plan Administrator are authorized to set off against or recoup from any Claims (to the extent not released pursuant to the Plan) of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administrator of any such claim they may have against the holder of such Claim.

N.      *Distributions Free and Clear*

Except as may be otherwise provided in this Plan, all distributions hereunder shall be free and clear of any Liens, Claims, encumbrances, and other interests.

O.      *De-Minimis Distributions and Donation*

There shall be no distributions on account of Allowed General Unsecured Claims to the extent such distribution will result in a payment of less than $50.00 to the holder of such Claim, and such amount otherwise payable upon such Claim shall revert back to the ROC Liquidation Estates.  Unless otherwise set forth in this Plan, the Plan Administrator may donate any remaining Plan Assets to a charitable institution if the distribution of such assets is too costly, too burdensome, or impracticable.

P.      *Claims Paid or Payable by Third Parties*

        1.      Claims Paid by Third Parties

The Debtors or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Debtor.  To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Debtor or Plan Administrator, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the Plan Administrator annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

45

2.    Claims Payable by Third Parties

To the extent that one or more of the Debtors' insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to a Debtor insurer, and such holder in fact repays all or a portion of the Claim to such insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or the Plan Administrator, as applicable, and the holder of such Claim.

3.    Applicability of Insurance Policies

Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Plan Administrator and any holders of Claims, may hold against any other Entity under any insurance policies.

## ARTICLE VIII
## EFFECTS OF PLAN CONFIRMATION

A.    *Injunction*

**Except as otherwise expressly provided in this Plan, and except in connection with the enforcement of the terms of this Plan or any documents provided for or contemplated in this Plan, all Entities who have held, hold or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Creditor Trust, or their successors and assignees or any of their assets and property, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates the Creditor Trust, or their successors and assignees, or any of their assets and property, with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, the Creditor Trust, or their successors and assignees or any of their assets and property, with respect to any such Claim or Interest; (d) asserting, directly or indirectly, any setoff, or recoupment of any kind against any obligation due the Debtors, the Estates, the Creditor Trust, or their successors and assignees or any of their assets and, with respect to any such Claim or Interest, unless approved by the Bankruptcy Court; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Without limiting the foregoing, the automatic stay provided under section 362(a) of the Bankruptcy Code shall remain in effect until the Chapter 11 Cases are closed. Nothing contained in this Article VIII.A shall prohibit the holder of a timely-filed proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Plan, or enjoin or prohibit the interpretation or enforcement by the holder of such Claim or**

46

Interest of any of the obligations of the Debtors or the Plan Administrator under this Plan. Furthermore, the releases set forth above do not release any non-Debtor fiduciary from Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

B.       *Exculpation and Limitation of Liability*

On the Effective Date, the Debtors, the Restructuring Committee, the Committee, the FILO Term Loan Lenders, the FILO Term Loan Agent, the Exit Term Loan Lenders, the Exit Term Loan Agent, in all such parties capacities, and any such parties' respective current and former (i) members, (ii) officers, (iii) directors, (iv) affiliates, (v) employees, (vi) advisors, (vii) attorneys, (viii) representatives, (ix) financial advisors, (x) investment bankers, or (xi) agents and any of such parties' successors and assigns (collectively, the "Exculpated Parties"), shall not have or incur, and are hereby released from, any claim, obligation, Causes of Action, or liability to one another or to any holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act taken or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of (i) the Chapter 11 Cases, (ii) formulation, negotiation, and filing of this Plan, (iii) filing the Chapter 11 Cases, (iv) the pursuit of confirmation of this Plan, (v) the consummation and implementation of this Plan, (vi) or the administration of this Plan or the property to be distributed under this Plan, (vii) the marketing, negotiation, approval and consummation of the Sales and the definitive documents evidencing such Sales or (viii) any other post-petition act taken or omission originating or occurring in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors, except for their fraud, willful misconduct, or gross negligence as determined by a Final Order. Notwithstanding the foregoing, the releases set forth in the immediately preceding sentence shall exclude (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases and (ii) the Debtors' indemnification obligations or other contractual obligations to officers and directors. For the avoidance of doubt, nothing herein shall affect any rights concerning the payment of Professional Fees. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability. The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to this Article VIII.B. Furthermore, the releases set forth above do not release any non-Debtor fiduciary from Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.

47

C.    *Release of Debtors, Restructuring Committee, Exit Term Loan Agent, Exit Term Loan Lenders, the FILO Term Loan Agent, FILO Term Loan Lenders, and Directors and Officers*

