# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1] | Case No. 20-81688-CRJ11 |
| Debtors. | Jointly Administered |

## ORDER APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, AND INTERESTS

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases seeking entry of this order (this "**Sale Order**") (a) authorizing the sale of the Acquired Assets (as defined in the Asset Purchase Agreement (as defined below)) free and clear of all Interests (as defined below), pursuant to that certain Asset Purchase Agreement, dated as of September 26, 2020, attached hereto as Exhibit A (the "**Asset Purchase Agreement**"), by and among the Debtors and Roundhill Group, LLC (the "**Buyer**"), and all other transaction documents related thereto; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting the related relief contemplated therein; and the Court having found that (i) the Court has

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Asset Purchase Agreement, as applicable.

44250914 v1

jurisdiction over this matter; (ii) venue is proper in this District; (iii) this is a core proceeding; (iv) the notice of the Motion and the Sale Hearing (as defined below) was sufficient under the circumstances; and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); and based on the statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at a hearing before this Court on September 29, 2020 (the "**Sale Hearing**"); and it appearing that no other notice need be given; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Jurisdiction, Core Proceeding, Statutory Predicates, and Venue**. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984 as amended July 17, 1984. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The predicates for the relief granted herein are Bankruptcy Code Sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B. **Just Cause**. The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Sale Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

C. **Notice**. The notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, the transactions contemplated therein or in connection therewith and corresponding transactions documents (the "**Transactions**"), and the proposed entry of this Sale Order was proper, timely, adequate, sufficient and appropriate under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bidding Procedures, Bankruptcy Code, the

Bankruptcy Rules, and the Local Rules. A reasonable opportunity to object or be heard regarding the relief granted by this Sale Order has been afforded to all interested persons and entities pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Accordingly, no other or further notice of the Motion, the Sale Hearing, or this Sale Order is necessary or required.

D. The Publication Notice was published in the *New York Times* on August 24, 2020. Such Publication Notice was compliant with the Bidding Procedures Order, and was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

E. **Extensive Efforts by Debtors**. Since before the commencement of the Chapter 11 Cases, the Debtors worked with their counsel and financial advisors to implement a viable transaction that would allow them to maximize the value of the Acquired Assets. The Sale Transaction that is the subject of this Sale Order is the result of the Debtors' extensive efforts seeking to maximize recoveries to the Debtors' estates for the benefit of the Debtors' creditors.

F. **Business Justification**. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) authorize the sale of the Acquired Assets free and clear of Interests other than Permitted Liens (as defined in the Asset Purchase Agreement) and Assumed Liabilities (as defined in the Asset Purchase Agreement); (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases; and (iii) grant related relief as set forth herein. Such compelling and sound business justification, which was set forth in the Motion and on the record at the Sale Hearing, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

G. **Bidding Procedures Order**. The Bidding Procedures Order [Docket No. 411] was entered by the Court on August 20, 2020, which, among other things (i) approved the Bidding Procedures; (ii) established the Assumption and Assignment Procedures; (iii) approved the form and manner of notice with respect to all procedures, protections, schedules, and agreements described in the Motion and attached thereto; and (iv) scheduled a date for the Auction and Sale Hearing. The Bidding Procedures provided a full, substantively and procedurally fair, and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets.

H. **Auction; Successful Bidder**. The sale process was properly conducted by the Debtors in accordance with the Bidding Procedures Order and in a manner designed to result in the highest or otherwise best offer for the Acquired Assets. At the Auction, the Debtors agreed in a reasonable exercise of their business judgment, in consultation with their management, the Restructuring Committee, advisors and the Bid Consultation Parties, to enter into and consummate Asset Purchase Agreement with the Buyer. At the conclusion of the Auction, the Buyer was determined to be the Successful Bidder for the Acquired Assets.

I. **Asset Purchase Agreement**. The consummation of the Transactions contemplated by the Asset Purchase Agreement, the Motion, and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

J. **Sale Hearing**. The Sale Hearing occurred on September 29, 2020 in accordance with the Bidding Procedures Order.

K. **Adequate Marketing; Highest or Otherwise Best Offer.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, including the

*Declaration of Ken D'Arcy in Support of Chapter 11 Petitions and First Day Pleadings of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors-Possession* [Docket No. 6 and the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* [Docket No. 355]; and (ii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, (a) the Debtors have adequately marketed the Acquired Assets and conducted a sale process in a non-collusive, fair and good faith manner in compliance with the Bidding Procedures Order; (b) the process set forth in the Bidding Procedures Order afforded a full, substantively and procedurally fair and reasonable opportunity for any interested party to make the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (c) the consideration provided by the Buyer in the Asset Purchase Agreement constitutes the highest or otherwise best offer to purchase the Acquired Assets and assume the Assumed Liabilities; (d) the consideration provided by the Buyer in the Asset Purchase Agreement provides fair and reasonable consideration for the Acquired Assets and the assumption of the Assumed Liabilities and constitutes reasonably equivalent value, fair value and reasonable market value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, the District of Columbia, or other applicable law; (e) the Sale will provide a greater recovery for the Debtors' creditors with respect to the Acquired Assets than would be provided by any other practically available alternative; (f) taking into consideration all relevant factors and circumstances, and after taking account of the Bid Protections, no other entity has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates; (g) unless the sale of the Acquired Assets is concluded expeditiously as provided for in the Sale Motion and the Asset Purchase Agreement, the Debtors' stakeholders recoveries will likely be diminished; and (h) the Debtors' determination that the consideration

provided by the Buyer under the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

L.     **No Successor Liability.**  Neither the Buyer nor any of its affiliates, officers, directors, shareholders, members, partners, principals or any of their respective representatives, successors, or assigns is an "insider or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or stockholders existed or exists between the Buyer and the Debtors.  The transfer of the Acquired Assets to and the assumption of the Assumed Liabilities by the Buyer, except as otherwise expressly set forth in the Asset Purchase Agreement, does not, and will not, subject the Buyer to any liability whatsoever, with respect to the operation of the Debtors' businesses prior to the closing of the Sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee, or vicarious liability.  Pursuant to the Asset Purchase Agreement, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Buyer is not holding itself out to the public as an *alter ego* or a continuation of the Debtors (including through any veil piercing theory).  Except as expressly provided in the Asset Purchase Agreement, neither the Buyer nor any of its affiliates are assuming any obligation or liability of any Debtor and/or any Debtor's estate.  The Sale does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors.  There is no substantial continuity between the Buyer and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyer.  The Buyer is not, and will not be following consummation of the Sale, a mere

continuation of the Debtors or the Debtors' estates, and the Buyer does not and will not constitute a successor to the Debtors or the Debtors' estates. None of the Transactions, including, without limitation, the Sale or the assumption and assignment of the Assigned Contracts, is being undertaken for the purpose of escaping liability for any of the Debtors' debts or other liabilities or hindering, delaying, or defrauding creditors under the Bankruptcy Code or for any other purpose that would give rise to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

M.     **Acquired Assets Property of the Estate.** The Acquired Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the Bankruptcy Code.

N.     **Sale in Best Interest/Fiduciary Duties**. The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to enter into the Asset Purchase Agreement and sell the Acquired Assets and such actions are appropriate under the circumstances of these Chapter 11 Cases, are in the best interests of the Debtors, their estates and creditors, and other parties in interest, and represent a reasonable exercise of business judgment by the Debtors and the Restructuring Committee and their fulfillment of their fiduciary duties under applicable law. Approval of the Asset Purchase Agreement, the Sale, and the Transactions at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest. Unless the sale is concluded expeditiously, the recoveries of all of the Debtors estates and constituencies are likely to be adversely affected.

O. **Not a *Sub Rosa* Plan.** The consummation of the Sale outside of a plan of reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors. The Asset Purchase Agreement, the Sale, this Sale Order and the transactions contemplated therein and herein and associated therewith and herewith do not constitute an impermissible *sub rosa* Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale, this Sale Order and the Asset Purchase Agreement do not otherwise circumvent the Chapter 11 safeguards, including those set forth in sections 1125 and 1129 of the Bankruptcy Code.

P. **Arm's-Length Sale.** The Asset Purchase Agreement, the Sale, and the Transactions were negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors, their insiders and affiliates, nor the Buyer or any of its Affiliates have engaged in any conduct that would cause or permit the Asset Purchase Agreement, the Sale, or any part of the transactions thereby to be avoided under Bankruptcy Code Section 363(n).

Q. **Good Faith Buyer.** The Buyer is a good faith purchaser under Bankruptcy Code Section 363(m) and, as such, is entitled to all of the protections afforded thereby. Specifically: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Buyer complied in all respects with the provisions of the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Buyer in connection with the Sale have been disclosed; (v) no common identity of directors, officers or controlling stockholders exists among the Buyer and the Debtors; (vi) the negotiations and

execution of the Asset Purchase Agreement were at arm's-length and in good faith, and at all times each of the Buyer and the Debtors were represented by competent counsel of their choosing; (vii) the Buyer did not in any way induce or cause the Chapter 11 filing of the Debtors; and (viii) the Buyer has not acted in a collusive manner with any person. The Buyer will be acting in good faith within the meaning of Bankruptcy Code Section 363(m) in closing the transactions contemplated by the Asset Purchase Agreement.

R. **Corporate Authority.** Each Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Acquired Assets has been duly and validly authorized by all necessary corporate actions of each of the Debtors; (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement; (iii) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby; and (iv) needs no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, which may be waived in accordance with the terms therewith.

S. **Free and Clear Findings Required by the Buyer.** The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Acquired Assets to the Buyer and the assumption and assignment of Acquired Contracts, were not, pursuant to Bankruptcy Code Section 363(f), free and clear (except for Permitted Liens and Assumed Liabilities) of (i) all pre-petition and post-petition liens of any kind whatsoever (statutory, consensual or non-consensual or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, preferences, priorities, judgments, hypothecations,

encumbrances, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, licenses, indentures, instruments, conditional sale arrangements, (ii) all claims as defined in Bankruptcy Code Section 101(5), including all rights or causes of action (whether in law or in equity), counterclaims, cross-claims, proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, proxy, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether accruing or arising any time prior to the Closing Date, and whether imposed by agreement, understanding, law, equity or otherwise, and (iii) all debts, liabilities (including without limitation product, environmental, tax, reclamation, pension, *alter ego*), obligations, contractual rights and claims and labor, employment and pension claims, decrees of any court or foreign or domestic governmental authority, in each case, whether known or unknown, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether accruing or arising any time prior to the Closing Date, and whether imposed by agreement, understanding, law, equity or otherwise (excluding Permitted Liens and Assumed Liabilities, (i), (ii), and (iii) collectively, the "**Interests**"). Except as expressly provided in the Asset Purchase Agreement, the Sale shall be free and clear of, and the Buyer shall not be responsible for, any Interests, including, without limitation, in respect of the following: (i) any

rights or Interests based on any successor, substantial continuation or transferee liability, (ii) any Interests that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or termination of the Debtors' or the Buyer's interest in the Acquired Assets, or any similar rights; (iii) any labor or employment agreements; (iv) mortgages, deeds of trust, and security interests; (v) intercompany loans and receivables between the Debtors and any non-Debtor subsidiary; (vi) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "**COBRA**"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (1) the WARN Act (29 U.S.C. §§2101 *et seq*.); (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (xii)

any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract that will be assumed and assigned pursuant to this Sale Order and the Asset Purchase Agreement; (xiii) any other Excluded Liabilities as provided in the Asset Purchase Agreement. A sale of the Acquired Assets other than one free and clear of all Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the Asset Purchase Agreement and approved herein free and clear of all Interests, except for Permitted Liens and Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

T.    **Valid and Binding Transfer.** The transfer of the Acquired Assets to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets and, except for the Permitted Liens and Assumed Liabilities, will vest the Buyer with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Interests and any liabilities of the Debtors.

U.    **Satisfaction of Section 363(f) Standards.** The transfer of the Acquired Assets to the Buyer under the Asset Purchase Agreement shall be a legal, valid, and effective transfer of all the legal, equitable, and beneficial right, title and interest in and to the Acquired Assets free and clear of all Interests, other than the Assumed Liabilities and Permitted Liens. The Debtors may sell the Acquired Assets free and clear of all Interests, except for the Permitted Liens and the Assumed Liabilities, because, in each case, one or more of the standards set forth in Bankruptcy Code Section 363(f)(1) through (5) has been satisfied, with all such Liens and Interests to attach to the proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect that they had as against the Acquired Assets, and any claims and defenses the Debtors and their estates may possess with respect thereto. Those holders of Interests, and non-debtor parties to the Assigned Contracts who did not object, or who withdrew their objections, to

the Motion are, without limitation, deemed to have consented pursuant to Bankruptcy Code Section 363(f)(2). In all cases, each such person with Interests in the Acquired Assets is enjoined from taking any action against the Buyer, the Buyer's affiliates, or any agent of the foregoing to recover any such Interest.

V. **Necessity of Order.** The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction without all of the relief provided for in this Sale Order (including, but not limited to, that the transfer of the Acquired Assets to the Buyer be free and clear of all Interests (other than Permitted Liens and the Assumed Liabilities)). The consummation of the Sale Transaction pursuant to this Sale Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

W. **Time of the Essence**. The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets. There is no credible basis for concluding that a delay in the sale of the Acquired Assets would result in a higher or better offer for the Acquired Assets than the offer reflected in the Asset Purchase Agreement. Therefore, time is of the essence in consummating the Sale, and the Debtors and the Buyer intend to close the Sale as soon as reasonably practicable.

X. **Assigned Contracts.** The Debtors have demonstrated that it is their sound business judgment to sell, assume, and assign the "Assumed Contracts" and "Assumed Leases" (as such terms are defined in the Asset Purchase Agreement), including, without limitation, the unexpired leases and executory contracts designated on <u>Schedule 1.1(j)</u> of the Asset Purchase Agreement or the Huntsman Backup Bid Agreement (but not the Century Arms Backup Bid Agreement) (collectively, the "**Assigned Contracts**" and, individually, an "**Assigned Contract**") to the Buyer

in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest. The Assigned Contracts being assigned to the Buyer are an integral part of the Acquired Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Assigned Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' estates. No section of any Assigned Contract that purports to prohibit, restrict, impose any penalty or fee on, or condition the use, consideration, or assignment of any such Assigned Contract in connection with the Transactions shall have any force or effect.

Y. **Cure and Adequate Assurance.** Through Buyer's commitment to pay all Cure Costs related to the Assigned Contracts, if any, and upon the payment of the Cure Costs by the Buyer pursuant to the terms of the Asset Purchase Agreement, the Buyer has cured or otherwise has demonstrated its ability to cure any default with respect to any act or omission that occurred prior to the Closing (as defined in the Asset Purchase Agreement) under any of the Assigned Contracts, within the meaning of Bankruptcy Code Section 365(b)(l)(A). The proposed Cure Costs or any other cure amount reached by agreement after any objection by a counterparty to an Assigned Contract (an "**Assigned Contract Objection**") or otherwise are deemed the amounts necessary to "cure" all "defaults," each within the meaning of Bankruptcy Code Section 365(b), under such Assigned Contracts. The Buyer's promise to perform the obligations under the Assigned Contracts shall constitute adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of Bankruptcy Code Sections 365(b)(l) and 365(f)(2). All counterparties to the Assigned Contracts who did not file an Assigned Contract Objection or an objection to the assumption and assignment of the Assigned Contracts prior to the Sale Hearing, are deemed to consent to the assumption by the Debtors of their respective Assigned Contract and

the assignment thereof to the Buyer. The filed objections of all counterparties to the Assigned Contracts that were heard at the Sale Hearing (to the extent not withdrawn or adjourned), were considered by the Court, and are overruled on the merits with prejudice. The Court finds that, with respect to all such Assigned Contracts, the payment of the proposed Cure Costs by the Buyer in accordance with the terms of the Asset Purchase Agreement is appropriate and is deemed to fully satisfy the Debtors' obligations under Bankruptcy Code Section 365(b). Accordingly, and without limitation of the Buyer's right under Section 1.5(d) of the Asset Purchase Agreement (or Section 1.5(e) in the case of the Huntsman Backup Bid Agreement (as defined below)), all of the requirements of Bankruptcy Code Section 365(b) have been satisfied for the assumption and the assignment by the Debtors to the Buyer of each of the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of Bankruptcy Code Section 365, it shall be transferred to the Buyer in accordance with the terms of this Sale Order that are applicable to the Acquired Assets.

Z. **Unenforceability of Anti-Assignment Provisions.** Any provisions in any Assigned Contract that restrict, limit, prohibit or condition the assumption, assignment, and sale of the Assigned Contracts or that allow the counterparty so such Assigned Contract to terminate, recapture, impose any penalty or fee, accelerate, increase any rate, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, should be deemed and found to be unenforceable anti-assignment provisions that are void and of no force and effect within the meaning of Bankruptcy Code Section 365(f).

AA. **Objections are Overruled**. All objections to the relief requested in the Motion that have not been withdrawn, waived, adjourned or settled as announced to the Court at the Sale Hearing or by stipulations filed with the Court are overruled except as otherwise set forth herein.

BB.   **Final Order**.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

CC.   **Best Interest**.  Entry of this Sale Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

DD.   **Findings and Conclusions**.  The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.     The Motion is **APPROVED** and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

2.     Any objections to the entry of this Sale Order or to the relief granted herein or the relief requested in the Motion, including any objections to the proposed Cure Costs or the assumption and assignment of any Assigned Contracts, that have not been adjourned, withdrawn, waived, or settled, or not otherwise addressed or resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

**Approval of the Sale of the Acquired Assets**

3.     The Debtors are authorized to enter into the Asset Purchase Agreement (and all schedules and exhibits thereto and all ancillary documents) and all the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects.  The transfer

of the Acquired Assets by the Debtors to the Buyer shall be a legal, valid and effective transfer of the Acquired Assets.

4.     Pursuant to Bankruptcy Code Section 363(b), the sale of the Acquired Assets to the Buyer free and clear of all Interests (other than the Permitted Liens and the Assumed Liabilities), and the transactions contemplated thereby is approved in all respects.

**Sale and Transfer of the Acquired Assets**

5.     Pursuant to Bankruptcy Code Sections 105, 363, and 365, the Debtors are authorized to (a) take any and all actions necessary or appropriate to perform their obligations under, and comply with the terms of, the Asset Purchase Agreement and consummate the Sale and the Transactions pursuant to, and in accordance with, the terms and conditions of the Asset Purchase Agreement and this Sale Order, including, without limitation (i) executing, acknowledging, and delivering such deeds, assignments, conveyances and other assurances, documents, and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets and (ii) entering into the Ancillary Agreements, any transition services or operations support agreements with the Buyer and any other agreements related to implementing the Transactions and (b) take any and all further actions as may be necessary or appropriate to the performance of their obligations as contemplated by the Asset Purchase Agreement or this Sale Order.  The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any reasonable expenses or costs that are required to be paid to consummate the Transactions or perform their obligations under the Asset Purchase Agreement.

6.     Following the Closing, the Debtors or the Buyer and/or their respective designees are authorized to execute and file a certified copy of this Sale Order, which, once filed, registered

or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, liabilities, and Interests in the Acquired Assets of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities). Upon the Closing and the Debtors' receipt of the Purchase Price, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Acquired Assets and a bill of sale transferring good and marketable title in the Acquired Assets to the Buyer free and clear of all Interests, except for the Permitted Liens and Assumed Liabilities. Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions.

7. Except for the Permitted Liens, Assumed Liabilities or as expressly provided in the Asset Purchase Agreement, pursuant to Bankruptcy Code Sections 105(a) and 363(f), upon the Closing and the Debtors' receipt of the Purchase Price, the Acquired Assets shall be transferred to the Buyer as required under the Asset Purchase Agreement, and such transfer shall be free and clear of all Interests of any person, including, without limitation, all such Interests specifically enumerated in this Sale Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto. Without limiting the generality of the foregoing, the Acquired Assets shall be transferred to the Buyer free and clear of the following: (i) satisfy and release of record, Mortgage, Assignment of

Leases and Rents, Security Agreement and Fixture Filing, dated June 15, 2018, and filed for record June 21, 2018, in/as Instrument No. RP2018-2856 of the Records of Herkimer County, New York, executed by Remington Arms Company, LLC, in favor of Ankura Trust Company, LLC, securing the original principal amount of $55,000000; (ii) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated June 15, 2018, and filed for record June 21, 2020, in/as Instrument No. RP2018-2857, of the records of Herkimer County, New York, executed by Remington Arms Company, LLC, in favor of Ankura Trust Company, LLC, securing the original principal amount of $100,000,000; (iii) satisfy and release of record, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated April 18, 2019, and filed for record April 22, 2019, in/as Instrument No. RP2019-[___], of the Records of Herkimer County, New York, executed by Remington Arms Company, LLC, in favor of Cantor Fitzgerald Securities, securing the original principal amount of $90,500,000; and (iv) satisfy and release of record, Lien Subordination Agreement by and between Remington Arms Company, LLC, Cantor Fitzgerald Securities, and Ankrura Trust Company, LLC, dated February 21, 2020, and filed for record February 28, 2020, in/as Instrument No. RP2020-[___], records of Herkimer County, New York.

8. The transfer of the Acquired Assets to the Buyer pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Interests of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order

of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

9. All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; *provided* that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order, or from enforcing its rights under Bankruptcy Code Section 365 or relieve the Buyer of any Assumed Liability.

10. Except as expressly permitted by the Asset Purchase Agreement or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, contract counterparties and other creditors, holding liens, claims encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, against or in a Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts, are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its respective successors and assigns, its respective property and the Acquired Assets, such persons' or entities' liens, claims, encumbrances, or other Interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability, *provided* that nothing herein shall impair or

otherwise affect any right under Bankruptcy Code Section 365 of a lease or contract counterparty to an Assigned Contract under its respective Assigned Contract(s), or relieve the Buyer of any Assumed Liability.

11.     Upon the Closing, each of the Debtors' creditors and any other holder of an Interest is authorized and directed, without cost to the Debtors, to execute such documents and take all other actions as may be necessary to release its Interest in the Acquired Assets, if any, as such Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements or other documents or agreements evidencing an Interest in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests, which the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then the Buyer and its designees are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Acquired Assets and to file, register, or otherwise record a certified copy of this Sale Order, which shall constitute conclusive evidence of the release of all Interests of any kind or nature whatsoever in the Debtors or the Acquired Assets (other than the Permitted Liens and Assumed Liabilities).  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Sale Order.

12.     Upon the Closing and the Debtors' receipt of the Purchase Price, all entities that are currently, or on the Closing may be, in possession of some or all of the Acquired Assets are

hereby directed to surrender possession of the Acquired Assets to the Buyer, unless the Buyer otherwise agrees.

13.    This Sale Order is self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.  However, the Debtors and the Buyer, and each of their respective officers, employees, and agents, are hereby authorized and empowered to take all actions and to execute and deliver any and all documents and instruments that either the Debtors or the Buyer deem necessary, desirable or appropriate to implement and effectuate the terms of the Asset Purchase Agreement and this Sale Order.

14.    To the maximum extent permitted by applicable non-bankruptcy law, (a) the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval (collectively, the "**Permits**") of the Debtors with respect to and included in the Acquired Assets, and (b) all Permits that are included in the Acquired Assets are deemed to have been, and hereby are directed to be, transferred to the Buyer as of the Closing Date.  Nothing in this Sale Order, and nothing in the foregoing sentence, authorizes the transfer or assignment of any governmental Permit or the discontinuation of any obligation thereunder without compliance with all applicable legal requirements and approvals under police or regulatory law.  To the extent any Permit cannot be transferred to the Buyer in accordance with this paragraph, the Buyer, with such assistance from the Debtors as is required under the Asset Purchase Agreement, will work promptly and diligently to apply for and secure all necessary government approvals for the transfer or new issuance of the Permit(s) to the Buyer, and the Debtors shall maintain the Permits to the extent required under and subject to the terms of the Asset Purchase Agreement.  For the avoidance of doubt, while nothing in this Sale Order or the Asset Purchase

Agreement releases, nullifies, limits, waives, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit, Buyer shall be entitled to operate under each state Permit currently held by or on behalf of the Debtors in relation to the Acquired Assets until such time as each such Permit is transferred to the Buyer and/or an equivalent Permit is issued to the Buyer.

15. To the extent provided by Bankruptcy Code Section 525, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement and this Sale Order.

**Implementation of the Sale**

16. Upon Closing, the Buyer shall (a) pay the Purchase Price to the Debtors; (b) pay the Cure Amounts as more fully described in paragraph 30 of this Sale Order and the Asset Purchase Agreement; (c) assume the Assumed Liabilities; and (d) perform any other obligations required to be performed by Buyer on the Closing. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Sale Order.

17. Within three (3) business days of the Debtors' receipt of the Net Sale Proceeds (as defined in the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 410] (as it may be amended from time to time, the "**Cash Collateral Order**")) from the sale of the Acquired Assets, the Debtors shall pay the

Net Sale Proceeds of the Acquired Assets to the Priority Term Loan Agent, for the account of the Priority Term Loan Secured Creditors, to the extent required under and in accordance with the terms of the Cash Collateral Order or such other order of the Court.  Upon the Priority Term Loan Agent's timely receipt of such payment, (a) the Priority Term Loan Obligations shall be paid and satisfied to the extent of the payment and (b) all liens and security interests against the Acquired Assets securing the Priority Term Loan Obligations shall be automatically released and discharged without further action by any person.  Upon the payment in full in cash of the Priority Term Loan Obligations and the occurrence of the Challenge Period Termination Date (as defined in the Cash Collateral Order), (w) the Debtors shall have no further indebtedness, liabilities or obligations owing under the Priority Term Loan Credit Agreement or the other "Financing Agreements" (as defined in the Priority Term Loan Agreement, the "**Priority Term Loan Documents**"), (x) other than any provisions thereof that survive pursuant to the terms thereof, the Priority Term Loan Credit Agreement and all other Priority Term Loan Documents (including, without limitation, any mortgages, guaranties and security agreements) and all of the Debtors' obligations thereunder shall terminate and be of no further force and effect, (y) all liens and security interests against the property and assets of the Debtors securing the Priority Term Loan Obligations shall be automatically fully released and discharged without further action by any person, and (z) each deposit account control agreement in respect of or other sweeps or blocks of any Debtor's deposit accounts or lockboxes in favor of any of the Priority Term Loan Secured Parties shall terminate.

18.     The Debtors shall pay the Net Sale Proceeds from the sale of the Acquired Assets to the FILO Agent, for the account of the FILO Term Loan Secured Creditors, to the extent required under and in accordance with the terms of the Cash Collateral Order or such other order of the Court.  For the avoidance of doubt, any further payment to the FILO Agent shall be subject

to orders previously entered by this Court and any further orders of this Court or provided under the Debtors' Chapter 11 plan.

19.     All parties in interest in these Chapter 11 Cases expressly reserve their rights with respect to any allocation of the Purchase Price or value among the purchased Acquired Assets, and any allocation of the Purchase Price or value among the purchased Acquired Assets as determined by the Buyer shall not be determinative or binding on any party in interest in these Chapter 11 Cases except as ordered by the Court after notice and a hearing.

## No Successor Liability

20.     Other than as expressly set forth in the Asset Purchase Agreement, the Buyer and its Affiliates shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Interests, including under any theory of successor or transferee liability, *de facto* merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, including without limitation, with respect to any of the following: (i) any foreign, federal, state, or local revenue law, pension law, ERISA, COBRA, tax law, labor law, employment law, the WARN Act, antitrust law, CERCLA, and any other environmental, health and safety laws, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations); (ii) under any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) under any unfair trade practices law, rule, regulation or doctrine with respect to the Debtors' liability under such law, rule, regulation or doctrine, or under any unfair trade practices liability law or doctrine; (iv) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to

which the Debtors are a party; (v) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (vi) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (viii) any environmental liabilities, debts, claims fines, penalties, or obligations arising from conditions, facts or circumstances first existing or occurring on or prior to the Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties or obligations arising under CERCLA, or any other environmental, health, and safety laws; (viii) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (ix) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors under any labor, employment, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations); (x) any bulk sale law; and (xi) any litigation. The Buyer shall have no liability or obligation under the WARN Act simply by virtue of its purchase of assets from the Debtors.

21. The Buyer has given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid and valuable consideration for the releases

of any potential claims of successor liability of the Buyer and which shall be deemed to have been given in favor of the Buyer by all holders of Interests and liabilities (except with respect to Permitted Liens and the Assumed Liabilities) in or against the Debtors, or the Acquired Assets. Without limiting the Buyer's obligation to pay and satisfy the Assumed Liabilities, upon consummation of the Sale, the Buyer shall not be deemed to (a) be the successor to the Debtors or their estates, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, *alter ego* or substantial continuation of the Debtors under any theory of law or equity (including veil piercing) as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Acquired Assets.

22.    Effective upon the Closing, except with respect to Assumed Liabilities and Permitted Liens, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Buyer, its Affiliates or its assets (including the Acquired Assets) with respect to any (a) Claim or Lien or (b) successor or transferee liability, including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or Claim; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking,

terminating, or failing or refusing to renew any License, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

**Good Faith**

23.     The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer without collusion and in good faith, as that term is used in Bankruptcy Code Section 363(m), and, accordingly, the reversal or modification on appeal of the authorization provided in this Sale Order to consummate the Sale and the Transactions shall not affect the validity of the transactions (including the assumption and assignment of any of the Assigned Contracts).  The Buyer is a purchaser in good faith of the Acquired Assets and is entitled to all the protections afforded by Bankruptcy Code Section 363(m).

24.     As a good faith purchaser of the Acquired Assets, the Buyer has not entered into an agreement with any other potential bidders at the Auction, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Acquired Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Buyer, and the Sale may not be avoided pursuant to Section 363(n) of the Bankruptcy Code.

25.     The consideration provided by the Buyer for the Acquired Assets under the Asset Purchase Agreement constitutes reasonably equivalent value, fair value, reasonable market value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under Bankruptcy Code Section 363(n).  The Asset Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or for any other purpose that would give rise to statutory

or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing. Neither the Debtors nor the Buyer have entered into the Asset Purchase Agreement or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities. No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Buyer. The Court's approval of the Motion and the Asset Purchase Agreement are in the best interests of the Debtors, the Debtors' estates, their creditors, and all other parties in interest.

26. Neither the Buyer nor any of its Affiliates is an "insider" as that term is defined in Section 101(31) of the Bankruptcy Code.

**Assumption and Assignment of Assigned Contracts; Assumed Liabilities**

27. Pursuant to Bankruptcy Code Sections 105(a), 363, and 365 and subject to and conditioned upon the Closing of the Sale, the Debtors' sale, assumption and assignment to the Buyer of the Assigned Contracts is approved, and the requirements of Bankruptcy Code Section 365(b)(1) with respect thereto are deemed satisfied.

28. The Debtors are authorized in accordance with Bankruptcy Code Sections 105(a) and 365 to (i) assume and assign to the Buyer, effective as of the Closing, as provided by, and in accordance with, the Bidding Procedures Order and the Asset Purchase Agreement, the Assigned Contracts free and clear of all Interests of any kind or nature whatsoever, other than the Permitted Liens and Assumed Liabilities, and (ii) execute and deliver to the Buyer such documents or other

instruments as the Buyer reasonably deems necessary to assign and transfer the Assigned Contracts to the Buyer.

29.    The Assigned Contracts shall be transferred and assigned to, pursuant to the Bidding Procedures Order and the Asset Purchase Agreement, and thereafter remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Assigned Contract (including, but not limited to, those of the type described in Bankruptcy Code Sections 365(b)(2), (e)(1), and (f)) that prohibits, restricts, requires the express consent or conditions such assignment or transfer. The Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Buyer. The Debtors may assign each Assigned Contract in accordance with Bankruptcy Code Sections 363 and 365, and any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contracts or terminate, recapture, require express consent, impose any penalty, condition, renewal, or extension, or modify any term or condition upon the assignment of such Assigned Contracts, constitute unenforceable anti-assignment provisions which are void and of no force and effect. All other requirements and conditions under Bankruptcy Code Sections 363 and 365 for the assumption by the Debtors and assignment to the Buyer of each Assigned Contract have been satisfied.

30.    All defaults and all other obligations or liabilities under any Assigned Contract occurring, arising, or accruing prior to the date of the assignment or transfer to the Buyer shall be deemed cured or satisfied upon payment by the Buyer (in accordance with Section 1.5 of the Asset Purchase Agreement of the Huntsman Backup Bid Agreement but not the Century Arms Backup Bid Agreement) of the proposed Cure Cost, as set forth in the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and Assignment, or any other cure amount

reached by agreement after an Assigned Contract Objection or otherwise, and, without limiting the foregoing, no effect shall be given to any default of the type set forth in Bankruptcy Code Section 365(b)(2), or the type of default concerning an unexpired lease of real property described in Bankruptcy Code Section 365(b)(1) whether or not such Assigned Contract is an executory contract within the meaning of Bankruptcy Code Section 365.

31.    Each non-Debtor counterparty to the Assigned Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors, the Buyer, or their respective property (including the Acquired Assets) any fee, acceleration, default, breach, Claim (including any counterclaim, defense, or setoff capable of being asserted against the Debtors), pecuniary loss, or condition to assignment existing, arising, or accruing as of the Closing Date, or arising by reason of the Closing, including any breach related to or arising out of any change-in-control provision in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts, and (b) asserting against the Buyer (or its property, including the Acquired Assets) any Claim or Lien, counterclaim, breach, condition or setoff asserted or capable of being asserted against the Debtors existing as of the Closing Date or arising by reason of the Closing except for the Assumed Liabilities and Permitted Liens.

32.    The Cure Costs amounts listed on the Notice of Assumption and Assignment, any Supplemental Notice of Assumption and Assignment or any other cure amount reached by agreement after an Assigned Contract Objection or otherwise, reflect the sole amounts necessary under Bankruptcy Code Section 365(b) to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due to the non-debtor parties in connection with the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts. Notwithstanding anything to the contrary herein, if the Cure Costs for an Assigned Contract is

determined to be greater than the proposed Cure Costs asserted in the Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment, the Buyer may decide, in its discretion, not to assume that Assigned Contract.  Notwithstanding anything to the contrary herein, in each case in accordance with Bidding Procedures Order and the terms and conditions of the Asset Purchase Agreement, the Buyer may decide not to assume one or more unexpired leases and executory contracts designated on Schedule 1.1(i) of the Asset Purchase Agreement (or Schedule 1.5(a) of the Huntsman Backup Bid Agreement).

33.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Contracts.

34.     Notwithstanding anything in the Asset Purchase Agreement or this Sale Order to the contrary and for the avoidance of doubt, the Acquired Assets shall not include any of the Excluded Assets as set forth in Section 1.2 of the Asset Purchase Agreement.

35.     The Buyer shall be responsible for the satisfaction of the Assumed Liabilities under the Asset Purchase Agreement, including without limitation those arising under the Assigned Contracts.  Except as provided in the Asset Purchase Agreement or this Sale Order, after the Closing, the Debtors and their estates shall have no further liability or obligations with respect to any Assumed Liability, including those arising under the Assigned Contracts, and all holders of such claims are forever barred and estopped from asserting any claims under any Assumed Liability (including those arising under the Assigned Contracts) against the Debtors, their successors or assigns, and their estates.

**Backup Bidder**

36.     Huntsman Holdings, LLC (the "**Huntsman Backup Bidder**") is hereby approved as a Backup Bidder and pursuant to Bankruptcy Code Sections 105, 363, and 365, the Asset Purchase Agreement attached hereto as Exhibit B (the "**Huntsman Backup Bid Agreement**") submitted by the Huntsman Backup Bidder, the sale of the Acquired Assets (as defined in the Huntsman Backup Bid Agreement and consummation of the Sale to the Huntsman Backup Bidder are hereby approved as a Backup Bid.  Century Arms, Inc. (the "**Century Arms Backup Bidder**" and collectively with the Huntsman Backup Bidder, the "**Backup Bidder**") is hereby approved as a Backup Bidder and pursuant to Bankruptcy Code Sections 105, 363, and 365, the Asset Purchase Agreement attached hereto as Exhibit C (the "**Century Arm Backup Bid Agreement**" and collectively with the Huntsman Backup Bid Agreement, the "**Backup Bid Agreement**") submitted by the Century Arms Backup Bidder, the sale of the Acquired Assets (as defined in the Century Arms Backup Bid Agreement and consummation of the Sale to the Century Arms Backup Bidder are hereby approved as a Backup Bid.  The Backup Bid pursuant to the terms set forth in the Backup Bid Agreement is hereby approved and authorized as a Backup Bid and shall remain open as a Backup Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the Auction.  In the event that the Successful Bidder cannot or refuses to consummate the Sale because of a breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not directed, to close, and take all actions necessary to close, with the Backup Bidder on the Backup Bid without further order of the Court, and in such case the findings and other provisions of this Sale Order shall apply to the applicable Backup Bidder and the applicable Backup Bid Agreement to the same extent they do with respect to the Buyer and the Asset Purchase Agreement.

**Other Provisions**

37.     Nothing in this Sale Order or in the Asset Purchase Agreement entered into pursuant to this Sale Order releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory authority of a governmental unit.

38.     This Sale Order and the Asset Purchase Agreement shall be binding in all respects upon all persons, entities, and known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Interests, all counterparties to the Assigned Contracts, all counterparties to contracts that are not assumed or assigned, all successors and assigns of the Buyer, each Debtor and their affiliates and subsidiaries, the Acquired Assets, and any trustees appointed in the Chapter 11 Cases or upon a conversion to cases under Chapter 7 of the Bankruptcy Code, and this Sale Order shall not be subject to amendment or modification and the Asset Purchase Agreement shall not be subject to rejection.  Nothing contained in any Chapter 11 plan confirmed in any Debtor's bankruptcy case, any order confirming any such Chapter 11 plan, or any other order in the Chapter 11 Cases shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or this Sale Order.

39.     To the extent applicable, the automatic stay pursuant to Section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Buyer to give the Debtors any notice provided for in the Asset Purchase Agreement, and (b) to allow the Buyer to take any and all actions permitted by the Asset Purchase Agreement.

40.     No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the Asset Purchase Agreement, the Motion, and this Sale Order.

41. This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) enforce the terms of the Asset Purchase Agreement; (ii) compel delivery of the Acquired Assets to the Buyer; (iii) interpret, implement, and enforce the provisions of this Sale Order; (iii) protect the Buyer, any of the Buyer's Affiliates, or any agent of the foregoing, against any Interests against the Debtors or the Acquired Assets of any kind or nature whatsoever, except for the Permitted Liens and Assumed Liabilities, and (iv) enter any order under Bankruptcy Code Sections 363 and 365.

42. No brokers were involved in consummation of the Sale, and no brokers' commissions are due to any person in connection with the Sale; *provided, however*, that this provision does not impact any transaction or other fees due to investment bankers or financial advisors employed (a) by the Debtors, including, but not limited to Ducera Partners LLC, or certain of their creditors for which the Debtors may be obligated to pay in accordance with an engagement letter with such professional(s), or (b) by the Buyer, including, but not limited to, in the case of the Backup Bidder, Moelis & Company LLC.

43. To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

44. The failure to specifically include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

45. The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, *provided* that the Debtors shall provide the Bid Consultation Parties with three (3) business days' notice thereof and *provided* further that any such modification, amendment, or supplement does not, based on the Debtors' judgment, have a material adverse effect on the Debtors' estates.

46. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Debtors and the Buyer are authorized to close the transaction immediately upon entry of this Sale Order. Time is of the essence in closing the transactions referenced herein, and the Debtors and the Buyer intend to close the transactions as soon as practicable. This Sale Order is a final, appealable order and the period in which an appeal must be filed shall commence upon the entry of this Sale Order.

47. The provisions of the Asset Purchase Agreement and this Sale Order may be specifically enforced in accordance with the Asset Purchase Agreement notwithstanding the appointment of any Chapter 7 or Chapter 11 trustee after the Closing.

48. Headings utilized in this Sale Order are for convenience of reference only, and do not constitute a part of this Sale Order for any other purpose.

49. All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

50. The provisions of this Sale Order are non-severable and mutually dependent.

51. All issues raised by Oracle America, Inc. ("**Oracle**") in *Oracle's Limited Objection and Reservation of Rights Regarding (a) Debtors' Motion for (a) an Order Establishing Bidding*

Procedures and Granting Related Relief and (ii) an Order or Orders Approving the Sale of the Debtors' Assets; and (b) Notice of Executory Contracts and Unexpired Leases that May Be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto (the "Oracle Objection") [Docket No. 529] are expressly reserved. The Oracle Objection may be set for hearing on an expedited basis upon the request of Oracle and/or the Debtors.

52.     Nothing in the Asset Purchase Agreement or in this Order shall have the effect of transferring, impairing, reducing or otherwise limiting any of the Debtors' rights in any insurance policies covering Excluded Liabilities or the proceeds of such polices. For the avoidance of doubt, the Debtors reserve control over the privilege concerning any retained documents and nothing in this Order relieves the Debtors of any document retention obligations.

53.     To the extent any molds and tooling manufactured by Oneida Molded Plastics, LLC ("**Oneida**") are included in the Acquired Assets (the "**Acquired Mold Product**"), any lien of Oneida on the Acquired Mold Product will be released and shall attach to the proceeds thereof with the same priority, extent, validity, avoidability and enforceability as Oneida's lien, if any, on the Acquired Mold Product. Nothing herein shall constitute a finding or ruling by this Court or an admission by the Debtors that any such liens are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such lien.

54.     Notwithstanding anything to the contrary in this Order or the Asset Purchase Agreement, the Debtors do not purport to assume or assign to Buyer the license agreement dated as of January 23, 2008 between Magpul Industries Corp ("**Magpul**") and the Debtors, and nothing

in this order limits or otherwise modifies, to the extent such license exists, any express or implied license granted by the Debtors to Magpul in connection with Magpul's production of accessories for Debtors' firearm products or any rights or defenses of the Debtors in connection therewith, including any right of revocation and any right to assign the Debtors' rights in connection therewith to the Buyer.

Dated this the 30th day of September, 2020.

/s/ Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge

**Exhibit A**

**Asset Purchase Agreement**

**Exhibit B**

**Huntsman Backup Bid Agreement**

44250914 v1

**Exhibit C**

**Century Arms Backup Bid Agreement**

44250914 v1

ASSET PURCHASE AGREEMENT

by and among

ROUNDHILL GROUP, LLC

as Buyer,

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.,

as Seller

SET FORTH ON THE SIGNATURE PAGES HERETO

Dated as of September 26, 2020

# TABLE OF CONTENTS

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS .................................. 6

    Section 1.1        Transfer of Acquired Assets ................................................ 6
    Section 1.2        Excluded Assets .................................................................. 9
    Section 1.3        Assumption of Liabilities ................................................. 12
    Section 1.4        Retention of Liabilities .................................................... 12
    Section 1.5        Assumed Leases and Assumed Contracts; Cure Amount .................. 13
    Section 1.6        Non-Assignment of Acquired Assets .................................. 14
    Section 1.7        Further Conveyances and Assumptions ............................. 15

ARTICLE 2. CONSIDERATION ..................................................................................... 16

    Section 2.1        Consideration .................................................................... 16
    Section 2.2        Good Faith Deposit .......................................................... 16

ARTICLE 3. CLOSING AND DELIVERIES ................................................................... 16

    Section 3.1        Closing .............................................................................. 16
    Section 3.2        Seller's Deliveries ............................................................ 16
    Section 3.3        Buyer's Deliveries ............................................................ 18

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ............................................. 18

    Section 4.1        Representations and Warranties of Seller ......................... 18
    Section 4.2        Representations and Warranties of Buyer ........................ 21
    Section 4.3        Warranties Exclusive; Schedules ..................................... 23
    Section 4.4        Survival of Representations and Warranties ..................... 23

ARTICLE 5. COVENANTS OF THE PARTIES .............................................................. 23

    Section 5.1        Covenants of Seller .......................................................... 23
    Section 5.2        Covenants of Buyer .......................................................... 25

ARTICLE 6. ADDITIONAL AGREEMENTS .................................................................. 27

    Section 6.1        Bankruptcy Matters .......................................................... 27
    Section 6.2        Transition Arrangements .................................................. 27
    Section 6.3        Further Assurances ........................................................... 28

ARTICLE 7. EMPLOYEES AND EMPLOYEE BENEFITS ........................................... 28

    Section 7.1        Transferred Employees .................................................... 28
    Section 7.2        Employment Tax Reporting .............................................. 29
    Section 7.3        Benefits ............................................................................. 29
    Section 7.4        WARN Act ....................................................................... 29
    Section 7.5        Third Party Beneficiary .................................................... 29

ARTICLE 8. TAXES ......................................................................................................... 30

    Section 8.1        Taxes Related to Purchase of Assets ................................ 30
    Section 8.2        Cooperation on Tax Matters ............................................. 30
    Section 8.3        Allocation of Purchase Price ............................................ 31

ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ................. 31

Section 9.1    Conditions Precedent to Performance by Seller ............................... 31
Section 9.2    Conditions Precedent to Performance by Buyer ............................... 33

ARTICLE 10. TERMINATION ................................................................................ 34

Section 10.1    Conditions of Termination ............................................................. 34
Section 10.2    Effect of Termination; Remedies ................................................... 35

ARTICLE 11. MISCELLANEOUS ......................................................................... 36

Section 11.1    Successors and Assigns ................................................................. 36
Section 11.2    Governing Law; Jurisdiction ......................................................... 36
Section 11.3    WAIVER OF JURY TRIAL ........................................................... 36
Section 11.4    Expenses ...................................................................................... 37
Section 11.5    Broker's and Finder's Fees ........................................................... 37
Section 11.6    Severability .................................................................................. 37
Section 11.7    Notices ......................................................................................... 37
Section 11.8    Amendments; Waivers .................................................................. 38
Section 11.9    Time of Essence ........................................................................... 38
Section 11.10    Public Announcements ................................................................ 39
Section 11.11    Entire Agreement ....................................................................... 39
Section 11.12    Parties in Interest ...................................................................... 39
Section 11.13    Bulk Sales Laws ......................................................................... 40
Section 11.14    Construction ............................................................................... 40
Section 11.15    Counterparts and Facsimile ......................................................... 40

ARTICLE 12. DEFINITIONS ................................................................................ 40

Section 12.1    Certain Terms Defined .................................................................. 40
Section 12.2    All Terms Cross-Referenced ........................................................ 48

## SCHEDULES

Schedule 1.1(i)    -    Assumed Business Contracts
Schedule 1.2(q)    -    Excluded Assets
Schedule 1.3(b)    -    Assumed Liabilities
Schedule 1.4(n)    -    Excluded Liabilities
Schedule 1.5(a)    -    Estimated Cure Amount
Schedule 4.1(g)    -    Compliance with Law
Schedule 4.1(h)    -    Contracts
Schedule 4.1(i)    -    Material Permits
Schedule 4.1(j)    -    Acquired Intellectual Property
Schedule 11.5    -    Brokers and Finders
Schedule 12.1(a)    -    Tradenames
Schedule 12.1(b)    -    Permitted Liens

**EXHIBIT**

Exhibit 1    -    Bidding Procedures Order
Exhibit 2    -    Trademark License Agreement

4

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of September 26, 2020 (the "<u>Effective Date</u>"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("<u>ROC</u>"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (collectively with ROC, "<u>Seller</u>"), and the Roundhill Group, LLC ("<u>Buyer</u>"), or a Buyer Acquisition Vehicle as assignee in accordance with <u>Section 11.1</u>.  Capitalized terms used in this Agreement are defined or cross-referenced in <u>Article 12</u>.

## *RECITALS*

A.      Seller is engaged in the manufacture, design, marketing and sale of shotguns, rifles, handguns and modular firearms and related components and accessories other than the Marlin Business (the "<u>Business</u>"). On July 27, 2020 (the "<u>Petition Date</u>"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Alabama (the "<u>Bankruptcy Court</u>" and the case arising under such petition, the "<u>Bankruptcy Case</u>").

B.      On the Petition Date, Seller filed a Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets (the "<u>Bidding Procedures Motion</u>") pursuant to which Seller sought, and the Bankruptcy Court approved, the Bidding Procedures Order attached hereto as Exhibit 1 (the "<u>Bidding Procedures Order</u>").

C.      Buyer desires to purchase the Acquired Assets free and clear of Liens, Claims and Interests (other than Permitted Liens), except for assumption of the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Buyer, the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

D.      Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Seller.

E.      The Acquired Assets and Assumed Liabilities are assets and liabilities of Seller, which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "<u>Sale Order</u>"), which order will include the authorization for the assumption by Seller and assignment to Buyer of certain executory contracts and unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code.  The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

F.      This Agreement is conditioned upon Vista Outdoor, Inc. ("<u>Vista</u>") being the

5

Case 20-81688-CRJ11    Doc 2905-17    Filed 09/30/22    Entered 09/30/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Page Sale of APA    Page 46 of 246

successful bidder for Debtors' ammunition business and related assets.

*STATEMENT OF AGREEMENT*

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS.

Section 1.1    Transfer of Acquired Assets.  At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities). For all purposes under this Agreement, the term "Acquired Assets" shall not include any Excluded Assets, and shall mean all of the other properties, assets, Interests and rights of Seller existing as of the Closing Date, of any kind or nature, real or personal, tangible or intangible, that in each case primarily relate to the ownership, operation and management of the Business, including, but not limited to:

(a)      The following real property (the "Owned Real Property"):

1.      Gun Factory
14 Hoefler Avenue[1]
Ilion, NY 13357

2.      Steam Plant Parcel
Accessible via Commerce Street[2]
Ilion, NY 13357

3.      Handgun Barrel Factory
5900 Highway 321 North
Lenoir City, TN 37771

4.      Auxiliary Property
6035 Hwy 321
Lenoir City, TN 37771

(b)       all Leases pursuant to which Seller has the right to possess, use, lease or occupy (or grant others the right to possess, use, lease or occupy) any Leased Real Property used in Seller's ownership, operation and management of the Business,

---

[1] Parcel Nos.: 120.37-4-1, 120.37-4-3, 120.37-4-29, 120.37-4-71, 120.37-4-77, 120.37-4-81, 120.37-5-8, 120.37-5-16, 120.37-5-36, 120.45-1-20.1

[2] Parcel No.: 119.36-1-13.3

6

together with all security and other deposits related thereto, prepaid rent and appurtenances thereto and associated therewith (collectively, the "Assumed Leases");

(c)     all Leasehold Improvements of Seller located on the Leased Real Property that is subject to the Assumed Leases (the "Assumed Leased Real Property");

(d)     all of Seller's owned (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property (including without limitation consumables located at the premises of the Business) that is in any of the foregoing cases primarily used for the ownership, operation or management of the Business (the "Owned FF&E"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E;

(e)     all of Seller's (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts primarily used for the ownership, operation or management of the Business, that are in each case leased pursuant to any Contract (the "Assumed FF&E Leases" and the equipment, machinery, furniture, fixtures and improvements, tooling and spare parts so leased, the "Leased FF&E"), (ii) rights under the Assumed FF&E Leases, and (iii) to the extent assignable, rights to any warranties and licenses received from manufacturers and lessors of the Leased FF&E;

(f)     all of Seller's (i) owned cars, trucks and other motor vehicles primarily used in connection with the Business (the "Owned Motor Vehicles"), and (ii) rights to the warranties and licenses received from manufacturers and sellers of the Owned Motor Vehicles;

(g)      (ii) all proceeds and recoveries from, policies (but not, for the avoidance of doubt, any Insurance Policies themselves) to the extent attributable to any of the Acquired Assets only to the extent in respect of periods on or after the Effective Date) (the rights described in this Section 1.1(h) being collectively the "Assumed Policy Rights");

(h)     all Contracts set forth on Schedule 1.1(i) (collectively, the "Assumed Business Contracts" and, together with the Assumed FF&E Leases, the Assumed Inbound IP Licenses, the Assumed Outbound IP Licenses, and the Assumed Motor Vehicle Leases, the "Assumed Contracts");

(i)     to the extent transferable under applicable Law, all Permits issued to Seller that are primarily used in connection with the ownership, operation and/or management of the Business, and all pending applications therefor;

(j)     all (i) registered and unregistered Intellectual Property owned and primarily used by Seller in connection with the ownership, operation and/or management of the Business, other than Excluded Assets, and any and all corresponding rights that, now or hereafter, may be secured throughout the world (collectively, the "Acquired Intellectual Property"), and (ii) to the extent transferable under applicable Law, all agreements under which Intellectual Property is licensed to Seller and used

7

primarily in connection with the ownership, operation and/or management of the Business, other than the Trademark License Agreement (collectively, the "Assumed Inbound IP Licenses");

(k)     the agreements listed on Schedule 1.1(k) under which Seller has granted licenses, sublicenses, or similar rights, permissions or franchises to use any Acquired Intellectual Property (the "Assumed Outbound IP Licenses");

(l)     all sales orders or other commitments of Seller to purchasers of goods, services or products produced or sold by the Business (the "Customer Orders");

(m)     all right, title and interest in and to all inventory, supplies and finished goods within the scope of the operations of the Business and located on the Owned Real Property and the Leased Real Property or (to the extent within the scope of the operations of the Business) in the possession of any third-party bailees (collectively, the "Inventory");

(n)     all (i) rights to refunds relating to, and prepaid expenses and deposits attributable to, any Purchase Orders, Customer Orders, Assumed Contracts and Inventory, and all rights under credit card merchant accounts, (ii) prepaid charges and deposits in respect of telephone, electricity, water and sewer and other utilities provided to the above-referenced Owned Real Property and the Assumed Leased Real Property, (iii) prepaid common area maintenance expenses relating to any Assumed Lease to the extent in respect of periods on or after the Closing Date and security deposits for any Assumed Lease, (iv) ordinary holdbacks (including ordinary credit card holdback payments or protection reserves) in connection with or relating to any Acquired Asset and (v) other deposits, prepaid charges and expenses paid by Seller and other rights of Seller in connection with or primarily relating to any Acquired Asset;

(o)     all goodwill, including all goodwill associated with the Business, with the Acquired Intellectual Property, and with any of the other Acquired Assets;

(p)     Claims held by Seller that relate to Acquired Assets;

(q)     all other tangible or intangible assets of Seller primarily used in connection with the ownership, operation and/or management of the Business;

(r)     to the extent permitted by applicable Law (and other than all Documents of Seller held by Seller or Seller's counsel related to the Retained Litigation), all Documents that are primarily used in, held for use in or intended to be used in, or that primarily relate to, the Acquired Assets, the Assumed Liabilities or the Business; provided, that Buyer shall provide Seller with reasonable access (during business hours with reasonable prior notice and without cost to Seller) to the same following the Closing to the extent reasonably necessary to permit Seller to wind-down and liquidate its estate after the Closing; and provided, further, that Seller shall keep such information confidential in accordance with all requirements of applicable Law;

8

(s)  all contents of the Remington Museum including all firearms of every nature which are owned by Seller, including but not limited to all antique, collectible, and historic firearms owned by Seller whether located at the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere;

(t)  all antique, collectible, and historic firearms owned by Seller whether not considered part of the Ilion, NY Remington Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere;

(u)  all antique, collectible, and historic firearms owned by Seller not considered part of the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere;

(v)  all rights and title to the shares of capital stock (and any other equity interests or rights convertible into equity interests) (the "RLC Shares") of Remington Licensing Corporation, a Delaware corporation, that are owned by RA Brands, L.L.C., a Delaware limited liability company (provided, that, Buyer reserves the right, in its sole discretion to assign to a third party or classify the assets described in this subsection (h) as an Excluded Asset at any time prior to the Closing Date; provided further that any such deduction shall have no effect on the Purchase Price); and

(t)  all artwork owned by Seller wherever located, including all artwork on loan or display outside the company including but not limited to all artwork located at the Remington Arms Museum location including artwork on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere.

Section 1.2  Excluded Assets.  Except as provided in Section 1.1, the Acquired Assets shall not include any right, title or interest of any Person other than Seller in any property or asset, or Seller's right, title and interest in, to and under properties and assets not used in connection with the ownership, operation and/or management of the Business, and shall specifically exclude the following properties, Contracts, Leases, and other assets, interests and rights of Seller (all such items not being acquired by Buyer being referred to in this Agreement as the "Excluded Assets"):

(a)  all rights of every nature and description (other than Assumed Policy Rights) under or arising out of all insurance policies of Seller (the "Insurance Policies"), including without limitation (i) with respect to Claims arising prior to the Effective Date (ii) to the extent of coverage of any Excluded Liabilities, (iii) under those insurance policies covering any tort liabilities that are not Assumed Liabilities, (iv) under the D&O Insurance, and (v) under those insurance policies covering liabilities and Claims against Seller and its affiliates relating to the Excluded Employee Liabilities);

9

Case 20-81688-CRJ11    Doc 2905-17    Filed 09/30/22    Entered 09/30/22 13:24:04    Desc
Exhibit RJN 5: Order Approving Page 9 of 129A    Page 50 of 246

(b)     any asset that is not owned or leased by Seller or not used or held for use in connection with the ownership, operation and management of the Business;

(c)     any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that (i)Seller shall provide Buyer with reasonable access to the same following the Closing to the extent relating to the Acquired Assets and when reasonably requested by Buyer; and (ii) Buyer shall be entitled upon reasonable request to be provided with copies of all such records, at its own expense, and provided, further, that Seller shall notify Buyer before disposing of any such records and upon Buyer's reasonable request shall transfer them to Buyer;

(d)     all (i) prepaid premiums in respect of all Insurance Policies, (ii) retainers, prepayments or on-account cash paid to Seller's professionals and advisors, including any carve-out under any DIP Facility or cash collateral arrangements (whether retained in the Bankruptcy Case or otherwise), and (iii) other deposits, prepaid charges and expenses paid by Seller to the extent in connection with or relating to any Excluded Asset;

(e)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes for any Straddle Period, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(f)     all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller entity;

(g)     all Documents exclusively relating to any Excluded Asset provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then- applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(h)     all Documents exclusively relating to any Employees who do not become Transferred Employees; provided that, to the extent permitted by applicable Law, Seller shall make copies of such Documents available to Buyer if reasonably related to addressing or defending any such Employees' claims against Buyer;

(i)     subject to Section 1.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities pursuant to Section 1.4(a));

(j)  all Employee Benefit Plans and all assets of, and Contracts exclusively relating to or associated with such plans;

(k)  all Cash and all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(l)  any rights of Seller under this Agreement or any Ancillary Agreement to which Seller is a party, including without limitation any rights relating to the Purchase Price;

(m)  copies of all Historic Firearms Books and Records of Seller provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then- applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(n)  all Documents of Seller held by Seller or Seller's counsel relating to (i) any litigation against Seller or (ii) the Excluded Employee Liabilities;

(o)  the D&O Insurance, and all proceeds thereof;

(p)  all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

(q)  any properties, Contracts, Leases, or other assets, interests and rights of Seller that (i) do not relate to the ownership, operation or management of the Business or (ii) are otherwise set forth on Schedule 1.2(q);

(r)  all Avoidance Actions;

(s)  Claims held by Seller against any party that are covered by, relate to or are based upon any Insurance Policies (including the D&O Insurance);

(t)  all assets subject to an Ammunitions Business Bid (as defined in the Bidding Procedures Order);

(u)  all assets primarily used in the Marlin Business, including all trademarks, service marks and logos containing Marlin or an abbreviation or derivation thereof;

(v)  all trademarks, service marks and logos containing Remington or an abbreviation or derivation thereof;

(w)  all trademarks, service marks, logos and domain names related to the Non-Core Brands, and all Intellectual Property exclusively used in connection with the products and services manufactured and sold under the Non-Core Brands;

11

Case 20-81688-CR11    Doc 2905-17    Filed 09/30/22    Entered 09/30/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Round 1 APA    Page 52 of 246

(x) the list of "Licensed Trademarks" affixed as Appendix B to the Trademark License Agreement between Vista Outdoor, Inc. and Buyer in substantially the form set forth in Exhibit 2 (the "Trademark License Agreement"); and

(y) any real property owned by of Seller other than the Owned Real Property.

Section 1.3    Assumption of Liabilities.    At the Closing, Buyer shall assume, and Buyer agrees to thereafter pay, perform and discharge when due, and indemnify, defend and hold harmless Seller, its Affiliates and all of their respective Related Persons from and against, the following liabilities (all items in this Section 1.3 being, collectively, the "Assumed Liabilities"):

(a) all liabilities and unperformed and unfulfilled obligations of Seller under the terms of any Assumed Contract or Assumed Lease (including all premium finance arrangements of Seller for Assumed Contracts), and the Cure Amount in connection with the assignment of the Assumed Leases and the Assumed Contracts to, and the assumption of the Assumed Leases and the Assumed Contracts by, Buyer;

(b) all liabilities and obligations of Seller set forth on Schedule 1.3(b);

(c) all liabilities and obligations for Post-Closing Taxes (including those relating to any Straddle Period);

(d) all liabilities and obligations for Transaction Taxes; and

(e) all liabilities under the CBA, as revised and amended to reflect the terms of Section 7.1 herein and to exclude any liability for unpaid wages, benefits or Pension Plan obligations.

Section 1.4    Retention of Liabilities.    Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Seller (all such liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities").  The Excluded Liabilities include, without limitation, the following liabilities and obligations:

(a) all liabilities and obligations under or relating to the Excluded Assets;

(b) all liabilities and obligations of Seller under or relating to the Priority Term Loan, the FILO Facility, the Exit Term Loan or the Intercompany Note;

(c) all liabilities and obligations relating to any Employee Benefit Plans (the "Excluded Employee Liabilities");

(d) all liabilities and obligations for Pre-Closing Income Taxes;

12

(e)     all liabilities and obligations of Seller arising under or incurred in connection with the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which Seller is a party and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(f)     all liabilities of, and Claims against, Seller arising from and in connection with grants of restricted common unit/share awards and stock options by Seller;

(g)     any liabilities and obligations of Seller under this Agreement, or under any Ancillary Agreement to which Seller is a party;

(h)     all liabilities under any Qualifying Excluded Contracts and Leases;

(i)     all State of Alabama Project Development Liabilities;

(j)     all City of Huntsville Project Development Liabilities;

(k)     the Retained Litigation;

(l)     all other liabilities and obligations arising out of or relating to Seller's ownership, operation or management of the Business and the Acquired Assets prior to the Closing;

(m)     all liabilities and obligations under the Pension Plan and otherwise payable to employees not retained by Buyer; and

(n)     all liabilities set forth on Schedule 1.4(n).

Section 1.5     Assumed Leases and Assumed Contracts; Cure Amount.

(a)     At such time as is specified in the Sale Order, pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Buyer and Buyer shall assume from Seller, the Assumed Leases and the Assumed Contracts. The amounts necessary, pursuant to Section 365 of the Bankruptcy Code, to cure any and all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults under any Assumed Lease or Assumed Contract (such aggregate amount, the "Cure Amount") shall be paid by Buyer, in each case as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order and this Agreement. Schedule 1.5(a) contains Seller's estimate as of the Effective Date of the Cure Amount. Buyer may, in its sole discretion (but subject to the limitations in Section 1.5(d)), amend Schedule 1.2(q) to indicate the rejection of any executory contracts at any time prior to the date of a final hearing to approve the sale of the Acquired Assets (the "Sale Hearing"), upon written notice to Seller; provided that the definition or interpretation of (i) "Acquired Assets" for the purposes of Section 1.3 only and (ii) "Assumed Liabilities"

13

and "Excluded Liabilities" for any purposes under this Agreement, shall not reflect any such amendment without the prior written consent of Seller.

(b)     Seller shall timely serve the motion seeking entry of the Sale Order to all parties to Leases and Contracts and, subject to <u>Section 1.6</u> and the performance of Buyer's obligations in <u>Section 5.2</u>, Seller shall use commercially reasonable efforts to cause the Assumed Leases and Assumed Contracts to be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and Seller shall comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign and delegate to Buyer all of Seller's rights and obligations under the Assumed Leases and Assumed Contracts.

(c)     Notwithstanding any provision in this Agreement to the contrary, if for any reason Buyer fails to pay the Cure Amount in respect of any Assumed Contract or Assumed Lease when due and payable pursuant to this Agreement, the Sale Order or any other Order of the Bankruptcy Court, (i) Seller shall be under no obligation whatsoever to pay or otherwise satisfy such Cure Amount or any other liability or obligation under such Assumed Contract or Assumed Lease, (ii) Buyer shall indemnify and hold harmless Seller in respect of such Cure Amount, liability or obligation as well as any expenses (including legal fees and expenses) incurred by Seller in defending any claim for payment of the Cure Amount or any other liability or obligation arising under such Contract or Lease asserted by the counterparty thereto and (iii) Seller may reject, and nothing in this Agreement shall prohibit Seller from rejecting, such Contract or Lease.

(d)     Notwithstanding any provision in this Agreement to the contrary, at any time prior to the Sale Hearing, Buyer may designate in writing to Seller any Contract or Lease as an Excluded Liability (and amend <u>Schedule 1.2(q)</u> for such purposes only), only if the rejection of such Contract or Lease would not give rise to a Claim in favor of the counterparty thereto having administrative priority or any other priority senior to a general unsecured Claim against the bankruptcy estate of Seller (the "<u>Qualifying Excluded Contracts and Leases</u>").  Seller may reject, and nothing in this Agreement shall prohibit Seller from rejecting, the Qualifying Excluded Contracts and Leases.

Section 1.6     <u>Non-Assignment of Acquired Assets</u>.     Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof (after giving effect to any waiver by the applicable counterparty, or any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent.  In

14

Case 20-31646-CRJ11   Doc 2905-17   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Round 1 APA    Page 55 of 246

such event, Seller and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to Seller or Buyer, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Seller would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Seller's obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Seller thereunder.

Section 1.7    Further Conveyances and Assumptions.

(a)    Seller shall deliver to Buyer at the Closing such Employee Records as is reasonably necessary for Buyer to transition the Transferred Employees into Buyer's records, as well as all other Documents included in the Acquired Assets.

(b)    At the Closing, and from time to time thereafter, Seller and Buyer shall, and Seller and Buyer shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

Section 1.8    Conflicts with Other Bidders. In the event of any conflict regarding the Acquired Assets or Assumed Liabilities between this Agreement and agreements governing other sales of the Seller's assets in the Bankruptcy Case (the "Other Agreements") defined herein or therein, Buyer shall cooperate in good faith with any other purchasers of Seller's assets pursuant to the Other Agreements, whether before or after the Closing Date, to ensure all assets or liabilities are adequately apportioned between the parties in order to reflect the intent of Buyer and any such other purchasers hereunder and thereunder. Without limitation to the foregoing, at the Closing, Buyer shall receive a non-exclusive, perpetual, worldwide, royalty-free license to use Patents Nos. 10,254,063 and 10,718,584 in the Business.

## ARTICLE 2. CONSIDERATION

Section 2.1    Consideration.    The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets (the "Purchase Price") shall be:

(a)    Thirteen Million United States Dollars (US $13,000,000.00) (the "Gross Closing Cash Payment"), to be adjusted pursuant to Section 2.2(b), and paid and delivered in accordance with Section 3.3(a); and

(b)    assumption of the Assumed Liabilities.

Section 2.2    Good Faith Deposit.

(a)    Buyer has paid to Seller the amount of Five Million United States Dollars (US $5,000,000.00) by wire transfer of immediately-available funds (the "Good Faith Deposit").  The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Seller or Buyer and shall be deposited in a segregated deposit account of Seller and held in trust to be administered solely in accordance with the terms of this Agreement and the Bidding Procedures Order.  Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b)    If the Closing occurs, the Gross Closing Cash Payment shall be reduced by the amount of the Good Faith Deposit (such resulting amount, the "Net Closing Cash Payment"), to be paid and delivered in accordance with Section 3.3(a).

(c)    If this Agreement is terminated pursuant to Section 10.1, the Good Faith Deposit shall be repaid to Buyer or retained by Seller in the amounts and at the times set forth in Section 10.2(a) through Section 10.2(c).

## ARTICLE 3. CLOSING AND DELIVERIES

Section 3.1    Closing.  Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Pacific Time, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in Article IX of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by Seller and Buyer, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "Closing Date").

Section 3.2    Seller's Deliveries.  At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a)    With the exception of all firearm-related Acquired Assets requiring Buyer to hold certain licenses or permits (the "Permitted Assets"), including

16

but not limited to a Federal Firearms License, or similar license, issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives, all of the Acquired Assets, together with one or more duly executed bills of sale, endorsed certificates of title and other evidence of transfer of motor vehicles and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller; provided that Seller's conveyance of deliverables relating to the Owned Real Property shall be governed by Section 3.2(g). Seller shall maintain possession of the Permitted Assets until a point-in-time when Buyer holds all requisite permits and/or licenses necessary to take possession of the Permitted Assets. No later than five (5) Business days after Buyer holds permits and/or licenses required under applicable Law to take possession of the Permitted Assets, Buyer shall deliver written notice of obtaining such permits and Seller shall turn over all Permitted Assets to Buyer upon receipt of such notice. Notwithstanding anything to the contrary in this Agreement, if Buyer is unable to obtain all requisite Permits sufficient under applicable Law to take possession of the Permitted Assets within seventy-five (75) days after the Effective Date (the "FFL Cutoff Date"), unless Buyer shall within 2 Business Days after the FFL Cutoff Day pay to Seller in immediately available funds the sum of Two Hundred and Fifty Thousand United States Dollars (US$ 250,000), in which event the FFL Cutoff Date shall for all purposes under this Agreement be one hundred (100) days after the Effective Date, then Seller may terminate this Agreement and retain the Good Faith Deposit, and if the Closing has already occurred, (1) Seller may in its sole discretion retain the Gross Closing Cash Payment as forfeited by Buyer and (2) Buyer shall either (a) return all of the Permitted Assets to Seller previously delivered by Seller to Buyer or (b) transfer all of the Permitted Assets to a third-party designee of Buyer with all requisite Permits sufficient under applicable Law to take possession of the Permitted Assets;

(b)     one or more duly executed assignment and assumption agreements for the Assumed Contracts and the Assumed Liabilities, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Assignment and Assumption Agreement");

(c)     one or more duly executed assignment and assumption agreements for the Assumed Leases, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Assignment and Assumption of Lease");

(d)     one or more duly executed assignments of (i) the trademark and patent registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States), (ii) the Internet domain name registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for filing with all applicable domain name registries, and (iii) general assignments of all other Acquired Intellectual Property, in each case in form and substance customary for transactions of

17

Case 20-81688-CRJ11    Doc 2936-17    Filed 09/30/22    Entered 09/30/22 13:40:04    Desc
Exhibit RJN 5: Order Approving Pound 7 of 14 PSA    Page 58 of 246

this nature and reasonably acceptable to Buyer and Seller (each, an "<u>Acquired Intellectual Property Assignment</u>");

(e)     the officer's certificate required to be delivered pursuant to <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u>;

(f)     one or more affidavits executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(g)     quitclaim deeds, or their equivalent in the applicable state, for the Owned Real Property, executed by Seller; and

(h)     a duly executed Limited Power of Attorney to enable Buyer to execute on Seller's behalf any further documents necessary to record the assignment to Buyer of Acquired Intellectual Property.

Section 3.3    <u>Buyer's Deliveries</u>. At the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a)     cash in an amount equal to the Net Closing Cash Payment, by wire transfer of immediately available funds to the account or accounts of Seller identified by Seller in writing reasonably in advance of the Closing;

(b)     one or more duly executed Assignment and Assumption Agreements;

(c)     one or more duly executed Acquired Intellectual Property Assignments;

(d)     the officer's certificate required to be delivered pursuant to <u>Section 9.1(a)</u> and <u>Section 9.1(b)</u>; and

(e)     such other documents, instruments and certificates as Seller may reasonably request to transfer, assign and delegate the Assumed Liabilities to Buyer in accordance with the terms and conditions hereof.

ARTICLE 4. <u>REPRESENTATIONS AND WARRANTIES</u>

Section 4.1    <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer as follows:

(a)     <u>Corporate Organization</u>. Each entity comprising Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of domicile. Subject to any necessary authority from the Bankruptcy Court, each entity comprising Seller has the requisite corporate or limited liability company power and authority to conduct the Business as now being conducted and to carry out its obligations under this Agreement.

18

(b)     Qualification to do Business. Each entity comprising Seller is duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c)     Authorization and Validity. Each entity comprising Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement to which Seller is a party and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement has been duly authorized, and at or before Closing the execution and delivery of the Ancillary Agreements to which Seller is a party will be duly authorized, by all necessary corporate or limited liability company action by the boards of directors or managers of Seller, and no other corporate or limited liability company proceedings are necessary for the performance by Seller of its obligations under this Agreement or the consummation by Seller of the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by Seller, and at Closing the Ancillary Agreement to which Seller is a party will be duly and validly executed and delivered by Seller, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, is the Agreement is, and each of the Ancillary Agreements to which Seller is a party will be at Closing, is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(d)     No Conflict or Violation. Neither the execution and delivery by Seller of this Agreement or any of the Ancillary Agreements to which Seller is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order) the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements to which Seller is a party, nor compliance by Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any breach of any provision of the respective certificates of incorporation or formation of Seller or the respective by-laws or operating agreements of Seller, or (y) violate any provision of law, regulation, rule or other legal requirement of any Government ("Law") or any order, judgment or decree of any court or Government ("Order") applicable to Seller or any of its properties or assets, except, in either of the foregoing cases (x) and (y), for any conflict or violation as would not reasonably be expected to cause a Material Adverse Effect.

(e)     Consents and Approvals. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Seller is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Seller after the Closing in order for Buyer to own or operate any of the Acquired Assets; (ii) the entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

19

Case 20-81688-CRJ11   Doc 2905-17   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Sale of 12A   Page 60 of 246

(f)    <u>Title and Ownership</u>.  Except as would not have a Material Adverse Effect, Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets.  Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

(g)    <u>Compliance with Law</u>.  Except as set forth on <u>Schedule 4.1(g)</u> or would not otherwise reasonably be expected to cause a Material Adverse Effect, (i) Seller has operated the Business in material compliance with all applicable Laws, and (ii) except as may result from the Bankruptcy Case, Seller has not received written notice of any violation of any applicable Laws, nor is Seller in default with respect to any Order applicable to the Acquired Assets.

(h)    <u>Contracts and Leases</u>.  As of the Effective Date, other than as set forth on <u>Schedule 4.1(h)</u> or in motions or other pleadings or similar items filed with the Bankruptcy Court, neither Seller nor, to Seller's Knowledge, any other party to any of the Assumed Contracts or Assumed Leases has commenced any action against any of the parties to such Assumed Contracts or Assumed Leases or given or received any written notice of any material default or violation under any Assumed Contract or Assumed Lease that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assumed Contracts and Assumed Leases).  Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assumed Contracts and Assumed Leases is, or will be at the Closing, valid, binding and in full force and effect against Seller, except as otherwise set forth on <u>Schedule 4.1(h)</u>.

(i)    <u>Permits</u>.  <u>Schedule 4.1(i)</u> sets forth a complete and correct list of all material Permits currently held by Seller in connection with the Business ("<u>Material Permits</u>"), and all such Material Permits at the current locations of the Business are, except as would not cause a Material Adverse Effect, in full force and effect.

(j)    <u>Intellectual Property</u>. <u>Schedule 4.1(j)</u> sets forth an accurate and complete list of all registrations and applications for Acquired Intellectual Property owned by the Sellers. The Sellers are the sole and exclusive owners of the Acquired Intellectual Property owned by the Sellers (including as set forth on <u>Schedule 4.1(j)</u>) free and clear of all Liens pursuant to the Sale Order.  Except as limited by section 365(c)(1)(A) of the Bankruptcy Code, Sellers own all right, title and interest to, or are valid licensees with respect to, the Acquired Intellectual Property, and, at Closing, will convey the Acquired Intellectual Property to Buyer free and clear of Liens pursuant to the Sale Order. To the Sellers' Knowledge, (i) no Person is engaging in any activity that materially infringes, dilutes, misappropriates or violates any Acquired Intellectual Property and (ii) no claim has been asserted to any Seller in writing that the use of any Acquired Intellectual Property or the operation of the Business infringes, dilutes, misappropriates or violates the Intellectual Property of any third party.

Section 4.2    Representations and Warranties of Buyer.  Buyer represents and warrants to Seller as follows:

(a)    Corporate Organization.  Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation.  Buyer has the requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b)    Qualification to do Business.  Buyer will as of the Closing Date be duly qualified to do business as a foreign limited liability company in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c)    Authorization and Validity.  Buyer has the requisite corporate power and authority necessary to enter into this Agreement and each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby.  This Agreement and each of the Ancillary Agreements to which Buyer is a party have been duly and validly executed and delivered by Buyer, and at Closing each Ancillary Agreement will be duly and are validly executed and delivered by Buyer, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Seller, the Agreement is, and each of the Ancillary Agreements will be at Closing, a valid and binding obligations of Buyer enforceable against it in accordance with their respective terms. Scott Soura is the sole member of Buyer and has as of the Closing ensured that Buyer and any Buyer Acquisition Vehicle has sufficient funds necessary to consummate the transactions contemplated by this Agreement.

(d)    No Conflict or Violation.  Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order) the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract,

indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject, except as would not materially and adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement or any of the Ancillary Agreements.

(e)     <u>Consents and Approvals</u>.     The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)     <u>Adequate Assurances Regarding Assumed Contracts and Assumed Leases</u>.  Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Leases.

(g)     <u>Financial Capability</u>.  Buyer and any Buyer Acquisition Vehicle currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor (i) to Seller of the Purchase Price and (ii) of any Cure Amount, and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(h)     <u>Investigation by Buyer</u>.  Buyer has conducted its own independent review and analysis of the Business, the Acquired Assets and the Assumed Liabilities, operations, technology, assets, liabilities, financial condition and prospects of the Business as formerly carried on by Seller and acknowledges that Seller has provided Buyer with reasonable access to the personnel, properties, premises and records of the Business for this purpose.  Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case.  In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither Seller nor any of its Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in <u>Section 4.1</u> (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Seller, its Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding

Case 20-81688-CRJ11   Doc 2958-17   Filed 09/30/22   Entered 09/30/22 13:40:04   Desc
Exhibit RJN 5: Order Approving Sale of 170A   Page 63 of 246

misrepresentation or concealment arising from actual fraud of Seller) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in Section 4.1 and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3    Warranties Exclusive; Schedules.

(a)    The representations and warranties contained in Article 4 are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed. Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (D) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS. SELLER AND SELLER'S AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATIONS OR WARRANTIES IN ANY OTHER AGREEMENT.

(b)    The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

Section 4.4    Survival of Representations and Warranties. None of the representations or warranties of Seller set forth in this Agreement or any Ancillary Agreement or in any certificate delivered pursuant to Section 9.2(a) or Section 9.2(b) shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement or any Ancillary Agreement shall survive in accordance with their respective terms).

ARTICLE 5. COVENANTS OF THE PARTIES

Section 5.1    Covenants of Seller. Seller covenants as follows:

(a)    Commercially Reasonable Efforts. Between the Effective Date and the Closing Date, Seller shall use commercially reasonable efforts to (except as may be disclosed to Buyer) (i) obtain all necessary consents, waivers, authorizations and

approvals of all Governments, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party, (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) maintain the Acquired Assets substantially in accordance with Seller's current practices and procedures (as adjusted for the effects of any COVID Restrictions).

(b)     Access to Properties and Documents; Confidentiality.  Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access (subject to any COVID Restrictions) during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10) to all Documents of Seller relating to the Acquired Assets and the Assumed Liabilities.  Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account any COVID Restrictions and Seller's resources and other commitments, during normal business hours, to all Acquired Assets, and to Seller's executive officers, accountants, counsel, employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 10).  The rights of access contained in this Section 5.1(b) are granted subject to, and on, the following terms and conditions:  (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this Section 5.1(b) or otherwise) will be governed and protected by the Confidentiality Agreement, dated as of September 8, 2020, by and between Buyer and ROC (the "Confidentiality Agreement"); and (iii) such rights of access shall not affect or modify the conditions set forth in Article 9 in any way. Buyer shall indemnify, defend and hold harmless (i) Seller, (ii) the lessors of any Leased Real Property, and (iii) Seller's and such lessors' respective Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or its accountants, counsel and representatives entry upon the Leased Real Property in connection with their exercise of the right of access pursuant to this Section 5.1(b), and (B) any and all other activities undertaken by Buyer or its accountants, counsel and representatives with respect to any such Leased Real Property in connection with their exercise of the right of access pursuant to this Section 5.1(b).

(c)     Operation of the Business.  Except as otherwise contemplated or permitted by this Agreement or the Ancillary Agreements, would not constitute a Material Adverse Effect, or with the prior consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or in connection with any Order relating to the Bankruptcy Case, between the Effective Date and the Closing Date, Seller shall (i) use commercially reasonable efforts to safeguard and maintain the Acquired Assets in their condition as of the Effective Date (except for ordinary wear and tear) and prevent any destruction thereof or material damage thereto between the Effective Date and the Closing Date, (ii) not enter into, materially amend or terminate any Assumed Contract or Assumed FF&E Lease outside of the ordinary course of business where such amendment or termination would have a material and adverse effect on the

24

value of the Acquired Assets taken as a whole and (iii) notify Buyer of any notices relating to or proposed changes affecting Seller's insurance policies covering any of the Acquired Assets. Notwithstanding the foregoing, nothing in this Agreement shall restrict Seller from rejecting any Contract or Lease that is not an Assumed Contract or Assumed FF&E Lease.

Section 5.2 <u>Covenants of Buyer</u>. Buyer covenants as follows:

(a) <u>Commercially Reasonable Efforts</u>. Buyer shall use all commercially reasonable efforts to (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(b) <u>Adequate Assurances Regarding Assumed Contracts and Assumed Leases</u>. With respect to each Assumed Contract and Assumed Lease that (i) is <u>not</u> a Qualifying Excluded Contract and Lease, Buyer shall provide adequate assurance of the future performance of such Assumed Contract or Assumed Lease by Buyer and (ii) <u>is</u> a Qualifying Excluded Contract and Lease, Buyer shall undertake reasonable efforts to provide adequate assurance of the future performance of such Assumed Contract or Assumed Lease by Buyer; <u>provided</u> that, for clarity the failure to provide adequate assurance shall not be a breach of this <u>Section 5.2(b)(ii)</u> if Buyer has undertaken reasonable efforts to provide such assurance. Buyer agrees that it will promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

(c) <u>Cure of Defaults</u>. Buyer shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed Lease or Assumed Contract for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing, then immediately following the entry of such Order, cure any and all defaults under the Assumed Contracts and Assumed Leases (other than Qualifying Excluded Contracts and Leases), including paying the applicable Cure Amount, which defaults are required to be cured under the Bankruptcy Code, so that such Assumed Contracts and Assumed Leases may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d) <u>Performance under Assumed Contracts and Assumed Leases</u>. Buyer shall (i) from and after the Closing Date, assume all obligations and liabilities of Seller under the Assumed Contracts and Assumed Leases, (ii) from and after the Closing Date, take all actions necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Assumed Contracts and Assumed Leases, and (iii) indemnify, defend and hold harmless Seller, Seller's Affiliates, and all of their

25

respective Related Persons from and against any damages, losses, costs, expenses and other liabilities arising out of a breach of this Section 5.2(d) or any of Buyer's other covenants contained in this Agreement or any Ancillary Agreements to which Buyer is a party.

(e)     Indemnification for Use of Real Property.  Buyer shall indemnify, defend and hold harmless (i) Seller, (ii) the lessors of any Leased Real Property, and (iii) Seller's and such lessors' respective Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or Buyer's agents' or representatives' entry upon the Owned Real Property or the Leased Real Property in connection with their exercise of the right of access pursuant to Section 5.1(b), and (B) any and all other activities undertaken by Buyer or Buyer's agents or representatives with respect to any such Owned Real Property or Leased Real Property.

(f)     Released Claims.  Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired Assets to the extent such Claims have been, or are at any time thereafter, released by or on behalf of Seller or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise or (ii) pursue, prosecute or assert any rights related to any Claims against employees, officers of directors of Seller, including by way of offset or recoupment.

Section 5.3     Real Property Matters. From and after the Effective Date until the Closing (or the earlier termination of this Agreement pursuant to Article 10), Seller shall, at no out-of-pocket cost or expense to Seller, use commercially reasonable efforts to assist Buyer in obtaining the following:

(a)     a commitment for a 2006 ALTA Owner's Title Insurance Policy for all real property to be purchased by Buyer (such policy together with a copy of all documents referenced therein, the "Title Commitment"), issued by a title insurance company satisfactory to Buyer (the "Title Company"), provided that, (A) any failure to obtain the Title Commitment for any reason other than Seller's failure to assist Buyer pursuant to this Section 5.3 shall not be a breach of or default under of this Agreement, and (B) Buyer obtaining the Title Commitment or a title insurance policy ("Title Policy") resulting therefrom, or any other form of title insurance, shall not be a condition to Buyer's performance of its obligations under this Agreement or Buyer's consummation of the transactions contemplated by this Agreement; and

(b)     a survey for all real property to be purchased by Buyer, dated no earlier than the Effective Date, prepared by a surveyor licensed in the jurisdiction where each real property to be acquired by Buyer is located and conforming to 2016 ALTA/ACSM Minimum Detail Requirements for Land Title Surveys (the "Survey").

## ARTICLE 6. ADDITIONAL AGREEMENTS

Section 6.1   Bankruptcy Matters.

(a)   Backup Bidder.   In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures Order, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures Order) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction.   Notwithstanding anything to the contrary in this Agreement, Seller may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the Inventory and the other assets of Seller, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)   Notice to Holders of Liens, Claims and Interests.   Seller has provided notice of the intent to seek entry of the Sale Order to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)   Entry of Sale Order.   Seller has filed with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order.   The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement (including any Assumed Contract), Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability.   Seller and Buyer shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement.   In the event that any Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Buyer will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.   For purposes of this Section 6.1(c) only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

Section 6.2   Transition Arrangements.

(a)   Access Covenant.   Upon reasonable request from Seller, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will

for a period of two (2) years following the Closing Date provide to Seller, and the accountants, counsel and representatives of Seller, including any administrator of the Plan or Seller's estate, such access to the pre-closing books and records relating to the Business as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation and litigation of claims and making of distributions contemplated under the Plan or otherwise.  Such access will include (a) reasonable access to Buyer's personnel, information technology systems and books and records and (b) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Seller engaged in such wind-down and liquidation process.  Buyer will provide such services free of any charges, fees or rents, provided that Seller will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Seller's employees engaged in the liquidation).

        (b)    <u>Transitional License</u>.  Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days, Buyer shall grant Seller a non-exclusive, royalty-free right and license to use the Acquired Intellectual Property, including the Business Name, in connection with the wind-down and liquidation of Seller's estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.

        (c)    <u>Transitional Regulatory Matters</u>.  From the Effective Date until the Closing Date, Buyer and Seller shall each use commercially reasonable efforts to cooperate in the registration of Buyer as licensee, as of and conditional upon the Closing, under the ATF Licenses.  Without limitation to the foregoing, Buyer shall file all required applications for the ATF Licenses by the close of business on the date that is seven (7) calendar days after the date of entry of the Sale Order, and shall within one Business Day thereafter provide Buyer reasonable evidence of same.

    Section 6.3    <u>Further Assurances</u>.  At the request and the sole expense of the requesting party, either party shall, at any time after the Closing Date, execute and deliver such documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

ARTICLE 7. <u>EMPLOYEES AND EMPLOYEE BENEFITS</u>

    Section 7.1    <u>Transferred Employees</u>.  Within seventy-five (75) days after entry of the Sale Order, Buyer shall offer employment to at least two hundred (200) union Employees related to Debtors' non-Marlin-related firearms business at the Ilion facility.  Each such offer shall include a waiver of any costs related to the termination of employment of such Employees by Seller in connection with the transactions contemplated by this Agreement (including without

limitation any severance or WARN Act payments), as against Buyer, Seller and their respective Affiliates. If the Closing occurs, any such Employees who accept any such offer no later than five (5) days after the Closing Date are referred to in this Agreement as the "Transferred Employees".

Section 7.2     Employment Tax Reporting.     With respect to Transferred Employees, Buyer and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment Tax reporting.

Section 7.3     Benefits.     From and after the Closing (or with respect to any Transferred Employee who is on an approved leave of absence as of the Closing, from and after his or her return to work), Buyer shall, or shall cause an Affiliate of Buyer to, provide (whether under existing or newly-established Buyer compensation or benefits plans (collectively, the "Buyer Plans")) to each Transferred Employee and their eligible dependents benefits under the Buyer Plans that are no less favorable to the applicable Transferred Employee in the aggregate than the practice, plans, policies or Contracts in effect for such Transferred Employee immediately prior to the Closing, provided that Buyer shall not assume any unpaid or unfunded liabilities which may be owed to Transferred Employees for periods prior to retention or employment by Buyer. If applicable, for purposes of eligibility, vesting and the calculation of the eligibility for and amount of vacation, sick pay, severance or other benefits under the Buyer Plans providing benefits to Transferred Employees, Buyer shall credit each Transferred Employee with his or her years of service with Seller to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan; provided, however, that no such service recognition shall result in any duplication of benefits or apply to any defined benefit pension plans. In addition, to the extent it has the right to do so, Buyer shall use commercially reasonable efforts to (a) waive under any health or welfare plans maintained by Buyer for Transferred Employees any pre-existing condition limitations and eligibility waiting periods for Transferred Employees and their eligible dependents (but only to the extent such pre-existing condition limitations, eligibility waiting periods and evidence of insurability requirements were satisfied under Seller's comparable health plans as of the Closing Date), and (b) provide that dollar amount of all eligible expenses incurred by Transferred Employees and their eligible dependents during the calendar year in which the Closing Date occurs shall be taken into account for purposes of satisfying the applicable deductibles, co-payments or out-of-pocket limitations for such calendar year under the relevant Buyer's health or welfare plans.

Section 7.4     WARN Act.  Buyer and Seller agree that:

(a)     Except as provided under the terms of the amended and modified CBA referenced hereinabove, Buyer shall not, at any time prior to ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" (as those terms are defined in the WARN Act) affecting the Transferred Employees without complying in full with the WARN Act.

Section 7.5     Third Party Beneficiary.  No provision of this Article 7 shall (a) create any third party beneficiary or other rights in any Employee or former employee (including any beneficiary or dependent thereof) of Seller, Buyer or any other Person,

29

Case 20-81166-CR-11   Doc 2905-17   Filed 09/30/22   Entered 09/30/22 13:40:04   Desc
Exhibit RJN 5: Order Approving Sale of Page 70 of 246

(b) constitute or create, or be deemed to constitute or create, an employment agreement or employee benefit plan, (c) constitute or be deemed to constitute an amendment to any employee benefit plan sponsored or maintained by Seller or Buyer, or (d) alter or change the employment at-will status of any Employees.

## ARTICLE 8. <u>TAXES</u>.

Section 8.1    <u>Taxes Related to Purchase of Assets</u>.  All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Seller as a result of the sale of the Acquired Assets (collectively, "<u>Transaction Taxes</u>"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(c) of the Bankruptcy Code, shall be paid by Buyer. Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and Seller agrees to assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 8.2    <u>Cooperation on Tax Matters</u>.

(a)    Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)    Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period of at least six (6) years from the Closing Date, and will give Seller notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to those portions of books, records, documents and other information that relate solely to the Acquired Assets or the Assumed Liabilities as Seller may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Seller. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities as they

30

existed on or before the Closing, unless such access cannot be limited to the appropriate information, in which case, Buyer may, at its reasonable discretion, retrieve electronic data compilations of the appropriate information.

(c)     If Seller receives any refund, overpayment or rebate of Taxes (including any refund, overpayment or rebate relating to any Straddle Period) that is attributable to Taxes paid by Buyer, it shall promptly, and in no case later than ten (10) Business Days after receipt thereof, pay such refund, overpayment or rebate over to Buyer net of any reasonable cost or expense incurred in connection with such refund, overpayment or rebate.

(d)     Seller shall prepare and file all Income Tax Returns for any Pre-Closing Taxes , whether or not such Tax Returns are required to be filed after the Closing Date, and Seller shall timely pay all Taxes reflected on such Tax Returns. Buyer shall prepare and file, or cause to be prepared and filed (with Seller's reasonable cooperation) all Tax Returns with respect to Post-Closing Taxes. Buyer and Seller shall reasonably cooperate in the preparation of any Tax Returns described in this <u>Section 8.2(d)</u>.

(e)     Buyer and Seller will cooperate and Buyer shall use commercially reasonable efforts to cause the Buyer or any Buyer Acquisition Vehicle to be registered with the Alcohol and Tobacco Tax and Trade Bureau as a "manufacturer" for purposes of the Firearms Ammunition and Excise Tax on or before the Closing Date.

Section 8.3     <u>Allocation of Purchase Price</u>.  Promptly (and in any event within sixty (60) days) following the Closing Date, Seller shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "<u>Allocation</u>").  Seller and Buyer will cooperate to resolve any disputes regarding the Allocation and to file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement.

ARTICLE 9. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES</u>.

Section 9.1     <u>Conditions Precedent to Performance by Seller</u>.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 9.1(c)(i)</u> and <u>Section 9.1(c)(ii)</u>) may be waived by Seller in its sole discretion:

(a)     <u>Trademark License Agreement</u>.  This Agreement is conditioned upon entry into the Trademark License Agreement, pursuant to which Vista will provide an exclusive license the use of certain Remington Brand-related Trademarks, for Buyer's continued use in segments of the Business outside of the Ammunitions Business following the Closing (such agreement or agreements being collectively, the "<u>IP Back-License</u>"), including Buyer's development, manufacture, marketing and/or sale of (1) Firearms; (2) Receivers; (3) Barrels; (4) Stocks; (5) Grips;

31

Case 20-81688-CRJ11   Doc 2906-17   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Sale of 1270A   Page 72 of 246

(6) Rails; (7) Butts; (8) Triggers; (9) Safeties; (10) Iron Sights (excluding any electronic, or optical sights, and any scopes); (11) Flash suppressors; (12) Recoil compensators; (13) Heatshields; (14) Silencers; (15) Sight adjustment tools; (16) Gunsmithing tools and kits; (17) Books and manuals (firearms related); (18) Magazines; (19) Gun Cases and (20) anything that is or can be affixed to or installed within a firearm of any kind.

(b)      Representations and Warranties of Buyer.  All representations and warranties made by Buyer in Section 4.2 shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(c)      Performance of the Obligations of Buyer.  Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(d)      Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(e)      No Violation of Orders.  No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(f)      Cure of Defaults.  At or prior to the Closing, any and all defaults under the Assumed Contracts and Assumed Leases (other than Qualifying Excluded Contracts and Leases) that are required to be cured under the Bankruptcy Code shall have been cured, so that such Assumed Contracts and Assumed Leases may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(g)      Vista Closing.  The Closing, as defined in that certain Asset Purchase Agreement entered into by and between Seller and Vista Outdoor Inc. in connection with the auction held under the Bidding Procedures Order, shall have been consummated

(h)      Ilion Investment Reserve.  On or prior to Closing, Buyer shall have deposited no less than Two Million Dollars (US$2,000,000) (the "Reserve Amount") into a segregated reserve account, which Reserve Amount shall be used only

32

Case 20-81688-CRJ11   Doc 2905-17   Filed 09/30/22   Entered 09/30/22 13:40:44   Desc
Exhibit RJN 5: Order Approving Requested APA    Page 73 of 246

to fund either (a) capital improvements and modernization costs of the Ilion, New York facility or (b) payment of salaries, wages, benefits, and the employer portion of payroll taxes in respect of such obligations and benefits for employees located at the Ilion, New York facility.

        (i)    <u>Buyer's Deliveries</u>.  Buyer shall have delivered to Seller all of the items set forth in <u>Section 3.3</u>.

        Section 9.2    <u>Conditions Precedent to Performance by Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 9.2(c)(i)</u> and <u>Section 9.2(c)(ii)</u>) may be waived by Buyer in its sole discretion:

        (a)    <u>Representations and Warranties of Seller</u>.  All representations and warranties made by Seller in <u>Section 4.1</u> shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

        (b)    <u>Performance of the Obligations of Seller</u>.  Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance (i) that do not result in a Material Adverse Effect or (ii) under those obligations of Seller set forth in <u>Section 6.2(c)</u>, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

        (c)    <u>Consents and Approvals</u>. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

        (d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

        (e)    <u>Trademark License Agreement</u>.  Buyer and Vista shall enter into the Trademark License Agreement, which provides for, among other things, use by Buyer of all (i) registered and unregistered Intellectual Property owned or used by Seller in connection with the ownership, operation and/or management of the Business and any and all corresponding rights that, now or hereafter, may be secured throughout the world, and (ii) to the extent transferable under applicable Law, Intellectual Property licensed to Seller in connection with the ownership, operation and/or management of the Business (collectively, the "<u>Vista Acquired Intellectual Property</u>").

33

(f)     Seller's Deliveries.  Seller shall have delivered to Buyer all of the items set forth in Section 3.2.

ARTICLE 10. TERMINATION.

Section 10.1    Conditions of Termination.  This Agreement may be terminated at any time before the Closing:

(a)     By mutual written consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Warranty Termination Date"), if the condition contained in Section 9.1(a) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(b) if Seller is then in material breach of this Agreement;

(c)     By Seller, by notice to Buyer, if Seller has previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(c) if Seller is then in material breach of this Agreement;

(d)     By Seller, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Approval Termination Date"), if any condition contained in Section 9.1(c) or Section 9.1(d) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(d) if Seller is then in material breach of this Agreement;

(e)     By Buyer, by notice to Seller, on or after the Warranty Termination Date, if the condition contained in Section 9.2(a) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(e) if Buyer is then in material breach of this Agreement;

(f)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with written notice of a failure to perform any material covenant of Seller contained in this Agreement and Seller has failed within five (5) days after such notice to perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(f) if Buyer is then in material breach of this Agreement;

(g)     By Buyer, by notice to Seller, after the Approval Termination Date, if any condition contained in Section 9.2(c) or Section 9.2(d) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(g) if Buyer is then in material breach of this Agreement;

34

(h)     By Buyer, by notice to Seller, or by Seller, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)     By Seller, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 60     calendar days after the Petition Date;

(j)     Automatically, upon the earlier of (i) Seller consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction; and

(k)     As provided for in Section 3.2(a).

Section 10.2     Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 10.1, this Agreement shall become null and void and have no effect (other than Article 10, Article 11, and Article 12, which shall survive termination), with no liability on the part of Seller or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 11.4, (ii) the obligation of Buyer under Section 6.1(a) and (iii) any liability provided for in Section 10.2(b) through Section 10.2(d), inclusive.

(b)     If this Agreement is terminated pursuant to Section 10.1(a), Section 10.1(d), Section 10.1(e), Section 10.1(f), Section 10.1(g), Section 10.1(h), Section 10.1(i) or Section 10.1(j), then the Good Faith Deposit shall, within three (3) Business Days, be returned by Seller to Buyer.

(c)     If this Agreement is terminated pursuant to Section 10.1(b), Section 10.1(c) or Section 3.2(a), then Seller may, at its sole election (i) within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee"), or (ii) without limitation to Seller's remedies under clause (i) of this Section 10.2(c) require Buyer to specifically perform under the terms of this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(d)     Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article VI (if the Closing shall have occurred) or the provisions of Section 3.2(a), (i) Seller's entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Seller retains such amount, then notwithstanding anything to the contrary contained herein, such Break Fee shall be the sole and exclusive remedy available to Seller and any other Person against Buyer, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions

35

contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Seller, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Seller, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby. Each Party acknowledges that the agreements contained in this <u>Section 10.2</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

ARTICLE 11. <u>MISCELLANEOUS</u>.

Section 11.1 <u>Successors and Assigns</u>. Prior to the Closing, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other, and any such attempted assignment without such prior written consent shall be void and of no force and effect; <u>provided</u> that if Buyer wishes, upon prior written notice to Seller, to assign its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to a Buyer Acquisition Vehicle, such prior written consent of Seller shall not unreasonably be withheld. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 11.2 <u>Governing Law; Jurisdiction</u>. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that Laws of such State are superseded by the Bankruptcy Code. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

Section 11.3 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF

LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.3</u>.

Section 11.4    <u>Expenses</u>.  Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated.  Buyer shall pay the cost of any surveys (without limitation to the restriction in <u>Section 5.1(b)(i)</u>), title insurance policies and title reports ordered by Buyer.

Section 11.5    <u>Broker's and Finder's Fees</u>.  Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than as set forth on <u>Schedule 11.5</u>, whose fees and expenses shall, as between the parties to this Agreement, be the responsibility of the party indicated on <u>Schedule 11.5</u>, and, to such party's Knowledge, no other broker or other Person is entitled to any commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 11.6    <u>Severability</u>.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 11.7    <u>Notices</u>.

(a)    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW

Case 20-81688-CRJ11    Doc 2456-17    Filed 09/30/22    Entered 09/30/22 13:40:04    Desc
Exhibit RJN 5: Order Approving Page 87 of 170    Page 78 of 246

Huntsville, Alabama 35824
Attention: Ken D'Arcy
Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California  90071
Attention: John-Paul Motley, Esq., and Stephen H. Warren, Esq.
Phone: (213) 430-6100 and (213) 430-7875, respectively
Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

Attention: Scott Soura
Email: soura@roundhillgroup.com
888 SE 3 Avenue, Suite 500
Fort Lauderdale, FL 33316

With a copy to (which copy alone shall not constitute notice):

Shulman Bastian Friedman & Bui, LLP
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Attention: James C. Bastian, Jr., Esq.
Email: jbastian@shulmanbastian.com

(b)     Any party may change its address for the purpose of this Section 11.7 by giving the other party written notice of its new address in the manner set forth above.

Section 11.8   Amendments; Waivers.   This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 11.9   Time of Essence.   Time is of the essence in the performance of each and every term of this Agreement.

Section 11.10   Specific Performance.   The provisions of this Agreement are uniquely related to Seller's and its Affiliates' desire to consummate the transactions contemplated by this Agreement, and such transactions represent a unique business opportunity at a unique

38

time for the Seller and its Affiliates. As a result, irreparable damage would occur to Seller and its Affiliates in the event that any of the obligations of Buyer under this Agreement were not performed in accordance with their specific terms. Although liquidated or other monetary damages may be available for the breach of covenants and undertakings contained in this Agreement, monetary damages would be difficult to ascertain and an inadequate remedy therefor. Accordingly, if Buyer breaches or threatens to breach any provision of this Agreement, then without limitation to Seller's rights under clause (i) of Section 10.2(c) Seller shall be entitled to an injunction or injunctions, specific performance and any and all other equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, this being in addition to any other remedies to which it is entitled at Law or equity. If Seller seeks an injunction or injunctions to prevent breaches of this Agreement or seeking to enforce specifically the terms and provisions of this Agreement, Seller shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such Order or injunction. Buyer irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. If any action or proceeding should be brought in equity to enforce the provisions of this Agreement, Buyer shall not allege, and hereby waives the defense, that there is an adequate remedy at Law.

Section 11.11 <u>Public Announcements</u>. Promptly after the execution and delivery of this Agreement, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein. Thereafter, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing party agrees to give the nondisclosing party prior notice of, and an opportunity to comment on, the proposed disclosure. Notwithstanding anything to the contrary in this <u>Section 11.11</u>, Seller (a) shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equityholders and lenders to the extent required by the provisions of any of Seller's bylaws, credit agreements and other pre-existing contractual obligations.

Section 11.12 <u>Entire Agreement</u>. This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

Section 11.13 <u>Parties in Interest</u>. Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third

39

Case 20-81688-CRJ11 Doc 2905-17 Filed 09/30/22 Entered 09/30/22 12:40:04 Desc
Exhibit RJN 5: Order Approving Reused 14A Page 80 of 246

Persons to Seller or Buyer. This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 11.14 <u>Bulk Sales Laws</u>. Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

Section 11.15 <u>Construction</u>. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

Section 11.16 <u>Counterparts and Facsimiles</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

## ARTICLE 12. <u>DEFINITIONS</u>.

Section 12.1 <u>Certain Terms Defined</u>. As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"<u>Alternative Transaction</u>" means Seller consummating one or more transactions or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of all or substantially all of the Business or the Acquired Assets by Seller to a purchaser or purchasers other than Buyer.

"<u>Ancillary Agreements</u>" means, collectively, the Assignment and Assumption Agreements, Assignment and Assumption of Leases, Acquired Intellectual Property Assignments, quitclaim deeds, and other certificates, affidavits and releases delivered pursuant to <u>Article 3</u>.

"<u>ATF</u>" means the United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

"<u>ATF Licenses</u>" means all of those licenses issued by ATF as provided by the GCA and the GCA's implementing regulations that are necessary for Buyer to conduct the Business as

40

currently conducted.

"Avoidance Actions" means any and all claims and remedies of Seller under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or other governmental action to close.

"Business Name" means "Remington," either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trade mark, corporate name, service mark and domain name, including without limitation those set forth on Schedule 12.1(a), and any confusingly similar variation, derivative or transaction thereof.

"Buyer Acquisition Vehicle" means a Creditworthy entity that is wholly-owned and controlled by Buyer's parent entity.

"Cash" means all cash and cash equivalents held by Seller, including all petty cash, register cash, undeposited checks, cash in transit as marketable securities, in each case as of immediately prior to the Closing (and including without limitation (i) the Good Faith Deposit, (ii) the Net Closing Cash Payment, (iii) any fee reserves or escrows established by Seller, and (iv) any cash in the Dominion Account (as defined in the Priority Term Loan)).

"CBA" means that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"City of Huntsville Project Development Liabilities" means all liabilities arising under (i) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Seller, as amended or otherwise modified from time to time, (ii) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000 and (iii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Seller in favor of the City of Huntsville.

"Claims" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or

41

unasserted actions against Seller or any of its Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Seller is a party; provided that Contracts do not include any Lease or any employment or similar Contracts.

"Creditworthy" means sufficiently capitalized, to the reasonable satisfaction of Seller upon provision to Seller of substantiating documentary evidence, to be able to pay the Purchase Price.

"D&O Insurance" means the policy in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Seller, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"DIP Facility" means any debtor-in-possession financing advanced to Seller in the Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies or arrangements that provide for compensation for employee benefits as to which Seller has any obligation or liability, contingent or otherwise.

"Employee Liabilities" means all liabilities of Seller to or with respect to all Employees whenever arising and liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Seller, including, for the avoidance of doubt, under the CBA.

"Employee Records" means all employment and benefit records (in whatever form

maintained) in the possession of Seller or its agents and pertaining to any Transferred Employee, or any spouse, dependent or other beneficiary of any such Transferred Employee.

"Employees" means all individuals, as of the date of this Agreement, who are employed by Seller (including Employees who are absent due to COVID Restrictions or vacation, family leave, short-term disability, COVID 19-related furloughs or absences or other approved leave of absence) in connection with the ownership, operation and management of the Business.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exit Term Loan" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"FILO Facility" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"GCA" means Gun Control Act of 1968 (Chapter 44 of Title 18, United States Code § 921 et seq).

"Government" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents

Case 20-81688-CRJ11 Doc 2405-17 Filed 09/30/22 Entered 09/30/22 13:47:04 Desc
Exhibit RJN 5: Order Approving Page 48 of 170A Page 84 of 246

thereof.

"Historic Firearms Books and Records" means all historic books and records relating to the sale of firearms included in the Acquired Assets, including all records required to be kept pursuant to parts 447, 478, and, 479 of title 27, Code of Federal Regulations.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

"Income Tax Return" means any Tax Return with respect to Income Taxes.

"Intellectual Property" means (1) all intellectual property arising from or in respect of the following: (a) all patents and applications therefore, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (b) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, including the Business Name, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (c) copyrights and registrations and applications therefore and works of authorship, and mask work rights, (d) all Software of Seller, (e) confidential information, know-how, trade secrets and inventions, and (f) all other intellectual property, (2) Seller's rights pursuant to any Contract with Remington Licensing Corporation and (3) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of Seller's rights or interests in intellectual property that is not an Excluded Asset and any related remedies, including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including, without limitation, security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, Permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"Knowledge" or any other similar term or knowledge qualification means, with respect to (i) Seller, the actual conscious knowledge of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement and (ii) Buyer, the actual conscious knowledge of Scott Soura (Manager of Buyer), as of the date the applicable representation or warranty is made or deemed made under this

Agreement.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property, in each of the foregoing cases, to the extent possessed, used or occupied in connection with the Business.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"Leases" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; and (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy or use of an asset.

"Marlin Business" means the design, development, testing, manufacture, marketing, sale and distribution of Marlin brand products (including discontinued products and those yet to be launched) using the Marlin name.

"Material Adverse Effect" means a state of facts, event, change or effect on the value of the Acquired Assets that results in a material and adverse effect on the value of the Acquired Assets taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy Case; (B) any action of Seller taken pursuant to, or any failure of Seller to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which Seller is a party; (C) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby, (D) changes, after the Effective Date, in United States generally accepted accounting principles, (E) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Seller operates the Business, (F) changes in the firearms, ammunition or sporting goods industries in general, (G) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared) or (H) any occurrence, outbreak, escalation or worsening of, or furloughs or Government actions (including any

45

Case 20-81688-CRJ11    Doc 2405-17    Filed 09/30/22    Entered 09/30/22 13:40:04    Desc
Exhibit RJN 5: Order Approving Page 46 of 170A    Page 86 of 246

quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other applicable Law, order, directive, guideline or recommendation by any Government of competent jurisdiction (collectively, "COVID Restrictions")) instituted in response to, any epidemic, pandemic or other disease (including without limitation the COVID-19 virus).

"Non-Core Brands" means Bushmaster, DPMS, Dakota, Tapco, H & R, Stormlake, AAC and Parker.

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Seller and used in the ownership, operation or management of the Business, but only to the extent set forth in Section 1.1(a).

"Pension Plan" means Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), as amended from time to time, whereby the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan), as amended from time to time, was merged into the Remington Arms Company, LLC Pension and Retirement Plan.

"Permit" means any permit, license, authorization, registration or certificate obtained from any Government.

"Permitted Liens" mean: (a) all Liens set forth on Schedule 12.1(b); (b) Liens and Interests consisting of (X) current Taxes and assessments, Liens for Taxes that are not yet delinquent or that are being contested in good faith, reservations in patents, and all easements, rights-of-way, encumbrances, Liens, covenants, conditions, restrictions, obligations, liabilities and other matters as may appear on record, and similar matters that would be disclosed by an accurate ALTA/ACSM survey of the Owned Real Property, and (Y) the applicable zoning and use regulations or other Laws of any Government; (c) purchase money Liens securing payments under capital lease arrangements; (d) all terms, conditions and restrictions under any applicable Permits; and (e) the rights under the Acquired Intellectual Property granted under (1) that certain Trademark License Agreement, by and between RA Brands and Crossman Corporation, a Delaware corporation, dated as of January 18, 2016, as amended by Amendment #1 to Trademark License Agreement, dated as of June 4, 2019 and as amended, supplemented and modified from time to time, (2) that certain Trademark License Agreement, by and between RA Brands and Gator Cases Inc., a Florida corporation, dated as of November 5, 2019, as amended by Amendment #1 to Trademark License Agreement, dated as of August 19, 2020 and as amended, supplemented and modified from time to time, and (3) that certain Exclusive Trademark License Agreement, by and between RA Brands and Buck Knives, Inc., a Nevada corporation, dated as of January 18, 2017, as amended, supplemented and modified from time to time.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

46

"<u>Plan</u>" means a Joint Chapter 11 Plan filed by Seller with the Bankruptcy Court.

"<u>Post-Closing Taxes</u>" means any (i) Taxes, other than Transaction Taxes, imposed on the Acquired Assets in respect of a taxable period (or portion thereof) beginning after the close of business on the day prior to the Closing Date and (ii) excise taxes of Seller attributable to the Business whether or not deferred and whether or not relating to periods before or after Closing.

"<u>Pre-Closing Income Taxes</u>" means any Income Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business, in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"<u>Pre-Closing Taxes</u>" means any Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business (other than any excise taxes (whether or not deferred)), in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"<u>Priority Term Loan</u>" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"<u>Related Person</u>" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"<u>Retained Litigation</u>" means all litigation and Claims arising or related to events prior to the Closing.

"<u>Seller D&Os</u>" means the current or former directors and officers insured under the D&O Insurance.

"<u>Software</u>" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Documents related to any of the foregoing.

"<u>State of Alabama Project Development Liabilities</u>" means all liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time.

47

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise (whether or not deferred), franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and "Tax" shall mean any one of them.

Section 12.2    All Terms Cross-Referenced.    Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| Acquired Assets | Section 1.1 |
| Acquired Intellectual Property | Section 1.1(k) |
| Acquired Intellectual Property Assignment | Section 3.2(d) |
| Affiliate | Section 12.1 |
| Agreement | *Preamble* |
| Allocation | Section 8.3 |
| Alternative Transaction | Section 12.1 |
| Approval Termination Date | Section 10.1(d) |
| Assignment and Assumption Agreement | Section 3.2(b) |
| Assignment and Assumption of Lease | Section 3.2(c) |
| Assumed Business Contracts | Section 1.1(i) |
| Assumed Contracts | Section 1.1(i) |
| Assumed FF&E Leases | Section 1.1(e) |
| Assumed Leased Real Property | Section 1.1(c) |
| Assumed Leases | Section 1.1(b) |
| Assumed Liabilities | Section 1.3 |

48

Assumed Motor Vehicle Leases ................................................................Section 1.1(g)
Assumed Policy Rights .............................................................................Section 1.1(h)
Avoidance Actions .................................................................................... Section 12.1
Bankruptcy Case ............................................................................................ *Recitals*
Bankruptcy Code ........................................................................................... *Recitals*
Bankruptcy Court ........................................................................................... *Recitals*
Bidding Procedures Motion ........................................................................... *Recitals*
Bidding Procedures Order .............................................................................. *Recitals*
Break Fee ...............................................................................................Section 10.2(c)
Business .......................................................................................................... *Recitals*
Business Day .............................................................................................. Section 12.1
Business Name ........................................................................................... Section 12.1
Buyer .......................................................................................................... Preamble
Buyer Acquisition Vehicle .......................................................................... Section 12.1
Buyer Plans ................................................................................................... Section 7.3
Cash ............................................................................................................ Section 12.1
CBA ............................................................................................................ Section 12.1
City of Huntsville Project Development Liabilities ..................................... Section 12.1
Claims ......................................................................................................... Section 12.1
Closing .......................................................................................................... Section 3.1
Closing Date .................................................................................................. Section 3.1
Code ............................................................................................................ Section 12.1
Confidentiality Agreement ..........................................................................Section 5.1(b)
Contract ...................................................................................................... Section 12.1
COVID Restrictions .................................................................................... Section 12.1
Creditworthy ............................................................................................... Section 12.1
Cure Amount ..............................................................................................Section 1.5(a)
Customer Order ..........................................................................................Section 1.1(l)
Documents .................................................................................................. Section 12.1
Effective Date ................................................................................................*Preamble*
Employee Benefit Plans .............................................................................. Section 12.1
Employee Liabilities ................................................................................... Section 12.1
Employee Records ....................................................................................... Section 12.1
Employees ................................................................................................... Section 12.1
Environmental Laws .................................................................................... Section 12.1
ERISA ......................................................................................................... Section 12.1
Excluded Assets ............................................................................................ Section 1.2
Excluded Employee Liabilities ................................................................... Section 1.3(f)
Excluded Liabilities ...................................................................................... Section 1.4
Final Order .................................................................................................. Section 12.1
FFL Cutoff Date ..........................................................................................Section 3.2(a)
Good Faith Deposit .....................................................................................Section 2.2(a)
Government .................................................................................................. Section 12.1
Gross Closing Cash Payment ......................................................................Section 2.1(a)
Intellectual Property .................................................................................... Section 12.1
Intercompany Note ...................................................................................... Section 12.1

49

Interests ............................................................................................................. Section 12.1
Inventory ..........................................................................................................Section 1.1(n)
Insurance Polcies ............................................................................................Section 1.2(a)
Law ....................................................................................................................Section 4.1(c)
Leased FF&E ...................................................................................................Section 1.1(e)
Leased Motor Vehicles ...................................................................................Section 1.1(g)
Leased Real Property ...................................................................................... Section 12.1
Leasehold Improvements ................................................................................ Section 12.1
Leases............................................................................................................... Section 12.1
Lien ................................................................................................................... Section 12.1
Material Adverse Effect ................................................................................... Section 12.1
Material Permits................................................................................................Section 4.1(g)
Necessary Consent ........................................................................................... Section 1.6
Net Closing Cash Payment ..............................................................................Section 2.2(b)
Order .................................................................................................................Section 4.1(c)
Owned FF&E ...................................................................................................Section 1.1(d)
Other Agreements ............................................................................................ Section 1.8
Owned Motor Vehicles .................................................................................... Section 1.1(f)
Owned Real Property ....................................................................................... Section 12.1
Pension Plan...................................................................................................... Section 12.1
Permitted Liens ................................................................................................ Section 12.1
Person................................................................................................................ Section 12.1
Petition Date...................................................................................................... *Recitals*
Plan ................................................................................................................... Section 12.1
Pre-Closing Income Taxes ............................................................................... Section 12.1
Priority Term Loan ........................................................................................... Section 12.1
Purchase Orders ...............................................................................................Section 1.1(m)
Purchase Price .................................................................................................. Section 2.1
Qualifying Excluded Contracts and Leases .....................................................Section 1.5(d)
Related Person .................................................................................................. Section 12.1
Reserve Amount................................................................................................Section 9.2(b)(iii)
Retained Litigation .......................................................................................... Section 12.1
ROC .................................................................................................................. Preamble
Sale Hearing.....................................................................................................Section 1.5(a)
Sale Order ......................................................................................................... *Recitals*
Seller ................................................................................................................ Preamble
Seller's Knowledge .......................................................................................... Section 12.1
Software ............................................................................................................ Section 12.1
State of Alabama Project Development Liabilities........................................... Section 12.1
Subsidiary(ies) ................................................................................................. Section 12.1
Tax Return ........................................................................................................ Section 12.1
Taxes ................................................................................................................. Section 12.1
Transaction Taxes ............................................................................................. Section 8.1
Transferred Employees .................................................................................... Section 7.1
WARN Act.........................................................................................................Section 7.4(a)
Warranty Termination Date ..............................................................................Section 10.1(b)

50

*[Signatures are on the following pages.]*

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER**

The Roundhill Group, LLC

By: _____

Name: Scott Sovra

Title: Manager

Case 20-81688-CRJ11   Doc 3405-7   Filed 09/30/22   Entered 09/30/22 13:40:04   Desc
Exhibit RJN 5: Order Approving Rule 52 of 147A   Page 93 of 246

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By: _____
    Name:
    Title:

**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By:_____
    Name:
    Title:

FGI HOLDING COMPANY, LLC

By: _____
    Name:
    Title:

BARNES BULLETS, LLC

By: _____
    Name:
    Title:

REMINGTON ARMS COMPANY, LLC

By: _____
    Name:
    Title:

RA BRANDS, L.L.C.