**On the Effective Date, except as otherwise provided in this Plan, the Debtors, the Restructuring Committee, the Exit Term Loan Agent, the Exit Term Loan Lenders, the FILO Term Loan Agent, the FILO Term Loan Lenders, in all such parties capacities, and any such parties' respective current and former (i) members, (ii) officers, (iii) directors, (iv) affiliates, (v) employees, (vi) advisors, (vii) attorneys, (viii) representatives, (ix) financial advisors, (x) investment bankers, or (xi) agents and any of such parties' successors and assigns, shall not have or incur, and are hereby, to the fullest extent permitted under applicable law, forever released from any claims, Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise to one another or to any holder of a Claim or Interest to the extent claiming through them or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any claims, Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be related, in whole or in part, to the Debtors, the Chapter 11 Cases, the Sales or the Estates, except for their fraud, willful misconduct, or gross negligence as determined by a Final Order. Notwithstanding the foregoing, the releases set forth in the immediately preceding sentence shall exclude (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases and (ii) the Debtors' indemnification obligations or other contractual obligations to officers and directors. For the avoidance of doubt, nothing herein shall affect any rights concerning the payment of Professional Fees. Furthermore, the releases set forth above do not release any non-Debtor fiduciary from Causes of Action, if any, held by the Pension Benefit Guaranty Corporation arising from a breach of fiduciary duty under Title I of ERISA nor do they waive any defenses thereto held by such parties.**

D.    *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.**

# ARTICLE IX
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

A.    *Conditions to the Effective Date*

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article IX.B:

(i)     The Confirmation Order shall have become a Final Order in full force and effect and shall not subject to any stay of effectiveness;

(ii)    the Confirmation Date shall have occurred and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

(iii)   all Statutory Fees incurred for periods arising prior to the Effective Date shall be paid by the Debtors or placed in a reserve for such purpose;

(iv)    the Insurance Condition is satisfied;

(v)     except as otherwise expressly provided herein, all documents to be executed, delivered, assumed, or performed upon or in connection with consummation of the Plan shall have been executed, delivered, assumed, or performed, as the case may be, and any conditions contained therein (other than consummation of the Plan or notice of consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement;

(vi)    all other actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered, as the case may be, to the appropriate parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable law;

(vii)   there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

(viii)  the Plan Professional Fee Reserve shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan; and

(ix)    the Allowed amount of the TTB Claim shall have been resolved and require Cash payments to the TTB from the Estates of no more than two million dollars ($2,000,000) in the aggregate in full and final satisfaction of such Claim, unless otherwise authorized pursuant to the prior written consent of the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders; and

(x)     All Franklin Managed Entities Expenses and Exit Term Loan Agent Expenses have been paid in full as provided in Article II.E.

49

B.      *Waiver of Conditions*

        The conditions to confirmation of the Plan and the Effective Date set forth in this Article IX may be waived only by the written agreement of the Debtors and the Exit Term Loan Agent at the direction of the Exit Term Loan Required Lenders in their sole and absolute discretion, in whole or in part, without notice, leave, or order of the Bankruptcy Court.

C.      *Substantial Consummation*

        "Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE X
## MODIFICATION, REVOCATION OR
## WITHDRAWAL OF PLAN

A.      *Modification and Amendments*

        Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek confirmation of the Plan consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each Debtor expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Debtor, one or more times, after the Confirmation Date, to the extent necessary to carry out the purposes and intent of the Plan. Each Debtor may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

B.      *Effect of Confirmation on Modifications*

        Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan; Effect of Non-Occurrence of Confirmation Date or Effective Date*

        The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all of the Debtors prior to the Confirmation Date and to file a subsequent plan. If the Debtors revoke or withdraw the Plan, the Confirmation Date does not occur, or the Effective Date does not occur within ninety (90) days of the Confirmation Date (or such other extended deadline as may be ordered by the Bankruptcy Court), then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of executory contracts or unexpired leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be

50

deemed null and void; and (iii) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity (including the Exit Term Loan Agent, Exit Term Loan Lenders, or holder(s) of the Huntsville Note); or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity (including the Exit Term Loan Agent, Exit Term Loan Lenders, or holder(s) of the Huntsville Note).

## ARTICLE XI
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the fullest extent permissible, including jurisdiction to:

(i)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(ii)    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

(iii)   resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which the Debtors may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(iv)    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including any distributions to holders of Allowed General Unsecured Claims pursuant to Article V.E;

(v)     adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(vi)    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

51

(vii)  enter and enforce any order and related agreements for the sale or transfer of property and obligations thereunder pursuant to, *inter alia*, sections 363, 1123, or 1146(a) of the Bankruptcy Code including the Asset Purchase Agreements;

(viii)  decide and resolve all matters related to the Sales and Asset Purchase Agreements, including any dispute in connection with amounts or other obligations owed to (or covenants incurred for the benefit of the Estate, or involving any other Asset;

(ix)  resolve any cases, controversies, suits, disputes (including any disputes related to the Plan Administrator Budget other than a request to exceed the Maximum GUC Oversight Administrator Expenses or $50,000 for the Franklin Managed Entities Expenses incurred after the Effective Date**)** or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(x)  issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan and ensure compliance with the Plan;

(xi)  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

(xii)  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.P.1;

(xiii)  resolve any disputes regarding the CBA, including any matter raised pursuant to section 1113 of the Bankruptcy Code;

(xiv)  resolve any disputes regarding the Retiree Plans and the Pension Plan;

(xv)  enforce or resolve any dispute related to the GL Insurance Assets and any Supplemental Insurance Procedures (including jurisdiction to approve any Supplemental Insurance Procedures);

(xvi)  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xvii)  determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(xviii)  enter an order or final decree concluding or closing the Chapter 11 Cases;