By: _____
    Name:
    Title:

OUTDOOR SERVICES, LLC

By: _____
    Name:
    Title:

Case 20-81688-CR11 Doc 2405-17 Filed 09/08/22 Entered 09/08/22 13:40:04 Desc
Exhibit RJN 5: Order Approving Page 53 of 170A Page 94 of 246

FGI FINANCE INC.

By: _____
   Name:
   Title:


HUNTSVILLE HOLDINGS LLC

By: _____
   Name:
   Title:


TMRI, INC.

By: _____
   Name:
   Title:


REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
   Name:
   Title:


32E PRODUCTIONS, LLC

By: _____
   Name:
   Title:


GREAT OUTDOORS HOLDCO, LLC

By: _____
   Name:
   Title:

S-3

**DISCLOSURE SCHEDULES**

**to**

**ASSET PURCHASE AGREEMENT**

**by and among**

**ROUNDHILL GROUP, LLC**

**and**

**REMINGTON OUTDOOR COMPANY, INC.**

**and**

**EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.**

**Dated as of September 26 , 2020**

These Disclosure Schedules (these "Schedules" and each a "Schedule") are furnished pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of September 26, 2020, by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to the Agreement (collectively with ROC, "Seller"), and Roundhill Group, LLC ("Buyer"). All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement, unless the context otherwise requires.

These Schedules are hereby incorporated in and made a part of the Agreement as if set forth in full therein and are an integral part of the Agreement. The information contained in these Schedules is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party to the Agreement to any third party of any matter whatsoever (including any violation of law or breach of contract). These Schedules and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties or covenants of the Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. In disclosing the information in these Schedules, Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. The disclosures in these Schedules are to be taken as relating to the representations and warranties as a whole, notwithstanding the fact that these Schedules are arranged by sections corresponding to the sections in the Agreement, or that a particular section of the Agreement makes reference to a specific section of the Schedules, and notwithstanding that a particular representation and warranty may not make a reference to the Schedules. Disclosure of an item on one Schedule shall be deemed disclosure on all other Schedules.

Neither the specification of any dollar amount in any representation or warranty nor the disclosure of a document or information in these Schedules is intended, or shall be construed or offered in any dispute between the parties to the Agreement as evidence of, the materiality of such dollar amount, document or information, nor does it establish any standard of materiality upon which to judge the inclusion or omission of any similar documents or information in such Schedule or any other Schedule. The headings and descriptions of the disclosures herein are for convenience of reference only and are not intended and do not alter the meaning of any provision of the Agreement or these Schedules.

**Schedule 1.1(i)**
**Assumed Business Contracts**

None.

3

**Schedule 1.2(q)**
**Excluded Assets**

1.   None.

Case 20-81688-CRJ11   Doc 2405-17   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Page 58 of 147A   Page 99 of 246

**Schedule 1.3(b)**
**Assumed Liabilities**

1.   None

**Schedule 1.4(n)**
**Excluded Liabilities**

1.  None

**Schedule 1.5(a)**
**Estimated Cure Amount**

None

7

**Schedule 4.1(g)**
**Compliance with Law**

1. Administrative Order on Consent, issued by the Missouri Department of Natural Resources to Remington Arms Company, LLC, No. 14-HW-E005 with regard to hazardous materials handling, storage and disposal.

2. In March 2020, the Company received a pre-litigation settlement offer from Trex Properties LLC concerning the Detrex Corporation facility located in Charlotte, NC. The offer names Para USA LLC (a Company subsidiary) is a potentially responsible party pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) for alleged transport or disposal of hazardous materials at the Detrex facility. The offer demanded a $12,000 payment to release all CERCLA, state and natural resource damage claims. Because the Company could not confirm that Para USA LLC actually deposited waste at the Trex facility, it did not accept the offer; however, the Company cannot rule out potential liability as a potentially responsible party.

3. Citation and Notification of Penalty regarding inspection number 1350744 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated March 26, 2019 (Ilion, NY).

4. Citation and Notification of Penalty regarding inspection number 1353904 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated March 26, 2019 (Ilion, NY).

5. Citation and Notification of Penalty regarding inspection number 1130012 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated June 8, 2016 (Lexington, MO).

6. Citation and Notification of Penalty regarding inspection number 314352477 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated November 4, 2011 (Ilion, NY).

7. Citation and Notification of Penalty regarding inspection number 315538082 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated August 31, 2011 (Lexington, MO).

8. Notice of Alleged Safety or Health Hazards issued by the U.S. Department of Labor, Occupational Safety and Health Administration, regarding Complaint Number 850727 (Lexington, MO).

8

Case 20-81688-CR-11    Doc 2405-17    Filed 09/08/22    Entered 09/08/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Page 62 of APA    Page 103 of 246

**Schedule 4.1(h)**
**Contracts**

1.  Seller received in August 2020 a proposed Settlement Agreement from the International Union, United Mine Workers of America regarding Grievance Nos. 32-2020 and 33-2020, alleging certain violations of the CBA.

# Schedule 4.1(i)

## Material Permits

a. Special Tax Stamps and Federal Firearms Licenses

| Site | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ilion, NY | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Huntsville, AL | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Sturgis, SD | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Lenoir City, TN | Federal Firearms License | 1-62-105-07-0A-07514 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Stormlake/Remington Arms |

b. Import/Export

| Business Area | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ammunition and Firearms | ITAR Registration | M23608 | U.S. Dept. of State, Office of Defense Trade Controls Compliance | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Borchers, S.A. Warehouse Distribution Agreement) | 050553995 (DA-0520-15) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Helmut Hofmann GMBH Warehouse Distribution Agreement) | 050672664 (DA-1349-18) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License | 050614380 (DA-2227-16) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |

10

| Category | Contract | Number | Counterparty | Debtor |
|---|---|---|---|---|
| | (Jaguar Gruppen A/S Warehouse Distribution Agreement) | | | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Midarms, SPRL, Warehouse Distribution Agreement) | 050583291 (DA-0001-16) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Norma Precision AB Warehouse Distribution Agreement) | 050698288 (DA-0788-19) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Raytrade Pty Ltd. Warehouse Distribution Agreement) | 050569321 (DA-1597-15) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Raytrade UK Limited Warehouse Distribution Agreement) | 050672127 (DA-1340-18) | U.S. Dept. of State | Remington Outdoor Company, Inc. Barnes Bullets, LLC |
| Ammunition and Firearms | Export License (Sako Ltd. Warehouse Distribution Agreement) | 050515421 (DA-1428-14) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Skenco Europe, Kft. Warehouse Distribution Agreement) | 050627594 (DA-0635-17) | U.S. Dept. of State | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001414 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001470 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |

| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001473 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
|----------|----------|----------|----------|----------|
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001512 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001516 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202002302 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202002684 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202003611 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202004581 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202005830 (application pending) | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202006481 (application pending) | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Export License | 0507154220 | U.S. Dept. of State | Remington Arms Company, LLC |

12

| Firearms | Export License | 050710057 | U.S. Dept of State | Remington Arms Company, LLC |
|---|---|---|---|---|
| | | | | |

13

**I. TRADEMARKS**

| Country | Trademark | Registration Number | Owner | Goods |
|---|---|---|---|---|
| Canada | ACR | TMA826,670 | RA Brands, L.L.C. | Firearms |
| United States of America | ACR | 4,019,998 | RA Brands, L.L.C. | Firearms |
| United States of America | ADAPTIVE COMBAT RIFLE | 3,946,418 | RA Brands, L.L.C. | Firearms |
| United States of America | ADVANCED ARMAMENT CORP. | 3,491,907 | RA Brands, L.L.C. | Silencers for firearms |
| United States of America | ADVANCED ARMAMENT CORP. SILENCERS MADE IN THE USA & Design | 4,503,536 | RA Brands, L.L.C. | Silencers for firearms |
| Canada | BACR | TMA849,550 | RA Brands, L.L.C. | Firearms |
| United States of America | BLACKOUT | 3,746,510 | RA Brands, L.L.C. | Flash suppressors for firearms |
| United States of America | BLASTOUT | 5,079,077 | RA Brands, L.L.C. | Muzzle attachments for firearms, namely, recoil compensators and flash suppressors |
| United States of America | BRAKEOUT | 3,954,435 | RA Brands, L.L.C. | Combined recoil compensator and flash suppressor for firearms |
| United States of America | FLIP THE SWITCH | 4,258,888 | RA Brands, L.L.C. | Firearms |
| United States of America | HALCYON | 5,341,554 | RA Brands, L.L.C. | Silencers for firearms |
| United States of America | HARRINGTON & RICHARDSON | 1,749,367 | Remington Arms Company, LLC | Firearms, namely, revolvers, rifles, shotguns and pistols |
| United States of America | HYPOSONE | 3,601,911 | RA Brands, L.L.C. | Baffle module sound reduction feature sold as an integral component of silencers for firearms |
| United States of America | ILLUSION | 4,905,498 | RA Brands, L.L.C. | Silencers for firearms |
| United States of America | P & Design | 1,882,081 | RA Brands, L.L.C. | Firearms, die-marking pistols, and parts therefor; ammunition |
| United States of America | PANTHER | 3,713,769 | Remington Arms Company, LLC | Rifles |
| Brazil | PANTHER ARMS | 840491409 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Canada | PANTHER ARMS | TMA891,091 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Chile | PANTHER ARMS | 1095992 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Hong Kong | PANTHER ARMS | 302581272 | RA Brands, L.L.C. | Firearms and structural parts therefor |
| Int'l Registration - Madrid Protocol Only | PANTHER ARMS | IR1159142 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Korea, Republic of | PANTHER ARMS | IR1159142 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Malaysia | PANTHER ARMS | 2013053727 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Mexico | PANTHER ARMS | 1391990 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Panama | PANTHER ARMS | 222415-01 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Singapore | PANTHER ARMS | IR1159142 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| St. Lucia | PANTHER ARMS | TM/2013/000113 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Thailand | PANTHER ARMS | TM380212 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Trinidad and Tobago | PANTHER ARMS | 46753 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| United States of America | PANTHER ARMS | 4,435,058 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |
| Uruguay | PANTHER ARMS | 444574 | RA Brands, L.L.C. | Firearms and replacement and structural parts therefor |

14

| United States of America | PARA | 2,716,330 | RA Brands, L.L.C. | Firearms, and replacement and structural parts therefore |
|---|---|---|---|---|
| Canada | PARDNER | TMA361,998 | Remington Arms Company, LLC | Shotguns |
| United States of America | PARDNER | 1,540,397 | Remington Arms Company, LLC | Shotguns |
| United States of America | PARDNER PUMP | 3,069,212 | Remington Arms Company, LLC | Firearms |
| Canada | SHOOT LIKE A GIRL . . . IF YOU CAN ! | TMA784,901 | RA Brands, L.L.C. | Firearms |
| United States of America | TI-RANT | 3,954,433 | RA Brands, L.L.C. | Silencers for firearms |
| United States of America | TOPPER | 1,754,497 | Remington Arms Company, LLC | Firearms, namely, revolvers, rifles, shotguns and pistols |
| European Union (Community) | VETERAN | 11606399 | Remington Arms Company, LLC | Firearms; ammunition and projectiles; explosives; fireworks; ammunition for firearms; holders for ammunition; launchers for ammunition; large calibre ammunition; medium calibre ammunition; small calibre ammunition; pellets; bullets; rockets; shells (projectiles); fuses for explosives; cartridges for firearms; bags for carrying firearms; protective cases adapted for firearms; protective shields adapted for firearms; scrapers for cleaning firearms; breeches of firearms; covers for firearms; barrel reflectors for firearms; firearm sights; foresights for firearms; sight protectors for firearms; sights, other than telescopic, for firearms; silencers for firearms; tripods and stands for firearms; cleaning brushes for firearms; accessories for firearms, namely grips for pistols; parts and fittings for firearms |
| Mexico | VETERAN | 1368618 | Remington Arms Company, LLC | Accessories for firearms, namely grips for pistols |
| United States of America | WOOD TECH | 4,602,778 | RA Brands, L.L.C. | Stocks for firearms with simulated wood grain, sold as a component part of firearms |

**PATENTS**

| Owner | Patent Number | Description |
|---|---|---|
| RA Brands LLC | 6,557,288 | COMPACT GOVERNMENT MODEL HANDGUN |
| RA Brands LLC | D562,931 | HANDGUN GRIP |
| RA Brands LLC | 7,530,191 | SEMI-AUTOMATIC HANDGUN, MAGAZINE, AND FOLLOWER |
| RA Brands, LLC | 8,726,557 | HAND GUARD ATTACHMENT SYSTEM FOR FIREARMS |
| RA Brands LLC | 6,070,512 | HANDGUN AND METHOD OF OPERATING HANDGUN |
| RA Brands LLC | 7,587,851 | RECEIVER GASKET |

**UNITED STATES COPYRIGHTS**

(1) Remington Arms Distribution Company, LLC: None

(2) Remington Arms Company, LLC: None

(3) RA Brands, L.L.C.

| Reg. No. | Published | Registered | Description |
|---|---|---|---|
| GP99,836 | April 11, 1975 | July 11, 1975 | "PETERS BLUE BELT AWARD BELT BUCKLE" |
| GP99,826 | February 24, 1975 | July 10, 1975 | "PETERS LONG RUN AWARD BELT BUCKLE" |
| GP99,827 | February 24, 1975 | July 10, 1975 | "PETERS HIGH GUN TROPHY BELT BUCKLE" |
| GP99,828 | June 25, 1975 | July 10, 1975 | "PETERS GOLDEN DUCK BELT BUCKLE" |

**CANADIAN COPYRIGHTS AND INDUSTRIAL DESIGNS**

(1) Remington Arms Distribution Company, LLC: None

(2) Remington Arms Company, LLC: None

(3) RA Brands, L.L.C.

Industrial Designs :

| Country | Title | Serial No. | Owner |
|---|---|---|---|

16

| Canada | BUTTSTOCK | 50133 | RA BRANDS, L.L.C. |

(4) Remington Outdoor Company, Inc.: None

## DOMAIN NAMES

| Domain Name | Account No. | Points To | Expiration Date | Account Holder |
|---|---|---|---|---|
| pantherarms.com | 21043774 | ADNS Services | 4/9/2025 | Remington Arms Company, Inc. |
| para-usa.com | 21043774 | ns1.supercp.com\|ns2.supercp.com | 1/19/2022 | Remington Arms Company, Inc. |
| paraord.com | 21043774 | Under Construction Page | 10/10/2022 | Remington Arms Company, Inc. |

17

**Schedule 11.5**
**Brokers and Finders**

1.  Ducera Partners.

## Schedule 12.1(a)
## Tradenames

Schedule 4.1(j) is hereby incorporated by reference.

**Schedule 12.1(b)**
**Permitted Liens**

1.  Liens securing (i) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000, and (ii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Seller in favor of the City of Huntsville.

2.  Excise Tax in the amount of $13,420,726 was due on July 29, 2020 has not been paid and the tax returns for such excise taxes have not been filed.

3.  State of Alabama - Sales and Use Tax - Period 05/01/2014 through 04/30/2017. Current Status: Auditor is reviewing information provided by Seller.

4.  TTB - Firearms and Ammunition Excise Tax - Period - Unknown. Current Status: The Seller received e-mail communication on July 23, 2020 from the TTB of intent to audit.

**EXHIBIT 1**

(*See* attached copy of Bidding Procedures Order)

S-1

Case 20-81668-CRJ11 Doc 2405-7 Filed 09/30/22 Entered 09/30/22 13:47:04 Desc
Exhibit RJN 5: Order Approving Agent's Sale of APA Page 116 of 246

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

In re:

REMINGTON OUTDOOR COMPANY, INC., *et al.*, [1]

Debtors.

Chapter 11

Case No. 20-81688-11

Joint Administration Requested

## ORDER ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALES OF ALL OR A PORTION OF THE DEBTORS' ASSETS

This matter having come before the Court upon the motion (the "**Motion**")[2] by Remington Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (collectively, the "**Chapter 11 Cases**"), seeking entry of this order (this "**Bidding Procedures Order**") (i) approving the proposed bidding procedures attached hereto as <u>Exhibit 1</u> (the "**Bidding Procedures**") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of their assets (the "**Acquired Assets**") through one or more sales of the Acquired Assets (each, a "**Sale Transaction**" or "**Sale**"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures, as applicable.

OMM_US:78645958.8

Case 20-81688-CRJ11   Doc 2405-17   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Page 7 of 120   Page 117 of 246

(iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto, including the procedures for the Debtors' selection of one or more stalking horse bidders (each, a "**Stalking Horse Bidder**"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (iv) scheduling (a) an auction (the "**Auction**") if the Debtors receive two (2) or more timely and acceptable Qualified Bids (as defined below), and (b) a final hearing (the "**Sale Hearing**") to approve one or more Sales of the Acquired Assets; and (v) granting related relief; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *General Order of Reference* of the United States District Court for the Northern District of Alabama dated July 16, 1984, as amended on July 17, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

2

OMM_US:78645958.8

Case 20-81688-CRJ11   Doc 2956-17   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Page 70 of 120   Page 118 of 246

C.     The notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Bidding Procedures Order is necessary or required.

D.     The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) approve the Bidding Procedures, including the procedures for selecting one or more Stalking Horse Bidders and the provision of the Bid Protections to be determined, (ii) establish the Assumption and Assignment Procedures, (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached hereto, (iv) schedule a date for the (a) Auction and (b) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, including the *Declaration of Bradley C. Meyer in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Meyer Declaration**") and the *Declaration of Colin M. Adams in Support of Debtors' Cash Collateral Motion and Bidding Procedures Motion* (the "**Adams Declaration**") are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

E.     The Bidding Procedures, substantially in the form attached hereto as Exhibit 1 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

3

OMM_US:78645958.8

F.      The Debtors are authorized to pay the break-up fee and expense reimbursement comprising the Bid Protections. The Bid Protections, to the extent payable under any Stalking Horse APA, (a)(x) are actual and necessary costs and expenses of preserving the Debtors' estate within the meaning of Section 503(b) of the Bankruptcy Code, and (y) shall be treated as allowed administrative claims against the Debtors' estates pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code, are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Acquired Assets, and the efforts that have been and will be expended by the Stalking Horse Bidders. The Bid Protections are a material inducement for, and condition of, each Stalking Horse Bidder's execution of the applicable Stalking Horse APA. Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidders are unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under its Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

G.      The Sale Notice and the Publication Notice, substantially in the forms attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Acquired Assets, including the sale of Acquired Assets free and clear of all liens, claims, and encumbrances, the Sale Transaction(s), the Bidding Procedures, the Auction and the Sale Hearing, and no other or further notice is required.

4

OMM_US:78645958.8

Case 20-81688-CRJ11 Doc 2405-7 Filed 09/30/22 Entered 09/30/22 13:40:04 Desc
Exhibit RJN 5: Order Approving Procedures of APA Page 120 of 246

H.    The Post-Auction Notice, substantially in the form attached hereto as Exhibit 4 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s), and no other or further notice is required.

I.    The Assumption and Assignment Notice, substantially in the form attached hereto as Exhibit 5 and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Costs, and no other or further notice is required.

J.    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted as set forth herein.[3]

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

---

[3] Notwithstanding anything to the contrary herein, the consummation of any Sale Transaction(s) is subject to entry of the Sale Order(s).

OMM_US:78645958.8

## I.    The Timeline for the Sale

3.    The Debtors are authorized to proceed with the Sale Transaction(s) in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

4.    Deadline                                                                **Action**

| Deadline | Action |
| --- | --- |
| August 18, 2020 at 10:00 a.m. (prevailing Central Time) | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| August 21, 2020 | Sale Notice Mailing Date |
| August 21, 2020 | Assumption and Assignment Service Date |
| September 1, 2020 at 4:00 p.m. (prevailing Central Time) | Sale Objection Deadline (defined below) excluding any objection based on identity of Stalking Horse Bidders, Successful Bidder or Backup Bidder or the form or substance of the Stalking Horse Bid, Successful Bid or Backup Bid |
| September 4, 2020 at 5:00 p.m. (prevailing Central Time) | Bid Deadline |
| September 8, 2020 at 12:00 p.m. (prevailing Central Time) | Reply Deadline (defined below) |
| September 8, 2020 by 4:00 p.m. (prevailing Central Time) or 14 days following service of the Supplemental Notice of Assumption and Assignment | Assumption and Assignment Objection Deadline (defined below) excluding any objection related to adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or Backup Bidder |
| September 17, 2020 at 10:00 a.m. (prevailing Central Time) | Auction |
| September 21, 2020 | Post-Auction Notice |
| September 23, 2020 at 10:00 a.m. (prevailing Central Time) | Sale Hearing |

6

OMM_US:78645958.8

Case 20-81688-CRJ11    Doc 3405-7    Filed 09/30/22    Entered 09/30/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Page 81 of 120    Page 122 of 246

5. For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "**Modifications**") in accordance with the provisions of the Bidding Procedures; *provided, however*, that the Debtors shall consult with the Consultation Parties or, to the extent provided therein, the Bid Consultation Parties, with respect to any Modifications. The Committee's right to request an extension of the above timeline for cause is expressly reserved.

## II. The Bidding Procedures

6. The Bidding Procedures are approved in their entirety. The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith. The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

7. The Debtors are authorized, in accordance with the Bidding Procedures, to require Diligence Parties to submit written indications of interest specifying, among other things, the Acquired Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party.

8. The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest. As further described in the Bidding Procedures, the Bid Deadline shall be **September 4, 2020 at 5:00 p.m. (prevailing Central Time)**. Any disputes or objections to the selection of Qualified Bid(s), Successful Bid(s), or Backup Bid(s) (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

OMM_US:78645958.8

9.     The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on **September 17, 2020 at 10:00 a.m. (prevailing Central Time)** virtually via video conferencing technology, or at such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

10.     The Prepetition Secured Creditors shall have the right, subject in all respects to the Bankruptcy Code and other applicable law and the satisfaction in cash or assumption of claims secured by senior liens, to credit bid all or any portion of their allowed secured claims pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable provisions of the Prepetition Credit Documents and any such credit bid shall be deemed a Qualified Bid subject to the Intercreditor Agreement (as defined in the D'Arcy Declaration); *provided*, *however*, that nothing herein or in the Bidding Procedures shall affect or in any way limit the right or ability of any party in interest, including the Committee, to object to the Prepetition Secured Creditors' right to credit bid, including the nature, amount, or scope of such credit bid, subject to the (a) applicable provisions of the Court's *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, (IV) Granting Related Relief, and (V) Scheduling A Final Hearing* Docket No. 90, including paragraph 20 and the Challenge Period (as defined therein), as the same may be modified in accordance with its terms and (b) Sale Objection Deadline (as defined below).

### III.  Stalking Horse Bidder and Bid Protections

11.     In accordance with the Bidding Procedures, the Debtors may designate one or more Stalking Horse Bidders for the various segments of their business and may enter into an asset purchase agreement with each Stalking Horse Bidder (each, a "**Stalking Horse APA**"), subject to higher or otherwise better offers at the Auction, which establishes a minimum Qualified Bid at the Auction with respect to the assets that are the subject thereof.

OMM_US:78645958.8

12.     Absent further order of the Court, the Stalking Horse APA shall (i) limit the break-up fee in favor of the Stalking Horse Bidder in the amount of no more than 3.5% of the cash consideration proposed to be paid at closing by the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Break-Up Fee**"); (ii) limit any reimbursement for the Stalking Horse Bidder's and its attorneys', accountants', investment bankers' and representatives' documented fees and expenses actually and reasonably incurred in negotiating and documenting the Stalking Horse APA, and in preserving and protecting Stalking Horse Bidder's rights and interests as buyer and lender in connection with the Chapter 11 Cases to an amount not to exceed 1.0% of the cash consideration proposed to be paid by at closing the Stalking Horse Bidder under the applicable Stalking Horse APA (the "**Expense Reimbursement**"); and/or (iii) set the initial overbid protection (the "**Minimum Overbid Increment**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**") in amounts to be determined by the Debtors in accordance with the Bidding Procedures.  In the event that the Debtors determine that the Bid Protections must exceed the amounts set forth herein, the Court shall hold a hearing on the approval of any such greater Bid Protections on an expedited basis, upon the request of the Debtors.

13.     The Bid Protections, to the extent payable under the Stalking Horse APAs, shall (a) constitute an allowed administrative expense claim against the Debtors pursuant to Sections 105(a) and 364(c)(1) of the Bankruptcy Code.  Subject to the foregoing, the Bid Protections shall be paid (i) in cash from the proceeds of any approved Sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the Sale contemplated by the Stalking Horse APA (as enhanced at the auction) is consummated.

14.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Bidder, upon such selection, the Debtors shall provide, to all parties on the Rule 2002 List, all

OMM_US:78645958.8

parties expressing an interest in the Acquired Assets and all parties holding liens on such Acquired Assets, three (3) business days' notice and an opportunity to object to the determination of such Stalking Horse Bidder and disclosure of the Bid Protections set forth in the Stalking Horse APA, and absent objection, the Debtors selection of such Stalking Horse Bidder shall be deemed designated without further order of the Court. To the extent necessary, the Debtors' right to seek this Court's approval of one or more Stalking Horse Bidders, with notice and a hearing, is hereby preserved.

## IV.   Notice Procedures

15.    The form of Sale Notice substantially in the form attached hereto as Exhibit 2 is approved.

16.    Within seven (7) days after the entry of this Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice and this Bidding Procedures Order, including the Bidding Procedures by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets within the past two years; (ii) any parties identified by AlixPartners as potential bidders; (iii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon or with respect to any of the Acquired Assets; (iv) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (v) counsel for the Committee; (vi) counsel to Cantor Fitzgerald Securities, as Priority Term Loan Agent under the Debtors' prepetition Priority Term Loan Credit Agreement; (vii) counsel to Ankura Trust Company, LLC, as FILO Agent under the Debtors' prepetition FILO Term Loan Agreement, and as Exit Term Loan Agent under the Debtors' prepetition Exit Term Loan Agreement; (viii) counsel to FILO Lenders; (ix) counsel to

10

OMM_US:78645958.8

Case 20-81688-CRJ11   Doc 2405-17   Filed 09/30/22   Entered 09/30/22 13:24:04   Desc
Exhibit RJN 5: Order Approving Page 85 of APA   Page 126 of 246

the Stalking Horse Bidder, if any; (x) counsel to Whitebox Advisors LLC; (xi) counsel for the Restructuring Committee; (xii) counsel to the Huntsville Note holder; (xiii) the Bankruptcy Administrator; (xiv) the Securities and Exchange Commission; (xv) the Internal Revenue Service; (xvi) counsel to the United Mine Workers of America; and (xvii) all known creditors of the Debtors, including their contract counterparties; *provided, however*, that to the extent email addresses are available, parties referenced in this paragraph 15 may be served by email.

17. Service of the Sale Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

18. The Publication Notice, substantially in the form attached hereto as <u>Exhibit 3</u>, is approved. The Debtors are directed to publish the Sale Notice, as modified for publication, in the *New York Times*, on one occasion on the Mailing Date or as soon as reasonably practicable thereafter. In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their case information website at https://cases.primeclerk.com/RemingtonOutdoor.

19. Service of the Publication Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to all unknown parties.

20. The form of the Post-Auction Notice, substantially in the form attached hereto as <u>Exhibit 4</u> is approved. As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, the Post-Auction Notice identifying any Successful Bidder(s).

## V.   Assumption and Assignment Procedures

21. The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are approved.

11

OMM_US:78645958.8

22.     The Notice of Assumption and Assignment, substantially in the form attached hereto as Exhibit 5 is approved.

23.     On or before **August 21, 2020** (any such date, the "**Assumption and Assignment Service Date**"), the Debtors shall file with the Court, and post on the Case Website at https://cases.primeclerk.com/RemingtonOutdoor, the Notice of Assumption and Assignment and Designated Contracts List.  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice.   On the Assumption and Assignment Service Date, the Debtors shall serve, via first-class mail, a customized version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List, on all counterparties to the Designated Contracts.  In addition, the Debtors shall serve, via first-class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information, but omits the Designated Contracts List on all parties on the Rule 2002 Notice List. Service of such Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

24.     Any objection by a counterparty to a Designated Contract (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; and (iii) include appropriate

OMM_US:78645958.8

documentation in support thereof. All Designated Contract Objections must be filed and served on (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, CA 90071, Attn: Steve Warren (swarren@omm.com) and Jennifer Taylor (jtaylor@omm.com); (ii) co-counsel for the Debtors, Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203, Attn: Derek Meek (dmeek@burr.com) and Hanna Lahr (hlahr@burr.com); (iii) counsel for the Restructuring Committee, Akin Gump Strauss Hauer & Feld LLP, 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Schultz (sschultz@akingump.com); (iv) counsel for the Committee, Fox Rothschild LLP, 345 California Street, Suite 2200, San Francisco, California 94104, Attn: Michael A. Sweet (msweet@foxrothschild.com) and Baker Donelson Bearman Caldwell & Berkowitz, P.C., 420 20th Street North, Birmingham, Alabama 35203, Attn: Matthew Cahill (mcahill@bakerdonelson.com) and Rita Hullett (rhullett@bakerdonelson.com); (v) the Bankruptcy Administrator, 400 Well Street, Decatur, Alabama 35602, Attn: Richard Blythe (richard_blythe@alnba.uscourts.gov); (vi) counsel to the Stalking Horse Bidder, if any; (vii) counsel to the FILO Lenders, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998, Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com) and Andrew V. Alfano (andrew.alfano@pillsburylaw.com); (viii) counsel to Whitebox Advisors LLC, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn: Andreas Andromalos (aandromalos@brownrudnick.com) and Tia C. Wallach (twallach@brownrudnick.com); (ix) all parties that have requested notice in the Chapter 11 Cases (collectively (i)–(ix), the "**Objection Recipients**"); and (x) counsel to any Successful Bidder(s), if known on the Sale Objection Deadline no later than 4:00 p.m. (prevailing Central Time) fourteen (14) days following the

OMM_US:78645958.8

Assumption and Assignment Service Date (the "**Assumption and Assignment Objection Deadline**").

25.     If a Designated Contract Objection is not consensually resolved before the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

26.     Any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, the Debtors reserve the right, and are authorized but not directed, to (i) supplement the Designated Contracts List with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

27.     In the event the Debtors exercise any of the rights listed above, the Debtors shall promptly serve the Supplemental Notice of Assumption and Assignment by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each Designated Contract listed on the Supplemental Notice of Assumption and Assignment at the last known address available to the Debtors.  Each Supplemental Notice of Assumption and Assignment shall set forth (i) the name and address of the counterparty to the Designated Contract listed thereon; (ii) the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder, if any, to withdraw such request for assumption and assignment of that Designated Contract prior to the closing of the applicable Sale Transaction); (iii) sufficient information to identify the Designated Contract; (iv) the Cure Costs, if any; and (v) proposed

OMM_US:78645958.8

adequate assurance, if known on the Assumption and Assignment Service Date. The Debtors are authorized, but not directed, to modify the Supplemental Notice of Assumption and Assignment as necessary and appropriate to provide customized individual notice to each Designated Contract counterparty. In addition, the Debtors are authorized, but not directed, to supplement the Designated Contract List on the Case Website with any additional Designated Contracts as the Debtors deem appropriate in their discretion. Service of such Supplemental Notice of Assumption and Assignment as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Designated Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

28.     Any objection by a counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment (which does not, for the avoidance of doubt, include any objection regarding the adequate assurance of future performance of any Stalking Horse Bidder, Successful Bidder or the Backup Bidder) (a "**Supplemental Designated Contract Objection**") must (i) be to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any; (ii) state, with specificity, the legal and factual basis thereof as well as what Cure Costs such objecting party believes are required, if any; (iii) include appropriate documentation in support of the objection; and (iv) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment.

29.     If a Supplemental Designated Contract Objection is not consensually resolved by the proposed effective date of assignment of the Designated Contract that is the subject of a Supplemental Designated Contract Objection, the Debtors shall seek an expedited hearing before

15

OMM_US:78645958.8

Case 20-81688-CRJ11   Doc 2905-17   Filed 09/30/22   Entered 09/30/22 13:40:04   Desc
Exhibit RJN 5: Order Approving Procedures Page 90 of APA    Page 131 of 246

the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court, including by filing a certification of no objection, (a "**Supplemental Designated Contract Order**") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

30.     Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them, except with respect to adequate assurance of future performance by such Successful Bidder. For the avoidance of doubt, any objections to the proposed form of adequate assurance of future performance of any Successful Bidder (other than a Stalking Horse Bidder) must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

31.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take

OMM_US:78645958.8

assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an "executory" contract. Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final purchase agreement with the Successful Bidder(s) (each, an "**Acquired Contract**") will be assumed and assigned to the Successful Bidder(s).

32.     Assignment by the Debtors to the Successful Bidder of a contract, lease or any other liability assumed under Section 365 of the Bankruptcy Code or otherwise relieves the Debtors and their estates from any such liability so assigned.

## VI.     The Sale Hearing

33.     A Sale Hearing to (i) approve a sale of a portion or substantially all of the Acquired Assets to the Successful Bidder(s) and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on **September 23, 2020 at 10:00 a.m. (prevailing Central Time)**, and may be adjourned or rescheduled without notice, subject to paragraph 4 of this Bidding Procedures Order. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid(s) and the Backup Bid(s) (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction(s) and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Bankruptcy Court.

OMM_US:78645958.8

34. Any and all objections, if any, to any Sale Transaction (but excluding any objection based on the specific identity of any Stalking Horse Bidder, the form or substance of any Stalking Horse APA, the specific identity of the Successful Bidder or the Backup Bidder, or the form or substance of the Successful Bid or the Backup Bid) must be filed no later than **September 1, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Objection Deadline**"). Any and all such objections must be served on the Objection Recipients and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline. All replies to such objections must be filed by **September 8, 2020 at 12:00 p.m.** (prevailing Central Time) (the "**Reply Deadline**").

35. Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Debtors' Acquired Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

36. Promptly following the Auction, the Debtors shall serve the Post-Auction Notice. The Debtors propose that any objections regarding the adequate assurance of future performance of the Successful Bidder or the Backup Bidder (other than the Stalking Horse Bidder) may be raised at the Sale Hearing.

## VII. Other Provisions

37. Notwithstanding anything herein or in the Bidding Procedures to the contrary, the Debtors shall not be permitted to modify the consultation rights of the Consultation Parties or the Bid Consultation Parties in the Bidding Procedures absent further order of this Court or the consent of any affected Consultation or Bid Consultation Parties.

38. Oneida's rights and priority in connection with any security interests it held in any assets of the Debtors pre-petition are hereby preserved and retained by Oneida to the extent they

18

OMM_US:78645958.8

Case 20-81688-CRJ11    Doc 2905-17    Filed 09/08/20    Entered 09/08/20 13:40:04    Desc
Exhibit RJN 5: Order Approving Bidding Procedures    Page 134 of 246

existed pre-petition and any such security interests shall attach to proceeds of such assets with the same priority, extent, validity, avoidability and enforceability. Nothing herein shall constitute a finding or ruling by this Court that any such security interests are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such security interest.

39. The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Bidding Procedures Order.

40. This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

41. This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

42. To the extent this Bidding Procedures Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Bidding Procedures Order shall govern.

43. To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

44. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

OMM_US:78645958.8

45.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse APA, and the implementation of this Bidding Procedures Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

OMM_US:78645958.8

## Exhibit 1

## Bidding Procedures

OMM_US:78645958.8

**EXHIBIT 2**

(*See* attached form of Trademark License Agreement)

EXHIBIT 2

## TRADEMARK LICENSE AGREEMENT

This Trademark License Agreement ("Agreement"), dated as of September __, 2020, (the "Effective Date"), is entered into by and between Vista Outdoor Inc., a Delaware corporation located at 1 Vista Way, Anoka, MN 55303 ("Licensor"), and the Roundhill Group, LLC ("Licensee"). Licensor and Licensee are sometimes referred to herein individually as a "Party" and together as the "Parties".

## RECITALS

WHEREAS, Licensor and Remington Outdoor Company, Inc., ("ROC") a Delaware corporation located at 100 Electronics Blvd., SW Huntsville, AL 35824 are, among others, parties to that certain Asset Purchase Agreement, dated September [●], 2020 (the "Ammunition APA"), pursuant to which Licensor, among other things, has acquired certain assets related to the ammunition business operated by ROC and certain of its Affiliates; and

WHEREAS, Licensee and ROC are, among others, parties to that certain Asset Purchase Agreement, dated September [●], 2020 (the "Firearms APA"), pursuant to which Licensee, among other things, has acquired certain assets (the "Firearms Assets") related to the firearms business operated by ROC and certain of its Affiliates; and

WHEREAS, in connection with the transactions contemplated by the Firearms APA, Licensee paid an aggregate purchase price of $12,500,000 to ROC in order to acquire the Firearms Assets; and

WHEREAS, following the Effective Date, Licensee has agreed to continue to invest in and otherwise develop the value of the brand and other intellectual property right included in the Licensed Trademarks; and

WHEREAS, Licensee's willingness to purchase the Firearms Assets and willingness to continue to invest in the Licensed Trademarks will have a direct and material benefit to Licensor, without which, Licensor would not have been willing to consummate the transactions contemplated by the Ammunition APA; and

WHEREAS, in connection with the transactions contemplated by the Ammunition APA and Firearms APA, Licensor has agreed, as of the Effective Date, to enter into this Agreement to enable use of the Licensed Trademarks (as defined below) in connection with Licensee's operation of the Firearms Business (as defined herein); and

WHEREAS, subject to the terms and conditions set forth herein, Licensor desires to exclusively license use of the Licensed Trademarks to License to manufacture, sell and/or distribute the Licensed Products;

WHEREAS, Licensee has the capability to perform such duties and desires to become an exclusive licensee of the Licensed Trademarks for said purpose; and

US_ACTIVE-154476691.21

WHEREAS, Licensor is willing to grant an exclusive trademark license for this purpose to use the Licensed Trademarks on the terms set forth in this Agreement and the Appendices attached to and forming part of this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

DEFINITIONS

Capitalized terms used but not defined in this list herein shall have the meaning given them in the body of this Agreement.

"Affiliate" means, with respect to any Person, any other Person who, as of the Effective Date or subsequent thereto, controls, is controlled by, or is under common control with such Person, but any such other Person shall be deemed to be an Affiliate only as long as such control exists.

"Field of Use" means manufacture, distribution, advertising, promotion, offer for sale, sale, import, export, servicing, and support of Licensed Products.

"Firearms Business" means Licensee's business related to the manufacture, distribution, advertising, promotion, offer for sale, sale, servicing, and support of Licensed Products under the Licensed Trademarks, which business, for the avoidance of doubt, excludes any business related to the manufacturing, distribution and sale of ammunition and any products not listed on Appendix A.

"Licensed Products" means the products listed on Appendix A.

"Licensed Trademarks" means the trademarks used in the Firearms Business including those listed in Appendix B, as such Appendix may be updated by mutual written agreement of the Parties from time to time.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government.

"Restricted Product" means: (a) any semi-automatic rifles; (b) any rifle-caliber pistols; (c) receivers and partial receivers of the foregoing, and (d) pistols with arm braces.

"Subsidiary" means, with respect to any Person, any other Person who, as of the Effective Date or subsequent thereto, is controlled by such Person, but any such other Person shall be deemed to be a Subsidiary only as long as such control exists.

"Third Party" means any Person other than Licensor, Licensee, and their respective Affiliates and Subsidiaries.

2

1.      LICENSE GRANT

A.      <u>Trademark License</u>. Licensor hereby grants to Licensee a non-transferable, exclusive (even as to Licensor), sublicensable (subject to <u>Section 1.F</u> herein), worldwide, royalty free, fully paid-up, right and license during the Term in the Field of Use to utilize the Licensed Trademarks solely (i) on all Licensed Products, (ii) the packaging accompanying Licensed Products, (iii) marketing materials and web site content relating to Licensed Products, and (iv) within a domain name (but, except as otherwise set forth herein) only in conjunction with the word "firearm", "firearms", "arms" or another word of similar meaning). For avoidance of doubt, neither the license in this <u>Section 1.A</u> herein nor any other provision of this Agreement shall restrict (or is intended to restrict) the right of Licensor to license the Licensed Trademarks to any other entity relating to any products or services outside the Field of Use. Licensee shall place on all packaging and marketing materials for Licensed Products appropriate trademark notices for the Licensed Trademarks and a notice indicating that the Licensed Trademarks are owned by Licensor and are used under license, and that Licensor is not a manufacturer, endorser, or seller of the Licensed Products.

B.      <u>Limitation on Licensee.</u> Notwithstanding anything to the contrary set forth herein, Licensee shall not (i) use the Licensed Trademarks on any Restricted Products (other than in connection with sales of Restricted Products to the military or a law enforcement agency), or (ii) otherwise market or sell Restricted Products under any other trademark on any web site or within any marketing materials that also include or reference the Licensed Trademarks or the Licensed Products marketed or sold using the Licensed Trademarks.

C.      <u>Exclusivity; Reservation of Rights</u>. The license granted hereunder is exclusive, except as otherwise contemplated hereby, even as to Licensor. Accordingly, during the Term, , Licensor shall not use or permit any Third Party to use any of the Licensed Trademarks on or in connection with the manufacture, distribution, advertising, promotion, offer for sale, sale, import, export, servicing, or support of Licensed Products, anywhere in the world. With the exception of the license specifically granted in this Agreement to the Licensed Trademarks, no license or rights beyond the scope set forth herein or under any other trademark, service mark, trade name, trade dress, domain name or any other intellectual property or other proprietary right of Licensor is granted by this Agreement. All rights not expressly granted by Licensor hereunder are expressly reserved by Licensor.

D.      <u>Trademark Usage Guidelines</u>. Licensee agrees to use the Licensed Trademarks in accordance with the Trademark Usage Guidelines included as <u>Appendix C</u> ("<u>Trademark Usage Guidelines</u>"). However, Licensee's continued use of the Licensed Trademarks in connection with the Licensed Products in the same or substantially the same manner as such Licensed Trademarks were previously used or are currently used shall be deemed to comply with the Trademark Usage Guidelines. If Licensee wishes to use the Licensed Trademarks in a manner that is not in accordance with the Trademark Usage Guidelines or in a manner that is not the same or substantially the same manner as such Licensed Trademarks were previously used or are currently used, Licensee must request Licensor's approval prior to such use. Requests for such approvals from Licensor in relation to the Licensed Trademarks under this Agreement are to be submitted in writing to the Licensor's authorized brand licensing representative designated to review and approve such uses; Licensor shall not unreasonably withhold its approval for any such use. Should

3

Licensor update or modify the Trademark Usage Guidelines, which must be reasonable and may not occur more than once per calendar year, such updates or modifications shall take effect ninety (90) days after written notice thereof is provided to Licensee, and Licensee shall implement any applicable changes within such timeframe or a commercially reasonable timeframe agreed by the Parties in writing; provided, however, that in no event may Licensor modify the Trademark Usage Guidelines in a manner that limits, eliminates or otherwise modifies the scope of the license granted to Licensee under Section 1.D or prohibits use of the Licensed Trademarks on and in connection with Licensed Products as used on the date hereof. For the avoidance of doubt, Licensee shall not be required to modify any Licensed Products or other materials and collateral existing prior to such effective date that were in compliance with the Trademark Usage Guidelines applicable as of their release. Licensee shall ensure that all Licensed Products sold by Licensee and all related quotations, specifications, and descriptive literature, and all other materials carrying the Licensed Trademarks, be marked with the appropriate trademark notices in accordance with the Trademark Usage Guidelines.

E.     No Assignment. Nothing in Section 1.A or Section 1.C of this Agreement is to be construed as an assignment or grant to Licensee of any right, title, or interest in the Licensed Trademarks or in any copyright, design, trademark, trade dress, domain name or other property right of Licensor beyond the license expressly granted.

F.     Sublicense Rights. Licensee shall be permitted to freely sublicense the Licensed Trademarks in the Field of Use, provided that all sublicensees shall be bound to the terms and conditions herein and shall be required to fully comply with the terms of this Agreement (including the confidentiality provisions and all Licensee restrictions). Licensee shall be strictly liable for any breach of the terms of this Agreement by a sublicensee, and shall be responsible for enforcing the usage restrictions set forth in this Agreement with regard to the Licensed Trademarks against all of its sublicensees. Any Affiliate sublicensee shall be jointly and severally liable with Licensee under this Agreement. Licensee shall provide Licensor with an updated list of all active sublicense agreements including the scope of and parties to the relevant sublicenses at least once per calendar year and additionally upon Licensor's reasonable request.

G.     Remington Domain Name. Notwithstanding anything to the contrary set forth herein, promptly following the Effective Date, the Parties shall cooperate in good faith and take all commercially reasonable measures to ensure that the "Remington.com" domain name (as well as any other domain names mutually agreed to by the Parties) link or otherwise provide access to separate websites for (i) the business of Licensor and its Affiliates (which, subject to the terms hereof, will be managed by Licensor) and (ii) the Firearms Business (which, subject to the terms hereof, will be managed by Licensee).

2.     QUALITY STANDARDS, QUALITY CONTROL AND INSPECTION

A.     Suppliers. Licensee will manufacture, or cause, direct, and supervise the manufacture of Licensed Products and will provide, or cause, direct and supervise, the provision of related services by the supplier(s) used by Licensee (or any other entity that controlled the Firearms Business) as of the Effective Date and such new suppliers as may be added from time to time by Licensee ("Suppliers"). Licensor and Licensee agree that such new Suppliers shall be of

4

at least comparable quality in terms of the products or services supplied as the Suppliers used by or on behalf of Licensor as of the Effective Date.

B.    <u>Product Standards</u>. Licensee shall make, label, distribute, offer, provide and sell Licensed Products in accordance with the Trademark Usage Guidelines and the general product/service quality standards established used in the Firearms Business as of the Effective Date ("<u>Existing Standards</u>"). Quality standards for Licensed Products not in existence as of the Effective Date shall be at least of a level comparable with the Existing Standards to the extent applicable to such Licensed Product ("<u>Comparable Standards</u>"). Licensee will distribute and sell only Licensed Products that meet the Existing Standards or Comparable Standards. Each Party acknowledges that it is in the Parties' mutual interest that Licensee market, promote, and sell Licensed Products branded with the Licensed Trademarks at prices and on terms that reflect the high value and quality associated with the Licensed Trademarks to preserve and enhance the goodwill and reputation associated with the Licensed Trademarks for premium quality products. Each Party covenants that it shall not take any actions that would be reasonably likely to result in a diminution in value to the value of the brands or the quality of the products associated with the Licensed Trademarks.

C.    <u>Quality Verification</u>. Licensee will assure testing, inspection and auditing of the products sufficient to minimize the likelihood of defective products entering the stream of commerce and, (1) before first sale or distribution of any Licensed Products manufactured and launched after the Effective Date and (2) during the Term as reasonably required by Licensor from time to time but no more than once per calendar year, furnish to Licensor without charge a copy of Licensee's and, if applicable, its Suppliers', quality verification, auditing and testing data for Licensor's review.

D.    <u>Quality Control Records</u>. If requested in writing by Licensor, Licensee shall reasonably make available and provide to Licensor, for Licensor's review, inspection and retention, such reasonable reports or data relating to quality control systems or processes for the Licensed Products. Should Licensor provide written notice outlining a reasonable basis upon which it believes that one or more Licensed Products does not conform to the applicable Existing Standards or Comparable Standards in accordance with this Agreement, Licensee will carry out appropriate quality control tests reasonably requested in writing by Licensor to determine whether such Licensed Products conform to the Existing Standards or Comparable Standards and will make commercially reasonable modifications and correction to Licensed Products to conform them to the Existing Standard or Comparable Standard and promptly provide to Licensor confirmation of such compliance activities and results. Licensee will keep, and request its Suppliers and Affiliates to keep, reasonable testing and quality control records for up to three (3) years from creation which records shall be open to inspection, during regular business hours of Licensee or its Suppliers, as applicable, by Licensor, upon at least ten (10) business days' prior written notice by Licensor.

E.    <u>Audits</u>. Upon Licensor's written request, Licensee shall permit Licensor's authorized representatives to inspect and audit during any operational hours the facilities, operations, and procedures of Licensee once per calendar year at a mutually agreed date for the sole purposes of determining whether the Licensed Products conform to the terms of this Agreement (the "<u>Annual Inspection</u>"). Licensee shall make available to Licensor for its review during such Annual Inspection, any requested information for evaluation of Licensee's compliance

hereunder, the Licensed Products, including information related to the manufacturing, handling, processing, offering, sale, marketing and distribution of the Licensed Products to the extent necessary to confirm compliance with this Agreement. During the Annual Inspection, Licensee will provide access to quality verification and testing data and any requested samples of Licensed Products including packaging, tags, labels, marketing and advertising materials and collateral and claims substantiation data for the Licensed Products that is specifically requested by Licensor at least two (2) weeks in advance for Licensor to determine and ensure compliance with this Agreement. Licensee, its Affiliates and Suppliers will make commercially reasonable modifications or corrections to their operations, processes and procedures, brand uses, corporate identification practices, the Licensed Products that Licensor deems necessary to ensure the Licensed Products and Licensee's operations, processes and procedures, brand uses, corporate identification practices, meet and maintain the requirements of this Agreement provided that a formal request for any such modifications is submitted in writing to Licensee.

F. <u>Customer Service</u>. Licensee shall also include with Licensed Products appropriate contact information for customer service and support in each country where the Licensed Products are distributed and sold. If requested in writing by Licensor, Licensee shall provide to Licensor a general outline of Licensee's warranty and service processes.

G. <u>Confidentiality</u>. All of the products, information and materials provided or made available by Licensee or its Suppliers pursuant to this <u>Section 2</u> will be deemed Licensee's confidential information, are for Licensor's internal purposes, and shall be used only by Licensor for confirming Licensee's compliance with this Agreement; in no event shall any such materials be disclosed to any other Person or used for any other purpose without Licensee's prior written consent.

H. <u>Compliance with Laws</u>. Licensee shall use the Licensed Trademarks only in such manner as will comply with the provisions of applicable laws relating to the Licensed Products. Licensee shall affix to all Licensed Products and all materials that bear a Licensed Trademark, including, but not limited to all labels, packaging, advertising, and promotional materials, invoices, and other printed materials (i) notices, warnings, instructions and safety information in compliance with applicable law (including trademark law), and (ii) a conspicuous statement, and such other legend as Licensor may from time to time require on the packaging of the Licensed Products indicating that the Licensed Products are sold, distributed, or manufactured under license from Licensor.

3. LICENSOR BANKRUPTCY AND COMMERCIAL LENDING TRANSACTIONS

A. Licensor acknowledges that Licensee's rights hereunder are preserved notwithstanding any putative rejection thereof under Section 365 of the Bankruptcy Code pursuant to *Mission Product Holdings, Inc. v. Tempnology LLC*, 139 S.Ct. 165 (2019). In the event any repudiation, disclaimer, rejection, proposed repudiation, proposed disclaimer or proposed rejection of this Agreement by Licensor in any bankruptcy proceeding or liquidation whether compulsory or voluntary or compounds with its creditors or takes or suffers any similar action in consequence ("<u>Bankruptcy Event</u>"), Licensee shall have the right to retain and fully exercise all of its rights hereunder. Without limiting the generality of the foregoing, no putative rejection of this Agreement or other Bankruptcy Event shall terminate or rescind any right granted to the Licensee.

6

B.	In the event of a Bankruptcy Event, Licensee further reserves all rights to assert that Section 365(n) of the Bankruptcy Code or similar laws of another jurisdiction, shall be implicated. The Parties intend that the Licensed Trademarks shall constitute and have the protections afforded "intellectual property" as the term is defined in 11 U.S.C. Section 101(35A) of the United States Code or similar laws of another jurisdiction. All of the rights granted to Licensee under this Agreement shall be deemed to exist immediately before the occurrence of any Bankruptcy Event in which Licensor is a debtor. The Parties wish for the protections of Section 365(n) of the Bankruptcy Code to apply fully if Licensor commences or has commenced against it a bankruptcy case under the Bankruptcy Code and for the protections of similar laws in other jurisdictions to apply in a Bankruptcy Event of Licensor or its property. Licensor acknowledges that the rights and licenses granted to Licensee pursuant to this Agreement shall not be affected by the rejection or repudiation of this Agreement. Licensor waives all rights to object to the application of Section 365(n) of the Bankruptcy Code or similar laws of another jurisdiction or any request for relief pursuant to Section 365(n) or similar laws of another jurisdiction by or on behalf of Licensee.

C.	In the event Licensor enters into a commercial lending transaction through which its lender requires assignment of the Licensed Trademarks be pledged as collateral, Licensor shall request that such lender shall acknowledge the rights of licensee hereunder, in writing, and accord Licensee protections substantially similar, but in no event less than, to those set forth in sections (a) and (b); provided, however, that if such lender is not willing to grant such consent, Licensor shall cooperate with Licensee in good faith in an effort to ensure that Licensee obtains such protections (provided, that, in no event shall Licensor be required to engage in any litigation or incur any out of pocket expenses in connection therewith). For the avoidance of doubt, it is the intent of the Parties for the license granted pursuant to this Agreement to extend and survive notwithstanding the exercise of any rights of foreclosure and/or sale by a lender pursuant to Article IX of the Uniform Commercial Code, as made applicable by state law.

D.	Promptly following the Effective Date, the Parties shall record a summary of this Agreement, in form and substance substantially similar to that attached hereto as Appendix D, with the United States Patent and Trademark Office.

4.	PACKAGING, ADVERTISING MATERIALS AND SAMPLES

A.	All packaging and related materials shall conform to the Existing Standards or Comparable Standards and the Trademark Usage Guidelines. If Licensee wishes to use any packaging or related materials that do not conform to the Existing Standards or Comparable Standards and the Trademark Usage Guidelines, such uses must be previewed with Licensor prior to Licensee's use.

B.	Except as otherwise contemplated hereby, Licensee will have sole responsibility for advertising and marketing expenses relating to Licensed Products. Licensee will reimburse Licensor for Licensor's reasonable out-of-pocket costs of producing any artwork and related materials requested by Licensee that Licensor chooses to create on Licensee's request, upon the submission of appropriate documentation as to Licensor's out-of-pocket costs. Licensor acknowledges that it will receive a direct economic benefit from Licensee's investment in the Licensed Trademarks and Licensed Products, including through Licensee's marketing efforts to

7

promote the shared brands. In furtherance of the foregoing, following the Effective Date, upon the written request of Licensee, Licensor shall promptly reimburse Licensee for up to Seven Million Five Hundred Thousand ($7,500,000) of its expenses incurred in connection with (i) the marketing, promotion or sale of the Licensed Products and/or (ii) Licensee's hiring of employees in connection with the operation of the Firearms Business and/or (iii) Licensee's reorganizing or modernizing the facilities used in the Firearms Business, which will be paid Licensor by wire transfer to an account designated by Licensee.

C.     Licensee shall not make any false claims or material misrepresentations about Licensed Products and agrees to include appropriate disclaimers or informational statements on packaging and in promotional materials for Licensed Products. Licensor assumes no liability to Licensee, its Affiliates, its customers, or any other Third Party, with respect to the performance of Licensed Products.

5.     OWNERSHIP AND PROTECTION OF RIGHTS

A.     Ownership. Licensee acknowledges that the Licensed Trademarks are inherently distinctive, that Licensor (and/or its Affiliates) is the owner of and has acquired a substantial and valuable goodwill in the Licensed Trademarks, and that all use thereof by Licensee and its Affiliates and Suppliers inures solely to the benefit of Licensor (and/or its Affiliates). Licensee agrees to put reasonable notice of such ownership that Licensor shall require on the tags or labels or packaging and/or advertising materials for the Licensed Products, including a trademark notice as applicable and in accordance with the Trademark Usage Guidelines.

B.     No Impairment; Undertakings. Licensee will not and will not permit its Affiliates or authorize its Suppliers or sublicensees to do anything that is intended to impair Licensor's proprietary rights in and to the Licensed Trademarks. Neither Licensee nor any of its Affiliates will claim any right or interest in the Licensed Trademarks, except such right as is expressly granted by this Agreement. Licensee and its Affiliates further agree not to dispute, or assist in disputing, directly or indirectly Licensor's right and title in the Licensed Trademarks. If, as a result of Licensee's use of the Licensed Trademarks, Licensee or any of its Affiliates are deemed by operation of law or otherwise to have acquired any title or other rights to any of the Licensed Trademarks or any of their components, Licensee agrees to and hereby does assign (and shall have its Affiliate(s) assign in writing, if applicable) the same to Licensor without the requirement of any further consideration. In furtherance of the above, Licensee shall ensure the concepts in Appendix E, to the extent reasonably practicable, are included in the relevant agreements between the Licensee and its Suppliers or sublicensees.

C.     Product Materials. Licensor acknowledges that Licensee owns all rights in all graphic designs and other creative works containing the Licensed Trademarks including in packaging, promotional materials, advertising, collateral materials and other merchandising materials prepared by or for Licensee for use in connection with the distribution of Licensed Products (apart from the Licensed Trademarks themselves).

D.     Obligation to Notify. Licensee shall promptly notify Licensor of any suspected infringement or misuse of any of the Licensed Trademarks that is brought to the attention of Licensee, and shall cooperate with Licensor, as Licensor shall reasonably require and at Licensor's

8

expense, in any action taken against such suspected infringement or misuse. Licensor agrees to keep Licensee reasonably informed of actual or suspected infringement or misuse of the Licensed Trademarks of which it is aware, upon Licensee's reasonable request.

E.     Prosecution. Licensee shall take reasonable steps that are necessary and prudent to maintain and protect Licensor's proprietary rights in the Licensed Trademarks during the Term. Accordingly, Licensee shall perform all reasonable actions and bear all costs and expenses incurred by Licensor associated with the prosecution and maintenance of the registrations for the Licensed Trademarks that are solely within the Field of Use, and shall promptly reimburse Licensor for any such costs and expenses within thirty (30) days of receiving Licensor's invoice therefore. For the avoidance of doubt, Licensor shall bear all costs and expenses associated with the prosecution and maintenance of the registrations for all trademarks acquired by Licensor under the Ammunition APA that are solely outside the Field of Use. With respect to registrations for Licensed Trademarks that are used both within and outside the Field of Use, Licensee and Licensor shall each pay one-half of all costs and expenses associated with the prosecution and maintenance of such registrations. Upon Licensee's reasonable request, Licensor shall cooperate with Licensee with respect to the filing and prosecution, and upon registration, maintenance, of any new trademarks that are the same or that are or could be deemed confusingly similar to any of the Licensed Trademarks in the existing territories or in new territories in order to further protect and/or expand existing trademark coverage relating to the Licensed Trademarks. In all such cases, Licensee shall be solely responsible for all of the costs and expenses related to such filing, prosecution, and maintenance, including Licensor's reasonable costs in relation thereto. All such applications and registrations shall be solely owned by Licensor and shall be deemed part of the Licensed Trademarks. In addition, Licensee shall cooperate with Licensor and execute any documents reasonably required by Licensor to protect the Licensed Trademarks.

F.     License Enforcement. Prior to bringing any claim or action against a Third Party under this Section 5.F, Licensee shall notify Licensor of the discovered suspected infringement or misuse that is the basis of such claim or action, and Licensor shall have the first right to elect to bring an enforcement action against such Third Party subject to Section 5.G. In the event that Licensor elects not to bring an action, or has not brought such action within sixty (60) days of receiving Licensee's notice, Licensee shall have the right to prosecute any such claims against such Third Party for infringement of the Licensed Trademarks within the Field of Use in Licensee's own name. Any such enforcement actions shall be brought against such Third Parties at Licensee's sole cost and expense. Licensee shall retain any recovery obtained from any such enforcement proceedings. If Licensor is required to be joined to any such proceeding (e.g., to establish standing), Licensor agrees to join such proceeding and Licensee agrees to reimburse Licensor for all of Licensor's reasonable costs and expenses associated with such proceedings (including attorney's fees). Licensor further agrees to provide documents and otherwise assist in such proceedings as may be reasonably requested by Licensee.

G.     Licensor may, in its sole discretion, take such steps to bring and/or prosecute such claims for infringement, misappropriation, or dilution of the Licensed Trademarks as Licensor may deem necessary both within and outside of the Field of Use. In the event Licensor elects to take such steps, Licensee shall cooperate fully with Licensor in such actions. Licensor shall have full control over any such enforcement action that it initiates or prosecutes, including, without limitation, the right to select counsel, to settle on any terms it deems advisable, to appeal any

9

adverse decision rendered in court, to discontinue any action taken by it, and to otherwise make any decision in respect thereto as Licensor deems advisable in its sole discretion. Licensor shall bear all expenses associated with any such actions brought by Licensor, provided, however, that Licensor shall also retain any recovery or settlement resulting from such enforcement actions. Licensor does not represent, warrant, or covenant that it will bring any enforcement action against any Third Party, and will bring such actions in Licensor's sole discretion. Licensor agrees to keep Licensee reasonably informed of any litigation brought by Licensor to enforce its rights in the Licensed Trademarks. For purpose of clarity, the entirety of this <u>Section 5.G</u> is subject <u>Section 5.F</u> above.

6.    INDEMNIFICATION

A.    Licensor agrees to defend, indemnify and hold harmless Licensee against all loss, expense and damage incurred and occasioned by any claim or action asserted by any Third Party (including any governmental agency) based on allegations that the Licensed Trademarks themselves (and not their uses) violate the intellectual property rights of any Third Party, provided that Licensor is reasonably notified of and tendered the defense to such claims solely with counsel of Licensor's own choosing, and no settlement is made without Licensor's prior written consent; and provided further that such indemnification obligation will not apply to third-party claims based on the use of the Licensed Trademark by Licensee in material violation of the terms and conditions of this Agreement. Licensee shall cooperate with Licensor in any such defense as Licensor shall request and at Licensor's expense. Except as expressly set forth in this Agreement, Licensor makes no warranties under this Agreement, either express or implied.

B.    Licensee agrees to defend, indemnify, and hold harmless Licensor and its Affiliates (including subsidiaries) and their parents, officers, directors, insurers, and agents against all loss, expense and damage incurred and occasioned by any claim or action asserted by any Third Party (including any governmental agency) arising out of or in any way related to the use, manufacture, distribution, offering, provision, marketing, or sale of the Licensed Products bearing or under the Licensed Trademarks (including product liability claims) and related marketing materials (including as described in <u>Section 4</u> herein) by Licensee or its Affiliates or its sublicensees (including, without limitation, any misuse of the Licensed Trademarks by such sublicensees), provided that Licensee is reasonably notified of and tendered the defense to such claims solely with counsel of the Licensee's own choosing and no settlement is made without the Licensee's prior written consent, not to be unreasonably withheld. Failure of Licensor to give prompt notice will not relieve Licensee of its obligations hereunder except to the extent such delayed notice materially prejudices Licensee. Licensor shall reasonably cooperate with Licensee in any such defense as Licensee shall request, at Licensee's expense.

C.    Licensor assumes no liability with respect to the Licensed Products. Licensee agrees to defend, indemnify and hold Licensor, its officers, agents, employees, successors or assigns harmless against any and all claims, demands, causes of action including, but not limited to, those relating to product liability, patent infringement and environmental law, and associated judgments, costs and expenses, including reasonable attorney's fees, arising out of (i) Licensee's manufacture, distribution, shipment, disposal, advertising, promotion or sale of the Licensed Products or (ii) any grossly negligent or willful act or omission by Licensee, agents or employees,

Case 20-81688-CRJ11   Doc 2405-17   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Round Trip AP20   Page 148 of 246

provided that Licensee receives prompt notice of such claim, demand or cause of action and is permitted to deal with it in Licensee's sole discretion.

D.　　Licensee hereby agrees, and shall ensure that its Affiliates and sublicensees agree, to comply with all laws and regulations applicable to the manufacture, sale, marketing and distribution of Licensed Products bearing the Licensed Trademarks. Licensee shall provide a warranty to its end customers of the Licensed Products bearing the Licensed Trademarks against defects in design, materials, and workmanship that reflects the high quality of the Licensed Products bearing the Licensed Trademarks.

E.　　Licensee will acquire and maintain at Licensee's sole expense throughout the Term and five (5) years thereafter, a policy of standard non-cancelable Commercial General Liability Insurance including coverage for Contractual Liability, Products Liability and Completed Operations on an occurrence basis. The limits of liability shall be $10,000,000 per occurrence, which may be satisfied through any combination of primary and excess or umbrella liability insurance. Licensor shall be named as an additional insured, and Licensee's insurance shall be primary and non-contributory to any insurance that may be carried by Licensor. Licensee's insurers shall be reasonably acceptable to Licensor. Licensee will direct the insurance company(ies) to furnish Licensor with a Certificate of Insurance evidencing such coverage on the Effective Date (or if not practicable, promptly thereafter), and to provide Licensor with at least thirty (30) days written notice prior to termination of coverage. For the avoidance of doubt, each Party's indemnification obligations under this Section 6 herein include the obligation to defend the other indemnified Party against each applicable third-party claim, to pay all costs and expenses, including, without limitation, attorneys' fees, associated with such defense, and to pay all damages awarded (or settlement amounts agreed to) in connection with each such claim.

F.　　The undertakings of this Section 6 shall survive expiration or termination of this Agreement.

7.　　TERM AND TERMINATION

A.　　This Agreement will begin on the Effective Date and will continue in perpetuity unless terminated earlier in accordance with the terms hereof (the "Term").

B.　　This Agreement may be terminated by Licensor upon written notice to Licensee under the following conditions:

1)　if Licensee or its Affiliates or any its other sublicensees fails to comply with any of the material terms and conditions of this Agreement and, if curable, fails to cure or otherwise remedy such breach within one hundred twenty sixty (120) days after the Licensor provides written notice to Licensee thereof; or

2)　if the Licensee enters into a bankruptcy proceeding or liquidation whether compulsory or voluntary (other than for the purpose of reorganization) or compounds with its creditors or takes or suffers any similar action in consequence and fails to operate the Firearms Business for a period of at least

11

twenty four (24) months following the date of such bankruptcy, liquidation or composition.

C.       All licenses and permissions granted by Licensor herein cease upon termination of this Agreement for any reason. After termination, Licensee shall and will continue thereafter to be obligated to assign to Licensor any rights Licensee may acquire in the Licensed Trademarks, if any, and to hold Licensor (and its Affiliates) harmless, and to defend and indemnify Licensor (and its Affiliates) as provided under <u>Section 6</u> of this Agreement. Licensee will promptly discontinue all use of and sale of Licensed Products incorporating the Licensed Trademarks and any materials using the Licensed Trademarks.

8.       MISCELLANEOUS

A.       <u>Independent Entities</u>. The Parties are independent and distinct entities. Licensee may not incur any obligation in Licensor's name or on its behalf. This Agreement will not be construed as constituting any joint venture, partnership, franchise or principal/agent relationship, nor will either Party do or permit any act that will be regarded as such.

B.       <u>Severability</u>. The declaration of any provision of this Agreement as invalid or not enforceable will not affect the remaining terms. The failure by either Party to enforce any provision of this Agreement will not affect that Party's right to enforce the same or any other provision of this Agreement.

C.       <u>Governing Law</u>. This Agreement is to be construed according to the laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the law any other jurisdiction.

D.       <u>LIMITATION OF LIABILITY</u>. EXCEPT FOR DAMAGES ARISING FROM THE INDEMNIFICATION AND INSURANCE OBLIGATIONS PURSUANT TO <u>SECTION 6</u> HEREIN, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR INDIRECT DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER UNDER THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

E.       <u>LIMIT ON WARRANTY</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

F.       <u>Force Majeure</u>. Notwithstanding anything to the contrary, neither Party will be liable (for any failure to perform or otherwise) under this Agreement in accordance with its terms if failure arises out of causes beyond the control of the Parties. Such causes may include, but are not limited to, acts of God or the public enemy, acts of civil or military authority, fires, floods, earthquakes, water disasters, strikes, sabotage, insurrection, epidemic, pandemic, nuclear incident, unavailability of energy or communications sources, materials or equipment not caused by the Parties, increase in component costs, riots, war or priorities resulting from the foregoing.

12

G.     _Delivery_. A written notice by either Party to the other will be deemed delivered if personally delivered or sent by an overnight international courier, or if sent registered or certified mail, return receipt requested, to the other Party at its address given in Section 8.H, or at the address specified by the other Party in the last notice of change of address, or otherwise provided under the terms of Section 8.C herein.

H.     _Notices_. Notices under this Agreement are to be addressed as follows:

If to Licensee:

> Attention: Scott Soura
> 888 SE 3 Avenue, Suite 500
> Fort Lauderdale, FL 33316
> Email: soura@roundhillgroup.com

> With a copy to (which copy alone shall not constitute notice):

> Shulman Bastian Friedman & Bui, LLP
> 100 Spectrum Center Drive, Suite 600
> Irvine, California 92618
> Attention: James C. Bastian, Jr., Esq.
> Email: jbastian@shulmanbastian.com

If to Licensor:

> Vista Outdoor Inc.
> 1 Vista Way
> Anoka, MN 55303
> Attention: Dylan S. Ramsey
> Email: Dylan.Ramsey@VistaOutdoor.com

> With a copy to (which copy alone shall not constitute notice):

> Reed Smith LLP
> 599 Lexington Avenue
> New York, NY 10022
> Attention: Christopher M. Sheaffer
> Email: Csheaffer@ReedSmith.com

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

I.     _Execution_. This Agreement may be executed by facsimile or PDF (electronic mail) copies in counterparts, each of which will be deemed an original and all of which together will constitute one and the same Agreement. Notwithstanding the foregoing, the Parties will deliver

13

Case 20-81688-CRJ11   Doc 2405-7   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Roundhill APA   Page 151 of 246

original execution copies of this Agreement to one another as soon as practicable following execution thereof.

J. <u>Merger; Amendments</u>. This Agreement, including all Appendices hereto, constitutes the entire understanding of the Parties with respect to the subject matter hereof, and will supersede any and all prior communications, negotiations, correspondence, course of dealings and other agreements between the Parties regarding such subject matter. This Agreement may only be amended or modified in a writing signed by both Parties. The terms and conditions of this Agreement will prevail notwithstanding any conflict with the terms and conditions of any purchase order, acknowledgment or other instrument submitted by Licensee.

K. <u>Assignment</u>. Licensee may not directly or indirectly assign this Agreement or transfer any of its rights or obligations under this Agreement, in each case, operation of law or otherwise, without the prior written consent of Licensor which shall not be unreasonably withheld; provided, however, that Licensee shall have the right to assign, transfer, sell, or pledge its rights hereunder without any required consent to: (i) any Affiliate of Licensee ; (ii) to a third-party as part of a sale of substantially all of Licensee's business, whether through an asset purchase, stock purchase, merger, consolidation, or the like; and (iii) to any lending institution, for security purposes or as collateral, from which Licensee obtains financing, which right of assignment shall include any rights of Licensee as a third-party beneficiary. Licensor may assign this Agreement, any of the Licensed Trademarks (subject to the license granted to Licensee hereunder), and/or any of its rights and obligations under this Agreement without restriction. Nothing in this Agreement, express or implied, is intended to confer upon any Person or party other than Licensee or Licensor, or their respective successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

L. <u>Survival</u>. The following Sections shall survive expiration or termination of this Agreement: <u>Section 5</u>, <u>Section 6</u>, and <u>Section 8</u>.

M. <u>Equitable Relief</u>. Each Party acknowledges and agrees that a breach or threatened breach by the other Party of its obligations under this Agreement shall give rise to irreparable harm to such Party for which monetary damages shall not be an adequate remedy, and if such a breach or threatened breach occurs such Party will, in addition to any and all other rights and remedies that may be available to such Party under this Agreement, whether at law, at equity, or otherwise in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other equitable relief that may be available from a court of competent jurisdiction, without any requirement to (i) post a bond or other security, or (ii) prove that monetary damages will not afford an adequate remedy. Each Party agrees that it will not oppose or otherwise challenge the appropriateness of reasonably requested equitable relief with respect to a breach of this Agreement by such Party.

N. To the extent that Licensee acquires the artwork of the Remington Museum (wherever located) pursuant to the terms of the Firearms APA, the Parties shall cooperate in good faith to ensure that such assets are split equally between the Parties based on value.

O.     To the extent Licensee receives any inventory related to the Dakota Arms business operated by ROC and its Affiliates, Licensee shall, following Licensor's written request, promptly transfer such inventory to Licensor.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the as of the date first above written.

LICENSOR

_____

Name:
Date:

LICENSEE

_____

Name:
Date:

[Signature Page to Trademark License Agreement]

## APPENDIX LIST

**Appendix A**: Accessories Included in Field of Use

**Appendix B**: Licensed Trademarks

**Appendix C**: Trademark Guidelines (relating to the Licensed Trademarks)

**Appendix D**: License Summary

**Appendix E**: Undertaking by Suppliers

17

**APPENDIX A**
**Licensed Products**

- Firearms
- Receivers
- Barrels
- Stocks
- Grips
- Rails
- Butts
- Triggers
- Safeties
- Iron Sights (excluding any electronic, or optical sights, and any scopes)
- Flash suppressors
- Recoil compensators
- Heatshields
- Silencers
- Sight adjustment tools
- Gunsmithing tools and kits
- Books and manuals (firearms related)
- Magazines
- Air Guns
- Paintball Guns
- Gun Cases; and
- Any other part or item not listed above that that can be affixed to or installed within a firearm and that was manufactured by ROC and sold under the Remington brand as part of a completed firearm as of the date of this Agreement.

18

Case 20-81688-CR11   Doc 2406-7   Filed 02/08/22   Entered 02/08/22 13:40:04   Desc
Exhibit RJN 5: Order Approving Rule 9019 APA   Page 156 of 246

## APPENDIX B
## <u>Licensed Trademarks</u>[1]

AIRMASTER (*for airguns and paintball guns only)
EXPRESS (*for airguns and paintball guns only)
TYRANT (*for airguns and paintball guns only)
R (Stylized)
R DEFENSE Logo
REMINGTON
REMINGTON & Ball Device
REMINGTON (Ball Design)
REMINGTON (Script)
REMINGTON (Stylized and Underlined)
REMINGTON (Stylized)
REMINGTON HTP HIGH TERMINAL PERFORMANCE
REMINGTON HYPERSONIC
REMINGTON in Circle & Underlined
REMINGTON UMC
REMINGTON UMC and Design
REMINGTON UMC and Red Ball Design

---

[1] <u>RS Note to Draft</u>: Parties to agree on any additional trademarks.

# APPENDIX C

## Trademark Usage Guidelines (Relating to the Licensed Trademarks)

1. Use of the Licensed Trademarks should include the appropriate trademark symbol, the ® or ™, in superscript following the most prominent occurrence in the relevant branding context. Every instance of use of a mark in running copy or otherwise must be capitalized, italicized, bolded, or otherwise treated with prominence.

2. Licensee shall clearly indicate on product packaging and advertising and promotional materials, that the Licensed Trademarks are used under license, and that Licensor is not a manufacturer, seller, distributor, or endorser of such products.

3. Licensee shall ensure that the Licensed Trademarks are displayed according to any specifications and/or brand standards which Licensor may provide or amend from time to time. It is Licensee's obligation to understand these restrictions and limitations.

4. Licensee shall not do anything inconsistent with Licensor's ownership of the Licensed Trademarks.

5. The Licensed Trademarks must be reproduced exactly as provided by Licensor. The Licensed Trademarks may not be altered, amended, distorted, or combined with any other symbols, words, images, or designs, and may not be incorporated into a tagline or slogan.

6. Any use of a Licensed Trademark which is not addressed in the guidelines set forth herein, must be approved by Licensor prior to its use. Submittals for approval should be faxed/emailed to the attention of the Licensor representative.

7. Usage of the Licensed Trademarks shall be in strict compliance with those restrictions set forth in that certain Trademark Settlement Agreement by and between Remington Arms Company, Inc. and Remington Products, Inc. dated December 5, 1986.

20 US_ACTIVE-154476691.21

Case 20-81688-CR-1 Doc 295-17 Filed 09/30/22 Entered 09/30/22 13:40:04 Desc
Exhibit RJN 5: Order Approving Round 11 TAPA Page 158 of 246

**APPENDIX D**

**License Summary**

NOTICE OF LICENSE

This document provides notice of a License Agreement (the "License Agreement") by and between [Vista Outdoor Inc.] ("Licensor") and Roundhill Group, LLC ("Licensee"), dated October __, 2020.

The material terms of the License Agreement are set forth below. Any owner of the Licensed Trademarks (as defined below) takes such ownership subject to the rights granted under the License Agreement.

1) Licensor has granted Licensee a non-transferable, exclusive (even as to Licensor), sublicensable, worldwide, royalty free, fully paid-up, right and license to use the trademarks attached hereto as Exhibit A (the "Licensed Trademarks").

2) Licensee has the exclusive right (even as to Licensor) to use the Licensed Trademarks in connection with the manufacture, distribution, advertising, promotion, offer for sale, sale, import, export, servicing, and support of firearms products.

3) The license granted to Licensee pursuant to the terms of the License Agreement does not include the right to use the Licensed Trademarks in connection with the manufacturing, distribution and sale of ammunition products, as well as certain other product categories mutually agreed to by Licensor and Licensee.

4) The license granted under the License Agreement is perpetual unless terminated in accordance with the terms of the License Agreement.

21

**APPENDIX E**

**UNDERTAKING BY LICENSEE'S SUPPLIER(S)**

Licensee shall ensure that its suppliers and sublicensees agree to the following provisions:

**1.** SUPPLIER ACKNOWLEDGES THAT THE TRADEMARKS (THE "PROPERTY RIGHTS") SPECIFIED BY LICENSEE AND/OR LICENSOR FOR USE ON _____ (THE "LICENSED PRODUCTS") ARE THE EXCLUSIVE PROPERTY OF LICENSOR AND ITS AFFILIATES AND THE LICENSED PRODUCTS ARE MADE BY US EXCLUSIVELY FOR LICENSEE AND FOR THE BENEFIT OF LICENSOR AND ITS AFFILIATES.

**2.** SUPPLIER WILL NOT AT ANY TIME CLAIM ANY RIGHT, TITLE OR INTEREST OR IMPAIR THE RIGHTS OF LICENSOR OR ITS AFFILIATES OR LICENSEE IN THE PROPERTY RIGHTS. SUPPLIER AGREES TO EXECUTE SUCH ADDITIONAL UNDERTAKINGS OR OTHER DOCUMENTS AS LICENSOR MAY DEEM APPROPRIATE IN THIS RESPECT.

**3.** SUPPLIER AGREES TO COMPLY WITH ALL LAWS AND REGULATIONS APPLICABLE TO THE MANUFACTURE OF LICENSED PRODUCTS.

**4.** SUPPLIER WILL CARRY OUT ALL QUALITY CONTROL PROCEDURES DESIGNATED BY LICENSEE TO DETERMINE THAT THE LICENSED PRODUCTS CONFORM TO THE QUALITY CONTROL SPECIFICATIONS SPECIFIED BY LICENSOR. SUPPLIER WILL COMPLY WITH ANY GUIDELINES PROVIDED BY LICENSEE OR LICENSOR WITH RESPECT TO THE LICENSED PRODUCTS. ANY PRODUCT NOT MEETING THE PRESCRIBED QUALITY STANDARDS WILL NOT BE SOLD UNDER ANY OF THE PROPERTY RIGHTS.

**5.** SUPPLIER WILL NOT SUBCONTRACT ANY ORDER OR PART THEREOF PLACED BY LICENSEE WITHOUT LICENSEE'S EXPRESS WRITTEN CONSENT.

**6.** UPON NOTICE TO SUPPLIER BY LICENSEE, SUPPLIER WILL PROMPTLY DELIVER OR DESTROY ALL MATERIALS IN SUPPLIER'S POSSESSION BEARING ANY OF THE PROPERTY RIGHTS.

**7.** WITHOUT LICENSOR'S EXPRESS WRITTEN CONSENT, SUPPLIER WILL NOT USE OR AUTHORIZE OTHERS TO USE LICENSOR'S OR ANY OF ITS AFFILIATES' NAMES OR ANY OF THE PROPERTY RIGHTS IN ADVERTISING OR PROMOTING ANY OF SUPPLIER'S ACTIVITIES, PRODUCTS OR SERVICES. NOTWITHSTANDING THE FOREGOING, SUPPLIER SHALL ENSURE THAT A

Case 20-81618-CR 11   Doc 2905-17   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Ground Lease... Exhibit A P20   Page 160 of 246

NOTICE INDICATING THAT THE PROPERTY RIGHTS ARE OWNED BY LICENSOR AND ARE USED UNDER LICENSE, AND THAT LICENSOR IS NOT A MANUFACTURER, ENDORSER, OR SELLER OF THE LICENSED PRODUCTS.

      **8.**     SUPPLIER AGREES AND CONFIRMS THAT LICENSOR HAS THE RIGHT TO ENFORCE THIS UNDERTAKING AGAINST SUPPLIER IN ANY APPROPRIATE LEGAL FORUM INDEPENDENTLY OF LICENSEE.

      **9.**     SUPPLIER'S AGREEMENT WITH LICENSEE SHALL BE CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF DELAWARE, U.S.A. AS APPLIED TO INSTRUMENTS EXECUTED AND PERFORMED IN DELAWARE.

Case 20-81688-CR11    Doc 2405-7    Filed 09/30/22    Entered 09/30/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Rule 2004 - Page 161 of 246

ASSET PURCHASE AGREEMENT

BY AND AMONG

HUNTSMAN HOLDINGS, LLC

AS BUYER,

REMINGTON OUTDOOR COMPANY, INC.

AND EACH OF THE OTHER SELLERS SET FORTH ON THE SIGNATURE PAGES
HERETO,

EFFECTIVE AS OF SEPTEMBER 25, 2020

# TABLE OF CONTENTS

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS ................................. 66

    Section 1.1        Transfer of Acquired Assets ....................................... 66
    Section 1.2        Excluded Assets ....................................................... 77
    Section 1.3        Assumption of Liabilities........................................... 1010
    Section 1.4        Retention of Liabilities .............................................. 1010
    Section 1.5        Assumed License Agreements...................................... 1212
    Section 1.6        Non-Assignment of Acquired Assets............................ 1313
    Section 1.7        Further Conveyances and Assumptions......................... 1313
    Section 1.8        Conflicts with Other Bidders ...................................... 1414

ARTICLE 2. CONSIDERATION .................................................................................. 1414

    Section 2.1        Consideration ......................................................... 1414
    Section 2.2        Good Faith Deposit ................................................. 1414

ARTICLE 3. CLOSING AND DELIVERIES.................................................................. 1515

    Section 3.1        Closing ................................................................. 1515
    Section 3.2        Sellers' Deliveries ................................................... 1515
    Section 3.3        Buyer's Deliveries .................................................. 1616

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ............................................... 1717

    Section 4.1        Representations and Warranties of Sellers .................... 1717
    Section 4.2        Representations and Warranties of Buyer...................... 1818
    Section 4.3        Warranties Exclusive; Schedules................................. 2020
    Section 4.4        Survival of Representations and Warranties................... 2020

ARTICLE 5. COVENANTS OF THE PARTIES .............................................................. 2121

    Section 5.1        Covenants of Sellers ................................................ 2121
    Section 5.2        Covenants of Buyer.................................................. 2222

ARTICLE 6. ADDITIONAL AGREEMENTS ................................................................ 2323

    Section 6.1        Bankruptcy Matters ................................................. 2323
    Section 6.2        Transitional Arrangements......................................... 2424
    Section 6.3        Further Assurances.................................................. 2424

ARTICLE 7. TAXES................................................................................................... 2424

    Section 7.1        Taxes Related to Purchase of Assets ............................ 2424
    Section 7.2        Cooperation on Tax Matters ...................................... 2525
    Section 7.3        Allocation of Purchase Price...................................... 2525

ARTICLE 8. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ............. 2626

    Section 8.1        Conditions Precedent to Performance by Sellers........... 2626
    Section 8.2        Conditions Precedent to Performance by Buyer............. 2626

ARTICLE 9. TERMINATION...................................................................................... 2727

    Section 9.1        Conditions of Termination ......................................... 2727
    Section 9.2        Effect of Termination; Remedies................................. 2828

ARTICLE 10. MISCELLANEOUS ......................................................................... 2929

    Section 10.1      Successors and Assigns........................................................ 2929
    Section 10.2      Governing Law; Jurisdiction.............................................. 2929
    Section 10.3      WAIVER OF JURY TRIAL................................................. 3030
    Section 10.4      Expenses............................................................................. 3030
    Section 10.5      Broker's and Finder's Fees ................................................ 3030
    Section 10.6      Severability ....................................................................... 3030
    Section 10.7      Notices............................................................................... 3130
    Section 10.8      Amendments; Waivers........................................................ 3131
    Section 10.9      Time of Essence................................................................. 3231
    Section 10.10    Public Announcements ....................................................... 3232
    Section 10.11    Entire Agreement............................................................... 3232
    Section 10.12    Parties in Interest.............................................................. 3232
    Section 10.13    Bulk Sales Laws................................................................ 3232
    Section 10.14    Construction...................................................................... 3232
    Section 10.15    Counterparts and Facsimile............................................... 3333

ARTICLE 11. DEFINITIONS ............................................................................... 3333

    Section 11.1      Certain Terms Defined....................................................... 3333
    Section 11.2      All Terms Cross-Referenced.............................................. 4040

## SCHEDULES

Section 1.1(b)   -   Owned Trademarks
Section 1.1(c)   -   Owned Intellectual Property
Section 1.5(a)   -   Executory Contracts
Section 1.5(b)   -   Estimated Cure Amount
Section 4.1(g)   -   Intellectual Property
Section 11.1(a)  -   Business Names / Tradenames

## EXHIBIT

Exhibit 1        -   Bidding Procedures Order

4

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), effective as of September 25, 2020 (the "Effective Date"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (with ROC, each a "Seller" and, collectively, the "Sellers") and Huntsman Holdings, LLC, a Delaware limited liability company ("Buyer"). Buyer and the Sellers are sometimes referred to herein, individually, as a "Party" and, collectively, as the "Parties".

## *RECITALS*

A.    On July 27, 2020 (the "Petition Date"), Sellers filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court" and the case arising under such petition, the "Bankruptcy Case").

B.    Pursuant to the Sellers' Bankruptcy Case, Buyer desires to purchase from Sellers certain Trademarks and certain other Intellectual Property, in each case, related to or associated with Sellers' Remington brand, logos, Business Names, Copyrights and Trademarks (collectively, the "Remington Brand"), described in greater detail herein as the Acquired Assets, free and clear of any and all Liens, Claims and Interests (other than Permitted Liens), except for assumption of the Assumed Liabilities, and Sellers desire to sell, convey, assign and transfer to Buyer, the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

C.    Buyer does not desire to purchase from Sellers any other assets or liabilities, which are described in greater detail herein as the Excluded Assets and Excluded Liabilities, and Sellers do not desire to sell, convey, assign or transfer any such Excluded Assets or Excluded Liabilities to Buyer.

D.    Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Sellers.

E.    The Acquired Assets and Assumed Liabilities are assets and liabilities of Sellers to be sold to and assumed by Buyer pursuant to an order of the Bankruptcy Court, in form and substance acceptable to Buyer, approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "Sale Order"), which order will include the authorization for the assumption by Sellers and assignment to Buyer of certain executory contracts and unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code. The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

## *STATEMENT OF AGREEMENT*

NOW, THEREFORE, in consideration of the foregoing and their respective

Case 20-81688-CRJ11    Doc 2905-7    Filed 09/30/20    Entered 09/30/20 13:40:04    Desc
Exhibit RJN 5: Order Approving Page 5 of APA    Page 166 of 246

representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE 1. <u>PURCHASE AND SALE OF THE ACQUIRED ASSETS</u>.

Section 1.1    <u>Transfer of Acquired Assets</u>.  At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Sellers shall sell to Buyer, and Buyer shall acquire from Sellers, all of Sellers' right, title and interest in and to the following assets, free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities) (the "<u>Acquired Assets</u>"):

(a)    an agreement, in form and substance reasonably satisfactory to Buyer and SIG Sauer, pursuant to which Buyer will receive from SIG Sauer a license for the use of certain Remington Brand-related Trademarks, which are not Owned Trademarks, for Buyer's continued use in segments of the Business outside of the Ammunitions Business following the Closing (the "<u>SIG Sauer License</u>");

(b)    the Trademarks set forth on <u>Section 1.1(b)</u> of the Disclosure Schedules (the "<u>Owned Trademarks</u>");

(c)    all other Intellectual Property, not used primarily in the Ammunitions Business, which is set forth on Section 1.1(c) of the Disclosure Schedules, owned or purported to be owned by any Sellers or any of their respective Subsidiaries constituting or associated with the Remington Brand, primarily used or primarily held for use in the operation of the Business, and any and all corresponding rights, including in any Contracts related to the development or creation of such Intellectual Property provided herein, in respect thereof that, now or hereafter, may be secured throughout the world, including, in each case, all moral rights and goodwill associated therewith (the Intellectual Property described in this clause (c), together with the Owned Trademarks, the "<u>Owned Intellectual Property</u>");

(d)    all licenses, sublicenses, or similar rights, permissions or franchises to use any Owned Intellectual Property, including all licenses, sublicenses, contract rights, permits or franchises with respect thereto (the "<u>Assumed License Agreements</u>"), and any and all corresponding rights in respect thereof that, now or hereafter, may be secured throughout the world, including, in each case, all moral rights and goodwill associated therewith (the "<u>Licensed Intellectual Property</u>" and, together with the Owned Intellectual Property, collectively, the "<u>Acquired Intellectual Property</u>");

(e)    all proceeds and recoveries from policies (but not, for the avoidance of doubt, any Insurance Policies themselves) to the extent attributable to any of the Acquired Assets only to the extent in respect of period on or after the Effective Date ("<u>Assumed Policy Rights</u>");

(f)    Claims held by Sellers that relate to the Acquired Assets and/or Assumed Liabilities;

(g)    to the extent permitted by applicable Law (and other than all Books and Records of Sellers held by Sellers or their counsel related to litigation or Claims for the Excluded

6

Liabilities), all Books and Records that are used in, held for use in or intended to be used in, or that reasonably relate to, the Acquired Assets or the Assumed Liabilities; provided, that Buyer shall provide Sellers with reasonable access (during business hours with reasonable prior notice and without cost to Sellers) to the same following the Closing to the extent reasonably necessary to permit Sellers to wind-down and liquidate their estate after the Closing; provided, further, that Buyer shall provide any other buyer of Sellers' lines of business or assets pursuant to the auction contemplated by the Bidding Procedures Order (an "Other Buyer") with reasonable access at such Other Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then-applicable COVID Restrictions) to the same to the extent reasonably related to the assets of Sellers purchased by such Other Buyer; and provided, further, that Sellers and each such Other Buyer shall keep such information confidential in accordance with this Agreement and all requirements of applicable Law (or in the case of any such Other Buyer, a confidentiality agreement reasonably acceptable to Buyer);

(h)     all rights and title to the shares of capital stock (and any other equity interests or rights convertible into equity interests) (the "RLC Shares") of Remington Licensing Corporation, a Delaware corporation, that are owned by RA Brands, L.L.C., a Delaware limited liability company (provided, that, Buyer reserves the right, in its sole discretion to assign to a third party or classify the assets described in this subsection (h) as an Excluded Asset at any time prior to the Closing Date; provided, however, that such assignment or classification of such assets as Excluded Assets shall not result in a reduction to the Purchase Price contained herein);

(i)     all goodwill and other intangible assets associated with the Acquired Intellectual Property;

(j)     all contents of the Ilion, NY Remington Arms Museum including all artwork and firearms of every nature which are owned by Sellers, including but not limited to all antique, collectible, and historic firearms owned by Sellers whether located at the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere; and

(k)     all antiques, collectibles, and historic firearms, including all artwork or firearms of every nature, owned by Sellers whether or not considered part of the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere.

Section 1.2     Excluded Assets.  Notwithstanding any provision to the contrary in Section 1.1, the Acquired Assets shall not include the following properties, Contracts, Leases, and other assets, interests and rights of Sellers (all such items not being acquired by Buyer being referred to in this Agreement as the "Excluded Assets"):

(a)     the Marlin brand, and all Intellectual Property (i) owned or used by Sellers in connection with the ownership, operation and/or management of the Business, other than the Acquired Intellectual Property, however used or held for use in the operation of the Business (including, for example, Trademarks related solely to a Non-Core Brand) and (ii) licensed to

7

Sellers in connection with the ownership, operation and/or management of the Business, other than the Acquired Intellectual Property, however used or held for use in the operation of the Business, including, in each case, all moral rights and goodwill associated therewith;

(b)    all Owned Real Property;

(c)    all Leases and all Leasehold Improvements of Sellers located on Leased Real Property;

(d)    all Contracts of the Business, except to the extent an Assumed License Agreement or if the transfer of a Contract would otherwise be required to transfer the Acquired Assets;

(e)    all of Sellers' owned or leased equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property and any rights to any warranties and licenses received from manufacturers and sellers related thereto;

(f)    all of Sellers' leased or owned cars, trucks and other motor vehicles and all rights to the warranties and licenses received from manufacturers and sellers related thereto;

(g)    all right, title and interest in and to all inventory, raw materials, works in process, parts (including spare and replacement parts), subassemblies, supplies and finished goods;

(h)    all servers, computers, hardware, networks, data communication lines, routers, hubs, switches and all other information technology equipment, and all associated documentation owned, leased, or used (or held for use) by Sellers;

(i)    all trade and non-trade accounts receivable, notes receivable and negotiable instruments of Sellers;

(j)    all sales orders or other commitments of Sellers to purchasers of goods, services or products produced, marketed or sold by the Business;

(k)    all outstanding purchase orders or other commitments of Sellers to suppliers of goods and services for materials, supplies or other items;

(l)    all Employee Liabilities;

(m)    all Employee Benefit Plans, together with all funding arrangements relating thereto (including, but not limited to, all assets, trusts, insurance policies and administration service contracts related thereto);

(n)    that certain Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan, as amended from time to time the "Pension Plan");

(o)    subject to Section 1.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving

8

effect to the entry of the Sale Order and any other Final Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent, such consent to transfer, assumption or assignment has not been effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities pursuant to Section 1.4(a));

(p)     all cash and cash equivalents held by Sellers, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities, in each case as of immediately prior to the Closing (and including without limitation (i) the Good Faith Deposit, (ii) the Net Closing Cash Payment, (iii) any fee reserves or escrows established by Sellers, and (iv) any cash in the Dominion Account (as defined in the Priority Term Loan)), in each case other than to the extent constituting an Acquired Asset;

(q)     all rights of every nature and description (other than Assumed Policy Rights) under or arising out of all insurance policies of Seller (the "Insurance Policies"), including without limitation (i) with respect to Claims arising prior to the Effective Date (ii) to the extent of coverage of any Excluded Liabilities, (iii) under those Insurance Policies covering any tort liabilities that are not Assumed Liabilities, (iv) under the D&O Insurance, and (v) under those Insurance Policies covering liabilities and Claims against Seller and its affiliates relating to the Excluded Employee Liabilities;

(r)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes for any Straddle Period, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(s)     except for the RLC Shares, all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller;

(t)     all Books and Records (i) which Sellers are required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that Sellers shall provide Buyer with access to the same following the Closing to the extent relating to the Acquired Assets and when requested by Buyer (at no cost to Buyer); (ii) exclusively relating to any Excluded Asset or Excluded Liability; and (iii) held by Sellers or Sellers' counsel relating to any litigation against any Seller or the Employee Liabilities;

(u)     any rights of Sellers under this Agreement or any Ancillary Agreement to which a Seller is a party, including, without limitation, any rights relating to the Purchase Price;

(v)     all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

(w)     all claims and remedies of Sellers under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code (each, an "Avoidance Action"); and

9

Case 20-81688-CRJ11    Doc 2405-7    Filed 09/08/22    Entered 09/08/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Revised APA    Page 170 of 246

(x)     Claims held by Sellers against any party that are covered by, relate to or are based upon any Insurance Policies (including the D&O Insurance).

Section 1.3     Assumption of Liabilities.  At the Closing, Buyer shall assume, and Buyer agrees to thereafter pay, perform and discharge when due, and indemnify, defend and hold harmless Sellers, their Affiliates and all of their respective Related Persons from and against, (a) all liabilities arising out of ownership of the Acquired Assets by Buyer after the Closing to the extent such liabilities arise solely out of any matter, occurrence, action, omission or circumstance that first occurred or existed after the Closing and (b) all pre-petition cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code solely in connection with the assumption and assignment of the Assumed License Agreements including the cost of obtaining consents in respect thereof (the "Cure Amount").

Section 1.4     Retention of Liabilities.  Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Sellers (all such liabilities and obligations not being assumed herein referred to as the "Excluded Liabilities").  Sellers and their Affiliates shall pay, perform and discharge when due each of the Excluded Liabilities, and indemnify, defend and hold harmless Buyer, its Affiliates and all of its Related Persons from and against, any and all liabilities, Claims and obligations arising out of or relating to the ownership, operation or management of the Excluded Assets and the Excluded Liabilities.  The Excluded Liabilities include, without limitation, the following:

(a)     all liabilities and obligations arising out of, relating to or otherwise in respect of the Acquired Assets arising prior to the Closing;

(b)     all liabilities and obligations under or relating to or otherwise arising, whether before, on or after Closing, out of, or in connection with, any of the Excluded Assets;

(c)     all liabilities and obligations under that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022) (the "UMWA"), as amended or otherwise modified from time to time;

(d)     all liabilities and obligations under the Pension Plan;

(e)     all liabilities and obligations relating to any withdrawal from a "multiemployer plan", as defined in Section 3(37) of ERISA;

(f)     all liabilities and obligations related to the Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses, to the extent applicable, for any action resulting from Employees' separation of employment prior to or on the Closing Date;

(g)     all liabilities arising under (i) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Sellers, as amended or

10

otherwise modified from time to time, (ii) that certain note issued by Sellers to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000 and (iii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Sellers in favor of the City of Huntsville;

(h)　all liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time;

(i)　all liabilities and obligations of Sellers under or relating to the DIP Facility, Priority Term Loan, the FILO Facility, the Exit Term Loan, the Intercompany Note or any other indebtedness (including all intercompany indebtedness among the Sellers and all guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit), except to the extent expressly included as an Assumed Liability;

(j)　all liabilities and obligations with respect to employment or other provision of services, compensation, severance, benefits or payments of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller (or any beneficiary or dependent of any such individual), whether or not employed by Buyer or any of its Affiliates after the Closing, that (i) arises out of or relates to the employment, service provider or other relationship between any Seller and any such individual, including but not limited to the termination of such relationship; (ii) arises out of or relates to any Employee Benefit Plan; or (iii) arises out of or relates to events or conditions occurring on or before the Closing Date;

(k)　all liabilities and obligations for Pre-Closing Taxes;

(l)　all liabilities and obligations in respect of drafts or checks outstanding at the Closing;

(m)　all liabilities and obligations under any futures contracts, options on futures, swap agreements or forward sale agreements;

(n)　all liabilities and obligations arising out of or relating to any business, asset or property formerly owned or operated by Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by Sellers;

(o)　all liabilities and obligations of Sellers arising under or incurred in connection with the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which any Seller is a party and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(p)　all liabilities and obligations of, and Claims against, Sellers arising from and in connection with grants of restricted common unit/share awards and stock options by Sellers; and

(q)　any liabilities and obligations of Sellers under this Agreement, or under any Ancillary Agreement to which a Seller is a party.

11

Section 1.5    Assumed License Agreements.

(a)    Section 1.5(a) of the Disclosure Schedules sets forth a list of all executory Contracts to which, to Sellers' Knowledge, one or more Seller is party and which are to be included in the Assumed License Agreements. From and after the Effective Date until two (2) Business Days prior to Closing, subject to the limitations set forth in <u>Section 1.5(e)</u>, Sellers shall make such deletions to Section 1.5(a) of the Disclosure Schedules as Buyer shall, in its sole discretion, request in writing. Any such deleted Contract shall be deemed to no longer be an Assumed License Agreement. From and after the Effective Date until two (2) Business Days prior to Closing, Sellers shall make such additions to Section 1.5(a) of the Disclosure Schedules as Buyer shall reasonably request in writing. All Contracts of Sellers that are not listed on Section 1.5(a) of the Disclosure Schedules shall not be considered an Acquired Asset and shall instead be deemed "<u>Rejected Contracts</u>."

(b)    Buyer may request certain modifications and amendments to any Contract as a condition to such Contract becoming an Assumed License Agreement, and Sellers shall use their commercially reasonable efforts to obtain such modifications or amendments. If Sellers are unable to obtain such modifications or amendments, Buyer may, in its sole discretion, subject to the limitations set forth in <u>Section 1.5(e)</u>, designate the Contract as a Rejected Contract. At such time as is specified in the Sale Order, pursuant to Section 365 of the Bankruptcy Code, Sellers shall take all actions required to assume and assign to Buyer (other than payment of Cure Amounts, which Cure Amounts shall be Assumed Liabilities) and Buyer shall assume from Sellers, the Assumed License Agreement. The Cure Amount shall be paid by Buyer, in each case as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order and this Agreement. Section 1.5(b) of the Disclosure Schedules contains Sellers' good faith estimate of the Cure Amount as of the Closing Date. Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, if at the time of the Closing there is a pending dispute over the Cure Amount associated with any Assumed License Agreement, Buyer may, in its sole discretion and at any time whether before or after the Closing, deem any such Contract subject to the dispute a Rejected Contracts and, will not be responsible for any costs associated with the applicable Rejected Contract.

(c)    As of the date hereof, Sellers have timely served the motion seeking entry of the Sale Order to all parties to Contracts. Subject to Section 1.6 and the performance of Buyer's obligations in Section 5.2, Sellers shall use commercially reasonable efforts to cause the Assumed License Agreement to be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and Sellers shall comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign and delegate to Buyer all of Sellers' rights and obligations under the Assumed License Agreement.

(d)    Notwithstanding any provision in this Agreement to the contrary, if for any reason Buyer fails to pay the Cure Amount in respect of any Assumed License Agreement when due and payable pursuant to this Agreement, the Sale Order or any other Order of the Bankruptcy Court, (i) Sellers shall be under no obligation whatsoever to pay or otherwise satisfy such Cure Amount or any other liability or obligation under such Assumed License Agreement, (ii) Buyer shall indemnify and hold harmless Sellers in respect of such Cure Amount, liability or obligation as well as any expenses (including legal fees and expenses) reasonably incurred by Sellers in

12

defending any claim for payment of the Cure Amount or any other liability or obligation arising under such Contract asserted by the counterparty thereto and (iii) Sellers may reject, and nothing in this Agreement shall prohibit Sellers from rejecting, such Contract.

(e)     Notwithstanding any provision in this Agreement to the contrary, at any time prior to the date of a final hearing to approve the sale of the Acquired Assets, Buyer may designate in writing to Seller any Contract or Lease as an Excluded Liability, only if the rejection of such Contract or Lease would not give rise to a Claim in favor of the counterparty thereto having administrative priority or any other priority senior to a general unsecured Claim against the bankruptcy estate of Sellers (the "Qualifying Excluded Contracts and Leases"); provided, that, for the avoidance of doubt, a Contract or Lease shall be considered a Qualifying Excluded Contract and Lease, and Buyer may reject such a Contract or Lease, if Buyer agrees to pay the entire amount of such Claim giving rise to an administrative priority or other priority senior to a general unsecured Claim against the bankruptcy estate of Sellers. Sellers may reject, and nothing in this Agreement shall prohibit Seller from rejecting, the Qualifying Excluded Contracts and Leases.

Section 1.6     Non-Assignment of Acquired Assets.     Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer, and shall not effect the assignment or transfer of any Acquired Asset, if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Sellers (each such action, a "Necessary Consent"), would constitute a breach thereof (after giving effect to any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent.  In such event, the Parties will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Sellers thereunder so that Buyer would not in fact receive all such rights, the Parties will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to Sellers or Buyer, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Sellers would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Sellers' obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Sellers thereunder.

Section 1.7     Further Conveyances and Assumptions.  At the Closing, and from time to time thereafter, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate

to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Sellers and their successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

Section 1.8    Conflicts with Other Bidders.  In the event of any conflict between this Agreement and any other bidder or bidders for Sellers' assets relating to the Acquired Assets or the Assumed Liabilities as defined herein in the applicable asset purchase agreement or agreements by and between Sellers and such other bidder or bidders (an "Other APA"), Buyer shall cooperate in good faith with any such other bidder or bidders, whether before or after the Closing Date, to ensure that all assets or liabilities are appropriately apportioned between Buyer and such bidder or bidders in order to reflect the intent of Buyer and any such other bidder or bidders under this Agreement and each applicable Other APA.

## ARTICLE 2. CONSIDERATION

Section 2.1    Consideration.  The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets (the "Purchase Price") shall be:

(a)    Thirty Five Million United States Dollars (US $35,000,000) (such amount, the "Gross Closing Cash Payment"), to be adjusted pursuant to Section 2.2(b), and paid and delivered in accordance with Section 3.3(a), which shall be allocated as follows:

(i)    (A) Ten Million Five Hundred Thousand United States Dollars (US $10,500,000), if there is a "going concern" buyer, as shall be determined by Sellers in their sole discretion, of the Sellers' Ilion, New York facility that assumes the CBA (the "Going Concern Buyer"), in order for such Going Concern Buyer to fund modernization costs of the Ilion, New York facility; or (B) Fifteen Million United States Dollars (US $15,000,000) in the event there is no Going Concern Buyer, as shall be determined by Seller in its sole discretion, of the Sellers' Ilion, New York facility, eligible employees of Sellers under the CBA, for the payment of all severance obligations and termination benefits and the employer portion of payroll taxes in respect of such severance obligations and termination benefits (the applicable amount escrowed pursuant to clause (A) or (B), the "Escrowed Amount"); provided, that, if the applicable Escrowed Amount is not used in full by the Going Concern Buyer or by Sellers in satisfaction of all severance-related benefits for employees of Sellers under the CBA, as applicable, such remaining Escrowed Amount shall be released to Sellers as amount payable to the estate;

(ii)    the remaining portion of the Gross Closing Cash Payment, allocated to Sellers; and

(b)    assumption of the Assumed Liabilities (including, without limitation, payment of the Cure Amount).

Section 2.2    Good Faith Deposit.

14

(a)     On or prior to the execution and delivery of this Agreement by Buyer, Buyer shall pay to Sellers the amount of Three Million Five Hundred Thousand United States Dollars (US $3,500,000) by wire transfer of immediately available funds (the "Good Faith Deposit").  The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Sellers or Buyer and shall be deposited in a segregated deposit account of Sellers and held in trust to be administered solely in accordance with the terms of this Agreement and the Bidding Procedures Order attached hereto as Exhibit 1 (the "Bidding Procedures").  Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b)     If the Closing occurs, the Gross Closing Cash Payment shall be reduced by the amount of the Good Faith Deposit (such resulting amount, the "Net Closing Cash Payment"), to be paid and delivered in accordance with Section 3.3(a).

(c)     If this Agreement is terminated pursuant to Section 9.1, the Good Faith Deposit shall be repaid to Buyer or retained by Sellers in the amounts and at the times set forth in Section 9.2 hereof.

## ARTICLE 3.  CLOSING AND DELIVERIES

Section 3.1     Closing.  Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Pacific Time, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in Article 8 of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by the Parties, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "Closing Date").

Section 3.2     Sellers' Deliveries.  At the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(a)     all of the Acquired Assets, together with one or more duly executed bills of sale, endorsed certificates of title and other evidence of transfer and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller;

(b)     one or more duly executed assignment and assumption agreements for the Assumed License Agreements, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer (each, an "Assignment and Assumption Agreement");

(c)     one or more duly executed assignments of (i) the trademark and patent registrations and applications included in the Acquired Intellectual Property registered in the name of Sellers, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States), (ii) the Internet domain name registrations and

Case 20-81688-CRJ11   Doc 2405-7   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Bidding Procedures Part A    Page 176 of 246

applications included in the Acquired Intellectual Property registered in the name of Sellers, in a form suitable for filing with all applicable domain name registries, and (iii) general assignments of all other Acquired Intellectual Property, in each case in form and substance customary for transactions of this nature and reasonably acceptable to Buyer, an any additional documents required to effectuate the assignment (each, an "Acquired Intellectual Property Assignment");

(d)     the officer's certificate required to be delivered pursuant to Section 8.2(a) and Section 8.2(b);

(e)     a duly executed Asset Purchase Agreement entered into by and between Seller and by SIG Sauer Inc. ("SIG Sauer" and such Asset Purchase Agreement, the "SIG Sauer APA") in connection with the auction held under the Bidding Procedures Order; and

(f)     one or more affidavits executed by Sellers, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that each Seller is not a foreign person within the meaning of Section 1445(f)(3) and Section 1446 of the Code.

Section 3.3     Buyer's Deliveries.  At the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(a)     cash in an amount equal to the Net Closing Cash Payment, by wire transfer of immediately available funds to the U.S. bank account or accounts of Sellers identified by Sellers in writing reasonably in advance of the Closing;

(b)     one or more duly executed Assignment and Assumption Agreements;

(c)     one or more duly executed Acquired Intellectual Property Assignments;

(d)     the officer's certificate required to be delivered pursuant to Section 8.1(a) and Section 8.1(b);

(e)     the SIG Sauer License;

(f)     if applicable, one or more agreements, in form and substance reasonably satisfactory to Buyer and the Going Concern Buyer, pursuant to which, among other things, Buyer will grant Going Concern Buyer a license for the use of certain Remington Brand-related Trademarks for Going Concern Buyer to manufacture firearms and firearms products to Buyer and other customers, retailers and sellers in the Firearms Business following the Closing, which license will terminate upon the earliest to occur of Going Concern Buyer's failure to (i) continue the manufacture of Remington firearms at the Ilion, New York facility, (ii) employ an agreed upon number of UMWA employees and (iii) meet minimum financial covenants  (the "Going Concern Buyer License"); and

(g)     such other documents, instruments and certificates as Sellers may reasonably request to transfer, assign and delegate the Assumed Liabilities to Buyer in accordance with terms and conditions hereof.

16

Case 20-81688-CRJ11   Doc 2906-27   Filed 09/30/22   Entered 09/30/22 13:40:04   Desc
Exhibit RJN 5: Order Approving Remington AFA   Page 177 of 246

ARTICLE 4. <u>REPRESENTATIONS AND WARRANTIES</u>

Section 4.1   <u>Representations and Warranties of Sellers</u>.  Each Seller represents and warrants to Buyer as follows:

(a)   <u>Corporate Organization</u>.  Each Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of incorporation or formation.  Subject to any necessary authority from the Bankruptcy Court, each Seller has the requisite corporate or limited liability company power and authority to use, own and operate the Acquired Assets and to carry out its obligations under this Agreement.  Each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)   <u>Authorization and Validity</u>.  Each Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement has been duly authorized by all necessary corporate or limited liability company action by the boards of directors or managers of each Seller, and no other corporate or limited liability company proceedings are necessary for the performance by each Seller of its obligations under this Agreement or the consummation by such Seller of the transactions contemplated by this Agreement.  This Agreement has been duly and validly executed and delivered by each Seller and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, is a valid and binding obligation of each Seller enforceable against such Seller in accordance with its terms.

(c)   <u>No Conflict or Violation</u>.  Neither the execution and delivery by any Seller of this Agreement or any of the Ancillary Agreements to which any Seller is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order), the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements, nor compliance by such Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any material breach of any provision of the respective certificates of incorporation or formation of such Seller or the by-laws or operating agreements of such Seller, or (y) materially violate any provision of law, regulation, rule or other legal requirement of any Governmental Authority ("<u>Law</u>") or any order, judgment or decree of any court or Governmental Authority ("<u>Order</u>") applicable to such Seller, any of such Seller's Affiliates or any of their respective properties or assets.

(d)   <u>Title and Ownership</u>.  Sellers have good and valid title to, or right by license, lease or other agreement to use, the Acquired Assets.  Subject to the entry of the Sale Order, at the Closing, Sellers will have the right to transfer, and Buyer will acquire good and marketable title to, in and under, the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

(e)    <u>Compliance with Law</u>. (i) Sellers have operated the Business in material compliance with all applicable Laws, and (ii) except as may result from the Bankruptcy Case,

17

Sellers have not received written notice of any violation of any applicable Laws, nor are Sellers in default with respect to any Order applicable to the Acquired Assets.

(f) License Agreements. As of the Effective Date, other than as set forth on Section 4.1(f) of the Disclosure Schedules or in motions or other pleadings or similar items filed with the Bankruptcy Court, no Seller nor, to such Seller's Knowledge, any other party to any of the Assumed License Agreements has commenced any action against any of the parties to such Assumed License Agreements or given or received any written notice of any material default or violation under any Assumed License Agreement that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assumed License Agreements). Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assumed License Agreements is, and will be at the Closing, valid, binding and in full force and effect against each Seller, except as otherwise set forth on Section 4.1(f) of the Disclosure Schedules.

(g) Intellectual Property. Section 4.1(g) of the Disclosure Schedules sets forth an accurate and complete list of all Acquired Intellectual Property. The Sellers are the sole and exclusive owners of the Owned Intellectual Property free and clear of all Liens pursuant to the Sale Order. Except as limited by section 365(c)(1)(A) of the Bankruptcy Code, Sellers own all right, title and interest to, or are valid licensees with respect to, the Acquired Intellectual Property, and, at Closing, will convey the Acquired Intellectual Property to Buyer free and clear of Liens pursuant to the Sale Order. To the Sellers' Knowledge, (i) no Person is engaging in any activity that infringes, dilutes, misappropriates or violates any Acquired Intellectual Property and (ii) no claim has been asserted to any Seller that the use of any Acquired Intellectual Property or the operation of the Business infringes, dilutes, misappropriates or violates the Intellectual Property of any third party

Section 4.2 Representations and Warranties of Buyer. Buyer represents and warrants to each Seller as follows:

(a) Corporate Organization. Buyer is an entity duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation. Buyer has the requisite power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b) Qualification to do Business. Buyer is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which Buyer is a party.

(c) Authorization and Validity. Buyer has the requisite corporate power and authority necessary to enter into this Agreement and each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder. The execution and

Case 20-31660-CMR-11 Doc 2405-7 Filed 09/30/22 Entered 09/30/22 13:47:04 Desc
Exhibit RJN 5: Order Approving Sale of 17A Page 179 of 246

delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby. This Agreement and each of the Ancillary Agreements to which Buyer is a party have been duly and validly executed and delivered by it and are valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

(d)      No Conflict or Violation.  Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

(e)      Consents and Approvals.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Governmental Authority or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)      Adequate Assurances Regarding Assumed License Agreements.  Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed License Agreements.

(g)      Financial Capability.  Buyer currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor to Sellers of the Purchase Price (including the Cure Amount), and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(h)      Investigation by Buyer.  Buyer has conducted its own independent review and analysis of the Acquired Assets and the Assumed Liabilities, operations, technology, assets, liabilities, financial condition and prospects of the Business as carried on by Sellers and acknowledges that Sellers have provided Buyer with reasonable access to the personnel, properties, premises and records for this purpose.  Buyer has conducted its own independent

19

review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations, warranties and covenants of Sellers contained herein and in the Ancillary Agreements, and Buyer (i) acknowledges that none of Sellers or their Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in Section 4.1 and Section 10.5 (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Sellers, their Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding misrepresentation or concealment arising from actual fraud of Sellers) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Sellers set forth in this Agreement, except, with regard to Sellers, for the representations and warranties contained in Section 4.1 and Section 10.5 and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3     <u>Warranties Exclusive; Schedules</u>.

(a)     The representations and warranties contained in Article 4 and Section 10.5 are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed. Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, SELLERS AND THEIR RESPECTIVE AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, OR (C) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS.

(b)     The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

Section 4.4     <u>Survival of Representations and Warranties</u>. None of the representations or warranties of Sellers set forth in this Agreement or in any certificate delivered pursuant to Section 8.2(a) and Section 8.2(b) shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement and each Ancillary Agreement shall survive in accordance with their respective terms).

Case 20-81688-CRJ11 Doc 2405-7 Filed 09/30/22 Entered 09/30/22 13:40:04 Desc
Exhibit RJN 5: Order Approving Page 181 of 246

# ARTICLE 5. COVENANTS OF THE PARTIES

Section 5.1    Covenants of Sellers.  Each Seller covenants as follows:

(a)    Commercially Reasonable Efforts.  Between the Effective Date and the Closing Date, Seller shall use commercially reasonable efforts to, and, as applicable, cause its Affiliates and Related Persons to, (i) obtain all Necessary Consents, waivers, authorizations and approvals of all Governmental Authorities, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party; (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements; and (iii) maintain and preserve the Acquired Assets substantially in accordance with Sellers' current practices and procedures.

(b)    Access to Properties and Books and Records; Confidentiality.  Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to Article 9) to all Books and Records of Seller relating to the Acquired Assets and the Assumed Liabilities.  Upon reasonable prior notice, Seller shall also afford Buyer reasonable access during normal business hours, to all Acquired Assets, and to Sellers' executive officers, accountants, counsel, Employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 9).  The rights of access contained in this Section 5.1(b) are granted subject to, and on, the following terms and conditions:  (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Sellers or their agents or representatives (whether pursuant to this Section 5.1(b) or otherwise) will be governed and protected by the Confidentiality Agreement, dated as of July 29, 2020 by and between Out O' Site, LLC and ROC (the "Confidentiality Agreement"); and (iii) such rights of access shall not affect or modify the conditions set forth in Article 8 in any way.

(c)    Operation of the Business.  Except (i) as otherwise contemplated or permitted by this Agreement or the Ancillary Agreements, (ii) with the prior consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or (iii) in connection with any Order relating to the Bankruptcy Case, between the Effective Date and the Closing Date, Sellers shall, and, as applicable, cause their Affiliates and Related Persons to, (A) use commercially reasonable efforts to safeguard and maintain the Acquired Assets in their condition as of the Effective Date (except for ordinary wear and tear) and prevent any destruction thereof or material damage thereto between the Effective Date and the Closing Date and (B) notify Buyer of any notices relating to or proposed changes affecting Sellers' Assumed Policy Rights covering any of the Acquired Assets.  Notwithstanding the foregoing, nothing in this Agreement shall restrict Seller from rejecting any (x) Contract or Lease that is not an Assumed License Agreement or (y) Qualifying Excluded Contracts and Leases.

(d)    Discontinuation of Remington Brand by Non-Core Brand Buyer. Sellers agree that for any of Non-Core Brand that Sellers assign, sell or convey to a third party on or after

21

the Effective Date, Sellers will require the buyer of any such Non-Core Brand to discontinue all use of any Remington Brand Trademarks, whether registered or common-law, on any product, marketing materials, promotional items, websites, manufacturing facilities, service offerings, trade name, trademarks, and all other business-related materials that include, incorporate, reference or use the Trademark within ninety (90) days of the date of the executed purchase agreement for such Non-Core Brand. Sellers acknowledge and agree that Buyer will be an express third-party beneficiary of the covenant imposed on the buyer of the Non-Core Brand in any sale, assignment or transfer agreement executed by any Seller and such buyer.

Section 5.2    Covenants of Buyer.  Buyer covenants as follows:

(a)    Commercially Reasonable Efforts.    Buyer shall use all commercially reasonable efforts to (i) obtain all consents and approvals of all Governmental Authorities, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    Adequate Assurances Regarding Assumed License Agreements.    With respect to each Assumed License Agreement, Buyer shall provide adequate assurance of the future performance of such Assumed License Agreement by Buyer; provided that, for clarity the failure to provide adequate assurance shall not be a breach of this Section 5.2(b) if Buyer has undertaken reasonable efforts to provide such assurance.  Buyer agrees that it will promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

(c)    Cure of Defaults.    Buyer shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed License Agreement for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing, then immediately following the entry of such Order, cure any and all defaults under the Assumed License Agreement, including paying the applicable Cure Amount, which defaults are required to be cured under the Bankruptcy Code, so that such Assumed License Agreement may be assumed by Sellers and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d)    Released Claims.  Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired Assets to the extent such Claims have been released by or on behalf of Sellers or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise, or (ii) pursue, prosecute or assert any rights related to any Avoidance Actions or Claims against Employees, officers of directors of Sellers, including by way of offset or recoupment.

22

Case 20-81688-CRJ11    Doc 2405-7    Filed 09/30/22    Entered 09/30/22 13:40:04    Desc
Exhibit RJN 5: Order Approving Bing Page 22 of 47A    Page 183 of 246

(e)     Discontinuation of Non-Core Brand Trademarks. Within ninety (90) days after assignment of the Owned Trademarks has been recorded at each of the respective worldwide trademark offices, Buyer agrees that it will file a Notice of Abandonment for any Trademarks that include both the Remington Brand and a Non-Core Brand and Buyer agrees that it will not seek registration, use, or license to or for any Non-Core Brand for any purpose thereafter.

ARTICLE 6. ADDITIONAL AGREEMENTS

Section 6.1     Bankruptcy Matters.

(a)     Backup Bidder.  In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction.  Notwithstanding anything to the contrary in this Agreement, Sellers may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the inventory and the other assets of Sellers, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)     Notice to Holders of Liens, Claims and Interests.  Sellers have provided notice of the Sale to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)     Entry of Sale Order.  Sellers have filed or will file with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order.  The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement (including any Assumed License Agreement), Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability.  The Parties shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement and the Ancillary Agreements, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and the Ancillary Agreements.  In the event that any Orders of the Bankruptcy Court relating to this Agreement and the Ancillary Agreements shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), the Parties will cooperate in determining and pursuing the response to any such appeal, petition or motion and the Parties shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.  For purposes of this Section 6.1(c) only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

23

Case 20-81688-CRJ11   Doc 2905-7   Filed 09/30/22   Entered 09/30/22 13:24:04   Desc
Exhibit RJN 5: Order Approving Bidding Procedures Exhibit 4-A   Page 184 of 246

Section 6.2    Transitional Arrangements.

(a)    Access Covenant.  Upon reasonable request from Sellers, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will following the Closing Date provide to Sellers, and the accountants, counsel and representatives of Sellers, including any administrator of the Plan or Sellers' estate, such access to the pre-closing books and records as are reasonably necessary to permit Sellers to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation of claims and making of distributions contemplated under the Plan.  Such services will include (i) reasonable access to Buyer's personnel, information technology systems and books and records and (ii) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Sellers engaged in such wind-down and liquidation process.  Buyer will provide such services free of any charges, fees or rents, provided that Sellers will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Sellers' employees engaged in the liquidation).

(b)    Transitional License.  Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days, Buyer shall, without limitation to the terms of the SIG Sauer License or the Going Concern Buyer License, grant Sellers a non-exclusive, royalty-free, non-transferrable, non-extendable right and license to use the Acquired Intellectual Property, including the Business Names, solely in connection with the wind-down and liquidation of Sellers' estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.  Thereafter, Sellers shall, and shall cause their Affiliates, to cease all further use of the Acquired Intellectual Property and Business Names, including with respect to company names.

Section 6.3    Further Assurances.  At the request and the sole expense of the requesting Party, Buyer or Sellers shall, at any time after the Closing Date, execute and deliver such documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

ARTICLE 7. TAXES.

Section 7.1    Taxes Related to Purchase of Assets.  All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Sellers as a result of the sale of the Acquired Assets (collectively, "Transaction Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(c) of the Bankruptcy Code, shall be paid by Buyer.  The Parties agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement and the Ancillary Agreements, and Buyer agrees to reasonably

24

Case 20-81688-CRJ11  Doc 2405-7  Filed 09/30/22  Entered 09/30/22 13:47:04  Desc
Exhibit RJN 5: Order Approving Page 24 of 47A    Page 185 of 246

assist Sellers in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 7.2     <u>Cooperation on Tax Matters</u>.

(a)     The Parties agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)     From and after the Closing Date, Buyer agrees that it will provide access to Sellers and their attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to the Books and Records relating to the Acquired Assets or the Assumed Liabilities as Sellers may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases of Sellers under Chapter 11 of the Bankruptcy Code. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities.

(c)     Sellers shall prepare and file all Income Tax Returns of Sellers, whether or not such Tax Returns are required to be filed prior to or after the Closing Date, and Sellers shall timely pay all Taxes reflected on such Tax Returns.

Section 7.3     <u>Allocation of Purchase Price</u>. Promptly (and in any event within ninety (90) days) following the Closing Date, Sellers shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "<u>Allocation</u>"). The Parties will cooperate to resolve any disputes regarding the Allocation and to file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement. If the Parties are not able to agree to the Allocation within forty-five (45) days after receipt of such Allocation by Sellers, the Parties shall retain an independent accounting firm (the "<u>Independent Accounting Firm</u>") to resolve their dispute. The determination of the Independent Accounting Firm shall be final and binding on all parties hereto. The cost of the Independent Accounting Firm shall be shared equally by Sellers, on the one hand, and Buyer, on the other hand. In the event that the Allocation is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation. No Party will take any position that is contrary to or inconsistent with the Allocation for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns).

Case 20-81169-CRJ11 Doc 2405-7 Filed 09/08/22 Entered 09/08/22 13:47:04 Desc
Exhibit RJN 5: Order Approving Page 25 of 47 A Page 186 of 246

ARTICLE 8. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES</u>.

Section 8.1    <u>Conditions Precedent to Performance by Sellers</u>.  The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in Section 8.1(c)) may be waived by Sellers in their sole discretion:

(a)    <u>Representations and Warranties of Buyer</u>.    All representations and warranties made by Buyer in Section 4.2 and Section 10.5 shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Sellers shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity, to that effect.

(b)    <u>Performance of the Obligations of Buyer</u>.  Buyer shall have performed, in all material respects, all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Sellers shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity, to that effect.

(c)    <u>Consents and Approvals</u>. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)    <u>Cure of Defaults</u>.  At or prior to the Closing, Buyer shall have cured, or made arrangements, reasonably satisfactory to Sellers, to promptly cure, any and all defaults under the Assumed License Agreements that are required to be cured under the Bankruptcy Code, so that such Assumed License Agreements may be assumed by Sellers and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(f)    <u>SIG Sauer Closing</u>.  The Closing, as defined in the SIG Sauer APA, shall have been consummated.

(g)    <u>Buyer's Deliveries</u>.  Buyer shall have delivered to Seller all of the items set forth in Section 3.3.

Section 8.2    <u>Conditions Precedent to Performance by Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which

26

(other than the conditions contained in Section 8.2(c)) may be waived by Buyer in its sole discretion:

(a)    <u>Representations and Warranties of Sellers</u>.  All representations and warranties made by Sellers in Section 4.1 and Section 10.5 shall be accurate in all material respects on and as of the Closing Date as if again made by Sellers on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of each Seller, solely in such capacity, to that effect.

(b)    <u>Performance of the Obligations of Sellers</u>.  Sellers shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of each Seller, solely in such capacity, to that effect.

(c)    <u>Consents and Approvals</u>. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)    <u>Sellers' Deliveries</u>.  Sellers shall have delivered to Buyer all of the items set forth in Section 3.2.

ARTICLE 9. <u>TERMINATION</u>.

Section 9.1    <u>Conditions of Termination</u>.  This Agreement may be terminated at any time before the Closing:

(a)    By mutual written consent of Sellers and Buyer;

(b)    By Sellers, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "<u>Warranty Termination Date</u>"), if the condition contained in Section 8.1(a) has not been satisfied or waived; provided, however, that Sellers shall not have the right to terminate this Agreement under this Section 9.1(b) if Sellers are then in material breach of this Agreement;

(c)    By Sellers, by notice to Buyer, if Sellers have previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant; <u>provided</u>, <u>however</u>, that Sellers shall not have the right to terminate this Agreement under this Section 9.1(c) if Sellers are then in material breach of this Agreement;

(d)     By Sellers, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Approval Termination Date"), if any condition contained in Section 8.1(c) or Section 8.1(d) has not been satisfied or waived; provided, however, that Sellers shall not have the right to terminate this Agreement under this Section 9.1(d) if Sellers are then in material breach of this Agreement;

(e)     By Buyer, by notice to Sellers, on or after the Warranty Termination Date, if the condition contained in Section 8.2(a) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 9.1(e) if Buyer is then in material breach of this Agreement;

(f)     By Buyer, by notice to Sellers, if Buyer has previously provided Sellers with written notice of a failure to perform any material covenant of Sellers contained in this Agreement and Sellers have failed within five (5) days after such notice to perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 9.1(f) if Buyer is then in material breach of this Agreement;

(g)     By Buyer, by notice to Sellers, after the Approval Termination Date, if any condition contained in Section 8.2(c) or Section 8.2(d) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 9.1(g) if Buyer is then in material breach of this Agreement;

(h)     By Buyer, by notice to Sellers, or by Sellers, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)     By Sellers, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 60 calendar days after the Petition Date;

(j)     By Buyer or Seller, on notice to the other, if the SIG Sauer APA is validly terminated in accordance with its terms; and

(k)     Automatically, subject to the payment of the Break Fee, upon the earlier of (i) Sellers consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction.

Section 9.2     Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 9.1, this Agreement shall become null and void and have no effect (other than Article 9, Article 10 and Article 11, which shall survive termination), with no liability on the part of Sellers or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 10.4, (ii) the obligation of Buyer under Section 6.1(a) and (iii) any liability provided for in Section 9.2, inclusive.

28

(b)     If this Agreement is terminated pursuant to Section 9.1(a), Section 9.1(d), Section 9.1(e), Section 9.1(f), Section 9.1(g), Section 9.1(h), Section 9.1(i), Section 9.1(j) and Section 9.1(k), then the Good Faith Deposit shall, within three (3) Business Days, be returned by Sellers to Buyer.

(c)     If this Agreement is terminated pursuant to Section 9.1(b) or Section 9.1(c), then Sellers may, at its sole election within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee").

(d)     Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article 6 (if the Closing shall have occurred) (i) Sellers' entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Sellers retain such amount, then notwithstanding anything to the contrary contained herein, such Break Fee shall be the sole and exclusive remedy available to Sellers and any other Person against Buyer, their Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) and the Break Fee shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Sellers, their Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Sellers, their Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby. Each Party acknowledges that the agreements contained in this Section 9.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

ARTICLE 10. MISCELLANEOUS.

Section 10.1     Successors and Assigns.  Prior to the Closing, no Party shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other Parties, and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided that Buyer wishes may assign its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to an Affiliate without Sellers' prior written consent.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 10.2     Governing Law; Jurisdiction.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Sellers are

no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

Section 10.3 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 10.3.

Section 10.4 <u>Expenses</u>. Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated. For all purposes under this Agreement, unless otherwise specified in the applicable clause, any obligation of Sellers to exercise commercially reasonable efforts shall not require the incurrence of any out-of-pocket expenses by Sellers.

Section 10.5 <u>Broker's and Finder's Fees</u>. Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than, in the case of Sellers, Ducera Partners, and in the case of Buyer, Moelis & Company, whose respective fees and expenses shall, as between the parties to this Agreement, be the responsibility of Sellers or Buyer, as applicable, and, to such party's knowledge, no other broker or other Person is entitled to any commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 10.6 <u>Severability</u>. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 10.7    <u>Notices</u>.

(a)    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Sellers:

> Remington Outdoor Company, Inc.
> 100 Electronics Blvd., SW
> Huntsville, Alabama 35824
> Attention: Ken D'Arcy
> Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

> O'Melveny & Myers LLP
> 400 South Hope Street
> Los Angeles, California  90071
> Attention: John A. Laco, Esq., and Stephen H. Warren, Esq.
> Phone: (213) 430-6544 and (213) 430-7875, respectively
> Email: jlaco@omm.com and swarren@omm.com, respectively

If to Buyer:

> Huntsman Holdings, LLC
> c/o King & Spalding LLP
> 353 N. Clark St., 12th Floor
> Chicago, IL 60654
> Contacts: Matt Warren & Keith Townsend
> Email: mwarren@kslaw.com; ktownsend@kslaw.com

(b)    Any party may change its address for the purpose of this Section 10.7 by giving the other party written notice of its new address in the manner set forth above.

Section 10.8    <u>Amendments; Waivers</u>.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing

31

Case 20-81688-CRJ11   Doc 2405-7   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Page 192 of 246

waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 10.9 <u>Time of Essence</u>. Time is of the essence in the performance of each and every term of this Agreement.

Section 10.10 <u>Public Announcements</u>. Promptly after the execution and delivery of this Agreement, the Parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein. Thereafter, no Party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing Party agrees to give the nondisclosing Party prior notice of, and an opportunity to comment on, the proposed disclosure. Notwithstanding anything to the contrary in this Section 10.10, Sellers (a) shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equityholders and lenders to the extent required by the provisions of any of Sellers' bylaws or other governing documents, credit agreements and other contractual obligations in effect as of the date of this Agreement.

Section 10.11 <u>Entire Agreement</u>. This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

Section 10.12 <u>Parties in Interest</u>. Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Parties and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to the Parties. This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against the Parties.

Section 10.13 <u>Bulk Sales Laws</u>. The Parties waive compliance with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

Section 10.14 <u>Construction</u>. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties hereto and no presumptions or

32

burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement.  Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form.  As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

Section 10.15  <u>Counterparts and Facsimiles</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.  Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

## ARTICLE 11. <u>DEFINITIONS</u>.

Section 11.1  <u>Certain Terms Defined</u>.  As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"<u>Alternative Transaction</u>" means any transaction or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale, transfer, license, lease or other disposition of the Business or any of the Acquired Assets, or any right or interest therein, to an acquiror other than Buyer (other than sales of inventory in the Ordinary Course of Business).

"<u>Ancillary Agreements</u>" means, collectively, the Assignment and Assumption Agreements, the SIG Sauer APA, the SIG Sauer License, the Going Concern Buyer License, Acquired Intellectual Property Assignments and other certificates, affidavits and releases delivered pursuant to Article 3.

"<u>Books and Records</u>" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"<u>Business</u>" means the design, manufacture, distribution, marketing and sale of (a) ammunitions and related components and accessories under the Remington Brand and Barnes brands and Trademarks (the "<u>Ammunitions Business</u>"); (b) sporting and hunting firearms, including shotguns and rifles, and related components and accessories under the Remington and Dakota Arms brands and Trademarks; (c) handguns, tactical, military and defense firearms including under the Bushmaster, DPMS, Tapco and AAC brands and Trademarks (clauses (b) and (c), together, the "<u>Firearms Business</u>"); and (d) apparel, accessories, cleaning solutions and supplies under the Business Names and other Trademarks and trade names.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or

33

Case 20-81688-CRJ11   Doc 2405-7   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Bidding Procedures   Page 194 of 246

other governmental action to close.

"Business Names" means "Remington" either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trade mark, corporate name, service mark and domain name, social media including without limitation those set forth on Section 11.1(a) of the Disclosure Schedules, and any confusingly similar variation, derivative or transaction thereof.

"CBA" means that certain Collective Bargaining Agreement between Remington Arms Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"Claims" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or unasserted actions against Sellers or any of their Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Sellers are a party; provided that Contracts do not include any Lease for Leased Real Property or any employment or similar Contracts.

"D&O Insurance" means the policy in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Sellers, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"DIP Facility" means any debtor-in-possession financing advanced to Sellers in the Bankruptcy Case.

"Disclosure Schedules" means the Disclosure Schedules delivered by Sellers concurrently with the execution and delivery of this Agreement.

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies or arrangements that provide for compensation for employee benefits as to which Sellers have any obligation or liability, contingent or otherwise.

"Employee Liabilities" means all liabilities of Sellers to or with respect to all Employees whenever arising and liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Sellers.

"Employees" means all individuals, as of the Effective Date, who are employed by Sellers (including employees who are absent due to vacation, family leave, short-term disability, COVID 19-related furloughs or absences or other approved leave of absence) in connection with the ownership, operation and management of the Business.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exit Term Loan" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"FILO Facility" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction

that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"Governmental Authority" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents thereof.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

"Income Tax Return" means any Tax Return with respect to Income Taxes.

"Intellectual Property" means (a) all intellectual property arising from or in respect of the following: (i) all letters patent, applications for letters patent, statutory invention registrations, registered designs, drawings, and similar or equivalent rights in inventions, designs and drawings, issued patents and patent applications therefore in the United States Patent and Trademark Office, the World Intellectual Property Organization, or any similar office or agency in any other jurisdiction, including continuations, divisionals, provisionals, continuations, continuations-in-part, renewals, extensions, substitutions, restorations, reexaminations, reissues or extensions of patent applications and patents issuing thereon ("Patents"), (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, source identifier, business identifier, Internet domain names, corporate names, and designs and general intangibles of a like nature, including the Business Names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency in the United States, any State thereof, or any other jurisdiction, and all extensions or renewals of any of the foregoing ("Trademarks"), (iii) any copyrights, any copyrightable work, any work of authorship, any moral rights related to any of the foregoing, any registration or recording of any copyright, copyrightable work or work of authorship, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and any renewal of any of the foregoing ("Copyrights"), (iv) all Software of Sellers, (v) confidential information, rights in data and databases, know-how, trade secrets and inventions (whether patentable or not), and (vi) all other intellectual property, (b) Sellers' rights pursuant to any Contract with Remington Licensing Corporation and (c) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of Sellers' rights or interests in intellectual property that is not an Excluded Asset and any related remedies, including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including, without limitation,

36

security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"<u>Knowledge</u>" or any other similar term or knowledge qualification means, with respect to Sellers, the actual knowledge, after reasonably inquiry of the applicable personnel, of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement.

"<u>Leased Real Property</u>" means all leasehold or subleasehold estates and other rights of Sellers to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property, in each of the foregoing cases, to the extent possessed, used or occupied in connection with the Business.

"<u>Leasehold Improvements</u>" means all buildings, structures, improvements and fixtures that are owned by Sellers and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"<u>Leases</u>" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Sellers have the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"<u>Lien</u>" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; and (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy or use of an asset.

"<u>Material Adverse Effect</u>" means a state of facts, event, change or effect on the value of the Acquired Assets that results in (a) a material adverse effect on Sellers ability to timely perform its obligations under the Agreement and the Ancillary Agreements and to timely consummate the transactions contemplated hereby and thereby or (b) a material and adverse effect on the value of the Acquired Assets taken as a whole, but for the purposes of clause (b) hereto excludes any state of facts, event, change or effect caused by events, changes or developments relating to (i) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy

37

Case; (ii) any action of Sellers taken pursuant to, or any failure of Sellers to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which a Seller is a party; (iii) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby; (iv) changes, after the Effective Date, in United States generally accepted accounting principles; (v) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Sellers operate the Business; (vi) changes in the firearms, ammunition or sporting goods industries in general; or (vii) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared); provided, however, that any fact, event, occurrence, or effect referred to in clauses (v) and (vi) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"Non-Core Brands" means, collectively, "Bushmaster", "DPMS", "Tapco", "AAC", "Dakota", "H&R", "Para Ordnance" and "Nesika" either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trade mark, corporate name, service mark and domain name.

"Ordinary Course of Business" means, with respect to any Person, the ordinary course of business consistent with past practice, including in respect of timing, frequency and magnitude, of such Person on or prior to the date hereof.

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Sellers and used in the ownership, operation or management of the Business.

"Permitted Liens" mean: (a) Liens and Interests consisting of (i) current Taxes and assessments, Liens for Taxes that are not yet delinquent or that are being contested in good faith, reservations in patents, and all easements, rights-of-way, encumbrances, Liens, covenants, conditions, restrictions, obligations, liabilities and other matters as may appear on record, and similar matters that would be disclosed by an accurate ALTA/ACSM survey of the Owned Real Property, and (ii) the applicable zoning and use regulations or other Laws of any Governmental Authority; (b) purchase money Liens securing payments under capital lease arrangements; (c) all terms, conditions and restrictions under any Permit; (d) Liens that will attach to the proceeds of the sale under this Agreement pursuant to Section 363 of the Bankruptcy Code or that will not survive the Closing and (e) Liens that Buyer agrees in writing to accept.

"Person" means any means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, joint venture, trust, association, union, entity, or other form of business organization or any Governmental Authority.

"Plan" means a Joint Chapter 11 Plan filed by Sellers with the Bankruptcy Court.

"Pre-Closing Taxes" means any Taxes paid, payable, or that become payable, in connection with Sellers or any of their Affiliates or relating to the Business (other than any excise taxes (whether or not deferred)), in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Priority Term Loan" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"Public Software" means any software that contains, or is derived in any manner (in whole or in part) from, any software that is distributed as free software, "copyleft," open source code software (e.g., Linux) or similar licensing or distribution models, including software licensed or distributed under any of the following licenses or distribution models, or licenses or distribution models similar to any of the following: (a) GNU General Public License (GPL) or Lesser/Library GPL (LGPL), (b) the Artistic License, (c) the Mozilla Public License, (d) the Netscape Public License, (e) the Sun Community Source License (SCSL), (f) the Sun Industry Standards Source License (SISSL), (g) the BSD License, (h) the Apache License, or (i) any other license described by the Open Source Initiative as set forth at www.opensource.org.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Books and Records related to any of the foregoing.

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise (whether or not deferred), franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and "Tax" shall mean any one of them.

Section 11.2    All Terms Cross-Referenced. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Acquired Assets | Section 1.1 |
| Acquired Intellectual Property | Section 1.1(a) |
| Acquired Intellectual Property Assignment | Section 3.2(c) |
| Affiliate | Section 11.1 |
| Agreement | Preamble |
| Allocation | Section 7.3 |
| Alternative Transaction | Section 11.1 |
| Ammunitions Business | Section 11.1 |
| Approval Termination Date | Section 9.1(d) |
| Assumed Liabilities | Section 1.3 |
| Assumed License Agreements | Section 1.1(a) |
| Assumed Policy Rights | Section 1.1(e) |
| Avoidance Actions | Section 1.2(w) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bidding Procedures | Section 2.2(a) |
| Books and Records | Section 11.1 |
| Break Fee | Section 9.2(c) |
| Business | Section 11.1 |
| Business Day | Section 11.1 |
| Business Names | Section 11.1 |
| Buyer | Preamble |
| Claims | Section 11.1 |
| Closing | Section 3.1 |
| Closing Date | Section 3.1 |
| Code | Section 11.1 |

Case 20-816668-CRJ11   Doc 2905-27   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Page 40 of 47A   Page 201 of 246

Confidentiality Agreement..................................................................Section 5.1(b)
Contract................................................................................................. Section 11.1
Copyrights ............................................................................................ Section 11.1
Cure Amount........................................................................................... Section 1.3
Disclosure Schedules ........................................................................... Section 11.1
Effective Date ..........................................................................................*Preamble*
Employee Benefit Plans ...................................................................... Section 11.1
Employee Liabilities ..........................................................................Section 1.2(d)
Employees ............................................................................................. Section 11.1
Environmental Laws ............................................................................ Section 11.1
ERISA ................................................................................................... Section 11.1
Escrowed Amounts ......................................................................... Section 2.1(a)(i)
Excluded Assets ...................................................................................... Section 1.2
Insurance Policies ...............................................................................Section 1.2(q)
Excluded Liabilities ............................................................................... Section 1.4
Final Order ........................................................................................... Section 11.1
Firearms Business ............................................................................... Section 11.1
Going Concern Buyer ...................................................................... Section 2.1(a)(i)
Going Concern Buyer License ......................................................... Section 3.3(f)
Good Faith Deposit ............................................................................Section 2.2(a)
Governmental Authority ..................................................................... Section 11.1
Gross Closing Cash Payment ...........................................................Section 2.1(a)
Independent Accounting Firm ............................................................. Section 7.3
Intellectual Property ............................................................................ Section 11.1
Intercompany Note ............................................................................... Section 11.1
Interests ................................................................................................ Section 11.1
Inventory .............................................................................................Section 1.2(g)
Jefferson River .........................................................................................*Recitals*
Jefferson River APA ................................................................................*Recitals*
Law .....................................................................................................Section 4.1(c)
Leased Real Property .......................................................................... Section 11.1
Leasehold Improvements .................................................................... Section 11.1
Leases ................................................................................................... Section 11.1
Licensed Intellectual Property .........................................................Section 1.1(a)
Lien ....................................................................................................... Section 11.1
Material Adverse Effect ...................................................................... Section 11.1
Necessary Consent ............................................................................... Section 1.6
Net Closing Cash Payment ...............................................................Section 2.2(b)
Non-Core Brand.................................................................................... Section 11.1
Order .................................................................................................Section 4.1(c)
Ordinary Course of Business .............................................................. Section 11.1
Other APA .............................................................................................. Section 1.8
Owned Intellectual Property ............................................................Section 1.1(c)
Owned Real Property .......................................................................... Section 11.1
Owned Trademarks...........................................................................Section 1.1(a)
Party or Parties .......................................................................................*Preamble*

41

Patents .................................................................................................... Section 11.1
Pension Plan .................................................................................... Section 1.2(n)
Person .................................................................................................. Section 11.1
Plan ...................................................................................................... Section 11.1
Pre-Closing Income Taxes .................................................................. Section 11.1
Priority Term Loan ............................................................................. Section 11.1
Public Software ................................................................................... Section 11.1
Purchase Price ....................................................................................... Section 2.1
Qualifying Excluded Contracts and Leases ...................................... Section 1.5(e)
RA Brands ........................................................................................ Section 1.1(g)
Rejected Contract ............................................................................. Section 1.5(a)
Related Person .................................................................................... Section 11.1
Remington Brand ..................................................................................... *Recitals*
RLC Shares ....................................................................................... Section 1.1(h)
ROC ......................................................................................................... Preamble
Sale Order ............................................................................................... *Recitals*
Sellers ..................................................................................................... *Preamble*
SIG Sauer ......................................................................................... Section 3.2(e)
SIG Sauer APA ................................................................................. Section 3.2(e)
SIG Sauer License ............................................................................ Section 3.3(e)
Knowledge ......................................................................................... Section 11.1
Software .............................................................................................. Section 11.1
Sporting and Hunting Business .......................................................... Section 11.1
Subsidiary(ies) ................................................................................... Section 11.1
Tax Return ........................................................................................... Section 11.1
Taxes .................................................................................................... Section 11.1
Trademarks .......................................................................................... Section 11.1
Transaction Taxes .................................................................................. Section 7.1
UMWA .............................................................................................. Section 1.4(c)
Warranty Termination Date .............................................................. Section 9.1(b)

Case 20-81688-CR11 Doc 2905-7 Filed 09/30/22 Entered 09/30/22 12:47:04 Desc
Exhibit RJN 5: Order Approving Appendix A Page 203 of 246

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER:**

HUNTSMAN HOLDINGS, LLC

By: _____
    Name:
    Title:

**SELLERS:**

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By: _____
    Name:
    Title:

**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By:_____
    Name:
    Title:

FGI HOLDING COMPANY, LLC

By: _____
    Name:
    Title:

BARNES BULLETS, LLC

By: _____
    Name:
    Title:

REMINGTON ARMS COMPANY, LLC

By: _____
    Name:
    Title:

RA BRANDS, L.L.C.

By: _____
    Name:
    Title:

OUTDOOR SERVICES, LLC

By: _____
    Name:

Title: _____

FGI FINANCE INC.

By: _____
    Name: _____
    Title: _____

HUNTSVILLE HOLDINGS LLC

By: _____
    Name: _____
    Title: _____

TMRI, INC.

By: _____
    Name: _____
    Title: _____

REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
    Name: _____
    Title: _____

32E PRODUCTIONS, LLC

By: _____
    Name: _____
    Title: _____

GREAT OUTDOORS HOLDCO, LLC

By: _____

Name:
Title:

**EXHIBIT 1**

Bidding Procedures Order

ASSET PURCHASE AGREEMENT

by and among

CENTURY ARMS, INC.

as Buyer,

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.,

as Seller

Dated as of September 25, 2020

# TABLE OF CONTENTS

Page

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS ................................... 5

    Section 1.1      Transfer of Acquired Assets ........................................... 5
    Section 1.2      Excluded Assets ............................................................... 5
    Section 1.3      Assumption of Liabilities ............................................... 7
    Section 1.4      Retention of Liabilities .................................................. 7
    Section 1.5      Assumed Leases and Assumed Contracts; Cure Amount ................... 7
    Section 1.6      Non-Assignment of Acquired Assets ............................. 7
    Section 1.7      Further Conveyances and Assumptions ....................... 7

ARTICLE 2. CONSIDERATION ....................................................................................... 8

    Section 2.1      Consideration .................................................................. 8
    Section 2.2      Good Faith Deposit ........................................................ 8
    Section 2.3      Post-Closing Inventory Adjustment ............................... 9

ARTICLE 3. CLOSING AND DELIVERIES ..................................................................... 10

    Section 3.1      Closing ........................................................................... 10
    Section 3.2      Seller's Deliveries ......................................................... 10
    Section 3.3      Buyer's Deliveries ......................................................... 11

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ............................................... 11

    Section 4.1      Representations and Warranties of Seller ..................... 11
    Section 4.2      Representations and Warranties of Buyer ..................... 12
    Section 4.3      Warranties Exclusive; Schedules ................................. 14
    Section 4.4      Survival of Representations and Warranties ................. 14

ARTICLE 5. COVENANTS OF THE PARTIES ............................................................... 14

    Section 5.1      Covenants of Seller ....................................................... 14
    Section 5.2      Covenants of Buyer ...................................................... 15

ARTICLE 6. ADDITIONAL AGREEMENTS ................................................................... 16

    Section 6.1      Bankruptcy Matters ...................................................... 16
    Section 6.2      Transition Arrangements ............................................... 17
    Section 6.3      Further Assurances ....................................................... 17

ARTICLE 7. [*RESERVED*] ............................................................................................ 17

ARTICLE 8. TAXES ......................................................................................................... 17

    Section 8.1      Taxes Related to Purchase of Assets ............................ 17
    Section 8.2      Cooperation on Tax Matters .......................................... 18
    Section 8.3      Allocation of Purchase Price ........................................ 19

ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ................. 19

    Section 9.1      Conditions Precedent to Performance by Seller ........... 19
    Section 9.2      Conditions Precedent to Performance by Buyer ........... 20

ARTICLE 10. TERMINATION ......................................................................................... 20

Section 10.1     Conditions of Termination ................................................ 20
Section 10.2     Effect of Termination; Remedies .................................... 21

ARTICLE 11. MISCELLANEOUS ............................................................ 22

Section 11.1     Successors and Assigns.................................................... 22
Section 11.2     Governing Law; Jurisdiction........................................... 23
Section 11.3     WAIVER OF JURY TRIAL ........................................... 23
Section 11.4     Expenses ......................................................................... 23
Section 11.5     Broker's and Finder's Fees ............................................. 23
Section 11.6     Severability .................................................................... 23
Section 11.7     Notices ............................................................................ 24
Section 11.8     Amendments; Waivers .................................................... 25
Section 11.9     Time of Essence .............................................................. 25
Section 11.10    Specific Performance ...................................................... 25
Section 11.11    Public Announcements .................................................... 26
Section 11.12    Entire Agreement ............................................................ 26
Section 11.13    Parties in Interest............................................................ 26
Section 11.14    Bulk Sales Laws .............................................................. 26
Section 11.15    Construction .................................................................... 26
Section 11.16    Counterparts and Facsimile............................................. 27

ARTICLE 12. DEFINITIONS.................................................................... 27

Section 12.1     Certain Terms Defined.................................................... 27
Section 12.2     All Terms Cross-Referenced........................................... 32

**SCHEDULE**

Schedule 1.1      -    Inventory Asset Register

**EXHIBIT**

Exhibit 1      -    Bidding Procedures Order

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of September 25, 2020 (the "<u>Effective Date</u>"), is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("<u>ROC</u>"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (collectively with ROC, "<u>Seller</u>"), and Century Arms, Inc. ("<u>Buyer</u>"). Capitalized terms used in this Agreement are defined or cross-referenced in <u>Article 12</u>.

## *RECITALS*

A.      Seller is engaged in the manufacture and sale of firearms and ammunition at various locations in the United States (the "<u>Business</u>"), and owns various assets related to the Business. On July 27, 2020 (the "<u>Petition Date</u>") Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Alabama (the "<u>Bankruptcy Court</u>" and the case arising under such petition, the "<u>Bankruptcy Case</u>").

B.      On the Petition Date, Seller filed a Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets (the "<u>Bidding Procedures Motion</u>") pursuant to which Seller sought, and the Bankruptcy Court approved, the Bidding Procedures Order attached hereto as Exhibit 1 (the "<u>Bidding Procedures Order</u>").

C.      Buyer desires to purchase the Acquired Assets free and clear of Liens, Claims and Interests, and Seller desires to sell, convey, assign and transfer the Acquired Assets to Buyer, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

D.      Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Seller.

E.      The Acquired Assets are assets of Seller, which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "<u>Sale Order</u>"), all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code. The consummation of the transactions set forth in this Agreement is subject, among other things, to the entry of the Sale Order.

Case 20-81688-CRJ11   Doc 2406-37   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Page 4 of 38A    Page 212 of 246

## STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS.

Section 1.1    Transfer of Acquired Assets.  At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens, Claims and Interests other than Permitted Liens.  For all purposes under this Agreement, the term "Acquired Assets" shall mean certain of Seller's finished goods inventory of Remington brand sporting and hunting firearms, including shotguns, handguns and rifles, and related components and accessories (which, for the avoidance of doubt and subject to Section 2.3(a), may include some or all of those assets set forth on Schedule 1.1), and notwithstanding anything to the contrary in this Agreement, Seller shall not be restricted by any provision of this Agreement from making sales of finished goods or other inventory to any person other than Buyer.

Section 1.2    Excluded Assets.  Notwithstanding any provision to the contrary in Section 1.1, the Excluded Assets shall mean all assets of Seller other than the Acquired Assets, and  shall specifically exclude the following properties, Contracts, Leases, and other assets, interests and rights of Seller (all such items not being acquired by Buyer being referred to in this Agreement as the "Excluded Assets"):

(a)    any right, title or interest of any Person other than Seller in any property or asset, or Seller's right, title and interest in, to and under properties and assets not used in connection with the ownership, operation and/or management of the Business;

(b)    all rights of every nature and description under or arising out of (including rights to refunds or adjustments relating to, and proceeds and recoveries from) all insurance policies of Seller(collectively, the "Excluded Insurance Policies");

(c)    any asset that is not owned or leased by Seller or not used or held for use in connection with the ownership, operation and management of the Business;

(d)    any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that Seller shall provide Buyer with reasonable access to the same following the Closing to the extent relating to the Acquired Assets and when reasonably requested by Buyer;

(e)    all (i) prepaid premiums in respect of all Excluded Insurance Policies, (ii) retainers, prepayments or on-account cash paid to Seller's professionals and advisors, including any carve-out under any DIP Facility or cash collateral arrangements (whether retained in the

5

Bankruptcy Case or otherwise), and (iii) other deposits, prepaid charges and expenses paid by Seller to the extent in connection with or relating to any Excluded Asset;

(f)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes for any Straddle Period, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(g)     all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller entity;

(h)     all Documents exclusively relating to any Excluded Asset;

(i)     all Documents exclusively relating to any Employees who do not become Transferred Employees; provided that, to the extent permitted by applicable Law, Seller shall make copies of such Documents available to Buyer if reasonably related to addressing or defending any such Employees' claims against Buyer;

(j)     subject to Section 1.6, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been effected or excused;

(k)     all Employee Benefit Plans and all assets of, and Contracts exclusively relating to or associated with such plans;

(l)     all Cash and all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(m)     any rights of Seller under this Agreement or any Ancillary Agreement to which Seller is a party, including without limitation any rights relating to the Purchase Price;

(n)     copies of all Historic Firearms Books and Records of Seller;

(o)     all Documents of Seller held by Seller or Seller's counsel relating to any litigation against Seller;

(p)     the D&O Insurance, and all proceeds thereof;

(q)     all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

(r)     any properties, Contracts, Leases, or other assets, interests and rights of Seller that do not relate to the ownership, operation or management of the Business;

(s)     all Avoidance Actions;

6

(t)     Claims held by Seller against any party that are covered by, relate to or are based upon any Excluded Insurance Policy or the D&O Insurance; and

(u)     all other assets of the Seller other than the Acquired Assets.

Section 1.3     <u>Assumption of Liabilities</u>.  Buyer shall not assume any of Seller's liabilities or obligations of whatever nature, whether presently in existence or arising hereafter.

Section 1.4     <u>Retention of Liabilities</u>.

**THIS SECTION INTENTIONALLY DELETED.**

Section 1.5     <u>Assumed Leases and Assumed Contracts; Cure Amount</u>.

**THIS SECTION INTENTIONALLY DELETED.**

Section 1.6     <u>Non-Assignment of Acquired Assets</u>.     Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof (after giving effect to any waiver by the applicable counterparty, or any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent.  In such event, Seller and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; <u>provided</u>, <u>however</u>, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to Seller or Buyer, under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Seller would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Seller's obligations, any and all rights of Seller thereunder.

Section 1.7     <u>Further Conveyances and Assumptions</u>.

(a)     Seller shall deliver to Buyer at the Closing all Documents included in the Acquired Assets.

7

(b)     At the Closing, and from time to time thereafter, Seller and Buyer shall, and Seller and Buyer shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

Section 1.8     Conflicts with Other Bidders.     In the event of any conflict regarding the Acquired Assets between this Agreement and agreements governing other sales of the Seller's assets in the Bankruptcy Case (the "Other Agreements") defined herein or therein, Buyer shall cooperate in good faith with any other purchasers of Seller's assets pursuant to the Other Agreements, whether before or after the Closing Date, to ensure all assets or liabilities are adequately apportioned between the parties in order to reflect the intent of Buyer and any such other purchasers hereunder and thereunder.

## ARTICLE 2. CONSIDERATION

Section 2.1     Consideration.     The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets (the "Purchase Price") shall be Two Million Five Hundred Thousand United States Dollars (US $2,500,000.00) (the "Gross Closing Cash Payment"), to be adjusted pursuant to Section 2.2(b) and Section 2.3, and paid and delivered in accordance with Section 3.3(a).

Section 2.2     Good Faith Deposit.

(a)     Concurrently with the execution and delivery of this Agreement, notwithstanding anything to the contrary in this Agreement, Buyer shall pay to Seller the amount of Two Hundred Fifty Thousand United States Dollars (US $250,000.00) by wire transfer of immediately-available funds (the "Good Faith Deposit").  The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Seller or Buyer and shall be deposited in a segregated deposit account of Seller and held in trust to be administered solely in accordance with the terms of this Agreement and the Bidding Procedures Order.  Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b)     If the Closing occurs, the Gross Closing Cash Payment shall be reduced by the amount of the Good Faith Deposit (such resulting amount, the "Net Closing Cash Payment"), to be paid and delivered in accordance with Section 3.3(a).

(c)     If this Agreement is terminated pursuant to Section 10.1, the Good Faith Deposit shall be repaid to Buyer or retained by Seller in the amounts and at the times set forth in Section 10.2(a) through Section 10.2(c).

Case 20-81688-CRJ11   Doc 2405-7   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Sale of ABA   Page 216 of 246

Section 2.3    Post-Closing Inventory Adjustment.

(a)    Buyer and Seller agree that, within thirty (30) days after the Closing Date, pursuant to a final determination of Purchase Price made in accordance with Section 2.3(b), there will be an upward or downward adjustment of the Purchase Price (the "Post-Closing Adjustment"), in an amount not to exceed Two Million Five Hundred Thousand United States Dollars ($2,500,000) (the "Collar Amount").  The Post-Closing Adjustment shall reflect the percentage differential basis between (1) the aggregate "Total Book Value" of the Acquired Assets (as calculated using the correlative "Total Book Value" of each of the applicable delivered assets, as set forth on Schedule 1.1) delivered by Seller to Buyer at the Closing and (2) the amount of Four Million, Eight Hundred and Fifty Thousand, Nine Hundred and Three United States Dollars (US$4,850,903).  For illustration purposes only, an aggregate Total Book Value of the Acquired Assets (as calculated using the correlative "Total Book Value" of each of the applicable delivered assets, as set forth on Schedule 1.1) delivered by Seller to Buyer at the Closing of $5,250,000 would result in a Purchase Price increase of $205,682 ($5,250,000 being an 8.2273% increase over $4,850,903) resulting in an aggregate Purchase Price of $2,705,682 (an 8.2273% increase over the Gross Closing Cash Payment).  Within three (3) days of the final determination of Purchase Price pursuant to Section 2.3(b), (1) Buyer shall pay to Seller any increase in the Purchase Price or (2) Seller shall refund to Buyer any decrease in the Purchase Price; provided that the absolute value of any increase or decrease in Purchase Price pursuant to this Section 2.3 or otherwise under this Agreement shall not exceed the Collar Amount.

(b)    As soon as reasonably practicable following the Closing Date, and in no event more than thirty (30) calendar days thereafter, Seller shall prepare a schedule setting forth in reasonable detail the adjustments to the Purchase Price contemplated by Section 2.3(a) (the "Closing Adjustment Documents"). Buyer and Seller shall cooperate in the review of the Closing Adjustment Documents in accordance with this Section 2.3. Without limiting the generality of the foregoing, each party shall provide the other party and its designees with reasonable access to its books, records, personnel and representatives and such other information as such party may require in connection with the preparation and review of the Closing Adjustment Documents and with respect to the resolution of any Disagreement (as defined below).

(c)    Within seven (7) calendar days after delivery of the Closing Adjustment Documents to Buyer, Buyer may dispute the Closing Adjustment Documents by giving written notice (a "Notice of Disagreement") to Seller setting forth in reasonable detail the basis for any such dispute, provide such dispute must be for an amount of not less than $150,000 (any such dispute being hereinafter called a "Disagreement"). Buyer and Seller shall promptly commence good faith negotiations with a view to resolving all such Disagreements. If Buyer does not give a Notice of Disagreement within the seven (7) calendar day period set forth herein, Buyer shall be deemed to have irrevocably accepted the Closing Adjustment Documents in the form delivered to Buyer by Seller.

(d)    If Buyer shall give a Notice of Disagreement, the parties shall meet promptly and attempt in good faith to negotiate a resolution to the Disagreement. If Buyer and Seller fail to resolve the Disagreement, then at any time after seven (7) calendar days have elapsed from delivery of the Notice of Disagreement, either party may invoke the Disagreement Resolution provisions set forth in Section 2.3(e) of this Agreement.

9

(e)	If the parties fail to resolve amicably any Disagreement in accordance with the procedures set forth in Section 2.3(b), either Buyer or Seller may refer the matter to binding arbitration pursuant to the provisions of this Section 2.3(e):

(i)	The arbitration shall be commenced by written submission by either Buyer or Seller to the Arbitrator of some or all of the issues as to which there is a Disagreement. The party not so commencing arbitration shall be given a reasonable opportunity to make a written submission to the Arbitrator of any other issues as to which there is a Disagreement.

(ii)	If the parties fail to reach agreement, either party may ask the Judicial Arbitration and Mediation Service ("JAMS") to select an arbitrator (the "Arbitrator"). The selection of an Arbitrator by JAMS shall be binding on the parties.

(iii)	The issues as to which there is a Disagreement shall be heard promptly by the Arbitrator. The parties shall not be permitted to conduct discovery. Buyer and Seller shall submit their positions to the Arbitrator by briefs, written statements and relevant documents. If either party requests a hearing, or if the Arbitrator believes that a hearing is desirable, a hearing shall be held at which the testimony of witnesses shall be received. Promptly after the hearing, if any, or after the issues in Disagreement shall have been submitted to the Arbitrator, the Arbitrator shall decide the matter by means of a written decision, accompanied by a written explanation, set forth in reasonable detail, of the reasons therefor. In making his decision, the Arbitrator shall be guided by the terms of this contract and by the law of the State of Delaware.

(iv)	All of the fees and expenses of the Arbitrator shall be paid one-half by Buyer and one-half by Seller. Each party shall bear its own costs.

ARTICLE 3. CLOSING AND DELIVERIES

Section 3.1	Closing.  Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Pacific Time, on the third (3rd) Business Day following the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in Article IX of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by Seller and Buyer, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "Closing Date").

Section 3.2	Seller's Deliveries.  At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a)	all of the Acquired Assets, together with one or more duly executed bills of sale and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller;

(b)    the officer's certificate required to be delivered pursuant to <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u>; and

(c)    one or more affidavits executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code.

Section 3.3    <u>Buyer's Deliveries</u>.  At the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a)    cash in an amount equal to the Net Closing Cash Payment, by wire transfer of immediately available funds to the account or accounts of Seller identified by Seller in writing reasonably in advance of the Closing;

(b)    the officer's certificate required to be delivered pursuant to <u>Section 9.1(a)</u> and <u>Section 9.1(b)</u>; and

(c)    such other documents, instruments and certificates as Seller may reasonably request from Buyer in accordance with the terms and conditions hereof.

ARTICLE 4. <u>REPRESENTATIONS AND WARRANTIES</u>

Section 4.1    <u>Representations and Warranties of Seller</u>.  Seller represents and warrants to Buyer as follows:

(a)    <u>Corporate Organization</u>.  Each entity comprising Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of domicile.  Subject to any necessary authority from the Bankruptcy Court, each entity comprising Seller has the requisite corporate or limited liability company power and authority to conduct the Business as now being conducted and to carry out its obligations under this Agreement.

(b)    <u>Authorization and Validity</u>.  Each entity comprising Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement has been duly authorized by all necessary corporate or limited liability company action by the boards of directors or managers of Seller, and no other corporate or limited liability company proceedings are necessary for the performance by Seller of its obligations under this Agreement or the consummation by Seller of the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by Seller and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(c)    <u>No Conflict or Violation</u>.  Neither the execution and delivery by Seller of this Agreement or any of the Ancillary Agreements to which Seller is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order) the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements, nor compliance by Seller with any of the

11

provisions hereof or thereof, will (x) conflict with or result in any breach of any provision of the respective certificates of incorporation or formation of Seller or the respective by-laws or operating agreements of Seller, or (y) violate any provision of law, regulation, rule or other legal requirement of any Government ("Law") or any order, judgment or decree of any court or Government ("Order") applicable to Seller or any of its properties or assets, except, in either of the foregoing cases (x) and (y), for any conflict or violation as would not reasonably be expected to cause a Material Adverse Effect.

(d)     Title and Ownership.   Except as would not have a Material Adverse Effect, Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets.   Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens.

Section 4.2     Representations and Warranties of Buyer.   Buyer represents and warrants to Seller as follows:

(a)     Corporate Organization.   Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation.   Buyer has the requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b)     Qualification to do Business.   Buyer is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the businesses conducted by it makes such qualification necessary.

(c)     Authorization and Validity.   Buyer has the requisite corporate power and authority necessary to enter into this Agreement and each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder.   The execution and delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby.   This Agreement and each of the Ancillary Agreements to which Buyer is a party have been duly and validly executed and delivered by it and are valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

(d)     No Conflict or Violation.   Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not

12

limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

(e)     Consents and Approvals.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)     Adequate Assurances Regarding Assumed Contracts and Assumed Leases.

**THIS SECTION INTENTIONALLY DELETED.**

(g)     Financial Capability.  Buyer currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and the payment therefor to Seller of the Purchase Price and, if applicable, any adjustments pursuant to Section 2.3 of this Agreement, and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(h)     Investigation by Buyer.  Buyer has conducted its own independent review and analysis of the Business, the Acquired Assets, operations, technology, assets, liabilities, financial condition and prospects of the Business as formerly carried on by Seller and acknowledges that Seller has provided Buyer with reasonable access to the personnel, properties, premises and records of the Business for this purpose.  Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case.  In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither Seller nor any of its Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in Section 4.1 (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Seller, its Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding misrepresentation or concealment arising from actual fraud of Seller) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in Section 4.1 and, with respect to such

13

representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3    Warranties Exclusive; Schedules.

(a)    The representations and warranties contained in Article 4 are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed.  Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed.  WITHOUT LIMITING THE FOREGOING, SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS, (C) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (D) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS.  SELLER AND SELLER'S AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATIONS OR WARRANTIES IN ANY OTHER AGREEMENT.

(b)    The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

Section 4.4    Survival of Representations and Warranties.    None of the representations or warranties of Seller set forth in this Agreement or any Ancillary Agreement or in any certificate delivered pursuant to Section 9.2(a) or Section 9.2(b) shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement or any Ancillary Agreement shall survive in accordance with their respective terms).

ARTICLE 5. COVENANTS OF THE PARTIES

Section 5.1    Covenants of Seller.  Seller covenants as follows:

(a)    Commercially Reasonable Efforts.  Between the Effective Date and the Closing Date, Seller shall use commercially reasonable efforts to (except as may be disclosed to Buyer) (i) obtain all necessary consents, waivers, authorizations and approvals of all Governments, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party, (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) maintain the Acquired Assets substantially in accordance with Seller's current practices and procedures (as adjusted for the effects of any COVID Restrictions).

14

(b)      Access to Properties and Documents; Confidentiality.  Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access (subject to any COVID Restrictions) during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10) to all Documents of Seller relating to the Acquired Assets.  Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account any COVID Restrictions and Seller's resources and other commitments, during normal business hours, to all Acquired Assets, and to Seller's executive officers, accountants, counsel, employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 10).  The rights of access contained in this Section 5.1(b) are granted subject to, and on, the following terms and conditions: (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this Section 5.1(b) or otherwise) will be governed and protected by the Confidentiality Agreement, dated as of July 29, 2020 by and between Buyer and ROC (the "Confidentiality Agreement"); and (iii) such rights of access shall not affect or modify the conditions set forth in Article 9 in any way.

Section 5.2      Covenants of Buyer.  Buyer covenants as follows:

(a)      Commercially Reasonable Efforts.  Buyer shall use all commercially reasonable efforts to (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, including removing the Acquired Assets from the Seller's property no later than 30 days after the Closing Date.

(b)      Adequate Assurances Regarding Assumed Contracts and Assumed Leases.

**THIS SECTION INTENTIONALLY DELETED.**

(c)      Cure of Defaults.

**THIS SECTION INTENTIONALLY DELETED.**

(d)      Performance under Assumed Contracts and Assumed Leases.

**THIS SECTION INTENTIONALLY DELETED.**

(e)      Indemnification for Use of Real Property.  Buyer shall indemnify, defend and hold harmless (i) Seller, and (ii) Seller's Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or Buyer's agents' or representatives' entry upon the Owned Real Property or the Leased Real Property in connection with their exercise of the right of access pursuant to Section 5.1(b), and (B) any and all other activities undertaken by Buyer or

15

Buyer's agents or representatives with respect to any such Leased Real Property or the Owned Real Property.

(f)     Released Claims.  Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired Assets to the extent such Claims have been, or are at any time thereafter, released by or on behalf of Seller or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise or (ii) pursue, prosecute or assert any rights related to any Claims against employees, officers of directors of Seller, including by way of offset or recoupment.

ARTICLE 6. ADDITIONAL AGREEMENTS

Section 6.1     Bankruptcy Matters.

(a)     Backup Bidder.  In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures Order, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures Order) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction.  Notwithstanding anything to the contrary in this Agreement, Seller may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the Inventory and the other assets of Seller, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)     Notice to Holders of Liens, Claims and Interests.  Seller has provided notice of the intent to seek entry of the Sale Order to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)     Entry of Sale Order.  Seller has filed with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order.  The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement, Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability.  Seller and Buyer shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement.  In the event that any Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Buyer will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.  For purposes of this Section 6.1(c) only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required

in connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

Section 6.2    Transition Arrangements.

(a)    Access Covenant.  Upon reasonable request from Seller, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will following the Closing Date provide to Seller, and the accountants, counsel and representatives of Seller, including any administrator of the Plan or Seller's estate, such access to the pre-closing books and records relating to the Business as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation and litigation of claims and making of distributions contemplated under the Plan or otherwise.  Such access will include (a) reasonable access to Buyer's personnel, information technology systems and books and records and (b) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Seller engaged in such wind-down and liquidation process.  Buyer will provide such services free of any charges, fees or rents, provided that Seller will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Seller's employees engaged in the liquidation).

(b)    Access to Buyer.  For a period of up to thirty (30) days following the Closing Date, Seller, or Seller's assignee, shall permit Buyer access to all properties at which the Acquired Assets are located as necessary for the purpose of inventorying and removal of the Acquired Assets; provided that all costs related to such removal (and the loading and preparation thereunder) shall be borne by Buyer.

Section 6.3    Further Assurances.  At the request and the sole expense of the requesting party, either party shall, at any time after the Closing Date, execute and deliver such documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

ARTICLE 7. EMPLOYEES AND EMPLOYEE BENEFITS

**THIS ARTICLE INTENTIONALLY DELETED.**

ARTICLE 8. TAXES.

Section 8.1    Taxes Related to Purchase of Assets.  All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Seller as a result of the sale of the Acquired Assets (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146 of the Bankruptcy Code, shall be paid by Buyer.

Case 20-81168-CRJ11    Doc 2906-7    Filed 09/30/22    Entered 09/30/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Sale of TFA    Page 225 of 246

Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and Seller agrees to assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 8.2    Cooperation on Tax Matters.

(a)    Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)    Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Acquired Assets that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets before the Closing Date, for a period of at least six (6) years from the Closing Date, and will give Seller notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period.  In addition, from and after the Closing Date, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to the books, records, documents and other information relating to the Acquired Assets as Seller may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Seller.  Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets.

(c)    If Seller receives any refund, overpayment or rebate of Pre-Closing Taxes (including any refund, overpayment or rebate relating to any Straddle Period) that is attributable to Taxes paid by Buyer, it shall promptly, and in no case later than ten (10) Business Days after receipt thereof, pay such refund, overpayment or rebate over to Buyer net of any reasonable cost or expense incurred in connection with such refund, overpayment or rebate.

(d)    Seller shall prepare and file all Income Tax Returns for any Pre-Closing Income Taxes of Seller, whether or not such Tax Returns are required to be filed after the Closing Date, and Seller shall timely pay all Taxes reflected on such Tax Returns.  Without limitation to the foregoing, Buyer shall pay, no later than thirty (30) calendar days following the Closing Date, all Taxes relating to the Business or Seller or its Affiliates that are in each case payable as of the Closing (determined without regard to any payment date extension under applicable Law).  Buyer and Seller shall reasonably cooperate in the preparation of any Tax Returns described in this Section 8.2(d).

Case 20-81688-CRJ11   Doc 2905-7   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Purchase of Ibit AFA   Page 226 of 246

(e)     Buyer and Seller will cooperate and Buyer shall use commercially reasonable efforts to cause Buyer or any Buyer Acquisition Vehicle to be registered with the Alcohol and Tobacco Tax and Trade Bureau as a "manufacturer" for purposes of the Firearms Ammunition and Excise Tax on or before the Closing Date.

Section 8.3     Allocation of Purchase Price.  Promptly (and in any event within sixty (60) days) following the Closing Date, Seller shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "Allocation").  Seller and Buyer will cooperate to resolve any disputes regarding the Allocation and to file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement.

## ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES.

Section 9.1     Conditions Precedent to Performance by Seller.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in Section 9.1(c)(i) and Section 9.1(c)(ii)) may be waived by Seller in its sole discretion:

(a)     Representations and Warranties of Buyer.  All representations and warranties made by Buyer in Section 4.2 shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(b)     Performance of the Obligations of Buyer.  Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

(c)     Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)     No Violation of Orders.  No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)     Cure of Defaults.

**THIS SECTION INTENTIONALLY DELETED.**

(f)     Buyer's Deliveries.  Buyer shall have delivered to Buyer all of the items set forth in Section 3.3.

Section 9.2     Conditions Precedent to Performance by Buyer.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in Section 9.2(c)(i) and Section 9.2(c)(ii)) may be waived by Buyer in its sole discretion:

(a)     Representations and Warranties of Seller.    All representations and warranties made by Seller in Section 4.1 shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(b)     Performance of the Obligations of Seller.  Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(c)     Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)     No Violation of Orders.  No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)     Seller's Deliveries.  Seller shall have delivered to Buyer all of the items set forth in Section 3.2.

ARTICLE 10. TERMINATION.

Section 10.1     Conditions of Termination.  This Agreement may be terminated at any time before the Closing:

(a)     By mutual written consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, on or after the date that is thirty (30) calendar days after the Effective Date (the "Warranty Termination Date"), if the condition contained in Section 9.1(a) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(b) if Seller is then in material breach of this Agreement;

(c)     By Seller, by notice to Buyer, if Seller has previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(c) if Seller is then in material breach of this Agreement;

(d)     By Seller, by notice to Buyer, on or after the date that is thirty (30) calendar days after the Effective Date (the "Approval Termination Date"), if any condition contained in Section 9.1(c) or Section 9.1(d) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(d) if Seller is then in material breach of this Agreement;

(e)     By Buyer, by notice to Seller, on or after the Warranty Termination Date, if the condition contained in Section 9.2(a) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(e) if Buyer is then in material breach of this Agreement;

(f)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with written notice of a failure to perform any material covenant of Seller contained in this Agreement and Seller has failed within five (5) days after such notice to perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(f) if Buyer is then in material breach of this Agreement;

(g)     By Buyer, by notice to Seller, after the Approval Termination Date, if any condition contained in Section 9.2(c) or Section 9.2(d) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(g) if Buyer is then in material breach of this Agreement;

(h)     By Buyer, by notice to Seller, or by Seller, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)     By Seller, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 60 calendar days after the Petition Date; and

(j)     Automatically, upon the earlier of (i) Seller consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction.

Section 10.2     Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 10.1, this Agreement shall become null and void and have no effect (other than Article 10, Article 11, and Article 12, which shall survive termination), with no liability on the part of Seller or Buyer, or their respective

21

Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 11.4, (ii) the obligation of Buyer under Section 6.1(a) and (iii) any liability provided for in Section 10.2(b) through Section 10.2(d), inclusive.

(b)    If this Agreement is terminated pursuant to Section 10.1(a), Section 10.1(d), Section 10.1(e), Section 10.1(f), Section 10.1(g), Section 10.1(h), Section 10.1(i) or Section 10.1(j), then the Good Faith Deposit shall, within three (3) Business Days, be returned by Seller to Buyer.

(c)    If this Agreement is terminated pursuant to Section 10.1(b) or Section 10.1(c), then Seller may, at its sole election (i) within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee"), or (ii) without limitation to Seller's remedies under clause (i) of this Section 10.2(c) require Buyer to specifically perform under the terms of this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(d)    Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article VI (if the Closing shall have occurred) (i) Seller's entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Seller retains such amount, then notwithstanding anything to the contrary contained herein, such Break Fee shall be the sole and exclusive remedy available to Seller and any other Person against Buyer, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Seller, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Seller, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby. Each Party acknowledges that the agreements contained in this Section 10.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

ARTICLE 11. MISCELLANEOUS.

Section 11.1    Successors and Assigns.  Prior to the Closing, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other, and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided that if Buyer wishes, upon prior written notice to Seller, to assign its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to a Buyer Acquisition Vehicle, such prior written consent of Seller shall not unreasonably be withheld.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 11.2  <u>Governing Law; Jurisdiction</u>.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

Section 11.3  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.3</u>.

Section 11.4  <u>Expenses</u>.  Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated.  Buyer shall pay the cost of any surveys (without limitation to the restriction in <u>Section 5.1(b)(i)</u>), title insurance policies and title reports ordered by Buyer.  For all purposes under this Agreement, unless otherwise specified in the applicable clause, any obligation of Seller to exercise commercially reasonable efforts shall not require the incurrence of any out-of-pocket expenses by Seller.

Section 11.5  <u>Broker's and Finder's Fees</u>.  Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than Ducera Partners, whose fees and expenses shall, as between the parties to this Agreement, be the responsibility of the Seller, and, to such party's Knowledge, no other broker or other Person is entitled to any commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 11.6  <u>Severability</u>.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of

Case 20-81688-CRJ11    Doc 2906-7    Filed 09/30/22    Entered 09/30/22 13:40:04    Desc
Exhibit RJN 5: Order Approving Page 231 of 246

this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 11.7 <u>Notices</u>.

(a) All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW
Huntsville, Alabama 35824
Attention: Ken D'Arcy
Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071
Attention: John Paul Motley, Esq., and Stephen H. Warren, Esq.
Phone: (213) 430-6100 and (213) 430-7875, respectively
Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

Century Arms, Inc.
430 S. Congress Avenue, Suite 1A
Delray Beach, Florida 33445
Phone: (561) 265-4500
Fax: (561) 265-4510
Attention: Michael Sucher
Email: ciams@centuryarms.com and msucher@centuryarms.com

With a copy to (which copy alone shall not constitute notice):

Ruberto, Israel & Weiner, P.C.
255 State Street, 7th Floor
Boston, Massachusetts 02109
Attention: James C. Fox, Esq. and Rion M. Vaughan, Esq.
Phone: (617) 742-4200
Fax: (617) 742-2355
Email: jcf@riw.com and rmv@riw.com

(b)     Any party may change its address for the purpose of this Section 11.7 by giving the other party written notice of its new address in the manner set forth above.

Section 11.8    Amendments; Waivers.    This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 11.9    Time of Essence.    Time is of the essence in the performance of each and every term of this Agreement.

Section 11.10  Specific Performance.    The provisions of this Agreement are uniquely related to Seller's and its Affiliates' desire to consummate the transactions contemplated by this Agreement, and such transactions represent a unique business opportunity at a unique time for the Seller and its Affiliates.  As a result, irreparable damage would occur to Seller and its Affiliates in the event that any of the obligations of Buyer under this Agreement were not performed in accordance with their specific terms.  Although liquidated or other monetary damages may be available for the breach of covenants and undertakings contained in this Agreement, monetary damages would be difficult to ascertain and an inadequate remedy therefor.  Accordingly, if Buyer breaches or threatens to breach any provision of this Agreement, then without limitation to Seller's rights under clause (i) of Section 10.2(c) Seller shall be entitled to an injunction or injunctions, specific performance and any and all other equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, this being in addition to any other remedies to which it is entitled at Law or equity.  If Seller seeks an injunction or injunctions to prevent breaches of this Agreement or seeking to enforce specifically the terms and provisions of this Agreement, Seller shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such Order or injunction.  Buyer irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security.  If any action or proceeding should be brought in equity to enforce the provisions of this Agreement, Buyer shall not allege, and hereby waives the defense, that there is an adequate remedy at Law.

Section 11.11  <u>Public Announcements</u>.  Promptly after the execution and delivery of this Agreement, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein.  Thereafter, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court.  If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing party agrees to give the nondisclosing party prior notice of, and an opportunity to comment on, the proposed disclosure.  Notwithstanding anything to the contrary in this <u>Section 11.11</u>, Seller (a) shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equityholders and lenders to the extent required by the provisions of any of Seller's bylaws, credit agreements and other pre-existing contractual obligations.

Section 11.12  <u>Entire Agreement</u>.  This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

Section 11.13  <u>Parties in Interest</u>.  Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to Seller or Buyer.  This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 11.14  <u>Bulk Sales Laws</u>.  Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

Section 11.15  <u>Construction</u>.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.  The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement.  In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement.  Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form.  As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

Section 11.16 <u>Counterparts and Facsimiles</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.  Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

## ARTICLE 12. <u>DEFINITIONS</u>.

Section 12.1 <u>Certain Terms Defined</u>.  As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"<u>Alternative Transaction</u>" means Seller consummating any transaction or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of all or substantially all of the Business or the Acquired Assets by Seller to a purchaser or purchasers other than Buyer.

"<u>Ancillary Agreements</u>" means, collectively, the certificates, affidavits and releases delivered pursuant to <u>Article 3</u>.

"<u>ATF</u>" means the United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

"<u>ATF Licenses</u>" means all of those licenses issued by ATF as provided by the GCA and the GCA's implementing regulations that are necessary for Buyer to conduct the Business as currently conducted.

"<u>Avoidance Actions</u>" means any and all claims and remedies of Seller under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or other governmental action to close.

"<u>Cash</u>" means all cash and cash equivalents held by Seller, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities, in each case as of immediately prior to the Closing (and including without limitation (i) the Good Faith Deposit, (ii) the Net Closing Cash Payment, (iii) any fee reserves or escrows established by Seller, and (iv) any cash in the Dominion Account (as defined in the Priority Term Loan)).

"<u>Claims</u>" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct

or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or unasserted actions against Seller or any of its Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Seller is a party; provided that Contracts do not include any Lease or any employment or similar Contracts.

"Creditworthy" means sufficiently capitalized, to the reasonable satisfaction of Seller upon provision to Seller of substantiating documentary evidence, to be able to pay the Purchase Price.

"D&O Insurance" means the policy in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Seller, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"DIP Facility" means any debtor-in-possession financing advanced to Seller in the Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control

Case 20-81688-CRJ11 Doc 2405-7 Filed 09/30/22 Entered 09/30/22 13:47:04 Desc
Exhibit RJN 5: Order Approving Page 236 of 246

or cleanup of any hazardous materials.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"GCA" means Gun Control Act of 1968 (Chapter 44 of Title 18, United States Code § 921 et seq).

"Government" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents thereof.

"Historic Firearms Books and Records" means all historic books and records relating to the sale of firearms included in the Acquired Assets, including all records required to be kept pursuant to parts 447, 478, and, 479 of title 27, Code of Federal Regulations.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

"Income Tax Return" means any Tax Return with respect to Income Taxes.

"Interests" means all rights and entitlements of any nature including, without limitation, security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, Permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"Knowledge" or any other similar term or knowledge qualification means, with respect to (i) Seller, the actual conscious knowledge of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement and (ii) Buyer, the actual conscious knowledge of Michael Sucher (President and Chief Executive Officer of Buyer), as of the date the applicable representation or warranty is made or deemed made under this Agreement.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property, in each of the foregoing cases, to the extent possessed, used or occupied in connection with the Business.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures

that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"<u>Leases</u>" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"<u>Lien</u>" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; and (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy or use of an asset.

"<u>Material Adverse Effect</u>" means a state of facts, event, change or effect on the value of the Acquired Assets that results in a material and adverse effect on the value of the Acquired Assets taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy Case; (B) any action of Seller taken pursuant to, or any failure of Seller to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which Seller is a party; (C) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby, (D) changes, after the Effective Date, in United States generally accepted accounting principles, (E) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Seller operates the Business, (F) changes in the firearms, ammunition or sporting goods industries in general, (G) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared) or (H) any occurrence, outbreak, escalation or worsening of, or furloughs or Government actions (including any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other applicable Law, order, directive, guideline or recommendation by any Government of competent jurisdiction (collectively, "<u>COVID Restrictions</u>")) instituted in response to, any epidemic, pandemic or other disease (including without limitation the COVID-19 virus).

"<u>Owned Real Property</u>" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Seller.

"<u>Permit</u>" means any permit, license, authorization, registration or certificate obtained from any Government.

30

Case 20-81688-CRJ11   Doc 2406-7   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Page 30 of APA   Page 238 of 246

"Permitted Liens" mean: (a) all terms, conditions and restrictions under any Permit; (b) Liens for taxes arising from the Firearms Ammunition and Excise Tax; (c) Liens that will attach to the proceeds of the sale under this Agreement pursuant to Section 363 of the Bankruptcy Code or that will not survive the Closing and (d) Liens that Buyer agrees in writing to accept.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"Plan" means a Joint Chapter 11 Plan filed by Seller with the Bankruptcy Court.

"Pre-Closing Income Taxes" means any Income Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business, in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Pre-Closing Taxes" means any Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business (other than any excise taxes (whether or not deferred)), in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Priority Term Loan" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Retained Litigation" means all litigation and Claims arising or related to events prior to the Closing.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Documents related to any of the foregoing.

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other

Case 20-81688-CRJ11 Doc 2906-3 Filed 09/30/22 Entered 09/30/22 13:40:14 Desc
Exhibit RJN 5: Order Approving Sale of ATA Page 239 of 246

Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"<u>Tax Return</u>" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"<u>Taxes</u>" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise (whether or not deferred), franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and "<u>Tax</u>" shall mean any one of them.

        Section 12.2   <u>All Terms Cross-Referenced</u>.  Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| Acquired Assets | Section 1.1 |
| Affiliate | Section 12.1 |
| Agreement | *Preamble* |
| Allocation | Section 8.3 |
| Alternative Transaction | Section 12.1 |
| Approval Termination Date | Section 10.1(d) |
| Arbitrator | Section 2.3(e)(ii) |
| Avoidance Actions | Section 12.1 |
| Bankruptcy Case | *Recitals* |
| Bankruptcy Code | *Recitals* |
| Bankruptcy Court | *Recitals* |
| Bidding Procedures Motion | *Recitals* |
| Bidding Procedures Order | *Recitals* |
| Break Fee | Section 10.2(c) |
| Business | *Recitals* |
| Business Day | Section 12.1 |
| Buyer | Preamble |
| Cash | Section 12.1 |
| Claims | Section 12.1 |
| Closing | Section 3.1 |

Case 20-81688-CRJ11   Doc 2405-7   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Sale of ABBA   Page 240 of 246

Closing Adjustment Documents ................................................................Section 2.3(b)
Closing Date.................................................................................................. Section 3.1
Code ............................................................................................................ Section 12.1
Collar Amount .............................................................................................Section 2.3(a)
Confidentiality Agreement...........................................................................Section 5.1(b)
Contract....................................................................................................... Section 12.1
COVID Restrictions ..................................................................................... Section 12.1
Creditworthy ............................................................................................... Section 12.1
Disagreement .............................................................................................Section 2.3(c)
Documents .................................................................................................. Section 12.1
DOJ ............................................................................................................Section 5.3(b)
Effective Date .............................................................................................Preamble
Employee Benefit Plans ............................................................................... Section 12.1
Employee Liabilities .................................................................................... Section 12.1
Employee Records ....................................................................................... Section 12.1
Employees.................................................................................................... Section 12.1
Environmental Laws .................................................................................... Section 12.1
ERISA .......................................................................................................... Section 12.1
Excluded Assets ............................................................................................ Section 1.2
Final Order .................................................................................................. Section 12.1
FTC ............................................................................................................Section 5.3(b)
Good Faith Deposit.....................................................................................Section 2.2(a)
Government .................................................................................................. Section 12.1
Gross Closing Cash Payment......................................................................Section 2.1(a)
Interests ....................................................................................................... Section 12.1
JAMS ......................................................................................................... Section 2.3(e)(ii)
Law ............................................................................................................Section 4.1(c)
Leased Real Property ................................................................................... Section 12.1
Leasehold Improvements ............................................................................. Section 12.1
Leases .......................................................................................................... Section 12.1
Lien ............................................................................................................. Section 12.1
Material Adverse Effect ............................................................................... Section 12.1
Necessary Consent ...................................................................................... Section 1.6
Net Closing Cash Payment ........................................................................Section 2.2(b)
Notice of Disagreement ..............................................................................Section 2.3(c)
Order ..........................................................................................................Section 4.1(c)
Other Agreements ....................................................................................... Section 1.8
Owned Real Property ................................................................................... Section 12.1
Pension Plan................................................................................................. Section 12.1
Person.......................................................................................................... Section 12.1
Petition Date................................................................................................ Recitals
Plan ............................................................................................................. Section 12.1
Post-Closing Adjustment .............................................................................Section 2.3(a)
Pre-Closing Income Taxes ........................................................................... Section 12.1
Priority Term Loan ...................................................................................... Section 12.1
Purchase Price.............................................................................................. Section 2.1

Related Person ................................................................................................... Section 12.1
Retained Litigation............................................................................................. Section 12.1
ROC ...................................................................................................................... Preamble
Sale Hearing.................................................................................................... Section 1.5(a)
Sale Order .............................................................................................................. *Recitals*
Seller .................................................................................................................... Preamble
Seller's Knowledge............................................................................................. Section 12.1
Software ............................................................................................................. Section 12.1
Subsidiary(ies) ................................................................................................... Section 12.1
Tax Return ......................................................................................................... Section 12.1
Taxes ................................................................................................................. Section 12.1
Transaction Taxes ............................................................................................... Section 8.1
Warranty Termination Date ............................................................................. Section 10.1(b)

*[Signatures are on the following pages.]*

34

Case 20-81688-CRJ11    Doc 2406-7    Filed 09/30/22    Entered 09/30/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Long Range APA    Page 242 of 246

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER**

CENTURY ARMS, INC.

By: _____
    Name: Michael Sucher
    Title: President and CEO

S-1

Case 20-81688-CRJ11    Doc 2408-7    Filed 09/30/22    Entered 09/30/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Long Range Sale APA    Page 243 of 246

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By: _____
    Name:
    Title:

**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By: _____
    Name:
    Title:

FGI HOLDING COMPANY, LLC

By: _____
    Name:
    Title:

BARNES BULLETS, LLC

By: _____
    Name:
    Title:

REMINGTON ARMS COMPANY, LLC

By: _____
    Name:
    Title:

RA BRANDS, L.L.C.

By: _____
    Name:
    Title:

OUTDOOR SERVICES, LLC

By: _____
    Name:
    Title:

S-2

Case 20-81688-CR11   Doc 2406-3   Filed 09/30/22   Entered 09/30/22 13:47:04   Desc
Exhibit RJN 5: Order Approving Page 35 of 48A   Page 244 of 246

FGI FINANCE INC.

By: _____
     Name:
     Title:


HUNTSVILLE HOLDINGS LLC

By: _____
     Name:
     Title:


TMRI, INC.

By: _____
     Name:
     Title:


REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
     Name:
     Title:


32E PRODUCTIONS, LLC

By: _____
     Name:
     Title:


GREAT OUTDOORS HOLDCO, LLC

By: _____
     Name:
     Title:

S-3

Case 20-81688-CRJ11    Doc 2406-7    Filed 09/30/22    Entered 09/30/22 13:47:04    Desc
Exhibit RJN 5: Order Approving Long Form APA    Page 245 of 246

**EXHIBIT 1**

(*See* attached copy of Bidding Procedures Order)

S-1

Case 20-81688-CRJ11 Doc 3408-7 Filed 09/30/22 Entered 09/30/22 13:40:04 Desc
Exhibit RJN 5: Order Approving Page 246 of 246