(xix)   adjudicate any and all disputes arising from or relating to distributions under the Plan;

(xx)    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(xxi)   determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(xxii)  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(xxiii) hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xxiv)  hear and determine all disputes that arise out of the transfer of the Plan Assets to the ROC Liquidation Estates, the Creditor Trust, or the Tort Claim Sub-Trust, as applicable, on the Effective Date;

(xxv)   enforce all orders previously entered by the Bankruptcy Court; and

(xxvi)  hear any other matter as to which the Bankruptcy Court has jurisdiction;

*provided, however*, that the Bankruptcy Court shall not retain exclusive jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents. For the avoidance of doubt, the foregoing does not create jurisdiction over Pension Plan disputes where the Bankruptcy Court otherwise lacks jurisdiction.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

A.  *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Debtors' counterparties to executory contracts, unexpired leases, and any other prepetition agreements.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Filing of Monthly and Quarterly Reports and Payment of Statutory Fees*

The filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly ROC Liquidation Estates reports shall be the responsibility of the Plan Administrator. All monthly operating reports covering pre-Effective Date periods shall be prepared and filed by the Debtors. All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Statutory Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  Statutory Fees relating to any period of time after the occurrence of the Effective Date shall be paid by the Plan Administrator.  All Statutory Fees shall be payable as set forth above and such obligations shall continue until the earliest of each particular Debtor's case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

D.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before the Effective Date.

E.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.    *Notices*

All notices, requests, and demands to or upon the Debtors shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

54

If to the Debtors, to:

> Remington Outdoor Company, Inc.
> 100 Electronics Boulevard SW
> Huntsville, AL 35824
> Attn: Ken D'Arcy

with copies to:

> O'Melveny & Myers LLP
> 400 South Hope Street
> Los Angeles, CA 90071-2899
> Attn: Steve Warren (swarren@omm.com)
>
> and
>
> Burr & Forman LLP
> 420 North 20th Street
> Suite 3400
> Birmingham, Alabama 35203
> Attn: Derek F. Meek (dmeek@burr.com)

If to the Plan Administrator to:

> To be set forth in the Plan Supplement.

If to the GUC Administrator to:

> To be set forth in the Plan Supplement.

In the notice of the Effective Date, the Debtors shall notify all Entities that, in order to continue to receive documents after the Effective Date pursuant to Bankruptcy Rule 2002, such Entity (excluding the Bankruptcy Administrator) must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After service of the notice of the Effective Date, the Plan Administrator shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the Bankruptcy Administrator and those Entities who have filed such renewed requests.

G.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. For the avoidance of doubt, (i) upon the occurrence of the Effective Date, the automatic stay pursuant to section 362 of the Bankruptcy Code of any litigation proceedings

55

against or involving the Debtors shall terminate and (ii) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.    *Entire Agreement*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at https://www.alnb.uscourts.gov/ or the website of the Debtors' notice and voting agent at https://cases.primeclerk.com/RemingtonOutdoor.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan shall control.

J.    *Nonseverability of Plan Provisions*

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent of the Debtors; and (iii) nonseverable and mutually dependent.

K.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and therefore, neither the Debtors nor the Plan Administrator will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

L.    *Closing of the Chapter 11 Cases*

The Plan Administrator shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, any

applicable Local Rules, and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.    *Document Retention*

On and after the Effective Date, the Plan Administrator shall maintain documents pursuant to the Document Preservation Order and, to the extent not inconsistent therewith, pursuant to its current document retention policy, as may be altered, amended, modified, or supplemented by the Plan Administrator. The Plan Administrator retains the right to seek further order of the Bankruptcy Court concerning records retention, including amendments and modifications of the Document Preservation Order.

N.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, Plan Supplement, or any other document (but excluding, for the avoidance of doubt, the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan (without reference to the Plan Supplement), the Plan (without reference to the Plan Supplement) shall govern and control.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

Dated: [          ], 2021

Respectfully submitted,

DEBTORS:

REMINGTON OUTDOOR COMPANY, INC.

By: _____
      Name:
      Title:


FGI HOLDING COMPANY, LLC

By: _____
      Name:
      Title:


FGI OPERATING COMPANY, LLC

By: _____
      Name:
      Title:


BARNES BULLETS, LLC

By: _____
      Name:
      Title:


REMINGTON ARMS COMPANY, LLC

By: _____
      Name:
      Title:


HUNTSVILLE HOLDINGS LLC

By: _____
      Name:
      Title:

58

TMRI, INC.

By: _____
      Name:
      Title:


REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
      Name:
      Title:


32E PRODUCTIONS, LLC

By: _____
      Name:
      Title:


GREAT OUTDOORS HOLDCO, LLC

By: _____
      Name:
      Title:


RA BRANDS, L.L.C.

By: _____
      Name:
      Title:


FGI FINANCE, INC.

By: _____
      Name:
      Title:


OUTDOOR SERVICES, LLC

By: _____
      Name:
      Title:

59

EXIT TERM LOAN LENDERS:

By: _____
     Name:
     Title:

COMMITTEE:

By: _____

    Name:

    Title: